**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                                              **PLAINTIFFS**
**DR. CHRIS RAGGIO**


**VS.**                                                              **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                     **DEFENDANTS**

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

---

COME NOW Dr. Chris Raggio and Dr. Donald Raggio, plaintiffs, by and through counsel, and file this their Reply in Support of Motion for Protective Order, as follows:

1.      The California Defendants attempt to paint the Doctors' Motion for a Protective Order as "unprecedented."  However, as shown in the cases cited by the Doctors, this is not an attempt at gamesmanship or for a tactical advantage.  Neither is this a request that has never been made before a court.  Again, several courts have acknowledged the importance of withholding material from a party where there is a concern that the party will tailor his or her testimony to fall in line with the evidence.  *See Bolithio v. Home Depot USA, Inc.*, 2010 US Dist. LEXIS 76032 (S.D. Fla. June 29, 2010), *Rankin v. Waldbaum*, 670 N.Y.S. 2d 1023 (N.Y. 1998).

2.      Furthermore, the California Defendants' reliance on *Seaboard Systems R.R., Inc.*
*v. Cantrell*, 520 So.2d 479 (Miss. 1987) is misplaced and has no bearing on the instant matter.
In *Seaboard Systems R.R., Inc.*, the plaintiff made a motion, during trial, to require that the
defendant produce a recorded statement that had been taken of a witness for the plaintiff. *Id.* at
481.  The request was made under Miss. R. Civ. P. 26(b)(3), a request for materials prepared in
anticipation of trial. *Id.* at 482.  While the trial court granted the request and the supreme court
affirmed, the supreme court's affirmation appears to be based on the fact that "[t]he written
statement of [the witness] and his subsequent testimony at trial were substantially the same." *Id.*

3.      In the instant matter the requested material does not concern statements made by a
third party witness to the litigation, nor have the parties arrived at trial.  Instead the bulk of the
requested material concerns the communications of the parties.  As pointed out by the Doctors in
their Motion, much of the communications made between the doctors and the California
Defendant were via email and these emails were sent to the California Defendant at his MTGOX
email address.   In that the California Defendant is believed to no longer have access to these
emails (and, interestingly, the California Defendant fails to address this allegation in his
Response), he can simply tailor his deposition testimony in accordance with the materials
requested.

4.      Based on the foregoing and the Doctors' Motion for Protective Order, the Doctors
respectfully request the Court to order the requested materials not be divulged to the Defendants
until such time the deposition of the California Defendant has been completed.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs, Dr. Chris Raggio and Dr.
Donald Raggio, respectfully request this Court to enter an Order granting the Plaintiffs' Motion

for Protective Order and allowing the Plaintiffs to withhold production of the documents until

after the Defendant has given his deposition testimony.

Respectfully submitted this the 27th day of September, 2016.

s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system and via email on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 27th day of September, 2016.

s/ Charles B. Martin
 CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO                                          **PLAINTIFFS**
DR. CHRIS RAGGIO


VS.                                          **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                     **DEFENDANTS**

---

**NOTICE OF SERVICE OF DISCOVERY RESPONSES**

---

Please take notice that Dr. Donald Raggio and Dr. Chris Raggio have this day served in

the above entitled action the following:

1)      **Plaintiffs' Responses to Code Collective, LLC and Jed Mccaleb's First Set of**
        **Requests for Production of Documents**

The undersigned retain the originals as custodian thereof.

This the 31st day of October, 2016.


                              **DR. DONALD RAGGIO AND**
                              **DR. CHRIS RAGGIO**

                              s/Charles "Brad" Martin
                              CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:

1

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and foregoing pleading via the Court's electronic filing system and via email on the following:

> Edwin S. Gault, Jr., Esq.
> Mandie B. Robinson, Esq.
> Forman Watkins & Krutz LLP
> 200 South Lamar Street, Suite 100
> Jackson, Mississippi 39201-4099
>
> Ethan Jacobs, Esq.
> Keller Sloan Roman Holland, LLP
> 555 Montgomery Street, 17th Floor
> San Francisco, CA 94111
> ejacobs@ksrh.com

Respectfully submitted, this the 31st day of October, 2016.

s/ Charles B. Martin
 CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO                                                          **PLAINTIFFS**
DR. CHRIS RAGGIO


VS.                                                          **CIVIL ACTION NO. 14-71**


MTGOX a sole proprietorship;
MTGOX, Inc., a Delaware corporation;
MT.GOX KK, a Japanese corporation;
TIBANE KK, a Japanese corporation;
MUTUM SIGILLUM, LLC a Delaware limited Liability Company;
CODE COLLECTIVE, LLC a New York limited liability company;
JED McCALEB, an individual;
MARK KARPELES, an individual;
JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5                    **DEFENDANTS**

<u>**NOTICE OF DEPOSITION**</u>

**To:**     Edwin S. Gault, Jr., Esq.
          Mandie B. Robinson, Esq.
          Forman Watkins & Krutz LLP
          200 South Lamar Street, Suite 100
          Jackson, Mississippi 39201-4099

     Please take notice that pursuant to Rule 30 of the Mississippi Rules of Civil Procedure,

Plaintiffs Donald Raggio and Chris Raggio will take the deposition upon oral examination of the

Defendant Jed McCaleb, before an officer authorized to administer oaths, commencing on

Thursday, November 17th 2016, at 10:00 a.m. at Forman Watkins & Krutz LLP, located at 200

South Lamar Street, Suite 100, Jackson, Mississippi 39201-4099.

     Said deposition shall be taken under oath before a videographer and court reporter who

will transcribe same.  Said deposition will continue from day to day until completed.  You are

invited to attend and participate.

     Respectfully submitted this the 31st day of October, 2016.

                         DONALD RAGGIO AND CHRIS RAGGIO, Plaintiffs

                         By: s/ Charles "Brad" Martin

CHARLES "BRAD" MARTIN, MSB# 100767


OF COUNSEL:

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
TYNER LAW FIRM, P.A.
5750 I-55 North
Jackson, Mississippi 39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system and via email on the following:


      Edwin S. Gault, Jr., Esq.
      Mandie B. Robinson, Esq.
      Forman Watkins & Krutz LLP
      200 South Lamar Street, Suite 100
      Jackson, Mississippi 39201-4099

      Ethan Jacobs, Esq.
      Keller Sloan Roman Holland, LLP
      555 Montgomery Street, 17th Floor
      San Francisco, CA 94111
      ejacobs@ksrh.com

Respectfully submitted, this the 31st day of October, 2016.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                              **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**VS.**                                              **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                    **DEFENDANTS**

<u>**NOTICE OF VIDEO DEPOSITION OF CODE COLLECTIVE, LLC**</u>
<u>**PURSUANT TO MISSISSIPPI RULE OF CIVIL PROCEDURE 30 (b)(6)**</u>

TO:   Edwin S. Gault, Jr., Esq.
      Mandie B. Robinson, Esq.
      Forman Watkins & Krutz LLP
      200 South Lamar Street, Suite 100
      Jackson, Mississippi 39201-4099

      Ethan Jacobs, Esq.
      Keller Sloan Roman Holland, LLP
      555 Montgomery Street, 17th Floor
      San Francisco, CA 94111
      ejacobs@ksrh.com

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Mississippi Rules of Civil

Procedure, Plaintiffs Donald Raggio and Chris Raggio will take the deposition upon oral

examination of the Defendant Code Collective, LLC, before an officer authorized to administer

oaths, commencing on Thursday, November 17th 2016, at 10:00 a.m. at Forman Watkins & Krutz

LLP, located at 200 South Lamar Street, Suite 100, Jackson, Mississippi 39201-4099.

Said deposition shall be taken under oath before a videographer and court reporter who will

transcribe same.  Said deposition will continue from day to day until completed.  You are invited to attend and participate.

The deponent shall in accordance with Rule 30(b)(6) designate one or more officers, agents or other persons who can testify in behalf of the corporation with respect to the following matters:

1.    1.      The truth, vel non, of the allegations of the Complaint on file herein and any basis of denial thereof and the substance of facts contradictory thereof;

2.      All affirmative facts or matters which you have asserted (or may hereinafter assert) in your answer or any other affirmative pleadings in this Cause.

3.      All facts known to you about any affirmative matters set out in any pleading which has heretofore been filed in this Cause, or which may hereinafter be filed in this Cause prior to the taking of your deposition, regardless of by whom filed.

4.      All information known to you about the facts which are asserted, inquired about, or mentioned in any Interrogatory, Request for Admission, or other discovery which has heretofore been filed in this Cause, or which may be filed in this Cause prior to the taking of your deposition.

5.      Any facts known to you which are, or may be relevant, to each and every document which you are requested to produce at the time of the taking of your deposition.

6.      Any statements, representations, or admissions alleged to have been made to you by the Plaintiff or Plaintiff's agents, servants, employees, representatives, or anyone having privity with the Plaintiff; whether or not each of them were or were not cooperative; as to each identify the company representative to whom such was made/communicated; and, to identify any statements, representations, admissions, or physical notations relating thereunto.

7.      To testify as to what you assert to be the true facts surrounding any and all documents furnished to you by, or on behalf of, the Plaintiff; if you dispute the correctness and/or accuracy

and/or truthfulness and/or correctness of any such documents then to testify as to the basis therefor and the identity of persons and documents relevant thereto; when such information was furnished to you; what, if anything, you consider insufficient or disputed about it; if from the Plaintiff, what additional information you requested; any evaluations which you have made of the damages suffered by the Plaintiff.

8.    The substance of all facts relied upon by you in denying any of the allegations set forth in the Complaint filed in this action and the name, address and telephone number of each person who has knowledge supporting, or which may support, each of said denials.

9.    The substance of all facts relied upon by you to support each of the defenses set forth in your Answer filed to Plaintiff's Complaint or otherwise, and the name, address and telephone number of each person who has knowledge supporting, or which may support, each of said defenses.

10.    If you contend that you were not guilty of negligence which was the sole proximate cause of the injury referred to in this case, to state the substance of the factual basis for such contention and the name, address and telephone number of each person who can support that contention, and identify any other person or entities which you believe is, or may be, liable to the Plaintiff.

11.    The substance of all statements whether written or oral obtained by you, or of which you have knowledge, from any witness purporting to have any knowledge of the facts surrounding the matter in this case, the injuries and damages suffered by the Plaintiff, or the value of Plaintiffs' claim.

12.    Any suits filed against you in any court, or claims made without a lawsuit, in which the Plaintiff of Plaintiffs claimed damages based upon those things complained of by the Plaintiff.

13.     The identity of any insurance policies applicable to this claim and any excess insurance policy applicable to this claim.

14.     Any expert witnesses you have hired or retained.

15.     Any expert opinions you have received.

16.     Any statements your employees or agents have provided to you or to third parties regarding the facts and matters contained in the Plaintiff's Complaint filed herein

17.     To testify as to any documents you claim are privileged.

18.     The corporate structure and corporate history of the defendant including, but not limited to all mergers, acquisitions, and buy outs in which the defendant has been involved.

19.     The location, existence, content and nature of this Defendant's file concerning the Plaintiffs.

20.     Events before, during and after the purchase, sale, delivery, and acceptance of the subject bitcoins and matters in connections therewith;

21.     Documents and tangible things provided by the Plaintiffs to Code Collective, or to Plaintiffs by Code Collective with regard to the matters and allegations contained in the Complaint on file herein;

22.     Documents and tangible things provided by Mark Karpeles to Code Collective, or to Mark Karpeles by Code Collective with regard to the matters and allegations contained in the Complaint on file herein;

23.     Documents evidencing all facsimile, e-mail, other written correspondence, or verbal communications between and among Plaintiff and Code Collective's agents and/or employees with regard to the occurrences complained of in the Complaint on file herein;

24.     Any correspondence between or among Code Collective agents and/or employees

and/or Plaintiffs;

25.     Any correspondence between or among Code Collective agents and/or employees and/or Mark Karpeles;

26.     Any correspondence between or among the Plaintiffs and Mark Karpeles;

27.     The custodian of all documents produced or to be produced in connection with discovery requests or relevant to these topics;

28.     Code Collective's records retention policy and documents containing same;

29.     The organization and management of Code Collective and the identity and responsibility of various managers; and,

30.     Code Collective's holding company system and affiliates.

Said depositions shall be taken pursuant to Rule 30(b)(6) of the Federal Mississippi of Civil Procedure and under oath before a court reporter who will transcribe same.  Said depositions will continue from day to day until completed.  You are invited to attend and participate.

This the 31st day of October, 2016.

> **DR. DONALD RAGGIO AND**
> **DR. CHRIS RAGGIO**
>
> s/Charles "Brad" Martin
> CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system and via email on the following:


Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 31st day of October, 2016.

s/ Charles B. Martin
 CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO                                        PLAINTIFFS
DR. CHRIS RAGGIO

**F I L E D**

**NOV 02 2016**

ZACK WALLACE, CIRCUIT CLERK

VS.                                        CAUSE NO. 14-CV-00071-TTG

BY _____ D.C.

MTGOX, *et al.*                                        DEFENDANTS

<u>ORDER</u>

This cause came on for hearing on October 18, 2016, and the Court orders as follows:

1.    Defendant Jed McCaleb and Code Collective, LLC (collectively McCaleb), shall

appear for a deposition in Jackson, Mississippi.

2.    Plaintiffs shall respond to Defendants' Request for Production of Documents and

produce documents not claimed as privileged on or before November 18, 2016.

SO ORDERED AND ADJUDGED this the _1st_ day of _Nov_____, 2016.

HONORABLE TOMIE T. GREEN

Agreed as to form:

/s/ Edwin S. Gault, Jr                        /s/ Mitchell H. Tyner, Sr
EDWIN S. GAULT, JR., MSB #10187               MITCHELL H. TYNER, SR.
MANDIE B. ROBINSON, MSB #100446               CHARLES BRAD MARTIN
FORMAN WATKINS & KRUTZ LLP                    Tyner Law Firm, P.A.
200 South Lamar Street, Ste. 100              5750 I-55 North
Jackson, MS 39201-4099                        Jackson, MS 39211
Post Office Box 22608                         mtyner@tynerlawfirm.com
Jackson, MS 39225-2608                        bmartin@tynerlawfirm.com
Telephone: (601) 960-8600
Facsimile: (601) 960-8613                     *Counsel for Drs. Donald and Chris Raggio*
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

*Counsel for Jed McCaleb and Code Collective, LLC*

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                                                          **PLAINTIFFS**
**DR. CHRIS RAGGIO**


**VS.**                                                                          **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                  **DEFENDANTS**

---

**NOTICE OF SERVICE OF DISCOVERY RESPONSES**

---

Please take notice that Dr. Donald Raggio and Dr. Chris Raggio have this day served in

the above entitled action the following:

1)      **Plaintiff Donald Raggio's First Set of Interrogatories to Defendants Jed
        McCaleb and Code Collective, LLC.**

2)      **Plaintiffs' First Set of Request for Production of Documents to Defendants
        Jed McCaleb and Code Collective, LLC.**

The undersigned retain the originals as custodian thereof.

This the 21st day of November, 2016.


                                        **DR. DONALD RAGGIO AND**
                                        **DR. CHRIS RAGGIO**

                                        s/Charles "Brad" Martin

1

CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 21st day of November, 2016.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO                                                    **PLAINTIFFS**
DR. CHRIS RAGGIO


VS.                                                          **CIVIL ACTION NO. 14-71**


MTGOX a sole proprietorship;
MTGOX, Inc., a Delaware corporation;
MT.GOX KK, a Japanese corporation;
TIBANE KK, a Japanese corporation;
MUTUM SIGILLUM, LLC a Delaware limited Liability Company;
CODE COLLECTIVE, LLC a New York limited liability company;
JED McCALEB, an individual;
MARK KARPELES, an individual;
JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5          **DEFENDANTS**

---

## SUBPOENA DUCES TECUM

STATE OF MISSISSIPPI

COUNTY OF HINDS

TO ANY LAWFUL OFFICER OR ANY OTHER PERSON AUTHORIZED TO SERVE
SUBPOENA:

    We command you to summons the Records Custodian at JPMorgan Chase Bank, N.A.,

7610 W. Washington St. Fl. 1, Indianapolis, IN 46231, pursuant to Rule 45 (d)(2) of the

Mississippi Rules Civil Procedure to mail (or otherwise produce) to/at the offices of Tyner Law

Firm, P.A., 5750 I-55 North, Jackson, Mississippi 39211, on the eleventh business day following

service of this subpoena (or if such be a Saturday, Sunday, or holiday, then on the next following

business day) the following items, to wit:

    See attached Exhibit "A."

Herein you should not fail under the penalty in such case made and provided and have then and there this writ.

**WITNESS MY HAND AND SEAL OF SAID COURT,** this the $22$ day of November, 2016.

Circuit Court of Hinds County, Mississippi
Mr. Zack Wallace
Circuit Clerk of Hinds County
BY:

ATTEST A TRUE COPY

NOV 22 2016

ZACK WALLACE CIRCUIT CLERK

BY _____ D.C.

Subpoena Requested By:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi 39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## EXHIBIT "A"

TO:   **JPMorgan Chase Bank, N.A.**
      **7610 W. Washington St. Fl. 1**
      **Indianapolis, IN 46231**

Bank account records for Washington Mutual account numbered ███████ maintained in the name of Jeb McCaleb, or to which he otherwise had authority to access, as including any other accounts held for Jeb McCaleb at any branch of JPMorgan Chase Bank, N.A. for the time period commencing January 1, 2010 and ending December 31, 2014. Such request includes all bank records and associated documents, including but not limited to check copies, statements, wire transfer confirmations and statements, opening and closing documents and forms, and currency and other reports associated with any transactions related to said accounts. The accounts requested means all accounts, including loan, collateralized, or any sort of debt account.

PROOF OF SERVICE -SUBPOENA

**(The person making the service must Complete Part I and Part II and return this form to the Clerk's Office.)**

PART I

I, the undersigned have served _____, the subpoena upon the person or entity named above in the manner set forth below:

( ) PERSONAL SERVICE:  I personally delivered copies to _____ on the _____ day of _____, 2016, where I found him/her to be in _____ County, State of _____.

( ) I was unable to serve the subpoena.

PART II

PROCESS SERVER'S RETURN - CERTIFICATE OF SERVICE

STATE OF_____

COUNTY OF_____

Personally appeared before me, the undersigned authority in and for the county and state aforesaid, the undersigned, who being by me first duly sworn according to law, states that the matters and facts set forth in Part I above are true and correct; that he/she was at least 18 years of age at the time he/she made service upon _____ and that he/she is not a party to this action.

_____
Signature of Process Server

_____
Printed Name of Process Server

_____
Telephone Number

_____
Street, Route or P.O. Address

_____
City, State and Zip Code

SWORN TO AND SUBSCRIBED before me, on this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

(SEAL)

MY COMMISSION EXPIRES: _____

4

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and foregoing pleading via the Court's electronic filing system on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 22nd day of November, 2016.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**                                    **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**VS.**                                                **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**        **DEFENDANTS**

---

## SUBPOENA DUCES TECUM

**STATE OF MISSISSIPPI**

**COUNTY OF HINDS**

TO ANY LAWFUL OFFICER OR ANY OTHER PERSON AUTHORIZED TO SERVE SUBPOENA:

We command you to summons the Records Custodian at Google, Inc. by service upon Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833, pursuant to Rule 45 (d)(2) of the Mississippi Rules Civil Procedure to mail (or otherwise produce) to/at the offices of Tyner Law Firm, P.A., 5750 I-55 North, Jackson, Mississippi 39211, on the eleventh business day following service of this subpoena (or if such be a Saturday, Sunday, or holiday, then on the next following business day) the following items, to wit:

See attached Exhibit "A."

Herein you should not fail under the penalty in such case made and provided and have then and there this writ.

**WITNESS MY HAND AND SEAL OF SAID COURT,** this the *22* day of November, 2016.

Circuit Court of Hinds County, Mississippi
Mr. Zack Wallace
Circuit Clerk of Hinds County
BY:

Subpoena Requested By:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

# EXHIBIT "A"

TO:   Google, Inc.
      by service upon Corporation Service Company
      2710 Gateway Oaks Drive, Suite 150N
      Sacramento, CA 95833,

      Copies of all emails, attachments, and any other electronically transmitted communication for the account of Jeb McCaleb (available email address ███████████ for the time period commencing January 1, 2010 and continuing through the end of December 31, 2014.

PROOF OF SERVICE -SUBPOENA

**(The person making the service must Complete Part I and Part II and return this form to the Clerk's Office.)**

PART I

I, the undersigned have served _____, the subpoena upon the person or entity named above in the manner set forth below:

( ) PERSONAL SERVICE:  I personally delivered copies to _____ on the _____ day of _____, 2016, where I found him/her to be in _____ County, State of _____.

( ) I was unable to serve the subpoena.


PART II

PROCESS SERVER'S RETURN - CERTIFICATE OF SERVICE

STATE OF_____

COUNTY OF_____

Personally appeared before me, the undersigned authority in and for the county and state aforesaid, the undersigned, who being by me first duly sworn according to law, states that the matters and facts set forth in Part I above are true and correct; that he/she was at least 18 years of age at the time he/she made service upon _____ and that he/she is not a party to this action.


_____
Signature of Process Server
_____
Printed Name of Process Server
_____
Telephone Number
_____
Street, Route or P.O. Address
_____
City, State and Zip Code

SWORN TO AND SUBSCRIBED before me, on this the ____ day of _____, 2016.


(SEAL)                    _____
                                NOTARY PUBLIC

MY COMMISSION EXPIRES: _____

4

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and foregoing pleading via the Court's electronic filing system on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 22nd day of November, 2016.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                                    **PLAINTIFFS**

VS.                                                    **CAUSE NO. 14-CV-00071-TTG**

MTGOX, *et al.*                                                    **DEFENDANTS**

**DEFENDANTS' MOTION TO QUASH AND FOR PROTECTIVE ORDER**

Jed McCaleb and Code Collective, LLC, (collectively Defendants) file this Motion to

Quash certain subpoenas issued to third parties, and for a Protective Order preventing and/or

limiting the information requested to that which is relevant to this claim.

1.      On November 22, 2016, Plaintiffs obtained subpoenas *duces tecum* from the

clerk to J.P. Morgan Chase Bank, N.A. in Indianapolis, Indiana, and to Google, Inc. in

Sacramento, California.  Copies of these subpoenas are attached as Exhibits A & B.  The

subpoenas seek bank records regarding a certain account, and copies of all emails for any

accounts held by Jed McCaleb, for the period from January 1, 2010 to December 31, 2014.

2.      These subpoenas are improper, seek production of information that is confidential

and protected for which no exception applies, seek irrelevant information, and are overbroad and

unduly burdensome.  Thus, they should be quashed under Rule 45(d) and Rule 26(d), and a

protective order entered preventing discovery into such information.[1]

---

[1] Rule 45(d)(1)(A) provides that "[o]n timely motion, the court from which a subpoena was issued shall quash or
modify the subpoena if it . . .; (ii) requires disclosure of privileged or other protected matter and no exception or
waiver applies, (iii) designates an improper place for examination, or (iv) subjects a person to undue burden or
expense." Rule 26(d) allows a motion for a protective order to be filed by "a party or by the person from whom
discovery is sought."

1

3.      First, the subpoenas were improperly issued for out-of-state companies, as no subpoenas or letters rogatory from the local courts were obtained as required by law.[2]

4.      Second, there is no dispute the bank records and emails are confidential and that McCaleb has a personal interest in this information.  *See J.T. Shannon Lumber Co., Inc. v. Gilco Limber, Inc.*, 2008 WL 3833216 (N.D. Miss. 2008) (recognizing people have a "personal interest" in documents sought by subpoenas to Microsoft, Google, and Yahoo! for contents of their inboxes).

5.      Third, it would be a violation of federal law for Google to respond to the subpoena.  *See Id.*  The *J.T. Shannon* court explained the Stored Communications Act of 1986 "prohibits a person or entity that provides an electronic communication service to the public from knowingly divulging the contents of any communication that is carried or maintained on the system," and the exceptions "do not include a civil subpoena." *Id.* at *1 (citing 18 U.S.C. § 2702(a)).  The court explained that because "the Act creates a zone of privacy . . . ," the subpoenas were "facially invalid."  *Id.* at *2.

6.      Fourth, the subpoenas seek information that is irrelevant to the Plaintiffs' claim that a hacker stole bitcoins from their account on the MTGOX exchange.  Since a subpoena cannot seek irrelevant information, they must be quashed.  *See Flechas v. Pitts,* 138 So. 3d 907, 911 (Miss. 2014) (finding a subpoena for all an attorney's records from representation of the decedent in multiple matters included information irrelevant to the will contest before the court). *See also Will-Drill Resources, Inc. v. J.R. Pounds, Inc.,* 2007 Wl 609791, *2 (S.D. Miss. 2007)

---

[2]  *See* Ind. Code Ann. § 34-44.5-1-6 (requiring out-of-state litigant to "submit the foreign subpoena to the clerk of the court in the county in which discovery is sought to be conducted in Indiana. . . ." for the clerk in Indiana to issue a local subpoena); Cal. Civ. Proc. Code § 2029.100 (same); Miss. Code Ann. § 11-59-5 (same); *Syngenta Crop Protection, Inc. v. Monsanto Co*., 908 So.2d 121 (Miss. 2005) (trial court lacked authority to subpoena nonresident nonparty corporations to produce documents located outside the state, even though nonresidents were registered to do business in state).

(granting defendant's motion to limit request to only the oil well at issue in the litigation);

*Burrell v. Jones,* No. 251-06-348CIV, 2007 WL 5674450 (Hinds County Circuit Court, 1st Dist.,

Dec. 10, 2007) (granting plaintiff's motion to quash defendants' subpoenas to casinos, noting the

past and future casino earnings from plaintiff were irrelevant as they could not be used as a basis

for valuation of future earnings).

7.     Fifth, the subpoenas are overbroad.  The subpoenas seek each and every record

related to the bank account and email accounts of Jed McCaleb for an entire four year period,

regardless of origin, substance, or any other factors to even attempt to tailor them to seek

information relevant to the current suit.  In *J.T. Shannon,* in which the defendant sought to quash

subpoenas seeking records of their email accounts, the court also found:

> the subpoenas are overly burdensome to Microsoft Corporation, Google, Inc. and
> Yahoo!, Inc.

> \*     \*     \*

> The subpoenas do not limit the requested documents to issues of the lawsuit, and
> by asking for the "full contents of the mailboxes ... and any retained, backed up or
> offline contents" in the possession of the internet service provider, the plaintiff
> requests an unlimited number of documents. This request alone is oppressive,
> especially when served on a non-party to a lawsuit.

*J.T. Shannon*, at \*2.

8.     Here, the subpoenas were not legally issued to companies outside Mississippi,

seek information that is confidential, protected, and irrelevant, and are overbroad.  Thus, they

should be quashed and a protective order entered to prevent the production of protected

information that is not tailored to be relevant to the claims at issue in this suit.

Respectfully submitted, this the 6th day of December, 2016.

**CODE COLLECTIVE, LLC, and
JED McCALEB, individually and formerly
doing business as MTGOX, a sole proprietorship**

By:      */s/ Edwin S. Gault, Jr.*                 
               EDWIN S. GAULT, JR., MSB #10187
               MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

Admitted *Pro Hac Vice*:

ETHAN JACOBS
KELLER SLOAN ROMAN HOLLAND, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Direct: (415) 249-8336
Facsimile: (415) 249-8333
ejacobs@ksrh.com

***Counsel for Jed McCaleb and Code Collective, LLC***

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system and via email on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER LAW FIRM, P.A.
> 5750 I-55 North
> Jackson, MS  39211
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

This, the 6th day of December, 2016.

/s/ *Edwin S. Gault, Jr.*
EDWIN S. GAULT, JR.

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Code Collective, LLC and Jed McCaleb, by and through counsel of record, does hereby

give notice to the Court that the following discovery was served as follows:

Defendant's Second Set of Requests for Production of Documents to Plaintiffs.

The undersigned retains the originals of the above papers as custodian thereof.

Respectfully submitted, this the 9th day of December, 2016.

                              **CODE COLLECTIVE, LLC, and**
                              **JED McCALEB, individually and formerly**
                              **doing business as MTGOX, a sole proprietorship**

                              By:    */s/Edwin S. Gault, Jr.*
                                     EDWIN S. GAULT, JR., MSB #10187
                                     MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

>Mitchell H. Tyner, Sr.
>Charles Brad Martin
>Tyner Law Firm, P.A.
>5750 I-55 North
>Jackson, MS  39211
>mtyner@tynerlawfirm.com
>bmartin@tynerlawfirm.com

Respectfully submitted, this the 9th day of December, 2016.


*/s/* Edwin S. Gault, Jr.
EDWIN S. GAULT, JR.

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                                                              **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**VS.**                                                                              **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                    **DEFENDANTS**
_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO QUASH
AND FOR PROTECTIVE ORDER**
_____

COME NOW THE PLAINTIFFS, Mississippi physicians, Dr. Chris Raggio & Dr. Donald Raggio, by and through the undersigned counsel, and file this their Response to Defendants' Motion to Quash and for Protective Order, and in support thereof would show unto the Court as follows, to wit:

I.

This cause of action arises out of the purchase and the subsequent theft of bitcoins. Plaintiffs, Doctors Chris and Donald Raggio wired money to Defendant Jed McCaleb's personal bank account in California (hereinafter referred to as "California Defendant") to purchase 9,400 bitcoins. To deliver the bitcoins, California Defendant required the Raggios to open an account on his bitcoin exchange called MTGOX. California Defendant was the sole proprietor of MTGOX exchange, which he built to become the largest bitcoin exchange in the world.

1

On January 9, 2011, Chris Raggio discovered that 9,400 bitcoins were missing from the Doctors' MTGOX account and, on the same date, contacted California Defendant regarding the missing bitcoins.  Chris Raggio discovered on January 10, 2011 the online address of where the stolen bitcoins had been transferred and immediately notified California Defendant as to same. California defendant allegedly traced the transaction and determined that another one of his account holders ("Baron") on his MTGOX exchange had stolen the bitcoins from the Raggios' MTGOX account and placed them into his own account.  California Defendant took control of and froze both the Doctors' account and Baron's account that consisted of the stolen bitcoins and $45,000.

Unbeknownst to the Raggios, in February 2011, California Defendant sold a majority interest of the MTGOX business to Defendant Tibanne K.K., a Japanese entity, which was owned by Defendant Mark Karpeles, a Frenchman with a conviction of computer fraud who had absconded to Japan to avoid serving a one year prison sentence.  Chris Raggio discovered that MTGOX had been sold via online news accounts.  He was never informed by California Defendant MTGOX would be sold to a convicted fugitive.  Furthermore, California Defendant never informed Chris Raggio that he retained an ownership interest in MTGOX or what role he would continue to retain in MTGOX, if any.

It was not until March 7, 2011, that the Doctors learned from California Defendant that Defendant Karpeles, the convicted Frenchman and fugitive from justice, would now be handling the matter of the stolen bitcoins.

After the March 7, 2011 email from California Defendant, the Chris Raggio began to communicate with Defendant Karpeles in order to recover their stolen coins, but to no avail. Defendant Karpeles (as Tibanne K.K.) would subsequently state, that upon buying MTGOX, he

had not assumed any of the liabilities, only the assets.  Suit in this matter was filed on March 5, 2014 against numerous defendants.

The Doctors in this matter have obtained subpoenas addressed to Google Inc. and JPMorgan Chase Bank seeking email records and bank records of the California Defendant.  As laid out below, the California Defendant testified at his deposition that he did not have a separate bank account for MTGOX, instead either using his own persona account or that of Defendant Code Collective.  Furthermore, the California Defendant testified he corresponded with Mark Karpeles using his Gmail account.

The Doctors are entitled to any and all discoverable information, not privileged, which bears on the question of how MTGOX monies were funneled into California Defendant's bank account as well as any and all correspondence the California Defendant sent/and or received via his Gmail account pertaining to MTGOX and the complete nature of the Defendant's business activities (in sufficient scope and detail to determine everything the California Defendant was doing while maintaining an interest in MTGOX), his involvement pertaining to the stolen bitcoins, any and all correspondence with Mark Karpeles, and any other relevant matter.

II.

Mississippi Rule of Civil Procedure 26(b) states the threshold for discoverable information and defines the baseline for discoverable information as follows:

> Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:  (1)  In general. -- Parties may obtain discovery regarding any matter, not privileged, which is ***relevant*** to the issues raised by the claims or defenses of any party... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. (emphasis added).

3

Accordingly, absent the operation of other rules of procedure, the general scope of discovery is limited only by its relevance to the issues raised by the claims and defenses of any party. Further, the discovery sought can run afoul of the Rules of Evidence, but if it is reasonable calculated to lead to the discovery of admissible evidence, then the scope is preserved.

### III.

The California Defendant brings his motion to quash the Doctors' *subpoena duces tecum* under Mississippi Rule of Civil Procedure 45, wherein a court is authorized to quash or modify a subpoena if it requires disclosure of privileged or other protected matter and no exception or waiver applies. California Defendant does not assert that the subject subpoenas fail to allow a reasonable time for compliance, or subjects any party to undue burden or expense. The subject subpoenas request bank records which pertain to California Defendant's operating activities, as well as emails within a limited frame of time which would show operational activities as well, all of which is information which is sought to determine the truth of the matters raised by the claims and defenses of this cause. The California Defendant must show a legal privilege protecting these documents and information, or prove that a protective order is warranted under M.R.C.P. 26(d), to quash or modify the subpoenas.

### IV.

The California Defendant asserts that his banking and email records are confidential and that the California Defendant has a personal interest in this information. The California Defendant supports this contention solely by citing to *J.T. Shannon Lumber Co. v. Gilco Lumber, Inc.*, 2008 WL 3833216 (N.D. Miss 2008).

However, the court in *J.T. Shannon Lumber Co*. never addressed the confidentiality of the material which was being sought (emails), but addressed the issue of whether a defendant has

4

standing to obtain an order quashing a subpoena issued to a non-party internet service provider. *Id*. The court found standing existed in that the documents sought were personal documents and details of the email accounts of defendant employees. *Id*.

Regardless, under any circumstances, the California Defendant does not cite to any case law in which the documents sought should be confidential or privileged, thus exempt for the power of the subpoenas. If the Doctors can satisfy the requirements of the Mississippi Rules of Civil Procedure 26(b), then this law is not a bar and no source of a privilege in this action regarding the requested records.

The California Defendant has styled its motion, asking for quashing of the subpoenas and that a protective order be put in place. As the Doctors read M.R.C.P. 45(d)(1)(A), the California Defendant must show privilege, or that the matter sought is otherwise *protected*. The California Defendant cannot show privilege; the only avenue, therefore, is a necessary connection between the motion for protective order and the remedy of quashing the subpoena. The Doctors have no objection presenting the myriad reasons indicating that the information sought is relevant to the issues raised in the claims and defenses of this case. Again, M.R.C.P. 26(b) permits discovery of matter that would not be admissible at trial, so long as the information sought is reasonably calculated to lead to admissible evidence. Relevancy for the purposes of discovery is not the same as relevancy of evidence sough to be admitted at trial. This is implicit in the Rule when it says that a ground of inadmissibility at trial (which would include, for instance, a relevancy objection) does not bar discovery, when the information is reasonably calculated to lead to admissible evidence. If the court is inclined to question the underlying relevancy of the information sought to the issues raised in the litigation, the Doctors can certainly articulate how discovery of this information will lead to admissible evidence. If the Court is inclined to impose

restrictive conditions on production of the materials, including *in camera* inspection, the Plaintiffs will comply with whatever demands are made of them.

V.

In light of the fact that the California Defendant can establish no confidentiality or privilege with respect to the requested information, it is abundantly clear that the California Defendant is basing its motion to quash almost solely on the assertion that these documents should be deemed protected under M.R.C.P. 26(d). M.R.C.P. 26(d) provides as follows:

> (d) Protective Orders. Upon motion by a party or by the person from who discovery is sought, and for good cause shown, the court in which the action is pending, or in the case of deposition the court that issued the subpoena therefore, may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
> (1) that the discovery not be had;
> (2) that the discovery may be had only on specified terms and conditions, including designation of the time or place;
> (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
> (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters;
> (5) that discovery be conducted with no one present except persons designated by the Court;
> (6) that a deposition after being sealed to be opened only by order of the court;
> (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way;
> (8) that the parties simultaneously file specific documents or information enclosed in sealed envelopes to be opened as directed by the court;
> (9) that the court make any other order which justice requires to protect the party or witness from annoyance, embarrassment, oppression or undue burden or expense, including provision for payment of expenses attendant upon such deposition or other discovery device by the party seeking same. M.R.C.P. 26(d)

The most prevalent assertion by the California Defendant about the requested discovery is that it seeks production of documents which are "irrelevant."  Permissible discovery under Mississippi Rule of Civil Procedure 26(b) is any matter, not privileged, which is relevant to the issues raised by the claims and defenses of the parties; further, inadmissibility of the matter is no objection if discovery of the same is reasonably calculated to lead to the discovery of admissible evidence.  The claims of this action go straight to how the California Defendant operated MTGOX while he was the sole owner and after he sold his controlling interest to Mark Karpeles.  The California Defendant also denies any involvement in the theft of the Doctors' stolen bitcoins.  The California Defendant affirmatively asserts the bitcoins were stolen by a third party.  These are just some of the issues the Doctors have a right to seek discovery upon.

To date, there are outstanding discovery responses due from the California Defendant which are due on December 21, 2016.  While the documents which are being sought pursuant to the *subpoena duces tecums* are also being sought through request for production of documents, at this time it is not possible to know what documents, if any, the California Defendant will produce.

In deposition testimony, the California Defendant testified as to the bank account and the email account of which are at issue in this matter.   When asked about what email addresses where used when the California Defendant corresponded with Mark Karpeles, the California Defendant replied he would sometimes use his Gmail account and provided the Gmail address. *See* Deposition of Jed McCaleb, attached as Exhibit A, pp 80-81.  Furthermore, the bank records of which have been subpoenaed are for the account (California Defendant's personal account) of which the Doctors wired money to for the funding of the MTGOX account.  *See* Exhibit B, redacted bank records of Don Raggio.  At his deposition, California Defendant testified that the

money wired was sent to his personal bank account.  *See* Exhibit A, p. 55, lines 19-21. However, the California Defendant later erroneously testified that the money was wired to an account owned by Defendant Code Collective.  *Id*. at p. 57, lines 15-18.  Furthermore, the California Defendant admitted he did not have a separate account from that of MTGOX.  *Id*. at 58, lines 2-4.

These considerations by no means exhaust all of the issues raised by the claims and defenses in this action, but highlight specific areas of inquiry which are critically relevant thereto. The Defendant's assertion that the information sought in the subpoenas is irrelevant has no force or substance.  This information is very relevant, material, and it is proper to have discovery of it.

VI.

The California Defendant raises the contention that the subpoenas are overbroad to support its effort to quash the subpoenas and/or obtain a protective order regarding the bank and email records.

The California Defendant takes issue with the various time periods over which the information is requested. All of the requests are made for the time period beginning January 1, 2010 and ending December 31, 2014.  The California Defendant apparently regards this effort as a fishing expedition to discover whether there is any evidence which will be useful as he complains the subpoenas are not tailored to seek information relevant to the current suit.  This is not a response which meets the substance of the purpose of the Doctors' inquiry, and the Doctors fail to see the impropriety of discovering information that is probative and useful in the case. The California Defendant readily admitted in his deposition testimony that he used the Gmail account to corresponded with Mark Karpeles and used his personal banking account to accept the wire transfer from the Doctors, as well as using it for MTGOX business.  *See* Exhibit A, pps. 55,

57-59 and 80-81.      The Doctors' purpose has been and will remain focused and specific to finding relevant and probative evidence concerning all of the issues presented in this response. The Doctors are entitled to the requested documents at least for the period of time over which the California Defendant had an interest in MTGOX, and to verify the California Defendant's deposition testimony which has been represented to be a truthful and accurate account.  The notion that the California Defendant's business activities and transactions are entitled to secrecy is absurd.  Nonetheless, the Doctors are fully willing to submit to whatever restrictions the Court would impose on the use of the information that is requested, but regardless, the Doctors are entitled to the information for the purposes of this case.

VII.

The California Defendant also argues that it would be a violation of federal law for Google, Inc. to respond to the subpoena under the Stored Communications Act of 1986 which generally prohibits an entity that provides an electronic communication service to the public from divulging the contents of any communication that is carried or maintained on the its systems. *J.T. Shannon* at *2 (citing 18 U.S.C. § 2702(a)).

The court in *J.T. Shannon* refused to permit discovery because it held that the Act does not provide an exception for civil discovery subpoenas.  *Id*. at 2.  The *J.T. Shannon* decision, however, does not leave parties in the Doctors' position without a method for discovering emails maintained by companies like Google.  Nor does the *J.T. Shannon* decision provide blanket protection to individuals who wish to hide behind the Stored Communications Act.

In *In Subpoena Duces Tecum to AOL, LLC*, 550 F.Supp. 2d 606 (E.D. Va. 2008), the court noted that a court may order a party that has filed a motion to quash to consent to a service provider disclosing the contents of emails sought under a subpoena.  *In Subpoena Duces Tecum*

*to AOL, LLC*, 550 F.Supp. 2d 606, 614 (E.D. Va. 2008) (citing *O' Grady v. Superior Court*, 44 Cal. Rptr. 3d 72. 88 (Calif. 6th Ct. App. 2006). Here, the California Defendant has filed a motion to quash [Dkt. 59]. This Court should deny the California Defendant's motion to quash and save significant time and expense by ordering the California Defendant to consent to having his email provider turn over his emails for the time frame requested. If California Defendant refuses to obtain this information, this Court can and should sanction the California Defendant.

The other leading case, *O'Grady v. Superior Court*, makes the same point as the *AOL* Court – the party who wished to quash a subpoena may be required to consent to the release of emails by an internet provider. *O' Grady v. Superior Court*, 44 Cal. Rptr. 3d 72. 88 (Calif. 6th Ct. App. 2006). The O'Grady court noted that copies of emails may still be sought from an intermediary provider, such as Google, if the discovery fits within one of the statutory exceptions of the Act – most obviously, a disclosure with the consent of a party to the communication. *Id*. at 88 (citing U.S.C. § 2702(b)(3)). The Stored Communications Act allows a provider to disclose emails under certain exceptions, such as the user's consent: "(b) Exceptions.—A person or entity may divulge the contents of a communication…(3) with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case or remote computing service. 18 U.S.C. § 2702(b)(3). In *O'Grady*, the court also noted, "[*w]here a party to the communication is also a party to the litigation, it would seem within the power of a court to require his consent to disclosure on pain of discovery sanctions*." *O'Grady* at 88 (citing U.S. Internet Service Providers Assn., Electronic Evidence Compliance-A Guide for Internet Service Providers, *supra*, 18 Berkeley Tech. L.J. 945, 965) (emphasis added).

This procedure is similar to a party's request of an opposing party's medical records. As in those cases, a party is required to sign an authorization form to release medical records which

may contain relevant and discoverable evidence. The Doctors respectfully submit that this Court should follow the procedure outlined above.

VIII.

Last, the California Defendant argues that the subpoenas were not properly issued for the out-of-state nonparties.  Should this Court find that subpoenas are in fact improperly issued, the Doctors would again submit that for the sake of judicial economy the Court may save significant time and expense by ordering the California Defendant to consent to having his email provider turn over his emails for the time frame requested, as well as ordering the consent of the California Defendant as to the requested bank records.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiffs would show that they are entitled to denial of the Defendants' motion as responded to herein, to all relief requested in the premises, and for such other further legal or equitable relief that this Court deems proper.

Respectfully submitted this the 16th day of December, 2016.

s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**OF COUNSEL:**
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

11

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system and via email on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 16th day of December, 2016.

s/ Charles B. Martin
 CHARLES "BRAD" MARTIN, MSB# 100767

12

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16

55

1      A.    I don't know.

2      Q.    Now, I believe you said that Chris Raggio

3  contacted you by e-mail.  Is that right?

4      A.    That's right.

5      Q.    Okay.  And how would he know to contact you;

6  do you know?

7      A.    I assume -- I mean, my -- the e-mail address

8  was listed on the Mt. Gox website.  So I assume that's

9  how he did it.

10      Q.    Okay.

11      A.    Yeah.

12      Q.    And what's your recollection of that

13  communication when he first contacted you?

14      A.    He was basically saying I want to, you know,

15  I want to buy X amount of dollars worth of bitcoin,

16  how do I do that?  And then I just explained to him

17  what he needed to do.

18      Q.    Okay.  And what was it that he needed to do?

19      A.    I believe he wired the money to my bank

20  account, and then I told him to put in an offer to --

21  on the exchange to buy the bitcoin.

22      Q.    Okay.  At that time, what was the normal

23  volume of bitcoin being traded daily?

24      A.    Oh, I have -- it was a very long time ago.  I

25  have no idea what that volume was back then.

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16

57

1          A.    I mean, you can figure it.  If bitcoin was 30

2     cents, I mean, you can figure it out.  Yeah, so ...

3          Q.    Thirty cents and --

4          A.    I mean, there's only -- at that point, what

5     would there -- there'd be, I mean, like, probably like

6     8,000,000 bitcoin mined at that point.  So 30 cents

7     times 8,000,000.

8          Q.    So that's two-and-a-half million.

9          A.    Yeah.

10         Q.    Something like that.  Come on now.

11         A.    So, yeah.

12         Q.    Did Chris go ahead and send you money, wire

13    it to you?

14         A.    He did.

15         Q.    And the -- what account was it that he sent

16    that money to?

17         A.    I believe he sent it to the Code Collective

18    business account.

19         Q.    Okay.  And Code Collective is the company

20    that you had for the --

21         A.    For the game.

22         Q.    -- for the game?

23         A.    Yeah.

24         Q.    And that was when you were mostly in New

25    York.  Right?

**Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16**

58

1      A.    That's right.

2      Q.    Okay.  You didn't open a separate account for

3  Mt. Gox?

4      A.    No.

5      Q.    And the account that he wired money to, was

6  that a checking account?

7      A.    Yes.

8      Q.    Who was that account with?

9            MR. GAULT:  You mean what bank?

10           MR. TYNER:  Yes.

11     A.    I believe Chase, but I could be wrong.

12  BY MR. TYNER:

13     Q.    Okay.  Did you have a lot of business

14  accounts at that time?

15     A.    No.  That was the only one.

16     Q.    What about personal accounts; did you have a

17  lot of personal accounts at that time?

18     A.    I don't believe so.

19     Q.    Did you have any?

20     A.    I don't remember, but probably.

21     Q.    Okay.  How would you pay your bills?

22     A.    I assume I have it in a bank account.

23     Q.    Okay.  Would -- did you do most of your

24  business with Chase?

25     A.    You mean my personal business or the --

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16

59

1      Q.     Uh-huh, yes.

2      A.     Like I say, I don't remember if that was my

3   bank, but -- or if that was my -- I don't remember if

4   that was my business bank or -- and I definitely don't

5   remember if that was my personal bank.  I could have

6   used a different bank, but I believe so.

7      Q.     Okay.  So my client, Chris, wired you money?

8      A.     Uh-huh.

9      Q.     And then did you have -- do you, at that

10  point, have to manually credit his account?

11     A.     That's right.

12     Q.     Okay.  And who would do that?

13     A.     I would.

14     Q.     Okay.  And, at that point, he was free to

15  trade.  Is that right?

16     A.     That's right.

17     Q.     Did Chris ask you to help him buy a large

18  amount of bitcoin?

19     A.     I believe he asked me about advice on how to

20  do it.

21     Q.     And what advice would you give him?

22     A.     I don't remember what I said to him.  I think

23  he was asking about this feature that I had on there

24  called dark pools, which basically meant that you

25  could put up an order, and people couldn't see that

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 54 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 61-1   Filed: 12/16/2016   Page 5 of 6
Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16

80

1      Q.    Okay.  And so you would -- you would e-mail

2   him about the Raggios?

3      A.    I may have.  You know, it wasn't -- it

4   definitely wasn't a regular thing.  I think maybe

5   Chris asked me to e-mail him one time or something,

6   yeah.

7      Q.    What e-mail address were you using at that

8   time?

9      A.    I had several.

10     Q.    What were they?

11     A.    Well, I had my personal e-mail account.  I

12  had my account for my new company.  Mark didn't turn

13  off my jed@mtgox account just because sometimes people

14  would still e-mail me there.

15     Q.    Your what X; what did you say, Jed?

16     A.    Jed@mtgox account.

17     Q.    Oh, jed@mtgox.

18     A.    Yeah.

19     Q.    Okay.

20     A.    And I have another personal account.  I mean,

21  I have a bunch of old e-mail accounts.

22     Q.    But if you were communicating with Mark, what

23  account would you use?

24     A.    Most likely, the jed@mtgox.

25     Q.    But you could have used your personal?

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16

81

1      A.    I would sometimes e-mail him from my personal

2  account.

3      Q.    What was that e-mail account?

4      A.    Jed2000@gmail.

5      Q.    Okay.  And then you probably had one at

6  Ripple, as well?

7      A.    Yeah.

8      Q.    And what was that e-mail?

9      A.    Jed@ripple.com.

10     Q.    Okay.  Any others?

11     A.    Yeah.  I have another personal account,

12  swamp12@yahoo.com.

13     Q.    Okay.

14     A.    Ripple was called The Open Coin briefly, so I

15  had an Open Coin account.

16     Q.    Okay.

17     A.    Yeah.  I had an account for Far Wilds still,

18  yeah.

19     Q.    Were they all jed@?

20     A.    Yeah, for the most part.

21     Q.    -- opencoin.com?

22     A.    Yeah.

23     Q.    Do you still have the Gmail account?

24     A.    My personal, Jed2000?

25     Q.    Yeah.

P0019

DR DONALD RAGGIO OR
REBECCA RAGGIO
4210 QUAIL RUN RD
JACKSON MS 39211-6201

06/14

STATEMENT DATE
01/10/11
ACCOUNT NUMBER

INFOLINE  1-888-797-7711
* * * * * * * * CHECKING ACCOUNT SUMMARY * * * * * * * * *
PREVIOUS BALANCE          5,101.82       AVERAGE BALANCE
 +    5  CREDITS         41,327.21                   15,235
 -   26  DEBITS          30,635.02       YTD INTEREST PAID
 -   SERVICE CHARGES          6.50                     .00
 +   INTEREST PAID            .00        FEES THIS PERIOD
ENDING BALANCE           15,787.51                    6.50


OVERDRAFT PAYMENT SERVICE IS A FEATURE OF THIS ACCOUNT

*******************************************************
*                       * TOTAL FOR THIS  *    TOTAL     *
*                       *    PERIOD       * YEAR-TO-DATE  *
*******************************************************
*TOTAL OVERDRAFT FEES  *         .00 *          .00 *
*******************************************************
*TOTAL RETURNED ITEM FEES*       .00 *          .00 *
*******************************************************

*******************************************************
**       TOTAL FOR PRIOR YEAR          *
*******************************************************
*TOTAL OVERDRAFT FEES   *                     70.00 *
*******************************************************
*TOTAL RETURNED ITEM FEES*                     .00 *
*******************************************************

* * * * * * * * CHECKING ACCOUNT TRANSACTIONS * * * * * * * *
    DEPOSITS AND OTHER CREDITS
DATE.........AMOUNT.TRANSACTION DESCRIPTION      CHK NO/ATM CD
12/16    12,500.00 DEPOSIT
12/20     9,500.00 DEPOSIT
12/20     2,000.00 DEPOSIT
12/30    10,000.00 CODE COLLECTIVE   ACH PMT
12/30     7,327.21 UNIV OF MS MEDIO PR PAYMENT
    CHECKS
DATE..CHECK NO..........AMOUNT    DATE..CHECK NO..........AMOUNT
12/14   8349*          309.05     12/14    8351          60.00
12/13   8350*           12.28     12/13    8352         200.00

RAGGIO  00068

```
DR DONALD RAGGIO OR                              06/14
REBECCA RAGGIO                           PAGE     2
4210 QUAIL RUN RD
JACKSON MS 39211-6201
                                         STATEMENT DATE
                                              01/10/11
                                         ACCOUNT NUMBER
```

```
    CHECKS
DATE..CHECK NO..........AMOUNT    DATE..CHECK NO..........AMOUNT
12/20      8354*       300.00     12/30     8421        235.00
12/20      8355      1,371.78     01/03     8423*        35.00
12/23      8356        268.07     01/04     8424        218.57
12/31      8358*       400.00     01/05     8425*       172.59
12/27      8420*       100.00     01/03     8427      3,099.58
    OTHER DEBITS
DATE.........AMOUNT.TRANSACTION DESCRIPTION       CHK NO/ATM CD
12/10      156.56 CAPITAL ONE ARC   CHECK PYMT          8346
12/10       55.00 COURTHOUSE INC    DUES PYMT
12/14      187.00 ENTERGY UTILITY   PAYMENT            8347
12/14       63.90 ATMOS ENERGY      ATMOS ENER         8349
12/17      469.43 JOHN HANCOCK LTC  LTC INS
12/21      104.55 MCI TELUSA ARC    VERIZONTX          8353
12/24    5,015.00 JED MCCALEB
                            WASH MUT BANK
12/24       59.99 FIA CARDSERVICES  CHECK PYMT         8357
12/27   15,015.00 JED MCCALEB
                            WASH MUT BANK
12/31      400.00 AXA EQUITABLE     INS.
01/03    2,271.67 AMERICAN EXPRESS ARC PMT             8425
01/10       55.00 COURTHOUSE INC    DUES PYMT
01/10        6.50 SERVICE CHARGE
* * * * * * * * * DAILY BALANCE SUMMARY * * * * * * * * * * *
DATE......BALANCE    DATE......BALANCE    DATE......BALANCE
12/09     5101.82    12/20    25916.82    12/31    21546.42
12/10     4890.26    12/21    25812.27    01/03    16240.17
12/13     4677.98    12/23    25544.20    01/04    16021.60
12/14     4058.03    12/24    20469.21    01/05    15849.01
12/16    16558.03    12/27     5354.21    01/10    15767.51
12/17    16088.60    12/30    22446.42
```

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                                **PLAINTIFFS**
**DR. CHRIS RAGGIO**


**VS.**                                                **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**        **DEFENDANTS**

---

**NOTICE OF SERVICE OF DISCOVERY RESPONSES**

---

        Please take notice that Dr. Donald Raggio has this day served in the above entitled action

the following:

   1)    **Plaintiff Donald Raggio's Second Set of Interrogatories to Defendants Jed
          McCaleb and Code Collective, LLC.**

The undersigned retain the originals as custodian thereof.

This the 19th day of December, 2016.


                              **DR. DONALD RAGGIO AND**
                              **DR. CHRIS RAGGIO**

                              s/Charles "Brad" Martin
                              CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

    Edwin S. Gault, Jr., Esq.
    Mandie B. Robinson, Esq.
    Forman Watkins & Krutz LLP
    200 South Lamar Street, Suite 100
    Jackson, Mississippi 39201-4099

    Ethan Jacobs, Esq.
    Keller Sloan Roman Holland, LLP
    555 Montgomery Street, 17th Floor
    San Francisco, CA 94111
    ejacobs@ksrh.com

           Respectfully submitted, this the 19th day of December, 2016.

                s/ Charles B. Martin
                 CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                                                                    **PLAINTIFFS**

VS.                                                                                    **CAUSE NO. 14-CV-00071-TTG**

MTGOX, et al.                                                                                    **DEFENDANTS**

### JED MCCALEB AND CODE COLLECTIVE, LLC'S REBUTTAL IN SUPPORT OF MOTION TO QUASH AND FOR PROTECTIVE ORDER

Jed McCaleb and Code Collective, LLC (together "Defendants"), file this Rebuttal in

Support of their Motion to Quash and for Protective Order (Doc. #59) as follows:

1.      Plaintiffs served subpoenas on J.P. Morgan Chase Bank, N.A. in Indiana, and

Google, Inc. in California.  The subpoenas seek bank records and copies of all emails for

accounts held by Jed McCaleb, from January 1, 2010 to December 31, 2014.

2.      Defendants' motion to quash showed that these subpoenas were not legally

served, sought confidential protected, and irrelevant information, and were overly burdensome.

3.      In their response (Doc. #61), Plaintiffs did not deny that the subpoenas on these

out-of-state, non-party recipients, were not legally served.[1]

4.      The Plaintiffs also concede it is illegal for Google to produce the emails sought.[2]

Realizing this, Plaintiffs ask the court to order Defendants to produce the requested emails.

However, the subpoena seeks every single email to or from Jed McCaleb from January of 2010

---

[1] *See* Ind. Code Ann. § 34-44.5-1-6 (requiring out-of-state litigant to "submit the foreign subpoena to the clerk of the court in the county in which discovery is sought to be conducted in Indiana. . . ." for the clerk in Indiana to issue a local subpoena); Cal. Civ. Proc. Code § 2029.100 (same); Miss. Code Ann. § 11-59-5 (same); *Syngenta Crop Protection, Inc. v. Monsanto Co*., 908 So.2d 121 (Miss. 2005) (trial court lacked authority to subpoena nonresident nonparty corporations to produce documents located outside the state, even though nonresidents were registered to do business in state).
[2] *See* 18 U.S.C. § 2702(a)) (the Stored Communications Act of 1986); *J.T. Shannon Lumber Co., Inc. v. Gilco Limber, Inc.*, 2008 WL 3833216 (N.D. Miss. 2008) (holding this Act prohibited Google from producing documents in response to a subpoena).  *See also* Correspondence from Google to Plaintiffs' counsel of Dec. 15, 2016, attached as Exhibit A, that it could not produce the records by law.

through December of 2014, with no regard for relevance.  The Defendants, in responding to

Plaintiffs' discovery, are producing all emails that are in any way related to the Plaintiffs,

discussions with others regarding this theft of bitcoins, or discussions with Mark Karpeles

regarding the sale of MTGOX.  If Plaintiffs believe they are entitled to more after reviewing the

information provided, the correct avenue is to file a motion to compel.

5.      Plaintiffs also assert the information sought is relevant.  M.R.C.P. 26 requires

matters to be "relevant to the issues raised by the **claims or defenses** of any party."  Here,

Plaintiffs **claim** a third-party stole bitcoins from their MTGOX account – not money, and assert

these Defendants should have returned the stolen bitcoins.  Plaintiffs **do not** claim these

Defendants stole the bitcoins, and even acknowledge the bitcoins are still in a frozen MTGOX

account.[3]  Thus, any bank records and emails discussing how money was paid to or from

MTGOX are irrelevant to the "claims" of theft, or any alleged promise to return stolen bitcoins.

6.      Even if relevant, a party may challenge a subpoena that seeks "proprietary,

confidential, or protected information sensitive to the party."  *Ezell v. Parker,* 2015 WL 859033,

at *1 (S.D. Miss. Feb. 27, 2015).[4]  This includes bank records and emails.  *See Id.* (citing *Old

Towne Dev. Grp., L.L.C. v. Matthews*, 2009 WL 2021723, at *1 (M.D. La. July 9, 2009) (a party

has a legitimate privacy interest in bank records)); *J.T. Shannon, supra*, at **1 (quashing

subpoena to Google for employees' emails, as "**they** have a personal interest in the documents

sought . . .").

---

[3]  *See* Complaint, Doc. #1 at ¶¶ 16 and 48 (noting upon learning of the theft, the Defendants "immediately started
working to discover the location of the stolen goods" and the actual "9,400 bitcoins are lodged with the MTGOX
accounts and noted on recently discovered 'Crisis Strategy Draft'").

[4]  *See* M.R.C.P. 45(d)(1)(A) (court shall quash subpoena requiring disclosure of privileged **or other protected
matters**) (emphasis added).

7.      Lastly, Plaintiffs circularly argue the requests seeking 5 full years of bank records and emails is not overly burdensome, because "this is not a response which meets the substance of the purpose of the Doctors' inquiry, . . ."[5]  Plaintiffs do not address the court's comments in *J.T. Shannon, supra,* quashing a subpoena to Google explaining:

> The subpoenas do not limit the requested documents to issues of the lawsuit, and by asking for the "full contents of the mailboxes ... and any retained, backed up or offline contents" in the possession of the internet service provider, the plaintiff requests an unlimited number of documents. This request alone is oppressive, especially when served on a non-party to a lawsuit.

*J.T. Shannon*, at *2.  Similarly, Plaintiffs' subpoenas seek bank records and emails for an entire five-year period, regardless of sender, recipient, topic, or any other attempt to tailor the request to documents which have any relevance to their claims of theft of bitcoins from their account. Thus, they are overbroad, overly burdensome, and must be quashed.

Respectfully submitted, this the 22nd day of December, 2016.

**CODE COLLECTIVE, LLC, and
JED McCALEB, individually and formerly doing
business as MTGOX, a sole proprietorship**

By:      */s/Mandie B. Robinson*
        EDWIN S. GAULT, JR., MSB #10187
        MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

---

[5]  Response to Motion to Quash, Doc. #61 at p. 8.

ETHAN JACOBS
KELLER SLOAN ROMAN HOLLAND, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Direct: (415) 249-8336
Facsimile: (415) 249-8333
ejacobs@ksrh.com


## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

>      Mitchell H. Tyner, Sr.
>      Charles Brad Martin
>      Tyner Law Firm, P.A.
>      5750 I-55 North
>      Jackson, MS  39211
>      mtyner@tynerlawfirm.com
>      bmartin@tynerlawfirm.com

Respectfully submitted, this the 22nd day of December, 2016.

                                        /s/ Mandie B. Robinson
                                        MANDIE B. ROBINSON

Google Inc.
1600 Amphitheatre Parkway
Mountain View, California 94043



google-legal-support@google.com
www.google.com

December 15, 2016

*Via Email and Express Courier*
*mitch@tynerlawfirm.com*

Mitchell H. Tyner, Sr.
Tyner Law Firm, P.A.
5750 I-55 North
Jackson, MI 39211
601-957-1113

Re: *Dr. Donald Raggio, Dr. Chris Raggio v. Mtgox, Mtgox, Inc., et al.*, In the Circuit Court of the First Judicial District Hinds County, Mississippi, 14-CV-00071-TTG (Internal Ref. No. 877432)

Dear Mitchell H. Tyner, Sr.:

Google Inc. ("Google"), a non-party to your litigation, has received your subpoena dated November 22, 2016, in the above-referenced matter (the "Subpoena"). As we understand it, your Subpoena requests documents related to the Gmail account associated with JED2000@GMAIL.COM from January 1, 2010 and continuing through the end of December 31, 2014.

At this point, however, as set forth more fully in the objections below, Google will not produce documents in response to the Subpoena because the Requests are objectionable. Google further hereby makes the following objections to the Subpoena.

**Jurisdiction**

Google objects to the Subpoena because it was issued by a state court without subpoena power over non-party Google. Google further objects on the grounds that to seek or compel disclosure from a California resident like Google, Petitioner must comply with Cal. Civ. Proc. Code §§ 2029.100, *et seq. See also* the Uniform Interstate Depositions and Discovery Act ("UIDDA").

Google resides in Santa Clara County, California, USA, where it has Custodians of Records. Google accepts subpoenas issued from Santa Clara Superior Court via personal service on the Google Custodian of Records for Google Inc. at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

California law provides a mechanism for obtaining a subpoena from a California court for use in judicial proceedings pending in other state court jurisdictions. *See* Cal. Civil Proc. Code § 2029.100 *et seq.*

**User Notification**

Google objects to the Subpoena to the extent it fails to allow sufficient time for Google to notify the affected user and for the user to assert his or her rights in response. Google provides its users at least 20 days to object to your request or to inform Google of their intent to file a motion to quash. If your subpoena sufficiently identifies a Google account, Google intends to forward notice of this matter, including your name and contact information, to the user at the email address provided by the user.

**Violation of Federal Law**

Google objects on the grounds that Section 2702(a) of the federal Stored Communications Act ("SCA") prohibits Google from disclosing the content of electronic communications or content stored on behalf of the user, pursuant to a subpoena. 18 U.S.C. § 2702(a) s*ee e.g., Suzlon Energy Ltd. v. Microsoft Corp,* 671 F.3d 726, 730 (9th Cir. 2011); *Theofel v. Farey-Jones,* 359 F.3d 1066 (9th Cir. 2004); *Mintz v. Mark*

RAGGIO   00333

EXHIBIT A

Google Inc.
1600 Amphitheatre Parkway
Mountain View, California 94043



google-legal-support@google.com
www.google.com

*Bartelstein & Assocs., Inc.* 885 F. Supp. 2d 987, 993-94 (C.D. Cal. 2012); *In re Subpoena Duces Tecum to AOL, LLC.,* 550 F.Supp.2d 606, 611 (E.D. Va. 2008); *Flagg v. City of Detroit,* 252 F.R.D. 346, 366 (E.D. Mich. 2008); *Viacom Int'l Inc. v. YouTube Inc.,* 253 F.R.D. 256 (S.D.N.Y. 2008); *O'Grady v. Superior Court of Santa Clara,* 139 Cal. App. 4th 1423, 1441-43 (2006).

Instead, the appropriate way to seek such content is to direct your request to the account holder who has custody and control of the data in the account, is not bound by the SCA, and is the party to whom discovery requests should be directed. *Suzlon,* 671 F.3d 726, 730-31; *Mintz,* 885 F. Supp. 2d at 993-94; *O'Grady,* 139 Cal. App. 4th at 1446-47. If the account holder is a party to the underlying litigation, you may serve a document request on the account holder for the content sought. *See Mintz,* 885 F. Supp. 2d at 993-94; *O'Grady,* 13 Cal. App. 4th at 1446-67; *see also Flagg,* 252 F.R.D. at 348, 366-67. Google users can obtain and produce their account content themselves, or by using Google Takeout, available at www.google.com/takeout/.

**Additional Objections**

1. Google objects to the Subpoena to the extent it seeks to impose an undue burden on a disinterested non-party. Google further objects to the Subpoena to the extent it seeks information already in a party's possession or available to a party from some other source (including public sources) that is more convenient, less burdensome or less expensive. Google objects to the Subpoena to the extent it seeks electronically stored information that is not reasonably accessible to Google.

2. Google objects to the Subpoena to the extent it seeks information that is not proportionate to the needs of the case, not relevant to any party's claims or defenses, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Google objects to the Subpoena to the extent it specifies a date of production that is unreasonable and unduly burdensome, including because it may not afford Google time to provide sufficient notice to the user.

4. Google objects to the Subpoena to the extent that it is vague, ambiguous, unlimited in time or scope, or fails to identify the information sought with reasonable particularity. Accordingly, Google further objects to the Subpoena to the extent it purports to require Google to preserve the requested information. Therefore you should not assume that Google will undertake steps to preserve any information in response to your Subpoena. Google is willing to meet and confer to discuss any preservation request.

5. Google objects to the Subpoena to the extent it seeks to impose obligations on Google beyond what is permissible under applicable law.

Google reserves the right to further object to the Subpoena in any additional response.

If you have any questions, please feel free to contact the undersigned at the Legal Support Department alias at GOOGLE-LEGAL-SUPPORT@GOOGLE.COM. Additionally, should you wish to seek any judicial relief in connection with this matter, Google requests the opportunity to meet and confer in advance of any such filing. Thank you.

Very truly yours,

Anjali Shrestha
Legal Investigations Support

### IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
### HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO                                                        **PLAINTIFFS**
DR. CHRIS RAGGIO


VS.                                                        **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                **DEFENDANTS**

---

### NOTICE OF SERVICE OF DISCOVERY RESPONSES

---

Please take notice that Dr. Donald Raggio and Dr. Chris Raggio have this day served in

the above entitled action the following:

1) **Plaintiffs' Responses to Code Collective, LLC and Jed Mccaleb's Second Set Of**
   **Requests for Production of Documents**

The undersigned retain the originals as custodian thereof.

This the 9th day of January, 2017.


                                              **DR. DONALD RAGGIO AND**
                                              **DR. CHRIS RAGGIO**

                                              s/Charles "Brad" Martin
                                              CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:

1

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 9th day of January, 2017.

s/ Charles B. Martin
 CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                                    **PLAINTIFFS**

**VS.**                                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                                    **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Jed McCaleb and Code Collective, LLC, by and through counsel of record, do hereby

give notice to the Court that the following discovery was served as follows:

1.      Responses to Dr. Donald Raggio's Second Set of Interrogatories to Defendants
Jed McCaleb and Code Collective, LLC.

Respectfully submitted, this the 18th day of January, 2017.

> **CODE COLLECTIVE, LLC, and
> JED McCALEB, individually and formerly
> doing business as MTGOX, a sole proprietorship**
>
> By:  /s/ *Edwin S. Gault, Jr.*
>        EDWIN S. GAULT, JR., MSB# 10187
>        MANDIE B. ROBINSON, MSB# 100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:   (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

Ethan Jacobs
KELLER SLOAN ROMAN HOLLAND, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Direct: (415) 249-8336
Facsimile: (415) 249-8333
ejacobs@ksrh.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

Mitchell H. Tyner, Sr.
Charles Brad Martin
Tyner Law Firm, P.A.
5750 I-55 North
Jackson, MS  39211
mtyner@tynerlawfirm.com
bmartin@tynerlawfirm.com

Respectfully submitted, this the 18th day of January, 2017.

/s/ *Edwin S. Gault, Jr.*
EDWIN S. GAULT, JR.

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO
DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

   Jed McCaleb and Code Collective, LLC, by and through counsel of record, do hereby

give notice to the Court that the following discovery documents were served as follows:

   1.  Jed McCaleb and Code Collective, LLC's Responses to Donald Raggio's First Set
     of Interrogatories; and

   2.  Jed McCaleb and Code Collective, LLC's Responses to Plaintiffs Dr. Donald
     Raggio and Dr. Chris Raggio's First Set of Request for Production of Documents.

   Respectfully submitted, this the 24th day of January, 2017.

          **CODE COLLECTIVE, LLC, and
          JED McCALEB, individually and formerly
          doing business as MTGOX, a sole proprietorship**

         By: <u>*/s/ Mandie B. Robinson*</u>
           EDWIN S. GAULT, JR., MSB# 10187
           MANDIE B. ROBINSON, MSB# 100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

Ethan Jacobs
KELLER SLOAN ROMAN HOLLAND, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Direct: (415) 249-8336
Facsimile: (415) 249-8333
ejacobs@ksrh.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> Tyner Law Firm, P.A.
> 5750 I-55 North
> Jackson, MS  39211
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 24th day of January, 2017.

/s/ *Mandie B. Robinson*
MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO
DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

<u>**NOTICE OF HEARING**</u>

Please take notice that pursuant to the Court's instructions, Defendants Jed McCaleb and

Code Collective, LLC, (collectively McCaleb) will bring on for hearing their Motion to Quash

and for Protective Order, and Motion for Summary Judgment Based on the Statute of Limitations

before the Honorable Judge Tomie T. Green, Hinds County Court Judge, Hinds County

Courthouse, 407 E. Pascagoula Street, Jackson, MS 39201, on April 18, 2017 at 9:00 a.m.

Respectfully submitted, this the 27th day of February, 2017.

**CODE COLLECTIVE, LLC, and
JED McCALEB, individually and formerly
doing business as MTGOX, a sole proprietorship**

By:  <u>/s/ *Edwin S. Gault, Jr.*</u>
     EDWIN S. GAULT, JR., MSB #10187
     MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:
FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and foregoing pleading via the Court's electronic mail system on the following:

       Mitchell H. Tyner, Sr.
       Charles Brad Martin
       Tyner Law Firm, P.A.
       5750 I-55 North
       Jackson, MS  39211
       mtyner@tynerlawfirm.com
       bmartin@tynerlawfirm.com

Respectfully submitted, this the 27th day of February, 2017.

                                   /s/ *Edwin S. Gault, Jr.*
                                   EDWIN S. GAULT, JR.

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO                                              **PLAINTIFFS**
DR. CHRIS RAGGIO


VS.                                                  **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**          **DEFENDANTS**

---

### NOTICE OF SERVICE OF DISCOVERY

---

Please take notice that the Plaintiffs have this day served in the above entitled action the

following:

1) **Plaintiffs Dr. Donald Raggio and Dr. Chris Raggio's Second Set of Request for Production of Documents to Defendants Jeb McCaleb and Code Collective, LLC**

The undersigned retain the originals as custodian thereof.

This the 2nd day of March, 2017.


                                    **DR. DONALD RAGGIO AND**
                                    **DR. CHRIS RAGGIO**

                                    s/Charles "Brad" Martin
                                    CHARLES "BRAD" MARTIN, MSB# 100767

1

OF COUNSEL:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 3rd day of March, 2017.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**


DR. DONALD RAGGIO                                                                    **PLAINTIFFS**
DR. CHRIS RAGGIO


VS.                                                                                  **CIVIL ACTION NO. 14-71**


MTGOX a sole proprietorship;
MTGOX, Inc., a Delaware corporation;
MT.GOX KK, a Japanese corporation;
TIBANE KK, a Japanese corporation;
MUTUM SIGILLUM, LLC a Delaware limited Liability Company;
CODE COLLECTIVE, LLC a New York limited liability company;
JED McCALEB, an individual;
MARK KARPELES, an individual;
JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5                           **DEFENDANTS**

---

**NOTICE OF SERVICE OF DISCOVERY**

---

      Please take notice that the Plaintiffs have this day served in the above entitled action the

following:

    1)    **Plaintiffs Dr. Donald Raggio and Dr. Chris Raggio's First Set of Request for**
            **Admissions to Defendant Jeb McCaleb**

The undersigned retain the originals as custodian thereof.

This the 3rd day of March, 2017.


                      **DR. DONALD RAGGIO AND**
                      **DR. CHRIS RAGGIO**

                      s/Charles "Brad" Martin
                      CHARLES "BRAD" MARTIN, MSB# 100767


OF COUNSEL:

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

      Edwin S. Gault, Jr., Esq.
      Mandie B. Robinson, Esq.
      Forman Watkins & Krutz LLP
      200 South Lamar Street, Suite 100
      Jackson, Mississippi 39201-4099

      Ethan Jacobs, Esq.
      Keller Sloan Roman Holland, LLP
      555 Montgomery Street, 17th Floor
      San Francisco, CA 94111
      ejacobs@ksrh.com

             Respectfully submitted, this the 3rd day of March, 2017.

                   s/ Charles B. Martin
                   CHARLES "BRAD" MARTIN, MSB# 100767

3

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                                    **PLAINTIFFS**
**DR. CHRIS RAGGIO**


**VS.**                                                    **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                **DEFENDANTS**

---

**NOTICE OF SERVICE OF DISCOVERY**

---

      Please take notice that Dr. Donald Raggio has this day served in the above entitled action

the following:

    1)    **Plaintiff Donald Raggio's Third Set of Interrogatories to Defendants Jed
        McCaleb and Code Collective, LLC.**

The undersigned retain the originals as custodian thereof.

This the 6th day of March, 2017.


                    **DR. DONALD RAGGIO AND
                    DR. CHRIS RAGGIO**

                    s/Charles "Brad" Martin
                    CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-6554 – *facsimile*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:


    Edwin S. Gault, Jr., Esq.
    Mandie B. Robinson, Esq.
    Forman Watkins & Krutz LLP
    200 South Lamar Street, Suite 100
    Jackson, Mississippi 39201-4099

    Ethan Jacobs, Esq.
    Keller Sloan Roman Holland, LLP
    555 Montgomery Street, 17th Floor
    San Francisco, CA 94111
    ejacobs@ksrh.com

          Respectfully submitted, this the 6th day of March, 2017.

              s/ Charles B. Martin
               CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                              **PLAINTIFFS**
**DR. CHRIS RAGGIO**


**VS.**                                                    **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**              **DEFENDANTS**

---

**NOTICE OF SERVICE OF DISCOVERY**

---

        Please take notice that the Plaintiffs have this day served in the above entitled action the

following:

    1)    **Plaintiffs Dr. Donald Raggio and Dr. Chris Raggio's Second Set of Request
          for Admissions to Defendant Jeb McCaleb**

The undersigned retain the originals as custodian thereof.

This the 20th day of March, 2017.


                                        **DR. DONALD RAGGIO AND**
                                        **DR. CHRIS RAGGIO**

                                        s/Charles "Brad" Martin
                                        CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:

1

MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER, GOZA, STACEY & MARTIN, LLC**
114 West Center Street
Canton, MS 39046
Phone: 601-401-1111
Fax: 601-957-6554

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:


Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Keller Sloan Roman Holland, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
ejacobs@ksrh.com

Respectfully submitted, this the 20th day of March, 2017.

s/ Charles B. Martin
 CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO
DR. CHRIS RAGGIO**                                                                **PLAINTIFFS**

**VS.**                                                        **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                                **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Jed McCaleb and Code Collective, LLC, by and through counsel of record, do hereby give notice to the Court that the following discovery documents were served as follows:

1.   Jed McCaleb and Code Collective, LLC's First Supplemental Responses to Plaintiffs Dr. Donald Raggio and Dr. Chris Raggio's First Set of Request for Production of Documents.

Respectfully submitted, this the 29th day of March, 2017.

**CODE COLLECTIVE, LLC, and
JED McCALEB, individually and formerly doing
business as MTGOX, a sole proprietorship**

By:      */s/Mandie B. Robinson*
           EDWIN S. GAULT, JR., MSB #10187
           MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER, GOZA, STACEY & MARTIN, LLC
> 114 West Center Street
> Canton, MS 39046
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 29th day of March, 2017.

/s/ Mandie B. Robinson
MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                          **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Code Collective, LLC and Jed McCaleb, by and through counsel of record, does hereby

give notice to the Court that the following discovery was served as follows:

*JED MCCALEB'S RESPONSES TO PLAINTIFFS' FIRST*
*SET OF REQUESTS FOR ADMISSION*

The undersigned retains the originals of the above papers as custodian thereof.

Respectfully submitted, this the 3rd day of April, 2017.

**CODE COLLECTIVE, LLC, and**
**JED McCALEB, individually and formerly**
**doing business as MTGOX, a sole proprietorship**

By:    */s/Mandie B. Robinson*
      EDWIN S. GAULT, JR., MSB #10187
      MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER, GOZA, STACEY & MARTIN, LLC
> 114 West Center Street
> Canton, MS 39046
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 3rd day of April, 2017.

/s/ Mandie B. Robinson
MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO
DR. CHRIS RAGGIO**                                                      **PLAINTIFFS**

**VS.**                                              **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                      **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Code Collective, LLC and Jed McCaleb, by and through counsel of record, does hereby

give notice to the Court that the following discovery was served as follows:

*JED MCCALEB'S RESPONSES TO PLAINTIFFS'
SECOND SET OF REQUESTS FOR ADMISSION*

The undersigned retains the originals of the above papers as custodian thereof.

Respectfully submitted, this the 3rd day of April, 2017.

> **CODE COLLECTIVE, LLC, and
> JED McCALEB, individually and formerly
> doing business as MTGOX, a sole proprietorship**
>
> By:   */s/Mandie B. Robinson*
>       EDWIN S. GAULT, JR., MSB #10187
>       MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER, GOZA, STACEY & MARTIN, LLC
> 114 West Center Street
> Canton, MS 39046
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 3rd day of April, 2017.


/s/ Mandie B. Robinson
MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Code Collective, LLC and Jed McCaleb, by and through counsel of record, does hereby

give notice to the Court that the following discovery was served as follows:

> *JED MCCALEB AND CODE COLLECTIVE, LLC'S RESPONSES
> TO PLAINTIFFS DR. DONALD RAGGIO AND DR. CHRIS
> RAGGIO'S SECOND SET OF REQUEST FOR PRODUCTION OF
> DOCUMENTS*

The undersigned retains the originals of the above papers as custodian thereof.

Respectfully submitted, this the 3rd day of April, 2017.

                                        **CODE COLLECTIVE, LLC, and
                                        JED McCALEB, individually and formerly
                                        doing business as MTGOX, a sole proprietorship**

                              By:    */s/Mandie B. Robinson*
                                        EDWIN S. GAULT, JR., MSB #10187
                                        MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS 39201-4099
Post Office Box 22608
Jackson, MS 39225-2608
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER, GOZA, STACEY & MARTIN, LLC
> 114 West Center Street
> Canton, MS 39046
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 3rd day of April, 2017.

/s/ Mandie B. Robinson

MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

   Code Collective, LLC and Jed McCaleb, by and through counsel of record, does hereby

give notice to the Court that the following discovery was served as follows:

   *JED MCCALEB AND CODE COLLECTIVE, LLC'S RESPONSES*
   *TO PLAINTIFFS DR. DONALD RAGGIO AND DR. CHRIS*
   *RAGGIO'S THIRD SET OF INTERROGATORIES*

The undersigned retains the originals of the above papers as custodian thereof.

   Respectfully submitted, this the 3rd day of April, 2017.

         **CODE COLLECTIVE, LLC, and**
         **JED McCALEB, individually and formerly**
         **doing business as MTGOX, a sole proprietorship**

         By: */s/Mandie B. Robinson*
            EDWIN S. GAULT, JR., MSB #10187
            MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER, GOZA, STACEY & MARTIN, LLC
> 114 West Center Street
> Canton, MS 39046
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 3rd day of April, 2017.


/s/ Mandie B. Robinson
MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**                                                                    **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**VS.**                                                                    **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**
**DEFENDANTS**
_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT BASED ON THE STATUTE OF LIMITATIONS WITH
INCORPORATED MEMORANDUM OF LAW**

_____

COME NOW THE PLAINTIFFS, Mississippi physicians, Doctor Chris Raggio and Doctor

Donald Raggio, by and through the undersigned counsel, and file this their Response to

Defendants' Motion for Summary Judgment Based on the Statute of Limitations, and in support

thereof would show unto the Court as follows, to wit:

## I.      INTRODUCTION

The California Defendants' Motion for Summary Judgment fails to set forth any

evidentiary basis or show that no genuine issues of material fact exists. The California Defendants

have premised their Motion upon the faulty belief that the claims of Dr. Chris Raggio and Dr.

Donald Raggio are timed barred by the applicable statute of limitations.   The California

1

Defendants attempt to persuade this Court that the statute of limitations began to run on the Doctors' claims from the time their bitcoins were stolen on January 9, 2011.  Even the most cursory of review of the Doctors' Complaint shows that their claims are based upon the later failure of the Defendants to deliver their bitcoins.

The California Defendants clearly have not "burdened" themselves with trying to identify any evidence for their Motion other than the affidavit of the California Defendant and two emails, out of numerous emails, that where sent to the California Defendant.    Instead, the California Defendants have used their Motion to confuse the issues and to unduly prejudice the Doctors, with, among other things, attempting to persuade this Court an earlier date should be used to determine the statute of limitations.

Accordingly, for the reasons set forth herein, the California Defendants' Motion for Summary Judgment should be denied.

## II.  <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

This cause of action arises out of the purchase of bitcoins and the failure of the Defendants to deliver the goods to the Plaintiffs, Doctors Chris and Donald Raggio (hereinafter "The Doctors").   The Doctors wired money to Defendant Code Collective, LLC, per the instructions of Defendant Jed McCaleb in California (hereinafter referred to as "California Defendant") to fund an account on the California Defendant's bitcoin exchange named MTGOX to purchase and sell bitcoins.   Bitcoins and currency could then be placed into the Raggios' account.   California Defendant was the sole proprietor of MTGOX exchange, which he built out to become the largest bitcoin exchange in the world.   MTGOX was an online bitcoin exchange which California Defendant launched in the fall of 2010, and by 2013 was handling 70% of all bitcoin transactions.

California Defendant was the creator of MTGOX, which allowed for the trading of bitcoins much like a typical commodity exchange.   Traders of bitcoins would place their bitcoins into individual accounts on the MTGOX exchange.

The Doctors in this matter are father and son who reside in Jackson, Mississippi.   The father, Dr. Donald Raggio, is a child psychologist and fully tenured professor in the Department of Pediatrics at the University of Mississippi Medical Center, where he has been employed for over forty years.   His son, Dr. Chris Raggio originally was a software engineer at Skytel in Jackson, Mississippi with an undergraduate degree in computer science from the University of Alabama.   In 1999, Chris matriculated into medical school at University of Mississippi School of Medicine.   After graduation, Chris began residency training in psychiatry at the Vanderbilt University Medical Center, where he completed his internship in psychiatry.   Throughout the years, Chris has maintained a strong interest in finance and economics as a passionate hobby. With all of his training, formally and informally, Chris developed a strong background in finance, economics, human behavior and computer science.

Chris discovered the existence of bitcoin in 2010.   He had the background and knowledge to complete a rigorous financial analysis of bitcoin's future value.   Chris' analysis revealed that bitcoin had a potential market capitalization of one billion dollars at a minimum.   At the time, in 2010, bitcoin had a market capitalization of two million dollars, meaning that bitcoin could increase five hundred times in value.   Chris' analysis has proven to be correct, with today's market capitalization of bitcoin being nearly seventeen billion dollars.

At the time, Chris did not have the capital for such a speculative investment strategy, but suggested the idea to his father, Donald Raggio, who had the capital.   Donald Raggio liked the

idea enough to provide the funds for the investment and asked his son to execute the investment strategy.

In 2010, the Doctors began to acquire bitcoins from the www.bitcoingateway.com website. However, the Doctors were limited in the volume of bitcoins they could purchase. Wanting to buy larger volumes of bitcoins, Dr. Chris Raggio contacted the owner of www.bitcoingateway.com, Eric Brigham, and inquired as to whom or where larger volumes of bitcoins could be acquired. Chris Raggio was given the name of the California Defendant, Jed McCaleb. Chris Raggio contacted the California Defendant and was informed that he and his father could trade larger volumes of bitcoins through California Defendant's MTGOX website.

In December 2010, at the instruction of Defendant McCaleb, the Doctors opened a MTGOX account and began to acquire bitcoins on the MTGOX exchange. *See* Exhibit A, Affidavit of Chris Raggio at ¶ 2-3. The California Defendant did not limit the amount of bitcoins that could be purchased or held in the Doctors' account, but he did limit the rate of bitcoin withdrawal. *Id* at ¶ 4. The MTGOX account was funded by wire transfers from Donald Raggio's bank account directly to California Defendant. *Id* ¶ 2.

On January 9, 2011, Chris Raggio discovered that 9,400 bitcoins were missing from their MTGOX account and, on the same date, contacted California Defendant regarding the missing bitcoins. *Id*. at ¶ 5 and Exhibit B, Compilation of Emails between Doctors and California Defendant, Jan. 9, 2011 at 10:36 P.M. email. Chris Raggio discovered on January 10, 2011 the online address of where the stolen bitcoins had been transferred and immediately notified California Defendant as to same. *Id*. at ¶ 6 and Exhibit B, Jan. 10, 2011 at 4:44 A.M. email. California defendant traced the transaction and determined that another one of his account holders

4

("Baron") on his MTGOX exchange had stolen the bitcoins from the Raggios' MTGOX account and moved them into his own MTGOX account.    *See* Exhibit A at ¶ 7 and Exhibit C pps. 74-75, Deposition of Jeb McCaleb.    The California Defendant testified that once it was discovered that stolen bitcoins had been moved to another MTGOX account he froze the suspect account which contained bitcoins and approximately $45,000.00.    *See* Exhibit C at 75 and 79.

Unbeknownst to the Doctors, in February 2011, California Defendant partnered with Tibanne K.K., which is owned by Defendant Mark Karpeles, by selling a majority interest of the MTGOX business.    *See* Exhibit D.    Karpeles is a Frenchman with a conviction of computer fraud who had absconded to Japan to avoid serving his prison sentence.    California Defendant continued to act as an administrator at MTGOX throughout 2011 and 2012.    *See* Exhibits E, F, and G, emails between Doctors and Jeb McCaleb.    After the partnering with Mark Karpeles, Karpeles left it to his partner, Defendant McCaleb, to conduct the investigation as to the Doctors' bitcoins.    *See* Exhibit H, February 12 -14 emails between partners Mark Karpeles and Jed McCaleb.    The Raggios did not learn until late February of 2011, that the California Defendant had partner with Mark Karpeles until online news accounts reported that MTGOX had been sold.

*Id*. at ¶ 9.    He was not informed by California Defendant he was partnering with Karpeles, a convicted fugitive.    *Id*. at ¶ 10.    Furthermore, California Defendant never informed the Raggios that he was continuing his own work with MTGOX as an administrator and that that he still owned a minority of MTGOX.    *Id*.

Throughout February the California Defendant made several misrepresentations to the Doctors regarding their bitcoins, writing on February 12, 2011, "Still investigating.    It will take a while I think to be sure."    *See* Exhibit I, February 12, 2011 at 1:55 PM email.    During    this

time, California Defendant made contact with Baron, the thief.   *See* Exhibit C, Deposition of Jed

McCaleb, pps. 76-78.   On February 26, 2011, California Defendant represented to Chris Raggio

the following:

> "It looks like at the very least this guy is going to give your coins back.  ***I want
> to wait longer though to gather more evidence if he is in fact related to the other
> fraud that has happened on the site***. (emphasis added)"

*See* Exhibit A at ¶ 11 and Exhibit J, Feb 26, 2011 at 9:33 A.M. email.   Chris Raggio wrote back

stating "Obviously I'd like the coins returned as soon as possible but it sounds like they have some

value to in terms of conducting our investigation (sic) into further fraud on the site."   *Id.* at ¶ 11

and Exhibit J, February 26, 2011 at 3:19 PM email.   While Chris Raggio wanted delivery of the

bitcoins as soon as possible, he agreed to delay delivery pursuant to the California Defendant's

request.   *Id*.   At all times, through both email and telephone conversations, California Defendant

asserted to the Doctors they would receive their bitcoins.   *Id*. at ¶ 13 and Exhibits F and J.

It was not until March 7, 2011, that the Doctors learned from California Defendant that

Defendant Karpeles, the convicted Frenchman and fugitive from justice, would now be handling

the matter of the stolen bitcoins.   *See* Raggio Affidavit at ¶ 12 and Exhibit J Mar 7, 2011 at 7:19

A.M. email.   Within the email, California Defendant represented:

> "Yeah Mark is the new owner and he will handle getting your coins back.   It will
> still take awhile though since he has to wait to be sure baron is bluffing ***about suing
> us etc.***"   (emphasis added)   *Id.*

After the March 7, 2011 email from California Defendant, Chris Raggio began to

communicate with Defendant Karpeles to obtain delivery the bitcoins that had been placed in

safekeeping by the California Defendant.   *See* Exhibit A at ¶ 14 and Exhibit J.   Throughout the

rest of 2011, Mark Karpeles made representations to the Doctors that the Raggio's bitcoins, which

had been put into safekeeping would be delivered as soon as he obtained legal authority in Japan. *Id.* and Exhibit J.   No authority was ever obtained.   *See* Exhibit A at ¶ 16.   On December 27, 2011, in response to an email from Chris Raggio, the California Defendant, and Karpeles' partner, continued his representations that the Doctors would receive delivery of their bitcoins which he had put into safekeeping, writing, "I'm sure he (Mark Karpeles) will eventually give it back to you.   I know he is trying to do everything very by the book so I think he had to wait for legal reasons."   *See* Exhibit A at 15 and Exhibit F, December 27, 2011 at 1:16 PM email.

In January 2012, the Doctors retained Japanese counsel to make contact with Mark Karpeles.   *See* Exhibit A at ¶ 16.   Defendant Karpeles (as Tibanne K.K.) would subsequently state, that upon buying MTGOX, he had not assumed any of the liabilities, only the assets.   *Id.* and Exhibit K.   Suit in this matter was filed on March 5, 2014 against numerous defendants.   Four days later, on March 9, 2014, MTGOX filed for bankruptcy protection in the Japan.   On April 25, 2015, MTGOX filed for bankruptcy protection in Bankruptcy Court for the Northern District of Texas, to temporarily halt U.S. legal action by traders who insisted the MTGOX operation was a fraud.

The crux of the California Defendants' summary judgment motion is that the statute of limitations ran on all claims asserted by the Doctors.   It is apparent on its face that no limitation period expired prior to the Doctors filing suit in that the Doctors' Complaint is predicated on the Defendant's failure to deliver the bitcoins.

## II.  SUMMARY JUDGMENT STANDARD

Miss. R. Civ. P. 56 states in relevant part that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

7

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   Miss. R. Civ. P. 56 summary judgment should generally be denied where the record is incomplete with regard to a material fact.   *Prescott v. Leaf River Forest Products, Inc.*, 740 So. 2d 301 (Miss. 1999).   The Mississippi Supreme Court addressed the issue of summary judgment in the case of *Miller v. Meeks*, 762 So. 2d 302 (Miss. 2000), per the Court:

> "An issue of fact may be present where there is more than one reasonable interpretation of undisputed testimony, where materially different but reasonable interpretations may be drawn from uncontradicted evidentiary facts, or when the purported establishment of the facts has been sufficiently incomplete or inadequate that the trial judge cannot say with reasonable confidence that the full facts of the matter have been disclosed."

Summary judgment is improper where the court merely believes it unlikely that the non-moving party will prevail at trial.   *National Screen Serv. Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651, (5th Cir. 1962).   "[T]he court cannot try issues of fact on a Rule 56 Motion; it may only determine whether there are issues to be tired."   Miss. R. Civ. P. cmt.   The court, therefore, must not "resolve factual disputes by weighing conflicting evidence, . . . since it is the province of the jury to assess the probative value of the evidence."   *Kennett-Murray Corp. v. Bone,* 662 F.2d 887, 892 (5th Cir. 1980).

The Mississippi Supreme Court has held that summary judgment should be granted only with great caution. *Womble v. Singing River Hospital*, 618 So. 2d 1252, 1256 (Miss. 1993.).   The Mississippi Supreme Court has further recognized:

> All motions for summary judgment should be viewed with great skepticism and if the trial court is to err, it is better to err on the side of denying the motion. When doubt exists whether there is a fact issue, the non-moving party gets its benefit.   Indeed, the party against whom the summary judgment is sought should be given the benefit of every reasonable doubt.

*Robinson v. Cobb*, 763 So. 2d 883, 886 (Miss. 2000).   Unless the trial court finds "beyond a reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim", a motion for summary judgment should be denied.   *Palmer v. Anderson Infirmary Benevolent Ass'n,* 656, So. 2d 790, 795 (Miss. 1995).   All that is required of a nonmoving party to survive a motion for summary judgment is to establish a genuine issue of material fact by means available under Miss. R. Civ. P. 56(c).   *Dailey v. Methodist Medical Center*, 790 So. 2d 903 (Miss. Ct. App. 2001); *Lyle v. Mladinich*, 584 So. 2d 397, 398 (Miss. 1991). In applying the summary judgment standard, the Court should review all evidentiary matters in the record to include depositions admissions and interrogatories.   *Seymour v. Brunswick Corp.*, 655 So 2d 892, 894 (Miss. 1995). The evidence is viewed in the light most favorable to the non-moving party, and they are given the benefit of every reasonable doubt.   *Mississippi Ins. Guar Ass'n v. Harkins & Co*., 652 So. 2d 732, 735 Miss. 1995).

## III.   **THE DOCTORS' CLAIMS ARE PREMISED ON THE FAILURE TO DELIVER THE BITCOINS TO THEIR RIGHTFUL OWNERS, NOT THE THEFT OF THE BITCOINS.**

The Doctors have filed claims for breach of the Mississippi Uniform Commercial Code, breach of contract, conspiracy, account stated, negligence, conversion, and specific performance. The California Defendants' argument that the claims are time barred are misplaced, as the bulk of the Doctors' claims, which have either a six or three-year statute of limitation, are not based on the hacking of their account and theft of their bitcoins, ***but upon the California Defendants' failure to deliver the coins to their rightful owners***.   *See* Exhibit L, Complaint.

It is pivotal in this matter that while the bitcoins in question were taken from the Doctors'

MTGOX account, these bitcoins were subsequently placed into another MTGOX account which also contained $45,000.00 and that the account was frozen by the California Defendant.  At any time, the stolen bitcoins could had been delivered to their rightful owners, if not for the misrepresentations and deceptions of the California Defendants.

The very earliest the statute of limitations on any claim could have begun to run as to the California Defendants would have been when Mark Karpeles disavowed buying any liabilities from the California in March of 2012.  Accordingly, the Doctor's claims were timely filed on March 5, 2014.

A. **California Defendants are Not Entitled to Summary Judgment on the Plaintiffs' Claims Governed by a Three-Year Statute of Limitation.**

A defendant bears the burden of showing a claim is barred by an applicable statute of limitations.  *Jenkins v. Pensacola Health Tr., Inc*., 933 So. 2d 923, 927 (Miss. 2006).  To show that a suit is barred by a statute of limitations, a defendant must prove that the relevant cause of action accrued outside the statute's limitation period.  *Id*.  This burden requires a defendant to "show that the claims for which [a plaintiff] did not provide a specific date of occurrence were barred by [the] statute [of limitations]."  *Id*.

A cursory review of the Doctors' Complaint reveals that the bulk of the Doctors' claims are based on the fact that their coins were not delivered as promised by the Defendants.[1] Paragraph 23 of the Complaint states the Defendants "failed to return the Raggios their bitcoins."

---

[1] The Doctors' claim for negligence is based on, but not limited to, the failure of the Defendants' to utilize reasonable and practical safeguards to protects the Doctors' bitcoins by utilizing adequate password protection. Even if the statute of limitations on this claim began to run on the January 9, 2011 date of the theft of the bitcoins, the evidence shows that the repeated misrepresentations of the Defendants, as discussed below, tolled the statute of limitations.

10

See Exhibit L at ¶ 23.   The Doctors' claim for breach of the Mississippi Uniform Commercial Code is predicated on "not delivering the 9,400 bitcoins that were ordered and paid in full by the Raggios…"   *Id*. at ¶ 24.   The breach of contract claim is based on the Defendants' breach by failing "to deliver said bitcoins."   *Id*. at ¶ 25.   The Doctors' account stated claim is predicated on the Defendants' failure and refusal "to return the remainder of the bitcoins, despite Plaintiffs' demands that they do so."   *Id*. at ¶ 35.   The conversion claim is based on the Defendants converting and taking "unlawful possession of, said bitcoins for their own use and benefit by refusing to return all of the bitcoin paid for and belonging to Plaintiffs."   *Id*. at ¶ 43.   It follows that the claims for a constructive trust and for specific performance are also based upon the failure to deliver the bitcoins. *Id*. at ¶ s 46-50.

In this case, there is no question that the bulk of the Doctors' claims did not accrue until Mark Karpeles disavowed any responsibility regarding the bitcoins in March of 2012. Accordingly, the Defendants' motion for summary judgment should be denied.

### B.   A Six Year Statute of Limitations Applies to the Doctors' Breach of Contract Claim under the Mississippi Uniform Commercial Code.

The California Defendants argue that the Doctors' claim for breach of contract under the Mississippi UCC, of which a six-year statute of limitation would apply, must fail in that bitcoins are not goods.   However, the California Defendants fail to cite to any case law for this proposition.

Miss. Code Ann. § 75-2-105 (1) defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for the sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."   Miss. Code Ann. § 75-2-105 (2017).   Bitcoins are indeed "things" as defined by the UCC in that bitcoins "have a specified form and nothing about the term "thing" implies they must

take physical form."  *See* Exhibit M, *Initial Thoughts on Applicability of UCC and ICITA*, The

BTC Law Blog, (Nov. 17, 2013) (available at http://www.btcblog.com/ucc-ucita-initla-thoughts)

(discussing that bitcoins are goods under the UCC).   Bitcoins may take a physical form and may

be moved.  *Id*.

The Internal Revenue Service has determined unequivocally that bitcoins are property.

*See* Internal Revenue Serv., Notice 2014-21, IRS Virtual Currency Guidance (Apr. 14, 2014)

(available at http://www.irs.gov/irb/2014-16_IRB/ar12.html).

Bitcoins clearly fit the definition of "goods" under the Mississippi Uniform Commercial

Code and, thus, a six-year statute of limitation applies to the Doctors' claim for breach under the

Mississippi UCC.   The California Defendants' motion as to this claim should be denied.

## IV.   **EVEN IF THE DOCTORS' CLAIMS WERE GOVERNED BY A THREE-YEAR STATUTE OF LIMITATIONS, ACCRUAL ONLY OCCURS WHEN KARPELES DISAVOWED ANY RESPONSIBILITY**

Evidence raises genuine issues of material fact about whether the California Defendants'

and Mark Karpeles's continual reassurances that the bitcoins would be delivered upon the

completion of an investigation, the later representation by the partners that a Japanese judgment

and delivery of the bitcoins was forthcoming induced the Doctors not to immediately file suit

within three years of the January 9, 2011 theft of the bitcoins.   It begs the question as to why

would the Doctors file a suit when there were repeated reassurances by the California Defendants

and Mark Karpeles that the bitcoins would be returned.   The Doctors claims are based on the

failure of the Defendants to deliver the bitcoins they purchased and which were being held for

safekeeping.

Accordingly, even if this Court reaches the conclusion that the Doctors' claims subject to

the three-year statute of limitation (breach of contract, account stated, negligence, conversion and specific performance) accrued more than three years before the Doctors sued the Defendants, the evidence raises fact questions as to whether the California Defendants are estopped from asserting limitations as a defense to the Doctors' tort claims and whether the statute of limitations were tolled by the continuing tort doctrine, fraudulent concealment and/or the discovery rule."

A.   **Genuine Issues of Material Fact Exist as to Whether the Defendants are Equitably Estopped from Asserting that the Statute of Limitations is a Defense to the Doctors' Claims.**

Mississippi has long recognized "that the doctrine of equitable estoppel may, in a proper case, be invoked to prevent [a] defendant from relying upon the statute of limitations. *Izard v. Mikell*, 163 So. 498, 499 (Miss. 1935.)   To invoke equitable estoppel in response to a statute of limitations affirmative defense, "the plaintiff must show ... that (1) it was induced by the conduct of the defendant not to file its complaint sooner, (2) resulting in its claim being barred by the applicable limitations, and (3) the defendant knew or had reason to know that such consequences would follow." *Harrison Enters., Inc. v. Trilogy Commc'ns, Inc.*, 818 So. 2d 1088, 1095 (Miss. 2002).

Equitable estoppel prevents a party from denying any material fact, induced by his or her words or conduct, upon which another person relied and changed his or her position and would suffer injury if the denial or contrary assertion was allowed. *Swartzfager v. Saul*, 2017 Miss. LEXIS 67 at 10 (Miss. Feb. 16, 2017) (quoting *Koval v. Koval*, 576 So. 2d 134, 137 (Miss. 1991). The doctrine is based on "public policy, fair dealing, good faith and justice[.]"   *Id*.   It is premised on "the belief that a person should do what he says he will do in situations where another party is injured by reliance on the first party's representations."   *Id*.   And its aim is to "forbid one to speak

13

against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." *Id.*

*Harrison* involved a suit open an open account where a seller, Trilogy, made repeated attempts to recover its debt from a buyer, Harrison Enterprises. *Harrison Enters., Inc. v. Trilogy Commc'ns, Inc.*, 818 So. 2d 1088, 1091 (Miss 2002.). Harrison responded to Trilogy's requests by asking for more time and promising to pay later. *Id.* When Trilogy finally responded to legal action, the Mississippi Supreme Court held that the equitable estoppel doctrine barred Harrison from asserting a limitations defense. *Id.* at 1096. The court's rationale is particularly noteworthy:

> The stated purpose behind the statute [of limitations] is to discourage lawsuits. Further, it is to reward the vigilant, not the negligent. It is to prevent false and stale claims. None of these concerns are exemplified here. Trilogy was trying to solve this problem without resorting to a lawsuit. Trilogy was vigilant in pursuing this debt, relying on continual reassurances by Harrison Enterprises.

*Id.*

Applying *Harrison* to analogous facts, the Mississippi Court of Appeals concluded that fact issues about whether equitable estoppel acted to toll limitations precluded summary judgment. *See Douglas Parker Elec., Inc. v. Miss. Design & Dev. Corp.*, 949 So. 2d 874, 879 (Miss App. 2007). The Court reversed a summary judgment order because the plaintiff's version of events – *taken as true, as required on summary judgment* – showed that the defendant, who had made "regular reassurances" that it would pay the plaintiff, knew or should have known that its actions would cause plaintiff to delay filing suit. *Id.* Cleary, the same reasoning applies to the case at bar.

1.    ***The Doctors were induced by the Defendants' conduct not to file their complaint sooner.***

"[I]nducement may consist either 'of an express representation that the claim will be settled without litigation or *conduct that suggests a lawsuit is not necessary.*'" *Peavey Elecs. Corp v. Baan U.S.A., Inc*., 10 So. 3d 945, 954 (Miss. Ct. App. 2009) (quoting *Miss. Dep't of Pub. Safety v. Stringer*, 748 So. 2d 662, 666 (Miss. 1999)) (emphasis added); *see also Douglas Parker*, 949 So. 2d at 879.   For instance, a party attempting to resolved a problem without resorting to a lawsuit may be "induced" not to file its complaint within the limitations period by "continual reassurances" that the other party will perform its obligations.   *See Harrison*, 818 So.2d at 1096; *see also Izard v. Mikell*, 163 So. 498, 499, (Miss. 1935) (holding that estoppel tolls limitations when a plaintiff is induced "to believe that an amicable adjustment of the claim will be made without suit"); *Douglas Parker*, 949 So. 2d at 879.

While the Doctors' complaint is predicated upon the Defendants' failure to rightfully deliver the bitcoins, assuming *arguendo* that the Doctors filed suit more than three years after the claims accrued, the evidence clearly raises a fact issue about whether the Defendants' continuing reassurances that once an investigation was completed and/or a Japanese judgment was obtained the Defendants would deliver the bitcoins induced the Doctors not to file suit within three years of the claims accruing.

Numerous emails document communications between the Doctors, the California Defendant, and Mark Karpeles after the January 9, 2011 theft of the Doctors' bitcoins.   *See* Exhibits E, F, G, I and J.   From February 2011 to December 2011, the Defendants made representations that once an investigation into the theft of the bitcoins was completed and/or a Japanese judgment was obtained the Defendants would deliver the bitcoins.   *See* Exhibits F and J.   For example, the California Defendant emailed the Doctors on February 26, 2011, writing "It

looks like at the very least this guy is going to give your coins back.   *I want to wait longer though to gather more evidence if he is in fact related to other fraud that has happened on the site*." (emphasis added).   *See* Exhibit J, Feb 26, 2011 at 9:33 A.M. email. Doctor Chris Raggio sent an email back that same day, writing "Obviously I'd like the coins returned as soon as possible but it sounds like they have some value to in terms of conducting your investigaoin (sic) into further fraud on the site."   *Id*.   This is a textbook example of inducement.   The evidence of the Defendants' reassurances that the bitcoins is more than sufficient to raise a fact question on the inducement element of equitable estoppel.   *See Peavey* 10 So. 3d at 954, *Harrison*, 818 So. 2d at 1096; *Stringer* 748 So. 2d at 66; *Douglas Parker*, 959 So. 2d at 879.

**2.      The Doctor's claims were barred by the statute of limitations because of the Defendants' conduct.**

Assuming, without conceding, that the Doctors' claims governed by a three-year statute of limitation accrued on January 9, 2011 - even before the Defendants committed wrongful acts that gave rise to the Doctors' claims – the Doctors' claims would have been barred by limitations because of the Defendants' successful efforts to induce the Doctors from filing suit earlier. Accordingly, the second element of equitable estoppel is satisfied.

**3.      The Defendants' knew their conduct would cause the consequences that followed.**

The evidence favorable to the Doctors raises a fact issue about whether the Defendants' knew their conduct would cause the consequences of the Doctors arguably filing claims that are time barred by the statute of limitations.   There is ample evidence that the Defendants promised the Doctors that the bitcoins would be delivered.   The Defendants clearly knew that their actions would prevent the Doctors from immediately filing a lawsuit.   The communications indicate the

16

Doctors were trying to solve this problem without resorting to a lawsuit and were vigilant in pursing this matter.   Allowing the Defendants to hide behind the statute of limitations, despite their repeated reassurances and promises, would set bad precedent and encourage others in the future to lie to escape their obligations.

**B.**   **Genuine Issues of Material Fact Exist About Whether the Fraudulent Concealment Doctrine Tolled Limitations on the Doctors' Claims.**

Fraudulent concealment of a cause of actions tolls the statute of limitations until "the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered."   Miss. Code Ann. § 15-1-37 (2017); *see also Robinson*, 763 So. 2d at 887.   "The fraudulent concealment doctrine 'applies to any cause of action.'"   *Robinson*, 763 So. 2d 883, 887 (Miss. 2000).   The Mississippi Supreme Court has ruled that two elements are necessary to establish fraudulent concealment.   First "there must be shown some act or conduct of an affirmative nature designed and which does prevent discovery of the claim.   *Id.* at 887, quoting *Reich v. Jesco, Inc.*, 526 So. 2d 550, 552 (Miss 1988) (plaintiff must show "some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim."   *See also Andrus v. Ellis*, 887 So. 2d 175, 181 (Miss. 2004).   Second, a plaintiff must prove that despite his due diligence he could not have discovered the available claim.   *Robinson*, 763 So. 2d at 887. A plaintiff need only demonstrate "reasonable diligence to discover the fraud sooner, or show that he could not, with reasonable diligence have done so.   *New York Life Ins. Co., v. Gill*, 182 So. 109, 113-114 (Miss. 1938).

**1.**   ***The Defendants took affirmative actions to prevent discovery of the Doctors' claims.***

The Doctors could not have discovered their cause of action until receipt of the March 2012

17

letter from Mark Karpeles stating "…we inherited only the assets related to the Bitcoin Exchange Service and we never inherited the debt which the former owner of the Exchange Service had incurred." *See* Exhibit K.  (translated from Japanese).   Continuing false representations are affirmative acts that constitute fraudulent concealment, tolling the limitations period.  *Lundy v. Hazlett*, 147 Miss. 808, 821 (1927).   By continuous acts of false representation, the Defendants prevented the Doctors from discovering their claims.   The California Defendant made multiple false representations and repeatedly mislead the Doctors that he was conducting an investigation and that once the investigation was completed their bitcoins would be delivered.  *See* Exhibits I and J.   Not only did the California Defendant mislead the Doctors in this regard, he also hid the fact that he had sold a majority interest of MTGOX to Mark Karpeles.  *See* Exhibit A at ¶ 10. Even after the sale of an majority interest in MTGOX, the California Defendant held an interest in MTGOX and was reached at MTGOX email address.  *See* Exhibits E, F G, I and J.   Mark Karpeles made continuing false representations to the Doctors about an "investigation" and a "judgment" from a Japanese Court.  *See* Exhibit J.

**2.       *The Doctors exercised due diligence in trying to discover its claims.***

Immediately upon realizing bitcoins were missing from their account, the Doctors notified the California Defendant and began a yearlong exercise in due diligence.  *See* Exhibit B.   In return they were promised an investigation was taking place and that that their bitcoins needed to be held to investigate other fraud on the MTOGX site.  *See* Exhibit I and J.   Throughout 2011, the Doctors made repeated contact with the Defendants about the status of the investigation and as to the judgment Mark Karpeles promised he was seeking.  *Id.*   In fact, on August 1, 2011, Chris Raggio asked Mark Karpeles for an update and a docket number.  *See* Exhibit J.   Karpeles wrote

back stating that there would be no judgment in Japan until 2012 due to the natural disaster that had taken place in the country.  *Id*.  In December of 2011, Chris Raggio emailed Mark Karpeles informing him it has been almost a year and that he wanted the bitcoins back.  *Id*.  At the same time, Chris Raggio emailed the California Defendant and reiterated the context of his email to Mark Karpeles.  *See* Exhibit F.  The California Defendant responded six days later, on December 27, writing "I'm sure he will eventually give it back to you.  I know he is trying to do everything very by the book so I think he had to wait for legal reasons."  *Id*.  The following month the Doctors retained Japanese attorneys and subsequently discovered that Karpeles disavowed any liability in this matter as referenced above.  *See* Exhibit K.

The fact that the Doctors were attempting to obtain additional knowledge about the "investigation" and "judgment" concerning their stolen bitcoins raises a fact issue on the second element of the fraudulent concealment doctrine.  Accordingly, summary judgment should be precluded.

### C.    Genuine Issues of Material Fact Exist as to When the Doctors' Claims Accrued Under the Continuing Tort Doctrine.

The Mississippi Supreme Court has defined the continuing tort doctrine as follows:

[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong.

A "continuing tort" is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.

*Estate of Fedrick v. Quorum Health Res., Inc*., 45 So. 3d 641, 643 (Miss. 2010) (quoting *Stevens*

*v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993)).

For example, the continuing tort doctrine has been applied to a claim for negligence arising out of a nursing home's negligent failure to place a patient on a restorative feeding program. *Quorum,* 45 So. 3d at 643.   In so holding, the *Quorum* court noted that the patient "needed feeding assistance throughout this entire period; therefore, a tortious omission may have occurred every day that the defendants failed to provide her this kind of assistance.  *Id*.  These allegations fit within the definition of a continuing tort, that is one inflicted over a period of time [involving] wrongful conduct that is repeated until desisted." *Id.*   In contrast, the doctrine did not toll the state of limitations for an emotional distress claim arising out of a single act of misconduct – the filing of a frivolous lawsuit.   See Randolph v. Lambert, 926 So. 2d 941. 945 (Miss. App. 2006).   The crucial distinction is whether the alleged harm resulted from a single act or from "continuing unlawful acts."  *Id.*

Here, the Doctors' claims arise out of the Defendants' continuing misrepresentations that their bitcoins would be delivered.   These misrepresentations began in February of 2011, when the California Defendant represented he wanted to wait to gather evidence about fraud that had taken place on MTGOX before delivering the bitcoins to the Doctors.   *See* Exhibit J.   The misrepresentations continued when Mark Karpeles made repeated false promises on March 14, 2011 where he wrote "We are currently trying to escalate the issue to obtain a judgment that would tell us what to do with the stolen coins.   We cannot just return them based on a decision taken on our own."  *Id*.   Again, on August 1, 2011, Karpeles writes "There will be no judgment done in Japan before 2012 on that case…"  *Id*.   Again, on December 27, 2011, the California Defendant responding to Doctor Chris Raggio's email informing him that the one year anniversary of the

theft was approaching, writes back (and from a MTGOX email address) stating "I'm sure he (Karpeles) will eventually give it to you.   I know he is trying to do everything by the book so I think he had to wait for legal reasons."   *See* Exhibit F.

Even after the Doctors were vigilant and inquired about the delviery of their bitcoins in several emails over the course of 2011, the Defendants continued to reassure the Doctors that they were being taken care of even though the Defendants never attempted to obtain a judgment regarding the bitcoins and that the bitcoins could have been delivered at any time.   Each and every one of these acts by the Defendants were "continuing unlawful acts."

In sum, the evidence most favorable to the Doctors raise fact issues about whether the Defendants engaged in repeated acts of wrongful conduct sufficient to toll the statute of limitations under the continuing tort doctrine.   Accordingly, this honorable court should deny the California Defendant's motion for summary judgment on these claims.

### D.   Genuine Issues of Material Fact Exist as to Whether the Discovery Rule Tolled the Statute of Limitations on the Doctors' Claims.

The discovery rule applies to toll limitations until "a plaintiff 'should have reasonable known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent.'"   *Boyles v. Schlumberger Tech. Corp.*, 832 So. 2d 503, 506 (Miss. 2002) (quoting Sarris v. Smith, 782 So. 2d 721, 725 (Miss. 2001)).   The statute of limitations begins to run "when the [plaintiff] can reasonably to be held to have knowledge of the injury itself; the cause of the injury, and the causative relationship between the injury and the conduct of the [defendant]."   *Boyles* 782 So. 2d at 725. (quoting *Smith v. Sanders*, 485 So. 2d 1051, 1052 (Miss. 1986)).

At issue in all cases is when a plaintiff discovers his or her injury.   *Sweeny v. Preston*, 642

So. 2d 332, 334 (Miss. 1994).   In *Sweeney*, the Mississippi Supreme Court noted that, "knowledge that there exists a causal relationship between the negligent act and the injury or disease complained of is essential because 'it is well-established that prescription does not run against one who has neither actual nor constructive notice of the facts that would entitle him to bring an action.'"   *Id*.   Whether a plaintiff knew about the injury has typically been reserved as a jury question.   *Barnes v. Singing River Hosp. Sys*., 733 So. 2d 199 (Miss. 1999).

Without a latent injury, the discovery rule cannot apply.   *PPG Architectural Finishes, Inc. v. Lowrey*, 909 So. 2d 47, 50 (Miss. 2005).   Latent injury "is defined as one where the plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question…[or] when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act."   *Id*.   To be latent, an injury "must be undiscoverable by reasonable methods."   *Id*. at 51.   "[T]o claim benefit of the discovery rule, a plaintiff must be reasonably diligent in investigating the circumstances surrounding the injury. The focus is on the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury."   *Wayne Gen. Hosp. v. Hayes*, 868 So. 2d 997, 1001 (Miss. 2004).

The behavior of the Defendants misrepresentations prevented the Doctors from discovering they had been injured.   In response to the Doctors' emails about the delivery of their bitcoins throughout 2011, they received false reassurances from the Defendants that delivery of the bitcoins was forthcoming, but that a Japanese judgment had to be obtained.   *See* Exhibits F and J.   Based on these false representations, they had no knowledge of any injury until Karpeles stated in the March 2012 letter that he did not purchase any liabilities and was not responsible for the lost

bitcoins.   *See* Exhibit K.

Because the Doctors could not have reasonably have known about their injury – much less, about the causative relationship between its injury and the Defendants' misconduct – the Doctor's tort claims did not accrue until receipt of the March 2012 letter.   Fact issues about the discovery rule's application precludes summary judgment.

## V.      CONCLUSION

The evidence shows that the California Defendants have not met their burden of showing that there is an absence of genuine issue of material fact as to any of the Doctors' claims.   The statute of limitations in this cause could not have begun to accrue until the March 2012 disavowal of any responsibility regarding the bitcoins.   Accordingly, the Defendants' motion for summary judgment should be denied.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs request this Court deny the Defendants' Motion for Summary Judgment.   The Plaintiffs also request any other relief that the court deems appropriate.

Respectfully submitted this the 7th day of April, 2017.

s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**OF COUNSEL:**
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
114 West Center Street
Canton, MS 39046
Phone: (601) 825-1111
Fax: (601) 957-6554

## CERTIFICATE OF SERVICE

23

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

      Edwin S. Gault, Jr., Esq.
      Mandie B. Robinson, Esq.
      Forman Watkins & Krutz LLP
      200 South Lamar Street, Suite 100
      Jackson, Mississippi 39201-4099

      Ethan Jacobs, Esq.
      Keller Sloan Roman Holland, LLP
      555 Montgomery Street, 17th Floor
      San Francisco, CA 94111
      ejacobs@ksrh.com

      Respectfully submitted, this the 7th day of April. 2017.

             s/ Charles B. Martin
              CHARLES "BRAD" MARTIN, MSB# 100767

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**                                                    **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**VS.**                                                    **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**          **DEFENDANTS**

### AFFIDAVIT OF CHRIS RAGGIO

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

I, Chris Raggio, being duly sworn, deposed and says:

1.      I am one of the Plaintiffs in the matter of Donald Raggio and Chris Raggio vs. MTGOX,
et. al, In the Circuit Court of Hinds County, First Judicial District, Cause No. 14-71, and I have
personal knowledge of the facts set forth in this affidavit.

2.      In December 2010, I opened an account (hereinafter the "Raggio Account") on the
MTGOX bitcoin exchange with my father, Don Raggio.  The account was funded with a wire
transfer from my father's bank account to Defendant McCaleb.

3.      After the account was funded, I began to purchase bitcoins which were placed into the
MTGOX account.

4.      My father and I were limited in the amount of bitcoins that could be withdrawn on a daily
basis.

5.      On January 9, 2011, I noticed that someone had conducted unauthorized withdrawals on
the account and notified Defendant McCaleb.

6.    The following day, on January 10, I discovered the electronic address/account at which the stolen bitcoins had been moved and I informed Defendant McCaleb as to same.

7.    It was subsequently discovered that another MTGOX account holder named "Baron" had purportedly stolen the bitcoins from the Raggio account.

8.    Defendant McCaleb took control and froze both the Baron account, which contained $45,000 and stolen bitcoins, and the Raggio Account.

9.    In late February 2011, I discovered from online news sources that Defendant McCaleb had sold MTGOX to Defendant Tibanne K.K., which was owned by Defendant Mark Karpeles.

10.   Defendant McCaleb never informed me that he was selling MTGOX, whether he retained any ownership interest in MTGOX nor did he inform me of what role, if any, he would retain in MTGOX.  Defendant McCaleb also failed to inform me that Defendant Karpeles was a convicted fugitive.

11.   On February 26, 2011, Defendant McCaleb sent me an email stating he wanted to wait to get my coins back until he had time to gather evidence that Baron was related to other fraud that had taken place on the MTGOX exchange.  I responded the same day letting the Defendant know that while I wanted the coins back, I understood the coins had value for the Defendant's investigation.

12.   On March 6, 2011, I emailed Defendant McCaleb to ask if I needed to direct my communications to the new owner of MTGOX.   The following day Defendant McCaleb responded in the affirmative.

13.   At all times, Defendant McCaleb made written and oral representations that I would receive my bitcoins back once an investigation was completed.

14.   I began to correspond thereafter with Defendant Karpeles, who also promised I would receive my bitcoins back once an investigation was completed and/or a judgment was obtained in Japan.

15.   On December 21, 2011, I emailed Defendant McCaleb informing him as to my recent communications with Mark Karpeles concerning the bitcoins.   On December 27, 2011,

Defendant McCaleb responded that he would talk to Karpeles and that "I'm sure he will eventually give it to you. I know he is trying to do everything by the book so I think he had to wait for legal reasons."

16.    After I retained Japanese counsel to investigate this matter in January of 2012, Defendant Tibanne K.K. made a representation in March of 2012 that they only inherited the assets related to the bitcoin exchange and never inherited the debt that Defendant McCaleb had incurred. Furthermore, Defendant Tibanne K.K. disavowed any responsibility. No Japanese judgment was ever obtained.

17. I delayed filing a suit in this matter because I relied on the representations that were made to me by the Defendants in this cause.

STATE OF _CALIFORNIA_
COUNTY OF _MARIN_

PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority in and for the aforesaid jurisdiction, Chris Raggio, who, having been by me first duly sworn stated on his/her oath that the matters and things contained in the foregoing Affidavit are true and correct as therein stated.

_____
CHRIS RAGGIO

SWORN TO AND SUBSCRIBED BEFORE ME, this the ___ day of _____, 2017.

_____
NOTARY PUBLIC

My Commission Expires:

SEE ATTACHED
California
All-Purpose Acknowledgement/
Jurat

# California Jurat Certificate

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of** _____MARIN_____ } s.s.

Subscribed and sworn to (or affirmed) before me on this _04th_ day of _April_,

20 _17_, by _Christopher Raggio_ and _____
Name of Signer (1)

_____, proved to me on the basis of
Name of Signer (2)

satisfactory evidence to be the person(s) who appeared before me.

_Neeraja Chandupatla_
Signature of Notary Public

NEERAJA CHANDUPATLA
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2164709
MARIN COUNTY
My Comm. Exp. October 12, 2020

_____
For other required information (Notary Name, Commission No. etc.)

Seal

──────────── *OPTIONAL INFORMATION* ────────────

*Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this jurat to an unauthorized document and may prove useful to persons relying on the attached document.*

**Description of Attached Document**

The certificate is attached to a document titled/for the purpose of

_Affidavit of Chris Raggio._

containing _3_ pages, and dated _4/04/2017_

**Additional Information**

Method of Affiant Identification

Proved to me on the basis of satisfactory evidence:
○ form(s) of identification  ○ credible witness(es)

Notarial event is detailed in notary journal on:

Page # _____  Entry # _____

Notary contact: _____

Other

☐ Affiant(s) Thumbprint(s)  ☐ Describe: _____

© 2009-2015 Notary Learning Center - All Rights Reserved   You can purchase copies of this form from our web site at www.TheNotarysStore.com

2/12/12                                    Gmail - account funded by wire

                                    Don Raggio <donald.raggio@gmail.com>

# account funded by wire

65 messages

---

**Don Raggio <donald.raggio@gmail.com>**                           **Mon, Dec 20, 2010 at 11:30 PM**
To: info@mtgox.com

Hello,

I'm based in the US.  I would like set up a Mt Gox account (right now I am having difficulty) and fund it with a wire
transfer of $25000 USD.   Can you help me with the wire transfer.  Please give me the account and wire
instructions.

Thanks,

Don

---

**Jed McCaleb <admin@mtgox.com>**                                  **Tue, Dec 21, 2010 at 6:19 AM**
To: Don Raggio <donald.raggio@gmail.com>

Hi Don,
You can send the wire to:
Jed McCaleb
Chase
SWIFT: CHASUS33XXX
routing#: 021272723
account#: 3160195000

My bank charges $15 for an incoming wire from the US and I think $50
for an international one.
Send me an email letting me know the amount you sent so I can keep an
eye out for it.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                           **Tue, Dec 21, 2010 at 10:01 AM**
To: Jed McCaleb <admin@mtgox.com>

Ok I created an account called donraggio.   Can you place the funds in
that account?   Thanks for your help.

Don
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                           **Tue, Dec 21, 2010 at 10:03 AM**
To: Jed McCaleb <admin@mtgox.com>

Let me know if you can put it in the donraggio account.   I'll wire
the money and let you know when it is sent.

Don

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    **Tue, Dec 21, 2010 at 10:39 AM**
To: Jed McCaleb <admin@mtgox.com>

Is it ok if I give you a call and talk about this.   I just have some
questions about doing the wire.   I appreciate you taking the time.
My number is 6016725100

Don

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                           **Tue, Dec 21, 2010 at 3:30 PM**
To: Don Raggio <donald.raggio@gmail.com>

Hi Don,
Yeah I can put it in that account.
I'm actually on vacation right now so it is hard to call. Can I call
you thursday?
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    **Tue, Dec 21, 2010 at 9:16 PM**
To: Jed McCaleb <admin@mtgox.com>

Is it ok if I send $5000 to start?

Don

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                           **Wed, Dec 22, 2010 at 1:05 AM**
To: Don Raggio <donald.raggio@gmail.com>

Sure how ever much you want to send.
Thanks
Jed
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                           **Thu, Dec 23, 2010 at 6:37 AM**
To: Don Raggio <donald.raggio@gmail.com>

Hi Don,
I'm around today. If you still want me to call you I can.
Thanks,

RAGGIO   00025

Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                                          Thu, Dec 23, 2010 at 9:50 AM
To: Jed McCaleb <admin@mtgox.com>

What number can I reach you at?

Don

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                                                  Thu, Dec 23, 2010 at 11:16 AM
To: Don Raggio <donald.raggio@gmail.com>

(917) 740-7509 but let me know when you want to call so I'll be around.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                                          Fri, Dec 24, 2010 at 8:55 AM
To: Jed McCaleb <admin@mtgox.com>

I'm going to send $5000 to be placed in the donraggio account on mt
gox.   Thanks.   I'll send the wire today.   If you have any questions
you can reach me at 6016725100

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                                          Fri, Dec 24, 2010 at 9:15 AM
To: Jed McCaleb <admin@mtgox.com>

Funds should be wired today.
Thanks

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                                                  Fri, Dec 24, 2010 at 10:01 AM
To: Don Raggio <donald.raggio@gmail.com>

Ok great I'll be looking for it.
Thanks,
Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                                          Fri, Dec 24, 2010 at 9:11 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

   Please let me know when to expect it to be in the account.
Thanks for your help.   Chris

Don

[Quoted text hidden]

RAGGIO   00026

**Don Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>                    Sat, Dec 25, 2010 at 12:28 AM

Jed,

Please let me know when to expect it to be in the account.   Thanks

Don
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**
To: Don Raggio <donald.raggio@gmail.com>            Sat, Dec 25, 2010 at 6:29 AM

It is there now.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>                   Mon, Dec 27, 2010 at 9:58 AM

Thanks.   The wire worked fine.   May I send another for $15000 to be
placed in my account?
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**
To: Don Raggio <donald.raggio@gmail.com>           Mon, Dec 27, 2010 at 10:08 AM

Yep I'll look out for it.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>                   Mon, Dec 27, 2010 at 12:26 PM

Sent it.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>                    Mon, Dec 27, 2010 at 2:05 PM

Hey, I'm looking to make a bulk purchase with the USD I sent.   Can you tell me how I can get the best deal for
the money?   Do you have any large bulk sellers or anyone that would place a large dark pool order?

Donald

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Mon, Dec 27, 2010 at 3:15 PM

Gmail - account funded by wire

To: Don Raggio <donald.raggio@gmail.com>

Hi Donald,
Well it depends on how fast you are hoping to convert the $ to BTC.
I'd suggest placing a large dark pool order around .27 and then you
will pick up any BTC that people are trying to sell. but it will
probably take a few days to get filled.
I see your wire as pending. it will probably clear by tomorrow.
Thanks,
Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                        Tue, Dec 28, 2010 at 12:27 PM
To: Jed McCaleb <admin@mtgox.com>

Ok, waiting for it to fill.  We'll see how the market plays out.

Don

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                        Tue, Dec 28, 2010 at 2:02 PM
To: Jed McCaleb <admin@mtgox.com>

Ok,  once the wire clears I'll try the dark pool order as you
suggested.    Thanks for the advice.

Don

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                        Tue, Dec 28, 2010 at 2:08 PM
To: Don Raggio <donald.raggio@gmail.com>

Oh it cleared this morning. I thought I saw you trading it.
Thanks,
Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                        Tue, Dec 28, 2010 at 6:30 PM
To: Jed McCaleb <admin@mtgox.com>

Yeah, I was able to make the trade.   Thanks for your help.     If I
need to am I able to make withdrawals via wire or ACH transfer?   How
would I go about doing it?

Thanks

Don

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                        Tue, Dec 28, 2010 at 7:53 PM
To: Don Raggio <donald.raggio@gmail.com>

Yeah I can ACH you your money back if you need it. That is the

cheapest option. I'll just need your account and routing number.

Also I noticed you have your dark pool order set to "Dark pool only".
You might want to set it to "dark pool and normal" so you can pick up
the trades as people sell small amounts of BTC. The "only" option will
just fill from other dark pool orders which will take longer to
happen.
Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Wed, Dec 29, 2010 at 5:49 AM
To: Jed McCaleb <admin@mtgox.com>

Jed can you send me 10,000 USD from my account?

My information is

Routing number 084201278

Account 03105229

If ACH won't work do you need more information to wire it to my
BancorpSouth account?   Let me know if there is a fee for wiring.
Thanks for your service.

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Wed, Dec 29, 2010 at 6:31 AM
To: Don Raggio <donald.raggio@gmail.com>

Ok no problem. I sent it back to you.
Thanks,
Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Sun, Jan 9, 2011 at 10:36 PM
To: Jed McCaleb <admin@mtgox.com>

Somebody is conducting unauthorized withdrawals on my account.  They've taken 9k in BTC so far.   I changed
the password.  Please Advise.   All were sent to 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

Don

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Sun, Jan 9, 2011 at 11:03 PM
To: Jed McCaleb <admin@mtgox.com>

Now I am trying to withdraw and I am getting invalid bitcoin address
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Mon, Jan 10, 2011 at 3:18 AM

RAGGIO  00029

6/14

To: Jed McCaleb <admin@mtgox.com>

can you give me IP address of who access my account for those withdrawals?

[Quoted text hidden]

**Jed McCaleb <admin@mtgox.com>**  Mon, Jan 10, 2011 at 3:26 AM
To: Don Raggio <donald.raggio@gmail.com>

Oh jeez that's bad.
I would go to IRC channel #bitcoin-dev and talk to theymos. He wrote a
block explorer that you can use to possibly track where the coins
went.
Any idea how someone got your password?
Jed.

[Quoted text hidden]

**Jed McCaleb <admin@mtgox.com>**  Mon, Jan 10, 2011 at 3:27 AM
To: Don Raggio <donald.raggio@gmail.com>

well I'm only storing the last login IP which was: 75.64.232.81

[Quoted text hidden]

**Donald Raggio <donald.raggio@gmail.com>**  Mon, Jan 10, 2011 at 4:14 AM
To: Jed McCaleb <admin@mtgox.com>

No I have no idea I just ran a key logger scanner and found nothing.   I ran block explored and just saw a new
address.   Is there anything I can do?

Sent from my iPhone
[Quoted text hidden]

**Donald Raggio <donald.raggio@gmail.com>**  Mon, Jan 10, 2011 at 4:15 AM
To: Jed McCaleb <admin@mtgox.com>

The last one would be me.

Sent from my iPhone
[Quoted text hidden]

**Donald Raggio <donald.raggio@gmail.com>**  Mon, Jan 10, 2011 at 4:17 AM
To: Jed McCaleb <admin@mtgox.com>

Can I withdraw my bitcoins in a few minutes?   I think last withdrawal was at 530 yesterday?

Sent from my iPhone
[Quoted text hidden]

**Donald Raggio <donald.raggio@gmail.com>**  Mon, Jan 10, 2011 at 4:19 AM
To: Jed McCaleb <admin@mtgox.com>

Can you keep monitoring the ip address and keep a log?

Gmail - account funded by wire

Sent from my iPhone

On Jan 10, 2011, at 3:27 AM, Jed McCaleb <admin@mtgox.com> wrote:

> 75.64.232.81

---

**Don Raggio <donald.raggio@gmail.com>**                         **Mon, Jan 10, 2011 at 4:44 AM**
To: Jed McCaleb <admin@mtgox.com>

Please freeze account and  send remaining bitcoin balance to
1DAFkiM5uxRDJb7UCqSX4RpRJPmh1M5ETF

Please watch
1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

This is where stolen coins went.

freeze BTCs if they come back to Mt. Gox.


Please log IPs and see if another IP tries to access account.  They most certainly will since there were 3
withdrawals in a row.


Thanks Jed.
Chris (for Don)
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              **Mon, Jan 10, 2011 at 4:51 AM**
To: Don Raggio <donald.raggio@gmail.com>

Yeah I froze the account and I'm logging all IP's on login now but you
should change the password back to the one that they have so they are
able to login still so we can see what their IP is.
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    **Mon, Jan 10, 2011 at 4:55 AM**
To: Jed McCaleb <admin@mtgox.com>

Ok I changed the password back to the one it was before.   Hopefully they will try to log in again.

Chris (for Don).

Sent from my iPhone
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    **Mon, Jan 10, 2011 at 5:11 AM**
To: Jed McCaleb <admin@mtgox.com>

The password is changed.   I just logged in and logged out.  Maybe we will get the ip of the person who did it.
My only guess is that I got hit by a keylogger.  I will scan my laptop today.   This is bad but hopefully you can
send the rest of the btcs once enough days have passed.   Thanks for your help.

Chris (for Don)

RAGGIO   00031

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    **Mon, Jan 10, 2011 at 9:32 AM**
To: Donald Raggio <donald.raggio@gmail.com>

ok someone logged in from: 192.231.69.201
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    **Mon, Jan 10, 2011 at 9:34 AM**
To: Donald Raggio <donald.raggio@gmail.com>

Maybe still you guys?
http://www.ip2location.com/free.asp
says:
MISSISSIPPI    JACKSON UNIVERSITY OF MISSISSIPPI MEDICAL CENTER
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          **Mon, Jan 10, 2011 at 11:03 AM**
To: Jed McCaleb <admin@mtgox.com>

That's us.   Thanks for checking.   Please keep watching.

Chris

Sent from my iPhone
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          **Mon, Jan 10, 2011 at 12:21 PM**
To: Jed McCaleb <admin@mtgox.com>

So right now the plan is for you to send it to my bitcoin address?   How many days will you need?   If so I won't
log in so you can see where the other party is coming from.

Chris (for Don)

Sent from my iPhone
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**             **Tue, Jan 11, 2011 at 4:49 AM**
To: Jed McCaleb <admin@mtgox.com>

Jed

once enough days have passed do you think you can send the remaining balance to:
1DAFkiM5uxRDJb7UCqSX4RpRJPmh1M5ETF    ?

Otherwise we can unfreeze the account and do daily withdrawals with a new password.

Thanks for your help and for talking ot me yesterday. Obviously this is a tough situation and I hope not to
encounter it again.   Thanks for guiding me through. I honestly don't know who could have done it.   THat's why I
was thinking it was  a key logger.   I just looked at the activity of the address in block explorer and haven't seen
any new transactions.   I haven't logged in the account since yesterday.   I don't know if the other party has

RAGGIO  00032

attempted to log in.    please let me know if you see any activity.

Thanks

Chris (for Don).
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                  Tue, Jan 11, 2011 at 7:52 AM
To: Jed McCaleb <admin@mtgox.com>

Please let me know when enough days will have passed that you can withdraw the bitcoins to my bitcoin
address.    Thanks for your help.

Chris (for Don)

Sent from my iPhone
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                           Tue, Jan 11, 2011 at 8:49 AM
To: Donald Raggio <donald.raggio@gmail.com>

I'll send it to you next monday on the 17th.
Thanks,
Jed.
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                  Wed, Jan 12, 2011 at 6:31 PM
To: Jed McCaleb <admin@mtgox.com>

Thanks for sending it on the 17th.    I logged in again just to see if there had been any activity.    I didn't see
anything logged.

Sent from my iPhone
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                  Sat, Jan 15, 2011 at 4:48 PM
To: Jed McCaleb <admin@mtgox.com>

Ok thanks for sending it monday.    Please let me know what address it's going to.    Also has anyone accessed
the account?    I logged in once.
Chris (for Don)

Thanks
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                  Mon, Jan 17, 2011 at 8:20 AM
To: Jed McCaleb <admin@mtgox.com>

Please let me know when you send it.    Please let me know if there are any problems.    Thanks for your help.

Chris (for Don)
[Quoted text hidden]

RAGGIO  00033

**Jed McCaleb <admin@mtgox.com>**
To: Donald Raggio <donald.raggio@gmail.com>

Mon, Jan 17, 2011 at 8:41 AM

ok what address do you want me to send it to?

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>

Mon, Jan 17, 2011 at 8:58 AM

Jed,
Please send entire balance to address

12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea

Please let me know if there are any problems
Thanks,

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**
To: Don Raggio <donald.raggio@gmail.com>

Mon, Jan 17, 2011 at 9:05 AM

ok there you go.
Have the stolen ones bent sent anywhere yet?
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>

Mon, Jan 17, 2011 at 9:23 AM

Jed,

Thanks for sending them out.    The stolen ones are still at the same address.   I don't know who has control over them or what he or she plans to do with them.   The log from bitcoin explorer is below.   I don't know how the password was obtained.   It wasn't an easy to guess password.   My only guess is a keylogger.   I ran software to detect one on that PC but none were found so I don't know what happened.   I guess they never bothered to login again to your site.    If they are careless enough to return them from that address to MtGox please seize them.   Let me know if you want to unfreeze my account at MtGox (and for me to change the password) or if it is just better to create a new account given what's happened.   Right now I'm just leaving it as is hoping they will login again and get their IP logged.      The information about the stolen coins is below. Good luck running your site.    I wish we could have spent more time with you discussing bitcoin's potential instead of this problem.  Maybe we'll have a chance to do that yet.   The future is very promising.

Chris (for Don)

# Address 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmM mQCh

Short link: http://blockexplorer.com/a/6C87FrVcb1

- First seen[?]: Block 101362 (2011-01-07 01:01:26)
- Received transactions: 4
- Received BTC: 9 506.33
- Sent transactions: 1
- Sent BTC: 100
- Hash160[?]: 89008dfd301ad098e368693d8bf9bcdedf78bd6c
- Public key[?]:
  04f0ceb57cc8038334c56317dc152c523f6dbb854f14f2ac63a7e9c227b9e1cee24f6bb2dcde2d9eb6f19acf57
  bd0eae4d7f9324905fa505f8a1a14b02a0b5c159

## Ledger[?]

Note: While the last "balance" is the accurate number of bitcoins available to this address, it is likely not the balance available to this person. Every time a transaction is sent, some bitcoins are usually sent back to yourself *at a new address* (not included in the Bitcoin UI), which makes the balance of a single address misleading. See the wiki for more info on transactions.

| Transaction[?] | Block[?] | Amount[?] | Type[?] | From/To[?] | Balance[?] |
|---|---|---|---|---|---|
| 691967a006... | Block 101362 (2011-01-07 01:01:26) | 100 | Received: Address | • 19n8ogD8imviHn9iZSpmUgdZgjTuDxzDwv | 100 |
| f73d2bb200... | Block 101362 (2011-01-07 01:01:26) | 100 | Sent: Address | • 1Lnfce21gYa4WMZFFR4iVUFz9F39tHmzZW  • 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ | 0 |
| 4d69213ee5... | Block 101380 (2011-01-07 02:49:29) | 3134.8 | Received: Address | • 1K5PeNuth8dtveBrAhw8c2n899gBvGKTut  • 16GanxZBBxbSeWa177iSi6Y42zirxxJLnz  • 1JCmxZiJBkQSpYEdYoukRcEz23YwrMWBzF | 3134.8 |
| a7b9ea9363... | Block 101607 (2011-01-08 10:27:16) | 3174.6 | Received: Address | • 1JSiXdtNihFuVp16pGfJeK8DBTAmAVDteV  • 19FuFSs6pVUsKrqUpnyRbZp5XGYSatpwUD  • 1CRCF7qQPV9Sybe5RUN9ZcsQfqbvXvcqyR  • 1EJxHS9F3BDME8r8gEijKVWc2rMKCD3Ssx  • 15fFrMJZkZ7YA1YRQT3PN41uKpkiRmN5ap | 6309.4 |
| | Block 101760 | | | • 1JHQRFF5P9867t9hiqmPxn9rpZUZjzb92C  • 16r2pK9zySywLi1beVRqCaRgCtW2rKkucZ  • 1MgHNzdUuNsE3N5gym5ojPuHGtPmifbosC  • 1DEY3nw7vUMXm5SoaVLxMG3rYeY5nP | |

2/12/12                                    Gmail - account funded by wire

| 14a797025a... | (2011-01-09 10:47:30) | 3096.93 | Received: Address | hmc | 9406.33 |

- 1NeJmfjhzqgpxskJrzFJoBebcjhyFaggZd
- 1Ay3N616QnNBp7bXwjKjatANHyKE2b NfHR
- 13peLjL4LDQm2tjuubYQjxYV8JhaJg QQPy
- 1LiMB3VwERw317K2RGh6ahJj3QaoTt RJG2

Bitcoin Block Explorer (beta) - Donate: 1Cwr8AsCfbbVQ2xoWiFD1Gb2VRbGsEf28

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    Sun, Jan 23, 2011 at 4:17 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

The stolen ones still haven't moved.   Can you check and see if anybody has logged in?

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              Mon, Jan 24, 2011 at 6:10 AM
To: Donald Raggio <donald.raggio@gmail.com>

No still no logins other than you.

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    Mon, Jan 24, 2011 at 6:11 AM
To: Jed McCaleb <admin@mtgox.com>

Thanks for checking.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                       Tue, Feb 1, 2011 at 8:09 PM
To: Jed McCaleb <admin@mtgox.com>

Jed, do you think we got hit by these guys running a dictionary attack?

http://www.bitcoin.org/smf/index.php?topic=3089.0

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              Tue, Feb 1, 2011 at 8:24 PM
To: Don Raggio <donald.raggio@gmail.com>

I don't think so. The attack happened after your account was stolen from. and also these guys didn't take BTC. They would just convert it to USD and take LR.
The coins still haven't moved?

[Quoted text hidden]

**Donald Raggio <donald.raggio@gmail.com>**                    Tue, Feb 1, 2011 at 9:04 PM
To: Jed McCaleb <admin@mtgox.com>

Jed
They haven't moved the coins.   I'm still not sure what happened.  I ran spyshelter a keylogger detector and didn't find anything.    Here is the block info.

[Quoted text hidden]

On Feb 1, 2011, at 8:24 PM, Jed McCaleb <admin@mtgox.com> wrote:

    1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

**Donald Raggio <donald.raggio@gmail.com>**                    Thu, Feb 10, 2011 at 6:54 AM
To: Jed McCaleb <admin@mtgox.com>

Thanks for telling me about Theymos.   It's hard for me to use IRC at work.   Maybe if we could get in touch with him he could create something that monitors that address and notifies us when they are transferred.    I would reward him and you with BTC for recovering the stolen BTC.   Does that sound like a good idea?


PS

  Thanks for creating such a cool platform.

Chris (for Don)

[Quoted text hidden]

**Jed McCaleb <admin@mtgox.com>**                    Thu, Feb 10, 2011 at 7:39 AM
To: Donald Raggio <donald.raggio@gmail.com>

Ok I sent him an email.

[Quoted text hidden]

**Don Raggio <donald.raggio@gmail.com>**                    Mon, Dec 26, 2011 at 3:43 AM
Draft To: Jed McCaleb <admin@mtgox.com>

[Quoted text hidden]

**In The Matter Of:**

*Dr. Donald Raggio and Dr. Chris Raggio v
MTGOX, a sole proprietorship, et al*

---

*Jed McCaleb 30(b)6 Representative*
*November 17, 2016*
*Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16*

---

*Aspire Reporting, LLC*
*P.O. Box 2605*
*Ridgeland, MS 39158-2605*
*1.800.73.STENO*

Original File cw111716 Jed McCaleb.txt

Min-U-Script® with Word Index

Dr. Donald Raggio and Dr. Chris Raggio vs. Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

---

**Page 1**

```
 1      IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
                   FIRST JUDICIAL DISTRICT
 2
    DR. DONALD RAGGIO
 3  DR. CHRIS RAGGIO                          PLAINTIFFS

 4  VS.                          CIVIL ACTION NO. 14-71

 5  MTGOX, a sole proprietorship;
    MTGOX, INC., a Delaware Corporation;
 6  MT.GOX KK, a Japanese Corporation;
    TIBANE KK, a Japanese Corporation;
 7  MUTUM SIGILLUM, LLC, a Delaware
    Limited Liability Company;
 8  CODE COLLECTIVE, LLC, a New York
    Limited Liability Company;
 9  JED McCALEB, an Individual;
    MARK CARPELES, an Individual;
10  JOHN DOES 1-5, and
    CORPORATE JOHN DOES 1-5           DEFENDANTS
11

12      *********************************
13      VIDEO DEPOSITION OF JED McCALEB, INDIVIDUALLY,
            AND AS 30(B)(6) REPRESENTATIVE OF
14           DEFENDANT CODE COLLECTIVE, LLC

15      *********************************
16          Taken at Forman, Watkins & Krutz,
              200 South Lamar Street, Suite 100,
17               Jackson, Mississippi,
              on Thursday, November 17, 2016,
18           beginning at approximately 10:00 a.m.
19
20      *********************************
21               CATHY M. WHITE, CCR
              Certified Court Reporter #1309
22                 Notary Public
23               ASPIRE REPORTING, LLC
                  Post Office Box 2605
24          Ridgeland, Mississippi  39158-2605
                     601.797.9240
25                  1.800.73.STENO
```

---

**Page 2**

```
 1            A P P E A R A N C E S
 2
 3  MITCHELL H. TYNER, ESQUIRE
    mitch@tynerlawfirm.com
 4  CHARLES "BRAD" MARTIN, ESQUIRE
    cbradmartin@gmail.com
 5  Tyner Law Firm
    5750 I-55 North
 6  Jackson, Mississippi  39211
    601.957.1113
 7
 8            COUNSEL FOR PLAINTIFFS
 9  EDWIN S. GAULT, JR., ESQUIRE
    Win.Gault@formanwatkins.com
10  Forman, Watkins & Krutz
    City Centre, Suite 100
11  200 South Lamar Street
    Jackson, Mississippi  39201
12  601.960.8600
13            COUNSEL FOR DEFENDANTS
14
15  VIDEOGRAPHER:  MATTHEW MAGEE
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1                   INDEX
 2  Style . . . . . . . . . . . . . . . .   1
 3  Appearances . . . . . . . . . . . . .   2
 4  Index . . . . . . . . . . . . . . . .   3
 5  Examination by Mr. Tyner  . . . . . .   4
 6  Certificate of Deponent . . . . . . . 118
 7  Certificate of Court Reporter . . . . 119
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1      VIDEOGRAPHER: Good morning.  This is the
 2  videotaped deposition of Mr. Jed McCaleb taken by
 3  counsel in the matter of Dr. Donald Raggio, et al.,
 4  versus MTGOX, a Sole Proprietorship, et al.  Today's
 5  date is November 17th, 2016.  The time is now 10 a.m.
 6  Counsel may now introduce themselves on the record.
 7      MR. TYNER: I'm Mitch Tyner representing the
 8  Raggios.
 9      MR. MARTIN: Brad Martin for the Raggios.
10      MR. GAULT: Win Gault for Jed.
11      VIDEOGRAPHER: The court reporter may now
12  swear in the witness.
13      (Witness sworn.)
14      MR. GAULT: Before we get started, there were
15  some e-mails and discussions about, you know, this
16  is -- this deposition is not limited in any way.  Are
17  we in agreement on that?
18      MR. TYNER: Yes.
19      MR. GAULT: Okay.  Thank you.
20           JED McCALEB,
21  having been duly sworn, was examined and testified as
22  follows:
23           EXAMINATION
24  BY MR. TYNER:
25      Q.  Good morning Jed.  May I call you Jed?
```

Dr. Donald Raggio and Dr. Chris Raggio
MTGOX, a sole proprietorship, et al

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16
Jed McCaleb 30(b)6 Representative
November 17, 2016

Page 5

1    A.  Sure, yeah.
2    Q.  And I'm Mitch.  We met a minute ago for the
3  first time.  Have you given a deposition before, Jed?
4    A.  No, this is the first time.
5    Q.  Okay.  I'm sure your lawyer's already told
6  you, it's relaxed, it's not like the courtroom.
7    A.  Uh-huh.
8    Q.  And here, unlike in the courtroom, you can
9  just ask if I -- I'm going to ask you some questions
10  that will be confusing.  Just get me to -- just say,
11  "Stop.  I don't understand what you're asking."
12    A.  Sure.
13    Q.  Just be comfortable.  If you need to stop,
14  take a break to go the restroom, you know, it's a
15  relaxed atmosphere here today, you know, so ...  Would you state
16  your name for the record?
17    A.  Jed McCaleb.
18    Q.  Do you have a middle name, Jed?
19    A.  No.
20    Q.  No?
21    A.  No.
22    Q.  All right.  Where were you born, Jed?
23    A.  In Arkansas.
24    Q.  Okay.  And how old are you?
25    A.  I'm 41.

Page 6

1    Q.  Okay.  Give me a brief educational
2  background.
3    A.  I went to college for about a semester and a
4  half.  I already knew how to program, and I just
5  started working in software.
6    Q.  Cool.
7    A.  Yeah.
8    Q.  Are there certain languages that you know how
9  to program in or --
10    A.  Yeah, quite a few.  Yeah.
11    Q.  Okay.  How did you learn that?
12    A.  Largely self-taught, some at school.
13    Q.  Did you go to high school in Arkansas?
14    A.  I did, uh-huh.
15    Q.  Did they teach you some programming classes
16  in high school?
17    A.  I took a programming class at a university
18  when I was in high school, yeah.
19    Q.  Oh, okay.
20    A.  But the high school, itself, doesn't teach a
21  programming class.
22    Q.  Okay.
23    A.  Yeah.
24    Q.  What University was that?
25    A.  University of Arkansas at Little Rock.

Page 7

1    Q.  What programming class was it, if you
2  remember?
3    A.  It was a long time ago.  I don't remember the
4  exact name of it.  I think it was just kind of intro
5  to programming.
6    Q.  And things are moving fast, aren't they?
7    A.  Yeah.
8    Q.  So when you finished high school, you started
9  college?
10    A.  That's right.
11    Q.  Where did you go to college?
12    A.  UC Berkeley.
13    Q.  And you only went one semester?
14    A.  Yes.  I dropped out second semester.
15    Q.  Okay.  And what did you do after that?
16    A.  I took a programming job in Connecticut, and
17  then -- yeah.
18    Q.  For a company?
19    A.  Uh-huh.
20    Q.  Who was that, what company?
21    A.  I forgot the name of it.  It's -- what's the
22  guy's name?  I forget the guy's name.  It was
23  somebody's name, LLC, something.
24    Q.  What kind of company was it?
25    A.  They did sort of document conversion, like,

Page 8

1  they basic- -- it was pre-internet, so it was
2  basically like making -- you know, taking, like, text
3  documents and making them, like, some linkable format,
4  something like the internet, but it was a little bit
5  before the days of the internet, so it was a bit
6  different, so ...
7    Q.  Okay.  Were you -- and you were programming
8  there?
9    A.  Uh-huh, that's right.
10    Q.  And so were you trying to create databases,
11  and then tag these documents, or --
12    A.  It was a system called Folio.  I was like --
13  sort of like a text -- it was sort of like the
14  internet, but offline.
15    Q.  Okay.
16    A.  Yeah.  It was, like, hyperlinked text
17  documents.
18    Q.  Okay.
19    A.  But in the computer.
20    Q.  What year would that be?
21    A.  That would be '94, '95, somewhere in there.
22    Q.  Okay.  And how long did you stay with that
23  company in Connecticut?
24    A.  Maybe six months maybe, something like that.
25    Q.  What did you do after that?

Dr. Donald Raggio and Dr. Chris Raggio v.
MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC
McCaleb 30(b)6 Representative
11-17-16
November 17, 2016

---

Page 9

1    A.  Then I worked for a game company in Berkeley.
2    Q.  Which one?
3    A.  It's called Junglevision.
4    Q.  Programming games?
5    A.  Yeah, uh-huh.
6    Q.  Are there any specific games that you got to
7  program that you recall?
8    A.  I think it was called, like -- I don't
9  remember the exact name, Space -- I don't know what
10  they released the title.  It was just called The Space
11  Game when I was working on it, but I don't know what
12  the title they eventually released it under.
13    Q.  In a game like that, are there multiple
14  programmers working on it, or is it normally one that
15  works -- does most of the work?
16    A.  I mean, nowadays, there's definitely
17  multiple.  Back then, there was, you know, sometimes
18  you would do it by yourself, sometimes there would be
19  multiple.  This particular one was worked on by many
20  people.  I was the only one working on it at the time.
21    Q.  Okay.
22    A.  Yeah.
23    Q.  And I'm sorry.  What the name of that company
24  again?
25    A.  It's called Junglevision.

---

Page 10

1    Q.  Are they still around?
2    A.  I don't know.
3    Q.  And that would have been probably around '96
4  or so?
5    A.  It was still probably, like, '95.
6    Q.  '95?
7    A.  Yeah.
8    Q.  How long did you stay there?
9    A.  Again, probably only about six months, yeah.
10  I was -- during all this time, I would work on
11  projects on my own, on my own games and things, so ...
12    Q.  What were you working on back then?
13    A.  Just various computer games.
14    Q.  Okay.  Did you ever commercially produce a
15  video game?
16    A.  Not then.  I did.  Before Mt. Gox, I was
17  working on a video game, but not back then.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  Where did you go after the programming?
21    A.  Let's see.  After that, I started a company
22  with a friend of mine in Boston called Watson
23  Software.
24    Q.  Okay.  What did you guys do with Watson
25  Software?

---

Page 11

1    A.  We did reporting for money managers.  So if
2  you wanted, you know -- it was basically, like,
3  reporting tools for asset managers, things like that.
4    Q.  Okay.  So it would be, like, setting up
5  accounts for the asset manager where they could report
6  to their clients?
7    A.  Yeah, so their clients could see, like, nice
8  charts and things like that, so ...
9    Q.  Uh-huh.  By then, they still weren't really
10  using the internet much, or not?
11    A.  It was early days, for sure.  I mean, the
12  internet was around for sure, but ...
13    Q.  But the stuff you were doing with Watson,
14  were you doing that online at that point?
15    A.  We had a website, yeah.
16    Q.  Okay.  And so just you and one other guy
17  owned that company.  Is that right?
18    A.  That's right.  I mean, we hired some
19  salespeople.
20    Q.  Uh-huh.
21    A.  But, yeah, it was mainly just the two of us.
22    Q.  And it was called Watson?
23    A.  Watson Software, yeah.
24    Q.  Software.  Okay.  Was it incorporated or an
25  LLC?

---

Page 12

1    A.  I don't exactly remember.  I believe it was
2  an LLC, or -- I believe it was an S corp.
3    Q.  An S corp?
4    A.  I don't remember exactly.
5    Q.  That would be common back then, yeah.
6    A.  Yeah.
7    Q.  And then how long did you guys run that
8  company?
9    A.  I don't really remember.  Maybe around a year
10  or something.  I don't know.  Maybe longer.
11    Q.  Who was the partner you had in the company?
12    A.  Christian Rudder.
13    Q.  What's the last name?
14    A.  Rudder.
15    Q.  Rudder, R-U-D-D-E-R?
16    A.  Yeah, uh-huh.
17    Q.  Okay.  And how did you know Christian Rudder?
18    A.  I've known him since junior high and high
19  school.
20    Q.  So he grew up in Arkansas, as well?
21    A.  That's right.
22    Q.  What town did you say you grew up in?
23    A.  I was born in Fayetteville.  I group up in
24  Little Rock.
25    Q.  Okay.  I remember, in college, going to the

---

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

| Page 13 |

1  Toad Suck Tourney in Arkansas.
2  A.  Oh.
3      MR. GAULT: To the what?
4      MR. TYNER: Toad Suck Tournament.  It was a
5  debate tournament.
6      THE WITNESS: Yeah, that sounds about right.
7      MR. TYNER: I think it was in Little Rock.
8  I'm not sure.  Oh, goodness, that's a long time ago.
9  BY MR. TYNER:
10   Q.  So did -- what did you do after -- or why did
11  you leave Watson?
12   A.  Why did I leave?  Basically, just -- it just
13  wasn't working as well as we were wanting it to work,
14  so I left to do other things.  And I believe, after I
15  left, I went to Silicon Valley and worked at a
16  startup.
17   Q.  Okay.
18   A.  I think that's the order of events.  It's
19  hard to remember.  There was a lot of moving around
20  back then.
21   Q.  So you were working for what kind of startup
22  when you went to Silicon Valley?
23   A.  They basically did remote administration of
24  computers.  So, yeah, it was, again, programming to do
25  with software to help remotely administer computers.

| Page 14 |

1   Q.  What was the name of that startup?
2   A.  It's called Everdream.
3   Q.  Everdream?
4   A.  Uh-huh.
5   Q.  Is it still around?
6   A.  No.
7   Q.  No?
8   A.  No.
9   Q.  We're proud of somebody that does that here
10  in town called Joel Bomgar.  I don't know if you've
11  seen the Bomgar company or not.
12   A.  Huh-uh.
13   Q.  But he started that in college, and it's
14  doing quite well.  But it was remote access?
15   A.  Yeah.
16   Q.  And it's supposed to be secure remote access?
17   A.  Yeah.
18   Q.  Is that the same thing we're talking about,
19  where you could remote in and maybe work on somebody's
20  machine or --
21   A.  Basically, it would -- it was sort of like
22  they would lease the computers to you so you wouldn't
23  just -- it would be more of a commodity rather than
24  you own the machine, they would own it, and then they
25  make sure everything was patched, and maintained, and

| Page 15 |

1  secure, and all this kind of stuff.
2   Q.  Okay.
3   A.  So we worked on that kind of stuff.
4   Q.  So you were involved with hardware, too, then
5  at that point?
6   A.  I was just doing the software stuff.
7   Q.  Okay.
8   A.  Because there was all this -- the software
9  tools to remotely administer the machine and to make
10  sure everything was secure.
11   Q.  Okay.  And how long were you there?
12   A.  I think I was there -- I was there -- I think
13  I was there for about a year.
14   Q.  Okay.  Have we gotten into the 2000s now?
15   A.  This is -- I stopped working there around, I
16  believe, '98 or '99.  Must have been '98 probably.
17   Q.  Okay.
18   A.  Yeah, or '99, somewhere in there.
19   Q.  Where did you go from there?
20   A.  Then I started another project on my own
21  called eDonkey2000, which was a file-sharing program.
22   Q.  Okay.  And that was around '99 or 2000?
23   A.  I think I released it in '99.
24   Q.  Okay.  And what did eDonkey; what was its
25  purpose?

| Page 16 |

1   A.  Basically, it allowed you to -- to share
2  files without going through a central server.  So it
3  was like a peer-to-peer network, similar to
4  BitTorrent, something like that, so ...
5   Q.  And you released that yourself.  Right?
6   A.  That's right.
7   Q.  Were you the 100 percent owner of that?
8   A.  I was at first.  Eventually, I brought on
9  someone to be CEO, and then he owned part of it.
10   Q.  And they got part of it?
11   A.  Yeah.
12   Q.  Who was that the?
13   A.  Sam Yagan.
14   Q.  Spell Yagan.
15   A.  Y-A-G-A-N.
16   Q.  Okay.  And then was that a -- did you make
17  money with eDonkey?
18   A.  We made some money, yeah.
19   Q.  How did you do that?
20   A.  How did we make money?
21   Q.  Yeah.  How did you get paid?
22   A.  There was ads, and we asked people to pay us,
23  so ...
24   Q.  Okay.  Is it kind of one of those volunteer
25  payments, if you use the software, maybe donate?

Dr. Donald Raggio and Dr. Chris Raggio vs MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC 11-17-16
Fred McCaleb 30(b)6 Representative
November 17, 2016

Page 17

1    A.  Well, it would remove the ad, and it was,
2  like, the pro version.
3    Q.  Oh, okay.
4    A.  So it had a couple other -- it was like a
5  freemium model kind of thing.
6    Q.  I gotcha.  And was that kind of your -- was
7  that your full-time work at that point?
8    A.  Oh, yeah, uh-huh.
9    Q.  How long did you continue with eDonkey?
10   A.  I believe it was six years or something like
11 that.
12   Q.  Uh-huh.
13   A.  I think we closed it in 2005, 2004, somewhere
14 in there.  2005, I think, or maybe in 2006.  I don't
15 remember exactly.
16   Q.  Okay.  Why did you close it?
17   A.  Why did we close it?  Basically, we had run
18 it for a long time.  We were kind of tired of doing
19 it.  There was -- the recording industry was, like,
20 threatening us.  So we just -- rather than fight them,
21 we decided to shut down.
22   Q.  So what did you do when you shut down
23 eDonkey?
24   A.  I took some time off.  I worked on various
25 other projects, kind of exploring what my next thing

Page 18

1  would be.  Eventually, I made this online game, and it
2  was like a massive multiplayer online game.
3    Q.  Oh, cool.  What was the name of that?
4    A.  It's called The Far Wilds.
5    Q.  And was that commercially viable?
6    A.  It may have -- I mean, it probably could have
7  sustained us.  It didn't -- it wasn't, like, as much
8  of a success as I would have liked it to be, but I
9  probably could have kept doing it.  But at some point,
10 there's, like, a, you know, high opportunity cost.
11   Q.  So about how long did you work on that?
12   A.  Oh, jeez.  I want to say two or three years.
13   Q.  And did you have a partner in --
14   A.  Uh-huh.
15   Q.  -- The Wilds?  Is it called the Wild?
16   A.  The Far Wilds.
17   Q.  The Far Wilds.
18   A.  Uh-huh.  Yeah, I did.
19   Q.  Was it -- there was a book when I was a kid I
20 used to love.
21   A.  The Wild Things?
22   Q.  Wild Things.  That's it.  Was it based on
23 Wild Things?
24   A.  No.
25   Q.  Okay.

Page 19

1    A.  It's kind of related, but, you know.
2    Q.  So probably around 2008 is when you closed
3  that?
4    A.  No, it was later.  It was -- it basically was
5  winding down, like, slightly before I started Mt. Gox.
6    Q.  Okay.
7    A.  So around 2009.
8    Q.  And you said there were some other people
9  involved?
10   A.  One other person, yeah.
11   Q.  Who was that?
12   A.  Chris Nojima.
13   Q.  Nojima?
14   A.  Uh-huh.
15   Q.  Japanese maybe?
16   A.  He's half Japanese, yeah.
17   Q.  And so y'all just -- you just shut the place
18 down.  Is that --
19   A.  That's right, yeah.
20   Q.  Were there a lot of employees?
21   A.  Well, it was -- I think we had hired maybe
22 one other person.  There was a lot of contractors,
23 yeah.  Basically just gave the site to someone that
24 wanted to run it.
25   Q.  Oh, okay.

Page 20

1    A.  So it's still up, but we're not running it
2  anymore.
3    Q.  I see.  Is it still going today?
4    A.  It is still going, yeah.  He's still
5  maintaining it.
6    Q.  What did you do after that?
7    A.  After that, I started Mt. Gox.
8    Q.  How did you get involved with Mt. Gox?
9    A.  How'd I get involved with it?
10   Q.  Yeah.
11   A.  Well, I mean, I wrote it.  I mean, I just
12 created it.
13   Q.  Okay.  And what was its purpose?
14   A.  At that time, there wasn't a good way to buy
15 and sell bitcoins.  So it was a way to do that, allow
16 people to do that.
17   Q.  I've read something about -- what do the
18 initials stand for?
19   A.  Magic:  The Gathering Online Exchange.
20   Q.  Yeah.  Why did you choose that?
21   A.  It was a domain I had left over from one of
22 these projects after eDonkey that I had done.
23   Q.  Uh-huh.
24   A.  It was a Magic:  The Gathering trading site,
25 and I just had the domain left.  So I didn't want to

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

Page 21

1  buy a new one, so I just used that one.
2    Q.  Okay.
3        MR. GAULT: Excuse me.  What did it stand
4  for?
5        THE WITNESS: Magic:  The Gathering Online
6  Exchange, which is a card name.
7  BY MR. TYNER:
8    Q.  It's a card game?
9    A.  Yeah.
10   Q.  And how long -- when you first bought that
11 domain, did you get it up as an exchange for the
12 cards?
13   A.  I did, yeah.
14   Q.  Okay.  And about when was that that you
15 started it?
16   A.  That was, I don't know, maybe 2007 or
17 something.  Yeah.
18   Q.  So you ran it for the online -- or the
19 gaming?
20   A.  Maybe 2004, 20- --
21   Q.  Magic:  The Online --
22   A.  Yeah.  I didn't run it very long.
23   Q.  -- Gaming Exchange?
24   A.  Yeah.  Basically, you know, I made it just to
25 kind of see -- yeah, just kind of -- because, you

Page 22

1  know, it was more just kind of like a hobby experiment
2  kind of thing, so ...
3    Q.  Okay.  How did that work?  I mean, I don't
4  understand that game or anything.
5    A.  Right.
6    Q.  Just --
7    A.  How did it work technically?
8    Q.  Yeah.  No.  What was the game about, and why
9  was there a need for an exchange?
10   A.  So Magic is a physical game, but with cards
11 that you can trade, and everyone can have their own
12 cards that they collect.  They've made an online
13 version of it where you have your online collection of
14 cards.  And in the online version, it's very
15 cumbersome to trade the cards around.  So I made a
16 little bot that would log into the site and allow
17 people to trade cards with it, so ...
18   Q.  Okay.
19   A.  You know, just to make it easier to trade.
20   Q.  Did you make money in that exchange?
21   A.  I didn't really make money.  I mean, I wasn't
22 trying to.  It was more just, as I said, just like a
23 hobby, kind of like for fun kind of thing.
24   Q.  Where the people had -- would they sign up
25 accounts so they could trade --

Page 23

1    A.  Yeah.
2    Q.  -- the cards?  And was there any money going
3  through there, or was it just the cards being traded
4  by --
5    A.  It was just the cards, yeah.
6    Q.  Okay.  So you couldn't just go on there and
7  buy a card?
8    A.  I mean, they have these things called event
9  tickets, where -- you can buy for money, but you
10 buy them from the Magic company, and then you can
11 trade these event tickets for cards.
12   Q.  Okay.  So the event ticket is like another
13 currency?
14   A.  Yeah.  Essentially like a digital currency
15 kind of thing.
16   Q.  And then -- okay.  So it would be easy to
17 exchange money --
18   A.  Right.
19   Q.  -- for the digital card?
20   A.  Right.
21   Q.  How interesting.
22   A.  Yeah.
23   Q.  And so that -- about how long did you have it
24 as the trading --
25   A.  I honestly don't remember.  It was probably

Page 24

1  just a few months.
2    Q.  Oh, not long at all?
3    A.  Yeah.  It ended up -- like I said, I just
4  made it as a hobby, and it started to become kind of a
5  hassle, so I just closed it down.
6    Q.  Okay.  How many accounts did you end up with
7  on there --
8    A.  Oh, man, I really don't remember.
9    Q.  -- for the Magical cards?
10   A.  I don't remember.
11   Q.  Have you got any idea if it was a hundred or
12 a thousand, 10,000?
13   A.  I mean, I would guess around 500 or
14 something.
15   Q.  Okay.
16   A.  Yeah.
17        MR. GAULT: So let's don't guess.  Either you
18 know it or you don't.
19   A.  I don't know it, but, you know.
20 BY MR. TYNER:
21   Q.  But it would be less than a thousand you
22 think?
23   A.  I mean, I don't really remember.  It could be
24 more, but ...
25   Q.  And about when did you stop -- did it close

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

---

Page 25

1 down, and you just -- and they stopped all the trading
2 for the cards?
3    A. Yeah. I stopped writing the bot that was --
4 that you would trade through, so ...
5    Q. All right. And I don't know. What is a bot?
6    A. Basically, it's a little piece of software
7 that's connecting to their -- to this Magic online
8 site and doing the trading. Right? So it's this,
9 like, automated trader kind of thing.
10    Q. Okay.
11    A. So, yeah.
12    Q. But that wouldn't require much of your time,
13 would it, or would it?
14    A. Well, it does if it breaks, or --
15    Q. Okay.
16    A. -- like, you know, there's -- or people have
17 issues, like, things don't work right. But, yeah.
18    Q. Okay. So did you charge for them to have
19 accounts on there?
20    A. No, I didn't charge for them having accounts.
21 No.
22    Q. Okay. And when made a trade, did you make a
23 little money on the trade or ...
24    A. I don't remember if I was charging commission
25 or not.

---

Page 26

1    Q. Okay. How were you supporting yourself
2 financially then at that time?
3    A. I had money from eDonkey.
4    Q. Okay. Did you sell eDonkey?
5    A. I didn't, no.
6    Q. But you had accumulated some --
7    A. We had benefit --
8    Q. Okay. So from -- about when do you think you
9 stopped the gaming cards on Mt. Gox?
10    A. About when? Like I said, it was -- I don't
11 remember exactly when I started it. It was -- but I
12 stopped, you know, a few months after that.
13    Q. Within a few months?
14    A. Yeah.
15    Q. Okay. And so then Mt. Gox was just a dormant
16 domain?
17    A. Uh-huh.
18    Q. And you -- I guess you were hosting it
19 somewhere. Did you have your own server that you kept
20 it on?
21    A. I mean, you just -- it was parked at a
22 registrar.
23    Q. Oh, okay.
24    A. You don't have to have a server. Right? You
25 just pay for the name.

---

Page 27

1    Q. Okay. So you took down the website entirely
2 at that point?
3    A. I'm pretty sure I did, yeah.
4    Q. Okay. And so how long was it dormant before
5 you started, kind of reinitialized Mt. Gox for
6 bitcoin?
7    A. The domain? I mean, well, depending on when
8 -- I mean, I started Mt. Gox for bitcoin in 2010. So
9 however many -- depending on when I stopped the
10 trading card site, so ...
11    Q. And do you know about when that was?
12    A. When I stopped the trading card site?
13    Q. Uh-huh.
14    A. Like I said, I started it in 2006, 2007,
15 2008, somewhere in there.
16    Q. Okay.
17    A. I think.
18    Q. So what did you do between the time that you
19 were doing the trading cards for Magic: The Online
20 Gaming Exchange until you went and kind of
21 reinitialized Mt. Gox for bitcoin?
22    A. Well, that's when I was making The Far Wilds,
23 my online game.
24    Q. Okay.
25    A. Yeah.

---

Page 28

1    Q. All right. And that was working for another
2 company. Right? Or no. That was yours.
3    A. That was me, yeah.
4    Q. Okay. And so that was probably a two- or
5 three-year period.
6    A. Uh-huh.
7    Q. Is that right?
8    A. Yeah.
9    Q. Okay. And, you know, sometimes I'll have to
10 get you -- we normally do say, "Uh-huh," and, "Huh-
11 uh," and it's hard to put down. I'll get you to say
12 "Yes," and, "No," or affirmative or something.
13    A. Sure. Okay.
14    Q. It's hard, when you read a transcript, to
15 know what you meant. So were you still working on
16 your game when you reinitiated Mt. Gox to do bitcoin,
17 or had you completed that? Were you done with it?
18    A. I wasn't working on it anymore, no.
19    Q. Okay. And then how did you get involved in
20 bitcoin?
21    A. So, I read an article on Slashdot and found
22 it very interesting.
23    Q. Did you start mining any bitcoin?
24    A. No.
25    Q. Okay. And so it was in 2010 that you started

---

Page 29

1  the exchange backup, or the domain name MTGOX?
2    A. That's right.
3    Q. Is that right? And did you use the -- some
4  of the same software that you had already created for
5  the magical card exchange, or was it just a complete
6  do-over and just used that domain name?
7    A. I don't think I used any significant amount
8  of software from it.
9    Q. So it was pretty much a fresh start, and you
10 just used that domain name?
11   A. That's right.
12   Q. Okay. So about when did you become
13 interested in bitcoin?
14   A. I believe the Slashdot article was in August,
15 something like that.
16   Q. Of '10?
17   A. 2010.
18   Q. 2010?
19   A. Uh-huh.
20   Q. And so then you started programming to create
21 the exchange pretty soon thereafter. Is that --
22   A. That's right.
23   Q. -- right? Okay. And how long did it take
24 you to program that and get it live?
25   A. I believe it was a couple of weeks.

Page 30

1    Q. Okay. So by August, September, you had
2  Mt. Gox up and running for --
3    A. I believe so.
4    Q. -- bitcoin exchange?
5       MR. GAULT: Do me a favor. All right? Wait
6  until he finishes his question, because you're kind of
7  jumping in there before he quite gets through.
8       THE WITNESS: Okay.
9       MR. GAULT: And I told you, it happens all
10 the time. Right?
11      THE WITNESS: Sure.
12      MR. GAULT: So just let him make sure he's
13 done with his question, and then you answer it.
14      THE WITNESS: Okay.
15 BY MR. TYNER:
16   Q. So within a few weeks of you reading this
17 article, you decided that there may be a need for the
18 exchange. Is that accurate? What made you put up the
19 exchange?
20   A. Well, I wanted to buy some bitcoins, and
21 there wasn't a good way to do it. I figured other
22 people might have the same issue.
23   Q. Was there any way of buying bitcoin
24 before you put Mt. Gox up?
25   A. Yes.

Page 31

1    Q. How was that?
2    A. You could find people in the forum. I think
3  there was some other exchange that wasn't that good
4  that you could use.
5    Q. Okay. What was that other exchange?
6    A. I don't remember the name.
7    Q. Was it in the U.S.?
8    A. It was.
9    Q. Okay. Do you remember what city it was in?
10   A. I don't.
11   Q. Did you buy any bitcoin through it, through
12 the other exchange?
13   A. I don't believe so.
14   Q. Okay. But you -- one of your motivations for
15 the exchange was so that you would have an opportunity
16 to purchase bitcoin yourself?
17   A. That's right.
18   Q. Okay. And you weren't interested in mining
19 at that time?
20   A. No.
21   Q. Why not?
22   A. Mining seems like -- well, if you're
23 interested in bitcoin and want to buy bitcoin, it
24 seems easier just to buy them than mine them.
25   Q. And what was the price of bitcoin when you

Page 32

1  put Mt. Gox up?
2    A. I mean, there wasn't a good price established
3  just because there wasn't a good market for it. So
4  it's hard to say what the price was.
5    Q. Okay. Did you eventually -- were you able to
6  purchase bitcoin?
7    A. I was.
8    Q. Did you -- how much, how many bitcoin did you
9  purchase?
10      THE WITNESS: Do I have to answer that?
11      MR. GAULT: You mean, just in general,
12 forever, or what?
13      MR. TYNER: Yeah.
14      MR. GAULT: Can we take a break?
15      MR. TYNER: Sure.
16      MR. GAULT: I want to talk to him about that.
17      MR. TYNER: I'm going to object to you
18 talking to him about that.
19      MR. GAULT: Okay.
20      MR. TYNER: He's under oath right now, and
21 we're not going to have conferences --
22      MR. GAULT: Okay. I instruct him not to
23 answer. So you can ask another question.
24      MR. TYNER: Okay.
25 BY MR. TYNER:

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

Page 33

1    Q.  Was Mt. Gox -- did you end up having a lot of
2  accounts quickly on Mt. Gox?
3    A.  I mean, I don't know what -- what do you mean
4  by "a lot"?
5    Q.  Well, in the -- let's just say you started it
6  in about August or September of 2010.  By the first of
7  the year, how many accounts had you accumulated?
8    A.  I don't remember the number of accounts.
9    Q.  Okay.
10    A.  No.
11    Q.  Was it over a thousand?
12    A.  Yes.
13    Q.  Was it over 10,000?
14    A.  I don't remember.
15    Q.  Over 5,000?
16    A.  I don't remember that, either.
17    Q.  Tell me how that would work.  How would you
18  sign up to buy on Mt. Gox?
19    A.  You would go and register.  You'd have to
20  enter your e-mail address, and, you know, user name,
21  and create a password, and then you had an account.
22  And if you wanted to buy bitcoin, you would have to
23  send money through various ways to Mt. Gox, and then
24  at that point, you'd have money on the exchange, and
25  then you can buy bitcoin.  If you wanted to sell

Page 34

1  bitcoin, then you would get a bitcoin address, and you
2  could send bitcoin to that address, and then you could
3  put up an order to buy and sell, things like this, so
4  ...
5    Q.  When somebody opened an account on Mt. Gox,
6  did they -- and they purchased bitcoin, where would
7  the bitcoin go?  Did they have a wallet?  Was that
8  automatically created when they created an account?
9    A.  So there was -- you're saying when they
10  opened an account and put dollars in?
11    Q.  Yes.
12    A.  And then they -- then they went and bought
13  bitcoin?
14    Q.  Yes.
15    A.  So it would go into -- Mt. Gox had a few
16  different wallets that were owned by it, the company
17  that would hold the bitcoin.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  And who was the company?
21    A.  Well, at first, it was me, and then I later
22  sold it, so then it wasn't me.
23    Q.  Okay.  So was there a company name?  Was it
24  just you individually?
25    A.  It was just me individually, yeah.

Page 35

1    Q.  All right.  That reminds me, what was Code
2  Collective?
3    A.  Code Collective was the company that made The
4  Far Wilds.
5    Q.  I'm -- oh, okay.
6    A.  The game, yeah.
7    Q.  All right.  And so you had several wallets to
8  receive the bitcoin.  Is that correct?
9    A.  That's right.
10    Q.  So the individual did not have a wallet on
11  Mt. Gox.  Is that right?
12    A.  That's right.
13    Q.  And then you just programmed it so that they
14  would have basically an account that would do debits
15  and credits to the account.  Is that correct?  Even
16  though the -- they didn't -- they didn't have access
17  to the wallet.  Correct?
18    A.  They did not have access to the wallet.
19    Q.  Okay.  And so how, if they wanted to move
20  bitcoin, how were they able to do that?
21    A.  On the website, they could request a
22  withdrawal, and then would give a bitcoin address that
23  they wanted their bitcoin sent to, so ...
24    Q.  Okay.  And on your end, what would you do
25  when they requested bitcoin?

Page 36

1    A.  If they were logged in and the request was
2  legitimate, we had -- and it was below the daily
3  limit, then they could send the bitcoin.
4    Q.  Okay.  So what I'm asking is, was there a
5  human in between the transaction?
6    A.  No.
7    Q.  Okay.  So it was automatic?  You'd programmed
8  it to do that.  Is that --
9    A.  That's right, yeah.
10    Q.  Okay.  And you said there was a limit?
11    A.  Yeah.  There was a daily limit of a thousand
12  dollars that you could withdraw.
13    Q.  Okay.  And what was the purpose of that?
14    A.  To prevent any kind of -- if someone's
15  account is compromised, to prevent any kind of --
16  like, to prevent -- to limit the size of the problem,
17  basically.
18    Q.  How would people get money into their account
19  on Mt. Gox?
20    A.  They could use a few different ways.  They
21  could use PayPal, they could wire me money, they could
22  use this thing called Liberty Reserve, and maybe there
23  were some other ways, as well.
24    Q.  What was Liberty Reserve?
25    A.  It was this -- I don't know how you describe

Dr. Donald Raggio and Dr. Chris Raggio v.
MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC 11-17-16
McCaleb 30(b)6 Representative
November 17, 2016

---

Page 37

1   it.  It's basically like PayPal, yeah.
2   Q.   Is it a U.S. company, as well?
3   A.   I think they were based in Costa Rica.
4   Q.   So let's say I opened up an account, and I
5   wanted to put money in, and I was going to use Liberty
6   Reserve.  How would I do that?
7   A.   You would -- basically, we had an address
8   that you could go into your Liberty Reserve wallet and
9   say, I want to send X amounts of dollars to this
10  address, and then we would see the transaction and
11  credit your account.
12  Q.   Okay.  So the money -- so the money would
13  come to Mt. Gox from Liberty?
14  A.   That's right.
15  Q.   How would I get money to Liberty?
16  A.   I don't remember how you would get Liberty
17  Reserve money.
18  Q.   Why didn't you just take credit cards?
19  A.   Because with credit cards, you can always
20  charge them back.  So it's a problem if somebody buys
21  a bunch of bitcoin on a credit card and then charges
22  their credit card back, so we don't get the money, but
23  then, now, they have the bitcoin.
24  Q.   I gotcha.  Let's see.  When did you sell off
25  most of Mt. Gox?

---

Page 38

1   A.   It was February 5th or 6th, 7th.
2   Q.   Okay.  So you really only had it under your
3   complete control for five --
4   A.   Yeah, I think was --
5   Q.   -- months?
6   A.   -- around five months, yeah.
7        MR. GAULT: Let him finish his question.
8        THE WITNESS: I'm sorry.
9        MR. TYNER: He's helping.  I'm not trying to
10  trick him.
11       MR. GAULT: I understand.  I'm not saying you
12  are.  I just want him to have a little space.  Happens
13  to everybody, by the way.  Everybody does that, so ...
14  BY MR. TYNER:
15  Q.   When you sold it, how many accounts were
16  there?
17  A.   I don't remember.
18  Q.   You don't have any idea?  Twenty-five
19  thousand?
20  A.   It was less than 25,000, but I don't remember
21  the exact number.
22  Q.   Was it more than 10,000?
23  A.   I don't think so, but, you know, it was a
24  long time ago.
25  Q.   How would I find out how many accounts there

---

Page 39

1   were?
2   A.   You could ask Mark.  He would probably know.
3   I mean, that's the only other person that would know,
4   I think.
5   Q.   And was -- besides just wanting to buy
6   bitcoin yourself, was there a financial -- hopefully,
7   a profit-- it would be a profitable exchange?  Was
8   there a profit motive?
9   A.   Not that much, honestly.  I mean, it was
10  still very early in the time of bitcoin, so it was
11  totally unclear if it would take off at all.  Like,
12  what it's done now, I think, has exceeded, like,
13  everybody's expectations at that point.  So, you know,
14  it was more just as a -- again, like, it was similar
15  to the first Mt. Gox project, where it was just kind
16  of a hobby into something that seemed cool to do.
17  Q.   Okay.  Well, what motivated you to sell it?
18  A.   I -- well, a few things.  I mean, it's -- it
19  ended up being a lot of work to run.  It's not that
20  interesting of a thing to run.  It's just a -- it's
21  simple.  Like, I like working on, like, hard,
22  technical problems, and it's not that.  So it wasn't
23  interesting.
24  Q.   You were bored?
25  A.   Yeah, yeah.

---

Page 40

1   Q.   Were you making money with it when you sold
2   it?
3   A.   It was profitable, yeah.
4   Q.   But boring?
5   A.   Yeah, yeah.
6   Q.   The -- how did you meet my client, Chris
7   Raggio?
8   A.   I think the first time I met him was at a
9   bitcoin conference in New York.
10  Q.   Okay.  And about when was that?
11  A.   I believe it was summer of 2012.
12  Q.   Okay.  So it was sometime after he had been
13  purchasing bitcoin --
14  A.   That's right.
15  Q.   -- through your exchange?
16  A.   Yeah.
17  Q.   Okay.  How did you guys -- how did it come
18  about that he bought bitcoin through Mt. Gox?
19  A.   He e-mailed me and said, "I want to buy
20  bitcoin," and just asked me the -- what he should do
21  to do it.
22  Q.   Okay.  And so tell me how that transaction
23  took place.  Was it more than -- well, back up.  Did
24  he have more than one transaction, or was it just one?
25  A.   One transaction -- like, one deposit of money

---

Dr. Donald Raggio and Dr. Chris Raggio v.                    McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                          November 17, 2016

| Page 41 | Page 43 |
|---|---|
| 1  onto Mt. Gox or -- | 1    Q.  Did you have different percentages for |
| 2    Q.  Yeah.  How many times did he send money? | 2  different accounts? |
| 3    A.  I don't remember how many times he sent | 3    A.  I believe so.  I believe there was some |
| 4  money.  I'm pretty sure it was more than one time, | 4  people that we designated as -- I mean, some |
| 5  though. | 5  relationships we had that we would give them a better |
| 6    Q.  Okay.  Do you remember the amounts? | 6  percentage. |
| 7    A.  Not exactly.  You know, I don't remember | 7    Q.  Okay.  And you don't remember what the |
| 8  exact amounts.  It was, you know, in the tens of | 8  standard percentage was? |
| 9  thousands, I think. | 9    A.  No.  I mean, I want to say it was around 1 |
| 10   Q.  Was that significant at that time? | 10  percent, but I don't remember if that's -- it's |
| 11   A.  It was on the higher end of people, yeah, for | 11  somewhere in that order. |
| 12  sure. | 12   Q.  How long was it after you put Mt. Gox back up |
| 13   Q.  But there were some that were spending more | 13  to trade bitcoin before it was profitable? |
| 14  than that? | 14   A.  I'm not sure.  I'm not sure. |
| 15   A.  Yeah.  He wasn't the highest. | 15   Q.  When you put Mt. Gox back up, did you have |
| 16   Q.  Okay.  In the top -- would you say it was in | 16  the physical server yourself, or did you have it |
| 17  the top 10 or 20 people buying it? | 17  hosted somewhere? |
| 18   A.  Probably, yeah. | 18   A.  No, it was hosted. |
| 19   Q.  Okay.  So it would be somebody you would | 19   Q.  Who was hosting it? |
| 20  remember? | 20   A.  I believe it was Amazon. |
| 21   A.  Yeah.  I mean, I knew who he was. | 21   Q.  And is that who you have the domain parked |
| 22   Q.  It was a fairly significant amount -- | 22  with, as well? |
| 23   A.  Yeah. | 23   A.  No. |
| 24   Q.  -- being purchased? | 24   Q.  Who was that that it was parked with? |
| 25   A.  Yeah. | 25   A.  The domain registrar? |

| Page 42 | Page 44 |
|---|---|
| 1    Q.  And so you did purchase bitcoin on his | 1    Q.  Yeah. |
| 2  behalf? | 2    A.  It's DirectNIC. |
| 3    A.  I didn't, no. | 3    Q.  Do you know where the server was physically |
| 4    Q.  Okay.  How did the transaction go down? | 4  located at Amazon that you -- |
| 5    A.  The way Mt. Gox works is people deposit | 5    A.  I don't remember which data center it was. |
| 6  money, and people deposit bitcoins, and then they put | 6    Q.  Did it take up much space? |
| 7  up offers saying, I'm willing to buy bitcoins at this | 7    A.  The server? |
| 8  price, I'm willing to sell bitcoins at this price, and | 8    Q.  No, no.  How much space did you use to run |
| 9  then if there's a cross, like, in the market, if | 9  Mt. Gox? |
| 10  there's a cross, then there's a trade.  Right? | 10   A.  Space in what sense? |
| 11   Q.  Yes. | 11   Q.  In the size. |
| 12   A.  So the operators of Mt. Gox are never | 12   A.  Like? |
| 13  involved in the trade.  It's just between individuals, | 13   Q.  Gigs. |
| 14  so ... | 14   A.  Oh, I have no idea.  I don't know. |
| 15   Q.  Okay.  And then how would MT-- -- how would | 15   Q.  Did you have an office for Mt. Gox? |
| 16  you get paid when they had a transaction? | 16   A.  No. |
| 17   A.  So, there's a -- there was a commission on | 17   Q.  So you would just run it out of your home? |
| 18  the transactions. | 18   A.  That's right. |
| 19   Q.  Okay.  What was the amount of commission? | 19   Q.  Okay.  Where was your home at that time? |
| 20  Was it a percentage of the amount of the trade or -- | 20   A.  When I started it, my home was in Patterson, |
| 21   A.  Yeah, it was a percentage of the trade. | 21  New York.  Sometime when I was running it, I moved to |
| 22   Q.  And what was that percentage amount? | 22  Costa Rica for a bit, yeah. |
| 23   A.  I don't remember the percentage.  I don't | 23   Q.  Were you working on your gaming, game |
| 24  remember.  I just don't remember.  It was a long time | 24  project, The Wild, while you were in New York? |
| 25  ago.  I just don't remember percentage. | 25   A.  I was, yeah. |

Dr. Donald Raggio and Dr. Chris Raggio vs    McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                November 17, 2016

---

**Page 45**

1    Q.   How long were you in New York?
2    A.   I think I was in New York about nine years.
3    Q.   And where in New York?
4    A.   Mainly New York City.  The last year, I
5    moved, or last two years maybe, I moved to Patterson,
6    New York, which is a bit outside.
7    Q.   Okay.
8    A.   Yeah.
9    Q.   A bit outside the city?
10   A.   Uh-huh, yeah.
11   Q.   So in about August, you started the bitcoin
12   exchange, and you were in New York.  Right?
13   A.   That's right.
14   Q.   And then sometime, you moved to Costa Rica?
15   A.   That's right.
16   Q.   Was that before the first of the year?
17   A.   Must have been, yeah.
18   Q.   What made you go to Costa Rica?
19   A.   It's much warmer.  We had two little kids.
20   It was easier to raise them there than in New York.
21   Q.   Were you married at that time?
22   A.   Was I married?  No.
23   Q.   I'm sorry?
24   A.   No.
25   Q.   Okay.  Have you ever been married?

---

**Page 46**

1    A.   No.
2    Q.   And is the mother of your children, is it one
3    mother?
4    A.   That's right, yes.
5    Q.   And you have two children?
6    A.   Yep.
7    Q.   Okay.  And what is her name, the mother of
8    the children?
9    A.   Misoon Burzlaff.  Misoon Burzlaff.
10   Q.   Would you spell Burzlaff?
11   A.   B-U-R-Z-L-A-F-F.
12        COURT REPORTER: First name, too?
13        THE WITNESS: Misoon, M-I-S-O-O-N.
14        COURT REPORTER: Thank you.
15   BY MR. TYNER:
16   Q.   And how long did you stay in Costa Rica?
17   A.   We lived there about a year.
18   Q.   So you were in Costa Rica at the time that
19   you sold Mt. Gox to Mark Karpeles?
20   A.   That's right.
21   Q.   Am I saying his last name correctly?
22   A.   I think so, yeah.
23        MR. TYNER: Okay.  That's K-A-R-P-E-L-E-S.
24        THE WITNESS: L-E-S, yeah.
25   BY MR. TYNER:

---

**Page 47**

1    Q.   Mark Karpeles.  Where did you meet Mark?
2    A.   I've never met Mark.
3    Q.   How did it come about that you sold Mt. Gox
4    to Mark?
5    A.   I had contracted Mark to do some integration
6    with a bank in Europe for me, so you could deposit
7    money in Mt. Gox with this European bank.  And, you
8    know, like I said, I was wanting to stop running
9    Mt. Gox.  I didn't want it to just go away because
10   people were depending on it, so I wanted someone else
11   to take it over.  He was big in the bitcoin world, so
12   I -- you know, so I asked if he would want to take it
13   over, and he did, so ...
14   Q.   When you went to Costa Rica, isn't that where
15   you said Liberty was located?
16   A.   It is, yeah.
17   Q.   Do you know the guys that had it?
18   A.   No.
19   Q.   Did you -- you never had interaction with
20   them while you were in Costa Rica?
21   A.   No.  I e-mailed them one time, but I didn't
22   get any significant response.
23   Q.   Okay.  After you sold Mt. Gox -- that would
24   have been February.  Right?
25   A.   That's right.

---

**Page 48**

1    Q.   Then what did you do?
2    A.   Then I started thinking about other projects,
3    other things to work on that would be more
4    interesting.
5    Q.   Did you work on anything while you were still
6    in Costa Rica?
7    A.   I started forming the idea for my next
8    company, yeah.
9    Q.   Okay.  And what was the next company?
10   A.   It's called Ripple.
11   Q.   And you were just forming the ideas while you
12   were in Costa Rica, or did you --
13   A.   That's right.
14   Q.   -- start working on --
15   A.   I mean, it was -- yeah.  It was mainly just,
16   like, thinking about it, how to do it, things like
17   that, so ...
18   Q.   Okay.  And you think you were in Costa Rica
19   about a year.  So you would have -- did you move back
20   to the U.S.?
21   A.   Yeah, I moved -- in the -- I believe it was
22   the summer of 2012, is when I moved back.
23   Q.   Okay.  And where did you move to when you
24   moved back?
25   A.   To California.

---

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

Page 49

1    Q.   What city?
2    A.   To Berkeley.
3    Q.   And did you start working on Ripple pretty
4    soon after you got back?
5    A.   Yeah, immediately.
6    Q.   Immediately?
7    A.   Yeah.
8    Q.   And Ripple was your brainchild, pretty much?
9    A.   That's right.
10   Q.   Did you have any partners in Ripple?
11   A.   I hired some people.  I eventually brought on
12   someone to be CEO, and so he was part owner of the
13   company at that point.
14   Q.   And who was the CEO?
15   A.   Chris Larsen.
16   Q.   And was Ripple, was it an S corp also, or how
17   was it set up?
18   A.   It was a C corp.
19   Q.   Okay.  So you owned shares of Ripple?
20   A.   That's right.
21   Q.   Okay.  What amount of shares did you own as a
22   percentage of Ripple?
23        MR. GAULT:  Hold on a second.  I either need
24   to talk to him about it, or I'm going to instruct him
25   not to answer.  So it's your choice.  I don't know --

Page 50

1    I mean, this is getting really into -- that kind of
2    question really doesn't have any relevance here.  If
3    he doesn't care and he'll answer it, that's fine with
4    me, but I need to talk to him about that.
5         MR. TYNER:  Okay.
6         MR. GAULT:  So I'll either instruct him not
7    to answer, or you can let me talk to him about it.
8         MR. TYNER:  All right.  Talk to him about it.
9         MR. GAULT:  Let's take a break.
10        VIDEOGRAPHER:  Off the record.  The time is
11   10:28.
12        (Recess.)
13        MR. GAULT:  You can ask him.
14        VIDEOGRAPHER:  Back on the record.  The time
15   is 10:50.
16   BY MR. TYNER:
17   Q.   What percentage of Ripple did you own?
18   A.   I don't remember the exact ownership.  It was
19   approximately 40 percent.
20   Q.   Okay.  And the 60 percent belonged to who
21   else?
22   A.   Chris owned the same percent I did.  There
23   were some initial investors that owned some, and there
24   was employees that owned the rest, so ...
25   Q.   Okay.  And how long did you stick with

Page 51

1    Ripple?
2    A.   Altogether -- I mean, depends on when you say
3    it started.  I left in, I think -- I want to say
4    summer of 2013.
5    Q.   Okay.
6    A.   Or spring of 2013.
7    Q.   And --
8    A.   I don't know if that makes sense.  Let me ...
9    Q.   I'm thinking you said you came back from
10   Costa Rica the summer of '12.  Right?
11   A.   That's right.
12   Q.   Is that right?
13   A.   Yeah.
14   Q.   And then you stayed -- you started working on
15   Ripple pretty quickly?
16   A.   Yeah.  I was -- it was roughly -- I think it
17   was, like, nine months or a year, something like this.
18   Q.   Okay.
19   A.   Yeah.
20   Q.   When you left, what did you do with the
21   shares of your stock?
22   A.   I retained them.
23   Q.   Okay.  And when you left, was Ripple
24   profitable?
25   A.   No.

Page 52

1    Q.   How would Ripple make money?
2    A.   You know, I don't know what their current
3    plan is, but --
4    Q.   What was your plan to make money with Ripple?
5    A.   Ripple is similar to bitcoin.  It had an
6    underlying digital currency.  So if that currency
7    appreciated in value, then it can sell that.
8    Q.   Okay.  So it's kind of dependent on Ripple
9    being successful.
10   A.   Yeah.
11   Q.   Is that right?  Or is the -- the only income
12   was really going to be on the appreciation of the
13   Ripple itself?
14   A.   That's right.
15   Q.   Is that right?
16   A.   Yeah.  I mean, that was the original plan.
17   Q.   Okay.  And did you guys develop a Ripple
18   exchange?
19   A.   No.
20   Q.   No.  How did people acquire Ripple?
21   A.   You could -- I mean, it was traded on other
22   exchanges.
23   Q.   Uh-huh.
24   A.   So, yeah.
25   Q.   Could they mine it like they did bitcoin?

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                November 17, 2016

---

Page 53

1   A.  No.
2   Q.  After you sold Mt. Gox to Mark Karpeles, did
3 you help him learn that system, or was there a
4 transition kind of period, or what?  How did that go?
5   A.  Yeah, I helped him for another few weeks,
6 just transition, teach him what I was doing, and
7 things like that.
8   Q.  And the -- was it just -- was it only located
9 on one server that Amazon was maintaining?
10   A.  I don't remember how many servers we had.
11 There may have been a database server, as well.
12   Q.  Okay.  And were they both in that same center
13 that Amazon had, or did you -- what I'm asking is, did
14 you have it two different places geographically?
15   A.  No.  It was just one center.
16   Q.  Okay.  When you sold it to Mark, did he move
17 the server?
18   A.  I believe he did.
19   Q.  Do you know where he moved it to?
20   A.  I don't know.
21   Q.  Okay.  And do you know how long after he
22 purchased it that he moved it?
23   A.  I don't know that, either.
24   Q.  Why do you think he moved it?
25   A.  I don't know, you know.

---

Page 54

1   Q.  Well, you just -- you thought he did, and I
2 just wondered if he told you that or --
3   A.  Oh, he told me that he was going to move it,
4 yeah.
5   Q.  Did you help him with that so he could have
6 access to move it, or -- because the data would have
7 to physically move, and I'm just thinking there would
8 be a shutdown or something in between.  I don't know.
9   A.  Well, he told me he was going to move it.  I
10 don't know why he was going to move it.  The -- moving
11 the server is not a hard operation.  You just -- you
12 just copy all the data to wherever the new location
13 is, and then you just, at some point, you point the
14 DNS at the new IP.  Right?  So it's actually --
15   Q.  It's not a big deal?
16   A.  People won't even notice.
17   Q.  Okay.
18   A.  Yeah.
19   Q.  So it wouldn't really require it be shut down
20 for a day --
21   A.  No.
22   Q.  -- and moved?  Okay.  Do you -- and you don't
23 know why he wanted to move it.  Right?
24   A.  I don't.
25   Q.  Do you know if he moved it to Japan?

---

Page 55

1   A.  I don't know.
2   Q.  Now, I believe you said that Chris Raggio
3 contacted you by e-mail.  Is that right?
4   A.  That's right.
5   Q.  Okay.  And how would he know to contact you;
6 do you know?
7   A.  I assume -- I mean, my -- the e-mail address
8 was listed on the Mt. Gox website.  So I assume that's
9 how he did it.
10   Q.  Okay.
11   A.  Yeah.
12   Q.  And what's your recollection of that
13 communication when he first contacted you?
14   A.  He was basically saying I want to, you know,
15 I want to buy X amount of dollars worth of bitcoin,
16 how do I do that?  And then I just explained to him
17 what he needed to do.
18   Q.  Okay.  And what was it that he needed to do?
19   A.  I believe he wired the money to my bank
20 account, and then I told him to put in an offer to --
21 on the exchange to buy the bitcoin.
22   Q.  Okay.  At that time, what was the normal
23 volume of bitcoin being traded daily?
24   A.  Oh, I have -- it was a very long time ago.  I
25 have no idea what that volume was back then.

---

Page 56

1   Q.  If you -- do you recall approximately the
2 price of bitcoin when my client was buying it?
3   A.  I believe -- I don't recall it, but looking
4 at the e-mails, it looks like it was around 30 cents
5 or something like that.
6   Q.  Okay.  If someone placed a large order, would
7 that affect the -- if someone was going to buy 10,000
8 bitcoin, would that be a -- $10,000 worth of bitcoin,
9 would that be a large order?
10   A.  I -- honestly, I don't remember if you were
11 able to move that much at that point or not.
12   Q.  And what I'm getting to is, if you place an
13 order like that, you could very easily run the price
14 up on yourself.  Is that true or not?
15   A.  I don't know if that's the threshold, but
16 there's definitely some amount of money where, if you
17 place an order, it would make the price go up for
18 sure, so ...
19   Q.  Do you know what the average order was on
20 Mt. Gox?
21   A.  I honestly don't remember.
22   Q.  And do you remember what the value of the
23 outstanding bitcoin was at that time?
24   A.  You mean the total bitcoin in the world?
25   Q.  Yes, uh-huh.

---

Dr. Donald Raggio and Dr. Chris Raggio Mc McCaleb 30(b)6 Code Collective, LLC 11-17-16ied McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

Page 57

1    A.   I mean, you can figure it.  If bitcoin was 30
2  cents, I mean, you can figure it out.  Yeah, so ...
3    Q.   Thirty cents and --
4    A.   I mean, there's only -- at that point, what
5  would there -- there'd be, I mean, like, probably like
6  8,000,000 bitcoin mined at that point.  So 30 cents
7  times 8,000,000.
8    Q.   So that's two-and-a-half million.
9    A.   Yeah.
10   Q.   Something like that.  Come on now.
11   A.   So, yeah.
12   Q.   Did Chris go ahead and send you money, wire
13 it to you?
14   A.   He did.
15   Q.   And the -- what account was it that he sent
16 that money to?
17   A.   I believe he sent it to the Code Collective
18 business account.
19   Q.   Okay.  And Code Collective is the company
20 that you had for the --
21   A.   For the game.
22   Q.   -- for the game?
23   A.   Yeah.
24   Q.   And that was when you were mostly in New
25 York.  Right?

Page 58

1    A.   That's right.
2    Q.   Okay.  You didn't open a separate account for
3  Mt. Gox?
4    A.   No.
5    Q.   And the account that he wired money to, was
6  that a checking account?
7    A.   Yes.
8    Q.   Who was that account with?
9        MR. GAULT:  You mean what bank?
10       MR. TYNER:  Yes.
11   A.   I believe Chase, but I could be wrong.
12 BY MR. TYNER:
13   Q.   Okay.  Did you have a lot of business
14 accounts at that time?
15   A.   No.  That was the only one.
16   Q.   What about personal accounts; did you have a
17 lot of personal accounts at that time?
18   A.   I don't believe so.
19   Q.   Did you have any?
20   A.   I don't remember, but probably.
21   Q.   Okay.  How would you pay your bills?
22   A.   I assume I have it in a bank account.
23   Q.   Okay.  Would -- did you do most of your
24 business with Chase?
25   A.   You mean my personal business or the --

Page 59

1    Q.   Uh-huh, yes.
2    A.   Like I say, I don't remember if that was my
3  bank, but -- or if that was my -- I don't remember if
4  that was my business bank or -- and I definitely don't
5  remember if that was my personal bank.  I could have
6  used a different bank, but I believe so.
7    Q.   Okay.  So my client, Chris, wired you money?
8    A.   Uh-huh.
9    Q.   And then did you have -- do you, at that
10 point, have to manually credit his account?
11   A.   That's right.
12   Q.   Okay.  And who would do that?
13   A.   I would.
14   Q.   Okay.  And, at that point, he was free to
15 trade.  Is that right?
16   A.   That's right.
17   Q.   Did Chris ask you to help him buy a large
18 amount of bitcoin?
19   A.   I believe he asked me about advice on how to
20 do it.
21   Q.   And what advice would you give him?
22   A.   I don't remember what I said to him.  I think
23 he was asking about this feature that I had on there
24 called dark pools, which basically meant that you
25 could put up an order, and people couldn't see that

Page 60

1  the order was there.  So if you wanted to buy a large
2  amount, most of it would be hidden so it wouldn't move
3  -- it wouldn't scare the market, essentially.
4    Q.   Okay.
5    A.   So, I think he had placed all of his order as
6  a dark pool, but there's different ways of placing it,
7  and I think he had placed it where it could only be
8  taken by other dark pool orders, and I think I told
9  him he should make it where it could be placed by dark
10 -- taken by dark pool orders and normal orders, so he
11 could have more people taking his offer.
12   Q.   Okay.
13   A.   So ...
14   Q.   And did they do that?  Did he follow that
15 advice?
16   A.   I don't know what he did.  I don't remember
17 what he did.
18   Q.   Okay.
19   A.   I didn't look.
20   Q.   At some point, he notified you that he had
21 bitcoin missing.  Correct?
22   A.   That's right.
23   Q.   How did he notify you of that?
24   A.   Via e-mail.
25   Q.   Okay.  And what did you do once he notified

Dr. Donald Raggio and Dr. Chris Raggio v.                     McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                     November 17, 2016

**Page 61**

1  you that he had bitcoin missing?
2     A.  I checked his account to see, you know, who
3  had logged in, things like that.
4     Q.  Okay.
5     A.  So ...
6     Q.  And what else did you do?  Did you
7  investigate it at all?
8     A.  Once he had told -- once he told me where the
9  bitcoins went, I looked to see where those bitcoins
10  went after that, because you can follow the trail of
11  coins.
12    Q.  Okay.  And where had they gone?
13    A.  So, it looks like they had gone to this one
14  bitcoin account, and then from that bitcoin account,
15  some had gone back to Mt. Gox, so ...
16    Q.  Okay.  And when was this going on,
17  approximately?
18    A.  I think he e-mailed me in January --
19    Q.  Okay.
20    A.  -- 2011.
21    Q.  January of '11.  Okay.  And how many bitcoin
22  were missing from his account?
23    A.  He told me 9,000, around.
24    Q.  Okay.  And so you were able to see that it
25  came out of his account, and you could trace it back

**Page 62**

1  into an account that it came back into Mt. Gox.  Is
2  that right?
3     A.  That was -- we -- we saw that much later,
4  though.  Like, I don't know if --
5     Q.  Okay.
6     A.  -- it moved back much later, or we weren't
7  able to see it until later, but that wasn't
8  immediately, so ...
9     Q.  Okay.  But, eventually, you could see it went
10  back into Mt. Gox?
11    A.  Yes.
12    Q.  And you knew which account that was.
13  Correct?
14    A.  Which account it went back to?
15    Q.  Yes.
16    A.  That's right.  But like I say, that happened
17  after I had already sold the site, so ...
18    Q.  When the money came back into the account,
19  you'd already sold Mt. Gox?
20    A.  I don't remember when the money came back
21  into the account, but --
22    Q.  I'm sorry.  I said money, and I meant
23  bitcoin.
24    A.  Right.
25    Q.  I don't know if there was --

**Page 63**

1     A.  Yeah.  I don't know when the bitcoin was
2  moved back into Mt. Gox, but I know that we didn't
3  discover it being moved back into Mt. Gox until after
4  I had sold it to Mark.
5     Q.  What was the date that you sold Mt. Gox to
6  Mark?
7     A.  It was February 5th, 6th, or 7th, somewhere
8  in there.
9     Q.  Okay.  Did you tell -- you were already aware
10  that the coin had been stolen.  Right?
11    A.  Well, I don't know if the coin was stolen.  I
12  know that it was -- Chris was claiming that.  Like, I
13  don't really know what happened to it, so ...
14    Q.  Okay.  But at the time you sold the exchange,
15  you knew that Chris had said there was --
16    A.  That's right.
17    Q.  -- 9,000 missing?  Okay.  And did you believe
18  Chris?
19    A.  I did.  I mean, it's -- you know, I mean, I'm
20  not a hundred percent certain, but, you know, I
21  believe him.
22    Q.  After -- well, before he reported to you that
23  he was missing this bitcoin, had anybody else had any
24  bitcoin missing?
25    A.  I don't know if it was before or after, but

**Page 64**

1  there have been other -- there was someone else that
2  lost some bitcoin.
3     Q.  And was that before you sold it, someone else
4  had lost bitcoin?
5     A.  I believe it was before, yeah.
6     Q.  How many bitcoin -- was it just one other
7  person or multiple?
8     A.  I believe it was two people.
9     Q.  Was that two including the Raggios?
10    A.  No, not including those.
11    Q.  So it would be three total?
12    A.  Yeah.
13    Q.  Okay.  And who would those people that had
14  bitcoin missing?
15    A.  Who are they?
16    Q.  Yes.
17    A.  I don't remember who they were.  I mean, I
18  don't think I ever -- I didn't have much interaction
19  with them.
20    Q.  How did you know that they were missing
21  bitcoin?
22    A.  Theirs were compromised in a different way,
23  for sure, and I could see the way that their accounts
24  were compromised.
25    Q.  Uh-huh.

Dr. Donald Raggio and Dr. Chris Raggio v
MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
November 17, 2016

Page 65

1   A.  And, yeah, so ...
2   Q.  Explain that to me.  How was -- how were the
3   Raggios' compromised?
4   A.  I don't know how the Raggios' were
5   compromised.  So -- yeah.  Somebody had his user name
6   and password, and was able to log in and take the
7   bitcoin, so ...
8   Q.  Okay.  And then -- but the other two, you
9   could tell how they were compromised?
10  A.  That's right.
11  Q.  And how was that?
12  A.  They were compromised by this thing called a
13  dictionary attack, which is where somebody tries
14  several different passwords again and again, and then
15  they eventually got the right password, and were able
16  to log into their account.
17  Q.  And how could you determine that was what
18  they did?
19  A.  I believe I saw as -- because to do this
20  dictionary attack, you basically have to try thousands
21  and thousands of passwords.  So it's thousands and
22  thousands of log-in attempts, and all of this is
23  logged.  So -- and every once in a while, I would look
24  at the server logs and see, and I could see, like, all
25  these attempts.  There was also -- in order to do a

Page 66

1   dictionary attack, you have to get somebody's user
2   name, as well.
3   Q.  Uh-huh.
4   A.  Because, otherwise, you're guessing two
5   things.  So prior to this dictionary attack, somebody
6   had done this thing where they were able to scrape a
7   bunch of user names from Mt. Gox, and these two
8   accounts were some of the user names that had gotten
9   discovered.  And both of those things indicate that
10  there was a dictionary attack, and then some amount of
11  coins were stolen from them.
12  Q.  What was the amount that was stolen from
13  them?
14  A.  I don't remember, but it was nowhere near
15  what Chris Raggio's was.
16  Q.  Okay.  So when -- you said that the -- I'm
17  sorry.  It's all a little confusing to me, so ...
18  A.  Yeah.
19  Q.  The other two that had been compromised, were
20  you able to trace them, as well, follow where those
21  coins went?
22  A.  I don't know if we even tried it.
23  Q.  Okay.
24  A.  So ...
25  Q.  It was such a small amount, it just didn't

Page 67

1   have any significance?
2   A.  Oh, those, they didn't withdraw bitcoin.
3   Those guys withdrew dollars.
4   Q.  Oh.
5   A.  Yeah.
6   Q.  So they withdrew cash?
7   A.  Yeah.
8   Q.  How much cash was it?
9   A.  I don't remember the amount, but it was less
10  than the Raggio theft, for sure.
11  Q.  Okay.  So it was less than $10,000 then?
12  A.  Yeah.
13  Q.  Okay.  And did you just -- did you pay for
14  that, or what did you do with those accounts?
15  A.  I don't remember what I did with them.  I
16  think I split it, like, they paid half and I paid
17  half.
18  Q.  Okay.  And you think that that happened
19  before or after Chris had his missing?
20  A.  I believe it happened after.
21  Q.  Was there a limitation on the amount
22  of cash someone could withdraw?
23  A.  If I remember correctly, it was a $1,000
24  limit of any kind, either dollars or cash -- dollars
25  or bitcoin.

Page 68

1   Q.  Okay.  So if -- just how does that work that
2   you would get your cash back?  I mean, like, if I had
3   an account, and I had 10,000 that was sitting there,
4   and I wanted to bring it back to my bank, how would I
5   do that?
6   A.  So there's a few different methods.  I could
7   send you PayPal, I could send you to Liberty Reserve,
8   and then maybe there were some other ones.
9   Q.  Okay.  So did it require a human to --
10  A.  Liberty Reserve didn't require a human.  I
11  don't remember if PayPal did or not.
12  Q.  So, if I was going to -- so, Liberty -- so,
13  if I made a request for $10,000 to go to Liberty --
14  A.  Uh-huh.
15  Q.  -- then they would have an account, I guess,
16  for me?
17  A.  Yep.
18  Q.  And it would get deposited there, and then I
19  would deal with Liberty to get it --
20  A.  That's right, yeah.
21  Q.  -- back?  Okay.  And you think that was --
22  would be handled by the software and be an automatic
23  kind of transaction?
24  A.  Yeah.  Liberty Reserve was automated, for
25  sure.

Dr. Donald Raggio and Dr. Chris Raggio vs. McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

---

Page 69

1    Q.  Okay.  But with PayPal, it may have required
2  human intervention?
3    A.  Yeah.  I don't remember if, PayPal, I had to
4  do it manually or not.
5    Q.  Okay.
6    A.  I may have automated it, but it may have been
7  manual.
8    Q.  Okay.  And so there was just probably a
9  button I could push on there and say send me this
10  amount of cash through PayPal, or Liberty, or
11  whatever.  Is that --
12    A.  That's right.
13    Q.  Okay.  So, really, all I would need would be
14  a user name and password to get access to the account?
15    A.  Yeah.
16        MR. GAULT: Excuse me real quick.  You've
17  been going about an hour and 15.  Do you want to take
18  a break, stretch your legs, whatever?  It's your call,
19  so ...
20        THE WITNESS: I'm good.
21        MR. GAULT: Okay.
22  BY MR. TYNER:
23    Q.  When -- and I believe you said you sold
24  Mt. Gox February the -- do you remember the date?
25    A.  It was the beginning of February.

---

Page 70

1    Q.  Okay.
2    A.  5th, 6th, 7th, something in there.
3    Q.  Did you tell the Raggios you had sold
4  Mt. Gox?
5    A.  I don't remember when I told him, but I told
6  him at some point, yeah.
7    Q.  Did you tell Mark Karpeles that the bitcoin
8  had gone missing for the Raggios' account?
9    A.  I did.
10    Q.  Okay.  And what -- was there a plan to get
11  them taken care of?  Did you have any kind of plan
12  to --
13    A.  So, like I said, it was unclear -- to me
14  the -- you know, it's unfortunate that those coins
15  went missing, but ultimately, someone compromised his
16  password.  It was either in someone he knows or
17  something on his computer, so we didn't feel at fault
18  for it, you know, but we would have liked to recover
19  his coins if we could, but it's not something that we
20  thought we were, like, actually responsible for.  And
21  I think Mark felt the same way.  So -- and then later,
22  when it came to light that these coins did come back,
23  then we thought maybe there's an opportunity to
24  recover his coins, so ...
25    Q.  And so when you saw them come back into an

---

Page 71

1  account, whose account was that?
2    A.  The user name on the account was Barron.
3    Q.  It was just a one-name --
4    A.  It's the -- yeah.  It's the user name, so,
5  yeah, just one.
6    Q.  Oh, the user name.  Okay.  So when you signed
7  up, you didn't have to put in a first and last name?
8    A.  No.
9    Q.  When someone registered for an account, did
10  you have any way to track that person at all?
11    A.  I just had their e-mail and their IP address.
12    Q.  You did log their IP address when they signed
13  up?
14    A.  Yes.
15    Q.  If someone was logging in, did you check to
16  make sure it was the same IP address?
17    A.  You can't do that because IP addresses
18  change.  Right?  People are on -- most people are not
19  on a static IP address.
20    Q.  So you did not have a check to see if it was
21  the same IP address when they logged in?
22    A.  No, because, like I said, you can't.  I mean,
23  nobody does that.
24    Q.  Okay.  But when they first signed up, you
25  kept that information, you stored the information

---

Page 72

1  about the IP address that created the new account?
2    A.  I did.
3    Q.  Okay.  And for this -- what did you say their
4  name was?
5    A.  Barron.
6    Q.  Yeah.  You had that IP address?
7    A.  I did, yeah.
8    Q.  Could you tell where he was located?
9    A.  I don't remember where it was.
10    Q.  But could you tell?
11    A.  I mean, you could do a -- yeah, you could do
12  a look-up on the IP address, and it doesn't tell you
13  conclusively, but, yeah.
14    Q.  Did you do that?
15    A.  I don't remember if I did or not.
16    Q.  Okay.  And you had no other way to identify
17  this person?
18    A.  Other than the e-mail, no.
19    Q.  And did you try to find out who it was
20  through the e-mail?
21    A.  I looked, yeah.  It was -- if I remember, the
22  e-mail address was, I think, Barron@contractor.net.
23  So I tried to figure out what this contractor.net
24  thing was.
25    Q.  Okay.  And were you able to find what

---

Dr. Donald Raggio and Dr. Chris Raggio vs   McCaleb 30(b)6 Code Collective, LLC 11-17-16   McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                    November 17, 2016

| Page 73 |
|---|

1  contractor.net was?
2    A.  Nothing ever useful came out of it, I don't
3  think, so ...
4    Q.  Okay.  I mean, you could -- you, obviously,
5  could figure out who had purchased that domain?
6    A.  Sometimes you can.  Often the whois stuff is
7  masked, so you can't see who bought it.
8    Q.  Okay.  And you don't remember if you
9  discovered who owned contractor.net or not?
10   A.  I don't remember.  I remember, like, pursuing
11 that, and never being fruitful.  So I don't remember
12 what I actually got at the end of it, but -- whether
13 it was hidden, or if it was some mail server that
14 served lots of people, or what.  I just remember it
15 not being useful.
16   Q.  You couldn't identify them?
17   A.  Yeah.
18   Q.  Okay.  So when the bitcoin came back into
19 Barron's account -- Barron, I should be able to
20 remember that now.  That's Trump's son.  When it came
21 back into Barron's account, what happened with it?
22   A.  I don't remember what he did, like, if he had
23 traded it or not.  So I don't know if it was still
24 sitting there, or if he had already exchanged it to
25 dollars, or what had happened, so ...

| Page 74 |
|---|

1    Q.  You just remember there was either dollars,
2  or bitcoin, or both, that came back into that account?
3    A.  Definitely -- I mean, I can't trace the
4  dollars, so it was definitely bitcoin that had come
5  back.
6    Q.  Okay.
7    A.  And by say "come back," I mean basically
8  like --
9    Q.  It went of Mt. Gox?
10   A.  -- Chris's bitcoin went to a certain bitcoin
11 account that had more than Chris's bitcoin there, and
12 bitcoin from that account went to this Barron account,
13 so just to be clear.
14   Q.  Can you tell, like, if you're looking -- if
15 you have an address, can you look at that and see how
16 many bitcoin are associated with that address?
17   A.  Yes.
18   Q.  Cool.  Do you recall how many you could see
19 at that address?
20   A.  I don't remember, but it was more than
21 Chris's.  I don't remember how many were there.
22   Q.  Okay.  And the amount of bitcoin that went
23 back to Mt. Gox, was it more than Chris's, or was it
24 the same amount?
25   A.  It wasn't the same amount as Chris's.  I

| Page 75 |
|---|

1  don't know if it was more or less.
2    Q.  Okay.  And did you take any action to try to
3  preserve that bitcoin that came back into Barron's
4  account?
5    A.  Once we realized that this had happened,
6  like, once I realized that there was some account that
7  Chris's coins had gone to, and then those coins that
8  that account had sent to Mt. Gox, then we froze that
9  Mt. Gox account.
10   Q.  Okay.
11   A.  So we froze Barron's account at that point.
12   Q.  Okay.  Did Barron's account -- you're not
13 sure if it had enough in there to cover Chris's loss
14 or not?
15   A.  I don't know if it had enough bitcoins.  It
16 had enough dollars for sure.  It was about $45,000
17 worth of stuff.
18   Q.  Okay.
19   A.  In other words, bitcoins or dollars.  I don't
20 know what it was denominated in, but at the time we
21 froze it, it was worth about $45,000.
22   Q.  Okay.  And that would be -- would that be
23 total bitcoin and cash or --
24   A.  I believe so, yeah.
25   Q.  Okay.

| Page 76 |
|---|

1    A.  I don't remember how it broke down, but --
2    Q.  Okay.
3    A.  Yeah.
4    Q.  And so, at some point, did you then transfer
5  money to Chris to cover that or bitcoin?
6    A.  Because at this point, I no longer owned
7  Mt. Gox, it was in Mark's hands, you know, I told -- I
8  explained to Mark the situation, and explained to him
9  the information why I thought that Barron was
10 suspicious, at least, and then I believe Mark
11 contacted Barron and tried to figure out what was
12 going on, so ...
13   Q.  Okay.  And did you try to help any to get
14 this taken care of?
15   A.  I had some e-mail exchange with Barron, as
16 well, and some exchange on the forum.  But beyond
17 that, no.
18   Q.  And the forum, what is the forum?
19   A.  There's a -- there was a pretty popular forum
20 for bitcoin where people can, like, post messages and
21 talk about it.  That was kind of where everybody knew
22 knew about bitcoin at that time would go and talk
23 about bitcoin stuff, so ...
24   Q.  And what's the name of that forum?  Or is it
25 -- is it a name, or how do you find it?

Dr. Donald Raggio and Dr. Chris Raggio v.                    Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                                        November 17, 2016

Page 77

1    A.  Bitcointalk.org.
2    Q.  Okay.
3    A.  Yeah.
4    Q.  And so is it just like a blog or something
5  that people talk back and forth or create topics
6  and --
7    A.  That's right.
8    Q.  I've seen that kind of stuff.
9    A.  Yeah, yeah.  Anyone can post a topic and
10  write, and then people reply to them, things like
11  this.
12    Q.  Okay.  And so you communicated with Barron on
13  the forum or directly, or with his e-mail?
14    A.  Both.
15    Q.  Okay.  And what was his response?
16    A.  He claimed that he had bought these bitcoin
17  off of somebody on IRC that he didn't know, and that,
18  basically, maybe the person he bought them from stole
19  them, but he didn't steal them.
20    Q.  Okay.  Would that be plausible?
21    A.  It seems unlikely to me.  I mean, it's
22  definitely possible, yeah.
23    Q.  But you could see it left the Raggios'
24  account --
25    A.  Uh-huh.

Page 78

1    Q.  -- and went to a number, went to a -- what do
2  you call that?
3    A.  Bitcoin address.
4    Q.  Address.  Okay.
5    A.  Yeah.
6    Q.  And you could see, in that address, that it
7  had not only the Raggios', but it had more bitcoin.
8  Do you recall -- theirs was about 9,000.  Do you
9  recall how much was in that address?
10    A.  I really don't remember.
11    Q.  You just remember it was more?
12    A.  I remember it was more.
13    Q.  And then you could see that bitcoin went from
14  that address into Barron's account.  Right?
15    A.  That's right.
16    Q.  Is that right?
17    A.  Uh-huh.
18    Q.  Okay.  And so Barron is claiming that he
19  bought bitcoin on IRC, and that's how -- and we
20  know -- well, we don't know where all of those bitcoin
21  came from at that address?
22    A.  That's right.  I don't know if he was
23  claiming that he owned that address, or if he had the
24  person that he bought them from send them directly to
25  Mt. Gox.  So, you know -- or this thing in the middle

Page 79

1  could actually maybe have been a -- like, another
2  wallet, basically, where it holds the bitcoins of lots
3  of different people.
4    Q.  Uh-huh.
5    A.  So it's hard to know.
6    Q.  Okay.  And so after y'all froze the account,
7  then what happened?
8    A.  Mark said he was going to continue to
9  investigate, and he thought that he needed court
10  approval to be able to send from one of his users'
11  accounts to another of his users' account.  So he told
12  me and Chris that he was trying to seek that approval.
13  I don't know what he was doing beyond that, if
14  anything, so ...
15    Q.  Did you call and talk to him or -- back up.
16  Did you ever talk to him personally, like, on the
17  phone?
18    A.  To Mark?
19    Q.  Yes.
20    A.  A couple of times, not very often.
21    Q.  So it was mostly e-mail, I presume?
22    A.  It was mostly -- I mean, I basically didn't
23  talk to him that much.  But, yeah, some e-mails.
24    Q.  E-mails?
25    A.  Yeah.

Page 80

1    Q.  Okay.  And so you would -- you would e-mail
2  him about the Raggios?
3    A.  I may have.  You know, it wasn't -- it
4  definitely wasn't a regular thing.  I think maybe
5  Chris asked me to e-mail him one time or something,
6  yeah.
7    Q.  What e-mail address were you using at that
8  time?
9    A.  I had several.
10    Q.  What were they?
11    A.  Well, I had my personal e-mail account.  I
12  had my account for my new company.  Mark didn't turn
13  off my jed@mtgox account just because sometimes people
14  would still e-mail me there.
15    Q.  Your what X; what did you say, Jed?
16    A.  Jed@mtgox account.
17    Q.  Oh, jed@mtgox.
18    A.  Yeah.
19    Q.  Okay.
20    A.  And I have another personal account.  I mean,
21  I have a bunch of old e-mail accounts.
22    Q.  But if you were communicating with Mark, what
23  account would you use?
24    A.  Most likely, the jed@mtgox.
25    Q.  But you could have used your personal?

Dr. Donald Raggio and Dr. Chris Raggio MtCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                    November 17, 2016

---

Page 81

1    A.  I would sometimes e-mail him from my personal
2  account.
3    Q.  What was that e-mail account?
4    A.  Jed2000@gmail.
5    Q.  Okay.  And then you probably had one at
6  Ripple, as well?
7    A.  Yeah.
8    Q.  And what was that e-mail?
9    A.  Jed@ripple.com.
10    Q.  Okay.  Any others?
11    A.  Yeah.  I have another personal account,
12  swamp12@yahoo.com.
13    Q.  Okay.
14    A.  Ripple was called The Open Coin briefly, so I
15  had an Open Coin account.
16    Q.  Okay.
17    A.  Yeah.  I had an account for Far Wilds still,
18  yeah.
19    Q.  Were they all jed@?
20    A.  Yeah, for the most part.
21    Q.  -- opencoin.com?
22    A.  Yeah.
23    Q.  Do you still have the Gmail account?
24    A.  My personal, Jed2000?
25    A.  Yeah.

---

Page 82

1    A.  Yes, I do.
2    Q.  Okay.  Can you go back and pull those e-mails
3  that you would have sent to Mark at that time?
4    A.  From my personal one?
5    Q.  Yes.
6    A.  It's technically possible, yeah.
7    Q.  And then what about the Mt. Gox e-mail?
8    A.  Those are gone.
9    Q.  Was the e-mail server for Mt. Gox the same
10  server that the exchange was hosted on?
11    A.  No.  We used -- well, I used Gmail for it.  I
12  think maybe Mark switched it off of Gmail at some
13  point.
14    Q.  You used Gmail for the e-mail for Mt. Gox?
15    A.  That's right, yeah.  They'll -- Google will
16  do a domain server for you for -- do a mail server for
17  you, if you ask them to.
18    Q.  Okay.
19    A.  So ...
20    Q.  And so when you first set up the e-mail for
21  Mt. Gox, you used the Google?
22    A.  Yeah.
23    Q.  Okay.  And then you think, at some point,
24  Mark may have changed it?
25    A.  I think so.  I'm not sure.

---

Page 83

1    Q.  Okay.  And what was his e-mail address?
2    A.  Well, he took over admin@mtgox.
3    Q.  Okay.
4    A.  Which was the main way people had contacted
5  me before.  And he took over -- and then he added
6  mark@mtgox.
7    Q.  Okay.  When you first started communicating
8  with Mark, do you remember what e-mail address that
9  was?
10    A.  What e-mail address I used?
11    Q.  Before he -- no.  Before he bought Mt. Gox,
12  what e-mail he used?
13    A.  I don't remember.  I think it was something
14  MagicalTux, was in there somewhere.
15    Q.  Okay.
16    A.  I don't know.
17    Q.  I can't -- is -- you said that you hired him
18  to write some code for Mt. Gox.  Is that right?
19    A.  That's right.  I contracted him to do this
20  integration for a bank in Europe.
21    Q.  Okay.  What bank was that?
22    A.  It was a bank in Finland.  I don't remember
23  the bank's name.
24    Q.  And so he would just write software to
25  communicate between the bank and Mt. Gox.  Is that

---

Page 84

1  right?
2    A.  That's right.  So when someone would deposit
3  money there, it would automatically get credited in
4  their account, things like that, so ...
5    Q.  Okay.  And you had just put this exchange up,
6  like, in August or so?
7    A.  Uh-huh.
8    Q.  About how long -- about when was it that you
9  got him to do the Finland bank?
10    A.  I don't know.  Approximately maybe December
11  or something like that.
12    Q.  Okay.  How did you find him?
13    A.  He had done other projects in the bitcoin
14  space, like, done other things for bitcoin, and he was
15  on IRC, and he was talking -- yeah.  So I just asked
16  him.
17    Q.  So you just saw him --
18    A.  Around.
19    Q.  -- in the groups?
20    A.  Yeah.
21    Q.  What was he doing with bitcoin before
22  Mt. Gox?
23    A.  I don't remember exactly what he had done
24  now.  I think he had made some way where you could see
25  the different bitcoin nodes on a map, and I think he

---

Dr. Donald Raggio and Dr. Chris Raggio
MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC 11-17-16
McCaleb 30(b)6 Representative
November 17, 2016

---

Page 85

1  had -- was selling hosting or something for bitcoin,
2  things like that, so ...
3      Q.  Selling hosting?
4      A.  Like, selling server hosting, so you could
5  host a server and pay for it in bitcoin.
6      Q.  Oh, okay.
7      A.  Yeah.
8      Q.  Just rack space?
9      A.  Yeah.
10     Q.  But pay for it in bitcoin?
11     A.  Exactly.
12     Q.  Okay.  How did you -- why didn't you use
13  somebody stateside to write that code for Finland?
14  What made him the right guy for that?
15     A.  I asked, in the channel, who had done stuff
16  like that before.  He had done work like that before,
17  so ...
18     Q.  Okay.  And so did he complete that project?
19     A.  I don't remember if he finished or not.
20     Q.  Okay.  I mean, that wouldn't be a big -- a
21  huge project, would it?
22     A.  It's more difficult than it sounds just
23  because their API is nonexistent, basically.  It's
24  like -- it's kind of a hassle, yeah.
25     Q.  So it's not really the coding that's so hard,

---

Page 86

1  but --
2      A.  Banks, dealing with bank software is
3  cumbersome.  So there's, like, intricacies there, I
4  guess.  Like, it's not -- it's not as easy as it
5  should be.
6      Q.  Okay.  And I guess that's for security.  I
7  mean ...
8      A.  No.  I think it's more just, like, legacy,
9  and just bad coding, and things like that on their
10  part.  So, just old.
11     Q.  Okay.  What software did you use to write --
12  or what programming language did you use to write
13  Mt. Gox?
14     A.  PHP.
15     Q.  And is that what he would use for this
16  interface?
17     A.  Yeah.
18     Q.  Okay.  PHP?
19     A.  Uh-huh.
20     Q.  What does PHP stand for, if you know?
21     A.  I don't know what PHP stands for.
22     Q.  So how long did you keep communicating with
23  Mark Karpeles after you sold Mt. Gox?
24     A.  Really, only for another month.  And then at
25  that point, he had pretty much taken over completely.

---

Page 87

1  He understood how the system worked, and he just kind
2  of ran it from there.  That was basically the extent
3  of it.
4      Q.  When he bought Mt. Gox, did he open a bank
5  account so you could transfer the cash to him?
6      A.  How did that work?  I don't know how we
7  transferred the cash.  At some point, we definitely
8  did.  I don't remember how it was transferred, though.
9      Q.  Do you think you wrote a check, or you wired
10  it?
11     A.  I doubt I -- I probably wired it.  I doubt I
12  would have wrote a check, but ...
13     Q.  What was the amount of cash that you
14  transferred when you sold it?
15     A.  I don't remember.  I just -- I don't
16  remember.
17     Q.  Over $100,000?
18     A.  Maybe.  I just don't remember how much it was
19  at all.
20     Q.  You think it was a million dollars?
21         MR. GAULT: He said he didn't know, third try
22  this time.
23         MR. TYNER: Well, we can narrow this down a
24  little bit.
25         THE WITNESS: I don't --

---

Page 88

1         MR. GAULT: If he doesn't know, he doesn't
2  know.
3         MR. TYNER: Well --
4      A.  It wasn't a million dollars.
5         MR. TYNER: Okay.  So he does know that.
6         MR. GAULT: You got me.
7  BY MR. TYNER:
8      Q.  You think it was less than half a million
9  dollars?
10     A.  Yeah.  I'm sorry.  I just don't really
11  remember.  It's really a long time ago.
12     Q.  And then what about the bitcoin?  How did you
13  transfer those wallets?
14     A.  Again, I don't recall, but I likely just gave
15  him the secret keys.
16     Q.  Gave him the secret keys?
17     A.  Yeah.
18     Q.  How does that work?
19     A.  Bitcoin addresses are just the public keys of
20  a corresponding secret key, and if you have the secret
21  key, you can make transactions on the bitcoin address.
22  Right?
23     Q.  Okay.
24     A.  So ...
25     Q.  So the bitcoin would have stayed in the

---

Dr. Donald Raggio and Dr. Chris Raggio vs    McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                November 17, 2016

Page 89

1  wallets that you created, and you just gave him access
2  to them?
3  A.  Well, I don't remember what happened,
4  actually.  Now that I think about it, he probably made
5  me send them to new wallets, but I don't remember what
6  we did.  But that's pretty straightforward, to either
7  send to a new address or do something, so ...
8  Q.  And how many -- about how many wallets did
9  you have for Mt. Gox?
10  A.  I don't know.  I mean, there -- I believe
11  there was one wallet for every customer, so they could
12  -- they would have a deposit address that we would
13  watch.  So there was probably quite a few.  None of
14  those would have bitcoin in them, though.  There was
15  just a handful that would actually retain bitcoin.
16  Q.  Okay.  And a handful, you're thinking five?
17  A.  Yeah.  I really don't remember how it was set
18  up.
19  Q.  But it wouldn't be one for every -- you
20  weren't retaining bitcoin in a whole bunch of
21  different wallets?
22  A.  No.
23  Q.  One for every --
24  A.  No.  No significant amount, no.
25  Q.  Okay.  And how many bitcoin were at Mt. Gox

Page 90

1  when you sold it?
2  A.  I really don't remember at all, you know.
3  Q.  At the time you sold Mt. Gox, it was the
4  largest bitcoin exchange in the world, wasn't it?
5  A.  That's right.
6  Q.  And I think you said a while ago, you thought
7  about 8- or 9,000,000 had been mined by then?
8  A.  Yeah.  I mean, we'd have to look at the chart
9  to see what the actual number was, but I think around
10  there, so ...
11  Q.  Around there?
12  A.  Yeah.
13  Q.  Do you remember the amount of bitcoin in
14  relationship to what was out?
15  A.  I remember, shortly after I sold it, Mark did
16  some demonstration, and I think he moved around
17  400,000 bitcoin to show that he had access to it, so
18  it was --
19  Q.  Oh, okay.
20  A.  But that was after.
21  Q.  Yeah.
22  A.  And I think he had -- I think there was a lot
23  more deposited after I had sold it, basically.  So it
24  was some amount less than that.
25  Q.  Okay.  And he would just move it so people

Page 91

1  could -- he could say, hey, I'm going -- I really did
2  buy this.  Is that trying to give confidence?
3  A.  People were worried that he didn't actually
4  have the bitcoin that was represented on the site.
5  Q.  Okay.
6  A.  Like I'd either sold it, or lost it, or
7  something like that.  So to prove that he still had
8  control over it, he moved it.
9  Q.  Oh, okay.  And that was -- it was after,
10  obviously, he bought it, but was it fairly soon after
11  he bought it?
12  A.  No, it was long after.  I mean, I don't
13  remember when it was.  Maybe --
14  Q.  Months?
15  A.  Months.  It was months after, but, yeah.
16  Q.  Okay.  So when you -- were you -- you said he
17  did it -- was it in a public forum, was he speaking,
18  or was it just on the --
19  A.  It was on Bitcointalk, I believe.
20  Q.  Okay.  And he was basically saying, look, I
21  really do have the coin, you guys look over here, and
22  you can see me, I'll move it?
23  A.  Yeah.
24  Q.  Is that -- is that right?
25  A.  Something like that, yeah.

Page 92

1  Q.  I'm just trying to understand all this.  I
2  mean, it's pretty amazing that anybody can actually
3  see it.  How do you go about doing that?  How do
4  you --
5  A.  Looking at it?
6  Q.  Uh-huh.
7  A.  Well, basically, that's what -- basically
8  any, like, bitcoin node can inspect the addresses.
9  Right?  And see -- I mean, that's what bitcoin is.
10  It's a way for all these different servers to agree on
11  what node owns -- or what address owns what.  Right?
12  So if you run a bitcoin node, you can look up a
13  particular address and see what -- how much it's
14  holding.
15  Q.  Okay.
16  A.  Yeah.
17  Q.  Okay.  So not everybody can do it, but you
18  have to be running a node to be able to see?
19  A.  That's right, yeah.
20  Q.  Okay.  And what's a node?
21  A.  It's just -- I mean, bitcoin is this
22  peer-to-peer network.  Right?  So it's just running
23  one of the pieces of software in the network.  Right?
24  Q.  Uh-huh.
25  A.  So something that's following the bitcoin

Dr. Donald Raggio and Dr. Chris Raggio vs.
MTGOX, a sole proprietorship, et al
McCaleb 30(b)6 Code Collective, LLC 11-17-16
Mark McCaleb 30(b)6 Representative
November 17, 2016

Page 93

1 protocol and is talking to the other bitcoin servers
2 out there in the world, so -- is a node.
3 Q. So would -- like, if you -- like, you can go
4 and download the bitcoin software to your computer?
5 A. That's right.
6 Q. And do you become a node when you do that, or
7 is that different?
8 A. I mean, "node" is not a very specific term,
9 but, I mean, I guess, technically, you'd become a node
10 if you -- well, you would become a node probably -- in
11 the real sense, you'd become a node if you start
12 validating, if you start mining, essentially, then you
13 become a node.
14 Q. Okay.
15 A. But you can get the block chain, and you can
16 verify the block chain. So, basically, you can look
17 at the thing and see if this is, indeed, the longest
18 chain, and things like that, so ...
19 Q. But if I've downloaded that software, I
20 should be able to go look at all these transactions?
21 A. That's right.
22 Q. Or do I still have to be mining?
23 A. No, you don't have to be mining.
24 Q. Okay. So if I knew what I was doing, I could
25 go look and see what --

Page 94

1 A. That's right, yeah.
2 Q. And you said you can see the address, and you
3 can see the amount of bitcoin that's held there?
4 A. Uh-huh.
5 Q. Is that right?
6 A. Yes.
7 Q. And so anybody that wants to download the
8 software could do that?
9 A. Yeah.
10 Q. Okay. Wow. So do you still have those same
11 wallets that you had when you had Mt. Gox?
12 A. No.
13 Q. What did you do with them?
14 A. I mean, the key -- like, I never had them
15 locally. The keys were only on the server, so, yeah.
16 Q. I don't understand that.
17 A. That's not true, actually. I had -- I
18 believe I had a cold wallet. So I had those local
19 keys, but that I must have transferred to Mark, so ...
20 Q. You had a -- what was cold? You said you had
21 a cold what?
22 A. A cold wallet.
23 Q. Okay. What is that?
24 A. That's where some bitcoin is not online. So
25 it's basically reserved, like, off the -- offline. So

Page 95

1 if someone hacks into your machine, and, like,
2 compromises it, they won't be able to take all the
3 bitcoin.
4 Q. Okay.
5 A. So ...
6 Q. And if it is offline, is it just on another
7 -- on a computer that's not connected to the net?
8 A. That's right.
9 Q. Is that right?
10 A. Yeah.
11 Q. Okay. I had heard something about you could
12 have paper. Is that -- is that true, you could
13 actually print your bitcoin?
14 A. Well, can you print the -- you can print the
15 secret key. Right? So if you've printed the secret
16 key and put that somewhere, then --
17 Q. And then --
18 A. -- and it's not anywhere online, then
19 that's --
20 Q. Okay.
21 A. -- what they mean by paper wallet.
22 Q. So then you could just delete everything even
23 off the computer because the key's all that you have to
24 have?
25 A. Right.

Page 96

1 Q. Okay. So you had -- you had cold, but you
2 didn't have paper?
3 A. That's right.
4 Q. Okay. How did you get the cold bitcoin to
5 Mark?
6 A. I don't remember the exact mechanism, but I
7 mean, you can always put the cold one back online.
8 Right? I mean, you have to do it at some point to
9 actually make the transaction.
10 Q. And so you would -- at that point, you would
11 take that computer that was not connected to the
12 internet. Is that right? And then you could
13 transfer? How did you get it from the cold computer
14 to the being live again?
15 A. So, there's a couple ways you can do it. You
16 can basically make the transaction, and then what the
17 -- what you need the private key for is to actually
18 sign the transaction. So you can take the
19 transaction, which is just a blob of data, move it to
20 the cold computer, have the cold computer sign it,
21 copy that signed transaction, and then, you know, on a
22 USB key or something, and then put it back online. I
23 don't remember the exact mechanism I used to transfer
24 the coins to him, though.
25 Q. Okay. But you don't keep up with those

Dr. Donald Raggio and Dr. Chris Raggio vs.                Mark McCaleb 30(b)6 Code Collective, LLC 11-17-16
MTGOX, a sole proprietorship, et al                       Mark McCaleb 30(b)6 Representative
                                                          November 17, 2016

Page 97

1    wallets that you had back then --
2       A.  No.
3       Q.  -- with Mt. Gox anymore?
4       A.  No.
5       Q.  Okay.  Did you empty those wallets?  I guess
6    you did, if you're not using them.
7       A.  Yeah.  I mean, I definitely -- like, whatever
8    was there, held by my wallets before, Mark took and
9    put somewhere else.  So there was no bitcoins left
10   that were under my control --
11      Q.  Okay.
12      A.  -- after we sold it, so ...
13      Q.  All right.
14      A.  I'm going to run to the bathroom real quick.
15          MR. GAULT:  Sure.  Let's take five.
16          VIDEOGRAPHER: Off the record.  the time is
17   11:48.
18          (Recess.)
19          VIDEOGRAPHER: Back on the record.  The time
20   is 12:02.
21   BY MR. TYNER:
22      Q.  I think I asked you this, but I just don't
23   remember the answer.  But about when was it that you
24   hired Mark Karpeles to do that interface with the
25   Finland bank?

Page 98

1       A.  I don't remember exactly.  It was, I think,
2    around December probably.
3       Q.  Okay.  And you don't remember if he completed
4    that or not before he actually bought the exchange?
5       A.  I'm pretty sure he completed it at some
6    point.  I just don't remember if it was before or
7    after transfer was done.
8       Q.  Okay.  And the transfer was the first part of
9    February?
10      A.  Yeah.
11      Q.  So it's not a lot of time to have completed
12   that.  Right?  What -- you said that you knew him from
13   the forums online.  Oh, and you put out a request,
14   could somebody do this coding.  Correct?
15      A.  That's right.
16      Q.  Okay.  And he responded to you?
17      A.  Yeah.
18      Q.  And said that he was capable of doing that?
19      A.  Yes.
20      Q.  Okay.  So in the course of that, the fact
21   that he was going to be writing the software to
22   interface with Mt. Gox, did you give him
23   access to Mt. Gox at that point?
24      A.  No.
25      Q.  Okay.  So he wouldn't need access?

Page 99

1       A.  No.
2       Q.  How would he be able to create this software
3    -- would he create the software or the interface and
4    just send it to you?  Is that what would happen?
5       A.  Yes.
6       Q.  Okay.  And so he would never have to have
7    access to Mt. Gox in order to complete his work?
8       A.  No.
9       Q.  Okay.  And why didn't you just do that
10   yourself?
11      A.  I was pretty busy doing other things for
12   Mt. Gox and other stuff, and, also, he had more
13   experience with doing things like that, so he would be
14   able to do it quicker than I would.
15      Q.  How did you know he had more experience?
16      A.  I mean, that's what he claimed.  He claimed
17   he had more experience doing it.
18      Q.  Okay.  But it was just his own -- he
19   responded to your request for somebody, and you
20   believed he was capable?
21      A.  That's right.
22      Q.  Okay.  You didn't do a background check on
23   him?
24      A.  No.
25      Q.  Did he give you some references to call?

Page 100

1       A.  No.  I mean, it was just for this small piece
2    of contract work.  You don't typically need to do
3    that, so ...
4       Q.  So when you say small piece, how much money
5    would you expect to pay him for that?
6       A.  I don't remember what we actually negotiated.
7    It would be maybe a couple thousand or something like
8    that, so ...
9       Q.  Okay.  So it wasn't a huge project?
10      A.  No.
11      Q.  And you -- so the sale took place in the
12   first part of February.  When did you start talking to
13   him about selling it to him?
14      A.  I don't remember the exact time.  Probably in
15   January, though.
16      Q.  So it kind of -- it went down pretty fast
17   then, from the time you started talking to Mark to the
18   point that you actually sold it to him?
19      A.  Yeah.  I mean, you know.
20      Q.  Only a month or so?
21      A.  Yeah.
22      Q.  Okay.  And did he pay you some money for
23   that, for the Mt. Gox?
24      A.  No.
25      Q.  Okay.  What was the agreement?

Dr. Donald Raggio and Dr. Chris Raggio    McCaleb 30(b)6 Code Collective, LLC 11-17-16ed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

|  | Page 101 |
| --- | --- |

1    A.  I would get 50 percent of the revenue for the
2  next, I believe, six months, so ...
3    Q.  And how much revenue was it producing when
4  you sold it to him?
5    A.  I mean, it would vary a lot, and it was
6  changing a lot.  You know, up until that point, it
7  probably hadn't produced that much.  I mean, I think,
8  at the time I sold it, I think, if it had kept going
9  at that exact rate, it would produce, like, 100,000 a
10  year or something like that.
11    Q.  Okay.  And so, let's see.  If you started the
12  first part of February, then you would think you would
13  get -- and when you say you were going to get half the
14  revenue, is that half the gross revenue?
15    A.  I believe it was half the gross revenue,
16  yeah.
17    Q.  Okay.  And so you would expect some payment
18  in March?
19    A.  In March?
20    Q.  Well, and it may not be monthly.  What time
21  -- how often were you to be paid your half?
22    A.  We didn't really specify those details, yeah.
23    Q.  So it very well could have all come in at the
24  end of the six months, and he'd just send you half of
25  it at the end of the six months?

|  | Page 102 |
| --- | --- |

1    A.  That's right, yeah.
2    Q.  Did he send you any money?
3    A.  He did.
4    Q.  Okay.  When did he send you money?
5    A.  I think it was about nine months after I sold
6  it.
7    Q.  Okay.  Just one payment?
8    A.  That's right.
9    Q.  Okay.  What was that amount?
10    A.  It was around 230,000, somewhere in there.
11    Q.  Okay.  At the end of the six months, did you
12  say, "Hey, where's my money," or --
13    A.  I did.
14    Q.  Okay.
15    A.  Yeah.
16    Q.  You had to start hounding him to send you --
17    A.  It wasn't hounding exactly.  I just had to
18  tell him a couple of times.
19    Q.  Okay.
20    A.  Yeah.
21    Q.  And how did you verify that was the right
22  amount?
23    A.  I still was able to look at the record of
24  transactions, so I could see the transactions that had
25  occurred.  And based on that, I could calculate how

|  | Page 103 |
| --- | --- |

1  much he would have made, so ...
2    Q.  Okay.  So that was pretty easy for you to
3  verify?
4    A.  That's right.
5    Q.  And then you retained a percentage ownership
6  of Mt. Gox?
7    A.  That's right.
8    Q.  And so -- let's see.  It was a sole
9  proprietorship when you sold it.  Right?
10    A.  Yes.
11    Q.  Okay.  So did you receive any money for your
12  -- or what percentage did you retain?
13    A.  Twelve percent.
14    Q.  Okay.  Did you receive anything for that 12
15  percent?
16    A.  What do you mean, receive anything for that?
17    Q.  Did you get payments?
18    A.  No.  I -- not from Mark, yeah.
19    Q.  Okay.  Did you get it in some other way?
20    A.  Right before -- eventually, he was going to
21  declare bankruptcy, and someone approached me wanting
22  to kind of save Mt. Gox, and I sold my 12 percent to
23  them for, I think, a dollar or $5, something really
24  nominal.
25    Q.  Okay.

|  | Page 104 |
| --- | --- |

1    A.  So ...
2    Q.  Who was that?
3    A.  It was this group called Sunlot Holdings.
4    Q.  Were they out of California, as well?
5    A.  I don't know where they were based.  One of
6  the people involved was from California.  One was from
7  the UK.  They were from, I think, from other parts of
8  the world, as well, so ...
9    Q.  Were they a venture capital fund, or just
10  some interested bitcoin people?
11    A.  I think it was a mix.
12    Q.  Okay.
13    A.  Yeah.
14    Q.  Did you know any of them personally?
15    A.  I think I had met one of them before.  I
16  definitely know one now.  I don't know if I'd met him
17  before or after that.  I think I met him before.
18    Q.  Who was that?
19    A.  Brock Pierce.
20    Q.  How did you know Brock?
21    A.  He -- just from bitcoin space, just from,
22  like, conventions and things like that, so --
23  conferences.
24    Q.  The wallets that you had when you were with
25  Mt. Gox, do you still have the information regarding

Dr. Donald Raggio and Dr. Chris Raggio v.                 McCaleb 30(b)6 Code Collective, LLC 11-17-16  McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                November 17, 2016

| Page 105 | Page 107 |
|---|---|
| 1  those wallets? | 1  don't understand it. |
| 2  A.  No. | 2  A.  Yeah. |
| 3  Q.  What did you do with it? | 3  Q.  So you transferred the bitcoin, and the cash, |
| 4  A.  I erased it when I sold it. | 4  and everything to Mark Karpeles when you sold it? |
| 5  Q.  You erased the wallets? | 5  A.  Yes. |
| 6  A.  Yeah.  I mean, all the private keys were no | 6  Q.  And when you sold it, you explained to him |
| 7  longer useful.  They didn't have money in them | 7  that these three accounts, I think you said three, had |
| 8  anymore. | 8  had -- had been compromised? |
| 9  Q.  Okay.  Can we -- can you go -- can I go, if I | 9  A.  That's right. |
| 10  knew how, and look at and find those wallets? | 10  Q.  Okay.  And the -- by the time -- at some |
| 11  A.  Possibly.  I think it would be really hard to | 11  point, you told the Raggios that you had seen it come |
| 12  tell what were the internal Mt. Gox wallets and what | 12  back into Barron's account.  Right? |
| 13  were people that were just sending money back and | 13  A.  That's right. |
| 14  forth to Mt. Gox. | 14  Q.  Okay.  And that you had frozen that account? |
| 15  Q.  Okay.  But if someone was technical enough, | 15  A.  Uh-huh. |
| 16  they could go back and see all of the transactions? | 16  Q.  "Yes?"  Instead of "uh-huh," say "yes" or |
| 17  Like, the block chain is open? | 17  "no." |
| 18  A.  You can definitely see all the transactions. | 18  A.  Yes. |
| 19  You just don't know who is the owner of these bitcoin | 19  Q.  Okay.  I'm sorry.  And so what had you -- |
| 20  addresses, so ... | 20  what had you told the Raggios about that?  Were you |
| 21  Q.  Okay.  The data that's kept with that | 21  going to get that back to them? |
| 22  address -- what data is kept with the address? | 22  A.  Like I said, once this money -- once we had |
| 23  A.  With the bitcoin address? | 23  realized that the money had -- or the bitcoins had |
| 24  Q.  Uh-huh. | 24  come to this Barron account, once we had frozen the |
| 25  A.  The only data it has is money -- like, | 25  Barron account, Mark already owned the site, so it |

| Page 106 | Page 108 |
|---|---|
| 1  bitcoin flows in and out. | 1  wasn't up to me anymore.  So, yeah. |
| 2  Q.  Okay. | 2  Q.  But did you tell the Raggios that you were |
| 3  A.  So the time of those flows and then amount. | 3  going to look into it and then release their amount to |
| 4  Q.  There's no -- no other data is kept with that | 4  them? |
| 5  address other than the amount of bitcoin flowing? | 5  A.  No, I don't believe I said that to them, |
| 6  A.  That's right, unless -- yeah. | 6  because it wasn't my say anymore.  I said that they |
| 7  Q.  I find it very fascinating.  This is not even | 7  would have to deal with Mark. |
| 8  relevant, but can you store more data in a block | 8  Q.  And did you confirm with Mark that he was |
| 9  chain? | 9  going to make sure that they got paid? |
| 10  A.  Yeah.  Well, sort of.  I mean, there's -- you | 10  A.  I recommended that Mark pay them, but it was |
| 11  could put more data in the transaction than just the | 11  Mark's decision whether to pay them or not. |
| 12  movement of money. | 12  Q.  And were you always truthful with the |
| 13  Q.  Uh-huh. | 13  Raggios? |
| 14  A.  You can, like, attach additional information | 14  A.  I believe so, yeah. |
| 15  to the transaction.  So you can kind of store | 15  Q.  When you and the mother of your children |
| 16  additional data there. | 16  moved to Costa Rica, you stayed about a year? |
| 17  Q.  I just see so many uses for the block chain | 17  A.  Uh-huh. |
| 18  besides currency. | 18  Q.  Right?  When you came back stateside, were |
| 19  A.  Yeah. | 19  you and she still together? |
| 20  Q.  So I find it fascinating.  Such as election | 20  A.  Yeah, yes. |
| 21  fraud. | 21  Q.  And are you still today?  "Yeah" is fine. |
| 22  A.  Right. | 22  A.  No, we're not. |
| 23  Q.  Seriously. | 23  Q.  Okay.  Where does she live now? |
| 24  A.  Yeah. | 24  A.  She lives in Berkeley. |
| 25  Q.  I think there are a lot more uses.  I just | 25  Q.  When you were running Mt. Gox, what would a |

Dr. Donald Raggio and Dr. Chris Raggio v.
MTGOX, a sole proprietorship, et al
McCaleb 30(b)6 Code Collective, LLC 11-17-16
November 17, 2016
McCaleb 30(b)6 Representative

---

**Page 109**

1   normal day be like for you?  What were you actually
2   doing?
3      A.  There was a lot of customer support-type
4   questions I would have to answer.  There was a lot of
5   improvements to the site I would be trying to make.
6   There was, you know, a lot of, like, keeping up with
7   the forums and what was happening, and just doing kind
8   of marketing, for lack of a better word, and trying to
9   find new ways to get money in and out of the site,
10  things like that.  So just general operations kind of
11  stuff.
12     Q.  When you were running Mt. Gox, did you get
13  any legal advice on securities, or money, currency, or
14  anything?
15        MR. GAULT: "Securities" meaning what?
16  BY MR. TYNER:
17     Q.  It's hard to define what bitcoin is, but
18  whether it's a security, or a commodity, or whatever.
19     A.  Yeah.  Eventually, I talked to some lawyers
20  about how bitcoin would be classified and running
21  Mt. Gox in general.
22     Q.  And when would that have been?
23     A.  I believe that was in around December or
24  something like that.
25     Q.  Have you come to a conclusion as to how it's

---

**Page 110**

1   classified on --
2      A.  I don't think the government has come to a
3   conclusion on how it's classified.  So I'll wait for
4   them to --
5      Q.  They still have not decided what it is?
6      A.  I mean, there's vague guidance on it, but
7   it's nothing completely conclusive, I don't think,
8   so -- or at least to my knowledge, it's not
9   conclusive.
10     Q.  Okay.  I think you said that you were
11  e-mailing Barron.  Right?  Is that --
12     A.  Yeah, that's right.
13     Q.  What did -- that's right.  I'm sorry.  He
14  told you that they were legitimate.  Did -- you never
15  did identify who Barron was, did you?
16     A.  No.  We asked for him to send identification.
17  He sent us what looked pretty clearly like a fake
18  passport, so ...
19     Q.  Okay.
20     A.  Yeah.
21     Q.  Do you remember where that one said he was
22  from or --
23     A.  I believe it was Russia.
24     Q.  Okay.
25     A.  Yeah.

---

**Page 111**

1      Q.  And so you did not release the money or
2   bitcoin to him?
3      A.  Again, it was in Mark's hands at this point,
4   but I don't know that Mark did.
5      Q.  Okay.
6      A.  I don't think he did.
7      Q.  Okay.
8         (Outside noise.)
9         MR. GAULT: Give me one second.  I'm just
10  going to tell them to, shh, keep it down.
11        MR. TYNER: It's not bothering me.  My head's
12  swimming.
13        (Discussion had off the record, not
14  reported.)
15  BY MR. TYNER:
16     Q.  When was the last time you talked to Chris
17  Raggio?
18     A.  It was a couple of months ago, something like
19  this.
20     Q.  What was the nature of that conversation?
21     A.  I asked if I could call him to -- I just
22  wanted to understand why he was pursuing this.
23     Q.  What did you say to Chris?
24     A.  Basically just asking him, like, why, when
25  all our previous conversations up until now, he was

---

**Page 112**

1   very much saying that this wasn't my responsibility,
2   it was Mark's responsibility, and just wondering why
3   he had changed his mind, and that, basically, he was
4   just wasting my money and time, and his own, probably,
5   and it seemed very frivolous to me.  Because prior, up
6   to that point, it seemed like we were friendly.  So it
7   seemed like a crappy thing for him to do.
8      Q.  Well, did -- but you represented to Mark that
9   he was going to get his coin.  Right?
10        MR. GAULT: Mark?
11     A.  I represented --
12  BY MR. TYNER:
13     Q.  I'm sorry.  To Chris Raggio.
14     A.  No, I didn't.
15     Q.  Okay.  Were you aware that Mark Karpeles told
16  him he would get it to him?
17     A.  I mean, he -- all I'd heard was what Chris
18  told me about his conversations with Mark.  He was
19  talking to Mark directly.
20     Q.  Uh-huh.
21     A.  So ...
22     Q.  So you never made calls or e-mails to Mark
23  Karpeles on Chris's behalf?  I take that back.  You
24  said, a while ago, you thought you may have e-mailed
25  him.

---

Dr. Donald Raggio and Dr. Chris Raggio v                    Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16    Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                                          November 17, 2016

| Page 113 |
| --- |

1    A.  I may have e-mailed him.  You know, I may
2  have e-mailed him asking him what was happening with
3  it.  So, you know, I don't remember -- again, it's a
4  long time ago.  I don't remember the exact character
5  of those e-mails.
6    Q.  Did you get a chance to review the documents
7  that we gave to your lawyers?
8    A.  Yes.
9    Q.  Was there anything in there that appeared to
10  be manufactured or incorrect, or did it look like the
11  transaction as you remembered it?
12    A.  I didn't notice anything that seemed that
13  way.
14    Q.  Okay.  Did -- for some time, at least we know
15  for nine months or so, that you had access to the
16  transactions and all at Mt. Gox.  Did that ever stop
17  or did you always have that access?
18    A.  No, it stopped after he made the payment to
19  me.  Actually, it may have even stopped a bit before,
20  but ...
21    Q.  And that payment was in around the fall of --
22    A.  2011.
23    Q.  Yeah, 2011.  But you were still -- you still
24  had a legitimate 12 percent interest in the company.
25  Did you make inquiry as to your portion of the

| Page 114 |
| --- |

1  proceeds for that 12 percent?
2    A.  At some point I did.  You know, he always
3  maintained that he wasn't disbursing any funds, so,
4  you know, I wouldn't be able to get anything until he
5  disbursed to the other shareholders, as well.
6    Q.  And you really didn't have any way to audit
7  him or --
8    A.  No.
9    Q.  -- see what was going on?
10    A.  No.
11    Q.  Were you aware that there were major problems
12  happening at Mt. Gox?
13    A.  No.
14    Q.  Was the bankruptcy a surprise to you?
15    A.  Yes.
16    Q.  In looking at some of the, you know -- later,
17  there were some more exchanges that came up, and it
18  may have been Bitstamp.  Seems like there was one in
19  Slovenia.  Is that Bitstamp?  I can't remember.
20    A.  Bitstamp is in Slovenia, yeah.
21    Q.  But there were a number of different
22  exchanges that came up.  And looking back at trades
23  from the other exchanges, there was always -- the
24  amount paid for bitcoin at Mt. Gox always seemed
25  elevated among the other ones.  Do you recall that?

| Page 115 |
| --- |

1    A.  I don't recall that being true.  It could be
2  true, but I wasn't paying close enough attention to
3  notice.
4    Q.  Okay.  You, fairly quickly after you sold
5  Mt. Gox, you went on to Ripple.  Is that accurate?
6    A.  I mean, it was a few months, but, yeah.
7    Q.  Yeah.  Okay.
8    A.  Yeah.
9    Q.  But you still kept up with the bitcoin world,
10  too.  Is that true?
11    A.  That's true, yeah.
12    Q.  And you would actually go to bitcoin
13  forums, or conventions, or whatever?
14    A.  Yeah.  I went to maybe just a couple, but,
15  yeah.
16    Q.  Okay.  And you met Chris Raggio personally at
17  one of them?
18    A.  Before I started Ripple, but, yes.
19    Q.  Okay.  And that was in New York.  Is that
20  right?
21    A.  Yes.
22    Q.  Where else did you attend the meetings?
23    A.  There was one in San Jose that I went to.  I
24  mean, I've been to others since, you know, since
25  Ripple.  But during the Ripple time, I just remember

| Page 116 |
| --- |

1  one in San Jose.  Maybe I went to another one, but ...
2    Q.  When you were -- how did it come up that you
3  were even interested in selling Mt. Gox?
4    A.  Like, how did I broach the subject with Mark?
5    Q.  Yes.
6    A.  I mean, I don't remember exactly, but I
7  probably just said I'm wanting to sell this, are you
8  interested in taking it over, so ...
9    Q.  And did you -- you didn't put it out and
10  advertise that you were selling Mt. Gox?
11    A.  No.
12    Q.  Like you would a car?
13    A.  No.
14    Q.  Okay.  Did you talk with anyone besides Mark
15  about purchasing Mt. Gox?
16    A.  Maybe, but I don't know.  I don't remember.
17    Q.  You said that you hired Mark in around
18  December of '10, and then you completed the sale of
19  Mt. Gox early part of February to Mark.  At what point
20  did you decide you wanted to sell Mt. Gox?
21    A.  I don't remember the exact point.  I mean, I
22  had been thinking about it for a while.  So probably
23  before I started talking to him.
24    Q.  Are you currently involved in any other
25  litigation --

Dr. Donald Raggio and Dr. Chris Raggio v. Caleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

| | Page 117 | | | Page 119 |
|---|---|---|---|---|

**Page 117**

1   A. No.

2   Q. -- as a party?

3   A. No.

4      MR. TYNER: Give me one second.

5      MR. GAULT: Sure.

6      MR. TYNER: Let's just go off the record for

7  a minute, and we'll take a break.

8      VIDEOGRAPHER: Off the record.  The time

9  is 12:37.

10    (Recess.)

11     VIDEOGRAPHER: Back on the record.  The time

12  is 1:02.

13     MR. TYNER: I don't think I have any more

14  questions for you.

15     THE WITNESS: Okay.

16     MR. TYNER: You're going to make your flight.

17     THE WITNESS: All right.  Thank you.

18     MR. TYNER: Have you got any questions?

19     MR. GAULT: No questions.

20     VIDEOGRAPHER: This concluded this

21  deposition.  The time is 1:02.

22    (Whereupon the deposition was concluded at

23  1:02 p.m., the same day.)

24

25

**Page 118**

1         DEPONENT'S CERTIFICATE

2     I, Jed McCaleb, the deponent in the foregoing

3  deposition, certify that I have read the foregoing

4  pages 4 - 117, being the total number of pages

5  relating to my testimony, as to the correctness

6  thereof, and that after reading said pages and subject

7  to any corrections I may have reflected below, I

8  certify that this testimony is true, correct and

9  complete and that the transcript thereof is true and

10  correct.

11

12          Jed McCaleb

13  STATE OF _____

      COUNTY OF _____

14

15     SWORN TO AND SUBSCRIBED before me on this the

16  _____ day of _____, 20____.

17

           NOTARY PUBLIC

18  My Commission expires: _____

19  PAGE | LINE | CORRECTION | REASON

20  _____|_____|_____|_____

21  _____|_____|_____|_____

22  _____|_____|_____|_____

23  _____|_____|_____|_____

24  _____|_____|_____|_____

25  _____|_____|_____|_____

**Page 119**

1        CERTIFICATE OF COURT REPORTER

2     I, Catherine M. White, CSR, and Notary Public

3  in and for the County of Hinds, State of Mississippi,

4  hereby certify that the foregoing pages, and including

5  this page, contain a true and correct transcript of

6  the testimony of the witness, as taken by me at the

7  time and place heretofore stated, and later reduced to

8  typewritten form by computer-aided transcription under

9  my supervision and to the best of my skill and

10  ability.

11     I further certify that I placed the witness

12  under oath to truthfully answer the questions in this

13  matter under the power vested in me by the State of

14  Mississippi.  I further certify that I am not in the

15  employ of or related to any counsel or party in this

16  matter, and have no interest, monetary or otherwise,

17  in the final outcome of the proceedings.

18     Witness my signature and seal this the ____

19  day of _____, 201___.

20

21

22        CATHERINE M. WHITE, CSR No. 1309

     My Commission Expires:

23  February 1, 2018

24

25

Dr. Donald Raggio and Dr. Chris Raggio vs. McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

**$**

**$1,000 (1)**
67:23
**$10,000 (3)**
56:8;67:11;68:13
**$100,000 (1)**
87:17
**$45,000 (2)**
75:16,21
**$5 (1)**
103:23

**A**

**able (19)**
32:5;35:20;56:11;
61:24;62:7;65:6,15;
66:6,20;72:25;73:19;
79:10;92:18;93:20;
95:2;99:2,14;102:23;
114:4
**access (13)**
14:14,16;35:16,18;
54:6;69:14;89:1;90:17;
98:23,25;99:7;113:15,
17
**account (73)**
33:21;34:5,8,10;
35:14,15;36:15,18;
37:4,11;55:20;57:15,
18;58:2,5,6,8,22;59:10;
61:2,14,14,22,25;62:1,
12,14,18,21;65:16;
68:3,15;69:14;70:8;
71:1,1,2,9;72:1;73:19,
21;74:2,11,12,12;75:4,
6,8,9,11,12;77:24;
78:14;79:6,11;80:11,
12,13,16,20,23;81:2,3,
11,15,17,23;84:4;87:5;
107:12,14,24,25
**accounts (20)**
11:5;22:25;24:6;
25:19,20;33:2,7,8;
38:15,25;43:2;58:14,
16,17;64:23;66:8;
67:14;79:11;80:21;
107:7
**accumulated (2)**
26:6;33:7
**accurate (2)**
30:18;115:5
**acquire (1)**
52:20
**action (1)**
75:2
**actual (1)**
90:9
**actually (18)**
54:14;70:20;73:12;
79:1;89:4,15;91:3;

92:2;94:17;95:13;96:9,
17;98:4;100:6,18;
109:1;113:19;115:12
**ad (1)**
17:1
**added (1)**
83:5
**additional (2)**
106:14,16
**address (40)**
33:20;34:1,2;35:22;
37:7,10;55:7;71:11,12,
16,19,21;72:1,6,12,22;
74:15,16,19;78:3,4,6,9,
14,21,23;80:7;83:1,8,
10;88:21;89:7,12;
92:11,13;94:2;105:22,
22,23;106:5
**addresses (4)**
71:17;88:19;92:8;
105:20
**admin@mtgox (1)**
83:2
**administer (2)**
13:25;15:9
**administration (1)**
13:23
**ads (1)**
16:22
**advertise (1)**
116:10
**advice (4)**
59:19,21;60:15;
109:13
**affect (1)**
56:7
**affirmative (1)**
28:12
**again (10)**
9:24;10:9;13:24;
39:14;65:14,14;88:14;
96:14;111:3;113:3
**ago (11)**
5:2;7:3;13:8;38:24;
42:25;55:24;88:11;
90:6;111:18;112:24;
113:4
**agree (1)**
92:10
**agreement (2)**
4:17;100:25
**ahead (1)**
57:12
**al (2)**
4:3,4
**allow (2)**
20:15;22:16
**allowed (1)**
16:1
**Altogether (1)**
51:2
**always (7)**
37:19;96:7;108:12;

113:17;114:2,23,24
**amazing (1)**
92:2
**Amazon (4)**
43:20;44:4;53:9,13
**among (1)**
114:25
**amount (30)**
29:7;41:22;42:19,20,
22;49:21;55:15;56:16;
59:18;60:2;66:10,12,
25;67:9,21;69:10;
74:22,24,25;87:13;
89:24;90:13,24;94:3;
102:9,22;106:3,5;
108:3;114:24
**amounts (3)**
37:9;41:6,8
**anymore (6)**
20:2;28:18;97:3;
105:8;108:1,6
**API (1)**
85:23
**appeared (1)**
113:9
**appreciated (1)**
52:7
**appreciation (1)**
52:12
**approached (1)**
103:21
**approval (2)**
79:10,12
**approximately (4)**
50:19;56:1;61:17;
84:10
**Arkansas (5)**
5:23;6:13,25;12:20;
13:1
**around (25)**
10:1,3;11:12;12:9;
13:19;14:5;15:15,22;
19:2,7;22:15;24:13;
38:6;43:9;56:4;61:23;
84:18;90:9,11,16;98:2;
102:10;109:23;113:21;
116:17
**article (3)**
28:21;29:14;30:17
**asset (2)**
11:3,5
**associated (1)**
74:16
**assume (3)**
55:7,8;58:22
**atmosphere (1)**
5:15
**attach (1)**
106:14
**attack (5)**
65:13,20;66:1,5,10
**attempts (2)**
65:22,25

**attend (1)**
115:22
**attention (1)**
115:2
**audit (1)**
114:6
**August (5)**
29:14;30:1;33:6;
45:11;84:6
**automated (1)**
25:9;68:24;69:6
**automatic (2)**
36:7;68:22
**automatically (2)**
34:8;84:3
**average (1)**
56:19
**aware (3)**
63:9;112:15;114:11
**away (1)**
47:9

**B**

**Back (54)**
9:17;10:12,17;12:5;
13:20;37:20,22;40:23;
43:12,15;48:19,22,24;
49:4;50:14;51:9;55:25;
61:15,25;62:1,6,10,14,
18,20;63:2,3;68:2,4,21;
70:22,25;73:18,21;
74:2,5,7,23;75:3;77:5;
79:15;82:2;96:7,22;
97:1,19;105:13,16;
107:12,21;108:18;
112:23;114:22;117:11
**background (2)**
6:2;99:22
**backup (1)**
29:1
**bad (1)**
86:9
**bank (19)**
47:6,7;55:19;58:9,
22;59:3,4,5,6;68:4;
83:20,21,22,25;84:9;
86:2;87:4;97:25;98:22
**bankruptcy (2)**
103:21;114:14
**Banks (1)**
86:2
**bank's (1)**
83:23
**Barron (13)**
71:2;72:5;73:19;
74:12;76:9,11,15;
77:12;78:18;107:24,
25;110:11,15
**Barron@contractornet (1)**
72:22
**Barron's (7)**
73:19,21;75:3,11,12;
73:18;74:2,4,10,10,11,

78:14;107:12
**based (4)**
18:22;37:3;102:25;
104:5
**basic- (1)**
8:1
**basically (33)**
8:2;11:2;13:12,23;
14:21;16:1;17:17;19:4,
23;21:24;25:6;35:14;
36:17;37:1,7;55:14;
59:24;65:20;74:7;
77:18;79:2,22;85:23;
87:2;90:23;91:20;92:7,
7;93:16;94:25;96:16;
111:24;112:3
**bathroom (1)**
97:14
**become (7)**
24:4;29:12;93:6,9,
10,11,13
**beginning (1)**
69:25
**behalf (2)**
42:2;112:23
**belonged (1)**
50:20
**below (1)**
36:2
**benefit (1)**
26:7
**Berkeley (4)**
7:12;9:1;49:2;
108:24
**besides (3)**
39:5;106:18;116:14
**better (2)**
43:5;109:8
**beyond (2)**
76:16;79:13
**big (3)**
47:11;54:15;85:20
**bills (1)**
58:21
**bit (7)**
8:4,5;44:22;45:6,9;
87:24;113:19
**bitcoin (139)**
27:6,8,21;28:16,20,
23;29:13;30:4,23;
31:11,16,23,23,25;
32:6,8;33:22,25;34:1,1,
2,6,7,13,17;35:8,20,22,
23,25;36:3;37:21,23;
39:6,10;40:9,13,18,20;
42:1;43:13;45:11;
47:11;52:5,25;55:15,
21,23;56:2,8,8,23,24;
57:1,6;59:18;60:21;
61:1,14,14,21;62:23;
63:1,23,24;64:2,4,6,14,
21;65:7;67:2,25;70:7;
73:18;74:2,4,10,10,11,

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

12,16,22;75:3,23;76:5,
20,22,23;77:16;78:3,7,
13,19,20;84:13,14,21,
25;85:1,5,10;88:12,19,
21,25;89:14,15,20,25;
90:4,13,17;91:4;92:8,9,
12,21,25;93:1,4;94:3,
24;95:3,13;96:4;
104:10,21;105:19,23;
106:1,5;107:3;109:17,
20;111:2;114:24;
115:9,12
bitcoins (12)
  20:15;30:20;42:6,7,
  8;61:9,9;75:15,19;
  79:2;97:9;107:23
Bitcointalk (1)
  91:19
Bitcointalkorg (1)
  77:1
Bitstamp (3)
  114:18,19,20
BitTorrent (1)
  16:4
blob (1)
  96:19
block (5)
  93:15,16;105:17;
  106:8,17
blog (1)
  77:4
Bomgar (2)
  14:10,11
book (1)
  18:19
bored (1)
  39:24
boring (1)
  40:4
born (2)
  5:22;12:23
Boston (1)
  10:22
bot (3)
  22:16;25:3,5
both (4)
  53:12;66:9;74:2;
  77:14
bothering (1)
  111:11
bought (13)
  21:10;34:12;40:18;
  73:7;77:16,18;78:19,
  24;83:11;87:4;91:10,
  11;98:4
Brad (1)
  4:9
brainchild (1)
  49:8
break (5)
  5:14;32:14;50:9;
  69:18;117:7
breaks (1)

25:14
brief (1)
  6:1
briefly (1)
  81:14
bring (1)
  68:4
broach (1)
  116:4
Brock (2)
  104:19,20
broke (1)
  76:1
brought (2)
  16:8;49:11
bunch (4)
  37:21;66:7;80:21;
  89:20
Burzlaff (3)
  46:9,9,10
B-U-R-Z-L-A-F-F (1)
  46:11
business (5)
  57:18;58:13,24,25;
  59:4
busy (1)
  99:11
button (1)
  69:9
buy (22)
  20:14;21:1;23:7,9,
  10;30:20;31:11,23,24;
  33:18,22,25;34:3;39:5;
  40:19;42:7;55:15,21;
  56:7;59:17;60:1;91:2
buying (3)
  30:23;41:17;56:2
buys (1)
  37:20

C

calculate (1)
  102:25
California (3)
  48:25;104:4,6
call (6)
  4:25;69:18;78:2;
  79:15;99:25;111:21
called (19)
  8:12;9:3,8,10,25;
  10:22;11:22;14:2,10;
  15:21;18:4,15;23:8;
  36:22;48:10;59:24;
  65:12;81:14;104:3
calls (1)
  112:22
came (15)
  51:9;61:25;62:1,18,
  20;70:22;73:2,18,20;
  74:2;75:3;78:21;
  108:18;114:17,22
can (47)

5:8;22:11,11;23:9,
10;32:14,23;33:25;
37:19;50:7,13;52:7;
57:1,2;61:10;73:6;
74:14,15;76:20;77:9;
82:2;87:23;88:21;
91:22;92:2,8,12,17;
93:3,15,15,16;94:2,3;
95:14,14;96:7,15,16,
18;105:9,9,9,18;106:8,
14,15
capable (2)
  98:18;99:20
capital (1)
  104:9
car (1)
  116:12
card (9)
  21:6,8;23:7,19;
  27:10,12;29:5;37:21,
  22
cards (16)
  21:12;22:10,12,14,
  15,17;23:2,3,5,11;24:9;
  25:2;26:9;27:19;37:18,
  19
care (3)
  50:3;70:11;76:14
cash (11)
  67:6,8,22,24;68:2;
  69:10;75:23;87:5,7,13;
  107:3
center (3)
  44:5;53:12,15
central (1)
  16:2
cents (4)
  56:4;57:2,3,6
CEO (3)
  16:9;49:12,14
certain (3)
  6:8;63:20;74:10
chain (6)
  93:15,16,18;105:17;
  106:9,17
chance (1)
  113:6
change (1)
  71:18
changed (2)
  82:24;112:3
changing (1)
  101:6
channel (1)
  85:15
character (1)
  113:4
charge (3)
  25:18,20;37:20
charges (1)
  37:21
charging (1)
  25:24

chart (1)
  90:8
charts (1)
  11:8
Chase (2)
  58:11,24
check (5)
  71:15,20;87:9,12;
  99:22
checked (1)
  61:2
checking (1)
  58:6
children (4)
  46:2,5,8;108:15
choice (1)
  49:25
choose (1)
  20:20
Chris (21)
  19:12;40:6;49:15;
  50:22;55:2;57:12;59:7,
  17;63:12,15,18;66:15;
  67:19;76:5;79:12;80:5;
  111:16,23;112:13,17;
  115:16
Chris's (8)
  74:10,11,21,23,25;
  75:7,13;112:23
Christian (2)
  12:12,17
city (4)
  31:9;45:4,9;49:1
claimed (3)
  77:16;99:16,16
claiming (1)
  63:12;78:18,23
class (3)
  6:17,21;7:1
classes (1)
  6:15
classified (3)
  109:20;110:1,3
clear (1)
  74:13
clearly (1)
  110:17
client (3)
  40:6;56:2;59:7
clients (2)
  11:6,7
close (4)
  17:16,17;24:25;
  115:2
closed (3)
  17:13;19:2;24:5
Code (6)
  35:1,3;57:17,19;
  83:18;85:13
coding (3)
  85:25;86:9;98:14
coin (6)
  63:10,11;81:14,15;

91:21;112:9
coins (10)
  61:11;66:11,21;
  70:14,19,22,24;75:7,7;
  96:24
cold (10)
  94:18,20,21,22;96:1,
  4,7,13,20,20
collect (1)
  22:12
collection (1)
  22:13
Collective (4)
  35:2,3;57:17,19
college (5)
  6:3;7:9,11;12:25;
  14:13
comfortable (1)
  5:13
commercially (1)
  10:14;18:5
commission (3)
  25:24;42:17,19
commodity (2)
  14:23;109:18
common (1)
  12:5
communicate (1)
  83:25
communicated (1)
  77:12
communicating (3)
  80:22;83:7;86:22
communication (1)
  55:13
company (24)
  7:18,20,24;8:23;9:1,
  23;10:21;11:17;12:8,
  11;14:11;23:10;28:2;
  34:16,20,23;35:3;37:2;
  48:8,9;49:13;57:19;
  80:12;113:24
complete (3)
  29:5;38:3;85:18;
  99:7
completed (5)
  28:17;98:3,5,11;
  116:18
completely (2)
  86:25;110:7
compromised (10)
  36:15;64:22,24;65:3,
  5,9,12;66:19;70:15;
  107:8
compromises (1)
  95:2
computer (10)
  8:19;10:13;70:17;
  93:4;95:7,23;96:11,13,
  20,20
computers (3)
  13:24,25;14:22
concluded (2)

Dr. Donald Raggio and Dr. Chris Raggio   McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

117:20,22
conclusion (2)
109:25;110:3
conclusive (2)
110:7,9
conclusively (1)
72:13
conference (1)
40:9
conferences (2)
32:21;104:23
confidence (1)
91:2
confirm (1)
108:8
confusing (2)
5:10;66:17
connected (2)
95:7;96:11
Connecticut (2)
7:16;8:23
connecting (1)
25:7
contact (1)
55:5
contacted (4)
55:3,13;76:11;83:4
continue (2)
17:9;79:8
contract (1)
100:2
contracted (2)
47:5;83:19
contractornet (3)
72:23;73:1,9
contractors (1)
19:22
control (3)
38:3;91:8;97:10
conventions (2)
104:22;115:13
conversation (1)
111:20
conversations (2)
111:25;112:18
conversion (1)
7:25
Cool (4)
6:6;18:3;39:16;
74:18
copy (2)
54:12;96:21
corp (4)
12:2,3;49:16,18
correctly (2)
46:21;67:23
corresponding (1)
88:20
cost (1)
18:10
Costa (13)
37:3;44:22;45:14,18;
46:16,18;47:14,20;

48:6,12,18;51:10;
108:16
counsel (2)
4:3,6
couple (8)
17:4;29:25;79:20;
96:15;100:7;102:18;
111:18;115:14
course (1)
98:20
court (4)
4:11;46:12,14;79:9
courtroom (2)
5:6,8
cover (2)
75:13;76:5
crappy (1)
112:7
create (2)
8:10;29:20;33:21;
77:5;99:2,3
created (6)
20:12;29:4;34:8,8;
72:1;89:1
credit (6)
37:11,18,19,21,22;
59:10
credited (1)
84:3
credits (1)
35:15
cross (2)
42:9,10
cumbersome (2)
22:15;86:3
currency (6)
23:13,14;52:6,6;
106:18;109:13
current (1)
52:2
currently (1)
116:24
customer (2)
89:11;109:3

D

daily (3)
36:2,11;55:23
dark (5)
59:24;60:6,8,9,10
data (11)
44:5;54:6,12;96:19;
105:21,22,25;106:4,8,
11,16
database (1)
53:11
databases (1)
8:10
date (3)
4:5;63:5;69:24
day (3)
54:20;109:1;117:23

days (2)
8:5;11:11
deal (3)
54:15;68:19;108:7
dealing (1)
86:2
debate (1)
13:5
debits (1)
35:14
December (4)
84:10;98:2;109:23;
116:18
decide (1)
116:20
decided (3)
17:21;30:17;110:5
decision (1)
108:11
declare (1)
103:21
define (1)
109:17
definitely (11)
9:16;56:16;59:4;
74:3,4;77:22;80:4;
87:7;97:7;104:16;
105:18
delete (1)
95:22
demonstration (1)
90:16
denominated (1)
75:20
dependent (1)
52:8
depending (3)
27:7,9;47:10
depends (1)
51:2
deposit (6)
40:25;42:5,6;47:6;
84:2;89:12
deposited (2)
68:18;90:23
deposition (5)
4:2,16;5:3;117:21,22
describe (1)
36:25
designated (1)
43:4
details (1)
101:22
determine (1)
65:17
develop (1)
52:17
dictionary (5)
65:13,20;66:1,5,10
different (17)
8:6;34:16;36:20;
43:1,2;53:14;59:6;
60:6;64:22;65:14;68:6;

79:3;84:25;89:21;
92:10;93:7;114:21
difficult (1)
85:22
digital (3)
23:14,19;52:6
directly (3)
77:13;78:24;112:19
DirectNIC (1)
44:2
disbursed (1)
114:5
disbursing (1)
114:3
discover (1)
63:3
discovered (2)
66:9;73:9
Discussion (1)
111:13
discussions (1)
4:15
DNS (1)
54:14
document (1)
7:25
documents (4)
8:3,11,17;113:6
dollar (1)
103:23
dollars (15)
34:10;36:12;37:9;
55:15;67:3,24,24;
73:25;74:1,4;75:16,19;
87:20;88:4,9
domain (12)
20:21,25;21:11;
26:16;27:7;29:1,6,10;
43:21,25;73:5;82:16
Donald (1)
4:3
donate (1)
16:25
done (11)
20:22;28:17;30:13;
39:12;66:6;84:13,14,
23;85:15,16;98:7
do-over (1)
29:6
dormant (2)
26:15;27:4
doubt (2)
87:11,11
down (14)
17:21,22;19:5,18;
24:5;25:1;27:1;28:11;
42:4;54:19;76:1;87:23;
100:16;111:10
download (2)
93:4;94:7
downloaded (1)
93:19
Dr (1)

4:3
dropped (1)
7:14
duly (1)
4:21
during (2)
10:10;115:25

E

early (3)
11:11;39:10;116:19
easier (3)
22:19;31:24;45:20
easily (1)
56:13
easy (3)
23:16;86:4;103:2
eDonkey (7)
15:24;16:17;17:9,23;
20:22;26:3,4
eDonkey2000 (1)
15:21
educational (1)
6:1
Either (10)
24:17;33:16;49:23;
50:6;53:23;67:24;
70:16;74:1;89:6;91:6
election (1)
106:20
elevated (1)
114:25
else (8)
47:10;50:21;61:6;
63:23;64:1,3;97:9;
115:22
e-mail (28)
33:20;55:3,7;60:24;
71:11;72:18,20,22;
76:15;77:13;79:21;
80:1,5,7,11,14,21;81:1,
3,8;82:7,9,14,20;83:1,
8,10,12
e-mailed (6)
40:19;47:21;61:18;
112:24;113:1,2
e-mailing (1)
110:11
e-mails (5)
4:15;56:4;79:23,24;
82:2;112:22;113:5
employees (2)
19:20;50:24
empty (1)
97:5
end (8)
24:6;33:1;35:24;
41:11;73:12;101:24,
25;102:11
ended (2)
24:3;39:19
enough (5)

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

75:13,15,16;105:15;
115:2
**enter (1)**
33:20
**entirely (1)**
27:1
**erased (2)**
105:4,5
**Essentially (3)**
23:14;60:3;93:12
**established (1)**
32:2
**et (2)**
4:3,4
**Europe (2)**
47:6;83:20
**European (1)**
47:7
**Even (7)**
35:15;54:16;66:22;
95:22;106:7;113:19;
116:3
**event (3)**
23:8,11,12
**events (1)**
13:18
**eventually (9)**
9:12;16:8;18:1;32:5;
49:11;62:9;65:15;
103:20;109:19
**Everdream (2)**
14:2,3
**everybody (4)**
38:13,13;76:21;
92:17
**everybody's (1)**
39:13
**everyone (1)**
22:11
**exact (11)**
7:4;9:9;38:21;41:8;
50:18;96:6,23;100:14;
101:9;113:4;116:21
**exactly (10)**
12:1,4;17:15;26:11;
41:7;84:23;85:11;98:1;
102:17;116:6
**EXAMINATION (1)**
4:23
**examined (1)**
4:21
**exceeded (1)**
39:12
**Exchange (31)**
20:19;21:6,11,23;
22:9,20;23:17;27:20;
29:1,5,21;30:4,18,19;
31:3,5,12,15;33:24;
39:7;40:15;45:12;
52:18;55:21;63:14;
76:15,16;82:10;84:5;
90:4;98:4
**exchanged (1)**

73:24
**exchanges (4)**
52:22;114:17,22,23
**Excuse (2)**
21:3;69:16
**expect (2)**
100:5;101:17
**expectations (1)**
39:13
**experience (3)**
99:13,15,17
**experiment (1)**
22:1
**Explain (1)**
65:2
**explained (4)**
55:16;76:8,8;107:6
**exploring (1)**
17:25
**extent (1)**
87:2

---

**F**

---

**fact (1)**
98:20
**fairly (3)**
41:22;91:10;115:4
**fake (1)**
110:17
**fall (1)**
113:21
**Far (6)**
18:4,16,17;27:22;
35:4;81:17
**fascinating (2)**
106:7,20
**fast (2)**
7:6;100:16
**fault (1)**
70:17
**favor (1)**
30:5
**Fayetteville (1)**
12:23
**feature (1)**
59:23
**February (9)**
38:1;47:24;63:7;
69:24,25;98:9;100:12;
101:12;116:19
**feel (1)**
70:17
**felt (1)**
70:21
**few (12)**
6:10;24:1;26:12,13;
30:16;34:15;36:20;
39:18;53:5;68:6;89:13;
115:6
**fight (1)**
17:20
**figure (5)**

57:1,2;72:23;73:5;
76:11
**figured (1)**
30:21
**files (1)**
16:2
**file-sharing (1)**
15:21
**financial (1)**
39:6
**financially (1)**
26:2
**find (10)**
31:2;38:25;72:19,25;
76:25;84:12;105:10;
106:7,20;109:9
**fine (2)**
50:3;108:21
**finish (1)**
38:7
**finished (2)**
7:8;85:19
**finishes (1)**
30:6
**Finland (5)**
83:22;84:9;85:13;
97:25;98:22
**first (18)**
5:3,4;16:8;21:10;
33:6;34:21;39:15;40:8;
45:16;46:12;55:13;
71:7,24;82:20;83:7;
98:8;100:12;101:12
**five (4)**
38:3,6;89:16;97:15
**flight (1)**
117:16
**flowing (1)**
106:5
**flows (2)**
106:1,3
**Folio (1)**
8:12
**follow (3)**
60:14;61:10;66:20
**following (1)**
92:25
**follows (1)**
4:22
**forever (1)**
32:12
**forget (1)**
7:22
**forgot (1)**
7:21
**format (1)**
8:3
**forming (2)**
48:7,11
**forth (2)**
77:5;105:14
**forum (8)**
31:2;76:16,18,18,19,

24;77:13;91:17
**forums (3)**
98:13;109:7;115:13
**found (1)**
28:21
**fraud (1)**
106:21
**free (1)**
59:14
**freemium (1)**
17:5
**fresh (1)**
29:9
**friend (1)**
10:22
**friendly (1)**
112:6
**frivolous (1)**
112:5
**froze (4)**
75:8,11,21;79:6
**frozen (2)**
107:14,24
**fruitful (1)**
73:11
**full-time (1)**
17:7
**fun (1)**
22:23
**fund (1)**
104:9
**funds (1)**
114:3

---

**G**

---

**game (17)**
9:1,11,13;10:15,17;
18:1,2;21:8;22:4,8,10;
27:23;28:16;35:6;
44:23;57:21,22
**games (4)**
9:4,6;10:11,13
**gaming (5)**
21:19,23;26:9;27:20;
44:23
**Gathering (3)**
20:19,24;21:5
**Gault (33)**
4:10,10,14,19;13:3;
21:3;24:17;30:5,9,12;
32:11,14,16,19,22;
38:7,11;49:23;50:6,9,
13;58:9;69:16,21;
87:21;88:1,6;97:15;
109:15;111:9;112:10;
117:5,19
**gave (5)**
19:23;88:14,16;89:1;
113:7
**general (3)**
32:11;109:10,21
**geographically (1)**

24;77:13;91:17
53:14
**gets (1)**
30:7
**Gigs (1)**
44:13
**given (1)**
5:3
**Gmail (4)**
81:23;82:11,12,14
**Good (8)**
4:1,25;20:14;30:21;
31:3;32:2,3;69:20
**goodness (1)**
13:8
**Google (2)**
82:15,21
**gotcha (1)**
17:6;37:24
**government (1)**
110:2
**Gox (94)**
10:16;19:5;20:7,8;
26:9,15;27:5,8,21;
28:16;30:2,24;32:1;
33:1,2,18,23;34:5,15;
35:11;36:19;37:13,25;
39:15;40:18;41:1;42:5,
12;43:12,15;44:9,15;
46:19;47:3,7,9,23;
53:2;55:8;56:20;58:3;
61:15;62:1,10,19;63:2,
3,5;66:7;69:24;70:4;
74:9,23;75:8,9;76:7;
78:25;82:7,9,14,21;
83:11,18,25;84:22;
86:13,23;87:4;89:9,25;
90:3;94:11;97:3;98:23;
99:7,12;100:23;103:6,
22;104:25;105:12,14;
108:25;109:12,21;
113:16;114:12,24;
115:5;116:3,10,15,19,
20
**grew (2)**
12:20,22
**gross (2)**
101:14,15
**group (2)**
12:23;104:3
**groups (1)**
84:19
**guess (8)**
24:13,17;26:18;
68:15;86:4,6;93:9;97:5
**guessing (1)**
66:4
**guidance (1)**
110:6
**guy (2)**
11:16;85:14
**guys (7)**
10:24;12:7;40:17;
47:17;52:17;67:3;

Dr. Donald Raggio and Dr. Chris Raggio v. McCaleb 30(b)6 Code Collective, LLC 11-17-16    Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

91:21
**guy's (2)**
7:22,22

## H

**hacks (1)**
95:1
**half (10)**
6:4;19:16;67:16,17;
88:8;101:13,14,15,21,
24
**handful (2)**
89:15,16
**handled (1)**
68:22
**hands (2)**
76:7;111:3
**happen (1)**
99:4
**happened (9)**
62:16;63:13;67:18,
20;73:21,25;75:5;79:7;
89:3
**happening (3)**
109:7;113:2;114:12
**happens (2)**
30:9;38:12
**hard (10)**
13:19;28:11,14;32:4;
39:21;54:11;79:5;
85:25;105:11;109:17
**hardware (1)**
15:4
**hassle (2)**
24:5;85:24
**head's (1)**
111:11
**heard (2)**
95:11;112:17
**held (2)**
94:3;97:8
**help (5)**
13:25;53:3;54:5;
59:17;76:13
**helped (1)**
53:5
**helping (1)**
38:9
**hey (2)**
91:1;102:12
**hidden (2)**
60:2;73:13
**high (8)**
6:13,16,18,20;7:8;
12:18,18;18:10
**higher (1)**
41:11
**highest (1)**
41:15
**hired (6)**
11:18;19:21;49:11;
83:17;97:24;116:17

**hobby (4)**
22:1;23;24:4;39:16
**hold (2)**
34:17;49:23
**holding (1)**
92:14
**Holdings (1)**
104:3
**holds (1)**
79:2
**home (3)**
44:17,19,20
**honestly (4)**
23:25;39:9;56:10,21
**hopefully (1)**
39:6
**host (1)**
85:5
**hosted (3)**
43:17,18;82:10
**hosting (5)**
26:18;43:19;85:1,3,4
**hounding (2)**
102:16,17
**hour (1)**
69:17
**How'd (1)**
20:9
**huge (2)**
85:21;100:9
**Huh- (1)**
28:10
**Huh-uh (1)**
14:12
**human (4)**
36:5;68:9,10;69:2
**hundred (2)**
24:11;63:20
**hyperlinked (1)**
8:16

## I

**idea (5)**
24:11;38:18;44:14;
48:7;55:25
**ideas (1)**
48:11
**identification (1)**
110:16
**identify (3)**
72:16;73:16;110:15
**immediately (3)**
49:5,6;62:8
**improvements (1)**
109:5
**including (2)**
64:9,10
**income (1)**
52:11
**incorporated (1)**
11:24
**incorrect (1)**

113:10
**indeed (1)**
93:17
**indicate (1)**
66:9
**individual (1)**
35:10
**individually (2)**
34:24,25
**individuals (1)**
42:13
**industry (1)**
17:19
**information (5)**
71:25,25;76:9;
104:25;106:14
**initial (1)**
50:23
**initials (1)**
20:18
**inquiry (1)**
113:25
**inspect (1)**
92:8
**Instead (1)**
107:16
**instruct (3)**
32:22;49:24;50:6
**integration (2)**
47:5;83:20
**interaction (2)**
47:19;64:18
**interest (1)**
113:24
**interested (6)**
29:13;31:18,23;
104:10;116:3,8
**interesting (5)**
23:21;28:22;39:20,
23;48:4
**interface (4)**
86:16;97:24;98:22;
99:3
**internal (1)**
105:12
**internet (6)**
8:4,5,14;11:10,12;
96:12
**intervention (1)**
69:2
**into (24)**
15:14;22:16;34:15;
36:18;37:8;39:16;50:1;
62:1,1,10,18,21;63:2,3;
65:16;70:25;73:18,21;
74:2;75:3;78:14;95:1;
107:12;108:9
**intricacies (1)**
86:3
**intro (1)**
7:4
**introduce (1)**
4:6

**investigate (2)**
61:7;79:9
**investors (1)**
50:23
**involved (8)**
15:4;19:9;20:8,9;
28:19;42:13;104:6;
116:24
**IP (10)**
54:14;71:11,12,16,
17,19,21;72:1,6,12
**IRC (3)**
77:17;78:19;84:15
**issue (1)**
30:22
**issues (1)**
25:17

## J

**January (3)**
61:18,21;100:15
**Japan (1)**
54:25
**Japanese (2)**
19:15,16
**Jed (10)**
4:2,10,20,25,25;5:3,
17,18,22;80:15
**jed@ (1)**
81:19
**jed@mtgox (4)**
80:13,16,17,24
**Jed@ripplecom (1)**
81:9
**Jed2000 (1)**
81:24
**Jed2000@gmail (1)**
81:4
**jeez (1)**
18:12
**job (1)**
7:16
**Joel (1)**
14:10
**Jose (2)**
115:23;116:1
**jumping (1)**
30:7
**Junglevision (2)**
9:3,25
**junior (1)**
12:18

## K

**Karpeles (9)**
46:19;47:1;53:2;
70:7;86:23;97:24;
107:4;112:15,23
**K-A-R-P-E-L-E-S (1)**
46:23
**keep (3)**

86:22;96:25;111:10
**keeping (1)**
109:6
**kept (8)**
18:9;26:19;71:25;
101:8;105:21,22;
106:4;115:9
**key (7)**
88:20,21;94:14;
95:15,16;96:17,22
**keys (6)**
88:15,16,19;94:15,
19;105:6
**key's (1)**
95:23
**kid (1)**
18:19
**kids (1)**
45:19
**kind (41)**
7:4,24;13:21;15:1,3;
16:24;17:5,6,18,25;
19:1;21:25,25;22:1,2,
23,23;23:15;24:4;25:9;
27:5,20;30:6;36:14,15;
39:15;50:1;52:8;53:4;
67:24;68:23;70:11;
76:21;77:8;85:24;87:1;
100:16;103:22;106:15;
109:7,10
**knew (8)**
6:4;41:21;62:12;
63:15;76:22;93:24;
98:12;105:10
**knowledge (1)**
110:8
**known (1)**
12:18
**knows (1)**
70:16

## L

**lack (1)**
109:8
**language (1)**
86:12
**languages (1)**
6:8
**large (4)**
56:6,9;59:17;60:1
**Largely (1)**
6:12
**largest (1)**
90:4
**Larsen (1)**
49:15
**last (6)**
12:13;45:4,5;46:21;
71:7;111:16
**later (7)**
19:4;34:21;62:3,6,7;
70:21;114:16

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 176 of 230

Case: 25Cl1:14-cv-00071-TTG   Document #: 77-3   Filed: 04/07/2017   Page 37 of 43
Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

lawyers (2)
109:19;113:7
lawyer's (1)
5:5
learn (2)
6:11;53:3
lease (1)
14:22
least (3)
76:10;110:8;113:14
leave (2)
13:11,12
left (9)
13:14,15;20:21,25;
51:3,20,23;77:23;97:9
legacy (1)
86:8
legal (1)
109:13
legitimate (3)
36:2;110:14;113:24
legs (1)
69:18
L-E-S (1)
46:24
less (5)
24:21;38:20;67:9,11;
75:1;88:8;90:24
Liberty (15)
36:22,24;37:5,8,13,
15,16;47:15;68:7,10,
12,13,19,24;69:10
light (1)
70:22
liked (2)
18:8;70:18
likely (2)
80:24;88:14
limit (5)
36:3,10,11,16;67:24
limitation (1)
67:21
limited (1)
4:16
linkable (1)
8:3
listed (1)
55:8
litigation (1)
116:25
Little (11)
6:25;8:4;12:24;13:7;
22:16;25:6,23;38:12;
45:19;66:17;87:24
live (3)
29:24;96:14;108:23
lived (1)
46:17
lives (1)
108:24
LLC (3)
7:23;11:25;12:2
local (1)

94:18
locally (1)
94:15
located (4)
44:4;47:15;53:8;
72:8
location (1)
54:12
log (4)
22:16;65:6,16;71:12
logged (4)
36:1;61:3;65:23;
71:21
logging (1)
71:15
log-in (1)
65:22
logs (1)
65:24
long (28)
7:3;8:22;10:8;12:7;
13:8;15:11;17:9,18;
18:11;21:10,22;23:23;
24:2;27:4;29:23;38:24;
42:24;43:12;45:1;
46:16;50:25;53:21;
55:24;84:8;86:22;
88:11;91:12;113:4
longer (3)
12:10;76:6;105:7
longest (1)
93:17
look (14)
60:19;65:23;74:15;
90:8;91:20,21;92:12;
93:16,20,25;102:23;
105:10;108:3;113:10
looked (3)
61:9;72:21;110:17
looking (5)
56:3;74:14;92:5;
114:16,22
looks (2)
56:4;61:13
look-up (1)
72:12
loss (1)
75:13
lost (3)
64:2,4;91:6
lot (16)
13:19;19:20,22;33:1,
4;39:19;58:13,17;
90:22;98:11;101:5,6;
106:25;109:3,4,6
lots (2)
73:14;79:2
love (1)
18:20

M

machine (4)

14:20,24;15:9;95:1
Magic (8)
20:19,24;21:5,21;
22:10;23:10;25:7;
27:19
Magical (2)
24:9;29:5
MagicalTux (1)
83:14
mail (2)
73:13;82:16
main (1)
83:4
mainly (3)
11:21;45:4;48:15
maintained (2)
14:25;114:3
maintaining (2)
20:5;53:9
major (1)
114:11
makes (1)
51:8
making (4)
8:2,3;27:22;40:1
man (1)
24:8
manager (1)
11:5
managers (2)
11:1,3
manual (1)
69:7
manually (2)
59:10;69:4
manufactured (1)
113:10
many (19)
9:19;24:6;27:9;32:8;
33:7;38:15,25;41:2,3;
53:10;61:21;64:6;
74:16,18,21;89:8,8,25;
106:17
map (1)
84:25
March (2)
101:18,19
Mark (47)
39:2;46:19;47:1,1,2,
4,5;53:2,16;63:4,6;
70:7,21;76:8,10;79:8,
18;80:12,22;82:3,12,
24;83:8;86:23;90:15;
94:19;96:5;97:8,24;
100:17;103:18;107:4,
25;108:7,8,10;111:4;
112:8,10,15,18,19,22;
116:4,14,17,19
mark@mtgox (1)
83:6
market (3)
32:3;42:9;60:3
marketing (1)

109:8
Mark's (4)
76:7;108:11;111:3;
112:2
married (3)
45:21,22,25
MARTIN (2)
4:9,9
masked (1)
73:7
massive (1)
18:2
matter (1)
4:3
may (17)
4:6,11,25;18:6;
30:17;53:11;69:1,6,6;
80:3;82:24;101:20;
112:24;113:1,1,19;
114:18
Maybe (26)
8:24,24;12:9,10;
14:19;16:25;17:14;
19:15,21;21:16,20;
36:22;45:5;68:8;70:23;
77:18;79:1;80:4;82:12;
84:10;87:18;91:13;
100:7;115:14;116:1,16
McCaleb (3)
4:2,20;5:17
mean (78)
9:16;11:11,18;18:6;
20:11,11;22:3,21;23:8;
24:13,23;26:21;27:7,8;
32:2,11;33:3,3;39:3,9,
18;41:21;43:4,9;48:15;
50:1;51:2;52:16,21;
55:7;56:24;57:1,2,4,5;
58:9,25;63:19,19;
64:17;68:2;71:22;
72:11;73:4;74:3,7;
77:21;79:22;80:20;
85:20;86:7;89:10;90:8;
91:12;92:2,9,21;93:8,
9;94:14;95:21;96:7,8;
97:7;99:16;100:1,19;
101:5,7;103:16;105:6;
106:10;110:6;112:17;
115:6,24;116:6,21
meaning (1)
109:15
meant (3)
28:15;59:24;62:22
mechanism (2)
96:6,23
meet (2)
40:6;47:1
meetings (1)
115:22
messages (1)
76:20
met (7)
5:2;40:8;47:2;

104:15,16,17;115:16
methods (1)
68:6
middle (1)
5:18;78:25
might (1)
30:22
million (4)
57:8;87:20;88:4,8
mind (1)
112:3
mine (3)
10:22;31:24;52:25
mined (1)
57:6;90:7
mining (6)
28:23;31:18,22;
93:12,22,23
minute (2)
5:2;117:7
Misoon (3)
46:9,9,13
M-I-S-O-O-N (1)
46:13
missing (11)
60:21;61:1,22;63:17,
23,24;64:14,20;67:19;
70:8,15
Mitch (2)
4:7;5:2
mix (1)
104:11
model (1)
17:5
money (56)
11:1;16:17,18,20;
22:20,21;23:2,9,17;
25:23;26:3;33:23,24;
36:18,21;37:5,12,12,
15,17,22;40:1,25;41:2,
4;42:6;47:7;52:1,4;
55:19;56:16;57:12,16;
58:5;59:7;62:18,20,22;
76:5;84:3;100:4,22;
102:2,4,12;103:11;
105:7,13,25;106:12;
107:22,23;109:9,13;
111:1;112:4
month (2)
86:24;100:20
monthly (1)
101:20
months (19)
8:24;10:9;24:1;
26:12,13;38:5,6;51:17;
91:14,15,15;101:2,24,
25;102:5,11;111:18;
113:15;115:6
more (30)
14:23;22:1,22;24:24;
38:22;39:14;40:23,24;
41:4,13;48:3;60:11;
74:11,20,23;75:1;78:7,

Case 3:14-cv-00071-TTC    Document #: 77-3    Filed: 04/07/2017    Page 38 of 43
Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16    Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

11,12;85:22;86:8;
90:23;99:12,15,17;
106:8,11,25;114:17;
117:13

**morning (2)**
4:1,25

**most (7)**
9:15;37:25;58:23;
60:2;71:18;80:24;
81:20

**mostly (3)**
57:24;79:21,22

**mother (4)**
46:2,3,7;108:15

**motivated (1)**
39:17

**motivations (1)**
31:14

**motive (1)**
39:8

**move (15)**
35:19;48:19,23;
53:16;54:3,6,7,9,10,23;
56:11;60:2;90:25;
91:22;96:19

**moved (18)**
44:21;45:5,5,14;
48:21,22,24;53:19,22,
24;54:22,25;62:6;63:2,
3;90:16;91:8;108:16

**movement (1)**
106:12

**moving (3)**
7:6;13:19;54:10

**Mt (94)**
10:16;19:5;20:7,8;
26:9,15;27:5,8,21;
28:16;30:2,24;32:1;
33:1,2,18,23;34:5,15;
35:11;36:19;37:13,25;
39:15;40:18;41:1;42:5,
12;43:12,15;44:9,15;
46:19;47:3,7,9,23;
53:2;55:8;56:20;58:3;
61:15;62:1,10,19;63:2,
3,5;66:7;69:24;70:4;
74:9,23;75:8,9;76:7;
78:25;82:7,9,14,21;
83:11,18,25;84:22;
86:13,23;87:4;89:9,25;
90:3;94:11;97:3;98:23;
99:7,12;100:23;103:6,
22;104:25;105:12,14;
108:25;109:12,21;
113:16;114:12,24;
115:5;116:3,10,15,19,
20

**MT- (1)**
42:15

**MTGOX (2)**
4:4;29:1

**much (25)**
11:10;18:7;25:12;

29:9;32:8;39:9;44:6,8;
45:19;49:8;56:11;62:3,
6;64:18;67:8;78:9;
79:23;86:25;87:18;
92:13;100:4;101:3,7;
103:1;112:1

**multiplayer (1)**
18:2

**multiple (4)**
9:13,17,19;64:7

**Must (3)**
15:16;45:17;94:19

---

### N

**name (34)**
5:16,18;7:4,21,22,22,
23;9:9,23;12:13;14:1;
18:3;21:6;26:25;29:1,
6,10;31:6;33:20;34:23;
46:7,12,21;65:5;66:2;
69:14;71:2,4,6,7;72:4;
76:24,25;83:23

**names (2)**
66:7,8

**narrow (1)**
87:23

**nature (1)**
111:20

**near (1)**
66:14

**need (9)**
5:13;22:9;30:17;
49:23;50:4;69:13;
96:17;98:25;100:2

**needed (3)**
55:17,18;79:9

**negotiated (1)**
100:6

**net (1)**
95:7

**network (3)**
16:3;92:22,23

**new (20)**
21:1;40:9;44:21,24;
45:1,2,3,4,6,12,20;
54:12,14;57:24;72:1;
80:12;89:5,7;109:9;
115:19

**next (4)**
17:25;48:7,9;101:2

**nice (1)**
11:7

**nine (4)**
45:2;51:17;102:5;
113:15

**nobody (1)**
71:23

**node (12)**
92:8,11,12,18,20;
93:2,6,8,9,10,11,13

**nodes (1)**
84:25

**noise (1)**
111:8

**Nojima (2)**
19:12,13

**nominal (1)**
103:24

**None (1)**
89:13

**nonexistent (1)**
85:23

**normal (1)**
55:22;60:10;109:1

**normally (2)**
9:14;28:10

**notice (3)**
54:16;113:12;115:3

**notified (2)**
60:20,25

**notify (1)**
60:23

**November (1)**
4:5

**nowadays (1)**
9:16

**nowhere (1)**
66:14

**number (5)**
33:8;38:21;78:1;
90:9;114:21

---

### O

**oath (1)**
32:20

**object (1)**
32:17

**obviously (2)**
73:4;91:10

**occurred (1)**
102:25

**off (13)**
17:24;37:24;39:11;
50:10;77:17;80:13;
82:12;94:25;95:23;
97:16;111:13;117:6,8

**offer (2)**
55:20;60:11

**offers (1)**
42:7

**office (1)**
44:15

**offline (1)**
8:14;94:25;95:6

**Often (3)**
73:6;79:20;101:21

**old (3)**
5:24;80:21;86:10

**once (9)**
60:25;61:8,8;65:23;
75:5,6;107:22,22,24

**one (48)**
7:13;9:2,14,19,20;
11:16;16:24;19:10,22;

20:21;21:1,1;31:14;
40:24,24,25,25;41:4;
46:2;47:21;53:9,15;
58:15;61:13;64:6;71:5;
79:10;80:5;81:5;82:4;
89:11,19,23;92:23;
96:7;102:7;104:5,6,15,
16;110:21;111:9;
114:18;115:17,23;
116:1,1;117:4

**one-name (1)**
71:3

**ones (2)**
68:8;114:25

**online (18)**
11:14;18:1,2;20:19;
21:5,18,21;22:12,13,
14;25:7;27:19,23;
94:24;95:18;96:7,22;
98:13

**only (15)**
7:13;9:20;10:9;38:2;
39:3;52:11;53:8;57:4;
58:15;60:7;78:7;86:24;
94:15;100:20;105:25

**onto (1)**
41:1

**open (3)**
58:2;81:14,15;87:4;
105:17

**opencoincom (1)**
81:21

**opened (3)**
34:5,10;37:4

**operation (1)**
54:11

**operations (1)**
109:10

**operators (1)**
42:12

**opportunity (3)**
18:10;31:15;70:23

**order (3)**
13:18;34:3;43:11;
56:6,9,13,17,19;59:25;
60:1,5;65:25;99:7

**orders (3)**
60:8,10,10

**original (1)**
52:16

**others (2)**
81:10;115:24

**otherwise (1)**
66:4

**out (17)**
7:14;38:25;44:17;
57:2;61:25;72:19,23;
73:2,5;76:11;90:14;
93:2;98:13;104:4;
106:1;109:9;116:9

**outside (3)**
45:6,9;111:8

**outstanding (1)**

56:23

**over (13)**
20:21;33:11,13,15;
47:11,13;83:2,5;86:25;
87:17;91:8,21;116:8

**own (11)**
10:11,11;14:24,24;
15:20;22:11;26:19;
49:21;50:17;99:18;
112:4

**owned (11)**
11:17;16:9;34:16;
49:19;50:22,23,24;
73:9;76:6;78:23;
107:25

**owner (3)**
16:7;49:12;105:19

**ownership (2)**
50:18;103:5

**owns (2)**
92:11,11

---

### P

**paid (7)**
16:21;42:16;67:16,
16;101:21;108:9;
114:24

**paper (2)**
95:12,21;96:2

**parked (3)**
26:21;43:21,24

**part (9)**
16:9,10;49:12;81:20;
86:10;98:8;100:12;
101:12;116:19

**particular (2)**
9:19;92:13

**partner (2)**
12:11;18:13

**partners (1)**
49:10

**parts (2)**
104:7

**party (1)**
117:2

**passport (1)**
110:18

**password (5)**
33:21;65:6,15;69:14;
70:16

**passwords (2)**
65:14,21

**patched (1)**
14:25

**Patterson (2)**
44:20;45:5

**pay (10)**
16:22;26:25;58:21;
67:13;85:5,10;100:5,
22;108:10,11

**paying (1)**
115:2

Dr. Donald Raggio and Dr. Chris Raggio
MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
November 17, 2016

payment (4)
101:17;102:7;
113:18,21
payments (2)
16:25;103:17
PayPal (7)
36:21;37:1;68:7,11;
69:1,3,10
peer-to-peer (2)
16:3;92:22
people (37)
9:20;16:22;19:8;
20:16;22:17,24;25:16;
30:22;31:2;36:18;
41:11,17;42:5,6;43:4;
47:10;49:11;52:20;
54:16;59:25;60:11;
64:8,13;71:18,18;
73:14;76:20;77:5,10;
79:3;80:13;83:4;90:25;
91:3;104:6,10;105:13
percent (12)
16:7;43:10;50:19,20,
22;63:20;101:1;
103:13,15,22;113:24;
114:1
percentage (11)
42:20,21,22,23,25;
43:6,8;49:22;50:17;
103:5,12
percentages (1)
43:1
period (2)
28:5;53:4
person (8)
19:10,22;39:3;64:7;
71:10;72:17;77:18;
78:24
personal (11)
58:16,17,25;59:5;
80:11,20,25;81:1,11,
24;82:4
personally (3)
79:16;104:14;115:16
phone (1)
79:17
PHP (4)
86:14,18,20,21
physical (2)
22:10;43:16
physically (2)
44:3;54:7
piece (3)
25:6;100:1,4
pieces (1)
92:23
Pierce (1)
104:19
place (5)
19:17;40:23;56:12,
17;100:11
placed (4)
56:6;60:5,7,9

places (1)
53:14
placing (1)
60:6
plan (5)
52:3,4,16;70:10,11
plausible (1)
77:20
pm (1)
117:23
point (36)
11:14;15:5;17:7;
18:9;27:2;33:24;39:13;
49:13;54:13,13;56:11;
57:4,6;59:10,14;60:20;
70:6;75:11;76:4,6;
82:13,23;86:25;87:7;
96:8,10;98:6,23;
100:18;101:6;107:11;
111:3;112:6;114:2;
116:19,21
pool (3)
60:6,8,10
pools (1)
59:24
popular (1)
76:19
portion (1)
113:25
possible (2)
77:22;82:6
Possibly (1)
105:11
post (2)
76:20;77:9
pre-internet (1)
8:1
preserve (1)
75:3
presume (1)
79:21
pretty (16)
27:3;29:9,21;41:4;
49:3,8;51:15;76:19;
86:25;89:6;92:2;98:5;
99:11;100:16;103:2;
110:17
prevent (3)
36:14,15,16
previous (1)
111:25
price (8)
31:25;32:2,4;42:8,8;
56:2,13,17
print (3)
95:13,14,14
printed (1)
95:15
prior (2)
66:5;112:5
private (2)
96:17;105:6
pro (1)

17:2
probably (25)
10:3,5,9;15:16;18:6,
9;19:2;23:25;28:4;
39:2;41:18;57:5;58:20;
69:8;81:5;87:11;89:4,
13;93:10;98:2;100:14;
101:7;112:4;116:7,22
problem (2)
36:16;37:20
problems (2)
39:22;114:11
proceeds (1)
114:1
produce (2)
10:14;101:9
produced (1)
101:7
producing (1)
101:3
profit (1)
39:8
profit- (1)
39:7
profitable (4)
39:7;40:3;43:13;
51:24
program (5)
6:4,9;9:7;15:21;
29:24
programmed (2)
35:13;36:7
programmers (1)
9:14
programming (12)
6:15,17,21;7:1,5,16;
8:7;9:4;10:20;13:24;
29:20;86:12
project (6)
15:20;39:15;44:24;
85:18,21;100:9
projects (5)
10:11;17:25;20:22;
48:2;84:13
Proprietorship (2)
4:4;103:9
protocol (1)
93:1
proud (1)
14:9
prove (1)
91:7
public (2)
88:19;91:17
pull (1)
82:2
purchase (4)
31:16;32:6,9;42:1
purchased (4)
34:6;41:24;53:22;
73:5
purchasing (2)
40:13;116:15

purpose (3)
15:25;20:13;36:13
pursuing (2)
73:10;111:22
push (1)
69:9
put (21)
28:11;30:18,24;32:1;
34:3,10;37:5;42:6;
43:12,15;55:20;59:25;
71:7;84:5;95:16;96:7,
22;97:9;98:13;106:11;
116:9

Q

quick (2)
69:16;97:14
quicker (1)
99:14
quickly (3)
33:2;51:15;115:4
quite (4)
6:10;14:14;30:7;
89:13

R

rack (1)
85:8
Raggio (7)
4:3;40:7;55:2;67:10;
111:17;112:13;115:16
Raggios (9)
4:8,9;64:9;70:3;
80:2;107:11,20;108:2,
13
Raggio's (1)
66:15
Raggios' (5)
65:3,4;70:8;77:23;
78:7
raise (1)
45:20
ran (2)
21:18;87:2
rate (1)
101:9
rather (2)
14:23;17:20
read (3)
20:17;28:14,21
reading (1)
30:16
real (3)
69:16;93:11;97:14
realized (3)
75:5,6;107:23
really (25)
11:9;12:9;22:21;
24:8,23;38:2;50:1,2;
52:12;54:19;63:13;
69:13;78:10;85:25;

86:24;88:10,11;89:17;
90:2;91:1,21;101:22;
103:23;105:11;114:6
recall (9)
9:7;56:1,3;74:18;
78:8,9;88:14;114:25;
115:1
receive (4)
35:8;103:11,14,16
Recess (3)
50:12;97:18;117:10
recollection (1)
55:12
recommended (1)
108:10
record (11)
4:6;5:16;50:10,14;
97:16,19;102:23;
111:13;117:6,8,11
recording (1)
17:19
recover (1)
70:18,24
references (1)
99:25
regarding (1)
104:25
register (1)
33:19
registered (1)
71:9
registrar (2)
26:22;43:25
regular (1)
80:4
reinitialized (2)
27:5,21
reinitiated (1)
28:16
related (1)
19:1
relationship (1)
90:14
relationships (1)
43:5
relaxed (2)
5:6,15
release (2)
108:3;111:1
released (4)
9:10,12;15:23;16:5
relevance (1)
50:2
relevant (1)
106:8
remember (105)
7:2,3;9:9;12:1,4,9,
25;13:19;17:15;23:25;
24:8,10,23;25:24;
26:11;31:6,9;33:8,14,
16;37:16;38:17,20;
41:3,6,7,20;42:23,24,
24,25;43:7,10;44:5;

50:18;53:10;56:10,21,
22;58:20;59:2,3,5,22;
60:16;62:20;64:17;
66:14;67:9,15,23;
68:11;69:3,24;70:5;
72:9,15,21;73:8,10,10,
11,14,20,22;74:1,20,
21;76:1;78:10,11,12;
83:8,13,22;84:23;
85:19;87:8,15,16,18;
88:11;89:3,5,17;90:2,
13,15;91:13;96:6,23;
97:23;98:1,3,6;100:6,
14;110:21;113:3,4;
114:19;115:25;116:6,
16,21
**remembered (1)**
113:11
**reminds (1)**
35:1
**remote (4)**
13:23;14:14,16,19
**remotely (2)**
13:25;15:9
**remove (1)**
17:1
**reply (1)**
77:10
**report (1)**
11:5
**reported (2)**
63:22;111:14
**reporter (3)**
4:11;46:12,14
**reporting (2)**
11:1,3
**represented (3)**
91:4;112:8,11
**representing (1)**
4:7
**request (5)**
35:21;36:1;68:13;
98:13;99:19
**requested (1)**
35:25
**require (4)**
25:12;54:19;68:9,10
**required (1)**
69:1
**Reserve (8)**
36:22,24;37:6,8,17;
68:7,10,24
**reserved (1)**
94:25
**responded (2)**
98:16;99:19
**response (2)**
47:22;77:15
**responsibility (2)**
112:1,2
**responsible (1)**
70:20
**rest (1)**

50:24
**restroom (1)**
5:14
**retain (2)**
89:15;103:12
**retained (2)**
51:22;103:5
**retaining (1)**
89:20
**revenue (5)**
101:1,3,14,14,15
**review (1)**
113:6
**Rica (13)**
37:3;44:22;45:14,18;
46:16,18;47:14,20;
48:6,12,18;51:10;
108:16
**right (129)**
5:22;7:10;8:9;11:17,
18;12:21;13:6;16:5,6,
19;19:22;5:23:18,20;
25:5,8,17;26:24;28:1,2,
7;29:2,3,11,22,23;30:5,
10;31:17;32:20;35:1,7,
9,11,12;36:9;37:14;
40:14;42:10;44:18;
45:12,13,15;46:4,20;
47:24,25;48:13;49:9,
20;50:8;51:10,11,12;
52:11,14,15;54:14,23;
55:3,4;57:25;58:1;
59:11,15,16;60:22;
62:2,16,24;63:10,16;
65:10,15;68:20;69:12;
71:18;77:7;78:14,15,
16,22;82:15;83:18,19;
84:1,2;85:14;88:22;
90:5;91:24;92:9,11,19,
22,23;93:5,21;94:1,5;
95:8,9,15,25;96:3,8,12;
97:13;98:12,15;99:21;
102:1,8,21;103:4,7,9,
20;106:6,22;107:9,12,
13;108:18;110:11,12,
13;112:9;115:20;
117:17
**Ripple (24)**
48:10;49:3,8,10,16,
19,22;50:17;51:1,15,
23;52:1,4,5,8,13,17,20;
81:6,14;115:5,18,25,25
**Rock (3)**
6:25;12:24;13:7
**roughly (1)**
51:16
**Rudder (4)**
12:12,14,15,17
**R-U-D-D-E-R (1)**
12:15
**run (11)**
12:7;17:17;19:24;
21:22;39:19,20;44:8,

17;56:13;92:12;97:14
**running (9)**
20:1;30:2;44:21;
47:8;92:18,22;108:25;
109:12,20
**Russia (1)**
110:23

---

### S

**sale (2)**
100:11;116:18
**salespeople (1)**
11:19
**Sam (1)**
16:13
**same (13)**
14:18;29:4;30:22;
50:22;53:12;70:21;
71:16,21;74:24,25;
82:9;94:10;117:23
**San (2)**
115:23;116:1
**save (1)**
103:22
**saw (4)**
62:3;65:19;70:25;
84:17
**saying (7)**
34:9;38:11;42:7;
46:21;55:14;91:20;
112:1
**scare (1)**
60:3
**school (7)**
6:12,13,16,18,20;
7:8;12:19
**scrape (1)**
66:6
**second (4)**
7:14;49:23;111:9;
117:4
**secret (6)**
88:15,16,20,20;
95:15,15
**secure (3)**
14:16;15:1,10
**securities (2)**
109:13,15
**security (2)**
86:6;109:18
**seek (1)**
79:12
**seemed (6)**
39:16;112:5,6,7;
113:12;114:24
**seems (4)**
31:22,24;77:21;
114:18
**self-taught (1)**
6:12
**sell (10)**
20:15;26:4;33:25;

34:3;37:24;39:17;42:8;
52:7;116:7,20
**selling (6)**
85:1,3,4;100:13;
116:3,10
**semester (3)**
6:3;7:13,14
**send (19)**
33:23;34:2;36:3;
37:9;41:2;57:12;68:7,
7;69:9;78:24;79:10;
89:5,7;99:4;101:24;
102:2,4,16;110:16
**sending (1)**
105:13
**sense (3)**
44:10;51:8;93:11
**sent (7)**
35:23;41:3;57:15,17;
75:8;82:3;110:17
**separate (1)**
58:2
**September (2)**
30:1;33:6
**Seriously (1)**
106:23
**served (1)**
73:14
**server (9)**
16:2;26:19,24;43:16;
44:3,7;53:9,11,17;
54:11;65:24;73:13;
82:9,10,16,16;85:4,5;
94:15
**servers (3)**
53:10;92:10;93:1
**set (3)**
49:17;82:20;89:17
**setting (1)**
11:4
**several (3)**
35:7;65:14;80:9
**share (1)**
16:1
**shareholders (1)**
114:5
**shares (3)**
49:19,21;51:21
**shh (1)**
111:10
**shortly (1)**
90:15
**show (1)**
90:17
**shut (4)**
17:21,22;19:17;
54:19
**shutdown (1)**
54:8
**sign (4)**
22:24;33:18;96:18,
20
**signed (4)**

71:6,12,24;96:21
**significance (1)**
67:1
**significant (5)**
29:7;41:10,22;47:22;
89:24
**Silicon (2)**
13:15,22
**similar (3)**
16:3;39:14;52:5
**simple (1)**
39:21
**site (11)**
19:23;20:24;22:16;
25:8;27:10,12;62:17;
91:4;107:25;109:5,9
**sitting (2)**
68:3;73:24
**situation (1)**
76:8
**six (7)**
8:24;10:9;17:10;
101:2,24,25;102:11
**size (2)**
36:16;44:11
**Slashdot (2)**
28:21;29:14
**slightly (1)**
19:5
**Slovenia (2)**
114:19,20
**small (3)**
66:25;100:1,4
**software (23)**
6:5;10:23,25;11:23,
24;13:25;15:6,8;16:25;
25:6;29:4,8;68:22;
83:24;86:2,11;92:23;
93:4,19;94:8;98:21;
99:2,3
**sold (34)**
34:22;38:15;40:1;
46:19;47:3,23;53:2,16;
62:17,19;63:4,5,14;
64:3;69:23;70:3;86:23;
87:14;90:1,3,15,23;
91:6;97:12;100:18;
101:4,8;102:5;103:9,
22;105:4;107:4,6;
115:4
**Sole (2)**
4:4;103:8
**somebody (11)**
14:9;34:5;37:20;
41:19;65:5,13;66:5;
77:17;85:13;98:14;
99:19
**somebody's (3)**
7:23;14:19;66:1
**someone (17)**
16:9;19:23;47:10;
49:12;56:6,7;64:1,3;
67:22;70:15,16;71:9,

Case 25CI1:14-cv-00071-TTG   Document # 77-3   Filed: 04/07/2017   Page 41 of 43
Dr. Donald Raggio and Dr. Chris Raggio   McCaleb 30(b)6   Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

15;84:2;95:1;103:21;
105:15
**someone's (1)**
36:14
**sometime (3)**
40:12;44:21;45:14
**sometimes (6)**
9:17,18;28:9;73:6;
80:13;81:1
**somewhere (12)**
8:21;15:18;17:13;
26:19;27:15;43:11,17;
63:7;83:14;95:16;97:9;
102:10
**son (1)**
73:20
**soon (3)**
29:21;49:4;91:10
**sorry (9)**
9:23;38:8;45:23;
62:22;66:17;88:10;
107:19;110:13;112:13
**sort (5)**
7:25;8:13,13;14:21;
106:10
**sounds (2)**
13:6;85:22
**Space (9)**
9:9,10;38:12;44:6,8,
10;84:14;85:8;104:21
**speaking (1)**
91:17
**specific (2)**
9:6;93:8
**specify (1)**
101:22
**Spell (2)**
16:14;46:10
**spending (1)**
41:13
**split (1)**
67:16
**spring (1)**
51:6
**stand (3)**
20:18;21:3;86:20
**standard (1)**
43:8
**stands (1)**
86:21
**start (8)**
28:23;29:9;48:14;
49:3;93:11,12;100:12;
102:16
**started (28)**
4:14;6:5;7:8;10:21;
14:13;15:20;19:5;20:7;
21:15;24:4;26:11;27:5,
8,14;28:25;29:20;33:5;
44:20;45:11;48:2,7;
51:3,14;83:7;100:17;
101:11;115:18;116:23
**startup (3)**

13:16,21;14:1
**state (1)**
5:15
**stateside (2)**
85:13;108:18
**static (1)**
71:19
**stay (3)**
8:22;10:8;46:16
**stayed (3)**
51:14;88:25;108:16
**steal (1)**
77:19
**stick (1)**
50:25
**still (26)**
10:1,5;11:9;14:5;
20:1,3,4,4;28:15;
39:10;48:5;73:23;
80:14;81:17,23;91:7;
93:22;94:10;102:23;
104:25;108:19,21;
110:5;113:23,23;115:9
**stock (1)**
51:21
**stole (1)**
77:18
**stolen (4)**
63:10,11;66:11,12
**Stop (5)**
5:11,13;24:25;47:8;
113:16
**stopped (9)**
15:15;25:1,3;26:9,
12;27:9,12;113:18,19
**store (2)**
106:8,15
**stored (1)**
71:25
**straightforward (1)**
89:6
**stretch (1)**
69:18
**stuff (11)**
11:13;15:1,3,6;73:6;
75:17;76:23;77:8;
85:15;99:12;109:11
**subject (1)**
116:4
**success (1)**
18:8
**successful (1)**
52:9
**Suck (2)**
13:1,4
**summer (4)**
40:11;48:22;51:4,10
**Sunlot (1)**
104:3
**supporting (1)**
26:1
**support-type (1)**
109:3

**supposed (1)**
14:16
**Sure (29)**
5:1,5,12;11:11,12;
13:8;14:25;15:10;27:3;
28:13;30:11,12;32:15;
41:4,12;43:14,14;
56:18;64:23;67:10;
68:25;71:16;75:13,16;
82:25;97:15;98:5;
108:9;117:5
**surprise (1)**
114:14
**suspicious (1)**
76:10
**sustained (1)**
18:7
**swamp12@yahoocom (1)**
81:12
**swear (1)**
4:12
**swimming (1)**
111:12
**switched (1)**
82:12
**sworn (2)**
4:13,21
**system (3)**
8:12;53:3;87:1

**T**

**tag (1)**
8:11
**talk (12)**
32:16;49:24;50:4,7,
8;76:21,22;77:5;79:15,
16,23;116:14
**talked (2)**
109:19;111:16
**talking (8)**
14:18;32:18;84:15;
93:1;100:12,17;
112:19;116:23
**teach (3)**
6:15,20;53:6
**technical (2)**
39:22;105:15
**technically (3)**
22:7;82:6;93:9
**tens (1)**
41:8
**term (1)**
93:8
**testified (1)**
4:21
**theft (1)**
67:10
**Theirs (2)**
64:22;78:8
**thereafter (1)**
29:21
**there'd (1)**

57:5
**thinking (6)**
48:2,16;51:9;54:7;
89:16;116:22
**third (1)**
87:21
**Thirty (1)**
57:3
**though (7)**
35:16;41:5;62:4;
87:8;89:14;96:24;
100:15
**thought (7)**
54:1;70:20,23;76:9;
79:9;90:6;112:24
**thousand (6)**
24:12,21;33:11;
36:11;38:19;100:7
**thousands (5)**
41:9;65:20,21,21,22
**threatening (1)**
17:20
**three (4)**
18:12;64:11;107:7,7
**three-year (1)**
28:5
**threshold (1)**
56:15
**ticket (1)**
23:12
**tickets (2)**
23:9,11
**times (5)**
41:2,3;57:7;79:20;
102:18
**tired (1)**
17:18
**title (2)**
9:10,12
**Toad (2)**
13:1,4
**today (3)**
5:15;20:3;108:21
**Today's (1)**
4:4
**together (1)**
108:19
**told (19)**
5:5;30:9;54:2,3,9;
55:20;60:8;61:8,8,23;
70:5,5;76:7;79:11;
107:11,20;110:14;
112:15,18
**took (9)**
6:17;7:16;17:24;
27:1;40:23;83:2,5;
97:8;100:11
**tools (2)**
11:3;15:9
**top (2)**
41:16,17
**topic (1)**
77:9

**topics (1)**
77:5
**total (3)**
56:24;64:11;75:23
**totally (1)**
39:11
**Tournament (2)**
13:4,5
**Tourney (1)**
13:1
**town (2)**
12:22;14:10
**trace (3)**
61:25;66:20;74:3
**track (1)**
71:10
**trade (5)**
22:11,15,17,19,25;
23:11;25:4,22,23;
42:10,13,20,21;43:13;
59:15
**traded (4)**
23:3;52:21;55:23;
73:23
**trader (1)**
25:9
**trades (1)**
114:22
**trading (7)**
20:24;23:24;25:1,8;
27:10,12,19
**trail (1)**
61:10
**transaction (16)**
36:5;37:10;40:22,24,
25;42:4,16;68:23;96:9,
16,18,19,21;106:11,15;
113:11
**transactions (8)**
42:18;88:21;93:20;
102:24,24;105:16,18;
113:16
**transcript (1)**
28:14
**transfer (7)**
76:4;87:5;88:13;
96:13,23;98:7,8
**transferred (5)**
87:7,8,14;94:19;
107:3
**transition (2)**
53:4,6
**trick (1)**
38:10
**tried (3)**
66:22;72:23;76:11
**tries (1)**
65:13
**true (7)**
56:14;94:17;95:12;
115:1,2,10,11
**Trump's (1)**
73:20

Dr. Donald Raggio and Dr. Chris Raggio v.
MTGOX, a sole proprietorship, et al

McCaleb 30(b)6 Code Collective, LLC 11-17-16   Jed McCaleb 30(b)6 Representative
November 17, 2016

truthful (1)
  108:12
try (5)
  65:20;72:19;75:2;
  76:13;87:21
trying (8)
  8:10;22:22;38:9;
  79:12;91:2;92:1;109:5,
  8
turn (1)
  80:12
Twelve (1)
  103:13
Twenty-five (1)
  38:18
two (12)
  11:21;18:12;45:5,19;
  46:5;53:14;64:8,9;
  65:8;66:4,7,19
two- (1)
  28:4
two-and-a-half (1)
  57:8
Tyner (41)
  4:7,7,18,24;13:4,7,9;
  21:7;24:20;30:15;
  32:13,15,17,20,24,25;
  38:9,14;46:15,23,25;
  50:5,8,16;58:10,12;
  69:22;87:23;88:3,5,7;
  97:21;109:16;111:11,
  15;112:12;117:4,6,13,
  16,18
typically (1)
  100:2

**U**

UC (1)
  7:12
uh (1)
  28:11
UK (1)
  104:7
ultimately (1)
  70:15
unclear (2)
  39:11;70:13
under (4)
  9:12;32:20;38:2;
  97:10
underlying (1)
  52:6
understood (1)
  87:1
unfortunate (1)
  70:14
university (3)
  6:17,24,25
unless (1)
  106:6
unlike (1)
  5:8

unlikely (1)
  77:21
up (45)
  11:4;12:20,22,23;
  20:1;21:11;22:24;24:3,
  6;30:2,18,24;32:1;
  33:1,18;34:3;37:4;
  39:19;40:23;42:7;
  43:12,15;44:6;49:17;
  56:14,17;59:25;71:7,
  13,24;79:15;82:20;
  84:5;89:18;92:12;
  96:25;101:6;108:1;
  109:6;111:25;112:5;
  114:17,22;115:9;116:2
USB (1)
  96:22
use (13)
  16:25;29:3;31:4;
  36:20,21,22;37:5;44:8;
  80:23;85:12;86:11,12,
  15
used (14)
  18:20;21:1;29:6,7,
  10;59:6;80:25;82:11,
  11,14,21;83:10,12;
  96:23
useful (3)
  73:2,15;105:7
user (9)
  33:20;65:5;66:1,7,8;
  69:14;71:2,4,6
users' (2)
  79:10,11
uses (2)
  106:17,25
using (3)
  11:10;80:7;97:6

**V**

vague (1)
  110:6
validating (1)
  93:12
Valley (2)
  13:15,22
value (2)
  52:7;56:22
various (2)
  10:13;17:24;33:23
vary (1)
  101:5
venture (1)
  104:9
verify (3)
  93:16;102:21;103:3
version (3)
  17:2;22:13,14
versus (1)
  4:4
Via (1)
  60:24

viable (1)
  18:5
video (2)
  10:15,17
VIDEOGRAPHER (9)
  4:1,11;50:10,14;
  97:16,19;117:8,11,20
videotaped (1)
  4:2
volume (2)
  55:23,25
volunteer (1)
  16:24

**W**

Wait (2)
  30:5;110:3
wallet (10)
  34:7;35:10,17,18;
  37:8;79:2;89:11;94:18,
  22;95:21
wallets (16)
  34:16;35:7;88:13;
  89:1,5,8,21;94:11;97:1,
  5,8;104:24;105:1,5,10,
  12
wants (1)
  94:7
warmer (1)
  45:19
wasting (1)
  112:4
watch (1)
  89:13
Watson (6)
  10:22,24;11:13,22,
  23;13:11
way (18)
  4:16;20:14,15;30:21,
  23;38:13;42:5;64:22,
  23;70:21;71:10;72:16;
  83:4;84:24;92:10;
  103:19;113:13;114:6
ways (6)
  33:23;36:20,23;60:6;
  96:15;109:9
website (4)
  11:15;27:1;35:21;
  55:8
weeks (3)
  29:25;30:16;53:5
weren't (4)
  11:9;31:18;62:6;
  89:20
what's (5)
  7:21;12:13;55:12;
  76:24;92:20
where's (1)
  102:12
Whereupon (1)
  117:22
wherever (1)

54:12
whois (1)
  73:6
whole (1)
  89:20
whose (1)
  71:1
Wild (5)
  18:15,21,22,23;
  44:24
Wilds (7)
  18:4,15,16,17;27:22;
  35:4;81:17
willing (2)
  42:7,8
Win (1)
  4:10
winding (1)
  19:5
wire (2)
  36:21;57:12
wired (5)
  55:19;58:5;59:7;
  87:9,11
withdraw (3)
  36:12;67:2,22
withdrawal (1)
  35:22
withdrew (2)
  67:3,6
Within (2)
  26:13;30:16
without (1)
  16:2
witness (15)
  4:12,13;13:6;21:5;
  30:8,11,14;32:10;38:8;
  46:13,24;69:20;87:25;
  117:15,17
wondered (1)
  54:2
wondering (1)
  112:2
word (1)
  109:8
words (1)
  75:19
work (19)
  9:15;10:10;13:13;
  14:19;17:7;18:11;22:3,
  7;25:17;33:17;39:19;
  48:3,5;68:1;85:16;
  87:6;88:18;99:7;100:2
worked (6)
  9:1,19;13:15;15:3;
  17:24;87:1
working (17)
  6:5;9:11,14,20;
  10:12,17;13:13,21;
  15:15;28:1,15,18;
  39:21;44:23;48:14;
  49:3;51:14
works (2)

9:15;42:5
world (6)
  47:11;56:24;90:4;
  93:2;104:8;115:9
worried (1)
  91:3
worth (4)
  55:15;56:8;75:17,21
Wow (1)
  94:10
write (6)
  77:10;83:18,24;
  85:13;86:11,12
writing (2)
  25:3;98:21
wrong (1)
  58:11
wrote (3)
  20:11;87:9,12

**Y**

Yagan (2)
  16:13,14
Y-A-G-A-N (1)
  16:15
y'all (2)
  19:17;79:6
year (11)
  8:20;12:9;15:13;
  33:7;45:4,16;46:17;
  48:19;51:17;101:10;
  108:16
years (4)
  17:10;18:12;45:2,5
Yep (2)
  46:6;68:17
York (12)
  40:9;44:21,24;45:1,
  2,3,4,6,12,20;57:25;
  115:19

**1**

1 (1)
  43:9
1:02 (3)
  117:12,21,23
10 (4)
  4:5;29:16;41:17;
  116:18
10,000 (5)
  24:12;33:13;38:22;
  56:7;68:3
10:28 (1)
  50:11
10:50 (1)
  50:15
100 (1)
  16:7
100,000 (1)
  101:9
11 (1)

Dr. Donald Raggio and Dr. Chris Raggio/McCaleb 30(b)6 Code Collective, LLC 11-17-16    Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

61:21
**11:48 (1)**
  97:17
**12 (5)**
  51:10;103:14,22;
  113:24;114:1
**12:02 (1)**
  97:20
**12:37 (1)**
  117:9
**15 (1)**
  69:17
**17th (1)**
  4:5

     **2**

**20 (1)**
  41:17
**20- (1)**
  21:20
**2000 (1)**
  15:22
**2000s (1)**
  15:14
**2004 (2)**
  17:13;21:20
**2005 (2)**
  17:13,14
**2006 (2)**
  17:14;27:14
**2007 (2)**
  21:16;27:14
**2008 (2)**
  19:2;27:15
**2009 (1)**
  19:7
**2010 (5)**
  27:8;28:25;29:17,18;
  33:6
**2011 (3)**
  61:20;113:22,23
**2012 (2)**
  40:11;48:22
**2013 (2)**
  51:4,6
**2016 (1)**
  4:5
**230,000 (1)**
  102:10
**25,000 (1)**
  38:20

     **3**

**30 (3)**
  56:4;57:1,6

     **4**

**40 (1)**
  50:19
**400,000 (1)**

90:17
**41 (1)**
  5:25

     **5**

**5,000 (1)**
  33:15
**50 (1)**
  101:1
**500 (1)**
  24:13
**5th (3)**
  38:1;63:7;70:2

     **6**

**60 (1)**
  50:20
**6th (3)**
  38:1;63:7;70:2

     **7**

**7th (3)**
  38:1;63:7;70:2

     **8**

**8- (1)**
  90:7
**8,000,000 (2)**
  57:6,7

     **9**

**9,000 (3)**
  61:23;63:17;78:8
**9,000,000 (1)**
  90:7
**94 (1)**
  8:21
**95 (3)**
  8:21;10:5,6
**96 (1)**
  10:3
**98 (2)**
  15:16,16
**99 (4)**
  15:16,18,22,23

AGREEMENT AND PLAN OF ACQUISITION

This AGREEMENT AND PLAN OF ACQUISITION (this "Agreement"), dated as of February 3, 2011, is entered into by and among Jed McCaleb, address of 509 E Branch Rd Patterson NY, USA ("Seller"), and K.K. Tibanne a Japanese Company with offices at 24-30, Kugayama 5-Chome, Suginami-ku, Tokyo 168-0082, Japan ("Buyer").

DEFINITIONS

Defined Terms. As used herein, the terms below shall have the following meanings. Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"**Bitcoin**" means a virtual digital store of value as defined by bitcoin.org

"**Revenue**" means any income minus any expense accrued from purchasing bitcoins for the purpose of immediate resale.

"**MTGOX** " means the mtgox.com business. This includes the mtgox.com domain name, the source code and database for the website, all the assets and liabilities of the website, the sum of the deposits in currency and bitcoins held for users of the website, and anything else that would reasonably be considered part of the mtgox.com business.
This term also applies to any website or business that uses any part of the existing mtgox.com business. For example if the domain name is changed and the code re-written but the user accounts remain this new site will still be considered "MTGOX" for the purposes of this agreement.

"**New Gox**" means a corporation or entity formed by the Buyer under conditions defined by this agreement, that is capable of issuing shares.

"**Current Net Funds**" means the sum of currency and bitcoin deposits held by MTGOX for users minus US $50,000 (fifty thousand United States dollars). These sums are calculated at the time the buyer starts to run the live mtgox.com database.

TERMS

Seller agrees to transfer MTGOX to the Buyer according to the transfer terms below.

The Seller represents being the sole owner of MTGOX and having the sole authority to sell MTGOX within the terms defined by this contract.

Buyer agrees to:

MCCALEB 000002

- To the best of its ability ensure that MTGOX is operated in compliance with any and all applicable laws of any country or territory it does business in.

- Form New Gox within six months or before  MTGOX reaches US $140,000 (one hundred fourty thousand United States dollars) in revenue.

- New Gox will acquire all of MTGOX, and will not charge the Seller any transaction fees. The Seller shall own 12% of New Gox at its formation.

- Not charge Seller transaction fees on MTGOX or New Gox.

-  Pay Seller an "**earn out**" for an "**earn out period**".
  The earn out is defined as 50% of the revenue generated by MTGOX or New Gox. The earn out is paid on a monthly basis due 7 (seven) days after the end of each month.
  The earn out period lasts for  a minimum of the first 6 months after this agreement. If after 6 months the earn out is less than US $60,000 (sixty thousand United States dollars) the earn out will continue until it has reached US $60,000 (sixty thousand United States dollars) in total.

- Allow Seller read only access to the Database used by MTGOX for auditing purposes until the earn out period is over.

- Pay any fees associated with the execution of this agreement such as domain transfer.


TRANSFER

All the elements of MTGOX will be transferred to the Buyer within 15 (fifteen) days after this agreement has been signed, with the exception of the Current Net Funds held by MTGOX. These will be transferred according to the following schedule:

33% of Current Net Funds within 15 (fifteen) days.
50% of Current Net Funds within 45 (fourty five) days.
75% of Current Net Funds within 75 (seventy five) days.
100% of Current Net Funds within 105 (one hundred and five) days.

If for some reason the net funds available at a given time on MTGOX are not enough to answer the needs of the service users, the buyer may require the seller to release more funds earlier for the only purpose of avoiding any service interruption.

Seller retains no control of MTGOX or New Gox after mtgox.com is transferred to the Buyer.


NO REPRESENTATION

MCCALEB 000003

Seller makes no representation about the regulatory status of mtgox.com or bitcoins in the US or anywhere else in the world. The Seller is uncertain if mtgox.com is compliant or not with any applicable US code or statute, or law of any country.


INDEMNIFICATION

Buyer agrees to indemnify Seller against any legal action that is taken against Buyer or Seller with regards to mtgox.com or anything acquired under this agreement.


**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

SELLER:

By: _____

Name:  ____Jed McCaleb_____

Date: 2/3/2011



BUYER:

K.K. Tibanne

By: _____

Name:  ____ Mark Karpeles _____

Title: _____

Date: _____

**MCCALEB 000004**

Seller makes no representation about the regulatory status of mtgox.com or bitcoins in the US or anywhere else in the world. The Seller is uncertain if mtgox.com is compliant or not with any applicable US code or statute, or law of any country.

INDEMNIFICATION

Buyer agrees to indemnify Seller against any legal action that is taken against Buyer or Seller with regards to mtgox.com or anything acquired under this agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement or caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

SELLER:

By: _____

Name: _____Jed McCaleb_____

Date: 2/3/2011

BUYER:

K.K. Tibanne

By: _____

Name: _____Mark Karpeles_____

Title: _____C E O_____

Date: _____Feb. 3rd 2011_____

 Gmail

**Chris Raggio <chris.raggio@gmail.com>**

---

**conference etc.**
6 messages

---

**Chris Raggio <chris.raggio@gmail.com>**                                    Tue, Aug 23, 2011 at 7:23 PM
To: jed@mtgox.com

Jed,

It was a real pleasure to meet you in person.  All of us really appreciate you taking time to make yourself available and to share your thoughts with us.  I remember you said you were interested in AI research and technological singularity discussion.   I imagine based on your history of how you basically used eDonkey to turn the internet into one big searchable hard drive I could see you doing something like making a piece of software that the turns the internet and every device attached to it into a planetary brain.    It reminds me of a book I read in the 90s called "Darwin Among Machines: The Evolution of Global Intelligence."   Hope you enjoy the book if you haven't read it already.

I believe that if this technological singularity happens humanity as it exists now will essentially be the "bootstrap" if you will for whatever comes next.  If that is the case, God help us.

http://www.amazon.com/Darwin-Among-Machines-Evolution-Intelligence/dp/0738200301/ref=sr_1_1?ie=UTF8&qid=1314144894&sr=8-1


Chris

---

**Jed McCaleb <jed@mtgox.com>**                                    Wed, Aug 24, 2011 at 11:16 PM
To: Chris Raggio <chris.raggio@gmail.com>

Hi Chris,
Yeah it was cool to finally meet so many people in person.
There was talk of getting some sort of bitcoin foundation going. There should be more details about it coming soon.
Thanks for the link. Yeah I think in the next 20-30 years things are going to get pretty crazy.
Jed.
[Quoted text hidden]

---

**Chris Raggio <chris.raggio@gmail.com>**                                    Thu, Sep 15, 2011 at 4:36 PM
To: Jed McCaleb <jed@mtgox.com>

Hi Jed,

How is the foundation coming?  There are some promising ideas out there.


http://thedailyattack.com/2011/08/12/bitcoin-open-transactions-the-kryptonite-of-net-neutrality-wonks/


Chris
[Quoted text hidden]

---

**Jed McCaleb <jed@mtgox.com>**                                    Fri, Sep 23, 2011 at 5:13 PM

1 of 2                                                                    RAGGIO   00002        8/22/2016 4:13 AM

To: Chris Raggio <chris.raggio@gmail.com>

Hi Chris,
I've got something interesting I'm working on. I'll let you know more
in another month or so.
Jed.
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                                    Fri, Sep 23, 2011 at 8:20 PM
To: Jed McCaleb <jed@mtgox.com>

Hi Jed,


Glad to hear it...


Chris
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                                    Mon, Nov 28, 2011 at 9:50 PM
To: Jed McCaleb <jed@mtgox.com>

Hi Jed,


I saw this story about smartphone adoption:  http://www.wired.com/gadgetlab/2011/11/smartphones-feature-phones/


I've been whiteboarding some ideas mostly stuff for improving convertibility.  Also playing around with NFC (Near Field
Communication) to familiarize myself with what it offers.   It's interesting but it needs more work.

http://www.paywithisis.com/

That's about it between me and my day job.   How is the stuff you have been working on coming along?

Chris
[Quoted text hidden]

RAGGIO   00003          8/22/2016 4:13 AM

Gmail - hey                                                                    https://mail.google.com/mail/u/0/?ui=2&ik=5948cge3e8&view=pt&q=to...

 Gmail

Chris Raggio <chris.raggio@gmail.com>

---

**hey**
4 messages

---

**Chris Raggio** <chris.raggio@gmail.com>                          Wed, Dec 21, 2011 at 8:18 PM
To: Jed McCaleb <jed@mtgox.com>

Hey Jed,

How's everything going? I'm feeling good.  I think 2012 is going to be a breakout year for bitcoin in terms of
technology maturation, wider adoption, and increased exchange value which everyone is so focused on.   I haven't
been doing much with the technology.  That is best left to guys like you who can code circles around me.  I've been
studying economics to try to understand how a currency as different from anything that has come before might change
things.  It's not easy.  Economics is a social science and most of it makes no sense at all.  Logical thinking is
disadvantageous to anyone trying to learn what is accepted as truth in this field.

Just to let you know I e-mailed Mark asking him what he intends to do with the stolen coins.  I haven't heard back from
him yet.  Originally he said he wanted to give "Baron a year to speak for himself."   I don't know why we would bother
with somebody who hides behind an alias and an altered passport but whatever.  We are approaching the 1 year
anniversary of the theft.

I'm not asking you to intervene on my or my father's behalf.  Mark is the owner of Mt Gox now.   It's his call whether he
wants to make things right with us as he did with Bitomat.  My father and I appreciate everything you did to investigate
and pursue the thief.  You didn't have to go to the lengths you went to for us.  We thank you.

Have a nice holiday,

Chris

---

**Jed McCaleb** <jed@mtgox.com>                                   Tue, Dec 27, 2011 at 1:16 PM
To: Chris Raggio <chris.raggio@gmail.com>

Hey Chris,
Yeah I think it is just a mater of time before something like bitcoin
takes hold.
I'll ask him again what is happening to the baron money. I'm sure he
will eventually give it to you. I know he is trying to do everything
very by the book so I think he had to wait for legal reasons.
Do you happen to remember those two guys from the conference in nyc
that were from Louisiana or mississippi? They owned a bank or
something down there. Did you get their contact info by any chance?
Thanks,
Jed.
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                          Tue, Dec 27, 2011 at 5:59 PM
To: Jed McCaleb <jed@mtgox.com>

Hey Jed,

I think it was two guys who told me they were from Louisiana.  They gave me a business card that said "Bitcoin
Solutions LLC" which is also the handle they use on the forums   Their business card is attached as an image.  I
talked to them at the conference for maybe 20 minutes.  The product that they were offering at that time was a

---

1 of 3                                                              RAGGIO   00004              8/22/2016 4:18 AM

pre-paid virtual visa card you purchase with bitcoins.

http://bitcoinsolutionsllc.com/

https://en.bitcoin.it/wiki/Bitcoin_Cashout

I told them that I was looking for something like that but that I wanted it to be reloadable at whatever the current exchange rate was.   I told them that I thought it would be really cool if the virtual card would actually just let you convert on the fly so that went you spent say $20.00 on the visa card it would just take 5 bitcoins (at $4 exchange rate) from a bitcoin account associated with the card.  All of this would essentially be invisible to the user and they could use it like any other card. In essence it wouldn't be much different than using the visa or mastercard you already have in Madrid.   By no means would this fix everything for users. There are many other issues to resolve such as volatility (this might be mitigated with options trading; increased aggregate market value will help over time).   It would still be a good place to start if it were possible.

Of course to make this work you would like to have a financial institution to partner with.  These guys said that they had a strong with relationship with a bank down there and that they were already talking to the bank about making this happen.  I said that sounded great.  I had never imagined that any financial institution would be interested in doing this. They said that they owned a bank or at least was talking to one that was interested.

As you already know banks are subject to regulations.  They are not well regulated but are very tightly regulated.  That means the regulators crack down hard on small stuff like bitcoin and totally miss colossally important things like MF Global or Lehman brothers that can crash the whole system in a few hours.

As much as I wanted to believe these guys I knew that it would be tough to do this because no commercial bank would want to be associated with bitcoin.  Credit unions or community banks would be equally uninterested.   I thought maybe an offshore bank would consider it but the rates they would charge for doing something like that would be exorbitant.   These guys actually told me that they were talking about a commercial bank based in the US.

I've been playing around with some ideas.  There can't be a single point of failure.  It needs to be decentralized like P2P (as exemplified by eDonkey) and the internet itself . The nodes *and* the edges in the graph will be attacked. Any link between the conventional system and the cryptocurrency system is what an adversary is going to try to sever.  So one thing that would help with this would be to have a whole lot of links and the ability to set up new links easily.

There are different ways to go about this.  I'm trying to see how to make individual run microexchanges possible at least conceptually.


Chris
[Quoted text hidden]



**20111227_174957.jpg**
204K

---

**Chris Raggio** <chris.raggio@gmail.com>                                         Tue, Aug 21, 2012 at 2:00 PM
To: Jed McCaleb <jed@mtgox.com>

http://yro.slashdot.org/story/12/08/21/1530248/bitcoin-card-to-launch-in-2-months-says-bitinstant

Looks interesting...

RAGGIO   00005                          8/22/2016 4:18 AM

Gmail - hey                                                          https://mail.google.com/mail/u/0/?ui=2&ik=59f8dg98e&view=pt&q=to...

[Quoted text hidden]

# M Gmail

**Chris Raggio <chris.raggio@gmail.com>**

___

## MF Global
1 message

___

**Chris Raggio <chris.raggio@gmail.com>**                                      Tue, Dec 27, 2011 at 9:23 PM
To: Jed McCaleb <jed@mtgox.com>

Jed,

I mentioned the MF Global collapse in the previous email.  People are saying the aftermath is bad already and may
get worse.    "Seg funds," customer accounts  are no longer safe.  Maybe investors will warm to bitcoin again as one
way to hedge against the conventional system should it falter or fail.

http://www.zerohedge.com/news/guest-post-run-global-banking-system-how-close-are-we

Chris

RAGGIO   00007                                      8/22/2016 4:27 AM

Gmail - DiRTY MONEY (An-Ten-Nae Remix)     Document 77-6     Filed 04/07/2017     Page 5 of 6
https://mail.google.com/mail/u/0/?ui=2&ik=5948ce3ea&view=pt&q=to...

 Gmail

**Chris Raggio <chris.raggio@gmail.com>**

---

## DiRTY MONEY - (An-Ten-Nae Remix)
4 messages

---

**Chris Raggio** <chris.raggio@gmail.com>                                        Wed, Dec 28, 2011 at 6:43 PM
Bcc: Eric Brigham <ebrigham@gmail.com>, Jed McCaleb <jed@mtgox.com>, "Walter, Mark Wayne"
<mark.walter@vanderbilt.edu>, Yifu Guo <yguo01@gmail.com>, Stephan <m@m.je>, bruce@brucewagner.com,
jgarzik@gmail.com

http://www.youtube.com/watch?v=IqoXDYwRUpI

---

**MAILER-DAEMON** <MAILER-DAEMON>                                               Wed, Dec 28, 2011 at 6:43 PM
To: chris.raggio@gmail.com

This is the mail system at host mail47-ch1-R.bigfish.com.

I'm sorry to have to inform you that your message could not
be delivered to one or more recipients. It's attached below.

For further assistance, please send mail to postmaster.

If you do so, please include this problem report. You can
delete your own text from the attached returned message.

            The mail system

<mark.walter@vanderbilt.edu>: host 129.59.15.82[129.59.15.82] said: 550 5.1.1
    <mark.walter@vanderbilt.edu>... Unregistered address -
    mark.walter@vanderbilt.edu (in reply to RCPT TO command)

Final-Recipient: rfc822; mark.walter@vanderbilt.edu
Original-Recipient: rfc822;mark.walter@vanderbilt.edu
Action: failed
Status: 5.1.1
Remote-MTA: dns; 129.59.15.82
Diagnostic-Code: smtp; 550 5.1.1 <mark.walter@vanderbilt.edu>... Unregistered
    address - mark.walter@vanderbilt.edu

--------- Forwarded message ----------
From: Chris Raggio <chris.raggio@gmail.com>
To: undisclosed-recipients:;
Cc:
Date: Wed, 28 Dec 2011 18:43:40 -0600
Subject: DiRTY MONEY - (An-Ten-Nae Remix)
http://www.youtube.com/watch?v=IqoXDYwRUpI

---

**Bruce Wagner** <bruce@onlyonetv.com>                                          Wed, Dec 28, 2011 at 6:46 PM
To: Chris Raggio <chris.raggio@gmail.com>

---

     RAGGIO   00008     8/22/2016 4:26 AM

**From:** Mark Karpeles <mark@tibanne.com>
**To:** "Jed McCaleb" <admin@mtgox.com>
**Date:** 2/14/2011 1:58:47 AM
**Subject:** Re:

Hi,

This is suspicious indeed, and the best course (for now) would probably
to freeze the account and watch withdraws from other accounts.

The main factor here is time, which hints at the events being related.
I'd be handling the investigation myself if I had the database here,
however with the server migration in progress I haven't got time to
install mtgox on the space I reserved yet (I'd prefer directly setting
it up on the new server with its own ip for SSL).

Anyway I'll keep you posted as soon as things are ready here. In the
meantime I'll check what I can find out about contractor.net.

Btw there have been other transactions:
http://blockexplorer.com/address/1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh


Mark

Le samedi 12 février 2011 à 15:34 -0500, Jed McCaleb a écrit :
> So here are the details of fraud and why I think it is this guy on the site...
> This account donraggio had about 9k btc stolen from him Jan 6th-9th.
> It looks like someone must have guessed or figured out his password
> somehow. I talked to him on the phone so I believe that this really
> happened.
> The stolen coins were sent to: 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh
> That address has sent 20 BTC to: 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ
> Which happens to be a mtgox address.
> The account that sent them there was name "baron"
>
> This baron account also has other suspicious activity.
> Out of the blue he deposited $75k in LR.
> With that he bought about $15k worth of coins. And has been just
> withdrawing the money since then.
>
> Date of baron btc funding: 1294363502 01 / 06 / 11 @ 7:25:02pm EST
> Date of LR fund U1172929: (01/06/11 @ 6:53:21pm, 7:14:07pm EST,
> 7:14:58pm) 1294361601 1294362847 1294362898
> Date of theft from donraggio: 1294367953 01 / 06 / 11 @ 8:39:13pm EST
> Date of start withdrawal to U2839087: 1294519650 01 / 08 / 11 @
> 2:47:30pm EST basically $1000 a day till now
> Date of LR fraud: Jan 20th
>
>
> His email is: baron@contractor.net
> Which I just find this on google:
> http://www.scamwarners.com/forum/viewtopic.php?f=12&t=10858
>
> My thought is that he is related to the guys who stole so much LR from
> us. I think he funded our LR account so he would be certain there
> would be LR there to steal.
> He definitely know who stole the coins from don raggio unless
> 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh is a mybitcoin address.
> What do you think?



Don Raggio <donald.raggio@gmail.com>

## Re: account funded by wire
32 messages

**theymos** <theymos@mm.st>
To: donald.raggio@gmail.com
Cc: admin@mtgox.com

Thu, Feb 10, 2011 at 2:01 PM

[Copied to Jed]

Sorry to hear about your misfortune. I can't track the thief myself, but here is some information that might help you.

Tracking BTC is difficult, especially if the attacker knows what he's doing. Here is the attacker's address history:
http://blockexplorer.com/address/1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

From this, you can see under the "sent" column that the owner of these addresses either knows the attacker or is the attacker:
1Lnfce21gYa4VMMZFFR4iVUFz9F39tHmz7W
12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ

Looking deeper at those addresses, it's possible that the owners of these addresses also know the attacker directly or indirectly:
1LiEy7V4GK1JUMBPomx2JcCREdRdtpvuj8
15ZpDyyehXLc8BiCUBMis5sTa2pJdNpdeD
1BR5DuhypnMkVmJoQ2YncKiyvQgsjLjBqm
1MTqhJjCunRRHk1UBQkkAJBc1BjRwvHpkD

Take a look at 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ's sending transaction:
http://blockexplorer.com/tx/ff31ac4bb91cf21c96cf779b406b61bad67857812eb9610ada806cc575da069f#i302983
That non-highlighted input address, 1HAnpTE76WTzVvEmyNmgpxZHGZqX6i1X6m, is guaranteed to also be owned by the owner
of 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ.

You can also get information from the attacker's received payments. 1BR5DuhypnMkVmJoQ2YncKiyvQgsjLjBqm was paid by
19CJwUXXBSnmZCkj2hUpyY1cAPZatC12TT, who therefore knows him. Look at that transaction:
http://blockexplorer.com/tx/fb4bf12185bce7f7c1b472fe74d4ad11560528ce57a8254a2ae23789ac2267b#o0
The non-highlighted output address is owned by either 19CJwUXXBSnmZCkj2hUpyY1cAPZatC12TT or
1BR5DuhypnMkVmJoQ2YncKiyvQgsjLjBqm.

You can continue going deeper, though it fans out quickly. The third level probably has several hundred addresses.

More "top-level" addresses will become known once the attacker spends more BTC from the target address. Keep watching the
page for 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh.

To find the attacker, you need to somehow link one of these addresses to a real person, and then get them to tell you who they
received the coins from. By following these transactions, you should eventually be able to trace the coins back to the attacker. You
might start by asking MtGox, MyBitcoin, Vekja, and other EWallet services whether they own any of these addresses.

Some day I plan to add a feature to Bitcoin Block Explorer that will show all addresses associated with a target (as I did manually in
the text above), but I am unfortunately too busy to work on that right now.

Tell me if you have any questions about getting address histories. I hope you find the thief!

On Thu, 10 Feb 2011 08:39 -0500, "Jed McCaleb" <admin@mtgox.com> wrote:
> Can I give this guy your email?
>
>
> --------- Forwarded message ----------
> From: Donald Raggio <donald.raggio@gmail.com>
> Date: Thu, Feb 10, 2011 at 7:54 AM
> Subject: Re: account funded by wire
> To: Jed McCaleb <admin@mtgox.com>
>
>

RAGGIO   00038

2/28/2014 4:35 PM

> Thanks for telling me about Theymos.   It's hard for me to use IRC at
> work.   Maybe if we could get in touch with him he could create
> something that monitors that address and notifies us when they are
> transferred.   I would reward him and you with BTC for recovering the
> stolen BTC.   Does that sound like a good idea?
>
>
>
> PS
>
>   Thanks for creating such a cool platform.
>
> Chris (for Don)
>
>
>
> On Jan 10, 2011, at 3:26 AM, Jed McCaleb <admin@mtgox.com> wrote:
>
> > Oh jeez that's bad.
> > I would go to IRC channel #bitcoin-dev and talk to theymos. He wrote a
> > block explorer that you can use to possibly track where the coins
> > went.
> > Any idea how someone got your password?
> > Jed.
> >
> > On Sun, Jan 9, 2011 at 11:36 PM, Don Raggio <donald.raggio@gmail.com> wrote:
> >> Somebody is conducting unauthorized withdrawals on my account.  They've
> >> taken 9k in BTC so far.   I changed the password.  Please Advise.  All were
> >> sent to 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh
> >>
> >> Don
> >>
> >

---

**Jed McCaleb** <admin@mtgox.com>
To: donald.raggio@gmail.com

Thu, Feb 10, 2011 at 3:40 PM

Well I'm pretty sure I found the guy if I understand theymos's site
correctly. He has enough coins in his account to repay you also. I've
frozen his account but want to make sure I'm right before I do
anything.
Do you know anyone else with an account on mtgox?
Do you know anyone that uses this domain: contractor.net ?
Thanks,
Jed.
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: donald.raggio@gmail.com

Thu, Feb 10, 2011 at 3:43 PM

Also do you mind telling me what your old password was? I assume you
changed it. It didn't seem like the same attack that got the other
guys password but maybe it was.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 9:21 PM

The only person know that has a mt gox account is Eric Brigham.  He told me about mt gox.  Never heard of contractor.net.

Thanks

[Quoted text hidden]

---

RAGGIO   00039

2/28/2014 4:35 PM

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 9:24 PM

do you want me to put the password in plaintext in an email or send it some other way?   I changed it back to the original password after you froze the account in hopes that the attacker would log in and you would catch the ip.  Let me know how you want to proceed.

Thanks
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>

Thu, Feb 10, 2011 at 9:27 PM

You should change the password and then email it to me in plaintext is fine.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 9:36 PM

Jed,

New password is tele9067

Thanks
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>

Thu, Feb 10, 2011 at 9:44 PM

no no don't tell me the new password. I meant the old password. The
one that this person must have gotten somehow.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 10:00 PM

the old password is ternot99

hope that helps.

Thanks

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 10:01 PM

i changed the mt gox password again to make it safe.

thanks

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Fri, Feb 11, 2011 at 5:16 PM

Jed,

Did you find out what you needed?

Thanks

---

RAGGIO   00040

Chris
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>                    Sat, Feb 12, 2011 at 1:55 PM

Still investigating. It will take awhile I think to be sure. the
suspect could have been using mybitcoin or something. Then we can't be
certain it came from him.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>                    Sat, Feb 12, 2011 at 2:20 PM

Theymos said something about asking "Mybitcoin,, Vekja, and other EWallet services whether they own any of these
addresses.".

Is sending inquiries to those sites a wise next step in yourinvestigation? thanks for looking into this for us.

Chris (for Don)

On Feb 12, 2011, at 1:55 PM, Jed McCaleb <admin@mtgox.com> wrote:

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>                    Sat, Feb 12, 2011 at 2:34 PM

Yeah I'm asking them...
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>                    Thu, Feb 17, 2011 at 1:32 AM

Jed,

I was wondering if it was safe to use the account for trading or if you would recommend a new one (the password has been
changed)?   Also have you found anything more out about the stolen ones?   Is the suspect's account still frozen?

Thanks,

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Don Raggio <donald.raggio@gmail.com>                    Thu, Feb 17, 2011 at 4:42 AM

You can use your account as long as you have a new password. Still
working on determining if this is absolutely the right guy, His
account is frozen.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>                    Tue, Feb 22, 2011 at 8:43 PM

---

RAGGIO   00041                    2/28/2014 4:35 PM

Case 3:19-cv-00022-HTW-LRA    Document 2-2    Filed 01/10/19    Page 200 of 230

Gmail - Re: account funded by wire

Case: 25CI1:14-cv-00071-TTG    Document #...7757@ail.google.com/mail/?ui=2&ik=42dadbb333&view=pt&search=...

Saw this posted on the forums. I don't know if this is the same guy but I thought you might want to see it if you haven't already.
http://www.bitcoin.org/smf/index.php?topic=3712.0

http://www.bitcoin.org/smf/index.php?topic=3712.msg52648#msg52648

Thanks for investigating this.    Good luck.

Chris (for Don).
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Wed, Feb 23, 2011 at 7:36 PM

http://www.bitcoin.org/smf/index.php?topic=3712.msg53798#msg53798

I'm guessing this is the guy.   He mentions having the same amount of BTC that was stolen from the account.

Chris (for Don)

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 24, 2011 at 9:20 PM

Saw your post on the forum

wow 16 pages!

Guys I really don't want to go into details about this until it is resolved. If baron is in fact a scammer the less he knows about what I know the better.
I'm still talking to baron and trying to get to the bottom of this.

Thanks for working on this Jed.   I didn't know this would get to be such a big deal in the community.   Can you please keep our names from being associated with this once it is resolved?   Please dont use our real name.   From reading the forum I fear retaliation even though we are the victims.

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>

Thu, Feb 24, 2011 at 9:26 PM

Yeah it is pretty annoying that it is on the forum.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: theymos <theymos@mm.st>

Thu, Mar 24, 2011 at 8:58 PM

Theymos,

I think Jed found the thief (Baron) but Mark (the new owner of Mt Gox) said he isn't able to complete his investigation yet and it has been put on hold due to events in Japan.   Thanks for providing the information from the address history.   I appreciate the work you and Jed put into tracking it down.    It did help track down the thief.   It's up to Mark to see if we are able to recover the stolen BTC.

---

RAGGIO   00042

2/28/2014 4:35 PM

On Thu, Feb 10, 2011 at 2:01 PM, theymos <theymos@mm.st> wrote:
[Quoted text hidden]

---

**theymos** <theymos@mm.st>
To: Don Raggio <donald.raggio@gmail.com>                              Thu, Mar 24, 2011 at 9:09 PM

Glad I was able to help! I hope you get your money back.

On Thu, 24 Mar 2011 20:58 -0500, "Don Raggio" <donald.raggio@gmail.com> wrote:

> Theymos,
>
> I think Jed found the thief (Baron) but Mark (the new owner of Mt Gox) said he isn't able to
> complete his investigation yet and it has been put on hold due to events in Japan.   Thanks
> for providing the information from the address history.   I appreciate the work you and Jed
> put into tracking it down.    It did help track down the thief.   It's up to Mark to see if we
> are able to recover the stolen BTC.

---

**Don Raggio** <donald.raggio@gmail.com>
To: theymos <theymos@mm.st>                                          Fri, May 20, 2011 at 9:58 PM

Theymos

It looks like there is a new transaction in Block Explorer dated 4-28.  Do you make anything of it?

| a01c1b8281... | Block 120711 (2011-04-28 20:34:02) | 3096.93 | Sent: Address | • 1MDphepGhrLrUDRUkhpHHGGd4mGsSsw94<br>• 1MeEDTHiSA1n1x6s9hM6qjPzs1x6vb4Y5j | 6309.4 |

Chris (for Don)
[Quoted text hidden]

---

**theymos** <theymos@mm.st>
To: Don Raggio <donald.raggio@gmail.com>                             Fri, May 20, 2011 at 10:40 PM

The scammer sent 2000 BTC to an address, and that address sent 200,000 BTC to MtGox:
I'm pretty sure 1MqsE... is a MtGox address. You should inform Mark about this new
development. The person who made that 200,000 BTC MtGox deposit is either the scammer
or someone who delt with him directly.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                                  Fri, May 20, 2011 at 11:56 PM

Mark,

Here is some more information.  Can you do anything?

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 202 of 230

Case: 25CI1:14-cv-00071-TTG      Document #: 7   Filed: 07/22/14   Page 87 of 8

Chris (for Don)

Begin forwarded message:

> **From:** "theymos" <theymos@mm.st>
> **Date:** May 20, 2011 10:40:08 PM CDT
> **To:** "Don Raggio" <donald.raggio@gmail.com>
> **Subject: Re: account funded by wire**

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: theymos <theymos@mm.st>                                    Sat, May 21, 2011 at 10:40 AM

I sent Mark an e-mail.   I'll let you know what his response is.

Chris (for Don)

[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>                    Sat, May 21, 2011 at 11:00 AM

Hi,

Based on what I can see, there is not much I can do at this point. Those address do not match addresses used on mtgox (and we had no such large deposit).

Mark
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: theymos <theymos@mm.st>                                    Sat, May 21, 2011 at 11:26 AM

I guess we can keep an eye on it.   I believe what he is doing is trying to get a judgement implicating the frozen funds with the theft so that they may be returned.

That's a humongous deposit.   I wonder who has it.   That's bad that the stolen money is now associated with it if I understand this correctly.

Chris (for Don)

Begin forwarded message:

> **From:** Mark Karpeles <admin@mtgox.com>
> **Date:** May 21, 2011 11:00:57 AM CDT
> **To:** Donald Raggio <donald.raggio@gmail.com>
> [Quoted text hidden]

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                            Sun, May 22, 2011 at 7:07 PM

RAGGIO   00044

2/28/2014 4:35 PM

All right we'll keep an eye on it.   Otherwise we will just wait and see how the "legal processing" rules with respect to the funds that were frozen in connection with the theft.

Chris (for Don)

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: theymos <theymos@mm.st>                                    Fri, Dec 23, 2011 at 10:17 PM

Theymos,

When we last communicated the stolen bitcoins were associated with1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh.  Now they appear to have been transferred to other addresses.  Seems like Mt. Gox addresses but I'm not certain.

Chris (writing for Don)

On Thu, Feb 10, 2011 at 2:01 PM, theymos <theymos@mm.st> wrote:
[Quoted text hidden]

---

**theymos** <theymos@mm.st>
To: Don Raggio <donald.raggio@gmail.com>                        Fri, Dec 23, 2011 at 10:46 PM

Yes, the funds do end up at MtGox eventually. I can't tell whether they're being sent to MtGox right away or if they were sold and then sent to MtGox, though.

You should let Mark know about this.

On Fri, Dec 23, 2011, at 10:17 PM, Don Raggio wrote:

> Theymos,
>
> When we last communicated the stolen bitcoins were associated
> with1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh.  Now they appear to have been
> transferred to other addresses.  Seems like Mt. Gox addresses but I'm not certain.

---

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                             Sat, Dec 24, 2011 at 1:33 AM
Cc: theymos <theymos@mm.st>
Bcc: djraggio@gmail.com

Hi,


I want to make you aware of these transfers associated with the following bitcoin address:

1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

Chris (for Don)



Chris (for Don)
[Quoted text hidden]

Gmail - (no subject)    Case: 25CI1:14-cv-00071-TTG    Document #: https://mail.google.com/mail/?ui=2&ik=72dadb1983&view=pt&search=...



## (no subject)
20 messages

---

**Jed McCaleb** <admin@mtgox.com>                                Sat, Feb 26, 2011 at 9:33 AM
To: Don Raggio <donald.raggio@gmail.com>

Hi Chris,
Can you think of a way that the thief would have gotten your mtgox username? Because he would have needed that before he did the dictionary attack.
It looks like at the very least this guy is going to give your coins back. I want to wait longer though to gather more evidence if he is in fact related to other fraud that has happened on the site.
Thanks,
Jed.

---

**Don Raggio** <donald.raggio@gmail.com>                          Sat, Feb 26, 2011 at 12:37 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

   I don't know but I'll try to let you know what I have thought about.   The first thought when it happened was to suspect a keylogger. You made a good point when you said most people who spy with those wouldn't know about Mt. Gox but I couldn't think of any other possibility and thought maybe they learned about Mt. Gox through the keylogger.   I ran several products but nothing malignant was detected. One of those products is called Spyshelter premium.   The other possibility is that thief through a keylogger of other means was able to access my gmail account but I didn't detect any intrusion there based on the IP log.   I should have picked a different username based on a psuedonym not one so closely related to the email account name.   On Mt. Gox I'll set up a new account under different name for future use.  That's as much information as I have.  If I think of anything else I'll let you know.  If you have any advice regarding on security or could refer me somewhere I'd love to hear it.  Like what secure e-mail providers to use. Strong password generators. Protection against phishing, keyloggers. Etc.  Maybe this would be a good thing for all users to read so they can do their part to protect themselves and Mt. Gox from scammers.    Please let me how you want to proceed from here with regard the coins and what other steps you feel necessary to resolve this.

Thanks,
Chris (for Don)
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                          Sat, Feb 26, 2011 at 3:19 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

   Obviously I'd like the coins returned as soon as it is possible but it sounds like they have some value to in terms of conducting your investigatoin into further fraud on the site.   ???  Let me know how you want to do this.  Also  If and when it is possible to return the coins I'm guessing we should use an alternate BC address? If I pick a new address will it link back to my wallet? Should I create a new wallet on another machine?  I'm sure people on the forum are watching that address the scammer used.

Chris (for Don)

On Sat, Feb 26, 2011 at 9:33 AM, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

Case 3:19-cv-00022-HTW-LRA    Document 2-2    Filed 01/10/19    Page 205 of 230

Gmail - (no subject)

Case: 25CI1:14-cv-00071-TTG    Document #: 7    Filed: ...    Page 2 of ...

https://mail.google.com/mail/u/0/?ik=72dad5538&view=pt&search=...

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Sat, Feb 26, 2011 at 7:52 PM

Jed,

Thanks for your help.   Youve done more than we expected tracking down the coins and unexpectedly having to put up with a lot of annoying chatter on the forums.   I asked Don and we still don't know how he would have gotten the username.   We don't have reason to believe anyone we know personally would have gotten the username.   We don't know how the thief would have gotten it.   Wish we could shed more light on it.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Sat, Mar 5, 2011 at 3:46 PM

Hi Jed,

   What's the status of the stolen coins?   Did you find out how the thief got the username?   Shouldn't we pick another username to trade now that that part of the account has been compromised?   Thanks for your help.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Sat, Mar 5, 2011 at 8:57 PM

Jed,

Just saw on the forums that you are transferring Mt. Gox.   Thanks for creating Mt. Gox and eDonkey among your other efforts.  BTC wouldn't be where it is without your efforts.   I know this growth has been exciting.   It was "annoying" to say the least that some scammer that tried to create a bunch of problems for all of us.   I guess that is a part of the growth.   Can't wait to see Bitcoin hit $10.

Chris

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Sun, Mar 6, 2011 at 10:22 AM

Jed,

I know you got a lot on your plate.   Do I keep talking to you or do I talk to the new owner regarding recovery of the stolen BTC?

Chris
[Quoted text hidden]

---

**Jed McCaleb** <jed@mtgox.com>
To: Mark Karpeles <admin@mtgox.com>, donald.raggio@gmail.com

Mon, Mar 7, 2011 at 7:19 AM

RAGGIO   00047

2/28/2014 4:19 PM

Hi Chris,
Yeah Mark is the new owner and he will handle getting your coins back.
It will still take awhile though since he has to wait to be sure baron
is bluffing about suing us etc.
Thanks,
Jed.

On Sun, Mar 6, 2011 at 11:37 AM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                          Tue, Mar 8, 2011 at 3:29 PM

Hi Mark,

I hope you are able to complete your investigation and return the coins.   If for some reason you have to take your
case public please respect our privacy wishes if possible by redacting our names or giving us a pseudonym.  We don't
want the "bad guy" to victimize us once again.   Best wishes for Mt Gox, your company, and hope to be using your
services in the future once this is cleared up.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                          Mon, Mar 14, 2011 at 7:50 AM

Mark,

    I'm sure you are busy but I wanted to check in to see if there
were any developmetnts with regard to stolen coins.    Thanks for
handling this for us.

Chris (for Don).

On Mar 7, 2011, at 7:19 AM, Jed McCaleb <jed@mtgox.com> wrote:

[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>
To: Don Raggio <donald.raggio@gmail.com>                     Mon, Mar 14, 2011 at 4:18 PM

Hi,

We are currently trying to escalate the issue to obtain a judgment that would tell us what to do with the stolen coins.
We cannot just return them based on a decision taken on our own.

This might however take longer than expected as we have had a little problem here in Japan, and most not urgent
requests were delayed to may.

Thanks,
Mark
[Quoted text hidden]

---

RAGGIO   00048                    2/28/2014 4:19 PM

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                    Thu, Mar 24, 2011 at 11:50 AM

Mark,

Hope things get back to normal in Japan.  Thank you for working to return the stolen coins to us.    Please keep us updated.

Thanks,

Chris (for Don).

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                    Thu, Mar 24, 2011 at 8:15 PM

Mark,
Is Baron still willing to hand the bitcoins over or do we have to wait for the "judgment?"  Thanks

Chris (for Don)

On Mon, Mar 14, 2011 at 4:18 PM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>
To: Don Raggio <donald.raggio@gmail.com>                Thu, Mar 24, 2011 at 11:01 PM

Hi,

Baron is requesting access to his funds and do not want to hear anything else for now. Recent problems in Japan have put a hold on most legal processing, which are reported to "later this year". I really cannot provide any ETA right now.

Mark
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                    Fri, May 20, 2011 at 9:57 PM

Mark,

Did you every resolve the issue with the stolen BTC?  It looks like there is a new transaction in Block Explorer dated 4-28.

| a01c1b8281... | Block 120711 (2011-04-28 20:34:02) | 3096.93 | Sent: Address | • 1MDphepGhrLrUDRUkhpHHGGd4mGsSsw94<br>• 1MeEDTHiSA1n1x6s9hM6qjPzs1x6vb4Y5j | 6309.4 |

Chris (for Don)
[Quoted text hidden]

RAGGIO   00049

2/28/2014 4:19 PM

Gmail - (no subject)

---

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                                      Mon, Aug 1, 2011 at 10:55 AM

Mark,

Have you heard anything about the situation with Baron or the case recently?   I know a lot has happened since March.  I was wondering if you could update me on the situation.  If there is a docket number or equivalent can you supply it to us so that we can follow the case.

Thank you,

Chris (for Don).

On Mon, Mar 14, 2011 at 4:18 PM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>
To: Don Raggio <donald.raggio@gmail.com>                                  Mon, Aug 1, 2011 at 11:31 AM

Hi,

There will be no judgment done in Japan before 2012 on that case: courts give priority to earthquake/tsunami related cases, and this "Baron" guy is 100% anonymous and we have no way to get in touch with him, and he never sent us any legal document (plus, the passport he submitted was altered), so the only way to make a fair judgment is to give him time (one year) to speak for himself.

Mark
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: "Chris.raggio@gmail.com" <Chris.raggio@gmail.com>                     Mon, Aug 1, 2011 at 8:35 PM

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: djraggio@gmail.com                                                    Mon, Aug 1, 2011 at 8:46 PM

Begin forwarded message:

**From:** Mark Karpeles <admin@mtgox.com>
**Date:** August 1, 2011 11:31:15 AM CDT
**To:** Don Raggio <donald.raggio@gmail.com>
**Subject: Re:**

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Mark Karpeles <admin@mtgox.com>                                       Tue, Dec 20, 2011 at 12:50 AM
Bcc: djraggio@gmail.com

RAGGIO   00050

2/28/2014 4:19 PM

Hi,

January 10, 2012 will mark the one year anniversary of our loss.  It was on that day Jed McCaleb froze the hacked Mt. Gox account to prevent further unauthorized withdrawals.

*On Mon, Jan 10, 2011 at 4:51 AM, Jed McCaleb <admin@mtgox.com> wrote:*
*Yeah I froze the account and I'm logging all IP's on login now but you*
*should change the password back to the one that they have so they are*
*able to login still so we can see what their IP is.*

It seems plain that "Baron" is not going to speak for himself (assuming that "Baron" refers to a "him.")  My father and I are real people.  We both work for living.  We don't hack or steal.  We don't hide behind aliases or altered passports.  Jed can attest to this.  I have had many conversations with him and we have had the pleasure of meeting in real life.

We are asking that the coins stolen from my father's Mt. Gox account be returned.   If you need us to help in any way let us know what we can do.  This is important for us but also for the confidence of the Bitcoin community as a whole.

http://coinbits.com/note/mt-gox-acquires-bitomat-pl-reimburses-lost-bitcoins-bitcoin/

Chris and Don Raggio

"The root problem with conventional currency is all the trust that's required to make it work," Satoshi Nakamoto
[Quoted text hidden]

平成 24 年 3 月 21 日

〒100-0005
東京都千代田区丸の内一丁目 7 番 12 号
サピアタワー 14F
弁護士法人北浜法律事務所東京事務所
Donald Raggio 氏代理人
弁護士　竹野　純様
弁護士　松下　外様

　　　　　　　　　　〒150-8512
　　　　　　　　　　東京都渋谷区桜丘町 26-1
　　　　　　　　　　セルリアンタワー 15F
　　　　　　　　　　株式会社 TIBANNE
　　　　　　　　　　代表取締役　Mark Karpeles

回　答　書

前　略

　当社は、貴職らから当社宛の平成 24 年 3 月 14 日付「ご通知」に対して以下の通り
回答いたします。

　まず、当社は、2011 年 3 月に、Jed McCaleb 氏（以下「譲渡人」といいます。）より
Bitcoin の交換所に関わる資産を譲り受けたに過ぎず、これ以前の bitcoin 交換所の
運営には一切関与していませんので、譲渡人による運営当時に発生した問題に関して
譲渡人が負担する法的責任を当社が承継する根拠はまったくありません。したがって、
貴職らからの請求にはなんらの理由もありませんので、この旨本書をもってご回答
いたします。

　なお、念のため、当社が譲渡人から引き継いだ記録を確認してみましたが、Raggio
氏の口座から多数回にわたり bitcoin が引き出されているのは、2011 年 1 月ごろで
あって、貴殿らご指摘の 2010 年 1 月ではありませんでした。加えて、これらの引き出
しは、いずれも Raggio 氏自身が登録したログインネーム及びパスワードを使用して
行われております。他方、これらの引き出しが何らかのサイバー攻撃により行われた
ことを示す証跡はなく、したがって、当時の運営主体に善管注意義務違反があったと
も考えられない状況です。

　上記の通りご回答いたします。

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　草　々

RAGGIO   00092

FILED

MAR 05 2014

BARBARA DUNN, CIRCUIT CLERK

D.C.

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**  
**DR. CHRIS RAGGIO**                                         **PLAINTIFFS**

**VS.**                              **CIVIL ACTION NO.** 14-71

**MTGOX a sole proprietorship;**  
**MTGOX, Inc., a Delaware corporation;**  
**MT.GOX KK, a Japanese corporation;**  
**TIBANE KK, a Japanese corporation;**  
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**  
**CODE COLLECTIVE, LLC a New York limited liability company;**  
**JED McCALEB, an individual;**  
**MARK KARPELES, an individual;**  
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                    **DEFENDANTS**

## COMPLAINT

### TRIAL BY STRUCK JURY DEMANDED

COME NOW the Plaintiffs, Dr. Donald Raggio and Dr. Chris Raggio, and file this their

claim for specific performance and damages regarding the purchase of bitcoin, and for cause

would show the following, to-wit:

## PARTIES

1.)     Dr. Donald Raggio and Dr. Chris Raggio are adult resident citizens of Hinds

County Mississippi residing in the 1st Judicial District of Hinds County, Mississippi.  They are

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 212 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 2 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 2 of 14

hereinafter referred to collectively as the "Plaintiffs" and/or "the Raggios". The Raggios wired

funds and purchased bitcoins from defendants beginning in 2010.

2.)  Defendant MTGOX, on information and belief, was a sole proprietorship

originally created, owned and operated by Defendant Jed McCaleb. MTGOX conducted

business throughout Mississippi and the United States.

3.)  Defendant Jed McCaleb is an adult resident citizen of New York and on

information and belief, he may be served with process of this court at 286 Union #1A, Brooklyn,

NY 11211. Jed McCaleb, at the relevant times herein was doing business in the State of

Mississippi and the United States.

4.)  Defendant Code Collective, LLC is a New York limited liability company who

may be served with process of this court through its registered agent, New York Department of

State and at its New York office located at 286 Union #1A, Brooklyn, NY 11211. Defendant

Code Collective, LLC conducted business throughout Mississippi and the United States.

5.)  Defendant MTGOX, Inc. is a Delaware corporation. It is believed that this

corporation was formed in 2013 and may be served with process of this court through its agent

for service of process, National Corporate Research, LTD located at 615 S Dupont Hwy, Dover,

DE 19901. MTGOX, Inc.'s principal place of business is located at Level 15-F, Cerulean

Tower, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan 150-8512.

6.)  Defendant Mutum Sigillum, LLC is a Delaware limited liability company with its

principal place of business located at Level 15-F, Cerulean Tower, 26-1 Sakuragaoka-cho,

Shibuya-ku, Tokyo, Japan 150-8512. Mutum Sigillum, LLC, is a subsidiary of MTGOX KK and

or Tibanne KK and may be served with process of this court through its designated agent for

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 213 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 3 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 3 of 14

service of process, Corpmax, Inc. located at 2915 Ogletown Road, Newark , DE 19713.  Mutum

Sigillum, LLC conducts business throughout Mississippi and the United States.

      7.)    Defendant MT.GOX KK is believed to be a Japanese corporation owned and

operated by Mark Karpales and Jed McCaleb, with its current principal place of business located

at Level 15-F, Cerulean Tower, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan 150-8512.

MT.GOX KK conducts business throughout Mississippi and the United States.  On information

and belief, MT.GOX KK is the parent of MTGOX, Inc. and conducts business in the United

States and Mississippi directly and by and through MTGOX, Inc. and Mutum Sigillum, LLC.

      8.)    Defendant Tibanne KK is a Japanes corporation with its principal place of

business located at Level 15-F, Cerulean Tower, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo,

Japan 150-8512.  Tibanne KK conducts business throughout Mississippi and the United States.

On information and belief, Tibanne KK is a parent of MTGOX KK and conducts its business in

the United States directly and through MTGOX, Inc. and through Mutum Sigillum, LLC.

      9.)    Defendant Mark Karpeles serves as the Chief Exective Officer of Mutum

Sigillum, LLC; MtGox, Inc.; Mt. Gox KK and Tibanne KK.  On information and belief,

Defendant Karpeles is the majority and/or sole shareholder of these companies.

## JURISDICTION AND VENUE

      10.)    This Court has personal jurisdiction and venue over Defendants because they

conducted business in this District and the unlawful conduct alleged in the Complaint occurred

in, was directed to and/or emanated from this district.   Venue is proper in this district because a

substantial part of the events or omissions giving rise to the unlawful conduct alleged in the

complaint occurred in, was directed to and/or emanated from this district.

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 214 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 4 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 4 of 14

### Factual Allegations

11.)     In 2010, the Raggios began doing business with Defendant Jed McCaleb directly

and through said defendant's companies, MTGOX and Code Collective, LLC.   At all relevant

times, all transactions were either initiated in Hinds County, Mississippi or terminated in Hinds

County, Mississippi.

12.)     The nature of the business relationship between the Raggios and Defendant

McCaleb was the sale of goods from Defendant McCaleb and his companies to the Raggios.  The

goods being purchased by the Raggios were an electronic currency known as Bitcoins.

13.)     To purchase the Bitcoins from Defendant McCaleb and his companies, the

Raggios would wire transfer funds directly to the personal account of Defendant McCaleb.

Defendant McCaleb would credit the Raggio's account on the exchange that Defendant McCaleb

had created; MTGOX.  When bitcoins were purchased with the funds, Defendant McCaleb,

through MTGOX would credit the Raggios MTGOX to reflect the bitcoins and the cash.

14.)     Upon purchase of bitcoins, the Raggios would routinely transfer all bitcoins to

their own personal wallets and have them removed from the MTGOX exchange utilizing the

system set up by Defendant McCaleb.  When purchasing a large number of bitcoins, Defendant

McCaleb would not allow transfers of the bitcoin to all go at once and forced the Raggios to

leave some bitcoin on Defendant McCaleb's MTGOX exchange.  When transferring cash to the

Raggios, Defendant McCaleb would wire transfer U.S. dollars through his New York company,

Code Collective, LLC.

15.)     Many transactions went through without a problem.  However, in January 2011,

the Raggio's placed an order for approximately 9,400 bitcoins.  Defendants McCaleb and

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 215 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 5 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 5 of 14

MTGOX secured the goods and the Raggios paid McCaleb and MTGOX the full cost of the
bitcoins and a fee for their service. Prior to delivering said bitcoins, defendant McCaleb and
MTGOX had the bitcoins stolen through a hacker(s) while they resided on said defendants
servers for safekeeping.

16.) Defendants Jed McCaleb and MTGOX were notified of the missing bitcoins on the
same date that the Raggio's learned of it which was on or about January 9, 2011. Defendants
McCaleb and MTGOX immediately started working to discover the location of the stolen goods.
Defendant McCaleb was able to determine the MTGOX account of the hacker which contained
stolen bitcoin and U.S. dollars. Defendant McCaleb blocked the account and represented to the
Raggios that he would replace the 9,400 stolen bitcoin from the hacker's account. The hacker
became known on the electronic message boards as "Baron", his moniker for these forums.

17.) Prior to returning the Raggio's 9,400 bitcoins, Defendant McCaleb entered into an
agreement to sell the majority of MTGOX to Mark Karpeles. Mark Karpeles purchased
MTGOX on or about March 6, 2011. As part of the sale, Mark Karpeles was informed of the
blocked Baron account and agreed to make sure that the Raggio's bitcoins were restored to them.
On information and belief, Jed McCaleb retained 12.5% of MTGOX in the transaction, but
represented to all outside sources that MTGOX was sold in its entirety to Mark Kapeles and
Defendant Karpele's companies.

18.) Mark Karpeles continued to run the MTGOX exchange. On information and
belief, Mark Karpeles operated the purchased exchange as MTGOX, MT.GOX KK, MTGOX,
Inc., Mutum Sugillum, LLC all under the umbrella of Tibanne KK. Corporate John Does 1-3 are
other companies through which Mark Karpeles operated the MTGOX exchange. All the

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 216 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 6 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 6 of 14

Karpeles companies and Karpeles as an individual are hereafter referred to as the "Defendants Karpeles & Companies".

19.)    Defendants Karpeles and Companies moved the MTGOX exchange headquarters to Japan, but the servers remained in the United States. On information and belief, those servers are located in Massachusetts.

20.)    Defendants Karpeles and Companies acknowledged responsibility to restore the Raggio's 9,400 bitcoin repeatedly and represented to the Raggios that he was going to restore their 9,400 bitcoin. Defendants Karpeles and Companies lied to the Raggios concerning his efforts and intentions to restore the 9,400 bitcoins, including representing that he had filed a legal action in Japan that would authorize him to restore the 9,400 bitcoins.

21.)    After Defendants Karpeles and Companies took over, Chris Raggio continually monitored the address of the 9,400 bitcoins that had been stolen and alerted Defendants Karpeles and Companies when those coins were actually moved back to the MTGOX exchange. Defendants Karpeles and Companies continued to assure the Raggios that he was working on restoring their 9,400 bitcoins.

22.)    After repeated delays in receiving the return of their bitcoins, the Raggios retained a Japanese law firm to make formal demand for the return of their 9,400 bitcoins which were still locked up in the frozen Baron account. By letter dated on or about March 13, 2012, the Japanese lawyers made demand by letter to Defendants Karpeles and Companies to return the Raggio's 9,400 bitcoins. Shortly thereafter the Raggios were stunned by Defendants Karpeles and Companies response which stated that he had only purchased the assets of the MTGOX exchange from Jed McCaleb and not the liabilities.

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 217 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 7 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 7 of 14

23.)     Defendants Corporate John Does 4 & 5 are the companies used by Mark Karpeles and Jed McCaleb to defraud the Raggios of their 9,400 bitcoins which have yet to be delivered pursuant to their original agreement.  Defendants John Does 1-5 are the individuals that assisted all the defendants and or directly caused the loss of the  Raggio's 9,400 bitcoins.  All defendants individually and in solido were aware of the Baron hacker's account, took steps to freeze the 9,400 bitcoin (and other assets of the hacker's) yet failed to return the Raggios their bitcoins.  On information and belief, those bitcoins are still under the care and control of the defendants yet they still fail to release the Plaintiffs' bitcoins to them.

## Cause of Action I.

## Breach of the Mississippi Uniform Commercial Code

24.     Defendants, and all of them individually and in concert, have breach the Mississippi Uniform Commercial Code by not delivering the 9,400 bitcoins that were ordered and paid for in full by the Raggios. Defendants have, through the commission of wrongful acts and omission of properly conducted transactions have breach the Mississippi Uniform Commercial Code and cause the Raggio the loss of their 9,400 bitcoins.

## Cause of Action II.

## Breach of Contract

25.     Defendants, and all of them individually and in concert have created multiple written and implied contracts in dealing with the Raggios.  The Raggios acted in good faith by paying defendants U.S. Dollars for 9,400 bitcoin, but defendants have breach their contracts with Raggios to deliver said bitcoins.

26.    Plaintiffs entered into one or more agreements with Defendantss whereby Defendants, and all of them individually and in concert agreed, among other things, to do each of the following with respect to any monies deposited by Plaintiffs with MTGOX:

    a.    to accept monies from Plaintiffs, in the form of bitcoins or United States Dollars, which Plaintiffs may deposit from time to time;

    b.    to keep said monies in a safe ad secure manner, consistent with fiduciary obligations commonly imposed upon financial services providers;

    c.    to comply with instructions that Plaintiffs may provide from time to time concerning the transfer, investment and disposition of said monies; and

    d.    to permit Plaintiffs to withdraw their monies and bitcoin at any time.

Plaintiffs allege that the legal effect of these agreements was to create legally binding obligations on the part of Defendants, and all of them individually and in concert.

27.    Plaintiffs have performed all conditions, covenants and promises required of them by said agreements, and in accordance with the terms and conditions thereof.

28.    Defendants, and all of them individually and in concert breached the agreements by, among other things: refusing to comply with Plaintiffs' instructions for withdrawing the entirety of their bitcoins; permitting the withdrawal of their bitcoins by Baron and by failing to disburse the frozen bitcoins of Baron to replace those stolen.

## Cause of Action III.

## Conspiracy

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 219 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 9 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 9 of 14

29.     Plaintiffs are informed and believe, and theron allege, that each of the Defendants knowingly and willfully conspired and agreed upon themselves to hinder, delay and deprive the Raggios of their rights with respect to their 9,400 bitcoins.

30.     Plaintiffs are further informed and believe, and thereon allege, that said Defendants, and all of them individually and in concert, did the acts and things alleged herein pursuant to, and in furtherance of, the conspiracy and their own agreements with one another , and/or furthered the conspiracy cooperating with, lending aid to, encouraging, ratifying or adopting those acts.

31.     Plaintiffs are informed and believe, and thereon allege, that there is not yet any last overt act in furtherance of said conspiracy, in that Defendants, and all of them individually and in concert are continuing to hinder delay and deprive the Raggios of their rights with respect to said bitcoins.

32.     Plaintiffs are informed and believe, and thereon allege, that Defendants acted willfully and with the intent to cause injury to Plaintiffs, and that Defendants are therefore guilty of malice, oppression and/or fraud in conscious disregard of the Plaintiffs' rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish said Defendants and deter others from engaging in similar misconduct.

## Cause of Action IV.

## Account Stated

33.     Plaintiffs reallege and adopted all proceding paragraphs 1-32 and incorporate them herein.

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 220 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 10 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 10 of 14

34.    Within the past three years, accounts were stated in writing between the Plaintiffs on the one hand, and Defendants, and all of them individually and in concert on the other hand. Although defendants have acknowledged and veriefied the total amount of bitcoins it has not delivered the 9,400 bitcoins purchased and paid for by Plaintiffs.  The remaining unreturned portions of said accounts, according to the reords of Defenants and Plaintiffs, total approximately 9,400 bitcoins as of the date of this complaint, which is now due and owing and which defendants should pay.

35.    Defendants, and all of them individually and in concert have failed and refused and continue to fail and refuse to return the remainder of the bitcoins, despite Plaintiffs' demands that they do so.  Thus, they owe the remaining due, owing and unpaid the above 9,400 bitcoins and prejudgment and post judgment interest thereon at the maximum legal rate.

36.    Defendants, and all of them individually and in concert have acted in an unreasonable manner causing much distress to the Plaintiffs and forcing Plaintiffs to hire attorneys in Japan and the United States to recover their 9,400 bitcoins.  The misconduct of the Defendants, and all of them individually and in concert warrants a reimbursement of the funds lost due to this litigation including all expenses, costs of collection and attorney fees.

## Cause of Action V.

### Negligence

37.    Plaintiffs incorporate by reference paragraphs 1-36 above of this complaint.

38.    At all releveant times, Defendants, and all of them individually and in concert had bitcoins belonging to Plaintiffs in their possession, custody and/or control, and therefore owed Plaintiffs a duty of care with respect to safeguarding said bitcoins.  Plaintiffs are informed and

believed, and thereon allege, that Defendants, and all of them individually and in concert served as fiduciaries with respect to said bitcoins, and that said role imposed certain fiduciary obligations upon defendants.

39.     Plaintiffs are informed and believe, and thereon allege, that Defendants, and all of them individually and in concert breached their duties to Plaintiffs by negligently performing their obligations, including but not limited to failing to utilize all reasonable and practical safeguards to protect the bitcoins of Plaintiffs and other customers by using an unsalted MD5 protocol for security.

40.     Plaintiffs suffered certain  general, special, incidental and consequential damages as a direct and proximate result of said negligence, including, among other thins:  the loss of bitcoins; the loss of use of said value of the bitcoins while the present action is pending; changes in the value of said bitcoins due to the fluctuating exchange rate; etc. all in amounts to be proven at trial.

## Cause of Action VI.

### Conversion

41.     Plaintiffs incorporate by reference paragraphs 1-40 of this complaint.

42.     At all relevant times, Plaintiffs were, and are, the lawful owners of certain bitcoins deposited with Defendants and all of them individually and in concert as alleged herein. As between Plaintiffs and Defendants, plaintiffs are entitled to possession of the bitcoins once they provide instructions to Defendants to deliver them, which Plaintiffs have done.

43.     Plaintiffs are informed and believe and theron allege that:  upon receiving Plaintiffs' instructions to deliver the bitcoins, Defendants, and all of them individually and in

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 222 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 12 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 12 of 14

concert converted and took unlawful possession of, said bitcoins for their own use and benefit by refusing to return all of the bitcoin paid for and belonging to Plaintiffs.  Plaintiffs are further informed and believe , and there on allege, that Defendants, and all of them individually and in concert intentionally, willfully and in flagrant disregard for Plaintiffs' right refused to deliver the bitcoins purchased by plaintiffs.

44.     Plaintiffs have suffered certain general, special, incidental and consequential damages as a direct and proximate result of said negligence, including, among other things: the loss of the bitcoins themselves; the loss of use of said bitcoins while the present action is pending; changes in the value of said bitcions due to fluctuating exchange rates; etc., all in amounts to be proven at trial;

45.     Plaintiffs are informed and believe, and thereon allege: that the aforementioned actions and omissions by Defendants, and all of them individually and in concert were intentional or so grossly wanton and willful that they show a conscious disregard for the rights of Plaintiffs.  Defendants, and all of them individually and in concert and their conduct is despicable, and subjected Plaintiffs to a cruel and unusual hardship in conscious disregard of their rights, all so as to justify an award for exemplary and punitive damages, and the right to recover attorney fees, costs and expenses.

## Cause of Actin VII.

### General and Notice Pleading of All Causes at Law & Equity and

### Claim for a Constructive Trust on Preserved Account

46.     Plaintiffs reallege all prior paragraphs 1-45 herein.

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 223 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 13 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 13 of 14

47. Plaintiffs pray that this court will hear their cause as the facts herein have been plead with specificity and allow plaintiffs recovery of their bitcoin and all damages generally and specifically under all applicable theories of recovery whether at law or equity.

48. On information and belief, the 9,400 bitcoins are lodged with the MTGOX accounts and noted on recently discovered "Crisis Strategy Draft" as the "-80,208 BTC From banned or suspicious accounts". Plaintiffs request that this court freeze said account so that these bitcoins cannot be distributed until such time as plaintiffs have had an opportunity to be heard and to lay proper claim to their bitcoin. Plaintiffs hereby assert a constructive trust over and with regard to the bitcoins contained in the banned or suspicious accounts.

### Cause of Action VIII.

### Specific Performance

49. Plaintiffs reallege all prior paragraphs 1-48 herein.

50. Plaintiffs paid for 9,400 bitcoins with U.S. Dollars. Defendants, and all of them individually and in concert have represented that they will deliver said 9,400 bitcoins. Plaintiffs request a judgment of and from Defendants, and all of them individually and in concert for all 9,400 of their bitcoin.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this court will allow their claim to proceed upon a struck jury and that said jury shall award them their 9,400 bitcoins against Defendants, and all of them individually and jointly along with punitive damages, special damages, attorney fees and all costs herein related to the pursuit of this cause.

Case 3:19-cv-00022-HTW-LRA   Document 2-2   Filed 01/10/19   Page 224 of 230
Case: 25CI1:14-cv-00071-TTG   Document #: 77-12   Filed: 04/07/2017   Page 14 of 14
Case: 25CI1:14-cv-00071-TTG   Document #: 1   Filed: 03/05/2014   Page 14 of 14

Respectfully submitted,

Dr. Donald Raggio &
Dr. Chris Raggio, Plaintiffs

By: _____
MITCHELL H. TYNER, SR. – MSB #8169

OF COUNSEL:

MITCHELL H. TYNER, SR. – MSB #8169
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-1113 – *facsimile*

## The BTC Law Blog

# Initial Thoughts on Applicability of UCC and UCITA

17 November 2013

If a Bitcoin transaction found its way in court, under what law would the transaction be evaluated?

It's easy to see that such a transaction would be evaluated under the contract law for the relevant jurisdiction. Since that is a jurisdiction-specific inquiry, it's often difficult to make general statements about what would happen unless there is some kind of shared law that applies.

I can think of two sets of laws drafted by the Uniform Law Commission that are potentially relevant: Article 2 of the Uniform Commercial Code (UCC-2) governing sales, and the Uniform Computer Information Transactions Act (UCITA) governing transactions in information. The former is adopted by all fifty member states of the United States of America. The latter has only been adopted by states along Washington D.C.'s border: Maryland and Virginia.

UCC-2 applies to transactions in goods. Are Bitcoins goods? It appears so. Here's the definition of "goods":

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action.
>
> UCC § 2-105

And to preempt those that consider Bitcoin to be "the money in which the price is to be paid", UCC-2 also applies to barter:

> The price can be made payable in money or otherwise. If it is payable in whole or in part in goods each party is a seller of the goods which he is to transfer.
>
> UCC § 2-304

Are Bitcoins things? Probably; they have a specified form, and nothing about the term "thing" implies that it must take a physical form. Indeed, Bitcoins can take physical form just like software can. Are they movable? They are definitely transferable, just like copies of software can be transferred. Because of Bitcoin's similarity to software, the answer likely turns on whether software is a "good" under UCC-2. Software is a good.

> Despite disagreement among commentators, a careful analysis indicates general judicial agreement that software is a good.
>
> Computer Software: Does Article 2 of the Uniform Commercial Code Apply? (1986)

Bitcoins are likely "goods" under UCC-2, so sellers of Bitcoin are wise to become familiar with its provisions, because they apply in forty-eight states.

Wait, forty-eight? Yes. As mentioned earlier, Maryland and Virginia enacted the UCITA to govern "computer information transactions".

**Next article**

Mixers and Money Laundering

**Previous article**

Bitcoin Exchange Reporting

**Links**

email

**Blog Archive**

Article index

"Computer information" means information in electronic form that is obtained from or through the use of a computer or that is in a form capable of being processed by a computer. The term includes a copy of the information and any documentation or packaging associated with the copy.

"Computer information transaction" means an agreement or the performance of it to create, modify, transfer, or license computer information or informational rights in computer information. […]

Definitions in Virginia's UCITA

Because this is the law in only two states, I know little about it. It's interesting that it seems to apply to Bitcoin transactions, and it probably creates some uncertainty for merchants and consumers in those two states. If there is reader interest I will learn more about UCITA. Send an email.

The information contained on this blog is not legal advice, and I am not your lawyer. You should discuss facts and circumstances specific to your particular situation with a competent, paid legal practitioner. None of the information on this blog is intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                          **PLAINTIFFS**

**VS.**                                                          **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                          **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Code Collective, LLC, and Jed McCaleb, individually and formerly doing business as

MTGOX, a sole proprietorship, by and through counsel of record, do hereby give notice to the

Court that the following discovery was served as follows:

*JED MCCALEB AND CODE COLLECTIVE, LLC'S FIRST SET OF
INTERROGATORIES TO PLAINTIFFS.*

The undersigned retains the originals of the above papers as custodian thereof.

Respectfully submitted, this the 25TH day of April, 2017.

**CODE COLLECTIVE, LLC, and
JED McCALEB, individually and formerly
doing business as MTGOX, a sole proprietorship**

By:   <u>*/s/Mandie B. Robinson*</u>
EDWIN S. GAULT, JR., MSB #10187
MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS 39201-4099
Post Office Box 22608
Jackson, MS 39225-2608
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

Mitchell H. Tyner, Sr.
Charles Brad Martin
TYNER, GOZA, STACEY & MARTIN, LLC
114 West Center Street
Canton, MS 39046
mtyner@tynerlawfirm.com
bmartin@tynerlawfirm.com

Respectfully submitted, this the 25TH day of April, 2017.

/s/ Mandie B. Robinson
MANDIE B. ROBINSON

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                        **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                        **DEFENDANTS**

<u>**NOTICE OF SERVICE OF DISCOVERY**</u>

Code Collective, LLC, and Jed McCaleb, individually and formerly doing business as

MTGOX, a sole proprietorship, by and through counsel of record, do hereby give notice to the

Court that the following discovery was served as follows:

*JED MCCALEB AND CODE COLLECTIVE, LLC'S THIRD SET OF*
*REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS.*

The undersigned retains the originals of the above papers as custodian thereof.

Respectfully submitted, this the 25TH day of April, 2017.

> **CODE COLLECTIVE, LLC, and**
> **JED McCALEB, individually and formerly**
> **doing business as MTGOX, a sole proprietorship**

> By:   */s/Mandie B. Robinson*
>       EDWIN S. GAULT, JR., MSB #10187
>       MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

Mitchell H. Tyner, Sr.
Charles Brad Martin
TYNER, GOZA, STACEY & MARTIN, LLC
114 West Center Street
Canton, MS 39046
mtyner@tynerlawfirm.com
bmartin@tynerlawfirm.com

Respectfully submitted, this the 25TH day of April, 2017.

/s/ Mandie B. Robinson
MANDIE B. ROBINSON