**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**V.**                                                                      **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual**                                            **DEFENDANTS**

---

**JED MCCALEB AND CODE COLLECTIVE, LLC'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT ON MEASURE OF DAMAGES**

---

Defendants Jed McCaleb and Code Collective, LLC (collectively, "McCaleb") hereby file this Motion for Partial Summary Judgment as to the proper measure of damages in this case and in support hereof state as follows:

1.      Plaintiffs filed this suit based on an alleged theft of approximately 9,400 bitcoins from their account on the MTGOX bitcoin exchange over seven years ago.[1]

2.      Plaintiffs wrongly maintain they are entitled to damages in the amount of the market value of bitcoins today, without any basis in law or fact for such a demand.

3.      Mississippi law limits the measure of damages to the value of the property at the time of loss, and there is no factual evidence of fraud or intentional acts by McCaleb that could support an award of punitive damages or otherwise affect that law.

4.      Moreover, Plaintiffs failed to "cover" or mitigate their damages in any way.

---

[1] A collection of Relevant Emails between Drs. Donald and Chris Raggio on the one hand, and McCaleb on the other, is attached as Exhibit A.   These emails reflect the opening of the account and Plaintiffs' notification of the alleged theft to McCaleb.   *See* Exhibit A at pp. 4-6.

5.      Thus, McCaleb is entitled to partial summary judgment that, in the event Plaintiffs succeed on any claim they have asserted, the measure of damages is the value of the bitcoins at the time of the theft.

## ITEMIZATION OF THE FACTS RELIED UPON AND NOT GENUINELY DISPUTED

6.      Plaintiffs allege that from January 7 to January 9, 2011, someone stole approximately 9,400 bitcoins from their MTGOX account. *See* Affidavit of Chris Raggio, attached as Exhibit B, at ¶ 5; Amended Complaint, attached as Exhibit C, at ¶ 11.

7.      At the time of the theft, the value of those bitcoins was approximately $3,100 ($0.33 per bitcoin). *See* Affidavit of Jed McCaleb, attached as Exhibit D, at ¶ 6.

8.      There was no written contract or terms of use for MTGOX users at the time. *See* Exhibit D, at ¶ 5.

9.      McCaleb sold the MTGOX exchange on February 11, 2011 to Tibanne KK, a Japanese company owned by Mark Karpeles. *See* Exhibit D, at ¶ 8.

10.      The Plaintiffs began corresponding with Tibanne KK through Mark Karpeles about the stolen bitcoin and claim Karpeles informed them in March 2012 that he was not responsible for recovering their bitcoins. *See* Exhibit B, at ¶ 15.

11.      At this time in March of 2012, the market value of bitcoin reached approximately $5.40. *See* Historical Pricing Charts from Coindesk.com, attached as Exhibit E; s*ee also* Request for Judicial Notice being filed contemporaneously with Motion.

12.    In February 2014, MTGOX Co., Ltd.—MTGOX's new owner—filed for bankruptcy in Japan. *See,* Reuters, "Mt. Gox files for bankruptcy, hit with lawsuit", February 28, 2014, attached as Exhibit F.[2]

13.    The Raggios never filed a proof of claim in the MTGOX bankruptcy. *See* Plaintiffs' Responses to Defendants' Second Set of Requests for Admission, attached as Exhibit H, at p. 1.

14.    Plaintiffs never purchased substitute bitcoins to replace the ones they claim were stolen. *See* Plaintiffs' Supplemental Discovery Responses served June 25, 2018 and related documents, collectively attached Exhibit I, at 2, 6-7.

15.    There is no evidence to support any claims that McCaleb embezzled, stole, or converted the Plaintiffs' bitcoins to his own use.   *See*, Deposition of Jed McCaleb, attached as Exhibit J; *see also* June 5, 2018 Hearing Transcript, attached as Exhibit K, at 26-34, 40 (this Court noted it considered matters pertaining to alleged embezzlement or fraud irrelevant).

## CONCLUSION

16.    Under Mississippi law governing the claims asserted by Plaintiffs, the measure of damages is the value of the property at the time of the theft, and there is no evidence to support any greater award for any alleged wrongful acts.

WHEREFORE, for the reasons stated above, and those set forth in McCaleb's Memorandum in Support of this Motion, McCaleb is entitled to partial summary judgment that the measure of damages in this case is limited to the value of the stolen bitcoin at the time of the theft.

---

[2] MTGOX Co., Ltd. also filed a bankruptcy proceeding in Texas. *See* Docket of U.S. Bankruptcy Court for the Northern District of Texas (Dallas), attached as Exhibit G.

Respectfully submitted, this the 5th day of October, 2018.

**JED McCALEB and**
**CODE COLLECTIVE, LLC**


By:    */s/ Edwin S. Gault Jr.*
        EDWIN S. GAULT, JR. (MSB #10187)
        MANDIE B. ROBINSON (MSB #100446)
        T. PEYTON SMITH (MSB #103867)

        *Attorneys for Defendants Jed McCaleb and*
        *Code Collective, LLC*


OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

4

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 5, 2018, I served a true and correct copy of the foregoing

document via electronic mail to the following counsel of record:

> Armin J. Moeller, Jr.
> Walter H. Boone
> Christine Crockett White
> Jonathan P. Dyal
> Andy Lowry
> Patrick Everman
> Perry P. Taylor
> Balch & Bingham, LLP
> 188 East Capitol Street
> Jackson, MS 39201-2608
> wboone@balch.com
> cwhite@balch.com
> alowry@balch.com
>
> ***Attorneys for Plaintiffs***

THIS, the 5th day of October, 2018.

> /s/ Edwin S. Gault, Jr.
> EDWIN S. GAULT, JR.

5

2/12/12                                    Gmail - account funded by wire



Don Raggio <donald.raggio@gmail.com>

# account funded by wire

65 messages

---

**Don Raggio <donald.raggio@gmail.com>**                    Mon, Dec 20, 2010 at 11:30 PM
To: info@mtgox.com

    Hello,

    I'm based in the US.  I would like set up a Mt Gox account (right now I am having difficulty) and fund it with a wire
    transfer of $25000 USD.   Can you help me with the wire transfer.  Please give me the account and wire
    instructions.

    Thanks,

    Don

---

**Jed McCaleb <admin@mtgox.com>**                          Tue, Dec 21, 2010 at 6:19 AM
To: Don Raggio <donald.raggio@gmail.com>

    Hi Don,
    You can send the wire to:
    Jed McCaleb
    Chase
    SWIFT: CHASUS33XXX
    routing#: 021272723
    account#: 3160195000

    My bank charges $15 for an incoming wire from the US and I think $50
    for an international one.
    Send me an email letting me know the amount you sent so I can keep an
    eye out for it.
    Thanks,
    Jed.
    [Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 21, 2010 at 10:01 AM
To: Jed McCaleb <admin@mtgox.com>

    Ok I created an account called donraggio.  Can you place the funds in
    that account?  Thanks for your help.

    Don
    [Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 21, 2010 at 10:03 AM
To: Jed McCaleb <admin@mtgox.com>

    Let me know if you can put it in the donraggio account.   I'll wire
    the money and let you know when it is sent.

Gmail - account funded by wire

Don

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 21, 2010 at 10:39 AM
To: Jed McCaleb <admin@mtgox.com>

Is it ok if I give you a call and talk about this.  I just have some
questions about doing the wire.  I appreciate you taking the time.
My number is 6016725100

Don

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Tue, Dec 21, 2010 at 3:30 PM
To: Don Raggio <donald.raggio@gmail.com>

Hi Don,
Yeah I can put it in that account.
I'm actually on vacation right now so it is hard to call. Can I call
you thursday?
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 21, 2010 at 9:16 PM
To: Jed McCaleb <admin@mtgox.com>

Is it ok if I send $5000 to start?

Don

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Wed, Dec 22, 2010 at 1:05 AM
To: Don Raggio <donald.raggio@gmail.com>

Sure how ever much you want to send.
Thanks
Jed
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Thu, Dec 23, 2010 at 6:37 AM
To: Don Raggio <donald.raggio@gmail.com>

Hi Don,
I'm around today. If you still want me to call you I can.
Thanks,

RAGGIO  00025

Jed.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Thu, Dec 23, 2010 at 9:50 AM
To: Jed McCaleb <admin@mtgox.com>

What number can I reach you at?

Don

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Thu, Dec 23, 2010 at 11:16 AM
To: Don Raggio <donald.raggio@gmail.com>

(917) 740-7509 but let me know when you want to call so I'll be around.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Fri, Dec 24, 2010 at 8:55 AM
To: Jed McCaleb <admin@mtgox.com>

I'm going to send $5000 to be placed in the donraggio account on mt
gox.  Thanks.  I'll send the wire today.   If you have any questions
you can reach me at 6016725100

On Tuesday, December 21, 2010, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Fri, Dec 24, 2010 at 9:15 AM
To: Jed McCaleb <admin@mtgox.com>

Funds should be wired today.
Thanks

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Fri, Dec 24, 2010 at 10:01 AM
To: Don Raggio <donald.raggio@gmail.com>

Ok great I'll be looking for it.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Fri, Dec 24, 2010 at 9:11 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

   Please let me know when to expect it to be in the account.
Thanks for your help.   Chris

Don

[Quoted text hidden]

RAGGIO  00026

**Don Raggio <donald.raggio@gmail.com>**                    Sat, Dec 25, 2010 at 12:28 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,

    Please let me know when to expect it to be in the account.   Thanks

Don
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Sat, Dec 25, 2010 at 6:29 AM
To: Don Raggio <donald.raggio@gmail.com>

It is there now.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                   Mon, Dec 27, 2010 at 9:58 AM
To: Jed McCaleb <admin@mtgox.com>

Thanks.   The wire worked fine.   May I send another for $15000 to be
placed in my account?
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Mon, Dec 27, 2010 at 10:08 AM
To: Don Raggio <donald.raggio@gmail.com>

Yep I'll look out for it.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                   Mon, Dec 27, 2010 at 12:26 PM
To: Jed McCaleb <admin@mtgox.com>

Sent it.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                   Mon, Dec 27, 2010 at 2:05 PM
To: Jed McCaleb <admin@mtgox.com>

Hey, I'm looking to make a bulk purchase with the USD I sent.   Can you tell me how I can get the best deal for
the money?   Do you have any large bulk sellers or anyone that would place a large dark pool order?

Donald

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Mon, Dec 27, 2010 at 3:15 PM

RAGGIO  00027

2/12/12                                    Gmail - account funded by wire

To: Don Raggio <donald.raggio@gmail.com>

Hi Donald,
Well it depends on how fast you are hoping to convert the $ to BTC.
I'd suggest placing a large dark pool order around .27 and then you
will pick up any BTC that people are trying to sell. but it will
probably take a few days to get filled.
I see your wire as pending. it will probably clear by tomorrow.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 28, 2010 at 12:27 PM
To: Jed McCaleb <admin@mtgox.com>

Ok, waiting for it to fill.  We'll see how the market plays out.

Don
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 28, 2010 at 2:02 PM
To: Jed McCaleb <admin@mtgox.com>

Ok,  once the wire clears I'll try the dark pool order as you
suggested.    Thanks for the advice.

Don
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Tue, Dec 28, 2010 at 2:08 PM
To: Don Raggio <donald.raggio@gmail.com>

Oh it cleared this morning. I thought I saw you trading it.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    Tue, Dec 28, 2010 at 6:30 PM
To: Jed McCaleb <admin@mtgox.com>

Yeah, I was able to make the trade.   Thanks for your help.      If I
need to am I able to make withdrawals via wire or ACH transfer?   How
would I go about doing it?

Thanks

Don
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    Tue, Dec 28, 2010 at 7:53 PM
To: Don Raggio <donald.raggio@gmail.com>

Yeah I can ACH you your money back if you need it. That is the

https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=inbox&th=12d076893352933e

RAGGIO  00028                    5/14

2/12/12                               Gmail - account funded by wire

cheapest option. I'll just need your account and routing number.

Also I noticed you have your dark pool order set to "Dark pool only".
You might want to set it to "dark pool and normal" so you can pick up
the trades as people sell small amounts of BTC. The "only" option will
just fill from other dark pool orders which will take longer to
happen.
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    **Wed, Dec 29, 2010 at 5:49 AM**
To: Jed McCaleb <admin@mtgox.com>

Jed can you send me 10,000 USD from my account?

My information is

Routing number 084201278

Account 03105229

If ACH won't work do you need more information to wire it to my
BancorpSouth account?   Let me know if there is a fee for wiring.
Thanks for your service.
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                           **Wed, Dec 29, 2010 at 6:31 AM**
To: Don Raggio <donald.raggio@gmail.com>

Ok no problem.  I sent it back to you.
Thanks,
Jed.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    **Sun, Jan 9, 2011 at 10:36 PM**
To: Jed McCaleb <admin@mtgox.com>

Somebody is conducting unauthorized withdrawals on my account. They've taken 9k in BTC so far.   I changed
the password.  Please Advise.   All were sent to 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

Don

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    **Sun, Jan 9, 2011 at 11:03 PM**
To: Jed McCaleb <admin@mtgox.com>

Now I am trying to withdraw and I am getting invalid bitcoin address
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                    **Mon, Jan 10, 2011 at 3:18 AM**

RAGGIO  00029

2/12/12                                    Gmail - account funded by wire

To: Jed McCaleb <admin@mtgox.com>

can you give me IP address of who access my account for those withdrawals?

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    **Mon, Jan 10, 2011 at 3:26 AM**
To: Don Raggio <donald.raggio@gmail.com>

Oh jeez that's bad.
I would go to IRC channel #bitcoin-dev and talk to theymos. He wrote a
block explorer that you can use to possibly track where the coins
went.
Any idea how someone got your password?
Jed.

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                    **Mon, Jan 10, 2011 at 3:27 AM**
To: Don Raggio <donald.raggio@gmail.com>

well I'm only storing the last login IP which was: 75.64.232.81

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          **Mon, Jan 10, 2011 at 4:14 AM**
To: Jed McCaleb <admin@mtgox.com>

No I have no idea I just ran a key logger scanner and found nothing.   I ran block explored and just saw a new
address.   Is there anything I can do?

Sent from my IPhone

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          **Mon, Jan 10, 2011 at 4:15 AM**
To: Jed McCaleb <admin@mtgox.com>

The last one would be me.

Sent from my IPhone

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          **Mon, Jan 10, 2011 at 4:17 AM**
To: Jed McCaleb <admin@mtgox.com>

Can I withdraw my bitcoins in a few minutes?   I think last withdrawal was at 530 yesterday?

Sent from my IPhone

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          **Mon, Jan 10, 2011 at 4:19 AM**
To: Jed McCaleb <admin@mtgox.com>

Can you keep monitoring the ip address and keep a log?

RAGGIO  00030

Gmail - account funded by wire

Sent from my iPhone

On Jan 10, 2011, at 3:27 AM, Jed McCaleb <admin@mtgox.com> wrote:

> 75.64.232.81

---

**Don Raggio <donald.raggio@gmail.com>**                          **Mon, Jan 10, 2011 at 4:44 AM**
To: Jed McCaleb <admin@mtgox.com>

Please freeze account and  send remaining bitcoin balance to
1DAFkiM5uxRDJb7UCqSX4RpRJPmh1M5ETF

Please watch
1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

This is where stolen coins went.

freeze BTCs if they come back to Mt. Gox.


Please log IPs and see if another IP tries to access account.  They most certainly will since there were 3
withdrawals in a row.


Thanks Jed.
Chris (for Don)
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          **Mon, Jan 10, 2011 at 4:51 AM**
To: Don Raggio <donald.raggio@gmail.com>

Yeah I froze the account and I'm logging all IP's on login now but you
should change the password back to the one that they have so they are
able to login still so we can see what their IP is.
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                          **Mon, Jan 10, 2011 at 4:55 AM**
To: Jed McCaleb <admin@mtgox.com>

Ok I changed the password back to the one it was before.   Hopefully they will try to log in again.

Chris (for Don).

Sent from my iPhone
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                          **Mon, Jan 10, 2011 at 5:11 AM**
To: Jed McCaleb <admin@mtgox.com>

The password is changed.   I just logged in and logged out.  Maybe we will get the ip of the person who did it.
My only guess is that I got hit by a keylogger.  I will scan my laptop today.   This is bad but hopefully we can
send the rest of the btcs once enough days have passed.   Thanks for your help.

Chris (for Don)

RAGGIO  00031

2/12/12                                Gmail - account funded by wire

[Quoted text hidden]

**Jed McCaleb <admin@mtgox.com>**                          Mon, Jan 10, 2011 at 9:32 AM
To: Donald Raggio <donald.raggio@gmail.com>

ok someone logged in from: 192.231.69.201
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Mon, Jan 10, 2011 at 9:34 AM
To: Donald Raggio <donald.raggio@gmail.com>

Maybe still you guys?
http://www.ip2location.com/free.asp
says:
MISSISSIPPI     JACKSON UNIVERSITY OF MISSISSIPPI MEDICAL CENTER
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                Mon, Jan 10, 2011 at 11:03 AM
To: Jed McCaleb <admin@mtgox.com>

That's us.   Thanks for checking.   Please keep watching.

Chris

Sent from my iPhone
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                Mon, Jan 10, 2011 at 12:21 PM
To: Jed McCaleb <admin@mtgox.com>

So right now the plan is for you to send it to my bitcoin address?   How many days will you need?     If so I won't
log in so you can see where the other party is coming from.

Chris (for Don)

Sent from my iPhone
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                   Tue, Jan 11, 2011 at 4:49 AM
To: Jed McCaleb <admin@mtgox.com>

Jed

once enough days have passed do you think you can send the remaining balance to:
1DAFkiM5uxRDJb7UCqSX4RpRJPmh1M5ETF      ?

Otherwise we can unfreeze the account and do daily withdrawals with a new password.

Thanks for your help and for talking ot me yesterday. Obviously this is a tough situation and I hope not to
encounter it again.   Thanks for guiding me through.  I honestly don't know who could have done it.  THat's why I
was thinking it was  a key logger.    I just looked at the activity of the address in block explorer and haven't seen
any new transactions.   I haven't logged in the account since yesterday.    I don't know if the other party has

https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=inbox&th=12d076893352933e                    9/14

RAGGIO  00032

Page9

2/12/12                    Gmail - account funded by wire

attempted to log in.    please let me know if you see any activity.

Thanks

Chris (for Don).

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>                  **Tue, Jan 11, 2011 at 7:52 AM**

Please let me know when enough days will have passed that you can withdraw the bitcoins to my bitcoin address.    Thanks for your help.

Chris (for Don)

Sent from my iPhone

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**
To: Donald Raggio <donald.raggio@gmail.com>           **Tue, Jan 11, 2011 at 8:49 AM**

I'll send it to you next monday on the 17th.
Thanks,
Jed.

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>               **Wed, Jan 12, 2011 at 6:31 PM**

Thanks for sending it on the 17th.    I logged in again just to see if there had been any activity.    I didn't see anything logged.

Sent from my iPhone

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>               **Sat, Jan 15, 2011 at 4:48 PM**

Ok thanks for sending it monday.    Please let me know what address it's going to.    Also has anyone accessed the account?  I logged in once.
Chris (for Don)

Thanks

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**
To: Jed McCaleb <admin@mtgox.com>               **Mon, Jan 17, 2011 at 8:20 AM**

Please let me know when you send it.    Please let me know if there are any problems.    Thanks for your help.

Chris (for Don)

[Quoted text hidden]

RAGGIO  00033

2/12/12                                Gmail – account funded by wire

**Jed McCaleb <admin@mtgox.com>**                          Mon, Jan 17, 2011 at 8:41 AM
To: Donald Raggio <donald.raggio@gmail.com>

ok what address do you want me to send it to?
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                   Mon, Jan 17, 2011 at 8:58 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,
Please send entire balance to address

12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea

Please let me know if there are any problems
Thanks,

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                          Mon, Jan 17, 2011 at 9:05 AM
To: Don Raggio <donald.raggio@gmail.com>

ok there you go.
Have the stolen ones bent sent anywhere yet?
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                   Mon, Jan 17, 2011 at 9:23 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,

Thanks for sending them out.    The stolen ones are still at the same address.    I don't know who has control
over them or what he or she plans to do with them.    The log from bitcoin explorer is below.  I don't know how
the password was obtained.  It wasn't an easy to guess password.    My only guess is a keylogger.  I ran
software to detect one on that PC but none were found so I don't know what happened.  I guess they
never bothered to login again to your site.    If they are careless enough to return them from that address to
MtGox please seize them.  Let me know if you want to unfreeze my account at MtGox (and for me to change the
password) or if it is just better to create a new account given what's happened.    Right now I'm just leaving it as
is hoping they will login again and get their IP logged.      The information about the stolen coins is below.
Good luck running your site.      I wish we could have spent more time with you discussing bitcoin's potential
instead of this problem.  Maybe we'll have a chance to do that yet.    The future is very promising.

Chris (for Don)

# Address 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmM mQCh

Short link: http://blockexplorer.com/a/6C87FrVcb1

- First seen[?]: Block 101362 (2011-01-07 01:01:26)
- Received transactions: 4
- Received BTC: 9 506.33
- Sent transactions: 1
- Sent BTC: 100
- Hash160[?]: 89008dfd301ad098e368693d8bf9bcdedf78bd6c
- Public key[?]:
  04f0ceb57cc8038334c56317dc152c523f6dbb854f14f2ac63a7e9c227b9e1cee24f6bb2dcde2d9eb6f19acf57
  bd0eae4d7f9324905fa505f8a1a14b02a0b5c159

## Ledger[?]

Note: While the last "balance" is the accurate number of bitcoins available to this address, it is likely not the balance available to this person. Every time a transaction is sent, some bitcoins are usually sent back to yourself *at a new address* (not included in the Bitcoin UI), which makes the balance of a single address misleading. See the wiki for more info on transactions.

| Transaction[?] | Block[?] | Amount[?] | Type[?] | From/To[?] | Balance[?] |
|---|---|---|---|---|---|
| 691967a006... | Block 101362 (2011-01-07 01:01:26) | 100 | Received: Address | • 19n8ogD8imviHn9iZSpmUgdZgjTuDxzDwv | 100 |
| f73d2bb200... | Block 101362 (2011-01-07 01:01:26) | 100 | Sent: Address | • 1Lnfce21gYa4WMZFFR4iVUFz9F39tHmz7W<br>• 12VLe9wFVdio8gEjRgFJdZ1g5qBDfVfZkJ | 0 |
| 4d69213ee5... | Block 101380 (2011-01-07 02:49:29) | 3134.8 | Received: Address | • 1K5PeNuth8dtyeBrAhw8c2n899gBvGKTut<br>• 16GanxZBBxbSeWa177iSi6Y42zirxxJLnz<br>• 1JCmxZjJBkQSpYEdYoukRcEz23YwMWBzF | 3134.8 |
| a7b9ea9363... | Block 101607 (2011-01-08 10:27:16) | 3174.6 | Received: Address | • 1JSiXdtNihFuVp16pGfJeK8DBTAmAVDteV<br>• 19FuFSs6pVUsKrqUpnyRbZp5XGYSatpwUD<br>• 1CRCF7qQPV9Sybe5RUN9ZcsQfqbyXycqyR<br>• 1EJxHS9F3BDME8r8gEIjKVWc2rMKCD3Ssx<br>• 15fFrMJZkZ7YA1YRQT3PN41uKpkiRmN5ap | 6309.4 |
| | Block 101760 | | | • 1JHQRFF5P9867t9hiqmPxn9rpZUZjzb92C<br>• 16r2pK9zySywLi1beVRqCaRgCtW2rKkucZ<br>• 1MgHNzdUuNsE3N5gym5ojPuHGtPmifbosC<br>• 1DEY3nw7vUMXm5SoaVLxMG3rYeY5nP | | |

Page12

2/12/12                                        Gmail - account funded by wire

| 14a797025a... | (2011-01- 3096.93<br>09<br>10:47:30) | Received:<br>Address | hmc<br>• 1NeJmfihzgqpxskJrzFJoBebcjhyFaggZd<br>• 1Ay3N616QnNBp7bXwjKjatANHyKE2b<br>NfHR<br>• 13peLjL4LDQm2tiuubYQjxYV8JhaJg<br>QQPy<br>• 1LiMB3VwERw317K2RGh6ahJj3QaoTt<br>RJG2 | 9406.33 |

Bitcoin Block Explorer (beta) - Donate: 1Cwr8AsCfbbVQ2xoWjFD1Gb2VRbGsEf28

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          Sun, Jan 23, 2011 at 4:17 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

The stolen ones still haven't moved.   Can you check and see if anybody has logged in?


Chris (for Don)
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**          Mon, Jan 24, 2011 at 6:10 AM
To: Donald Raggio <donald.raggio@gmail.com>

No still no logins other than you.
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**          Mon, Jan 24, 2011 at 6:11 AM
To: Jed McCaleb <admin@mtgox.com>

Thanks for checking.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**          Tue, Feb 1, 2011 at 8:09 PM
To: Jed McCaleb <admin@mtgox.com>

Jed, do you think we got hit by these guys running a dictionary attack?

http://www.bitcoin.org/smf/index.php?topic=3089.0


Chris (for Don)


[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**          Tue, Feb 1, 2011 at 8:24 PM
To: Don Raggio <donald.raggio@gmail.com>

2/12/12                              Gmail - account funded by wire

I don't think so. The attack happened after your account was stolen
from. and also these guys didn't take BTC. They would just convert it
to USD and take LR.
The coins still haven't moved?

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    Tue, Feb 1, 2011 at 9:04 PM
To: Jed McCaleb <admin@mtgox.com>

Jed
They haven't moved the coins.  I'm still not sure what happened.  I ran spyshelter a keylogger detector and didn't
find anything.    Here is the block info.

[Quoted text hidden]

On Feb 1, 2011, at 8:24 PM, Jed McCaleb <admin@mtgox.com> wrote:

      1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

---

**Donald Raggio <donald.raggio@gmail.com>**                    Thu, Feb 10, 2011 at 6:54 AM
To: Jed McCaleb <admin@mtgox.com>

Thanks for telling me about Theymos.   It's hard for me to use IRC at work.   Maybe if we could get in touch with
him he could create something that monitors that address and notifies us when they are transferred.   I would
reward him and you with BTC for recovering the stolen BTC.   Does that sound like a good idea?


PS

  Thanks for creating such a cool platform.

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              Thu, Feb 10, 2011 at 7:39 AM
To: Donald Raggio <donald.raggio@gmail.com>

Ok I sent him an email.

[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                       Mon, Dec 26, 2011 at 3:43 AM
Draft To: Jed McCaleb <admin@mtgox.com>


[Quoted text hidden]

---

Page14

Gmail - conference etc.                                    https://mail.google.com/mail/u/0/?ui=2&ik=5948c6e8e8&view=pt&q=f...

# M Gmail

Chris Raggio <chris.raggio@gmail.com>

## conference etc.

6 messages

---

**Chris Raggio** <chris.raggio@gmail.com>                         Tue, Aug 23, 2011 at 7:23 PM
To: jed@mtgox.com

Jed,

It was a real pleasure to meet you in person. All of us really appreciate you taking time to make yourself available and to share your thoughts with us. I remember you said you were interested in AI research and technological singularity discussion. I imagine based on your history of how you basically used eDonkey to turn the internet into one big searchable hard drive I could see you doing something like making a piece of software that the turns the internet and every device attached to it into a planetary brain. It reminds me of a book I read in the 90s called "Darwin Among Machines: The Evolution of Global Intelligence." Hope you enjoy the book if you haven't read it already.

I believe that if this technological singularity happens humanity as it exists now will essentially be the "bootstrap" if you will for whatever comes next. If that is the case, God help us.

http://www.amazon.com/Darwin-Among-Machines-Evolution-Intelligence/dp/0738200301/ref=sr_1_1?ie=UTF8&qid=1314144894&sr=8-1

Chris

---

**Jed McCaleb** <jed@mtgox.com>                                   Wed, Aug 24, 2011 at 11:16 PM
To: Chris Raggio <chris.raggio@gmail.com>

Hi Chris,
Yeah it was cool to finally meet so many people in person.
There was talk of getting some sort of bitcoin foundation going. There should be more details about it coming soon.
Thanks for the link. Yeah I think in the next 20-30 years things are going to get pretty crazy.
Jed.
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                         Thu, Sep 15, 2011 at 4:36 PM
To: Jed McCaleb <jed@mtgox.com>

Hi Jed,

How is the foundation coming? There are some promising ideas out there.

http://thedailyattack.com/2011/08/12/bitcoin-open-transactions-the-kryptonite-of-net-neutrality-wonks/

Chris
[Quoted text hidden]

---

**Jed McCaleb** <jed@mtgox.com>                                   Fri, Sep 23, 2011 at 5:13 PM

1 of 2                                          RAGGIO  00002              8/22/2016 4:13 AM

To: Chris Raggio <chris.raggio@gmail.com>

Hi Chris,
I've got something interesting I'm working on. I'll let you know more
in another month or so.
Jed.
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                         Fri, Sep 23, 2011 at 8:20 PM
To: Jed McCaleb <jed@mtgox.com>

Hi Jed,


Glad to hear it...


Chris
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                         Mon, Nov 28, 2011 at 9:50 PM
To: Jed McCaleb <jed@mtgox.com>

Hi Jed,


I saw this story about smartphone adoption:  http://www.wired.com/gadgetlab/2011/11/smartphones-feature-phones/


I've been whiteboarding some ideas mostly stuff for improving convertibility.  Also playing around with NFC (Near Field
Communication) to familiarize myself with what it offers.   It's interesting but it needs more work.

http://www.paywithisis.com/

That's about it between me and my day job.   How is the stuff you have been working on coming along?


Chris
[Quoted text hidden]

RAGGIO   00003                         8/22/2016 4:13 AM

 **Gmail**                                          Chris Raggio <chris.raggio@gmail.com>

---

## hey
4 messages

---

**Chris Raggio** <chris.raggio@gmail.com>                              Wed, Dec 21, 2011 at 8:18 PM
To: Jed McCaleb <jed@mtgox.com>

Hey Jed,

How's everything going? I'm feeling good.  I think 2012 is going to be a breakout year for bitcoin in terms of
technology maturation, wider adoption, and increased exchange value which everyone is so focused on.   I haven't
been doing much with the technology.  That is best left to guys like you who can code circles around me.  I've been
studying economics to try to understand how a currency as different from anything that has come before might change
things.  It's not easy.  Economics is a social science and most of it makes no sense at all.  Logical thinking is
disadvantageous to anyone trying to learn what is accepted as truth in this field.

Just to let you know I e-mailed Mark asking him what he intends to do with the stolen coins.  I haven't heard back from
him yet.  Originally he said he wanted to give "Baron a year to speak for himself."  I don't know why we would bother
with somebody who hides behind an alias and an altered passport but whatever.  We are approaching the 1 year
anniversary of the theft.

I'm not asking you to intervene on my or my father's behalf.  Mark is the owner of Mt Gox now.  It's his call whether he
wants to make things right with us as he did with Bitomat.  My father and I appreciate everything you did to investigate
and pursue the thief.  You didn't have to go to the lengths you went to for us.  We thank you.

Have a nice holiday,

Chris

---

**Jed McCaleb** <jed@mtgox.com>                                        Tue, Dec 27, 2011 at 1:16 PM
To: Chris Raggio <chris.raggio@gmail.com>

Hey Chris,
Yeah I think it is just a mater of time before something like bitcoin
takes hold.
I'll ask him again what is happening to the baron money. I'm sure he
will eventually give it to you. I know he is trying to do everything
very by the book so I think he had to wait for legal reasons.
Do you happen to remember those two guys from the conference in nyc
that were from Louisiana or mississippi? They owned a bank or
something down there. Did you get their contact info by any chance?
Thanks,
Jed.
[Quoted text hidden]

---

**Chris Raggio** <chris.raggio@gmail.com>                              Tue, Dec 27, 2011 at 5:59 PM
To: Jed McCaleb <jed@mtgox.com>

Hey Jed,

I think it was two guys who told me they were from Louisiana.  They gave me a business card that said "Bitcoin
Solutions LLC" which is also the handle they use on the forums   Their business card is attached as an image.  I
talked to them at the conference for maybe 20 minutes.  The product that they were offering at that time was a

---

                                    RAGGIO   00004

pre-paid virtual visa card you purchase with bitcoins.

http://bitcoinsolutionsllc.com/

https://en.bitcoin.it/wiki/Bitcoin_Cashout

I told them that I was looking for something like that but that I wanted it to be reloadable at whatever the current exchange rate was.   I told them that I thought it would be really cool if the virtual card would actually just let you convert on the fly so that went you spent say $20.00 on the visa card it would just take 5 bitcoins (at $4 exchange rate) from a bitcoin account associated with the card.  All of this would essentially be invisible to the user and they could use it like any other card. In essence it wouldn't be much different than using the visa or mastercard you already have in Madrid.   By no means would this fix everything for users.  There are many other issues to resolve such as volatility (this might be mitigated with options trading; increased aggregate market value will help over time).   It would still be a good place to start if it were possible.

Of course to make this work you would like to have a financial institution to partner with.  These guys said that they had a strong with relationship with a bank down there and that they were already talking to the bank about making this happen.  I said that sounded great.  I had never imagined that any financial institution would be interested in doing this. They said that they owned a bank or at least was talking to one that was interested.

As you already know banks are subject to regulations.  They are not well regulated but are very tightly regulated.  That means the regulators crack down hard on small stuff like bitcoin and totally miss colossally important things like MF Global or Lehman brothers that can crash the whole system in a few hours.

As much as I wanted to believe these guys I knew that it would be tough to do this because no commercial bank would want to be associated with bitcoin.  Credit unions or community banks would be equally uninterested.   I thought maybe an offshore bank would consider it but the rates they would charge for doing something like that would be exorbitant.   These guys actually told me that they were talking about a commercial bank based in the US.

I've been playing around with some ideas.  There can't be a single point of failure.  It needs to be decentralized like P2P (as exemplified by eDonkey) and the internet itself . The nodes *and* the edges in the graph will be attacked.  Any link between the conventional system and the cryptocurrency system is what an adversary is going to try to sever.  So one thing that would help with this would be to have a whole lot of links and the ability to set up new links easily.

There are different ways to go about this.  I'm trying to see how to make individual run microexchanges possible at least conceptually.


Chris
[Quoted text hidden]



**20111227_174957.jpg**
204K

---

**Chris Raggio** <chris.raggio@gmail.com>                         Tue, Aug 21, 2012 at 2:00 PM
To: Jed McCaleb <jed@mtgox.com>

http://yro.slashdot.org/story/12/08/21/1530248/bitcoin-card-to-launch-in-2-months-says-bitinstant

Looks interesting...

Gmail - hey                                                    https://mail.google.com/mail/u/0/?ui=2&ik=5948c6e8e8&view=pt&q=to...

[Quoted text hidden]

RAGGIO   00006

                                                                                       8/22/2016 4:18 AM

Case: 25CI1:14-cv-00071-JAS     Document #: 232-1     Filed: 10/05/2018     Page 20 of 51

 **Gmail**                                    **Chris Raggio <chris.raggio@gmail.com>**

---

## Bitcoin's Hogwarts: San Francisco Tech Space "20Mission"
1 message

---

**Chris Raggio <chris.raggio@gmail.com>**                          Tue, May 22, 2012 at 8:44 PM
To: Jed McCaleb <jed@mtgox.com>

http://www.thebitcointrader.com/2012/05/bitcoins-hogwarts-san-francisco-tech.html

| From: | "Mark Karpeles" <mark@tibanne.com> |
|---|---|
| To: | "Jed McCaleb" <admin@mtgox.com> |
| Date: | 2/14/2011 1:58:47 AM |
| Subject: | Re: |

Hi,

This is suspiscious indeed, and the best course (for now) would probably
to freeze the account and watch withdraws from other accounts.

The main factor here is time, which hints at the events being related.
I'd be handling the investigation myself if I had the database here,
however with the server migration in progress I haven't got time to
install mtgox on the space I reserved yet (I'd prefer directly setting
it up on the new server with its own ip for SSL).

Anyway I'll keep you posted as soon as things are ready here. In the
meantime I'll check what I can find out about contractor.net.

Btw there have been other transactions:
http://blockexplorer.com/address/1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh


Mark

Le samedi 12 février 2011 à 15:34 -0500, Jed McCaleb a écrit :
> So here are the details of fraud and why I think it is this guy on the site...
> This account donraggio had about 9k btc stolen from him Jan 6th-9th.
> It looks like someone must have guessed or figured out his password
> somehow. I talked to him on the phone so I believe that this really
> happened.
> The stolen coins were sent to: 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh
> That address has sent 20 BTC to: 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ
> Which happens to be a mtgox address.
> The account that sent them there was name "baron"
>
> This baron account also has other suspicious activity.
> Out of the blue he deposited $75k in LR.
> With that he bought about $15k worth of coins. And has been just
> withdrawing the money since then.
>
> Date of baron btc funding: 1294363502 01 / 06 / 11 @ 7:25:02pm EST
> Date of LR fund U1172929: (01/06/11 @ 6:53:21pm, 7:14:07pm EST,
> 7:14:58pm) 1294361601 1294362847 1294362898
> Date of theft from donraggio: 1294367953 01 / 06 / 11 @ 8:39:13pm EST
> Date of start withdrawal to U2839087: 1294519650 01 / 08 / 11 @
> 2:47:30pm EST basically $1000 a day till now
> Date of LR fraud: Jan 20th
>
>
> His email is: baron@contractor.net
> Which I just find this on google:
> http://www.scamwarners.com/forum/viewtopic.php?f=12&t=10858
>
> My thought is that he is related to the guys who stole so much LR from
> us. I think he funded our LR account so he would be certain there
> would be LR there to steal.
> He definitely know who stole the coins from don raggio unless
> 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh is a mybitcoin address.
> What do you think?



**Don Raggio** <donald.raggio@gmail.com>

## Re: account funded by wire
32 messages

**theymos** <theymos@mm.st>                                          Thu, Feb 10, 2011 at 2:01 PM
To: donald.raggio@gmail.com
Cc: admin@mtgox.com

[Copied to Jed]

Sorry to hear about your misfortune. I can't track the thief myself, but here is some information that might help you.

Tracking BTC is difficult, especially if the attacker knows what he's doing. Here is the attacker's address history:
http://blockexplorer.com/address/1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

From this, you can see under the "sent" column that the owner of these addresses either knows the attacker or is the attacker:
1Lnfce21gYa4VMZFFR4iVUFz9F39tHmz7W
12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ

Looking deeper at those addresses, it's possible that the owners of these addresses also know the attacker directly or indirectly:
1LiEy7V4GK1JUMBPomx2JcCREdRdtpvuj8
15ZpDyyehXLc8BiCUBMis5sTa2pJdNpdeD
1BR5DuhypnMkVmJoQ2YncKiyvQgsjLjBqm
1MTqhJjCunRRHk1UBQkkAJBc1BjRwvHpkD

Take a look at 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ's sending transaction:
http://blockexplorer.com/tx/ff31ac4bb91cf21c96cf779b406b61bad67857812eb9610ada806cc575da069f#i302983
That non-highlighted input address, 1HAnpTE76WTzVvEmyNmgpxZHGZqX6i1X6m, is guaranteed to also be owned by the owner
of 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ.

You can also get information from the attacker's received payments. 1BR5DuhypnMkVmJoQ2YncKiyvQgsjLjBqm was paid by
19CJwUXXBSnmZCkj2hUpyY1cAPZatC12TT, who therefore knows him. Look at that transaction:
http://blockexplorer.com/tx/fb4bf12185bce7ff7c1b472fe74d4ad11560528ce57a8254a2ae23789ac2267b#o0
The non-highlighted output address is owned by either 19CJwUXXBSnmZCkj2hUpyY1cAPZatC12TT or
1BR5DuhypnMkVmJoQ2YncKiyvQgsjLjBqm.

You can continue going deeper, though it fans out quickly. The third level probably has several hundred addresses.

More "top-level" addresses will become known once the attacker spends more BTC from the target address. Keep watching the
page for 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh.

To find the attacker, you need to somehow link one of these addresses to a real person, and then get them to tell you who they
received the coins from. By following these transactions, you should eventually be able to trace the coins back to the attacker. You
might start by asking MtGox, MyBitcoin, Vekja, and other EWallet services whether they own any of these addresses.

Some day I plan to add a feature to Bitcoin Block Explorer that will show all addresses associated with a target (as I did manually in
the text above), but I am unfortunately too busy to work on that right now.

Tell me if you have any questions about getting address histories. I hope you find the thief!

On Thu, 10 Feb 2011 08:39 -0500, "Jed McCaleb" <admin@mtgox.com> wrote:
> Can I give this guy your email?
>
>
> ---------- Forwarded message ----------
> From: Donald Raggio <donald.raggio@gmail.com>
> Date: Thu, Feb 10, 2011 at 7:54 AM
> Subject: Re: account funded by wire
> To: Jed McCaleb <admin@mtgox.com>
>
>

> Thanks for telling me about Theymos.   It's hard for me to use IRC at
> work.   Maybe if we could get in touch with him he could create
> something that monitors that address and notifies us when they are
> transferred.   I would reward him and you with BTC for recovering the
> stolen BTC.   Does that sound like a good idea?
>
>
>
> PS
>
>   Thanks for creating such a cool platform.
>
> Chris (for Don)
>
>
> On Jan 10, 2011, at 3:26 AM, Jed McCaleb <admin@mtgox.com> wrote:
>
> > Oh jeez that's bad.
> > I would go to IRC channel #bitcoin-dev and talk to theymos. He wrote a
> > block explorer that you can use to possibly track where the coins
> > went.
> > Any idea how someone got your password?
> > Jed.
> >
> > On Sun, Jan 9, 2011 at 11:36 PM, Don Raggio <donald.raggio@gmail.com> wrote:
> >> Somebody is conducting unauthorized withdrawals on my account.  They've
> >> taken 9k in BTC so far.   I changed the password.  Please Advise.   All were
> >> sent to 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh
> >>
> >> Don
> >>
> >

**Jed McCaleb** <admin@mtgox.com>                                      Thu, Feb 10, 2011 at 3:40 PM
To: donald.raggio@gmail.com

Well I'm pretty sure i found the guy if I understand theymos's site
correctly. He has enough coins in his account to repay you also. I've
frozen his account but want to make sure I'm right before I do
anything.
Do you know anyone else with an account on mtgox?
Do you know anyone that uses this domain: contractor.net ?
Thanks,
Jed.
[Quoted text hidden]

**Jed McCaleb** <admin@mtgox.com>                                      Thu, Feb 10, 2011 at 3:43 PM
To: donald.raggio@gmail.com

Also do you mind telling me what your old password was? I assume you
changed it. It didn't seem like the same attack that got the other
guys password but maybe it was.
[Quoted text hidden]

**Donald Raggio** <donald.raggio@gmail.com>                            Thu, Feb 10, 2011 at 9:21 PM
To: Jed McCaleb <admin@mtgox.com>

The only person know that has a mt gox account is Eric Brigham.   He told me about mt gox.   Never heard of contractor.net.

Thanks
[Quoted text hidden]

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 9:24 PM

do you want me to put the password in plaintext in an email or send it some other way?   I changed it back to the original password after you froze the account in hopes that the attacker would log in and you would catch the ip.  Let me know how you want to proceed.

Thanks
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>

Thu, Feb 10, 2011 at 9:27 PM

You should change the password and then email it to me in plaintext is fine.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 9:36 PM

Jed,

New password is tele9067

Thanks
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>
To: Donald Raggio <donald.raggio@gmail.com>

Thu, Feb 10, 2011 at 9:44 PM

no no don't tell me the new password. I meant the old password. The one that this person must have gotten somehow.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 10:00 PM

the old password is ternot99

hope that helps.

Thanks

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Thu, Feb 10, 2011 at 10:01 PM

i changed the mt gox password again to make it safe.

thanks

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>
To: Jed McCaleb <admin@mtgox.com>

Fri, Feb 11, 2011 at 5:16 PM

Jed,

Did you find out what you needed?

Thanks

RAGGIO   00040

2/28/2014 4:35 PM

Chris
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>                              Sat, Feb 12, 2011 at 1:55 PM
To: Donald Raggio <donald.raggio@gmail.com>

Still investigating. It will take awhile I think to be sure. the
suspect could have been using mybitcoin or something. Then we can't be
certain it came from him.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                    Sat, Feb 12, 2011 at 2:20 PM
To: Jed McCaleb <admin@mtgox.com>

Theymos said something about asking "Mybitcoin,, Vekja, and other EWallet services whether they own any of these
addresses.".

Is sending inquiries to those sites a wise next step in yourinvestigation? thanks for looking into this for us.

Chris (for Don)


On Feb 12, 2011, at 1:55 PM, Jed McCaleb <admin@mtgox.com> wrote:

---

**Jed McCaleb** <admin@mtgox.com>                              Sat, Feb 12, 2011 at 2:34 PM
To: Donald Raggio <donald.raggio@gmail.com>

Yeah I'm asking them...
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                       Thu, Feb 17, 2011 at 1:32 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,

I was wondering if it was safe to use the account for trading or if you would recommend a new one (the password has been
changed)?  Also have you found anything more out about the stolen ones?  Is the suspect's account still frozen?

Thanks,

Chris (for Don)


[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>                              Thu, Feb 17, 2011 at 4:42 AM
To: Don Raggio <donald.raggio@gmail.com>

You can use your account as long as you have a new password. Still
working on determining if this is absolutely the right guy, His
account is frozen.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                       Tue, Feb 22, 2011 at 8:43 PM
To: Jed McCaleb <admin@mtgox.com>

RAGGIO  00041

2/28/2014 4:35 PM

Saw this posted on the forums. I don't know if this is the same guy but I thought you might want to see it if you haven't already.
http://www.bitcoin.org/smf/index.php?topic=3712.0

http://www.bitcoin.org/smf/index.php?topic=3712.msg52648#msg52648

Thanks for investigating this.    Good luck.

Chris (for Don).
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                        Wed, Feb 23, 2011 at 7:36 PM
To: Jed McCaleb <admin@mtgox.com>

http://www.bitcoin.org/smf/index.php?topic=3712.msg53798#msg53798

I'm guessing this is the guy.   He mentions having the same amount of BTC that was stolen from the account.

Chris (for Don)

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                                     Thu, Feb 24, 2011 at 9:20 PM
To: Jed McCaleb <admin@mtgox.com>

Saw your post on the forum

wow 16 pages!

Guys I really don't want to go into details about this until it is resolved. If baron is in fact a scammer the less he
knows about what I know the better.
I'm still talking to baron and trying to get to the bottom of this.

Thanks for working on this Jed.   I didn't know this would get to be such a big deal in the community.   Can you
please keep our names from being associated with this once it is resolved?   Please dont use our real name.   From
reading the forum I fear retaliation even though we are the victims.

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>                                              Thu, Feb 24, 2011 at 9:26 PM
To: Donald Raggio <donald.raggio@gmail.com>

Yeah it is pretty annoying that it is on the forum.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                        Thu, Mar 24, 2011 at 8:58 PM
To: theymos <theymos@mm.st>

Theymos,

I think Jed found the thief (Baron) but Mark (the new owner of Mt Gox) said he isn't able to complete his investigation yet and it has
been put on hold due to events in Japan.   Thanks for providing the information from the address history.   I appreciate the work you
and Jed put into tracking it down.    It did help track down the thief.   It's up to Mark to see if we are able to recover the stolen BTC.

RAGGIO   00042

                                                                                                2/28/2014 4:35 PM

On Thu, Feb 10, 2011 at 2:01 PM, theymos <theymos@mm.st> wrote:
[Quoted text hidden]

---

**theymos** <theymos@mm.st>                                                Thu, Mar 24, 2011 at 9:09 PM
To: Don Raggio <donald.raggio@gmail.com>

Glad I was able to help! I hope you get your money back.

On Thu, 24 Mar 2011 20:58 -0500, "Don Raggio" <donald.raggio@gmail.com> wrote:

> Theymos,
>
> I think Jed found the thief (Baron) but Mark (the new owner of Mt Gox) said he isn't able to
> complete his investigation yet and it has been put on hold due to events in Japan.   Thanks
> for providing the information from the address history.   I appreciate the work you and Jed
> put into tracking it down.   It did help track down the thief.   It's up to Mark to see if we
> are able to recover the stolen BTC.

---

**Don Raggio** <donald.raggio@gmail.com>                                   Fri, May 20, 2011 at 9:58 PM
To: theymos <theymos@mm.st>

Theymos

It looks like there is a new transaction in Block Explorer dated 4-28.  Do you make anything of it?

| a01c1b8281 .. | Block 120711 (2011-04-28 20:34:02) | 3096.93 | Sent: Address | • 1MDphepGhrLrUDRUkhpHHGGd4mGsSs w94<br>• 1MeEDTHiSA1n1x6s9hM6qjPzs1x6vb4Y5j | 6309.4 |

Chris (for Don)
[Quoted text hidden]

---

**theymos** <theymos@mm.st>                                                Fri, May 20, 2011 at 10:40 PM
To: Don Raggio <donald.raggio@gmail.com>

The scammer sent 2000 BTC to an address, and that address sent 200,000 BTC to MtGox:
I'm pretty sure 1MqsE... is a MtGox address. You should inform Mark about this new
development. The person who made that 200,000 BTC MtGox deposit is either the scammer
or someone who delt with him directly.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                                Fri, May 20, 2011 at 11:56 PM
To: Mark Karpeles <admin@mtgox.com>

Mark,

Here is some more information.  Can you do anything?

RAGGIO   00043
                                                                          2/28/2014 4:35 PM

Chris (for Don)

Begin forwarded message:

> **From:** "theymos" <theymos@mm.st>
> **Date:** May 20, 2011 10:40:08 PM CDT
> **To:** "Don Raggio" <donald.raggio@gmail.com>
> **Subject: Re: account funded by wire**

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                    Sat, May 21, 2011 at 10:40 AM
To: theymos <theymos@mm.st>

I sent Mark an e-mail.   I'll let you know what his response is.

Chris (for Don)

[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                    Sat, May 21, 2011 at 11:00 AM
To: Donald Raggio <donald.raggio@gmail.com>

Hi,

Based on what I can see, there is not much I can do at this point. Those address do not match addresses used on mtgox (and we had no such large deposit).

Mark
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                    Sat, May 21, 2011 at 11:26 AM
To: theymos <theymos@mm.st>

I guess we can keep an eye on it.   I believe what he is doing is trying to get a judgement implicating the frozen funds with the theft so that they may be returned.

That's a humongous deposit.   I wonder who has it.   That's bad that the stolen money is now associated with it if I understand this correctly.

Chris (for Don)

Begin forwarded message:

> **From:** Mark Karpeles <admin@mtgox.com>
> **Date:** May 21, 2011 11:00:57 AM CDT
> **To:** Donald Raggio <donald.raggio@gmail.com>
> [Quoted text hidden]

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                    Sun, May 22, 2011 at 7:07 PM
To: Mark Karpeles <admin@mtgox.com>

RAGGIO  00044

2/28/2014 4:35 PM

Gmail - Re: account funded by wire                                        https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

All right we'll keep an eye on it.    Otherwise we will just wait and see how the "legal processing" rules with respect to the funds that
were frozen in connection with the theft.

Chris (for Don)

[Quoted text hidden]

Don Raggio <donald.raggio@gmail.com>                                           Fri, Dec 23, 2011 at 10:17 PM
To: theymos <theymos@mm.st>

Theymos,

When we last communicated the stolen bitcoins were associated with1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh.  Now they
appear to have been transferred to other addresses.  Seems like Mt. Gox addresses but I'm not certain.

Chris (writing for Don)

On Thu, Feb 10, 2011 at 2:01 PM, theymos <theymos@mm.st> wrote:
[Quoted text hidden]

theymos <theymos@mm.st>                                                        Fri, Dec 23, 2011 at 10:46 PM
To: Don Raggio <donald.raggio@gmail.com>

Yes, the funds do end up at MtGox eventually. I can't tell whether they're being sent to
MtGox right away or if they were sold and then sent to MtGox, though.

You should let Mark know about this.

On Fri, Dec 23, 2011, at 10:17 PM, Don Raggio wrote:

> Theymos,
>
> When we last communicated the stolen bitcoins were associated
> with1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh.  Now they appear to have been
> transferred to other addresses.  Seems like Mt. Gox addresses but I'm not certain.

Don Raggio <donald.raggio@gmail.com>                                           Sat, Dec 24, 2011 at 1:33 AM
To: Mark Karpeles <admin@mtgox.com>
Cc: theymos <theymos@mm.st>
Bcc: djraggio@gmail.com

Hi,

I want to make you aware of these transfers associated with the following bitcoin address:

1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh

Chris (for Don)

Chris (for Don)
[Quoted text hidden]

Gmail - (no subject)                                  https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...



Don Raggio <donald.raggio@gmail.com>

## (no subject)
20 messages

---

**Jed McCaleb** <admin@mtgox.com>                              Sat, Feb 26, 2011 at 9:33 AM
To: Don Raggio <donald.raggio@gmail.com>

Hi Chris,
Can you think of a way that the thief would have gotten your mtgox
username? Because he would have needed that before he did the
dictionary attack.
It looks like at the very least this guy is going to give your coins
back. I want to wait longer though to gather more evidence if he is in
fact related to other fraud that has happened on the site.
Thanks,
Jed.

---

**Don Raggio** <donald.raggio@gmail.com>                       Sat, Feb 26, 2011 at 12:37 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

 I don't know but I'll try to let you know what I have thought about.   The first thought when it happened was to suspect
a keylogger. You made a good point when you said most people who spy with those wouldn't know about Mt. Gox but
I couldn't think of any other possibility and thought maybe they learned about Mt. Gox through the keylogger.   I ran
several products but nothing malignant was detected. One of those products is called Spyshelter premium.   The other
possibility is that thief through a keylogger of other means was able to access my gmail account but I didn't  detect
any intrusion there based on the IP log.   I should have picked a different username based on a psuedonym not one
so closely related to the email account name.   On Mt. Gox I'll set up a new account under different name for future
use.  That's as much information as I have.   If I think of anything else I'll let you know.  If you have any advice
regarding on security or could refer me somewhere I'd love to hear it.  Like what secure e-mail providers to use.
Strong password generators.  Protection against phishing, keyloggers. Etc.  Maybe this would be a good thing for all
users to read so they can do their part to protect themselves and Mt. Gox from scammers.    Please let me how you
want to proceed from here with regard the coins and what other steps you feel necessary to resolve this.

Thanks,
Chris (for Don)
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                       Sat, Feb 26, 2011 at 3:19 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

 Obviously I'd like the coins returned as soon as it is possible but it sounds like they have some value to in terms of
conducting your investigatoin into further fraud on the site.   ???   Let me know how you want to do this.  Also  If and
when it is possible to return the coins I'm guessing we should use an alternate BC address?  If I pick a new address
will it link back to my wallet?  Should I create a new wallet on another machine?  I'm sure people on the forum are
watching that address the scammer used.

Chris (for Don)

On Sat, Feb 26, 2011 at 9:33 AM, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

1 of 6                                      RAGGIO  00046                          2/28/2014 4:19 PM

**Donald Raggio** <donald.raggio@gmail.com>                              Sat, Feb 26, 2011 at 7:52 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

Thanks for your help.   Youve done more than we expected tracking down the coins and unexpectedly having to put
up with a lot of annoying chatter on the forums.   I asked Don and we still don't know how he would have gotten the
username.   We don't have reason to believe anyone we know personally would have gotten the username.   We don't
know how the thief would have gotten it.    Wish we could shed more light on it.

Chris
[Quoted text hidden]

**Don Raggio** <donald.raggio@gmail.com>                                 Sat, Mar 5, 2011 at 3:46 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

   What's the status of the stolen coins?  Did you find out how the thief got the username?  Shouldn't we pick another
username to trade now that that part of the account has been compromised?   Thanks for your help.

Chris
[Quoted text hidden]

**Don Raggio** <donald.raggio@gmail.com>                                 Sat, Mar 5, 2011 at 8:57 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

Just saw on the forums that you are transferring Mt. Gox.   Thanks for creating Mt. Gox and eDonkey among your
other efforts.   BTC wouldn't be where it is without your efforts.   I know this growth has been exciting.   It
was "annoying" to say the least that  some scammer that tried to create a bunch of problems for all of us. I guess that
is a part of the growth.  Can't wait to see Bitcoin hit $10.

Chris

[Quoted text hidden]

**Donald Raggio** <donald.raggio@gmail.com>                              Sun, Mar 6, 2011 at 10:22 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,

I know you got a lot on your plate.   Do I keep talking to you or do I talk to the new owner regarding recovery of the
stolen BTC?

Chris
[Quoted text hidden]

**Jed McCaleb** <jed@mtgox.com>                                          Mon, Mar 7, 2011 at 7:19 AM
To: Mark Karpeles <admin@mtgox.com>, donald.raggio@gmail.com

RAGGIO  00047

Hi Chris,
Yeah Mark is the new owner and he will handle getting your coins back.
It will still take awhile though since he has to wait to be sure baron
is bluffing about suing us etc.
Thanks,
Jed.

On Sun, Mar 6, 2011 at 11:37 AM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                    Tue, Mar 8, 2011 at 3:29 PM
To: Mark Karpeles <admin@mtgox.com>

Hi Mark,

I hope you are able to complete your investigation and return the coins.  If for some reason you have to take your
case public please respect our privacy wishes if possible by redacting our names or giving us a pseudonym.  We don't
want the "bad guy" to victimize us once again.   Best wishes for Mt Gox, your company, and hope to be using your
services in the future once this is cleared up.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                    Mon, Mar 14, 2011 at 7:50 AM
To: Mark Karpeles <admin@mtgox.com>

Mark,

    I'm sure you are busy but I wanted to check in to see if there
were any developmetnts with regard to stolen coins.    Thanks for
handling this for us.


Chris (for Don).


On Mar 7, 2011, at 7:19 AM, Jed McCaleb <jed@mtgox.com> wrote:

[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                    Mon, Mar 14, 2011 at 4:18 PM
To: Don Raggio <donald.raggio@gmail.com>

Hi,

We are currently trying to escalate the issue to obtain a judgment that would tell us what to do with the stolen coins.
We cannot just return them based on a decision taken on our own.

This might however take longer than expected as we have had a little problem here in Japan, and most not urgent
requests were delayed to may.


Thanks,
Mark
[Quoted text hidden]

---

Page32

**Don Raggio** <donald.raggio@gmail.com>                    Thu, Mar 24, 2011 at 11:50 AM
To: Mark Karpeles <admin@mtgox.com>

Mark,

Hope things get back to normal in Japan.  Thank you for working to return the stolen coins to us.   Please keep us
updated.

Thanks,

Chris (for Don).

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                    Thu, Mar 24, 2011 at 8:15 PM
To: Mark Karpeles <admin@mtgox.com>

Mark,
Is Baron still willing to hand the bitcoins over or do we have to wait for the "judgment?"  Thanks

Chris (for Don)

On Mon, Mar 14, 2011 at 4:18 PM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                    Thu, Mar 24, 2011 at 11:01 PM
To: Don Raggio <donald.raggio@gmail.com>

Hi,

Baron is requesting access to his funds and do not want to hear anything else for now. Recent problems in Japan
have put a hold on most legal processing, which are reported to "later this year". I really cannot provide any ETA right
now.

Mark
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                    Fri, May 20, 2011 at 9:57 PM
To: Mark Karpeles <admin@mtgox.com>

Mark,

Did you every resolve the issue with the stolen BTC?  It looks like there is a new transaction in Block Explorer dated
4-28.

| a01c1b8281... | Block 120711 (2011-04-28 20:34:02) | 3096.93 | Sent: Address | • 1MDphepGhrLrUDRUkhpHHGGd4mGsSsw94<br>• 1MeEDTHiSA1n1x6s9hM6qjPzs1x6vb4Y5j | 6309.4 |

Chris (for Don)

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                    Mon, Aug 1, 2011 at 10:55 AM
To: Mark Karpeles <admin@mtgox.com>

Mark,

   Have you heard anything about the situation with Baron or the case recently?   I know a lot has happened since March.  I was wondering if you could update me on the situation.  If there is a docket number or equivalent can you supply it to us so that we can follow the case.

Thank you,

Chris (for Don).

On Mon, Mar 14, 2011 at 4:18 PM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                                    Mon, Aug 1, 2011 at 11:31 AM
To: Don Raggio <donald.raggio@gmail.com>

Hi,

There will be no judgment done in Japan before 2012 on that case: courts give priority to earthquake/tsunami related cases, and this "Baron" guy is 100% anonymous and we have no way to get in touch with him, and he never sent us any legal document (plus, the passport he submitted was altered), so the only way to make a fair judgment is to give him time (one year) to speak for himself.


Mark
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                    Mon, Aug 1, 2011 at 8:35 PM
To: "Chris.raggio@gmail.com" <Chris.raggio@gmail.com>

  [Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                                    Mon, Aug 1, 2011 at 8:46 PM
To: djraggio@gmail.com



Begin forwarded message:

   **From:** Mark Karpeles <admin@mtgox.com>
   **Date:** August 1, 2011 11:31:15 AM CDT
   **To:** Don Raggio <donald.raggio@gmail.com>
   **Subject: Re:**


   [Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                    Tue, Dec 20, 2011 at 12:50 AM
To: Mark Karpeles <admin@mtgox.com>
Bcc: djraggio@gmail.com

RAGGIO  00050

2/28/2014 4:19 PM

Hi,

January 10, 2012 will mark the one year anniversary of our loss.  It was on that day Jed McCaleb froze the hacked Mt. Gox account to prevent further unauthorized withdrawals.

*On Mon, Jan 10, 2011 at 4:51 AM, Jed McCaleb <admin@mtgox.com> wrote:*
*Yeah I froze the account and I'm logging all IP's on login now but you*
*should change the password back to the one that they have so they are*
*able to login still so we can see what their IP is.*

It seems plain that "Baron" is not going to speak for himself (assuming that "Baron" refers to a "him.")  My father and I are real people.  We both work for living.  We don't hack or steal.  We don't hide behind aliases or altered passports. Jed can attest to this.  I have had many conversations with him and we have had the pleasure of meeting in real life.

We are asking that the coins stolen from my father's Mt. Gox account be returned.   If you need us to help in any way let us know what we can do.  This is important for us but also for the confidence of the Bitcoin community as a whole.

http://coinbits.com/note/mt-gox-acquires-bitomat-pl-reimburses-lost-bitcoins-bitcoin/


Chris and Don Raggio


"The root problem with conventional currency is all the trust that's required to make it work," Satoshi Nakamoto
[Quoted text hidden]

RAGGIO  00051

2/28/2014 4:19 PM

| From: | baron@contractor.net |
|---|---|
| Sent: | Wednesday, February 23, 2011 4:21 PM |
| To: | admin@mtgox.com |
| Subject: | solution |

"There is pretty strong evidence that this guy was involved in some theft of BTC. I'm trying to talk to him to make absolutely certain."

it was hard to say to me this real reason?

I want to forget this situation and save my nerves.
I agree to return that money(3000 USD, because I received 9000 BTC in that time rate was about 0.30/btc) to bitcoin member from which was stoled funds, because it's too small amount to waste my and I think yours time. I am holding my BTC ( not withdrawing , or exchanging ) to do this, everytime I am ready to send money, Just tell me where. Or I can send to your bitcoin , so when you will firgure out , what is what, you will have from where return stolen money.

I think it's right decision .

You must understand that I make money from money, so my blocked money not making any money, so I am loosing money every day.

Do you agree?

| From: | Mark Karpeles <mark@tibanne.com> |
|---|---|
| To: | Jed McCaleb <admin@mtgox.com> |
| Sent: | 1/28/2011 10:45:05 AM |
| Subject: | Re: Re: |

Hi,

I can understand your worries, however having mtgox working with only a fraction of the amounts being exchanged might be problematic too.

By taking over mtgox, one of the first step will be to define terms & conditions defining exactly how the users are insured, and what they can do if (for example) someone manages to exploit problems in the site.

This means also that I need to be 100% sure we will be able to answer any withdraw request from someone who deposited anything. Any problem on this side might have a desastrous effect not only on mtgox, but on the whole bitcoin economy itself (ie. the moment when people understand the world is not all pink and get scared).

Anyway I both understand your worries (just giving up mtgox to someone you never met) and mine (taking the resposability of a site without having the whole lot of stuff received by people).
I haven't found any solution that would solve both problems at the same time yet, but I'm still thinking about it.

If you have any idea regarding that please let me know.

Also a loss of $50k even before starting is rather large, especially considering what I could read in the mtgox presentation.

Anyway I'm tired, it's 00:45 here, I'll think more tonight and will reply again tommorow.

Mark

PS: As for the framework no problem, I have plans if things go smootly to adapt mtgox on the framework we use here :)

Le vendredi 28 janvier 2011 à 10:10 -0500, Jed McCaleb a écrit :
> Hi Mark,
> I'm trying to think of the best way to handle the transfer.
> I guess I should hold a lot of the BTC and $ in reserve for some
> amount of time. Right now I only keep 1/3 of the BTC on the server
> anyway to limit the exposure if something terrible goes wrong. And
> deposits always are greater than withdrawals so there is a
> considerable buffer of both cash and BTC.
>
> Also there was a hacking incident since we started talking. Someone
> was able to take about $50k in LR. The problem was that LR allows
> multiple transactions in their call to
> https://api.libertyreserve.com/xml/transfer.aspx and I wasn't checking
> that the LR account name they gave was valid. So they would just close
> the current transaction and start another. Basically like a SQL
> injection attack. Obviously a big mistake on my part.
> I know now you probably wonder if the whole site is riddled with bugs.
> I like to think I'm pretty careful about this type of thing and there
> is nothing like this left in there. And I know this guy was hacking
> around on the site trying various things for a month or so. So that is
> some indication that there is nothing this bad on there.

SRC05946

```
>
> The loss of the 50k although a lot of money shouldn't actually be an
> issue as long as deposits continue to be greater than withdrawals. We
> can just let the loss ride until the site either makes it or not.
> And maybe you know some crafty way to track these guys down. The two
> IPs they used seem static. The machines both respond to pings.
>
> Also I don't know if I mentioned but the site is built on this php
> framework called lithium.
> Jed.
>
>
> On Mon, Jan 24, 2011 at 1:28 PM, Jed McCaleb <admin@mtgox.com> wrote:
> > Hi Mark,
> > So here is what I'm thinking:
> > No cash upfront.
> > I get 50% of revenue for 6 months or until I get $60k whichever is greater.
> > 12% of the company you form to hold mtgox.
> > How does this sound?
> > Thanks,
> > Jed.
> >
```

SRC05947

**From:**      Jed McCaleb <jed@mtgox.com>
**To:**        Mark Karpeles <admin@mtgox.com>
**Sent:**      4/28/2011 9:33:07 AM
**Subject:**

I can't tell how big an issue it will be to be short 80k BTC if the
price goes to $100 or something. That is quite a bit to owe at that
point but mtgox should have made a ton of BTC getting to there. There
is also still the fact that the BTC balance will probably never fall
below 80k. So maybe you don't really need to worry about it.
There are 3 solutions I have thought of:
- Slowly buy more BTC with the USD that Gox Bot has. Hopefully you
would fill up the loss before the price got out of hand.
- Buy a big chunk of BTC (really just moving the BTC debt to the USD
side) If BTC goes up this is a huge win. Problem is there isn't enough
BTC for sale on mtgox. Maybe you could find someone on the forum to do
it?
- Get those crystal island people to invest. They have 200+ BTC so
they could fill in the gap.

Maybe you could just mine it?

SRC11778

| | |
|---|---|
| **From:** | Jed McCaleb <jed@mtgox.com> |
| **To:** | Mark Karpeles <admin@mtgox.com> |
| **Sent:** | 4/30/2011 8:13:49 AM |
| **Subject:** | |

Can you start tracking the daily or every 4 hour usd/btc balance:
select sum(usd)/1000,sum(btc)/1000 from Users;
It would be good to know how the site balance is changing.
I'm guessing the level of BTC might actually go down as the price
rises since I think the site will have a balance around the current
price ratio. So if the price goes to $10 (which it seems like it will
do soon given the rate of deposits). We would need to hold 3.4 million
USD to justify the current level of BTC. Maybe that is reasonable
actually but I could easily imagine only 1 mil in deposits and 100k in
BTC which is very close to the danger zone.

Oh if you implement options it will be easier to hedge this btc95k
loss without having to spend $300k now.

SRC11912

**From:**        Jed McCaleb <jed@mtgox.com>
**To:**          Mark Karpeles <admin@mtgox.com>
**Sent:**        7/1/2011 3:42:13 PM
**Subject:**

```
Please, please give me a way to wake you up.
I promise only to do it if I'm sure the site is broken.
I won't drunk dial you.
```

SRC12680

**From:**        Jed McCaleb <jed@mtgox.com>
**To:**          Adam <adam@mtgox.com>;Mark Karpeles <admin@mtgox.com>
**Sent:**        7/2/2011 1:32:06 PM
**Subject:**

Site is screwed again.
Are you just intent on burning this thing to the ground? Why do you
refuse to give me or someone in a different timezone a way to wake you
up?

SRC12692

| | |
|---|---|
| **From:** | Jed McCaleb <jed@mtgox.com> |
| **To:** | Mark Karpeles <admin@mtgox.com> |
| **Sent:** | 7/2/2011 4:42:51 PM |
| **Subject:** | |

It was stuck at 15.50. You couldn't place a sell order below that.
Extremely annoying if you just made a bet that the price will drop.
Seems to be working now. Maybe you woke up and fixed it or maybe not
who knows since you don't communicate.
Jed.

SRC12697

| | |
|---|---|
| From: | Jed McCaleb <jed@mtgox.com> |
| Sent: | 7/2/2011 5:02:25 PM |
| Subject: | |

Mark,
I wanted to talk to you on the phone about all this since it will be much quicker but whatever

You guys are fucking this up so big time.
Before the hack mtgox was on pace to be easily worth $30 million dollars. Much more if it
continued to grow along with bitcoins. Now that has all changed obviously.
You are extremely lucky that tradehill kinda sucks and camp BX isn't ready yet. But that
window is closing soon. There will be an e

Mark,
My balance, Other people's balance
Re-Design.
Camp BX
Hire people damit. It is really embarassing to say you have 2 people on staff.
Blame issues
you slaming the code
This was a prototype so I could see if I liked lithium.
I wrote it in 2 weeks
PR fuck ups:
Only communicating in IRC
Allowing withdrawing before issuing the Press Release
Never updating the status
Not handling the volume of email
That interview with onlyoneTV
Proving you hold the bitcoins on IRC
Did you do simple things like mail all the large account holders to reassure them? 20 people
probably hold 50% of the funds on the site
TOS for the site
Posting how the exchange is regulated
Getting a team together. It is crazy to run a 30million dollar business by yourself. You need
to decide what role you want in the company. CTO, CEO, Lead programmer etc.
In the meantime I can help you get a lot of this stuff going:
Design
Finding a CEO
Finding more programmers
Finding a Designer
Getting someone to security Audit the site
TOS for the site
Get the 4million in a money market account so it is making interest
Talk to lawyers in the US
Got to get volume back up
Make sure everyone has reclaimed their account
Put out the press release
Get the websocket working again


Good luck with the company,
Jed.

SRC12698

**From:**      Jed McCaleb <jed@mtgox.com>
**Sent:**      Tuesday, December 06, 2011 10:09 PM
**To:**        Mark Karpeles
**Subject:**   Re: EARNOUT


> As for sending you $263,431.00 it should be fine, as long as you
> accept the fact we may be required to ask funds back once the
> accounting is completed, in April.
Yes that is fine.

I'd rather receive this money in 2012. So a wire in the first days of January would be great.
Thanks Mark,
Jed.

On Mon, Dec 5, 2011 at 6:13 PM, Mark Karpeles <admin@mtgox.com> wrote:
> Hi,
> Unfortunately it is not possible for us to cover the loss of funds
> directly taken from an account. Whatever the reason may be, your
> account has been accessed directly and funds were withdrawn out of it.
> Should you need funds to be located you need first to do a police
> declaration stating the exact loss, and send us a copy so we can start an investigation here.
> Those conditions are the same for everyone, and we cannot make
> exceptions until most of our biggest investigations are completed.
> Once we get the police reports we'll be able to submit the account
> informations to the appropriate law enforcement agency, and possibly
> get the insurance to refund the lost funds.
> As for sending you $263,431.00 it should be fine, as long as you
> accept the fact we may be required to ask funds back once the
> accounting is completed, in April. We won't know the exact amount
> until we complete the whole accounting, which we had to re-do from
> zero due to the fact it needs to be done in a specific way for
> compliance with US, EU, JP, HK and other international laws.
> Please note that all the funds we are sending are subject of
> investigation for now, with FinCEN looking closely at our activity,
> and preventing move of funds to accounts suspected of illegal
> activity. We are working on solving this issue and expect a ruling
> that would clear us of money laundering within the next months.
>
> While I'm not considering the BTC stolen from the rooted box to be
> required to be paid by you, it is not up to me to decide. There is a
> criminal investigation in progress to locate those BTC. I don't know
> how long it'll take, but it's moving forward.
>
> Mark
>
> On Tue, Dec 6, 2011 at 3:00 AM, Jed McCaleb <jed@mtgox.com> wrote:
>>
>> Hi Mark,
>> You need to pay me the earnout.

1

\>> I have been very patient and have waited months beyond when this was due.
\>>
\>> I know you said you want to wait to see how much I still owe the
\>> company from the chase account.
\>> This is taking too long and I also reduced the amount of cash in my
\>> mtgox account when you took over to be the approximate value of what
\>> I still owed from chase. So I don't think I owe you much more.
\>> Once your accounting is done and you determine how much I still owe
\>> you can take it from my mtgox account.
\>>
\>> In the meantime you need to pay me:
\>> $263,431
\>> + 2995 BTC (What was lost during the hack from my mtgox account)
\>> + 145 BTC (What was lost during the hack from my fivegrinder account)
\>> I'll send you the wire information tomorrow.
\>>
\>> I don't think the BTC that was stolen when the box was rooted should
\>> come out of my earn out for the following reasons:
\>> The contract between us was already signed.
\>> You had root access to the box at that point The terms of this sale
\>> are already extremely favorable to you. You are getting such a good
\>> deal as it is.
\>>
\>>
\>> Thanks,
\>> Jed.
\>
\>

2

**From:**     Jed McCaleb <jed@mtgox.com>
**Sent:**     2/1/2012 11:39:15 AM
**Subject:**  IMPORTANT

Hi Mark,
I'm going to try one last time to get through to you.

You are holding mtgox back.

You are fucking up the company.

You are incompetent as a manager.

Anyone I have talked to that knows anything about mtgox says the same thing:
Roger Ver
Jesse Powell
Andrew Lee
Steve DeProspero
Adam Turner
Any customer of yours

You don't listen to what anyone says. You are incapable of delegating authority so nothing gets done. Haven't you noticed how many people are upset with you? Do you think you are doing a good job?

Please,please, please step down as CEO and find someone else to run the company.
Mtgox won't be around in a year if you don't do this.

I'm sure you are a good programmer but this doesn't make you a good manager. You clearly don't know how to run a business. It is ok to admit that.

If it is a pride thing you can still be the face of the company but you have to give control to someone else.

If you won't take the advice of literally *everyone* around you, then please make an offer for the 12% I still own. Serious I want to sell them make me an offer.

Thanks,
Jed.

SRC13552

| | |
|---|---|
| **From:** | Mark Karpeles <mark@tibanne.com> |
| **To:** | Jed McCaleb <jed@mtgox.com> |
| **Sent:** | 2/1/2012 6:41:03 PM |
| **Subject:** | Re: A request regarding your ID |

Hi,

Just so you may know, we've spent ~4 million yen a month during the past 3 months to progress on getting legal. This progress will allow us to display a healthy business and bring in investors without fear to see the business closed the next day by a police raid. Our operating cost for the past year is far from $788k, however it'll get close to that once we finish what we are doing right now.

Now, the fact is, by its concept, MtGox acts as a money transmitter under US, EU, Japanese, Hong Kong, Australian and by law of most countries. This means that since its very beginning, MtGox has been operating illegally and allowing operations which shouldn't have been allowed (for example, allowing people to sell bitcoin or to withdraw is illegal).

This spending is not scheduled to go on forever, however running costs will increase (we need to hire 5~20 people by the end of 2012 to be operating legally, including auditors), but it is expected that the resulting company image will also increase quite a lot.

None of the candidates I saw for director had enough knowledge of international laws, banking laws and every single rule related to the business being run here. Some were ready to run MtGox as an illegal business by moving it to unregulated tax haven and control it from there. This would however be a major setback for Bitcoin, and not going to bring much business. The things we are doing right now will however most likely see someone else sitting as director, someone with experience in running a bitcoin exchange. I'll give more details once things gets clearer.

Anyway the business is being restructured to fit the requirement of acting legally, with proper auditing, and jobs for everyone. We've had a few setbacks and lost investments (Andrew is one), however things are globally moving in the right direction, including in terms of bringing investments.

Mark

2012/2/2 Jed McCaleb <jed@mtgox.com>
Holy shit I just saw this: https://mtgox.com/press_release_20120201.html
Are you guys really spending $788k a year!
What on earth are you doing?

Mark I'm sure you are a smart guy and a good programmer. But you
really really need to find someone that is a competent manager. Anyone
I've talked to that knows anything about mtgox says the same thing.
Please just ask anyone that works there what would help the company
run better. I'm sure they will all say that you need to delegate some
authority. You are the bottleneck for everything. It is really holding
the company back.
Andrew was telling me he saw you making the freaking yubikeys while he
was there! A completely mindless activity that you could easily have a
support person do.
Anyway I could go on and on about things that are messed up but it
seems pointless since the other issue is you don't listen to anyone.

SRC13555

Haven't you noticed how many people are upset with you? Do you think
you are doing a good job?

Jed.


2012/1/30 Jed McCaleb <jed@mtgox.com>:
> Well I'm still waiting for a P&L sheet from you guys. I just need what
> your expenses are vs what your revenue is. Without this it is
> impossible to put a value on the shares. or just make me an offer.
> Jed.
>
> 2012/1/30 Mark Karpeles <mark@tibanne.com>:
>> Hi,
>>
>> How much would you be willing to sell 15 of your 60 shares for?
>>
>> We can also do the transfer instead, just need some paperwork and signature
>> from both you, as donator, and the receiver of shares.
>>
>>
>> Mark
>>
>>
>> 2012/1/31 Jed McCaleb <jed@mtgox.com>
>>>
>>> Hi guys,
>>> The better solution is to transfer 3% of the shares to:
>>> Dawn Mi Soon Burzlaff
>>> 3037 Deakin
>>> Berkeley CA 94705
>>>
>>> That way you can avoid giving them my ID.
>>>
>>> Even better than that would be for mark or mtgox to buy 3% (or more) from
>>> me.
>>> Thanks,
>>> Jed.
>>>
>>> 2012/1/29 momoko asai 浅井桃子 <momoko@tibanne.com>:
>>> > Hello Jed,
>>> >
>>> > I want to ask if it is okay with you that we (MTGOX) submit your ID
>>> > (copy of your passport) to HSBC Australia. It is required to submit all
>>> > the IDs of 10%~ shareholders of our company in order to open an account
>>> > at the bank.
>>> >
>>> > Please let me know if you are ok with that.
>>> >
>>> > We really appreciate your understanding and cooperation.
>>> >
>>> > Thank you very much,
>>> >
>>> > Momoko

SRC13556

```
>>> > --
>>> > =========================================
>>> > Momoko Asai
>>> >
>>> > TIBANNE Co.,Ltd.
>>> >
>>> > Cerulean Tower 15F, Sakuragaoka-cho 26-1,
>>> > Shibuya-ku Tokyo, Japan 150-8512
>>> >
>>> > Tel: 03-4588-3921
>>> > Fax: 03-4588-3915
>>> > -----------------------------------------
>>> > 浅井桃子(あさい ももこ)
>>> >
>>> > 株式会社 TIBANNE(ティバン)
>>> > 〒150-8512　東京都渋谷区桜丘町26-1
>>> > セルリアンタワー15F
>>> >
>>> > Tel: 03-4588-3921
>>> > Fax: 03-4588-3915
>>> > =========================================
>>
>>
```

SRC13557

**From:** IMCEAEX-
_O=UMMC_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPD
LT+29_CN=RECIPIENTS_CN=CRAGGIO@umc.edu
**To:** djraggio@gmail.com ,draggio@umc.edu
**Subject:**
**Date:** Wed, 15 Dec 2010 07:44:19 +0000

One day, while I was learning about cipherspace, I discovered BitCoin
<http://en.wikipedia.org/wiki/Bitcoin> .  BitCoin is a completely
decentralized, anonymous online monetary system that relies on a distributed
database to facilitate transactions.  The creator put a great deal of effort
into ensuring that the system is secure and reliable.  Unfortunately, there
are no real assets backing he currency of BitCoin (and no coercive government
backing it either).  Thus ends BitCoin.

I can imagine, though, a system like BitCoin that allows people to write
promissory notes and sign them with an RSA digital signature (to prevent
couterfeiting).  These promissory notes could be backed by gold, silver, fiat
currencies, stocks and bonds, or pretty much anything.  Then, these notes
could be transfered from one person to another anonymously.

Couple this with an ebay-like service that allows people to swap these
virtual currencies.  Say, for example, that I have a gold note issued by a
bank in South Africa.  Since taking delivery of the gold could be a problem,
I trade my notes for notes issued by a bank in U.S.A.  Then, I can redeem
those notes and have them FedEx me the gold (insured, of course).

This system would be Fed-proof, IRS-proof, FBI-proof and judgment-proof.
This system would protect the users against monetary inflation, making it
Fed-proof.  Since nobody has a bossman ratting out their earnings, it is IRS-
proof.  It is FBI and NSA proof because all transactions are encrypted and
anonymous.  And, most importantly, it is judgment-proof because it is
perfectly legal.

There are, at present, no laws that could be used to criminalize what I
propose.  Laws against money-laundering, for example, do not apply because
there is no way to prove that the money came from an illegal source, such as
drug dealing.  Laws against tax-evasion do not apply either, because no taxes
have ever been levied on imaginary currency.  In addition, if you had your
day in court, you could defend yourself on First Amendment grounds.  Besides,
international free trade agreements also have generous loopholes.

So what we are dealing with is anarcho-capitalism and wildcat banking on a
global scale.  If not for my non-existant programming skills, I'd be forking
a new project off BitCoin right now.

Anybody here know C++?


Sent from my iPhone

RAGGIO00341

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO                                              PLAINTIFFS
DR. CHRIS RAGGIO

VS.                                                    CIVIL ACTION NO. 14-71

MTGOX a sole proprietorship;
MTGOX, Inc., a Delaware corporation;
MT.GOX KK, a Japanese corporation;
TIBANE KK, a Japanese corporation;
MUTUM SIGILLUM, LLC a Delaware limited Liability Company;
CODE COLLECTIVE, LLC a New York limited liability company;
JED McCALEB, an individual;
MARK KARPELES, an individual;
JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5               DEFENDANTS

### AFFIDAVIT OF CHRIS RAGGIO

STATE OF MISSISSIPPI
COUNTY OF HINDS

I, Chris Raggio, being duly sworn, deposed and says:

1.      I am one of the Plaintiffs in the matter of Donald Raggio and Chris Raggio vs. MTGOX,

et. al, In the Circuit Court of Hinds County, First Judicial District, Cause No. 14-71, and I have

personal knowledge of the facts set forth in this affidavit.

2.      In December 2010, I opened an account (hereinafter the "Raggio Account") on the

MTGOX bitcoin exchange with my father, Don Raggio.  The account was funded with a wire

transfer from my father's bank account to Defendant McCaleb.

3.      After the account was funded, I began to purchase bitcoins which were placed into the

MTGOX account.

4.      My father and I were limited in the amount of bitcoins that could be withdrawn on a daily

basis.

5.      On January 9, 2011, I noticed that someone had conducted unauthorized withdrawals on

the account and notified Defendant McCaleb.

6.     The following day, on January 10, I discovered the electronic address/account at which the stolen bitcoins had been moved and I informed Defendant McCaleb as to same.

7.     It was subsequently discovered that another MTGOX account holder named "Baron" had purportedly stolen the bitcoins from the Raggio account.

8.     Defendant McCaleb took control and froze both the Baron account, which contained $45,000 and stolen bitcoins, and the Raggio Account.

9.     In late February 2011, I discovered from online news sources that Defendant McCaleb had sold MTGOX to Defendant Tibanne K.K., which was owned by Defendant Mark Karpeles.

10.     Defendant McCaleb never informed me that he was selling MTGOX, whether he retained any ownership interest in MTGOX nor did he inform me of what role, if any, he would retain in MTGOX.  Defendant McCaleb also failed to inform me that Defendant Karpeles was a convicted fugitive.

11.     On February 26, 2011, Defendant McCaleb sent me an email stating he wanted to wait to get my coins back until he had time to gather evidence that Baron was related to other fraud that had taken place on the MTGOX exchange.  I responded the same day letting the Defendant know that while I wanted the coins back, I understood the coins had value for the Defendant's investigation.

12.     On March 6, 2011, I emailed Defendant McCaleb to ask if I needed to direct my communications to the new owner of MTGOX.  The following day Defendant McCaleb responded in the affirmative.

13.     At all times, Defendant McCaleb made written and oral representations that I would receive my bitcoins back once an investigation was completed.

14.     I began to correspond thereafter with Defendant Karpeles, who also promised I would receive my bitcoins back once an investigation was completed and/or a judgment was obtained in Japan.

15.     On December 21, 2011, I emailed Defendant McCaleb informing him as to my recent communications with Mark Karpeles concerning the bitcoins.  On December 27, 2011,

Defendant McCaleb responded that he would talk to Karpeles and that "I'm sure he will eventually give it to you.  I know he is trying to do everything by the book so I think he had to wait for legal reasons."

16.     After I retained Japanese counsel to investigate this matter in January of 2012, Defendant Tibanne K.K. made a representation in March of 2012 that they only inherited the assets related to the bitcoin exchange and never inherited the debt that Defendant McCaleb had incurred. Furthermore, Defendant Tibanne K.K. disavowed any responsibility.  No Japanese judgment was ever obtained.

17.  I delayed filing a suit in this matter because I relied on the representations that were made to me by the Defendants in this cause.

STATE OF _CALIFORNIA_
COUNTY OF _MARIN_

        PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority in and for the aforesaid jurisdiction, Chris Raggio, who, having been by me first duly sworn stated on his/her oath that the matters and things contained in the foregoing Affidavit are true and correct as therein stated.

_____
CHRIS RAGGIO

SWORN TO AND SUBSCRIBED BEFORE ME, this the ___ day of _____, 2017.

_____
NOTARY PUBLIC

My Commission Expires:

SEE ATTACHED
California
All-Purpose Acknowledgement/
Jurat

# California Jurat Certificate

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of** _____ MARIN _____ } s.s.

Subscribed and sworn to (or affirmed) before me on this 04th day of April,

20 17, by ___ Christopher Raggio ___ and
Name of Signer (1)

_____, proved to me on the basis of
Name of Signer (2)

satisfactory evidence to be the person(s) who appeared before me.

_Neeraja Chandupatla_
Signature of Notary Public

NEERAJA CHANDUPATLA
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2164709
MARIN COUNTY
My Comm. Exp. October 12, 2020

_____
For other required information (Notary Name, Commission No. etc.)

Seal

──────── OPTIONAL INFORMATION ────────

*Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this jurat to an unauthorized document and may prove useful to persons relying on the attached document.*

**Description of Attached Document**

The certificate is attached to a document titled/for the purpose of

Affidavit of Chris Raggio.

containing __3__ pages, and dated __4/04/2017__

**Additional Information**

Method of Affiant Identification

Proved to me on the basis of satisfactory evidence:
○ form(s) of identification   ○ credible witness(es)

Notarial event is detailed in notary journal on:

Page # _____   Entry # _____

Notary contact: _____

Other

☐ Affiant(s) Thumbprint(s)   ☐ Describe: _____

© 2009-2015 Notary Learning Center - All Rights Reserved       You can purchase copies of this form from our web site at www.TheNotarysStore.com

# IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO                                                          **PLAINTIFFS**
DR. CHRIS RAGGIO

V.                                                                  **CIVIL ACTION NO. 14-71**


MTGOX, Inc., a Delaware corporation;
CODE COLLECTIVE, LLC a New York Limited Liability Company;
JED McCALEB, an individual                                          **DEFENDANTS**


## AMENDED COMPLAINT
## TRIAL BY JURY DEMANDED

COME NOW the Plaintiffs, Dr. Donald Raggio and Dr. Chris Raggio, and file this their claim for specific performance and damages regarding the purchase of bitcoins, and for cause would show the following, to-wit:

## PARTIES

1.    Dr. Donald Raggio and Dr. Chris Raggio are adult resident citizens of Hinds County, Mississippi, residing in the  First Judicial District of Hinds County, Mississippi. The Raggios wired funds and purchased bitcoins from Defendants beginning in 2010.

2.    Defendant Jed McCaleb is an adult resident citizen of New York and on information and belief, he may be served with process of this court at 286 Union #1A, Brooklyn, NY 11211.  Jed McCaleb, at the relevant times herein was doing business in the State of Mississippi and the United States.

3.    Defendant Code Collective, LLC is a New York limited liability company who may be served with process of this court through its registered agent, New York Department of State and at its New York office located at 286 Union #1A, Brooklyn, NY

11211. Defendant Code Collective, LLC conducted business throughout Mississippi and the United States.

4.     Defendant MTGOX, Inc. is a Delaware corporation. It is believed that this corporation was formed in 2013 and may be served with process of this court through its agent for service of process, National Corporate Research, LTD located at 615 S. Dupont Hwy, Dover, Delaware 19901. MTGOX, Inc.'s principal place of business is located at Level 15-F, Cerulean Tower, 26-1Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan 150-8512.

## JURISDICTION AND VENUE

5.     This Court has personal jurisdiction and venue over Defendants in that they conducted business in this district and the State of Mississippi and the unlawful conduct alleged in the Complaint occurred in, was directed to and/or emanated from this district. Venue is proper in this district because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this complaint occurred in, was directed to and/or emanated from this district.

## FACTUAL ALLEGATIONS

### The Raggios Purchase Bitcoins from MTGOX

6.     In late 2010, Chris and Don Raggio (the "Raggios") signed up for an account on the MTGOX exchange. The purpose of MTGOX was the exchange and deposit of Bitcoin, a digital cryptocurrency. ("Bitcoin" with capitalization is commonly used to describe the concept of Bitcoin or the entire network itself while "bitcoins" are commonly used to describe the unit of account.) MTGOX was owned and operated by Defendants Jed McCaleb and Code Collective, LLC at the time the Raggios created their MTGOX account. Before creating a MTGOX account, Chris Raggio researched Defendant McCaleb,

including several phone conversations with McCaleb, and relied on McCaleb's representations in forming the belief that MTGOX was a competent and reliable bitcoin exchange. On information and belief, the MTGOX website made similar representations as to the exchange's being a secure, trustworthy place to buy and sell bitcoins. The Raggios justifiably reposed their trust in Defendants to act as their fiduciary in holding their bitcoins safely and providing a secure exchange environment. The details of internet security were so technical that clients such as the Raggios had to rely on Defendants' representations.

7.      Around the time the Raggios signed up for a MTGOX account, there was no other avenue to make large purchases of bitcoins. This was part of the reason the Raggios chose MTGOX, along with Defendants' representations that it was a safe and reputable place to purchase bitcoins.

8.      In order to deposit money into the exchange, the Raggios would wire transfer United States dollars ("USD") from their bank in Jackson, Mississippi directly to Jed McCaleb's personal account. Once McCaleb received the wire transfer, he would personally credit the Raggios' MTGOX account with a USD balance in the same amount that the Raggios wired. The Raggios would use that USD to purchase bitcoins on the exchange. Each transaction on MTGOX included a transaction fee that inured to the benefit of MTGOX, McCaleb, and other Defendants.

9.      After the Raggios purchased bitcoins, their MTGOX account would reflect both their balance of bitcoins and their remaining USD balance. The Raggios relied on Defendants' express and implied representation that a MTGOX account was a reasonably secure medium for holding bitcoins. By providing such MTGOX accounts to buyers, MTGOX itself benefited, as these accounts were part of their protocol for profiting from

transaction fees; further, while the bitcoins remained in MTGOX accounts, they were in the possession and control of MTGOX and McCaleb, ostensibly for the benefit of buyers like the Raggios. By providing such accounts to buyers, MTGOX represented that the bitcoins would be safe and assumed a duty to take reasonable measures to keep them safe.

10.     The Raggios would routinely remove their bitcoins from MTGOX. After purchasing the bitcoins, they would transfer them from MTGOX to their own personal bitcoin addresses or "wallets.". These addresses were completely independent of MTGOX. Due to MTGOX policy, they were prohibited from withdrawing more than $1,000 worth of USD or bitcoins per day (i.e. they could not transfer more than $1,000 worth of bitcoins out of MTGOX in a given 24-hour period). While the purchased bitcoins remained with MTGOX, they remained in the possession and control of MTGOX.

### The Theft of the Raggios' Bitcoins

11.     On January 9, 2011, Chris Raggio noticed unauthorized bitcoin withdrawals from their MTGOX account. On January 7, 3,134.8 bitcoins had been transferred out of their account. On January 8, another 3,174.6 bitcoins had been transferred out of their account. On January 9, another 3,096.93 bitcoins had been transferred out of their account. These three withdrawals totaled 9,406.33 bitcoins. The amounts of the withdrawals were such as to withdraw the maximum $1,000 worth of bitcoins allowed by MTGOX on each day.

12.     Contrary to explicit and implicit representations to the public and to the Raggios, MTGOX was operating with grossly unsophisticated security measures that fell far below the contemporary state of the art for an exchange holding valuable commodities such as bitcoins; these defective measures included, but were not limited to, using an unsalted

MD5 protocol for security. This allowed a hack to compromise the Raggios' MTGOX account through no fault of the Raggios, in adddition to other inadequate security measures. Defendants knew that their security measures were inadequate but did not take steps to improve them or to warn clients such as the Raggios of the dangers.

13.     Immediately upon noticing the unauthorized bitcoin withdrawals, Chris Raggio notified McCaleb, and McCaleb initially advised him to seek out an individual in the Bitcoin community called Theymos in order to potentially track the stolen bitcoins. Chris Raggio also requested that McCaleb monitor the Bitcoin address where his bitcoins had been transferred (the "Unauthorized Address"). McCaleb's actions fell far below what a reasonable exchange operator should have done in response to an apparent hack. Futhermore, McCaleb did not provide the Raggios a list of the Internet Protocol ("IP") addresses that had accessed their MTGOX account, which McCaleb provided to other victims of hacks on MTGOX.

14.     The only immediate action McCaleb took was to freeze the Raggios' MTGOX account. McCaleb said he was going to log any IP addresses that attempted to login to the Raggios' MTGOX account in the hope that the person responsible for the unauthorized withdrawals would attempt to login to the Raggios' account again. On information and belief, the individual never attempted to login to the Raggios' account after the third unauthorized withdrawal.

15.     The stolen bitcoins were not the only bitcoins in the Raggios' MTGOX account. On January 17, 2011, McCaleb sent Chris Raggio the full amount of remaining bitcoins in the Raggios' MTGOX account to the Raggios' personal address.

*MTGOX Identifies the Thief, but Does Nothing on the Raggios' Behalf*

16.   On February 10, 2011, one month after the unauthorized withdrawals, McCaleb emailed Chris Raggio stating that he thought he had found the person responsible for the unauthorized withdrawals, that the user had enough bitcoins in his MTGOX account to repay Chris Raggio, and that he had frozen the user's MTGOX account. McCaleb also stated he wanted "to make sure I'm right before I do anything."

17.   On information and belief, McCaleb identified the other MTGOX user (the alleged thief) by linking transactions from the previously mentioned Unauthorized Address to the user's MTGOX account. The alleged thief went by the username "Baron" on MTGOX and on the online Bitcoin message board forums. However, McCaleb did not initially identify the alleged thief as Baron to Chris Raggio. Chris Raggio found out about Baron on the online Bitcoin message board forums.

18.   On or around February 11, 2011, McCaleb sold 88% of MTGOX to Mark Karpeles, and McCaleb retained 12% of MTGOX for himself. Despite representing to outside sources that McCaleb sold the entirety of MTGOX to Karpeles, McCaleb continued to play an integral role in MTGOX operations long after the sale date.

19.   On February 23, 2011, despite admitting no fault, Baron expressed to McCaleb a willingness to return $3,000 USD simply to make the situation go away.

20.   On February 26, 2011, McCaleb stated to Raggio in an email that "at the very least, this guy is going to give your coins back." McCaleb did not convey Baron's offer to pay $3,000. Further, McCaleb advised Raggio against recovering the bitcoins at this time, citing McCaleb's purported need to investigate further. Raggio relied on McCaleb's representation that his bitcoins would be returned. This representation was false. McCaleb

had no intent to obtain cash or bitcoins from Baron and return them to the Raggios. Due to other hacks of MTGOX, the exchange was operating on a fractional reserve and would have been unable to pay out all its accounts had there been a run on the exchange. Making false representations to clients like the Raggios, and omitting highly material facts such as those set forth above, was part of Defendants' scheme to continue profiting from MTGOX without rectifying its defects, restoring the deficient bitcoin balance, or compensating hacked clients such as the Raggios.

21.     On March 5, 2011, Chris Raggio became aware of McCaleb's sale of MTGOX interest to Karpeles and asked if he should talk to McCaleb or Karpeles moving forward with the recovery of the stolen bitcoins. On March 6, 2011, McCaleb told Chris Raggio that Karpeles would be handling it.

22.     Chris Raggio and Mark Karpeles continued to communicate regarding the recovery of the stolen bitcoins, with Karpeles leading Raggio to believe that the stolen bitcoins would at some point be returned to the Raggios. This representation, upon which the Raggios reasonably relied, was false, as neither Karpeles nor McCaleb had any intent to return the bitcoins or otherwise make good on the Raggios' behalf.

### McCaleb and Karpeles Converted the Bitcoins to Their Own Use

23.     In January 2012, Chris Raggio retained counsel in Japan to investigate the matter and assist in recovery of the bitcoins. His Japanese counsel made a demand to Karpeles for the stolen bitcoin.

24.     In March 2012, Chris Raggio received a letter from Karpeles stating that he would not be returning the stolen bitcoins and that McCaleb was the responsible party. Karpeles claimed that he only purchased the assets of MTGOX and not the liabilities. This

is the first time that either McCaleb or Karpeles ever gave any indication to the Raggios that their bitcoins would not be returned.

25.     On information and belief, the bitcoins in the Unauthorized Address were ultimately transferred to other Bitcoin addresses controlled by MTGOX. Therefore, the stolen bitcoins were eventually back in the control of either McCaleb or Karpeles.

26.     At all times leading up to the March 2012 letter from Karpeles, both McCaleb and Karpeles reassured Raggio that he would get his stolen bitcoins back. There was never a reason for Raggio to believe the stolen bitcoins would not be returned.

27.     On information and belief, at all relevant times, MTGOX was not fully solvent. Through mismanagement and hacks, the exchange had lost significant amounts of bitcoins and USD and was operating without a full reserve of bitcoins and USD. Furthermore, on information and belief, both McCaleb and Karpeles were aware of the insolvency at all relevant times. At no point did McCaleb or Karpeles ever notify the MTGOX users of this insolvency. Therefore, while representing to Raggio that they were working to return his bitcoins, McCaleb and Karpeles were, on information and belief, keeping the recovered bitcoins from the Unauthorized Address in the possession of MTGOX for their own use and benefit. At all relevant times, Defendants held out MTGOX to the public as a legitimate business, but in fact operated MTGOX without any regard for corporate formalities, frustrating the contractual expectations of Plaintiffs and other buyers, for the purposes of their fraudulent and wrongful misconduct, and thus abused the corporate form.

28.     Around the time he first conveyed an interest in MTGOX to Karpeles, McCaleb withdrew a large number of bitcoins into his personal account, some of which he

dribbled back into MTGOX so that it could meet immediate obligations to clients. He retained a large number for himself, including bitcoins that were the rightful property of the Raggios, to whom McCaleb owed a duty to make whole from their loss of the hacked bitcoins. After McCaleb later sold the rest of his interest in MTGOX, McCaleb went on to found cryptocurrencies Ripple (XRP) and Stellar Lumens (XLM). He stated publicly that he had also sold all of his personal bitcoins to found these other cryptocurrencies. On information and belief, some of the bitcoins that were returned to MTGOX addresses, including some or all of those stolen from the Raggios, were commingled with McCaleb's personal bitcoins and used to fund Ripple and Stellar Lumens.

29. After a falling out with the other founders of Ripple, McCaleb currently has a settlement agreement which entitles him to estimated nine billion (9,000,000,000) XRP (the cryptocurrency for Ripple). As of the time of this filing, XRP is valued at $0.292. Therefore, the estimated nine billion (9,000,000,000) XRP would have a current total value of approximately $2,628,000,000.

30. Since the time the Raggios' bitcoins were stolen, Bitcoin has experienced several of what are called "hard forks." After a "hard fork," there exists two separate and distinct blockchains. These blockchains retain the exact same transaction history up to the moment of the hard fork, but each blockchain moving forward is completely independent of the other. As a result, much like a stock split, each address that existed prior to the hard fork now exists on the two separate blockchains, and it retains the exact same amount of cryptocurrency on each blockchain.

31. One prominent hard fork was the Bitcoin Cash ("BCH") hard fork which occurred on August 1, 2017. For example, if an address contained 5 bitcoins on the Bitcoin

blockchain prior to August 1, 2017, that address now contains 5 bitcoins on the Bitcoin blockchain and 5 BCH on the Bitcoin Cash blockchain.  As of the time of this filing, Bitcoin Cash is valued at $505.03. Therefore, the 9406.33 BCH would have a current total value of approximately $4,750,478.

32.    The Bitcoin Cash hard fork is not the only hard fork to occur. Because the Raggios' bitcoins were stolen prior to any of the prominent hard forks, they were deprived of the benefits due to them simply by owning bitcoins at the time of these hard forks.

**COUNT ONE:**
**BREACH OF MISSISSIPPI UNIFORM COMMERCIAL CODE § 75-2-301**

33.    Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

34.    The Raggios paid Defendants in full for 9,406.33 bitcoins pursuant to a contract between the parties.

35.    In accordance with the Mississippi Uniform Commercial Code, Defendants were required "to transfer and deliver" the 9,406.33 bitcoins to the Raggios "in accordance with the contract."  Miss. Code Ann. § 75-2-301.

36.    Defendants failed "to transfer and deliver" the 9,406.33 bitcoins to the Raggios.  Despite repeated requests by the Raggios for delivery of the bitcoins and repeated assurances by Defendants that the bitcoins would be provided, Defendants never delivered the 9,406.33 bitcoins to the Raggios.  Accordingly, Defendants have breached their obligations under Miss. Code Ann. § 75-2-301.

**COUNT TWO:**
**BREACH OF WARRANTY UNDER MISSISSIPPI**
**UNIFORM COMMERCIAL CODE §§ 75-2-313, 314, AND/OR 315**

37.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

38.     Defendants represented that bitcoins purchased by the Raggios would be made available in a manner that allowed the Raggios to transfer the bitcoins to their personal address.  This representation was made affirmatively, through communications and contract documents; indirectly, through a description of Defendants' business, which involved selling bitcoins to persons who would then transfer the bitcoins out of the MTGOX exchange; and through prior transactions, whereby the Raggios purchased bitcoins and transferred them to their personal addresses, which served as a model for the bitcoin transaction at issue.  Based on this and other conduct and representations of Defendants, the contract between the Raggios and Defendants included an express warranty that the 9,406.33 bitcoins purchased by the Raggios would be made available in a manner that allowed the Raggios to transfer the bitcoins to the Raggios' personal address.  *See* Miss. Code Ann. § 75-2-313.

39.     Defendants were aware that the Raggios were relying on Defendants to make the 9,406.33 bitcoins purchased by the Raggios available in a manner that allowed the Raggios to transfer the bitcoins to the Raggios' personal address, as this was the parties' standard practice and the very purpose of Defendants' business.  Accordingly, the contract between Defendants and the Raggios included an implied warranty that the 9,406.33 bitcoins would be fit for this purpose—i.e., that Defendants would make the bitcoins

available in a manner that allowed the Raggios to transfer the bitcoins to the Raggios' personal address. *See* Miss. Code Ann. § 75-2-315.

40.     As with all contracts for the sale of goods by a merchant, the contract between the Raggios and Defendants included an implied warranty of merchantability.  This required, at minimum and without limitation, that the bitcoins be "fit for the ordinary purposes for which such goods are used" and "adequately contained [or] packaged." *See* Miss. Code Ann. § 75-2-314(2)(c), (e).

41.     Defendants failed to provide and/or secure the 9,406.33 bitcoins in a manner that permitted the Raggios to transfer the bitcoins to their personal address.  Accordingly, Defendants breached the express and implied warranties set forth at Miss. Code Ann. §§ 75-2-313, -314, and/or -315.

## COUNT THREE:
## BREACH OF MISSISSIPPI UNIFORM COMMERCIAL CODE § 75-2-503

42.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

43.     Defendants were required to make the 9,406.33 bitcoins purchased by the Raggios "available for the period reasonably necessary to enable the [Raggios] to take possession." *See* Miss. Code Ann. § 75-2-503(1)(a).

44.     Defendants failed to safeguard and make available the 9,406.33 bitcoins for a reasonable period of time to enable the Raggios to take possession and transfer the bitcoins to their personal address.  Accordingly, Defendants breached their obligations under Miss. Code Ann. § 75-2-503.

## COUNT FOUR:
## DEFENDANTS ARE LIABLE FOR LOSS OF BITCOINS
## UNDER MISSISSIPPI UNIFORM COMMERCIAL CODE § 75-2-509

45.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

46.     Defendants bore all risk of loss of the 9,406.33 bitcoins until the Raggios received possession of the bitcoins.  *See* Miss. Code Ann. § 75-2-509(3).

47.     Defendants never delivered possession of the 9,406.33 bitcoins to the Raggios because the Defendants prohibited the Raggios from transferring the bitcoins to their personal address.  Accordingly, Defendants bore all risk that the bitcoins would be stolen.

## COUNT FIVE:
## BREACH OF DUTY AS SECURITIES INTERMEDIARY UNDER
## MISSISSIPPI UNIFORM COMMERCIAL CODE § 75-8-507

48.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

49.     Defendants operated as a "securities intermediary" because they maintained a "securities account" on the MTGOX exchange for the benefit of the Raggios.  *See* Miss. Code Ann. §§ 75-8-105, -501.

50.     The Raggios had a "securities entitlement" to all bitcoins credited to their account on the MTGOX exchange, and were authorized to issue "entitlement orders" regarding the transfer of said bitcoins.  *See id*.

51.     Only the Raggios and their authorized representatives were permitted to issue entitlement orders to Defendants.  *See* Miss. Code Ann. §§ 75-8-107.

52.     Defendants were required to comply with proper entitlement orders directing a transfer of the bitcoins.  *See* Miss. Code Ann. §§ 75-8-507(a).  Defendants were not permitted to transfer the bitcoins at the direction any other person.

53.     Where a securities intermediary such as Defendants "transfers a financial asset [i.e., bitcoins] pursuant to an ineffective entitlement order, the securities intermediary shall reestablish a security entitlement in favor of the person entitled to it, and pay or credit any payments or distributions that the person did not receive as a result of the wrongful transfer.  If the securities intermediary does not reestablish a security entitlement, the securities intermediary is liable to the entitlement holder for damages."  Miss. Code Ann. §§ 75-8-507(b).

54.     Defendants transferred or permitted a transfer of 9,406.33 bitcoins out of the Raggios' MTGOX account pursuant to an ineffective entitlement order.  Accordingly, Defendants are legally obligated to replace the 9,406.33 bitcoins or pay to the Raggios an amount not less than the current value of such bitcoins.

## COUNT SIX:
## BREACH OF CONTRACT

55.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

56.     Defendants, individually and in concert, have created multiple written and implied contracts in dealing with the Raggios.  The Raggios acted in good faith by paying USD for 9,406.33 bitcoins, but Defendants have breached their contracts with Raggios to deliver said bitcoins.

57.     Plaintiffs entered into one or more agreements with Defendants whereby Defendants agreed, among other things, to do each of the following with respect to any

monies deposited by Plaintiffs with Defendant Jed McCaleb and MTGOX, in consideration

for Plaintiffs' initial acquisition of the bitcoins from or via Defendants, and for the goodwill

associated with same and with the services offered:

a.   to accept monies from Plaintiffs, in the form of bitcoins or USD, which

Plaintiffs may deposit from time to time;

b.   to keep said monies in a safe and secure manner, consistent with fiduciary

obligations commonly imposed upon financial services providers;

c.   to comply with instructions that Plaintiffs may provide from time to time

concerning the transfer, investment and disposition of said monies; and

d.   to permit Plaintiffs to withdraw their USD and bitcoins at any time.

Plaintiffs allege that the legal effect of these agreements was to create legally binding

obligations on the part of Defendants, individually and in concert.

58.   Plaintiffs have performed all conditions, covenants, and promises required of

them by said agreements, and in accordance with the terms and conditions thereof.

59.   Defendants, individually and in concert, breached the agreements by, among

other things: refusing to comply with Plaintiffs' intention of withdrawing the entirety of

their bitcoins; permitting the unauthorized withdrawal of their bitcoins; and by failing to

disburse the frozen bitcoins of Baron to replace those stolen. Thus Defendants caused

Plaintiffs to suffer damages, including but not limited to the loss of their bitcoins.

60.   Defendants' breach was deliberate and in bad faith, such as to amount to a

tortious breach of contract in its own right, said tort being intentional, wanton, and willful,

and thus further making Defendants liable for punitive damages, in an amount sufficient to

punish Defendants and to deter others from defrauding the public in such a manner, and for all reasonable attorney fees, expenses, and costs incurred by Plaintiffs in this civil action

## COUNT SEVEN:
## CONSPIRACY

61. Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

62. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants knowingly and willfully conspired and agreed upon themselves to hinder, delay and deprive the Raggios of their rights with respect to their 9,406.33 bitcoins.

63. Plaintiffs are further informed and believe, and thereon allege, that said Defendants, individually and in concert, did the acts and things alleged herein pursuant to, and in furtherance of, the conspiracy and their own agreements with one another, and/or furthered the conspiracy cooperating with, lending aid to, encouraging, ratifying or adopting those acts.

64. Plaintiffs are informed and believe, and thereon allege, that there is not yet any last overt act in furtherance of said conspiracy, in that Defendants, and all of them individually and in concert are continuing to hinder delay and deprive the Raggios of their rights with respect to said bitcoins.

## COUNT EIGHT:
## ACCOUNT STATED

65. Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

66. Between 2011 and 2012, accounts were stated in writing between the Plaintiffs on the one hand, and Defendants, on the other hand. Although Defendants have

acknowledged and verified the total number of bitcoins, they have not delivered the 9,406.33 bitcoins purchased and paid for by Plaintiffs. The remaining unreturned portions of said accounts, according to the records of Defendants and Plaintiffs, total approximately 9,406.33 bitcoins as of the date of this complaint, which is now due and owing and which Defendants should pay.

67.     Defendants, individually and in concert have failed and refused and continue to fail and refuse to return the remainder of the bitcoins, despite Plaintiffs' demands that they do so. Thus, they owe the remaining 9,406.33 bitcoins and prejudgment and post judgment interest thereon at the maximum legal rate.

**COUNT NINE:**
**NEGLIGENCE AND GROSS NEGLIGENCE**

68.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

69.     At all relevant times, Defendants, individually and in concert, had bitcoins belonging to Plaintiffs in their possession, custody and/or control, and therefore owed Plaintiffs a duty of care with respect to safeguarding said bitcoins. Plaintiffs are informed and believed, and thereon allege, that Defendants, individually and in concert, served as fiduciaries with respect to said bitcoins, and that said role imposed certain fiduciary obligations upon Defendants.

70.     Plaintiffs are informed and believe, and thereon allege, that Defendants, individually and in concert, breached their duties to Plaintiffs by negligently performing their obligations, including but not limited to failing to utilize all reasonable and practical safeguards to protect the bitcoins of Plaintiffs and other customers. This allowed a hackto compromise the Raggios' MTGOX account.

71.     Plaintiffs suffered certain general, special, incidental and consequential damages as a direct and proximate result of said negligence, including, among other things: the loss of bitcoins; the loss of use of said value of the bitcoins while the present action is pending; changes in the value of said bitcoins due to the fluctuating exchange rate; the necessity of retaining legal counsel to vindicate their rights; etc., all in amounts to be proven at trial.

72.     Further, Defendants' negligence was so willful and wanton as to amount to gross negligence, thus entitling Plaintiffs to punitive damages in an amount sufficient to punish Defendants and to deter others from defrauding the public in such a manner, and to all reasonable attorney fees, expenses, and costs incurred by Plaintiffs in this civil action

## COUNT TEN:
## CONVERSION

73.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

74.     At all relevant times, Plaintiffs were, and are, the lawful owners of certain bitcoins deposited with Defendants, individually and in concert, as alleged herein.  Plaintiffs were entitled to possession of the bitcoins once purchased.

75.     Plaintiffs are informed and believe and thereon allege that: upon receiving Plaintiffs' instructions to deliver the bitcoins, Defendants, individually and in concert, converted and took unlawful possession of said bitcoins for their own use and benefit by refusing to return all of the bitcoins paid for and belonging to Plaintiffs.  Plaintiffs are further informed and believe and allege that Defendants intentionally and willfully refused to deliver the bitcoins purchased by Plaintiffs.

76.     Plaintiffs have suffered certain general, special, incidental and consequential damages as a direct and proximate result of said negligence, including, among other things: the loss of the bitcoins themselves; the loss of use of said bitcoins while the present action is pending; changes in the value of said bitcoins due to fluctuating exchange rates; etc., all in amounts to be proven at trial. Due to the fluctuating nature of bitcoins, Plaintiffs cannot be made whole by being repaid the value of the bitcoins at the time of their conversion. Plaintiffs seek either return of comparable bitcoins or the present cash value of their bitcoins, including all value bestowed by hard forks subsequent to the conversion.

77.     Plaintiffs are informed and believe, and thereon allege: that the aforementioned actions and omissions by Defendants, individually and in concert, were intentional or so grossly wanton and willful that they show a conscious disregard for the rights of Plaintiffs.  Defendants subjected Plaintiffs to a cruel and unusual hardship in conscious disregard of their rights, all so as to justify an award for exemplary and punitive damages, in an amount sufficient to punish Defendants and to deter others from defrauding the public in such a manner, and for all reasonable attorney fees, expenses, and costs incurred by Plaintiffs in this civil action.

## COUNT ELEVEN:
## GENERAL AND NOTICE PLEADING OF ALL CAUSES AT LAW & EQUITY AND CLAIM FOR A CONSTRUCTIVE TRUST ON CORPORATE ACCOUNTS

78.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

79.     Plaintiffs pray that this court will hear their cause as the facts herein have been plead with specificity and allow Plaintiffs recovery of their bitcoins and all damages generally and specifically under all applicable theories of recovery whether at law or equity.

80.     On information and belief, Defendant McCaleb commingled the Raggios'
and MTGOX account holders' fiat currency and bitcoins with his own personal bank
account and Bitcoin wallet, making it impossible to determine which amounts were
personal and which amount belonged to MTGOX account holders. Defendant McCaleb
used the Raggios' and account holders' funds for operating expenses at MTGOX and for his
own personal benefit. Upon the sale of a majority interest to Mark Karpeles, Defendant
McCaleb used the embezzled cash and bitcoins to fund his new ventures, such as Open
Coin, Ripple, Stellar and Light Year. Plaintiffs request that this court freeze said corporate
accounts so that funds may not be distributed until such time as the Raggios have had an
opportunity to be heard and to lay proper claim to their bitcoins or materially similar
bitcoins, which, as set forth above, Defendants obtained or hold by abuse of confidence,
commission of wrong, and unconscionable conduct, artifice, concealment, and questionable
means, and generally against equity and good conscience, such that they hold said bitcoins
in a constructive trust for Plaintiffs.

81.     Further, on information and belief, Defendants used some or all of Plaintiffs'
bitcoins, or of comparable bitcoins which in right and equity should have been given to
Plaintiffs in restoration or compensation for the bitcoins Defendants allowed or caused to be
unlawfully taken, to invest in and facilitate the creation or propagation of new or alternative
cryptocurrencies, from which Defendants have reaped large profits, contrary to the rule of
equity that no one should profit from his own wrongdoing. Those profits are held in a
constructive trust for Plaintiffs. Defendants should be required to disgorge the appropriate
share of those unjustly and inequitably-acquired profits and pay them over to Plaintiffs,

whose bitcoins were used against their consent and in violation of law and against equity and good conscience to further the schemes of Defendants.

## COUNT TWELVE:
## SPECIFIC PERFORMANCE

82.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

83.     Plaintiffs paid for 9,406.33 bitcoins with U.S. dollars. Defendants have represented that they will deliver said 9,406.33 bitcoins. Plaintiffs request a judgment of and from Defendants, individually and in concert, for 9,406.33 bitcoins with UTXOs that predate the Bitcoin Cash (August 1, 2017) and Bitcoin Gold (October 24, 2017) hard forks. No other remedy will make Plaintiffs whole.

## COUNT THIRTEEN:
## UNJUST ENRICHMENT

84.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

85.     At all relevant times, Plaintiffs were, and are, the lawful owners of certain bitcoins deposited with Defendants. As between Plaintiffs and Defendants, Plaintiffs were entitled to possession of the bitcoins once they provide instructions to Defendants to deliver them, which Plaintiffs have done.

86.     Plaintiffs are informed and believe and thereon allege that: upon receiving Plaintiffs' instructions to deliver the bitcoins, Defendants, individually and in concert, converted and took unlawful possession of, said bitcoins for their own use and benefit by refusing to return all of the bitcoins paid for and belonging to Plaintiffs. Plaintiffs are further informed and believe, and thereon allege, that Defendants, individually and in concert,

intentionally, willfully and in flagrant disregard for Plaintiffs' right refused to deliver the bitcoins purchased by Plaintiffs.

87.     The circumstances render the Defendants' retention of the Plaintiffs' property inequitable and the Defendants have been unjustly enriched by the retention of the Plaintiffs' property.

88.     The Plaintiffs are entitled to damages as a result of the Defendants' unjust enrichment, including the disgorgement of all bitcoins retained by the Defendants, the proceeds for any sale of the bitcoins, all profits received from the invested monies of which profits were received through the conversion of the Plaintiffs' bitcoins, any and all hard forked cryptocurrencies which would be or was received, and any other equitable remedy so available to the Plaintiffs.

## COUNT FOURTEEN:
## BAILMENT

89.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth here.

90.     Both at common law and under statute, Defendants acted as bailees for the bitcoins purchased by Plaintiffs, and voluntarily agreed for Plaintiffs to give those bitcoins to them for safekeeping, taking possession but not ownership thereof, for the mutual benefit of bailors and bailees. Defendants failed to exercise the required level of care, such that Plaintiffs' bitcoins were stolen while in Defendants' custody, and Defendants are thus liable to Plaintiffs for return of the bitcoins or materially similar ones, there being no other remedy that will make Plaintiffs whole. In the alternative, Defendants should be required to pay over the present cash value of materially similar bitcoins, including the value of the intervening hard forks.

91.     Defendants were grossly negligent in mishandling the bitcoins and failing to exercise the minimal reasonable standard of care for a cryptocurrency exchange, and are thus liable for punitive damages for their wanton and deliberate misconduct, in an amount sufficient to punish Defendants and to deter others from defrauding the public in such a manner, and for all reasonable attorney fees, expenses, and costs incurred by Plaintiffs in this civil action.

**COUNT FIFTEEN:**
**FRAUD**

92.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth herein.

93.     At all times, including in the specific time, place, and manner alleged in the foregoing, Defendants made intentionally false representations to Plaintiffs, including but not limited to that they would keep Plaintiffs' bitcoins safe; that they were providing a safe means for the holding of bitcoins purchased from MTGOX; and that they were diligently investigating the theft of the Raggios' bitcoins with the intent of restoring them to the Raggios or otherwise making good on the theft. Despite their duty to Plaintiffs to keep their bitcoins reasonably safe and to take reasonable measures to recover the stolen bitcoins, Defendants omitted the material facts that MTGOX was not a secure exchange, that Plaintiffs' bitcoins were not reasonably safe in MTGOX accounts, and that Defendants were not in fact diligently investigating the theft of the bitcoins, but rather were seeking to convert them to their own use and benefit. All of these misrepresentations and omissions were material, on the facts set forth above. The Raggios reasonably relied on these

representations and suffered harm thereby as a direct and proximate result, including but not limited to the loss of their bitcoins.

94.    Defendants are therefore liable to Plaintiffs for their economic damages incurred, in such an amount as to put Plaintiffs in the same position as if their bitcoins had not been stolen, as well as for punitive damages in an amount sufficient to punish Defendants and to deter others from defrauding the public in such a manner, and for all reasonable attorney fees, expenses, and costs incurred by Plaintiffs in this civil action.

## COUNT SIXTEEN:
## NEGLIGENT MISREPRESENTATION

95.    Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth herein.

96.    As set forth above, Defendants made numerous material misrepresentations to Plaintiffs as well as omitting material facts of high importance, including but not limited to MTGOX's being a secure cryptocurrency exchange when in fact it was not, and to their diligently investigating the theft of the Raggios' bitcoins in an effort to restore them to the Raggios, when in fact they were not. In making these misrepresentations or omissions, Defendants failed to act with the degree of diligence which the public is entitled to expect of the operators of a cryptocurrency exchange. Plaintiffs reasonably relied on those misrepresentations and reasonably relied on Defendants not to omit material facts, and suffered damages as a direct and proximate result, including but not limited to the loss of their bitcoins.

97.    Defendants are therefore liable to Plaintiffs for their economic damages incurred, in such an amount as to put Plaintiffs in the same position as if their bitcoins had

not been stolen. Further, Defendants' negligence was so wanton and willful as to amount to gross negligence, thus entitling Plaintiffs to punitive damages in an amount sufficient to punish Defendants and to deter others from defrauding the public in such a manner, and for all reasonable attorney fees, expenses, and costs incurred by Plaintiffs in this civil action.

## COUNT SEVENTEEN:
## PUNITIVE DAMAGES

98.     Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth herein.

99.     The actions of Defendants, individually and/or collectively, were done without a legitimate or arguable reason, and knowingly, willfully, maliciously, and intentionally and/or with reckless disregard for the rights of the Raggios evidencing bad faith on the part of each Defendants, and entitling the Raggios to punitive damages, in an amount to be determined at the trial of this matter, to punish Defendants and to deter others from engaging in the same or similar activities.

## COUNT EIGHTEEN:
## CORPORATE OFFICER LIABILITY

100.    Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth herein.

101.    By participating directly in the misconduct and wrongdoing set forth above, Defendant McCaleb incurred personal liability for all wrongdoing committed by or on behalf of MTGOX, and is liable to Plaintiffs for all damages pleaded herein.

## COUNT NINETEEN:
## PIERCING THE CORPORATE VEIL

102.    Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth herein.

103.    As alleged above, Defendants abused the corporate form of MTGOX, flagrantly disregarding corporate formalities, in the pursuit of fraudulent and wrongful misconduct, and thus frustrating the legitimate expectations of Plaintiffs and other buyers who regarded MTGOX as a legitimate cryptocurrency exchange rather than as a scam operated for the exclusive benefit of Defendants. Defendants are thus personally liable to Plaintiffs for all damages pleaded herein.

**COUNT TWENTY:**
**BREACH OF FIDUCIARY DUTY**

104.    Plaintiffs incorporate and adopt by reference each of the preceding paragraphs as fully set forth herein.

105.    Defendants held themselves out to the Raggios and to the public as operating a safe, secure bitcoin exchange. After the Raggios' account was hacked, McCaleb held himself out to the Raggios as using his peculiar knowledge as the MTGOX operator to investigate the theft and to make good their loss. Under those circumstances, the Raggios reasonably and justifiably reposed their trust in Defendants and depended upon them to make good on their representations.

106.    Thus, Defendants owed the Raggios a fiduciary duty to keep their bitcoins secure and to make good on any loss due to Defendants' own wrongful deeds and omissions. Defendants breached that duty, causing the Raggios to incur damages as set forth above. Defendants are therefore liable to the Raggios for all damages arising from this breach.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this court will allow their claim to proceed before a jury and that said jury shall award them their 9,406.33 bitcoins (with UTXOs predating the August 1, 2017, Bitcoin Cash hard fork) against

Defendants, or else money damages sufficient to compensate them for their lost bitcoins and their lost profits and business opportunities following foreseeably, consequentially, and proximately from Defendants' misconduct, thus placing them in the position they would have been in had Defendants' misconduct not occurred and all of them individually and jointly; along with punitive damages, special damages as set forth above, reasonable attorney fees and expenses, all costs herein related to the pursuit of this cause, and any other remedy as to which the Plaintiffs may be entitled.

Respectfully submitted, this 18th day of September, 2018.

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**

By:      *s/ Armin J. Moeller, Jr.*
Armin J. Moeller, Jr.,  MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS
DR. DONALD RAGGIO AND
DR. CHRIS RAGGIO

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com

BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned counsel, do hereby certify that on this day, I have electronically filed the foregoing with the Clerk of the Court using the MEC system which sent notification of such filing to the following (except as otherwise shown, in which case service was made via United States mail, postage prepaid):

> Edwin S. Gault, Jr., Esq.
> Amanda B. Robinson, Esq.
> T. Peyton Smith, Esq.
> Forman Watkins & Krutz LLP
> P.O. Box 22608
> Jackson, Mississippi 39201
> Win.Gault@formanwatkins.com
> Peyton.Smith@formanwatkins.com
> Mandi.Robinson@formanwatkins.com

> Ethan Jacobs, Esq.                    *(via U.S. mail)*
> Holland Law, LLP
> 220 Montgomery Street, Suite 800
> San Francisco, California 94104

So certified, this the 18th day of September, 2018.

> *s/ Armin J. Moeller, Jr.*
> ARMIN J. MOELLER, JR.

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO                                    **PLAINTIFFS**
DR. CHRIS RAGGIO

VS.                                         **CAUSE NO. 14-CV-00071-TTG**

MTGOX, *et al*                                       **DEFENDANTS**

## AFFIDAVIT OF JED MCCALEB

**STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

  Jed McCaleb, being first duly sworn says:

  1. My name is Jed McCaleb. I am over 18 years old. I understand the nature of an oath and I am otherwise competent to testify to the matters stated in this affidavit. I have personal knowledge of the facts set forth in this affidavit and, if called to testify, I could and would competently testify to the facts set forth herein.

  2. I am the creator and former owner of the business MTGOX. MTGOX was created as an exchange which allowed users to purchase bitcoins from each other and redeem the contents of their accounts when desired. I was also the managing member of Code Collective, LLC, through which wire transfers were made.

  3. In 2010, the Raggios opened an account on the MTGOX exchange, and began purchasing bitcoins from other users on the exchange.

1

**EXHIBIT A**

4.    The Raggios wire transferred funds to an account held by Code Collective, some of which was then used to purchase bitcoins for their MTGOX account from other MTGOX users.

5.    The Raggios did not sign any contracts or agree to any terms of service in any way with me, individually or doing business as MTGOX, or with Code Collective, LLC.

6.    The Raggios purchased approximately 9,400 bitcoins from other MTGOX users in January of 2011. The 9,400 bitcoins were placed into Plaintiffs' account on the MTGOX exchange. The value of 9,400 bitcoins was approximately $3,100.00 at the time.

7.    On January 9, 2011, Chris Raggio informed me that he believed someone had hacked the Raggios' MTGOX account and stolen 9,400 bitcoins.

8.    On February 11, 2011, I sold the MTGOX business to Tibanne K.K.

9.    The Raggios were aware I had sold the MTGOX business and had no authority or control over the business. A copy of an email from Chris Raggio to me dated December 21, 2011, evidencing this is attached as Exhibit 1 to this Affidavit.

10.    The Raggios were aware that I had no knowledge of what was occurring with regard to the alleged theft of their bitcoins after the sale of the business, except for the information that was passed from the Raggios to me. A copy of an email from Don Raggio to me dated May 30, 2011, explaining "about the situation with Baron [the suspected thief]" and promising to "keep [me] posted on the outcome" of the theft is attached as Exhibit 2 to this Affidavit.

2

**EXHIBIT A**

11.    The market value of 9,400 bitcoins is now approximately $6 million dollars.

FURTHER AFFIANT SAYETH NOT.

_____

**Jed McCaleb**

SWORN TO AND SUBSCRIBED BEFORE ME, this 29 day of June, 2016.

_____

NOTARY PUBLIC

(seal)



SURINDER KUMAR
COMM. # 2080623
NOTARY PUBLIC • CALIFORNIA
SAN FRANCISCO COUNTY
Comm. Exp. OCT. 2, 2018

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California, County of _SAN FRANCISCO_
Subscribed and sworn to (or affirmed) before me on this _29th_ day
of _JUNE_ _2016_ by _JED MCCALEB_
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _Surinder Kumar_ (seal)

3

**EXHIBIT A**

X-Mozilla-Status: 0001
X-Mozilla-Status2: 00000000
Delivered-To: jed@mtgox.com
Received: by 10.180.109.232 with SMTP id hv8cs77869wib;
    Wed, 21 Dec 2011 18:18:57 -0800 (PST)
Received: by 10.14.48.66 with SMTP id u42mr3472718eeb.59.1324520335858;
    Wed, 21 Dec 2011 18:18:55 -0800 (PST)
Return-Path: <chris.raggio@gmail.com>
Received: from mail-ee0-f53.google.com (mail-ee0-f53.google.com [74.125.83.53])
    by mx.google.com with ESMTPS id q2si4762464eef.172.2011.12.21.18.18.55
    (version=TLSv1/SSLv3 cipher=OTHER);
    Wed, 21 Dec 2011 18:18:55 -0800 (PST)
Received-SPF: pass (google.com: domain of chris.raggio@gmail.com designates
74.125.83.53 as permitted sender) client-ip=74.125.83.53;
Authentication-Results: mx.google.com; spf=pass (google.com: domain of
chris.raggio@gmail.com designates 74.125.83.53 as permitted sender)
smtp.mail=chris.raggio@gmail.com; dkim=pass (test mode) header.i=@gmail.com
Received: by eekd41 with SMTP id d41so7930555eek.12
    for <jed@mtgox.com>; Wed, 21 Dec 2011 18:18:55 -0800 (PST)
DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
    d=gmail.com; s=gamma;
    h=mime-version:date:message-id:subject:from:to:content-type;
    bh=Vp7CQCr8euClRPIbafIqDFIHEi9Nzafei73lCDIWq8c=;
    b=AoQPsA+ikmODkPmTshdfBZOS6SgaqCvOIYVjHOVXWnP4ZePAaKnfeh0pl1by7
miSQI
    sgSnmATu3iLFI5GycXH1MOVqKnX5tFLZ0s+JCVrqYscISSRcrb5zhWfVSxlV5Ii1A
N38
    C0LNjdidMMK9Gp8LyEXRUCrzEmFLQWxbXHfXM=
MIME-Version: 1.0
Received: by 10.204.157.154 with SMTP id b26mr2658774bkx.101.1324520335577;
Wed, 21 Dec 2011 18:18:55 -0800 (PST)
Received: by 10.204.188.133 with HTTP; Wed, 21 Dec 2011 18:18:55 -0800 (PST)
Date: Wed, 21 Dec 2011 20:18:55 -0600
Message-ID:
<CALG=A06VKw-DrrqqnrWmCBLWv5Y04SY9wqoAPotPyh5J1U4seA@mail.gmail.com
>
Subject: hey
From: Chris Raggio <chris.raggio@gmail.com>
To: Jed McCaleb <jed@mtgox.com>
Content-Type: multipart/alternative; boundary=0015175dd9e219916504b4a4ecbe

--0015175dd9e219916504b4a4ecbe
Content-Type: text/plain; charset=ISO-8859-1

Hey Jed,

How's everything going? I'm feeling good.  I think 2012 is going to be a

EXHIBIT 1

breakout year for bitcoin in terms of technology maturation, wider adoption, and increased exchange value which everyone is so focused on. I haven't been doing much with the technology.  That is best left to guys like you who can code circles around me.  I've been studying economics to try to understand how a currency as different from anything that has come before might change things.  It's not easy.  Economics is a social science and most of it makes no sense at all.  Logical thinking is disadvantageous to anyone trying to learn what is accepted as truth in this field.

Just to let you know I e-mailed Mark asking him what he intends to do with the stolen coins.  I haven't heard back from him yet.  Originally he said he wanted to give "Baron a year to speak for himself."   I don't know why we would bother with somebody who hides behind an alias and an altered passport but whatever.  We are approaching the 1 year anniversary of the theft.

I'm not asking you to intervene on my or my father's behalf.  Mark is the owner of Mt Gox now.   It's his call whether he wants to make things right with us as he did with Bitomat.  My father and I appreciate everything you did to investigate and pursue the thief.  You didn't have to go to the lengths you went to for us.   We thank you.

Have a nice holiday,

Chris

**EXHIBIT 1**

Date: Mon, 30 May 2011 10:52:46 -0500
Message-ID: <BANLkTiko0o0TKjz=KURqn4Q-UbJpk6Sbiw@mail.gmail.com>
Subject: Re:
From: Don Raggio <donald.raggio@gmail.com>
To: Jed McCaleb <jed@mtgox.com>
Content-Type: multipart/alternative; boundary=000e0cdf1bea4ff03304a48047be

--000e0cdf1bea4ff03304a48047be
Content-Type: text/plain; charset=ISO-8859-1

Jed,

Thanks for taking the time to talk to me.   If I think of anything cool to
do with bitcoin I'll let you know.   Near the end of the call you asked
about the situation with Baron. Here is what I know.   Last I heard from
Mark was that Baron was not willing to give the coins back voluntarily.
Baron said that he wanted access to his funds.   Mark said that he didn't
feel comfortable just unilaterally handing the coins over to me. These funds
I assume he is speaking of are the ones that you froze.     Mark said that
to resolve the issue he was seeking a "judgement" in a court, but that due
to the disaster in Japan "legal processing" would be held up until later
this year.   That's honestly what he told me.   I am glad you did what you
could to take action against this scammer.  Hopefully this will work and I
will get the coins back.    And if for some reason that doesn't work out
maybe bitcoin will hit 1000 and what we will have more than enough
regardless.     By the way somebody did move the funds that were stolen from
the address in a transaction dated 4-28.  I asked Theymos to look at the
block explorer and he reported the following.

"The scammer sent 2000 BTC to an address, and that address sent 200,000 BTC
to MtGox: I'm pretty sure 1MqsE... is a MtGox address. You should inform
Mark about this new development. The person who made that 200,000 BTC MtGox
deposit is either the scammer or someone who delt with him directly."

Mark claims that the address in question is not a MtGox address and
that MtGox received no deposit as large as 200,000 BTC.  Mark said that he
didn't see any action that he could take at this time.   I'll try to keep in
touch with Mark (hopefully without pestering him).   I'll keep you posted on
the outcome.

**EXHIBIT 2**

Case: 25CI1:14-cv-00071-JAS     Document #: 232-5     Filed: 10/05/2018     Page 1 of 5



Case: 25CI1:14-cv-00071-JAS    Document #: 232-5    Filed: 10/05/2018    Page 2 of 5

1m  12h  1d  1w  1m  3m  1y  All          Jan 9, 2011   to   Jan 10, 2011    ⬇ Export

$0.32

coindesk

9. Jan          06:00          12:00          18:00          10. Jan

Case: 25CI1:14-cv-00071-JAS     Document #: 232-5     Filed: 10/05/2018     Page 3 of 5



Case: 25CI1:14-cv-00071-JAS     Document #: 232-5     Filed: 10/05/2018     Page 4 of 5








Case: 25CI1:14-cv-00071-JAS       Document #: 232-6       Filed: 10/05/2018       Page 1 of 5

# REUTERS

| Imprisoned In Myanmar | Energy & Environment | Brexit | North Korea | Charged: The Future of Autos |

BUSINESS NEWS

FEBRUARY 28, 2014 / 3:50 AM / 5 YEARS AGO

# Mt. Gox files for bankruptcy, hit with lawsuit

Yoshifumi Takemoto, Sophie Knight



TOKYO (Reuters) - Mt. Gox, once the world's biggest bitcoin exchange, filed for bankruptcy protection in Japan on Friday, saying it may have lost nearly half a billion dollars worth of the virtual coins due to hacking into its faulty computer system.

Mark Karpeles (2nd L), chief executive of Mt. Gox, attends a news conference at the Tokyo District Court in Tokyo February 28, 2014. Mt. Gox, once the world's biggest bitcoin exchange, filed for bankruptcy protection on Friday, saying it may have lost all of its investors' virtual coins due to hacking into its faulty computer system. Karpeles, bowing in contrition and wearing a suit instead of his customary T-shirt, apologised in Japanese at a news conference for the company's collapse, blaming "a weakness in our system." REUTERS/Yuya Shino

The collapse caps a tumultuous few weeks in which the company has remained virtually silent after halting trades of the crypto-currency, shaking the nascent but burgeoning bitcoin community.

RELATED COVERAGE

Mt. Gox bitcoin debacle: huge heist or sloppy glitch?

Wearing a suit instead of his customary T-shirt, Mt. Gox's French CEO Mark Karpeles bowed in contrition and apologized in Japanese at a news conference at the Tokyo District Court, blaming his firm's collapse on a "weakness in our system", but predicting that bitcoin would continue to grow.

"First of all, I'm very sorry," he said. "The bitcoin industry is healthy and it is growing. It will continue, and reducing the impact is the most important point."

Angry investors have been seeking answers for what happened to their holdings of cash and bitcoins on the unregulated Tokyo-based exchange.

SPONSORED

Gregory Greene, who estimated his bitcoin stake at $25,000, filed a lawsuit in the U.S. District Court in Chicago late on Thursday, saying Mt. Gox had failed "to provide its users with the level of security protection for which they paid.

Case: 25CI1:14-cv-00071-JAS    Document #: 232-6    Filed: 10/05/2018    Page 3 of 5

Baker & McKenzie, a Chicago-based law firm that represents Mt. Gox, declined to comment. It is not yet clear if the firm is representing the exchange in this lawsuit.

Mt. Gox said the exchange, used overwhelmingly by foreigners, had lost 750,000 of its users' bitcoins and 100,000 of its own. At the current bitcoin price of about $565, that would total some $480 million - representing about 7 percent of the estimated global total of bitcoins.

Mark Karpeles (L), chief executive of Mt. Gox, attends a news conference at the Tokyo District Court in Tokyo February 28, 2014. Mt. Gox, once the world's biggest bitcoin exchange, filed for bankruptcy protection on Friday, saying it may have lost all of its investors' virtual coins due to hacking into its faulty computer system. Karpeles, bowing in contrition and wearing a suit instead of his customary T-shirt, apologised in Japanese at a news conference for the company's collapse, blaming "a weakness in our system." REUTERS/Yuya Shino

"This may be telling for the level of traceability of the transactions. Bitcoin has been telling us that it is more traceable than cash. The question is, how much more and is there the potential for real recourse in the case of theft," said Moshe Cohen, assistant professor at Columbia Business School in New York.

Mt. Gox said there was a discrepancy of 2.8 billion yen ($27.4 million) in its bank accounts when it checked on Monday. Junko Suetomi, a lawyer with Baker & MacKenzie, said she could not comment on the balances of foreign bank accounts held by the company.

## PROBLEM WITH EXCHANGE, NOT BITCOIN

Many bitcoin market participants have said Mt. Gox's problems were specific to the company and were caused by what they said was a lax attitude by Karpeles, while bitcoin itself - free of any central bank control - was still a noble venture.

"If we could agree on legal regulation, we should let (bitcoin and regulators) co-exist," said Keiichi Hida, a bitcoin investor and member of the Japan Digital Money Association. He lost about 100,000 yen worth of bitcoins, but seemed unconcerned as he became interested in the virtual currency as a form of "study".

"We should make it a national project to have bitcoin used nationwide at the time of the 2020 Tokyo Olympics," he said.

Mt. Gox shut its website on Tuesday after freezing withdrawals earlier this month in the wake of a series of technical difficulties.

The exchange had liabilities of 6.5 billion yen ($63.67 million), dwarfing its total assets of 3.84 billion yen, the company said. It had 127,000 creditors in bankruptcy, just over 1,000 of whom are Japanese.

Slideshow (2 Images)

The company and Karpeles have said little in the days before Friday's court filing, which is similar to Chapter 11 bankruptcy in the United

Case: 25CI1-14-cv-00071-JAS    Document #: 232-6    Filed: 10/05/2018    Page 5 of 5

States, except that they were working with others to resolve their problems."

Another lawyer, Akio Shinomiya at Yodoyabashi and Yamagami, said Mt. Gox wanted to file a criminal complaint against what he said was a hacking attack, but had no specific means of doing so.

"Bitcoin has always been volatile and speculative, said bitcoin user Ken Shishido, who had about a tenth of his bitcoin holdings at Mt. Gox, but has seen the rest of his bitcoins soar tenfold since he began trading 18 months ago.

"It's too bad that this happened, but we have to let it go. And then we'll buy more."

Fortress Investment Group became one of the first big investors to say it had lost money investing in bitcoin. In a regulatory filing with the U.S. Securities and Exchange Commission, the company said it incurred $3.7 million in unrealized losses in 2013.

(Here is a list of related stories on bitcoin and the collapse of Mt.

Additional reporting by Nathan Layne and Emi Emoto in Tokyo, and Jonathan Stempel, Emily Flitter and David Gaffen in New York; Writing by William Mallard; Editing by Ian Geoghegan

*Our Standards:*   <u>*The Thomson Reuters Trust Principles.*</u>

**MORE FROM REUTERS**

READ MORE »        TOP ARTICLES      1/5

**SPONSORED**

**EXHIBITS, REFORM**

**U.S. Bankruptcy Court**
**Northern District of Texas (Dallas)**
**Bankruptcy Petition #: 14-31229-sgj15**

*Date filed:* 03/09/2014

*Assigned to:* Stacey G. Jernigan
Chapter 15
Voluntary
Asset

| | |
|---|---|
| ***Debtor*** | represented by **MtGox Co., Ltd.** |
| **MtGox Co., Ltd.** | PRO SE |
| Level 15-F, Cerulean Tower | |
| 26-1 Sakuragaoka-cho | **Erin Elizabeth Broderick** |
| Shibuya-ku | Baker & McKenzie LLP |
| Tokyo 150-8152 | 300 East Randolph Street, Suite 5000 |
| OUTSIDE U. S. | Chicago, IL 60601 |
| Japan | 312-861-8935 |
| *aka* **MtGox KK** | Fax : 312-698-2698 |
| | Email: erin.broderick@bakermckenzie.com |
| | *TERMINATED: 05/07/2014* |

**John E. Mitchell**
(See above for address)
*TERMINATED: 05/07/2014*

**David William Parham**
(See above for address)
*TERMINATED: 05/07/2014*

**Rosa A. Shirley**
(See above for address)
*TERMINATED: 05/07/2014*

***Foreign Representative***               represented by **Marcus Alan Helt**
**Nobuaki Kobayashi**                                           Gardere Wynne Sewell LLP
DALLAS-TX                                                              1601 Elm Street
                                                                                 Suite 3000
                                                                                 Dallas, TX 75201
                                                                                 214-999-4526
                                                                                 Fax : 214-999-3526
                                                                                 Email: mhelt@gardere.com

**David J. Molton**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(212) 209-4822
Fax : (212) 938-2822
Email: dmolton@brownrudnick.com

**Daniel J. Saval**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036

Case: 25CI1:14-cv-00071-JAS     Document #: 232-7     Filed: 10/05/2018     Page 2 of 2

(212) 209-4905
Fax : (212) 938-2893
Email: dsaval@brownrudnick.com

**Thomas C. Scannell**
Gardere Wynne Sewell LLP
1601 Elm St., Ste. 3000
Dallas, TX 75201
214-999-4289
Fax : 214-999-3289
Email: tscannell@gardere.com

*U.S. Trustee*
**United States Trustee**
1100 Commerce Street
Room 976
Dallas, TX 75242
214-767-8967

| Filing Date | Docket Text |
|---|---|
| 03/09/2014 | 1 (3 pgs) Chapter 15 Petition for Recognition of Foreign Proceeding.. Fee Amount $1213 Filed by MtGox Co., Ltd. (Parham, David) |
| 03/09/2014 | Receipt of filing fee for Petition foreign proceeding (chapter 15)(14-31229-15) [misc,petfp15a] (1213.00). Receipt number 18717818, amount $1213.00 (re: Doc# 1). (U.S. Treasury) |
| 03/09/2014 | 2 (15 pgs; 2 docs) Declaration re: *Verified Petition for Recognition and Chapter 15 Relief* filed by Debtor MtGox Co., Ltd. (RE: related document(s)1 Petition foreign proceeding (chapter 15)). (Attachments: # 1 Exhibit A - Proposed Order) (Parham, David) |
| 03/09/2014 | 3 (34 pgs) Declaration re: *Declaration of Robert Marie Mark Karpeles* filed by Debtor MtGox Co., Ltd. (RE: related document(s)1 Petition foreign proceeding (chapter 15), 2 Declaration). (Parham, David) |
| 03/10/2014 | 4 (18 pgs) Motion for protective order *Emergency Application for an Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code, Scheduling Recognition Hearing, and Specifying Form and Manner of Notice* Filed by Debtor MtGox Co., Ltd. (Parham, David) |
| 03/10/2014 | 5 (81 pgs; 2 docs) Declaration re: *Declaration of Tod L. Gamlen* filed by Debtor MtGox Co., Ltd. (RE: related document(s)4 Motion for protective order *Emergency Application for an Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code, Scheduling Recognition Hearing, and Specifying Form and Manner of Notice*). (Attachments: # 1 Part 2 of Declaration) (Parham, David) |
| 03/10/2014 | 6 (29 pgs) Brief in support filed by Debtor MtGox Co., Ltd. (RE: related document(s)2 Declaration, 4 Motion for protective order *Emergency Application for an Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code, Scheduling Recognition Hearing, and Specifying Form and Manner of Notice*). (Parham, David) |
| 03/10/2014 | 7 (3 pgs) Declaration re: *Statement Pursuant to Bankruptcy Rule 1007(a)(4)* filed by Debtor MtGox Co., Ltd. (RE: related document(s)1 Petition foreign proceeding (chapter 15)). (Parham, David) |

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

### PLAINTIFFS' RESPONSE TO
### DEFENDANTS' SECOND SET OF REQUESTS FOR ADMISSION

COME NOW the Plaintiffs, by and through counsel, in the above styled and numbered cause, and file this their Response to Defendants' Second Set of Requests for Admission, as follows:

### GENERAL OBJECTIONS AND QUALIFICATIONS

These responses are made based on information presently available to the Plaintiffs. As discovery in this case is incomplete, there may be further facts that develop which may affect the Plaintiffs' response which the Plaintiffs are presently unaware despite due diligence. The Plaintiffs reserve the right to modify or supplement their response with such relevant information they may subsequently discover. As such, their response is made without prejudice to them using or relying at trial on information herein omitted through a good faith oversight, error or mistake, though subsequently discovered.

Subject to these general qualifications, specific objections and responses are set out below:

**REQUEST NO. 1**:

Admit you did not file a claim in any bankruptcy case proceeding, or action in which MTGOX is a debtor.

**RESPONSE**: Admitted.

**REQUEST NO. 2**:

Admit you did not file a claim in any bankruptcy case proceeding, or action in which

Mark Karpeles is a debtor.

**RESPONSE**:  Admitted.

RESPECTFULLY SUBMITTED, this the 30th day of August, 2017.

> **DR. DONALD RAGGIO**
> **AND CHRIS RAGGIO**
>
> s/Charles "Brad" Martin
> CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER, GOZA, STACEY & MARTIN, LLC**
114 West Center Street
Canton, MS 39046
Phone: 601-401-1111
Fax: 601-957-6554

### <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375

Ethan Jacobs, Esq.
Holland Law, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

Respectfully submitted, this the 30th day of August, 2017.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                              **PLAINTIFFS**

VS.                                              **CAUSE NO. 14-CV-00071-TTG**

MTGOX, et al.                                              **DEFENDANTS**

**CHRIS AND DONALD RAGGIOS' FIFTH SUPPLEMENTAL RESPONSES TO**
**DEFENDANTS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

COME NOW Doctors Chris and Donald Raggio, Plaintiffs, by and through counsel, in the

above styled and numbered cause and file this their Fifth Supplemental Responses to Defendants'

Third Set of Requests for Production of Documents, as follows:

**GENERAL OBJECTIONS AND QUALIFICATIONS**

These responses are made on the basis of information presently available to the Plaintiffs,

Doctors Chris and. Donald Raggio, upon their information and belief.  As discovery in this case is

incomplete, there may be further facts that develop which may affect the Plaintiffs' responses

which the Plaintiffs are presently unaware despite due diligence.  The Plaintiffs reserve the right

to modify or supplement their responses with such relevant information as they may subsequently

discover.  As such, their responses are made without prejudice to then using or relying at trial on

information herein omitted through a good faith oversight, error or mistake, though subsequently

discovered.

Subject to these general qualifications, specific objections and responses are set out below:

**REQUEST NO. 3**: Produce a copy of all statements, screenshots, or other documentation

which show the monthly contents and/or origin of incoming deposits or purchases from December

1, 2010 through the filing of this suit, for any accounts, wallets, or other location where either

Plaintiff has stored, held, owned, purchased, or traded any type of digital currencies, including but not limited to E-gold, Liberty Reserve, bitcoin, altcoin, mastercoin, peercoin, darkcoin, litecoin, zetacoin, feathercoin, ethereum, digitalcoin, counterparty, novacoin, dogecoin, or primecoin.

**RESPONSE:** Objection, this request is not designed to obtain information reasonably calculated to lead to the discovery of relevant evidence pertaining to the claims and defenses of any party. Plaintiff further objects in that this interrogatory is made to cause annoyance, embarrassment, oppression and undue burden or expense to the Plaintiff. Without waiving the aforesaid objections please see RAGGIO 00070-00087, which has previously been produced.

**SUPPLEMENTAL RESPONSE:** Subject to the aforesaid objections and that the request is not limited in time and scope, Plaintiff Chris Raggio responds in accordance to the July 1, 2010 through January 31, 2013 time period set forth in the Circuit Court's June 5, 2018 Order.

See RAGGIO 00070-00087 and RAGGIO 00338-00340.

RESPECTFULLY SUBMITTED, this the 25th day of June, 2018.

**DOCTORS CHRIS AND DONALD RAGGIO**

s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER, GOZA, STACEY & MARTIN, LLC**
3352 North Liberty Street
Canton, MS 39046
Phone: 601-401-1111
Fax: 601-957-6554

2

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
T. Peyton Smith, Esq.
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375

Ethan Jacobs, Esq.
Holland Law, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

Respectfully submitted, this the 25th day of June, 2018.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                            **PLAINTIFFS**

**VS.**                                                      **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                              **DEFENDANTS**

**CHRIS RAGGIO'S FIRST SUPPLEMENTAL
RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

COMES NOW Dr. Chris Raggio, Plaintiff, by and through counsel, in the above styled and numbered cause, by and through counsel, and files this his First Supplemental Responses to Defendants' First of Interrogatories, as follows:

**GENERAL OBJECTIONS AND QUALIFICATIONS**

These responses are made on the basis of information presently available to the Plaintiff, Dr. Chris Raggio, upon his information and belief. As discovery in this case is incomplete, there may be further facts that develop which may affect the Plaintiff's responses which the Plaintiff is presently unaware despite due diligence. The Plaintiff reserves the right to modify or supplement his responses with such relevant information as he may subsequently discover. As such, his responses are made without prejudice to him using or relying at trial on information herein omitted through a good faith oversight, error or mistake, though subsequently discovered.

Subject to these general qualifications, specific objections and responses are set out below:

**INTERROGATORY NO. 2:** Identify any other bitcoin accounts to which you moved bitcoins which were ever held in your MTGOX account or any wallet owned by you, including any accounts associated with bitcoingateway.com.

**RESPONSE:** Objection, this request is not designed to obtain information reasonably calculated to lead to the discovery of relevant evidence pertaining to the claims and defenses of any party.  Plaintiff further objects in that this interrogatory is made to cause annoyance, embarrassment, oppression and undue burden or expense to the Plaintiff.

**SUPPLEMENTAL RESPONSE:**  Subject to the aforesaid objections and that the request is not limited in time and scope, Plaintiff Chris Raggio responds in accordance to the July 1, 2010 through January 31, 2013 time period set forth in the Circuit Court's June 5, 2018 Order.

See documents previously produced as see RAGGIO 00070-00087.  Supplemental documentation is being produced as RAGGIO 00338-00340 which are emails from Bitcoin Gateway.

The MTGOX transaction log produced shows the bitcoin addresses which were affiliated with my bitcoin wallet.  All transactions shown on the MTGOX transaction log were conducted by me except for the three unauthorized transactions undertaken by "Baron" and one authorized transaction conducted by Jed McCaleb.  All three of the Baron transactions were sent to a bitcoin address starting with 1DVQ.  The last transaction shown on June 25, 2011 shows a manual withdrawal of 20,844.169 BTC. This transaction was undertaken by Jed McCaleb in which he sent to my bitcoin wallet the remaining bitcoins except for those hacked by Baron.  It is my belief that this transaction actually took place sometime in January 2011, not June 2011.

RAGGIO 00338-00340 are Bitcoin Gateway emails which show three buys conducted by me of 500 bitcoins each.  Each time these bitcoins were sent to my wallet, of which I no longer possess.  I do not recall the actual bitcoin addresses to which these were delivered.

During the time period ordered by the Court, I believe these are the only cryptocurrency transactions conducted by me, although I may have obtained free and small amounts of bitcoins

through a bitcoin faucet.  If I did obtain bitcoins from a faucet these would have been a small fraction of a bitcoin.

**INTERROGATORY NO. 6**: Identify any accounts, wallets, or other location where either Plaintiff has stored, held, owned, purchased, or traded any type of digital currencies, including but not limited to E-gold, Liberty Reserve, bitcoin, altcoin, mastercoin, peercoin, darkcoin, litecoin, zetacoin, feathercoin, ethereum, digitalcoin, counterparty, novacoin, dogecoin, or primecoin, from December 1, 2010 through the filing of this suit.

**RESPONSE:** Objection, this request is not designed to obtain information reasonably calculated to lead to the discovery of relevant evidence pertaining to the claims and defenses of any party.  Plaintiff further objects in that this interrogatory is made to cause annoyance, embarrassment, oppression and undue burden or expense to the Plaintiff.

**SUPPLEMENTAL RESPONSE:** See Supplemental Response to Interrogatory No. 2.

RESPECTFULLY SUBMITTED, this the 25th day of June, 2018.

**DR. CHRIS RAGGIO**

s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767

OF COUNSEL:
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER, GOZA, STACEY & MARTIN, LLC**
3342 North Liberty Street
Canton, MS 39046
Phone: 601-401-1111
Fax: 601-957-6554

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

Edwin S. Gault, Jr., Esq.
Mandie B. Robinson, Esq.
Forman Watkins & Krutz LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099

Ethan Jacobs, Esq.
Holland Law, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

Respectfully submitted, this the 25th day of June, 2018.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

RAGGIO  00070

DonRaggio          Open orders: 0   Sign out

Your wallet:   **0.00000000 BTC**          $62.69800

**HOME**                                              **TRADE**      **API**     **MOBILE**     **FORT GOX**     **SETTINGS**

Our Terms of Service and Privacy Policy have gone into effect for all user accounts. Please click here to review them. You will not be able to add funds or access the trading functions of the site until you have agreed to the TOS.

# Review

TRADE

FUNDING OPTIONS

ACCOUNT HISTORY

TRADE DATA

RAGGIO 00071



## Transactions



Please choose which history you want to see: [BTC] [USD]

| DATE (Y/M/D) | TYPE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|
| Sat 25 Jun 2011 04:57:02 AM GMT | Out | Fixing balance to match | 20,844.16900000 BTC | 0.00000000 BTC |
| Mon 10 Jan 2011 10:29:38 AM GMT | Out | 1CyPTez73fVn7KwXPCu3Li15e78eag1aMY | 2,986.84200000 BTC | 20,844.16900000 BTC |
| Mon 10 Jan 2011 05:06:13 AM GMT | Fee | BTC bought: [tid:27211] 10.00000000 BTC at $0.32800 (fee) | 0.06500000 BTC | 23,831.01100000 BTC |
| Mon 10 Jan 2011 05:06:13 AM GMT | In | BTC bought: [tid:27211] 10.00000000 BTC at $0.32800 | 10.00000000 BTC | 23,831.07600000 BTC |
| Mon 10 Jan 2011 04:57:14 AM GMT | Out | 1CCaJLNoQ4U9CbwJ3xWbsbze1niN81fFVo | 52.67200000 BTC | 23,821.07600000 BTC |
| Mon 10 Jan 2011 04:37:24 AM GMT | Out | BTC sold: [tid:27210] 93.24800000 BTC at $0.31750 | 93.24800000 BTC | 23,873.74800000 BTC |

RAGGIO 00072

| | | | | |
|---|---|---|---|---|
| Mon 10 Jan 2011 04:37:24 AM GMT | Out | BTC sold: [tid:27209] 6.75200000 BTC at $0.31760 | 6.75200000 BTC | 23,966.99600000 BTC |
| Mon 10 Jan 2011 04:29:28 AM GMT | Out | BTC sold: [tid:27208] 100.00000000 BTC at $0.31760 | 100.00000000 BTC | 23,973.74800000 BTC |
| Sun 09 Jan 2011 10:29:15 AM GMT | Out | 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh | 3,096.93400000 BTC | 24,073.74800000 BTC |
| Sat 08 Jan 2011 10:25:32 AM GMT | Out | 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh | 3,174.60300000 BTC | 27,170.68200000 BTC |
| Fri 07 Jan 2011 02:39:13 AM GMT | Out | 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh | 3,134.79600000 BTC | 30,345.28500000 BTC |
| Sun 02 Jan 2011 04:24:29 PM GMT | Out | 12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea | 2,404.83500000 BTC | 33,480.08100000 BTC |
| Sun 02 Jan 2011 04:20:47 PM GMT | Fee | BTC bought: [tid:26991] 10.00000000 BTC at $0.30000 (fee) | 0.06500000 BTC | 35,884.91600000 BTC |
| Sun 02 Jan 2011 04:20:47 PM GMT | In | BTC bought: [tid:26991] 10.00000000 BTC at $0.30000 | 10.00000000 BTC | 35,884.98100000 BTC |
| Sun 02 Jan 2011 04:20:47 PM GMT | Fee | BTC bought: [tid:26990] 140.00000000 BTC at $0.29997 (fee) | 0.91000000 BTC | 35,874.98100000 BTC |
| Sun 02 Jan 2011 04:20:47 PM GMT | In | BTC bought: [tid:26990] 140.00000000 BTC at $0.29997 | 140.00000000 BTC | 35,875.89100000 BTC |
| Sun 02 Jan 2011 04:19:59 PM GMT | Out | 12o8N9z4FxeEaGhMLETZsnouGSd2cdgu2o | 1,000.00000000 BTC | 35,735.89100000 BTC |
| Wed 29 Dec 2010 05:51:19 AM GMT | Fee | BTC bought: [tid:26889] 200.00000000 BTC at $0.28101 (fee) | 1.30000000 BTC | 36,735.89100000 BTC |
| Wed 29 Dec 2010 05:51:19 AM GMT | In | BTC bought: [tid:26889] 200.00000000 BTC at $0.28101 | 200.00000000 BTC | 36,737.19100000 BTC |
| Wed 29 Dec 2010 05:12:31 AM GMT | Fee | BTC bought: [tid:26887] 85.00000000 BTC at $0.28101 (fee) | 0.55200000 BTC | 36,537.19100000 BTC |
| Wed 29 Dec 2010 | | BTC bought: [tid:26887] 85.00000000 BTC at | | |

RAGGIO 00073

| | | | | |
|---|---|---|---|---|
| 05:12:31 AM GMT | In | $0.28101 | 85.00000000 BTC | 36,537.74300000 BTC |
| Wed 29 Dec 2010 05:09:00 AM GMT | Fee | BTC bought: [tid:26886] 750.00000000 BTC at $0.28101 (fee) | 4.87500000 BTC | 36,452.74300000 BTC |
| Wed 29 Dec 2010 05:09:00 AM GMT | In | BTC bought: [tid:26886] 750.00000000 BTC at $0.28101 | 750.00000000 BTC | 36,457.61800000 BTC |
| Wed 29 Dec 2010 04:47:07 AM GMT | Fee | BTC bought: [tid:26885] 150.00000000 BTC at $0.28101 (fee) | 0.97500000 BTC | 35,707.61800000 BTC |
| Wed 29 Dec 2010 04:47:07 AM GMT | In | BTC bought: [tid:26885] 150.00000000 BTC at $0.28101 | 150.00000000 BTC | 35,708.59300000 BTC |
| Wed 29 Dec 2010 04:40:18 AM GMT | Fee | BTC bought: [tid:26884] 100.00000000 BTC at $0.28101 (fee) | 0.65000000 BTC | 35,558.59300000 BTC |
| Wed 29 Dec 2010 04:40:18 AM GMT | In | BTC bought: [tid:26884] 100.00000000 BTC at $0.28101 | 100.00000000 BTC | 35,559.24300000 BTC |
| Wed 29 Dec 2010 03:40:38 AM GMT | Fee | BTC bought: [tid:26876] 2,000.00000000 BTC at $0.28101 (fee) | 13.00000000 BTC | 35,459.24300000 BTC |
| Wed 29 Dec 2010 03:40:38 AM GMT | In | BTC bought: [tid:26876] 2,000.00000000 BTC at $0.28101 | 2,000.00000000 BTC | 35,472.24300000 BTC |
| Wed 29 Dec 2010 03:08:52 AM GMT | Fee | BTC bought: [tid:26848] 3,600.00000000 BTC at $0.28101 (fee) | 23.40000000 BTC | 33,472.24300000 BTC |
| Wed 29 Dec 2010 03:08:52 AM GMT | In | BTC bought: [tid:26848] 3,600.00000000 BTC at $0.28101 | 3,600.00000000 BTC | 33,495.64300000 BTC |
| Wed 29 Dec 2010 02:18:51 AM GMT | Fee | BTC bought: [tid:26847] 392.61100000 BTC at $0.28100 (fee) | 2.55100000 BTC | 29,895.64300000 BTC |
| Wed 29 Dec 2010 02:18:51 AM GMT | In | BTC bought: [tid:26847] 392.61100000 BTC at $0.28100 | 392.61100000 BTC | 29,898.19400000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26840] 10.00000000 BTC at $0.28000 (fee) | 0.06500000 BTC | 29,505.58300000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26840] 10.00000000 BTC at $0.28000 | 10.00000000 BTC | 29,505.64800000 BTC |

RAGGIO   00074

| | | | | |
|---|---|---|---|---|
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26839] 1,000.00000000 BTC at $0.28000 (fee) | 6.50000000 BTC | 29,495.64800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26839] 1,000.00000000 BTC at $0.28000 | 1,000.00000000 BTC | 29,502.14800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26838] 1,000.00000000 BTC at $0.28000 (fee) | 6.50000000 BTC | 28,502.14800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26838] 1,000.00000000 BTC at $0.28000 | 1,000.00000000 BTC | 28,508.64800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26837] 100.00000000 BTC at $0.28000 (fee) | 0.65000000 BTC | 27,508.64800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26837] 100.00000000 BTC at $0.28000 | 100.00000000 BTC | 27,509.29800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26836] 6.82000000 BTC at $0.28000 (fee) | 0.04400000 BTC | 27,409.29800000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26836] 6.82000000 BTC at $0.28000 | 6.82000000 BTC | 27,409.34200000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26835] 149.00000000 BTC at $0.27990 (fee) | 0.96800000 BTC | 27,402.52200000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26835] 149.00000000 BTC at $0.27990 | 149.00000000 BTC | 27,403.49000000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26834] 49.75000000 BTC at $0.27900 (fee) | 0.32300000 BTC | 27,254.49000000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26834] 49.75000000 BTC at $0.27900 | 49.75000000 BTC | 27,254.81300000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26833] 2,500.00000000 BTC at $0.27890 (fee) | 16.25000000 BTC | 27,205.06300000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26833] 2,500.00000000 BTC at $0.27890 | 2,500.00000000 BTC | 27,221.31300000 BTC |

Fee BTC bought [tid:268832] 44.94000000 BTC at 0.29200000 BTC 24,721.31300000 BTC
$0.27890 (fee)

Case: 25CI1.14-cv-00071-JAS    Document #: 232-9    Filed: 10/05/2018    Page 13 of 28

(3 pages, 128 results)

| 1 | 2 | 3 | > | >> |

RAGGIO 00075

## QUICK LINKS

TRADE
SUPPORT
GET VERIFIED
PRIVACY POLICY

TRADE API
FEE SCHEDULE
FAQ
TERMS OF USE

## OUR COMPANY

ABOUT US      CONTACT US

## APPS AND SOCIAL

VeriSign
Trusted
VERIFY ▸

© 2010 - 2011 Tibanne Co. Ltd. (Japan) |

DonRaggio          Open orders: 0   Sign out

Your wallet:   **0.00000000 BTC**      $62.69800

| HOME | | TRADE | API | MOBILE | FORT GOX | SETTINGS |

Our Terms of Service and Privacy Policy have gone into effect for all user accounts. Please click here to review them. You will not be able to add funds or access the trading functions of the site until you have agreed to the TOS.

# Review

TRADE

FUNDING OPTIONS

ACCOUNT HISTORY

TRADE DATA



## Transactions

Please choose which history you want to see: [BTC] [USD]

| DATE (Y/M/D) | TYPE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26832] 44.94000000 BTC at $0.27890 | 44.94000000 BTC | 24,721.60500000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26831] 0.34000000 BTC at $0.27890 (fee) | 0.00200000 BTC | 24,676.66500000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26831] 0.34000000 BTC at $0.27890 | 0.34000000 BTC | 24,676.66700000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26830] 10.60000000 BTC at $0.27890 (fee) | 0.06800000 BTC | 24,676.32700000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26830] 10.60000000 BTC at $0.27890 | 10.60000000 BTC | 24,676.39500000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26829] 16.84000000 BTC at $0.27890 (fee) | 0.10900000 BTC | 24,665.79500000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26829] 16.84000000 BTC at $0.27890 | 16.84000000 BTC | 24,665.90400000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26828] 1,200.00000000 BTC at $0.27870 (fee) | 7.80000000 BTC | 24,649.06400000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26828] 1,200.00000000 BTC at $0.27870 | 1,200.00000000 BTC | 24,656.86400000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26827] 2,457.95000000 BTC at $0.27750 (fee) | 15.97600000 BTC | 23,456.86400000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26827] 2,457.95000000 BTC at $0.27750 | 2,457.95000000 BTC | 23,472.84000000 BTC |

RAGGIO   00076

| | | | | |
|---|---|---|---|---|
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26826]<br>18.89000000 BTC at $0.27500<br>(fee) | 0.12000000 BTC | 21,014.89000000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26826]<br>18.89000000 BTC at $0.27500 | 18.89000000 BTC | 21,015.01200000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26825]<br>369.59000000 BTC at $0.27300<br>(fee) | 2.40200000 BTC | 20,996.12000000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26825]<br>369.59000000 BTC at $0.27300 | 369.59000000 BTC | 20,998.52400000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26824]<br>681.00000000 BTC at $0.27200<br>(fee) | 4.42600000 BTC | 20,628.93400000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26824]<br>681.00000000 BTC at $0.27200 | 681.00000000 BTC | 20,633.36000000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26823]<br>101.50600000 BTC at $0.27050<br>(fee) | 0.65900000 BTC | 19,952.36000000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26823]<br>101.50600000 BTC at $0.27050 | 101.50600000 BTC | 19,953.01900000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26822]<br>10.00000000 BTC at $0.27000<br>(fee) | 0.06500000 BTC | 19,851.51300000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26822]<br>10.00000000 BTC at $0.27000 | 10.00000000 BTC | 19,851.57800000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26821]<br>1,000.00000000 BTC at<br>$0.27000 (fee) | 6.50000000 BTC | 19,841.57800000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26821]<br>1,000.00000000 BTC at<br>$0.27000 | 1,000.00000000 BTC | 19,848.07800000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26820]<br>100.00000000 BTC at $0.27000<br>(fee) | 0.65000000 BTC | 18,848.07800000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26820]<br>100.00000000 BTC at $0.27000 | 100.00000000 BTC | 18,848.72800000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26819]<br>135.00000000 BTC at $0.27000<br>(fee) | 0.87700000 BTC | 18,748.72800000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26819]<br>135.00000000 BTC at $0.27000 | 135.00000000 BTC | 18,749.60500000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26818]<br>1,000.00000000 BTC at<br>$0.27000 (fee) | 6.50000000 BTC | 18,614.60500000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | In | BTC bought: [tid:26818]<br>1,000.00000000 BTC at<br>$0.27000 | 1,000.00000000 BTC | 18,621.10500000 BTC |
| Tue 28 Dec 2010<br>03:53:49 PM GMT | Fee | BTC bought: [tid:26817]<br>76.66000000 BTC at $0.27000<br>(fee) | 0.49800000 BTC | 17,621.10500000 BTC |

RAGGIO  00077

| | | | | |
|---|---|---|---|---|
| Tue 28 Dec 2010 03:53:49 PM GMT | Fee | BTC bought: [tid:26816] 33.60000000 BTC at $0.27000 (fee) | 0.21800000 BTC | 17,544.94300000 BTC |
| Tue 28 Dec 2010 03:53:49 PM GMT | In | BTC bought: [tid:26816] 33.60000000 BTC at $0.27000 | 33.60000000 BTC | 17,545.16100000 BTC |
| Tue 28 Dec 2010 03:25:03 PM GMT | Fee | BTC bought: [tid:26815] 194.38000000 BTC at $0.26880 (fee) | 1.26300000 BTC | 17,511.56100000 BTC |
| Tue 28 Dec 2010 03:25:03 PM GMT | In | BTC bought: [tid:26815] 194.38000000 BTC at $0.26880 | 194.38000000 BTC | 17,512.82400000 BTC |
| Tue 28 Dec 2010 03:25:03 PM GMT | Fee | BTC bought: [tid:26814] 1,394.04700000 BTC at $0.26880 (fee) | 9.06100000 BTC | 17,318.44400000 BTC |
| Tue 28 Dec 2010 03:25:03 PM GMT | In | BTC bought: [tid:26814] 1,394.04700000 BTC at $0.26880 | 1,394.04700000 BTC | 17,327.50500000 BTC |
| Tue 28 Dec 2010 03:25:03 PM GMT | Fee | BTC bought: [tid:26813] 67.19000000 BTC at $0.26880 (fee) | 0.43600000 BTC | 15,933.45800000 BTC |
| Tue 28 Dec 2010 03:25:03 PM GMT | In | BTC bought: [tid:26813] 67.19000000 BTC at $0.26880 | 67.19000000 BTC | 15,933.89400000 BTC |
| Sun 26 Dec 2010 11:55:12 AM GMT | Fee | BTC bought: [tid:26761] 6,679.88000000 BTC at $0.24639 (fee) | 43.41900000 BTC | 15,866.70400000 BTC |
| Sun 26 Dec 2010 11:55:12 AM GMT | In | BTC bought: [tid:26761] 6,679.88000000 BTC at $0.24639 | 6,679.88000000 BTC | 15,910.12300000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | Fee | BTC bought: [tid:26760] 27.66000000 BTC at $0.26470 (fee) | 0.17900000 BTC | 9,230.24300000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | In | BTC bought: [tid:26760] 27.66000000 BTC at $0.26470 | 27.66000000 BTC | 9,230.42200000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | Fee | BTC bought: [tid:26759] 17.45000000 BTC at $0.26440 (fee) | 0.11300000 BTC | 9,202.76200000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | In | BTC bought: [tid:26759] 17.45000000 BTC at $0.26440 | 17.45000000 BTC | 9,202.87500000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | Fee | BTC bought: [tid:26758] 415.00000000 BTC at $0.26000 (fee) | 2.69700000 BTC | 9,185.42500000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | In | BTC bought: [tid:26758] 415.00000000 BTC at $0.26000 | 415.00000000 BTC | 9,188.12200000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | Fee | BTC bought: [tid:26757] 1,407.58000000 BTC at $0.26000 (fee) | 9.14900000 BTC | 8,773.12200000 BTC |
| Sun 26 Dec 2010 11:41:56 AM GMT | In | BTC bought: [tid:26757] 1,407.58000000 BTC at $0.26000 | 1,407.58000000 BTC | 8,782.27100000 BTC |

| | | | | |
|---|---|---|---|---|
| Sun 26 Dec 2010 11:41:56 AM GMT | Fee | BTC bought: [tid:26756] 32.31000000 BTC at $0.26000 (fee) | 0.21000000 BTC | 7,374.69100000 BTC |

(3 pages, 128 results)   <<  |  <  |  1  |  2  |  3  |  >  |  >>

QUICK LINKS

TRADE
SUPPORT
GET VERIFIED
PRIVACY POLICY

TRADE API
FEE SCHEDULE
FAQ
TERMS OF USE

OUR COMPANY

ABOUT US    CONTACT US

APPS AND SOCIAL



© 2010 - 2011 Tibanne Co. Ltd. (Japan) |

RAGGIO   00079

DonRaggio          Open orders: 0    Sign out

Your wallet:  **0.00000000 BTC**      $62.69800

| **HOME** | | **TRADE** | **API** | **MOBILE** | **FORT GOX** | **SETTINGS** |

Our Terms of Service and Privacy Policy have gone into effect for all user accounts. Please click here to review them. You will not be able to add funds or access the trading functions of the site until you have agreed to the TOS.

# Review

TRADE

FUNDING OPTIONS

ACCOUNT HISTORY

TRADE DATA



## Transactions



Please choose which history you want to see: [BTC] [USD]

| DATE (Y/M/D) | TYPE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|
| Sun 26 Dec 2010 11:41:56 AM GMT | In | BTC bought: [tid:26756] 32.31000000 BTC at $0.26000 | 32.31000000 BTC | 7,374.90100000 BTC |
| Sun 26 Dec 2010 11:39:48 AM GMT | Fee | BTC bought: [tid:26755] 160.00000000 BTC at $0.25990 (fee) | 1.04000000 BTC | 7,342.59100000 BTC |

RAGGIO   00080

| Date | Type | Description | Amount | Balance |
|---|---|---|---|---|
| Sun 26 Dec 2010 11:39:48 AM GMT | | BTC bought: [tid:26755] 160.00000000 BTC at $0.25990 | 160.00000000 BTC | 7,183.49100000 BTC |
| Sun 26 Dec 2010 11:39:13 AM GMT | Fee | BTC bought: [tid:26754] 20.00000000 BTC at $0.25980 (fee) | 0.13000000 BTC | 7,183.63100000 BTC |
| Sun 26 Dec 2010 11:39:13 AM GMT | In | BTC bought: [tid:26754] 20.00000000 BTC at $0.25980 | 20.00000000 BTC | 7,183.76100000 BTC |
| Sun 26 Dec 2010 07:25:04 AM GMT | Out | 16GrQkcWsw4HgyVDepsn16bGDqCKhNt6R3 | 300.00000000 BTC | 7,163.76100000 BTC |
| Sun 26 Dec 2010 07:22:43 AM GMT | Fee | BTC bought: [tid:26753] 1,929.01000000 BTC at $0.26000 (fee) | 12.53800000 BTC | 7,463.76100000 BTC |
| Sun 26 Dec 2010 07:22:43 AM GMT | In | BTC bought: [tid:26753] 1,929.01000000 BTC at $0.26000 | 1,929.01000000 BTC | 7,476.29900000 BTC |
| Sun 26 Dec 2010 07:22:43 AM GMT | Fee | BTC bought: [tid:26752] 1,757.36000000 BTC at $0.26000 (fee) | 11.42200000 BTC | 5,547.28900000 BTC |
| Sun 26 Dec 2010 07:22:43 AM GMT | In | BTC bought: [tid:26752] 1,757.36000000 BTC at $0.26000 | 1,757.36000000 BTC | 5,558.71100000 BTC |
| Sun 26 Dec 2010 07:22:43 AM GMT | Fee | BTC bought: [tid:26751] 64.63000000 BTC at $0.26000 (fee) | 0.42000000 BTC | 3,801.35100000 BTC |
| Sun 26 Dec 2010 07:22:43 AM GMT | In | BTC bought: [tid:26751] 64.63000000 BTC at $0.26000 | 64.63000000 BTC | 3,801.77100000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26750] 2,242.64000000 BTC at $0.26000 (fee) | 14.57700000 BTC | 3,737.14100000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26750] 2,242.64000000 BTC at $0.26000 | 2,242.64000000 BTC | 3,751.71800000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26749] 14.03000000 BTC at $0.25500 (fee) | 0.09100000 BTC | 1,509.07800000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26749] 14.03000000 BTC at $0.25500 | 14.03000000 BTC | 1,509.16900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26748] 30.00000000 BTC at $0.25011 (fee) | 0.19500000 BTC | 1,495.13900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26748] 30.00000000 BTC at $0.25011 | 30.00000000 BTC | 1,495.33400000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26747] 1,150.00000000 BTC at $0.25000 (fee) | 7.47500000 BTC | 1,465.33400000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26747] 1,150.00000000 BTC at $0.25000 | 1,150.00000000 BTC | 1,472.80900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26746] 100.00000000 BTC at $0.25000 (fee) | 0.65000000 BTC | 322.80900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26746] 100.00000000 BTC at $0.25000 | 100.00000000 BTC | 323.45900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26745] 129.26000000 BTC at $0.25000 (fee) | 0.84000000 BTC | 223.45900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26745] 129.26000000 BTC at $0.25050 | 129.26000000 BTC | 224.29900000 BTC |
| Sun 26 Dec 2010 07:16:57 AM GMT | Fee | BTC bought: [tid:26744] 85.66000000 BTC at $0.24990 (fee) | 0.55600000 BTC | 95.03900000 BTC |

RAGGIO   00081

| Sun 26 Dec 2010 07:16:57 AM GMT | In | BTC bought: [tid:26744] 85.66000000 BTC at $0.24990 | 85.66000000 BTC | 95.59500000 BTC |
| Sun 26 Dec 2010 07:13:47 AM GMT | Fee | BTC bought: [tid:26743] 10.00000000 BTC at $0.24990 (fee) | 0.06500000 BTC | 9.93500000 BTC |
| Sun 26 Dec 2010 07:13:47 AM GMT | In | BTC bought: [tid:26743] 10.00000000 BTC at $0.24990 | 10.00000000 BTC | 10.00000000 BTC |

(3 pages, 128 results)    << | < | 1 | 2 | 3

---

## QUICK LINKS

TRADE
SUPPORT
GET VERIFIED
PRIVACY POLICY

TRADE API
FEE SCHEDULE
FAQ
TERMS OF USE

## OUR COMPANY

ABOUT US    CONTACT US

## APPS AND SOCIAL



© 2010 - 2011 Tibanne Co. Ltd. (Japan) |

DonRaggio          Open orders: 0    Sign out

Your wallet:    **0.00000000 BTC**        $62.69800

| HOME | | TRADE | API | MOBILE | FORT GOX | SETTINGS |

Our Terms of Service and Privacy Policy have gone into effect for all user accounts. Please click here to review them. You will not be able to add funds or access the trading functions of the site until you have agreed to the TOS.

# Review

TRADE

FUNDING OPTIONS

**ACCOUNT HISTORY**

TRADE DATA



## Transactions

Please choose which history you want to see: [BTC] [USD]

| DATE (Y/M/D) | TYPE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|
| Sat 25 Jun 2011 04:57:02 AM GMT | In | Fixing balance to match | $20,844.16900 | $62.69800 |
| Mon 17 Jan 2011 03:02:52 PM GMT | Out | | $20,844.16900 | $-20,781.47100 |
| Mon 10 Jan 2011 05:06:13 AM GMT | Spent | BTC bought: [tid:27211] 10.00000000 ฿TC at $0.32800 | $3.28000 | $62.69800 |
| Mon 10 Jan 2011 04:37:24 AM GMT | Fee | BTC sold: [tid:27210] 93.24800000 ฿TC at $0.31750 (fee) | $0.19224 | $65.97800 |
| Mon 10 Jan 2011 04:37:24 AM GMT | Earned | BTC sold: [tid:27210] 93.24800000 ฿TC at $0.31750 | $29.60624 | $66.17024 |
| Mon 10 Jan 2011 04:37:24 AM GMT | Fee | BTC sold: [tid:27209] 6.75200000 ฿TC at $0.31760 (fee) | $0.01344 | $36.56400 |
| Mon 10 Jan 2011 04:37:24 AM GMT | Earned | BTC sold: [tid:27209] 6.75200000 ฿TC at $0.31760 | $2.14444 | $36.57744 |
| Mon 10 Jan 2011 04:29:28 AM GMT | Fee | BTC sold: [tid:27208] 100.00000000 ฿TC at $0.31760 (fee) | $0.20600 | $34.43300 |
| Mon 10 Jan 2011 04:29:28 AM GMT | Earned | BTC sold: [tid:27208] 100.00000000 ฿TC at $0.31760 | $31.76000 | $34.63900 |
| Sun 02 Jan 2011 04:20:47 PM GMT | Spent | BTC bought: [tid:26991] 10.00000000 ฿TC at $0.30000 | $2.99900 | $2.87900 |
| Sun 02 Jan 2011 04:20:47 PM GMT | Spent | BTC bought: [tid:26990] 140.00000000 ฿TC at $0.29997 | $41.99500 | $5.87800 |
| Wed 29 Dec 2010 12:30:13 PM GMT | Out | | $10,000.00000 | $47.87300 |
| Wed 29 Dec 2010 05:51:19 AM GMT | Spent | BTC bought: [tid:26889] 200.00000000 ฿TC at $0.28101 | $56.20200 | $10,047.87300 |

RAGGIO   00083

| | | | | |
|---|---|---|---|---|
| Wed 29 Dec 2010 05:09:37 AM GMT | Spent | BTC bought: [tid:26887] 85.60000000 BTC at $0.28101 | $23.88500 | $10,104.07500 |
| Wed 29 Dec 2010 05:09:00 AM GMT | Spent | BTC bought: [tid:26886] 750.00000000 BTC at $0.28101 | $210.75700 | $10,127.96000 |
| Wed 29 Dec 2010 04:47:07 AM GMT | Spent | BTC bought: [tid:26885] 150.00000000 BTC at $0.28101 | $42.15100 | $10,338.71700 |
| Wed 29 Dec 2010 04:40:18 AM GMT | Spent | BTC bought: [tid:26884] 100.00000000 BTC at $0.28101 | $28.10100 | $10,380.86800 |
| Wed 29 Dec 2010 03:40:38 AM GMT | Spent | BTC bought: [tid:26876] 2,000.00000000 BTC at $0.28101 | $562.02000 | $10,408.96900 |
| Wed 29 Dec 2010 03:08:52 AM GMT | Spent | BTC bought: [tid:26848] 3,600.00000000 BTC at $0.28101 | $1,011.63500 | $10,970.98900 |
| Wed 29 Dec 2010 02:18:51 AM GMT | Spent | BTC bought: [tid:26847] 392.61100000 BTC at $0.28100 | $110.32300 | $11,982.62400 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26840] 10.00000000 BTC at $0.28000 | $2.80000 | $12,092.94700 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26839] 1,000.00000000 BTC at $0.28000 | $280.00000 | $12,095.74700 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26838] 1,000.00000000 BTC at $0.28000 | $280.00000 | $12,375.74700 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26837] 100.00000000 BTC at $0.28000 | $28.00000 | $12,655.74700 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26836] 6.82000000 BTC at $0.28000 | $1.90900 | $12,683.74700 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26835] 149.00000000 BTC at $0.27990 | $41.70500 | $12,685.65600 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26834] 49.75000000 BTC at $0.27900 | $13.88000 | $12,727.36100 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26833] 2,500.00000000 BTC at $0.27890 | $697.25000 | $12,741.24100 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26832] 44.94000000 BTC at $0.27890 | $12.53300 | $13,438.49100 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26831] 0.34000000 BTC at $0.27890 | $0.09400 | $13,451.02400 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26830] 10.60000000 BTC at $0.27890 | $2.95600 | $13,451.11800 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26829] 16.84000000 BTC at $0.27890 | $4.69600 | $13,454.07400 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26828] 1,200.00000000 BTC at $0.27870 | $334.44000 | $13,458.77000 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26827] 2,457.95000000 BTC at $0.27750 | $682.08100 | $13,793.21000 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26826] 18.89000000 BTC at $0.27500 | $5.19400 | $14,475.29100 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26825] 369.59000000 BTC at $0.27300 | $100.89800 | $14,480.48500 |

RAGGIO  00084

| | | | | |
|---|---|---|---|---|
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26824] 687.06000000 BTC at 0.27000 | $185.51200 | $14,739.38300 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26823] 101.50600000 BTC at $0.27050 | $27.45700 | $14,766.61500 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26822] 10.00000000 BTC at $0.27000 | $2.70000 | $14,794.07200 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26821] 1,000.00000000 BTC at $0.27000 | $270.00000 | $14,796.77200 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26820] 100.00000000 BTC at $0.27000 | $27.00000 | $15,066.77200 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26819] 135.00000000 BTC at $0.27000 | $36.45000 | $15,093.77200 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26818] 1,000.00000000 BTC at $0.27000 | $270.00000 | $15,130.22200 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26817] 76.66000000 BTC at $0.27000 | $20.69800 | $15,400.22200 |
| Tue 28 Dec 2010 03:53:49 PM GMT | Spent | BTC bought: [tid:26816] 33.60000000 BTC at $0.27000 | $9.07100 | $15,420.92000 |
| Tue 28 Dec 2010 03:25:03 PM GMT | Spent | BTC bought: [tid:26815] 194.38000000 BTC at $0.26880 | $52.24900 | $15,429.99100 |
| Tue 28 Dec 2010 03:25:03 PM GMT | Spent | BTC bought: [tid:26814] 1,394.04700000 BTC at $0.26880 | $374.71900 | $15,482.24000 |
| Tue 28 Dec 2010 03:25:03 PM GMT | Spent | BTC bought: [tid:26813] 67.19000000 BTC at $0.26880 | $18.06000 | $15,856.95900 |
| Tue 28 Dec 2010 12:20:16 PM GMT | In | | $15,000.00000 | $15,875.01900 |
| Sun 26 Dec 2010 11:55:12 AM GMT | Spent | BTC bought: [tid:26761] 6,679.88000000 BTC at $0.24639 | $1,645.85500 | $875.01900 |

(2 pages, 69 results)         1 | 2 | > | >>

## QUICK LINKS

TRADE
SUPPORT
GET VERIFIED
PRIVACY POLICY

TRADE API
FEE SCHEDULE
FAQ
TERMS OF USE

## OUR COMPANY

ABOUT US    CONTACT US

## APPS AND SOCIAL


VeriSign Trusted
VERIFY ▸

© 2010 - 2011 Tibanne Co. Ltd. (Japan) |

DonRaggio        Open orders: 0   Sign out

Your wallet:   **0.00000000 BTC**      $62.69800

| HOME | | TRADE | API | MOBILE | FORT GOX | SETTINGS |
|------|--|-------|-----|--------|----------|----------|

Our Terms of Service and Privacy Policy have gone into effect for all user accounts. Please click here to review them. You will not be able to add funds or access the trading functions of the site until you have agreed to the TOS.

# Review

TRADE

FUNDING OPTIONS

**ACCOUNT HISTORY**

TRADE DATA



## Transactions

Please choose which history you want to see: [BTC] [USD]

| DATE (Y/M/D) | TYPE | DESCRIPTION | AMOUNT | BALANCE |
|--------------|------|-------------|--------|---------|
| Sun 26 Dec 2010<br>11:41:56 AM GMT | Spent | BTC bought: [tid:26760]<br>27.66000000 BTC at $0.26470 | $7.32100 | $2,520.87400 |
| Sun 26 Dec 2010<br>11:41:56 AM GMT | Spent | BTC bought: [tid:26759]<br>17.45000000 BTC at $0.26440 | $4.61300 | $2,528.19500 |
| Sun 26 Dec 2010<br>11:41:56 AM GMT | Spent | BTC bought: [tid:26758]<br>415.00000000 BTC at $0.26000 | $107.90000 | $2,532.80800 |
| Sun 26 Dec 2010<br>11:41:56 AM GMT | Spent | BTC bought: [tid:26757]<br>1,407.58000000 BTC at $0.26000 | $365.97000 | $2,640.70800 |
| Sun 26 Dec 2010<br>11:41:56 AM GMT | Spent | BTC bought: [tid:26756]<br>32.31000000 BTC at $0.26000 | $8.40000 | $3,006.67800 |
| Sun 26 Dec 2010<br>11:39:48 AM GMT | Spent | BTC bought: [tid:26755]<br>160.00000000 BTC at $0.25990 | $41.58400 | $3,015.07800 |
| Sun 26 Dec 2010<br>11:39:13 AM GMT | Spent | BTC bought: [tid:26754]<br>20.00000000 BTC at $0.25980 | $5.19500 | $3,056.66200 |
| Sun 26 Dec 2010<br>07:22:43 AM GMT | Spent | BTC bought: [tid:26753]<br>1,929.01000000 BTC at $0.26000 | $501.54200 | $3,061.85700 |
| Sun 26 Dec 2010<br>07:22:43 AM GMT | Spent | BTC bought: [tid:26752]<br>1,757.36000000 BTC at $0.26000 | $456.91300 | $3,563.39900 |
| Sun 26 Dec 2010<br>07:22:43 AM GMT | Spent | BTC bought: [tid:26751]<br>64.63000000 BTC at $0.26000 | $16.80300 | $4,020.31200 |
| Sun 26 Dec 2010<br>07:16:57 AM GMT | Spent | BTC bought: [tid:26750]<br>2,242.64000000 BTC at $0.26000 | $583.08600 | $4,037.11500 |
| Sun 26 Dec 2010<br>07:16:57 AM GMT | Spent | BTC bought: [tid:26749]<br>14.03000000 BTC at $0.25500 | $3.57700 | $4,620.20100 |
| Sun 26 Dec 2010<br>07:16:57 AM GMT | Spent | BTC bought: [tid:26748]<br>30.00000000 BTC at $0.25011 | $7.50300 | $4,623.77800 |

RAGGIO  00086

| | | | | |
|---|---|---|---|---|
| Sun 26 Dec 2010 07:16:57 AM GMT | Spent | BTC bought: [tid:26747] 1150.00000000 BTC at $0.25000 | $287.50000 | $4,631.28100 |
| Sun 26 Dec 2010 07:16:57 AM GMT | Spent | BTC bought: [tid:26746] 100.00000000 BTC at $0.25000 | $25.00000 | $4,918.78100 |
| Sun 26 Dec 2010 07:16:57 AM GMT | Spent | BTC bought: [tid:26745] 129.26000000 BTC at $0.25000 | $32.31400 | $4,943.78100 |
| Sun 26 Dec 2010 07:16:57 AM GMT | Spent | BTC bought: [tid:26744] 85.66000000 BTC at $0.24990 | $21.40600 | $4,976.09500 |
| Sun 26 Dec 2010 07:13:47 AM GMT | Spent | BTC bought: [tid:26743] 10.00000000 BTC at $0.24990 | $2.49900 | $4,997.50100 |
| Sat 25 Dec 2010 12:27:38 PM GMT | In | | $5,000.00000 | $5,000.00000 |

(2 pages, 69 results)          << | < | 1 | 2

## QUICK LINKS

TRADE
SUPPORT
GET VERIFIED
PRIVACY POLICY

TRADE API
FEE SCHEDULE
FAQ
TERMS OF USE

## OUR COMPANY

ABOUT US        CONTACT US

## APPS AND SOCIAL



© 2010 - 2011 Tibanne Co. Ltd. (Japan) |

RAGGIO  00087

Case: 25CI1:14-cv-00071-JAS     Document #: 232-9     Filed: 10/05/2018     Page 26 of 28



**Chris Raggio <chris.raggio@gmail.com>**

---

## BitcoinGateway.com - BTC Transaction Complete
1 message

---

**no-reply@bitcoingateway.com** <no-reply@bitcoingateway.com>         Mon, Dec 13, 2010 at 9:34 PM
To: chris.raggio@gmail.com

Dear Chris,
Thank you for purchasing bitcoins at BitcoinGateway.com!
500.00 BTC have been sent to the address labeled: Main

Depending on congestion in the bitcoin network (outside our control), it will take anywhere from a few minutes
to an hour for your address to receive the coins. Thank you for your patience.

Regards,
BitcoinGateway.com

RAGGIO00338 3/7/18, 1:23 PM

                                        **Chris Raggio <chris.raggio@gmail.com>**

---

## BitcoinGateway.com - BTC Transaction Complete
1 message

---

**no-reply@bitcoingateway.com** <no-reply@bitcoingateway.com>                    Tue, Dec 14, 2010 at 2:20 PM
To: chris.raggio@gmail.com

Dear Chris,
Thank you for purchasing bitcoins at BitcoinGateway.com!
500.00 BTC have been sent to the address labeled: Main

Depending on congestion in the bitcoin network (outside our control), it will take anywhere from a few minutes
to an hour for your address to receive the coins. Thank you for your patience.

Regards,
BitcoinGateway.com

RAGGIO00339
6/7/18, 1:25 PM

Case: 25CI1:14-cv-00071-JAS    Document #: 232-9    Filed: 10/05/2018    Page 28 of 28

                                          **Chris Raggio <chris.raggio@gmail.com>**

---

## BitcoinGateway.com - BTC Transaction Complete
1 message

---

**no-reply@bitcoingateway.com** <no-reply@bitcoingateway.com>                    Thu, Dec 16, 2010 at 4:46 AM
To: chris.raggio@gmail.com

Dear Chris,
Thank you for purchasing bitcoins at BitcoinGateway.com!
500.00 BTC have been sent to the address labeled: Main

Depending on congestion in the bitcoin network (outside our control), it will take anywhere from a few minutes
to an hour for your address to receive the coins. Thank you for your patience.

Regards,
BitcoinGateway.com

RAGGIO00340 3/7/18, 1:28 PM

# In The Matter Of:

*Dr. Donald Raggio and Dr. Chris Raggio v*
*MTGOX, a sole proprietorship, et al*

---

*Jed McCaleb 30(b)6 Representative*
*November 17, 2016*
*Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16*

---

*Aspire Reporting, LLC*
*P.O. Box 2605*
*Ridgeland, MS 39158-2605*
*1.800.73.STENO*

Case: 3:14-cv-00071-JAS    Document #: 232-10    Filed: 10/05/2018    Page 2 of 42

---

Page 1

```
 1      IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
                 FIRST JUDICIAL DISTRICT
 2
    DR. DONALD RAGGIO
 3  DR. CHRIS RAGGIO                        PLAINTIFFS

 4  vs.                        CIVIL ACTION NO. 14-71

 5  MTGOX, a sole proprietorship;
    MTGOX, INC., a Delaware Corporation;
 6  MT.GOX KK, a Japanese Corporation;
    TIBANE KK, a Japanese Corporation;
 7  MUTUM SIGILLUM, LLC, a Delaware
    Limited Liability Company;
 8  CODE COLLECTIVE, LLC, a New York
    Limited Liability Company;
 9  JED McCALEB, an Individual;
    MARK CARPELES, an Individual;
10  JOHN DOES 1-5, and
    CORPORATE JOHN DOES 1-5              DEFENDANTS
11
12      ****************************************
13    VIDEO DEPOSITION OF JED McCALEB, INDIVIDUALLY,
          AND AS 30(B)(6) REPRESENTATIVE OF
14          DEFENDANT CODE COLLECTIVE, LLC
15      ****************************************
16           Taken at Forman, Watkins & Krutz,
             200 South Lamar Street, Suite 100,
17               Jackson, Mississippi,
               on Thursday, November 17, 2016,
18          beginning at approximately 10:00 a.m.
19
20      ****************************************
                CATHY M. WHITE, CCR
21         Certified Court Reporter #1309
                 Notary Public
22
23              ASPIRE REPORTING, LLC
                Post Office Box 2605
24         Ridgeland, Mississippi  39158-2605
                     601.797.9240
25                  1.800.73.STENO
```

Page 3

```
                      INDEX
 2  Style . . . . . . . . . . . . . . . . . . . . .   1
 3  Appearances . . . . . . . . . . . . . . . . . .   2
 4  Index . . . . . . . . . . . . . . . . . . . . .   3
 5  Examination by Mr. Tyner . . . . . . . . . . .    4
 6  Certificate of Deponent . . . . . . . . . .    118
    Certificate of Court Reporter . . . . . . . .  119
```

Page 2

```
 1        A P P E A R A N C E S

 3  MITCHELL H. TYNER, ESQUIRE
    mitch@tynerlawfirm.com
 4  CHARLES "BRAD" MARTIN, ESQUIRE
    cbradmartin@gmail.com
 5  Tyner Law Firm
    5750 I-55 North
 6  Jackson, Mississippi  39211
    601.957.1113
 7
 8        COUNSEL FOR PLAINTIFFS

 9  EDWIN S. GAULT, JR., ESQUIRE
    Win.Gault@formanwatkins.com
10  Forman, Watkins & Krutz
    City Centre, Suite 100
11  200 South Lamar Street
    Jackson, Mississippi  39201
12  601.960.8600

13        COUNSEL FOR DEFENDANTS

14
    VIDEOGRAPHER:  MATTHEW MAGEE
15
```

Page 4

1    VIDEOGRAPHER: Good morning. This is the
2 videotaped deposition of Mr. Jed McCaleb taken by
3 counsel in the matter of Dr. Donald Raggio, et al.,
4 versus MTGOX, a Sole Proprietorship, et al. Today's
5 date is November 17th, 2016. The time is now 10 a.m.
6 Counsel may now introduce themselves on the record.
7    MR. TYNER: I'm Mitch Tyner representing the
8 Raggios.
9    MR. MARTIN: Brad Martin for the Raggios.
10   MR. GAULT: Win Gault for Jed.
11   VIDEOGRAPHER: The court reporter may now
12 swear in the witness.
13   (Witness sworn.)
14   MR. GAULT: Before we get started, there were
15 some e-mails and discussions about, you know, this
16 is -- this deposition is not limited in any way. Are
17 we in agreement on that?
18   MR. TYNER: Yes.
19   MR. GAULT: Okay. Thank you.
20        JED McCALEB,
21 having been duly sworn, was examined and testified as
22 follows:
23        EXAMINATION
24 BY MR. TYNER:
25   Q.  Good morning Jed. May I call you Jed?

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
NERGOX, Glass sole proprietorship, et al     Document #: 232-10     Filed: 10/05/2018     Page 3 of 43     November 17, 2016
Case 3:14-cv-00013-JAJ

1    A.  Sure, yeah.
2    Q.  And I'm Mitch.  We met a minute ago for the
3  first time.  Have you given a deposition before, Jed?
4    A.  No, this is the first time.
5    Q.  Okay.  I'm sure your lawyer's already told
6  you, it's relaxed, it's not like the courtroom.
7    A.  Uh-huh.
8    Q.  And here, unlike in the courtroom, you can
9  just ask if I -- I'm going to ask you some questions
10  that will be confusing.  Just get me to -- just say,
11  "Stop.  I don't understand what you're asking."
12    A.  Sure.
13    Q.  Just be comfortable.  If you need to stop,
14  take a break to go the restroom, you know, it's a
15  relaxed atmosphere here today, so ...  Would you state
16  your name for the record?
17    A.  Jed McCaleb.
18    Q.  Do you have a middle name, Jed?
19    A.  No.
20    Q.  No?
21    A.  No.
22    Q.  All right.  Where were you born, Jed?
23    A.  In Arkansas.
24    Q.  Okay.  And how old are you?
25    A.  I'm 41.

1    Q.  Okay.  Give me a brief educational
2  background.
3    A.  I went to college for about a semester and a
4  half.  I already knew how to program, and I just
5  started working in software.
6    Q.  Cool.
7    A.  Yeah.
8    Q.  Are there certain languages that you know how
9  to program in or --
10    A.  Yeah, quite a few.  Yeah.
11    Q.  Okay.  How did you learn that?
12    A.  Largely self-taught, some at school.
13    Q.  Did you go to high school in Arkansas?
14    A.  I did, uh-huh.
15    Q.  Did they teach you some programming classes
16  in high school?
17    A.  I took a programming class at a university
18  when I was in high school, yeah.
19    Q.  Oh, okay.
20    A.  But the high school, itself, doesn't teach a
21  programming class.
22    Q.  Okay.
23    A.  Yeah.
24    Q.  What University was that?
25    A.  University of Arkansas at Little Rock.

1    Q.  What programming class was it, if you
2  remember?
3    A.  It was a long time ago.  I don't remember the
4  exact name of it.  I think it was just kind of intro
5  to programming.
6    Q.  And things are moving fast, aren't they?
7    A.  Yeah.
8    Q.  So when you finished high school, you started
9  college?
10    A.  That's right.
11    Q.  Where did you go to college?
12    A.  UC Berkeley.
13    Q.  And you only went one semester?
14    A.  Yes.  I dropped out second semester.
15    Q.  Okay.  And what did you do after that?
16    A.  I took a programming job in Connecticut, and
17  then -- yeah.
18    Q.  For a company?
19    A.  Uh-huh.
20    Q.  Who was that, what company?
21    A.  I forgot the name of it.  It's -- what's the
22  guy's name?  I forget the guy's name.  It was
23  somebody's name, LLC, something.
24    Q.  What kind of company was it?
25    A.  They did sort of document conversion, like,

1  they basic- -- it was pre-internet, so it was
2  basically like making -- you know, taking, like, text
3  documents and making them, like, some linkable format,
4  something like the internet, but it was a little bit
5  before the days of the internet, so it was a bit
6  different, so ...
7    Q.  Okay.  Were you -- and you were programming
8  there?
9    A.  Uh-huh, that's right.
10    Q.  And so were you trying to create databases,
11  and then tag these documents, or --
12    A.  It was a system called Folio.  I was like --
13  sort of like a text -- it was sort of like the
14  internet, but offline.
15    Q.  Okay.
16    A.  Yeah.  It was, like, hyperlinked text
17  documents.
18    Q.  Okay.
19    A.  But in the computer.
20    Q.  What year would that be?
21    A.  That would be '94, '95, somewhere in there.
22    Q.  Okay.  And how long did you stay with that
23  company in Connecticut?
24    A.  Maybe six months maybe, something like that.
25    Q.  What did you do after that?

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, CK3472 or (2003) JASI Document #: 232-10 Filed: 10/05/2018 Page 1 of 13 November 17, 2016
MTGOX, a sole proprietorship, et al

Page 9

1    A.  Then I worked for a game company in Berkeley.
2    Q.  Which one?
3    A.  It's called Junglevision.
4    Q.  Programming games?
5    A.  Yeah, uh-huh.
6    Q.  Are there any specific games that you got to
7  program that you recall?
8    A.  I think it was called, like -- I don't
9  remember the exact name, Space -- I don't know what
10  they released the title.  It was just called The Space
11  Game when I was working on it, but I don't know what
12  the title they eventually released it under.
13    Q.  In a game like that, are there multiple
14  programmers working on it, or is it normally one that
15  works -- does most of the work?
16    A.  I mean, nowadays, there's definitely
17  multiple.  Back then, there was, you know, sometimes
18  you would do it by yourself, sometimes there would be
19  multiple.  This particular one was worked on by many
20  people.  I was the only one working on it at the time.
21    Q.  Okay.
22    A.  Yeah.
23    Q.  And I'm sorry.  What the name of that company
24  again?
25    A.  It's called Junglevision.

Page 10

1    Q.  Are they still around?
2    A.  I don't know.
3    Q.  And that would have been probably around '96
4  or so?
5    A.  It was still probably, like, '95.
6    Q.  '95?
7    A.  Yeah.
8    Q.  How long did you stay there?
9    A.  Again, probably only about six months, yeah.
10  I was -- during all this time, I would work on
11  projects on my own, on my own games and things, so ...
12    Q.  What were you working on back then?
13    A.  Just various computer games.
14    Q.  Okay.  Did you ever commercially produce a
15  video game?
16    A.  Not then.  I did.  Before Mt. Gox, I was
17  working on a video game, but not back then.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  Where did you go after the programming?
21    A.  Let's see.  After that, I started a company
22  with a friend of mine in Boston called Watson
23  Software.
24    Q.  Okay.  What did you guys do with Watson
25  Software?

Page 11

1    A.  We did reporting for money managers.  So if
2  you wanted, you know -- it was basically, like,
3  reporting tools for asset managers, things like that.
4    Q.  Okay.  So it would be, like, setting up
5  accounts for the asset manager where they could report
6  to their clients?
7    A.  Yeah, so their clients could see, like, nice
8  charts and things like that, so ...
9    Q.  Uh-huh.  By then, they still weren't really
10  using the internet much, or not?
11    A.  It was early days, for sure.  I mean, the
12  internet was around for sure, but ...
13    Q.  But the stuff you were doing with Watson,
14  were you doing that online at that point?
15    A.  We had a website, yeah.
16    Q.  Okay.  And so just you and one other guy
17  owned that company.  Is that right?
18    A.  That's right.  I mean, we hired some
19  salespeople.
20    Q.  Uh-huh.
21    A.  But, yeah, it was mainly just the two of us.
22    Q.  And it was called Watson?
23    A.  Watson Software, yeah.
24    Q.  Software.  Okay.  Was it incorporated or an
25  LLC?

Page 12

1    A.  I don't exactly remember.  I believe it was
2  an LLC, or -- I believe it was an S corp.
3    Q.  An S corp?
4    A.  I don't remember exactly.
5    Q.  That would be common back then, yeah.
6    A.  Yeah.
7    Q.  And then how long did you guys run that
8  company?
9    A.  I don't really remember.  Maybe around a year
10  or something.  I don't know.  Maybe longer.
11    Q.  Who was the partner you had in the company?
12    A.  Christian Rudder.
13    Q.  What's the last name?
14    A.  Rudder.
15    Q.  Rudder, R-U-D-D-E-R?
16    A.  Yeah, uh-huh.
17    Q.  Okay.  And how did you know Christian Rudder?
18    A.  I've known him since junior high and high
19  school.
20    Q.  So he grew up in Arkansas, as well?
21    A.  That's right.
22    Q.  What town did you say you grew up in?
23    A.  I was born in Fayetteville.  I group up in
24  Little Rock.
25    Q.  Okay.  I remember, in college, going to the

Page 13

1    Toad Suck Tourney in Arkansas.
2        A.   Oh.
3            MR. GAULT: To the what?
4            MR. TYNER: Toad Suck Tournament.  It was a
5    debate tournament.
6            THE WITNESS: Yeah, that sounds about right.
7            MR. TYNER: I think it was in Little Rock.
8    I'm not sure.  Oh, goodness, that's a long time ago.
9    BY MR. TYNER:
10       Q.   So did -- what did you do after -- or why did
11   you leave Watson?
12       A.   Why did I leave?  Basically, just -- it just
13   wasn't working as well as we were wanting it to work,
14   so I left to do other things.  And I believe, after I
15   left, I went to Silicon Valley and worked at a
16   startup.
17       Q.   Okay.
18       A.   I think that's the order of events.  It's
19   hard to remember.  There was a lot of moving around
20   back then.
21       Q.   So you were working for what kind of startup
22   when you went to Silicon Valley?
23       A.   They basically did remote administration of
24   computers.  So, yeah, it was, again, programming to do
25   with software to help remotely administer computers.

Page 14

1        Q.   What was the name of that startup?
2        A.   It's called Everdream.
3        Q.   Everdream?
4        A.   Uh-huh.
5        Q.   Is it still around?
6        A.   No.
7        Q.   No?
8        A.   No.
9        Q.   We're proud of somebody that does that here
10   in town called Joel Bomgar.  I don't know if you've
11   seen the Bomgar company or not.
12       A.   Huh-uh.
13       Q.   But he started that in college, and it's
14   doing quite well.  But it was remote access?
15       A.   Yeah.
16       Q.   And it's supposed to be secure remote access?
17       A.   Yeah.
18       Q.   Is that the same thing we're talking about,
19   where you could remote in and maybe work on somebody's
20   machine or --
21       A.   Basically, it would -- it was sort of like
22   they would lease the computers to you so you wouldn't
23   just -- it would be more of a commodity rather than
24   you own the machine, they would own it, and then they
25   make sure everything was patched, and maintained, and

Page 15

1    secure, and all this kind of stuff.
2        Q.   Okay.
3        A.   So we worked on that kind of stuff.
4        Q.   So you were involved with hardware, too, then
5    at that point?
6        A.   I was just doing the software stuff.
7        Q.   Okay.
8        A.   Because there was all this -- the software
9    tools to remotely administer the machine and to make
10   sure everything was secure.
11       Q.   Okay.  And how long were you there?
12       A.   I think I was there -- I was there -- I think
13   I was there for about a year.
14       Q.   Okay.  Have we gotten into the 2000s now?
15       A.   This is -- I stopped working there around, I
16   believe, '98 or '99.  Must have been '98 probably.
17       Q.   Okay.
18       A.   Yeah, or '99, somewhere in there.
19       Q.   Where did you go from there?
20       A.   Then I started another project on my own
21   called eDonkey2000, which was a file-sharing program.
22       Q.   Okay.  And that was around '99 or 2000?
23       A.   I think I released it in '99.
24       Q.   Okay.  And what did eDonkey; what was its
25   purpose?

Page 16

1        A.   Basically, it allowed you to -- to share
2    files without going through a central server.  So it
3    was like a peer-to-peer network, similar to
4    BitTorrent, something like that, so ...
5        Q.   And you released that yourself.  Right?
6        A.   That's right.
7        Q.   Were you the 100 percent owner of that?
8        A.   I was at first.  Eventually, I brought on
9    someone to be CEO, and then he owned part of it.
10       Q.   And they got part of it?
11       A.   Yeah.
12       Q.   Who was that the?
13       A.   Sam Yagan.
14       Q.   Spell Yagan.
15       A.   Y-A-G-A-N.
16       Q.   Okay.  And then was that a -- did you make
17   money with eDonkey?
18       A.   We made some money, yeah.
19       Q.   How did you do that?
20       A.   How did we make money?
21       Q.   Yeah.  How did you get paid?
22       A.   There was ads, and we asked people to pay us,
23   so ...
24       Q.   Okay.  Is it kind of one of those volunteer
25   payments, if you use the software, maybe donate?

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
v. MTGOX, Inc., a sole proprietorship, et al
CaseGOX, Cl d-cv-00031, JAS 2 Document #: 232-10 Filed: 10/05/2018 Page 6 of 13 November 17, 2016

1   A.  Well, it would remove the ad, and it was,
2   like, the pro version.
3   Q.  Oh, okay.
4   A.  So it had a couple other -- it was like a
5   freemium model kind of thing.
6   Q.  I gotcha.  And was that kind of your -- was
7   that your full-time work at that point?
8   A.  Oh, yeah, uh-huh.
9   Q.  How long did you continue with eDonkey?
10  A.  I believe it was six years or something like
11  that.
12  Q.  Uh-huh.
13  A.  I think we closed it in 2005, 2004, somewhere
14  in there.  2005, I think, or maybe in 2006.  I don't
15  remember exactly.
16  Q.  Okay.  Why did you close it?
17  A.  Why did we close it?  Basically, we had run
18  it for a long time.  We were kind of tired of doing
19  it.  There was -- the recording industry was, like,
20  threatening us.  So we just -- rather than fight them,
21  we decided to shut down.
22  Q.  So what did you do when you shut down
23  eDonkey?
24  A.  I took some time off.  I worked on various
25  other projects, kind of exploring what my next thing

1   would be.  Eventually, I made this online game, and it
2   was like a massive multiplayer online game.
3   Q.  Oh, cool.  What was the name of that?
4   A.  It's called The Far Wilds.
5   Q.  And was that commercially viable?
6   A.  It may have -- I mean, it probably could have
7   sustained us.  It didn't -- it wasn't, like, as much
8   of a success as I would have liked it to be, but I
9   probably could have kept doing it.  But at some point,
10  there's, like, a, you know, high opportunity cost.
11  Q.  So about how long did you work on that?
12  A.  Oh, jeez.  I want to say two or three years.
13  Q.  And did you have a partner in --
14  A.  Uh-huh.
15  Q.  -- The Wilds?  Is it called the Wild?
16  A.  The Far Wilds.
17  Q.  The Far Wilds.
18  A.  Uh-huh.  Yeah, I did.
19  Q.  Was it -- there was a book when I was a kid I
20  used to love.
21  A.  The Wild Things?
22  Q.  Wild Things.  That's it.  Was it based on
23  Wild Things?
24  A.  No.
25  Q.  Okay.

1   A.  It's kind of related, but, you know.
2   Q.  So probably around 2008 is when you closed
3   that?
4   A.  No, it was later.  It was -- it basically was
5   winding down, like, slightly before I started Mt. Gox.
6   Q.  Okay.
7   A.  So around 2009.
8   Q.  And you said there were some other people
9   involved?
10  A.  One other person, yeah.
11  Q.  Who was that?
12  A.  Chris Nojima.
13  Q.  Nojima?
14  A.  Uh-huh.
15  Q.  Japanese maybe?
16  A.  He's half Japanese, yeah.
17  Q.  And so y'all just -- you just shut the place
18  down.  Is that --
19  A.  That's right, yeah.
20  Q.  Were there a lot of employees?
21  A.  Well, it was -- I think we had hired maybe
22  one other person.  There was a lot of contractors,
23  yeah.  Basically just gave the site to someone that
24  wanted to run it.
25  Q.  Oh, okay.

1   A.  So it's still up, but we're not running it
2   anymore.
3   Q.  I see.  Is it still going today?
4   A.  It is still going, yeah.  He's still
5   maintaining it.
6   Q.  What did you do after that?
7   A.  After that, I started Mt. Gox.
8   Q.  How did you get involved with Mt. Gox?
9   A.  How'd I get involved with it?
10  Q.  Yeah.
11  A.  Well, I mean, I wrote it.  I mean, I just
12  created it.
13  Q.  Okay.  And what was its purpose?
14  A.  At that time, there wasn't a good way to buy
15  and sell bitcoins.  So it was a way to do that, allow
16  people to do that.
17  Q.  I've read something about -- what do the
18  initials stand for?
19  A.  Magic:  The Gathering Online Exchange.
20  Q.  Yeah.  Why did you choose that?
21  A.  It was a domain I had left over from one of
22  these projects after eDonkey that I had done.
23  Q.  Uh-huh.
24  A.  It was a Magic:  The Gathering trading site,
25  and I just had the domain left.  So I didn't want to

Page 21

1 buy a new one, so I just used that one.
2 Q. Okay.
3 MR. GAULT: Excuse me. What did it stand
4 for?
5 THE WITNESS: Magic: The Gathering Online
6 Exchange, which is a card name.
7 BY MR. TYNER:
8 Q. It's a card game?
9 A. Yeah.
10 Q. And how long -- when you first bought that
11 domain, did you get it up as an exchange for the
12 cards?
13 A. I did, yeah.
14 Q. Okay. And about when was that that you
15 started it?
16 A. That was, I don't know, maybe 2007 or
17 something. Yeah.
18 Q. So you ran it for the online -- or the
19 gaming?
20 A. Maybe 2004, 20- --
21 Q. Magic: The Online --
22 A. Yeah. I didn't run it very long.
23 Q. -- Gaming Exchange?
24 A. Yeah. Basically, you know, I made it just to
25 kind of see -- yeah, just kind of -- because, you

Page 22

1 know, it was more just kind of like a hobby experiment
2 kind of thing, so ...
3 Q. Okay. How did that work? I mean, I don't
4 understand that game or anything.
5 A. Right.
6 Q. Just --
7 A. How did it work technically?
8 Q. Yeah. No. What was the game about, and why
9 was there a need for an exchange?
10 A. So Magic is a physical game, but with cards
11 that you can trade, and everyone can have their own
12 cards that they collect. They've made an online
13 version of it where you have your online collection of
14 cards. And in the online version, it's very
15 cumbersome to trade the cards around. So I made a
16 little bot that would log into the site and allow
17 people to trade cards with it, so ...
18 Q. Okay.
19 A. You know, just to make it easier to trade.
20 Q. Did you make money in that exchange?
21 A. I didn't really make money. I mean, I wasn't
22 trying to. It was more just, as I said, just like a
23 hobby, kind of like for fun kind of thing.
24 Q. Where the people had -- would they sign up
25 accounts so they could trade --

Page 23

1 A. Yeah.
2 Q. -- the cards? And was there any money going
3 through there, or was it just the cards being traded
4 by --
5 A. It was just the cards, yeah.
6 Q. Okay. So you couldn't just go on there and
7 buy a card?
8 A. I mean, they have these things called event
9 tickets, which are -- you can buy for money, but you
10 buy them from the Magic company, and then you can
11 trade these event tickets for cards.
12 Q. Okay. So the event ticket is like another
13 currency?
14 A. Yeah. Essentially like a digital currency
15 kind of thing.
16 Q. And then -- okay. So it would be easy to
17 exchange money --
18 A. Right.
19 Q. -- for the digital card?
20 A. Right.
21 Q. How interesting.
22 A. Yeah.
23 Q. And so that -- about how long did you have it
24 as the trading --
25 A. I honestly don't remember. It was probably

Page 24

1 just a few months.
2 Q. Oh, not long at all?
3 A. Yeah. It ended up -- like I said, I just
4 made it as a hobby, and it started to become kind of a
5 hassle, so I just closed it down.
6 Q. Okay. How many accounts did you end up with
7 on there --
8 A. Oh, man, I really don't remember.
9 Q. -- for the Magical cards?
10 A. I don't remember.
11 Q. Have you got any idea if it was a hundred or
12 a thousand, 10,000?
13 A. I mean, I would guess around 500 or
14 something.
15 Q. Okay.
16 A. Yeah.
17 MR. GAULT: So let's don't guess. Either you
18 know it or you don't.
19 A. I don't know it, but, you know.
20 BY MR. TYNER:
21 Q. But it would be less than a thousand you
22 think?
23 A. I mean, I don't really remember. It could be
24 more, but ...
25 Q. And about when did you stop -- did it close

Page 25

```
 1   down, and you just -- and they stopped all the trading
 2   for the cards?
 3      A.  Yeah.  I stopped writing the bot that was --
 4   that you would trade through, so ...
 5      Q.  All right.  And I don't know.  What is a bot?
 6      A.  Basically, it's a little piece of software
 7   that's connecting to their -- to this Magic online
 8   site and doing the trading.  Right?  So it's this,
 9   like, automated trader kind of thing.
10      Q.  Okay.
11      A.  So, yeah.
12      Q.  But that wouldn't require much of your time,
13   would it, or would it?
14      A.  Well, it does if it breaks, or --
15      Q.  Okay.
16      A.  -- like, you know, there's -- or people have
17   issues, like, things don't work right.  But, yeah.
18      Q.  Okay.  So did you charge for them to have
19   accounts on there?
20      A.  No, I didn't charge for them having accounts.
21   No.
22      Q.  Okay.  And when made a trade, did you make a
23   little money on the trade or ...
24      A.  I don't remember if I was charging commission
25   or not.
```

Page 26

```
 1      Q.  Okay.  How were you supporting yourself
 2   financially then at that time?
 3      A.  I had money from eDonkey.
 4      Q.  Okay.  Did you sell eDonkey?
 5      A.  I didn't, no.
 6      Q.  But you had accumulated some --
 7      A.  We had benefit --
 8      Q.  So from -- about when do you think you
 9   stopped the gaming cards on Mt. Gox?
10      A.  About when?  Like I said, it was -- I don't
11   remember exactly when I started it.  It was -- but I
12   stopped, you know, a few months after that.
13      Q.  Within a few months?
14      A.  Yeah.
15      Q.  Okay.  And so then Mt. Gox was just a dormant
16   domain?
17      A.  Uh-huh.
18      Q.  And you -- I guess you were hosting it
19   somewhere.  Did you have your own server that you kept
20   it on?
21      A.  I mean, you just -- it was parked at a
22   registrar.
23      Q.  Oh, okay.
24      A.  You don't have to have a server.  Right?  You
25   just pay for the name.
```

Page 27

```
 1      Q.  Okay.  So you took down the website entirely
 2   at that point?
 3      A.  I'm pretty sure I did, yeah.
 4      Q.  Okay.  And so how long was it dormant before
 5   you started, kind of reinitialized Mt. Gox for
 6   bitcoin?
 7      A.  The domain?  I mean, well, depending on when
 8   -- I mean, I started Mt. Gox for bitcoin in 2010.  So
 9   however many -- depending on when I stopped the
10   trading card site, so ...
11      Q.  And do you know about when that was?
12      A.  When I stopped the trading card site?
13      Q.  Uh-huh.
14      A.  Like I said, I started it in 2006, 2007,
15   2008, somewhere in there.
16      Q.  Okay.
17      A.  I think.
18      Q.  So what did you do between the time that you
19   were doing the trading cards for Magic:  The Online
20   Gaming Exchange until you went and kind of
21   reinitialized Mt. Gox for bitcoin?
22      A.  Well, that's when I was making The Far Wilds,
23   my online game.
24      Q.  Okay.
25      A.  Yeah.
```

Page 28

```
 1      Q.  All right.  And that was working for another
 2   company.  Right?  Or no.  That was yours.
 3      A.  That was me, yeah.
 4      Q.  Okay.  And so that was probably a two- or
 5   three-year period.
 6      A.  Uh-huh.
 7      Q.  Is that right?
 8      A.  Yeah.
 9      Q.  Okay.  And, you know, sometimes I'll have to
10   get you -- we normally do say, "Uh-huh," and, "Huh-
11   uh," and it's hard to put down.  I'll get you to say
12   "Yes," and, "No," or affirmative or something.
13      A.  Sure.  Okay.
14      Q.  It's hard, when you read a transcript, to
15   know what you meant.  So were you still working on
16   your game when you reinitiated Mt. Gox to do bitcoin,
17   or had you completed that?  Were you done with it?
18      A.  I wasn't working on it anymore, no.
19      Q.  Okay.  And then how did you get involved in
20   bitcoin?
21      A.  So, I read an article on Slashdot and found
22   it very interesting.
23      Q.  Did you start mining any bitcoin?
24      A.  No.
25      Q.  Okay.  And so it was in 2010 that you started
```

Dr. Donald Raggio and Dr. Chris Raggio
MTGOX, a sole proprietorship, et al
MtGoCaleb 30(b)6 Code Collective, LLC 11-17-16
Case 3:14-cv-00911-JAS    Document #: 232-10    Filed: 10/05/2018    Page 2 of 43
Jed McCaleb 30(b)6 Representative
November 17, 2016

Page 29

1 the exchange backup, or the domain name MTGOX?
2    A.   That's right.
3    Q.   Is that right?  And did you use the -- some
4 of the same software that you had already created for
5 the magical card exchange, or was it just a complete
6 do-over and just used that domain name?
7    A.   I don't think I used any significant amount
8 of software from it.
9    Q.   So it was pretty much a fresh start, and you
10 just used that domain name?
11    A.   That's right.
12    Q.   Okay.  So about when did you become
13 interested in bitcoin?
14    A.   I believe the Slashdot article was in August,
15 something like that.
16    Q.   Of '10?
17    A.   2010.
18    Q.   2010?
19    A.   Uh-huh.
20    Q.   And so then you started programming to create
21 the exchange pretty soon thereafter.  Is that --
22    A.   That's right.
23    Q.   -- right?  Okay.  And how long did it take
24 you to program that and get it live?
25    A.   I believe it was a couple of weeks.

Page 30

1    Q.   Okay.  So by August, September, you had
2 Mt. Gox up and running for --
3    A.   I believe so.
4    Q.   -- bitcoin exchange?
5         MR. GAULT: Do me a favor.  All right?  Wait
6 until he finishes his question, because you're kind of
7 jumping in there before he quite gets through.
8         THE WITNESS: Okay.
9         MR. GAULT: And I told you, it happens all
10 the time.  Right?
11         THE WITNESS: Sure.
12         MR. GAULT: So just let him make sure he's
13 done with his question, and then you answer it.
14         THE WITNESS: Okay.
15 BY MR. TYNER:
16    Q.   So within a few weeks of you reading this
17 article, you decided that there may be a need for the
18 exchange.  Is that accurate?  What made you put up the
19 exchange?
20    A.   Well, I wanted to buy some bitcoins, and
21 there wasn't a good way to do it.  I figured other
22 people might have the same issue.
23    Q.   Okay.  Was there any way of buying bitcoin
24 before you put Mt. Gox up?
25    A.   Yes.

Page 31

1    Q.   How was that?
2    A.   You could find people in the forum.  I think
3 there was some other exchange that wasn't that good
4 that you could use.
5    Q.   Okay.  What was that other exchange?
6    A.   I don't remember the name.
7    Q.   Was it in the U.S.?
8    A.   It was.
9    Q.   Okay.  Do you remember what city it was in?
10    A.   I don't.
11    Q.   Did you buy any bitcoin through it, through
12 the other exchange?
13    A.   I don't believe so.
14    Q.   Okay.  But you -- one of your motivations for
15 the exchange was so that you would have an opportunity
16 to purchase bitcoin yourself?
17    A.   That's right.
18    Q.   Okay.  And you weren't interested in mining
19 at that time?
20    A.   No.
21    Q.   Why not?
22    A.   Mining seems like -- well, if you're
23 interested in bitcoin and want to buy bitcoin, it
24 seems easier just to buy them than mine them.
25    Q.   And what was the price of bitcoin when you

Page 32

1 put Mt. Gox up?
2    A.   I mean, there wasn't a good price established
3 just because there wasn't a good market for it.  So
4 it's hard to say what the price was.
5    Q.   Okay.  Did you eventually -- were you able to
6 purchase bitcoin?
7    A.   I was.
8    Q.   Did you -- how much, how many bitcoin did you
9 purchase?
10         THE WITNESS: Do I have to answer that?
11         MR. GAULT: You mean, just in general,
12 forever, or what?
13         MR. TYNER: Yeah.
14         MR. GAULT: Can we take a break?
15         MR. TYNER: Sure.
16         MR. GAULT: I want to talk to him about that.
17         MR. TYNER: I'm going to object to you
18 talking to him about that.
19         MR. GAULT: Okay.
20         MR. TYNER: He's under oath right now, and
21 we're not going to have conferences --
22         MR. GAULT: Okay.  I instruct him not to
23 answer.  So you can ask another question.
24         MR. TYNER: Okay.
25 BY MR. TYNER:

Dr. Donald Raggio and Dr. Chris Raggio
ARTEGCY, a sole proprietorship, et al

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16
Jed McCaleb 30(b)6 Representative
November 17, 2016

Case 3:17-cv-00931-LAC   Document #: 232-10   Filed: 10/05/2018   Page 10 of 43

Page 33

1    Q.   Was Mt. Gox -- did you end up having a lot of
2  accounts quickly on Mt. Gox?
3    A.   I mean, I don't know what -- what do you mean
4  by "a lot"?
5    Q.   Well, in the -- let's just say you started it
6  in about August or September of 2010.  By the first of
7  the year, how many accounts had you accumulated?
8    A.   I don't remember the number of accounts.
9    Q.   Okay.
10   A.   No.
11   Q.   Was it over a thousand?
12   A.   Yes.
13   Q.   Was it over 10,000?
14   A.   I don't remember.
15   Q.   Over 5,000?
16   A.   I don't remember that, either.
17   Q.   Tell me how that would work.  How would you
18  sign up to buy on Mt. Gox?
19   A.   You would go and register.  You'd have to
20  enter your e-mail address, and, you know, user name,
21  and create a password, and then you had an account.
22  And if you wanted to buy bitcoin, you would have to
23  send money through various ways to Mt. Gox, and then
24  at that point, you'd have money on the exchange, and
25  then you can buy bitcoin.  If you wanted to sell

Page 34

1  bitcoin, then you would get a bitcoin address, and you
2  could send bitcoin to that address, and then you could
3  put up an order to buy and sell, things like this, so
4  ...
5    Q.   When somebody opened an account on Mt. Gox,
6  did they -- and they purchased bitcoin, where would
7  the bitcoin go?  Did they have a wallet?  Was that
8  automatically created when they created an account?
9    A.   So there was -- you're saying when they
10  opened an account and put dollars in?
11   Q.   Yes.
12   A.   And then they -- then they went and bought
13  bitcoin?
14   Q.   Yes.
15   A.   So it would go into -- Mt. Gox had a few
16  different wallets that were owned by it, the company
17  that would hold the bitcoin.
18   Q.   Okay.
19   A.   Yeah.
20   Q.   And who was the company?
21   A.   Well, at first, it was me, and then I later
22  sold it, so then it wasn't me.
23   Q.   Okay.  So was there a company name?  Was it
24  just you individually?
25   A.   It was just me individually, yeah.

Page 35

1    Q.   All right.  That reminds me, what was Code
2  Collective?
3    A.   Code Collective was the company that made The
4  Far Wilds.
5    Q.   I'm -- oh, okay.
6    A.   The game, yeah.
7    Q.   All right.  And so you had several wallets to
8  receive the bitcoin.  Is that correct?
9    A.   That's right.
10   Q.   So the individual did not have a wallet on
11  Mt. Gox.  Is that right?
12   A.   That's right.
13   Q.   And then you just programmed it so that they
14  would have basically an account that would do debits
15  and credits to the account.  Is that correct?  Even
16  though the -- they didn't -- they didn't have access
17  to the wallet.  Correct?
18   A.   They did not have access to the wallet.
19   Q.   Okay.  And so how, if they wanted to move
20  bitcoin, how were they able to do that?
21   A.   On the website, they could request a
22  withdrawal, and then would give a bitcoin address that
23  they wanted their bitcoin sent to, so ...
24   Q.   And on your end, what would you do
25  when they requested bitcoin?

Page 36

1    A.   If they were logged in and the request was
2  legitimate, we had -- and it was below the daily
3  limit, then they could send the bitcoin.
4    Q.   Okay.  So what I'm asking is, was there a
5  human in between the transaction?
6    A.   No.
7    Q.   Okay.  So it was automatic?  You'd programmed
8  it to do that.  Is that --
9    A.   That's right, yeah.
10   Q.   Okay.  And you said there was a limit?
11   A.   Yeah.  There was a daily limit of a thousand
12  dollars that you could withdraw.
13   Q.   Okay.  And what was the purpose of that?
14   A.   To prevent any kind of -- if someone's
15  account is compromised, to prevent any kind of --
16  like, to prevent -- to limit the size of the problem,
17  basically.
18   Q.   How would people get money into their account
19  on Mt. Gox?
20   A.   They could use a few different ways.  They
21  could use PayPal, they could wire me money, they could
22  use this thing called Liberty Reserve, and maybe there
23  were some other ways, as well.
24   Q.   What was Liberty Reserve?
25   A.   It was this -- I don't know how you describe

Page 37

1   it. It's basically like PayPal, yeah.
2       Q.  Is it a U.S. company, as well?
3       A.  I think they were based in Costa Rica.
4       Q.  So let's say I opened up an account, and I
5   wanted to put money in, and I was going to use Liberty
6   Reserve. How would I do that?
7       A.  You would -- basically, we had an address
8   that you would go into your Liberty Reserve wallet and
9   say, I want to send X amounts of dollars to this
10  address, and then we would see the transaction and
11  credit your account.
12      Q.  Okay. So the money -- so the money would
13  come to Mt. Gox from Liberty?
14      A.  That's right.
15      Q.  How would I get money to Liberty?
16      A.  I don't remember how you would get Liberty
17  Reserve money.
18      Q.  Why didn't you just take credit cards?
19      A.  Because with credit cards, you can always
20  charge them back. So it's a problem if somebody buys
21  a bunch of bitcoin on a credit card and then charges
22  their credit card back, so we don't get the money, but
23  then, now, they have the bitcoin.
24      Q.  I gotcha. Let's see. When did you sell off
25  most of Mt. Gox?

Page 38

1       A.  It was February 5th or 6th, 7th.
2       Q.  Okay. So you really only had it under your
3   complete control for five --
4       A.  Yeah, I think was --
5       Q.  -- months?
6       A.  -- around five months, yeah.
7           MR. GAULT: Let him finish his question.
8           THE WITNESS: I'm sorry.
9           MR. TYNER: He's helping. I'm not trying to
10  trick him.
11          MR. GAULT: I understand. I'm not saying you
12  are. I just want him to have a little space. Happens
13  to everybody, by the way. Everybody does that, so ...
14  BY MR. TYNER:
15      Q.  When you sold it, how many accounts were
16  there?
17      A.  I don't remember.
18      Q.  You don't have any idea? Twenty-five
19  thousand?
20      A.  It was less than 25,000, but I don't remember
21  the exact number.
22      Q.  Was it more than 10,000?
23      A.  I don't think so, but, you know, it was a
24  long time ago.
25      Q.  How would I find out how many accounts there

Page 39

1   were?
2       A.  You could ask Mark. He would probably know.
3   I mean, that's the only other person that would know,
4   I think.
5       Q.  And was -- besides just wanting to buy
6   bitcoin yourself, was there a financial -- hopefully,
7   a profit- -- it would be a profitable exchange? Was
8   there a profit motive?
9       A.  Not that much, honestly. I mean, it was
10  still very early in the time of bitcoin, so it was
11  totally unclear if it would take off at all. Like,
12  what it's done now, I think, has exceeded, like,
13  everybody's expectations at that point. So, you know,
14  it was more just as a -- again, like, it was similar
15  to the first Mt. Gox project, where it was just kind
16  of a hobby into something that seemed cool to do.
17      Q.  Okay. Well, what motivated you to sell it?
18      A.  I -- well, a few things. I mean, it's -- it
19  ended up being a lot of work to run. It's not that
20  interesting of a thing to run. It's just a -- it's
21  simple. Like, I like working on, like, hard,
22  technical problems, and it's not that. So it wasn't
23  interesting.
24      Q.  You were bored?
25      A.  Yeah, yeah.

Page 40

1       Q.  Were you making money with it when you sold
2   it?
3       A.  It was profitable, yeah.
4       Q.  But boring?
5       A.  Yeah, yeah.
6       Q.  The -- how did you meet my client, Chris
7   Raggio?
8       A.  I think the first time I met him was at a
9   bitcoin conference in New York.
10      Q.  Okay. And about when was that?
11      A.  I believe it was summer of 2012.
12      Q.  Okay. So it was sometime after he had been
13  purchasing bitcoin --
14      A.  That's right.
15      Q.  -- through your exchange?
16      A.  Yeah.
17      Q.  Okay. How did you guys -- how did it come
18  about that he bought bitcoin through Mt. Gox?
19      A.  He e-mailed me and said, "I want to buy
20  bitcoin," and just asked me the -- what he should do
21  to do it.
22      Q.  Okay. And so tell me how that transaction
23  took place. Was it more than -- well, back up. Did
24  he have more than one transaction, or was it just one?
25      A.  One transaction -- like, one deposit of money

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
Case 3:14-cv-01011-ACR Document #: 232-10 Filed: 10/05/2018 Page 2 of 43 November 17, 2016
MTGOX, a sole proprietorship, et al

Page 41

1    onto Mt. Gox or --
2    Q.  Yeah.  How many times did he send money?
3    A.  I don't remember how many times he sent
4    money.  I'm pretty sure it was more than one time,
5    though.
6    Q.  Okay.  Do you remember the amounts?
7    A.  Not exactly.  You know, I don't remember
8    exact amounts.  It was, you know, in the tens of
9    thousands, I think.
10   Q.  Was that significant at that time?
11   A.  It was on the higher end of people, yeah, for
12   sure.
13   Q.  But there were some that were spending more
14   than that?
15   A.  Yeah.  He wasn't the highest.
16   Q.  Okay.  In the top -- would you say it was in
17   the top 10 or 20 people buying it?
18   A.  Probably, yeah.
19   Q.  Okay.  So it would be somebody you would
20   remember?
21   A.  Yeah.  I mean, I knew who he was.
22   Q.  It was a fairly significant amount --
23   A.  Yeah.
24   Q.  -- being purchased?
25   A.  Yeah.

Page 42

1    Q.  And so you did purchase bitcoin on his
2    behalf?
3    A.  I didn't, no.
4    Q.  Okay.  How did the transaction go down?
5    A.  The way Mt. Gox works is people deposit
6    money, and people deposit bitcoins, and then they put
7    up offers saying, I'm willing to buy bitcoins at this
8    price, I'm willing to sell bitcoins at this price, and
9    then if there's a cross, like, in the market, if
10   there's a cross, then there's a trade.  Right?
11   Q.  Yes.
12   A.  So the operators of Mt. Gox are never
13   involved in the trade.  It's just between individuals,
14   so ...
15   Q.  Okay.  And then how would MT- -- how would
16   you get paid when they had a transaction?
17   A.  So, there's a -- there was a commission on
18   the transactions.
19   Q.  Okay.  What was the amount of commission?
20   Was it a percentage of the amount of the trade or --
21   A.  Yeah, it was a percentage of the trade.
22   Q.  And what was that percentage amount?
23   A.  I don't remember the percentage.  I don't
24   remember.  I just don't remember.  It was a long time
25   ago.  I just don't remember percentage.

Page 43

1    Q.  Did you have different percentages for
2    different accounts?
3    A.  I believe so.  I believe there was some
4    people that we designated as -- I mean, some
5    relationships we had that we would give them a better
6    percentage.
7    Q.  Okay.  And you don't remember what the
8    standard percentage was?
9    A.  No.  I mean, I want to say it was around 1
10   percent, but I don't remember if that's -- it's
11   somewhere in that order.
12   Q.  How long was it after you put Mt. Gox back up
13   to trade bitcoin before it was profitable?
14   A.  I'm not sure.  I'm not sure.
15   Q.  When you put Mt. Gox back up, did you have
16   the physical server yourself, or did you have it
17   hosted somewhere?
18   A.  No, it was hosted.
19   Q.  Who was hosting it?
20   A.  I believe it was Amazon.
21   Q.  And is that who you have the domain parked
22   with, as well?
23   A.  No.
24   Q.  Who was that that it was parked with?
25   A.  The domain registrar?

Page 44

1    Q.  Yeah.
2    A.  It's DirectNIC.
3    Q.  Do you know where the server was physically
4    located at Amazon that you --
5    A.  I don't remember which data center it was.
6    Q.  Did it take up much space?
7    A.  The server?
8    Q.  No, no.  How much space did you use to run
9    Mt. Gox?
10   A.  Space in what sense?
11   Q.  In the size.
12   A.  Like?
13   Q.  Gigs.
14   A.  Oh, I have no idea.  I don't know.
15   Q.  Did you have an office for Mt. Gox?
16   A.  No.
17   Q.  So you would just run it out of your home?
18   A.  That's right.
19   Q.  Okay.  Where was your home at that time?
20   A.  When I started it, my home was in Patterson,
21   New York.  Sometime when I was running it, I moved to
22   Costa Rica for a bit, yeah.
23   Q.  Were you working on your gaming, game
24   project, The Wild, while you were in New York?
25   A.  I was, yeah.

Case 3:14-cv-00023-IAS   Document #: 232-10   Filed: 10/05/2018   Page 13 of 43
MTGOX1.1 sole proprietorship/Cal

Page 45

1    Q.   How long were you in New York?
2    A.   I think I was in New York about nine years.
3    Q.   And where in New York?
4    A.   Mainly New York City.  The last year, I
5    moved, or last two years maybe, I moved to Patterson,
6    New York, which is a bit outside.
7    Q.   Okay.
8    A.   Yeah.
9    Q.   A bit outside the city?
10   A.   Uh-huh, yeah.
11   Q.   So in about August, you started the bitcoin
12   exchange, and you were in New York.  Right?
13   A.   That's right.
14   Q.   And then sometime, you moved to Costa Rica?
15   A.   That's right.
16   Q.   Was that before the first of the year?
17   A.   Must have been, yeah.
18   Q.   What made you go to Costa Rica?
19   A.   It's much warmer.  We had two little kids.
20   It was easier to raise them there than in New York.
21   Q.   Were you married at that time?
22   A.   Was I married?  No.
23   Q.   I'm sorry?
24   A.   No.
25   Q.   Okay.  Have you ever been married?

Page 46

1    A.   No.
2    Q.   And is the mother of your children, is it one
3    mother?
4    A.   That's right, yes.
5    Q.   And you have two children?
6    A.   Yep.
7    Q.   Okay.  And what was her name, the mother of
8    the children?
9    A.   Misoon Burzlaff.  Misoon Burzlaff.
10   Q.   Would you spell Burzlaff?
11   A.   B-U-R-Z-L-A-F-F.
12       COURT REPORTER: First name, too?
13       THE WITNESS: Misoon, M-I-S-O-O-N.
14       COURT REPORTER: Thank you.
15   BY MR. TYNER:
16   Q.   And how long did you stay in Costa Rica?
17   A.   We lived there about a year.
18   Q.   So you were in Costa Rica at the time that
19   you sold Mt. Gox to Mark Karpeles?
20   A.   That's right.
21   Q.   Am I saying his last name correctly?
22   A.   I think so, yeah.
23       MR. TYNER: Okay.  That's K-A-R-P-E-L-E-S.
24       THE WITNESS: L-E-S, yeah.
25   BY MR. TYNER:

Page 47

1    Q.   Mark Karpeles.  Where did you meet Mark?
2    A.   I've never met Mark.
3    Q.   How did it come about that you sold Mt. Gox
4    to Mark?
5    A.   I had contracted Mark to do some integration
6    with a bank in Europe for me, so you could deposit
7    money in Mt. Gox with this European bank.  And, you
8    know, like I said, I was wanting to stop running
9    Mt. Gox.  I didn't want it to just go away because
10   people were depending on it, so I wanted someone else
11   to take it over.  He was big in the bitcoin world, so
12   I -- you know, so I asked if he would want to take it
13   over, and he did, so ...
14   Q.   When you went to Costa Rica, isn't that where
15   you said Liberty was located?
16   A.   It is, yeah.
17   Q.   Do you know the guys that had it?
18   A.   No.
19   Q.   Did you -- you never had interaction with
20   them while you were in Costa Rica?
21   A.   No.  I e-mailed them one time, but I didn't
22   get any significant response.
23   Q.   Okay.  After you sold Mt. Gox -- that would
24   have been February.  Right?
25   A.   That's right.

Page 48

1    Q.   Then what did you do?
2    A.   Then I started thinking about other projects,
3    other things to work on that would be more
4    interesting.
5    Q.   Did you work on anything while you were still
6    in Costa Rica?
7    A.   I started forming the idea for my next
8    company, yeah.
9    Q.   Okay.  And what was the next company?
10   A.   It's called Ripple.
11   Q.   And you were just forming the ideas while you
12   were in Costa Rica, or did you --
13   A.   That's right.
14   Q.   -- start working on --
15   A.   I mean, it was -- yeah.  It was mainly just,
16   like, thinking about it, how to do it, things like
17   that, so ...
18   Q.   Okay.  And you think you were in Costa Rica
19   about a year.  So you would have -- did you move back
20   to the U.S.?
21   A.   Yeah, I moved -- in the -- I believe it was
22   the summer of 2012, is when I moved back.
23   Q.   Okay.  And where did you move to when you
24   moved back?
25   A.   To California.

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
Case 2:15-cv-00121-JES
MTGOX, a sole proprietorship, et al    Document #: 232-10    Filed: 10/05/2018    Page 14 of 43    November 17, 2016

Page 49

1  Q.  What city?
2  A.  To Berkeley.
3  Q.  And did you start working on Ripple pretty
4  soon after you got back?
5  A.  Yeah, immediately.
6  Q.  Immediately?
7  A.  Yeah.
8  Q.  And Ripple was your brainchild, pretty much?
9  A.  That's right.
10  Q.  Did you have any partners in Ripple?
11  A.  I hired some people.  I eventually brought on
12  someone to be CEO, and so he was part owner of the
13  company at that point.
14  Q.  And who was the CEO?
15  A.  Chris Larsen.
16  Q.  And was Ripple, was it an S corp also, or how
17  was it set up?
18  A.  It was a C corp.
19  Q.  Okay.  So you owned shares of Ripple?
20  A.  That's right.
21  Q.  Okay.  What amount of shares did you own as a
22  percentage of Ripple?
23      MR. GAULT: Hold on a second.  I either need
24  to talk to him about it, or I'm going to instruct him
25  not to answer.  So it's your choice.  I don't know --

Page 50

1  I mean, this is getting really into -- that kind of
2  question really doesn't have any relevance here.  If
3  he doesn't care and he'll answer it, that's fine with
4  me, but I need to talk to him about that.
5      MR. TYNER: Okay.
6      MR. GAULT: So I'll either instruct him not
7  to answer, or you can let me talk to him about it.
8      MR. TYNER: All right.  Talk to him about it.
9      MR. GAULT: Let's take a break.
10      VIDEOGRAPHER: Off the record.  The time is
11  10:28.
12      (Recess.)
13      MR. GAULT: You can ask him.
14      VIDEOGRAPHER: Back on the record.  The time
15  is 10:50.
16  BY MR. TYNER:
17  Q.  What percentage of Ripple did you own?
18  A.  I don't remember the exact ownership.  It was
19  approximately 40 percent.
20  Q.  Okay.  And the 60 percent belonged to who
21  else?
22  A.  Chris owned the same percent I did.  There
23  were some initial investors that owned some, and there
24  was employees that owned the rest, so ...
25  Q.  Okay.  And how long did you stick with

Page 51

1  Ripple?
2  A.  Altogether -- I mean, depends on when you say
3  it started.  I left in, I think -- I want to say
4  summer of 2013.
5  Q.  Okay.
6  A.  Or spring of 2013.
7  Q.  And --
8  A.  I don't know if that makes sense.  Let me ...
9  Q.  I'm thinking you said you came back from
10  Costa Rica the summer of '12.  Right?
11  A.  That's right.
12  Q.  Is that right?
13  A.  Yeah.
14  Q.  And then you stayed -- you started working on
15  Ripple pretty quickly?
16  A.  Yeah.  I was -- it was roughly -- I think it
17  was, like, nine months or a year, something like this.
18  Q.  Okay.
19  A.  Yeah.
20  Q.  When you left, what did you do with the
21  shares of your stock?
22  A.  I retained them.
23  Q.  Okay.  And when you left, was Ripple
24  profitable?
25  A.  No.

Page 52

1  Q.  How would Ripple make money?
2  A.  You know, I don't know what their current
3  plan is, but --
4  Q.  What was your plan to make money with Ripple?
5  A.  Ripple is similar to bitcoin.  It had an
6  underlying digital currency.  So if that currency
7  appreciated in value, then it can sell that.
8  Q.  Okay.  So it's kind of dependent on Ripple
9  being successful.
10  A.  Yeah.
11  Q.  Is that right?  Or is the -- the only income
12  was really going to be on the appreciation of the
13  Ripple itself?
14  A.  That's right.
15  Q.  Is that right?
16  A.  Yeah.  I mean, that was the original plan.
17  Q.  Okay.  And did you guys develop a Ripple
18  exchange?
19  A.  No.
20  Q.  No.  How did people acquire Ripple?
21  A.  You could -- I mean, it was traded on other
22  exchanges.
23  Q.  Uh-huh.
24  A.  So, yeah.
25  Q.  Could they mine it like they did bitcoin?

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
Case 3:14-cv-00027-JAG   Document #: 232-10   Filed: 10/05/2018   Page 15 of 43   November 17, 2016
MTGOX, a sole proprietorship, et al

Page 53

1    A.  No.
2    Q.  After you sold Mt. Gox to Mark Karpeles, did
3  you help him learn that system, or was there a
4  transition kind of period, or what?  How did that go?
5    A.  Yeah, I helped him for another few weeks,
6  just transition, teach him what I was doing, and
7  things like that.
8    Q.  And the -- was it just -- was it only located
9  on one server that Amazon was maintaining?
10    A.  I don't remember how many servers we had.
11  There may have been a database server, as well.
12    Q.  Okay.  And were they both in that same center
13  that Amazon had, or did you -- what I'm asking is, did
14  you have it two different places geographically?
15    A.  No.  It was just one center.
16    Q.  Okay.  When you sold it to Mark, did he move
17  the server?
18    A.  I believe he did.
19    Q.  Do you know where he moved it to?
20    A.  I don't know.
21    Q.  Okay.  And do you know how long after he
22  purchased it that he moved it?
23    A.  I don't know, either.
24    Q.  Why do you think he moved it?
25    A.  I don't know, you know.

Page 54

1    Q.  Well, you just -- you thought he did, and I
2  just wondered if he told you that or --
3    A.  Oh, he told me that he was going to move it,
4  yeah.
5    Q.  Did you help him with that so he could have
6  access to move it, or -- because the data would have
7  to physically move, and I'm just thinking there would
8  be a shutdown or something in between.  I don't know.
9    A.  Well, he told me he was going to move it.  I
10  don't know why he was going to move it.  The -- moving
11  the server is not a hard operation.  You just -- you
12  just copy all the data to wherever the new location
13  is, and then you just, at some point, you point the
14  DNS at the new IP.  Right?  So it's actually --
15    Q.  It's not a big deal?
16    A.  People won't even notice.
17    Q.  Okay.
18    A.  Yeah.
19    Q.  So it wouldn't really require it be shut down
20  for a day --
21    A.  No.
22    Q.  -- and moved?  Okay.  Do you -- and you don't
23  know why he wanted to move it.  Right?
24    A.  I don't.
25    Q.  Do you know if he moved it to Japan?

Page 55

1    A.  I don't know.
2    Q.  Now, I believe you said that Chris Raggio
3  contacted you by e-mail.  Is that right?
4    A.  That's right.
5    Q.  Okay.  And how would he know to contact you;
6  do you know?
7    A.  I assume -- I mean, my -- the e-mail address
8  was listed on the Mt. Gox website.  So I assume that's
9  how he did it.
10    Q.  Okay.
11    A.  Yeah.
12    Q.  And what's your recollection of that
13  communication when he first contacted you?
14    A.  He was basically saying I want to, you know,
15  I want to buy X amount of dollars worth of bitcoin,
16  how do I do that?  And then I just explained to him
17  what he needed to do.
18    Q.  Okay.  And what was it that he needed to do?
19    A.  I believe he wired the money to my bank
20  account, and then I told him to put in an offer to --
21  on the exchange to buy the bitcoin.
22    Q.  Okay.  At that time, what was the normal
23  volume of bitcoin being traded daily?
24    A.  Oh, I have -- it was a very long time ago.  I
25  have no idea what that volume was back then.

Page 56

1    Q.  If you -- do you recall approximately the
2  price of bitcoin when my client was buying it?
3    A.  I believe -- I don't recall it, but looking
4  at the e-mails, it looks like it was around 30 cents
5  or something like that.
6    Q.  Okay.  If someone placed a large order, would
7  that affect the -- if someone was going to buy 10,000
8  bitcoin, would that be a -- $10,000 worth of bitcoin,
9  would that be a large order?
10    A.  I -- honestly, I don't remember if you were
11  able to move that much at that point or not.
12    Q.  And what I'm getting to is, if you place an
13  order like that, you could very easily run the price
14  up on yourself.  Is that true or not?
15    A.  I don't know if that's the threshold, but
16  there's definitely some amount of money where, if you
17  place an order, it would make the price go up for
18  sure, so ...
19    Q.  Do you know what the average order was on
20  Mt. Gox?
21    A.  I honestly don't remember.
22    Q.  And do you remember what the value of the
23  outstanding bitcoin was at that time?
24    A.  You mean the total bitcoin in the world?
25    Q.  Yes, uh-huh.

Dr. Donald Raggio and Dr. Chris Raggio v. Ied McCaleb 30(b)6 Representative
Case 6:15-cv-00295-JAS-1 Document #: 232-10 Filed: 10/05/2018 Page 16 of 43
Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16
MTGOX, a sole proprietorship, et al
November 17, 2016

Page 57

1    A.  I mean, you can figure it.  If bitcoin was 30
2  cents, I mean, you can figure it out.  Yeah, so ...
3    Q.  Thirty cents and --
4    A.  I mean, there's only -- at that point, what
5  would there -- there'd be, I mean, like, probably like
6  8,000,000 bitcoin mined at that point.  So 30 cents
7  times 8,000,000.
8    Q.  So that's two-and-a-half million.
9    A.  Yeah.
10    Q.  Something like that.  Come on now.
11    A.  So, yeah.
12    Q.  Did Chris go ahead and send you money, wire
13  it to you?
14    A.  He did.
15    Q.  And the -- what account was it that he sent
16  that money to?
17    A.  I believe he sent it to the Code Collective
18  business account.
19    Q.  Okay.  And Code Collective is the company
20  that you had for the --
21    A.  For the game.
22    Q.  -- for the game?
23    A.  Yeah.
24    Q.  And that was when you were mostly in New
25  York.  Right?

Page 58

1    A.  That's right.
2    Q.  Okay.  You didn't open a separate account for
3  Mt. Gox?
4    A.  No.
5    Q.  And the account that he wired money to, was
6  that a checking account?
7    A.  Yes.
8    Q.  Who was that account with?
9       MR. GAULT:  You mean what bank?
10       MR. TYNER:  Yes.
11    A.  I believe Chase, but I could be wrong.
12  BY MR. TYNER:
13    Q.  Okay.  Did you have a lot of business
14  accounts at that time?
15    A.  No.  That was the only one.
16    Q.  What about personal accounts; did you have a
17  lot of personal accounts at that time?
18    A.  I don't believe so.
19    Q.  Did you have any?
20    A.  I don't remember, but probably.
21    Q.  Okay.  How would you pay your bills?
22    A.  I assume I have it in a bank account.
23    Q.  Okay.  Would -- did you do most of your
24  business with Chase?
25    A.  You mean my personal business or the --

Page 59

1    Q.  Uh-huh, yes.
2    A.  Like I say, I don't remember if that was my
3  bank, but -- or if that was my -- I don't remember if
4  that was my business bank or -- and I definitely don't
5  remember if that was my personal bank.  I could have
6  used a different bank, but I believe so.
7    Q.  Okay.  So my client, Chris, wired you money?
8    A.  Uh-huh.
9    Q.  And then did you have -- do you, at that
10  point, have to manually credit his account?
11    A.  That's right.
12    Q.  Okay.  And who would do that?
13    A.  I would.
14    Q.  Okay.  And, at that point, he was free to
15  trade.  Is that right?
16    A.  That's right.
17    Q.  Did Chris ask you to help him buy a large
18  amount of bitcoin?
19    A.  I believe he asked me about advice on how to
20  do it.
21    Q.  And what advice would you give him?
22    A.  I don't remember what I said to him.  I think
23  he was asking about this feature that I had on there
24  called dark pools, which basically meant that you
25  could put up an order, and people couldn't see that

Page 60

1  the order was there.  So if you wanted to buy a large
2  amount, most of it would be hidden so it wouldn't move
3  -- it wouldn't scare the market, essentially.
4    Q.  Okay.
5    A.  So, I think he had placed all of his order as
6  a dark pool, but there's different ways of placing it,
7  and I think he had placed it where it could only be
8  taken by other dark pool orders, and I think I told
9  him he should make it where it could be placed by dark
10  -- taken by dark pool orders and normal orders, so he
11  could have more people taking his offer.
12    Q.  Okay.
13    A.  So ...
14    Q.  And did they do that?  Did he follow that
15  advice?
16    A.  I don't know what he did.  I don't remember
17  what he did.
18    Q.  Okay.
19    A.  I didn't look.
20    Q.  At some point, he notified you that he had
21  bitcoin missing.  Correct?
22    A.  That's right.
23    Q.  How did he notify you of that?
24    A.  Via e-mail.
25    Q.  Okay.  And what did you do once he notified

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16Jed McCaleb 30(b)6 Representative
Cartel 26C1:17-cv-9025l-JAS   a Document #: 232-10   Filed: 10/05/2018   Page 7 of 43 17, 2016
MTGOX, a sole proprietorship/etal                                              November

| Page 61 | Page 63 |
|---|---|
| 1 you that he had bitcoin missing? | 1 A. Yeah. I don't know when the bitcoin was |
| 2 A. I checked his account to see, you know, who | 2 moved back into Mt. Gox, but I know that we didn't |
| 3 had logged in, things like that. | 3 discover it being moved back into Mt. Gox until after |
| 4 Q. Okay. | 4 I had sold it to Mark. |
| 5 A. So ... | 5 Q. What was the date that you sold Mt. Gox to |
| 6 Q. And what else did you do? Did you | 6 Mark? |
| 7 investigate it at all? | 7 A. It was February 5th, 6th, or 7th, somewhere |
| 8 A. Once he had told -- once he told me where the | 8 in there. |
| 9 bitcoins went, I looked to see where those bitcoins | 9 Q. Okay. Did you tell -- you were already aware |
| 10 went after that, because you can follow the trail of | 10 that the coin had been stolen. Right? |
| 11 coins. | 11 A. Well, I don't know if the coin was stolen. I |
| 12 Q. Okay. And where had they gone? | 12 know that it was -- Chris was claiming that. Like, I |
| 13 A. So, it looks like they had gone to this one | 13 don't really know what happened to it, so ... |
| 14 bitcoin account, and then from that bitcoin account, | 14 Q. Okay. But at the time you sold the exchange, |
| 15 some had gone back to Mt. Gox, so ... | 15 you knew that Chris had said there was -- |
| 16 Q. Okay. And when was this going on, | 16 A. That's right. |
| 17 approximately? | 17 Q. -- 9,000 missing? Okay. And did you believe |
| 18 A. I think he e-mailed me in January -- | 18 Chris? |
| 19 Q. Okay. | 19 A. I did. I mean, it's -- you know, I mean, I'm |
| 20 A. -- 2011. | 20 not a hundred percent certain, but, you know, I |
| 21 Q. January of '11. Okay. And how many bitcoin | 21 believe him. |
| 22 were missing from his account? | 22 Q. After -- well, before he reported to you that |
| 23 A. He told me 9,000, around. | 23 he was missing this bitcoin, had anybody else had any |
| 24 Q. Okay. And so you were able to see that it | 24 bitcoin missing? |
| 25 came out of his account, and you could trace it back | 25 A. I don't know if it was before or after, but |

| Page 62 | Page 64 |
|---|---|
| 1 into an account that it came back into Mt. Gox. Is | 1 there have been other -- there was someone else that |
| 2 that right? | 2 lost some bitcoin. |
| 3 A. That was -- we -- we saw that much later, | 3 Q. And was that before you sold it, someone else |
| 4 though. Like, I don't know if -- | 4 had lost bitcoin? |
| 5 Q. Okay. | 5 A. I believe it was before, yeah. |
| 6 A. -- it moved back much later, or we weren't | 6 Q. How many bitcoin -- was it just one other |
| 7 able to see it until later, but that wasn't | 7 person or multiple? |
| 8 immediately, so ... | 8 A. I believe it was two people. |
| 9 Q. Okay. But, eventually, you could see it went | 9 Q. Was that two including the Raggios? |
| 10 back into Mt. Gox? | 10 A. No, not including those. |
| 11 A. Yes. | 11 Q. So it would be three total? |
| 12 Q. And you knew which account that was. | 12 A. Yeah. |
| 13 Correct? | 13 Q. Okay. And who would those people that had |
| 14 A. Which account it went back to? | 14 bitcoin missing? |
| 15 Q. Yes. | 15 A. Who are they? |
| 16 A. That's right. But like I say, that happened | 16 Q. Yes. |
| 17 after I had already sold the site, so ... | 17 A. I don't remember who they were. I mean, I |
| 18 Q. When the money came back into the account, | 18 don't think I ever -- I didn't have much interaction |
| 19 you'd already sold Mt. Gox? | 19 with them. |
| 20 A. I don't remember when the money came back | 20 Q. How did you know that they were missing |
| 21 into the account, but -- | 21 bitcoin? |
| 22 Q. I'm sorry. I said money, and I meant | 22 A. Theirs were compromised in a different way, |
| 23 bitcoin. | 23 for sure, and I could see the way that their accounts |
| 24 A. Right. | 24 were compromised. |
| 25 Q. I don't know if there was -- | 25 Q. Uh-huh. |

Page 65

1  A.  And, yeah, so ...
2  Q.  Explain that to me.  How was -- how were the
3  Raggios' compromised?
4  A.  I don't know how the Raggios' was
5  compromised.  So -- yeah.  Somebody had his user name
6  and password, and was able to log in and take the
7  bitcoin, so ...
8  Q.  Okay.  And then -- but the other two, you
9  could tell how they were compromised?
10  A.  That's right.
11  Q.  And how was that?
12  A.  They were compromised by this thing called a
13  dictionary attack, which is where somebody tries
14  several different passwords again and again, and then
15  they eventually got the right password, and were able
16  to log into their account.
17  Q.  And how could you determine that was what
18  they did?
19  A.  I believe I saw as -- because to do this
20  dictionary attack, you basically have to try thousands
21  and thousands of passwords.  So it's thousands and
22  thousands of log-in attempts, and all of this is
23  logged.  So -- and every once in a while, I would look
24  at the server logs and see, and I could see, like, all
25  these attempts.  There was also -- in order to do a

Page 66

1  dictionary attack, you have to get somebody's user
2  name, as well.
3  Q.  Uh-huh.
4  A.  Because, otherwise, you're guessing two
5  things.  So prior to this dictionary attack, somebody
6  had done this thing where they were able to scrape a
7  bunch of user names from Mt. Gox, and these two
8  accounts were some of the user names that had gotten
9  discovered.  And both of those things indicate that
10  there was a dictionary attack, and then some amount of
11  coins were stolen from them.
12  Q.  What was the amount that was stolen from
13  them?
14  A.  I don't remember, but it was nowhere near
15  what Chris Raggio's was.
16  Q.  Okay.  So when -- you said that the -- I'm
17  sorry.  It's all a little confusing to me, so ...
18  A.  Yeah.
19  Q.  The other two that had been compromised, were
20  you able to trace them, as well, follow where those
21  coins went?
22  A.  I don't know if we even tried it.
23  Q.  Okay.
24  A.  So ...
25  Q.  It was such a small amount, it just didn't

Page 67

1  have any significance?
2  A.  Oh, those, they didn't withdraw bitcoin.
3  Those guys withdrew dollars.
4  Q.  Oh.
5  A.  Yeah.
6  Q.  So they withdrew cash?
7  A.  Yeah.
8  Q.  How much cash was it?
9  A.  I don't remember the amount, but it was less
10  than the Raggio theft, for sure.
11  Q.  Okay.  So it was less than $10,000 then?
12  A.  Yeah.
13  Q.  Okay.  And did you just -- did you pay for
14  that, or what did you do with those accounts?
15  A.  I don't remember what I did with them.  I
16  think I split it, like, they paid half and I paid
17  half.
18  Q.  Okay.  And you think that that happened
19  before or after Chris had his missing?
20  A.  I believe it happened after.
21  Q.  Okay.  Was there a limitation on the amount
22  of cash someone could withdraw?
23  A.  If I remember correctly, it was a $1,000
24  limit of any kind, either dollars or cash -- dollars
25  or bitcoin.

Page 68

1  Q.  Okay.  So if -- just how does that work that
2  you would get your cash back?  I mean, like, if I had
3  an account, and I had 10,000 that was sitting there,
4  and I wanted to bring it back to my bank, how would I
5  do that?
6  A.  So there's a few different methods.  I could
7  send you PayPal, I could send you to Liberty Reserve,
8  and then maybe there were some other ones.
9  Q.  Okay.  So did it require a human to --
10  A.  Liberty Reserve didn't require a human.  I
11  don't remember if PayPal did or not.
12  Q.  So, if I was going to -- so, Liberty -- so,
13  if I made a request for $10,000 to go to Liberty --
14  A.  Uh-huh.
15  Q.  -- then they would have an account, I guess,
16  for me?
17  A.  Yep.
18  Q.  And it would get deposited there, and then I
19  would deal with Liberty to get it --
20  A.  That's right, yeah.
21  Q.  -- back?  Okay.  And you think that was --
22  would be handled by the software and be an automatic
23  kind of transaction?
24  A.  Yeah.  Liberty Reserve was automated, for
25  sure.

Page 69

1    Q.  Okay.  But with PayPal, it may have required
2  human intervention?
3    A.  Yeah.  I don't remember if, PayPal, I had to
4  do it manually or not.
5    Q.  Okay.
6    A.  I may have automated it, but it may have been
7  manual.
8    Q.  Okay.  And so there was just probably a
9  button I could push on there and say send me this
10  amount of cash through PayPal, or Liberty, or
11  whatever.  Is that --
12    A.  That's right.
13    Q.  Okay.  So, really, all I would need would be
14  a user name and password to get access to the account?
15    A.  Yeah.
16        MR. GAULT: Excuse me real quick.  You've
17  been going about an hour and 15.  Do you want to take
18  a break, stretch your legs, whatever?  It's your call,
19  so ...
20        THE WITNESS: I'm good.
21        MR. GAULT: Okay.
22  BY MR. TYNER:
23    Q.  When -- and I believe you said you sold
24  Mt. Gox February the -- do you remember the date?
25    A.  It was the beginning of February.

Page 70

1    Q.  Okay.
2    A.  5th, 6th, 7th, something in there.
3    Q.  Did you tell the Raggios you had sold
4  Mt. Gox?
5    A.  I don't remember when I told him, but I told
6  him at some point, yeah.
7    Q.  Did you tell Mark Karpeles that the bitcoin
8  had gone missing for the Raggios' account?
9    A.  I did.
10    Q.  Okay.  And what -- was there a plan to get
11  them taken care of?  Did you have any kind of plan
12  to --
13    A.  So, like I said, it was unclear -- to me
14  the -- you know, it's unfortunate that those coins
15  went missing, but ultimately, someone compromised his
16  password.  It was either in someone he knows or
17  something on his computer, so we didn't feel at fault
18  for it, you know, but we would have liked to recover
19  his coins if we could, but it's not something that we
20  thought we were, like, actually responsible for.  And
21  I think Mark felt the same way.  So -- and then later,
22  when it came to light that these coins did come back,
23  then we thought maybe there's an opportunity to
24  recover his coins, so ...
25    Q.  And so when you saw them come back into an

Page 71

1  account, whose account was that?
2    A.  The user name on the account was Barron.
3    Q.  It was just a one-name --
4    A.  It's the -- yeah.  It's the user name, so,
5  yeah, just one.
6    Q.  Oh, the user name.  Okay.  So when you signed
7  up, you didn't have to put in a first and last name?
8    A.  No.
9    Q.  When someone registered for an account, did
10  you have any way to track that person at all?
11    A.  I just had their e-mail and their IP address.
12    Q.  You did log their IP address when they signed
13  up?
14    A.  Yes.
15    Q.  If someone was logging in, did you check to
16  make sure it was the same IP address?
17    A.  You can't do that because IP addresses
18  change.  Right?  People are on -- most people are not
19  on a static IP address.
20    Q.  So you did not have a check to see if it was
21  the same IP address when they logged in?
22    A.  No, because, like I said, you can't.  I mean,
23  nobody does that.
24    Q.  Okay.  But when they first signed up, you
25  kept that information, you stored the information

Page 72

1  about the IP address that created the new account?
2    A.  I did.
3    Q.  Okay.  And for this -- what did you say their
4  name was?
5    A.  Barron.
6    Q.  Yeah.  You had that IP address?
7    A.  I did, yeah.
8    Q.  Could you tell where he was located?
9    A.  I don't remember where it was.
10    Q.  But could you tell?
11    A.  I mean, you could do a -- yeah, you could do
12  a look-up on the IP address, and it doesn't tell you
13  conclusively, but, yeah.
14    Q.  Did you do that?
15    A.  I don't remember if I did or not.
16    Q.  Okay.  And you had no other way to identify
17  this person?
18    A.  Other than the e-mail, no.
19    Q.  And did you try to find out who it was
20  through the e-mail?
21    A.  I looked, yeah.  It was -- if I remember, the
22  e-mail address was, I think, Barron@contractor.net.
23  So I tried to figure out what this contractor.net
24  thing was.
25    Q.  Okay.  And were you able to find what

Dr. Donald Raggio and Dr. Chris Raggio<br>
ATPG25C1, a sole proprietorship, et al

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16<br>
Jed McCaleb 30(b)6 Representative<br>
November 17, 2016

Case 3:15-cv-00031-JAG   Document #: 232-10   Filed: 10/05/2018   Page 20 of 43

Page 73

1 contractor.net was?
2    A.  Nothing ever useful came out of it, I don't
3 think, so ...
4    Q.  Okay.  I mean, you could -- you, obviously,
5 could figure out who had purchased that domain?
6    A.  Sometimes you can.  Often the whois stuff is
7 masked, so you can't see who bought it.
8    Q.  Okay.  And you don't remember if you
9 discovered who owned contractor.net or not?
10    A.  I don't remember.  I remember, like, pursuing
11 that, and never being fruitful.  So I don't remember
12 what I actually got at the end of it, but -- whether
13 it was hidden, or if it was some mail server that
14 served lots of people, or what.  I just remember it
15 not being useful.
16    Q.  You couldn't identify them?
17    A.  Yeah.
18    Q.  Okay.  So when the bitcoin came back into
19 Barron's account -- Barron, I should be able to
20 remember that now.  That's Trump's son.  When it came
21 back into Barron's account, what happened with it?
22    A.  I don't remember what he did, like, if he had
23 traded it or not.  So I don't know if it was still
24 sitting there, or if he had already exchanged it to
25 dollars, or what had happened, so ...

Page 74

1    Q.  You just remember there was either dollars,
2 or bitcoin, or both, that came back into that account?
3    A.  Definitely -- I mean, I can't trace the
4 dollars, so it was definitely bitcoin that had come
5 back.
6    Q.  Okay.
7    A.  And by say "come back," I mean basically
8 like --
9    Q.  It went of Mt. Gox?
10    A.  -- Chris's bitcoin went to a certain bitcoin
11 account that had more than Chris's bitcoin there, and
12 bitcoin from that account went to this Barron account,
13 so just to be clear.
14    Q.  Can you tell, like, if you're looking -- if
15 you have an address, can you look at that and see how
16 many bitcoin are associated with that address?
17    A.  Yes.
18    Q.  Cool.  Do you recall how many you could see
19 at that address?
20    A.  I don't remember, but it was more than
21 Chris's.  I don't remember how many were there.
22    Q.  Okay.  And the amount of bitcoin that went
23 back to Mt. Gox, was it more than Chris's, or was it
24 the same amount?
25    A.  It wasn't the same amount as Chris's.  I

Page 75

1 don't know if it was more or less.
2    Q.  Okay.  And did you take any action to try to
3 preserve that bitcoin that came back into Barron's
4 account?
5    A.  Once we realized that this had happened,
6 like, once I realized that there was some account that
7 Chris's coins had gone to, and then those coins that
8 that account had sent to Mt. Gox, then we froze that
9 Mt. Gox account.
10    Q.  Okay.
11    A.  So we froze Barron's account at that point.
12    Q.  Okay.  Did Barron's account -- you're not
13 sure if it had enough in there to cover Chris's loss
14 or not?
15    A.  I don't know if it had enough bitcoins.  It
16 had enough dollars for sure.  It was about $45,000
17 worth of stuff.
18    Q.  Okay.
19    A.  In other words, bitcoins or dollars.  I don't
20 know what it was denominated in, but at the time we
21 froze it, it was worth about $45,000.
22    Q.  Okay.  And that would be -- would that be
23 total bitcoin and cash or --
24    A.  I believe so, yeah.
25    Q.  Okay.

Page 76

1    A.  I don't remember how it broke down, but --
2    Q.  Okay.
3    A.  Yeah.
4    Q.  And so, at some point, did you then transfer
5 money to Chris to cover that or bitcoin?
6    A.  Because at this point, I no longer owned
7 Mt. Gox, it was in Mark's hands, you know, I told -- I
8 explained to Mark the situation, and explained to him
9 the information why I thought that Barron was
10 suspicious, at least, and then I believe Mark
11 contacted Barron and tried to figure out what was
12 going on, so ...
13    Q.  Okay.  And did you try to help any to get
14 this taken care of?
15    A.  I had some e-mail exchange with Barron, as
16 well, and some exchange on the forum.  But beyond
17 that, no.
18    Q.  And the forum, what is the forum?
19    A.  There's a -- there was a pretty popular forum
20 for bitcoin where people can, like, post messages and
21 talk about it.  That was kind of where everybody that
22 knew about bitcoin at that time would go and talk
23 about bitcoin stuff, so ...
24    Q.  And what's the name of that forum?  Or is it
25 -- is it a name, or how do you find it?

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
Case 2:14-cv-00421-AS Document #: 232-10 Filed: 10/05/2018 Page 20 of 43 November 17, 2016
MTGOX, a sole proprietorship/etal

Page 77

1     A.  Bitcointalk.org.
2     Q.  Okay.
3     A.  Yeah.
4     Q.  And so is it just like a blog or something
5  that people talk back and forth or create topics
6  and --
7     A.  That's right.
8     Q.  I've seen that kind of stuff.
9     A.  Yeah, yeah.  Anyone can post a topic and
10  write, and then people reply to them, things like
11  this.
12     Q.  Okay.  And so you communicated with Barron on
13  the forum or directly, or with his e-mail?
14     A.  Both.
15     Q.  Okay.  And what was his response?
16     A.  He claimed that he had bought these bitcoin
17  off of somebody on IRC that he didn't know, and that,
18  basically, maybe the person he bought them from stole
19  them, but he didn't steal them.
20     Q.  Okay.  Would that be plausible?
21     A.  It seems unlikely to me.  I mean, it's
22  definitely possible, yeah.
23     Q.  But you could see it left the Raggios'
24  account --
25     A.  Uh-huh.

Page 78

1     Q.  -- and went to a number, went to a -- what do
2  you call that?
3     A.  Bitcoin address.
4     Q.  Address.  Okay.
5     A.  Yeah.
6     Q.  And you could see, in that address, that it
7  had not only the Raggios', but it had more bitcoin.
8  Do you recall -- theirs was about 9,000.  Do you
9  recall how much was in that address?
10     A.  I really don't remember.
11     Q.  You just remember it was more?
12     A.  I remember it was more.
13     Q.  And then you could see that bitcoin went from
14  that address into Barron's account.  Right?
15     A.  That's right.
16     Q.  Is that right?
17     A.  Uh-huh.
18     Q.  Okay.  And so Barron is claiming that he
19  bought bitcoin on IRC, and that's how -- and we
20  know -- well, we don't know where all of those bitcoin
21  came from at that address?
22     A.  That's right.  I don't know if he was
23  claiming that he owned that address, or if he had the
24  person that he bought them from send them directly to
25  Mt. Gox.  So, you know -- or this thing in the middle

Page 79

1  could actually maybe have been a -- like, another
2  wallet, basically, where it holds the bitcoins of lots
3  of different people.
4     Q.  Uh-huh.
5     A.  So it's hard to know.
6     Q.  Okay.  And so after y'all froze the account,
7  then what happened?
8     A.  Mark said he was going to continue to
9  investigate, and he thought that he needed court
10  approval to be able to send from one of his users'
11  accounts to another of his users' account.  So he told
12  me and Chris that he was trying to seek that approval.
13  I don't know what he was doing beyond that, if
14  anything, so ...
15     Q.  Did you call and talk to him or -- back up.
16  Did you ever talk to him personally, like, on the
17  phone?
18     A.  To Mark?
19     Q.  Yes.
20     A.  A couple of times, not very often.
21     Q.  So it was mostly e-mail, I presume?
22     A.  It was mostly -- I mean, I basically didn't
23  talk to him that much.  But, yeah, some e-mails.
24     Q.  E-mails?
25     A.  Yeah.

Page 80

1     Q.  Okay.  And so you would -- you would e-mail
2  him about the Raggios?
3     A.  I may have.  You know, it wasn't -- it
4  definitely wasn't a regular thing.  I think maybe
5  Chris asked me to e-mail him one time or something,
6  yeah.
7     Q.  What e-mail address were you using at that
8  time?
9     A.  I had several.
10     Q.  What were they?
11     A.  Well, I had my personal e-mail account.  I
12  had my account for my new company.  Mark didn't turn
13  off my jed@mtgox account just because sometimes people
14  would still e-mail me there.
15     Q.  Your what X; what did you say, Jed?
16     A.  Jed@mtgox account.
17     Q.  Oh, jed@mtgox.
18     A.  Yeah.
19     Q.  Okay.
20     A.  And I have another personal account.  I mean,
21  I have a bunch of old e-mail accounts.
22     Q.  But if you were communicating with Mark, what
23  account would you use?
24     A.  Most likely, the jed@mtgox.
25     Q.  But you could have used your personal?

Dr. Donald Raggio and Dr. Chris Raggio
MTG OX, a sole proprietorship, et al

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16
Jed McCaleb 30(b)6 Representative
November 17, 2016

Case 3:14-cv-00852-RCL   Document #: 232-10   Filed: 10/05/2018   Page 32 of 43

Page 81

1    A.   I would sometimes e-mail him from my personal
2  account.
3    Q.   What was that e-mail account?
4    A.   Jed2000@gmail.
5    Q.   Okay.  And then you probably had one at
6  Ripple, as well?
7    A.   Yeah.
8    Q.   And what was that e-mail?
9    A.   Jed@ripple.com.
10   Q.   Okay.  Any others?
11   A.   Yeah.  I have another personal account,
12  swamp12@yahoo.com.
13   Q.   Okay.
14   A.   Ripple was called The Open Coin briefly, so I
15  had an Open Coin account.
16   Q.   Okay.
17   A.   Yeah.  I had an account for Far Wilds still,
18  yeah.
19   Q.   Were they all jed@?
20   A.   Yeah, for the most part.
21   Q.   -- opencoin.com?
22   A.   Yeah.
23   Q.   Do you still have the Gmail account?
24   A.   My personal, Jed2000?
25   Q.   Yeah.

Page 82

1    A.   Yes, I do.
2    Q.   Okay.  Can you go back and pull those e-mails
3  that you would have sent to Mark at that time?
4    A.   From my personal one?
5    Q.   Yes.
6    A.   It's technically possible, yeah.
7    Q.   And then what about the Mt. Gox e-mail?
8    A.   Those are gone.
9    Q.   Was the e-mail server for Mt. Gox the same
10  server that the exchange was hosted on?
11   A.   No.  We used -- well, I used Gmail for it.  I
12  think maybe Mark switched it off of Gmail at some
13  point.
14   Q.   You used Gmail for the e-mail for Mt. Gox?
15   A.   That's right, yeah.  They'll -- Google will
16  do a domain server for you for -- do a mail server for
17  you, if you ask them to.
18   Q.   Okay.
19   A.   So ...
20   Q.   And so when you first set up the e-mail for
21  Mt. Gox, you used the Google?
22   A.   Yeah.
23   Q.   Okay.  And then you think, at some point,
24  Mark may have changed it?
25   A.   I think so.  I'm not sure.

Page 83

1    Q.   Okay.  And what was his e-mail address?
2    A.   Well, he took over admin@mtgox.
3    Q.   Okay.
4    A.   Which was the main way people had contacted
5  me before.  And he took over -- and then he added
6  mark@mtgox.
7    Q.   Okay.  When you first started communicating
8  with Mark, do you remember what e-mail address that
9  was?
10   A.   What e-mail address I used?
11   Q.   Before he -- no.  Before he bought Mt. Gox,
12  what e-mail he used?
13   A.   I don't remember.  I think it was something
14  MagicalTux, was in there somewhere.
15   Q.   Okay.
16   A.   I don't know.
17   Q.   I can't -- is -- you said that you hired him
18  to write some code for Mt. Gox.  Is that right?
19   A.   That's right.  I contracted him to do this
20  integration for a bank in Europe.
21   Q.   Okay.  What bank was that?
22   A.   It was a bank in Finland.  I don't remember
23  the bank's name.
24   Q.   And so he would just write software to
25  communicate between the bank and Mt. Gox.  Is that

Page 84

1  right?
2    A.   That's right.  So when someone would deposit
3  money there, it would automatically get credited in
4  their account, things like that, so ...
5    Q.   Okay.  And you had just put this exchange up,
6  like, in August or so?
7    A.   Uh-huh.
8    Q.   Okay.  About how long -- about when was it that you
9  got him to do the Finland bank?
10   A.   I don't know.  Approximately maybe December
11  or something like that.
12   Q.   Okay.  How did you find him?
13   A.   He had done other projects in the bitcoin
14  space, like, done other things for bitcoin, and he was
15  on IRC, and he was talking -- yeah.  So I just asked
16  him.
17   Q.   So you just saw him --
18   A.   Around.
19   Q.   -- in the groups?
20   A.   Yeah.
21   Q.   What was he doing with bitcoin before
22  Mt. Gox?
23   A.   I don't remember exactly what he had done
24  now.  I think he had made some way where you could see
25  the different bitcoin nodes on a map, and I think he

Dr. Donald Raggio and Dr. Chris Raggio v. Tied McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                  November 17, 2016

McCaleb 30(b)6 Code Collective, LLC 11-17-16
Case 3:14-cv-00501-JAS    Document #: 232-10    Filed: 10/05/2018    Page 22 of 43

1 had -- was selling hosting or something for bitcoin,
2 things like that, so ...
3    Q.  Selling hosting?
4    A.  Like, selling server hosting, so you could
5 host a server and pay for it in bitcoin.
6    Q.  Oh, okay.
7    A.  Yeah.
8    Q.  Just rack space?
9    A.  Yeah.
10    Q.  But pay for it in bitcoin?
11    A.  Exactly.
12    Q.  Okay.  How did you --  why didn't you use
13 somebody stateside to write that code for Finland?
14 What made him the right guy for that?
15    A.  I asked, in the channel, who had done stuff
16 like that before.  He had done work like that before,
17 so ...
18    Q.  Okay.  And so did he complete that project?
19    A.  I don't remember if he finished or not.
20    Q.  Okay.  I mean, that wouldn't be a big -- a
21 huge project, would it?
22    A.  It's more difficult than it sounds just
23 because their API is nonexistent, basically.  It's
24 like -- it's kind of a hassle, yeah.
25    Q.  So it's not really the coding that's so hard,

1 but --
2    A.  Banks, dealing with bank software is
3 cumbersome.  So there's, like, intricacies there, I
4 guess.  Like, it's not -- it's not as easy as it
5 should be.
6    Q.  Okay.  And I guess that's for security.  I
7 mean ...
8    A.  No.  I think it's more just, like, legacy,
9 and just bad coding, and things like that on their
10 part.  So, just old.
11    Q.  Okay.  What software did you use to write --
12 or what programming language did you use to write
13 Mt. Gox?
14    A.  PHP.
15    Q.  And is that what he would use for this
16 interface?
17    A.  Yeah.
18    Q.  Okay.  PHP?
19    A.  Uh-huh.
20    Q.  What does PHP stand for, if you know?
21    A.  I don't know what PHP stands for.
22    Q.  So how long did you keep communicating with
23 Mark Karpeles after you sold Mt. Gox?
24    A.  Really, only for another month.  And then at
25 that point, he had pretty much taken over completely.

1 He understood how the system worked, and he just kind
2 of ran it from there.  That was basically the extent
3 of it.
4    Q.  When he bought Mt. Gox, did he open a bank
5 account so you could transfer the cash to him?
6    A.  How did that work?  I don't know how we
7 transferred the cash.  At some point, we definitely
8 did.  I don't remember how it was transferred, though.
9    Q.  Do you think you wrote a check, or you wired
10 it?
11    A.  I doubt I -- I probably wired it.  I doubt I
12 would have wrote a check, but ...
13    Q.  What was the amount of cash that you
14 transferred when you sold it?
15    A.  I don't remember.  I just -- I don't
16 remember.
17    Q.  Over $100,000?
18    A.  Maybe.  I just don't remember how much it was
19 at all.
20    Q.  You think it was a million dollars?
21      MR. GAULT:  He said he didn't know, third try
22 this time.
23      MR. TYNER:  Well, we can narrow this down a
24 little bit.
25      THE WITNESS:  I don't --

1      MR. GAULT:  If he doesn't know, he doesn't
2 know.
3      MR. TYNER:  Well --
4    A.  It wasn't a million dollars.
5      MR. TYNER:  Okay.  So he does know that.
6      MR. GAULT:  You got me.
7 BY MR. TYNER:
8    Q.  You think it was less than half a million
9 dollars?
10    A.  Yeah.  I'm sorry.  I just don't really
11 remember.  It's really a long time ago.
12    Q.  And then what about the bitcoin?  How did you
13 transfer those wallets?
14    A.  Again, I don't recall, but I likely just gave
15 him the secret keys.
16    Q.  Gave him the secret keys?
17    A.  Yeah.
18    Q.  How does that work?
19    A.  Bitcoin addresses are just the public keys of
20 a corresponding secret key, and if you have the secret
21 key, you can make transactions on the bitcoin address.
22 Right?
23    Q.  Okay.
24    A.  So ...
25    Q.  So the bitcoin would have stayed in the

Dr. Donald Raggio and Dr. Chris Raggio, McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al November 17, 2016

Case 3:14-cv-00581-LRS    Document #: 232-10    Filed: 10/05/2018    Page 24 of 43

Page 89

1 wallets that you created, and you just gave him access
2 to them?
3   A. Well, I don't remember what happened,
4 actually. Now that I think about it, he probably made
5 me send them to new wallets, but I don't remember what
6 we did. But that's pretty straightforward, to either
7 send to a new address or do something, so ...
8   Q. And how many -- about how many wallets did
9 you have for Mt. Gox?
10   A. I don't know. I mean, there -- I believe
11 there was one wallet for every customer, so they could
12 -- they would have a deposit address that we would
13 watch. So there was probably quite a few. None of
14 those would have bitcoin in them, though. There was
15 just a handful that would actually retain bitcoin.
16   Q. Okay. And a handful, you're thinking five?
17   A. Yeah. I really don't remember how it was set
18 up.
19   Q. But it wouldn't be one for every -- you
20 weren't retaining bitcoin in a whole bunch of
21 different wallets?
22   A. No.
23   Q. One for every --
24   A. No. No significant amount, no.
25   Q. Okay. And how many bitcoin were at Mt. Gox

Page 90

1 when you sold it?
2   A. I really don't remember at all, you know.
3   Q. At the time you sold Mt. Gox, it was the
4 largest bitcoin exchange in the world, wasn't it?
5   A. That's right.
6   Q. And I think you said a while ago, you thought
7 about 8- or 9,000,000 had been mined by then?
8   A. Yeah. I mean, we'd have to look at the chart
9 to see what the actual number was, but I think around
10 there, so ...
11   Q. Around there?
12   A. Yeah.
13   Q. Do you remember the amount of bitcoin in
14 relationship to what was out?
15   A. I remember, shortly after I sold it, Mark did
16 some demonstration, and I think he moved around
17 400,000 bitcoin to show that he had access to it, so
18 it was --
19   Q. Oh, okay.
20   A. But that was after.
21   Q. Yeah.
22   A. And I think he had -- I think there was a lot
23 more deposited after I had sold it, basically. So it
24 was some amount less than that.
25   Q. Okay. And he would just move it so people

Page 91

1 could -- he could say, hey, I'm going -- I really did
2 buy this. Is that trying to give confidence?
3   A. People were worried that he didn't actually
4 have the bitcoin that was represented on the site.
5   Q. Okay.
6   A. Like I'd either sold it, or lost it, or
7 something like that. So to prove that he still had
8 control over it, he moved it.
9   Q. Oh, okay. And that was -- it was after,
10 obviously, he bought it, but was it fairly soon after
11 he bought it?
12   A. No, it was long after. I mean, I don't
13 remember when it was. Maybe --
14   Q. Months?
15   A. Months. It was months after, but, yeah.
16   Q. Okay. So when you -- were you -- you said he
17 did it -- was it in a public forum, was he speaking,
18 or was it just on the --
19   A. It was on Bitcointalk, I believe.
20   Q. Okay. And he was basically saying, look, I
21 really do have the coin, you guys look over here, and
22 you can see me, I'll move it?
23   A. Yeah.
24   Q. Is that -- is that right?
25   A. Something like that, yeah.

Page 92

1   Q. I'm just trying to understand all this. I
2 mean, it's pretty amazing that anybody can actually
3 see it. How do you go about doing that? How do
4 you --
5   A. Looking at it?
6   Q. Uh-huh.
7   A. Well, basically, that's what -- basically
8 any, like, bitcoin node can inspect the addresses.
9 Right? And see -- I mean, that's what bitcoin is.
10 It's a way for all these different servers to agree on
11 what node owns -- or what address owns what. Right?
12 So if you run a bitcoin node, you can look up a
13 particular address and see what -- how much it's
14 holding.
15   Q. Okay.
16   A. Yeah.
17   Q. Okay. So not everybody can do it, but you
18 have to be running a node to be able to see?
19   A. That's right, yeah.
20   Q. Okay. And what's a node?
21   A. It's just -- I mean, bitcoin is this
22 peer-to-peer network. Right? So it's just running
23 one of the pieces of software in the network. Right?
24   Q. Uh-huh.
25   A. So something that's following the bitcoin

Case 3:15-cv-09052-JAS    Document #: 232-10    Filed: 10/05/2018    Page 25 of 43

**Page 93**

1  protocol and is talking to the other bitcoin servers
2  out there in the world, so -- is a node.
3      Q.  So would -- like, if you -- like, you can go
4  and download the bitcoin software to your computer?
5      A.  That's right.
6      Q.  And do you become a node when you do that, or
7  is that different?
8      A.  I mean, "node" is not a very specific term,
9  but, I mean, I guess, technically, you'd become a node
10 if you -- well, you would become a node probably -- in
11 the real sense, you'd become a node if you start
12 validating, if you start mining, essentially, then you
13 become a node.
14     Q.  Okay.
15     A.  But you can get the block chain, and you can
16 verify the block chain.  So, basically, you can look
17 at the thing and see if this is, indeed, the longest
18 chain, and things like that, so ...
19     Q.  But if I've downloaded that software, I
20 should be able to go look at all these transactions?
21     A.  That's right.
22     Q.  Or do I still have to be mining?
23     A.  No, you don't have to be mining.
24     Q.  Okay.  So if I knew what I was doing, I could
25 go look and see what --

**Page 94**

1      A.  That's right, yeah.
2      Q.  And you said you can see the address, and you
3  can see the amount of bitcoin that's held there?
4      A.  Uh-huh.
5      Q.  Is that right?
6      A.  Yes.
7      Q.  And so anybody that wants to download the
8  software could do that?
9      A.  Yeah.
10     Q.  Okay.  Wow.  So do you still have those same
11 wallets that you had when you had Mt. Gox?
12     A.  No.
13     Q.  What did you do with them?
14     A.  I mean, the key -- like, I never had them
15 locally.  The keys were only on the server, so, yeah.
16     Q.  I don't understand that.
17     A.  That's not true, actually.  I had -- I
18 believe I had a cold wallet.  So I had those local
19 keys, but that I must have transferred to Mark, so ...
20     Q.  You had a -- what was cold?  You said you had
21 a cold what?
22     A.  A cold wallet.
23     Q.  Okay.  What is that?
24     A.  That's where some bitcoin is not online.  So
25 it's basically reserved, like, off the -- offline.  So

**Page 95**

1  if someone hacks into your machine, and, like,
2  compromises it, they won't be able to take all the
3  bitcoin.
4      Q.  Okay.
5      A.  So ...
6      Q.  And if it is offline, is it just on another
7  -- on a computer that's not connected to the net?
8      A.  That's right.
9      Q.  Is that right?
10     A.  Yeah.
11     Q.  Okay.  I had heard something about you could
12 have paper.  Is that -- is that true, you could
13 actually print your bitcoin?
14     A.  Well, can you print the -- you can print the
15 secret key.  Right?  So if you've printed the secret
16 key and put that somewhere, then --
17     Q.  And then --
18     A.  -- and it's not anywhere online, then
19 that's --
20     Q.  Okay.
21     A.  -- what they mean by paper wallet.
22     Q.  So then you could just delete everything even
23 off the computer because the key's all that you have to
24 have?
25     A.  Right.

**Page 96**

1      Q.  Okay.  So you had -- you had cold, but you
2  didn't have paper?
3      A.  That's right.
4      Q.  Okay.  How did you get the cold bitcoin to
5  Mark?
6      A.  I don't remember the exact mechanism, but I
7  mean, you can always put the cold one back online.
8  Right?  I mean, you have to do it at some point to
9  actually make the transaction.
10     Q.  And so you would -- at that point, you would
11 take that computer that was not connected to the
12 internet.  Is that right?  And then you could
13 transfer?  How did you get it from the cold computer
14 to the being live again?
15     A.  So, there's a couple ways you can do it.  You
16 can basically make the transaction, and then what the
17 -- what you need the private key for is to actually
18 sign the transaction.  So you can take the
19 transaction, which is just a blob of data, move it to
20 the cold computer, have the cold computer sign it,
21 copy that signed transaction, and then, you know, on a
22 USB key or something, and then put it back online.  I
23 don't remember the exact mechanism I used to transfer
24 the coins to him, though.
25     Q.  Okay.  But you don't keep up with those

Page 97

1  wallets that you had back then --
2      A.  No.
3      Q.  -- with Mt. Gox anymore?
4      A.  No.
5      Q.  Okay.  Did you empty those wallets?  I guess
6  you did, if you're not using them.
7      A.  Yeah.  I mean, I definitely -- like, whatever
8  was there, held by my wallets before, Mark took and
9  put somewhere else.  So there was no bitcoins left
10  that were under my control --
11      Q.  Okay.
12      A.  -- after we sold it, so ...
13      Q.  All right.
14      A.  I'm going to run to the bathroom real quick.
15          MR. GAULT:  Sure.  Let's take five.
16          VIDEOGRAPHER:  Off the record.  the time is
17  11:48.
18          (Recess.)
19          VIDEOGRAPHER:  Back on the record.  The time
20  is 12:02.
21  BY MR. TYNER:
22      Q.  I think I asked you this, but I just don't
23  remember the answer.  But about when was it that you
24  hired Mark Karpeles to do that interface with the
25  Finland bank?

Page 98

1      A.  I don't remember exactly.  It was, I think,
2  around December probably.
3      Q.  Okay.  And you don't remember if he completed
4  that or not before he actually bought the exchange?
5      A.  I'm pretty sure he completed it at some
6  point.  I just don't remember if it was before or
7  after transfer was done.
8      Q.  Okay.  And the transfer was the first part of
9  February?
10      A.  Yeah.
11      Q.  So it's not a lot of time to have completed
12  that.  Right?  What -- you said that you knew him from
13  the forums online.  Oh, and you put out a request,
14  could somebody do this coding.  Correct?
15      A.  That's right.
16      Q.  Okay.  And he responded to you?
17      A.  Yeah.
18      Q.  And said that he was capable of doing that?
19      A.  Yes.
20      Q.  Okay.  So in the course of that, the fact
21  that he was going to be writing the software to
22  interface with the Finland bank, did you give him
23  access to Mt. Gox at that point?
24      A.  No.
25      Q.  Okay.  So he wouldn't need access?

Page 99

1      A.  No.
2      Q.  How would he be able to create this software
3  -- would he create the software or the interface and
4  just send it to you?  Is that what would happen?
5      A.  Yes.
6      Q.  Okay.  And so he would never have to have
7  access to Mt. Gox in order to complete his work?
8      A.  No.
9      Q.  Okay.  And why didn't you just do that
10  yourself?
11      A.  I was pretty busy doing other things for
12  Mt. Gox and other stuff, and, also, he had more
13  experience with doing things like that, so he would be
14  able to do it quicker than I would.
15      Q.  How did you know he had more experience?
16      A.  I mean, that's what he claimed.  He claimed
17  he had more experience doing it.
18      Q.  Okay.  But it was just his own -- he
19  responded to your request for somebody, and you
20  believed he was capable?
21      A.  That's right.
22      Q.  Okay.  You didn't do a background check on
23  him?
24      A.  No.
25      Q.  Did he give you some references to call?

Page 100

1      A.  No.  I mean, it was just for this small piece
2  of contract work.  You don't typically need to do
3  that, so ...
4      Q.  So when you say small piece, how much money
5  would you expect to pay him for that?
6      A.  I don't remember what we actually negotiated.
7  It would be maybe a couple thousand or something like
8  that, so ...
9      Q.  Okay.  So it wasn't a huge project?
10      A.  No.
11      Q.  And you -- so the sale took place in the
12  first part of February.  When did you start talking to
13  him about selling it to him?
14      A.  I don't remember the exact time.  Probably in
15  January, though.
16      Q.  So it kind of -- it went down pretty fast
17  then, from the time you started talking to Mark to the
18  point that you actually sold it to him?
19      A.  Yeah.  I mean, you know.
20      Q.  Only a month or so?
21      A.  Yeah.
22      Q.  Okay.  And did he pay you some money for
23  that, for the Mt. Gox?
24      A.  No.
25      Q.  Okay.  What was the agreement?

1   A. I would get 50 percent of the revenue for the
2  next, I believe, six months, so ...
3   Q. And how much revenue was it producing when
4  you sold it to him?
5   A. I mean, it would vary a lot, and it was
6  changing a lot. You know, up until that point, it
7  probably hadn't produced that much. I mean, I think,
8  at the time I sold it, I think, if it had kept going
9  at that exact rate, it would produce, like, 100,000 a
10  year or something like that.
11   Q. Okay. And so, let's see. If you started the
12  first part of February, then you would think you would
13  get -- and when you say you were going to get half the
14  revenue, is that half the gross revenue?
15   A. I believe it was half the gross revenue,
16  yeah.
17   Q. Okay. And so you would expect some payment
18  in March?
19   A. In March?
20   Q. Well, and it may not be monthly. What time
21  -- how often were you to be paid your half?
22   A. We didn't really specify those details, yeah.
23   Q. So it very well could have all come in at the
24  end of the six months, and he'd just send you half of
25  it at the end of the six months?

1   A. That's right, yeah.
2   Q. Did he send you any money?
3   A. He did.
4   Q. Okay. When did he send you money?
5   A. I think it was about nine months after I sold
6  it.
7   Q. Okay. Just one payment?
8   A. That's right.
9   Q. Okay. What was that amount?
10   A. It was around 230,000, somewhere in there.
11   Q. Okay. At the end of the six months, did you
12  say, "Hey, where's my money," or --
13   A. I did.
14   Q. Okay.
15   A. Yeah.
16   Q. You had to start hounding him to send you --
17   A. It wasn't hounding exactly. I just had to
18  tell him a couple of times.
19   Q. Okay.
20   A. Yeah.
21   Q. And how did you verify that was the right
22  amount?
23   A. I still was able to look at the record of
24  transactions, so I could see the transactions that had
25  occurred. And based on that, I could calculate how

1  much he would have made, so ...
2   Q. Okay. So that was pretty easy for you to
3  verify?
4   A. That's right.
5   Q. And then you retained a percentage ownership
6  of Mt. Gox?
7   A. That's right.
8   Q. And so -- let's see. It was a sole
9  proprietorship when you sold it. Right?
10   A. Yes.
11   Q. Okay. So did you receive any money for your
12  -- or what percentage did you retain?
13   A. Twelve percent.
14   Q. Okay. Did you receive anything for that 12
15  percent?
16   A. What do you mean, receive anything for that?
17   Q. Did you get payments?
18   A. No. I -- not from Mark, yeah.
19   Q. Okay. Did you get it in some other way?
20   A. Right before -- eventually, he was going to
21  declare bankruptcy, and someone approached me wanting
22  to kind of save Mt. Gox, and I sold my 12 percent to
23  them for, I think, a dollar or $5, something really
24  nominal.
25   Q. Okay.

1   A. So ...
2   Q. Who was that?
3   A. It was this group called Sunlot Holdings.
4   Q. Were they out of California, as well?
5   A. I don't know where they were based. One of
6  the people involved was from California. One was from
7  the UK. They were from, I think, from other parts of
8  the world, as well, so ...
9   Q. Were they a venture capital fund, or just
10  some interested bitcoin people?
11   A. I think it was a mix.
12   Q. Okay.
13   A. Yeah.
14   Q. Did you know any of them personally?
15   A. I think I had met one of them before. I
16  definitely know one now. I don't know if I'd met him
17  before or after that. I think I met him before.
18   Q. Who was that?
19   A. Brock Pierce.
20   Q. How did you know Brock?
21   A. He -- just from bitcoin space, just from,
22  like, conventions and things like that, so --
23  conferences.
24   Q. The wallets that you had when you were with
25  Mt. Gox, do you still have the information regarding

---

1  those wallets?
2    A.  No.
3    Q.  What did you do with it?
4    A.  I erased it when I sold it.
5    Q.  You erased the wallets?
6    A.  Yeah.  I mean, all the private keys were no
7  longer useful.  They didn't have money in them
8  anymore.
9    Q.  Okay.  Can we -- can you go -- can I go, if I
10  knew now, and look at and find those wallets?
11    A.  Possibly.  I think it would be really hard to
12  tell what were the internal Mt. Gox wallets and what
13  were people that were just sending money back and
14  forth to Mt. Gox.
15    Q.  Okay.  But if someone was technical enough,
16  they could go back and see all of the transactions?
17  Like, the block chain is open?
18    A.  You can definitely see all the transactions.
19  You just don't know who is the owner of these bitcoin
20  addresses, so ...
21    Q.  Okay.  The data that's kept with that
22  address -- what data is kept with the address?
23    A.  With the bitcoin address?
24    Q.  Uh-huh.
25    A.  The only data it has is money -- like,

1  bitcoin flows in and out.
2    Q.  Okay.
3    A.  So the time of those flows and then amount.
4    Q.  There's no -- no other data is kept with that
5  address other than the amount of bitcoin flowing?
6    A.  That's right, unless -- yeah.
7    Q.  I find it very fascinating.  This is not even
8  relevant, but can you store more data in a block
9  chain?
10    A.  Yeah.  Well, sort of.  I mean, there's -- you
11  could put more data in the transaction than just the
12  movement of money.
13    Q.  Uh-huh.
14    A.  You can, like, attach additional information
15  to the transaction.  So you can kind of store
16  additional data there.
17    Q.  I just see so many uses for the block chain
18  besides currency.
19    A.  Yeah.
20    Q.  So I find it fascinating.  Such as election
21  fraud.
22    A.  Right.
23    Q.  Seriously.
24    A.  Yeah.
25    Q.  I think there are a lot more uses.  I just

1  don't understand it.
2    A.  Yeah.
3    Q.  So you transferred the bitcoin, and the cash,
4  and everything to Mark Karpeles when you sold it?
5    A.  Yes.
6    Q.  And when you sold it, you explained to him
7  that these three accounts, I think you said three, had
8  had -- had been compromised?
9    A.  That's right.
10    Q.  Okay.  And the -- by the time -- at some
11  point, you told the Raggios that you had seen it come
12  back into Barron's account.  Right?
13    A.  That's right.
14    Q.  Okay.  And that you had frozen that account?
15    A.  Uh-huh.
16    Q.  "Yes?"  Instead of "uh-huh," say "yes" or
17  "no."
18    A.  Yes.
19    Q.  Okay.  I'm sorry.  And so what had you --
20  what had you told the Raggios about that?  Were you
21  going to get that back to them?
22    A.  Like I said, once this money -- once we had
23  realized that the money had -- or the bitcoins had
24  come to this Barron account, once we had frozen the
25  Barron account, Mark already owned the site, so it

1  wasn't up to me anymore.  So, yeah.
2    Q.  But did you tell the Raggios that you were
3  going to look into it and then release their amount to
4  them?
5    A.  No, I don't believe I said that to them,
6  because it wasn't my say anymore.  I said that they
7  would have to deal with Mark.
8    Q.  And did you confirm with Mark that he was
9  going to make sure that they got paid?
10    A.  I recommended that Mark pay them, but it was
11  Mark's decision whether to pay them or not.
12    Q.  And were you always truthful with the
13  Raggios?
14    A.  I believe so, yeah.
15    Q.  When you and the mother of your children
16  moved to Costa Rica, you stayed about a year?
17    A.  Uh-huh.
18    Q.  Right?  When you came back stateside, were
19  you and she still together?
20    A.  Yeah, yes.
21    Q.  And are you still today?  "Yeah" is fine.
22    A.  No, we're not.
23    Q.  Okay.  Where does she live now?
24    A.  She lives in Berkeley.
25    Q.  When you were running Mt. Gox, what would a

Dr. Donald Raggio and Dr. Chris Raggio v. McCaleb 30(b)6 Code Collective, LLC 11-17-16 Ted McCaleb 30(b)6 Representative
Case 2:15-cv-00032-JCal Document #: 232-10 Filed: 10/05/2018 Page 29 of 43 November 17, 2016
MTGOX, a sole proprietorship, et al

Page 109

1 normal day be like for you? What were you actually
2 doing?
3 A. There was a lot of customer support-type
4 questions I would have to answer. There was a lot of
5 improvements to the site I would be trying to make.
6 There was, you know, a lot of, like, keeping up with
7 the forums and what was happening, and just doing kind
8 of marketing, for lack of a better word, and trying to
9 find new ways to get money in and out of the site,
10 things like that. So just general operations kind of
11 stuff.
12 Q. When you were running Mt. Gox, did you get
13 any legal advice on securities, or money, currency, or
14 anything?
15 MR. GAULT: "Securities" meaning what?
16 BY MR. TYNER:
17 Q. It's hard to define what bitcoin is, but
18 whether it's a security, or a commodity, or whatever.
19 A. Yeah. Eventually, I talked to some lawyers
20 about how bitcoin would be classified and running
21 Mt. Gox in general.
22 Q. And when would that have been?
23 A. I believe that was in around December or
24 something like this.
25 Q. Have you come to a conclusion as to how it's

Page 110

1 classified on --
2 A. I don't think the government has come to a
3 conclusion on how it's classified. So I'll wait for
4 them to --
5 Q. They still have not decided what it is?
6 A. I mean, there's vague guidance on it, but
7 it's nothing completely conclusive, I don't think,
8 so -- or at least to my knowledge, it's not
9 conclusive.
10 Q. Okay. I think you said that you were
11 e-mailing Barron. Right? Is that --
12 A. Yeah, that's right.
13 Q. What did -- that's right. I'm sorry. He
14 told you that they were legitimate. Did -- you never
15 did identify who Barron was, did you?
16 A. No. We asked for him to send identification.
17 He sent us what looked pretty clearly like a fake
18 passport, so ...
19 Q. Okay.
20 A. Yeah.
21 Q. Do you remember where that one said he was
22 from or --
23 A. I believe it was Russia.
24 Q. Okay.
25 A. Yeah.

Page 111

1 Q. And so you did not release the money or
2 bitcoin to him?
3 A. Again, it was in Mark's hands at this point,
4 but I don't know that Mark did.
5 Q. Okay.
6 A. I don't think he did.
7 Q. Okay.
8 (Outside noise.)
9 MR. GAULT: Give me one second. I'm just
10 going to tell them to, shh, keep it down.
11 MR. TYNER: It's not bothering me. My head's
12 swimming.
13 (Discussion had off the record, not
14 reported.)
15 BY MR. TYNER:
16 Q. When was the last time you talked to Chris
17 Raggio?
18 A. It was a couple of months ago, something like
19 this.
20 Q. What was the nature of that conversation?
21 A. I asked if I could call him to -- I just
22 wanted to understand why he was pursuing this.
23 Q. What did you say to Chris?
24 A. Basically just asking him, like, why, when
25 all our previous conversations up until now, he was

Page 112

1 very much saying that this wasn't my responsibility,
2 it was Mark's responsibility, and just wondering why
3 he had changed his mind, and that, basically, he was
4 just wasting my money and time, and his own, probably,
5 and it seemed very frivolous to me. Because prior, up
6 to that point, it seemed like we were friendly. So it
7 seemed like a crappy thing for him to do.
8 Q. Well, did -- but you represented to Mark that
9 he was going to get his coin. Right?
10 MR. GAULT: Mark?
11 A. I represented --
12 BY MR. TYNER:
13 Q. I'm sorry. To Chris Raggio.
14 A. No, I didn't.
15 Q. Okay. Were you aware that Mark Karpeles told
16 him he would get it to him?
17 A. I mean, he -- all I'd heard was what Chris
18 told me about his conversations with Mark. He was
19 talking to Mark directly.
20 Q. Uh-huh.
21 A. So ...
22 Q. So you never made calls or e-mails to Mark
23 Karpeles on Chris's behalf? I take that back. You
24 said, a while ago, you thought you may have e-mailed
25 him.

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al
November 17, 2016

Case 2:14-cv-00792-JAS   Document #: 232-10   Filed: 10/05/2018   Page 30 of 43

---

Page 113

1    A. I may have e-mailed him. You know, I may
2 have e-mailed him asking him what was happening with
3 it. So, you know, I don't remember -- again, it's a
4 long time ago. I don't remember the exact character
5 of those e-mails.
6    Q. Did you get a chance to review the documents
7 that we gave to your lawyers?
8    A. Yes.
9    Q. Was there anything in there that appeared to
10 be manufactured or incorrect, or did it look like the
11 transaction as you remembered it?
12    A. I didn't notice anything that seemed that
13 way.
14    Q. Okay. Did -- for some time, at least we know
15 for nine months or so, that you had access to see the
16 transactions and all at Mt. Gox. Did that ever stop
17 or did you always have that access?
18    A. No, it stopped after he made the payment to
19 me. Actually, it may have even stopped a bit before,
20 but ...
21    Q. And that payment was in around the fall of --
22    A. 2011.
23    Q. Yeah, 2011. But you were still -- you still
24 had a legitimate 12 percent interest in the company.
25 Did you make inquiry as to your portion of the

---

Page 114

1 proceeds for that 12 percent?
2    A. At some point I did. You know, he always
3 maintained that he wasn't disbursing any funds, so,
4 you know, I wouldn't be able to get anything until he
5 disbursed to the other shareholders, as well.
6    Q. And you really didn't have any way to audit
7 him or --
8    A. No.
9    Q. -- see what was going on?
10    A. No.
11    Q. Were you aware that there were major problems
12 happening at Mt. Gox?
13    A. No.
14    Q. Was the bankruptcy a surprise to you?
15    A. Yes.
16    Q. In looking at some of the, you know -- later,
17 there were some more exchanges that came up, and it
18 may have been Bitstamp. Seems like there was one in
19 Slovenia. Is that Bitstamp? I can't remember.
20    A. Bitstamp is in Slovenia, yeah.
21    Q. But there were a number of different
22 exchanges that came up. And looking back at trades
23 from the other exchanges, there was always -- the
24 amount paid for bitcoin at Mt. Gox always seemed
25 elevated among the other ones. Do you recall that?

---

Page 115

1    A. I don't recall that being true. It could be
2 true, but I wasn't paying close enough attention to
3 notice.
4    Q. Okay. You, fairly quickly after you sold
5 Mt. Gox, you went on to Ripple. Is that accurate?
6    A. I mean, it was a few months, but, yeah.
7    Q. Yeah. Okay.
8    A. Yeah.
9    Q. But you still kept up with the bitcoin world,
10 too. Is that true?
11    A. That's true, yeah.
12    Q. Okay. And you would actually go to bitcoin
13 forums, or conventions, or whatever?
14    A. Yeah. I went to maybe just a couple, but,
15 yeah.
16    Q. Okay. And you met Chris Raggio personally at
17 one of them?
18    A. Before I started Ripple, but, yes.
19    Q. Okay. And that was in New York. Is that
20 right?
21    A. Yes.
22    Q. Where else did you attend the meetings?
23    A. There was one in San Jose that I went to. I
24 mean, I've been to others since, you know, since
25 Ripple. But during the Ripple time, I just remember

---

Page 116

1 one in San Jose. Maybe I went to another one, but ...
2    Q. When you were -- how did it come up that you
3 were even interested in selling Mt. Gox?
4    A. Like, how did I broach the subject with Mark?
5    Q. Yes.
6    A. I mean, I don't remember exactly, but I
7 probably just said I'm wanting to sell this, are you
8 interested in taking it over, so ...
9    Q. And did you -- you didn't put it out and
10 advertise that you were selling Mt. Gox?
11    A. No.
12    Q. Like you would a car?
13    A. No.
14    Q. Okay. Did you talk with anyone besides Mark
15 about purchasing Mt. Gox?
16    A. Maybe, but I don't know. I don't remember.
17    Q. You said that you hired Mark in around
18 December of '10, and then you completed the sale of
19 Mt. Gox early part of February to Mark. At what point
20 did you decide you wanted to sell Mt. Gox?
21    A. I don't remember the exact point. I mean, I
22 had been thinking about it for a while. So probably
23 before I started talking to him.
24    Q. Are you currently involved in any other
25 litigation --

---

Dr. Donald Raggio and Dr. Chris Raggio·McCaleb 30(b)6 Code Collective, LLC 11-17-16·Jed McCaleb 30(b)6 Representative
Case 3:17-cv-90051-JCS· Document #: 232-10· Filed: 10/05/2018· Page 31 of 43 November 17, 2016
MTG3CO, a sole proprietorship, et al

Page 117

| | |
|---|---|
| 1 | A.· No. |
| 2 | Q.· -- as a party? |
| 3 | A.· No. |
| 4 | · · · MR. TYNER: Give me one second. |
| 5 | · · · MR. GAULT: Sure. |
| 6 | · · · MR. TYNER: Let's just go off the record for |
| 7 | a minute, and we'll take a break. |
| 8 | · · · · · VIDEOGRAPHER: Off the record.· The time |
| 9 | is 12:37. |
| 10 | · · · (Recess.) |
| 11 | · · · VIDEOGRAPHER: Back on the record.· The time |
| 12 | is 1:02. |
| 13 | · · · MR. TYNER: I don't think I have any more |
| 14 | questions for you. |
| 15 | · · · THE WITNESS: Okay. |
| 16 | · · · MR. TYNER: You're going to make your flight. |
| 17 | · · · THE WITNESS: All right.· Thank you. |
| 18 | · · · MR. TYNER: Have you got any questions? |
| 19 | · · · MR. GAULT: No questions. |
| 20 | · · · VIDEOGRAPHER: This concluded this |
| 21 | deposition.· The time is 1:02. |
| 22 | · · · (Whereupon the deposition was concluded at |
| 23 | 1:02 p.m., the same day.) |
| 24 | |
| 25 | |

Page 118

| | |
|---|---|
| 1 | · · · · · DEPONENT'S CERTIFICATE |
| 2 | · · · · I, Jed McCaleb, the deponent in the foregoing |
| 3 | deposition, certify that I have read the foregoing |
| 4 | pages 4 - 117, being the total number of pages |
| 5 | relating to my testimony, as to the correctness |
| 6 | thereof, and that after reading said pages and subject |
| 7 | to any corrections I may have reflected below, I |
| 8 | certify that this testimony is true, correct and |
| 9 | complete and that the transcript thereof is true and |
| 10 | correct. |
| 11 | · · · · · · · · · · · _____ |
| 12 | · · · · · · · · · · · Jed McCaleb |
| 13 | STATE OF _____ |
| · | COUNTY OF _____ |
| 14 | · · · · SWORN TO AND SUBSCRIBED before me on this the |
| 15 | _____ day of _____, 20___. |
| 16 | |
| 17 | · · · · · · · · · · · _____ |
| · | · · · · · · · · · · · NOTARY PUBLIC |
| 18 | My Commission expires:· _____ |
| 19 | PAGE | LINE | CORRECTION · · · | REASON |
| 20 | _____|_____|_____|_____ |
| 21 | _____|_____|_____|_____ |
| 22 | _____|_____|_____|_____ |
| 23 | _____|_____|_____|_____ |
| 24 | _____|_____|_____|_____ |
| 25 | _____|_____|_____|_____ |

Page 119

| | |
|---|---|
| 1 | · · · · · CERTIFICATE OF COURT REPORTER |
| 2 | · · · · I, Catherine M. White, CSR, and Notary Public |
| 3 | in and for the County of Hinds, State of Mississippi, |
| 4 | hereby certify that the foregoing pages, and including |
| 5 | this page, contain a true and correct transcript of |
| 6 | the testimony of the witness, as taken by me at the |
| 7 | time and place heretofore stated, and later reduced to |
| 8 | typewritten form by computer-aided transcription under |
| 9 | my supervision and to the best of my skill and |
| 10 | ability. |
| 11 | · · · · I further certify that I placed the witness |
| 12 | under oath to truthfully answer the questions in this |
| 13 | matter under the power vested in me by the State of |
| 14 | Mississippi.· I further certify that I am not in the |
| 15 | employ of or related to any counsel or party in this |
| 16 | matter, and have no interest, monetary or otherwise, |
| 17 | in the final outcome of the proceedings. |
| 18 | · · · · Witness my signature and seal this the _____ |
| 19 | day of _____, 201___. |
| 20 | |
| 21 | |
| 22 | · · · · · _____ |
| · | · · · · · CATHERINE M. WHITE, CSR No. 1309 |
| 22 | My Commission Expires: |
| 23 | February 1, 2018 |
| 24 | |
| 25 | |

Dr. Donald Raggio and Dr. Chris Raggio  Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16  Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al  November 17, 2016

Case 3:14-cv-00014-JAS   Document #: 232-10   Filed: 10/05/2018   Page 82 of 43

## $

**$1,000 (1)**
67:23
**$10,000 (3)**
56:8;67:11;68:13
**$100,000 (1)**
87:17
**$45,000 (2)**
75:16,21
**$5 (1)**
103:23

## A

**able (19)**
32:5;35:20;56:11;
61:24;62:7;65:6,15;
66:6,20;72:25;73:19;
79:10;92:18;93:20;
95:2;99:2,14;102:23;
114:4
**access (13)**
14:14,16;35:16,18;
54:6;69:14;89:1;90:17;
98:23,25;99:7;113:15,
17
**account (73)**
33:21;34:5,8,10;
35:14,15;36:15,18;
37:4,11;55:20;57:15,
18;58:2,5,6,8,22;59:10;
61:2,14,14,22,25;62:1,
12,14,18,21;65:16;
68:3,15;69:14;70:8;
71:1,1,2,9;72:1;73:19,
21;74:2,11,12,12;75:4,
6,8,9,11,12;77:24;
78:14;79:6,11;80:11,
12,13,16,20,23;81:2,3,
11,15,17,23;84:4;87:5;
107:12,14,24,25
**accounts (20)**
11:5;22:25;24:6;
25:19,20;33:2,7,8;
38:15,25;43:2;58:14,
16,17;64:23;66:8;
67:14;79:11;80:21;
107:7
**accumulated (2)**
26:6;33:7
**accurate (2)**
30:18;115:5
**acquire (1)**
52:20
**action (1)**
75:2
**actual (1)**
90:9
**actually (18)**
54:14;70:20;73:12;
79:1;89:4,15;91:3;

92:2;94:17;95:13;96:9,
17;98:4;100:6,18;
109:1;113:19;115:12
**ad (1)**
17:1
**added (1)**
83:5
**additional (2)**
106:14,16
**address (40)**
33:20;34:1,2;35:22;
37:7,10;55:7;71:11,12,
16,19,21;72:1,6,12,22;
74:15,16,19;78:3,4,6,9,
14,21,23;80:7;83:1,8,
10;88:21;89:7,12;
92:11,13;94:2;105:22,
22,23;106:5
**addresses (4)**
71:17;88:19;92:8;
105:20
**admin@mtgox (1)**
83:2
**administer (2)**
13:25;15:9
**administration (1)**
13:23
**ads (1)**
16:22
**advertise (1)**
116:10
**advice (4)**
59:19,21;60:15;
109:13
**affect (1)**
56:7
**affirmative (1)**
28:12
**again (10)**
9:24;10:9;13:24;
39:14;65:14,14;88:14;
96:14;111:3;113:3
**ago (11)**
5:2;7:3;13:8;38:24;
42:25;55:24;88:11;
90:6;111:18;112:24;
113:4
**agree (1)**
92:10
**agreement (2)**
4:17;100:25
**ahead (1)**
57:12
**al (2)**
4:3,4
**allow (2)**
20:15;22:16
**allowed (1)**
16:1
**Altogether (1)**
51:2
**always (7)**
37:19;96:7;108:12;

113:17;114:2,23,24
**amazing (1)**
92:2
**Amazon (4)**
43:20;44:4;53:9,13
**among (1)**
114:25
**amount (30)**
29:7;41:22;42:19,20,
22;49:21;55:15;56:16;
59:18;60:2;66:10,12,
25;67:9,21;69:10;
74:22,24,25;87:13;
89:24;90:13,24;94:3;
102:9,22;106:3,5;
108:3;114:24
**amounts (3)**
37:9;41:6,8
**anymore (6)**
20:2;28:18;97:3;
105:8;108:1,6
**API (1)**
85:23
**appeared (1)**
113:9
**appreciated (1)**
52:7
**appreciation (1)**
52:12
**approached (1)**
103:21
**approval (2)**
79:10,12
**approximately (4)**
50:19;56:1;61:17;
84:10
**Arkansas (5)**
5:23;6:13,25;12:20;
13:1
**around (25)**
10:1,3;11:12;12:9;
13:19;14:5;15:15,22;
19:2,7;22:15;24:13;
38:6;43:9;56:4;61:23;
84:18;90:9,11,16;98:2;
102:10;109:23;113:21;
116:17
**article (3)**
28:21;29:14;30:17
**asset (2)**
11:3,5
**associated (1)**
74:16
**assume (3)**
55:7,8;58:22
**atmosphere (1)**
5:15
**attach (1)**
106:14
**attack (5)**
65:13,20;66:1,5,10
**attempts (2)**
65:22,25

**attend (1)**
115:22
**attention (1)**
115:2
**audit (1)**
114:6
**August (5)**
29:14;30:1;33:6;
45:11;84:6
**automated (3)**
25:9;68:24;69:6
**automatic (2)**
36:7;68:22
**automatically (2)**
34:8;84:3
**average (1)**
56:19
**aware (3)**
63:9;112:15;114:11
**away (1)**
47:9

## B

**Back (54)**
9:17;10:12,17;12:5;
13:20;37:20,22;40:23;
43:12,15;48:19,22,24;
49:4;50:14,51:9;55:25;
61:15,25;62:1,6,10,14,
18,20;63:2,3;68:2,4,21;
70:22,25;73:18,21;
74:2,5,7,23;75:3;77:5;
79:15;82:2;96:7,22;
97:1,19;105:13,16;
107:12,21;108:18;
112:23;114:22;117:11
**background (2)**
6:2;99:22
**backup (1)**
29:1
**bad (1)**
86:9
**bank (19)**
47:6,7;55:19;58:9,
22;59:3,4,5,6;68:4;
83:20,21,22,25;84:9;
86:2;87:4;97:25;98:22
**bankruptcy (2)**
103:21;114:14
**Banks (1)**
86:2
**bank's (1)**
83:23
**Barron (13)**
71:2;72:5;73:19;
74:12;76:9,11,15;
77:12;78:18;107:24;
108:10:11,15
**Barron@contractornet (1)**
72:22
**Barron's (7)**
73:19,21;75:3,11,12;
73:18;74:2,4,10,10,11,

78:14;107:12
**based (4)**
18:22;37:3;102:25;
104:5
**basic- (1)**
8:1
**basically (33)**
8:2;11:2;13:12,23;
14:21;16:1;17:17;19:4,
23;21:24;25:6;35:14;
36:17;37:1,7;55:14;
59:24;65:20;74:7;
77:18;79:2,22;85:23;
87:2;90:23;91:20;92:7,
7;93:16;94:25;96:16;
111:24;112:3
**bathroom (1)**
97:14
**become (7)**
24:4;29:12;93:6,9,
10,11,13
**beginning (1)**
69:25
**behalf (2)**
42:2;112:23
**belonged (1)**
50:20
**below (1)**
36:2
**benefit (1)**
26:7
**Berkeley (4)**
7:12;9:1;49:2;
108:24
**besides (3)**
39:5;106:18;116:14
**better (2)**
43:5;109:8
**beyond (2)**
76:16;79:13
**big (3)**
47:11;54:15;85:20
**bills (1)**
58:21
**bit (7)**
8:4,5;44:22;45:6,9;
87:24;113:19
**bitcoin (139)**
27:6,8,21;28:16,20,
23;29:13;30:4,23;
31:11,16,23,23,25;
32:6,8;33:22,25;34:1,1,
2,6,7,13,17;35:8,20,22,
23,25;36:3;37:21,23;
39:6,10;40:9,13,18,20;
42:1;43:13;45:11;
47:11;52:5,25;55:15,
21,23;56:2,8,8,23,24;
57:1,6;59:18;60:21;
61:1,14,14,21;62:23;
63:1,23,24;64:2,4,6,14,
21;65:7;67:2,25;70:7;
73:18;74:2,4,10,10,11,

12,16,22;75:3,23;76:5,
20,22,23;77:16;78:3,7,
13,19,20;84:13,14,21,
25;85:1,5,10;88:12,19,
21,25;89:14,15,20,25;
90:4,13,17;91:4;92:8,9,
12,21,25;93:1,4;94:3,
24;95:3,13;96:4;
104:10,21;105:19,23;
106:1,5;107:3;109:17,
20;111:2;114:24;
115:9,12
**bitcoins (12)**
20:15;30:20;42:6,7,
8;61:9,9;75:15,19;
79:2;97:9;107:23
**Bitcointalk (1)**
91:19
**Bitcointalkorg (1)**
77:1
**Bitstamp (3)**
114:18,19,20
**BitTorrent (1)**
16:4
**blob (1)**
96:19
**block (5)**
93:15,16;105:17;
106:8,17
**blog (1)**
77:4
**Bomgar (2)**
14:10,11
**book (1)**
18:19
**bored (1)**
39:24
**boring (1)**
40:4
**born (2)**
5:22;12:23
**Boston (1)**
10:22
**bot (3)**
22:16;25:3,5
**both (4)**
53:12;66:9;74:2;
77:14
**bothering (1)**
111:11
**bought (13)**
21:10;34:12;40:18;
73:7;77:16,18;78:19,
24;83:11;87:4;91:10,
11;98:4
**Brad (1)**
4:9
**brainchild (1)**
49:8
**break (5)**
5:14;32:14;50:9;
69:18;117:7
**breaks (1)**

25:14
**brief (1)**
6:1
**briefly (1)**
81:14
**bring (1)**
68:4
**broach (1)**
116:4
**Brock (2)**
104:19,20
**broke (1)**
76:1
**brought (2)**
16:8;49:11
**bunch (4)**
37:21;66:7;80:21;
89:20
**Burzlaff (3)**
46:9,9,10
**B-U-R-Z-L-A-F-F (1)**
46:11
**business (5)**
57:18;58:13,24,25;
59:4
**busy (1)**
99:11
**button (1)**
69:9
**buy (22)**
20:14;21:1;23:7,9,
10;30:20;31:11,23,24;
33:18,22,25;34:3;39:5;
40:19;42:7;55:15,21;
56:7;59:17;60:1;91:2
**buying (3)**
30:23;41:17;56:2
**buys (1)**
37:20

**C**

**calculate (1)**
102:25
**California (3)**
48:25;104:4,6
**call (6)**
4:25;69:18;78:2;
79:15;99:25;111:21
**called (19)**
8:12;9:3,8,10,25;
10:22;11:22;14:2,10;
15:21;18:4,15;23:8;
36:22;48:10;59:24;
65:12;81:14;104:3
**calls (1)**
112:22
**came (15)**
51:9;61:25;62:1,18,
20;70:22;73:2,18,20;
74:2;75:3;78:21;
108:18;114:17,22
**can (47)**

5:8;22:11,11;23:9,
10;32:14,23,33:25;
37:19;50:7,13;52:7;
57:1,2;61:10;73:6;
74:14,15;76:20;77:9;
82:2;87:23;88:21;
91:22;92:2,8,12,17;
93:3,15,15,16;94:2,3;
95:14,14;96:7,15,16,
18;105:9,9,9,18;106:8,
14,15
**capable (2)**
98:18;99:20
**capital (1)**
104:9
**car (1)**
116:12
**card (9)**
21:6,8;23:7,19;
27:10,12;29:5;37:21,
22
**cards (16)**
21:12;22:10,12,14,
15,17;23:2,3,5,11;24:9;
25:2;26:9;27:19;37:18,
19
**care (3)**
50:3;70:11;76:14
**cash (11)**
67:6,8,22,24;68:2;
69:10;75:23;87:5,7,13;
107:3
**center (1)**
44:5;53:12,15
**central (1)**
16:2
**cents (4)**
56:4;57:2,3,6
**CEO (3)**
16:9;49:12,14
**certain (3)**
6:8;63:20;74:10
**chain (6)**
93:15,16,18;105:17;
106:9,17
**chance (1)**
113:6
**change (1)**
71:18
**changed (2)**
82:24;112:3
**changing (1)**
101:6
**channel (1)**
85:15
**character (1)**
113:4
**charge (3)**
25:18,20;37:20
**charges (1)**
37:21
**charging (1)**
25:24

**chart (1)**
90:8
**charts (1)**
11:8
**Chase (2)**
58:11,24
**check (5)**
71:15,20;87:9,12;
99:22
**checked (1)**
61:2
**checking (1)**
58:6
**children (4)**
46:2,5,8;108:15
**choice (1)**
49:25
**choose (1)**
20:20
**Chris (21)**
19:12;40:6;49:15;
50:22;55:2;57:12;59:7,
17;63:12,15,18;66:15;
67:19;76:5;79:12;80:5;
111:16,23;112:13,17;
115:16
**Chris's (8)**
74:10,11,21,23,25;
75:7,13;112:23
**Christian (2)**
12:12,17
**city (4)**
31:9;45:4,9;49:1
**claimed (3)**
77:16;99:16,16
**claiming (2)**
63:12;78:18,23
**class (3)**
6:17,21;7:1
**classes (1)**
6:15
**classified (3)**
109:20;110:1,3
**clear (1)**
74:13
**clearly (1)**
110:17
**client (3)**
40:6;56:2;59:7
**clients (2)**
11:6,7
**close (4)**
17:16,17;24:25;
115:2
**closed (3)**
17:13;19:2;24:5
**Code (6)**
35:1,3;57:17,19;
83:18;85:13
**coding (3)**
85:25;86:9;98:14
**coin (6)**
63:10,11;81:14,15;

91:21;112:9
**coins (10)**
61:11;66:11,21;
70:14,19,22,24;75:7,7;
96:24
**cold (10)**
94:18,20,21,22;96:1,
4,7,13,20,20
**collect (1)**
22:12
**collection (1)**
22:13
**Collective (4)**
35:2,3;57:17,19
**college (5)**
6:3;7:9,11;12:25;
14:13
**comfortable (1)**
5:13
**commercially (2)**
10:14;18:5
**commission (3)**
25:24;42:17,19
**commodity (2)**
14:23;109:18
**common (1)**
12:5
**communicate (1)**
83:25
**communicated (1)**
77:12
**communicating (3)**
80:22;83:7;86:22
**communication (1)**
55:13
**company (24)**
7:18,20,24;8:23;9:1,
23;10:21;11:17;12:8,
11;14:11;23:10;28:2;
34:16,20,23;35:3;37:2;
48:8;9:49;13;57:19;
80:12;113:24
**complete (4)**
29:5;38:3;85:18;
99:7
**completed (5)**
28:17;98:3,5,11;
116:18
**completely (2)**
86:25;110:7
**compromised (10)**
36:15;64:22,24;65:3,
5,9,12;66:19;70:15;
107:8
**compromises (1)**
95:2
**computer (10)**
8:19;10:13;70:17;
93:4;95:7,23;96:11,13,
20,20
**computers (2)**
13:24,25;14:22
**concluded (2)**

117:20,22
**conclusion (2)**
109:25;110:3
**conclusive (2)**
110:7,9
**conclusively (1)**
72:13
**conference (1)**
40:9
**conferences (2)**
32:21;104:23
**confidence (1)**
91:2
**confirm (1)**
108:8
**confusing (2)**
5:10;66:17
**connected (2)**
95:7;96:11
**Connecticut (2)**
7:16;8:23
**connecting (1)**
25:7
**contact (1)**
55:5
**contacted (4)**
55:3,13;76:11;83:4
**continue (2)**
17:9;79:8
**contract (1)**
100:2
**contracted (2)**
47:5;83:19
**contractornet (3)**
72:23;73:1,9
**contractors (1)**
19:22
**control (4)**
38:3;91:8;97:10
**conventions (2)**
104:22;115:13
**conversation (1)**
111:20
**conversations (2)**
111:25;112:18
**conversion (1)**
7:25
**Cool (4)**
6:6;18:3;39:16;
74:18
**copy (2)**
54:12;96:21
**corp (4)**
12:2,3;49:16,18
**correctly (2)**
46:21;67:23
**corresponding (1)**
88:20
**cost (1)**
18:10
**Costa (13)**
37:3;44:22;45:14,18;
46:16,18;47:14,20;

48:6,12,18;51:10;
108:16
**counsel (2)**
4:3,6
**couple (8)**
17:4;29:25;79:20;
96:15;100:7;102:18;
111:18;115:14
**course (1)**
98:20
**court (4)**
4:11;46:12,14;79:9
**courtroom (2)**
5:6,8
**cover (2)**
75:13;76:5
**crappy (1)**
112:7
**create (6)**
8:10;29:20;33:21;
77:5;99:2,3
**created (6)**
20:12;29:4;34:8,8;
72:1;89:1
**credit (6)**
37:11,18,19,21,22;
59:10
**credited (1)**
84:3
**credits (1)**
35:15
**cross (2)**
42:9,10
**cumbersome (2)**
22:15;86:3
**currency (6)**
23:13,14;52:6,6;
106:18;109:13
**current (1)**
52:2
**currently (1)**
116:24
**customer (2)**
89:11;109:3

## D

**daily (3)**
36:2,11;55:23
**dark (5)**
59:24;60:6,8,9,10
**data (11)**
44:5;54:6,12;96:19;
105:21,22,25;106:4,8,
11,16
**database (1)**
53:11
**databases (1)**
8:10
**date (3)**
4:5;63:5;69:24
**day (3)**
54:20;109:1;117:23

**days (2)**
8:5;11:11
**deal (3)**
54:15;68:19;108:7
**dealing (1)**
86:2
**debate (1)**
13:5
**debits (1)**
35:14
**December (4)**
84:10;98:2;109:23;
116:18
**decide (1)**
116:20
**decided (3)**
17:21;30:17;110:5
**decision (1)**
108:11
**declare (1)**
103:21
**define (1)**
109:17
**definitely (11)**
9:16;56:16;59:4;
74:3,4;77:22;80:4;
87:7;97:7;104:16;
105:18
**delete (1)**
95:22
**demonstration (1)**
90:16
**denominated (1)**
75:20
**dependent (1)**
52:8
**depending (3)**
27:7,9;47:10
**depends (1)**
51:2
**deposit (6)**
40:25;42:5,6;47:6;
84:2;89:12
**deposited (2)**
68:18;90:23
**deposition (5)**
4:2,16;5:3;117:21,22
**describe (1)**
36:25
**designated (1)**
43:4
**details (1)**
101:22
**determine (1)**
65:17
**develop (1)**
52:17
**dictionary (5)**
65:13,20;66:1,5,10
**different (17)**
8:6;34:16;36:20;
43:1,2;53:14;59:6;
60:6;64:22;65:14;68:6;

79:3;84:25;89:21;
92:10;93:7;114:21
**difficult (1)**
85:22
**digital (3)**
23:14,19;52:6
**directly (3)**
77:13;78:24;112:19
**DirectNIC (1)**
44:2
**disbursed (1)**
114:5
**disbursing (1)**
114:3
**discover (1)**
63:3
**discovered (2)**
66:9;73:9
**Discussion (1)**
111:13
**discussions (1)**
4:15
**DNS (1)**
54:14
**document (1)**
7:25
**documents (4)**
8:3,11,17;113:6
**dollar (1)**
103:23
**dollars (15)**
34:10;36:12;37:9;
55:15;67:3,24,24;
73:25;74:1,4;75:16,19;
87:20;88:4,9
**domain (12)**
20:21,25;21:11;
26:16;27:7;29:1,6,10;
43:21,25;73:5;82:16
**Donald (1)**
4:3
**donate (1)**
16:25
**done (11)**
20:22;28:17;30:13;
39:12;66:6;84:13,14,
23;85:15,16;98:7
**do-over (1)**
29:6
**dormant (2)**
26:15;27:4
**doubt (1)**
87:11,11
**down (14)**
17:21,22;19:5,18;
24:5;25:1;27:1;28:11;
42:4;54:19;76:1;87:23;
100:16;111:10
**download (2)**
93:4;94:7
**downloaded (1)**
93:19
**Dr (1)**

4:3
**dropped (1)**
7:14
**duly (1)**
4:21
**during (2)**
10:10;115:25

## E

**early (3)**
11:11;39:10;116:19
**easier (3)**
22:19;31:24;45:20
**easily (1)**
56:13
**easy (3)**
23:16;86:4;103:2
**eDonkey (7)**
15:24;16:17;17:9,23;
20:2;26:3,4
**eDonkey2000 (1)**
15:21
**educational (1)**
6:1
**Either (10)**
24:17;33:16;49:23;
50:6;53:23;67:24;
70:16;74:1;89:6;91:6
**election (1)**
106:20
**elevated (1)**
114:25
**else (8)**
47:10;50:21;61:6;
63:23;64:1,3;97:9;
115:22
**e-mail (28)**
33:20;55:3,7;60:24;
71:11;72:18,20,22;
76:15;77:13;79:21;
80:1,5,7,11,14,21;81:1,
3,8;82:7,9,14,20;83:1,
8,10,12
**e-mailed (6)**
40:19;47:21;61:18;
112:24;113:1,2
**e-mailing (1)**
110:11
**e-mails (7)**
4:15;56:4;79:23,24;
82:2;112:22;113:5
**employees (2)**
19:20;50:24
**empty (1)**
97:5
**end (8)**
24:6;33:1;35:24;
41:11;73:12;101:24,
25;102:11
**ended (2)**
24:3;39:19
**enough (5)**

Dr. Donald Raggio and Dr. Chris Raggio Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al. November 17, 2016
Case 3:14-cv-00041-JAS Document #: 232-10 Filed: 10/05/2018 Page 85 of 43

75:13,15,16;105:15;
115:2
**enter (1)**
33:20
**entirely (1)**
27:1
**erased (2)**
105:4,5
**Essentially (3)**
23:14;60:3;93:12
**established (1)**
32:2
**et (2)**
4:3,4
**Europe (2)**
47:6;83:20
**European (1)**
47:7
**Even (7)**
35:15;54:16;66:22;
95:22;106:7;113:19;
116:3
**event (3)**
23:8,11,12
**events (1)**
13:18
**eventually (9)**
9:12;16:8;18:1;32:5;
49:11;62:9;65:15;
103:20;109:19
**Everdream (2)**
14:2,3
**everybody (4)**
38:13,13;76:21;
92:17
**everybody's (1)**
39:13
**everyone (1)**
22:11
**exact (11)**
7:4;9:9;38:21;41:8;
50:18;96:6,23;100:14;
101:9;113:4;116:21
**exactly (10)**
12:1,4;17:15;26:11;
41:7;84:23;85:11;98:1;
102:17;116:6
**EXAMINATION (1)**
4:23
**examined (1)**
4:21
**exceeded (1)**
39:12
**Exchange (31)**
20:19;21:6,11,23;
22:9,20;23:17;27:20;
29:1,5,21;30:4,18,19;
31:3,5,12,15;33:24;
39:7;40:15;45:12;
52:18;55:21;63:14;
76:15,16;82:10;84:5;
90:4;98:4
**exchanged (1)**

73:24
**exchanges (4)**
52:22;114:17,22,23
**Excuse (2)**
21:3;69:16
**expect (2)**
100:5;101:17
**expectations (1)**
39:13
**experience (3)**
99:13,15,17
**experiment (1)**
22:1
**Explain (1)**
65:2
**explained (4)**
55:16;76:8,8;107:6
**exploring (1)**
17:25
**extent (1)**
87:2

**F**

**fact (1)**
98:20
**fairly (3)**
41:22;91:10;115:4
**fake (1)**
110:17
**fall (1)**
113:21
**Far (6)**
18:4,16,17;27:22;
35:4;81:17
**fascinating (2)**
106:7,20
**fast (2)**
7:6;100:16
**fault (1)**
70:17
**favor (1)**
30:5
**Fayetteville (1)**
12:23
**feature (1)**
59:23
**February (9)**
38:1;47:24;63:7;
69:24,25;98:9;100:12;
101:12;116:19
**feel (1)**
70:17
**felt (1)**
70:21
**few (12)**
6:10;24:1;26:12,13;
30:16;34:15;36:20;
39:18;53:5;68:6;89:13;
115:6
**fight (1)**
17:20
**figure (5)**

57:1,2;72:23;73:5;
76:11
**figured (1)**
30:21
**files (1)**
16:2
**file-sharing (1)**
15:21
**financial (1)**
39:6
**financially (1)**
26:2
**find (10)**
31:2;38:25;72:19,25;
76:25;84:12;105:10;
106:7,20;109:9
**fine (2)**
50:3;108:21
**finish (1)**
38:7
**finished (2)**
7:8;85:19
**finishes (1)**
30:6
**Finland (5)**
83:22;84:9;85:13;
97:25;98:22
**first (18)**
5:3,4;16:8;21:10;
33:6;34:21;39:15;40:8;
45:16;46:12;55:13;
71:7,24;82:20;83:7;
98:8;100:12;101:12
**five (4)**
38:3,6;89:16;97:15
**flight (1)**
117:16
**flowing (1)**
106:5
**flows (2)**
106:1,3
**Folio (1)**
8:12
**follow (3)**
60:14;61:10;66:20
**following (1)**
92:25
**follows (1)**
4:22
**forever (1)**
32:12
**forget (1)**
7:22
**forgot (1)**
7:21
**format (1)**
8:3
**forming (2)**
48:7,11
**forth (2)**
77:5;105:14
**forum (8)**
31:2;76:16,18,18,19,

24;77:13;91:17
**forums (3)**
98:13;109:7;115:13
**found (1)**
28:21
**fraud (1)**
106:21
**free (1)**
59:14
**freemium (1)**
17:5
**fresh (1)**
29:9
**friend (1)**
10:22
**friendly (1)**
112:6
**frivolous (1)**
112:5
**froze (4)**
75:8,11,21;79:6
**frozen (2)**
107:14,24
**fruitful (1)**
73:11
**full-time (1)**
17:7
**fun (1)**
22:23
**fund (1)**
104:9
**funds (1)**
114:3

**G**

**game (17)**
9:1,11,13;10:15,17;
18:1,2;21:8;22:4,8,10;
27:23;28:16;35:6;
44:23;57:21,22
**games (4)**
9:4,6;10:11,13
**gaming (5)**
21:19,23;26:9;27:20;
44:23
**Gathering (3)**
20:19,24;21:5
**Gault (33)**
4:10,10,14,19;13:3;
21:3;24:17;30:5,9,12;
32:11,14,16,19,22;
38:7,11;49:23;50:6,9,
13;58:9;69:16,21;
87:21;88:1,6;97:15;
109:15;111:9;112:10;
117:5,19
**gave (5)**
19:23;88:14,16;89:1;
113:7
**general (3)**
32:11;109:10,21
**geographically (1)**

24;77:13;91:17
53:14
**gets (1)**
30:7
**Gigs (1)**
44:13
**given (1)**
5:3
**Gmail (4)**
81:23;82:11,12,14
**Good (8)**
4:1,25;20:14;30:21;
31:3;32:2,3;69:20
**goodness (1)**
13:8
**Google (2)**
82:15,21
**gotcha (2)**
17:6;37:24
**government (1)**
110:2
**Gox (94)**
10:16;19:5;20:7,8;
26:9,15;27:5,8,21;
28:16;30:2,24;32:1;
33:1,2,18,23;34:5,15;
35:11;36:19;37:13,25;
39:15;40:18;41:1;42:5,
12;43:12,15;44:9,15;
46:19;47:3,7,9,23;
53:2;55:8;56:20;58:3;
61:15;62:1,10,19;63:2,
3,5;66:7;69:24;70:4;
74:9,23;75:8,9;76:7;
78:25;82:7,9,14,21;
83:11,18,25;84:22;
86:13,23;87:4;89:9,25;
90:3;94:11;97:3;98:23;
99:7,12;100:23;103:6,
22;104:25;105:12,14;
108:25;109:12,21;
113:16;114:12,24;
115:5;116:3,10,15,19,
20
**grew (1)**
12:20,22
**gross (2)**
101:14,15
**group (2)**
12:23;104:3
**groups (1)**
84:19
**guess (8)**
24:13,17;26:18;
68:15;86:4,6;93:9;97:5
**guessing (1)**
66:4
**guidance (1)**
110:6
**guy (2)**
11:16;85:14
**guys (7)**
10:24;12:7;40:17;
47:17;52:17;67:3;

91:21
**guy's (2)**
7:22,22

# H

**hacks (1)**
95:1
**half (10)**
6:4;19:16;67:16,17;
88:8;101:13,14,15,21,
24
**handful (2)**
89:15,16
**handled (1)**
68:22
**hands (2)**
76:7;111:3
**happen (1)**
99:4
**happened (9)**
62:16;63:13;67:18,
20;73:21,25;75:5;79:7;
89:3
**happening (3)**
109:7;113:2;114:12
**happens (2)**
30:9;38:12
**hard (10)**
13:19;28:11,14;32:4;
39:21;54:11;79:5;
85:25;105:11;109:17
**hardware (1)**
15:4
**hassle (2)**
24:5;85:24
**head's (1)**
111:11
**heard (2)**
95:11;112:17
**held (2)**
94:3;97:8
**help (5)**
13:25;53:3;54:5;
59:17;76:13
**helped (1)**
53:5
**helping (1)**
38:9
**hey (2)**
91:1;102:12
**hidden (2)**
60:2;73:13
**high (8)**
6:13,16,18,20;7:8;
12:18,18;18:10
**higher (1)**
41:11
**highest (1)**
41:15
**hired (6)**
11:18;19:21;49:11;
83:17;97:24;116:17

**hobby (4)**
22:1,23;24:4;39:16
**hold (2)**
34:17;49:23
**holding (1)**
92:14
**Holdings (1)**
104:3
**holds (1)**
79:2
**home (3)**
44:17,19,20
**honestly (4)**
23:25;39:9;56:10,21
**hopefully (1)**
39:6
**host (1)**
85:5
**hosted (3)**
43:17,18;82:10
**hosting (5)**
26:18;43:19;85:1,3,4
**hounding (2)**
102:16,17
**hour (1)**
69:17
**How'd (1)**
20:9
**huge (2)**
85:21;100:9
**Huh- (1)**
28:10
**Huh-uh (1)**
14:12
**human (4)**
36:5;68:9,10;69:2
**hundred (2)**
24:11;63:20
**hyperlinked (1)**
8:16

# I

**idea (5)**
24:11;38:18;44:14;
48:7;55:25
**ideas (1)**
48:11
**identification (1)**
110:16
**identify (3)**
72:16;73:16;110:15
**immediately (3)**
49:5,6;62:8
**improvements (1)**
109:5
**including (2)**
64:9,10
**income (1)**
52:11
**incorporated (1)**
11:24
**incorrect (1)**

113:10
**indeed (1)**
93:17
**indicate (1)**
66:9
**individual (1)**
35:10
**individually (2)**
34:24,25
**individuals (1)**
42:13
**industry (1)**
17:19
**information (5)**
71:25,25;76:9;
104:25;106:14
**initial (1)**
50:23
**initials (1)**
20:18
**inquiry (1)**
113:25
**inspect (1)**
92:8
**Instead (1)**
107:16
**instruct (3)**
32:22;49:24;50:6
**integration (2)**
47:5;83:20
**interaction (2)**
47:19;64:18
**interest (1)**
113:24
**interested (6)**
29:13;31:18,23;
104:10;116:3,8
**interesting (5)**
23:21;28:22;39:20,
23;48:4
**interface (4)**
86:16;97:24;98:22;
99:3
**internal (1)**
105:12
**internet (6)**
8:4,5,14;11:10,12;
96:12
**intervention (1)**
69:2
**into (24)**
15:14;22:16;34:15;
36:18;37:8;39:16;50:1;
62:1,1,10,18,21;63:2,3;
65:16;70:25;73:18,21;
74:2;75:3;78:14;95:1;
107:12;108:3
**intricacies (1)**
86:3
**intro (1)**
7:4
**introduce (1)**
4:6

**investigate (1)**
61:7;79:9
**investors (1)**
50:23
**involved (8)**
15:4;19:9;20:8,9;
28:19;42:13;104:6;
116:24
**IP (10)**
54:14;71:11,12,16,
17,19,21;72:1,6,12
**IRC (3)**
77:17;78:19;84:15
**issue (1)**
30:22
**issues (1)**
25:17

# J

**January (3)**
61:18,21;100:15
**Japan (1)**
54:25
**Japanese (2)**
19:15,16
**Jed (10)**
4:2,10,20,25,25;5:3,
17,18,22;80:15
**jed@ (1)**
81:19
**jed@mtgox (4)**
80:13,16,17,24
**Jed@ripplecom (1)**
81:9
**Jed2000 (1)**
81:24
**Jed2000@gmail (1)**
81:4
**jeez (1)**
18:12
**job (1)**
7:16
**Joel (1)**
14:10
**Jose (2)**
115:23;116:1
**jumping (1)**
30:7
**Junglevision (2)**
9:3,25
**junior (1)**
12:18

# K

**Karpeles (9)**
46:19;47:1;53:2;
70:7;86:23;97:24;
107:4;112:15,23
**K-A-R-P-E-L-E-S (1)**
46:23
**keep (3)**

86:22;96:25;111:10
**keeping (1)**
109:6
**kept (8)**
18:9;26:19;71:25;
101:8;105:21,22;
106:4;115:9
**key (7)**
88:20,21;94:14;
95:15,16;96:17,22
**keys (6)**
88:15,16,19;94:15,
19;105:6
**key's (1)**
95:23
**kid (1)**
18:19
**kids (1)**
45:19
**kind (41)**
7:4,24;13:21;15:1,3;
16:24;17:5,6,18,25;
19:1;21:25,25;22:1,2,
23,23;23:15;24:4;25:9;
27:5;20;30:6;36:14,15;
39:15;50:1;52:8;53:4;
67:24;68:23;70:11;
76:21;77:8;85:24;87:1;
100:16;103:22;106:15;
109:7,10
**knew (8)**
6:4;41:21;62:12;
63:15;76:22;93:24;
98:12;105:10
**knowledge (1)**
110:8
**known (1)**
12:18
**knows (1)**
70:16

# L

**lack (1)**
109:8
**language (1)**
86:12
**languages (1)**
6:8
**large (4)**
56:6,9;59:17;60:1
**Largely (1)**
6:12
**largest (1)**
90:4
**Larsen (1)**
49:15
**last (6)**
12:13;45:4,5;46:21;
71:7;111:16
**later (6)**
19:4;34:21;62:3,6,7;
70:21;114:16

Dr. Donald Raggio and Dr. Chris Raggio
v.
MTC Corp, a sole proprietorship, et al

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16

Case 3:11:14-cv-00041-JAS     Document #: 232-10     Filed: 10/05/2018     Page 37 of 43

Jed McCaleb 30(b)6 Representative
November 17, 2016

**lawyers (2)**
109:19;113:7
**lawyer's (1)**
5:5
**learn (2)**
6:11;53:3
**lease (1)**
14:22
**least (3)**
76:10;110:8;113:14
**leave (2)**
13:11,12
**left (9)**
13:14,15;20:21,25;
51:3,20,23;77:23;97:9
**legacy (1)**
86:8
**legal (1)**
109:13
**legitimate (3)**
36:2;110:14;113:24
**legs (1)**
69:18
**L-E-S (1)**
46:24
**less (7)**
24:21;38:20;67:9,11;
75:1;88:8;90:24
**Liberty (15)**
36:22,24;37:5,8,13,
15,16;47:15;68:7,10,
12,13,19,24;69:10
**light (1)**
70:22
**liked (2)**
18:8;70:18
**likely (2)**
80:24;88:14
**limit (5)**
36:3,10,11,16;67:24
**limitation (1)**
67:21
**limited (1)**
4:16
**linkable (1)**
8:3
**listed (1)**
55:8
**litigation (1)**
116:25
**Little (11)**
6:25;8:4;12:24;13:7;
22:16;25:6,23;38:12;
45:19;66:17;87:24
**live (3)**
29:24;96:14;108:23
**lived (1)**
46:17
**lives (1)**
108:24
**LLC (3)**
7:23;11:25;12:2
**local (1)**

94:18
**locally (1)**
94:15
**located (4)**
44:4;47:15;53:8;
72:8
**location (1)**
54:12
**log (4)**
22:16;65:6,16;71:12
**logged (4)**
36:1;61:3;65:23;
71:21
**logging (1)**
71:15
**log-in (1)**
65:22
**logs (1)**
65:24
**long (28)**
7:3;8:22;10:8;12:7;
13:8;15:11;17:9,18;
18:11;21:10,22;23:23;
24:2;27:4;29:23;38:24;
42:24;43:12;45:1;
46:16;50:25;53:21;
55:24;84:8;86:22;
88:11;91:12;113:4
**longer (3)**
12:10;76:6;105:7
**longest (1)**
93:17
**look (14)**
60:19;65:23;74:15;
90:8;91:20,21;92:12;
93:16,20,25;102:23;
105:10;108:3;113:10
**looked (3)**
61:9;72:21;110:17
**looking (5)**
56:3;74:14;92:5;
114:16,22
**looks (2)**
56:4;61:13
**look-up (1)**
72:12
**loss (1)**
75:13
**lost (3)**
64:2,4;91:6
**lot (16)**
13:19;19:20,22;33:1,
4;39:19;58:13,17;
90:22;98:11;101:5,6;
106:25;109:3,4,6
**lots (2)**
73:14;79:2
**love (1)**
18:20

**M**

**machine (4)**

14:20,24;15:9;95:1
**Magic (8)**
20:19,24;21:5,21;
22:10;23:10;25:7;
27:19
**Magical (2)**
24:9;29:5
**MagicalTux (1)**
83:14
**mail (2)**
73:13;82:16
**main (1)**
83:4
**mainly (3)**
11:21;45:4;48:15
**maintained (1)**
14:25;114:3
**maintaining (2)**
20:5;53:9
**major (1)**
114:11
**makes (1)**
51:8
**making (4)**
8:2,3;27:22;40:1
**man (1)**
24:8
**manager (1)**
11:5
**managers (2)**
11:1,3
**manual (1)**
69:7
**manually (2)**
59:10;69:4
**manufactured (1)**
113:10
**many (19)**
9:19;24:6;27:9;32:8;
33:7;38:15,25;41:2,3;
53:10;61:21;64:6;
74:16,18,21;89:8,8,25;
106:17
**map (1)**
84:25
**March (2)**
101:18,19
**Mark (47)**
39:2;46:19;47:1,1,2,
4,5;53:2,16;63:4,6;
70:7,21;76:8,10;79:8,
18;80:12,22;82:3,12,
24;83:8;86:23;90:15;
94:19;96:5;97:8,24;
100:17;103:18;107:4,
25;108:7,8,10;111:4;
112:8,10,15,18,19,22;
116:4,14,17,19
**mark@mtgox (1)**
83:6
**market (1)**
32:3;42:9;60:3
**marketing (1)**

109:8
**Mark's (4)**
76:7;108:11;111:3;
112:2
**married (3)**
45:21,22,25
**MARTIN (2)**
4:9,9
**masked (1)**
73:7
**massive (1)**
18:2
**matter (1)**
4:3
**may (17)**
4:6,11,25;18:6;
30:17;53:11;69:1,6,6;
80:3;82:24;101:20;
112:24;113:1,1,19;
114:18
**Maybe (26)**
8:24,24;12:9,10;
14:19;16:25;17:14;
19:15,21;21:16,20;
36:22;45:5;68:8;70:23;
77:18;79:1;80:4;82:12;
84:10;87:18;91:13;
100:7;115:14;116:1,16
**McCaleb (2)**
4:2,20;5:17
**mean (78)**
9:16;11:11,18;18:6;
20:11,11;22:3,21;23:8;
24:13,23;26:21;27:7,8;
32:2,11;33:3,3;39:3,9,
18;41:21;43:4,9;48:15;
50:1;51:2;52:16,21;
55:7;56:24;57:1,2,4,5;
58:9,25;63:19,19;
64:17;68:2;71:22;
72:11;73:4;74:3,7;
77:21;79:22;80:20;
85:20;86:7;89:10;90:8;
91:12;92:2,9,21;93:8,
9;94:14;95:21;96:7,8;
97:7;99:16;100:1,19;
101:5,7;103:16;105:6;
106:10;110:6;112:17;
115:6,24;116:6,21
**meaning (1)**
109:15
**meant (3)**
28:15;59:24;62:22
**mechanism (2)**
96:6,23
**meet (2)**
40:6;47:1
**meetings (1)**
115:22
**messages (1)**
76:20
**met (7)**
5:2;40:8;47:2;

104:15,16,17;115:16
**methods (1)**
68:6
**middle (2)**
5:18;78:25
**might (1)**
30:22
**million (2)**
57:8;87:20;88:4,8
**mind (1)**
112:3
**mine (3)**
10:22;31:24;52:25
**mined (2)**
57:6;90:7
**mining (6)**
28:23;31:18,22;
93:12,22,23
**minute (2)**
5:2;117:7
**Misoon (3)**
46:9,9,13
**M-I-S-O-O-N (1)**
46:13
**missing (11)**
60:21;61:1,22;63:17,
23,24;64:14,20;67:19;
70:8,15
**Mitch (2)**
4:7;5:2
**mix (1)**
104:11
**model (1)**
17:5
**money (56)**
11:1;16:17,18,20;
22:20,21;23:2,9,17;
25:23;26:3;33:23,24;
36:18,21;37:5,12,12,
15,17,22;40:1,25;41:2,
4;42:6;47:7;52:1,4;
55:19;56:16;57:12,16;
58:5;59:7;62:18,20,22;
76:5;84:3;100:4,22;
102:2,4,12;103:11;
105:7,13,25;106:12;
107:22,23;109:9,13;
111:1;112:4
**month (2)**
86:24;100:20
**monthly (1)**
101:20
**months (19)**
8:24;10:9;24:1;
26:12,13;38:5,6;51:17;
91:14,15,15;101:2,24,
25;102:5,11;111:18;
113:15;115:6
**more (26)**
14:23;22:1,22;24:24;
38:22;39:14;40:23,24;
41:4,13;48:3;60:11;
74:11,20,23;75:1;78:7,

Dr. Donald Raggio and Dr. Chris Raggio Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16 Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al.
Case 2:16-cv-00014-JAS Document #: 232-10 Filed: 10/05/2018 Page 88 of 43
November 17, 2016

11,12;85:22;86:8;
90:23;99:12,15,17;
106:8,11,25;114:17;
117:13
**morning (2)**
4:1,25
**most (7)**
9:15;37:25;58:23;
60:2;71:18;80:24;
81:20
**mostly (3)**
57:24;79:21,22
**mother (4)**
46:2,3,7;108:15
**motivated (1)**
39:17
**motivations (1)**
31:14
**motive (1)**
39:8
**move (15)**
35:19;48:19,23;
53:16;54:3,6,7,9,10,23;
56:11;60:2;90:25;
91:22;96:19
**moved (18)**
44:21;45:5,5,14;
48:21,22,24;53:19,22,
24;54:22,25;62:6;63:2,
3;90:16;91:8;108:16
**movement (1)**
106:12
**moving (3)**
7:6;13:19;54:10
**Mt (94)**
10:16;19:5;20:7,8;
26:9,15;27:5,8,21;
28:16;30:2,24;32:1;
33:1,2,18,23;34:5,15;
35:11;36:19;37:13,25;
39:15;40:18;41:1;42:5,
12;43:12,15;44:9,15;
46:19;47:3,7,9,23;
53:2;55:8;56:20;58:3;
61:15;62:1,10,19;63:2,
3,5;66:7;69:24;70:4;
74:9,23;75:8,9;76:7;
78:25;82:7,9,14,21;
83:11,18,25;84:22;
86:13,23;87:4;89:9,25;
90:3;94:11;97:3;98:23;
99:7,12;100:23;103:6,
22;104:25;105:12,14;
108:25;109:12,21;
113:16;114:12,24;
115:5;116:3,10,15,19,
20
**MT- (1)**
42:15
**MTGOX (2)**
4:4;29:1
**much (25)**
11:10;18:7;25:12;

29:9;32:8;39:9;44:6,8;
45:19;49:8;56:11;62:3,
6;64:18;67:8;78:9;
79:23;86:25;87:18;
92:13;100:4;101:3,7;
103:1;112:1
**multiplayer (1)**
18:2
**multiple (4)**
9:13,17,19;64:7
**Must (3)**
15:16;45:17;94:19

## N

**name (34)**
5:16,18;7:4,21,22,22,
23;9:9,23;12:13;14:1;
18:3;21:6;26:25;29:1,
6,10;31:6;33:20;34:23;
46:7,12,21;65:5;66:2;
69:14;71:2,4,6,7;72:4;
76:24,25;83:23
**names (2)**
66:7,8
**narrow (1)**
87:23
**nature (1)**
111:20
**near (1)**
66:14
**need (9)**
5:13;22:9;30:17;
49:23;50:4;69:13;
96:17;98:25;100:2
**needed (3)**
55:17,18;79:9
**negotiated (1)**
100:6
**net (1)**
95:7
**network (3)**
16:3;92:22,23
**new (20)**
21:1;40:9;44:21,24;
45:1,2,3,4,6,12,20;
54:12,14;57:24;72:1;
80:12;89:5,7;109:9;
115:19
**next (4)**
17:25;48:7,9;101:2
**nice (1)**
11:7
**nine (4)**
45:2;51:17;102:5;
113:15
**nobody (1)**
71:23
**node (12)**
92:8,11,12,18,20;
93:2,6,8,9,10,11,13
**nodes (1)**
84:25

**noise (1)**
111:8
**Nojima (2)**
19:12,13
**nominal (1)**
103:24
**None (1)**
89:13
**nonexistent (1)**
85:23
**normal (3)**
55:22;60:10;109:1
**normally (2)**
9:14;28:10
**notice (3)**
54:16;113:12;115:3
**notified (2)**
60:20,25
**notify (1)**
60:23
**November (1)**
4:5
**nowadays (1)**
9:16
**nowhere (1)**
66:14
**number (5)**
33:8;38:21;78:1;
90:9;114:21

## O

**oath (1)**
32:20
**object (1)**
32:17
**obviously (2)**
73:4;91:10
**occurred (1)**
102:25
**off (13)**
17:24;37:24;39:11;
50:10;77:17;80:13;
82:12;94:25;95:23;
97:16;111:13;117:6,8
**offer (2)**
55:20;60:11
**offers (1)**
42:7
**office (1)**
44:15
**offline (3)**
8:14;94:25;95:6
**Often (3)**
73:6;79:20;101:21
**old (3)**
5:24;80:21;86:10
**once (9)**
60:25;61:8,8;65:23;
75:5,6;107:22,22,24
**one (48)**
7:13;9:2,14,19,20;
11:16;16:24;19:10,22;

20:21;21:1,1;31:14;
40:24,24,25,25;41:4;
46:2;47:21;53:9,15;
58:15;61:13;64:6;71:5;
79:10;80:5;81:5;82:4;
89:11,19,23;92:23;
96:7;102:7;104:5,6,15,
16;110:21;111:9;
114:18;115:17,23;
116:1,1;117:4
**one-name (1)**
71:3
**ones (2)**
68:8;114:25
**online (18)**
11:14;18:1,2;20:19;
21:5,18,21;22:12,13,
14;25:7;27:19,23;
94:24;95:18;96:7,22;
98:13
**only (15)**
7:13;9:20;10:9;38:2;
39:3;52:11;53:8;57:4;
58:15;60:7;78:7;86:24;
94:15;100:20;105:25
**onto (1)**
41:1
**open (5)**
58:2;81:14,15;87:4;
105:17
**opencoincom (1)**
81:21
**opened (3)**
34:5,10;37:4
**operation (1)**
54:11
**operations (1)**
109:10
**operators (1)**
42:12
**opportunity (3)**
18:10;31:15;70:23
**order (13)**
13:18;34:3;43:11;
56:6,9,13,17,19;59:25;
60:1,5;65:25;99:7
**orders (3)**
60:8,10,10
**original (1)**
52:16
**others (2)**
81:10;115:24
**otherwise (1)**
66:4
**out (17)**
7:14;38:25;44:17;
57:2;61:25;72:19,23;
73:2,5;76:11;90:14;
93:2;98:13;104:4;
106:1;109:9;116:9
**outside (3)**
45:6,9;111:8
**outstanding (1)**

56:23
**over (13)**
20:21;33:11,13,15;
47:11,13;83:2,5;86:25;
87:17;91:8,21;116:8
**own (11)**
10:11,11;14:24,24;
15:20;22:11;26:19;
49:21;50:17;99:18;
112:4
**owned (11)**
11:17;16:9;34:16;
49:19;50:22,23,24;
73:9;76:6;78:23;
107:25
**owner (3)**
16:7;49:12;105:19
**ownership (2)**
50:18;103:5
**owns (2)**
92:11,11

## P

**paid (7)**
16:21;42:16;67:16,
16;101:21;108:9;
114:24
**paper (3)**
95:12,21;96:2
**parked (3)**
26:21;43:21,24
**part (9)**
16:9,10;49:12;81:20;
86:10;98:8;100:12;
101:12;116:19
**particular (3)**
9:19;92:13
**partner (2)**
12:11;18:13
**partners (1)**
49:10
**parts (1)**
104:7
**party (1)**
117:2
**passport (1)**
110:18
**password (5)**
33:21;65:6,15;69:14;
70:16
**passwords (2)**
65:14,21
**patched (1)**
14:25
**Patterson (2)**
44:20;45:5
**pay (10)**
16:22;26:25;58:21;
67:13;85:5,10;100:5,
22;108:10,11
**paying (1)**
115:2

Dr. Donald Raggio and Dr. Chris Raggio
MTCOE, a sole proprietorship, et al

Jed McCaleb 30(b)6 Code Collective, LLC 11-17-16
2:16-cv-00011-JAS   Document #: 232-10   Filed: 10/05/2018

Jed McCaleb 30(b)6 Representative
November 17, 2016
Page 80 of 43

**payment (4)**
101:17;102:7;
113:18,21
**payments (2)**
16:25;103:17
**PayPal (7)**
36:21;37:1;68:7,11;
69:1,3,10
**peer-to-peer (2)**
16:3;92:22
**people (37)**
9:20;16:22;19:8;
20:16;22:17,24;25:16;
30:22;31:2;36:18;
41:11,17;42:5,6;43:4;
47:10;49:11;52:20;
54:16;59:25;60:11;
64:8,13;71:18,18;
73:14;76:20;77:5,10;
79:3;80:13;83:4;90:25;
91:3;104:6,10;105:13
**percent (12)**
16:7;43:10;50:19,20,
22;63:20;101:1;
103:13,15,22;113:24;
114:1
**percentage (11)**
42:20,21,22,23,25;
43:6,8;49:22;50:17;
103:5,12
**percentages (1)**
43:1
**period (2)**
28:5;53:4
**person (8)**
19:10,22;39:3;64:7;
71:10;72:17;77:18;
78:24
**personal (11)**
58:16,17,25;59:5;
80:11,20,25;81:1,11,
24;82:4
**personally (3)**
79:16;104:14;115:16
**phone (1)**
79:17
**PHP (4)**
86:14,18,20,21
**physical (2)**
22:10;43:16
**physically (1)**
44:3;54:7
**piece (3)**
25:6;100:1,4
**pieces (1)**
92:23
**Pierce (1)**
104:19
**place (5)**
19:17;40:23;56:12,
17;100:11
**placed (4)**
56:6;60:5,7,9

**places (1)**
53:14
**placing (1)**
60:6
**plan (5)**
52:3,4,16;70:10,11
**plausible (1)**
77:20
**pm (1)**
117:23
**point (36)**
11:14;15:5;17:7;
18:9;27:2;33:24;39:13;
49:13;54:13,13;56:11;
57:4,6;59:10,14;60:20;
70:6;75:11;76:4,6;
82:13,23;86:25;87:7;
96:8,10;98:6,23;
100:18;101:6;107:11;
111:3;112:6;114:2;
116:19,21
**pool (3)**
60:6,8,10
**pools (1)**
59:24
**popular (1)**
76:19
**portion (1)**
113:25
**possible (2)**
77:22;82:6
**Possibly (1)**
105:11
**post (2)**
76:20;77:9
**pre-internet (1)**
8:1
**preserve (1)**
75:3
**presume (1)**
79:21
**pretty (16)**
27:3;29:9,21;41:4;
49:3,8;51:15;76:19;
86:25;89:6;92:2;98:5;
99:11;100:16;103:2;
110:17
**prevent (3)**
36:14,15,16
**previous (1)**
111:25
**price (8)**
31:25;32:2,4;42:8,8;
56:2,13,17
**print (3)**
95:13,14,14
**printed (1)**
95:15
**prior (2)**
66:5;112:5
**private (2)**
96:17;105:6
**pro (1)**

17:2
**probably (25)**
10:3,5,9;15:16;18:6,
9;19:2;23:25;28:4;
39:2;41:18;57:5;58:20;
69:8;81:5;87:11;89:4,
13;93:10;98:2;100:14;
101:7;112:4;116:7,22
**problem (2)**
36:16;37:20
**problems (2)**
39:22;114:11
**proceeds (1)**
114:1
**produce (2)**
10:14;101:9
**produced (1)**
101:7
**producing (1)**
101:3
**profit (1)**
39:8
**profit- (1)**
39:7
**profitable (4)**
39:7;40:3;43:13;
51:24
**program (5)**
6:4,9;9:7;15:21;
29:24
**programmed (2)**
35:13;36:7
**programmers (1)**
9:14
**programming (12)**
6:15,17,21;7:1,5,16;
8:7;9:4;10:20;13:24;
29:20;86:12
**project (6)**
15:20;39:15;44:24;
85:18,21;100:9
**projects (5)**
10:11;17:25;20:22;
48:2;84:13
**Proprietorship (2)**
4:4;103:9
**protocol (1)**
93:1
**proud (1)**
14:9
**prove (1)**
91:7
**public (2)**
88:19;91:17
**pull (1)**
82:2
**purchase (4)**
31:16;32:6,9;42:1
**purchased (4)**
34:6;41:24;53:22;
73:5
**purchasing (2)**
40:13;116:15

**purpose (2)**
15:25;20:13;36:13
**pursuing (2)**
73:10;111:22
**push (1)**
69:9
**put (21)**
28:11;30:18,24;32:1;
34:3,10;37:5;42:6;
43:12,15;55:20;59:25;
71:7;84:5;95:16;96:7,
22;97:9;98:13;106:11;
116:9

# Q

**quick (2)**
69:16;97:14
**quicker (1)**
99:14
**quickly (3)**
33:2;51:15;115:4
**quite (4)**
6:10;14:14;30:7;
89:13

# R

**rack (1)**
85:8
**Raggio (7)**
4:3;40:7;55:2;67:10;
111:17;112:13;115:16
**Raggios (9)**
4:8,9;64:9;70:3;
80:2;107:11,20;108:2,
13
**Raggio's (1)**
66:15
**Raggios' (5)**
65:3,4;70:8;77:23;
78:7
**raise (1)**
45:20
**ran (2)**
21:18;87:2
**rate (1)**
101:9
**rather (2)**
14:23;17:20
**read (3)**
20:17;28:14,21
**reading (1)**
30:16
**real (3)**
69:16;93:11;97:14
**realized (3)**
75:5,6;107:23
**really (25)**
11:9;12:9;22:21;
24:8,23;38:2;50:1,2;
52:12;54:19;63:13;
69:13;78:10;85:25;

**recall (9)**
9:7;56:1,3;74:18;
78:8,9;88:14;114:25;
115:1
**receive (4)**
35:8;103:11,14,16
**Recess (3)**
50:12;97:18;117:10
**recollection (1)**
55:12
**recommended (1)**
108:10
**record (11)**
4:6;5:16;50:10,14;
97:16,19;102:23;
111:13;117:6,8,11
**recording (1)**
17:19
**recover (2)**
70:18,24
**references (1)**
99:25
**regarding (1)**
104:25
**register (1)**
33:19
**registered (1)**
71:9
**registrar (2)**
26:22;43:25
**regular (1)**
80:4
**reinitialized (2)**
27:5,21
**reinitiated (1)**
28:16
**related (1)**
19:1
**relationship (1)**
90:14
**relationships (1)**
43:5
**relaxed (2)**
5:6,15
**release (2)**
108:3;111:1
**released (4)**
9:10,12;15:23;16:5
**relevance (1)**
50:2
**relevant (1)**
106:8
**remember (105)**
7:2,3;9:9;12:1,4,9,
25;13:19;17:15;23:25;
24:8,10,23;25:24;
26:11;31:6,9;33:8,14,
16;37:16;38:17,20;
41:3,6,7,20;42:23,24,
24,25;43:7,10;44:5;

**86:24;88:10,11;89:17;
90:2;91:1,21;101:22;
103:23;105:11;114:6**

50:18;53:10;56:10,21,
22;58:20;59:2,3,5,22;
60:16;62:20;64:17;
66:14;67:9,15,23;
68:11;69:3,24;70:5;
72:9,15,21;73:8,10,10,
11,14,20,22;74:1,20,
21;76:1;78:10,11,12;
83:8,13,22;84:23;
85:19;87:8,15,16,18;
88:11;89:3,5,17;90:2,
13,15;91:13;96:6,23;
97:23;98:1,3,6;100:6,
14;110:21;113:3,4;
114:19;115:25;116:6,
16,21

**remembered (1)**
113:11

**reminds (1)**
35:1

**remote (4)**
13:23;14:14,16,19

**remotely (2)**
13:25;15:9

**remove (1)**
17:1

**reply (1)**
77:10

**report (1)**
11:5

**reported (2)**
63:22;111:14

**reporter (3)**
4:11;46:12,14

**reporting (2)**
11:1,3

**represented (3)**
91:4;112:8,11

**representing (1)**
4:7

**request (5)**
35:21;36:1;68:13;
98:13;99:19

**requested (1)**
35:25

**require (4)**
25:12;54:19;68:9,10

**required (1)**
69:1

**Reserve (8)**
36:22,24;37:6,8,17;
68:7,10,24

**reserved (1)**
94:25

**responded (2)**
98:16;99:19

**response (2)**
47:22;77:15

**responsibility (2)**
112:1,2

**responsible (1)**
70:20

**rest (1)**

50:24

**restroom (1)**
5:14

**retain (2)**
89:15;103:12

**retained (2)**
51:22;103:5

**retaining (1)**
89:20

**revenue (5)**
101:1,3,14,14,15

**review (1)**
113:6

**Rica (13)**
37:3;44:22;45:14,18;
46:16,18;47:14,20;
48:6,12,18;51:10;
108:16

**right (129)**
5:22;7:10;8:9;11:17,
18;12:21;13:6;16:5,6;
19:19;22:5;23:18,20;
25:5,8,17;26:24;28:1,2,
7;29:2,3,11,22,23;30:5,
10;31:17;32:20;35:1,7,
9,11,12;36:9;37:14;
40:14;42:10;44:18;
45:12,13,15;46:4,20;
47:24,25;48:13;49:9,
20;50:8;51:10,11,12;
52:11,14,15;54:14,23;
55:3,4;57:25;58:1;
59:11,15,16;60:22;
62:2,16,24;63:10,16;
65:10,15;68:20;69:12;
71:18;77:7;78:14,15,
16,22;82:15;83:18,19;
84:1,2;85:14;88:22;
90:5;91:24;92:9,11,19,
22,23;93:5,21;94:1,5;
95:8,9,15,25;96:3,8,12;
97:13;98:12,15;99:21;
102:1,8,21;103:4,7,9,
20;106:6,22;107:9,12,
13;108:18;110:11,12,
13;112:9;115:20;
117:17

**Ripple (24)**
48:10;49:3,8,10,16,
19,22;50:17;51:1,15,
23;52:1,4,5,8,13,17,20;
81:6,14;115:5,18,25,25

**Rock (3)**
6:25;12:24;13:7

**roughly (1)**
51:16

**Rudder (4)**
12:12,14,15,17

**R-U-D-D-E-R (1)**
12:15

**run (11)**
12:7;17:17;19:24;
21:22;39:19,20;44:8,

17:56:13;92:12;97:14

**running (9)**
20:1;30:2;44:21;
47:8;92:18,22;108:25;
109:12,20

**Russia (1)**
110:23

---

## S

**sale (2)**
100:11;116:18

**salespeople (1)**
11:19

**Sam (1)**
16:13

**same (13)**
14:18;29:4;30:22;
50:22;53:12;70:21;
71:16,21;74:24,25;
82:9;94:10;117:23

**San (2)**
115:23;116:1

**save (1)**
103:22

**saw (4)**
62:3;65:19;70:25;
84:17

**saying (7)**
34:9;38:11;42:7;
46:21;55:14;91:20;
112:1

**scare (1)**
60:3

**school (7)**
6:12,13,16,18,20;
7:8;12:19

**scrape (1)**
66:6

**second (4)**
7:14;49:23;111:9;
117:4

**secret (6)**
88:15,16,20,20;
95:15,15

**secure (3)**
14:16;15:1,10

**securities (2)**
109:13,15

**security (2)**
86:6;109:18

**seek (1)**
79:12

**seemed (6)**
39:16;112:5,6,7;
113:12;114:24

**seems (4)**
31:22,24;77:21;
114:18

**self-taught (1)**
6:12

**sell (10)**
20:15;26:4;33:25;

34:3;37:24;39:17;42:8;
52:7;116:7,20

**selling (6)**
85:1,3,4;100:13;
116:3,10

**semester (3)**
6:3;7:13,14

**send (19)**
33:23;34:2;36:3;
37:9;41:2;57:12;68:7,
7;69:9;78:24;79:10;
89:5,7;99:4;101:24;
102:2,4,16;110:16

**sending (1)**
105:13

**sense (3)**
44:10;51:8;93:11

**sent (7)**
35:23;41:3;57:15,17;
75:8;82:3;110:17

**separate (1)**
58:2

**September (2)**
30:1;33:6

**Seriously (1)**
106:23

**served (1)**
73:14

**server (19)**
16:2;26:19,24;43:16;
44:3,7;53:9,11,17;
54:11;65:24;73:13;
82:9,10,16,16;85:4,5;
94:15

**servers (3)**
53:10;92:10;93:1

**set (3)**
49:17;82:20;89:17

**setting (1)**
11:4

**several (3)**
35:7;65:14;80:9

**share (1)**
16:1

**shareholders (1)**
114:5

**shares (3)**
49:19,21;51:21

**shh (1)**
111:10

**shortly (1)**
90:15

**show (1)**
90:17

**shut (4)**
17:21,22;19:17;
54:19

**shutdown (1)**
54:8

**sign (4)**
22:24;33:18;96:18,
20

**signed (4)**

71:6,12,24;96:21

**significance (1)**
67:1

**significant (5)**
29:7;41:10,22;47:22;
89:24

**Silicon (2)**
13:15,22

**similar (3)**
16:3;39:14;52:5

**simple (1)**
39:21

**site (11)**
19:23;20:24;22:16;
25:8;27:10,12;62:17;
91:4;107:25;109:5,9

**sitting (2)**
68:3;73:24

**situation (1)**
76:8

**six (7)**
8:24;10:9;17:10;
101:2,24,25;102:11

**size (2)**
36:16;44:11

**Slashdot (2)**
28:21;29:14

**slightly (1)**
19:5

**Slovenia (2)**
114:19,20

**small (3)**
66:25;100:1,4

**software (23)**
6:5;10:23,25;11:23,
24;13:25;15:6,8;16:25;
25:6;29:4,8;68:22;
83:24;86:2,11;92:23;
93:4,19;94:8;98:21;
99:2,3

**sold (34)**
34:22;38:15;40:1;
46:19;47:3,23;53:2,16;
62:17,19;63:4,5,14;
64:3;69:23;70:3;86:23;
87:14;90:1,3,15,23;
91:6;97:12;100:18;
101:4,8;102:5;103:9,
22;105:4;107:4,6;
115:4

**Sole (1)**
4:4;103:8

**somebody (11)**
14:9;34:5;37:20;
41:19;65:5,13;66:5;
77:17;85:13;98:14;
99:19

**somebody's (3)**
7:23;14:19;66:1

**someone (17)**
16:9;19:23;47:10;
49:12;56:6,7;64:1,3;
67:22;70:15,16;71:9,

15;84:2;95:1;103:21;
105:15
**someone's (1)**
36:14
**sometime (3)**
40:12;44:21;45:14
**sometimes (6)**
9:17,18;28:9;73:6;
80:13;81:1
**somewhere (12)**
8:21;15:18;17:13;
26:19;27:15;43:11,17;
63:7;83:14;95:16;97:9;
102:10
**son (1)**
73:20
**soon (3)**
29:21;49:4;91:10
**sorry (9)**
9:23;38:8;45:23;
62:22;66:17;88:10;
107:19;110:13;112:13
**sort (5)**
7:25;8:13,13;14:21;
106:10
**sounds (2)**
13:6;85:22
**Space (9)**
9:9,10;38:12;44:6,8,
10;84:14;85:8;104:21
**speaking (1)**
91:17
**specific (2)**
9:6;93:8
**specify (1)**
101:22
**Spell (2)**
16:14;46:10
**spending (1)**
41:13
**split (1)**
67:16
**spring (1)**
51:6
**stand (3)**
20:18;21:3;86:20
**standard (1)**
43:8
**stands (1)**
86:21
**start (8)**
28:23;29:9;48:14;
49:3;93:11,12;100:12;
102:16
**started (28)**
4:14;6:5;7:8;10:21;
14:13;15:20;19:5;20:7;
21:15;24:4;26:11;27:5,
8,14;28:25;29:20;33:5;
44:20;45:11;48:2,7;
51:3,14;83:7;100:17;
101:11;115:18;116:23
**startup (3)**

13:16,21;14:1
**state (1)**
5:15
**stateside (2)**
85:13;108:18
**static (1)**
71:19
**stay (3)**
8:22;10:8;46:16
**stayed (3)**
51:14;88:25;108:16
**steal (1)**
77:19
**stick (1)**
50:25
**still (26)**
10:1,5;11:9;14:5;
20:1,3,4,4;28:15;
39:10;48:5;73:23;
80:14;81:17,23;91:7;
93:22;94:10;102:23;
104:25;108:19,21;
110:5;113:23,23;115:9
**stock (1)**
51:21
**stole (1)**
77:18
**stolen (4)**
63:10,11;66:11,12
**Stop (5)**
5:11,13;24:25;47:8;
113:16
**stopped (9)**
15:15;25:1,3;26:9,
12;27:9,12;113:18,19
**store (2)**
106:8,15
**stored (1)**
71:25
**straightforward (1)**
89:6
**stretch (1)**
69:18
**stuff (11)**
11:13;15:1,3,6;73:6;
75:17;76:23;77:8;
85:15;99:12;109:11
**subject (1)**
116:4
**success (1)**
18:8
**successful (1)**
52:9
**Suck (2)**
13:1,4
**summer (4)**
40:11;48:22;51:4,10
**Sunlot (1)**
104:3
**supporting (1)**
26:1
**support-type (1)**
109:3

**supposed (1)**
14:16
**Sure (29)**
5:1,5,12;11:11,12;
13:8;14:25;15:10;27:3;
28:13;30:11,12;32:15;
41:4,12;43:14,14;
56:18;64:23;67:10;
68:25;71:16;75:13,16;
82:25;97:15;98:5;
108:9;117:5
**surprise (1)**
114:14
**suspicious (1)**
76:10
**sustained (1)**
18:7
**swamp12@yahoocom (1)**
81:12
**swear (1)**
4:12
**swimming (1)**
111:12
**switched (1)**
82:12
**sworn (2)**
4:13,21
**system (3)**
8:12;53:3;87:1

## T

**tag (1)**
8:11
**talk (12)**
32:16;49:24;50:4,7,
8;76:21,22;77:5;79:15,
16,23;116:14
**talked (2)**
109:19;111:16
**talking (8)**
14:18;32:18;84:15;
93:1;100:12,17;
112:19;116:23
**teach (3)**
6:15,20;53:6
**technical (2)**
39:22;105:15
**technically (1)**
22:7;82:6;93:9
**tens (1)**
41:8
**term (1)**
93:8
**testified (1)**
4:21
**theft (1)**
67:10
**Theirs (2)**
64:22;78:8
**thereafter (1)**
29:21
**there'd (1)**

57:5
**thinking (6)**
48:2,16;51:9;54:7;
89:16;116:22
**third (1)**
87:21
**Thirty (1)**
57:3
**though (7)**
35:16;41:5;62:4;
87:8;89:14;96:24;
100:15
**thought (7)**
54:1;70:20,23;76:9;
79:9;90:6;112:24
**thousand (6)**
24:12,21;33:11;
36:11;38:19;100:7
**thousands (5)**
41:9;65:20,21,21,22
**threatening (1)**
17:20
**three (3)**
18:12;64:11;107:7,7
**three-year (1)**
28:5
**threshold (1)**
56:15
**ticket (1)**
23:12
**tickets (2)**
23:9,11
**times (5)**
41:2,3;57:7;79:20;
102:18
**tired (1)**
17:18
**title (2)**
9:10,12
**Toad (2)**
13:1,4
**today (3)**
5:15;20:3;108:21
**Today's (1)**
4:4
**together (1)**
108:19
**told (19)**
5:5;30:9;54:2,3,9;
55:20;60:8;61:8,8,23;
70:5,5;76:7;79:11;
107:11,20;110:14;
112:15,18
**took (9)**
6:17;7:16;17:24;
27:1;40:23;83:2,5;
97:8;100:11
**tools (2)**
11:3;15:9
**top (2)**
41:16,17
**topic (1)**
77:9

**topics (1)**
77:5
**total (3)**
56:24;64:11;75:23
**totally (1)**
39:11
**Tournament (2)**
13:4,5
**Tourney (1)**
13:1
**town (2)**
12:22;14:10
**trace (1)**
61:25;66:20;74:3
**track (1)**
71:10
**trade (15)**
22:11,15,17,19,25;
23:11;25:4,22,23;
42:10,13,20,21;43:13;
59:15
**traded (4)**
23:3;52:21;55:23;
73:23
**trader (1)**
25:9
**trades (1)**
114:22
**trading (7)**
20:24;23:24;25:1,8;
27:10,12,19
**trail (1)**
61:10
**transaction (16)**
36:5;37:10;40:22,24,
25;42:4,16;68:23;96:9,
16,18,19,21;106:11,15;
113:11
**transactions (7)**
42:18;88:21;93:20;
102:24,24;105:16,18;
113:16
**transcript (1)**
28:14
**transfer (7)**
76:4;87:5;88:13;
96:13,23;98:7,8
**transferred (5)**
87:7,8,14;94:19;
107:3
**transition (2)**
53:4,6
**trick (1)**
38:10
**tried (3)**
66:22;72:23;76:11
**tries (1)**
65:13
**true (7)**
56:14;94:17;95:12;
115:1,2,10,11
**Trump's (1)**
73:20

Case: 2:14-cv-00041-JAS   Document #: 232-10   Filed: 10/05/2018   Page 42 of 43

**truthful (1)**
108:12
**try (5)**
65:20;72:19;75:2;
76:13;87:21
**trying (8)**
8:10;22:22;38:9;
79:12;91:2;92:1;109:5,
8
**turn (1)**
80:12
**Twelve (1)**
103:13
**Twenty-five (1)**
38:18
**two (12)**
11:21;18:12;45:5,19;
46:5;53:14;64:8,9;
65:8;66:4,7,19
**two- (1)**
28:4
**two-and-a-half (1)**
57:8
**Tyner (41)**
4:7,7,18,24;13:4,7,9;
21:7;24:20;30:15;
32:13,15,17,20,24,25;
38:9,14;46:15,23,25;
50:5,8,16;58:10,12;
69:22;87:23;88:3,5,7;
97:21;109:16;111:11,
15;112:12;117:4,6,13,
16,18
**typically (1)**
100:2

**U**

**UC (1)**
7:12
**uh (1)**
28:11
**UK (1)**
104:7
**ultimately (1)**
70:15
**unclear (2)**
39:11;70:13
**under (4)**
9:12;32:20;38:2;
97:10
**underlying (1)**
52:6
**understood (1)**
87:1
**unfortunate (1)**
70:14
**university (3)**
6:17,24,25
**unless (1)**
106:6
**unlike (1)**
5:8

**unlikely (1)**
77:21
**up (45)**
11:4;12:20,22,23;
20:1;21:11;22:24;24:3,
6;30:2,18,24;32:1;
33:1,18;34:3;37:4;
39:19;40:23;42:7;
43:12,15;44:6;49:17;
56:14,17;59:25;71:7,
13,24;79:15;82:20;
84:5;89:18;92:12;
96:25;101:6;108:1;
109:6;111:25;112:5;
114:17,22;115:9;116:2
**USB (1)**
96:22
**use (13)**
16:25;29:3;31:4;
36:20,21,22;37:5;44:8;
80:23;85:12;86:11,12,
15
**used (14)**
18:20;21:1;29:6,7,
10;59:6;80:25;82:11,
11,14,21;83:10,12;
96:23
**useful (3)**
73:2,15;105:7
**user (9)**
33:20;65:5;66:1,7,8;
69:14;71:2,4,6
**users' (2)**
79:10,11
**uses (2)**
106:17,25
**using (3)**
11:10;80:7;97:6

**V**

**vague (1)**
110:6
**validating (1)**
93:12
**Valley (2)**
13:15,22
**value (2)**
52:7;56:22
**various (3)**
10:13;17:24;33:23
**vary (1)**
101:5
**venture (1)**
104:9
**verify (3)**
93:16;102:21;103:3
**version (3)**
17:22;23:13,14
**versus (1)**
4:4
**Via (1)**
60:24

**viable (1)**
18:5
**video (2)**
10:15,17
**VIDEOGRAPHER (9)**
4:1,11;50:10,14;
97:16,19;117:8,11,20
**videotaped (1)**
4:2
**volume (2)**
55:23,25
**volunteer (1)**
16:24

**W**

**Wait (2)**
30:5;110:3
**wallet (10)**
34:7;35:10,17,18;
37:8;79:2;89:11;94:18,
22;95:21
**wallets (16)**
34:16;35:7;88:13;
89:1,5,8,21;94:11;97:1,
5,8;104:24;105:1,5,10,
12
**wants (1)**
94:7
**warmer (1)**
45:19
**wasting (1)**
112:4
**watch (1)**
89:13
**Watson (6)**
10:22,24;11:13,22,
23;13:11
**way (18)**
4:16;20:14,15;30:21,
23;38:13;42:5;64:22,
23;70:21;71:10;72:16;
83:4;84:24;92:10;
103:19;113:13;114:6
**ways (6)**
33:23;36:20,23;60:6;
96:15;109:9
**website (4)**
11:15;27:1;35:21;
55:8
**weeks (3)**
29:25;30:16;53:5
**weren't (4)**
11:9;31:18;62:6;
89:20
**what's (5)**
7:21;12:13;55:12;
76:24;92:20
**where's (1)**
102:12
**Whereupon (1)**
117:22
**wherever (1)**

**54:12**
**whois (1)**
73:6
**whole (1)**
89:20
**whose (1)**
71:1
**Wild (5)**
18:15,21,22,23;
44:24
**Wilds (7)**
18:4,15,16,17;27:22;
35:4;81:17
**willing (2)**
42:7,8
**Win (1)**
4:10
**winding (1)**
19:5
**wire (2)**
36:21;57:12
**wired (5)**
55:19;58:5;59:7;
87:9,11
**withdraw (3)**
36:12;67:2,22
**withdrawal (1)**
35:22
**withdrew (2)**
67:3,6
**Within (2)**
26:13;30:16
**without (1)**
16:2
**witness (15)**
4:12,13;13:6;21:5;
30:8,11,14;32:10;38:8;
46:13,24;69:20;87:25;
117:15,17
**wondered (1)**
54:2
**wondering (1)**
112:2
**word (1)**
109:8
**words (1)**
75:19
**work (19)**
9:15;10:10;13:13;
14:19;17:7;18:11;22:3,
7;25:17;33:17;39:19;
48:3,5;68:1;85:16;
87:6;88:18;99:7;100:2
**worked (6)**
9:1,19;13:15;15:3;
17:24;87:1
**working (17)**
6:5;9:11,14,20;
10:12,17;13:3,21;
15:15;28:1,15,18;
39:21;44:23;48:14;
49:3;51:14
**works (2)**

**9:15;42:5**
**world (6)**
47:11;56:24;90:4;
93:2;104:8;115:9
**worried (1)**
91:3
**worth (4)**
55:15;56:8;75:17,21
**Wow (1)**
94:10
**write (6)**
77:10;83:18,24;
85:13;86:11,12
**writing (2)**
25:3;98:21
**wrong (1)**
58:11
**wrote (3)**
20:11;87:9,12

**Y**

**Yagan (2)**
16:13,14
**Y-A-G-A-N (1)**
16:15
**y'all (2)**
19:17;79:6
**year (11)**
8:20;12:9;15:13;
33:7;45:4,16;46:17;
48:19;51:17;101:10;
108:16
**years (4)**
17:10;18:12;45:2,5
**Yep (2)**
46:6;68:17
**York (12)**
40:9;44:21,24;45:1,
2,3,4,6,12,20;57:25;
115:19

**1**

**1 (1)**
43:9
**1:02 (3)**
117:12,21,23
**10 (4)**
4:5;29:16;41:17;
116:18
**10,000 (5)**
24:12;33:13;38:22;
56:7;68:3
**10:28 (1)**
50:11
**10:50 (1)**
50:15
**100 (1)**
16:7
**100,000 (1)**
101:9
**11 (1)**

Dr. Donald Raggio and Dr. Chris Raggio McCaleb 30(b)6 Code Collective, LLC 11-17-16    Jed McCaleb 30(b)6 Representative
MTGOX, a sole proprietorship, et al                                                      November 17, 2016

Case: 2:14-cv-00421-JAS    Document #: 232-10    Filed: 10/05/2018    Page 43 of 43

61:21
**11:48 (1)**
    97:17
**12 (5)**
    51:10;103:14,22;
    113:24;114:1
**12:02 (1)**
    97:20
**12:37 (1)**
    117:9
**15 (1)**
    69:17
**17th (1)**
    4:5

---

**2**

**20 (1)**
    41:17
**20- (1)**
    21:20
**2000 (1)**
    15:22
**2000s (1)**
    15:14
**2004 (2)**
    17:13;21:20
**2005 (2)**
    17:13,14
**2006 (2)**
    17:14;27:14
**2007 (2)**
    21:16;27:14
**2008 (2)**
    19:2;27:15
**2009 (1)**
    19:7
**2010 (5)**
    27:8;28:25;29:17,18;
    33:6
**2011 (3)**
    61:20;113:22,23
**2012 (2)**
    40:11;48:22
**2013 (2)**
    51:4,6
**2016 (1)**
    4:5
**230,000 (1)**
    102:10
**25,000 (1)**
    38:20

---

**3**

**30 (3)**
    56:4;57:1,6

---

**4**

**40 (1)**
    50:19
**400,000 (1)**

90:17
**41 (1)**
    5:25

---

**5**

**5,000 (1)**
    33:15
**50 (1)**
    101:1
**500 (1)**
    24:13
**5th (3)**
    38:1;63:7;70:2

---

**6**

**60 (1)**
    50:20
**6th (3)**
    38:1;63:7;70:2

---

**7**

**7th (3)**
    38:1;63:7;70:2

---

**8**

**8- (1)**
    90:7
**8,000,000 (2)**
    57:6,7

---

**9**

**9,000 (3)**
    61:23;63:17;78:8
**9,000,000 (1)**
    90:7
**94 (1)**
    8:21
**95 (3)**
    8:21;10:5,6
**96 (1)**
    10:3
**98 (2)**
    15:16,16
**99 (4)**
    15:16,18,22,23

```
 1        IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
               OF HINDS COUNTY, MISSISSIPPI
 2

 3   DR. DONALD RAGGIO
     DR. CHRIS RAGGIO                              PLAINTIFFS
 4

 5   VERSUS                            CAUSE NO. 251-14-071

     MTGOX, A SOLE PROPRIETORSHIP,
 6   MTGOX, INC., A DELAWARE CORPORATION,
     MT.GOX KK, A JAPANESE CORPORATION,
 7   TIBANE KK, A JAPANESE CORPORATION,
     MUTUM SIGILLUM, LLC, A DELAWARE
 8   LIMITED LIABILITY COMPANY,
     CODE COLLECTIVE, LLC, A NEW YORK LIMITED
 9   LIABILITY COMPANY; JED MCCALEB, AN
     INDIVIDUAL; MARK KARPELES, AN INDIVIDUAL;
10   JOHN DOES 1-5 AND CORPORATE JOHN DOES 1-5     DEFENDANTS

11

12   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

13   TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE

14   HEARING IN THE ABOVE-STYLED AND NUMBERED CAUSE BEFORE

15   THE HONORABLE JOSEPH A. SCLAFANI, CIRCUIT COURT JUDGE,

16   ON THE 5th DAY OF JUNE, 2018.

17   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

18

19

20                 (Appearances noted herein.)

21

22

23   Reported by:  LINDSEY McINTOSH, CCR
                    Official Court Reporter
24                  Post Office Box 22711
                    Jackson, Mississippi  39225-2711
25                  CCR # 1732
```

```
 1   APPEARANCES:

 2        Present and Representing the Plaintiffs:

 3             HONORABLE CHARLES "BRAD" MARTIN
               Tyner, Goza, Stacey & Martin, LLC
 4             3352 North Liberty
               Canton, Mississippi  39046
 5

 6        Present and Representing the Defendants:

 7             HONORABLE EDWIN S. GAULT, JR.
               HONORABLE MANDIE B. ROBINSON
 8             HONORABLE T. PEYTON SMITH
               Forman Watkins & Krutz, LLP
 9             210 East Capitol Street, Suite 2200
               Jackson, Mississippi  39201-2375
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          BY THE COURT:  Good morning.  I -- I've

2      taken a look at everything y'all sent me.

3      I've looked at the docket.  I looked at the

4      complaint.  I've looked at the interloc

5      papers and everything.  And I feel like

6      before I can rule on any discovery motions I

7      need to understand the factual allegations,

8      because in reviewing the complaint -- and it

9      just seemed -- I couldn't get an

10     understanding of exactly what is being

11     alleged here.  So before I can rule on

12     discovery, I need to understand exactly

13     what's being alleged here.

14          So the first issue -- the first question

15     I have in my mind is, all right, I -- I

16     believe that bitcoins are a good.  Okay.  So

17     I think that based on the case law I've

18     looked at, bitcoins are -- while not legal

19     tender or currency, they have the same

20     characteristics of legal tender -- tender or

21     currency.

22          Therefore, the way I see this case is a

23     currency exchange, just like if I was trading

24     100 U.S. dollars for 100 Italian lira.  It is

25     a currency exchange.  Even though it's not

1 legal tender recognized by the U.S. Treasury,

2 it's the closest thing that I can draw an

3 analogy to for purposes of my understanding.

4 So if -- and you may disagree, but this is in

5 my mind the way I'm trying to conceptualize

6 what the case is about.

7   So if I'm going to engage in a currency

8 exchange, I go to a currency exchange and I

9 place an order.  I say, "I want 100 Italian

10 lira.  And how much does that cost in U.S.

11 dollars?"  And I trade the U.S. dollars for

12 the lira.  Okay.  So that's how I'm working

13 in my mind.

14   So in January of 2011, the plaintiffs

15 placed an order for 9,400 bitcoin; is that

16 correct?

17   BY MR. MARTIN:  I believe it was

18 actually in December of 2010, Your Honor.

19   BY THE COURT REPORTER:  What's your

20 name, please?

21   BY MR. MARTIN:  Charles Martin.

22   BY THE COURT:  Okay.  So in December of

23 2010, an order was placed for 9,400 bitcoins

24 through the defendant's exchange; is that

25 correct?

1    BY MR. MARTIN:  That's correct,

2    Your Honor.

3    BY THE COURT:  Okay.  Was that order

4    ever filled?  Did the 9,400 bitcoins actually

5    go into the account of the plaintiffs on the

6    exchange?

7    BY MR. MARTIN:  That's correct, Your

8    Honor.

9    BY THE COURT:  Okay.  So the -- the

10    bitcoins were delivered.  We had delivery of

11    the currency that was being purchased,

12    correct?

13    BY MR. MARTIN:  At that time, yes.

14    BY THE COURT:  Okay.  Now, so then what

15    happened was at some point in January of

16    2011, a hacker with the handle Baron somehow

17    accessed the plaintiff's account on the

18    exchange -- not their wallet, but the account

19    on the exchange, and misappropriated the

20    9,400 bitcoins; is that correct?

21    BY MR. MARTIN:  That's what we believe,

22    Your Honor.  We're not entirely sure whether

23    it came out of the account or the wallet, but

24    they -- we know that they were removed from

25    something, Your Honor.

```
 1            BY THE COURT:  Okay.  What's the

 2       defendant's position on that?

 3            BY MR. GAULT:  Win Gault for the

 4       defendant.  I'm also here with Mandie

 5       Robinson and Peyton Smith.

 6            So we generally agree with that, except

 7       the person who went into the Mt. Gox account

 8       had the Raggios' password.

 9            BY THE COURT:  Okay.  They --

10            BY MR. GAULT:  So it's not some --

11       running some dictionary, or whatever they

12       call, attack.  They had the password of the

13       Raggios, entered it, went in and moved the

14       coins.

15            BY THE COURT:  I -- I'm fairly new to

16       this, but I do have some level of

17       understanding of the way bitcoins work and

18       the way these exchanges work and the

19       difference between the account on the

20       exchange and the wallet of the accountholder.

21       And that's what I'm trying to understand

22       here.

23            This -- the 9,400 bitcoins at issue here,

24       is it -- is it disputed or undisputed where

25       they were at the time they were hacked?  What
```

1       is the plaintiff's position?

2           BY MR. MARTIN:   I'm unsure, Your Honor.

3       What I -- what I do know, though -- if this

4       is correct.   Like I say, I don't -- I don't

5       know with 100 percent certainty.   I want to

6       say that Jed McCaleb had one wallet at the

7       time and that everybody's bitcoins were

8       commingled into that wallet.

9           BY THE COURT:   Okay.

10          BY MR. MARTIN:   When you logged onto

11      Mt. Gox to look at your account, though, you

12      would just see the -- you would see a listing

13      of the bitcoins that you bought.

14          BY THE COURT:   Okay.

15          BY MR. MARTIN:   But I want to say that

16      there was just one wallet at that time.

17          BY THE COURT:   Okay.   That -- and

18      that's -- that's consistent with what I

19      understand.   The Mt. Gox exchange, all of the

20      bitcoins on -- that were being traded on that

21      exchange were in Mr. McCaleb's wallet?

22          BY MR. MARTIN:   Correct.

23          BY THE COURT:   Okay.   And --

24          BY MR. MARTIN:   That's -- that's my

25      belief.

```
 1              BY THE COURT:  Okay.  Then the

 2         plaintiff, the Raggios, had their own

 3         separate wallet.  And they were able to

 4         transfer bitcoins from the exchange into

 5         their own wallet; isn't that correct?

 6              BY MR. MARTIN:  Theoretically.  And

 7         let -- and let me ask the Court this to

 8         make -- make sure I understand the question.

 9              BY THE COURT:  Yes, sir.

10              BY MR. MARTIN:  I'm assuming you mean a

11         wallet outside of Mt. Gox?

12              BY THE COURT:  Yes.

13              BY MR. MARTIN:  Yes, I believe that's

14         correct.

15              BY THE COURT:  Okay.  That's -- and

16         that's what I'm trying to understand.

17         Were -- were these 9,400 bitcoins stolen from

18         the McCaleb's wallet on the exchange -- what

19         essentially functioned as the exchange, or

20         were they stolen out of the personal wallet

21         of the plaintiffs?

22              BY MR. MARTIN:  They were stolen from

23         the Mt. Gox wallet.

24              BY THE COURT:  Okay.  That's -- that's

25         what I thought.  That's what I wanted to
```

1    understand.

2         BY MR. MARTIN:    And -- and, Your Honor,

3    there's one thing that Mr. Gault mentioned

4    that, again, we're unsure about.    He

5    mentioned that the hacker had the Raggios'

6    password.    Looking at e-mails from that time,

7    Jed McCaleb sends a series of e-mails to

8    Chris Raggio saying, "Is it possible someone

9    had a keylogger on your computer?"    Chris

10   Raggio searches his computer and finds no

11   evidence of such.    Never shared the password

12   with anybody.

13        There's an e-mail, if I recall

14   correctly -- I want to say it was February

15   the 10th, 2011 -- where it appears to almost

16   be a slip of the tongue from the defendant,

17   where he says -- he mentioned something about

18   a -- I'm trying to recall it correctly.    I

19   don't have that e-mail with me.

20        But he mentions a password -- or no, he

21   mentions a dictionary attack in that e-mail.

22   It's the first time he ever mentions it to

23   Chris Raggio.    He never mentions it again.

24   But in my mind, when I see that, the

25   possibility that there was actually a

```
 1          dictionary attack certainly may exist.

 2               BY THE COURT:  Okay.  A dictionary

 3          attack --

 4               BY MR. MARTIN:  Right.

 5               BY THE COURT:  -- of the Mt. Gox wallet?

 6               BY MR. MARTIN:  Yes.  Versus someone

 7          having --

 8               BY THE COURT:  Understood.

 9               BY MR. MARTIN:  -- the Raggios'

10          password.

11               BY THE COURT:  Okay.  I understand

12          that's -- there's a dispute about that.

13               BY MR. MARTIN:  Yes, sir.

14               BY THE COURT:  Okay.  All right.  That's

15          actually not, in my mind right now, one of

16          the issues that I had in my mind.  Okay.

17               Now, in your briefing there is some

18          discussion amongst both sides alleging that

19          this Baron may, in fact, be either

20          Mr. McCaleb or Mr. Raggio.  Okay.  Is there

21          any evidence to support -- I'm going to ask

22          each one of you individually.  I'm going to

23          start with the plaintiff.  Is there any

24          evidence -- does the defendant have any

25          evidence to support their assertion that
```

1    Mr. Raggio may be Baron?

2    BY MR. MARTIN:  No, Your Honor.  And

3    actually, that assertion is absurd.  The

4    reason I say that is these bitcoins went back

5    into another Mt. Gox account that was frozen

6    by Jed McCaleb under the direction of Mark

7    Karpeles.  So if my client was the hacker or

8    the thief, he has to be the worst one in the

9    world to return the coins back to another

10    Mt. Gox account.

11    BY THE COURT:  Okay.  Understood.

12    Mr. Gault, do you have any evidence to

13    substantiate -- or is there any evidence to

14    substantiate plaintiff's claim that

15    Mr. McCaleb is Baron?

16    BY MR. GAULT:  No, Your Honor.  And the

17    truth of the matter is, neither side has

18    evidence of either one of those allegations.

19    BY THE COURT:  Okay.

20    BY MR. GAULT:  All we have is suspicion

21    at this point.  They suspect it.  We suspect

22    it.  We think it's weird that somebody would

23    have their password.  They think it's weird

24    that, you know, Jed is back there working it.

25    But the truth of the matter is neither side

1    has this.

2         BY THE COURT:  Okay.  All right.  The

3    9,400 bitcoins that are at issue in this case

4    that were transferred to Baron's account

5    through hacking, what is the current status

6    of that account?  Does anyone know?  Does

7    plaintiff have any evidence as to the current

8    status of that account with those bitcoins?

9         BY MR. MARTIN:  We do not, Your Honor.

10   We assume that it's in the hands of a

11   bankruptcy court in Japan.

12        BY THE COURT:  Okay.  What is the

13   defendant's position?

14        BY MR. GAULT:  It's interesting you ask

15   because I asked my client yesterday that

16   question, "Have you seen any evidence from

17   the database from the Mt. Gox bankruptcy to

18   show if those coins are still there?"  He

19   says, "I haven't.  I don't know."

20        So we don't know where they are.  I

21   suspect they're wrapped up in the Mt. Gox

22   bankruptcy in Japan.  I would add they didn't

23   file a proof of claim in that bankruptcy.

24        BY THE COURT:  Okay.  All right.  If I

25   am correct that bitcoins are goods, subject

1    to the UCC, which is what I believe -- and

2    I'm not asking you to commit to that.  If

3    that is correct, the issue -- do you believe

4    the issue of cover is a relevant issue?  I

5    want to ask the plaintiff first.

6        BY MR. MARTIN:  I'm sorry, Your Honor.

7    I don't understand your question.

8        BY THE COURT:  Okay.  If bitcoins are

9    goods, subject to the UCC -- I want you to

10    assume that for this question.

11        BY MR. MARTIN:  Yes, sir.

12        BY THE COURT:  Okay.  And you've pled

13    that in the complaint --

14        BY MR. MARTIN:  That's correct.

15        BY THE COURT:  -- that they're goods.

16    So I assume you would agree, though I'm not

17    asking you to agree with me.  I want you to

18    assume for this question that bitcoins are

19    goods governed by the UCC.  Is the issue of

20    cover relevant?

21        BY MR. MARTIN:  I'm going to have to

22    plead ignorance, Your Honor, on that.  This

23    is the first case I've had in probably ten

24    years where actually the UCC has come -- come

25    into play.

1        BY THE COURT:  Okay.

2        BY MR. MARTIN:  I don't want to

3    embarrass myself, but I don't know what

4    cover --

5        BY THE COURT:  Okay.  And that's fine,

6    and I'm sorry.  That's not -- that was

7    something that in reading the defendant's

8    response -- or in reading some of their

9    motion papers, the issue of cover was raised.

10    And I spent some time this morning looking at

11    that issue, because the Court believes that

12    cover is a relevant issue.

13        And I wanted to see what -- Mr. Gault,

14    from your papers it appears to me that the

15    defendants believe cover is an issue; is that

16    correct?

17        BY MR. GAULT:  Yes, Your Honor.

18        BY THE COURT:  Okay.  All right.  All

19    right.  And then I have one other question.

20    What -- before we start on the motions,

21    what -- I'm going to ask the plaintiff first.

22    What do you believe the issue or issues of

23    fact were that Judge Green identified in

24    denying a ruling on the limitations issue at

25    this time?  The reason I ask that is, I don't

1    have a transcript of that hearing.

2         I've looked at her order, I've looked at

3    the interloc briefing, and I can't from the

4    papers I've reviewed.  So I want to -- I want

5    to hear the plaintiff -- and this is very

6    important to me.  What do you believe are the

7    issues of fact that preclude a ruling on

8    statute of limitations?

9         BY MR. MARTIN:  Yes, Your Honor.  And I

10   wish we had a transcript as well.

11        BY THE COURT:  Is there a transcript?

12        BY MR. MARTIN:  No, Your Honor.

13        BY THE COURT:  There was no court

14   reporter at the hearing?

15        BY MR. MARTIN:  I don't believe there

16   was.

17        BY THE COURT:  I know with Judge Green

18   you have to ask for a court reporter to be

19   present.  So if no one requested it, there

20   wouldn't have been one.

21        BY MR. MARTIN:  I requested a copy of

22   one subsequent to the hearing and was told

23   that there was not one.

24        BY THE COURT:  Okay.  And like I said,

25   my understanding of her procedures are if you

1    don't ask for one in advance, there is not

2    a -- there is not a court reporter there at a

3    civil motion hearing.  So did y'all ask for

4    one?

5        BY MR. GAULT:  You know, I -- I cannot

6    recall --

7        BY THE COURT:  Okay.

8        BY MR. GAULT:  -- if we did or we

9    didn't.

10       BY THE COURT:  Okay.  I'm -- I'm sorry

11   to get off the subject.  Tell me what you

12   believe -- what is the plaintiff's contention

13   regarding the issues of fact that preclude a

14   ruling on statute of limitations.

15       BY MR. MARTIN:  Yes, Your Honor.  There

16   are several.

17       BY THE COURT:  Okay.

18       BY MR. MARTIN:  First of all, the

19   bitcoins are a good under the UCC, subject to

20   a six-year statute of limitations.  I believe

21   our suit was filed in March of 2014, so

22   that's a little more than three years after

23   the theft of the bitcoins, although there is

24   some question of when the statute of

25   limitations would begin to run.

1      Would it be at the time of the theft?
2   We -- we assert that the statute of
3   limitations would not begin to run until Mark
4   Karpeles said, "Sorry, I'm washing my hands
5   of this," with his Japanese letter, which I
6   believe came in March of 2012.
7      BY THE COURT:  Okay.  So your position
8   is that if this is a good, even if it was
9   delivered, the theft of that good is still
10  subject to a six-year statute of limitations
11  under the UCC?
12     BY MR. MARTIN:  Well, Your Honor, we
13  also assert that it had not be delivered
14  because it was -- at this time, it was always
15  in Mt. Gox's wallet.  It wasn't in our -- our
16  client's wallet.
17     BY THE COURT:  Okay.
18     BY MR. MARTIN:  So it's still being held
19  under the care and custody of Jed McCaleb.
20     BY THE COURT:  Okay.  All right.  So
21  that's one issue.  Keep going.
22     BY MR. MARTIN:  The other issues,
23  Your Honor -- I think that's our strongest
24  issue -- argument on that side.  But we also
25  have a series of e-mails, which I'm sure the

1    Court has now seen, that goes to every

2    estoppel argument that there is, fraudulent

3    concealment, equitable estoppel, promissory

4    estoppel, where Jed McCaleb is constantly

5    telling our client, also along with Mark

6    Karpeles, "Don't worry.  We're going to do an

7    investigation.  Baron's threatened to sue us.

8    Mark Karpeles is going to file a lawsuit in

9    Japan to make sure that we're fine.  You

10   know, we have to cover ourselves."

11       In December of 2011, Jed McCaleb sends an

12   e-mail to Chris Raggio saying, "Don't worry.

13   Mark Karpeles is doing everything by the

14   book."  Yet when you look at the e-mails that

15   the defendant turned over, if you look at

16   these 6,000 e-mails that we found from a

17   third-party source in Japan, you see that

18   there is ultimate chaos going on in Mt. Gox

19   the entire time, that both Jed McCaleb and

20   Mark Karpeles were at loggerheads with

21   another one.

22       Jed McCaleb was -- from what I can --

23   from what I can tell from these e-mails was

24   wanting to get paid.  Mark Karpeles keeps

25   putting him off.  There's evidence that

```
 1          Mt. Gox was insolvent, that it was a

 2          fractional reserve exchange. And Jed McCaleb

 3          keeps quiet about this the entire time.

 4          Never says anything to my client, never says

 5          anything to any other -- any other Mt. Gox

 6          customers about his concerns about Mark

 7          Karpeles' management of Mt. Gox.

 8               BY THE COURT: Okay. All right. Got

 9          you. All right. I have -- I have -- those

10          are all my preliminary questions. And,

11          Mr. Gault, do you have something to add?

12               BY MR. GAULT: Yeah, just one thing. So

13          the Court has raised UCC. And one of the

14          things that I wanted to talk about today, so

15          their complaint just -- I think has maybe two

16          sentences of UCC, no reference to any UCC

17          section.

18               If they're going to make a claim under

19          the UCC, I -- I would suggest that that be

20          fleshed out so that we know what that claim

21          is, because we may take issue with the Court

22          of whether it's a good or not because there's

23          writings and findings and cases on both sides

24          of that. And we may -- we may take a

25          different position. But if that's going to
```

```
 1        be -- if they're going to travel under the

 2        UCC, we need to know what section.

 3             BY THE COURT:  Yeah.  Well, I was -- one

 4        of the reasons I wanted to raise this issue

 5        was I agree that there are certain causes of

 6        action that must be pled if we're traveling

 7        under the UCC versus a general tort

 8        negligence claim or general common law torts.

 9        And I don't know if there has been a

10        scheduling order.  That was one of the

11        questions I was going to ask.  Is there a

12        scheduling order in this case?

13             BY MR. MARTIN:  There is not,

14        Your Honor.

15             BY THE COURT:  Okay.  So there was no --

16        there has been no deadline set for amendment

17        of the pleadings?

18             BY MR. GAULT:  No.  No, Your Honor.

19        And -- and honestly what -- what we did, I

20        mean, from the beginning, we filed our motion

21        on statute of limitations --

22             BY THE COURT:  That's right.  Right.

23             BY MR. GAULT:  -- and it kind of took a

24        while and it kind of took a while and things

25        have built up.  And really beyond that, you
```

1   know, nothing has happened.  So we -- no, we

2   don't have a scheduling order.  We don't have

3   any deadlines in place.

4       BY THE COURT:  Okay.  One of the things

5   I want to come out of this hearing today with

6   is a scheduling order with a deadline for

7   amendment of the pleadings because -- I

8   understand different courts have different

9   views on what is procedurally proper and

10  desirable in controlling a civil case.  For

11  me, I feel like we have to know what claims

12  are at issue before we -- determine that

13  we've completed all our discovery before we

14  file our dispositive motions.

15      So the Court is going to put in place a

16  scheduling order.  It's going -- I don't know

17  if you've seen it.  I have a template for a

18  scheduling order I've used in -- I'm using in

19  all my civil cases.  So we will have a

20  deadline for amendments to the pleading.

21  We'll have an expert deadline for plaintiff,

22  expert deadline for defendant, discovery

23  deadline, dispositive motion deadline.

24      How long of a period of discovery -- and

25  that's going to drive everything I give you.

```
 1          How much -- how long of a period of discovery

 2          does the plaintiff believe they need in this

 3          case with timely rulings on your pending

 4          discovery motions?

 5              BY MR. MARTIN:  Yes, Your Honor.

 6          Mr. Gault and I discussed this yesterday

 7          briefly.  We feel that we would probably need

 8          a year with a trial set for sometime in the

 9          latter half of next year.

10              BY THE COURT:  Okay.  Mr. Gault, what is

11          your position on the length of time on

12          discovery?

13              BY MR. GAULT:  And we did talk yesterday

14          trying to resolve some of these massive

15          number of discovery motions, which I know

16          you -- the courts hate.  So we talked about

17          setting a trial date in -- sometime in the

18          back half of next year.

19              In terms of how much discovery, you know,

20          I don't know -- they've already deposed my

21          client.  I haven't deposed either plaintiff.

22          I just don't know why we would need much more

23          than six, nine months for discovery.  I mean,

24          I just don't know that it will be that much.

25              BY THE COURT:  All right.  All right.
```

```
1          If I gave you a nine-month -- nine-month

2     discovery period, you would have to -- the

3     plaintiff -- that would give the plaintiff

4     about four months to designate their experts.

5     Would four months of additional discovery

6     give you enough time to designate your

7     experts?

8          BY MR. MARTIN:  We feel comfortable with

9     that, Your Honor.

10         BY THE COURT:  Okay.  All right.  And

11    then I'd give you five months to designate

12    yours.

13         BY MR. GAULT:  Would be fine.

14         BY THE COURT:  Would you be good with

15    that?

16         BY MR. GAULT:  Would be fine.

17         BY THE COURT:  Okay.  All right.  And

18    then I'll work from that to give you a

19    scheduling order.  I'm going to probably give

20    you 60 days from today to amend the -- the

21    deadline to amend the pleadings.

22         BY MR. MARTIN:  Yes, Your Honor.

23         BY THE COURT:  And then any -- any

24    deadline can be -- those are firm deadlines,

25    but obviously good cause shown always
```

```
 1          entitles a party to relief.  But I'm -- I'm a

 2          believer in giving fair deadlines and I'm a

 3          believer in holding parties to deadlines

 4          because the prejudice that results is often

 5          something you can't quantify.  So the -- the

 6          default rule is going to be we're going to

 7          stick with those deadlines.

 8               And then I will do my best, because of

 9          the size of this case, to give plenty of time

10          between the dispositive motion deadline and

11          the trial date in order to allow for

12          dispositive motions to be filed, a hearing, a

13          ruling, and still give you enough time to

14          then prepare for trial.  So I'm going to -- I

15          will do my best to give you deadlines you can

16          work with.  Okay.

17               BY MR. GAULT:  Your Honor --

18               BY THE COURT:  Yes, sir.

19               BY MR. GAULT:  -- talking about the

20          scheduling order, would we need to wait until

21          discovery is over to file a dispositive

22          motion?  And this is what I'm thinking.

23          There's a fairly significant difference in

24          the two sides on the measure of damages here.

25          All right.  We think we're going to win on
```

1     the facts, we think we're going to win on the

2     law, but let's just for the sake of

3     discussion say they do.

4          What are their damages?  We'd say their

5     damages are 3,000 bucks.  They'd say they're

6     60 million.  So I'm -- I'm wondering if --

7     and in my mind, I'm thinking that we could

8     maybe file a motion for partial summary

9     judgment on the measure of damages at some

10    time, you know, prior to us getting, you

11    know, into -- through discovery.

12         BY THE COURT:  All right.  I'm -- my

13    general rule on dispositive motions is I'm

14    not going to tell you when you file them.

15    I'm going to tell you when they have to be on

16    file.

17         BY MR. GAULT:  Okay.

18         BY THE COURT:  So if a party wants to

19    file a dispositive -- partially dispositive

20    or fully dispositive motion at any time, the

21    only thing I would caution you on is if

22    discovery is still ongoing, obviously 56(f).

23    And what I'm hearing you talk about very well

24    may implicate or may turn on the issue of

25    cover and the discovery on that issue and --

1    but I'm not going to --

2         BY MR. GAULT:  Understood.

3         BY THE COURT:  -- tell a party they

4    can't file a dispositive motion at any time.

5    The plaintiff can file a partially

6    dispositive or fully dispositive motion

7    anytime you think it's ripe.  The defendant

8    can do too.

9         BY MR. GAULT:  Understood.

10        BY THE COURT:  Okay.  All right.  I have

11   gone through all of your motions, and I want

12   to start with the plaintiff's motion --

13   Docket Number 80, plaintiff's motion to

14   compel discovery responses.

15        I want to make a general comment before

16   we start on the specific motions.  The reason

17   I wanted to get the facts in my mind before

18   we started ruling on -- I started ruling on

19   these motions is it seems to me that both

20   sides are trying to do an awful lot of

21   fishing, and I'm not going to let one side

22   fish and the other side not.

23        So in some ways, my rulings on those

24   motions I hope reflect the fact that I

25   believe both sides are trying to do a whole

```
 1        lot of improper fishing.  And that's not -- I

 2        understand in litigation we try to cast the

 3        net as broad as we can and then we bring it

 4        in.

 5            And part of the reason I asked about any

 6        evidence to substantiate the claims that

 7        either side is this hacker is, as a general

 8        proposition, I don't believe the personal

 9        financial information of any party, absent a

10        specific showing, is ever going to be

11        discoverable, just in a general -- I view

12        this as a general commercial dispute.  Okay.

13            The plaintiff ordered something.  It may

14        or may not have been delivered.  It may

15        have not -- may or may not have been stolen

16        as a result of negligence of the defendant.

17        That's what this case is about.

18            I don't think the personal financial

19        information of the individual defendant is

20        relevant.  I don't think the personal

21        financial information of the plaintiff is

22        relevant, with one exception.  The issue of

23        cover is a real issue in this case.  As

24        Mr. Gault said -- and I'm not agreeing with

25        his numbers, but as Mr. Gault said, the issue
```

of cover may make this a $3,000 case or a
$60 million case.

So the plaintiff's trading history in
virtual currency and bitcoins is relevant to
a substantive issue in this case. Therefore,
I believe -- and I want to hear from you on
this, but I just want you to know where I'm
thinking before we start tackling this. I
believe that while as a general proposition
the financial information of both parties is
not discoverable, the very limited or narrow
issue of plaintiff's trading history and
bitcoin and virtual currency is relevant to
an issue in this case.

So that's my general thought on the law
and my general thought in reviewing these
motions. So I want to hear the plaintiff
first on Docket Number 81, which is his
motion to compel the personal financial
information of -- of the individual defendant
Mr. McCaleb.

BY MR. MARTIN: Yes, Your Honor.

BY THE COURT: And I've read your
papers. So, I mean, if you have something
you want to add or if you want to tell me why

1    you disagree with my -- or tell me if I'm

2    wrong on the general law that the --

3    generally, as a proposition, the financial

4    information of a party is not relevant.

5    Why -- why in this case has the plaintiff met

6    their burden to show that Mr. McCaleb's

7    personal financial information is relevant?

8         BY MR. MARTIN:  Well, Your Honor, this

9    case -- I've been practicing law for 16

10   years.  I think this is probably the most

11   interesting case I've ever had a chance to

12   practice on.

13        In this case, we have e-mails -- a

14   substantial amount of e-mails that were

15   turned over from this third party, along with

16   the BancorpSouth document, which I believe

17   has been produced for the account of Chris

18   Raggio, that shows money being directly wired

19   into Jed McCaleb's own personal bank account

20   at Mt. Gox.  Mt. Gox never had a corporate

21   account.

22        BY THE COURT:  Understood.

23        BY MR. MARTIN:  So every bit of money

24   from every Mt. Gox customer apparently was

25   going into Jed McCaleb's account.  We want to

```
 1        see where that money is going.  Was it

 2        actually being used for the purchase of

 3        bitcoins?  Was it actually being used to fund

 4        Mt. Gox customers' accounts, specifically our

 5        own client's?

 6             BY THE COURT:  Why is that relevant to

 7        the 9,400 bitcoins at issue in this case?

 8             BY MR. MARTIN:  Well, Your Honor,

 9        there's several things.

10             BY THE COURT:  Okay.  And again, that's

11        why I asked the preliminary question.  This

12        is an identifiable good.  These are specific

13        goods.  We -- we know what your client

14        attempted to purchase.  So why is what the

15        individual defendant is doing with respect to

16        other customers or other orders, even other

17        orders for your client -- how is that

18        relevant?

19             BY MR. MARTIN:  I think, again, it goes

20        to show the level of mismanagement at

21        Mt. Gox, what was being done in regards to

22        the 9,400 bitcoins.  Was there ever an

23        investigation being conducted?  And I think

24        it's important to -- to remind the Court that

25        these bitcoins came back into an account at
```

1    Mt. Gox, let's call it the Baron account,

2    that had a certain number of bitcoins along

3    with $45,000 in U.S. cash.

4        BY THE COURT:  Right.

5        BY MR. MARTIN:  We have a Skype log that

6    shows a chat between Mark Karpeles and Jed

7    McCaleb where Mark Karpeles is talking about

8    the financial situation at Mt. Gox.  But then

9    Jed McCaleb reminds him, "Hey, you have Baron

10   bitcoin."  Later on he reminds him, "Hey,

11   there's cash in the Baron account."  Looking

12   at this, I come to the conclusion that he's

13   telling him, "Go ahead and dip into this."

14       I think that this shows malfeasance on

15   behalf of both Mark Karpeles, but more

16   importantly our California defendant, who all

17   the time is telling our client, "Don't worry.

18   We're going to take care of you.  Mark

19   Karpeles is doing everything by the book.

20   We're conducting an investigation."

21       BY THE COURT:  Okay.  Mr. Gault, do you

22   have any response?

23       BY MR. GAULT:  I do, Your Honor.  So the

24   Court is right on in that the financial --

25   the bank records, the tax returns, the

```
 1            investment accounts, all of those financial

 2            records have to do with did Jed steal the

 3            bitcoins and take that money and stick it

 4            into his account or did Chris Raggio take

 5            that money and stick it into his account at

 6            BancorpSouth.

 7                 The three of us were meeting last week

 8            and going through all this and debating it.

 9            And -- and I -- and I said, "I'll be honest

10            with you.  Where is the evidence that Chris

11            Raggio did it?  Where's the evidence that Jed

12            did it?  There is none."  And the truth of

13            the matter is neither side ought to get this.

14            And when Your Honor asked when -- right when

15            we got here what proof did we have, that was

16            kind of the way I saw this.

17                 So what he just talked about as to all

18            that other stuff, that has nothing to do with

19            the financial records.  That may be his

20            theory, but the financial records, the tax

21            returns, the bank records, the investment

22            account have nothing to do with that

23            allegation that he makes.  It has to do with

24            only the theft and trying to prove the money

25            went into some account.
```

1          And so I think that Your Honor is exactly

2     right with respect to these financial

3     records.  So what -- again, and I guess in

4     response to him, what he was talking about

5     these financial records, have nothing to do

6     with it.

7          BY THE COURT:  Okay.  The Court -- the

8     Court is going to find that the personal

9     financial records of Mr. McCaleb are not

10    relevant to the issues in dispute in this

11    case.  The Court believes that plaintiffs

12    have to meet a burden to show -- a

13    particularized burden to show the relevance

14    of personal financial information of the

15    individual defendant under these facts and

16    circumstances, and the plaintiff has not met

17    the burden to show that they are relevant to

18    specific facts in this case to meet their

19    burden.

20         Therefore, the general rule that the

21    personal information of a party is not

22    discoverable will be enforced by the Court.

23    And the Court is going to deny the motion to

24    compel, Docket Number 81, regarding the tax

25    returns, financial statements and bank and

1       investment records of Mr. McCaleb.

2           The next motion before the Court is

3       plaintiff's motion to quash and for

4       protective order.  The subject of this motion

5       is third-party subpoenas issued to UMC and

6       BancorpSouth.  Now, with respect to the UMC

7       e-mail account, was the plaintiff

8       transmitting e-mails from that account

9       relevant to the transaction at issue in this

10      lawsuit?

11          BY MR. MARTIN:  No, Your Honor, never.

12          BY THE COURT:  Okay.  What is the

13      defendant's position on that?

14          BY MR. GAULT:  We -- we would disagree.

15      The e-mails show that there's an e-mail from

16      our client to their client that says, "Hey,

17      somebody has just logged into your account

18      from an UMMC e-mail address."  His client

19      responds, "That's us."  I got the e-mail here

20      if Your Honor wants to see it.

21          BY THE COURT:  Okay.  My general view on

22      the subpoena to UMC is much like my general

23      view on the Google subpoena.  It seems to be

24      far too broad to seek all e-mails.  Now,

25      my -- my concern is I do believe both sides

1    are entitled to e-mail from the UMC e-mail

2    account as well as from the Gmail account of

3    the individual defendant.  So I kind of want

4    to generally talk about really both together.

5         It seems to me -- does -- does the

6    plaintiff have access to his e-mail account

7    on the UMC server?

8         BY MR. MARTIN:  I don't believe.  He no

9    longer does, Your Honor.

10         BY THE COURT:  Okay.  He no longer has

11    that access?

12         BY MR. MARTIN:  Donald Raggio still

13    does, but Chris Raggio does not.

14         BY THE COURT:  Okay.  Was it -- which

15    Raggio's e-mail account was the e-mails that

16    you have sent or received from?  My

17    understanding was it was the father's

18    account.

19         BY MR. GAULT:  Well, Your Honor, that's

20    a question that I have a difficult time

21    answering, because as the e-mails started

22    out, they were from Donald Raggio's, I think,

23    Gmail account, but it was really Chris Raggio

24    sending them the whole time on his dad's

25    e-mail, which is a little strange.  And we'll

```
 1          get into that.  So to answer your question,

 2          they -- they've come from both on Gmail.  I

 3          do not know about UMMC.

 4               BY THE COURT:  Okay.  If I allow the

 5          subpoena to be served -- I want to hear from

 6          the plaintiff on this.  What would your

 7          objection be to much like the subpoena with

 8          respect to Google, that the subpoenaed

 9          e-mails be delivered to you, that you are

10          provided with a list of search terms by

11          defendant, and that you run those search

12          terms, you take that -- the e-mails that are

13          yielded from the search terms, you review

14          them for privilege, and anything that is

15          relevant to this case, identified through

16          their search terms, you produce to the -- to

17          the plaintiff -- or the defendant?

18               BY MR. MARTIN:  We'd have no objection

19          to that, Your Honor.

20               BY THE COURT:  Okay.  Does the defendant

21          have any objection to that?

22               BY MR. GAULT:  No, Your Honor.

23               BY THE COURT:  Okay.  All right.  With

24          respect to the UMC e-mail, what I'm going to

25          order is that the subpoena require the
```

```
 1          production of those e-mails to plaintiff's

 2          counsel.  The defendant will provide a list

 3          of search terms to plaintiff's counsel.

 4          Plaintiff's counsel will run those search

 5          terms, will review the e-mails that those

 6          search terms yield for privilege, and any

 7          e-mails that are not privileged shall be

 8          produced to the defendant.

 9              And if the plaintiff believes that there

10          is a privileged e-mail, that that shall be

11          logged and the log shall be delivered to the

12          defendants.  That's my ruling on the motion

13          to compel with respect to the UMC subpoena.

14              With respect to the BancorpSouth

15          subpoena, the Court is concerned about the

16          scope of the subpoena.  Again, I believe that

17          the personal financial information of the

18          plaintiffs, just like the individual

19          defendants, is not relevant in this case,

20          with -- with the singular exception of

21          Mr. Raggio's trading history in bitcoin or

22          other virtual currency, as that goes to the

23          issue of damages recovered.

24              Is the defendant -- would the defendant

25          have any objection to limiting the subpoena
```

```
 1          to BancorpSouth to only those records?
 2               BY MR. GAULT:  To only the records --
 3          trading records?
 4               BY THE COURT:  Well, my -- my concern
 5          with the BancorpSouth subpoena is it's just
 6          too broad.
 7               BY MR. GAULT:  Understood.
 8               BY THE COURT:  How can we limit that to
 9          the singular issue of what the Court believes
10          is relevant?
11               BY MR. GAULT:  So, Your Honor, I don't
12          know that the -- I don't think that the
13          BancorpSouth records --
14               BY THE COURT:  Would show that?
15               BY MR. GAULT:  -- would show any kind of
16          trading of cryptocurrency.  So it may just be
17          that Your Honor's ruling for that ought to be
18          like the financial for Jed's.
19               BY THE COURT:  Okay.  Sir, is there
20          any -- do you have any reason to believe that
21          Mr. Raggio's BancorpSouth records would
22          reflect any trading in cryptocurrency?
23               BY MR. MARTIN:  The only thing it would
24          reflect would be the deposits made into Jed
25          McCaleb's bank account.
```

1                BY THE COURT:  Okay.

2                BY MR. MARTIN:  And I believe that --

3        those documents have already been turned

4        over.

5                BY THE COURT:  Okay.  The Court is going

6        to grant plaintiff's motion to quash with

7        respect to the subpoena issued to

8        BancorpSouth.

9                BY MR. GAULT:  And, Your Honor, just

10       housekeeping --

11               BY THE COURT:  Yes, sir.

12               BY MR. GAULT:  On the UMMC, the subpoena

13      is for plaintiff's employment records to

14      personnel files.

15              BY THE COURT:  Yes, sir.  What I'm --

16      what I'm -- I am quashing that subpoena --

17              BY MR. GAULT:  Understood.

18              BY THE COURT:  -- to the extent that it

19      seeks anything other than the production of

20      e-mails.

21              BY MR. GAULT:  Okay.

22              BY THE COURT:  Those e-mails will be

23      delivered to plaintiff.  Plaintiff shall run

24      the search terms that defendant identifies,

25      review those e-mails that the search terms

```
 1                    yield, assert any privilege, and provide the

 2                    e-mails as well as a log to the defendant.

 3                         BY MR. GAULT:  Understood.

 4                         BY THE COURT:  All right.  The next

 5                    motion is Docket Number 97, plaintiff's

 6                    motion to reopen the deposition and compel

 7                    testimony.  The Court does not believe that

 8                    the additional testimony sought is relevant

 9                    to the issues in this case; therefore, the

10                    Court's going to deny that motion.

11                         I want to take the sanctions motion up

12                    last.  So the next motion is plaintiff's

13                    motion for protective order seeking the

14                    doctor's tax returns, financial accounts and

15                    bitcoin -- bitcoin holdings, purchases and

16                    sales.

17                         For the reasons that the Court previously

18                    discussed, the Court does not believe that

19                    defendant's tax returns -- I mean, that --

20                    strike that.  The Court does not believe that

21                    the plaintiff doctor's tax returns are

22                    relevant.  The Court finds that the financial

23                    accounts to the extent they reflect trading

24                    in bitcoins or cryptocurrency are relevant,

25                    and therefore the Court will grant that
```

1    motion in part but deny that motion in part.

2        And the Court is going to require the

3    plaintiff to produce financial account

4    information regarding the trading in bitcoins

5    as well as information regarding bitcoin

6    holdings.

7        BY MR. MARTIN:  Your Honor, just -- just

8    for clarification, is that limited only to

9    bitcoin or does it also include other

10    cryptocurrency?

11        BY THE COURT:  All cryptocurrency.

12        BY MR. MARTIN:  Yes, Your Honor.

13        BY THE COURT:  Okay.  Plaintiff, with

14    respect to your motions -- the motion for

15    sanctions, I'm going to do that one last.  Do

16    you have any other discovery dispute that

17    you -- that the plaintiff asserts that you'd

18    like the Court to address?

19        BY MR. MARTIN:  I think we covered

20    everything, Your Honor.

21        BY THE COURT:  Okay.  All right.  Now

22    we're going to go to defendant's motions.

23    The first motion is Docket Number 129,

24    defendant's motion for protective order.

25    Okay.  The subject of this motion for

1    protective order is a request by plaintiff

2    for defendant to authenticate 13,722 pages of

3    e-mails that were obtained by the plaintiff

4    from a third party.

5        As a general proposition, requests for

6    admission for authenticity need to be limited

7    to the issues in dispute in this case.   The

8    Court, based on the information provided by

9    counsel, finds that all 13,722 pages of these

10    documents could not possibly be relevant to

11    the issues in dispute in this case.

12        The Court believes plaintiff is entitled

13    to request to admission in a reasonable

14    number, seeking authentication of documents

15    obtained from a third party from the

16    plaintiff, but that that request for

17    authentication through request for admissions

18    need to be reasonably limited.   And the Court

19    finds that dumping 13,722 pages is not

20    reasonably limited.

21        The Court is going to grant the motion

22    for protective order, but the Court is going

23    to do that subject to the right of the

24    plaintiff to resubmit to the defendant a

25    reasonable number of e-mails or pages that

```
 1              were produced that the plaintiff in good

 2              faith believes are relevant to the facts and

 3              issues in dispute in this case.

 4                   And, sir, I'm not going to limit you --

 5              I'm not going to put a numerical limit on

 6              you.  If you tell me -- you represent to the

 7              Court that 1,000 of these pages are relevant

 8              to the dispute in this case, you can -- it

 9              will be certainly proper for you to serve

10              request for admissions on that 1,000 pages of

11              e-mails.  But I'm going to require you to

12              exercise some sort of review over these

13              13,722 pages before I'm going to obligate the

14              defendant to respond to them.

15                   But I'm not going to in any way attempt

16              to unreasonably limit you in -- in your

17              request.  If in good faith you represent to

18              the Court that you have gone through these

19              documents, and whatever number pages you

20              believe are relevant, I'm going to require

21              them to authenticate them -- to review them

22              and authenticate them.

23                   BY MR. MARTIN:  Yes, Your Honor.

24                   BY THE COURT:  The next motion is the

25              motion to compel discovery responses in
```

1    Docket Number 134.  Mr. Gault, what is the

2    subject -- what is the actual discovery

3    device at issue in this motion?

4        BY MR. GAULT:  One second, Your Honor.

5        BY THE COURT:  These -- these are --

6    these are interrogatories.

7        BY MR. GAULT:  So I was just looking at

8    that, Your Honor.  It is -- there are

9    interrogatories and there are requests for

10    production as well.

11        BY THE COURT:  Okay.  I believe that my

12    prior ruling covers the subject of this

13    discovery motion, that as a general

14    proposition, the personal financial

15    information is not discoverable and

16    plaintiffs have no obligation to produce to

17    the defendant personal financial information,

18    with the exception of records reflecting the

19    trading by the plaintiffs in cryptocurrency.

20        BY MR. GAULT:  That's right, Your Honor.

21    And there are specific interrogatories and

22    requests for production that cover that

23    latter part.

24        BY THE COURT:  Okay.  Again, sir, the

25    plaintiff is not required to provide general

1    information.  But that limited specific

2    amount of financial information, I'm going to

3    order that you provide that to the defendant

4    in the form of interrogatory responses, if

5    that's appropriate, or you're certainly

6    entitled to point them to documents if that's

7    sufficient to answer the question of the

8    trading during the relevant time period.

9          BY MR. MARTIN:  Yes, Your Honor.

10          BY MR. GAULT:  And, Your Honor, we do

11    have a request for production that would

12    cover that.  And so if they have documents,

13    regardless of whether they give us the

14    information in the interrogatory, they'll

15    need to produce the documents as well?

16          BY THE COURT:  Yes, sir.  What I'm

17    trying to do, sir, is to give you an

18    opportunity.  If you can answer the

19    interrogatory so limited by referencing

20    specific documents, you're not required to do

21    it both ways.  You can give them the

22    documents or you can give them an

23    interrogatory response and the documents, as

24    long as the documents reflect all trading

25    during the relevant time period in

```
 1            cryptocurrency by the plaintiffs.

 2                 BY MR. MARTIN:  Yes, Your Honor.

 3                 BY MR. GAULT:  Your Honor, the -- the

 4            relevant time period, I guess that's a good

 5            point we ought to bring up.  This theft, for

 6            lack of a better word, was in 2011.

 7                 BY THE COURT:  Correct.

 8                 BY MR. GAULT:  So would the relevant

 9            time period be from, say, 2011 through today

10            or would it be --

11                 BY THE COURT:  No, sir.  No, sir.

12                 BY MR. GAULT:  -- would it be through,

13            say, 2014, '15?

14                 BY THE COURT:  Did you -- do your -- do

15            your requests have a time limit?

16                 BY MR. GAULT:  Good question.  We go

17            2010 through the filing of the lawsuit, which

18            was in 2014.

19                 BY THE COURT:  The Court believes that

20            six months prior to the alleged theft is

21            reasonable, and the Court believes that two

22            years after the alleged theft is reasonable.

23            So the Court is going to grant the motion for

24            protective order -- or grant a motion for

25            protective order to the extent that those
```

```
1        discovery requests regarding the trading

2        history seek information more than six months

3        prior to January of '11 and more than two

4        years after January of '11.  So it's going to

5        be six months before and two years after the

6        trading history.

7             BY MR. GAULT:  Yes, Your Honor.  And we

8        understand and accept that ruling with this

9        caveat, is that if and when we get the

10       documents -- you know, sometimes these

11       traders will get coins and hold them and

12       sometimes they're for a long time, sometimes

13       they're short time.  If the documents show

14       that there may be relevancy beyond the two

15       years, I just want to make sure we can come

16       back to the Court --

17            BY THE COURT:  Yes, sir.  Mr. Gault, I'm

18       certainly not going to limit your ability

19       after receiving the discovery to come back in

20       and -- and make an argument as to why

21       additional time either before or after is

22       relevant based on the documentation.  But I'm

23       not -- I am going to put reasonable limits at

24       the outset, just like I've done on the

25       discovery that you're entitled to.
```

1    BY MR. GAULT:  Understood.

2    BY THE COURT:  The next motion is Docket

3    Number 160, motion for leave to file surreply

4    and incorporate surreply motion to motion for

5    sanctions.

6    As a general proposition, if a party has

7    something they want to say to the Court, even

8    if they don't do it in writing, I'm going to

9    allow you to argue the motion orally, so I'm

10    going to hear the argument anyway.  So the

11    Court's going to grant that motion.  So

12    Docket Number 160 is granted.

13    The final motion is motion for

14    reconsideration with respect to the subpoena

15    that was served on Google.  The Court cannot

16    imagine that it was contemplated that that

17    subpoena would yield 76,000 e-mails.  It

18    seems to me that that couldn't have been

19    contemplated by the Court.  Although I don't

20    know what was contemplated by the Court, that

21    couldn't have been contemplated.

22    So I do believe that plaintiff is

23    entitled to what I would almost call

24    confirmatory discovery.  My understanding is

25    that Mr. McCaleb has produced to the

1  plaintiff the e-mails that he believes are

2  relevant to this dispute, but that the

3  plaintiff is entitled to confirm that through

4  a serve -- what I would call essentially a

5  server level search of the Gmail e-mails.  My

6  concern, however, is the cost associated with

7  the defendant's search of the e-mails.

8      The Court believes that it would be

9  reasonable under these circumstances to

10  require the plaintiff to provide to the

11  defendant a list of search terms.  The

12  defendant will then run those search terms

13  and will determine what the volume of e-mail

14  is.  If the volume is not too great -- and, I

15  mean, that's a gray area because I can't

16  guess when we're talking about 76,000

17  e-mails.  I have no way to guess how many the

18  search terms will yield.

19      Now, I will say this, sir.  If you

20  provide to him a search term "bitcoin,"

21  that's going to yield a far greater volume

22  than if you provide search terms that are

23  much more narrowly tailored.  I'm going to

24  require that the defendant run the search

25  terms and then come back to the Court with an

1    announcement of how many pages of e-mails the

2    plaintiff's search terms yield.

3        If the Court believes that the number of

4    e-mails would not impose an undo burden on

5    the defendant to review them for privilege

6    and produce them, that's what the Court is

7    going to do once it knows what the universe

8    is.   However, if the plaintiff provides a

9    list of search terms that are so broad and it

10   cuts it in half and there's 37,000 pages that

11   have to be reviewed, the Court is going to

12   consider cost shifting under the Rules of

13   Mississippi Civil Procedure.

14        So in some ways, sir, the plaintiff is

15   going to be in control of, to the extent you

16   can know through your search terms, whether

17   the Court is going to require the defendant

18   to pay for that privilege review or require

19   the plaintiff to do it.   So I would just ask

20   that you carefully consider the search terms

21   you provide, because if they're too broad, it

22   may pose an undo burden on the defendant.

23        But if they're narrowly tailored, the

24   Court is going to enforce the general rule

25   that a party is responsible to cover the

```
 1              costs of reasonable discovery by the other
 2              side.  So that's going to be my ruling on the
 3              motion to consider reconsideration.
 4                   So again, just so the record's clear, the
 5              plaintiff will provide to the defendant a
 6              list of search terms.  The defendant will run
 7              those search terms in the 76,000 pages and
 8              will report to the Court the number of
 9              responsive documents.  Now, if the defendant
10              believes that it's a small universe and the
11              defendant is willing to -- to cover the cost
12              of that and do a privilege log and produce
13              them to the plaintiff without further
14              intervention of the Court, that can be done
15              amongst the parties.
16                   However, if the defendant believes that
17              the search terms yield too great a volume and
18              that it's an undo burden on the defendant to
19              review them, I want the defendant to file a
20              supplement to this motion with the Court and
21              the Court will promptly rule on -- on that
22              motion.
23                   Does the defendant have any other
24              discovery issues?
25                   BY MR. GAULT:  No, Your Honor.
```

1         BY THE COURT:  Okay.  All right.  Now I

2    want to hear from plaintiff on their motion

3    for sanctions.  I have read the papers, but I

4    do not want to curtail either party in making

5    their record on this motion.  So I want the

6    plaintiff -- I want you to make your

7    argument, and you make whatever argument you

8    want to make on the motion for sanctions.

9         BY MR. MARTIN:  Yes, Your Honor.

10   Your Honor, as you're aware, having looked at

11   the record in this case, our motion for

12   sanctions is predicated on these third-party

13   e-mails that we received from a gentleman in

14   Japan who had shown great interest in

15   Mt. Gox, had written several blog articles.

16        And his theories align with ours in

17   regards to what happened at Mt. Gox

18   thereafter, after Jed McCaleb and the theft

19   of the bitcoins and whatnot, issues that may

20   or may not be relevant to this instant

21   matter.  I contacted him, and low and behold

22   he turns over these 6,000 e-mails that appear

23   to be a fairly large volume of e-mails that

24   were located on the Mt. Gox server and that

25   were sent or received by Jed McCaleb.

1          To back up a little bit, though, we

2     originally submitted our first request for

3     production of documents to the defendant, and

4     a certain number of documents were turned

5     over.   Thereafter, we located a Daily Beast

6     article that referenced an April 28th, 2011,

7     e-mail between Jed McCaleb and Mark Karpeles

8     referencing a loss of 80,000 bitcoins from

9     Mt. Gox.

10         I sent a good faith letter.   These

11    documents, including that April 28th e-mail,

12    were turned over, along with the language

13    that all correspondence between the defendant

14    and Mark Karpeles were being produced.   Once

15    we looked at these documents that were

16    produced, lined them up with what we had from

17    the third party, we saw that there were a

18    certain amount of e-mails that were never

19    turned over by Mr. McCaleb.

20         BY THE COURT:   And that's about 18

21    e-mails; is that correct?

22         BY MR. MARTIN:   Sixteen e-mails and what

23    would purport to be two drafts.

24         BY THE COURT:   Two drafts.   It was 18

25    total.   Okay.

1       BY MR. MARTIN:  Right.  Now, looking at

2   these e-mails -- let's start with the two

3   drafts.  There's a draft from July of 2011,

4   which basically is lambasting Mark Karpeles

5   and his management as CEO or majority partner

6   of Mt. Gox, telling him, "You're F'ing up

7   Mt. Gox.  You need to step down.  You need to

8   get a CEO."  There's -- on and on and on.

9   Basically a laundry list of what's wrong.

10      There's another draft e-mail that comes

11  in February of 2012 where he basically

12  reiterates -- reiterates this same language

13  to him.  In regards to the -- the 16 e-mails

14  that were actually sent, there's one that

15  falls on the same day in February of 2012,

16  the same day that he drafts the second draft

17  that he apparently did not send, again

18  complaining about Mark Karpeles' management

19  and whatnot.

20      Mark Karpeles responds by saying,

21  "Mt. Gox has been operating illegally the

22  entire time.  We're not a licensed money

23  transmitter," and so on.  Jed McCaleb really

24  doesn't have much to say to that, Your Honor.

25  There's another e-mail that falls in March of

1   2012 where he asks Mark Karpeles -- or he's

2   asking him essentially, "Are you using

3   customer deposits to pay the bills at

4   Mt. Gox?"

5   We filed the motion for sanctions. They

6   responded that they turned over all relevant

7   documents. Jed McCaleb swore an affidavit

8   out that he didn't have these 16 e-mails, but

9   he had -- did have the two drafts, that Mark

10   Karpeles' name was not listed on these two

11   drafts so he never would have found it.

12   But I think if you look at these two

13   drafts, you look at some of the 16 e-mails,

14   it's pretty apparent why he didn't want these

15   e-mails to be turned over. They're -- they

16   show egregious behavior on behalf of Mark

17   Karpeles that Jed McCaleb more or less went

18   along with by not ever saying anything

19   publically to his customers. Remember,

20   during this entire time --

21   BY THE COURT: I understand that, but my

22   question is going to be very specific. The

23   e-mail -- the -- strike that. The search

24   terms that the defendant used when it

25   initially went through the e-mails for your

```
 1    production -- for the production to the
 2    plaintiff, would any of the 16 e-mails that
 3    were actually sent, would they have resulted
 4    in a hit of one of those search terms where
 5    it would be reasonable or possible that the
 6    defendant pulled those e-mails -- that e-mail
 7    or those e-mails from the production?  Would
 8    a hit of a search term that were -- the
 9    search terms were provided, would that have
10    resulted in a hit on one of those 16 e-mails?
11         BY MR. MARTIN:  I'm unsure, Your Honor.
12    And the reason I'm --
13         BY THE COURT:  Okay.
14         BY MR. MARTIN:  -- unsure is because of
15    the affidavit that Jed McCaleb swore to --
16         BY THE COURT:  Okay.
17         BY MR. MARTIN:  -- and that it has
18    contradictions.  He lists certain search
19    terms.  But I -- but from what I can --
20    looking at this affidavit, he -- he swears in
21    the affidavit he never ran a search on the
22    e-mail address admin@mtgox.com.  That's
23    important.
24         They also mentioned that in their motion
25    for leave to file a surreply, that he never
```

1    ran a search for those documents.  Yet during

2    the first production of documents, before any

3    good faith letters were sent, before any

4    motions were filed, we received 99 of those

5    e-mails, which begs the question, what e-mail

6    address was he searching?

7        BY THE COURT:  Right.

8        BY MR. MARTIN:  There was an address

9    jed@mtgox.com, but that e-mail address wasn't

10   created until Mark Karpeles became an

11   88 percent partner.  That e-mail address was

12   created, I believe, March the 4th of 2011.

13   So that e-mail did -- did not exist until

14   seven or eight months into the existence of

15   Mt. Gox.

16       BY THE COURT:  Right.

17       BY MR. MARTIN:  Now, they're going to

18   argue that we're not prejudiced by this -- by

19   these lack of e-mails.

20       BY THE COURT:  Now, I -- I know that

21   argument.  What I want to hear from you is --

22   and this what I'm trying -- I'm truly trying

23   to determine this, and I have not made a

24   decision yet.  I'm trying to determine if

25   there is any evidence to suggest that a

1       search run by the defendants would have

2       yielded a hit on one of these 16 e-mails and

3       that the defendants pulled it from the

4       production.

5               BY MR. MARTIN:  Yes, Your Honor.  Will

6       you bear with me just for a moment,

7       Your Honor?

8               BY THE COURT:  Yes, sir.

9   (PAUSE IN PROCEEDINGS)

10              BY MR. MARTIN:  Yes, Your Honor, it

11      would.  Bear with me again just for a moment,

12      Your Honor.

13              BY THE COURT:  Yes, sir.  Take your

14      time.  This is an important issue.

15  (PAUSE IN PROCEEDINGS)

16              BY MR. MARTIN:  We feel it would,

17      Your Honor.  One of the search terms that he

18      claims that he ran was in regards to -- let

19      me make sure I'm reading this correctly,

20      Your Honor.  Yes, the sale of Mt. Gox to

21      Martin (phonetic).  I know that's open to

22      interpretation.

23              BY THE COURT:  Okay.  Wait a minute,

24      now.  That -- that's not a search term, the

25      sale of Mt. Gox.  It -- Mr. Gault, was that a

1    search term?

2         BY MR. GAULT:  Not to my knowledge.

3         BY MR. MARTIN:  Well, he -- he says in

4    here, "I searched for all e-mails discussing

5    the Raggios, the theft of bitcoins, Baron,

6    the sale of Mt. Gox to Martin.

7         BY THE COURT:  Okay.

8         BY MR. MARTIN:  I don't know exactly

9    what the search term he was running, but --

10        BY THE COURT:  Okay.  Was --

11        BY MR. MARTIN:  -- that was the subject

12   matter.

13        BY THE COURT:  Was -- were the specific

14   search terms that were run provided to the

15   plaintiff?

16        BY MR. MARTIN:  I don't believe they

17   were, Your Honor, no.

18        BY THE COURT:  Okay.  Mr. Gault, were

19   the specific search terms that were run by

20   Mr. McCaleb provided to the plaintiff?

21        BY MR. GAULT:  Prior to the search?

22        BY THE COURT:  No, sir.  In connection

23   with this motion for sanctions.

24        BY MR. GAULT:  Okay.

25        BY THE COURT:  Okay.  My understanding

```
 1          is the defendant's defense to this motion is
 2          they -- that Mr. McCaleb ran a list of search
 3          terms that were reasonable and that these 16
 4          e-mails would not have been yielded in that
 5          list of search terms.  Is that the
 6          defendant's position?
 7                 BY MR. GAULT:  No, Your Honor.
 8                 BY THE COURT:  Okay.  What is the
 9          defendant's position on why these e-mails
10          were missed?
11                 BY MR. GAULT:  Sure, Your Honor.  So
12          there are 18 e-mails at issue in the motion
13          for sanctions.
14                 BY THE COURT:  Right.  Two are drafts.
15          I'm not -- I can understand why that might
16          not have -- that's why I'm setting the two
17          drafts aside.  What I'm focusing on --
18                 BY MR. GAULT:  The other 16 --
19                 BY THE COURT:  -- is the 16.
20                 BY MR. GAULT:  -- we -- Jed does not
21          have, did not have, still does not have
22          within his thumb drive.  Essentially, he
23          downloaded --
24                 BY THE COURT:  So the Court is mistaken.
25          What the defendant's position is -- as I
```

```
 1    understand it, these e-mails were yielded
 2    through a search of the 13,000 pages of
 3    e-mails that the plaintiff obtained from a
 4    third party.  Is that correct, sir?  The 16
 5    e-mails that we're talking about here that
 6    were not produced by Mr. McCaleb, the
 7    plaintiff obtained those e-mails through a
 8    search of the 13,000 e-mails that the
 9    plaintiff obtained from a third party?
10         BY MR. MARTIN:  That is correct,
11    Your Honor.
12         BY THE COURT:  Okay.
13         BY MR. GAULT:  Correct.
14         BY THE COURT:  The defendant,
15    Mr. McCaleb, had a thumb drive with a subset
16    of those 13,000 e-mails; is that correct?
17         BY MR. GAULT:  Correct.
18         BY THE COURT:  Okay.  So the defendant's
19    position is the reason these 16 e-mails were
20    not produced was because the defendant didn't
21    have access to them and could not have
22    produced them?
23         BY MR. GAULT:  Didn't have them, doesn't
24    have them, and that is absolutely the
25    position of --
```

```
1              BY THE COURT:  Okay.  So the Court is in
2         error in saying that the e-mails were not
3         identified because of the search terms?
4              BY MR. GAULT:  Correct.
5              BY THE COURT:  Okay.  So I apologize to
6         both parties on that.  I misunderstood that.
7         I want to strike that issue from this record.
8         And what I want you to address, sir, is do
9         you have any reason to believe that the
10        defendant had access to a greater volume of
11        e-mails than he searched?
12             BY MR. MARTIN:  Yes, Your Honor.
13             BY THE COURT:  Okay.
14             BY MR. MARTIN:  We feel we do.
15        Mr. Gault just made the assertion that what
16        Jed McCaleb had was a subset of these 13,000
17        pages of e-mails -- 16,000 -- well, 6,000
18        e-mails.  While he certainly had some of
19        those e-mails, it's -- it's not actually a
20        subset in that they turned over documents
21        that fell outside the date range of the
22        documents that were turned over to us by the
23        third party.  So his set is different than --
24             BY THE COURT:  Okay.  So it includes
25        some -- there is some overlap --
```

```
 1              BY MR. MARTIN:  Right.
 2              BY THE COURT:  -- between the subset.
 3     But the 13,000 includes some e-mails that
 4     Mr. McCaleb had, and Mr. McCaleb had some
 5     e-mails that were outside of the 13,000
 6     subset?
 7              BY MR. MARTIN:  Correct, Your Honor.
 8              BY THE COURT:  So it's not a universe --
 9              BY MR. MARTIN:  That's right.  Correct.
10              BY THE COURT:  It's not a closed
11     universe?
12              BY MR. MARTIN:  Right.
13              BY THE COURT:  Understood.  Okay.  So
14     have you conducted any discovery with respect
15     to whether Mr. McCaleb had access to anything
16     more than the 6,000 e-mails that defense
17     counsel has represented to the Court he had
18     access to?
19              BY MR. MARTIN:  We have not, Your Honor.
20              BY THE COURT:  Okay.  Have you asked him
21     that at a deposition?
22              BY MR. MARTIN:  I don't believe we did,
23     Your Honor.
24              BY THE COURT:  Okay.  All right.  The
25     Court -- well, I want to hear from -- thank
```

1 you, sir.  Do you have anything else you want

2 to add?

3   BY MR. MARTIN:  No, Your Honor, other

4 than just I want to reiterate again the

5 problem with the affidavit where he mentions

6 that he searched for -- did not search for

7 admin@mtgox, when it's apparent he clearly

8 did.  It's just -- again, coupled with the

9 damning language in these e-mails, it just

10 doesn't make sense that we never got these

11 e-mails.

12   BY THE COURT:  Yes, sir.  You would

13 agree with me, though, that if the defendant

14 didn't have the e-mails within his custody,

15 possession or control, he can't produce them

16 to you?

17   BY MR. MARTIN:  If he did not have them

18 in his custody, yes, Your Honor.

19   BY THE COURT:  Okay.  Thank you, sir.  I

20 want to hear from Mr. Gault.  And, Mr. Gault,

21 I apologize for misunderstanding the parties.

22 I did my best to read everything that was

23 submitted.

24   BY MR. GAULT:  I have to tell you,

25 it's -- I -- I am impressed, because it was

1       a -- that's about two and a half years worth

2       of stuff built up on that.

3              So first, Your Honor -- so the 16

4       e-mails, all right, I love those e-mails.

5       Those e-mails are going to be on my exhibit

6       list.  All right.  So -- and I'll tell you

7       why.  They claim that we conspired with the

8       buyer of Mt. Gox, Mark Karpeles, to keep

9       their 9,400 bitcoins.  They -- it's a

10      conspiracy claim.

11             These 16 e-mails are far from a

12      conspiracy when our client is telling him,

13      "You're messing this company up.  Fix it."

14      All right.  So these 16 e-mails are going to

15      be on our exhibit list.  So I love them.  I

16      wouldn't hide them in any respect.  But the

17      Court is right, we don't have them.  So we

18      can't produce what we don't have.

19             BY THE COURT:  Mr. Gault, you're making

20      a representation to the Court that your

21      client did not have in his custody,

22      possession or control these 16 e-mails?

23             BY MR. GAULT:  I'm making -- yes, Your

24      Honor.

25             BY THE COURT:  Okay.

1    BY MR. GAULT:  And I'm making a

2    representation that he searched it, we

3    searched it.  Mandie Robinson's sitting right

4    here, and she has run the discovery and she

5    is here for the Court to ask whatever the

6    Court wants to ask.  She -- we ran it.  We

7    hired an independent e-discovery company.

8    They searched it.

9         So we have -- we have -- feel like we

10   have done everything we can do, because I

11   hate discovery disputes.  I hate this.  I

12   want the facts and law and let the chips fall

13   where they may, but I don't want any of this.

14   I just want to get it done.  So yes, Your

15   Honor, that is our representation.

16        BY THE COURT:  Okay.

17        BY MR. GAULT:  Oh, Your Honor, I'm

18   sorry.  One other thing.

19        BY THE COURT:  Yes, sir.

20        BY MR. GAULT:  Your Honor asked if they

21   had asked Jed McCaleb in a deposition about

22   this search or whether he had access to

23   others.  He -- he was not asked that.  They

24   deposed him.  He was not asked that.  They

25   wanted to depose him before written discovery

1    was done.

2        And I remember being in Judge Green's

3    courtroom and she saying, "You don't want

4    written discovery?"  And Mitch Tyner's like,

5    "No.  I want to take his deposition right

6    now."  So they had the opportunity to do

7    discovery, but they -- they chose to depose

8    him first.  So I just note that to the Court,

9    that they did not ask that at the deposition.

10        BY THE COURT:  Yes, sir.  Mr. Martin,

11    the Court is going to deny the motion at this

12    time.  However, the Court is not going to

13    limit you with respect to any attempt you may

14    make to discover and/or confirm the

15    representations made by defense counsel that

16    these 16 e-mails were not within the custody,

17    possession or control of Mr. McCaleb at the

18    time that he made his document production.

19        If you so choose to serve an

20    interrogatory on that subject, the defendant

21    will be required to answer it under oath.

22    And if the answer is inconsistent with the

23    representations of defense counsel, there

24    will be serious consequences for that.  But

25    at this time, the Court is going to deny your

 1         Motion 127 for sanctions.

 2              Does the parties have any -- do the

 3         parties have any other issues they'd like to

 4         raise with the Court?  Plaintiff?

 5              BY MR. MARTIN:  I don't believe so,

 6         Your Honor.

 7              BY MR. GAULT:  No, Your Honor.

 8              BY THE COURT:  Okay.  Defendant?

 9              BY MR. GAULT:  No, Your Honor.

10              BY THE COURT:  Okay.  Thank y'all very

11         much.  We're off the record.

12                   (END OF HEARING)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              COURT REPORTER'S CERTIFICATE

2

3    STATE OF MISSISSIPPI

4    COUNTY OF HINDS

5

6         I, Lindsey P. McIntosh, CCR, Official Court

7    Reporter for Hinds County Circuit Court, do hereby

8    certify that the foregoing 68 pages, and including this

9    page, constitute a true and correct transcript of the

10   proceedings had upon the hearing in the above entitled

11   and numbered cause before the Honorable Joseph A.

12   Sclafani, Circuit Court Judge, on the 5th day of June,

13   2018.

14        I do further certify that my certificate annexed

15   hereto applies only to the original and certified

16   transcript.  The undersigned assumes no responsibility

17   for the accuracy of any reproduced copies not made under

18   my control or direction.

19        Witness my signature, this the 13th day of June,

20   2018.

21

22

23   LINDSEY P. McINTOSH, CCR
     Official Court Reporter
24   CCR NO. 1732

25

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                                      **PLAINTIFFS**

**V.**                                                               **CAUSE NO. 14-71**

MTGOX, Inc., a Delaware corporation;
CODE COLLECTIVE, LLC, a New York limited liability company;
And JED McCALEB, an individual;

                                                                     **DEFENDANTS**

---

**JED MCCALEB AND CODE COLLECTIVE, LLC'S MEMORANDUM IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON MEASURE OF DAMAGES**

---

Plaintiffs allege that someone stole 9,400 units of the virtual currency known as bitcoins from their account with the MTGOX bitcoin exchange. The market value of Plaintiffs' bitcoins at the time of the theft in 2011 was approximately $3,100. The value is now twenty thousand times that amount—over $60 million. Plaintiffs claim they are entitled to recover as damages not the value of what they lost at the time, but the value today. Neither the Court nor a jury may award damages on that basis. Jed McCaleb and Code Collective, LLC therefore request partial summary judgment holding that the measure of Plaintiffs' damages must be measured at the time of the alleged theft.

## FACTUAL BACKGROUND

In 2010, Jed McCaleb and his company, Code Collective, LLC (collectively "McCaleb"), created the MTGOX bitcoin exchange, which allowed users to buy and sell bitcoins from each other. McCaleb is a California-based software developer and entrepreneur.

Drs. Donald and Chris Raggio ("the Raggios" or "Plaintiffs") created an account on the MTGOX exchange in late 2010 and deposited $5,000. *See*, Relevant E-mails, attached to

1

McCaleb's Motion as Exhibit A, at p. 4-6; *see also*, Affidavit of Chris Raggio, attached to McCaleb's Motion as Exhibit B, at ¶ 2; Amended Complaint, attached to McCaleb's Motion as Exhibit C, at ¶ 6. There was no written contract or terms of use for MTGOX users at the time. *See* Affidavit of Jed McCaleb, attached to McCaleb's Motion as Exhibit D, at ¶ 5. The Raggios traded bitcoins with other MTGOX users and the bitcoins they purchased were placed in their MTGOX account. *See*, Exhibit A, at p. 4-6; *see*, Exhibit B, at ¶ 3.

The Raggios allege that from January 7 to January 9, 2011, someone stole approximately 9,400 bitcoins from their MTGOX account. *See* Exhibit C ¶ 11. At the time, the value of those bitcoins was approximately $3,100 ($0.33 per bitcoin). *See* Exhibit D, at ¶ 6. The Raggios discovered the theft on January 9, 2011 and immediately told McCaleb. *See* Exhibit A, at p. 6-7. There is no evidence the exchange's security measures were circumvented. Rather, the theft was perpetrated by someone using the Raggios' own password to access their account. *See* Exhibit A, at pp. 7-8, and 50 (discussing the use of the Raggios' password, Chris Raggio's guess he "got hit by a keylogger," and that he did not "know how the password was obtained.").

At McCaleb's suggestion, the Raggios enlisted the help of Michael Marquardt—known as "Theymos" on bitcoin message boards—to trace the bitcoin theft and electronic movement of the bitcoins. McCaleb believed he might have identified the MTGOX account of the person responsible for the unauthorized withdrawals and froze that user's account pending further investigation. *See* Exhibit C, at ¶ 16. On February 10, 2011 (one month after the theft), the Raggios thanked McCaleb for recommending Theymos and said that if they succeeded in recovering their bitcoins, they "would reward [Theymos] and [McCaleb] with [bitcoin]." *See* Exhibit A, at p. 14. The Raggios also thanked McCaleb "for creating such a cool platform." *Id.*

McCaleb sold the MTGOX exchange on February 11, 2011 to Tibanne KK, a Japanese company owned by Mark Karpeles. *See* Exhibit D, at ¶ 8. The Raggios began corresponding with Karpeles regarding the recovery of their allegedly stolen bitcoins. *See* Exhibit B, at ¶ 14. The Raggios told Theymos that Karpeles had taken over the investigation and "[i]t's up to Mark [Karpeles] to see if we are able to recover the stolen BTC." *See* Exhibit A, at p. 28-29.

On May 30, 2011, the Raggios told McCaleb:

> I am glad you did what you could to take action against this scammer. Hopefully this will work and I will get the coins back. And if for some reason that doesn't work out maybe bitcoin will hit 1000 and what [sic] we will have more than enough regardless.

*See* Exhibit A, at p. 40. And, on December 21, 2011, the Raggios e-mailed McCaleb, updating him on the investigation and acknowledging that he was not responsible for "mak[ing] things right:"

> I'm not asking you to intervene on my or my father's behalf. Mark is the owner of Mt Gox now. It's his call whether he wants to make things right with us as he did with Bitomat. My father and I appreciate everything you did to investigate and pursue the thief. You didn't have to go to the lengths you went to for us. We thank you.

*See* Exhibit A, at p. 38-39. The Raggios corresponded with McCaleb well into 2012 (including an in-person meeting in August 2011), discussing wide-ranging topics including philosophical issues related to technology, the future of bitcoin, ideas for future development, and the status of the bitcoin theft. *See generally* Exhibit A, also at p. 15-22, 38-40. Throughout this time, the Raggios never suggested that McCaleb had breached any obligation to them or was responsible for recovering their bitcoins. *Id.*; *see also,* Exhibit D, at ¶¶ 9-10, with emails attached as Exhibit 1 thereto.

Meanwhile, the Raggios continued to correspond with MTGOX's owner, Tibanne KK, through Karpeles. According to the Raggios, Karpeles told them in March 2012 that he was not

responsible for recovering their bitcoins. *See* Exhibit B, at ¶ 15. The Raggios do not allege they told McCaleb they were going to seek to hold him responsible for recovering their bitcoins at that time. *See* Exhibit C, at ¶¶ 23-26. In March 2012, the market value of bitcoin reached approximately $5.40, at which price the allegedly stolen 9,400 bitcoins were worth approximately $51,000. *See* Historical Pricing Charts from Coindesk.com, attached to McCaleb's Motion as Exhibit E; *see also*, *generally*, https://www.coindesk.com/price/.[1]

In February 2014, MTGOX Co., Ltd.—MTGOX's new owner—filed for bankruptcy in Japan. *See,* Reuters, "Mt. Gox files for bankruptcy, hit with lawsuit", February 28, 2014, attached to McCaleb's Motion as Exhibit F. MTGOX Co., Ltd. also filed a bankruptcy proceeding in Texas. *See* Docket of U.S. Bankruptcy Court for the Northern District of Texas (Dallas), attached to McCaleb's Motion as Exhibit G. The Raggios never filed a proof of claim in the MTGOX bankruptcy. *See* Plaintiffs' Responses to Defendants' Second Set of Requests for Admission, attached to McCaleb's Motion as Exhibit H, at p. 1. By the time of the MTGOX bankruptcy, more than three years had passed since the alleged theft. The Raggios never purchased substitute bitcoins to replace the ones they claim were stolen. *See* Plaintiffs' Supplemental Discovery Responses served June 25, 2018 and related documents, collectively attached to McCaleb's Motion as Exhibit I, at 2, 6-7.

The Raggios filed suit on March 5, 2014, three years and 54 days after the theft. By that date, the bitcoins price had reached approximately $660, from $0.33, a roughly 2,000-fold increase. *See* Exhibit A, at p. 40; Deposition of Jed McCaleb (November 17, 2016), attached to McCaleb's Motion as Exhibit J, at 39; Exhibit E; *see also*, *generally*, https://www.coindesk.com/price/. Their Amended Complaint includes twenty counts, including

---

[1] Pursuant to Mississippi Rule of Evidence 201, McCaleb will be requesting the Court take judicial notice of the value of bitcoin on the relevant dates, as established via Coindesk.com.

claims for breach of the Mississippi Uniform Commercial Code, breach of contract, conspiracy, bailment, negligent misrepresentation, fraud, account stated, negligence, conversion, and specific performance. *See* Exhibit C at ¶¶ 33-106.

## ARGUMENT

Plaintiffs cannot recover $60 million as damages for the alleged theft of $3,000 worth of bitcoins, and McCaleb is entitled to partial summary judgment on that basis. Under Mississippi law, a defendant may move for summary judgment, M.R.C.P. 56(b), and the trial court shall grant the motion "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). Partial summary judgment can "remov[e] from trial issues that ought not be there," allowing "[t]he courts and litigants … to concentrate on the real to the exclusion of the pretended." *Vickers v. First Mississippi Nat. Bank*, 458 So.2d 1055, 1061 (Miss. 1984) (citation omitted). Here, there is no genuine dispute that the injury to Plaintiffs occurred in January 2011, and McCaleb therefore is entitled to judgment as a matter of law that Plaintiffs' damages—if any—are measured as of that time. To permit the parties to focus on substantive issues in this case, McCaleb moves for partial summary judgment fixing damages at the value of the bitcoins at the time of the alleged theft in January 2011.

### I.    THE MEASURE OF DAMAGES FOR PLAINTIFFS' CLAIMS IS THE VALUE OF THE BITCOINS AT THE TIME OF THE ALLEGED THEFT

Plaintiffs claim they were injured by the alleged theft of 9,400 bitcoins from their MTGOX account in January 2011. Under any of Plaintiffs' theories of liability, the measure of damages is the injury to Plaintiffs at the time of the theft.

Plaintiffs assert claims for conversion (Count Ten), bailment (Count Fourteen), and negligence (Counts Nine and Sixteen), and its various other tort claims (other than fraud) amount to variations of those claims. The measure of damages for all these claims is the value of the property at the time it was taken or lost. *See Masonite Corp. v. Williamson*, 404 So.2d 565, 568 (Miss. 1981) ("the measure of damages in an action for conversion is the value of the property at the time and place of its conversion"); *Wachob Leasing Co., Inc. v. Gulfport Aviation Partners, LLC*, 2016 WL 10536040, *6 (S.D.Miss. 2016) (*aff'd* 730 Fed.Appx. 277 (5th Cir. 2018)) (measure of damages for bailment and negligently lost property is the fair market value of the property at the time it is lost).

This is consistent with longstanding Mississippi Supreme Court precedent:

> Anyone whose property is damaged, destroyed or taken away by the negligence or wrong of others is entitled to recover damages from the wrongdoer in a sum sufficient to compensate him for the loss and restore him, in effect, to his former situation. The recovery must be in proportion to the kind or amount of interest which the injured party had in the property. . . . Thus it is to be seen that in computation of damages a person is to be made whole . . . it is never contemplated that the injured party should realize a profit from the damages sustained.

*Mississippi Power Co. v. Harrison*, 152 So.2d 892, 903 (Miss. 1963) (citation omitted). An injured party is entitled to "a sum as will restore him as near as possible to his *former* position." *Id.* (emphasis added); *see also, Leard v. Breland*, 514 So.2d 778, 782 (Miss. 1987).

This overarching principle—that damages are to restore a party to its pre-breach position—runs through all of Mississippi law, and applies to all of Plaintiffs' claims. For example, the Uniform Commercial Code measures damages for non-delivery as "the difference between the market price *at the time when the buyer learned of the breach* and the contract price." *See*, Miss. Code. Ann. § 75-2-713. Similarly, in negligent misrepresentation cases, Mississippi courts follow

the "benefit-of-the-bargain rule," where the represented value of the property is the measure of damages with "the date of sale/discovery being the touchstone." *Browder v. Williams*, 765 So.2d 1281, 1286 (Miss. 2000). In one form or another, this principle governs the damages for all of Plaintiffs' claims. *See, Lloyd Ford Co., Inc. v. Sharp*, 192 So.2d 398 (Miss. 1966) ("in fraud and deceit cases [we] aligned ourselves with the majority rule known as the 'benefit-of-the-bargain' rule"); *see also, Leard*, 514 So.2d at 782 (purpose of breach of contract damages to restore injured party to financial position he would have been in had there been no breach); *Powers v. American Express Financial Advisors, Inc.*, 238 F.3d 414, 2000 WL 1784167, *1 (4th Cir. 2000) (securities entitlement holder granted damages for cash value of loss at time of breach).

There is no genuine dispute that Plaintiffs discovered the alleged theft by January 9, 2011. Whether Plaintiffs say McCaleb stole the bitcoins for himself, negligently allowed someone else to steal them, or breached a contract by failing to return them, the injury took place in January 2011. The actions and inactions they allege regarding McCaleb as the basis for all their claims took place on or before that time: failing to transfer, deliver, or return the bitcoins (Ex. C ¶¶ 36, 47, 56, 66, 75, 86), failing to provide or secure the bitcoins in a certain manner (¶ 41), failing to safeguard the bitcoins (¶¶ 44, 70, 90), transferring the bitcoins pursuant to ineffective entitlement orders (¶ 54), and misleading Plaintiffs about keeping the bitcoins safe (¶¶ 93, 96, 105). The appropriate measure of damages is the value of the bitcoins at the time of the alleged theft. The court therefore should grant summary judgment on this issue.

## II.   PLAINTIFFS' FAILURE TO COVER BARS CONSEQUENTIAL DAMAGES ON ITS CLAIMS UNDER U.C.C. CHAPTER TWO

Plaintiffs cannot recover consequential damages under their U.C.C. claims in Counts One through Four because they failed to seek cover. Under Chapter 2 of the U.C.C., cover is "the buyer's good faith attempt to mitigate his losses by purchasing substitute goods within a reasonable

time." *H & W Industries, Inc. v. Occidental Chemical Corp.*, 911 F.2d 1118, 1123, FN9 (5th Cir. 1990). "Failure to cover does not deprive the buyer of all remedies, but he may not recover consequential damages." *Id.*; *see also,* Miss. Code Ann. § 75-2-713. Plaintiffs' damages therefore are limited to the market value of the non-delivered or non-conforming good at the time of breach: the approximately $3,100 Plaintiffs' bitcoins were worth in January 2011. *Id*.

There is no genuine dispute that Plaintiffs never sought cover by purchasing substitute bitcoins: Plaintiffs' discovery responses stated that they purchased no bitcoins between the alleged theft and January 31, 2013. *See* Exhibit I, at 2, 6-7.

Under the U.C.C., Plaintiffs had "the right **and duty** to cover [their] losses, that is, to buy the goods contracted for reasonably on the market and then to recover his damages from the party breaching the contract at the difference between the contract price and the cover price." *Wander Ltd. v. Krouse & Co., Inc.*, 368 So.2d 235, 237 (Miss. 1979). "The goal of the cover remedy is to place the buyer only in as good a position as he would have occupied had the seller performed." *Terex Corp. v. Ingalls Shipbuilding, Inc.*, 671 So.2d 1316, 1320 (Miss. 1996) (lowering damages award to prevent plaintiff from obtaining windfall from breach). There is no evidence that Plaintiffs covered here, and the measure of damages for Counts One through Four therefore is the market value of the bitcoins at the time of the alleged theft.

### III.    PLAINTIFFS' FAILURE TO MITIGATE DAMAGES PRECLUDES RECOVERY FOR DAMAGES FROM THE POST-BREACH APPRECIATION OF BITCOIN

Plaintiffs cannot recover damages attributable to the increase in bitcoin's price after McCaleb's alleged wrongdoing because they never sought to mitigate their damages by purchasing substitute bitcoins. Plaintiffs are "charged with a duty of mitigating their damages." *See, e.g., Wall v. Swilley*, 562 So.2d 1252, 1258 (Miss. 1990); *see also R. McKnight & Son v. C & I Entertainment*,

100 So.3d 1022, 1028 (Miss. Ct. App. 2012) ("A claimant has a duty within a reasonable length of time after such original damage to remedy the faulty situation and prevent subsequent damage."). The duty to mitigate applies equally to claims ranging from breach of contract to negligence. *See, e.g., Byrd Brothers, LLC v. Herring*, 861 So.2d 1070, 1073-74 (Miss. Ct. App. 2003) (party injured by breach of contract obligated to mitigate damages); *Manhattan Nursing & Rehabilitation Center, LLC v. Pace*, 134 So.3d 810, 818 (Miss.Ct.App. 2014) (plaintiff in negligence action "is required to take reasonable steps to mitigate his damages").

As discussed above, Plaintiffs could have purchased substitute bitcoins to mitigate their damages and did not. *See* Section II above; *see also* Exhibit I, at 2, 6-7. McCaleb cannot be held responsible for Plaintiffs' failure to mitigate their damages. If Plaintiffs had bought substitute bitcoins, they could have recovered the purchase price from McCaleb (if he is found liable). Plaintiffs would have borne the risk of bitcoin price decreases and reaped the benefits of price increases, just as they did before the alleged theft. It is always unreasonable to impose those risks on potential defendants—in this case, it would be ridiculous. Plaintiffs' failure to mitigate therefore must limit their damages to the market value of their allegedly stolen bitcoins at the time of the loss, and partial summary judgment on this issue is appropriate.

## IV.    PLAINTIFFS' CLAIMED DAMAGES WERE NOT REASONABLY FORESEEABLE

In the alternative, to the extent Plaintiffs claim they are entitled to recover the value of their stolen bitcoins at today's market price, they cannot recover those damages because they were not reasonably foreseeable at the time of the alleged breach. Damages for lost profits and consequential damages require that the damages be reasonably foreseeable. *See, Massey-Ferguson, Inc. v. Evans*, 406 So.2d 15, 19 (Miss. 1981) (lost profits must be foreseeable); *see also, Aetna Cas. & Sur. Co. v. Day*, 487 So.2d 830, 835 (Miss. 1986) ("generally a plaintiff may recover consequential

damages reasonably foreseeable at the time the contract was made"). It was not reasonably foreseeable at the time of the breach that the price of a bitcoin would reach $6,500. It could never be reasonably foreseeable that an asset's value would multiple 20,000-fold in a few years. There is no genuine dispute that the future 20,000-fold appreciation of bitcoin was not reasonably foreseeable in January 2011, and the Court therefore should preclude Plaintiffs from recovering based on the price of bitcoin after January 2011.

## V.     PLAINTIFFS ARE NOT ENTITLED TO SPECIFIC PERFORMANCE

Plaintiffs, anticipating the legal obstacles to claiming damages measured years after their claims arose, seek specific performance—*i.e.*, delivery of 9,400 bitcoins. *See* Exhibit C, at ¶¶ 82-83. First and foremost, there is no written contract binding McCaleb to perform. *See* Exhibit D, at ¶ 5. This alone should be fatal to Plaintiffs' claim. *See,* 81A C.J.S. *Specific Performance* § 46 (2004) ("valid contract is a prerequisite to specific performance"). But, in addition, bitcoins are not the type of property subject to specific performance.

"The specific performance of a contract is not a matter of absolute right, but is a matter of grace." *Roberts v. Spence*, 209 So.2d 623, 625 (Miss. 1968). Specific performance therefore is ordinarily not available where, as here, "the parties have an adequate remedy at law to recover damages." *Id.*, at 626. There are narrow exceptions, such as for real estate, "because of real estate's unique nature," but no exception for virtual currency. *See, e.g., In re Estate of Pickett*, 879 So.2d 467, 471 (Miss.Ct.App. 2004); *see also,* Miss. Code Ann. § 75-2-716.

Here, money damages are an adequate remedy and there is no exception that makes specific performance available. Every bitcoin is identical to every other bitcoin, so there is nothing inherently unique about them that would justify specific performance. Indeed, Plaintiffs do not even seek delivery of the *particular* bitcoins that were stolen (which they know is impossible) and

instead demand delivery of *any* 9,406.33 bitcoins. Exhibit C, at ¶ 83. Plaintiffs' request for specific performance is an improper attempt to avoid the proper measure of damages at the time of breach. The Court should dismiss Plaintiffs' claim for specific performance (Count Twelve) and rule that specific performance is not available on Plaintiffs' claims.

## VI.   NO EVIDENCE SUPPORTS AN AWARD OF DETERRENCE-BASED DAMAGES

Finally, Plaintiffs are not entitled to various remedies that are not based on making them whole but rather on equitable principles associated with deterring misfeasance. *See* Exhibit C, at ¶¶ 60, 65-99. These include punitive damages, constructive trust, and disgorgement of profits. *Id.* These damages are reserved for situations requiring intervention by the court to "prevent [a] wrongdoer's enrichment from ill-gotten gains" (disgorgement of profits), to punish a wrongdoer "as an example so that others may be deterred" (punitive damages), and "to prevent fraud, overreaching or other wrongful acts" (constructive trust). *See, Standard Life Ins. Co. of Indiana v. Veal*, 354 So.2d 239, 247 (Miss. 1977) (punitive damages); *see also, U.S. S.E.C. v. Halek*, 537 F. App'x 576, 580 (5th Cir. 2013) (disgorgement of profits); 8 MS Prac. Encyclopedia MS Law § 73:2 (constructive trusts). After more than four years of discovery, there is no evidence to support such claims and this Court noted that it considered matters pertaining to alleged embezzlement or fraud irrelevant. *See*, June 5, 2018 Hearing Transcript, attached to McCaleb's Motion as Exhibit K, at 26-34, 40. The Court should grant summary judgment barring these claimed remedies.

## CONCLUSION

The appropriate measure of damages in this case is the value of the bitcoins at the time of the alleged theft in January 2011. Plaintiffs assert claims and remedies that purport to entitle them to the present-day value of the bitcoins or to specific performance. These efforts must fail because they are not supported by fact or law. Plaintiffs' failure to cover or mitigate their damages likewise

limits their recovery. McCaleb requests that partial summary judgment be entered (1) setting the measure of damages in this case at the value of the bitcoins at the time of the alleged theft or, in the alternative, some reasonable time thereafter as determined by the Court; and, (2) barring Plaintiffs from recovering specific performance, consequential damages, punitive damages, or **<u>any</u>** other damages in excess of an amount that could have been prevented by a reasonable attempt to cover or mitigate damages.

Respectfully submitted, this the <u>5th</u> day of October, 2018.

**JED McCALEB and
CODE COLLECTIVE, LLC**

By:    */s/ Edwin S. Gault Jr.*
      EDWIN S. GAULT, JR. (MSB #10187)
      MANDIE B. ROBINSON (MSB #100446)
      T. PEYTON SMITH (MSB #103867)

      *Attorneys for Defendants Jed McCaleb and
      Code Collective, LLC*

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2018, I served a true and correct copy of the foregoing

document via electronic mail to the following counsel of record:

Armin J. Moeller, Jr.
Walter H. Boone
Christine Crockett White
Jonathan P. Dyal
Andy Lowry
Patrick Everman
Perry P. Taylor
Balch & Bingham, LLP
188 East Capitol Street
Jackson, MS 39201-2608
wboone@balch.com
cwhite@balch.com
alowry@balch.com

***Attorneys for Plaintiffs***

THIS, the <u>5th</u> day of October, 2018.

/s/    *Edwin S. Gault, Jr.*
        EDWIN S. GAULT, JR.

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**V.**                                                             **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual;**                                     **DEFENDANTS**

---

### JED MCCALEB AND CODE COLLECTIVE, LLC'S
### MOTION FOR JUDICIAL NOTICE

---

Defendants Jed McCaleb and Code Collective, LLC (together the "Defendants"), file this Motion for Judicial Notice, pursuant to Mississippi Rule of Evidence 201, and state the following:

1. CoinDesk.com is a leading electronic publication specializing in bitcoin and digital currencies.

2. Among the services provided by CoinDesk.com is providing bitcoin price and market data that is derived from the world's leading bitcoin exchanges.

3. Cryptocurrency market participants and observers routinely rely on bitcoin data from CoinDesk.com for value determinations. *See, e.g.*, Evelyn Cheng, *Mark Cuban Backs New $20 Million Cyptocurrency Venture Fund*, August 22, 2017, https://www.cnbc.com/2017/08/22/mark-cuban-backs-new-20-million-cryptocurrency-venture-fund.html.

For the foregoing reasons, and pursuant to Mississippi Rule of Evidence 201, Defendants move the Court for an order taking judicial notice of the historic bitcoin pricing data available at CoinDesk.com and the fact that CoinDesk.com is a reliable source for such information.

Respectfully submitted, this the 5<u>th</u> day of October, 2018.

**JED McCALEB and**
**CODE COLLECTIVE, LLC**


By:   */s/ Edwin S. Gault Jr.*
      EDWIN S. GAULT, JR. (MSB #10187)
      MANDIE B. ROBINSON (MSB #100446)
      T. PEYTON SMITH (MSB #103867)

      *Attorneys for Defendants Jed McCaleb and*
      *Code Collective, LLC*

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com


ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2018, I served a true and correct copy of the foregoing

document via electronic mail to the following counsel of record:

Armin J. Moeller, Jr.
Walter H. Boone
Christine Crockett White
Jonathan P. Dyal
Andy Lowry
Patrick Everman
Perry P. Taylor
Balch & Bingham, LLP
188 East Capitol Street
Jackson, MS 39201-2608
wboone@balch.com
cwhite@balch.com
alowry@balch.com

***Attorneys for Plaintiffs***

THIS, the 5th day of October, 2018.

/s/    *Edwin S. Gault, Jr.*
          EDWIN S. GAULT, JR.

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                          **PLAINTIFFS**

**V.**                                                                        **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual;**                                              **DEFENDANTS**

---

**JED MCCALEB AND CODE COLLECTIVE, LLC'S**
**REQUEST FOR JUDICIAL NOTICE**

---

Defendants Jed McCaleb and Code Collective, LLC (together the "Defendants"), file this Request for Judicial Notice, pursuant to Mississippi Rule of Evidence 201, and state the following:

1. CoinDesk.com is a leading electronic publication specializing in bitcoin and digital currencies.

2. Among the services provided by CoinDesk.com is providing bitcoin price and market data that is derived from the world's leading bitcoin exchanges.

3. Cryptocurrency market participants and observers routinely rely on bitcoin data from CoinDesk.com for value determinations. *See, e.g.*, Evelyn Cheng, *Mark Cuban Backs New $20 Million Cyptocurrency Venture Fund*, August 22, 2017, https://www.cnbc.com/2017/08/22/mark-cuban-backs-new-20-million-cryptocurrency-venture-fund.html.

For the foregoing reasons, and pursuant to Mississippi Rule of Evidence 201, Defendants move the Court for an order taking judicial notice of the historic bitcoin pricing data available at CoinDesk.com and the fact that CoinDesk.com is a reliable source for such information.

Respectfully submitted, this the 5th day of October, 2018.

**JED McCALEB and**
**CODE COLLECTIVE, LLC**

By:     */s/ Edwin S. Gault Jr.*
        EDWIN S. GAULT, JR. (MSB #10187)
        MANDIE B. ROBINSON (MSB #100446)
        T. PEYTON SMITH (MSB #103867)

        *Attorneys for Defendants Jed McCaleb and*
        *Code Collective, LLC*

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2018, I served a true and correct copy of the foregoing

document via electronic mail to the following counsel of record:

Armin J. Moeller, Jr.
Walter H. Boone
Christine Crockett White
Jonathan P. Dyal
Andy Lowry
Patrick Everman
Perry P. Taylor
Balch & Bingham, LLP
188 East Capitol Street
Jackson, MS 39201-2608
wboone@balch.com
cwhite@balch.com
alowry@balch.com

*Attorneys for Plaintiffs*

THIS, the 5th day of October, 2018.

/s/     *Edwin S. Gault, Jr.*
            EDWIN S. GAULT, JR.

| From: | mec.nef@mec.ms.gov |
| To: | mec.nef@mec.ms.gov |
| Subject: | Activity in Case 25CI1:14-cv-00071-JAS RAGGIO V MTGOX ET AL Docket Annotation |
| Date: | Tuesday, October 9, 2018 10:01:27 AM |

**Zack Wallace**
**Hinds County Circuit Clerk**
NOTICE OF ELECTRONIC CASE FILING

<span style="color:red">This is an automatic e-mail message generated by the Mississippi Electronic Courts (MEC) system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.</span>

The document described below has been docketed in MEC, and you are able to access it by clicking on the Document Number hyperlink. You may only access the document one time using the link provided in this e mail. Be sure to download and/or print a copy of each document during this first viewing. Subsequent viewing of the document after the first will require you to login and pay $.20 per page.

You may visit mec.ms.gov for further updates related to the project. For technical support, please contact the MEC help desk at 601-576-4650 or send an e-mail to helpdesk@mec.ms.gov.

Mississippi Electronic Courts

Seventh Circuit Court District

## Notice of Electronic Filing

The following transaction was entered on 10/9/2018 at 9:59 AM CDT and filed on 10/9/2018
**Case Name:** RAGGIO V MTGOX ET AL
**Case Number:** 25CI1:14-cv-00071-JAS
**Filer:**
**Document Number:** 236(No document attached)

**Docket Text:**
<span style="color:red">DOCKET ANNOTATION as to [234] : Attorney has re-filed as entry # 235. (LC)</span>

**25CI1:14-cv-00071-JAS Notice has been electronically mailed to:**

Armin J. Moeller, Jr amoeller@balch.com, kbrock@balch.com, kprem@balch.com

Mark D. Ray mdray@umc.edu, tbarnett@umc.edu

Mitchell H. Tyner, Sr mtyner@tynerlawfirm.com, lphillips@tynerlawfirm.com, rsumlar@tynerlawfirm.com, tpenson@tynerlawfirm.com

Walter Boone wboone@balch.com, ccabrera@balch.com, rsanford@balch.com

Christine Crockett White cwhite@balch.com, bnelson@balch.com, nthompson@balch.com

Edwin S. Gault, Jr Win.Gault@formanwatkins.com, sheila.toth@formanwatkins.com

Jonathan Paul Dyal jdyal@balch.com, agroves@balch.com, bmarshall@balch.com

Amanda B. Robinson mandie.robinson@formanwatkins.com,
amy.robertson@formanwatkins.com, kristy.grizzell@formanwatkins.com

Charles Bradford Martin (Terminated) bmartin@tynerlawfirm.com, cbradmartin@gmail.com,
frontdesk@tynerlawfirm.com, lphillips@tynerlawfirm.com, mtyner@tynerlawfirm.com

Andy Lowry alowry@balch.com, pfairchild@balch.com

T. Peyton Smith peyton.smith@formanwatkins.com, marissa.miller@formanwatkins.com

Michael Patrick Everman peverman@balch.com, callen@balch.com

Perry Taylor ptaylor@balch.com, pptaylor3@gmail.com

**25CI1:14-cv-00071-JAS Notice will be delivered by other means to:**

Ethan Isaac Jacobs


**25CI1:14-cv-00071-JAS Parties to the Case:**

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**And JED McCALEB, an individual.**                     **DEFENDANTS**

### NOTICE OF HEARING

Please take notice that pursuant to the Court's instructions, Defendants Jed McCaleb and

Code Collective, LLC, will bring on for hearing their Motion to Dismiss and Motion for Partial

Summary Judgment before the Honorable Joseph A. Sclafani, Hinds County Court Judge, Hinds

County Courthouse, 407 E. Pascagoula Street, Jackson, MS 39201, on December 14, 2018 at

9:00 a.m.

Respectfully submitted, this the 9th day of October, 2018.

                                        **CODE COLLECTIVE, LLC, and**
                                        **JED McCALEB, individually and formerly**
                                        **doing business as MTGOX, a sole proprietorship**

                                        By:     /s/ *Edwin S. Gault, Jr.*
                                                EDWIN S. GAULT, JR., MSB #10187
                                                MANDIE B. ROBINSON, MSB #100446
                                                T. PEYTON SMITH, MSB #103867

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Ste. 2200
Jackson, MS  39201-2375
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

Armin J. Moeller, Jr.
Walter H. Boone
Christine Crockett White
Jonathan P. Dyal
Andy Lowry
Patrick Everman
Perry P. Taylor
Balch & Bingham, LLP
188 East Capitol Street
Jackson, MS 39201-2608
wboone@balch.com
cwhite@balch.com
alowry@balch.com

***Attorneys for Plaintiffs***

Respectfully submitted, this the 9th day of October, 2018.

/s/ *Edwin S. Gault, Jr.*
EDWIN S. GAULT, JR.

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                              PLAINTIFFS

V.                                                    CIVIL ACTION NO. 14-71

MTGOX a sole proprietorship, et al.                          DEFENDANTS

## AGREED ORDER SETTING BRIEFING SCHEDULE

ON THIS DAY the Court has considered the parties' joint request for a briefing schedule for Defendants' motions to dismiss and for partial summary judgment in this civil action, and finding that this request is well taken and in the interests of the orderly administration of justice, hereby orders as follows:

1.     Plaintiffs will serve their response briefs to the motion to dismiss and to the motion for partial summary judgment no later than Thursday, October 25, 2018.

2.     Defendants will serve their reply briefs, if any, in support of said motions, no later than Monday, November 5, 2018.

SO ORDERED, this the 9th day of October, 2018.

_____
CIRCUIT COURT JUDGE

Prepared & submitted by:

*/s/ Andy Lowry*

Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944
BALCH & BINGHAM, LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
(601) 961-9900 Phone
(888) 954-5405 Fax
alowry@balch.com
amoeller@balch.com

*Attorneys for Plaintiffs*

Agreed to by:

*s/ Edwin S. Gault, Jr.*

Edwin S. Gault, Jr., MSB # 10187
Amanda B. Robinson, MSB # 100446
T. Peyton Smith, MSB # 103867
FORMAN WATKINS & KRUTZ LLP
Post Office Box 22608
Jackson, Mississippi 39201
Win.Gault@formanwatkins.com
Peyton.Smith@formanwatkins.com
Mandie.Robinson@formanwatkins.com

Ethan Jacobs (admitted *pro hac vice*)
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

*Attorneys for Defendants*

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**V.**                                                          **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**And JED McCALEB, an individual;**

                                                                **DEFENDANTS**

---

### JED MCCALEB AND CODE COLLECTIVE, LLC'S SUPPLEMENT TO THE MOTION FOR RECONSIDERATION

### (EXPEDITED CONSIDERATION REQUESTED)

---

Jed McCaleb and Code Collective, LLC (collectively "McCaleb"), file this Supplement to the Motion for Reconsideration of the Order Regarding Defendants' Motion to Quash and for Protective Order related to Google.

1.     As noted in the original Motion for Reconsideration, Plaintiffs' request to produce e-mails from Jed McCaleb's personal Google account resulted in an estimated 76,000 e-mails to review for production.[1]

2.     This Court held a review of that magnitude was unreasonable and instructed Plaintiffs' counsel to "provide the defendants a list of search terms" that are "narrowly tailored."[2] The Court stated if "the search terms yield too great a volume and it's an undue burden on the

---

[1] *See* Document 190.
[2] *See* Relevant pages from the Transcript of the Hearing held June 5, 2018, attached collectively as Exhibit A, at pp. 49-50 (warning Plaintiffs to "carefully consider the search terms you provide, . . .").

defendant to review them, I want the defendant to file a supplement to this motion. . . ."[3]  At the hearing, the Court specifically cautioned against the use of overbroad search terms like "bitcoin."[4]

3.        Plaintiffs' counsel provided a list of <u>33 separate</u> search terms and instructed that all possible variations of 6 of these terms should also be searched.[5]

4.        McCaleb provided the documents to an independent computer litigation specialist for these terms to be searched.  The results of this search revealed there were actually 83,473 total documents, and the search terms submitted by Plaintiffs would require reviewing 15,592 of them. This list includes, but is not limited to, *every single document* in McCaleb's Google account that includes the term "MTGOX" or "Gox" over a five-year timespan, without any parameters crafted to eliminate irrelevant documents.  These two terms alone would require the review of 3,713 documents.[6]  The use of such a search term when analyzing the creator of MTGOX's Google account is as unreasonable as the Court's example of searching for every email using the word "bitcoin." It cannot be reasonable for Plaintiff's to obtain every single e-mail in which McCaleb ever referenced the exchange.

5.        Plaintiffs retained new counsel during this time and McCaleb's attorneys explained the history of the issue.  Plaintiffs' new counsel requested a copy of the search terms that were used along with other information, which McCaleb provided.[7]  Plaintiffs' counsel

---

[3] *See id.* at p. 51.
[4] *See id.* at p. 49.
[5] *See* Email from Brad Martin to Mandie Robinson dated July 9, 2018 attached as Exhibit B (explaining terms such as "Fraud!" required searching fraud, fraudulent, and fraudulently)
[6] The term "Gox" identified 2,241 documents, which include either emails or attachments, while the term "MtGox" identified 2,483.  Overlap between the documents results in a total 3,713.
[7] *See* Emails between Win Gault and Walter Boone dated August 2, 2018, attached as Exhibit C; Email from Mandie Robinson to Walter Boone dated August 7, 2018, as part of a string of emails between counsel attached collectively as Exhibit D, at p. 4.

responded by noting they would consult with Birmingham attorney Alex Khoury, whose focus they identified as E-Discovery.[8]

6.      Despite the nearly 16,000 documents identified by Plaintiffs' proposed search terms, and while recognizing the searches could be narrowed, Mr. Khoury stated there were "additional terms that should be searched."[9]

7.      Plaintiffs offered to remove the search terms "Mark" and "missing," and asked for a calculation of the number of documents yielded by this new search.[10]

8.      The new search still identified 12,459 separate documents.  McCaleb's counsel informed Plaintiffs' counsel of this fact and that this number of documents is too broad and poses an undue burden to review.[11]  In an effort to focus the search to emails that are more likely to be relevant, McCaleb's counsel suggested limiting the date range of the search, which currently spans a five-year period dating back to before the MTGOX bitcoin exchange was even created.[12]

9.      Plaintiffs responded with a lengthy explanatory request, which suggested eliminating only 5 months of the **five-year** time span. At the same time, Plaintiffs asked for specific examples of "false positives." These cannot be identified without actually reviewing the documents themselves. Furthermore, Plaintiffs asked to add "Mark" back as a search term, albeit with certain parameters (such as "Mark" not within five words of the term "check").[13]

10.      Despite it being Plaintiffs' responsibility to craft reasonable search terms, McCaleb set out to recommend some obvious, simple steps to bring this issue to a reasonable solution.[14]

---

[8] *See* Email from Walter Boone to Mandie Robinson dated August 7, 2018, attached as Exhibit E; *see also* Exhibit G (discussing Alex Khoury's role).
[9] *See* Email from Alex Khoury to Mandie Robinson dated August 8, 2018, attached as Exhibit F.
[10] *See* Exhibit D, at p. 2.
[11] *See* Exhibit D, at p. 1.
[12] *Id.*
[13] *See* Email from Walter Boone to Win Gault dated September 10, 2018, attached as Exhibit G.
[14] *See* Email from Win Gault to Walter Boone dated September 12, 2018, attached as Exhibit H.

McCaleb proposed (1) limiting the timeframe to two years after the alleged theft; (2) running compound searches requiring hits for "Gox" or "MTGOX" to include at least one additional search term; (3) running compound searches for some search terms (attack, bug, bugs, fraud, hack, illegal, investing*, steal, stole, and theft), requiring them to appear in a document with either "Gox" or "MTGOX;" and, (4) excluding attachments and other family documents associated with the search terms "LR" and "Liberty Reserve," because these documents are likely to be irrelevant. McCaleb also explained that if any document uncovered in this search "provide[s] a good faith basis for seeking later documents then we can revisit the issue." McCaleb concluded by stating he "stand[s] ready to run an additional search."[15]

11.    Plaintiffs responded by arguing that 12,000 documents is reasonable.[16] But, in an effort to "compromise," Plaintiffs stated they would be agreeable to (1) limiting the search to a four-and-a-half-year time frame (June 1, 2010 to December 31, 2014); (2) requiring an additional search term to appear in any document containing "Gox" or "MTGOX;" (3) searching for "Mark" but "not within 5 words of . . . check, document, word, agreement, or calendar" and not "within 2 words of the last name of any individuals unrelated to this matter;" (4) accepting McCaleb's proposed limitation on "LR" and "Liberty Reserve;" and, (5) running compound searches on "attack, bug, bugs, dictionary, fraud, illegal, investing*, steal, stole, theft, and thief" by eliminating results that are "within 2 of [False Positive Identifier]."

12.    This proposal places an unreasonable burden on McCaleb to produce "false positive identifiers" and to identify "the last name of any individuals unrelated to this matter," to say nothing of bearing the cost of running these complex searches. The timeframe also remains unreasonably broad. Moreover, it seems the parties fundamentally disagree as to what constitutes

---

[15] *Id.*
[16] *See* Email from Walter Boone to Win Gault dated September 25, 2018, attached as Exhibit I.

a "false positive." McCaleb objects to the breadth of the searches because they will almost certainly yield results that have no bearing on the present litigation.

13.    Plaintiffs have approached McCaleb's Gmail account in a manner that appears calculated to take discovery in this case back to square one. That is not the purpose of this subpoena. McCaleb has already responded to extensive discovery over the past four years, and Plaintiffs already received all his MTGOX emails. The Court was clear that it is allowing discovery pursuant to the subpoena to move forward purely as "confirmatory discovery."[17] Prior discovery was "related to the allegations in Plaintiff's [Original] complaint," meaning the focus has been on the Raggios, Baron, the sale of MTGOX to Mark Karpeles, and the security of the exchange at the time of the Raggios' alleged theft.[18] Rather than focus on this narrow set of issues, Plaintiffs want to use this subpoena to improperly cast another lure to explore new, unsubstantiated claims. This is precisely what the Court sought to avoid at the original hearing on this issue.

14.    Moreover, it is clear that some of the terms are calculated to search for evidence of malfeasance or mismanagement of MTGOX generally, which this Court has recognized is irrelevant to the issue of the Raggios' bitcoins.[19]

15.    In essence, the review of 12,459 documents (including an unknown number of pages) would unquestionably impose an undue burden on McCaleb.  McCaleb has already had to pay an independent computer specialist, not to mention incurring substantial attorney fees, all in effort to accommodate Plaintiffs' repeated attempts to cast a wider net than they should have (and

---

[17] *See* Ex. A, at p. 48-49.
[18] *See, e.g.,* McCaleb's Responses (and supplements) to Plaintiffs' First Request for Production of Documents, attached collectively at Exhibit J, at Requests 1, 15.
[19] *See* Ex. A, at pp. 29-30 (Plaintiffs' want to know if all customers' money was truly "being used for the purchase of bitcoins" or "to fund Mt. Gox customers' accounts," and the Court questions why what McCaleb did with other customers' money was relevant).

the Court cautioned against). The requests in Plaintiffs' last correspondence would significantly increase the cost of this search without narrowing the scope of review in a meaningful way.

16.    This Court previously instructed "the defendant run the search terms and then come back to the Court with an announcement of how many pages of e-mails the plaintiff's [sic] search terms yield."[20] Therefore, McCaleb hereby submits this Supplement to the Motion to Reconsider to inform the Court of the number of e-mails at issue. If Plaintiffs continue to insist on search terms that yield an unreasonable volume of documents for review, McCaleb requests the Court's assistance in limiting the searches to avoid the undue burden of review, and further requests that Plaintiffs be required to pay all expenses and attorney fees associated with the searches and expense of reviewing the emails. In the alternative, McCaleb proposes search parameters truly calculated to lead to the discovery of emails relevant to the claims and defenses at issue in this litigation, such as those set forth in the email attached as Exhibit H.

17.    Finally, McCaleb requests expedited consideration of this Supplemental Motion so as not to interfere with the hearing currently set on December 14, 2018.

    Respectfully submitted, this the 11th day of October, 2018.

                    **CODE COLLECTIVE, LLC, and**
                    **JED McCALEB**

        By:    /s/ *Edwin S. Gault, Jr.*
                    EDWIN S. GAULT, JR. (MSB #10187)
                    MANDIE B. ROBINSON (MSB #100446)
                    T. PEYTON SMITH (MSB #103867)

---

[20] *See* Exhibit A. at p. 49.

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2018, I served a true and correct copy of the foregoing

document via the Court's electronic filing system to the following counsel of record:

Armin J. Moeller, Jr.
Walter H. Boone
Christine Crockett White
Jonathan P. Dyal
Andy Lowry
Patrick Everman
Perry P. Taylor
Balch & Bingham, LLP
188 East Capitol Street
Jackson, MS 39201-2608
wboone@balch.com
cwhite@balch.com
alowry@balch.com

***Attorneys for Plaintiffs***

THIS, the 11th day of October 2018.

/s/    *Edwin S. Gault, Jr.*
       EDWIN S. GAULT, JR.

1          IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
                 OF HINDS COUNTY, MISSISSIPPI
2

3   DR. DONALD RAGGIO
    DR. CHRIS RAGGIO                              PLAINTIFFS
4

    VERSUS                           CAUSE NO. 251-14-071
5

    MTGOX, A SOLE PROPRIETORSHIP,
6   MTGOX, INC., A DELAWARE CORPORATION,
    MT.GOX KK, A JAPANESE CORPORATION,
7   TIBANE KK, A JAPANESE CORPORATION,
    MUTUM SIGILLUM, LLC, A DELAWARE
8   LIMITED LIABILITY COMPANY,
    CODE COLLECTIVE, LLC, A NEW YORK LIMITED
9   LIABILITY COMPANY; JED MCCALEB, AN
    INDIVIDUAL; MARK KARPELES, AN INDIVIDUAL;
10  JOHN DOES 1-5 AND CORPORATE JOHN DOES 1-5     DEFENDANTS

11

12  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

13  TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE

14  HEARING IN THE ABOVE-STYLED AND NUMBERED CAUSE BEFORE

15  THE HONORABLE JOSEPH A. SCLAFANI, CIRCUIT COURT JUDGE,

16  ON THE 5th DAY OF JUNE, 2018.

17  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

18

19

20             (Appearances noted herein.)

21

22

23  Reported by:  LINDSEY McINTOSH, CCR
                  Official Court Reporter
24                Post Office Box 22711
                  Jackson, Mississippi  39225-2711
25                CCR # 1732

EXHIBIT A

```
 1  APPEARANCES:

 2       Present and Representing the Plaintiffs:

 3           HONORABLE CHARLES "BRAD" MARTIN
             Tyner, Goza, Stacey & Martin, LLC
 4           3352 North Liberty
             Canton, Mississippi  39046
 5

 6       Present and Representing the Defendants:

 7           HONORABLE EDWIN S. GAULT, JR.
             HONORABLE MANDIE B. ROBINSON
 8           HONORABLE T. PEYTON SMITH
             Forman Watkins & Krutz, LLP
 9           210 East Capitol Street, Suite 2200
             Jackson, Mississippi  39201-2375
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          you disagree with my -- or tell me if I'm

 2          wrong on the general law that the --

 3          generally, as a proposition, the financial

 4          information of a party is not relevant.

 5          Why -- why in this case has the plaintiff met

 6          their burden to show that Mr. McCaleb's

 7          personal financial information is relevant?

 8               BY MR. MARTIN:  Well, Your Honor, this

 9          case -- I've been practicing law for 16

10          years.  I think this is probably the most

11          interesting case I've ever had a chance to

12          practice on.

13               In this case, we have e-mails -- a

14          substantial amount of e-mails that were

15          turned over from this third party, along with

16          the BancorpSouth document, which I believe

17          has been produced for the account of Chris

18          Raggio, that shows money being directly wired

19          into Jed McCaleb's own personal bank account

20          at Mt. Gox.  Mt. Gox never had a corporate

21          account.

22               BY THE COURT:  Understood.

23               BY MR. MARTIN:  So every bit of money

24          from every Mt. Gox customer apparently was

25          going into Jed McCaleb's account.  We want to

EXHIBIT A

```
 1        see where that money is going.  Was it

 2        actually being used for the purchase of

 3        bitcoins?  Was it actually being used to fund

 4        Mt. Gox customers' accounts, specifically our

 5        own client's?

 6             BY THE COURT:  Why is that relevant to

 7        the 9,400 bitcoins at issue in this case?

 8             BY MR. MARTIN:  Well, Your Honor,

 9        there's several things.

10             BY THE COURT:  Okay.  And again, that's

11        why I asked the preliminary question.  This

12        is an identifiable good.  These are specific

13        goods.  We -- we know what your client

14        attempted to purchase.  So why is what the

15        individual defendant is doing with respect to

16        other customers or other orders, even other

17        orders for your client -- how is that

18        relevant?

19             BY MR. MARTIN:  I think, again, it goes

20        to show the level of mismanagement at

21        Mt. Gox, what was being done in regards to

22        the 9,400 bitcoins.  Was there ever an

23        investigation being conducted?  And I think

24        it's important to -- to remind the Court that

25        these bitcoins came back into an account at
```

EXHIBIT A

1    BY MR. GAULT:  Understood.

2    BY THE COURT:  The next motion is Docket

3    Number 160, motion for leave to file surreply

4    and incorporate surreply motion to motion for

5    sanctions.

6    As a general proposition, if a party has

7    something they want to say to the Court, even

8    if they don't do it in writing, I'm going to

9    allow you to argue the motion orally, so I'm

10    going to hear the argument anyway.  So the

11    Court's going to grant that motion.  So

12    Docket Number 160 is granted.

13    The final motion is motion for

14    reconsideration with respect to the subpoena

15    that was served on Google.  The Court cannot

16    imagine that it was contemplated that that

17    subpoena would yield 76,000 e-mails.  It

18    seems to me that that couldn't have been

19    contemplated by the Court.  Although I don't

20    know what was contemplated by the Court, that

21    couldn't have been contemplated.

22    So I do believe that plaintiff is

23    entitled to what I would almost call

24    confirmatory discovery.  My understanding is

25    that Mr. McCaleb has produced to the

EXHIBIT A

1       plaintiff the e-mails that he believes are

2       relevant to this dispute, but that the

3       plaintiff is entitled to confirm that through

4       a serve -- what I would call essentially a

5       server level search of the Gmail e-mails.  My

6       concern, however, is the cost associated with

7       the defendant's search of the e-mails.

8           The Court believes that it would be

9       reasonable under these circumstances to

10      require the plaintiff to provide to the

11      defendant a list of search terms.  The

12      defendant will then run those search terms

13      and will determine what the volume of e-mail

14      is.  If the volume is not too great -- and, I

15      mean, that's a gray area because I can't

16      guess when we're talking about 76,000

17      e-mails.  I have no way to guess how many the

18      search terms will yield.

19           Now, I will say this, sir.  If you

20      provide to him a search term "bitcoin,"

21      that's going to yield a far greater volume

22      than if you provide search terms that are

23      much more narrowly tailored.  I'm going to

24      require that the defendant run the search

25      terms and then come back to the Court with an

EXHIBIT A

1      announcement of how many pages of e-mails the

2      plaintiff's search terms yield.

3          If the Court believes that the number of

4      e-mails would not impose an undo burden on

5      the defendant to review them for privilege

6      and produce them, that's what the Court is

7      going to do once it knows what the universe

8      is.   However, if the plaintiff provides a

9      list of search terms that are so broad and it

10     cuts it in half and there's 37,000 pages that

11     have to be reviewed, the Court is going to

12     consider cost shifting under the Rules of

13     Mississippi Civil Procedure.

14         So in some ways, sir, the plaintiff is

15     going to be in control of, to the extent you

16     can know through your search terms, whether

17     the Court is going to require the defendant

18     to pay for that privilege review or require

19     the plaintiff to do it.   So I would just ask

20     that you carefully consider the search terms

21     you provide, because if they're too broad, it

22     may pose an undo burden on the defendant.

23         But if they're narrowly tailored, the

24     Court is going to enforce the general rule

25     that a party is responsible to cover the

EXHIBIT A

```
 1              costs of reasonable discovery by the other

 2              side.  So that's going to be my ruling on the

 3              motion to consider reconsideration.

 4                  So again, just so the record's clear, the

 5              plaintiff will provide to the defendant a

 6              list of search terms.  The defendant will run

 7              those search terms in the 76,000 pages and

 8              will report to the Court the number of

 9              responsive documents.  Now, if the defendant

10              believes that it's a small universe and the

11              defendant is willing to -- to cover the cost

12              of that and do a privilege log and produce

13              them to the plaintiff without further

14              intervention of the Court, that can be done

15              amongst the parties.

16                  However, if the defendant believes that

17              the search terms yield too great a volume and

18              that it's an undo burden on the defendant to

19              review them, I want the defendant to file a

20              supplement to this motion with the Court and

21              the Court will promptly rule on -- on that

22              motion.

23                  Does the defendant have any other

24              discovery issues?

25                  BY MR. GAULT:  No, Your Honor.
```

EXHIBIT A

**Mandie Robinson**

| | |
|---|---|
| **From:** | Brad Martin <bmartin@tynerlawfirm.com> |
| **Sent:** | Monday, July 09, 2018 9:59 AM |
| **To:** | Mandie Robinson |
| **Subject:** | Raggio vs. MTGOX - Search Terms for Google Emails |

Mandie,

As discussed, please find the following list of search terms.  Any word which ends in an exclamation mark denotes a search should be ran for any variation of that word.

Raggio
Baron
Karpeles
Mark
Mtgox
Gox
Thief
Theft
Hack!
Bug
Bugs
Fraud!
"weak password"
"brute force"
Attack!
Dictionary
Investig!
Illegal
Stole!
Steal!
"Liberty reserve"
LR
Missing
Tibanne
Theymos

The following email addresses:

admin@mtgox.com
jed@mtgox.com
info@mtgox.com
donald.raggio@gmail.com
mark@tibanne.com
theymos@mm.st
chris.raggio@gmail.com
baron@contractor.net

EXHIBIT B

Thanks,

Charles "Brad" Martin
**TYNER, GOZA, STACEY & MARTIN, LLC**
3352 North Liberty
Canton, MS 39046
Phone: 601-401-1111
Fax: 601-957-6554

EXHIBIT B

**Mandie Robinson**

| | |
|---|---|
| **From:** | Boone, Walter <wboone@balch.com> |
| **Sent:** | Thursday, August 02, 2018 5:05 PM |
| **To:** | Win Gault |
| **Cc:** | Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Mandie Robinson; Khoury, Alex |
| **Subject:** | RE: Scheduling Order |

Thanks, Win.  Can you get us any or all of the following:

1. The search terms Tyner asked to use
2. The search terms your guy actually used (if different)
3. How many documents hit on each term.  Usually there is a spreadsheet that lists the hits by search term.
4. How many unique documents hit on terms (the 16k number may actually be much smaller if it contains duplicate documents that contained multiple keywords)
5. Examples of false positives they've found which might tell us how to narrow.

With the above information, we think we can help tighten the search terms up, and lessen the number of docs.  That way we don't have to argue about 15,000.

See what you think.

-----Original Message-----
From: Win Gault [mailto:Win.Gault@formanwatkins.com]
Sent: Thursday, August 02, 2018 2:17 PM
To: Boone, Walter
Cc: Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Mandie Robinson
Subject: RE: Scheduling Order

[External Email] Please use caution.


While you are getting your arms around all this, I wanted to make you aware of a discovery issue.  Tyner served a subpoena on Google for our client's personal emails from January 2010 - December 2014 to be produced to us for review.  Over 76,000 emails plus attachments were produced to us by Google.  Judge Sclafani ordered Tyner to submit search terms to narrow the results to relevant emails, and warned against broad terms likely to identify unrelated documents.  Tyner provided a list of over 35 terms, and we hired an e-discovery computer specialist to search the emails.  The search still identified 15,592 separate emails that would need to be reviewed.  Obviously, this remains an unreasonable amount.

We can discuss after you get up to speed.

Win Gault
Forman Watkins & Krutz LLP
www.formanwatkins.com


-----Original Message-----

EXHIBIT C

From: Boone, Walter [mailto:wboone@balch.com]
Sent: Wednesday, August 1, 2018 12:04 PM
To: Win Gault <Win.Gault@formanwatkins.com>
Cc: Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Lowry, Andy
<alowry@balch.com>; Taylor, Perry <ptaylor@balch.com>
Subject: RE: Scheduling Order

Here is a proposed scheduling order which we would propose to submit jointly to the Court.  Thanks.

-----Original Message-----
From: Win Gault [mailto:Win.Gault@formanwatkins.com]
Sent: Wednesday, August 01, 2018 11:45 AM
To: Boone, Walter
Subject: Re: Scheduling Order

[External Email] Please use caution.


Talking to Jed at 1:30.

> On Jul 31, 2018, at 4:31 PM, Boone, Walter <wboone@balch.com> wrote:
>
> As discussed, in light of our appearance in this case and our substitution as counsel for Raggio, we respectfully request an extension/amendment of the scheduling order as follows:
>
> 1.  Thirty (30) day extension on the deadline to amend the pleadings.
>
> 2. Ninety (90) day extension on all other deadlines.
>
> 3.  We will need a new pretrial conference date and trial setting based in these extensions.
>
> Can you agree?  If so, we can get you a draft of an unopposed motion tomorrow.
>
> Please let us know as soon as you know, since we anticipated filing a motion unopposed or not.
>
> Thanks.
>
>
> Walter Boone, Partner, Balch & Bingham LLP
> 188 East Capitol Street   Suite 1400 Jackson, MS 39201-2133
> t:(601) 965-8179 f:(888) 856-9542 e:wboone@balch.com www.balch.com
>
>
> ~~
>
>
>
>
> CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.
> ~~

EXHIBIT C

>
>
Important Confidentiality And Limited Liability Notice-- This email and any attachments may be confidential and protected by law. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the email or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and deleting this copy and the reply from your system. Please note that any views or opinions expressed in this email are solely those of the author and do not necessarily represent those of Forman Watkins & Krutz LLP. (FWK). The recipient should check this email and any attachments for the presence of viruses. FWK accepts no liability for any damage caused by any virus transmitted by this email. Thank you for your cooperation.

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

EXHIBIT C

**Mandie Robinson**

---

| | |
|---|---|
| **From:** | Peyton Smith |
| **Sent:** | Tuesday, September 04, 2018 10:36 AM |
| **To:** | Boone, Walter; Mandie Robinson |
| **Cc:** | Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Khoury, Alex |
| **Subject:** | RE: Raggio v. MTGOX (Search of Google emails) |

Walter, removing "mark" and "missing" only reduces the number of documents from approximately 15,000 to approximately 12,000. This is still too broad. One option may be to limit the scope of time within which we are searching. Currently the search spans five years worth of emails.

**Peyton Smith**
Forman Watkins & Krutz LLP

---

**From:** Boone, Walter <wboone@balch.com>
**Sent:** Friday, August 31, 2018 2:00 PM
**To:** Mandie Robinson <Mandie.Robinson@formanwatkins.com>
**Cc:** Win Gault <Win.Gault@formanwatkins.com>; Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Lowry, Andy <alowry@balch.com>; Taylor, Perry <ptaylor@balch.com>; Peyton Smith <Peyton.Smith@formanwatkins.com>; Khoury, Alex <akhoury@balch.com>
**Subject:** RE: Raggio v. MTGOX (Search of Google emails)

My apologies, but here is the current search term list.  We left off "bug" and "bugs".  Thanks.

EXHIBIT D

| New Terms | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| admin@mtgox.com | 0 |
| Attack* | 554 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug* | 402 |
| Bugs | 531 |
| chris.raszlo@gmail.com | 0 |
| Dictionary | 60 |
| donald.raszlo@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 552 |
| ips@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| mark@tibanne.com | 0 |
| Mtgox | 784 |
| Raszlo | 3 |
| Steal* | 326 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 6 |
| Tibanne | 5 |
| "weak password" | 0 |

**From:** Boone, Walter
**Sent:** Friday, August 31, 2018 1:53 PM
**To:** 'Mandie Robinson'
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** RE: Raggio v. MTGOX (Search of Google emails)

Win and Mandie,

Based on yours and Mandie Robinson's correspondence below, we understand that using the search terms provided by Brad Martin yielded 15,592 total documents and 8,861 unique hits. As you can see in the charts below, we have removed some terms in an attempt to limit both the number of total documents and unique hits. The far left chart is the original terms and results, the middle chart is our new list, and the far right chart contains the terms we removed. Removing "Mark" and "Missing" should reduce 2,853 unique hits as we understand it.

Please let us know how many total documents and unique hits the new terms list (middle chart) yields, and whether you believe that result is sufficiently narrow.  Thanks.

2

EXHIBIT D

| Prior Terms | Unique hits | New Terms | Unique hits | Removed Terms | |
|---|---|---|---|---|---|
| "brute force" | 38 | "brute force" | 38 | Mark | |
| "Liberty reserve" | 12 | "Liberty reserve" | 12 | Missing | |
| "weak password" | 0 | admin@mtsox.com | 0 | | |
| admin@mtsox.com | 0 | Attack* | 354 | | |
| Attack* | 354 | Baron | 6 | 2,858 unique hits rem |
| Baron | 6 | baron@contractor.net | 0 | Total doc number red |
| baron@contractor.net | 0 | chris.rassio@gmail.com | 0 | | |
| Bug | 402 | Dictionary | 60 | | |
| Bugs | 331 | donald.rassio@gmail.com | 0 | | |
| chris.rassio@gmail.com | 0 | Fraud* | 294 | | |
| Dictionary | 60 | Gox | 699 | | |
| donald.rassio@gmail.com | 0 | Hack* | 931 | | |
| Fraud* | 294 | Illegal | 243 | | |
| Gox | 699 | info@mtsox.com | 0 | | |
| Hack* | 931 | Investig* | 552 | | |
| Illegal | 243 | jed@mtsox.com | 0 | | |
| info@mtsox.com | 0 | Karpeles | 0 | | |
| Investig* | 552 | LR | 65 | | |
| jed@mtsox.com | 0 | mark@tibanne.com | 0 | | |
| Karpeles | 0 | Mtgox | 764 | | |
| LR | 65 | Raggio | 3 | | |
| Mark | 1,513 | Steal* | 328 | | |
| mark@tibanne.com | 0 | Stole* | 125 | | |
| Missing | 1,317 | Theft | 117 | | |
| Mtgox | 764 | Theymos | 4 | | |
| Raggio | 3 | theymos@mm.st | 0 | | |
| Steal* | 328 | Thief | 8 | | |
| Stole* | 125 | Tibanne | 3 | | |
| Theft | 117 | "weak password" | 0 | | |
| Theymos | 4 | | | | |
| theymos@mm.st | 0 | | | | |
| Thief | 8 | | | | |
| Tibanne | 3 | | | | |
| | | | | | |
| 8,861 unique hits | | | | | |
| 13,592 total docs | | | | | |



Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

EXHIBIT D

**From:** Mandie Robinson [mailto:Mandie.Robinson@formanwatkins.com]
**Sent:** Tuesday, August 07, 2018 10:18 AM
**To:** Boone, Walter
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** Raggio v. MTGOX (Search of Google emails)

**[External Email] Please use caution.**

Good morning Walter,

To answer your questions on the Google searches (your email attached), the search terms Plaintiffs' provided are in the email from Brad Martin (also attached), and all were searched. There are 83,473 total documents (emails plus attachments). To review every document containing a search term would require review of 15,592 documents because even if the term is only in an attachment, it would still require reviewing the email. There are no duplicates in this number of documents. The largest possibility for false positives are common words or words that have multiple uses. (i.e., "Mark" can be a name, a verb, or another noun). The unique hits (the number of documents that contain only one particular search term) are listed below:

Let us know your thoughts after you review this information.

Thanks,
Mandie

| Term | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| "weak password" | 0 |
| admin@mtgox.com | 0 |
| Attack* | 554 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 531 |
| chris.raggio@gmail.com | 0 |
| Dictionary | 60 |
| donald.raggio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 552 |
| jed@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| Mark | 1,513 |
| mark@tibanne.com | 0 |
| Missing | 1,317 |

EXHIBIT D

| Mtgox | 784 |
|-------|-----|
| Raggio | 3 |
| Steal* | 328 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 8 |
| Tibanne | 5 |

**Mandie Robinson**

Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
D: 601.974.8735 | F: 601.960.8613
mandie.robinson@formanwatkins.com

**Forman**Watkins

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT D

## Mandie Robinson

| | |
|---|---|
| **From:** | Boone, Walter <wboone@balch.com> |
| **Sent:** | Tuesday, August 07, 2018 1:28 PM |
| **To:** | Mandie Robinson |
| **Cc:** | Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex |
| **Subject:** | RE: Raggio v. MTGOX (Search of Google emails) |

Thanks, Mandie.  My partner, Alex Khoury, is our guru on this stuff.  We will be back in touch.



Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
**www.balch.com**

---

**From:** Mandie Robinson [mailto:Mandie.Robinson@formanwatkins.com]
**Sent:** Tuesday, August 07, 2018 10:18 AM
**To:** Boone, Walter
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** Raggio v. MTGOX (Search of Google emails)

**[External Email] Please use caution.**

Good morning Walter,

To answer your questions on the Google searches (your email attached), the search terms Plaintiffs' provided are in the email from Brad Martin (also attached), and all were searched.  There are 83,473 total documents (emails plus attachments).  To review every document containing a search term would require review of 15,592 documents because even if the term is only in an attachment, it would still require reviewing the email.  There are no duplicates in this number of documents.  The largest possibility for false positives are common words or words that have multiple uses.  (i.e., "Mark" can be a name, a verb, or another noun).  The unique hits (the number of documents that contain only one particular search term) are listed below:

Let us know your thoughts after you review this information.

Thanks,
Mandie

| Term | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| "weak password" | 0 |
| admin@mtgox.com | 0 |
| Attack* | 554 |

1

EXHIBIT E

| Baron | 6 |
|---|---|
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 531 |
| chris.raggio@gmail.com | 0 |
| Dictionary | 60 |
| donald.raggio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 552 |
| jed@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| Mark | 1,513 |
| mark@tibanne.com | 0 |
| Missing | 1,317 |
| Mtgox | 784 |
| Raggio | 3 |
| Steal* | 328 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 8 |
| Tibanne | 5 |

**Mandie Robinson**

Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
D: 601.974.8735 | F: 601.960.8613
mandie.robinson@formanwatkins.com

**Forman**Watkins

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT E

**Mandie Robinson**

| | |
|---|---|
| **From:** | Khoury, Alex <akhoury@balch.com> |
| **Sent:** | Wednesday, August 08, 2018 11:21 AM |
| **To:** | Mandie Robinson; Boone, Walter |
| **Cc:** | Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith |
| **Subject:** | RE: Raggio v. MTGOX (Search of Google emails) |

Mandie,

Thank you for this information. It is very helpful. I certainly see some areas where we can tighten these searches, especially around the term "missing." I think limiting "Mark" poses some challenges, but I'm certainly open to discussing that with you and hearing your ideas for narrowing that search. Also, I think there are a few additional terms that should be searched. Are you available to talk about this later today or tomorrow?

Best Regards,

Alex



K. Alex Khoury, Partner, Balch & Bingham LLP
1901 Sixth Avenue North • Suite 1500 • Birmingham, AL 35203-4642
t: (205) 226-3408   f: (866) 317-8482   e: akhoury@balch.com
**www.balch.com**

---

**From:** Mandie Robinson [mailto:Mandie.Robinson@formanwatkins.com]
**Sent:** Tuesday, August 07, 2018 10:18 AM
**To:** Boone, Walter
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** Raggio v. MTGOX (Search of Google emails)

**[External Email] Please use caution.**

Good morning Walter,

To answer your questions on the Google searches (your email attached), the search terms Plaintiffs' provided are in the email from Brad Martin (also attached), and all were searched. There are 83,473 total documents (emails plus attachments). To review every document containing a search term would require review of 15,592 documents because even if the term is only in an attachment, it would still require reviewing the email. There are no duplicates in this number of documents. The largest possibility for false positives are common words or words that have multiple uses. (i.e., "Mark" can be a name, a verb, or another noun). The unique hits (the number of documents that contain only one particular search term) are listed below:

Let us know your thoughts after you review this information.

Thanks,
Mandie

EXHIBIT F

| Term | Unique hits |
|------|-------------|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| "weak password" | 0 |
| admin@mtgox.com | 0 |
| Attack* | 554 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 531 |
| chris.raggio@gmail.com | 0 |
| Dictionary | 60 |
| donald.raggio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 552 |
| jed@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| Mark | 1,513 |
| mark@tibanne.com | 0 |
| Missing | 1,317 |
| Mtgox | 784 |
| Raggio | 3 |
| Steal* | 328 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 8 |
| Tibanne | 5 |

**Mandie Robinson**

Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
D: 601.974.8735 | F: 601.960.8613
mandie.robinson@formanwatkins.com



EXHIBIT F

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT F

**Mandie Robinson**

| | |
|---|---|
| **From:** | Boone, Walter <wboone@balch.com> |
| **Sent:** | Monday, September 10, 2018 6:00 PM |
| **To:** | Win Gault |
| **Cc:** | Mandie Robinson; Peyton Smith; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Khoury, Alex; Taylor, Perry |
| **Subject:** | Discovery of Gmail Account |

Win,

We need some resolution on the production of your client's gmail account.

The Court's June 5 Order required our client to provide you with search terms to identify potentially relevant documents, which Brad Martin did on July 9. Based on an email we received from Mandie Robinson on August 7, those search terms reduced the number of documents to be reviewed from 83,473 to 15,592. Your position was that even the greatly reduced number is unreasonable. In her email, she represented that common words were likely to hit on "false positives." Mandie pointed out the term "Mark," which had 1,513 unique hits, although she failed to identify any specific false positives that were coming up in the search. Nor have you provided us any indication on what the other "false positives" were or whether you even looked to determine if there were "false positives." Alex Khoury, our eDiscovery lawyer, proposed a meet and confer to discuss ways to eliminate false positives and further reduce the document count, but you declined that offer.

In our desire to avoid an unnecessary discovery dispute over these emails, on August 31, we offered to simply eliminate the two most prolific terms, "mark" and "missing," from the search term list, even though those terms are clearly calculated to lead to the discovery of relevant evidence. Removing those terms reduced the documents to be reviewed to approximately 12,000—down from 83,473. (We asked for, but have not yet received, a breakdown of which hits happened on which terms.) In his email dated September 4, Peyton maintains that "[t]his is still too broad." We note that the 12,000 documents, which you claim is still an unreasonable number, is fewer than the 13,000 emails Judge Sclafani believed was reasonable for our client to review in the June 5 order.

We would like to get beyond discovery disputes and on to the merits of this case, but that will require some cooperation from the Defendant. For purposes of our present dispute (and without waiving our ability to come back later to request any portion of, or the entirety of, the gmail account), here is our proposal to further limit these documents so that we can overcome this impasse:

- We will agree to limit the date range of the searches to June 1, 2010 to December 31, 2014. That cuts out five months of emails we deem the least likely to contain relevant information. We cannot reduce the date range on the back end because we believe there are relevant documents in that time period (and probably beyond).
- We continue to be willing to work with you to limit any of the searches you contend are overbroad and to eliminate "false positives." To do so, you will have to actually confer with us on the basis of your claim of over breadth and work with us to identify and eliminate actual "false positives," not hypothetical "false positives." (This process will go faster and be less expensive if we let our eDiscovery people talk directly about identifying and eliminating the false positives.) As you know, this is a simple and straightforward process which can be accomplished with a minimal investment of time and energy, but only if we confer and let the experts talk.
- Restore the search term "Mark" but target it as follows: "Mark" without stemming and not within 5 words of the following: check, document, word, agreement. We will also agree to eliminate "Mark" within 2 of the last name of any individuals unrelated to this matter.

EXHIBIT G

I am hopeful that we can come to an agreement along these lines.  Please let us know your thoughts.



Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
**www.balch.com**

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT G

**Mandie Robinson**

| | |
|---|---|
| **From:** | Win Gault <Win.Gault@formanwatkins.com> |
| **Sent:** | Wednesday, September 12, 2018 4:10 PM |
| **To:** | Boone, Walter |
| **Cc:** | Mandie Robinson; Peyton Smith; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Khoury, Alex; Taylor, Perry |
| **Subject:** | RE: Discovery of Gmail Account |
| **Attachments:** | SearchTermsReport.pdf |

Your email seems to imply that we somehow have refused to cooperate or that we are somehow responsible for the inability to develop search terms which yield a reasonable number of documents.  We obviously disagree.

Judge Sclafani explained at the hearing that he considered Plaintiffs' Google subpoena overbroad and cautioned that the search terms should be narrowly tailored. Yet your email proposes that we produce every email in Jed's account that includes the term "Gox" or "MTGOX" over a nearly five-year span. That is not narrow tailoring.

Plaintiffs have obtained voluminous discovery over the past two years, and no evidence so much as suggests Jed stole the Raggios' bitcoins. The judge made clear he did not consider discovery on conspiracy-theory-driven claims (embezzlement, conversion, etc.) relevant. Yet the broad search terms and timeframe you've proposed are calculated to continue exploring those theories. These searches effectively seek to take discovery in this years-old case back to square one.

Your email asked us to identify false positives and asked for a breakdown of the number of hits per search term. Identifying false positives requires loading emails onto the review platform, which we have not done. We have, however, attached a chart that shows the number of hits on your proposed search terms, which underscores the overbreadth of a number of those terms.

If this search is to be narrowly tailored, we think running "compound" searches to reduce the number of hits is a good starting point. For example:

- Require that results for several terms (attack, bug, bugs, fraud, hack, illegal, investing*, steal, stole, and theft) also include either Gox or MTGOX. Those terms collectively account for over 17,000 hits, and are not narrowly tailored to topics related to Plaintiffs' claims.
- Require that results for Gox and MTGOX also include a hit on an additional search term (excluding Gox or MTGOX). Those terms collectively account for over 5,000 hits, and not narrowly tailored to topics related to Plaintiffs' claims.
- Exclude attachments and other family documents that include the terms "LR" or "Liberty Reserve" because these terms return relatively few hits in emails but include a very large number of "family" documents.

We also propose limiting the timeframe. Judge Sclafani indicated at the hearing that two years after the theft would make a good starting point for establishing the relevant timeframe. This would cut the searchable set in half. If emails from that period provide a good faith basis for seeking later documents then we can revisit the issue.

Regarding the 13,000 emails referenced in your email, the Judge's ruling makes clear that he believes it would be **unreasonable** to ask us to review that many emails. As Judge Sclafani stated at the hearing, "the Court finds that dumping 13,772 pages is not reasonably limited."

We stand ready to run an additional search, hopefully narrowly tailored this time.

EXHIBIT H

**Win Gault**
Forman Watkins & Krutz LLP
www.formanwatkins.com

---

**From:** Boone, Walter <wboone@balch.com>
**Sent:** Monday, September 10, 2018 6:00 PM
**To:** Win Gault <Win.Gault@formanwatkins.com>
**Cc:** Mandie Robinson <Mandie.Robinson@formanwatkins.com>; Peyton Smith <Peyton.Smith@formanwatkins.com>; Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Lowry, Andy <alowry@balch.com>; Khoury, Alex <akhoury@balch.com>; Taylor, Perry <ptaylor@balch.com>
**Subject:** Discovery of Gmail Account

Win,

We need some resolution on the production of your client's gmail account.

The Court's June 5 Order required our client to provide you with search terms to identify potentially relevant documents, which Brad Martin did on July 9. Based on an email we received from Mandie Robinson on August 7, those search terms reduced the number of documents to be reviewed from 83,473 to 15,592. Your position was that even the greatly reduced number is unreasonable. In her email, she represented that common words were likely to hit on "false positives." Mandie pointed out the term "Mark," which had 1,513 unique hits, although she failed to identify any specific false positives that were coming up in the search. Nor have you provided us any indication on what the other "false positives" were or whether you even looked to determine if there were "false positives." Alex Khoury, our eDiscovery lawyer, proposed a meet and confer to discuss ways to eliminate false positives and further reduce the document count, but you declined that offer.

In our desire to avoid an unnecessary discovery dispute over these emails, on August 31, we offered to simply eliminate the two most prolific terms, "mark" and "missing," from the search term list, even though those terms are clearly calculated to lead to the discovery of relevant evidence. Removing those terms reduced the documents to be reviewed to approximately 12,000—down from 83,473. (We asked for, but have not yet received, a breakdown of which hits happened on which terms). In his email dated September 4, Peyton maintains that "[t]his is still too broad." We note that the 12,000 documents, which you claim is still an unreasonable number, is fewer than the 13,000 emails Judge Sclafani believed was reasonable for our client to review in the June 5 order.

We would like to get beyond discovery disputes and on to the merits of this case, but that will require some cooperation from the Defendant. For purposes of our present dispute (and without waiving our ability to come back later to request any portion of, or the entirety of, the gmail account), here is our proposal to further limit these documents so that we can overcome this impasse:

- We will agree to limit the date range of the searches to June 1, 2010 to December 31, 2014. That cuts out five months of emails we deem the least likely to contain relevant information. We cannot reduce the date range on the back end because we believe there are relevant documents in that time period (and probably beyond).
- We continue to be willing to work with you to limit any of the searches you contend are overbroad and to eliminate "false positives." To do so, you will have to actually confer with us on the basis of your claim of over breadth and work with us to identify and eliminate actual "false positives," not hypothetical "false positives." (This process will go faster and be less expensive if we let our eDiscovery people talk directly about identifying and eliminating the false positives.) As you know, this is a simple and straightforward process which can be accomplished with a minimal investment of time and energy, but only if we confer and let the experts talk.

EXHIBIT H

- Restore the search term "Mark" but target it as follows: "Mark" without stemming and not within 5 words of the following: check, document, word, agreement. We will also agree to eliminate "Mark" within 2 of the last name of any individuals unrelated to this matter.

I am hopeful that we can come to an agreement along these lines. Please let us know your thoughts.



Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT H

**Mandie Robinson**

---

| | |
|---|---|
| **From:** | Win Gault |
| **Sent:** | Wednesday, October 10, 2018 12:03 PM |
| **To:** | Mandie Robinson |
| **Subject:** | FW: McCaleb Gmail Account |

**Win Gault**
Forman Watkins & Krutz LLP
Direct Dial: 601-969-7834

---

**From:** Boone, Walter <wboone@balch.com>
**Sent:** Tuesday, September 25, 2018 10:03 AM
**To:** Win Gault <Win.Gault@formanwatkins.com>
**Cc:** Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Khoury, Alex <akhoury@balch.com>; Taylor, Perry <ptaylor@balch.com>; Lowry, Andy <alowry@balch.com>
**Subject:** McCaleb Gmail Account

Win:

Thanks for your email of 9/12/18.  Unfortunately, I fear that Raggio is being asked to narrow search terms that likely contain relevant information based on assumptions and guesses and not real data, which is available.  We are willing to compromise on these searches, as detailed below, but first, we note the following issues, which we deem significant:

1. **McCaleb's Unknown Arbitrary Number of Documents Which Constitute a "Reasonable" Number to Review.**  You ask that we continue to reduce the number of "hits" by restricting search terms.  So far, we have reduced the number from 84,000 to 14,000 to 12,000.  However, you have provided no information on whether or how the documents generated are not relevant, and no information on "false positives" that are generated by those search terms.  You seem to have some arbitrary number of documents in mind which you think constitutes a "reasonable" number that you will review.  Can you tell us what that arbitrary number is?  If you are shooting for some goal (albeit arbitrary), I think it's fair to let us know what that is.

2. **McCaleb's Unwillingness to Conduct Any Review for Relevance or "False Positives."**  In our last correspondence, we asked that you tell us how the search terms we proposed are generating "false positives" so that we can refine the terms to eliminate those known false positives.  In your response, you again decline.  But more importantly, you told us that you have not reviewed any of the "hits" for false positives.  "Identifying false positives requires loading emails onto the review platform, <u>which we have not done</u>."  (Emphasis added.) So, as of today, you cannot tell us or the Court that these "hits" contain irrelevant documents.  To the contrary, as far as you know, every one of the "hits" could be a relevant document.  And you have not done any kind of "spot" review or partial review to even help us narrow the search terms. (Thus, the only basis for refusing to review and produce them must be the "arbitrary number" problem in the prior paragraph).  The stated reason for this lack of review is that "identifying false positives requires loading emails onto the review platform. . ."  Our tech people tell us that the emails appear to be in a Relativity Early Case Assessment database right now, which contains the searchable text of the emails, as evidenced by the search term hit reports you've provided.  We also use ECA databases to search and cull email, and we have the ability to view the extracted text of the emails to identify false positives in that ECA platform before we load the documents into our review platform.  Please double check whether you are able to identify false positives because we think you can.  If it would help to have

EXHIBIT I

our tech people talk to yours to figure out if you can identify some false positives before loading the documents into a review platform, we are happy to do that.

3. **Limitation of Review Period.** We already proposed to limit the review period to begin on June 1, 2010 rather than January 1, 2010. Yet, we didn't see any confirmation that the latest search included this narrowing of the time frame, or that it reduced the hits. Was the last search so limited? If it was not, I would like to know what effect the time limitation we proposed has on the document count before we discuss another time limitation.

4. **Limitation of Term "Mark."** Likewise, we proposed that we include the search term "Mark" with certain restrictions. However, you have not shown us the results of that search, so we cannot judge what the effectiveness is of narrowing search terms by running "compound" searches. Before we embark on "compound" searches, we request that you run the one we proposed and provide us the results.

5. **Reported "Hits" Increasing When Search Terms Remain the Same.** We also don't understand why the unique "hits" in your last two emails have increased for search terms that have remained the same. For some reason, the number of "hits" increased by 786 for search terms we didn't change. See the table below.  Please explain why the number of hits increased for these terms between August 7 and September 12.

| Search Terms | Unique Hits (9/12/18 email) | Unique Hits (8/7/18 email) | Difference |
|---|---|---|---|
| "brute force" | 87 | 58 | +29 |
| Attack* | 622 | 554 | +68 |
| Baron | 16 | 6 | +10 |
| Bug | 448 | 402 | +46 |
| Bugs | 574 | 531 | +43 |
| Dictionary | 99 | 60 | +39 |
| Fraud* | 321 | 294 | +27 |
| Gox | 783 | 699 | +84 |
| Hack* | 1072 | 931 | +141 |
| Illegal | 276 | 243 | +33 |
| Investig* | 606 | 552 | +54 |
| Karpeles | 9 | 0 | +9 |
| LR | 72 | 65 | +7 |
| Mtgox | 949 | 784 | +165 |
| Steal* | 353 | 328 | +25 |
| Theft | 123 | 117 | +6 |
| | | | +786 |

Although we have already narrowed the relevant document pool from 83,473 documents to 12,000 documents, we are willing to further compromise on the search terms as follows:
1. **Limitation of Review Period**. As stated in my previous email, we agree to limit the time period of the search to June 1, 2010 to December 31, 2014. We will consider revisiting the date range issue if this limited range, plus the other measures proposed herein, do not reasonably limit the document pool.
2. **Further Narrowing of Search Terms**. We will agree to further compromise the search terms as follows:
   a. MTGOX &  GOX—Your latest hit report indicates that the terms Gox and MTGOX resulted in 3,986 hits of which 1,732 were unique, meaning those 1,732 documents did not contain any of our other search terms.  This also means that the remaining 2,254 documents that contain the terms GOX or MTGOX also

EXHIBIT I

contain at least one additional search term, making them far more likely, in our opinion, to be relevant. We will agree for now to limit the search to these 2,254 documents containing the terms GOX or MTGOX and at least one additional search term. We reserve the right to test additional compound searches against the remaining 1,732 GOX or MTGOX documents based on our review of the GOX or MTGOX documents produced.

b. <u>Mark</u>—We agree to run the search term "Mark" without stemming and not within 5 words of the following:  check, document, word, agreement, or calendar.  We will also agree to eliminate "Mark" within 2 of the last name of any individuals unrelated to this matter.

c. <u>LR and Liberty Reserve</u>—The term Liberty Reserve only hits 78 documents, which we believe is not an unreasonable number and requires no modification.  The term LR only hits 87 documents, but when you count the attachments to those 87 documents, the document count for the term LR climbs to 1,109.  We propose that you review the 87 documents that actually hit the term LR first, without looking at the attachments, and then only review the attachments to any of those 87 documents that are actually relevant to this litigation.

d. <u>Attack, Bug, Bugs, Dictionary, Fraud, Illegal, Investig*, Steal, Stole, Theft, and Thief</u>—We agree to compound these search terms to eliminate known false positives using the following formula:  [Search Term] not within 2 of [False Positive Identifier 1] or [False Positive Identifier 2], etc.  This method of compounding search terms to eliminate false positives is an efficient and effective means of separating potentially relevant documents from irrelevant documents without requiring us to guess the words your client might have used in his emails.

e. <u>All other search terms</u>—all of the remaining search terms are specific enough to this litigation that no further narrowing is reasonable.

We believe limiting the searches as we proposed will significantly reduce the number of documents to review and will target the review to documents most likely to be relevant to this litigation.  We would like to see the hit reports for the searches limited as proposed herein.  If you contend that our proposal to narrowly tailor the search terms is too burdensome, please explain the alleged burden so that we can evaluate your objection and look for additional ways to address it, if possible, or seek additional guidance from the Court.

Finally, if your client's goal is to reduce the burden of his discovery obligations to as near zero as possible, there is an alternative compromise we are willing to offer, namely:

1. You run privilege search terms across the entire 83,473 documents and pull out and log any documents that hit your privilege search terms.

2. You then dump all of the remaining documents on us, designated as attorneys-eyes only.

3. We then cull the documents to weed out emails that are obviously irrelevant and either return or destroy those documents.

4. Documents not eliminated by our culling will then be reviewed by us for relevance.  Any documents we deem not relevant will be returned to you or destroyed.

We are willing to enter into a consent protective order and a clawback agreement to protect your client from the disclosure of any non-relevant, embarrassing or confidential information and from the inadvertent production of privileged materials that might slip through your privilege search.  This compromise shifts virtually all of the burden of reviewing your client's  emails to the Plaintiffs.  If this sounds like something your client would consider, please let me know.

Thanks.



EXHIBIT I

Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT I

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

---

**JED MCCALEB AND CODE COLLECTIVE, LLC'S RESPONSES TO PLAINTIFFS**
**DR. DONALD RAGGIO AND DR. CHRIS RAGGIO'S FIRST SET OF REQUEST FOR**
**PRODUCTION OF DOCUMENTS**

COME NOW, the Defendants, Jed McCaleb and Code Collective, LLC (together

"Defendants"), and respond to the Plaintiffs; First Set of Request for Production of Documents

as follows:

**GENERAL OBJECTIONS**

Defendants object to any request to the extent it seeks documents or contents of any

public forums or filings as Plaintiffs have equal access to such information.  Defendants

further object to production of documents which are not relevant or related to the allegations

of the Complaint in any way, including any emails to or from Mark Karpeles from McCaleb's

"gmail" account which do not discuss the Raggios, the alleged theft of bitcoins, or the sale of

MTGOX.

**RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 1:** All documents of any  kind (including electronic documents or

information stored electronically) which you have under your control or possession which

relate,  directly  or  indirectly,  to any  facts and/or  circumstances  tending  to support  or

disprove  the  allegations  of the  Plaintiffs  in  the  complaint  (or  any  amendments  thereto)  or

the  Defendant's  defenses in this action.

1

**RESPONSE NO. 1:** Documents are being produced.  This response may be supplemented.


**REQUEST NO. 2:**  All documents of any kind (including electronic documents or information stored electronically) or photographs identified or referred to in your responses to  the Plaintiffs' Interrogatories, or upon which you relied in drafting said responses.

**RESPONSE NO. 2:** Documents are being produced.


**REQUEST NO. 3:** All documents that you provided to any third party relating to any of the allegations in the complaint.

**RESPONSE NO. 3**: Defendants object to the extent this request seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, there are none.


**REQUEST NO. 4:** All documents or objects intended to be introduced into evidence as  exhibits in the trial of this matter.

**RESPONSE NO. 4:**  Defendants have not made a decision on what documents or objects they may seek to introduce into evidence at the trial of this matter.  This response will be supplemented.


**REQUEST NO. 5:** Please produce all records regarding the Plaintiffs.

**RESPONSE NO. 5:** Records in the possession of the Defendants are being produced.

2

**REQUEST NO. 6:** All documents relating to any current or former MTGOX owner, agent, employee or contractor involved in any of the allegations in the complaint.

**RESPONSE NO. 6:** Defendants object to this request as overbroad, unduly burdensome, and seeking irrelevant information not calculated to lead to the discovery of admissible evidence, as it seeks *all* documents related to *any* MTGOX owner regardless of whether such documents relate to the allegations of the Complaint. Without waiving said objection, Defendants are producing all documents related to any other MTGOX owner that <u>do</u> relate to the allegations of the Complaint.

**REQUEST NO. 7:** Produce a copy of the resume, curriculum vitae and any other discoverable background information of any experts you plan to call at trial of this matter.

**RESPONSE NO. 7:** Defendants have not retained any experts at this time. This response will be supplemented if experts are retained to testify at trial.

**REQUEST NO. 8:** Produce a copy of each document, photograph or other tangible item you provided to any testifying expert, non-testifying expert, or consultant you have consulted with regarding this matter or relied upon by any expert you have consulted with regarding this matter.

**RESPONSE NO. 8:** None at this time.

**REQUEST NO. 9:** All documents relating to the qualification or opinion of any testifying or non-testifying expert witness or consultant retained by you or your counsel, including but not limited to: (a) the expert or consultant's resume or curriculum vitae; (b) any other documents supporting his or her qualifications or your assertion of his or her status as

3

EXHIBIT J

an expert; (c) all reports, drafts, and notes prepared or relied upon by the expert or consultant in providing advice or rending an opinion, and (d) relevant portions of any books, treatises, articles, or other documents that the expert regards as authoritative on the subject about which you contend he or she is an expert.

**RESPONSE NO. 9:** None at this time.

**REQUEST NO. 10:** Produce copies of all complaints and lawsuits filed against you or any other business entity owned or operated by you from 2010 to current where plaintiffs have made claims substantially similar to those in the instant complaint.

**RESPONSE NO. 10:** Defendants object to this request as the terms "substantially similar" are unclear. Without waiving that objection, there are none.

**REQUEST NO. 11:** All documents prepared in connection with any legal or administrative proceeding, other than this action, which relate in any way to any claim at issue in this action or any allegation in the complaint.

**RESPONSE NO. 11:** Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving this objection, there are no other proceedings which relate to the claims alleged in the Complaint.

**REQUEST NO. 12:** All documents relating to any statements from any potential witness, or other person with any information or knowledge relating to the claims in this action or allegations in the complaint.

EXHIBIT J

**RESPONSE NO. 12:** Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents in Defendants' possession are being produced.


**REQUEST NO. 13:** Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of  correspondence, between you and the Plaintiffs.

**RESPONSE NO. 13:** Responsive documents in the possession of Defendants are being produced.


**REQUEST NO. 14:** Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and Mark Karpeles.

**RESPONSE NO. 14:** Defendants object to this request as overbroad, unduly burdensome, and seeking irrelevant information not calculated to lead to the discovery of admissible evidence. Without waiving said objection, Defendants are producing all correspondence between Defendants and Mark Karpeles related to the allegations within Plaintiffs' Complaint.


**REQUEST NO. 15:** Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and Mark Karpeles regarding the sale of MTGOX to Mark Karpeles and/or Tibanne.

EXHIBIT J

**RESPONSE NO. 15**: Documents in the Defendants' possession are being produced.


**REQUEST NO. 16:** Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of  correspondence, between you and any other individual and/or entity regarding the sale of MTGOX to Mark Karpeles and/or Tibanne.

**RESPONSE NO. 16:** Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Defendants further object to this request as overbroad, unduly burdensome, and seeking irrelevant information not calculated to lead to the discovery of admissible evidence.  Without waiving these objections, correspondence with the Raggios regarding the sale of MTGOX are being produced.


 **REQUEST NO. 17**: Produce all documents, including but not limited to contracts, draft contracts, terms and conditions and any other pertinent document relating to the sale of MTGOX  to Mark Karpeles and/or Tibanne.

**RESPONSE NO. 17**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents in the Defendants' possession are being produced.


**REQUEST NO. 18**: Produce any documents which reflect the relationship between the defendants, including any written agreements between the parties.

**RESPONSE NO. 18**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents in the Defendants' possession are being produced.

EXHIBIT J

**REQUEST NO. 19**: Produce any and all exculpatory and indemnification agreements with Mark Karpeles or any other individual or entity concerning the incident complained of in Plaintiffs' Complaint.

**RESPONSE NO. 19**:  The contract for the sale of MTGOX to K.K. Tibanne containing an indemnification provision is being produced.

**REQUEST NO. 20**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and Mark Karpeles and/or Tibanne regarding the bitcoins missing  and/or stolen from the Donald Raggio MTGOX account.

**RESPONSE NO. 20**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents in Defendants' possession are being produced.

**REQUEST NO. 21**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and any other individual or entity regarding the bitcoins missing  and/or stolen from the Donald Raggio MTGOX account.

**RESPONSE NO. 21**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, see response to Request Nos. 3, 14, and 20.

**REQUEST NO. 22**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of

EXHIBIT J

correspondence, between you and Mark Karpeles and/or Tibanne regarding any bitcoins, money,  or any other form of currency missing or stolen from MTGOX accounts or MTGOX wallets.

**RESPONSE NO. 22**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, responsive documents are being produced.

**REQUEST NO. 23**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and any other individual or entity regarding any bitcoins, money,  or any other form of currency missing or stolen from MTGOX accounts or MTGOX wallets.

**RESPONSE NO. 23**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents are being produced.

**REQUEST NO. 24**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and the individual identified as "Baron".

**RESPONSE NO. 24**: Documents in the possession of the Defendants are being produced.

**REQUEST NO. 25**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of

8

EXHIBIT J

correspondence, between you and any other individual or entity regarding the individual identified as "Baron".

**RESPONSE NO. 25**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving this objection, documents are being produced.

**REQUEST NO. 26**: Produce all documents reflecting any expenditures you have made regarding the security of the MTGOX website and/or computer coding of MTGOX while you held and/or retained any percentage of ownership interest in MTGOX.

**RESPONSE NO. 26**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving this objection, no such documents exist.

**REQUEST NO. 27**: Produce all documents regarding any audits of any type that were conducted regarding the security of the MTGOX website and/or computer coding of MTGOX while you held and/or retained any percentage of ownership interest in MTGOX.

**RESPONSE NO. 27**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving this objection, no such documents exist.

**REQUEST NO. 28**: Produce all documents relating to the security of the MTGOX website and/or computer coding of MTGOX while you held and/or retained any percentage of ownership interest in MTGOX.

EXHIBIT J

**RESPONSE NO. 28**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents are being produced.

**REQUEST NO. 29**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and any other individual or entity regarding the security of the  MTGOX website and/or computer coding of MTGOX while you held and/or retained any percentage of ownership interest in MTGOX.

**RESPONSE NO. 29**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents are being produced.

**REQUEST  NO. 30**: All documents showing your level of financial sophistication, including complete copies of all your individual state and federal tax returns and financial statements for the years beginning with the two calendar years immediately preceding the year in  which began operating MTGOX as a bitcoin exchange through 2014.

**RESPONSE NO. 30**:  Defendants object to this request as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeking information that is completely irrelevant to the allegations that the Defendants should pay Plaintiffs for the alleged theft of bitcoins from the Plaintiffs' account.

**REQUEST NO. 31**: All financial account statements pertaining to any individual checking, money management, or investment accounts, including but not limited to  bank,

EXHIBIT J

savings and loan, credit union, securities, brokerage and/or mutual fund accounts which you  maintain or did maintain during the two calendar year immediately preceding the year in which  you began operating MTGOX as a bitcoin exchange through 2014.

**RESPONSE NO. 31**: Defendants object to this request as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeking information that is completely irrelevant to the allegations that the Defendants should pay Plaintiffs for the alleged theft of bitcoins from the Plaintiffs' account.


**REQUEST NO. 32**: All financial account statements pertaining to any MTGOX checking, money management, or investment accounts, including but not limited to  bank, savings and loan, credit union, securities, brokerage and/or mutual fund accounts which MTGOX maintained.

**RESPONSE NO. 32**: Defendants object to this request as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeking information that is completely irrelevant to the allegations that the Defendants should pay Plaintiffs for the alleged theft of bitcoins from the Plaintiffs' account.  Without waiving this objection, Defendants are not in possession of any documents responsive to this request.


**REQUEST NO. 33**: Any and all documents pertaining to the implementation of MTGOX bitcoin wallets while you held and/or retained any percentage of ownership interest in  MTGOX.

**RESPONSE NO. 33**: These Defendants are not in possession of any documents responsive to this request.

EXHIBIT J

**REQUEST NO. 34**: Any and all documents pertaining to bitcoin wallets owned, held, or possessed by MTGOX while you held and/or retained any percentage of ownership interest in  MTGOX.

**RESPONSE NO. 34:** Defendants object to this request as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeking information that is completely irrelevant to the allegations that the Defendants should pay Plaintiffs for the alleged theft of bitcoins from the Plaintiffs' account.  Without waiving this objection, Defendants are not in possession of any documents responsive to this request.


**REQUEST NO. 35**: Any and all documents pertaining to bitcoin addresses owned, held, or possessed by MTGOX while you held and/or retained any percentage of ownership interest in  MTGOX.

**RESPONSE NO. 35**: Defendants object to this request to the extent it seeks confidential private documents of individual consumers.  Without waiving this objection, Defendants are not in possession of any documents responsive to this request.


**REQUEST NO. 36**:  Any and all documents pertaining to terms and conditions regarding MTGOX accounts in which an accountholder would have to abide by upon opening, owning and/or possession a MTGOX account.

**RESPONSE NO. 36**: These Defendants are not in possession of any documents responsive to this request.

EXHIBIT J

**REQUEST NO. 37**: Any and all documents pertaining to bitcoin addresses owned, held, or possessed by MTGOX while you held and/or retained any percentage of ownership interest in  MTGOX.

**RESPONSE NO. 37:** Defendants object to this request as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeking information that is completely irrelevant to the allegations that the Defendants should pay Plaintiffs for the alleged theft of bitcoins from the Plaintiffs' account.  Without waiving this objection, documents in the possession of these Defendants in which McCaleb and Mark Karpeles may have discussed any addresses of MTGOX relating to the sale of MTGOX are being produced.

**REQUEST NO. 38**: Any and all documents pertaining to bitcoins, bitcoin wallets, and bitcoin addresses owned, held, or possessed by yourself while you held and/or retained any  percentage of ownership interest in MTGOX.

**RESPONSE NO. 38**: Defendants object to this request as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeking information that is completely irrelevant to the claims at issue which involve the alleged theft of bitcoins from Plaintiffs' by a third party, not these Defendants.

Respectfully submitted, this the 24th day of January, 2017.

**CODE COLLECTIVE, LLC, and**
**JED McCALEB, individually and formerly**
**doing business as MTGOX, a sole**
**proprietorship**

By:    */s/Edwin S. Gault, Jr.*
         EDWIN S. GAULT, JR., MSB #10187
         MANDIE B. ROBINSON, MSB #100446

13

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com


ETHAN JACOBS
KELLER SLOAN ROMAN HOLLAND, LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Direct: (415) 249-8336
Facsimile: (415) 249-8333
ejacobs@ksrh.com


## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> Tyner Law Firm, P.A.
> 5750 I-55 North
> Jackson, MS  39211
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 24th day of January, 2017.

/s/ Edwin S. Gault, Jr.
EDWIN S. GAULT, JR.

14

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT**
**HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                                    **PLAINTIFFS**

VS.                                                    **CAUSE NO. 14-CV-00071-TTG**

MTGOX, et al.                                                    **DEFENDANTS**

**JED MCCALEB AND CODE COLLECTIVE, LLC'S FIRST SUPPLEMENT TO**
**RESPONSES TO PLAINTIFFS DR. DONALD RAGGIO AND DR. CHRIS RAGGIO'S**
**FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

COME NOW, the Defendants, Jed McCaleb and Code Collective, LLC (together "Defendants"), and submit this First Supplement to Responses to the Plaintiffs' First Set of Request for Production of Documents.  These responses are intended solely to provide supplemental information to the specific requests stated below.

**GENERAL OBJECTIONS**

Defendants object to any request to the extent it seeks documents or contents of any public forums or filings as Plaintiffs have equal access to such information.  Defendants further object to production of documents which are not relevant or related to the allegations of the Complaint in any way, including any emails to or from Mark Karpeles from McCaleb's "gmail" account which do not discuss the Raggios, the alleged theft of bitcoins, or the sale of MTGOX.

Notwithstanding the General Objections stated above, emails contained in McCaleb's "gmail" account to or from Mark Karpeles are being produced.

**RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 14:** Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and Mark Karpeles.

1

**RESPONSE NO. 14:** Defendants object to this request as overbroad, unduly burdensome, and seeking irrelevant information not calculated to lead to the discovery of admissible evidence. Without waiving said objection, Defendants are producing all correspondence between Defendants and Mark Karpeles related to the allegations within Plaintiffs' Complaint.

**SUPPLEMENTAL RESPONSE NO. 14:** Defendants object to this request as overbroad, unduly burdensome, and seeking irrelevant information not calculated to lead to the discovery of admissible evidence. Without waiving said objection, Defendants are producing all correspondence between Defendants and Mark Karpeles.

**REQUEST NO. 15:** Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and Mark Karpeles regarding the sale of MTGOX to Mark Karpeles and/or Tibanne.

**RESPONSE NO. 15**: Documents in the Defendants' possession are being produced.

**SUPPLEMENTAL RESPONSE NO. 15:** Additional documents are being produced.

**REQUEST NO. 17**: Produce all documents, including but not limited to contracts, draft contracts, terms and conditions and any other pertinent document relating to the sale of MTGOX  to Mark Karpeles and/or Tibanne.

**RESPONSE NO. 17**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents in the Defendants' possession are being produced.

**SUPPLEMENTAL RESPONSE NO. 17:** Additional documents are being produced.

EXHIBIT J

**REQUEST NO. 22**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and Mark Karpeles and/or Tibanne regarding any bitcoins, money,  or any other form of currency missing or stolen from MTGOX accounts or MTGOX wallets.

**RESPONSE NO. 22**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, responsive documents are being produced.

**SUPPLEMENTAL RESPONSE NO. 22:**  In addition to the objections stated above, Defendants object to the extent this request is overbroad as it contains no time limit and seeks irrelevant information regarding missing or stolen currency occurring after the sale.  Without waiving this objection, additional documents are being produced.


**REQUEST NO. 23**:  Produce all documents, including but not limited to letters, emails, attachments, private messages, forum messages, text messages and any other form of correspondence, between you and any other individual or entity regarding any bitcoins, money,  or any other form of currency missing or stolen from MTGOX accounts or MTGOX wallets.

**RESPONSE NO. 23**: Defendants object to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.  Without waiving this objection, documents are being produced.

**SUPPLEMENTAL RESPONSE NO. 23:**  In addition to the objections stated above, Defendants object to the extent this request is overbroad as it contains no time limit and seeks

EXHIBIT J

irrelevant information regarding missing or stolen currency occurring after the sale.  Without

waiving this objection, additional documents are being produced.


**REQUEST NO. 35**: Any and all documents pertaining to bitcoin addresses owned, held,

or possessed by MTGOX while you held and/or retained any percentage of ownership interest

in  MTGOX.

**RESPONSE NO. 35**: Defendants object to this request to the extent it seeks confidential

private documents of individual consumers.  Without waiving this objection, Defendants are not

in possession of any documents responsive to this request.

**SUPPLEMENTAL RESPONSE NO. 35:**  Other than bitcoin addresses identified in

the documents produced in this action, the Defendants are not in possession of documents

responsive to this request.


**REQUEST NO. 37**: Any and all documents pertaining to bitcoin addresses owned, held,

or possessed by MTGOX while you held and/or retained any percentage of ownership interest

in  MTGOX.

**RESPONSE NO. 37:** Defendants object to this request as overly broad, unduly

burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and

seeking information that is completely irrelevant to the allegations that the Defendants should

pay Plaintiffs for the alleged theft of bitcoins from the Plaintiffs' account.  Without waiving this

objection, documents in the possession of these Defendants in which McCaleb and Mark

Karpeles may have discussed any addresses of MTGOX relating to the sale of MTGOX are

being produced.

EXHIBIT J

**SUPPLEMENTAL RESPONSE NO. 37:** Other than bitcoin addresses identified in the documents produced in this action, the Defendants are not in possession of documents responsive to this request.

Respectfully submitted, this the 29th day of March, 2017.

                                           **CODE COLLECTIVE, LLC, and**
                                           **JED McCALEB, individually and formerly**
                                           **doing business as MTGOX, a sole**
                                           **proprietorship**

               By:     */s/Mandie B. Robinson*
                             EDWIN S. GAULT, JR., MSB #10187
                             MANDIE B. ROBINSON, MSB #100446

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
200 South Lamar Street, Ste. 100
Jackson, MS  39201-4099
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

EXHIBIT J

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via email on the following:

> Mitchell H. Tyner, Sr.
> Charles Brad Martin
> TYNER, GOZA, STACEY & MARTIN, LLC
> 114 West Center Street
> Canton, MS 39046
> mtyner@tynerlawfirm.com
> bmartin@tynerlawfirm.com

Respectfully submitted, this the 29th day of March, 2017.

> /s/ Mandie B. Robinson
> MANDIE B. ROBINSON

EXHIBIT J

### IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
### HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                       **CAUSE NO. 14-CV-00071**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**And JED McCALEB, an individual.**                          **DEFENDANTS**

### NOTICE OF HEARING

Please take notice that pursuant to the Court's instructions, Defendants Jed McCaleb and Code Collective, LLC, will bring on for hearing their Supplement to the Motion for Reconsideration before the Honorable Joseph A. Sclafani, Hinds County Circuit Court Judge, Hinds County Courthouse, 407 E. Pascagoula Street, Jackson, MS 39201, on November 9, 2018 at 9:30 a.m.

Respectfully submitted, this the 16th day of October, 2018.

> **CODE COLLECTIVE, LLC, and**
> **JED McCALEB, individually and formerly**
> **doing business as MTGOX, a sole proprietorship**

> By: */s/ Mandie B. Robinson*
> EDWIN S. GAULT, JR., MSB #10187
> MANDIE B. ROBINSON, MSB #100446
> T. PEYTON SMITH, MSB #103867

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Ste. 2200
Jackson, MS  39201-2375
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com


## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic mail system on the following:

Armin J. Moeller, Jr.
Walter H. Boone
Christine Crockett White
Jonathan P. Dyal
Andy Lowry
Patrick Everman
Perry P. Taylor
Balch & Bingham, LLP
188 East Capitol Street
Jackson, MS 39201-2608
amoeller@balch.com
wboone@balch.com
cwhite@balch.com
jdyal@balch.com
alowry@balch.com
peverman@balch.com
ptaylor@balch.com

*Attorneys for Plaintiffs*

Respectfully submitted, this the 16th day of October, 2018.

/s/ *Mandie B. Robinson*
MANDIE B. ROBINSON