**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

DR. DONALD RAGGIO                                          **PLAINTIFFS**
DR. CHRIS RAGGIO

**VS.**                                          **CIVIL ACTION NO. 14-71**

JED MCCALEB
AND CODE COLLECTIVE, LLC                                          **DEFENDANTS**

**PLAINTIFFS' RESPONSE TO DEFENDANT JED MCCALEB AND CODE
COLLECTIVE, LLC'S SUPPLEMENT TO THE MOTION FOR RECONSIDERATION**

**I.      INTRODUCTION**

During the hearing on June 5, 2018, the Court ordered Plaintiffs to produce a "narrowly

tailored" list of search terms for McCaleb's Gmail account, and "if the Court believes that the

number of emails would not impose an undue burden on the defendant to review them for

privilege and produce them, that's what the Court is going to do . . ."  [Transcript, at 49-50].

Plaintiffs produced a narrowly tailored list, further narrowed that list on multiple occasions, and

Defendants still refuse to produce documents.

During the history of this dispute, three conclusions are inescapable.

First, Plaintiffs have fully and completely complied with the Court's order to narrow the

search terms, and reduce the alleged "burden" on Defendants.  Plaintiffs have reduced the

number of documents by 88%, from 83,473 documents to 9,783 documents.  By any stretch, the

now much reduced number is reasonable, and does not impose undue burden.

Second, Defendants have made no showing of that the search terms are producing

documents not relevant to the litigation.  In fact, and unbelievably, Defendants have apparently

not reviewed a single document in the Gmail account generated pursuant to any of the search

terms. **Defendants' Exhibit H**, ("Identifying false positives requires loading emails onto the

review platform, <u>which we have not done</u>.") (Emphasis added). Thus, as far as Defendants know, every single one of the 9,783 documents could be relevant to this litigation. And yet, they insist upon further "narrowing" and exclusion of potentially relevant documents.

Third, there are already problems with Defendants' reporting of search results, and the possibility that known documents which should have been a "hit" with the proposed search terms are not being reported as such. Plaintiffs are presently aware of thirty-six emails from McCaleb in that Gmail account that contain one or more of the search terms proposed by Plaintiffs, and Defendants originally reported ***zero*** hits for those search terms. Thus, there is substantial risk of further litigation on the sufficiency of Defendants' efforts to adequately search the Gmail account.

Defendants' motion should be denied, and Defendants should be ordered to: (1) produce the Gmail account under tight controls for Plaintiffs' review, as set forth below; or (2) review and produce the documents generated by Plaintiffs' proposed modified search terms described below.

## II. BACKGROUND ON THE PARTIES SEARCH TERM NEGOTIATIONS

Although Defendants jumbled the chronology to tell their story, the email exchanges between Plaintiffs and Defendants speak for themselves, and Plaintiffs encourage the Court to review those emails to acquaint itself with the Parties' positions and how we got to this point. *See* **Defendants' Exhibits B through I**. The following is a brief summary:

- On July 8, Plaintiffs sent Defendants a list of thirty-three search terms. **Defendants' Exhibit B**.

- On August 2, Defendants confirmed that the search terms cut the pool of documents to be searched from 83,473 down to 15,592. Defendants added that 15,592 documents was "obviously…an unreasonable amount." **Defendants' Exhibit C**.

- In response, Plaintiffs' new counsel asked to see, among other things, the search terms used and the number of document hits on each term so that Plaintiffs could assess the situation and consider ways to narrow the searches. **Defendants' Exhibit C**.

- On August 7, Defendants provided a chart showing the search terms used and the number of "unique" hits attributable to each. Defendants informed Plaintiffs that the search term *Mark* was likely to produce false positives because *Mark* can be used as "a name, a verb, or another noun." **Defendants' Exhibit D, p. 4**.

- On August 8, Alex Khoury, a certified eDiscovery specialist for Plaintiffs, responded by agreeing that some of the terms could be narrowed and requesting a call to discuss ways to narrow the searches. **Defendants' Exhibit F**.

- Defendants did not reply to Mr. Khoury's email and refused to meet and confer to discuss narrowing the searches.

- On August 31, Plaintiffs offered to cut the two most prolific search terms, "missing" and "Mark," completely. **Defendants' Exhibit D, p. 4**.

- On September 4, Defendants responded saying that cutting "missing" and "Mark" only reduced the number of documents to be reviewed from 15,000 to approximately 12,000, which was "still too broad." **Defendants' Exhibit D, p. 1**.

- On September 10, Plaintiffs (1) agreed to eliminate five months of emails they deemed "least likely to contain relevant information"; (2) renewed their offer to confer with Defendants to narrow the searches to eliminate "false positives";[1] and (3) proposed returning "Mark" to the search term list with search parameters designed to eliminate foreseeable false positive hits. **Defendants' Exhibit G**.

- On September 12, Defendants revealed that they have been declaring Plaintiffs' proposed search terms over broad *without having even looked at the results* of those searches. **Defendants' Exhibit H**. Moreover, Defendants (1) again rejected the offer to confer with Plaintiffs to narrow the searches and (2) did not indicate to what extent the prior proposal from Plaintiffs would limit the review. Instead, Defendants ignored Plaintiffs' proposal and proposed their own search parameters, which they are now asking the Court to impose, namely:

  - Limit the review of documents containing the search terms "attack, bug, bugs, fraud, hack, illegal, investing*, steal, stole and theft" to only those documents that also contain the terms GOX or MTGOX.[2]

---

[1] In the context of eDiscovery keyword searching, a false positive is a document that contains a search term but in a context that is not relevant to the intended search.

[2] To clarify what appears to be a typographical error by Defendants, "investing*" is not one of Plaintiffs' search terms. The search term should be "investig*", which is a stemmed search for variations of the word "investigate."

- Limit the review of documents containing the terms GOX or MTGOX to those documents that also hit on an additional search term.

- Limit the review of documents containing the terms "LR" and "Liberty Reserve" by excluding the review of their family documents.

- Limit the temporal scope of the review to the period of the two years following the theft of Plaintiffs' bitcoin.

- On September 25, Plaintiffs sent an email to Defendants noting, among other things, multiple inaccuracies and inconsistencies in Defendants' correspondence regarding the search of McCaleb's Gmail account. **Defendants' Exhibit I**. Nevertheless, and despite not knowing to what extent their prior proposal would have reduced the document pool, Plaintiffs narrowed their search proposal further, as follows:

    - Asked Defendants to run the searches using the date range proposed in Plaintiffs' September 10 email but agreed to revisit the date range issue if that limitation, coupled with the other proposed search parameters, did not reasonably limit the document pool.

    - Accepted Defendants' proposal to only review documents containing the terms "GOX" and "MTGOX" if they also contain at least one other search term.

    - Reiterated Plaintiffs request to run "Mark" with limiting parameters to eliminate foreseeable false positives.

    - Agreed to couple the search terms *attack, bug, bugs, dictionary, fraud, illegal, investig\*, steal, stole, theft,* and *thief* with limiting parameters to eliminate false positives.

    - Accepted Defendants' proposal not to review the family documents for any document that hit the search terms "LR" or "Liberty Reserve".

- In that same email, Plaintiffs offered an alternative proposal that would shift virtually all of the burden of reviewing McCaleb's Gmail to Plaintiffs. **Defendants' Exhibit I**. Plaintiffs proposed that Defendants run privilege searches against the universe of the Gmails and then produce all remaining documents to Plaintiffs as attorneys' eyes only subject to a protective order and Clawback agreement. Plaintiffs' counsel would then search the emails using keywords of their choosing and review the hits. All documents deemed irrelevant to this litigation would be returned to Defendants or destroyed.

- On October 11, in response to Plaintiffs' proposals, Defendants filed their **Supplement to the Motion for Reconsideration**.

The final two emails, **Defendants' Exhibits H and I**, constitute what are essentially the two alternative proposed search parameters that are currently before the Court.

## III.   THE STARTING POINT: DEFENDANTS HAVE NOT DISCLOSED HOW MANY DOCUMENTS RESULTED FROM LAST SEARCH.

Defendants' Supplemental Brief is notable for what it does not say than more so than for what it says.  In a dispute over the number of documents to be reviewed, Defendants have failed to inform the Court or Plaintiffs exactly how many documents remain to be reviewed after applying the search parameters to which the Parties have already agreed.  Defendants know, or easily could know this number, and yet they fail to share the information with Defendants and have omitted it from their Supplemental Brief.

Using the minimal information that Defendants have provided so far, we know that the number of documents remaining to be reviewed is down from 83,473 documents to 9,783 documents, an 88% reduction in volume.  The number of documents remaining might actually be less.[3]

Whether the current review set of documents is 9,783 or 8,997, these figures are the correct starting point for evaluating the few remaining search parameters that are in dispute and the alleged burden Defendants claim to be trying to avoid.

## II.   THE GOAL: NARROWLY TAILORED SEARCH TERMS LIKELY TO PRODUCE RELEVANT INFORMATION OR AN ARBITRARY, UNIDENTIFIED NUMBER OF DOCUMENTS WHICH WOULD BE "REASONABLE" TO DEFENDANTS?

Defendants appear to believe that a narrowly tailored search is one that yields an arbitrary number of documents that they have determined is "reasonable" for them to review, without regard for how many potentially relevant documents the search eliminates, sight unseen.

---

[3] For example, the number of documents that Defendants reported to Plaintiffs increased inexplicably by 786 documents between August 7 and September 12.  Plaintiffs asked Defendants for an explanation for the increase, but none has been forthcoming.

Plaintiffs contend that narrowly tailored searches are those that eliminate as many irrelevant documents as possible while minimizing the loss of potentially relevant documents in the process.

Defendants' goal of obtaining an arbitrary quantity of results versus improving the precision of the searches to eliminate irrelevant documents is evident:  First, Defendants argue that Plaintiffs' search terms are not narrowly tailored despite an 88% reduction in volume, and yet they admit that *they have not actually looked at any of the documents* to determine whether they are, in fact, relevant.  **Defendants' Exhibit H**, ("Identifying false positives requires loading emails onto the review platform, <u>which we have not done</u>."  (Emphasis added).  Counsel claims that his team cannot look at the documents to identify false positives until they load the documents into a review platform, which they have not done.  Because Defendants have not reviewed (and claim they cannot review) any of the documents generated pursuant to the search terms, Defendants cannot say with certainty that a single one of the 9,783 documents remaining to be reviewed is irrelevant to this case.  Thus, Defendants' argument that the searches that reduced 83,473 documents to 9,783 documents are not already narrowly tailored is based on their arbitrary assumptions about the quantity of relevant documents, not actual knowledge that the searches are overbroad.

Second, Defendants have rejected every offer from Plaintiffs to discuss ways to improve the precision of the searches by crafting them to eliminate false positives.  **Defendants' Exhibits C, F, G, and I**.  Defendants have opted instead to repeatedly ask Plaintiffs to guess at ways to narrow the searches rather than providing any information about the documents that would help Plaintiffs with that process.  Defendants take the position that they cannot help Plaintiffs identify false positive documents because they have not loaded the documents into a document-review

6

platform. **Defendants' Exhibit H**. As the Parties' correspondence shows, it would be more accurate for Defendants to say that they choose not to help Plaintiffs eliminate false positives from the document set, not that they cannot.

Defendants make much ado about having hired an eDiscovery consultant, and yet any eDiscovery consultant could advise Defendants on multiple ways to identify and remove false positives from a document set before the documents are loaded into a review database.[4] Nevertheless, Plaintiffs offered on several occasions to let their eDiscovery experts confer with Defendants' expert to discuss the process. **Defendants' Exhibits C, G, and I**. Defendants ignored the offer each time.

The end result of this dialogue has been a clear intent to limit this discovery to some arbitrary, and unidentified, number of documents without any regard to whether the search generates relevant information.

## III.   GETTING TO THE GOAL

Through their words and deeds in discovery to date, Defendants have made it clear that they believe any burden is too great when it comes to reviewing McCaleb's Gmail account emails. Nevertheless, Plaintiffs have proposed, and hereby propose again, two solutions which get Plaintiffs what they are entitled to: (1) production of the entire non-privileged Gmail account under tight controls described below, which would result in minimal or no burden to Defendants; or (2) further modification of search terms as described below.

---

[4] Plaintiffs are not certain whom Defendants ultimately hired as their eDiscovery consultant, but the cost estimate from Advanced Discovery, which Defendants submitted to the Court as evidence of their burden in their Motion for Reconsideration, contemplates software with analytic capabilities that enable Defendants to identify false positives in a variety of ways at no additional cost except for the project manager's time. *See* Defs.' Mot. for Reconsideration, Ex. A, Aff. of Mandie B. Robinson, Doc. # 190-1 at p. 6 (including analytics processing at no cost and project management at $195/hr).

A.   **PRODUCTION OF NON-PRIVILEGED GMAIL ACCOUNT UNDER TIGHT CONTROLS.**

Plaintiffs have proposed an alternative way to manage the review and production of McCaleb's Gmails that addresses all the disputed issues. **Defendants' Exhibit I**. Specifically, in that email, Plaintiffs proposed that they be allowed to cull and review McCaleb's Gmail account at their own expense, following a protocol that will protect McCaleb's legitimate concerns about privileged, confidential, and irrelevant information, as follows:

- Defendants may run privilege search terms across the entire 83,473 documents and pull out and log any documents that hit the privilege search terms.

- Defendants would then dump all of the remaining emails in their native format on Plaintiffs, designated as attorneys-eyes only. Those documents would be reviewed by Balch personnel (and those specifically retained by them).

- Plaintiffs will then cull the remaining emails by date range and keywords, using false-positive identifiers to eliminate false-positive hits on the keywords. All documents that Plaintiffs eliminate though such culling will be returned to Defendants or destroyed without ever having been reviewed by us.

- Documents not eliminated by Plaintiffs' keyword and date-range culling will then be reviewed by Plaintiffs for relevance. Any documents deemed not relevant by Plaintiffs will be returned to Defendants or destroyed. Plaintiffs will not retain the irrelevant emails in their document database.

Plaintiffs have offered to enter into a protective order and a clawback agreement to protect McCaleb from the disclosure of any irrelevant or confidential information and from the inadvertent production of privileged materials that might slip through Defendants' privilege search. This compromise shifts virtually the entire burden of reviewing Defendants' emails to the Plaintiffs and, at the same time, provides Plaintiffs and the Court a level of assurance that the emails will be searched adequately and efficiently. Defendants never responded to this proposal.

Moreover, the production of the Gmail account and its search by Plaintiffs will reduce the likelihood of further discovery disputes regarding the sufficiency of McCaleb's search and

production.  As the Court is already aware, there are some troubling problems with McCaleb's story about the eighteen emails he previously failed to produce, including the two alleged "draft" emails regarding Karpeles that Defendants incorrectly informed the Court had never been sent but in fact were sent.[5]  Moreover, Plaintiffs have reason to believe similar holes may exist in McCaleb's Gmail account, and Defendants' reports about their searches of that account.  For example, Defendants' counsel originally reported **_zero_** hits in McCaleb's Gmail account for the search terms *admin@mtgox.com, info@mtgox.com, karpeles, tibanne*, and *mark@tibanne*. Plaintiffs are presently aware of thirty-six emails from McCaleb in that Gmail account that contain one or more of these terms.  Those emails are attached as **Plaintiffs' Exhibit A**.  Thus, there is substantial uncertainty (already) about whether Defendants are accurately reporting what has been searched, and what has been returned from each search.  The production of the Gmail account and its search by Plaintiffs at Plaintiffs' sole expense will reduce the likelihood of further discovery disputes regarding the sufficiency of Defendants' own searches.

### B.      FURTHER MODIFICATION OF SEARCH TERMS.

Defendants have proposed four search parameters.  **Defendants' Exhibit H.**  Plaintiffs responded to Defendants' proposed search parameters and offered several of their own, including an offer to alleviate Defendants' burden entirely by conducting the review of McCaleb's emails themselves.  **Defendants' Exhibit I**.  Although Plaintiffs believed the negotiation was still ongoing, Defendants apparently disagreed and filed their Supplemental Brief without any prior indication to Plaintiffs that the Parties were at an impasse.

---

[5] The fact that the two so-called "draft" emails were in fact sent is apparent on the face of the emails, as both emails contain a "sent" stamp showing the exact date and time they were sent from McCaleb's email account. The question now is, to whom were they sent?  Defendants produced those two emails as PDFs, which stripped them of their metadata so Plaintiffs cannot see who the recipient(s) were.

As Defendants acknowledge in their Supplemental Brief, two of their four search parameters have already been agreed to by Plaintiffs.  They are:

- Limit the review of documents containing the terms GOX or MTGOX to those documents that also hit on an additional search term; and

- Limit the review of documents containing the terms "LR" and "Liberty Reserve" by excluding the review of their family documents.

The search parameters over which the Parties **do not agree** are as follows:

- Defendants' Parameter 1—Limit the review of documents containing the search terms *attack, bug, bugs, fraud, hack, illegal, investig\*, steal, stole, thief*, and *theft* to only those documents that also contain the terms *GOX* or *MTGOX*.

- Defendants' Parameter 2—Limit the temporal scope of the review to the two years following the theft of Plaintiffs' bitcoins.

- Plaintiffs' Parameter 1—Include documents that contain the search term *Mark* without stemming and not within five words of the following false positive identifiers: check, document, word, agreement, or calendar, and not within two words of the last name of any individuals not related to this matter.

These three search parameters, and Plaintiffs' proposed solutions and modifications to same, are discussed below.

### 1.   **Defendants' Parameter 1:  Compound Searches for Common Terms**

Defendants propose using compound searches for the topical, but common, search terms *attack, bug, bugs, fraud, hack, illegal, investig\*, steal, stole, thief*, and *theft*, by combining them with the terms *GOX* or *MTGOX*.  Plaintiffs agreed to use compound searches for these common terms, but not by joining them to *GOX* or *MTGOX*.  Defendants' proposal is flawed because assumes that McCaleb and others referred to GOX or MTGOX by name every time they discussed security, hacking, or theft of bitcoins related to the MTGOX exchange.  It is not reasonable to expect individuals who knew they were talking about MTGOX, either because of their audience or the context of the conversation, to identify the exchange by name in every

instance.[6]  Because we know for a fact that McCaleb discussed hacking at MTGOX in emails without referring to the exchange by name, we know there is a high likelihood that requiring the terms *GOX* or *MTGOX* to be included in every document Defendants review will result in the exclusion of relevant documents.

*Plaintiffs' Proposed Solution*:  Plaintiffs agreed to use compound searches for the common terms, but proposed compounding the terms with "false positive identifiers" to eliminate false positive hits on these terms.  A false positive identifier is a term that, when paired with the search term, indicates that the document is more likely than not to be irrelevant.  For example, the search terms *bug* or *bugs* may refer to vulnerabilities in MTGOX's software code that allowed the hack to occur, which would be relevant, but when the words *bug* or *bugs* appear in an email from the domain "orkin.com", we know those emails probably use the search terms to refer to insects and are false hits that can be eliminated from the review set without anyone having to lay eyes on them.

Defendants rejected Plaintiffs' proposal to compound the common search terms with false positive identifies because (1) they claim they cannot find false positives identifiers without loading the documents into a document-review database and (2) they claim loading the documents into a review database and *actually looking at them* to identify false positives is too burdensome.  Defendants offer no facts to support either of these claims, and both are demonstrably false.

There are two simple culling techniques the Parties can use to identify false positives with minimal effort and without loading the documents into a document-review database—

---

[6] As a hypothetical example, it would be unreasonable to expect attorneys at the same firm to refer to their firm by name every time they emailed each other about something that happened at work.  Moreover, we know from studying the emails in McCaleb's MTGOX email account that McCaleb and others did, in fact, discuss hacking incidents at MTGOX without referring to MTGOX or GOX by name in their discussion.  *See* **Plaintiffs' Exhibit B**.

elimination of irrelevant domain names[7] and sampling the extracted text[8] of the documents.  A short explanation of each method follows:

- *Domain Elimination*.  Defendants' eDiscovery expert would provide both Parties with a list of domain names for the emails containing the search terms *attack, bug, bugs, fraud, hack, illegal, investig\*, steal, stole, thief*, and *theft*.  The Parties then work together to identify the domain names they believe can be eliminated sight unseen.  Those documents are eliminated, and the document hit counts are updated.  Plaintiffs anticipate that this method of identifying false positives will be especially effective in reducing the number of documents because Defendants previously reported to the Court that McCaleb's Gmail account contains "thousands of irrelevant communications from advertisers, utility providers, magazines and newspapers, online shopping websites, travel providers, and the like."  Defs.' Mot. for Reconsideration, Doc. # 190, at ¶ 8.  Typically, these types of spam emails can be identified easily by their domain names.

- *Sampling*.  To identify false positives through sampling, one of the Parties would need to review the extracted text of a random sample of documents that contain the search terms.[9]  If they find documents that contain a search term but that are irrelevant, e.g., news articles about Russians *hacking* Hillary's emails or references to *illegal* drugs, the false-positive indicators, i.e., "Hillary" or "drugs," can be built into the keyword searches to eliminate those types of conversations across the entire data set.  An example of such a search might be: *illegal* not within two words of *drugs* (illegal not w/2 drugs).

For a document set as small as the one at issue here (only 4,085 documents contain the "common" search terms), meaningful reduction through elimination of false positive documents can be accomplished in a single day, if both Parties work together in good faith.  However, to the extent Defendants are unable or remain unwilling to work with Plaintiffs to cull false positive documents out of the document set, Plaintiffs stand ready, willing, and able to do it on their own, as described above.

---

[7] Email addresses consist of two parts: an account name and a domain name.  The account name is located before the @ symbol, and the domain name is located after the @ symbol.  Domain names are usually associated with a particular business or entity that is responsible for providing an email account to the user.  Thus, a walmart.com domain name indicates that the email was sent by someone with an email account provided by WalMart.

[8] When electronic data like McCaleb's emails are being prepared for importation  into a database through a process unimaginatively called "processing,"  the text of the emails, *inter alia*,  is "extracted" from the email file and used to populate a searchable text field in the database.  This searchable text content is called "extracted text."

[9] This should be done after the domain-name elimination to improve effectiveness.

2.    **Defendants' Parameter 2:  Date-Range Limitation**

Defendants propose limiting the document review to a date range beginning with the theft of Plaintiffs' bitcoins on January 7, 2011 and ending two years thereafter, or January 7, 2013. Defendants' proposal to eliminate all documents dated before the theft of Defendants' bitcoins is unreasonable, would prejudice Plaintiffs, and should be rejected.   Consider, for example, documents containing the search terms: *attack, bug(s)*, *hack\**, *steal, theft, or thief*.   Documents containing these terms dated prior to January 7, 2011 may show McCaleb's knowledge or concerns about vulnerabilities in MTGOX software or about prior bitcoin hacks and thefts. Such documents, which Defendants' proposal would cast aside without review, would be relevant to Plaintiffs negligence claims, at a minimum.

Even if it were not clear that eliminating all emails prior to January 7, 2011 has a high probability of eliminating potentially relevant emails, Defendants have not made any showing that such a draconian date limitation would significantly affect the size of the document pool. How many emails containing search terms are dated between June 1, 2010 and January 7, 2011? How many between January 7, 2013 and December 31, 2014?  What would those numbers be after a reasonable effort to eliminate false positives?  We do not know because, once again, Defendants have failed to provide the information Plaintiffs and the Court need to evaluate Defendants' cries of "burden".[10]  The date range of the document search should not be cut off so as to eliminate potentially relevant documents from discovery based on nothing more than bald assertions of burden by Defendants.  *See, e.g., Dawkins v. Redd Pest Control Co., Inc.*,607 So.2d 1232, 1236 (Miss. 1992) (holding that, among other things, a trial court's exercise of discretion

---

[10] Defendants have the emails in a searchable database in the hands of an eDiscovery expert.  They could have found out the number of documents within these date ranges in a matter of minutes, assuming they did not know them already.  If the numbers supported Defendants' claims of undue burden, it is reasonable to assume they would have included them in their brief.

in discovery matters should take into account the parties' *factual showings* and weighing the importance of the information against the *hardships* and *cost of production*) (emphasis added); <u>*Abraham v. Alpha Chi Omega*</u>, 271 F.R.D. 556, 559 (N.D. Tex. 2010) (holding that a party resisting discovery on the grounds of undue burden "must show specifically how each document request is … burdensome").  Here, Defendants simply state in conclusory fashion that Plaintiffs' date range is burdensome.  Defendants provide no factual showings upon which the Court can weigh the value of information against the evidence of any burden at all.

   ***Plaintiffs' proposed solution***:  Plaintiffs' agreed to limit the date range, but not as narrowly as Defendants propose.  Plaintiffs proposed excluding documents within the range January 1, 2010 to June 1, 2010 as a starting point and asked Defendants to report on the effect of that date limitation on the number of documents before Plaintiffs would consider a more narrow range.  Defendants never provided that information to Plaintiffs, nor did they inform the Court of the number of documents that would remain using Plaintiffs' proposed date range.  At this point, there is no evidence that even one of the 9,783 documents containing a search term is dated between June 1, 2010 and January 7, 2011 or between January 7, 2013 and December 31, 2014.  Absent some evidence of burden caused by documents within these date ranges, there is no basis for the Court to even consider Defendants' request to exclude such documents from discovery without review.

### 3.       Plaintiffs' Parameter 1—Compound Search for "Mark"

   In their August 7 email to Plaintiffs regarding search terms, Defendants identified the search term *Mark* as a term that was likely to produce false positives because *Mark* can be used as "a name, a verb, or another noun."  **Defendants' Exhibit D.**  In the hope of getting McCaleb's emails from Defendants sooner rather than later, Defendants offered to remove *Mark* from the

list of search terms, along with the search term *missing*, because these were the two most prolific search terms. **Defendants' Exhibit D, p. 2.**

After Defendants balked at Plaintiffs' proposal to remove the most common terms and refused to cooperate further regarding the identification of false positives, Plaintiffs proposed to return *Mark* to the search term list with certain limitations to alleviate Defendants' stated concerns about false positives. Specifically, Plaintiffs proposed limiting the term *Mark* by not stemming it and compounding the search to exclude the following false positive identifiers: check, document, word, agreement, or calendar, and the last name of any individuals named Mark who are not involved in this matter.

In their Supplemental Brief, Defendants object to this search parameter in paragraph 12. As with the "common" search terms discussed above, Defendants claim that identifying a false-positive identifier, in this case the last names of individuals named Mark who are not relevant to this dispute, is an "unreasonable burden." Defendants complain of "bearing the cost of running these complex searches" without explaining what that cost would be and ignoring that these are, in fact, routine eDiscovery processes which result in little cost at all.

## V.  CONCLUSION

In light of Defendants' unexplained discrepancies in their hit-count reports, their unwillingness to work with Plaintiffs to narrow the search terms in a way that will reduce the risk of eliminating relevant documents, and their prior eDiscovery miscues, Plaintiffs respectfully request that the Court order that McCaleb's Gmail account be reviewed according to the tight controls set forth above.

If the Court is unwilling to order the Plaintiffs' proposal, Plaintiffs ask that the Court order Defendants to proceed with the review of McCaleb's Gmails using the following search parameters:

- Review of documents containing the terms GOX or MTGOX shall be limited to those documents that also hit on an additional search term;

- Review of documents containing the terms "LR" and "Liberty Reserve" shall exclude the review of their family documents.

- Review of documents containing the search terms *attack, bug, bugs, fraud, hack, illegal, investig\*, steal, stole, thief*, and *theft* shall be limited by the inclusion of false positive identifies identified through a combination of domain name culling and sampling.

- The relevant time frame for the review shall be June 1, 2010 to December 31, 2014.

- The review shall include documents that contain the search term *Mark*, without stemming, and not within five words of the false positive identifiers: check, document, word, agreement, or calendar, and not within two words of the last name of any individuals not related to this matter/

Although Plaintiffs have not been provided with enough information to estimate the final document count after such limitations are imposed, we do know the final count will be less than 10,000 documents, probably much less, which is a substantial and reasonable narrowing from the 83,473 documents in McCaleb's Gmail account.

Respectfully submitted, this 22nd day of October, 2018.

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**

By:      **s/ Walter H. Boone**_____

Walter H. Boone, MSB No. 8651
Armin J. Moeller, Jr.,  MSB No. 3399
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS
DR. DONALD RAGGIO AND
DR. CHRIS RAGGIO

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

## CERTIFICATE OF SERVICE

I, the undersigned counsel, do hereby certify that on this day, I have electronically filed the foregoing with the Clerk of the Court using the MEC  system which sent notification of such filing to the following (except as otherwise shown, in which case service was made via United States mail, postage prepaid):

Edwin S. Gault, Jr., Esq.
Amanda B. Robinson, Esq.
T. Peyton Smith, Esq.
Forman Watkins & Krutz LLP
P.O. Box 22608
Jackson, Mississippi 39201
Win.Gault@formanwatkins.com
Peyton.Smith@formanwatkins.com
Mandi.Robinson@formanwatkins.com

Ethan Jacobs, Esq.                    *(via U.S. mail)*
Holland Law, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

So certified, this the 22nd day of October, 2018.

*s/ Walter H. Boone*
WALTER H. BOONE

261055.4

18

Defendants' Exhibit B

**Mandie Robinson**

| | |
|---|---|
| **From:** | Brad Martin <bmartin@tynerlawfirm.com> |
| **Sent:** | Monday, July 09, 2018 9:59 AM |
| **To:** | Mandie Robinson |
| **Subject:** | Raggio vs. MTGOX - Search Terms for Google Emails |

Mandie,

As discussed, please find the following list of search terms.  Any word which ends in an exclamation mark denotes a search should be ran for any variation of that word.

Raggio
Baron
Karpeles
Mark
Mtgox
Gox
Thief
Theft
Hack!
Bug
Bugs
Fraud!
"weak password"
"brute force"
Attack!
Dictionary
Investig!
Illegal
Stole!
Steal!
"Liberty reserve"
LR
Missing
Tibanne
Theymos

The following email addresses:

admin@mtgox.com
jed@mtgox.com
info@mtgox.com
donald.raggio@gmail.com
mark@tibanne.com
theymos@mm.st
chris.raggio@gmail.com
baron@contractor.net

1

EXHIBIT B

Thanks,

Charles "Brad" Martin
**TYNER, GOZA, STACEY & MARTIN, LLC**
3352 North Liberty
Canton, MS 39046
Phone: 601-401-1111
Fax: 601-957-6554

EXHIBIT B

# Defendants' Exhibit C

**Mandie Robinson**

| | |
|---|---|
| **From:** | Boone, Walter <wboone@balch.com> |
| **Sent:** | Thursday, August 02, 2018 5:05 PM |
| **To:** | Win Gault |
| **Cc:** | Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Mandie Robinson; Khoury, Alex |
| **Subject:** | RE: Scheduling Order |

Thanks, Win.  Can you get us any or all of the following:

1.      The search terms Tyner asked to use
2.      The search terms your guy actually used (if different)
3.      How many documents hit on each term.  Usually there is a spreadsheet that lists the hits by search term.
4.      How many unique documents hit on terms (the 16k number may actually be much smaller if it contains duplicate documents that contained multiple keywords)
5.      Examples of false positives they've found which might tell us how to narrow.

With the above information, we think we can help tighten the search terms up, and lessen the number of docs.  That way we don't have to argue about 15,000.

See what you think.

-----Original Message-----
From: Win Gault [mailto:Win.Gault@formanwatkins.com]
Sent: Thursday, August 02, 2018 2:17 PM
To: Boone, Walter
Cc: Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Mandie Robinson
Subject: RE: Scheduling Order

[External Email] Please use caution.


While you are getting your arms around all this, I wanted to make you aware of a discovery issue.  Tyner served a subpoena on Google for our client's personal emails from January 2010 - December 2014 to be produced to us for review.  Over 76,000 emails plus attachments were produced to us by Google.  Judge Sclafani ordered Tyner to submit search terms to narrow the results to relevant emails, and warned against broad terms likely to identify unrelated documents.  Tyner provided a list of over 35 terms, and we hired an e-discovery computer specialist to search the emails.  The search still identified 15,592 separate emails that would need to be reviewed.  Obviously, this remains an unreasonable amount.

We can discuss after you get up to speed.

Win Gault
Forman Watkins & Krutz LLP
www.formanwatkins.com


-----Original Message-----

EXHIBIT C

From: Boone, Walter [mailto:wboone@balch.com]
Sent: Wednesday, August 1, 2018 12:04 PM
To: Win Gault <Win.Gault@formanwatkins.com>
Cc: Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Lowry, Andy <alowry@balch.com>; Taylor, Perry <ptaylor@balch.com>
Subject: RE: Scheduling Order

Here is a proposed scheduling order which we would propose to submit jointly to the Court.  Thanks.

-----Original Message-----
From: Win Gault [mailto:Win.Gault@formanwatkins.com]
Sent: Wednesday, August 01, 2018 11:45 AM
To: Boone, Walter
Subject: Re: Scheduling Order

[External Email] Please use caution.


Talking to Jed at 1:30.

> On Jul 31, 2018, at 4:31 PM, Boone, Walter <wboone@balch.com> wrote:
>
> As discussed, in light of our appearance in this case and our substitution as counsel for Raggio, we respectfully request an extension/amendment of the scheduling order as follows:
>
> 1.  Thirty (30) day extension on the deadline to amend the pleadings.
>
> 2. Ninety (90) day extension on all other deadlines.
>
> 3.  We will need a new pretrial conference date and trial setting based in these extensions.
>
> Can you agree?  If so, we can get you a draft of an unopposed motion tomorrow.
>
> Please let us know as soon as you know, since we anticipated filing a motion unopposed or not.
>
> Thanks.
>
>
> Walter Boone, Partner, Balch & Bingham LLP
> 188 East Capitol Street  Suite 1400 Jackson, MS 39201-2133
> t:(601) 965-8179 f:(888) 856-9542 e:wboone@balch.com www.balch.com
>
>
> ~~
>
>
>
>
> CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.
> ~~

EXHIBIT C

> 
> 

Important Confidentiality And Limited Liability Notice-- This email and any attachments may be confidential and protected by law. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the email or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and deleting this copy and the reply from your system. Please note that any views or opinions expressed in this email are solely those of the author and do not necessarily represent those of Forman Watkins & Krutz LLP. (FWK). The recipient should check this email and any attachments for the presence of viruses. FWK accepts no liability for any damage caused by any virus transmitted by this email. Thank you for your cooperation.

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

EXHIBIT C

Defendants' Exhibit D

**Mandie Robinson**

| | |
|---|---|
| **From:** | Peyton Smith |
| **Sent:** | Tuesday, September 04, 2018 10:36 AM |
| **To:** | Boone, Walter; Mandie Robinson |
| **Cc:** | Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Khoury, Alex |
| **Subject:** | RE: Raggio v. MTGOX (Search of Google emails) |

Walter, removing "mark" and "missing" only reduces the number of documents from approximately 15,000 to approximately 12,000. This is still too broad. One option may be to limit the scope of time within which we are searching. Currently the search spans five years worth of emails.

**Peyton Smith**
Forman Watkins & Krutz LLP

**From:** Boone, Walter <wboone@balch.com>
**Sent:** Friday, August 31, 2018 2:00 PM
**To:** Mandie Robinson <Mandie.Robinson@formanwatkins.com>
**Cc:** Win Gault <Win.Gault@formanwatkins.com>; Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Lowry, Andy <alowry@balch.com>; Taylor, Perry <ptaylor@balch.com>; Peyton Smith <Peyton.Smith@formanwatkins.com>; Khoury, Alex <akhoury@balch.com>
**Subject:** RE: Raggio v. MTGOX (Search of Google emails)

My apologies, but here is the current search term list.  We left off "bug" and "bugs".  Thanks.

EXHIBIT D

| New Terms | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| admin@mtgox.com | 0 |
| Attack* | 954 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 531 |
| chris.raggio@gmail.com | 0 |
| Dictionary | 60 |
| donald.raggio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 952 |
| jed@mtgox.com | 0 |
| Karpales | 0 |
| LR | 65 |
| mark@tibanne.com | 0 |
| Mtgox | 764 |
| Raggio | 3 |
| Steal* | 326 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 6 |
| Tibanne | 3 |
| "weak password" | 0 |

**From:** Boone, Walter
**Sent:** Friday, August 31, 2018 1:53 PM
**To:** 'Mandie Robinson'
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** RE: Raggio v. MTGOX (Search of Google emails)

Win and Mandie,

Based on yours and Mandie Robinson's correspondence below, we understand that using the search terms provided by Brad Martin yielded 15,592 total documents and 8,861 unique hits. As you can see in the charts below, we have removed some terms in an attempt to limit both the number of total documents and unique hits. The far left chart is the original terms and results, the middle chart is our new list, and the far right chart contains the terms we removed. Removing "Mark" and "Missing" should reduce 2,853 unique hits as we understand it.

Please let us know how many total documents and unique hits the new terms list (middle chart) yields, and whether you believe that result is sufficiently narrow.  Thanks.

2

EXHIBIT D

| Prior Terms | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| "weak password" | 0 |
| admin@mtgox.com | 0 |
| Attack* | 954 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 391 |
| chris.rossio@gmail.com | 0 |
| Dictionary | 60 |
| donald.rossio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 951 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 932 |
| led@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| Mark | 1,515 |
| mark@tibanne.com | 0 |
| Missing | 1,517 |
| Mtgox | 784 |
| Raggio | 5 |
| Steal* | 328 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 8 |
| Tibanne | 5 |

8,861 unique hits
13,592 total docs

| New Terms | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| admin@mtgox.com | 0 |
| Attack* | 954 |
| Baron | 6 |
| baron@contractor.net | 0 |
| chris.rossio@gmail.com | 0 |
| Dictionary | 60 |
| donald.rossio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 951 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 932 |
| led@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| mark@tibanne.com | 0 |
| Mtgox | 784 |
| Raggio | 5 |
| Steal* | 328 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 8 |
| Tibanne | 5 |
| "weak password" | 0 |

| Removed Terms |
|---|
| Mark |
| Missing |

2,858 unique hits rem
Total doc number red



BALCH
& BINGHAM LLP

Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

EXHIBIT D

**From:** Mandie Robinson [mailto:Mandie.Robinson@formanwatkins.com]
**Sent:** Tuesday, August 07, 2018 10:18 AM
**To:** Boone, Walter
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** Raggio v. MTGOX (Search of Google emails)

**[External Email] Please use caution.**

Good morning Walter,

To answer your questions on the Google searches (your email attached), the search terms Plaintiffs' provided are in the email from Brad Martin (also attached), and all were searched. There are 83,473 total documents (emails plus attachments). To review every document containing a search term would require review of 15,592 documents because even if the term is only in an attachment, it would still require reviewing the email. There are no duplicates in this number of documents. The largest possibility for false positives are common words or words that have multiple uses. (i.e., "Mark" can be a name, a verb, or another noun). The unique hits (the number of documents that contain only one particular search term) are listed below:

Let us know your thoughts after you review this information.

Thanks,
Mandie

| Term | Unique hits |
|---|---|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| "weak password" | 0 |
| admin@mtgox.com | 0 |
| Attack* | 554 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 531 |
| chris.raggio@gmail.com | 0 |
| Dictionary | 60 |
| donald.raggio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 552 |
| jed@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| Mark | 1,513 |
| mark@tibanne.com | 0 |
| Missing | 1,317 |

# Defendants' Exhibit F

**Mandie Robinson**

| | |
|---|---|
| **From:** | Khoury, Alex <akhoury@balch.com> |
| **Sent:** | Wednesday, August 08, 2018 11:21 AM |
| **To:** | Mandie Robinson; Boone, Walter |
| **Cc:** | Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith |
| **Subject:** | RE: Raggio v. MTGOX (Search of Google emails) |

Mandie,

Thank you for this information. It is very helpful. I certainly see some areas where we can tighten these searches, especially around the term "missing." I think limiting "Mark" poses some challenges, but I'm certainly open to discussing that with you and hearing your ideas for narrowing that search. Also, I think there are a few additional terms that should be searched. Are you available to talk about this later today or tomorrow?

Best Regards,

Alex



K. Alex Khoury, Partner, Balch & Bingham LLP
1901 Sixth Avenue North • Suite 1500 • Birmingham, AL 35203-4642
t: (205) 226-3408  f: (866) 317-8482  e: akhoury@balch.com
www.balch.com

**From:** Mandie Robinson [mailto:Mandie.Robinson@formanwatkins.com]
**Sent:** Tuesday, August 07, 2018 10:18 AM
**To:** Boone, Walter
**Cc:** Win Gault; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Taylor, Perry; Peyton Smith; Khoury, Alex
**Subject:** Raggio v. MTGOX (Search of Google emails)

**[External Email] Please use caution.**

Good morning Walter,

To answer your questions on the Google searches (your email attached), the search terms Plaintiffs' provided are in the email from Brad Martin (also attached), and all were searched. There are 83,473 total documents (emails plus attachments). To review every document containing a search term would require review of 15,592 documents because even if the term is only in an attachment, it would still require reviewing the email. There are no duplicates in this number of documents. The largest possibility for false positives are common words or words that have multiple uses. (i.e., "Mark" can be a name, a verb, or another noun). The unique hits (the number of documents that contain only one particular search term) are listed below:

Let us know your thoughts after you review this information.

Thanks,
Mandie

EXHIBIT F

| Term | Unique hits |
|------|-------------|
| "brute force" | 58 |
| "Liberty reserve" | 12 |
| "weak password" | 0 |
| admin@mtgox.com | 0 |
| Attack* | 554 |
| Baron | 6 |
| baron@contractor.net | 0 |
| Bug | 402 |
| Bugs | 531 |
| chris.raggio@gmail.com | 0 |
| Dictionary | 60 |
| donald.raggio@gmail.com | 0 |
| Fraud* | 294 |
| Gox | 699 |
| Hack* | 931 |
| Illegal | 243 |
| info@mtgox.com | 0 |
| Investig* | 552 |
| jed@mtgox.com | 0 |
| Karpeles | 0 |
| LR | 65 |
| Mark | 1,513 |
| mark@tibanne.com | 0 |
| Missing | 1,317 |
| Mtgox | 784 |
| Raggio | 3 |
| Steal* | 328 |
| Stole* | 125 |
| Theft | 117 |
| Theymos | 4 |
| theymos@mm.st | 0 |
| Thief | 8 |
| Tibanne | 5 |

**Mandie Robinson**

Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
D: 601.974.8735 | F: 601.960.8613
mandie.robinson@formanwatkins.com

FormanWatkins

EXHIBIT F

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT F

# Defendants' Exhibit G

**Mandie Robinson**

| | |
|---|---|
| **From:** | Boone, Walter <wboone@balch.com> |
| **Sent:** | Monday, September 10, 2018 6:00 PM |
| **To:** | Win Gault |
| **Cc:** | Mandie Robinson; Peyton Smith; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Khoury, Alex; Taylor, Perry |
| **Subject:** | Discovery of Gmail Account |

Win,

We need some resolution on the production of your client's gmail account.

The Court's June 5 Order required our client to provide you with search terms to identify potentially relevant documents, which Brad Martin did on July 9. Based on an email we received from Mandie Robinson on August 7, those search terms reduced the number of documents to be reviewed from 83,473 to 15,592. Your position was that even the greatly reduced number is unreasonable. In her email, she represented that common words were likely to hit on "false positives." Mandie pointed out the term "Mark," which had 1,513 unique hits, although she failed to identify any specific false positives that were coming up in the search. Nor have you provided us any indication on what the other "false positives" were or whether you even looked to determine if there were "false positives." Alex Khoury, our eDiscovery lawyer, proposed a meet and confer to discuss ways to eliminate false positives and further reduce the document count, but you declined that offer.

In our desire to avoid an unnecessary discovery dispute over these emails, on August 31, we offered to simply eliminate the two most prolific terms, "mark" and "missing," from the search term list, even though those terms are clearly calculated to lead to the discovery of relevant evidence. Removing those terms reduced the documents to be reviewed to approximately 12,000—down from 83,473. (We asked for, but have not yet received, a breakdown of which hits happened on which terms.) In his email dated September 4, Peyton maintains that "[t]his is still too broad." We note that the 12,000 documents, which you claim is still an unreasonable number, is fewer than the 13,000 emails Judge Sclafani believed was reasonable for our client to review in the June 5 order.

We would like to get beyond discovery disputes and on to the merits of this case, but that will require some cooperation from the Defendant. For purposes of our present dispute (and without waiving our ability to come back later to request any portion of, or the entirety of, the gmail account), here is our proposal to further limit these documents so that we can overcome this impasse:

- We will agree to limit the date range of the searches to June 1, 2010 to December 31, 2014. That cuts out five months of emails we deem the least likely to contain relevant information. We cannot reduce the date range on the back end because we believe there are relevant documents in that time period (and probably beyond).
- We continue to be willing to work with you to limit any of the searches you contend are overbroad and to eliminate "false positives." To do so, you will have to actually confer with us on the basis of your claim of over breadth and work with us to identify and eliminate actual "false positives," not hypothetical "false positives." (This process will go faster and be less expensive if we let our eDiscovery people talk directly about identifying and eliminating the false positives.) As you know, this is a simple and straightforward process which can be accomplished with a minimal investment of time and energy, but only if we confer and let the experts talk.
- Restore the search term "Mark" but target it as follows: "Mark" without stemming and not within 5 words of the following: check, document, word, agreement. We will also agree to eliminate "Mark" within 2 of the last name of any individuals unrelated to this matter.

EXHIBIT G

I am hopeful that we can come to an agreement along these lines.  Please let us know your thoughts.



Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT G

# Defendants' Exhibit H

**Mandie Robinson**

| | |
|---|---|
| **From:** | Win Gault <Win.Gault@formanwatkins.com> |
| **Sent:** | Wednesday, September 12, 2018 4:10 PM |
| **To:** | Boone, Walter |
| **Cc:** | Mandie Robinson; Peyton Smith; Moeller, Armin; White, Christy Crockett; Lowry, Andy; Khoury, Alex; Taylor, Perry |
| **Subject:** | RE: Discovery of Gmail Account |
| **Attachments:** | SearchTermsReport.pdf |

Your email seems to imply that we somehow have refused to cooperate or that we are somehow responsible for the inability to develop search terms which yield a reasonable number of documents. We obviously disagree.

Judge Sclafani explained at the hearing that he considered Plaintiffs' Google subpoena overbroad and cautioned that the search terms should be narrowly tailored. Yet your email proposes that we produce every email in Jed's account that includes the term "Gox" or "MTGOX" over a nearly five-year span. That is not narrow tailoring.

Plaintiffs have obtained voluminous discovery over the past two years, and no evidence so much as suggests Jed stole the Raggios' bitcoins. The judge made clear he did not consider discovery on conspiracy-theory-driven claims (embezzlement, conversion, etc.) relevant. Yet the broad search terms and timeframe you've proposed are calculated to continue exploring those theories. These searches effectively seek to take discovery in this years-old case back to square one.

Your email asked us to identify false positives and asked for a breakdown of the number of hits per search term. Identifying false positives requires loading emails onto the review platform, which we have not done. We have, however, attached a chart that shows the number of hits on your proposed search terms, which underscores the overbreadth of a number of those terms.

If this search is to be narrowly tailored, we think running "compound" searches to reduce the number of hits is a good starting point. For example:

- Require that results for several terms (attack, bug, bugs, fraud, hack, illegal, investing*, steal, stole, and theft) also include either Gox or MTGOX. Those terms collectively account for over 17,000 hits, and are not narrowly tailored to topics related to Plaintiffs' claims.
- Require that results for Gox and MTGOX also include a hit on an additional search term (excluding Gox or MTGOX). Those terms collectively account for over 5,000 hits, and not narrowly tailored to topics related to Plaintiffs' claims.
- Exclude attachments and other family documents that include the terms "LR" or "Liberty Reserve" because these terms return relatively few hits in emails but include a very large number of "family" documents.

We also propose limiting the timeframe. Judge Sclafani indicated at the hearing that two years after the theft would make a good starting point for establishing the relevant timeframe. This would cut the searchable set in half. If emails from that period provide a good faith basis for seeking later documents then we can revisit the issue.

Regarding the 13,000 emails referenced in your email, the Judge's ruling makes clear that he believes it would be **unreasonable** to ask us to review that many emails. As Judge Sclafani stated at the hearing, "the Court finds that dumping 13,772 pages is not reasonably limited."

We stand ready to run an additional search, hopefully narrowly tailored this time.

EXHIBIT H

**Win Gault**
Forman Watkins & Krutz LLP
www.formanwatkins.com

**From:** Boone, Walter <wboone@balch.com>
**Sent:** Monday, September 10, 2018 6:00 PM
**To:** Win Gault <Win.Gault@formanwatkins.com>
**Cc:** Mandie Robinson <Mandie.Robinson@formanwatkins.com>; Peyton Smith <Peyton.Smith@formanwatkins.com>; Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Lowry, Andy <alowry@balch.com>; Khoury, Alex <akhoury@balch.com>; Taylor, Perry <ptaylor@balch.com>
**Subject:** Discovery of Gmail Account

Win,

We need some resolution on the production of your client's gmail account.

The Court's June 5 Order required our client to provide you with search terms to identify potentially relevant documents, which Brad Martin did on July 9. Based on an email we received from Mandie Robinson on August 7, those search terms reduced the number of documents to be reviewed from 83,473 to 15,592. Your position was that even the greatly reduced number is unreasonable. In her email, she represented that common words were likely to hit on "false positives." Mandie pointed out the term "Mark," which had 1,513 unique hits, although she failed to identify any specific false positives that were coming up in the search. Nor have you provided us any indication on what the other "false positives" were or whether you even looked to determine if there were "false positives." Alex Khoury, our eDiscovery lawyer, proposed a meet and confer to discuss ways to eliminate false positives and further reduce the document count, but you declined that offer.

In our desire to avoid an unnecessary discovery dispute over these emails, on August 31, we offered to simply eliminate the two most prolific terms, "mark" and "missing," from the search term list, even though those terms are clearly calculated to lead to the discovery of relevant evidence. Removing those terms reduced the documents to be reviewed to approximately 12,000—down from 83,473. (We asked for, but have not yet received, a breakdown of which hits happened on which terms). In his email dated September 4, Peyton maintains that "[t]his is still too broad." We note that the 12,000 documents, which you claim is still an unreasonable number, is fewer than the 13,000 emails Judge Sclafani believed was reasonable for our client to review in the June 5 order.

We would like to get beyond discovery disputes and on to the merits of this case, but that will require some cooperation from the Defendant. For purposes of our present dispute (and without waiving our ability to come back later to request any portion of, or the entirety of, the gmail account), here is our proposal to further limit these documents so that we can overcome this impasse:

- We will agree to limit the date range of the searches to June 1, 2010 to December 31, 2014. That cuts out five months of emails we deem the least likely to contain relevant information. We cannot reduce the date range on the back end because we believe there are relevant documents in that time period (and probably beyond).
- We continue to be willing to work with you to limit any of the searches you contend are overbroad and to eliminate "false positives." To do so, you will have to actually confer with us on the basis of your claim of over breadth and work with us to identify and eliminate actual "false positives," not hypothetical "false positives." (This process will go faster and be less expensive if we let our eDiscovery people talk directly about identifying and eliminating the false positives.) As you know, this is a simple and straightforward process which can be accomplished with a minimal investment of time and energy, but only if we confer and let the experts talk.

EXHIBIT H

- Restore the search term "Mark" but target it as follows: "Mark" without stemming and not within 5 words of the following: check, document, word, agreement. We will also agree to eliminate "Mark" within 2 of the last name of any individuals unrelated to this matter.

I am hopeful that we can come to an agreement along these lines. Please let us know your thoughts.



Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT H

# Defendants' Exhibit I

**Mandie Robinson**

| | |
|---|---|
| **From:** | Win Gault |
| **Sent:** | Wednesday, October 10, 2018 12:03 PM |
| **To:** | Mandie Robinson |
| **Subject:** | FW: McCaleb Gmail Account |

**Win Gault**
Forman Watkins & Krutz LLP
Direct Dial: 601-969-7834

**From:** Boone, Walter <wboone@balch.com>
**Sent:** Tuesday, September 25, 2018 10:03 AM
**To:** Win Gault <Win.Gault@formanwatkins.com>
**Cc:** Moeller, Armin <amoeller@balch.com>; White, Christy Crockett <cwhite@balch.com>; Khoury, Alex
<akhoury@balch.com>; Taylor, Perry <ptaylor@balch.com>; Lowry, Andy <alowry@balch.com>
**Subject:** McCaleb Gmail Account

Win:

Thanks for your email of 9/12/18.  Unfortunately, I fear that Raggio is being asked to narrow search terms that likely contain relevant information based on assumptions and guesses and not real data, which is available.  We are willing to compromise on these searches, as detailed below, but first, we note the following issues, which we deem significant:

1. **McCaleb's Unknown Arbitrary Number of Documents Which Constitute a  "Reasonable" Number to Review.**  You ask that we continue to reduce the number of "hits" by restricting search terms.  So far, we have reduced the number from 84,000 to 14,000 to 12,000.  However, you have provided no information on whether or how the documents generated are not relevant, and no information on "false positives" that are generated by those search terms.  You seem to have some arbitrary number of documents in mind which you think constitutes a "reasonable" number that you will review.  Can you tell us what that arbitrary number is?  If you are shooting for some goal (albeit arbitrary), I think it's fair to let us know what that is.

2. **McCaleb's Unwillingness to Conduct Any Review for Relevance or "False Positives."**  In our last correspondence, we asked that you tell us how the search terms we proposed are generating "false positives" so that we can refine the terms to eliminate those known false positives.  In your response, you again decline.  But more importantly, you told us that you have not reviewed any of the "hits" for false positives.  "Identifying false positives requires loading emails onto the review platform, <u>which we have not done</u>."  (Emphasis added). So, as of today, you cannot tell us or the Court that these "hits" contain irrelevant documents.  To the contrary, as far as you know, every one of the "hits" could be a relevant document.  And you have not done any kind of "spot" review or partial review to even help us narrow the search terms. (Thus, the only basis for refusing to review and produce them must be the "arbitrary number" problem in the prior paragraph).  The stated reason for this lack of review is that "identifying false positives requires loading emails onto the review platform. . ."  Our tech people tell us that the emails appear to be in a Relativity Early Case Assessment database right now, which contains the searchable text of the emails, as evidenced by the search term hit reports you've provided.  We also use ECA databases to search and cull email, and we have the ability to view the extracted text of the emails to identify false positives in that ECA platform before we load the documents into our review platform.  Please double check whether you are able to identify false positives because we think you can.  If it would help to have

1

EXHIBIT I

our tech people talk to yours to figure out if you can identify some false positives before loading the documents into a review platform, we are happy to do that.

3. **Limitation of Review Period.**  We already proposed to limit the review period to begin on June 1, 2010 rather than January 1, 2010.  Yet, we didn't see any confirmation that the latest search included this narrowing of the time frame, or that it reduced the hits.  Was the last search so limited?  If it was not, I would like to know what effect the time limitation we proposed has on the document count before we discuss another time limitation.

4. **Limitation of Term "Mark."**  Likewise, we proposed that we include the search term "Mark" with certain restrictions.  However, you have not shown us the results of that search, so we cannot judge what the effectiveness is of narrowing search terms by running "compound" searches.  Before we embark on "compound" searches, we request that you run the one we proposed and provide us the results.

5. **Reported "Hits" Increasing When Search Terms Remain the Same**.  We also don't understand why the unique "hits" in your last two emails have increased for search terms that have remained the same.  For some reason, the number of "hits" increased by 786 for search terms we didn't change.  See the table below.    Please explain why the number of hits increased for these terms between August 7 and September 12.

| Search Terms | Unique Hits (9/12/18 email) | Unique Hits (8/7/18 email) | Difference |
|---|---|---|---|
| "brute force" | 87 | 58 | +29 |
| Attack* | 622 | 554 | +68 |
| Baron | 16 | 6 | +10 |
| Bug | 448 | 402 | +46 |
| Bugs | 574 | 531 | +43 |
| Dictionary | 99 | 60 | +39 |
| Fraud* | 321 | 294 | +27 |
| Gox | 783 | 699 | +84 |
| Hack* | 1072 | 931 | +141 |
| Illegal | 276 | 243 | +33 |
| Investig* | 606 | 552 | +54 |
| Karpeles | 9 | 0 | +9 |
| LR | 72 | 65 | +7 |
| Mtgox | 949 | 784 | +165 |
| Steal* | 353 | 328 | +25 |
| Theft | 123 | 117 | +6 |
|  |  |  | +786 |

Although we have already narrowed the relevant document pool from 83,473 documents to 12,000 documents, we are willing to further compromise on the search terms as follows:
1.  **Limitation of Review Period**.  As stated in my previous email, we agree to limit the time period of the search to June 1, 2010 to December 31, 2014.  We will consider revisiting the date range issue if this limited range, plus the other measures proposed herein, do not reasonably limit the document pool.
2.  **Further Narrowing of Search Terms**.  We will agree to further compromise the search terms as follows:
    a.  MTGOX &  GOX—Your latest hit report indicates that the terms Gox and MTGOX resulted in 3,986 hits of which 1,732 were unique, meaning those 1,732 documents did not contain any of our other search terms.  This also means that the remaining 2,254 documents that contain the terms GOX or MTGOX also

2

EXHIBIT I

contain at least one additional search term, making them far more likely, in our opinion, to be relevant. We will agree for now to limit the search to these 2,254 documents containing the terms GOX or MTGOX and at least one additional search term. We reserve the right to test additional compound searches against the remaining 1,732 GOX or MTGOX documents based on our review of the GOX or MTGOX documents produced.

b. <u>Mark</u>—We agree to run the search term "Mark" without stemming and not within 5 words of the following: check, document, word, agreement, or calendar. We will also agree to eliminate "Mark" within 2 of the last name of any individuals unrelated to this matter.

c. <u>LR and Liberty Reserve</u>—The term Liberty Reserve only hits 78 documents, which we believe is not an unreasonable number and requires no modification. The term LR only hits 87 documents, but when you count the attachments to those 87 documents, the document count for the term LR climbs to 1,109. We propose that you review the 87 documents that actually hit the term LR first, without looking at the attachments, and then only review the attachments to any of those 87 documents that are actually relevant to this litigation.

d. <u>Attack, Bug, Bugs, Dictionary, Fraud, Illegal, Investig*, Steal, Stole, Theft, and Thief</u>—We agree to compound these search terms to eliminate known false positives using the following formula: [Search Term] not within 2 of [False Positive Identifier 1] or [False Positive Identifier 2], etc. This method of compounding search terms to eliminate false positives is an efficient and effective means of separating potentially relevant documents from irrelevant documents without requiring us to guess the words your client might have used in his emails.

e. <u>All other search terms</u>—all of the remaining search terms are specific enough to this litigation that no further narrowing is reasonable.

We believe limiting the searches as we proposed will significantly reduce the number of documents to review and will target the review to documents most likely to be relevant to this litigation. We would like to see the hit reports for the searches limited as proposed herein. If you contend that our proposal to narrowly tailor the search terms is too burdensome, please explain the alleged burden so that we can evaluate your objection and look for additional ways to address it, if possible, or seek additional guidance from the Court.

Finally, if your client's goal is to reduce the burden of his discovery obligations to as near zero as possible, there is an alternative compromise we are willing to offer, namely:

1. You run privilege search terms across the entire 83,473 documents and pull out and log any documents that hit your privilege search terms.

2. You then dump all of the remaining documents on us, designated as attorneys-eyes only.

3. We then cull the documents to weed out emails that are obviously irrelevant and either return or destroy those documents.

4. Documents not eliminated by our culling will then be reviewed by us for relevance. Any documents we deem not relevant will be returned to you or destroyed.

We are willing to enter into a consent protective order and a clawback agreement to protect your client from the disclosure of any non-relevant, embarrassing or confidential information and from the inadvertent production of privileged materials that might slip through your privilege search. This compromise shifts virtually all of the burden of reviewing your client's emails to the Plaintiffs. If this sounds like something your client would consider, please let me know.

Thanks.



EXHIBIT I

Walter Boone, Partner, Balch & Bingham LLP
188 East Capitol Street • Suite 1400 • Jackson, MS 39201-2133
t: (601) 965-8179   f: (888) 856-9542   e: wboone@balch.com
www.balch.com

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

EXHIBIT I

# Plaintiffs' Exhibit A

| | |
|---|---|
| **From:** | Malmi Martti <martti.malmi@aalto.fi> |
| **To:** | Vladimir Marchenko <vladimir@marchenko.co.uk>;theymos <theymos@mm.st> |
| **CC:** | Jeff Garzik <jgarzik@exmulti.com>;Mike Hearn <hearn@google.com>;Pieter Wuille <pieter.wuille@gmail.com>;Marc Bevand <m.bevand@gmail.com>;Matt Corallo <matt@bluematt.me>;Jed McCaleb <jed@mtgox.com>;Gavin Andresen <gavinandresen@gmail.com>;Nils Schneider <nils@nilsschneider.net>;info@bitcoin.cz <info@bitcoin.cz>;solar <laszlo.hanyecz@heliacal.net>;Stefan Thomas <moon@justmoon.de>;mark@tibanne.com <mark@tibanne.com>;theymos <theymos@mm.st> |
| **Sent:** | 9/10/2011 1:39:03 AM |
| **Subject:** | RE: bitcointalk.org attack |

I'd like to pass the responsibility over the forum hosting to someone else. I've managed the hosting for 2 years now and I'd like to move on. Also, I don't have the time or skill to thoroughly investigate the hacking incident, although Theymos has been helping with it.

I can give the database or the VPS image to whoever we decide should manage it. I believe the hacker only managed to inject a javascript to the forum, but this should be confirmed before using the database. If we want to continue with the same SMF 1.1.14 setting, we'll also need to find the exploit.

If the hosting costs something, I can send the donated funds for that.

So, any ideas who should manage the hosting? Volunteers?

---------------------------------------
From: vmartchenko@gmail.com [vmartchenko@gmail.com] on behalf of Vladimir Marchenko [vladimir@marchenko.co.uk]
Sent: 10 September 2011 0:20
To: theymos
Cc: Malmi Martti; Jeff Garzik; Mike Hearn; Bruce Wagner; Pieter Wuille; email@onlyonetv.com; Marc Bevand; Matt Corallo; Jed McCaleb; Gavin Andresen; Nils Schneider; info@bitcoin.cz; solar; Stefan Thomas
Subject: bitcointalk.org attack

I can host emeregency index page for bitcointalk if it helps.

Let me know if it is needed and HTML file to host, than I will set up
a server on a separate IP. You point DNS to it.
It all can take 15 mites or less to get it going. Once all is sorted
you just point DNS to the usual place.

Kind Regards,
Vladimir.

| | |
|---|---|
| **From:** | theymos <theymos@mm.st> |
| **To:** | Mark Karpeles <mark@tibanne.com>;Malmi Martti <martti.malmi@aalto.fi> |
| **CC:** | Vladimir Marchenko <vladimir@marchenko.co.uk>;Jeff Garzik <jgarzik@exmulti.com>;Mike Hearn <hearn@google.com>;Pieter Wuille <pieter.wuille@gmail.com>;Marc Bevand <m.bevand@gmail.com>;Matt Corallo <matt@bluematt.me>;Jed McCaleb <jed@mtgox.com>;Gavin Andresen <gavinandresen@gmail.com>;Nils Schneider <nils@nilsschneider.net>;info@bitcoin.cz <info@bitcoin.cz>;solar <laszlo.hanyecz@heliacal.net>;Stefan Thomas <moon@justmoon.de> |
| **Sent:** | 9/10/2011 2:17:26 PM |
| **Subject:** | Re: bitcointalk.org attack |

I have no problem with Mark doing it. He has a lot of resources and
experience. Sirius will still have control over the DNS, and the current
administrators will (presumably) still have access to database backups,
so centralization won't be a huge issue.

# Plaintiffs' Exhibit B

**From:**   Jed McCaleb <jed2000@gmail.com>
**Sent:**   Saturday, July 17, 2010 10:20 PM
**To:**   info@mtgox.com

sads

**From:**      Jed McCaleb <jed2000@gmail.com>
**Sent:**      Tuesday, August 24, 2010 6:51 AM
**To:**        admin@mtgox.com
**Subject:**   Fwd: RSS Feed


---------- Forwarded message ----------
From: **Jim Nguyen** <jimmy.winn@gmail.com>
Date: Sat, Aug 21, 2010 at 2:10 PM
Subject: RSS Feed
To: support@mtgox.com


Hi,

I am the writer for bitcoinblogger.com.  I was wondering if it were possible for you to create an RSS feed so I
can put your market prices on my blog in real-time.  Some other have mentioned this in the bitcoin.org forum,
so I think this would be helpful for you too if you can do this to help spread the word about bitcoins.

Thanks,
Jim

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Tuesday, August 24, 2010 6:51 AM |
| **To:** | admin@mtgox.com |
| **Subject:** | Fwd: Slashes in URL in notification message + graphs suggestion |

---------- Forwarded message ----------
From: **Andrei Melnikov** <andy.melnikov@gmail.com>
Date: Mon, Aug 23, 2010 at 11:25 AM
Subject: Slashes in URL in notification message + graphs suggestion
To: support@mtgox.com

Slashes should be forward, not backward:
http://www.mtgox.com/code/unsubscribe.php?email=andy.melnikov@gmail.com

Also your "All time chart" is wrong and useless. You should have
separate Ask and Bid japanese candle charts instead of single chart.
And "close" price must be the same as "open" next day. Now you seem to
use price of last deal and price of first deal as close and open deal
in the chart - that is incorrect and undermines whole idea of
candlestick charts as they are used in FX trading.

On 22 August 2010 01:20,  <support@mtgox.com> wrote:
>
> You Bought 39 BTC for 0.065!
> ----------
> You are recieving this email because you opted in in your mtgox.com account
> You can unsubscribe in your account settings or by clicking this link:
http://\\www.mtgox.com\code\unsubscribe.php?email=andy.melnikov@gmail.com
>


--
Andrei

**From:**           Jed McCaleb <jed2000@gmail.com>
**Sent:**           Monday, August 5, 2013 6:00 PM
**To:**             Mark Karpeles
**Subject:**        dst investment group


Hey Mark can you respond to the DST guy. He will be in tokyo this week. He is an irish citizen living in hong kong so you should be able to talk to him.

**From:**          Jed McCaleb <jed2000@gmail.com>
**Sent:**          Monday, February 24, 2014 8:37 PM
**To:**            Mark Karpeles
**Subject:**       mtgox


Hey Mark,
Let me know if you need a way out of this:
http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft
I know how.
Jed.

1

**From:**          Jed McCaleb <jed2000@gmail.com>
**Sent:**          Wednesday, August 8, 2012 8:36 AM
**To:**            Mark Karpeles

Hey Mark,
Is the deal going anywhere with the coinlab guys?

**From:**       Jed McCaleb <jed2000@gmail.com>
**Sent:**       Monday, October 15, 2012 3:54 PM
**To:**         Mark Karpeles

Hey our new bitcoinish system is ready for people to integrate. Let me know if you want access.
Jed.

1

**From:**                Jed McCaleb <jed2000@gmail.com>
**Sent:**                Friday, May 31, 2013 5:59 PM
**To:**                    Mark Karpeles; Gonzague Gay-Bouchery


Hey guys in the process of looking for people to buy my shares I found some people that are interested in buying the whole company. Is this something you would consider and if so what price range would you expect?

1

**From:**          Jed McCaleb <jed2000@gmail.com>
**Sent:**          Friday, August 2, 2013 9:19 PM
**To:**            Mark Karpeles; Gonzague G-B; Stafford, Thomas (DST Investment)

Hi Mark and Gonzague,
I want to introduce you to Tom Stafford. He is a partner at Yuri Milner's investment firm DST. They are interested in buying my mtgox shares. DST would be a great partner for mtgox. Tom will be in Tokyo next week so I hope you guys will be able to meet him.
Thanks,
Jed.

1

**From:**            Jed McCaleb <jed2000@gmail.com>
**Sent:**            Friday, February 7, 2014 2:35 PM
**To:**              Mark Karpeles

Hi Mark,

Can you please distribute some of the bitcoins that you guys have made so far? Mtgox is sitting on a huge pile and I'm really worried that there will be some legal trouble or something that will lock up these coins. It is much safer for us the shareholders if at least some of the coins are distributed out.

Thanks

Jed.

1

**From:**          Jed McCaleb <jed2000@gmail.com>
**Sent:**          Wednesday, September 18, 2013 11:51 AM
**To:**            Mark Karpeles

Hi Mark have you gotten the numbers to Tom from DST that he needed?

**From:**               Jed McCaleb <jed2000@gmail.com>
**Sent:**               Sunday, May 13, 2012 9:45 PM
**To:**                 mark@tibanne.com

Hi Mark,
What is happening with dwolla? When will there be enough money in there to handle withdrawals? I have $200k+ I
want to pull out through there. It seems there hasn't been money in there for a month or so.

Also have you gotten an email from Peter from coinlab. Those guys are interested in investing in mtgox. It would be
good to get them involved I think.

Thanks,
Jed.

1

**From:**        Jed McCaleb <jed2000@gmail.com>
**Sent:**        Friday, June 1, 2012 10:31 AM
**To:**          mark@tibanne.com
**Subject:**     Re:

please reply to me

On Fri, May 18, 2012 at 6:52 AM, Jed McCaleb <jed2000@gmail.com> wrote:
> Hi Mark,
> What is happening with dwolla? When will there be enough money in
> there to handle withdrawals? I have $200k+ I want to pull out through
> there. It seems there hasn't been money in there for a month or so.
>
> Thanks,
> Jed.

1

**From:**        Jed McCaleb <jed2000@gmail.com>
**Sent:**        Tuesday, October 16, 2012 8:52 AM
**To:**          Mark Karpeles
**Subject:**     Re:

Still very rough looking but:

ripple.com/beta
user: beta
pass: can i see?

The client still has a lot of issues but the server API is to the point where people can integrate their services.
You probably want to look at:
http://ripple.com/wiki/index.php/Nexus_Integration_Manual

Jed.

On Mon, Oct 15, 2012 at 3:33 PM, Mark Karpeles <mark@tibanne.com> wrote:
 Hi,

 Sounds interesting, could you show me more ? :)


 Mark


 On Tue, Oct 16, 2012 at 5:54 AM, Jed McCaleb <jed2000@gmail.com> wrote:
  Hey our new bitcoinish system is ready for people to integrate. Let me
  know if you want access.
  Jed.



 ---

 Kind regards,

 **Mark** Karpeles
 *Chief Executive Officer*
 Tibanne Co. Ltd.

 E: mark@tibanne.com
 T: +81 3 4520 6200
 W: http://www.tibanne.com

 This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then
 immediately delete this message.

1

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Sunday, June 2, 2013 10:49 PM |
| **To:** | Mark Karpeles |
| **Cc:** | Gonzague Gay-Bouchery |
| **Subject:** | Re: |

They are trustworthy and have run much larger businesses in the same space. Let's assume you agree with them philosophically and trust them, what price range would you consider?
Thanks,
Jed.

On May 31, 2013 7:05 PM, "Mark Karpeles" <mark@tibanne.com> wrote:
Hi,

It really depends on how trustworthy those people are - and also on their aim - before anything.

Then, we can start talking about a price.


Mark


On Sat, Jun 1, 2013 at 7:58 AM, Jed McCaleb <jed2000@gmail.com> wrote:

Hey guys in the process of looking for people to buy my shares I found some people that are interested in buying the whole company. Is this something you would consider and if so what price range would you expect?




--

Kind regards,

**Mark** Karpeles
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Monday, June 3, 2013 11:23 PM |
| **To:** | Mark Karpeles |
| **Cc:** | Gonzague Gay-Bouchery |
| **Subject:** | Re: |

Can you guys send me the corporate formation docs, like the by-laws etc. Its ok if they are in Japanese.
Thanks,
Jed.

On Sun, Jun 2, 2013 at 8:48 PM, Jed McCaleb <jed2000@gmail.com> wrote:

They are trustworthy and have run much larger businesses in the same space. Let's assume you agree with them philosophically and trust them, what price range would you consider?
Thanks,
Jed.

On May 31, 2013 7:05 PM, "Mark Karpeles" <mark@tibanne.com> wrote:

Hi,

It really depends on how trustworthy those people are - and also on their aim - before anything.

Then, we can start talking about a price.

Mark

On Sat, Jun 1, 2013 at 7:58 AM, Jed McCaleb <jed2000@gmail.com> wrote:

Hey guys in the process of looking for people to buy my shares I found some people that are interested in buying the whole company. Is this something you would consider and if so what price range would you expect?

--

Kind regards,

**Mark** Karpeles
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com

1

T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Monday, September 23, 2013 2:51 PM |
| **To:** | Mark Karpeles; Gonzague G-B |
| **Subject:** | Re: |

Great. Can you please send me the numbers as well.
Thanks,
Jed.

On Wed, Sep 18, 2013 at 2:39 PM, Mark Karpeles <mark@tibanne.com> wrote:
 Hi,

Gonzague sent him the numbers about 6 days ago.

Mark

On Thu, Sep 19, 2013 at 1:50 AM, Jed McCaleb <jed2000@gmail.com> wrote:
 Hi Mark have you gotten the numbers to Tom from DST that he needed?

Kind regards,

**Mark** Karpeles
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Friday, May 18, 2012 8:53 AM |
| **To:** | mark@tibanne.com |
| **Subject:** | Re: |

Hi Mark,
What is happening with dwolla? When will there be enough money in there to handle withdrawals? I have $200k+ I want to pull out through there. It seems there hasn't been money in there for a month or so.

Thanks,
Jed.

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Monday, February 24, 2014 8:49 PM |
| **To:** | Mark Karpeles |
| **Subject:** | Re: mtgox |

jesus.
How many btc do you guys have left?

This is why I wanted you to make that distribution...


On Mon, Feb 24, 2014 at 6:40 PM, Mark Karpeles <mark@tibanne.com> wrote:
  Yes


  On Tue, Feb 25, 2014 at 11:39 AM, Jed McCaleb <jed2000@gmail.com> wrote:
   So is this doc basically correct that that many coins are missing?



  On Mon, Feb 24, 2014 at 6:38 PM, Mark Karpeles <mark@tibanne.com> wrote:
   You know how?

   As of right now we are about to file for bankruptcy, but what way out do you have?


   On Tue, Feb 25, 2014 at 11:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:
    Hey Mark,
    Let me know if you need a way out of this:
    http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft
    I know how.
    Jed




  Kind regards,

  **Mark Karpeles**
  *Chief Executive Officer*
  Tibanne Co. Ltd.

  E: mark@tibanne.com
  T: +81 3 4520 6200
  W: http://www.tibanne.com


1

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

--

Kind regards,

**Mark** Karpeles
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Monday, February 24, 2014 9:00 PM |
| **To:** | Mark Karpeles |
| **Subject:** | Re: mtgox |

Wow ok that is way worse than I thought. What about the bitcoins you have made in profit? Also gone?
You need to stop the trading and stop processing any deposits or withdrawals and go into bankruptcy.

On Mon, Feb 24, 2014 at 6:55 PM, Mark Karpeles <mark@tibanne.com> wrote:
  As of right now we have ~1992.20084662 (not counting processing change)

On Tue, Feb 25, 2014 at 11:48 AM, Jed McCaleb <jed2000@gmail.com> wrote:
  jesus.
  How many btc do you guys have left?

  This is why I wanted you to make that distribution...

On Mon, Feb 24, 2014 at 6:40 PM, Mark Karpeles <mark@tibanne.com> wrote:
  Yes

On Tue, Feb 25, 2014 at 11:39 AM, Jed McCaleb <jed2000@gmail.com> wrote:
  So is this doc basically correct that that many coins are missing?

On Mon, Feb 24, 2014 at 6:38 PM, Mark Karpeles <mark@tibanne.com> wrote:
  You know how?

  As of right now we are about to file for bankruptcy, but what way out do you have?

On Tue, Feb 25, 2014 at 11:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:
  Hey Mark,
  Let me know if you need a way out of this:
  http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft
  I know how.
  Jed.

1

Kind regards,

**Mark Karpeles**
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

--

Kind regards,

**Mark Karpeles**
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

--

Kind regards,

**Mark Karpeles**
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

**From:**        Jed McCaleb <jed2000@gmail.com>
**Sent:**        Wednesday, February 26, 2014 7:30 AM
**To:**          Mark Karpeles; Gonzague G-B
**Subject:**     Re: mtgox

You guys should tell people what is going on.

I think you should handle the dissolution something along these lines.
-Email everyone to tell them what is going on and tell them the following plan.
-Convert everyone's btc to usd at around $500/btc -Give people one or two months to login to their accounts.
-Consider any account not logged into abandoned.
-Take the balance of all the non-abandoned accounts this is your total debt.
-total debt/total assets on hand is your payback ratio.
-Pay every non-abandoned account back their account balance*payback ratio.
-Declare bankruptcy.

If you declare bankruptcy before you do this, the bankruptcy process will take most of the remaining funds rather than them being distributed to the customers.
Jed.


On Mon, Feb 24, 2014 at 6:55 PM, Mark Karpeles <mark@tibanne.com> wrote:
>
> As of right now we have ~1992.20084662 (not counting processing
> change)
>
>
> On Tue, Feb 25, 2014 at 11:48 AM, Jed McCaleb <jed2000@gmail.com> wrote:
>>
>> jesus.
>> How many btc do you guys have left?
>>
>> This is why I wanted you to make that distribution...
>>
>>
>> On Mon, Feb 24, 2014 at 6:40 PM, Mark Karpeles <mark@tibanne.com> wrote:
>>>
>>> Yes
>>>
>>>
>>> On Tue, Feb 25, 2014 at 11:39 AM, Jed McCaleb <jed2000@gmail.com> wrote:
>>>>
>>>> So is this doc basically correct that that many coins are missing?
>>>>
>>>>
>>>>
>>>> On Mon, Feb 24, 2014 at 6:38 PM, Mark Karpeles <mark@tibanne.com> wrote:

1

>>>>>
>>>>> You know how?
>>>>>
>>>>> As of right now we are about to file for bankruptcy, but what way out do you have?
>>>>>
>>>>>
>>>>> On Tue, Feb 25, 2014 at 11:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:
>>>>>>
>>>>>> Hey Mark,
>>>>>> Let me know if you need a way out of this:
>>>>>> http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strate
>>>>>> gy-Draft
>>>>>> I know how.
>>>>>> Jed.
>>>>>
>>>>>
>>>>>
>>>>>
>>>>> --
>>>>> Kind regards,
>>>>>
>>>>> Mark Karpeles
>>>>> Chief Executive Officer
>>>>> Tibanne Co. Ltd.
>>>>>
>>>>> E: mark@tibanne.com
>>>>> T: +81 3 4520 6200
>>>>> W: http://www.tibanne.com
>>>>>
>>>>> This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
>>>>
>>>>
>>>
>>>
>>>
>>> --
>>> Kind regards,
>>>
>>> Mark Karpeles
>>> Chief Executive Officer
>>> Tibanne Co. Ltd.
>>>
>>> E: mark@tibanne.com
>>> T: +81 3 4520 6200
>>> W: http://www.tibanne.com
>>>
>>> This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
>>
>>
>

2

>
>
> --
> Kind regards,
>
> Mark Karpeles
> Chief Executive Officer
> Tibanne Co. Ltd.
>
> E: mark@tibanne.com
> T: +81 3 4520 6200
> W: http://www.tibanne.com
>
> This message may contain confidential and privileged information. If it has been sent to you in error, please reply to
advise the sender of the error and then immediately delete this message.

**From:**      Jed McCaleb <jed2000@gmail.com>
**Sent:**      Monday, February 24, 2014 8:40 PM
**To:**      Mark Karpeles
**Subject:**      Re: mtgox

So is this doc basically correct that that many coins are missing?

On Mon, Feb 24, 2014 at 6:38 PM, Mark Karpeles <mark@tibanne.com> wrote:
You know how?

As of right now we are about to file for bankruptcy, but what way out do you have?

On Tue, Feb 25, 2014 at 11:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Hey Mark,
Let me know if you need a way out of this:
http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft
I know how.
Jed

---

Kind regards,

**Mark** Karpeles
*Chief Executive Officer*
Tibanne Co. Ltd.

E: mark@tibanne.com
T: +81 3 4520 6200
W: http://www.tibanne.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

1

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Thursday, July 26, 2012 5:43 PM |
| **To:** | Peter Vessenes |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Next Steps with Gox and CoinLab |

Hi Guys,
Some deal like this seems very reasonable to me.
Mark you have done a great job securing and setting up the backend of mtgox. But at this point the things it really needs to grow aren't technical but more things like management, dealing with banks and regulators, marketing and other such tasks.
I really think it will be hard to take mtgox beyond where it is now without A) investment and B) a management team.
Jed.

On Thu, Jul 26, 2012 at 1:25 AM, Peter Vessenes <peter@coinlab.com> wrote:
  p.s. I cc'ed Jed on this as well; I'd love to have him weigh in on his thoughts, since he's a shareholder as well.


On Thu, Jul 26, 2012 at 5:21 PM, Peter Vessenes <peter@coinlab.com> wrote:
  Hey,

  This is a little private to talk about in the office, but I have what look to be some reasonable numbers, and some thoughts about them, so I thought I'd e-mail you.

  Here's my take: I'm excited! I think I can take Mt. Gox to the next level, I have access to high quality banking and investors, and I'm well placed in the Bitcoin world to take care of the exchange. I don't think I can do it on just a management contract, though. Partly it's just going to be a big job, and partly my investors have been pretty clear that they want to see me running it; it makes sense -- they know me and trust me, and I think that kind of trust is going to be needed to take Mt. Gox to the next level.

  Would you be open to a buyout? I would imagine it structured similar to Jed's, but more favorable for you, both in that it would guarantee money (we can talk about how much, but I am thinking in the low single-digit millions based on the Mt. Gox finances right now), and that it would have some built in upside (I'm thinking it would tier up to a cap of roughly $10-12mm in value over four years or so).

  I think if we could do a buyout, and work out something like a 6 month transition plan where you pass off operations and technology to our team plus your folks that want to continue with Mt. Gox, I could have in 12 to 18 months:

  - Totally legal US exchange with easy money in/out for traders
  - Investors from a major New York stock market investing
  - A significant finance round closed, possibly in excess of $5mm
  - Very smooth cashflow without major losses month on month
  - Quarterly checks to you with a significant number of zeros

1

I'm thinking this would be good for you -- it would lock in some value, give you some upside, and you'd get to work on some of your other fascinating projects without Mt. Gox eating your life.

What do you think of this as a structure to talk over? I'd love to review the finances with you tomorrow, and see what your take on the numbers is.

Peter

---

## PETER VESSENES
CEO



**peter@coinlab.com**  /  206.486.6856  / SKYPE: vessenes
811 FIRST AVENUE  /  SUITE 480  /  SEATTLE, WA 98104

---

## PETER VESSENES
CEO



**peter@coinlab.com**  /  206.486.6856  / SKYPE: vessenes
811 FIRST AVENUE  /  SUITE 480  /  SEATTLE, WA 98104

2

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Wednesday, October 2, 2013 6:20 PM |
| **To:** | Gonzague Gay-Bouchery; Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.


On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.


On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002


E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

1

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards




--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002


E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)"
<Stafford@DSTInvestment.com> wrote:

2

Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Tuesday, October 8, 2013 10:13 AM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:

> Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you
> would want the company to buy them back. This might be a good way to get a clean cap table
> for you and as some appreciation to me for the good deal I gave you originally with mtgox.
> How much would you guys be willing to buy them back for?
> Thanks,
> Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
> Thanks for getting me the numbers guys.
> It looks like you have taken in quite a bit of profit.
> This also doesn't seem to include how much you have taken in in BTC.
> When are you planing on issuing a distribution? It seems like one is long overdue.
> Also mark I have to admit I'm a bit concerned about this relationship you have set up with
> tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much
> not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to
> tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning
> off. I'm sure you didn't set it up this way to make my effective share go down but you can see
> how this is the effect. We need to do something to adjust this. Do you have any ideas?
> Thanks,
> Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
> Here you are
>
> Cheers
> --
> Gonzague GAY-BOUCHERY
>
> TIBANNE Co.,Ltd.
> Marketing & Corporate Communication Manager
>
> Round Cross 2B, Shibuya 2-11-5,
> Shibuya-ku Tokyo, Japan 150-0002
>
> [x]
> E: gonzague@tibanne.com
> P: +81 (0)3-4520-6203 - Direct
> P: +81 (0)3-4520-6200
> F: +81 (0)3-4520-6299
> S: gbgtibanne
>
> Begin forwarded message:

2

**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)"
<Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)"
<Stafford@DSTInvestment.com> wrote:

3

Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Wednesday, October 16, 2013 8:55 AM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,

1

Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:

> For example in March 2013 expenses tab there are expenses for salary and other
> things but also this large "Subcontracting Expense". I'm assuming this
> subcontracting expense is to Tibanne?
>
> You guys have a better idea of what the business is worth. Could you make me
> an offer for the shares? I'm willing to take BTC or USD.
> Thanks,
> Jed.
>
>
> On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery
> <gonzague@tibanne.com> wrote:
> Hi Jed
>
> Sorry for the late reply.
>
> First let me "clear up" the Tibanne/MtGox question you had in your previous
> email.
> As for today Mt.Gox has, besides some attorneys fees no other real costs.
> Everything ranging from Staffing, equipment, office rent, servers and so on is
> paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are,
> as far as I am concerned and to the best of my knowledge, "siphoned off" from
> Mt.Gox to Tibanne.
> For example I am myself a Tibanne Employee even though I am spending more
> than 99.9% of my time on Mt.Gox and its development.
>
> Now when it comes to your shares we could indeed consider buying them back,
> what range do you have in mind?
>
> Regards

Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:

> Also as you guys know I've been trying to sell my mtgox shares.
> I just realized that maybe you would want the company to buy
> them back. This might be a good way to get a clean cap table for
> you and as some appreciation to me for the good deal I gave you
> originally with mtgox. How much would you guys be willing to
> buy them back for?
> Thanks,
> Jed.

> On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb
> <jed2000@gmail.com> wrote:
> Thanks for getting me the numbers guys.
> It looks like you have taken in quite a bit of profit.
> This also doesn't seem to include how much you have taken in
> in BTC.
> When are you planing on issuing a distribution? It seems like
> one is long overdue.
> Also mark I have to admit I'm a bit concerned about this
> relationship you have set up with tibanne and mtgox. It looks
> like tibanne is getting a % of the mtgox revenue. This is very
> much not in the spirit of our deal (Unless I also get stock in
> tibanne, or 12% of what is sent to tibanne, or something else).
> Basically I'm denied the mtgox revenue that tibanne is
> siphoning off. I'm sure you didn't set it up this way to make my
> effective share go down but you can see how this is the effect.
> We need to do something to adjust this. Do you have any ideas?
> Thanks,
> Jed.

3

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery
<gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002


E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery
<gonzague@tibanne.com>
**Subject: Re: Question on the Data
Required**
**Date:** September 13, 2013 3:18:45 PM
GMT+09:00
**To:** "Stafford, Thomas (DST
Investment)"
<Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles
<mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as
promised here you are the data.

1. You will find an Excel document for the
accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate
to contact me directly.

Regards

4

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication
Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas
(DST Investment)"
<Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly
balance of cash & bitcoins held
by MtGox / deposited with
MtGox. Gives us a feel for size
and scope of the business and
how it has changed over time

3d) looking to see whether
accounts opened say in wk 1
2012 are still active 1 week later/
10 weeks later/ 20 weeks later/
50 weeks later etc. Shows us
how sticky the platform is and
whether users continue to use the
service over time or move away

from the platform. For this type
of KPI, we usually see it as a % -
ie for every 100 new users who
"opened accounts" in wk1 2012,
what % were still active 1 week
later/ 10 weeks later/ 20 weeks
later/ 50 weeks later etc
--> could look at the data on
monthly basis instead of weekly
if easier
Specifically, we thought to
define active accounts in two
different ways:
3d)i) accounts that actively
traded bitcoins at each point of
measurement (ie 1 / 10/20/50
weeks later etc)
3d)ii) accounts that had positive
balances at each point of
measurement

Happy to jump on the phone
quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B
[mailto:gonzague@tibanne.com]
Sent: Monday, September 9,
2013 3:40 PM
To: Stafford, Thomas (DST
Investment)
Subject: Question on the Data
Required

Hi Thomas

I have a few questions for you,
could you please define

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

6

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Thursday, October 17, 2013 12:56 AM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

1

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002


E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.

Case: 25CI1:14-cv-00071-JAS   Document #: 241-9   Filed: 10/22/2018   Page 49 of 124

For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:

Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers

3

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:

**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

4

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a
feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20
weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the
service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every
100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20
weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom



-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

**From:**           Jed McCaleb <jed2000@gmail.com>
**Sent:**           Thursday, October 17, 2013 1:17 AM
**To:**             Gonzague Gay-Bouchery
**Cc:**             Mark Karpeles
**Subject:**        Re: Question on the Data Required

Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

1

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

2

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:

For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

3

F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:


Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>

4

**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:

Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20

weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc

--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards


Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Wednesday, October 23, 2013 12:17 AM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:


Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me
know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

3

Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:

Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox

4

revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

6

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Thursday, October 24, 2013 11:02 PM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

I'm traveling so can't be on Skype. If you have to tell me the number of bitcoins you hold on the phone it will have to wait till next week.

On Oct 24, 2013 8:13 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

I am still waiting for you to come back on me regarding this matter? When are you available?

Also I have another request for you. We are establishing a new business partnership with a financial institution in Europe that will help us to resolve our Withdrawal problems and before they can accept us (Contract is going to sign) they are requiring a Copy of your ID alongside a proof of residence not holder than 3 month (Utility bill), could you please be kind enough to send me this documents ASAP by courier than we can move forward with them?
Please understand that these documents are ONLY for the purpose of being able to start working with them and that it is only for the benefit of the company in order to resolve some of its latest banking hurdles.

Finally, I have to check the details but we will have to make some change on MtGox articles of association in order to add alongside the company official Japanese name : 株式会社ＭＴＧＯＸ (hope you can read this) or K.K. MTGOX, the most common english name of MTGOX CO., LTD. Please take note of this change and I will give you more details about it when I can.

Again I am at your disposal for the first point.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

1

F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:56 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

I would rather talk to you about this over Skype or Phone, since we have to take under consideration several factors.

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:39 PM, Jed McCaleb <jed2000@gmail.com> wrote:

All I really need to know is the total bitcoin and normal currency that you guys have made so far. You can just send me an email or skype it to me.

On Tue, Oct 22, 2013 at 10:19 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
I am going to be on several meetings today as well as being outside of the office tomorrow, can we do it Friday instead? Please note that I will be in a meeting Friday from 10 to 11am JST

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne


On Oct 23, 2013, at 2:17 PM, Jed McCaleb <jed2000@gmail.com> wrote:


yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne


On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:


Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
Gonzague GAY-BOUCHERY

3

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me
know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

5

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:


Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox

revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a
feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20
weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the
service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every
100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20
weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

8

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

**From:**        Jed McCaleb <jed2000@gmail.com>
**Sent:**        Wednesday, October 23, 2013 12:40 AM
**To:**          Gonzague Gay-Bouchery
**Cc:**           Mark Karpeles
**Subject:**     Re: Question on the Data Required

All I really need to know is the total bitcoin and normal currency that you guys have made so far. You can just send me an email or skype it to me.

On Tue, Oct 22, 2013 at 10:19 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
I am going to be on several meetings today as well as being outside of the office tomorrow, can we do it Friday instead? Please note that I will be in a meeting Friday from 10 to 11am JST

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:17 PM, Jed McCaleb <jed2000@gmail.com> wrote:


yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

1

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:


Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

2

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:

Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,

3

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large
"Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm
willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing,
equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No
revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to
Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on
Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in
mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:


Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.


Regards




--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:

Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

--
Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Sunday, October 27, 2013 1:37 PM |
| **To:** | Gonzague G-B |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

I'll be online tonight (your morning) if you have a min please find me on skype.

On Thu, Oct 24, 2013 at 9:03 PM, Gonzague G-B <gonzague@tibanne.com> wrote:
No problem I will wait next week!

However I was not aware that we have a copy of your passport sorry for that, what I will need however is a recent utility bill

Thks!

Sent from my iPhone

On Oct 25, 2013, at 13:02, Jed McCaleb <jed2000@gmail.com> wrote:

I'm traveling so can't be on Skype. If you have to tell me the number of bitcoins you hold on the phone it will have to wait till next week.

On Oct 24, 2013 8:13 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

I am still waiting for you to come back on me regarding this matter? When are you available?

Also I have another request for you. We are establishing a new business partnership with a financial institution in Europe that will help us to resolve our Withdrawal problems and before they can accept us (Contract is going to sign) they are requiring a Copy of your ID alongside a proof of residence not holder than 3 month (Utility bill), could you please be kind enough to send me this documents ASAP by courier than we can move forward with them?
Please understand that these documents are ONLY for the purpose of being able to start working with them and that it is only for the benefit of the company in order to resolve some of its latest banking hurdles.

Finally, I have to check the details but we will have to make some change on MtGox articles of association in order to add alongside the company official Japanese name : 株式会社ＭＴＧＯＸ (hope you can read this) or K.K. MTGOX, the most common english name of MTGOX CO., LTD. Please take note of this change and I will give you more details about it when I can.

Again I am at your disposal for the first point.

Regards

1

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:56 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


I would rather talk to you about this over Skype or Phone, since we have to take under consideration several
factors.

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:39 PM, Jed McCaleb <jed2000@gmail.com> wrote:


All I really need to know is the total bitcoin and normal currency that you guys have made so far. You can just
send me an email or skype it to me.

On Tue, Oct 22, 2013 at 10:19 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

2

I am going to be on several meetings today as well as being outside of the office tomorrow, can we do it Friday instead? Please note that I will be in a meeting Friday from 10 to 11am JST

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:17 PM, Jed McCaleb <jed2000@gmail.com> wrote:


yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:


Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

4

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:

Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:

6

Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

7

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:

Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:

8

3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

--
Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Wednesday, October 30, 2013 9:10 AM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

Please just find me on skype. I should be on there when you get this in your morning.

On Sun, Oct 27, 2013 at 5:39 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Thanks for getting back to me. I have a few meeting this morning and I am not sure if I will be able to have time
for you, however tomorrow morning and the day after tomorrow (29 & 30) I will be fine, what about you?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 28, 2013, at 3:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:


I'll be online tonight (your morning) if you have a min please find me on skype.

On Thu, Oct 24, 2013 at 9:03 PM, Gonzague G-B <gonzague@tibanne.com> wrote:
No problem I will wait next week!

However I was not aware that we have a copy of your passport sorry for that, what I will need however is a
recent utility bill

1

Thks!

Sent from my iPhone

On Oct 25, 2013, at 13:02, Jed McCaleb <jed2000@gmail.com> wrote:

I'm traveling so can't be on Skype. If you have to tell me the number of bitcoins you hold on the phone it will have to wait till next week.

On Oct 24, 2013 8:13 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

I am still waiting for you to come back on me regarding this matter? When are you available?

Also I have another request for you. We are establishing a new business partnership with a financial institution in Europe that will help us to resolve our Withdrawal problems and before they can accept us (Contract is going to sign) they are requiring a Copy of your ID alongside a proof of residence not holder than 3 month (Utility bill), could you please be kind enough to send me this documents ASAP by courier than we can move forward with them?
Please understand that these documents are ONLY for the purpose of being able to start working with them and that it is only for the benefit of the company in order to resolve some of its latest banking hurdles.

Finally, I have to check the details but we will have to make some change on MtGox articles of association in order to add alongside the company official Japanese name : 株式会社ＭＴＧＯＸ (hope you can read this) or K.K. MTGOX, the most common english name of MTGOX CO., LTD. Please take note of this change and I will give you more details about it when I can.

Again I am at your disposal for the first point.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:56 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

I would rather talk to you about this over Skype or Phone, since we have to take under consideration several factors.

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:39 PM, Jed McCaleb <jed2000@gmail.com> wrote:


All I really need to know is the total bitcoin and normal currency that you guys have made so far. You can just send me an email or skype it to me.

On Tue, Oct 22, 2013 at 10:19 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
I am going to be on several meetings today as well as being outside of the office tomorrow, can we do it Friday instead? Please note that I will be in a meeting Friday from 10 to 11am JST

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:17 PM, Jed McCaleb <jed2000@gmail.com> wrote:


yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:



Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

4

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com

P: +81 (0)3-4520-6203 – Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

6

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:


Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

7

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards

--

Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:

Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

9

1) a)
3) d) i) & ii)

Regards

Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Sunday, November 3, 2013 7:01 PM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

So I think the following is fair:
Let's just value the company at its current assets. This is the lowest it could possibly be worth.
Current assets are:
V=(Cash in bank + value of bicoins held)
So I should get V*.12 as a disbursement. Then 12% of what is left after that for you guys buying my shares.
P=V*.12+(V-V*.12)*.12
I don't care what currency you pay P in.
This is the absolute floor of what my shares should be worth since this assumes mtgox is worth 0 beyond the
assets. If you guys don't want to buy back my shares I'd still like at least my 12% of the bitcoins you have made
so far since this is due regardless.
Thanks
Jed.

On Oct 30, 2013 7:09 AM, "Jed McCaleb" <jed2000@gmail.com> wrote:
Please just find me on skype. I should be on there when you get this in your morning.

On Sun, Oct 27, 2013 at 5:39 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Thanks for getting back to me. I have a few meeting this morning and I am not sure if I will be able to have time
for you, however tomorrow morning and the day after tomorrow (29 & 30) I will be fine, what about you?

Regards
---
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

1

On Oct 28, 2013, at 3:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:


I'll be online tonight (your morning) if you have a min please find me on skype.

On Thu, Oct 24, 2013 at 9:03 PM, Gonzague G-B <gonzague@tibanne.com> wrote:
No problem I will wait next week!

However I was not aware that we have a copy of your passport sorry for that, what I will need however is a recent utility bill

Thks!

Sent from my iPhone

On Oct 25, 2013, at 13:02, Jed McCaleb <jed2000@gmail.com> wrote:

I'm traveling so can't be on Skype. If you have to tell me the number of bitcoins you hold on the phone it will have to wait till next week.

On Oct 24, 2013 8:13 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

I am still waiting for you to come back on me regarding this matter? When are you available?

Also I have another request for you. We are establishing a new business partnership with a financial institution in Europe that will help us to resolve our Withdrawal problems and before they can accept us (Contract is going to sign) they are requiring a Copy of your ID alongside a proof of residence not holder than 3 month (Utility bill), could you please be kind enough to send me this documents ASAP by courier than we can move forward with them?
Please understand that these documents are ONLY for the purpose of being able to start working with them and that it is only for the benefit of the company in order to resolve some of its latest banking hurdles.

Finally, I have to check the details but we will have to make some change on MtGox articles of association in order to add alongside the company official Japanese name : 株式会社ＭＴＧＯＸ (hope you can read this) or K.K. MTGOX, the most common english name of MTGOX CO., LTD. Please take note of this change and I will give you more details about it when I can.

Again I am at your disposal for the first point.

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,

2

Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:56 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


I would rather talk to you about this over Skype or Phone, since we have to take under consideration several factors.

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:39 PM, Jed McCaleb <jed2000@gmail.com> wrote:


All I really need to know is the total bitcoin and normal currency that you guys have made so far. You can just send me an email or skype it to me.

On Tue, Oct 22, 2013 at 10:19 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
I am going to be on several meetings today as well as being outside of the office tomorrow, can we do it Friday instead? Please note that I will be in a meeting Friday from 10 to 11am JST

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.

3

Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:17 PM, Jed McCaleb <jed2000@gmail.com> wrote:


yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:



Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

4

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,

--

Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--

Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

6

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:


Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:

Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.


On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

8

Regards

--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom

9

-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

--
Sent from my iPad

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Wednesday, November 13, 2013 12:39 PM |
| **To:** | Gonzague Gay-Bouchery |
| **Cc:** | Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

Hi guys. What are your thoughts on this? This seems very fair to me.
If you think the company isn't worth the current assets you should clearly just shut down and distribute those assets.
Jed.

On Sun, Nov 3, 2013 at 5:00 PM, Jed McCaleb <jed2000@gmail.com> wrote:

So I think the following is fair:
Let's just value the company at its current assets. This is the lowest it could possibly be worth.
Current assets are:
V=(Cash in bank + value of bicoins held)
So I should get V*.12 as a disbursement. Then 12% of what is left after that for you guys buying my shares.
P=V*.12+(V−V*.12)*.12
I don't care what currency you pay P in.
This is the absolute floor of what my shares should be worth since this assumes mtgox is worth 0 beyond the assets. If you guys don't want to buy back my shares I'd still like at least my 12% of the bitcoins you have made so far since this is due regardless.
Thanks
Jed.

On Oct 30, 2013 7:09 AM, "Jed McCaleb" <jed2000@gmail.com> wrote:
Please just find me on skype. I should be on there when you get this in your morning.

On Sun, Oct 27, 2013 at 5:39 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Thanks for getting back to me. I have a few meeting this morning and I am not sure if I will be able to have time for you, however tomorrow morning and the day after tomorrow (29 & 30) I will be fine, what about you?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

1

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 28, 2013, at 3:37 AM, Jed McCaleb <jed2000@gmail.com> wrote:


I'll be online tonight (your morning) if you have a min please find me on skype.

On Thu, Oct 24, 2013 at 9:03 PM, Gonzague G-B <gonzague@tibanne.com> wrote:
No problem I will wait next week!

However I was not aware that we have a copy of your passport sorry for that, what I will need however is a recent utility bill

Thks!

Sent from my iPhone

On Oct 25, 2013, at 13:02, Jed McCaleb <jed2000@gmail.com> wrote:

I'm traveling so can't be on Skype. If you have to tell me the number of bitcoins you hold on the phone it will have to wait till next week.

On Oct 24, 2013 8:13 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed

I am still waiting for you to come back on me regarding this matter? When are you available?

Also I have another request for you. We are establishing a new business partnership with a financial institution in Europe that will help us to resolve our Withdrawal problems and before they can accept us (Contract is going to sign) they are requiring a Copy of your ID alongside a proof of residence not holder than 3 month (Utility bill), could you please be kind enough to send me this documents ASAP by courier than we can move forward with them?
Please understand that these documents are ONLY for the purpose of being able to start working with them and that it is only for the benefit of the company in order to resolve some of its latest banking hurdles.

Finally, I have to check the details but we will have to make some change on MtGox articles of association in order to add alongside the company official Japanese name : 株式会社ＭＴＧＯＸ (hope you can read this) or K.K. MTGOX, the most common english name of MTGOX CO., LTD. Please take note of this change and I will give you more details about it when I can.

Again I am at your disposal for the first point.

Regards

2

\-\-\-
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:56 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:


I would rather talk to you about this over Skype or Phone, since we have to take under consideration several factors.

Regards
\-\-\-
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:39 PM, Jed McCaleb <jed2000@gmail.com> wrote:


All I really need to know is the total bitcoin and normal currency that you guys have made so far. You can just send me an email or skype it to me.

On Tue, Oct 22, 2013 at 10:19 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

3

I am going to be on several meetings today as well as being outside of the office tomorrow, can we do it Friday instead? Please note that I will be in a meeting Friday from 10 to 11am JST

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 23, 2013, at 2:17 PM, Jed McCaleb <jed2000@gmail.com> wrote:


yeah I'm on skype

On Tue, Oct 22, 2013 at 10:09 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed,

I have some update for you regarding you last question, when can you make yourself available on Skype?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

4

On Oct 17, 2013, at 3:16 PM, Jed McCaleb <jed2000@gmail.com> wrote:


Ok sounds great.

On Oct 16, 2013 11:07 PM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:
Hi Jed,

What about then 14h30 (2:30pm) JST Tuesday 22nd on Skype?

Regards,
--
**Gonzague GAY-BOUCHERY**

**TIBANNE Co.,Ltd.**
**Manager, Business Development**

**Round Cross 2B, Shibuya 2-11-5,**
**Shibuya-ku Tokyo, Japan 150-0002**



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 17, 2013, at 2:55 PM, Jed McCaleb <jed2000@gmail.com> wrote:


How about anytime before 3pm your time monday or Tuesday?

On Oct 16, 2013 10:50 PM, "Gonzague G-B" <gonzague@tibanne.com> wrote:
Hi Jed

Would next week work for you too? And if so when (date and time)?

Thks

Sent from my iPhone

On Oct 16, 2013, at 22:55, Jed McCaleb <jed2000@gmail.com> wrote:

I'm pretty flexible. Thursday morning for you guys or Friday early afternoon for you guys works. Or let me know a time. I'm jed.mccaleb on Skype.

On Oct 16, 2013 12:26 AM, "Gonzague Gay-Bouchery" <gonzague@tibanne.com> wrote:

Hi Jed

When will you be available to talk about the possible opportunity for us to purchase back your share?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Manager, Business Development

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 10:29 AM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:

Hi Jed,

Again this expense is related to what I was explaining you, also we had to wire more staff and move from one Bldg to another, everything is accounted for and there are no tricks here according to our accountant (please remember that I am not an accountant).

This said, regarding your share please give me a fe more days that I can check with our accountant here and see what can be done.

Regards,
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200

F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 9, 2013, at 12:13 AM, Jed McCaleb <jed2000@gmail.com> wrote:


For example in March 2013 expenses tab there are expenses for salary and other things but also this large "Subcontracting Expense". I'm assuming this subcontracting expense is to Tibanne?

You guys have a better idea of what the business is worth. Could you make me an offer for the shares? I'm willing to take BTC or USD.
Thanks,
Jed.

On Mon, Oct 7, 2013 at 10:36 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Hi Jed

Sorry for the late reply.

First let me "clear up" the Tibanne/MtGox question you had in your previous email.
As for today Mt.Gox has, besides some attorneys fees no other real costs. Everything ranging from Staffing, equipment, office rent, servers and so on is paid by Tibanne and Tibanne alone and then billed to Mt.Gox. No revenues are, as far as I am concerned and to the best of my knowledge, "siphoned off" from Mt.Gox to Tibanne.
For example I am myself a Tibanne Employee even though I am spending more than 99.9% of my time on Mt.Gox and its development.

Now when it comes to your shares we could indeed consider buying them back, what range do you have in mind?

Regards
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Oct 3, 2013, at 8:19 AM, Jed McCaleb <jed2000@gmail.com> wrote:

7

Also as you guys know I've been trying to sell my mtgox shares. I just realized that maybe you would want the company to buy them back. This might be a good way to get a clean cap table for you and as some appreciation to me for the good deal I gave you originally with mtgox. How much would you guys be willing to buy them back for?
Thanks,
Jed.

On Wed, Oct 2, 2013 at 9:07 AM, Jed McCaleb <jed2000@gmail.com> wrote:
Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.

On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002

E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:

**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>
**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards




--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox / deposited with MtGox. Gives us a feel for size and scope of the business and how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:

3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/30 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom


-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

--
Sent from my iPad

10

| | |
|---|---|
| **From:** | Jed McCaleb <jed2000@gmail.com> |
| **Sent:** | Wednesday, October 2, 2013 11:07 AM |
| **To:** | Gonzague Gay-Bouchery; Mark Karpeles |
| **Subject:** | Re: Question on the Data Required |

Thanks for getting me the numbers guys.
It looks like you have taken in quite a bit of profit.
This also doesn't seem to include how much you have taken in in BTC.
When are you planing on issuing a distribution? It seems like one is long overdue.
Also mark I have to admit I'm a bit concerned about this relationship you have set up with tibanne and mtgox. It looks like tibanne is getting a % of the mtgox revenue. This is very much not in the spirit of our deal (Unless I also get stock in tibanne, or 12% of what is sent to tibanne, or something else). Basically I'm denied the mtgox revenue that tibanne is siphoning off. I'm sure you didn't set it up this way to make my effective share go down but you can see how this is the effect. We need to do something to adjust this. Do you have any ideas?
Thanks,
Jed.


On Tue, Sep 24, 2013 at 7:31 PM, Gonzague Gay-Bouchery <gonzague@tibanne.com> wrote:
Here you are

Cheers
--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002


E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

Begin forwarded message:


**From:** Gonzague Gay-Bouchery <gonzague@tibanne.com>
**Subject: Re: Question on the Data Required**
**Date:** September 13, 2013 3:18:45 PM GMT+09:00
**To:** "Stafford, Thomas (DST Investment)" <Stafford@DSTInvestment.com>

1

**Cc:** Mark Karpeles <mark@tibanne.com>

Dear Tom

Thank you very much for your patience and as promised here you are the data.

1. You will find an Excel document for the accounting data as well as
2. Several CSVs for the rest.

If you have any questions please do not hesitate to contact me directly.

Regards




--
Gonzague GAY-BOUCHERY

TIBANNE Co.,Ltd.
Marketing & Corporate Communication Manager

Round Cross 2B, Shibuya 2-11-5,
Shibuya-ku Tokyo, Japan 150-0002



E: gonzague@tibanne.com
P: +81 (0)3-4520-6203 - Direct
P: +81 (0)3-4520-6200
F: +81 (0)3-4520-6299
S: gbgtibanne

On Sep 9, 2013, at 5:40 PM, "Stafford, Thomas (DST Investment)"
<Stafford@DSTInvestment.com> wrote:


Hi Gonzague:

1a) was looking for the weekly balance of cash & bitcoins held by MtGox /
deposited with MtGox. Gives us a feel for size and scope of the business and
how it has changed over time

3d) looking to see whether accounts opened say in wk 1 2012 are still active 1

week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc. Shows us how sticky the platform is and whether users continue to use the service over time or move away from the platform. For this type of KPI, we usually see it as a % - ie for every 100 new users who "opened accounts" in wk1 2012, what % were still active 1 week later/ 10 weeks later/ 20 weeks later/ 50 weeks later etc
--> could look at the data on monthly basis instead of weekly if easier
Specifically, we thought to define active accounts in two different ways:
3d)i) accounts that actively traded bitcoins at each point of measurement (ie 1 / 10/20/50 weeks later etc)
3d)ii) accounts that had positive balances at each point of measurement

Happy to jump on the phone quickly to discuss live if helpful?

Best,
Tom

-----Original Message-----
From: Gonzague G-B [mailto:gonzague@tibanne.com]
Sent: Monday, September 9, 2013 3:40 PM
To: Stafford, Thomas (DST Investment)
Subject: Question on the Data Required

Hi Thomas

I have a few questions for you, could you please define

1) a)
3) d) i) & ii)

Regards

--
Sent from my iPad

3

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                    **PLAINTIFFS**

**V.**                                          **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship, et al.**                  **DEFENDANTS**

### AGREED ORDER AMENDING BRIEFING SCHEDULE

ON THIS DAY the Court has considered the parties' joint request for to amend the

briefing schedule for Defendants' motion for partial summary judgment in this civil action,

set by order of this Court [238]; and, finding that this request is well taken and in the

interests of the orderly administration of justice, hereby orders as follows:

1.       Plaintiffs will serve their response brief to the motion for partial summary

judgment no later than Thursday, November 1, 2018.

2.       Defendants will serve their reply brief, if any, in support of said motion, no

later than Monday, November 12, 2018.

The order [238] is otherwise unchanged.

SO ORDERED, this the 2 4 day of October, 2018.

CIRCUIT COURT JUDGE

Prepared & submitted by:

*/s/ Andy Lowry*

Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944
BALCH & BINGHAM, LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
(601) 961-9900 Phone
(888) 954-5405 Fax
alowry@balch.com
amoeller@balch.com

*Attorneys for Plaintiffs*

Agreed to by:

*s/ Edwin S. Gault, Jr.*

Edwin S. Gault, Jr., MSB # 10187
Amanda B. Robinson, MSB # 100446
T. Peyton Smith, MSB # 103867
FORMAN WATKINS & KRUTZ LLP
Post Office Box 22608
Jackson, Mississippi 39201
Win.Gault@formanwatkins.com
Peyton.Smith@formanwatkins.com
Mandie.Robinson@formanwatkins.com

Ethan Jacobs (admitted *pro hac vice*)
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

*Attorneys for Defendants*

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**DR. DONALD RAGGIO and**                                    **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**V.**                                                 **CIVIL ACTION NO. 14-71**

**JED McCALEB et al.**                                      **DEFENDANTS**

### PLAINTIFFS' RESPONSE OPPOSING MOTION TO DISMISS

Defendants have moved to dismiss [231] the Amended Complaint under M.R.C.P. 12(b)(6). For the reasons stated herein, the motion should be denied.

A motion to dismiss under M.R.C.P. 12(b)(6) is granted only if the complaint on its face fails to state a claim on which relief may be had. *HeartSouth, PLLC v. Boyd*, 865 So. 2d 1095, 1101 (Miss. 2003). "A Rule 12(b)(6) motion should not be granted unless it appears 'to a certainty that the plaintiff is entitled to no relief under any set of facts that could be proved in support the claim.' " *Id.* (quoting Rule 12 cmt.). The motion "is not favored," and all facts alleged in the complaint must be taken as true and interpreted "in a manner most favorable to the non-movant." *Tucker v. Hinds County*, 558 So. 2d 869, 872 (Miss. 1990).

"Further, Mississippi is a 'notice-pleadings' state; fact pleadings are not required." *City of Meridian v. $104,960.00 U.S. Currency*, 231 So. 3d 972, 974 (Miss. 2017) (quoting *Children's Med. Group, P.A. v. Phillips*, 940 So. 2d 931, 934 (Miss. 2006)). Therefore, "under our rules, [the plaintiff] is *not required to plead the specific wrongful conduct*. At the pleading stage, he is required only to place [the defendant] on reasonable notice of the claims against it and to demonstrate that he has alleged a recognized cause of action upon which, under

some set of facts, he might prevail." *Id.* (quoting *Phillips*, 940 So. 2d at 934) (emphasis added).

Finally, mixed questions of fact and law are inappropriate for decision via a Rule 12(b)(6) motion. *Qualcomm Inc. v. Am. Wireless License Group, LLC*, 980 So. 2d 261, 272–73 (Miss. 2007) (affirming denial of motion to dismiss). Issues involving "highly technical" matters that "require a great deal of familiarity with the underlying technology" are such as to "rarely warrant resolution pursuant to Rule 12(b)(6)." *Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 2012 WL 2906571, at *2 (N.D. Cal. July 16, 2012).

Following the sequence of Defendants' motion, we will address Defendants' arguments regarding (1) the UCC counts, (2) the statute-of-limitations defense which Defendants have recycled from their failed motion for summary judgment [29], (3) the claim for an accounting, and (4) the claim for a constructive trust (and/or for unjust enrichment).

### 1.    UCC Counts

The motion to dismiss begins by arguing that counts one through four of the Amended Complaint must be dismissed because they are brought under chapter two of the Uniform Commercial Code, which Defendants claim does not apply to this case because (a) McCaleb was not a "seller," (b) bitcoins are not "goods," and (c) McCaleb "delivered" the bitcoins to Plaintiffs. Defendants then attack count five because they say bitcoins cannot be securities under chapter eight of the UCC. None of these arguments can support a motion to dismiss.

First, Defendants contend that they were not "sellers" under the UCC, and that McCaleb acted more like a broker who connected buyers and sellers but did not sell his own bitcoin. But McCaleb arguably entered into sale transactions with the owners of the bitcoin

because it was the nature of his "exchange" that he delivered goods "primarily for resale." Miss. Code Ann. § 75-2-326(1)(b). The allegations that Defendants commingled bitcoins via MTGOX, Am. Comp. at ¶ 28, support the finding that Defendants took possession of bitcoins. See also Am. Comp. at ¶ 10 (bitcoins "remained in the possession and control of MTGOX"). McCaleb received wire transfers into his personal account before crediting them on MTGOX, and transactions did not pass simply from one client to another; McCaleb took a fee from each transaction. Am. Comp. at ¶ 8. These facts, and the reasonable inferences from them, support a "seller" relationship to the Raggios. Parties brought bitcoins to MTGOX to be sold to someone else, a "sale or return" transaction in which "the buyer becomes the owner of the goods," Miss. Code Ann. § 75-9-109 cmt. 6, and thus Defendants became owners who then sold bitcoins to the Raggios and others.

These facts distinguish the unpublished Federal Circuit decision on which Defendants seek to rely. We note also that the *Milo & Gabby LLC* decision was highly fact-intensive (the district court had "empaneled an advisory jury to answer underlying factual questions" as to whether Amazon.com had offered certain goods for sale). 693 Fed. Appx. 879, 882 (Fed. Cir. May 23, 2017). Whether McCaleb was a "seller" will turn upon technical details of how bitcoins were transferred on the site, all of which is subject to further discovery. Moreover, expert testimony will also be required on the technical matters, not required to be set forth in detail in notice pleading, relating to the exact nature of bitcoins under the UCC. Defendants' arguments would be better addressed by a Rule 56 motion after discovery concludes.

Second, Defendants assert that bitcoins are not goods because they are supposedly a form of currency. This question, however, is a mixed question of fact and law, unsuitable

for a Rule 12(b)(6) motion. It has been observed that "Bitcoin is simply software that is run on a decentralized collection of computer systems. Anyone can download and run it." Shawn Bayern, "Dynamic Common Law and Technological Change: The Classification of Bitcoin," 71 Wash. & Lee L. Rev. Online 22, 29 (2014). *Cf.* Andrew Rodau, "Computer Software: Does Article 2 of the Uniform Commercial Code Apply?" 35 Emory L. J. 853, 864 (1986) (software is a good); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 676 (3d Cir. 1991) (same). Therefore, if Bitcoin is software, then bitcoins are a good. They certainly fit the UCC definition, quoted by Defendants, of "goods" as things "movable at the time of identification to the contract for sale." Indeed, Plaintiffs' bitcoins were moved right out of their MTGOX account without their permission.

Moreover, Defendants' argument that bitcoins are not a "good" is based entirely on their theory that bitcoins are "money" and thus excluded from the definition of "goods." But Mississippi law defines "money" as "a medium of exchange currently authorized or adopted by a domestic or foreign government," which scarcely describes bitcoins, and anyway is not a suitable basis for a motion that must rest entirely on the face of the Amended Complaint. Miss. Code Ann. § 75-1-201(b)(24). And even if bitcoins were, somehow, money for some purposes, the definition of "goods" "is intended to cover the sale of money when money is being treated as a commodity." Miss. Code Ann. § 75-2-105 cmt. 1. Accordingly, the purchase and sale of foreign currency is a transaction subject to Article 2. *Id.* The Amended Complaint can certainly support the reasonable inference that bitcoins were bought and sold as a commodity.

Finally, as to "delivery," Defendants cite no law on this issue, which presents another mixed question of law and fact: what is the "delivery" of electronic goods like

bitcoins? The concept of "delivery" hinges upon the transfer of "risk of loss"; delivery is accomplished when the risk of loss passes from seller to buyer. *See, e.g.,* Miss. Code Ann. § 75-2-509. It is a reasonable inference from the facts of the Amended Complaint that it makes no sense to hold the Raggios responsible for the risk of loss of their bitcoins from an account on a website managed, not by them, but by Defendants, and over whose security they exercised little or no control. Furthermore, Plaintiffs were restricted by MTGOX form withdrawing the bitcoins at will; the site had a daily limit of $1,000.00, Am. Comp. at ¶ 10, and thus MTGOX continued to exercise control over the bitcoins even in the Raggios' account. Here too, the technical aspect of the case does not tend to show that there is no set of facts under which Plaintiffs could prevail.

Last of the UCC counts is count five, which pleads in the alternative that bitcoins are securities. Regarding whether bitcoins can be regarded as "securities" under the UCC, Defendants cite (outside the pleadings) a news article (i.e., hearsay, *Alexander v. State*, 610 So. 2d 320, 331 (Miss. 1992)) quoting alleged statements from SEC officials that bitcoins are not securities in the eyes of the SEC. We note however that the SEC has argued to the contrary in court, persuading a federal district court to rule that bitcoins are "investment contracts" and thus securities under 15 U.S.C. § 77b. *Sec. & Exch. Comm'n v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013), *adhered to on reconsideration*, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014). Whether bitcoins can be regarded as securities under *Mississippi's* UCC statute is not a question that will be decided by the *federal* agency. But the *Shavers* decisions contradict Defendants' motion as to that question.

Defendants' other arguments, such as that bitcoins "have no issuer, and Plaintiffs do not allege otherwise," ignore the fact that only notice pleading is required under Mississippi

law. The Amended Complaint is not required to plead every fact needed to obtain a judgment against Defendants; it merely needs to place them on notice that, for instance, Plaintiffs allege that the bitcoins are securities under the UCC. Defendants do not meet the "no set of facts" standard for a motion to dismiss on this and the other UCC counts, and their motion should be denied.

### 2.   Statute of Limitations Arguments

The bulk of Defendants' motion resurrects their statute-of-limitations argument that they have already made once in a prior motion for summary judgment [29], reciting arguments already presented in their memorandum [30] supporting that motion. This Court has already considered and rejected Defendants' arguments [181], and Defendants failed in their petition for interlocutory appeal from that order. Defendants file this motion to dismiss on a theory that could not support summary judgment, and which was twice denied on that basis.

This Court was correct to rule that the question of when the various statutes of limitations began to run is a fact question for the jury, and that ruling applies equally to the new claims brought in the Amended Complaint. (Plaintiffs' claims for breach of contract, conversion, negligence, conspiracy, specific performance, and account stated were all in the original Complaint and all the subject of Defendants' Rule 56 memorandum (at 4).) Defendants make no argument specifically tailored to any cause of action, choosing to believe all of the claims are really either conversion or negligence. Motion [231] at 5.

This is not, however, a case like *Howard v. Wilson*, 62 So. 3d 955 (Miss. 2011), cited by Defendants, where the complaint expressly alleged that "an employee of Citi Trends, Jocelyn Howard, maliciously, reckless, negligently, and violently attacked Lyshell Wilson

with a pair of scissors." *Howard*, 62 So. 3d at 956. The Mississippi Supreme Court correctly held that such an allegation could not be pleaded as "negligence" to evade the one-year statute of limitations on an intentional tort (assault). *Id.* at 957. Defendants never explain how the Amended Complaint supposedly fails to state facts supporting breach of contract, conspiracy, fraud, negligent misrepresentation, etc. or how Plaintiffs have attempted to plead around one statute of limitations to get access to another.

Instead, Defendants' motion instead relies on their insistence that the statute of limitations began to run in January 2011, the time that the bitcoins went missing from Plaintiffs' account—the exact argument they tried to make in support of their (twice rejected) Rule 56 motion.

In successfully opposing that motion, and in successfully opposing Defendants' petition for interlocutory appeal, Plaintiffs contended that the statute failed to start running, or was tolled, until March 2012, when it became clear that MTGOX was not going to deliver the bitcoins to them, despite those bitcoins having returned to MTGOX (and then been whisked back out), and despite the repeated (and ultimately false) assurances of Defendants and their co-conspirators. Plaintiffs expected, trusted, and believed, based on Defendants' assurances, that their loss would be made good, until they were abruptly disabused of this idea in March 2012.

Contrary to the motion to dismiss (at 7), the fact of the bitcoins' having gone missing did not necessarily, in itself, prove breach of contract, negligence , bailment, or fraud since McCaleb might had some reasonable justification for the missing bitcoins or actually made good on his assurances that Plaintiffs would be made whole. Nor did it prove conversion, as McCaleb sought to persuade Plaintiffs that someone else was the thief. McCaleb went to

some effort, indeed, to convince Plaintiffs that he had done nothing wrong, that the bitcoins were missing due to Plaintiffs' own fault, and that McCaleb was nonetheless diligently working to recover them and would restore them to Plaintiffs. All of these continuing efforts (or pretense of efforts) and representations were sufficient justification for Plaintiffs to believe that they may not have had a cause of action at all.

The Amended Complaint states that until March 2012, "both McCaleb and Karpeles reassured Raggio that he would get his stolen bitcoins back. There was never a reason for Raggio to believe the stolen bitcoins would not be returned." See also Am. Comp. at ¶¶ 16–22.

This allegation alone (which must be taken as true) sufficiently states a claim that, even if the three-year statute had begun to run in January 2011, a jury could find that there is no limitations bar, due to (a) equitable estoppel, (b) the continuing-tort doctrine, (c) fraudulent concealment, or (d) the discovery rule. We take each of these in turn, largely reprising the rebuttals already made in this suit.

### a.   *Equitable Estoppel*

Mississippi has long recognized "that the doctrine of equitable estoppel may, in a proper case, be invoked to prevent [a] defendant from relying upon the statute of limitations. *Izard v. Mikell*, 163 So.498, 499 (Miss. 1935) (quoting 37 C.J. § 44). To invoke equitable estoppel in response to a statute of limitations affirmative defense, the plaintiff must show that "(1) it was induced by the conduct of [the defendant] to not file its complaint sooner, (2) resulting in its claim being barred by the statute of limitations, and (3) [the defendant] knew or had reason to know that such consequences would follow." *Harrison Enters., Inc. v. Trilogy Commc'ns, Inc.*, 818 So. 2d 1088, 1095 (Miss. 2002).

"Equitable estoppel prevents a party from denying any material fact, induced by his or her words or conduct, upon which another person relied and changed his or her position and would suffer injury if the denial or contrary assertion was allowed." *Swartzfager v. Saul*, 213 So. 3d 55, 65 (Miss. 2017). "It is premised on 'the belief that a person should do what he says he will do in situations where another party is injured by reliance on the first party's representations.'" *Id.* (quoting *Koval v. Koval*, 576 So. 2d 134, 138 (Miss. 1991)). "And its aim is to 'forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon.' " *Id.* (quoting *Koval*, 576 So. 2d at 137).

"Concerning the application of equitable estoppel, '[the] issue becomes a question for the trier of fact when there is evidence to support a finding that the plaintiff reasonably relied on the actions of the defendant to his detriment.'" *City of Tupelo v. McMillin*, 192 So. 3d 948, 956 (Miss. 2016) (quoting *Trosclair v. Miss. Dep't of Transp.*, 757 So. 2d 178, 181 (Miss. 2000)).

The *Harrison Enterprises* case already cited involved a suit on an open account where a seller, Trilogy, made repeated attempts to recover its debt from a buyer, Harrison Enterprises. *Harrison Enters.*, 818 So. 2d at 1091. Harrison responded to Trilogy's requests by asking for more time and promising to pay later. *Id.* When Trilogy finally resorted to legal action, the Mississippi Supreme Court held that the equitable-estoppel doctrine barred Harrison from asserting a limitations defense. *Id.* at 1096. The Court's rationale is particularly relevant: "The stated purpose behind the statute [of limitations] is to discourage lawsuits. Further, it is to *reward the vigilant, not the negligent*. It is to prevent false and stale claims. None of these concerns are exemplified here. Trilogy was trying to solve this

problem without resorting to a lawsuit. Trilogy was *vigilant in pursuing this debt, relying on continual reassurances* by Harrison Enterprises." *Id.* (emphasis added). The Raggios did not sit on their hands; they were in frequent contact with Defendants and their co-conspirators, relying on their "continual reassurances" that the return of their bitcoins was just around the corner.

"[I]nducement may consist either of an express representation that the claim will be settled without litigation or conduct that suggests a lawsuit is not necessary." *Peavey Elecs. Corp v. Baan U.S.A., Inc.*, 10 So. 3d 945, 954 (Miss. Ct. App. 2009) (quoting *Miss. Dep't of Pub. Safety v. Stringer*, 748 So. 2d 662, 666 (Miss. 1999)). For instance, a party attempting to resolve a problem without resorting to a lawsuit may be "induced" not to file its complaint within the limitations period by "continual reassurances" that the other party will perform its obligations. *See Harrison*, 818 So.2d at 1096; *see also Izard*, 163 So. at 499 (holding that estoppel tolls limitations when plaintiff induced "to believe that an amicable adjustment of the claim will be made without suit" (quoting 37 C.J. at § 44)).

The Amended Complaint's allegations support a finding of equitable estoppel. Defendants and their co-conspirator kept reassuring the Raggios that the matter was being handled and that they would regain their bitcoins. This was inducement. Thus, on Defendants' argument, this caused the statute of limitations to expire while Defendants were still leading Plaintiffs on. And the Amended Complaint clearly alleges that Defendants knew all along they were never going to restore the bitcoins. Am. Comp. at ¶¶ 22, 26. They knew or had reason to know they were trying to delay the Raggios from seeking legal relief. The elements of equitable estoppel are met. This Court should so hold.

### b.    *Fraudulent Concealment*

Fraudulent concealment of a cause of action tolls the statute of limitations until "the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered." Miss. Code Ann. § 15-1-67 (2017); *Robinson v. Cobb*, 763 So. 2d 883, 887 (Miss. 2000). Two elements are necessary to establish fraudulent concealment. First "there must be shown some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim." *Id.* (quoting *Reich v. Jesco, Inc.*, 526 So. 2d 550, 552 (Miss 1988)). Second, a plaintiff must prove that despite his reasonable due diligence he could not have discovered the available claim. *Id.*

As alleged in the Amended Complaint, Defendants kept up the pretense that they were investigating the missing bitcoins and would deliver them to Plaintiffs upon completion of the investigation. A jury could find that this was a deliberate act to conceal Plaintiffs' claims against them. A jury could also find that Plaintiffs, by promptly notifying Defendants of the loss and following their instructions, exercised a reasonable measure of due diligence. Sufficiency of diligence "is a question of fact, not one of law." *Robinson*, 763 So. 2d at 889.

Thus, the statute would not have begun to run until Defendants' scheme was laid bare in March 2012. The motion to dismiss should be denied on this basis as well.

### c.    *Discovery Rule*

The discovery rule applies to toll limitations until a plaintiff "should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent." *Boyles v. Schlumberger Tech. Corp.*, 832 So. 2d 503, 506 (Miss. 2002) (quoting *Sarris v. Smith*, 782 So. 2d 721, 725 (Miss. 2001)). The

statute of limitations begins to run after the plaintiff "can reasonably to be held to have knowledge of the injury itself; the cause of the injury, and the causative relationship between the injury and the conduct of the [defendant]." *Id.* (quoting *Smith v. Sanders*, 485 So. 2d 1051, 1052 (Miss. 1986)). Here, Defendants concealed the true cause of the injury—their own gross negligence, dishonesty, and deliberate acts—and thus Plaintiffs could not recognize the causative relationship.

Where there is a latent injury, the discovery rule applies. *PPG Architectural Finishes, Inc. v. Lowrey*, 909 So. 2d 47, 50 (Miss. 2005). Latent injury "is defined as one where the 'plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question … [or] when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act." *Id.* (quoting *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 168 (Miss.1999)). To be latent, an injury "must be undiscoverable by reasonable methods." *Id.* at 51. The "knowledge that there exists a causal relationship between the negligent act and the injury or disease complained of *is essential* because 'it is well-established that prescription does not run against one who has neither actual nor constructive notice of the facts that would entitle him to bring an action.' " *Id.* (quoting *Sweeney v. Preston*, 642 So. 2d 332, 334 (Miss. 1994)) (emphasis in *PPG*).

Obviously, as pleaded in the Amended Complaint, Plaintiffs had no way to know the technical failings of MTGOX, let alone that they were dealing with con artists rather than legitimate businessmen. They were not aware of "the facts that would entitle them to bring an action" because the "causal relationship" was concealed from them. It cannot be maintained that there is no set of facts Plaintiffs could marshal to prove that the discovery rule applies.

### d.    Continuing Tort

"[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong." *Estate of Fedrick v. Quorum Health Res., Inc.*, 45 So.3d 641, 643 (Miss. 2010) (quoting *Pierce v. Cook*, 992 So. 2d 612, 619 (Miss. 2008)).

The Amended Complaint pleads a continuing series of falsehoods and misrepresentations by Defendants, and it cannot be said that on no set of facts could this constitute a continuing tort. "A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993) (emphasis omitted) (quoting C.J.S., Limitations of Actions § 177 (1987)). "Continual unlawful acts" is what the Amended Complaint alleges. For this reason as well, the motion to dismiss should be denied. The statute of limitations was tolled by the wrongful, deliberate acts of Defendants and their co-conspirators.

### 3.    Accounting

McCaleb asks to dismiss count eight (accounting) because, he says, that applies only between creditor and debtor. Whether McCaleb became indebted to Plaintiffs for the bitcoins purchased by them but held by him on his own website is not, to Plaintiffs' mind, so clear as Defendants appear to think. Certainly, a bank holding McCaleb's money in an account for him stands to him as a debtor to a creditor. *Holland v. Peoples Bank & Tr. Co.*, 3 So. 3d 94, 102 (Miss. 2008). McCaleb created an exchange with accounts maintained and

secured (or not so very secured) by him, holding cash and bitcoins. It does not appear self-evident that on no set of facts could a reasonable jury find that McCaleb stood indebted to Plaintiffs for the bitcoins held on his website. Just as a bank must be liable for an accounting to its customers, so must McCaleb and MTGOX.

Mississippi law is that an accounting is available where discovery is needed, the accounts are complex, and a fiduciary or trust relationship exists. *Univ. Nursing Assocs., PLLC v. Phillips*, 842 So. 2d 1270, 1275 (Miss. 2003). These allegations are sufficiently alleged in the Amended Complaint so that Plaintiffs' claim for an accounting cannot be dismissed at this stage.

The motion to dismiss should be denied as to count eight.

### 4.       Constructive Trust

Finally, Defendants say there can be no constructive trust because McCaleb was not alleged to have legal title to Plaintiffs' bitcoins. Defendants misapprehend the claim. Paragraph 80 of the Amended Complaint alleges that McCaleb commingled Plaintiffs' cash and bitcoins with those of others, used some or all of Plaintiffs' bitcoins to invest in new cryptocurrencies, and thereby acquired wealth by profiting from his own wrongdoing. The legal title in question is his title to the assets he acquired through his wrongdoing. *See also* ¶¶ 28–39, 81.

A constructive trust "arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience," holds property he ought not to be allowed to hold and enjoy. *Allred v. Fairchild*, 785 So. 2d 1064, 1067 (Miss. 2001) (quoting *Sojourner v. Sojourner*,

153 So. 2d 803, 807 (Miss. 1963)). "[T]he imposition of a constructive trust [is] grounded in the equitable principle that one should not be permitted to profit from his own wrongdoing." *Hyland v. Simmons*, 378 A.2d 260, 263 (N.J. Ch. 1977). The remedy is cognate with unjust enrichment. *Sojourner*, 153 So. 2d at 807.

If, as alleged in the Amended Complaint, Defendants used some or all of Plaintiffs' bitcoins to fund their investments, and profited thereby, a clear case for unjust enrichment and constructive trust would be proved. Stated differently, once Plaintiffs commingled Plaintiffs' cash and bitcoins, used those proceeds to invest in other cryptocurrencies, and gained substantial profits (exceeding two billion dollars, Am. Comp. at ¶ 29), a constructive trust was created for Plaintiffs' benefit by which Plaintiffs are entitled to their fair share of those substantial profits. Those profits, by the way, vastly exceed the $60 million value for the bitcoins. The Amended Complaint sufficiently states a claim for constructive trust, and here too, the motion to dismiss should be denied.

Therefore, Defendants have failed to make the necessary showing as to any cause of action pleaded in the Amended Complaint: "to grant this motion there must appear to a certainty that the plaintiff is entitled to no relief under any set of facts that could be proved in support of the claim." *Lester Eng'g Co. v. Richland Water & Sewer Dist.*, 504 So. 2d 1185, 1187 (Miss. 1987) (quoting *Busching v. Griffin*, 465 So. 2d 1037, 1039 (Miss. 1985)). No such "certainty" is produced by the motion, which therefore should be denied in its entirety.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs ask that this Court DENY Defendants' motion to dismiss.

Respectfully submitted, this the 25th day of October, 2018.

                                    *s/ Andy Lowry*
                                    Armin J. Moeller, Jr., MSB No. 3399
                                    Walter H. Boone, MSB No. 8651
                                    Christine Crockett White, MSB No. 10107
                                    Jonathan P. Dyal, MSB No. 99146
                                    Andy Lowry, MSB No. 100782
                                    Patrick Everman, MSB No. 104870
                                    Perry P. Taylor, MSB No. 104944

                                    ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

> Edwin S. Gault, Jr., Esq.
> Amanda B. Robinson, Esq.
> T. Peyton Smith, Esq.
> FORMAN WATKINS & KRUTZ LLP
> Post Office Box 22608
> Jackson, Mississippi 39201
> Win.Gault@formanwatkins.com
> Peyton.Smith@formanwatkins.com
> Mandie.Robinson@formanwatkins.com
>
> Ethan Jacobs, Esq.                      *(via U.S. mail)*
> HOLLAND LAW, LLP
> 220 Montgomery Street, Suite 800
> San Francisco, California 94104

This the 25th day of October, 2018.

> *s/ Andy Lowry*
> Andy Lowry

**IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI**
**FIRST JUDICIAL DISTRICT**

DR. DONALD RAGGIO and                                    **PLAINTIFFS**
DR. CHRIS RAGGIO

V.                                                          **CIVIL ACTION NO. 14-71**

JED McCALEB et al.                                        **DEFENDANTS**

<u>**PLAINTIFFS' RESPONSE OPPOSING PARTIAL SUMMARY JUDGMENT**</u>

        Defendants have moved for partial summary judgment on a host of issues relating to damages, claiming that the time is ripe for this Court to rule on the amount of damages recoverable by Plaintiffs. The measure of damages will be a question for the finder of fact about which there are already material disputes, and Defendants' legal arguments purport-edly limiting damages are simply not correct. Partial summary judgment should be denied for three reasons: (1) Defendants' motion raises factual issues which are already in dispute, and discovery has not been completed; (2) the motion is not ripe and further discovery is needed pursuant to Rule 56(f); and (3) Defendants' recitation of the law on the issues is incomplete and, in some cases, erroneous.

        Plaintiffs submit the following response to Defendants' Motion. In part A of this response, Plaintiffs address the itemized "facts" alleged by Defendants to be undisputed but which are very much in dispute. In part B, Plaintiffs will demonstrate that the additional "facts" not itemized in support of Defendants' motion but relied upon and alleged to be "undisputed," are also in dispute. Finally, Plaintiffs' response will address the reasons why additional discovery is needed on these issues. In support of this Response, Plaintiffs have also submitted a Memorandum Brief, which is incorporated herein by reference.

261105.2

A.    Many "Undisputed" Facts in Defendants' Itemization Are Very Much in Dispute.

Plaintiffs respond to Defendants' itemization of "undisputed" facts as follows, following Defendants' numbering, which begins at 6:

6.    Admitted. The precise number is 9,406.33 bitcoins.

7.    Admitted. While different sources for the period have slightly different values, the figure is approximately correct.

8.    Denied. Plaintiffs do claim a breach of contract, and that claim is based, in part, on written promises and representations. See Amended Complaint, ¶¶ 55-60. Moreover, McCaleb and Code Collective made written representations on the MTGOX website, promising users it was, among other things, "safe and easy." Affidavit of Chris Raggio, Ex. A, at ¶ 3; see ex. A to affidavit. Plaintiffs purchased bitcoins on the MTGOX website "[b]ased on the [written] representations that it would be 'safe and easy.'" *Id.*

9.    Denied. McCaleb retained an interest in MTGOX even after the purported "transaction," and continued to hold himself out to Plaintiffs with influence and control over MTGOX. Ex. A at ¶¶ 9-15 (outlining facts and representations made by McCaleb before and after "transaction"). These facts, among others generated in discovery, support Plaintiffs' Count Nineteen: Piercing the Corporate Veil, wherein Plaintiffs allege that "Defendants abused the corporate form of MTGOX, flagrantly disregarding corporate formalities, in the pursuit of fraudulent and wrongful misconduct, and thus frustrating the legitimate expectations of Plaintiffs and other buyers who regarded MTGOX as a legitimate cryptocurrency exchange . . . ."

10.     Admitted, but incomplete. Plaintiffs admit that they began corresponding with Mark Karpeles who ultimately told them that he was not responsible for recovering their bitcoins. However, the factual statement omits McCaleb's correspondence with, and promises to, Plaintiffs prior to his referring them to Karpeles, who, as part of his conspiracy with McCaleb, made his own assurances to Plaintiffs for months until disclaiming all responsibility in March 2012. Ex. A at ¶¶9- 15 (outlining facts and representations made by McCaleb before and after "transaction").

11.     Admitted, but incomplete. According to Dr. Raggio and based upon that more than 100-fold increase in price, "I could not justify that substantial investment just to replace the missing bitcoin which I had been promised." Ex. A at ¶¶17.

12.     Admitted in part; denied in part. Plaintiffs admit, on information and belief, that the entity named MTGOX Co., Ltd. filed for bankruptcy in Japan. However, Plaintiffs deny that this entity was "MTGOX's new owner." To the contrary, Plaintiffs allege that McCaleb was always an "owner" of MTGOX, and personally liable to the Plaintiffs for the acts alleged by Plaintiffs. Ex. A at ¶¶9-15; Count Nineteen Amended Complaint ("Defendants abused the corporate form of MTGOX, flagrantly disregarding corporate formalities, in the pursuit of fraudulent and wrongful misconduct, and thus frustrating the legitimate expectations of Plaintiffs and other buyers who regarded MTGOX as a legitimate cryptocurrency exchange . . .").

13.     Denied. Plaintiffs have now filed a proof of claim in the bankruptcy proceeding. Ex. A at ¶19.

14.     Admitted, but incomplete. Plaintiffs admit that they did not purchase bitcoins to replace the stolen bitcoins. However, Plaintiffs did so because (1) they did not trust

MTGOX and believe it was prudent to purchase new bitcoins from the same site with lax security or whose owners repeatedly (and. it turned out, falsely) represented that they would be made whole; (2) Plaintiffs did not know of another location where they could safely replace the bitcoins; and (3) even if they had known of such a place, by March 2012 when Karpeles told them he would not replace their bitcoins, the value of bitcoin had increased substantially, they did not have the money, and they could not justify the substantial investment. Ex. A at ¶17.

15.     Admitted, but incomplete. While Plaintiffs admit that they have no evidence in discovery so far that McCaleb committed the actual theft of Plaintiffs' bitcoins in January, 2011, Plaintiffs intend to conduct additional discovery on that subject. See Ex. B at ¶ 7.  But more importantly for purposes of damages, Plaintiffs have alleged a number of claims including gross negligence, fraud, unjust enrichment, and piercing the corporate veil, which will entitle Plaintiffs actual damages in excess of $60 million, and punitive damages.

**B.      Many "Facts" Alleged in Defendants' Memorandum Are Likewise Disputed.**

Defendants in their memorandum stray well beyond the facts itemized in their motion as "undisputed." The following are critical examples of facts which Defendants allege are true (without support or itemization) which are, in fact, hotly disputed or which are so woefully incomplete as to obscure their true meaning.

1.      Defendants allege that "[t]here is no evidence the exchange's security measures were circumvented." Defs. Memo. at 2. That "fact" is hotly disputed. According to Darek Dabbs, Plaintiffs' cybersecurity expert, "I disagree with that factual assertion . . . ."

Affidavit of Darek Dabbs, Sr., Ex. C, at ¶ 9. Dabbs has submitted an affidavit establishing the following:

- "The security measures in place at MTGOX in December and January 2011 were inadequate and failed to meet the cyber security industry best practices and common standards of the time." *Id*. at ¶ 7.

- "Security practitioners at that time knew to use salted password hashing on all password databases." *Id*. at ¶ 8

- McCaleb was aware of probes at the time, but "McCaleb did not have adequate security procedures in places to either detect those probes, or prevent unauthorized access." *Id*. at ¶ 11.

- "Had adequate security protocols been in place, this vulnerability [SQL injection attack] may not have existed and the hack most likely could have been prevented or mitigated." *Id*. at ¶ 12.

- "I do believe that there is sufficient evidence that I have seen to date for a jury to find that MTGOX' security failures rose to the level of gross negligence. I certainly believe that the failures I have seen so far were grossly negligent." *Id*. at ¶ 14.

Thus, Plaintiffs contend (and have offered evidence) that the exchange's security measures were circumvented, that Defendants' security measures were deficient, and Defendants' security failures were grossly negligent.

2.      Not only is there evidence that the security measures were circumvented, but there is evidence that McCaleb himself knew that security measures were being circumvented, and that those lapses were a "big mistake on my part." See January 28, 2011 Email from McCaleb to Karpeles, attached as Ex. D. In that email, McCaleb acknowledged that MTGOX had been subject to "basically like a SQL Injection attack. Obviously a big mistake on my part." Moreover, McCaleb acknowledges that he knew of the hacking during the timeframe of the Raggios' theft. "And I know this guy was hacking around on the site trying various thing [*sic*] for a month or so." Ex. D.

3.    Defendants allege that "the theft was perpetrated by someone using the Raggios' own password to access their account." Defs. Memo. at 2. Defendants want to blame the victim, the Raggios, for this theft. Plaintiffs deny that the theft was their fault. Darek Dabbs testifies that "I have not seen evidence to support Jed McCaleb's claim that the Raggios' account was compromised through the fault of the Raggios." Ex. C at ¶ 11. Instead, the probable use of the Raggios' passwords for the theft was also caused by Defendants' lax security measures, and "[h]ad adequate security protocols been in place, this vulnerability may not have existed and the hack most likely could have been prevented or mitigated." *Id*. at ¶ 12.

4.    Defendants allege that after the "transaction" or "sale" of MTGOX to Karpeles, "[t]he Raggios began corresponding with Karpeles regarding the recovery of their allegedly stolen bitcoins." Defs. Memo. at 2. While there is correspondence to Karpeles beginning much after the transaction date, there is also correspondence between the Raggios and McCaleb after the transaction date in which McCaleb makes misrepresentations and statements which are completely inconsistent with the "sale" of MTGOX and purported absence of continuing responsibility, including:

- February 12, 2011 Email from McCaleb to Raggios:  "Still investigating. It will take awhile I think to be sure. . . ." Ex. E (emails) at RAGGIO 41.

- February 17, 2011 Email from McCaleb to Raggios: ". . . Still working on determining if this is absolutely the right guy. His account is frozen." Ex. E at RAGGIO 41.

- February 26, 2011 Email from McCaleb to Raggios. "It looks like at the very least this guy is going to give your coins back. I want to wait longer thought to gather more evidence if he is in fact related to other fraud that has happened on the site." Ex. E at RAGGIO 46.

- March 7, 2011 Email from McCaleb to Raggios. "Yeah Mark is the new owner and he will handle getting your coins back. It will still take awhile

since he has to wait to be sure baron is bluffing about suing us, etc." Ex. E at RAGGIO 0048.

This correspondence contradicts McCaleb's implication that he no longer had any role or responsibility in the return of the Raggios' bitcoins after the transaction date.

5.      Defendants allege that "McCaleb sold the MTGOX exchange on February 11, 2018 . . . ." Defs. Memo. at 3. However, even if such a transaction occurred, McCaleb continued to have an interest in the revenue of MTGOX and owned a substantial percentage of MTGOX. See Ex. D at SRC 05947 ("I get 50% of the revenue for 6 months or until I get $60K whichever is greater. 12% of the company you form to hold mtgox."). Skype chat logs also indicate McCaleb's involvement for months after the alleged sale. Ex. F. See also ex. G (Apr. 28, 2011 email from McCaleb to Karpeles). Thus, Defendants' insinuation that after the transaction, McCaleb had no further interest in, dealings on behalf of, or control over, MTGOX will be hotly disputed.

6.      Finally, Defendants allege that "the Raggios never suggested that McCaleb had breached any obligation to them or was responsible for recovering their bitcoins." Defs. Memo. at 3. The Raggios did not have to claim that McCaleb was responsible because McCaleb took on that obligation on his own. See ex. A at ¶ 15 (McCaleb told the Raggios "I'm sure he will eventually give it to you. I know he is trying to do everything by the book so I think he had to wait for legal reasons."). But more importantly, the Raggios did not know, and could not have known, the depth of the ineptitude, security lapses and outright fraud which was occurring, as demonstrated in the following:

- McCaleb's acknowledgement of multiple hacks and thefts. See McCaleb Email to Karpeles dated January 28, 2011, ex. D at SRC 5946 ("there was a hacking incident since we started talking. Someone was able to take about $50k in LR.")

- McCaleb's acknowledgement of his prior knowledge of hacks at the time of the theft of the Raggios account. "And I know this guy was hacking around on the site trying various things for a month or so. . ." *Id.*

- McCaleb's recommendation to paper over thefts and "let the loss ride" "We can just let the loss ride until the site either makes it or not." *Id.*

- McCaleb's acknowledgement that MTGOX was 80,000 bitcoins short from prior thefts. See McCaleb Email to Karpeles dated April 28, 2011 ("I can't tell how big an issue it will be to be short 80k BTC . . . That is quite a bit to owe . . .") Ex. G.

Thus, the failure of the Raggios to complain ignores McCaleb's representations that the Raggios would be made whole and also McCaleb's fraudulent omissions that MTGOX had been hacked on multiple occasions.

### C.   Defendants' Motion Should Be Denied Under Rule 56(f).

Under Rule 56, the trial court may delay ruling on the motion in order to permit further discovery. M.R.C.P. 56(f). "Should it appear from the affidavit of a party opposing the motion that he cannot for the reasons stated present by affidavit facts essential to justify his opposition," the court can delay ruling on the motion pending "depositions to be taken" or "discovery to be had." *Id.* Plaintiffs have attached the Affidavit of Walter H. Boone, counsel of record for Plaintiffs, as Exhibit B to this Response, in support of their request to delay ruling on the present motion under Rule 56(f).

As an initial matter, discovery in this matter is scheduled to end March 15, 2019, and is not over. *Id.* at ¶ 5. Neither party has designated its expert witnesses, and Plaintiffs' expert witnesses will render opinions relevant to Defendants' Motion for Partial Summary Judgment. *Id.* at ¶ 8. Moreover, there is specific discovery which Plaintiffs need and which will be relevant to damages, including but not limited to the following:

- Document discovery of Jed McCaleb's gmail account which has been withheld by Defendants;

- Document discovery on the server images for mtgox.com;

- Deposition of Jed McCaleb;

- Deposition of Mark Karpeles;

- Document and expert discovery on the security of mtgox.com in general and Defendants' claim in their Motion for Partial Summary Judgment that there "is no evidence the exchange's security measures were circumvented" as alleged on Page 2 of their Memorandum;

- Document and expert discovery on Defendants' claim that the "theft was perpetrated by someone using the Raggios' own password to access their account" as Defendants allege on Page 2 of their Memorandum;

- Document and expert discovery on Defendants' claim that the "theft was perpetrated by someone using the Raggios' own password to access their account" as Defendants allege on Page 2 of their Memorandum;

- Document, fact and expert discovery on the chronology and circumstances surrounding the theft of Plaintiffs' bitcoins, including the allegations that McCaleb converted the bitcoins to his own use;

- Document, fact and expert discovery on the ability to purchase bitcoins from sources other than mtgox.com, as Defendants allege that Raggio was able to, and required to, cover, as alleged in Defendants' motion;

- Document, fact and expert discovery on the facts surrounding the "sale" of mtgox.com from Jed McCaleb to Tibanne K.K. and the timeline for such sale including evidence to support of Plaintiffs' Count Nineteen, Piercing the Corporate Veil, among other claims;

- Document, fact and expert discovery on Plaintiffs' claims for fraud, piercing the corporate veil, unjust enrichment, and other claims which will support Plaintiffs' claims for damages far in excess of the value of the missing bitcoins.

Affidavit of Walter H. Boone, Ex. B, at ¶ 7. Thus, the Court should delay ruling on Defendants' motion until discovery is completed and the parties can properly present all issues to the Court for resolution.

WHEREFORE, PREMISES CONSIDERED, this Court should DENY the motion for partial summary judgment; or in the alternative, GRANT Plaintiffs' Rule 56(f) request

and POSTPONE any ruling on Defendants' motion until discovery has been completed and

Plaintiffs.

      Respectfully submitted, this the 1st day of November, 2018.

*s/ Andy Lowry*_____
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has

electronically filed the foregoing with the Clerk of the Court via this Court's MEC system,

providing electronic service on all counsel registered therefor, and serving via United States

mail (postage prepaid) as set forth below:

> Edwin S. Gault, Jr., Esq.
> Amanda B. Robinson, Esq.
> T. Peyton Smith, Esq.
> FORMAN WATKINS & KRUTZ LLP
> Post Office Box 22608
> Jackson, Mississippi 39201
> Win.Gault@formanwatkins.com
> Peyton.Smith@formanwatkins.com
> Mandie.Robinson@formanwatkins.com

> Ethan Jacobs, Esq.                *(via U.S. mail)*
> HOLLAND LAW, LLP
> 220 Montgomery Street, Suite 800
> San Francisco, California 94104

So certified, this the 1st day of November, 2018.

> *s/Andy Lowry*
> Andy Lowry

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO and                                         PLAINTIFFS
DR. CHRIS RAGGIO

V.                                                  CIVIL ACTION NO. 14-71

JED McCALEB et al.                                           DEFENDANTS

### AFFIDAVIT OF DR. CHRIS RAGGIO

STATE OF MISSISSIPPI

COUNTY OF HINDS

PERSONALLY APPEARED before the undersigned officer duly authorized by law to administer oaths, Dr. Chris Raggio, who, after being duly sworn and deposed, states as follows:

1.     I am over eighteen years of age and am competent to give this Affidavit, which is based upon my personal knowledge.

2.     I am one of the Plaintiffs in the matter of Dr. Donald Raggio and Dr. Chris Raggio vs. MTGOX, et. al, In the Circuit Court of Hinds County, First Judicial District, Cause No. 14-71, and I have personal knowledge of the facts set forth in this affidavit.

3.     My father and I created an account on the bitcoin exchange, MTGOX, in December 2010. At the time, MTGOX was the only source known to me for purchasing large amounts of bitcoin.  The front page of the website said "safe and easy" looking materially like the pictures attached hereto. Ex. A. Based on the representations that it would be "safe and easy," I then began purchasing bitcoin on the website.

4.     I purchased bitcoin because I hoped, and had an expectation, that the bitcoin would gain substantial value.  While no one knew the future of bitcoin or the future value of

bitcoin, I did know that at least one possibility, and the one I hoped would occur, was that the bitcoin would gain hundreds, thousands, or even tens of thousands of percent in value. I was not alone in my expectation regarding the future value of bitcoin, and I shared that expectation with many other early bitcoin investors, many of whom communicated publicly about those expectations.

5.     At the time this lawsuit was filed, I still owned a substantial majority of the bitcoin I bought from other sources besides MTGOX in 2010 and the bitcoin I was successfully able to withdraw from MTGOX in 2011.

6.     On January 9, 2011, I noticed that someone had conducted three (3) unauthorized withdrawals on my MTGOX account. The withdrawals totaled 9406.33 bitcoin. I immediately notified Jed McCaleb of the unauthorized withdrawals. McCaleb stated he had frozen my MTGOX account, and began logging all IP addresses on login.

7.     The following day, on January 10, I discovered the bitcoin address to which the stolen bitcoin had been moved, and I informed McCaleb of that address.

8.     I was later told that another MTGOX account holder named "Baron" had purportedly stolen the bitcoin.

9.     On February 10, 2011, McCaleb informed me that he had frozen the Baron account and that the account had enough bitcoin to repay me.

10.    On February 26, 2011, Jed McCaleb sent me an email stating that "at the very least this guy is going to give your coins back" but that he wanted to "wait longer though to gather more evidence if he is in fact related to other fraud that has happened on the site." I responded the same day letting McCaleb know that while I wanted the coins back, I understood the coins had value for investigating further fraud on the site.

11.     On March 5, 2011, I notified Jed McCaleb that I had seen on the online forums that he was transferring MTGOX, and on March 6, 2011, I emailed Jed McCaleb again to ask if I needed to direct my communications to the new owner of MTGOX.

12.     On March 7, 2011, Jed McCaleb replied to both emails by saying "Yeah Mark is the new owner and he will handle getting your coins back." Prior to that March 5 email, McCaleb never informed me that he was selling MTGOX. McCaleb also never informed me that he, in fact, retained a 12% ownership interest in MTGOX.

13.     At all times prior to the March 5-7 email correspondence between myself and Jed McCaleb, he made written and oral representations that I would receive my bitcoin back once an investigation was completed.

14.     On March 8, 2011, I began to correspond with Mark Karpeles, who said that a judgment must be obtained in Japan in order to direct any action on the stolen bitcoin.

15.     On December 21, 2011, I emailed Jed McCaleb informing him as to my recent communications with Mark Karpeles concerning the bitcoin. On December 27, 2011, Jed McCaleb responded that he would talk to Mark Karpeles and that "I'm sure he will eventually give it to you. I know he is trying to do everything by the book so I think he had to wait for legal reasons."

16.     After I retained Japanese counsel to investigate this matter in January of 2012, Mark Karpeles made a representation in March of 2012 that his company only inherited the assets related to the bitcoin exchange and never inherited the liabilities that Jed McCaleb had incurred.

17.     In March, 2012, after Karpeles told me that I would not be made whole on the missing bitcoin, I did not trust MTGOX, and I did not believe it was prudent to replace

the lost bitcoin with new bitcoin from the same site with lax security and whose owners repeatedly and falsely represented to me that I would be made whole. Likewise, I was not aware of another location where I could safely replace that number of missing bitcoin. Even if I had known of such an alternate safe location to replace the missing bitcoin, by that time, the bitcoin had increased substantially in value to approximately $50,000. I did not have $50,000 at that time and even if I did, I could not justify that substantial investment just to replace the missing bitcoin which I had been promised. The price of bitcoin never returned to the level at which I originally purchased it.

18.     I delayed filing a suit in this matter because I relied on the representations that were made to me by Jed McCaleb and Mark Karpeles.

19.     On October 16, 2018, I filed a proof of claim in the civil rehabilitation proceedings in Japan relating to MTGOX.

20.     In November, 2013, the value of my missing bitcoin was approximately $9,200,000. At the time of the filing of this lawsuit in March, 2014, the value of my missing bitcoin was approximately $6,225,000. Since filing suit, the value of my missing bitcoin reached a price of approximately $165 million and the value of my missing bitcoin cash reach a price of $38 million. Today, as of the date of this affidavit, the value of my missing bitcoin is approximately $59.5 million and the value of my missing bitcoin cash is approximately $3.9 million.

21.     I expect to retain experts to testify regarding the nature and extent of my full damages.

Further, Affiant Sayeth Not.

_____
Dr. Chris Raggio

Sworn to and subscribed before me this 1st day of ~~October~~ November, 2018.

*Jacquelyn R. Broussard*

Notary Public

My Commission expires: 6/26/2020





IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| DR. DONALD RAGGIO and | PLAINTIFFS |
| DR. CHRIS RAGGIO | |
| | |
| V. | CIVIL ACTION NO. 14-71 |
| | |
| JED McCALEB et al. | DEFENDANTS |

<u>AFFIDAVIT OF WALTER H. BOONE</u>

STATE OF MISSISSIPPI

COUNTY OF HINDS

PERSONALLY APPEARED before the undersigned officer duly authorized by law to administer oaths, Walter H. Boone, who, after being duly sworn and deposed, states as follows:

1.    I am over eighteen years of age and am competent to give this Affidavit, which is based upon my personal knowledge.

2.    I give this Affidavit for use in evidence in the above-styled matter and for any purposes allowed by law.

3.    This Affidavit is provided in response to Defendants' October 5, 2018 Motion for Partial Summary Judgment.

4.    I am a Parnter at the law firm of Balch & Bingham, LLP.  I am counsel for Plaintiffs, Dr. Donald Raggio and Dr. Chris Raggio, along with Armin J. Moeller, Jr., Christine Crockett White, Andy Lowry, Perry Taylor and Alex Khoury.

5.    Discovery in this matter is scheduled to end March 15, 2019.  Because the discovery deadline is five (5) months away, the parties have not yet concluded discovery.

6.      Although each party has conducted various discovery up to this point, further discovery is necessary for the parties to prepare this case for trial and for Plaintiffs to properly respond to Defendant's Motion for Partial Summary Judgment.

7.      Plaintiffs plan to conduct additional written, oral and document discovery regarding a number of issues including, but not limited to, the following, all of which is relevant to damages and necessary to properly respond to Defendants' Motion for Partial Summary Judgment:

a.      Document discovery of Jed McCaleb's gmail account which has been withheld by Defendants. Further discovery on these email accounts could provide multiple facts supporting Plaintiffs' claims including: (1) additional statements evidencing the difficulty of obtaining large amounts of bitcoin from any other source, (2) additional evidence on the foreseeability of bitcoin's price appreciation, and (3) McCaleb's knowledge of the security vulnerabilities at MTGOX in December 2010 and January 2011.

b.      Document discovery regarding the server images for mtgox.com, which, according to Plaintiffs' expert, Darek Dabbs, will contain critical information relevant to the case including webserver log and data files that depict login/logout activity; Web Server and Blog server production code and any backup code; Firewall and Web Application Firewall configurations; and full Server image(s) to include all databases.

c.      Deposition of Jed McCaleb, which will shed light on (1) piercing the corporate veil relating to the transaction; (2) McCaleb's unjust enrichment; (3) additional statements evidencing the difficulty of obtaining large amounts of

bitcoin from any other source, (4) additional evidence on the foreseeability of bitcoin's price appreciation, (5) McCaleb's knowledge of the security vulnerabilities at MTGOX in December 2010 and January 2011; and (6) McCaleb's attempts to cover up knowledge of security lapses to prop us MTGOX ;

d.   Deposition of Mark Karpeles, which will shed light on several factual issues regarding (1) the insolvency of MTGOX at the time of the transaction, (2) McCaleb's knowledge about prior security lapses, (3) McCaleb's efforts to conceal the true condition of MTGOX from account holders while McCaleb got his payout, and (4) McCaleb's involvement in Karpeles' decision after delay to deny the Raggios' request to return the missing bitcoin, and other material fact questions;

e.   Document and Expert Discovery on the security of mtgox.com in general and Defendants' claim in their Motion for Partial Summary Judgment that there "is no evidence the exchange's security measures were circumvented" as alleged on Page 2 of their Memorandum.

f.   Document and Expert Discovery on Defendants' claim that the "theft was perpetrated by someone using the Raggios' own password to access their account" as Defendants allege on Page 2 of their Memorandum;

g.   Document, Fact and Expert Discovery on the chronology and circumstances surrounding the theft of Plaintiffs' bitcoins, including the allegations that McCaleb converted the bitcoin to his own use;

h.    Document, Fact and Expert Discovery on the ability to purchase bitcoins from sources other than mtgox.com, as Defendants allege that Raggio was able to, and required to, cover, as alleged in Defendants' motion;

i.    Document, Fact and Expert Discovery on the facts surrounding the "sale" of mtgox.com from Jed McCaleb to Tibanne K.K. and the timeline for such sale including evidence to support of Plaintiffs' Count Nineteen, Piercing the Corporate Veil, among other claims;

j.    Document, Fact and Expert Discovery on Plaintiffs' claims for fraud, piercing the corporate veil, unjust enrichment, and other claims which will support Plaintiffs' claims for damages far in excess of the value of the missing bitcoin.

8.    Neither party has designated its expert witnesses.  Plaintiffs' expert witnesses can and will render opinions relevant to Defendants' Motion for Partial Summary Judgment.

9.    The aforementioned discovery is necessary for Plaintiffs to properly respond to Defendant's Motion for Partial Summary Judgment.

Further, Affiant Sayeth Not.

_____
Walter H. Boone

Sworn to and subscribed before me this ___ day of November, 2018.

_____
Notary Public

My Commission expires: 6|26|2020



IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO and
DR. CHRIS RAGGIO                                          PLAINTIFFS

V.                                                          CIVIL ACTION NO. 14-71

JED McCALEB et al.                                          DEFENDANTS

### AFFIDAVIT OF DAREK DABBS, SR

STATE OF VIRGINIA

INDEPENDENT CITY OF SUFFOLK

PERSONALLY APPEARED before the undersigned officer duly authorized by law to administer oaths, Darek Dabbs, who, after being duly sworn and deposed, states as follows:

1.     I am over eighteen years of age and am competent to give this Affidavit, which is based upon my personal knowledge.

2.     I have been retained by Dr. Chris Raggio to be an expert witness in the matter of Dr. Donald Raggio and Dr. Chris Raggio vs. MTGOX, et. al, In the Circuit Court of Hinds County, First Judicial District, Cause No. 14-71, and I have personal knowledge of the facts set forth in this affidavit.

3.     All of the opinions set forth in this affidavit are made to a reasonable degree of certainty in the field of cyber security.

4.     I have reviewed all of the documents listed in Appendix A attached to this affidavit.

5.     I would like to review the following evidence regarding MTGOX's cyber security including the forensic artifacts that would contain:

- Webserver log and data files that depict login/logout activity;
- Web Server and Blog server production code and any backup code
- Firewall and Web Application Firewall configurations;
- Full Server image(s) to include all databases

6.      Jed McCaleb has not provided Plaintiffs a copy of the server images in this case.

7.      The security measures in place at MTGOX in December and January 2011 were inadequate and failed to meet the cyber security industry best practices and common standards of the time.  The webserver software was noted as being written in PHP-Lithium, which during 2011 was only available as a beta software and most likely presented multiple vulnerabilities causing weaknesses with webserver security.   User Account Logging of auditable events was not implemented until after the Raggio user account suspected compromise occurred, and even after the incident the implementation was not sufficient to support a reasonable forensic investigation.

8.      From the time the Raggios' created an account on MTGOX (December 24, 2010) through the time of the hack of their account (January 7-9, 2011), MTGOX did not have salted password hashing implemented.  Security practitioners at that time knew to use salted password hashing on all password databases.

9.      I read in Defendant Jed McCaleb's Memorandum Brief in Support of Motion for Partial Summary Judgment the allegation that "There is no evidence the exchange's security measures were circumvented." I disagree with that factual assertion and intend to offer opinions contrary to those assertions at the appropriate time.

10.      I read in Defendant Jed McCaleb's Memorandum Brief in Support of Motion for Partial Summary Judgment the allegation that "the theft was perpetrated by someone using the Raggios' own password to access their account."  While that assertion may be

true, I have not seen evidence to support Jed McCaleb's claim that the Raggios' account was compromised through the fault of the Raggios. Instead, in my opinion, the account was accessed through the use of the Raggios' own password, but that access was caused by the unauthorized hack of the password database caused by a SQL injection attack.

11.    In documents produced so far in this case, McCaleb has already acknowledged that security measures on the site were being probed in the same timeframe that the Raggios' bitcoins were stolen. But at that time, McCaleb did not have adequate security procedures in places to either detect those probes, or prevent unauthorized access.

12.    In my opinion, and based on the information I have seen to date, the most likely explanation for the compromise of the Raggios' account data was through an SQL injection vulnerability. An SQL injection attack would have allowed the hacker to access the encrypted database of account user names and passwords. With access to the encrypted database, the hacker could have cracked the password to access the Raggios' account. According to publicly available sources, we know that MTGOX was subjected to an SQL injection attack at some point in 2011, and there is evidence to suggest the attack occurred in January 2011 and could explain the compromise to the Raggios' account. Had adequate security protocols been in place, this vulnerability would not have existed and the hack could have been prevented.

13.    Although my review of the documents and information in this case is not complete and my opinions are not fully formed, I do believe that there is sufficient evidence that I have seen to date for a jury to find that MTGOX' security failures rose to the level of gross negligence. I certainly believe that the failures I have seen so far were grossly negligent.

14.     Because my review of documents and information is not yet complete, I reserve the right to add to and modify the opinions set forth in this affidavit.

Further, Affiant Sayeth Not.

_____
Darek Dabbs, Sr.

Sworn to and subscribed before me this ⌊ day of November, 2018.

_____
Notary Public

My Commission expires: 6/30/2022

BRIAN DOUGLAS PARSONS
NOTARY PUBLIC
REGISTRATION # 7776176
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
JUNE 30, 2022

## Appendix A

136177075.txt

1361770758574142976.eml

Confidential Investigative Report FINAL w attach.pdf

log_otc_from_rtf.pdf

Mt Gox Account Dump Pastebin 8oct2014

Mtgox is changing owners_bitcointalkforum.pdf

myznc-#bitcoin-otc.log

myznc-#bitcoin-otc.log.tar.bz2

myznc-#bitcoin-otc_log.pdf

New Bitcoin Exchange (mtgox.com)_bitcointalkforum.pdf

otc.log

otc_log.pdf

otc_log.rtf

scan.JPG

Bitcoin\Baron Transactions SRC13723-14137.pdf

Bitcoin\Baron Transactions SRC13723-14137.txt

Bitcoin\Baron Transactions SRC13723-14137.xlsx

Bitcoin\BitcoinTalk Posts

Bitcoin\Defendants' Produced Discovery PDFS and attachments

Bitcoin\IRC Chat Log SRC14197-14208.pdf

Bitcoin\BitcoinTalk Posts\Baron

Bitcoin\BitcoinTalk Posts\Jed

Bitcoin\BitcoinTalk Posts\MagicalTux

Bitcoin\BitcoinTalk Posts\mtgox

Bitcoin\BitcoinTalk Posts\Baron\1 (posts 1-20).pdf

Bitcoin\BitcoinTalk Posts\Baron\2 (posts 21-40).pdf

Bitcoin\BitcoinTalk Posts\Baron\3 (posts 41-60).pdf

Bitcoin\BitcoinTalk Posts\Baron\4 (posts 61- 80).pdf

Bitcoin\BitcoinTalk Posts\Baron\5 (posts 81- end).pdf

Bitcoin\BitcoinTalk Posts\Jed\(1-20).pdf

Bitcoin\BitcoinTalk Posts\Jed\(101-120).pdf

Bitcoin\BitcoinTalk Posts\Jed\(121-140).pdf

Bitcoin\BitcoinTalk Posts\Jed\(141 -160).pdf

Bitcoin\BitcoinTalk Posts\Jed\(161- 180)pdf.pdf

Bitcoin\BitcoinTalk Posts\Jed\(181- end).pdf

Bitcoin\BitcoinTalk Posts\Jed\(21-40).pdf

Bitcoin\BitcoinTalk Posts\Jed\(41-60).pdf

Bitcoin\BitcoinTalk Posts\Jed\(61-80).pdf

Bitcoin\BitcoinTalk Posts\Jed\(81-100).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (1-20).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (101 -120).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (121 -140).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (141 - 160).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (161 -180).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (181 -200).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (201 -220).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (21-40).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (221-240).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (241 -260).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (261-280).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (281 -300).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (301 -320).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (321 -340).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (341 -360).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (361-380).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (381- 400).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (401-420).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (41-60).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (421-440).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (441-460).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (461-480).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (481 -500).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (501-520).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (521-540).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (541-560).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (561-580).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (581-600).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (601-end).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (61-80).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (81-100).pdf

Bitcoin\BitcoinTalk Posts\mtgox\1 (post 1-20).pdf

Bitcoin\BitcoinTalk Posts\mtgox\10 (post 181- 185).pdf

Bitcoin\BitcoinTalk Posts\mtgox\2 (post 21-40).pdf

Bitcoin\BitcoinTalk Posts\mtgox\3 (post 41-60).pdf

Bitcoin\BitcoinTalk Posts\mtgox\4 (post 61-80).pdf

Bitcoin\BitcoinTalk Posts\mtgox\5 (post 81-100).pdf

Bitcoin\BitcoinTalk Posts\mtgox\6 (post 101 - 120).pdf

Bitcoin\BitcoinTalk Posts\mtgox\7 (post 121 -140).pdf

Bitcoin\BitcoinTalk Posts\mtgox\8 (post 141-160).pdf

Bitcoin\BitcoinTalk Posts\mtgox\9 (post 161-180).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000001 Executed Signatures on Contract selling MTGOX to Tibanne (Karpeles).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000002 MTGOX sale contract to Tibanne (Karpeles).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000005 20110226-Re_logs otc-1361315.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000006 20110226-Re_logs otc-5370381.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000007 19691231-no_subject-768181.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000008 20101217-Re_deal-7156751.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000009 20101220-account funded by wire-1299061.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000010 20101221-funding-1295519.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000011 20101221-Re_account funded by wire-1273423.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000012 20101221-Re_account funded by wire-1277694.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000013 20101221-Re_account funded by wire-1280348.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000014 20101221-Re_account funded by wire-1284749.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000015 20101221-Re_account funded by wire-1289154.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000016 20101221-Re_account funded by wire-1293555.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000017 20101223-Re_account funded by wire-1262485.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000018 20101223-Re_account funded by wire-1265712.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000019 20101223-Re_account funded by wire-1270743.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000020 20101224-account funded by wire-1236414.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000021 20101224-Re_account funded by wire-1242546.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000022 20101224-Re_account funded by wire-1248745.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000023 20101224-Re_account funded by wire-1252490.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000024 20101224-Re_account funded by wire-1258037.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000025 20101225-Re_account funded by wire-1232076.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000026 20101227-Re_account funded by wire-1193201.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000027 20101227-Re_account funded by wire-1199421.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000028 20101227-Re_account funded by wire-1213726.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000029 20101227-Re_account funded by wire-1220432.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000030 20101227-Re_account funded by wire-1225331.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000031 20101228-Re_account funded by wire-1159934.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000032 20101228-Re_account funded by wire-1165909.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000033 20101228-Re_account funded by wire-1173280.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000034 20101228-Re_account funded by wire-1178756.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000035 20101228-Re_account funded by wire-1186000.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000036 20101229-Re_account funded by wire-1145570.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000037 20101229-Re_account funded by wire-1151845.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000038 20110109-Re_account funded by wire-1113141.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000039 20110109-Re_account funded by wire-1129184.pdf

| From: | Mark Karpeles <mark@tibanne.com> |
| To: | Jed McCaleb <admin@mtgox.com> |
| Sent: | 1/28/2011 10:45:05 AM |
| Subject: | Re: Re: |

Hi,

I can understand your worries, however having mtgox working with only a fraction of the amounts being exchanged might be problematic too.

By taking over mtgox, one of the first step will be to define terms & conditions defining exactly how the users are insured, and what they can do if (for example) someone manages to exploit problems in the site.

This means also that I need to be 100% sure we will be able to answer any withdraw request from someone who deposited anything. Any problem on this side might have a desastrous effect not only on mtgox, but on the whole bitcoin economy itself (ie. the moment when people understand the world is not all pink and get scared).


Anyway I both understand your worries (just giving up mtgox to someone you never met) and mine (taking the resposability of a site without having the whole lot of stuff received by people).
I haven't found any solution that would solve both problems at the same time yet, but I'm still thinking about it.

If you have any idea regarding that please let me know.


Also a loss of $50k even before starting is rather large, especially considering what I could read in the mtgox presentation.


Anyway I'm tired, it's 00:45 here, I'll think more tonight and will reply again tommorow.


Mark


PS: As for the framework no problem, I have plans if things go smootly to adapt mtgox on the framework we use here :)

Le vendredi 28 janvier 2011 à 10:10 -0500, Jed McCaleb a écrit :
> Hi Mark,
> I'm trying to think of the best way to handle the transfer.
> I guess I should hold a lot of the BTC and $ in reserve for some
> amount of time. Right now I only keep 1/3 of the BTC on the server
> anyway to limit the exposure if something terrible goes wrong. And
> deposits always are greater than withdrawals so there is a
> considerable buffer of both cash and BTC.
>
> Also there was a hacking incident since we started talking. Someone
> was able to take about $50k in LR. The problem was that LR allows
> multiple transactions in their call to
> https://api.libertyreserve.com/xml/transfer.aspx and I wasn't checking
> that the LR account name they gave was valid. So they would just close
> the current transaction and start another. Basically like a SQL
> injection attack. Obviously a big mistake on my part.
> I know now you probably wonder if the whole site is riddled with bugs.
> I like to think I'm pretty careful about this type of thing and there
> is nothing like this left in there. And I know this guy was hacking
> around on the site trying various things for a month or so. So that is
> some indication that there is nothing this bad on there.

SRC05946

Case: 25CI1:14-cv-00071-JAS   Document #: 244-4   Filed: 11/01/2018   Page 2 of 2

```
>
> The loser is whoever is not in control. I think that is actually a bit of a
> issue as long as deposits continue to be greater than withdrawals. We
> can just let the loss ride until the site either makes it or not.
> And maybe you know some crafty way to track these guys down. The two
> IPs they used seem static. The machines both respond to pings.
>
> Also I don't know if I mentioned but the site is built on this php
> framework called lithium.
> Jed.
>
>
> On Mon, Jan 24, 2011 at 1:28 PM, Jed McCaleb <admin@mtgox.com> wrote:
> > Hi Mark,
> > So here is what I'm thinking:
> > No cash upfront.
> > I get 50% of revenue for 6 months or until I get $60k whichever is greater.
> > 12% of the company you form to hold mtgox.
> > How does this sound?
> > Thanks,
> > Jed.
> >
```

SRC05947

2/12/12                                          Gmail - account funded by wire

**Jed McCaleb <admin@mtgox.com>**                              **Mon, Jan 17, 2011 at 8:41 AM**
To: Donald Raggio <donald.raggio@gmail.com>

ok what address do you want me to send it to?
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                       **Mon, Jan 17, 2011 at 8:58 AM**
To: Jed McCaleb <admin@mtgox.com>

Jed,
Please send entire balance to address

12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea

Please let me know if there are any problems
Thanks,

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              **Mon, Jan 17, 2011 at 9:05 AM**
To: Don Raggio <donald.raggio@gmail.com>

ok there you go.
Have the stolen ones bent sent anywhere yet?
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                       **Mon, Jan 17, 2011 at 9:23 AM**
To: Jed McCaleb <admin@mtgox.com>

Jed,

Thanks for sending them out.    The stolen ones are still at the same address.   I don't know who has control
over them or what he or she plans  to do with them.   The log from bitcoin explorer is below.   I don't know how
the password was obtained.   It wasn't an easy to guess password.    My only guess is a keylogger.   I ran
software to detect one on that PC but none were found so I don't know what happened.   I guess they
never bothered to login again to your site.    If they are careless enough to return them from that address to
MtGox please seize them. Let me know if you want to unfreeze my account at MtGox (and for me to change the
password) or if it is just better to create a new account given what's happened.   Right now I'm just leaving it as
is hoping they will login again and get their IP logged.       The information about the stolen coins is below.
Good luck running your site.      I wish we could have spent more time with you discussing bitcoin's potential
instead of this problem.   Maybe we'll have a chance to do that yet.   The future is very promising.

Chris (for Don)

# Address 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmM mQCh

RAGGIO  00034                          11/14

2/12/12                                   Gmail - account funded by wire

Short link: http://blockexplorer.com/a/6C87FrVcb1

- First seen[?]: Block 101362 (2011-01-07 01:01:26)
- Received transactions: 4
- Received BTC: 9 506.33
- Sent transactions: 1
- Sent BTC: 100
- Hash160[?]: 89008dfd301ad098e368693d8bf9bcdedf78bd6c
- Public key[?]:
  04f0ceb57cc8038334c56317dc152c523f6dbb854f14f2ac63a7e9c227b9e1cee24f6bb2dcde2d9eb6f19acf57
  bd0eae4d7f9324905fa505f8a1a14b02a0b5c159

## Ledger[?]

Note: While the last "balance" is the accurate number of bitcoins available to this address, it is likely not the balance available to this person. Every time a transaction is sent, some bitcoins are usually sent back to yourself *at a new address* (not included in the Bitcoin UI), which makes the balance of a single address misleading. See the wiki for more info on transactions.

| Transaction[?] | Block[?] | Amount[?] | Type[?] | From/To[?] | Balance[?] |
|---|---|---|---|---|---|
| 691967a006... | Block 101362 (2011-01-07 01:01:26) | 100 | Received: Address | • 19n8ogD8imviHn9iZSpmUgdZgjTuDxzDwv | 100 |
| f73d2bb200... | Block 101362 (2011-01-07 01:01:26) | 100 | Sent: Address | • 1Lnfce21gYa4WMZFFR4iVUFz9F39tH mz7W  • 12VLe9wFVdio8gEjRqFJdZ1g5qBDfVfZkJ | 0 |
| 4d69213ee5... | Block 101380 (2011-01-07 02:49:29) | 3134.8 | Received: Address | • 1K5PeNuth8dtyeBrAhw8c2n899gBvG KTut  • 16GanxZBBxbSeWa177iSi6Y42zirxx JLnz  • 1JCmxZjJBkQSpYEdYoukRcEz23YwM WBzF | 3134.8 |
| a7b9ea9363... | Block 101607 (2011-01-08 10:27:16) | 3174.6 | Received: Address | • 1JSiXdtNihFuVp16pGfJeK8DBTAmAV DteV  • 19FuFSs6pVUsKrqUpnyRbZp5XGYSat pwJD  • 1CRCF7qQPV9Sybe5RUN9ZcsQfqbyXv cqyR  • 1EJxHS9F3BDME8r8gEljKVWc2rMKCD 3Ssx  • 15fFrMJZkZ7YA1YRQT3PN41uKpkiRm N5ap | 6309.4 |
| | Block 101760 | | | • 1JHQRFF5P9867t9hiqmPxn9rpZUZjz b92C  • 16r2pK9zySywLi1beVRgCaRgCtW2rK kucZ  • 1MqHNzdUuNsE3N5gym5ojPuHGtPmif bosC  • 1DEY3nw7vUMXm5SoaVLxMG3rYeY5nP | |

RAGGIO   00035

Page12

2/12/12                                              Gmail - account funded by wire

| 14a797025a... | (2011-01-09 10:47:30) | 3096.93 | Received: Address | hmc | 9406.33 |
|---|---|---|---|---|---|

- 1NeJmfihzggpxskJrzFJoBebcjhvFaggZd
- 1Ay3N616QnNBp7bXwjKjatANHyKE2b NfHR
- 13peLjL4LDQm2tiuubYQjxYV8JhaJg QQPy
- 1LiMB3VwERw317K2RGh6ahJj3QaoTt RJG2

Bitcoin Block Explorer (beta) - Donate: 1Cwr8AsCfbbVQ2xoWiFD1Gb2VRbGsEf28

[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    Sun, Jan 23, 2011 at 4:17 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

The stolen ones still haven't moved.   Can you check and see if anybody has logged in?

Chris (for Don)
[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              Mon, Jan 24, 2011 at 6:10 AM
To: Donald Raggio <donald.raggio@gmail.com>

No still no logins other than you.
[Quoted text hidden]

---

**Donald Raggio <donald.raggio@gmail.com>**                    Mon, Jan 24, 2011 at 6:11 AM
To: Jed McCaleb <admin@mtgox.com>

Thanks for checking.
[Quoted text hidden]

---

**Don Raggio <donald.raggio@gmail.com>**                       Tue, Feb 1, 2011 at 8:09 PM
To: Jed McCaleb <admin@mtgox.com>

Jed, do you think we got hit by these guys running a dictionary attack?

http://www.bitcoin.org/smf/index.php?topic=3089.0

Chris (for Don)

[Quoted text hidden]

---

**Jed McCaleb <admin@mtgox.com>**                              Tue, Feb 1, 2011 at 8:24 PM
To: Don Raggio <donald.raggio@gmail.com>

Gmail - Re: account funded by wire                    https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

> Thanks for telling me about Theymos.  It's hard for me to use IRC at
> work.  Maybe if we could get in touch with him he could create
> something that monitors that address and notifies us when they are
> transferred.   I would reward him and you with BTC for recovering the
> stolen BTC.   Does that sound like a good idea?
>
>
>
> PS
>
>   Thanks for creating such a cool platform.
>
> Chris (for Don)
>
>
>
> On Jan 10, 2011, at 3:26 AM, Jed McCaleb <admin@mtgox.com> wrote:
>
> > Oh jeez that's bad.
> > I would go to IRC channel #bitcoin-dev and talk to theymos. He wrote a
> > block explorer that you can use to possibly track where the coins
> > went.
> > Any idea how someone got your password?
> > Jed.
> >
> > On Sun, Jan 9, 2011 at 11:36 PM, Don Raggio <donald.raggio@gmail.com> wrote:
> >> Somebody is conducting unauthorized withdrawals on my account.  They've
> >> taken 9k in BTC so far.  I changed the password.  Please Advise.  All were
> >> sent to 1DVQEpTFjxYpZMVy4Bam9MCxeGEtmMmQCh
> >>
> >> Don
> >>
> >

---

**Jed McCaleb** <admin@mtgox.com>                    Thu, Feb 10, 2011 at 3:40 PM
To: donald.raggio@gmail.com

Well I'm pretty sure I found the guy if I understand theymos's site
correctly. He has enough coins in his account to repay you also. I've
frozen his account but want to make sure I'm right before I do
anything.
Do you know anyone else with an account on mtgox?
Do you know anyone that uses this domain: contractor.net ?
Thanks,
Jed.
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>                    Thu, Feb 10, 2011 at 3:43 PM
To: donald.raggio@gmail.com

Also do you mind telling me what your old password was? I assume you
changed it. It didn't seem like the same attack that got the other
guys password but maybe it was.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                    Thu, Feb 10, 2011 at 9:21 PM
To: Jed McCaleb <admin@mtgox.com>

The only person know that has a mt gox account is Eric Brigham.  He told me about mt gox.  Never heard of contractor.net.

Thanks
[Quoted text hidden]

---

RAGGIO   00039

Gmail - Re: account funded by wire                                    https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

Chris
[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>                                          Sat, Feb 12, 2011 at 1:55 PM
To: Donald Raggio <donald.raggio@gmail.com>

Still investigating. It will take awhile I think to be sure. the
suspect could have been using mybitcoin or something. Then we can't be
certain it came from him.
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                                Sat, Feb 12, 2011 at 2:20 PM
To: Jed McCaleb <admin@mtgox.com>

Theymos said something about asking "Mybitcoin,, Vekja, and other EWallet services whether they own any of these
addresses.".

Is sending inquiries to those sites a wise next step in yourinvestigation? thanks for looking into this for us.

Chris (for Don)


On Feb 12, 2011, at 1:55 PM, Jed McCaleb <admin@mtgox.com> wrote:

---

**Jed McCaleb** <admin@mtgox.com>                                          Sat, Feb 12, 2011 at 2:34 PM
To: Donald Raggio <donald.raggio@gmail.com>

Yeah I'm asking them...
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                    Thu, Feb 17, 2011 at 1:32 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,

I was wondering if it was safe to use the account for trading or if you would recommend a new one (the password has been
changed)?  Also have you found anything more out about the stolen ones?  Is the suspect's account still frozen?

Thanks,

Chris (for Don)


[Quoted text hidden]

---

**Jed McCaleb** <admin@mtgox.com>                                          Thu, Feb 17, 2011 at 4:42 AM
To: Don Raggio <donald.raggio@gmail.com>

You can use your account as long as you have a new password. Still
working on determining if this is absolutely the right guy, His
account is frozen.
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                    Tue, Feb 22, 2011 at 8:43 PM
To: Jed McCaleb <admin@mtgox.com>

Gmail - (no subject)                                          https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...



Don Raggio <donald.raggio@gmail.com>

## (no subject)
20 messages

---

**Jed McCaleb** <admin@mtgox.com>                                    Sat, Feb 26, 2011 at 9:33 AM
To: Don Raggio <donald.raggio@gmail.com>

Hi Chris,
Can you think of a way that the thief would have gotten your mtgox
username? Because he would have needed that before he did the
dictionary attack.
It looks like at the very least this guy is going to give your coins
back. I want to wait longer though to gather more evidence if he is in
fact related to other fraud that has happened on the site.
Thanks,
Jed.

---

**Don Raggio** <donald.raggio@gmail.com>                             Sat, Feb 26, 2011 at 12:37 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

   I don't know but I'll try to let you know what I have thought about.   The first thought when it happened was to suspect
a keylogger. You made a good point when you said most people who spy with those wouldn't know about Mt. Gox but
I couldn't think of any other possibility and thought maybe they learned about Mt. Gox through the keylogger.    I ran
several products but nothing malignant was detected. One of those products is called Spyshelter premium.   The other
possibility is that thief through a keylogger of other means was able to access my gmail account but I didn't  detect
any intrusion there based on the IP log.   I should have picked a different username based on a psuedonym not one
so closely related to the email account name.   On Mt. Gox I'll set up a new account under different name for future
use.  That's as much information as I have.  If I think of anything else I'll let you know.  If you have any advice
regarding on security or could refer me somewhere I'd love to hear it.  Like what secure e-mail providers to use.
Strong password generators.  Protection against phishing, keyloggers. Etc.  Maybe this would be a good thing for all
users to read so they can do their part to protect themselves and Mt. Gox from scammers.    Please let me how you
want to proceed from here with regard the coins and what other steps you feel necessary to resolve this.

Thanks,
Chris (for Don)
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                             Sat, Feb 26, 2011 at 3:19 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

   Obviously I'd like the coins returned as soon as it is possible but it sounds like they have some value to in terms of
conducting your investigatoin into further fraud on the site.   ???   Let me know how you want to do this.  Also  If and
when it is possible to return the coins I'm guessing we should use an alternate BC address?  If I pick a new address
will it link back to my wallet?  Should I create a new wallet on another machine?   I'm sure people on the forum are
watching that address the scammer used.

Chris (for Don)

On Sat, Feb 26, 2011 at 9:33 AM, Jed McCaleb <admin@mtgox.com> wrote:
[Quoted text hidden]

---

1 of 6                                      RAGGIO   00046                              2/28/2014 4:19 PM

Gmail - (no subject)                                          https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

---

**Donald Raggio** <donald.raggio@gmail.com>                          Sat, Feb 26, 2011 at 7:52 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

Thanks for your help.   Youve done more than we expected tracking down the coins and unexpectedly having to put
up with a lot of annoying chatter on the forums.   I asked Don and we still don't know how he would have gotten the
username.   We don't have reason to believe anyone we know personally would have gotten the username.   We don't
know how the thief would have gotten it.   Wish we could shed more light on it.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                             Sat, Mar 5, 2011 at 3:46 PM
To: Jed McCaleb <admin@mtgox.com>

Hi Jed,

What's the status of the stolen coins?   Did you find out how the thief got the username?   Shouldn't we pick another
username to trade now that that part of the account has been compromised?   Thanks for your help.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                             Sat, Mar 5, 2011 at 8:57 PM
To: Jed McCaleb <admin@mtgox.com>

Jed,

Just saw on the forums that you are transferring Mt. Gox.   Thanks for creating Mt. Gox and eDonkey among your
other efforts.   BTC wouldn't be where it is without your efforts.   I know this growth has been exciting.   It
was "annoying" to say the least that  some scammer that tried to create a bunch of problems for all of us.  I guess that
is a part of the growth.   Can't wait to see Bitcoin hit $10.

Chris

[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                          Sun, Mar 6, 2011 at 10:22 AM
To: Jed McCaleb <admin@mtgox.com>

Jed,

I know you got a lot on your plate.   Do I keep talking to you or do I talk to the new owner regarding recovery of the
stolen BTC?

Chris
[Quoted text hidden]

---

**Jed McCaleb** <jed@mtgox.com>                                      Mon, Mar 7, 2011 at 7:19 AM
To: Mark Karpeles <admin@mtgox.com>, donald.raggio@gmail.com

RAGGIO   00047

2 of 6                                                                                            2/28/2014 4:19 PM

Gmail - (no subject)                                    https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

Hi Chris,
Yeah Mark is the new owner and he will handle getting your coins back.
It will still take awhile though since he has to wait to be sure baron
is bluffing about suing us etc.
Thanks,
Jed.

On Sun, Mar 6, 2011 at 11:37 AM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                          Tue, Mar 8, 2011 at 3:29 PM
To: Mark Karpeles <admin@mtgox.com>

Hi Mark,

I hope you are able to complete your investigation and return the coins.   If for some reason you have to take your
case public please respect our privacy wishes if possible by redacting our names or giving us a pseudonym.  We don't
want the "bad guy" to victimize us once again.   Best wishes for Mt Gox, your company, and hope to be using your
services in the future once this is cleared up.

Chris
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                             Mon, Mar 14, 2011 at 7:50 AM
To: Mark Karpeles <admin@mtgox.com>

Mark,

    I'm sure you are busy but I wanted to check in to see if there
were any developmetnts with regard to stolen coins.    Thanks for
handling this for us.


Chris (for Don).


On Mar 7, 2011, at 7:19 AM, Jed McCaleb <jed@mtgox.com> wrote:

[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                                  Mon, Mar 14, 2011 at 4:18 PM
To: Don Raggio <donald.raggio@gmail.com>

Hi,

We are currently trying to escalate the issue to obtain a judgment that would tell us what to do with the stolen coins.
We cannot just return them based on a decision taken on our own.

This might however take longer than expected as we have had a little problem here in Japan, and most not urgent
requests were delayed to may.


Thanks,
Mark
[Quoted text hidden]

---

3 of 6                                          RAGGIO  00048                        2/28/2014 4:19 PM

Gmail - (no subject)                                    https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

**Don Raggio** <donald.raggio@gmail.com>                          Thu, Mar 24, 2011 at 11:50 AM
To: Mark Karpeles <admin@mtgox.com>

Mark,

Hope things get back to normal in Japan.  Thank you for working to return the stolen coins to us.   Please keep us
updated.

Thanks,

Chris (for Don).

[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                          Thu, Mar 24, 2011 at 8:15 PM
To: Mark Karpeles <admin@mtgox.com>

Mark,
Is Baron still willing to hand the bitcoins over or do we have to wait for the "judgment?"  Thanks

Chris (for Don)

On Mon, Mar 14, 2011 at 4:18 PM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                          Thu, Mar 24, 2011 at 11:01 PM
To: Don Raggio <donald.raggio@gmail.com>

Hi,

Baron is requesting access to his funds and do not want to hear anything else for now. Recent problems in Japan
have put a hold on most legal processing, which are reported to "later this year". I really cannot provide any ETA right
now.

Mark
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                          Fri, May 20, 2011 at 9:57 PM
To: Mark Karpeles <admin@mtgox.com>

Mark,

Did you every resolve the issue with the stolen BTC?  It looks like there is a new transaction in Block Explorer dated
4-28.

| a01c1b8281... | Block 120711 (2011-04-28 20:34:02) | 3096.93 | Sent: Address | • 1MDphepGhrLrUDRUkhpHHGGd4mGsSsw94  • 1MeEDTHiSA1n1x6s9hM6qjPzs1x6vb4Y5j | 6309.4 |

Chris (for Don)

[Quoted text hidden]

RAGGIO   00049

Gmail - (no subject)                                                    https://mail.google.com/mail/?ui=2&ik=42dadbb538&view=pt&search=...

---

**Don Raggio** <donald.raggio@gmail.com>                                   Mon, Aug 1, 2011 at 10:55 AM
To: Mark Karpeles <admin@mtgox.com>

Mark,

  Have you heard anything about the situation with Baron or the case recently?   I know a lot has happened since
March.  I was wondering if you could update me on the situation.  If there is a docket number or equivalent can you
supply it to us so that we can follow the case.

Thank you,

Chris (for Don).

On Mon, Mar 14, 2011 at 4:18 PM, Mark Karpeles <admin@mtgox.com> wrote:
[Quoted text hidden]

---

**Mark Karpeles** <admin@mtgox.com>                                        Mon, Aug 1, 2011 at 11:31 AM
To: Don Raggio <donald.raggio@gmail.com>

Hi,

There will be no judgment done in Japan before 2012 on that case: courts give priority to earthquake/tsunami related
cases, and this "Baron" guy is 100% anonymous and we have no way to get in touch with him, and he never sent us
any legal document (plus, the passport he submitted was altered), so the only way to make a fair judgment is to give
him time (one year) to speak for himself.


Mark
[Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                   Mon, Aug 1, 2011 at 8:35 PM
To: "Chris.raggio@gmail.com" <Chris.raggio@gmail.com>

   [Quoted text hidden]

---

**Donald Raggio** <donald.raggio@gmail.com>                                Mon, Aug 1, 2011 at 8:46 PM
To: djraggio@gmail.com



Begin forwarded message:

>    **From:** Mark Karpeles <admin@mtgox.com>
>    **Date:** August 1, 2011 11:31:15 AM CDT
>    **To:** Don Raggio <donald.raggio@gmail.com>
>    **Subject: Re:**


   [Quoted text hidden]

---

**Don Raggio** <donald.raggio@gmail.com>                                   Tue, Dec 20, 2011 at 12:50 AM
To: Mark Karpeles <admin@mtgox.com>
Bcc: djraggio@gmail.com

                                                              RAGGIO   00050

5 of 6                                                                                              2/28/2014 4:19 PM

[Thu Mar 3 12:21:16 2011] **Mark Karpelès:** mtgox.com's dns record has a 24 hours expiration
[Thu Mar 3 12:21:34 2011] **mtgox:** that isn't that bad
[Thu Mar 3 12:22:15 2011] **mtgox:** it usually switches sooner and it isn't that bad if people can't get to it for a few hours
[Thu Mar 3 12:22:59 2011] **Mark Karpelès:** also the ssl certificate may be compromised, will have to revoke it asap
[Thu Mar 3 12:26:02 2011] **Mark Karpelès:** no php file seems to have been modified
[Thu Mar 3 12:26:26 2011] **Mark Karpelès:** mh
[Thu Mar 3 12:26:47 2011] **Mark Karpelès:** not sure about the "tornado" thing running on port 8080
[Thu Mar 3 12:26:52 2011] **Mark Karpelès:** as root
[Thu Mar 3 12:27:24 2011] **mtgox:** are you comparing the php to something or just looking at mod dates?
[Thu Mar 3 12:27:32 2011] **Mark Karpelès:** I did just look at mod dates
[Thu Mar 3 12:27:45 2011] **mtgox:** that can be faked right?
[Thu Mar 3 12:27:57 2011] **Mark Karpelès:** yep, but usually people who erase /var/log do not go that far
[Thu Mar 3 12:28:09 2011] **mtgox:** once copied I'll run a diff against the zip you sent me
[Thu Mar 3 12:28:26 2011] **mtgox:** I'll send you a new zip. Since I changed a few things
[Thu Mar 3 12:28:38 2011] **Mark Karpelès:** the diff will show me that
[Thu Mar 3 12:28:45 2011] **Mark Karpelès:** I'll be more looking for suspicious things
[Thu Mar 3 12:28:50 2011] **mtgox:** ok
[Thu Mar 3 12:29:48 2011] **mtgox:** the tornado thing isn't essential yet
[Thu Mar 3 12:31:17 2011] **mtgox:** what is the new IP? I might as well get that going
[Thu Mar 3 12:32:59 2011] **Mark Karpelès:** 174.121.74.59
[Thu Mar 3 12:34:58 2011] **mtgox:** setting up ssl
[Thu Mar 3 12:36:17 2011] **mtgox:** ok I updated the DNS
[Thu Mar 3 12:37:42 2011] **Mark Karpelès:** I created dns oldgox.xta.net pointing to the ip of the server (more for me than for you I guess)
[Thu Mar 3 12:41:48 2011] **Mark Karpelès:** arg
[Thu Mar 3 12:42:32 2011] **Mark Karpelès:** the key is protected by password
[Thu Mar 3 12:44:09 2011] **mtgox:** mine? yeah
[Thu Mar 3 12:44:16 2011] **Mark Karpelès:** ok
[Thu Mar 3 12:44:35 2011] **Mark Karpelès:** I'll need that to setup it here (can't get a certificate until the domain is transfered)
[Thu Mar 3 12:45:08 2011] **mtgox:** pass is: 3r56t
[Thu Mar 3 12:46:51 2011] **Mark Karpelès:** ok
[Thu Mar 3 12:46:52 2011] **Mark Karpelès:** chain setup
[Thu Mar 3 12:46:55 2011] **Mark Karpelès:** ssl works
[Thu Mar 3 12:47:51 2011] **Mark Karpelès:** 4112 files
[Thu Mar 3 12:48:06 2011] **Mark Karpelès:** is there anywhere where write access is required?
[Thu Mar 3 12:48:19 2011] **Mark Karpelès:** oh, and I'll disable mtgox on the current server so people do not enter orders by mistake
[Thu Mar 3 12:48:37 2011] **mtgox:** did you already move the DB?
[Thu Mar 3 12:48:41 2011] **Mark Karpelès:** I will now
[Thu Mar 3 12:49:03 2011] **mtgox:** there was just a big trade
[Thu Mar 3 12:50:15 2011] **mtgox:** this theft will drive the BTC price down at least I bet so it won't be as big a loss as it seems now.
[Thu Mar 3 12:50:52 2011] **Mark Karpelès:** I guess so
[Thu Mar 3 12:50:56 2011] **Mark Karpelès:** still problematic
[Thu Mar 3 12:50:59 2011] **Mark Karpelès:** and it have a global impact
[Thu Mar 3 12:51:08 2011] **mtgox:** yeah
[Thu Mar 3 12:52:06 2011] **mtgox:** ug I hope no one has BTC being sent to us right now
[Thu Mar 3 12:52:23 2011] **Mark Karpelès:** I'll keep the wallet
[Thu Mar 3 12:52:35 2011] **Mark Karpelès:** shouldn't be a problem
[Thu Mar 3 12:52:36 2011] **mtgox:** but don't install it there
[Thu Mar 3 12:52:48 2011] **Mark Karpelès:** bitcoind will run on a different host anyway
[Thu Mar 3 12:54:31 2011] **Mark Karpelès:** meh?
[Thu Mar 3 12:54:34 2011] **Mark Karpelès:** mtgox db only 2MB?
[Thu Mar 3 12:54:52 2011] **mtgox:** yeah probably
[Thu Mar 3 12:55:26 2011] **mtgox:** the DB seems unmessed with as far as I can tell
[Thu Mar 3 12:55:40 2011] **Mark Karpelès:** ok
[Thu Mar 3 12:55:44 2011] **Mark Karpelès:** I restored it here
[Thu Mar 3 12:55:50 2011] **Mark Karpelès:** now need to locate the db config file
[Thu Mar 3 12:56:06 2011] **Mark Karpelès:** (I also chmod'ed 0000 the mtgox root so nobody can access the site and to trades)
[Thu Mar 3 12:56:08 2011] **mtgox:** oh one ugly thing would be if they grabbed the User table
[Thu Mar 3 12:56:26 2011] **Mark Karpelès:** passwords are not encrypted?
[Thu Mar 3 12:56:42 2011] **mtgox:** they are but just md5
[Thu Mar 3 12:56:49 2011] **Mark Karpelès:** ok

SRC14141

[Thu Mar 3 12:56:55 2011] **Mark Karpelès**: I'll upgrade that to salt md5 (crypt())
[Thu Mar 3 12:56:59 2011] **mtgox**: they can run an offline dictonary attack easily now
[Thu Mar 3 12:57:05 2011] **Mark Karpelès**: (ie. change password on login)
[Thu Mar 3 12:57:39 2011] **mtgox**: yeah we should probably do that
[Thu Mar 3 12:58:05 2011] **Mark Karpelès**: ok
[Thu Mar 3 12:58:11 2011] **Mark Karpelès**: anyway where is the database configured~
[Thu Mar 3 12:58:31 2011] **mtgox**: db layout.txt
[Thu Mar 3 12:58:49 2011] **Mark Karpelès**: and does it need db btcx ?
[Thu Mar 3 12:59:07 2011] **mtgox**: you can set the DB name in a config file for the site
[Thu Mar 3 12:59:11 2011] **Mark Karpelès**: I see it's used in "noserve"
[Thu Mar 3 12:59:26 2011] **mtgox**: yeah that is the config file
[Thu Mar 3 12:59:42 2011] **Mark Karpelès**: ok
[Thu Mar 3 12:59:48 2011] **Mark Karpelès**: so the database is btcx, and not mtgox ?
[Thu Mar 3 13:00:07 2011] **mtgox**: yeah
[Thu Mar 3 13:00:18 2011] **Mark Karpelès**: 3.8MB
[Thu Mar 3 13:00:21 2011] **Mark Karpelès**: bigger
[Thu Mar 3 13:00:49 2011] **Mark Karpelès**: restoring
[Thu Mar 3 13:01:41 2011] **Mark Karpelès**: ok
[Thu Mar 3 13:01:41 2011] **mtgox**: oh heh that was the DB for when mtgox was a completly different site
[Thu Mar 3 13:01:47 2011] **Mark Karpelès**: I see
[Thu Mar 3 13:01:51 2011] **mtgox**: soory about that
[Thu Mar 3 13:01:56 2011] **Mark Karpelès**: that one looks better
[Thu Mar 3 13:05:49 2011] **Mark Karpelès**: where are sessions stored?
[Thu Mar 3 13:06:02 2011] **mtgox**: another DB: sessions
[Thu Mar 3 13:06:05 2011] **Mark Karpelès**: yep
[Thu Mar 3 13:06:13 2011] **Mark Karpelès**: it's hard coded
[Thu Mar 3 13:06:15 2011] **Mark Karpelès**: I'll change that
[Thu Mar 3 13:07:26 2011] **mtgox**: there is also that blog DB for wordpress. But not very essential.
[Thu Mar 3 13:07:47 2011] **Mark Karpelès**: db "blog" ?
[Thu Mar 3 13:08:04 2011] **mtgox**: the name is "blog"
[Thu Mar 3 13:08:30 2011] **mtgox**: of the DB that my wordpress install was using
[Thu Mar 3 13:08:45 2011] **Mark Karpelès**: ok
[Thu Mar 3 13:08:50 2011] **Mark Karpelès**: history seems fine
[Thu Mar 3 13:09:24 2011] **Mark Karpelès**: most of the site seems to be working
[Thu Mar 3 13:09:51 2011] **mtgox**: ok let me give you the LR info so you can set that up
[Thu Mar 3 13:09:56 2011] **Mark Karpelès**: yep
[Thu Mar 3 13:09:58 2011] **Mark Karpelès**: in noserve
[Thu Mar 3 13:10:08 2011] **Mark Karpelès**: can you encrypt the data ?
[Thu Mar 3 13:10:19 2011] **Mark Karpelès**: I do not trust skype
[Thu Mar 3 13:11:25 2011] **mtgox**: what is the best way without using PGP?
[Thu Mar 3 13:11:33 2011] **Mark Karpelès**: meh
[Thu Mar 3 13:11:42 2011] **Mark Karpelès**: let me think
[Thu Mar 3 13:11:44 2011] **mtgox**: call you?
[Thu Mar 3 13:12:35 2011] **Mark Karpelès**: got a "SQL Error"
[Thu Mar 3 13:12:38 2011] **Mark Karpelès**: guess some stuff doesn't work yet
[Thu Mar 3 13:12:51 2011] **mtgox**: what is the error?
[Thu Mar 3 13:13:16 2011] **Mark Karpelès**: good question, there's nothing in phplog.txt
[Thu Mar 3 13:13:40 2011] **mtgox**: where do you get it? what file
[Thu Mar 3 13:13:44 2011] **mtgox**: happens on users/settings
[Thu Mar 3 13:13:56 2011] **Mark Karpelès**: seems unable to load current settings
[Thu Mar 3 13:14:12 2011] **mtgox**: is it a session maybe?
[Thu Mar 3 13:14:33 2011] **Mark Karpelès**: the session should be fine
[Thu Mar 3 13:16:43 2011] **mtgox**: oh did you change the name of the DB?
[Thu Mar 3 13:16:47 2011] **Mark Karpelès**: yes
[Thu Mar 3 13:17:03 2011] **mtgox**: it is hard wired on line 93 of UserController
[Thu Mar 3 13:17:43 2011] **Mark Karpelès**: ok
[Thu Mar 3 13:17:44 2011] **Mark Karpelès**: going to grep more
[Thu Mar 3 13:17:51 2011] **Mark Karpelès**: settings fixed
[Thu Mar 3 13:18:15 2011] **Mark Karpelès**: found 2 other hardwire
[Thu Mar 3 13:18:16 2011] **Mark Karpelès**: fixed

SRC14142

[Thu Mar 3 20:37:50 2011] **Mark Karpelès:** him
[Thu Mar 3 20:37:55 2011] **Mark Karpelès:** I see another failed withdraw
[Thu Mar 3 20:38:26 2011] **mtgox:** LR? or BTC?
[Thu Mar 3 20:38:30 2011] **Mark Karpelès:** LR
[Thu Mar 3 20:38:48 2011] **Mark Karpelès:** it's a "Can't parse" error, with empty result
[Thu Mar 3 20:39:15 2011] **Mark Karpelès:** I solved the previous ones by updating the token and running them manually
[Thu Mar 3 20:41:07 2011] **Mark Karpelès:** let's add more debug~
[Thu Mar 3 20:41:19 2011] **Mark Karpelès:** here
[Thu Mar 3 20:41:42 2011] **Mark Karpelès:** and process manually that withdraw
[Thu Mar 3 20:43:18 2011] **Mark Karpelès:** done
[Thu Mar 3 20:43:36 2011] **mtgox:** just uncomment line 133 in code/lr/functions.php
[Thu Mar 3 20:43:40 2011] **Mark Karpelès:** next time it fails, I'll know why
[Thu Mar 3 20:43:54 2011] **Mark Karpelès:** I already got the xml
[Thu Mar 3 20:44:07 2011] **Mark Karpelès:** just that curl failed, but I don't know why since result of curl_error() is not logged
[Thu Mar 3 20:44:18 2011] **Mark Karpelès:** I removed the code using ob_start() to capture curl result
[Thu Mar 3 20:44:25 2011] **Mark Karpelès:** replaced with use of CURLOPT_RETURNTRANSFER
[Thu Mar 3 20:44:29 2011] **mtgox:** oh ok
[Thu Mar 3 20:44:39 2011] **Mark Karpelès:** and added a check for failure, calling logMsg(curl_error($handler))
[Thu Mar 3 20:44:58 2011] **mtgox:** so you changed the password of the gmail email right?
[Thu Mar 3 20:45:02 2011] **Mark Karpelès:** yep
[Thu Mar 3 20:45:11 2011] **Mark Karpelès:** since there is a possibility it was compromised
[Thu Mar 3 20:45:28 2011] **Mark Karpelès:** replied to a couple of emails (solving people's issues)
[Thu Mar 3 20:45:38 2011] **Mark Karpelès:** I also located the bitcoin transaction causing all the bitcoins to disappear
[Thu Mar 3 20:45:46 2011] **Mark Karpelès:** in the wallet
[Thu Mar 3 20:45:57 2011] **mtgox:** which was it?
[Thu Mar 3 20:46:09 2011] **Mark Karpelès:** http://blockexplorer.com/tx/e67a0550848b7932d7796aeea16ab0e48a5cfe81c4e8cca2c5b03e0416850114
[Thu Mar 3 20:47:30 2011] **mtgox:** was this the only one?
[Thu Mar 3 20:47:39 2011] **mtgox:** so they only took 80k?
[Thu Mar 3 20:47:57 2011] **Mark Karpelès:** looks so
[Thu Mar 3 20:48:36 2011] **Mark Karpelès:** they took a big bunch of what was on the wallet
[Thu Mar 3 20:48:45 2011] **Mark Karpelès:** the remaining was withdrawn by people via the site
[Thu Mar 3 20:49:53 2011] **Mark Karpelès:** when I restored the wallet there was only 1.3 btc, which were owned by someone who did a deposit (directly credited to his account)
[Thu Mar 3 20:52:02 2011] **Mark Karpelès:** sent file "trx.png"<files alt=""><file size="100207" index="0">trx.png</file></files>
[Thu Mar 3 20:55:03 2011] **Mark Karpelès:** anyway I think we should update the inventory of mtgox assets
[Thu Mar 3 20:55:25 2011] **mtgox:** What do you mean?
[Thu Mar 3 20:56:33 2011] **Mark Karpelès:** I'd like to know how much of mtgox hasn't been stolen yet
[Thu Mar 3 20:56:57 2011] **mtgox:** well this is the only BTC stolen
[Thu Mar 3 20:57:04 2011] **mtgox:** the rest is in my wallet here
[Thu Mar 3 20:57:14 2011] **Mark Karpelès:** when compared to SELECT SUM(BTC),SUM(USD) FROM `Users`
[Thu Mar 3 20:57:47 2011] **mtgox:** and then there is the 50k USD stolen by the LR fraud - baron's money if we end up keeping that
[Thu Mar 3 20:59:10 2011] **Mark Karpelès:** 255563.728 BTC (5000 here) and 158928.208 USD (11573.47 here)
[Thu Mar 3 21:00:19 2011] **Mark Karpelès:** so we lost ~31% of the BTC
[Thu Mar 3 21:00:47 2011] **mtgox:** yeah something like that
[Thu Mar 3 21:01:53 2011] **Mark Karpelès:** btw for the schedule in the contract, I'll count that starting today (effective move of mtgox) and not since date of signature of contract
[Thu Mar 3 21:02:10 2011] **mtgox:** ok
[Thu Mar 3 21:02:32 2011] **Mark Karpelès:** or maybe march 1st, would be easier to compute
[Thu Mar 3 21:02:41 2011] **mtgox:** thats fine
[Thu Mar 3 21:02:55 2011] **Mark Karpelès:** ok
[Thu Mar 3 21:03:06 2011] **mtgox:** I think that is when I reset Gox Bot anyway
[Thu Mar 3 21:03:21 2011] **Mark Karpelès:** btw I also opened a mtgox twitter account
[Thu Mar 3 21:03:26 2011] **mtgox:** ok good
[Thu Mar 3 21:03:47 2011] **Mark Karpelès:** password update has already started
[Thu Mar 3 21:03:59 2011] **Mark Karpelès:** some people cannot login because their password was wrongly encoded, I'll add a workaround for that
[Thu Mar 3 21:05:06 2011] **Mark Karpelès:** I also fixed the 5 minutes cron
[Thu Mar 3 21:05:17 2011] **Mark Karpelès:** it needed 15 minutes to run, now only takes 1 minute
[Thu Mar 3 21:08:01 2011] **mtgox:** do you want to set up that tornado thing?
[Thu Mar 3 21:10:00 2011] **mtgox:** also how do you want to give me the email password?
[Thu Mar 3 21:11:05 2011] **Mark Karpelès:** mh
[Thu Mar 3 21:11:22 2011] **Mark Karpelès:** google has nothing for shared access?
[Thu Mar 3 21:12:57 2011] **mtgox:** what do you mean? well we could each have our own email@mtgox account

SRC14145

[Mon Apr 18 23:01:19 2011] **mtgox:** no you can email him to see what's up
[Fri Apr 22 07:10:46 2011] **mtgox:** hey can you hold the funds of user 231
[Fri Apr 22 07:11:05 2011] **mtgox:** he wants to borrow 8k with his btc as collateral
[Fri Apr 22 07:11:20 2011] **mtgox:** I've met him in person before and chatted with him a lot
[Fri Apr 22 07:12:33 2011] **mtgox:** I was about to take this offer at 1.2 though :)
[Fri Apr 22 07:12:44 2011] **mtgox:** oops wrong window
[Fri Apr 22 08:42:57 2011] **Mark Karpelès:** mh?
[Fri Apr 22 08:43:21 2011] **Mark Karpelès:** just the top 3 lines
[Fri Apr 22 08:43:46 2011] **mtgox:** basically can you hold the funds of user 231
[Fri Apr 22 08:43:57 2011] **Mark Karpelès:** ok
[Fri Apr 22 08:44:36 2011] **mtgox:** thanks. Gox seems to be rocking lately. on pace to make more than 100k in a year right
[Fri Apr 22 08:44:46 2011] **Mark Karpelès:** yeah
[Fri Apr 22 08:44:55 2011] **Mark Karpelès:** euro have been adding a lot of liquidity
[Fri Apr 22 08:45:05 2011] **Mark Karpelès:** there are 10~30 deposits each day processed automatically
[Fri Apr 22 08:45:11 2011] **mtgox:** awesome
[Fri Apr 22 08:45:35 2011] **mtgox:** have you looked into dwolla?
[Fri Apr 22 08:45:51 2011] **mtgox:** I'm kind of trying to close down this US account
[Fri Apr 22 08:46:21 2011] **Mark Karpelès:** heh
[Fri Apr 22 08:47:02 2011] **mtgox:** here I'm producing documentation to open the account, I'm almost done (waiting for my japanese bank to issue a few certificates), I'll send all that next week via fedex, and have the new bank account open probably early may
[Fri Apr 22 08:47:09 2011] **Mark Karpelès:** going to switch mtgox to the new system may 1st too
[Fri Apr 22 08:47:40 2011] **Mark Karpelès:** btw Dwolla is only available in US
[Fri Apr 22 08:48:00 2011] **mtgox:** yeah US is big though
[Fri Apr 22 08:49:18 2011] **Mark Karpelès:** mh
[Fri Apr 22 08:56:31 2011] **Mark Karpelès:** registered on dwolla :)
[Fri Apr 22 08:58:47 2011] **mtgox:** people are interested in options: http://www.bitcoin.org/smf/index.php?topic=6260.msg91874;topicseen#msg91874
[Fri Apr 22 08:58:56 2011] **mtgox:** this is maybe easier to implement than margin trading
[Fri Apr 22 09:01:59 2011] **Mark Karpelès:** btw I removed the sleep(6) on login
[Fri Apr 22 09:06:35 2011] **mtgox:** you have something else to prevent dictionary attacks now?
[Fri Apr 22 09:07:16 2011] **Mark Karpelès:** yep
[Fri Apr 22 09:07:27 2011] **Mark Karpelès:** I limit to 10 bad passwords per 24 hours per ip
[Fri Apr 22 09:07:38 2011] **mtgox:** ok good
[Fri Apr 22 09:07:48 2011] **Mark Karpelès:** new sql table LoginVelocity
[Fri Apr 22 10:58:35 2011] **mtgox:** http://www.bitcoin.org/smf/index.php?topic=6261.msg91924;topicseen#msg91924
[Fri Apr 22 11:00:01 2011] **Mark Karpelès:** you got the confirmation from the bank that funds from the other time cannot be reversed?
[Fri Apr 22 11:02:22 2011] **mtgox:** well I never asked but the transfer was between accounts authorized by him and he seems legit so I don't think it is a worry
[Fri Apr 22 11:02:33 2011] **Mark Karpelès:** ok
[Fri Apr 22 11:02:44 2011] **mtgox:** plus he is actually trading
[Fri Apr 22 11:03:14 2011] **mtgox:** I'd tell him why though. people like taht create a lot of volume for the site
[Fri Apr 22 22:03:44 2011] **mtgox:** you had gox bot sell?
[Fri Apr 22 22:19:19 2011] **Mark Karpelès:** yep
[Fri Apr 22 22:19:55 2011] **Mark Karpelès:** need to do accounting, and having all the assets at a fixed rate makes stuff easier
[Fri Apr 22 22:22:23 2011] **mtgox:** but you also need to refill the lost BTC
[Fri Apr 22 22:22:44 2011] **Mark Karpelès:** yep
[Fri Apr 22 22:23:55 2011] **mtgox:** well whatever you want to do but I think you should avoid selling the BTC if you can. it will be worth much more at the end of the year
[Fri Apr 22 22:23:58 2011] **Mark Karpelès:** however for the 2010 accounting it was better that way (need to fill the fee_* values too)
[Fri Apr 22 22:24:32 2011] **mtgox:** I'm working on improving the generation of bitcoin addresses on mtgox by not using the bitcoin client at all for that
[Fri Apr 22 22:58:49 2011] **Mark Karpelès:** oh btw if you could do a google docs spreadsheet or something with the mtgox funds/coins you still have, it'd make stuff easier here
[Fri Apr 22 23:00:24 2011] **mtgox:** ok
[Fri Apr 22 23:00:43 2011] **mtgox:** oh I was wondering. did baron ever contact you again?
[Fri Apr 22 23:01:18 2011] **mtgox:** only a bit
[Fri Apr 22 23:01:27 2011] **Mark Karpelès:** some stuff about starting a lawsuit or something
[Fri Apr 22 23:01:31 2011] **mtgox:** I sent him the address of my lawyer
[Fri Apr 22 23:01:34 2011] **Mark Karpelès:** didn't get anything since then
[Fri Apr 22 23:02:00 2011] **mtgox:** man I wish I had locked his funds when there was 75k in it. Oh well
[Fri Apr 22 23:02:50 2011] **Mark Karpelès:** well, here I'm trying to get a legal seal on this saying we are doing the right thing, however it'll require ~1 year or so
[Fri Apr 22 23:03:23 2011] **mtgox:** whoa a year
[Fri Apr 22 23:05:35 2011] **Mark Karpelès:** btw if you want to know, I wrote a system similar to blockexplorer that allows me to get an internal representation of the blockchain, and will allow me to easily check for incoming funds on LOTS of bitcoins addresses without having to poll the bitcoind for each address
[Fri Apr 22 23:05:54 2011] **Mark Karpelès:** planning on adding addr activity alerts too (to monitor bitcoin addrs holding stolen funds)

SRC14153

[Sat Apr 23 11:38:02 2011] **Mark Karpelès:** hi
[Sat Apr 23 11:38:20 2011] mtgox: hey
[Sat Apr 23 11:39:13 2011] **Mark Karpelès:** I'm on phone with Bruce, he asks if you got his deposit
[Sat Apr 23 11:39:25 2011] mtgox: yeah its pending
[Sat Apr 23 11:39:28 2011] **Mark Karpelès:** ok
[Sat Apr 23 11:40:02 2011] mtgox: you shoudl buy back those btc for gox bot. I have $80k pending
[Sat Apr 23 11:40:02 2011] **Mark Karpelès:** been talking about the article in Forbes
[Sat Apr 23 11:40:12 2011] mtgox: price will be $2 next week
[Sat Apr 23 11:40:26 2011] **Mark Karpelès:** tell bruce hi
[Sat Apr 23 11:42:44 2011] **Mark Karpelès:** he's going to help me open the bank account for the US company in NY
[Sat Apr 23 11:45:22 2011] mtgox: oh ok great
[Sat Apr 23 11:45:38 2011] **Mark Karpelès:** we'll try to get this running before Forbes is out
[Sat Apr 23 11:45:53 2011] mtgox: it already came out right?
[Sat Apr 23 11:46:08 2011] **Mark Karpelès:** the article is out online, but the printed copy will be out soon
[Sat Apr 23 11:46:27 2011] mtgox: I wonder what the difference in circulation is?
[Sat Apr 23 11:47:13 2011] **Mark Karpelès:** he predicts it's going to be a blast once out in print
[Sat Apr 23 11:53:43 2011] **Mark Karpelès:** ok
[Sat Apr 23 22:58:24 2011] mtgox: mtgox is seeming really slow?
[Sat Apr 23 23:00:03 2011] **Mark Karpelès:** let me check
[Sat Apr 23 23:21:31 2011] mtgox: does it seeem slow to you?
200 OK 12.66s
[Sat Apr 23 23:23:01 2011] **Mark Karpelès:** magicaltux@Memo1 ~ $ time curl -s http://mtgox.com >/dev/null

real 0m0.571s
user 0m0.000s
sys 0m0.000s
[Sat Apr 23 23:23:06 2011] **Mark Karpelès:** got 0.5s from Japan
[Sat Apr 23 23:23:25 2011] **Mark Karpelès:** that's slow, but not as excessive as 12s
[Sat Apr 23 23:23:51 2011] mtgox: this is when I do something like place an order
[Sat Apr 23 23:23:55 2011] mtgox: maybe it is the DB
[Sat Apr 23 23:24:01 2011] **Mark Karpelès:** ok
[Sat Apr 23 23:24:04 2011] **Mark Karpelès:** I/O sync
[Sat Apr 23 23:24:18 2011] **Mark Karpelès:** probably related to the chain import
[Sat Apr 23 23:25:24 2011] mtgox: seems better now I guess
[Sat Apr 23 23:26:16 2011] **Mark Karpelès:** reducing import speed
[Tue Apr 26 03:13:18 2011] mtgox: can you unblock account 231 when you get a chance
[Tue Apr 26 06:52:25 2011] mtgox: this idoc guy seems sketchy to me. I guess there isn't much we can do though
[Tue Apr 26 10:32:56 2011] **Mark Karpelès:** unblocking 231
[Tue Apr 26 10:33:22 2011] mtgox: k thanks
[Tue Apr 26 10:33:29 2011] **Mark Karpelès:** as for idoc, not much we can do indeed, I noticed right from the start he'd be troublesome
[Tue Apr 26 10:33:40 2011] **Mark Karpelès:** but I kinda hoped it'd get better with time
[Tue Apr 26 10:34:29 2011] mtgox: He really sounds like a teenager. I hope he isn't stealing his parents money or something crazy
[Tue Apr 26 10:37:23 2011] **Mark Karpelès:** well, in this kind of cases we are (kinda) covered by the fact his parents are the ones supposed to protect their bank account
[Tue Apr 26 10:37:39 2011] **Mark Karpelès:** and we won't be able to provide a refund without getting the "goods" back anyway
[Tue Apr 26 10:38:37 2011] mtgox: do you have a beta of the new site up yet?
[Tue Apr 26 10:39:29 2011] **Mark Karpelès:** btw I'll need a detail of each transaction since march (just need an excel sheet with date, account id and credit/debit, plus the source), and to know the exact total of USD handled by mtgox (mainly for accounting, at the fiscal year ended march 31st)
[Tue Apr 26 10:39:55 2011] **Mark Karpelès:** I'm still working on the beta, I mostly implemented /code/ again with the same API, and will use the same frontend for the time being
[Tue Apr 26 10:40:13 2011] **Mark Karpelès:** once I move stuff to my DB I'll be able to work on a new frontend without breaking anything
[Tue Apr 26 10:41:01 2011] mtgox: you can get that from the DB
[Tue Apr 26 10:41:08 2011] mtgox: just go
[Tue Apr 26 10:41:25 2011] **Mark Karpelès:** yep, I get the "manual" transactions from db
[Tue Apr 26 10:41:30 2011] **Mark Karpelès:** (type=9)
[Tue Apr 26 10:41:37 2011] mtgox: yep
[Tue Apr 26 10:42:06 2011] mtgox: mh
[Tue Apr 26 10:42:24 2011] **Mark Karpelès:** well, I'll account all those as is, and will not make accounting for the US bank fees for wires
[Tue Apr 26 10:45:54 2011] mtgox: btw
[Tue Apr 26 10:46:06 2011] **Mark Karpelès:** http://www.newbergconsulting.com/ <- I got someone with an email on this domain asking about the mtgox api
[Tue Apr 26 10:46:41 2011] mtgox: heh funny
[Tue Apr 26 10:46:59 2011] mtgox: I'm tempted to make a bot. It seems like it would be fun

SRC14154

[Fri Apr 29 12:07:21 2011] **Mark Karpelès:** let me create one
[Fri Apr 29 12:08:10 2011] **Mark Karpelès:** 1M5Rn7ej5dW7XHjtGW6cc9bZ6kAK5819hg
[Fri Apr 29 12:09:51 2011] **mtgox:** ok so we are all set for the BTC. I'll figure out the USD once you get your account set up and I can wire you the money
[Fri Apr 29 12:09:56 2011] **Mark Karpelès:** mh
[Fri Apr 29 12:10:00 2011] **Mark Karpelès:** this is going to have people talking
[Fri Apr 29 12:10:12 2011] **Mark Karpelès:** people were monitoring "that mysterious bitcoin address with 250kBTC"
[Fri Apr 29 12:10:28 2011] **mtgox:** was that mtgox?
[Fri Apr 29 12:10:31 2011] **Mark Karpelès:** no, that was you
[Fri Apr 29 12:10:39 2011] **mtgox:** oh heh
[Fri Apr 29 12:10:57 2011] **Mark Karpelès:** mtgox funds are in a machine that transfers funds all the time, even if no people are doing anything
[Fri Apr 29 12:11:14 2011] **Mark Karpelès:** so funds are never on the same addresses for too long
[Fri Apr 29 12:11:42 2011] **mtgox:** they'll just think they are going to be sold I bet
[Fri Apr 29 12:11:46 2011] **Mark Karpelès:** yep
[Fri Apr 29 12:11:54 2011] **Mark Karpelès:** makes sense when you see the current market
[Fri Apr 29 12:11:54 2011] **mtgox:** which is good
[Fri Apr 29 12:12:02 2011] **mtgox:** drive down that price
[Fri Apr 29 12:12:13 2011] **Mark Karpelès:** and buy btc while it's low
[Fri Apr 29 12:12:53 2011] **Mark Karpelès:** btw euro account has reached 90k€ in 3 weeks (133k$)
[Fri Apr 29 12:13:27 2011] **Mark Karpelès:** average of 17 incoming wires per day
[Fri Apr 29 12:13:40 2011] **Mark Karpelès:** (per working day, I should say)
[Fri Apr 29 12:13:47 2011] **Mark Karpelès:** and 12 outgoing wires
[Fri Apr 29 12:14:12 2011] **mtgox:** yeah mtgox is holding over 1 million $ if you count the btc
[Fri Apr 29 12:14:14 2011] **mtgox:** pretty crazy
[Fri Apr 29 12:14:27 2011] **Mark Karpelès:** agreed
[Fri Apr 29 12:14:38 2011] **Mark Karpelès:** and no reason to stop here anyway
[Fri Apr 29 12:14:50 2011] **Mark Karpelès:** today was pretty good (over 90k volume)
[Fri Apr 29 12:19:08 2011] **Mark Karpelès:** will probably go down during the weekend
[Fri Apr 29 12:19:46 2011] **mtgox:** oh also I made a separate account for my trade bot so it will be easy for me to keep track of how it is doing. could you get rid of its fee? account is BotBot
[Fri Apr 29 12:20:08 2011] **mtgox:** yeah doesn't seem to be anything big coming in on the US side at least
[Fri Apr 29 12:20:12 2011] **Mark Karpelès:** done
[Fri Apr 29 12:20:16 2011] **mtgox:** thanks
[Fri Apr 29 12:20:24 2011] **Mark Karpelès:** the ~25k$ came in?
[Fri Apr 29 12:20:30 2011] **mtgox:** yeah
[Fri Apr 29 12:20:40 2011] **mtgox:** he took it up to 2.5
[Fri Apr 29 12:20:45 2011] **Mark Karpelès:** I see
[Fri Apr 29 12:20:48 2011] **Mark Karpelès:** ok, anything from the idoc guy?
[Fri Apr 29 12:21:11 2011] **mtgox:** well the frist 20k + anoth 30k
[Fri Apr 29 12:21:18 2011] **Mark Karpelès:** ok
[Fri Apr 29 12:21:24 2011] **Mark Karpelès:** so he really sent another 30k
[Fri Apr 29 12:21:30 2011] **mtgox:** yeah
[Fri Apr 29 12:22:02 2011] **Mark Karpelès:** got another 15k from someone I guess
[Fri Apr 29 12:22:09 2011] **Mark Karpelès:** (already forwarded to you
[Fri Apr 29 12:22:47 2011] **mtgox:** you have to take in 15k or so a day or the price will drop right
[Fri Apr 29 12:23:00 2011] **mtgox:** since there are 7k btc made a day
[Fri Apr 29 12:23:08 2011] **mtgox:** europe already gets ~15k/day
[Fri Apr 29 12:23:14 2011] **Mark Karpelès:** well, except during weekend
[Fri Apr 29 12:28:01 2011] **Mark Karpelès:** added column "LastLogDate" to Users db so we can know who's not using their account anymore
[Fri Apr 29 12:28:22 2011] **Mark Karpelès:** anyway accounts with still the "old passwords" are those which haven't logged in even once since mtgox was moved
[Fri Apr 29 12:29:16 2011] **Mark Karpelès:** that would be 49886 USD and 17902 BTC
[Fri Apr 29 12:30:35 2011] **Mark Karpelès:** still it's been only 2 months
[Fri Apr 29 12:31:54 2011] **mtgox:** yeah there are place I haven't been for years but one day I'll go back to to claim some funds or whatever. Not sure you can ever really take it but it helps for buffer
[Fri Apr 29 12:32:24 2011] **Mark Karpelès:** yep, especially if we have to do international wires (delays, etc)
[Fri Apr 29 12:32:59 2011] **Mark Karpelès:** btw LR balance = $6,637.14
[Fri Apr 29 12:33:19 2011] **Mark Karpelès:** (got the ~9.5k from lr exchange + 5k deposit from someone else)
[Fri Apr 29 12:37:30 2011] **mtgox:** yeah I already started the process for the next one
[Fri Apr 29 12:39:44 2011] **Mark Karpelès:** ok
[Fri Apr 29 13:02:42 2011] **Mark Karpelès:** http://www.bitcoin.org/smf/index.php?topic=6762.0 <- already people talking
[Sat Apr 30 07:21:46 2011] **mtgox:** the other way I was thinking of getting the 95k btc back is:
[Sat Apr 30 07:22:28 2011] **mtgox:** sell a ton of btc 85k gets the price back to $1 and at that point hopefully the market will deflate further
[Sat Apr 30 07:22:44 2011] **mtgox:** giving us a chance to buy back the 95k

SRC14158

[Sat Apr 30 23:39:55 2011] **Mark Karpelès** :)
[Sat Apr 30 23:40:10 2011] **mtgox:** so put it low enough where I don't hit it :)
[Sat Apr 30 23:40:52 2011] **Mark Karpelès:** let's say 80k BTC, that's 120k$
[Sat Apr 30 23:40:57 2011] **Mark Karpelès:** let's give gox bot a loan big enough for this
[Sat Apr 30 23:41:45 2011] **mtgox:** ok. maybe better for a new account so the accounting is more clear?
[Sat Apr 30 23:42:10 2011] **Mark Karpelès:** not much of a problem, gox bot's balance is not authoritative anymore anyway
[Sat Apr 30 23:42:17 2011] **Mark Karpelès:** I'm using the Fee_* cols in trade table
[Sat Apr 30 23:42:23 2011] **Mark Karpelès:** and will add their content for older trades too
[Sat Apr 30 23:42:38 2011] **Mark Karpelès:** will be much better and provide accurate historical data
[Sat Apr 30 23:43:26 2011] **mtgox:** ok. actually can you wait to place the order? I'm wondering how far it will drop. I bet a lot of other speculators will also dump if they see it going down
[Sat Apr 30 23:43:37 2011] **Mark Karpelès:** yep
[Sat Apr 30 23:43:47 2011] **Mark Karpelès:** on the other side, going down = people will buy "while it's low"
[Sat Apr 30 23:43:58 2011] **mtgox:** but they can't get money in
[Sat Apr 30 23:44:19 2011] **mtgox:** ok gtg
[Sat Apr 30 23:44:25 2011] **mtgox:** talk to you soon
[Sat Apr 30 23:44:44 2011] **Mark Karpelès:** suppressed addition of funds to gox bot
[Sun May 1 20:48:04 2011] **mtgox:** .
[Sun May 1 20:48:31 2011] **mtgox:** did euro funds come in on the weekend?
[Sun May 1 20:51:31 2011] **mtgox:** any new ideas about the DDOS?
[Sun May 1 21:03:11 2011] **Mark Karpelès:** euro do not come in the weekend
[Sun May 1 21:03:27 2011] **Mark Karpelès:** as for the ddos, it seems obviously russia originated, and I'd be surprised it has no relation with btcex
[Sun May 1 21:03:33 2011] **Mark Karpelès:** I see you sold your coins?
[Sun May 1 21:03:44 2011] **mtgox:** I'm in the middle right now
[Sun May 1 21:03:53 2011] **mtgox:** there is a big wall at 2 though
[Sun May 1 21:04:10 2011] **mtgox:** and another at 1.5
[Sun May 1 21:05:03 2011] **Mark Karpelès:** :D
[Sun May 1 21:07:12 2011] **Mark Karpelès:** mh
[Sun May 1 21:07:18 2011] **mtgox:** I wish the real time mega chart worked
[Sun May 1 21:07:35 2011] **Mark Karpelès:** the real?
[Sun May 1 21:07:52 2011] **mtgox:** yeah there was a realtime one
[Sun May 1 21:08:01 2011] **mtgox:** hooked up to tornado
[Sun May 1 21:08:56 2011] **Mark Karpelès:** guess we could adapt it
[Sun May 1 21:14:42 2011] **mtgox:** oh that is gox bot at 1.5
[Sun May 1 21:14:56 2011] **Mark Karpelès:** yep
[Sun May 1 21:15:00 2011] **Mark Karpelès:** in semi dark
[Sun May 1 21:16:39 2011] **Mark Karpelès:** I've split in 1.5 1.2 1.1
[Sun May 1 21:20:34 2011] **mtgox:** oh and the gox bot funds are why I thought there was a large deposit
[Sun May 1 21:21:10 2011] **Mark Karpelès:** ah
[Sun May 1 21:21:10 2011] **Mark Karpelès:** :p
[Sun May 1 21:21:12 2011] **Mark Karpelès:** nah
[Sun May 1 21:21:18 2011] **Mark Karpelès:** I reset the fund and did a manual "loan"
[Sun May 1 21:21:50 2011] **mtgox:** I do: select sum(usd)/1000,sum(btc)/1000 from Users;
[Sun May 1 21:22:03 2011] **Mark Karpelès:** :)
[Sun May 1 21:22:06 2011] **Mark Karpelès:** you could exclude gox bot
[Sun May 1 21:22:12 2011] **Mark Karpelès:** (and myself too, I guess)
[Sun May 1 21:31:39 2011] **mtgox:** oh he admits the ddos
[Sun May 1 21:31:56 2011] **mtgox:** don't you run the jpy bank for him?
[Sun May 1 21:35:44 2011] **mtgox:** http://www.bitcoin.org/smf/index.php?topic=6864.40
[Sun May 1 21:36:16 2011] **Mark Karpelès:** yes, I do
[Sun May 1 21:36:20 2011] **Mark Karpelès:** well, let's say I did
[Sun May 1 21:36:40 2011] **mtgox:** is there anything in it?
[Sun May 1 21:37:04 2011] **Mark Karpelès:** no
[Sun May 1 21:37:04 2011] **mtgox:** wow what a crazy dude
[Sun May 1 21:37:05 2011] **Mark Karpelès:** zero
[Sun May 1 21:37:11 2011] **Mark Karpelès:** never had a single JPY deposit
[Sun May 1 21:40:29 2011] **Mark Karpelès:** anyway yesterday evening I had a really bad feeling, and transfered 200k BTC out of the online wallet system
[Sun May 1 21:40:36 2011] **Mark Karpelès:** onto an offline wallet
[Sun May 1 21:40:45 2011] **mtgox:** good
[Sun May 1 21:41:04 2011] **Mark Karpelès:** I'm the kind of sysadmin who gets bad feelings before bad stuff happens
[Sun May 1 21:41:20 2011] **mtgox:** there was no break in though?

SRC14161

[Fri May 6 07:32:02 2011]  **mtgox:**  hey http://mtmm.xta.net/CSA/California/www.carbs.xta.net/if_ethorhtml seems fine but I can't load the site
[Fri May 6 07:39:57 2011]  **mtgox:**  is the websocket down?
[Fri May 6 07:40:09 2011]  **mtgox:**  I can get the site fine now
[Fri May 6 07:40:17 2011]  **mtgox:**  but the websocket seems down
[Fri May 6 07:50:50 2011]  **Mark Karpelès:**  mh
[Fri May 6 07:50:53 2011]  **Mark Karpelès:**  I'll reload websocket
[Fri May 6 07:51:12 2011]  **Mark Karpelès:**  reloaded
[Fri May 6 07:54:19 2011]  **mtgox:**  ok thanks working now
[Fri May 6 07:55:26 2011]  **Mark Karpelès:**  btw I understand you don't want to manage the bank account anymore, I need to tell me when you do this kind of things, would make it easier to plan
[Fri May 6 07:55:42 2011]  **Mark Karpelès:**  I paid a guy to go to US bring the stuff and open the bank account directly next week
[Fri May 6 07:55:59 2011]  **mtgox:**  what happened to the agent?
[Fri May 6 07:56:16 2011]  **mtgox:**  I did tell you? you said may 1st in the middle of april
[Fri May 6 07:56:18 2011]  **Mark Karpelès:**  h's still doing his work
[Fri May 6 07:56:26 2011]  **Mark Karpelès:**  I told you agent => middle of may
[Fri May 6 07:56:38 2011]  **mtgox:**  also you have dwolla now right
[Fri May 6 07:56:43 2011]  **mtgox:**  so you don't really need an account
[Fri May 6 07:56:57 2011]  **Mark Karpelès:**  I probably don't have enough funds on dwolla
[Fri May 6 07:57:05 2011]  **Mark Karpelès:**  (unless I link the dwolla account to a bank account)
[Fri May 6 07:57:15 2011]  **Mark Karpelès:**  new site version was planned for may 1st, however I'll have to wait a bit there to settle the ddos problem first
[Fri May 6 07:57:21 2011]  **mtgox:**  But just take deposits on dwolla
[Fri May 6 07:57:29 2011]  **mtgox:**  I'm still doing the withdrawals
[Fri May 6 07:57:37 2011]  **Mark Karpelès:**  yep
[Fri May 6 07:57:38 2011]  **Mark Karpelès:**  ok
[Fri May 6 07:58:02 2011]  **Mark Karpelès:**  any info on the things I sent you (people credited by error)?
[Fri May 6 07:58:45 2011]  **mtgox:**  I think that eof guy is wrong but I'm not going to argue
[Fri May 6 07:58:55 2011]  **mtgox:**  the other was just a mistake
[Fri May 6 07:59:05 2011]  **Mark Karpelès:**  ok
[Fri May 6 07:59:06 2011]  **mtgox:**  sucks to do this stuff manually
[Fri May 6 07:59:10 2011]  **mtgox:**  yep
[Fri May 6 07:59:15 2011]  **Mark Karpelès:**  want me to do a little interface on the current mtgox?
[Fri May 6 07:59:29 2011]  **Mark Karpelès:**  like have people input their bank info, remove the money from their mtgox account and send you an email to jed@mtgox.com with all the infos ?
[Fri May 6 08:00:03 2011]  **mtgox:**  well it would have been nice awhile ago but it shouldn't be that much more like this right?
[Fri May 6 08:00:25 2011]  **mtgox:**  I can also fund your dwolla account
[Fri May 6 08:00:32 2011]  **Mark Karpelès:**  this way you wouldn't have to remove manually, people would be capped to $1000/day (and have to retry next day to get more)
[Fri May 6 08:00:50 2011]  **Mark Karpelès:**  you'd need a dwolla account too, and you'll be capped to $10000/trx (if company, $5000 if private)
[Fri May 6 08:01:06 2011]  **mtgox:**  a day?
[Fri May 6 08:01:24 2011]  **Mark Karpelès:**  I'd have to check, but I think so
[Fri May 6 08:01:44 2011]  **mtgox:**  that should be ok
[Fri May 6 08:02:50 2011]  **mtgox:**  are they attacking right now? the bot keeps timing out when it tries to make trades
[Fri May 6 08:02:58 2011]  **Mark Karpelès:**  nope
[Fri May 6 08:03:23 2011]  **Mark Karpelès:**  will submit ticket
[Fri May 6 11:16:14 2011]  **Mark Karpelès:**  got some funds in, btw
[Fri May 6 11:16:33 2011]  **mtgox:**  in dwolla?
[Fri May 6 11:16:40 2011]  **Mark Karpelès:**  no, in intl wire
[Fri May 6 11:16:50 2011]  **Mark Karpelès:**  bitcoin price will go up again in a short time
[Fri May 6 11:17:14 2011]  **mtgox:**  k thanks
[Fri May 6 11:17:46 2011]  **Mark Karpelès:**  and I'll have more LR by monday
[Fri May 6 11:18:39 2011]  **mtgox:**  if this bot of mine works it will really reduce the volatility of the market
[Fri May 6 12:39:10 2011]  **Mark Karpelès:**

Mark,

I made some adjustments, so your user should not have any access issues.

Best regards,
[Fri May 6 12:39:16 2011]  **Mark Karpelès:**  regarding the problems you had earlier
[Fri May 6 23:00:50 2011]  **mtgox:**  I have a deposit for 1234.56 but no corresponding email?
[Fri May 6 23:52:09 2011]  **Mark Karpelès:**  let me check
[Fri May 6 23:52:56 2011]  **Mark Karpelès:**  account: ericools
[Sat May 7 00:11:19 2011]  **mtgox:**  I'm getting access denied when I try to select on Activity_Btc_Added
[Sat May 7 00:11:53 2011]  **Mark Karpelès:**  mh?

SRC14166

[Sat May 7 00:12:01 2011] **Mark Karpelès:** all, the usual bug when one dumps a view

[Sat May 7 00:12:03 2011] **Mark Karpelès:** need to fix that

[Sat May 7 00:29:13 2011] **mtgox:** Is it possible that you dont send some trades to the websocket? The buys and sells I'm getting seemed to have missed a trade that is in my history

[Sat May 7 00:30:20 2011] **mtgox:** maybe if the trade happens in a particular way it isn't sent?

[Sat May 7 00:30:38 2011] **Mark Karpelès:** I added code where there is insertion in Trade to push those to the ws

[Sat May 7 00:31:16 2011] **Mark Karpelès:** btw, I'm still fighting with LR api, it sucks

[Sat May 7 00:32:15 2011] **mtgox:** yeah their thing kind of sucks

[Sat May 7 00:32:26 2011] **Mark Karpelès:** they use a mysql-like date format

[Sat May 7 00:32:31 2011] **Mark Karpelès:** but put the day before the month

[Sat May 7 00:32:39 2011] **Mark Karpelès:** 2011-24-03 16:10:41

[Sat May 7 00:34:40 2011] **Mark Karpelès:** ok fixed

[Sat May 7 00:36:08 2011] **Mark Karpelès:** now I have the whole LR history stored in db, and it'll update automatically, will be easier than using their f*cking interface

[Sat May 7 00:37:15 2011] **Mark Karpelès:** and I'll make it so when LR calls the "status" url, I just check for new lines and credit the appropriate accounts, even if one was missed previously (will avoid all those LR troubles when their API isn't working rightà

[Sat May 7 00:41:37 2011] **mtgox:** I'm pretty sure you didn't send a trade. I'll log higher up to make certain

[Sat May 7 00:46:05 2011] **Mark Karpelès:** possible the http request failed

[Sat May 7 00:46:18 2011] **Mark Karpelès:** anyway, time to sleep

[Sat May 7 00:46:36 2011] **Mark Karpelès:** (and dwolla contacted me to check my EIN number)

[Sat May 7 00:46:54 2011] **mtgox:** there isn't an http request

[Sat May 7 00:47:19 2011] **mtgox:** > (and dwolla contacted me to check my EIN number)

[Sat May 7 00:47:24 2011] **mtgox:** that is fine right?

[Sat May 7 00:47:32 2011] **Mark Karpelès:** yep, I sent them the IRS letter back

[Sat May 7 00:47:43 2011] **Mark Karpelès:** as for the http req, it's mtgox => websocket server

[Sat May 7 00:48:19 2011] **mtgox:** oh I see

[Sat May 7 00:49:04 2011] **mtgox:** is it hard to fix that access denied thing before you go to bed?

[Sat May 7 00:49:14 2011] **Mark Karpelès:** access denied?

[Sat May 7 00:49:36 2011] **mtgox:** for the Activity_Usd_Added table

[Sat May 7 00:49:44 2011] **Mark Karpelès:** ah

[Sat May 7 00:49:45 2011] **Mark Karpelès:** one sec

[Sat May 7 00:51:24 2011] **Mark Karpelès:** fxed

[Sat May 7 00:51:32 2011] **mtgox:** k thanks

[Sat May 7 09:46:52 2011] **mtgox:** ug I thought those ddosers gave up

[Sat May 7 14:19:55 2011] **mtgox:** does the attack still seem weak to you?

[Sat May 7 21:55:27 2011] **mtgox:** let me know when you are back

[Sat May 7 21:55:35 2011] **mtgox:** site is still down

[Sat May 7 22:50:44 2011] **mtgox:** it blocked me

[Sat May 7 22:51:01 2011] **mtgox:** "Too many failure from your IP, temporarily blocked"

[Sat May 7 22:51:05 2011] **mtgox:** my first attempt

[Sun May 8 03:17:15 2011] **mtgox:** pycurl.error: (60, 'Peer certificate cannot be authenticated with known CA certificates')

[Sun May 8 03:17:41 2011] **mtgox:** when I try to get my orders with my bot

[Sun May 8 06:18:29 2011] **mtgox:** did you just change your cert?

[Sun May 8 06:19:18 2011] **mtgox:** wget https://mtgox.com

--2011-05-07 21:13:06-- https://mtgox.com/

Resolving mtgox.com... 199.59.163.86

Connecting to mtgox.com|199.59.163.86|:443... connected.

ERROR: cannot verify mtgox.comâs certificate, issued by â/C=IL/O=StartCom Ltd./OU=Secure Digital Certificate Signing/CN=StartCom Class 2 Primary Intermediate Server CAâ

Unable to locally verify the issuerâs authority.

ERROR: certificate common name âwww.mtgox.comâmtgox.comâ

To connect to mtgox.com insecurely, use â--no-check-certificateâ.

[Sun May 8 06:19:27 2011] **mtgox:** this was fine yesterday

[Mon May 9 07:48:42 2011] **Mark Karpelès:** you may need to install the intermediate certificate to your local trust store

[Mon May 9 07:49:20 2011] **mtgox:** but it is just weird that it happened all the sudden

[Mon May 9 07:50:12 2011] **Mark Karpelès:** it's linked to the proxy, that does not handle serving intermediate certificates

[Mon May 9 07:50:56 2011] **Mark Karpelès:** mh

[Mon May 9 07:51:08 2011] **Mark Karpelès:** btw I rewrote LR so withdraws are handled async

[Mon May 9 07:51:18 2011] **mtgox:** my main issue is not getting all the trades. but I worked around it pretty much I think

[Mon May 9 07:54:11 2011] **Mark Karpelès:** any pattern on the trades you are not getting?

[Mon May 9 07:54:55 2011] **mtgox:** I can't quite tell. I'm pretty sure it is some depth changes also.

[Mon May 9 07:55:33 2011] **mtgox:** There is some chance it is this pythin websocket implementation but I don't really see what is going wrong

[Mon May 9 07:55:36 2011] **Mark Karpelès:** will be easier with the new mtgox for me, anyway, the current code is a bit hacky

SRC14167

[Wed May 11 11:15:12 2011] **mtgox:** so can your point people to withdraw by dwolla rather than ACH now?
[Wed May 11 11:15:21 2011] **Mark Karpelès:** yep
[Wed May 11 11:15:25 2011] **Mark Karpelès:** I'll try as much as possible
[Wed May 11 11:15:31 2011] **Mark Karpelès:** however dwolla funds will not be enough
[Wed May 11 11:15:47 2011] **Mark Karpelès:** since I use a withdraw queue, it should be fine
[Wed May 11 11:16:26 2011] **mtgox:** I'll be adding 5k a day and deposits should be more than withdrawals still
[Wed May 11 11:16:34 2011] **Mark Karpelès:** yep
[Wed May 11 11:16:48 2011] **Mark Karpelès:** still got some guys wiring insane amounts of money to here in Japan
[Wed May 11 11:17:12 2011] **Mark Karpelès:** good thing is once I get the US bank account, I'll be able to wire to there for 350¥ (~US$4.3)
[Wed May 11 11:17:35 2011] **Mark Karpelès:** cheapest intl wire possible:)
[Wed May 11 11:17:40 2011] **mtgox:** I'll also just transfer my balance to it
[Wed May 11 11:17:56 2011] **Mark Karpelès:** yep
[Wed May 11 12:00:53 2011] **mtgox:** why is fee_usd negative on some trades?
[Wed May 11 12:04:25 2011] **Mark Karpelès:** brace for impact
[Wed May 11 12:05:28 2011] **Mark Karpelès:** I probably ran an old request by mistake when trying to get back the original request, after exporting those data for accounting
[Wed May 11 12:06:13 2011] **Mark Karpelès:** could fix that easily, just hadn't time for that yet
[Wed May 11 12:06:36 2011] **mtgox:** heh ok but the btc one is correct?
[Wed May 11 12:06:47 2011] **Mark Karpelès:** most likely
[Wed May 11 12:06:59 2011] **Mark Karpelès:** I'll re-run the queries to fix this
[Wed May 11 12:07:42 2011] **Mark Karpelès:** waiting to see a new high
[Wed May 11 12:08:12 2011] **mtgox:** I'm still trying to figure out how to deal with this 95k btc debt. I sort of feel like you should start transitioning the btc debt to usd debt
[Wed May 11 12:08:41 2011] **Mark Karpelès:** I'm discussing this too here, and we got a few strategies ready for this
[Wed May 11 12:09:03 2011] **mtgox:** I was trying to think of something with options but doesn't seem better
[Wed May 11 11:07 2011] **mtgox:** if you just let fees cover it you will be throwing away a ton of money I think
[Wed May 11 12:15:11 2011] **mtgox:** what are your ideas?
[Wed May 11 12:18:29 2011] **mtgox:** well right before those wires hit I think you should buy up to 6 or so. This will knock 15k btc off it at least
[Wed May 11 12:18:43 2011] **Mark Karpelès:** one of the possibilities will be to invest in some mining hardware/staff, and I'm also seeing to have a mtgox-affiliated mining pool (more miners => we collect a lot of btc without doing anything => and we can also send mtgox BTC transactions without any fees)
[Wed May 11 12:21:18 2011] **mtgox:** mining sounds good but did you calculate how much mining you would need to do? Looks something like 62 cards for a year at current difficulty
[Wed May 11 12:21:52 2011] **Mark Karpelès:** that's why I'm negociating stuff, and seeing how cheap I can get hardware here.
[Wed May 11 12:22:13 2011] **Mark Karpelès:** also got a few contacts from people with a lot of btc who are looking to sell
[Wed May 11 12:23:34 2011] **mtgox:** that would be a good option
[Wed May 11 12:23:42 2011] **Mark Karpelès:** yep
[Wed May 11 12:24:29 2011] **mtgox:** The thing is you can always do these other things that make btc but you are still trowing money away if the price of BTC goes up. Seems safer to convert the debt and then do these other things
[Wed May 11 12:25:24 2011] **mtgox:** the market is most likely not going to sustain the current rate anyway
[Wed May 11 12:25:48 2011] **mtgox:** why do you think that?
[Wed May 11 12:26:24 2011] **mtgox:** when talking to these guys about buying btc if it will help to make the price lower I can also take a chunk from them
[Wed May 11 12:27:29 2011] **Mark Karpelès:** yep, anyway solving this is urgent, but acting too fast is not good either
[Wed May 11 12:29:18 2011] **mtgox:** I'm not saying buy it all off the market just do it in little bursts to start to limit the exposure
[Thu May 12 07:27:32 2011] **Mark Karpelès:** funds on dwolla won't be able to keep up with the withdraws
[Thu May 12 07:33:56 2011] **mtgox:** how much is in there now?
[Thu May 12 07:34:11 2011] **mtgox:** what is the withdraw rate ~ 10k a day?
[Thu May 12 07:34:39 2011] **Mark Karpelès:** 14k
[Thu May 12 07:35:20 2011] **mtgox:** well I think starting tomorrow you will be getting 5k a day from me
[Thu May 12 07:35:53 2011] **Mark Karpelès:** ok
[Fri May 13 01:29:51 2011] **mtgox:** you there?
[Fri May 13 06:55:42 2011] **Mark Karpelès:** yes
[Fri May 13 06:57:08 2011] **mtgox:** Can you think of some reason why I get "Not logged in" when I try to get my orders now with the bot?
[Fri May 13 06:57:47 2011] **Mark Karpelès:** there has been no changes on this point
[Fri May 13 06:57:57 2011] **mtgox:** so weird
[Fri May 13 06:57:58 2011] **Mark Karpelès:** ah, except if you did too many bad passwords
[Fri May 13 06:58:01 2011] **Mark Karpelès:** tell me your bot's ip
[Fri May 13 06:58:32 2011] **mtgox:** 201.191.119.69
[Fri May 13 06:58:36 2011] **mtgox:** that is why I'm sure
[Fri May 13 06:58:47 2011] **mtgox:** I changed my pass and forgot to tell the bot
[Fri May 13 06:58:57 2011] **mtgox:** oh wait
[Fri May 13 06:59:01 2011] **mtgox:** wrong IP
[Fri May 13 07:01:07 2011] **Mark Karpelès:** $40.91 balance on dwolla now (but only $5.6k of pending withdraws)
[Fri May 13 07:02:45 2011] **mtgox:** it is: 50.17.205.179
[Fri May 13 07:02:58 2011] **mtgox:** did my 5k hit?

SRC14170

[Wed May 18 08:33:12 2011] **Mark Karpelès:** Peter Vessenes
[Wed May 18 08:33:32 2011] **mtgox:** are you serious. what an asshole
[Wed May 18 08:33:37 2011] **mtgox:** can you forward me the email?
[Wed May 18 08:33:49 2011] **Mark Karpelès:** yep
[Wed May 18 08:34:04 2011] **Mark Karpelès:** forwarded
[Wed May 18 08:34:42 2011] **mtgox:** god I hat that guy
[Wed May 18 08:34:48 2011] **mtgox:** er hate
[Wed May 18 08:34:54 2011] **mtgox:** this is total BS
[Wed May 18 08:35:08 2011] **mtgox:** you can look up all our email exchanges
[Wed May 18 08:35:23 2011] **Mark Karpelès:** well, I'm not worried anyway
[Wed May 18 08:36:32 2011] **mtgox:** don't even reply to him
[Thu May 19 10:23:20 2011] **mtgox:** hey so is the dwolla deposit rate greater than withdrawals now?
[Thu May 19 10:23:37 2011] **mtgox:** do I need to deposit more or is it ok?
[Thu May 19 10:24:51 2011] **Mark Karpelès:** Not ok yet
[Thu May 19 10:25:01 2011] **Mark Karpelès:** And this is crazy btw
[Thu May 19 10:25:07 2011] **mtgox:** what?
[Thu May 19 10:25:19 2011] **Mark Karpelès:** Really got 500k in bank here
[Thu May 19 10:25:33 2011] **mtgox:** wow
[Thu May 19 10:25:36 2011] **mtgox:** so it is hitting now?
[Thu May 19 10:25:44 2011] **Mark Karpelès:** Running background checks with the bank of japan
[Thu May 19 10:25:48 2011] **mtgox:** so curious what that is going to do to the rate
[Thu May 19 10:25:59 2011] **mtgox:** is the guy from the US?
[Thu May 19 10:26:21 2011] **Mark Karpelès:** It'll hit soon, dunno if the guy intends to move btc to heavens or buy bits by bits
[Thu May 19 10:26:41 2011] **Mark Karpelès:** The guy has an address in hawaii
[Thu May 19 10:27:01 2011] **mtgox:** There is actually enough to cover it up to about 10.5 or so
[Thu May 19 10:27:09 2011] **mtgox:** which is also crazy
[Thu May 19 10:27:14 2011] **Mark Karpelès:** When I lookup his name I get tons of pages about some lawyer
[Thu May 19 10:27:26 2011] **mtgox:** what is his name>
[Thu May 19 10:27:28 2011] **mtgox:** ?
[Thu May 19 10:27:31 2011] **Mark Karpelès:** Not sure if same guy
[Thu May 19 10:27:59 2011] **Mark Karpelès:** Ryan M Grant
[Thu May 19 10:28:45 2011] **Mark Karpelès:** That's the name provided by the remote bank, Standard Chartered Bank
[Thu May 19 10:30:03 2011] **Mark Karpelès:** I'll have to call the bank anyway
[Thu May 19 21:43:56 2011] **mtgox:** that is a bit scary. mr 500k just put in a lot of really low bids
[Thu May 19 21:46:56 2011] **mtgox:** mh
[Thu May 19 21:47:11 2011] **Mark Karpelès:** somehow it's better for me
[Thu May 19 21:48:17 2011] **Mark Karpelès:** gives me some time to get funds around before he buys expensive and have LR run dry
[Thu May 19 21:48:25 2011] **mtgox:** that is true
[Thu May 19 21:48:38 2011] **mtgox:** I just wonder if he knows that it will drop
[Thu May 19 21:50:29 2011] **Mark Karpelès:** maybe he just hopes
[Thu May 19 21:51:32 2011] **mtgox:** yeah it is just weird since I think everyother large deposit just bought up all the coins it could instantly
[Thu May 19 21:53:35 2011] **Mark Karpelès:** well, he got plently to play around
[Sat May 21 08:36:09 2011] **mtgox:** man it is tanking
[Sat May 21 10:12:46 2011] **mtgox:** hmm is the server having issues?
[Sat May 21 10:21:11 2011] **mtgox:** I get: "Another trade is still in progress, please retry in a few seconds"
[Sat May 21 10:30:43 2011] **mtgox:** Well now I'm just getting Connection refused on the websocket
[Sat May 21 10:40:04 2011] **mtgox:** websocket seems ok again
[Sat May 21 11:13:54 2011] **mtgox:** well something is still screwy. Bot is missing a lot of messages
[Sun May 22 10:06:55 2011] **Mark Karpelès:** hi
[Sun May 22 10:07:12 2011] **Mark Karpelès:** finally got the bank account setup, I should receive the last details this week via fedex
[Sun May 22 10:13:57 2011] **mtgox:** ok great
[Sun May 22 10:14:18 2011] **mtgox:** I was thinking you should probably look into registering as an msb in the US
[Sun May 22 10:14:41 2011] **mtgox:** I don't think it actually costs much at the federal level. It is just the states that get you
[Sun May 22 10:15:11 2011] **mtgox:** I'm pretty sure you are in violation of US law right now
[Sun May 22 10:15:26 2011] **mtgox:** which maybe you don't care about if you never go to the US?
[Sun May 22 10:16:53 2011] **Mark Karpelès:** Well, I don't care really much, however I think it's a good idea to be on line with regulations
[Sun May 22 10:17:01 2011] **Mark Karpelès:** I'll check the costs t oregister as MSB, and what it implies
[Sun May 22 10:21:50 2011] **Mark Karpelès:** I wonder how a japanese company registers as MSB in US
[Sun May 22 11:09:57 2011] **mtgox:** Well it will be bad if the US declares it unlicensed or what ever maybe not for you personally but for the site in general it could cause problems
[Sun May 22 11:10:20 2011] **mtgox:** I'll try to find a good lawyer for you to talk to about this

SRC14175

[Sun May 22 11:11:59 2011] **Mark Karpelès:** ok
[Tue May 24 21:59:53 2011] mtgox: hey how is dwolla holding up?
[Tue May 24 22:02:02 2011] **Mark Karpelès:** not bad
[Tue May 24 22:02:06 2011] **Mark Karpelès:** btw want the US account infos ?
[Tue May 24 22:02:26 2011] mtgox: sure can you email it to me
[Tue May 24 22:02:27 2011] **Mark Karpelès:** ok
[Tue May 24 22:03:56 2011] **Mark Karpelès:** sent
[Tue May 24 22:07:05 2011] mtgox: so at somepoint I need to tally up how much USD I owe you. Have time to do it now? I just need the amount you are holding in the various accounts
[Tue May 24 22:07:24 2011] **Mark Karpelès:** heh
[Tue May 24 22:07:49 2011] mtgox: that's going to be a pain, and we don't need to forget that goxbot's balance is "wrong"
[Tue May 24 22:08:06 2011] **Mark Karpelès:** (well, he has zero)
[Tue May 24 22:08:12 2011] mtgox: yeah yeah
[Tue May 24 22:08:33 2011] mtgox: and I need to figure in the trade fees
[Tue May 24 22:08:48 2011] **Mark Karpelès:** I got xls files for the trade fee
[Tue May 24 22:08:52 2011] **Mark Karpelès:** for march & april
[Tue May 24 22:09:17 2011] **Mark Karpelès:** fichiers envoyés "Trades_201103.xls", "Trades_201104.xls"<files alt=""><file size="554496" index="0">Trades_201103.xls</file><file size="3056640" index="1">Trades_201104.xls</file>
</files>
[Tue May 24 22:09:20 2011] mtgox: I'll just select sum(fee_usd) from the DB
[Tue May 24 22:09:29 2011] **Mark Karpelès:** nah, it's borked for one of the months
[Tue May 24 22:09:36 2011] mtgox: oh ok
[Tue May 24 22:09:41 2011] **Mark Karpelès:** there are negative fees
[Tue May 24 22:10:03 2011] mtgox: oh I thought you fixed that
[Tue May 24 22:11:10 2011] **Mark Karpelès:** not high priority since I already got the xls files
[Tue May 24 22:11:29 2011] **Mark Karpelès:** and more busy working on the legal context with some lawyers than on the database data nobody can see
[Tue May 24 22:12:18 2011] mtgox: japanese lawyers?
[Tue May 24 22:12:32 2011] mtgox: they still say everything is fine?
[Tue May 24 22:12:55 2011] **Mark Karpelès:** international lawyers in Japan
[Tue May 24 22:13:10 2011] **Mark Karpelès:** they cover ~100 countries and are quite expensive, however I got some contacts
[Tue May 24 22:21:03 2011] mtgox: do you have other people working on the code at this point or just you?
[Tue May 24 22:22:38 2011] **Mark Karpelès:** I make the main changes, and got a tester, and a reviewer
[Tue May 24 22:31:30 2011] **Mark Karpelès:** mh
[Tue May 24 22:31:43 2011] **Mark Karpelès:** accounting is difficult since there are funds in many places which are currently moving
[Tue May 24 22:32:20 2011] mtgox: yeah there are 4 accounts right? LR, dwolla, Euro, JPY
[Tue May 24 22:33:16 2011] **Mark Karpelès:** also USD in Japan
[Tue May 24 22:33:33 2011] **Mark Karpelès:** and australia too
[Tue May 24 22:33:35 2011] mtgox: have you spent money out of the accounts for anything other than withdrawals?
[Tue May 24 22:34:18 2011] **Mark Karpelès:** nothing that isn't accounted for (basically, lawyer fees, and stuff for the new support staff)
[Tue May 24 22:35:16 2011] mtgox: well it is only going to become more of a mess so we should set aside some time to do it soonish
[Tue May 24 22:35:23 2011] **Mark Karpelès:** yep
[Tue May 24 22:35:33 2011] **Mark Karpelès:** anyway finally got a bank in US, will make things easier
[Tue May 24 22:36:02 2011] **Mark Karpelès:** oh and the new lady doing support also has some background in accounting, and will help me account for all those funds to make sure everything's fine
[Tue May 24 22:37:41 2011] mtgox: ok I guess you can just send me a snapshot at anypoint and I can figure it out. Just need the gox balance and everything you have and everything you have spent
[Tue May 24 22:38:55 2011] **Mark Karpelès:** yep
[Tue May 24 22:40:42 2011] **Mark Karpelès:** I could also analyze each operation type=9 since the start and assign each one to something
[Tue May 24 22:40:47 2011] mtgox: you don't have a list of what you are working on for the site by anychance? It would make me bug you less if I could see what was coming down the pipe
[Tue May 24 22:40:49 2011] **Mark Karpelès:** will have to at a point, anyway
[Tue May 24 22:41:08 2011] **Mark Karpelès:** can't audit the whole system without this info
[Tue May 24 22:41:12 2011] mtgox: Yeah I want to do the accounting in a few ways just to make sure
[Tue May 24 22:41:44 2011] **Mark Karpelès:** btw I already have a full accounting of all the euro, dwolla, and LR moves now
[Tue May 24 22:41:53 2011] mtgox: what's missing is manual corrections
[Tue May 24 22:44:47 2011] **Mark Karpelès:** LR is going out really fast, and AurumXchange is almost out of funds
[Tue May 24 22:44:51 2011] **Mark Karpelès:** I'm exchanging another 100k this week
[Tue May 24 22:45:18 2011] mtgox: still no word from LR itself?
[Tue May 24 22:45:35 2011] **Mark Karpelès:** they want MtGox to have a ToS in good form
[Tue May 24 22:45:36 2011] **Mark Karpelès:** working on this
[Tue May 24 22:46:02 2011] **Mark Karpelès:** however buying LRUSD from LR has a cost, it seems
[Tue May 24 22:46:16 2011] **Mark Karpelès:** while Aurum sells us BTC without fees
[Tue May 24 22:46:35 2011] mtgox: how do they do it for free if LR charges them?
[Tue May 24 22:46:56 2011] **Mark Karpelès:** they send us LR they bought from other people for a fee
[Tue May 24 22:47:38 2011] **Mark Karpelès:** http://blog.aurumxchange.com/2011/03/liberty-reserve-to-wire-at-only-199.html <- because I bought so much LR from them they are doing a special operation

SRC14176

[Wed Jul 6 11:09:13 2011] **Mark Karpelès:** both
[Wed Jul 6 11:09:19 2011] **Mark Karpelès:** some for A, some for B
[Wed Jul 6 11:09:20 2011] **mtgox:** ok great
[Wed Jul 6 11:10:39 2011] **mtgox:** Also do you still think that someone got access to my myphpadmin account?
[Wed Jul 6 11:11:06 2011] **mtgox:** seems weird that the SQLi and that would happen at the same time
[Wed Jul 6 11:11:17 2011] **Mark Karpelès:** there is definitely something wrong here, I could confirm that some data was stolen by SQLi thanks to keeping /all/ the apache logs
[Wed Jul 6 11:11:26 2011] **Mark Karpelès:** but it only allowed read only access
[Wed Jul 6 11:11:41 2011] **mtgox:** the SQLi only had read only?
[Wed Jul 6 11:11:57 2011] **mtgox:** how is that?
[Wed Jul 6 11:12:01 2011] **Mark Karpelès:** yes
[Wed Jul 6 11:12:08 2011] **Mark Karpelès:** because they can only inject parts of a select
[Wed Jul 6 11:12:51 2011] **mtgox:** oh ok. I thought they could terminate the statement and enter a new one.
[Wed Jul 6 11:12:55 2011] **mtgox:** that makes more sense
[Wed Jul 6 11:13:10 2011] **mtgox:** beacuse they could have gotten all the BTC if they could update
[Wed Jul 6 11:14:30 2011] **Mark Karpelès:** yeah
[Wed Jul 6 11:14:36 2011] **Mark Karpelès:** but they still got access to your account
[Wed Jul 6 11:14:42 2011] **Mark Karpelès:** and the guy claimed it was not via a SQLi
[Wed Jul 6 11:14:43 2011] **mtgox:** yeah for sure
[Wed Jul 6 11:14:52 2011] **mtgox:** oh really
[Wed Jul 6 11:15:08 2011] **mtgox:** what guy?
[Wed Jul 6 11:15:17 2011] **Mark Karpelès:** the one I sent you a log of recently
[Wed Jul 6 11:15:25 2011] **Mark Karpelès:** he confirmed whatever he used was not possible on the new system
[Wed Jul 6 11:15:49 2011] **mtgox:** not sure I got that log
[Wed Jul 6 11:15:57 2011] **Mark Karpelès:** I mailed it to you
[Wed Jul 6 11:16:05 2011] **Mark Karpelès:** the guy who initially claimed you were holding 30kBTC for him
[Wed Jul 6 11:16:18 2011] **mtgox:** oh beerpool guy
[Wed Jul 6 11:16:24 2011] **mtgox:** he admitted to hacking in
[Wed Jul 6 11:18:04 2011] **Mark Karpelès:** yes
[Wed Jul 6 11:18:11 2011] **Mark Karpelès:** and provided some details
[Wed Jul 6 11:18:16 2011] **Mark Karpelès:** and asked to be paid to provide full details
[Wed Jul 6 11:19:02 2011] **mtgox:** but this guy isn't canadian. It seemed like english wasn't his first language
[Wed Jul 6 11:19:23 2011] **Mark Karpelès:** he's not the only one who got access
[Wed Jul 6 11:19:36 2011] **Mark Karpelès:** and said he was not the one who published the db online after downloading it via sqli
[Wed Jul 6 11:21:47 2011] **Mark Karpelès:** anyway there are still attacks going on, and I'm going to add emails on withdraws that cannot be turned off
[Wed Jul 6 11:22:29 2011] **mtgox:** yeah I was thinking it should send an email on withdrawal
[Wed Jul 6 11:22:38 2011] **Mark Karpelès:** yep
[Wed Jul 6 11:23:13 2011] **mtgox:** This will be a constant battle for you. Mtgox is probably the best site on the internet to hack into. a big pile of untraceable money
[Wed Jul 6 11:23:28 2011] **Mark Karpelès:** yeah
[Wed Jul 6 11:23:30 2011] **Mark Karpelès:** except we trace it
[Wed Jul 6 11:23:36 2011] **Mark Karpelès:** if we have reasons to
[Wed Jul 6 11:25:28 2011] **Mark Karpelès:** for the wire I'll need more infos, and I'll have to submit your ID documents to the Bank of Japan as the amount is quite important for an international wire
[Wed Jul 6 11:25:57 2011] **mtgox:** did you figure out how much money is unclaimed on there still?
[Wed Jul 6 11:26:09 2011] **mtgox:** or left in there
[Wed Jul 6 11:26:15 2011] **Mark Karpelès:** yep
[Wed Jul 6 11:26:41 2011] **Mark Karpelès:** less than 50k, when excluding stuff like gox bot
[Wed Jul 6 11:27:00 2011] **mtgox:** less than 50k USD unclaimed?
[Wed Jul 6 11:27:05 2011] **Mark Karpelès:** yes
[Wed Jul 6 11:27:13 2011] **mtgox:** oh that is pretty good
[Wed Jul 6 11:27:19 2011] **Mark Karpelès:** that's less than 1%
[Wed Jul 6 11:27:22 2011] **mtgox:** I still have an unclaimed accoutn actually
[Wed Jul 6 11:29:19 2011] **Mark Karpelès:** oh?
[Wed Jul 6 11:29:28 2011] **mtgox:** Five Grinder
[Wed Jul 6 11:29:36 2011] **mtgox:** I got denined a couple times
[Wed Jul 6 11:29:44 2011] **Mark Karpelès:** 47$
[Wed Jul 6 11:29:58 2011] **mtgox:** but ~170 BTC I think
[Wed Jul 6 11:30:11 2011] **Mark Karpelès:** 0 btc
[Wed Jul 6 11:30:25 2011] **Mark Karpelès:** it got refused because you already use the same email on account "jed"
[Wed Jul 6 11:30:31 2011] **mtgox:** did someone else claim it?
[Wed Jul 6 11:30:39 2011] **mtgox:** it should have BTC for sure in there
[Wed Jul 6 11:31:05 2011] **mtgox:** not claimed

SRC14192

[Wed Jul 6 13:21:31 2011] **Mark Karpelès:** history can be converted for people with wanna see
[Wed Jul 6 13:23:17 2011] mtgox: ok It sounds more complicated than it needs to be but I'll just have to see it in action.
[Wed Jul 6 13:25:52 2011] mtgox: <Jere_Jones> Can my account have a usd balance and a euro balance?
[00:16] <@MagicalTux> Jere_Jones: yes
[Wed Jul 6 13:26:03 2011] mtgox: I guess this is the part that is weird to me
[Wed Jul 6 13:26:32 2011] mtgox: when you sell btc I guess you choose which currency you want to sell it into?
[Wed Jul 6 13:26:44 2011] mtgox: and you have to show all these balances to the user?
[Wed Jul 6 13:27:01 2011] mtgox: I need to know this for the design actually
[Wed Jul 6 13:27:49 2011] mtgox: Can you just hide the fact that there are multiple balances? and just show the total converted into whatever currency they have picked as their display currency?
[Wed Jul 6 13:27:58 2011] **Mark Karpelès:** nah, wouldn't make sense
[Wed Jul 6 13:28:04 2011] **Mark Karpelès:** anyway most people will have only one currency
[Wed Jul 6 13:28:23 2011] **Mark Karpelès:** they choose their currency in the header
[Wed Jul 6 13:28:31 2011] **Mark Karpelès:** and then the whole site acts with this balance in this currency
[Wed Jul 6 13:29:26 2011] mtgox: so if they have a USD balance and a Eur balance it will only show one or the other depending on what they have selected as their display currency?
[Wed Jul 6 13:29:41 2011] **Mark Karpelès:** yes
[Wed Jul 6 13:29:50 2011] mtgox: When do you care what currency your balance is in?
[Wed Jul 6 13:29:53 2011] **Mark Karpelès:** and can switch easily from one or the other
[Wed Jul 6 13:30:01 2011] **Mark Karpelès:** I guess you shouldn't have to care
[Wed Jul 6 13:30:15 2011] mtgox: That is why I'm saying you should combine them
[Wed Jul 6 13:30:26 2011] mtgox: with the fees included
[Wed Jul 6 13:30:34 2011] **Mark Karpelès:** would make trading technically impossible
[Wed Jul 6 13:33:21 2011] mtgox: well you would have to just be more clevver when they placed their order. If they had 100USD and 50 Eur and the display was in USD and they wanted to buy $120 worth of BTC it would just make an order for $100 usd and X EUR.
[Wed Jul 6 13:33:35 2011] mtgox: but whatever you can do taht later. people will ask how to convert their USD balance to Euro though and things like that
[Wed Jul 6 13:34:32 2011] **Mark Karpelès:** we'll allow people to convert their USD balance to EUR/AUD/etc depending on their country in one shot, without fees. Will be possible only once per account and cause closing of the USD balance
[Wed Jul 6 13:36:10 2011] mtgox: Ok you could also allow them let them do it however often but just charge whatever fee it would take to make it worth it for you
[Wed Jul 6 13:36:40 2011] **Mark Karpelès:** that would be illegal
[Wed Jul 6 13:36:51 2011] **Mark Karpelès:** we are not a registered money exchanger
[Wed Jul 6 13:36:55 2011] mtgox: oh ok
[Thu Jul 7 19:19:48 2011] mtgox: seems hung
[Thu Jul 7 19:54:37 2011] mtgox: hung again
[Fri Jul 8 07:11:30 2011] **Mark Karpelès:** if you want to have a look: https://yubikey.mtgox.com/ (must be logged in on mtgox first)
[Fri Jul 8 10:04:43 2011] mtgox: Hey so the new landing page has a thing about how the site is secure and another about how it is legal. Can you tell me how the company is registered/regulated so I can write something good for the legal part?
[Fri Jul 8 10:05:13 2011] mtgox: Also for the secure part, I really think we should get a 3rd party audit
[Fri Jul 8 10:05:27 2011] mtgox: I can look for a company unless you have one in mind
[Sun Jul 10 20:04:52 2011] mtgox: Hi
[Sun Jul 10 20:04:58 2011] mtgox: Did you send my wire?
[Sat Jul 16 06:09:16 2011] mtgox: are you there?
[Sat Jul 16 06:29:20 2011] mtgox: well something screwy is happening again
[Sat Jul 16 06:44:25 2011] **Mark Karpelès:** mh?
[Thu Jul 28 08:32:37 2011] mtgox: hey hows it going?
[Thu Jul 28 08:32:46 2011] mtgox: could you give botbot 0% fee again
[Thu Jul 28 09:09:04 2011] **Mark Karpelès:** Oh, need to check
[Thu Jul 28 09:09:38 2011] **Mark Karpelès:** Right now I'm in Hong Kong
[Thu Jul 28 09:12:41 2011] **Mark Karpelès:** https://twitter.com/magicaltux/status/96372006857089026
[Thu Jul 28 13:58:05 2011] mtgox: oh ok cool
[Thu Jul 28 13:58:12 2011] mtgox: site is super slow btw
[Thu Jul 28 14:46:26 2011] **Mark Karpelès:** mh
[Thu Jul 28 14:46:35 2011] **Mark Karpelès:** the wifi here sucks, typing one ssh command takes ages
[Thu Jul 28 14:48:48 2011] **Mark Karpelès:** ok got it
[Thu Jul 28 14:49:04 2011] **Mark Karpelès:** I'll be back in japan in a few hours
[Thu Jul 28 14:49:07 2011] **Mark Karpelès:** with real internet
[Thu Jul 28 14:51:37 2011] mtgox: ok did you get the bank account all set up there?
[Thu Jul 28 14:51:51 2011] **Mark Karpelès:** it'll take 7 days for the bank account to be created
[Thu Jul 28 14:52:01 2011] **Mark Karpelès:** and another 15 days before I receive the elements for internet access
[Thu Jul 28 14:52:17 2011] **Mark Karpelès:** but with this receiving an international wire will not cost anything anymore
[Thu Jul 28 14:52:30 2011] **Mark Karpelès:** I have another meeting in one month to discuss international banking
[Thu Jul 28 14:54:25 2011] mtgox: do you want me to write or at least edit the copy for the new website? I asked laurent but he said to ask you
[Thu Jul 28 14:56:19 2011] **Mark Karpelès:** yeah, we are most likely not going to use that version, it looks too cheap compared to what we got from a guy here. Was interesting for some ideas, but that's all
[Fri Jul 29 00:24:03 2011] mtgox: Yeah that one you sent me was better

SRC14194

| | |
|---|---|
| **From:** | Jed McCaleb <jed@mtgox.com> |
| **To:** | Mark Karpeles <admin@mtgox.com> |
| **Sent:** | 4/28/2011 9:33:07 AM |
| **Subject:** | |

I can't tell how big an issue it will be to be short 80k BTC if the
price goes to $100 or something. That is quite a bit to owe at that
point but mtgox should have made a ton of BTC getting to there. There
is also still the fact that the BTC balance will probably never fall
below 80k. So maybe you don't really need to worry about it.
There are 3 solutions I have thought of:
- Slowly buy more BTC with the USD that Gox Bot has. Hopefully you
would fill up the loss before the price got out of hand.
- Buy a big chunk of BTC (really just moving the BTC debt to the USD
side) If BTC goes up this is a huge win. Problem is there isn't enough
BTC for sale on mtgox. Maybe you could find someone on the forum to do
it?
- Get those crystal island people to invest. They have 200+ BTC so
they could fill in the gap.

Maybe you could just mine it?

SRC11778

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO and                                **PLAINTIFFS**
DR. CHRIS RAGGIO

V.                                               **CIVIL ACTION NO. 14-71**

JED McCALEB et al.                                   **DEFENDANTS**

### PLAINTIFFS' MEMORANDUM BRIEF OPPOSING
### PARTIAL SUMMARY JUDGMENT

Defendants have moved for partial summary judgment on a host of issues relating to damages, claiming that the time is ripe for this Court to rule on the amount of damages recoverable by Plaintiffs. The measure of damages will be a question for the finder of fact about which there are already material disputes, and Defendants' legal arguments purportedly limiting damages are simply not correct. Partial summary judgment should be denied for three reasons.

First, Defendants' motion raises factual issues which are already in dispute, and discovery has not been completed. Plaintiffs have responded to Defendants' itemization of material facts, and demonstrated the nature and extent of the factual record relevant to these issues which are in dispute. Plaintiffs have submitted the affidavits of Chris Raggio and Darek Dabbs, which further demonstrate the extent of the factual disputes at issue in this case. Moreover, Plaintiffs have responded to the factual assertions littering Defendants' brief which are hotly disputed, not included in Defendants' itemization, and which cannot be relied upon in Defendants' attempt to sidestep the disputes in the factual record. All in all, the question of damages is, has been, and will always be, a question for the jury.

Second, the motion is not ripe. Discovery has not been completed, and documents are being withheld by Defendants (specifically, McCaleb's Gmail account), Plaintiffs have not yet deposed McCaleb about those documents and Plaintiffs' newly alleged claims, and experts have not been designated or deposed, including damages experts. Pursuant to Rule 56(f), Plaintiffs have submitted the affidavit of their attorney Walter H. Boone, which outlines the facts essential to Plaintiffs' claims which have not been developed and must be developed before this Court properly can rule on this motion.

Finally, Defendants' recitation of the law on the issues is incomplete and, in some cases, erroneous. For example, even as to conversion and bailment, there is controlling Mississippi law providing for "*a compensation approximating the profits that might have been made out of it in the market*." But more importantly, Defendants' motion addresses only four of the torts pleaded in the Amended Complaint: conversion, bailment, negligence, and fraud. Defendants overlook tortious breach of contract, conspiracy, negligent misrepresentation, and breach of fiduciary duty. Defendants' motion therefore fails to make any argument regarding the damages available for those torts, and summary judgment cannot be granted with regard to the damages available for them.

For all of these reasons, the Court must either deny Defendants' Motion for Partial Summary Judgment, or hold it in abeyance until such time as discovery is complete.

## I.   Defendants' Motion for Partial Summary Judgment Cannot Be Granted Because There Are Material Facts in Dispute

"Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Taylor Mach. Works, Inc. v. Great Am. Surplus Lines Ins. Co.*, 635 So. 2d 1357, 1361 (Miss. 1994). All evidence must be

viewed in the light that most favors the non-movant. *Id.* "Where there is doubt as to whether a fact issue exists, the non-moving party gets the benefit of this doubt, and all other doubts." *Id.* at 1360. Only where "no reasonable juror" could find the facts alleged by the non-movant to be true will summary judgment be proper. *Cothern v. Vickers, Inc.*, 759 So. 2d 1241, 1250 (Miss. 2000).

Plaintiffs' response opposing summary judgment identifies numerous material issues of fact, some high points of which are recapitulated below:

- ***McCaleb's Written Representations***. Despite Defendants' "undisputed" fact that there is no written contract, Plaintiffs do claim a breach of contract, and that claim is based, in part, on written promises and representations. See Amended Complaint, ¶¶ 55-60. Moreover, McCaleb and Code Collective made written representations on the MTGOX website, promising users it was, among other things, "safe and easy." Affidavit of Chris Raggio, Ex. A, at ¶ 3. Plaintiffs purchased bitcoins on the MTGOX website "[b]ased on the [written] representations that it would be 'safe and easy.'" *Id.*

- ***McCaleb Had Control After Transaction***. McCaleb retained an interest in MTGOX even after the purported "transaction," and continued to hold himself out to Plaintiffs with influence and control over MTGOX. Ex. A at ¶¶ 9- 15 (outlining facts and representations made by McCaleb before and after "transaction"). Defendants allege that "McCaleb sold the MTGOX exchange on February 11, 2018 . . . ." Defs. Memo. at 3. However, even if such a transaction occurred, McCaleb continued to have an interested in the revenue of MTGOX and owned a substantial percentage of MTGOX. See

McCaleb email to Karpeles dated January 24, 2011, ex. D, at SRC 05947 ("I get 50% of the revenue for 6 months or until I get $60K whichever is greater. 12% of the company you form to hold mtgox."). Thus, Defendants' insinuation that after the transaction, McCaleb had no further interest in, dealings on behalf of, or control over, MTGOX will be hotly disputed. These facts, among others generated in discovery, support Plaintiffs' Count Nineteen: Piercing the Corporate Veil, wherein Plaintiffs allege that "Defendants abused the corporate form of MTGOX, flagrantly disregarding corporate formalities, in the pursuit of fraudulent and wrongful misconduct, and thus frustrating the legitimate expectations of Plaintiffs and other buyers who regarded MTGOX as a legitimate cryptocurrency exchange . . . ."

- ***Plaintiffs Could Not Cover***. Plaintiffs admit that they did not purchase bitcoins to replace the stolen bitcoins. However, Plaintiffs did so because (1) they did not trust MTGOX or believe it was prudent to purchase new bitcoin from the same site with lax security and whose owners repeatedly and falsely represented that they would be made whole; (2) Plaintiffs did not know of another location where they could safely replace the bitcoin; and (3) even if they had known of such a place, the value of bitcoin had increased substantially, they did not have the money, and they could not justify the substantial investment. Ex. A at ¶17.

- ***Defendants' Security Measures Were Grossly Negligent***. Defendants allege that "[t]here is no evidence the exchange's security measures were circumvented." Defs. Memo. at 2. That "fact" is hotly disputed. According to Darek Dabbs,

Plaintiffs' cybersecurity expert, "I disagree with that factual assertion . . ."
Affidavit of Darek Dabbs, Sr., Ex. C, at ¶ 9. Dabbs has submitted an affidavit
establishing the following:

- "The security measures in place at MTGOX in December and January
  2011 were inadequate and failed to meet the cyber security industry
  best practices and common standards of the time." *Id.* at ¶ 7.

- "Security practitioners at that time knew to use salted password
  hashing on all password databases." *Id.* at ¶ 8

- McCaleb was aware of probes at the time, but "McCaleb did not have
  adequate security procedures in places to either detect those probes, or
  prevent unauthorized access." *Id.* at ¶ 11.

- "Had adequate security protocols been in place, this vulnerability
  [SQL injection attack] may not have existed and the hack most likely
  could have been prevented or mitigated." *Id.* at ¶ 12.

- "I do believe that there is sufficient evidence that I have seen to date
  for a jury to find that MTGOX' security failures rose to the level of
  gross negligence. I certainly believe that the failures I have seen so far
  were grossly negligent." *Id.* at ¶ 14.

- ***McCaleb Knew About Negligent Security***. Not only is there evidence that the
  security measures were circumvented, but there is evidence that McCaleb
  himself knew that security measures were being circumvented, and that those
  lapses were a "big mistake on my part." Ex. D. In that email, McCaleb
  acknowledged that MTGOX had been subject to "basically like a SQL

Injection attack. Obviously a big mistake on my part." Moreover, McCaleb acknowledges that he knew of the hacking during the timeframe of the Raggios' theft. "And I know this guy was hacking around on the site trying various thing [sic] for a month or so." Ex. D.

- ***Plaintiffs Were Not at Fault for Theft***. Defendants allege that "the theft was perpetrated by someone using the Raggios' own password to access their account." Defs. Memo. at 2. Defendants want to blame the victim, the Raggios, for this theft. Plaintiffs deny that the theft was their fault. Darek Dabbs testifies that "I have not seen evidence to support Jed McCaleb's claim that the Raggios' account was compromised through the fault of the Raggios." Ex. C at ¶ 11. Instead, the probable use of the Raggios' passwords for the theft was also caused by Defendants' lax security measures, and "[h]ad adequate security protocols been in place, this vulnerability may not have existed and the hack most likely could have been prevented or mitigated." *Id*. at ¶ 12.

- ***After Transaction, McCaleb Continued to Exercise Control.*** Defendants allege that after the "transaction" or "sale" of MTGOX to Karpeles, "[t]he Raggios began corresponding with Karpeles regarding the recovery of their allegedly stolen bitcoins." Defs. Memo. at 2. While there is correspondence to Karpeles beginning much after the transaction date, there is also correspondence between the Raggios and McCaleb after the transaction date in which McCaleb makes misrepresentations and statements which are completely

inconsistent with the "sale" of MTGOX and purported absence of continuing responsibility, including:

- February 12, 2011 email from McCaleb to Raggios:  "Still investigating. It will take awhile I think to be sure. . . ." Ex. E (emails) at RAGGIO 41.

- February 17, 2011 email from McCaleb to Raggios: ". . . Still working on determining if this is absolutely the right guy. His account is frozen." Ex. E at RAGGIO 41.

- February 26, 2011 email from McCaleb to Raggios. "It looks like at the very least this guy is going to give your coins back. I want to wait longer thought to gather more evidence if he is in fact related to other fraud that has happened on the site." Ex. E at RAGGIO 46.

- March 7, 2011 email from McCaleb to Raggios. "Yeah Mark is the new owner and he will handle getting your coins back. It will still take awhile since he has to wait to be sure baron is bluffing about suing us, etc." Ex. E at RAGGIO 0048.

- ***Plaintiffs Did Not Complain Because They Were Misled and Didn't Know the Depth of Fraud***. Finally, Defendants allege that "the Raggios never suggested that McCaleb had breached any obligation to them or was responsible for recovering their bitcoins." Defs. Memo. at 3. The Raggios did not have to claim that McCaleb was responsible because McCaleb took on that obligation on his own. See ex. A at ¶ 15 (McCaleb said "I'm sure he will eventually give it to you. I know he is trying to do everything by the book so I think he had to

wait for legal reasons."). But more importantly, the Raggios did not know, and could not have known, the depth of the ineptitude on security lapses and outright fraud which was occurring, as demonstrated in the following:

- McCaleb's acknowledgement of multiple hacks and thefts. See ex. D at SCR05946 ("there was a hacking incident since we started talking. Someone was able to take about $50k in LR.")

- McCaleb's acknowledgement of his prior knowledge of hacks at the time of the theft of the Raggios account. "And I know this guy was hacking around on the site trying various things for a month or so. . . ." *Id.*

- McCaleb's recommendation to paper over thefts and "let the loss ride": "We can just let the loss ride until the site either makes it or not." *Id.*

- McCaleb's acknowledgement that MTGOX was 80,000 bitcoins short from prior thefts: "I can't tell how big an issue it will be to be short 80k BTC . . . That is quite a bit to owe . . . ." Ex. G.

Thus, Defendants rely on a host of so-called "undisputed" facts in support of their motion which are, in fact, hotly disputed. Summary judgment should be denied.

## II.    Defendants' Motion Is Not Ripe and Should Be Denied Under Rule 56(f)

Under Rule 56(f), the trial court may delay ruling on the motion in order to permit further discovery. M.R.C.P. 56(f). The rule "contemplates that completion of discovery in some instances is desirable and necessary before a court can determine that there are genuine issues as to the material facts." *Roberts v. Boots Smith Oilfield Servs., LLC*, 200 So. 3d

1022, 1026 (Miss. 2016) (quoting *Smith v. H.C. Bailey Cos.*, 477 So.2d 224, 232 (Miss.1985)).

"This is especially true where the party seeking to invoke the protections of Rule 56(f)

claims the necessary information rests within the possession of the party seeking summary

judgment." *Id.* (quoting *Prescott v. Leaf River Forest Prods., Inc.*, 740 So.2d 301, 308

(Miss.1999)). Courts should "discourage the practice of parties resisting discovery on the

one hand and moving for summary judgment on the other." *Id.* (quoting *Smith*, 477 So. 2d

at 232).

 In the *Roberts* case, the plaintiff's affidavit attached to his motion "laid out what dis-

covery he planned on conducting, when that discovery should be completed, and what facts

he intended to gather." *Id.* at 1027. Because the discovery to be sought was relevant to the

issues at stake in the Rule 56 motion, the Supreme Court held that the trial court abused its

discretion in denying the Rule 56(f) motion. *Id.* at 1028.

 Resisting discovery while demanding summary judgment is exactly what Defendants

have done in this case, obstructing access to McCaleb's Gmail account and giving

inadequate or misleading responses to written discovery requests. The affidavit of counsel

for Plaintiffs regarding discovery to be sought is attached to the Rule 56 response, and

includes the following needed discovery:

- Document discovery of Jed McCaleb's Gmail account which has been withheld by Defendants.

- Document discovery on the server images for mtgox.com.

- Deposition of Jed McCaleb

- Deposition of Mark Karpeles

- Document and expert discovery on the security of mtgox.com in general and Defendants' claim in their Motion for Partial Summary Judgment that there

"is no evidence the exchange's security measures were circumvented" as alleged on Page 2 of their Memorandum

- Document and expert discovery on Defendants' claim that the "theft was perpetrated by someone using the Raggios' own password to access their account" as Defendants allege on page 2 of their Memorandum

- Document and expert discovery on Defendants' claim that the "theft was perpetrated by someone using the Raggios' own password to access their account" as Defendants allege on page 2 of their Memorandum;

- Document, fact and expert discovery on the chronology and circumstances surrounding the theft of Plaintiffs' bitcoins, including the allegations that McCaleb converted the bitcoins to his own use;

- Document, fact and expert discovery on the ability to purchase bitcoins from sources other than mtgox.com, as Defendants allege that Raggio was able to, and required to, cover, as alleged in Defendants' motion;

- Document, fact and expert discovery on the facts surrounding the "sale" of mtgox.com from Jed McCaleb to Tibanne K.K. and the timeline for such sale including evidence to support of Plaintiffs' Count Nineteen, Piercing the Corporate Veil, among other claims;

- Document, fact and expert Discovery on Plaintiffs' claims for fraud, piercing the corporate veil, unjust enrichment, and other claims which will support Plaintiffs' claims for damages far in excess of the value of the missing bitcoins.

Affidavit of Walter H. Boone, Ex. B, at ¶ 7.

In short, discovery has not closed in this case, nor have expert witnesses been designated. The highly technical issues as to cybersecurity and the nature of bitcoins make this case particularly inappropriate for summary judgment at this time, as the parties are likely to present a "battle of the experts" for a jury to decide, including expert opinions on damages. *Eli Investments, LLC v. Silver Slipper Casino Venture, LLC*, 118 So. 3d 151, 155 (Miss. 2013) (reversing summary judgment; "the winner in a battle of the experts is to be decided by the jury"). Summary judgment would be premature at this stage.

### III.   Defendants' Recitation of the Law Is Incomplete and Incorrect

Although Plaintiffs believe, as set forth above, that Defendants' motion is insufficient and premature, it is also the case that the law does not support their position that this is a case about three thousand dollars in damages. To the contrary, Plaintiffs will offer evidence that the case is worth at least $165 million, if not more. See Ex. A ¶ 20 (identifying value of missing bitcoin over time, at least as high as $165 million).

#### A.   *Damages for Conversion Include Consequential Damages and Lost Profits*

Conversion (or bailment) damages are not limited to the fair-market value of the converted property at the time of loss. *Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So. 2d 187, 191 (Miss. 2000). Relying chiefly on a Colorado case, the Court in *Pride Oil* endorsed the propositions that unusual damages "flowing from a conversion" can be recovered if "both parties have these consequences in contemplation at the time of the wrong complained of, as the probable result thereof," and the consequences are not uncertain, "remote as to cause, nor speculative and conjectural." *Id.* at 191–92 (citation omitted). The Court also held that "the general rule is that compensation for lost profits may be recovered in an action for conversion, where the loss is a proximate result of the defendant's act, and where the loss can be shown with reasonable certainty." *Id.* at 192 (citation omitted).

Here, there is nothing speculative or conjectural about the lost profits and consequential damages due to the loss of the Raggios' bitcoins. The history of bitcoin values is sufficiently clear that Defendants can ask this Court to take judicial notice thereof.

As for the point about contemplation by both parties, the Colorado case on which our Supreme Court relied, *Colorado Kenworth Corp. v. Whitworth*, 357 P.2d 626 (Colo. 1960), has since been overruled in part by a later Colorado case on the specific issue of stock con-

verted by the defendant which then rose in value, costing the plaintiff more than he'd initially paid for it—certainly a relevant fact pattern here. *Vanderbeek v. Vernon Corp.*, 50 P.3d 866 (Colo. 2002). The court held that in tort cases, the "contemplated by both parties" rule doesn't apply, and it held the award of the higher price to be proper. *Vanderbeek*, 50 P.3d at 873–74. Given that the Mississippi Supreme Court found the Colorado precedent convincing in *Pride Oil*, it is reasonable to suppose that the Court would equally endorse the later modification of that holding, particularly as it's consonant with Mississippi law on foreseeability in tort (discussed separately below).

The *Vanderbeek* holding is also consonant with Texas case law regarding the conversion of items that tend to fluctuate in value:

> With specific reference to the wrongful sale of **stocks or bonds, and because of their fluctuating value**, the prevailing view modifies the rule somewhat, and holds that the true and just measure of damages is the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of the conversion to enable him to replace the stock. And **if the conversion is willful, fraudulent or attended with gross negligence**, the owner may recover the **highest value between the date of conversion and the filing of suit**.

*Reed v. White, Weld & Co.*, 571 S.W.2d 395, 397 (Tex. Civ. App. 1978) (emphasis added & citations omitted). *See also Glaspey v. Prelusky*, 219 P.2d 585, 587–88 (Wash. 1950) (willful conversion can justify damages of "the highest price shown between the time of the conversion and the institution of the suit").

Therefore, the tortious nature of Defendants' misconduct, which the Raggios will show rose at least to the level of gross negligence, affects the valuation of the property lost.

These cases are in line with older Mississippi jurisprudence which, on the subject of an asset like bitcoins, may in fact be more appropriate than recent cases on more mundane objects of conversion. In *Jamison v. Moon*, 43 Miss. 598 (1870), the Court took note of other

states whose rule was "that the jury are not confined to the value of the thing at the time of the taking, and interest on such value, to the time of trial, but they may take the highest market value at any time between the conversion and the trial." It went on to add: "In an active commercial country, where dealing in the barter and sale of commodities and stocks is the business of large numbers of the community, the tendency would seem natural to give to the party *wrongfully deprived of his property or stock, a compensation approximating the profits that might have been made out of it in the market.* What are proper damages, depends very much on the circumstances of the case." *Id.* (emphasis added). That is what the Raggios urge here: "the circumstances of the case" are so unusual that the question of what will make the Raggios whole is best left to a jury. America has not become less of an "active commercial country" since 1870; rather, we would submit, the opposite.

The rationale, again from a case specifically involving the conversion of stocks, is that "a wrongdoer should not be allowed to benefit from his misdeed," and therefore he "should not be allowed to retain a converted item, which may have greatly increased in value, and pay a lesser amount." *Plikus v. Plikus*, 599 A.2d 392, 394 (Conn. Ct. App. 1991) (ordering return of stocks as damages). The Raggios believe that the Mississippi Supreme Court, properly briefed, will agree with the equity and justice of this principle, and with the *Pilkus* court's solution: restitution of the property in kind, not merely cash.

In so holding, our high Court would be concurring with the holdings of our neighboring states Alabama and Louisiana in comparable cases.

"The determination of this fair market value, *particularly with property that fluctuates in value*, however, must be its value at the date of conversion, *or at any time subsequent thereto and before trial*." *Ott v. Fox*, 362 So. 2d 836, 841 (Ala. 1978) (emphasis added). "There are

some transactions in stocks in which to hold a defendant liable *only for the value of the stocks at the date of their actual conversion would afford a very inadequate remedy*; as, for instance, where one buys stocks *with the intention of holding them for a rise* in the market and the broker sells them without authority so that the principal *loses the opportunity of availing himself of the rise*." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So. 2d 756, 761–62 (La. 1985) (emphasis added). The Raggios expressly acquired their bitcoins as an investment. Ex. A at ¶ ¶ 4–5.

Notably, the *Quealy* court held that, to be made whole "[i]n the case of stock, which fluctuates in value, applying the general rule of damages will not always accomplish the goal of making the victim whole," so that the plaintiff had to be awarded in damages the cost of the stocks *as of the day before trial*, "an amount sufficient to enable him to repurchase exactly what was lost." *Id.* at 762 (citing La. Civ. Code arts. 2315 and 1995). On that theory, damages cannot properly be ascertained until "the day before trial," making summary judgment inappropriate. *See also Steranko v. Inforex, Inc.*, 362 N.E.2d 222, 232 (Mass. Ct. App. 1977) (holding employer wrongfully withheld stock benefits and had to both convey stock and pay damages due to fall in its value).

To rule otherwise, it has been noted, encourages the unscrupulous to commit "efficient breaches" when they believe that the property in question is likely to rise in value. *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 165 (S.D. Tex. 2009).

Therefore, summary judgment is not proper as to the amount of compensatory damages.

### 2.    *Fact Questions Exist as to the Availability of Cover*

If the Raggios' bitcoins are held to be goods or some other thing of value covered by the Uniform Commercial Code, then according to Defendants, the Raggios had a duty to

cover (i.e., to buy more bitcoins to replace the ones of which they were deprived), and cannot recover consequential damages, such as the appreciation of value in their bitcoins over time. Note that the burden of proof here falls on Defendants. *Carnation Co. v. Olivet Egg Ranch*, 189 Cal. App. 3d 809, 816–17 (Cal. Ct. App. 1986) (discussing authorities).

First, while the Raggios have pleaded UCC causes of action in an abundance of caution, the state of the law as to bitcoin is presently as subject to fluctuation. Expert testimony is likely to be necessary for the jury to decide whether or not the bitcoins are goods or some other thing of value covered by the UCC. Summary judgment is premature here.

Even if cover is proved to be at issue, certain facts must be proved to show that cover was an option for the Raggios. The reason they came to MTGOX in the first place was to find a source where thousands of dollars' worth of bitcoins could be bought. Ex. A at ¶ 3. After the loss of the bitcoins, Raggio was not aware of another location where he could safely replace his missing bitcoins. *Id.* at ¶ 17. Even if he had known of such an alternate safe location to replace the missing bitcoins, by that time, the bitcoins had increased substantially in value to approximately $50,000. *Id.* Raggio did not have $50,000 at that time and would not had a duty to make such a substantial expenditure, even if he had the money. *Id.* Thus, even if the Raggios were obligated to cover (which is denied), there are factual disputes regarding their ability to do so.

Therefore, genuine issues of material fact exist as to the duty to cover and the Raggios' ability to do so. Summary judgment is improper here.

### 3.    *Genuine Issues of Material Fact Exist as to Duty to Mitigate*

The same points regarding cover apply to mitigation of damages. "Of course, mitigation is an affirmative defense" that requires Defendants to prove a failure in duty on the part of the Raggios. *Wall v. Swilley*, 562 So. 2d 1252, 1258 (Miss. 1990). On the issue of mitigation of damages, the Mississippi Supreme Court has cited (in *Flight Line v. Tanksley*, 608 So. 2d 1149, 1163 (Miss. 1992)) the federal district court's decision in *Buras v. Shell Oil Co.*, 666 F. Supp. 919 (S.D. Miss. 1987). In that decision, Judge Lee wrote:

> Furthermore, **where the party at fault and the injured party have equal opportunity to reduce the damages by the same means**, and equal knowledge of the consequences of failing to act, the **defendant may not diminish his liability by contending that the injured party failed to mitigate damages**. In other words, a damage award will not be reduced on account of damages **which the defendant could have avoided as easily as the plaintiff**.

*Buras*, 666 F. Supp. at 924–25 (emphasis added). It was open at all times for Defendants, just as easily as the Raggios, to open their wallets (wallets substantially larger than those of the Raggios) and replace the lost bitcoins when it was inexpensive to do so. Indeed, as shown above, the lack of ready access to large numbers of bitcoins outside MTGOX meant that it was probably easier for Defendants to restore them than for Plaintiffs to replace them.

Also, as in the case of cover, Defendants have the burden to prove that the Raggios had spare funds at hand to purchase more bitcoins; where funds are necessary to repair a loss and the injured party cannot reasonably do so, he has no duty to mitigate. *Lake v. Gautreaux*, 893 So. 2d 252, 256 (Miss. Ct. App. 2004). Defendants, who have the burden of this affirmative defense, have made no showing that the Raggios had both the funds to cover and the means to find 9,406.33 bitcoins to purchase. As shown above, the Raggios aver otherwise. Here too, summary judgment is improper.

### 4.    *Foreseeability Is a Question for the Jury*

Foreseeability of damages is a classic instance of a question for the finder of fact, provided only that some evidence can be supplied to support the claim. *Hankins Lumber Co. v. Moore*, 774 So. 2d 459, 464 (Miss. Ct. App. 2000). Defendants' brief is notably weak here, simply asserting without citation to any documentary or testimonial support that the appreciation in value of bitcoins could not be foreseen in 2011. Foreseeability will be a question for the finder of fact.

"If *some* injury is to be anticipated, this Court will find liability even if the *particular* injury could not be foreseen." *Gulledge v. Shaw*, 880 So. 2d 288, 293 (Miss. 2004) (emphasis in original). The Raggios are not arguing that, because of the loss of their bitcoins, they were caused "to miss a flight to London and, consequently, miss attending an auction and a once-in-a-lifetime opportunity to purchase a rare piece of art," or any other such remote, unforeseeable effect. *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1279 (Miss. 2007). Rather, their damages flow from the simple fact that the bitcoins appreciated in value, and that the bitcoins *might* do so was an injury easily to be anticipated by Defendants, even if the *particular* degree of increase was not foreseeable at the time (which, before expert witnesses have been designated and discovery concluded, the Raggios by no means concede).

"In satisfying the requirement of foreseeability, a plaintiff is not required to prove that the *exact* injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within the *particular kind or class of injury or harm* which reasonably could be expected to flow from the defendant's negligence." *Id.* at 1278 (emphasis added). Damages due to appreciation in value are in the "kind or class of injury"

that was easily foreseeable by Defendants at the time; indeed, they very much wanted to

grow rich from their bitcoins.

Here, there is substantial evidence that bitcoin investors expected, and certainly

hoped, that the value of bitcoin would explode in value. According to Raggio,

> I purchased bitcoin because I hoped, and had an expectation, that the bitcoin
> would gain substantial value. While no one knew the future of bitcoin or the
> future value of bitcoin, I did know that at least one possibility, and the one I
> hoped would occur, was that the bitcoin would gain hundreds, thousands, or
> even tens of thousands of percent in value. I was not alone in my expectation
> regarding the future value of bitcoin, and I shared that expectation with many
> other early bitcoin investors, many of whom communicated publicly about
> those expectations.

Ex. A at ¶ 5. Certainly, Raggio's expectation was shared by many others including McCaleb

himself. On April 28, 2011, McCaleb speculated that the price of a single bitcoin might soon

reach "$100 or something." Ex. G. He told Karpeles in April 2011 that he expected that

bitcoin "will be worth much more at the end of the year." Ex. F at SRC14153. Likewise, in

the May 2011 email quoted by Defendants themselves at page 3 of their memorandum, the

Raggios consider it possible in talking to McCaleb that "maybe bitcoin will hit 1000 . . . ."

Defendants' Motion, Ex. A., at 40 (SRC11912). McCaleb did not respond that Raggio's

expectation was crazy talk, and subsequent events proved Raggio's expectations correct. See

Ex. A at ¶ 20 (charting value of missing bitcoin from $9.2 million in November 2013, to

$6.225 million in March of 2014, to almost $200 million since filing suit, to over $60 million

today).

It will therefore be for a jury, having heard fact and expert testimony on the subject,

to decide whether an appreciation in value was a foreseeable result. Summary judgment

should be denied.

### 5.      *Specific Performance Is the Most Appropriate Remedy*

The volatile nature of bitcoin makes specific performance the most suitable remedy to make the Raggios' loss whole. A leading treatise states:

> Among the factors to be considered in granting a decree for specific performance, the most important seem to be the following: difficulty and uncertainty in determining the amount of damages to be awarded for the defendant's breach, difficulty and uncertainty in the collection of damages after they are awarded, the insufficiency of money damages to obtain the duplicate or the substantial equivalent of the promised performance, either because the subject matter of the contract is unique or rare and cannot easily be duplicated or because the obtaining of a substantial equivalent involves difficulty, delay, and inconvenience.

Arthur L. Corbin, *Corbin on Contracts* § 63.7 (Joseph M. Perillo ed.) (1979). "A debt denominated in bitcoins satisfies nearly all of these criteria. Because of the rapidly changing market value of bitcoins (denominated in dollars and other traditional currencies), calculating damages risks significant error." Shawn Bayern, "Dynamic Common Law and Technological Change: The Classification of Bitcoin," 71 Wash. & Lee L. Rev. Online 22, 29 (2014) (footnote omitted).

Mississippi law also favors specific performance in such circumstances: "[A]stute observers have long noticed that in practice specific performance has become widely available. . . . Where a contracting party can feasibly be given what he bargained for, where is the justice in decreeing a substitute?" *Osborne v. Bullins*, 549 So. 2d 1337, 1340 (Miss. 1989). Where indeed?

And specific performance is an appropriate remedy for breach of contract as to personal property where money damages would not provide an adequate remedy. *Cumbest v. Harris*, 363 So. 2d 294, 296 (Miss. 1978). The 1968 case relied upon by Defendants reflects an obsolescent and cramped view of specific performance. "Modern writers think that the

'difficulty of enforcement' [of specific performance of a contract] is exaggerated and that the trend is toward specific performance." *Grayson-Robinson Stores, Inc. v. Iris Constr. Corp.*, 168 N.E.2d 377, 379 (citing 5 A. Corbin, *Corbin on Contracts* § 1172 (1955); 5 S. Williston & G. Thompson, *Williston on Contracts* § 1423, at 3977 (rev. ed. 1937); *Restatement of Contracts*, § 371, cmt. a (1932)).

### 6.   *Summary Judgment on Punitive Damages Is Premature*

Under Miss. Code Ann. § 11-1-65(1), no "issues relating to punitive damages" may be addressed until the finder of fact has ascertained whether to award compensatory damages, and if such an award is made, the court is required to "promptly commence an evidentiary hearing" on whether the issue can go to the jury. Therefore, the only way summary judgment on punitive damages can be proper is if Defendants prove that they are not liable for any damages whatsoever. But even their own motion does not go that far; it merely argues that if they are found at fault, the amount of compensatory damages is limited. Therefore, the issue of punitive damages is not proper for summary judgment.

Nor do Plaintiffs believe that this honorable Court's remarks at the June 2018 hearing were meant to preclude Plaintiffs from presenting evidence of fraud, particularly since at the time, Plaintiffs' complaint did not plead fraud. And even if Defendants were guilty at worst of gross negligence, or tortious breach of contract, that would still allow the issue of punitive damages to go to the jury. *See Estate of Minor v. USAA*, 247 So. 3d 1266, 1271–72 (Miss. Ct. App. 2017) (reversing partial summary judgment as to punitive damages). Nothing in Defendants' motion can justify partial summary judgment foreclosing either of those causes of action.

Further, while not strictly "exemplary" damages as named by Defendants in their motion, damages for "entirely foreseeable ... additional inconvenience and expense, attorneys fees and the like ... in an effort to have the oversight corrected" due to Defendants' lack of ordinary care are recoverable: "It is no more than just that the injured party be compensated for these injuries." *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992). A reasonable jury could award such damages to the Raggios.

As for unjust enrichment and constructive trust, discovery has not yet closed in this case, and Defendants' motion does not seriously argue for summary judgment here: the motion does not even address the elements of these equitable remedies, merely treating them as equivalent to punitive damages. A constructive trust "arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience," holds property he ought not to be allowed to hold and enjoy. *Allred v. Fairchild*, 785 So. 2d 1064, 1067 (Miss. 2001) (quoting *Sojourner v. Sojourner*, 153 So. 2d 803, 807 (Miss. 1963)). Defendants' motion does not suffice to prove there is no genuine issue of material fact as to "any form of unconscionable conduct, artifice, concealment, or questionable means" on the part of Defendants. Plaintiffs' response suggests the contrary. At the very least, this Court should allow discovery to conclude before preempting those issues.

Summary judgment therefore is improper here as well.

WHEREFORE, PREMISES CONSIDERED, this Court should DENY the motion for partial summary judgment; or in the alternative, GRANT Plaintiffs' Rule 56(f) motion

and POSTPONE any ruling on Defendants' motion until discovery has been completed and

Plaintiffs can thus file a comprehensive response in opposition.

       Respectfully submitted, this the 1st day of November, 2018.

                 *s/ Andy Lowry*
                 Armin J. Moeller, Jr., MSB No. 3399
                 Walter H. Boone, MSB No. 8651
                 Christine Crockett White, MSB No. 10107
                 Jonathan P. Dyal, MSB No. 99146
                 Andy Lowry, MSB No. 100782
                 Patrick Everman, MSB No. 104870
                 Perry P. Taylor, MSB No. 104944

                 ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has

electronically filed the foregoing with the Clerk of the Court via this Court's MEC system,

providing electronic service on all counsel registered therefor, and serving via United States

mail (postage prepaid) as set forth below:

>       Edwin S. Gault, Jr., Esq.
>       Amanda B. Robinson, Esq.
>       T. Peyton Smith, Esq.
>       FORMAN WATKINS & KRUTZ LLP
>       Post Office Box 22608
>       Jackson, Mississippi 39201
>       Win.Gault@formanwatkins.com
>       Peyton.Smith@formanwatkins.com
>       Mandie.Robinson@formanwatkins.com
>
>       Ethan Jacobs, Esq.          *(via U.S. mail)*
>       HOLLAND LAW, LLP
>       220 Montgomery Street, Suite 800
>       San Francisco, California 94104

So certified, this the 1st day of November, 2018.

>                              *s/Andy Lowry*
>                              Andy Lowry

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                               **PLAINTIFFS**

**V.**                                                              **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual**                                    **DEFENDANTS**

---

### JED MCCALEB AND CODE COLLECTIVE, LLC'S REPLY TO PLAINTIFFS'
### RESPONSE OPPOSING MOTION TO DISMISS

---

Plaintiffs have taken discovery for several years, yet they cannot explain the theory of their claims against Jed McCaleb. Rather than articulate how their factual allegations could support their claims, Plaintiffs argue that their complaint only needs to put McCaleb "on notice" of the claims against him. *See, e.g.,* Response at 1, 5-6. But inserting a defendant's name into the rote elements of a claim without any factual substance is insufficient. As the Mississippi Supreme Court explains, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Penn Nat. Gaming, Inc. v. Ratliff*, 954 So.2d 427, 431 (Miss. 2007). This is particularly true where, as here, the pleading is an amended complaint filed after years of extensive discovery.

Plaintiffs' argument also ignores the U.S. Supreme Court's clarification of the pleading standard in its *Twombly* and *Iqbal* decisions.[1] A complaint's allegations must at the very least "nudge … claims across the line from conceivable to plausible" and courts must exercise "judicial experience and common sense" when engaging in the "context-specific task" of determining

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

"whether a complaint states a *plausible* claim for relief." *Twombly*, 550 U.S. at 561-63, 570 (2007); *Iqbal*, 556 U.S. at 678-79 (2009) (emphasis added). Courts "are not bound to accept as true legal conclusions couched as factual allegations." *Iqbal*, 556 U.S. at 678. Because Mississippi courts are guided by federal practice, the U.S. Supreme Court's clarification of the pleading standard informs the analysis here. *See Penn Nat. Gaming*, 954 So.2d at 432 (citation omitted).

The time has come to determine whether the allegations in Plaintiffs' Amended Complaint state claims that are plausible on their face. Plaintiffs' Response reveals that they do not.

## I.   PLAINTIFFS' ALLEGATIONS DO NOT STATE PLAUSIBLE CLAIMS UNDER THE UCC

At the June 2018 hearing, this Court gave Plaintiffs a deadline for clarifying their UCC claims. Yet Plaintiffs' amended UCC claims are still conclusory, contradictory, and scattershot. Dismissal is required here because Plaintiffs' scant factual allegations alongside generalized recitations of the elements of claims do not state plausible claims for relief.

### a.   *Plaintiffs cannot articulate how McCaleb is a "seller"*

For Plaintiffs' Chapter Two claims (Counts One through Four) to survive, McCaleb must be a "seller" as defined by the UCC. A "seller" is "a person who sells or contracts to sell goods," and a "sale" is "passing of title from the seller to the buyer for a price." Motion at 2 (quoting Miss. Code Ann. §§ 75-2-103(1)(d) and 75-2-106(1)). Here, the critical feature of a sale is that the seller *must have title* to the item being sold.

Plaintiffs argue that McCaleb is a seller because "transactions did not pass simply from one client to another," and instead involved (1) funds moving from the buyer to McCaleb before being transmitted to the seller, (2) McCaleb charging a commission on transactions, and (3) McCaleb "t[aking] possession of [the] bitcoins." Response at 3. Thus, Plaintiffs' argument is that

2

every exchange of money for bitcoins between MTGOX users was really two transactions: (1) a sale from one MTGOX user to MTGOX, and (2) a second sale from MTGOX to another MTGOX user. Under this strained theory, MTGOX—and, by extension, McCaleb—was a seller in every bitcoin transaction between two users on the MTGOX exchange.

But the allegations above do not support a plausible inference that when one MTGOX user sold bitcoins to a second MTGOX user, title passed from MTGOX to the second MTGOX user for a price, making MTGOX the seller. *See* Miss. Code Ann. § 75-2-106(1). For one thing, if MTGOX "t[ook] possession" of bitcoins after *every* transaction between users on the exchange, it necessary took possession *from itself*—a meaningless transfer of possession with no implications on transfer of title. Plaintiffs conspicuously avoid explaining how this or the other two factors they mention support an inference that McCaleb was a seller.

Instead, Plaintiffs attempt to avoid the need to plausibly allege McCaleb was a seller by insisting that they need "further discovery" or "expert testimony" regarding "technical details of how bitcoins were transferred on the site." Response at 3. But they need to *allege* facts that state a claim; discovery is for gathering *evidence* to prove those allegations. Because Plaintiffs' allegations do not support a plausible claim that McCaleb was a seller, the Court should dismiss their UCC Chapter Two claims.

b. *Plaintiffs cannot articulate how bitcoins have an "issuer"*

Plaintiffs' UCC Chapter Eight claim (Count Five) can only proceed if bitcoins are a security. But as stated above, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Penn Nat. Gaming*, 954 So.2d at 431. Plaintiffs' Amended Complaint merely makes conclusory assertions that McCaleb was a

3

"securities intermediary" without alleging any facts that support an inference that he was one. *See* First Amended Complaint ("FAC") ¶¶ 49-50.

McCaleb's motion argued that bitcoins have no issuer and therefore cannot meet the statutory definition of a "security;" Plaintiffs' response is simply that "only notice pleading is required under Mississippi law." *See* Response at 5-6. Plaintiffs do not even try to articulate how the facts they allege could support an inference that bitcoins have an "issuer." This is because Plaintiffs cannot allege in good faith facts that support the inference that there is an "issuer" of bitcoins under the UCC. The Court therefore should dismiss Count Five.

c.  *Plaintiffs' own allegations and authorities show that "delivery" occurred*

As Plaintiffs argue, "delivery is accomplished when the risk of loss passes from seller to buyer." Response at 4-5 (citing Miss. Code Ann. § 75-2-509). Applying that test, Plaintiffs' own allegations show that McCaleb delivered the bitcoins to Plaintiffs. Under Section 75-2-509(2)(b), "where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer: … (b) on acknowledgement by the bailee of the buyer's right to possession of the goods." Plaintiffs allege that the bitcoins were credited to Plaintiffs' account and that Plaintiffs (and the hacker) then transferred them out of that account. *See* FAC ¶¶ 9-11. The allegations that MTGOX permitted Plaintiffs (or someone else using their login) to transfer bitcoins in Plaintiffs' account out of the MTGOX exchange necessarily imply that MTGOX had acknowledged Plaintiffs' right to possess those bitcoins. What could be a more unambiguous acknowledgement of a party's right to possess something than allowing him to remove it from one's own possession? Because Plaintiffs' own allegations presume delivery, the Court should dismiss the UCC Chapter Two claims.

d.  *Plaintiffs' allegations are inconsistent with bitcoins being "goods"*

4

Plaintiffs explicitly allege that bitcoins are a cryptocurrency, which is incompatible with them being a good. *See* Mot. at 3; FAC ¶ 8 (explaining that bitcoin is "a digital cryptocurrency"). Plaintiffs respond with a flawed syllogism: if Bitcoin (with a capital "B") is software, and software is a "good," then bitcoins (the currency generated by running the Bitcoin software) also are "goods." *See* Response at 4. *See also* FAC ¶ 6 ("Bitcoin with capitalization is commonly used to describe the concept of Bitcoin of the entire network itself while bitcoins are commonly used to describe the unit of account."). Because "Bitcoin" and "bitcoins" are different things, Bitcoin's status as a good does not mean bitcoins are goods.

Plaintiffs also attacks a straw man by arguing that bitcoins are not "money" under the UCC definition. Response at 4. McCaleb argued that bitcoins are not "goods," but not that bitcoins are "money."

Because Plaintiffs' factual allegations are inconsistent with bitcoins being "goods," the Court should dismiss the UCC Chapter Two claims.

## II.   PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ON THE FACE OF THE COMPLAINT

Plaintiffs' first response to McCaleb's statute of limitations arguments is to urge the Court to reject them because a different motion with statute of limitations arguments did not prevail. But Plaintiffs provide no argument that this motion is procedurally improper and no citation to support their suggestion that the grounds for the two motions are the same. As explained below, their substantive response to McCaleb's statute of limitations arguments is no better.

### a.   *Several of Plaintiffs' claims are time-barred on the face of the complaint*

As stated in the Motion to Dismiss, taking the facts pled in the Amended Complaint as true, Plaintiffs knew at the moment they discovered the theft on January 9, 2011 that McCaleb

had: (1) breached his contract to keep the bitcoins safe (Count Six); (2) negligently safeguarded Plaintiffs' bitcoins (Count Nine); (3) failed and refused to deliver the bitcoins purchased by Plaintiffs (Counts Eight and Ten); (4) failed to exercise the required level of care as bailee to safeguard the bitcoins (Count Fourteen); (5) fraudulently and/or negligently misrepresented that MTGOX was a secure cryptocurrency exchange (Counts Fifteen and Sixteen); and, (6) breached his fiduciary duty as a safe and secure bitcoin exchange (Count Twenty). The statute of limitations would have accrued for all claims by this date, regardless of whether accrual is triggered by breach (Counts Six, Seven, Eight, Ten, Fifteen, Sixteen, and Twenty) or knowledge of injury (Counts Nine and Fourteen). *See* Motion at 5-7. Plaintiffs' only responses are conclusory statements and tolling or equitable doctrines.

### b. *Plaintiffs fail to plead fraudulent concealment with the requisite particularity*

Plaintiffs do not plead fraudulent concealment with the required particularity. Fraudulent concealment is subject to the heightened pleading standards for fraud and therefore requires "[t]he circumstances of the alleged fraud such as the time, place and contents of any false representations or conduct" to be pled with specificity. *Trustmark Nat. Bank v. Meador*, 81 So.3d 1112, 1119 (Miss. 2012) (fraudulent concealment subject to heightened standard); *see also In re Hudson*, 962 So.2d 90, 93 (Miss. Ct. App. 2007) (describing heightened fraud standard). Plaintiffs' allegation that McCaleb said he thought Baron was going to return Plaintiffs' bitcoins does not support fraudulent concealment. *See* Response at 11. Rather, fraudulent concealment requires "some act or conduct of an affirmative nature designed to prevent *and which does prevent discovery* of the claim." *Meador*, 81 So.3d at 1119. Plaintiffs have pled nothing with specificity or particularity that can be said to have *prevented discovery* of a claim. In fact, Plaintiffs allege that they knew of their

injury in January 2011 and that they promptly took action. *See* FAC ¶¶ 11-13. Plaintiffs'
allegations therefore cannot support the application of fraudulent concealment.

   c. *The discovery rule does not apply because Plaintiffs knew of their injury*

   The discovery rule does not apply here because Plaintiffs' injury is not a latent injury.
*Sutherland v. Estate of Ritter*, 959 So.2d 1004, 1008 (Miss. 2007). The injury here was the
deprivation of Plaintiffs' possession and enjoyment of their bitcoins. By their own admission,
Plaintiffs knew in January 2011 that the bitcoins had been taken. *See* FAC ¶ 11. A "latent injury"
is "one where the plaintiff will be precluded from discovering harm or injury" because it is "an
injury which is hidden or unseen." *Sutherland*, 959 So.2d at 1008. The cases cited by Plaintiffs are
medical negligence cases (or quote medical negligence cases in dicta) and apply a different
statutory discovery rule. *Id.*; *see* Response at 11-12.

   d. *Plaintiffs have not pled a continuing tort*

   The continuing tort doctrine requires "repeated acts of wrongful conduct" to toll the statute
of limitations and does not apply "[w]here the tortious conduct has been completed." *Peavey Elecs.
Corp. v. Baan U.S.A., Inc.*, 10 So.3d 945, 955 (Miss. Ct. App. 2009) (quoting *Stevens v. Lake*, 615
So.2d 1177, 1183 (Miss. 1993)). "[C]ontinual ill effects from an original violation" do not trigger
the continuing tort doctrine. *Id.*

   Here, the injury is the deprivation of Plaintiffs' use and benefit of their bitcoins, and it
occurred when their bitcoins were stolen. A continued deprivation of property due to theft does
not trigger the continuing tort doctrine. *See Sporn v. MCA Records, Inc.*, 448 N.E.2d 1324, 1326
(N.Y. Ct. App. 1983). Like in *Peavey,* claims of alleged misrepresentations *after* the original
violation are not relevant to a continuing tort analysis. *Id.* ("If Baan fraudulently induced Peavey
to purchase defective software, the tort was completed with the purchase. Baan's subsequent

7

denials that the software it tendered was defective, even if false, do not transform this into a 'continuing' tort."). The continuing tort doctrine does not apply here.

> e.   *Plaintiffs' allegations do not support application of equitable estoppel*

Finally, Plaintiffs argue that equitable estoppel should bar McCaleb from asserting a statute of limitations defense. Unlike the other doctrines, equitable estoppel is not a tolling doctrine. Instead, it is an equitable remedy to bar an otherwise valid statute of limitations defense, "an extraordinary remedy" that "should only be invoked to prevent unconscionable results." *Harrison Enterprises, Inc. v. Trilogy Communications, Inc.*, 818 So.2d 1088, 1095 (Miss. 2002).

A party invoking equitable estoppel must establish it was induced by the defendant's conduct not to file its complaint sooner, resulting in its claim being barred by the statute of limitations, and that the defendant knew or had reason to know that would happen. *Peavey*, 10 So.3d at 953. Plaintiffs freely admit that by March 2012 they had full knowledge of their claims and that the bitcoins were not going to be returned. *See* Response at 11; FAC ¶¶ 24-26. At that time, nearly two years remained on the statute of limitations, but they did not file during that period. Plaintiffs' failure to file their claim for the next two years did not result in any way from any of McCaleb's conduct. *See Townes v. Rusty Ellis Builder, Inc.*, 98 So.3d 1046, 1056 (Miss. 2012). This is particularly true where, as here, the conduct Plaintiffs allege they relied on was Mark Karpeles's conduct, not McCaleb's. The complaint alleges that McCaleb's involvement ended in March 2011, three years before they sued him. *See* FAC ¶¶ 21-22. Plaintiffs do not allege facts that support a reasonable inference that McCaleb induced them to wait to file their complaint until the statute of limitations had run.

### III.   PLAINTIFFS CANNOT PROVE ANY SET OF FACTS THAT CREATE A CONSTRUCTIVE TRUST OR ACCOUNT STATED

    *a.  Account stated*

Plaintiffs offer no response to McCaleb's argument that their complaint does not allege he promised to pay them anything—an element of an account stated claim whose absence is fatal to Count Eight. *See* 1 Am. Jur. 2d Accounts and Accounting §§ 32-33; *see also Ingalls v. Ingalls Iron Works, Co.*, 258 F.2d 750, 751-52 (5th Cir. 1958) (account stated presupposes debt account to be settled). Furthermore, "an account stated cannot create primary liability or be utilized simply as another means to attempt to collect under a disputed contract since account stated merely determines the amount of the debt where liability previously existed." *Id.* Therefore, even if there was a set of facts that supports an account stated, it is not an independent cause of action.

Regarding the other element of an account stated claim—a prior debtor-creditor relationship between the parties—Plaintiffs respond only that "it is not, to Plaintiffs' mind, so clear" that no such relationship existed. But they do not identify any allegations or reasons that would support a conclusion that Plaintiffs were McCaleb's creditors; their response is not an argument at all.

    *b.  Constructive trust*

Plaintiffs' claim for constructive trust relies on and requires that McCaleb "embezzled cash and bitcoins" that belong to them, but they should be estopped from asserting that claim based on their own admissions. FAC ¶ 80. Plaintiffs have deposed McCaleb and reviewed thousands of documents he produced, yet at the June 5, 2018 discovery hearing Plaintiffs' counsel admitted that there is no evidence to support a claim that McCaleb stole their bitcoins. Plaintiffs therefore should be judicially estopped from proceeding with a claim premised on the theory that McCaleb stole from them. *See Kirk v. Pope*, 973 So.2d 981, 991 (Miss. 2007) (estoppel appropriate where current position is inconsistent with previous one and court accepted previous position).

## CONCLUSION

WHEREFORE, for the reasons stated above, and those set forth in the previously-filed

Motion to Dismiss, McCaleb urges the Court to dismiss Plaintiffs' claims with prejudice.

Respectfully submitted, this the 5th day of November, 2018.

**JED McCALEB and
CODE COLLECTIVE, LLC**

By:   */s/ Edwin S. Gault Jr.*

EDWIN S. GAULT, JR. (MSB #10187)
MANDIE B. ROBINSON (MSB #100446)
T. PEYTON SMITH (MSB #103867)

*Attorneys for Defendants Jed McCaleb and
Code Collective, LLC*

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## CERTIFICATE OF SERVICE

10

I hereby certify that on November 5, 2018, I served a true and correct copy of the foregoing document via electronic mail to the following counsel of record:

> Armin J. Moeller, Jr.
> Walter H. Boone
> Christine Crockett White
> Jonathan P. Dyal
> Andy Lowry
> Patrick Everman
> Perry P. Taylor
> Balch & Bingham, LLP
> 188 East Capitol Street
> Jackson, MS 39201-2608
> wboone@balch.com
> cwhite@balch.com
> alowry@balch.com
>
> **_Attorneys for Plaintiffs_**

THIS, the 5th day of November, 2018.

> _/s/ Edwin S. Gault, Jr._
> EDWIN S. GAULT, JR.

11

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**RAGGIO, et al.**                                                        **PLAINTIFFS**

**vs.**                                          **CIVIL ACTION NO. 14-0071**

**MTGOX, INC., et al.**                                                **DEFENDANTS**

## ORDER

THIS MATTER is before the Court on Defendants Jed McCaleb and Code Collective, LLC's Supplement to the Motion for Reconsideration [Docket No. 239]. For the reasons stated on the record following the November 9, 2018, hearing, the Court finds that the motion is not well-taken.

ACCORDINGLY, IT IS HEREBY ORDERED that Defendants Jed McCaleb and Code Collective, LLC's Supplement to the Motion for Reconsideration [Docket No. 239] is DENIED.

SO ORDERED, this the _____ day of November, 2018.

_____
Circuit Judge

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                          **PLAINTIFFS**

**V.**                                          **CIVIL ACTION NO. 14-71**

**MTGOX a sole proprietorship, et al.**                        **DEFENDANTS**

### AGREED ORDER AMENDING SCHEDULING ORDER

ON THIS DAY the Court has considered the parties' joint request for to amend the briefing schedule for the parties' designations of expert witnesses in this matter, set by order of this Court [227]; and, finding that this request is well taken and in the interests of the orderly administration of justice, hereby orders as follows:

1.    Plaintiffs will serve designations of their expert witnesses, if any, no later than December 7, 2018.

2.    Defendants will serve designations of their expert witnesses, if any, no later than January 18, 2019.

The order [227] is otherwise unchanged.

SO ORDERED, this the _13th_ day of November, 2018.

_____
CIRCUIT COURT JUDGE

Prepared & submitted by:

*/s/ Andy Lowry*
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944
BALCH & BINGHAM, LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
(601) 961-9900 Phone
(888) 954-5405 Fax
alowry@balch.com
amoeller@balch.com

*Attorneys for Plaintiffs*

Agreed to by:

*s/ Edwin S. Gault, Jr.*
Edwin S. Gault, Jr., MSB # 10187
Amanda B. Robinson, MSB # 100446
T. Peyton Smith, MSB # 103867
FORMAN WATKINS & KRUTZ LLP
Post Office Box 22608
Jackson, Mississippi 39201
Win.Gault@formanwatkins.com
Peyton.Smith@formanwatkins.com
Mandie.Robinson@formanwatkins.com

Ethan Jacobs (admitted *pro hac vice*)
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

*Attorneys for Defendants*

2

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                              **PLAINTIFFS**

**V.**                                                      **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual**                              **DEFENDANTS**

---

**JED MCCALEB AND CODE COLLECTIVE, LLC'S REPLY TO PLAINTIFFS'
RESPONSE OPPOSING MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiffs' Opposition effectively admits the core arguments of McCaleb's motion: Plaintiffs failed to seek cover, and Plaintiffs' damages should be measured at the time of the alleged theft. Plaintiffs' principal response is that that they could not cover, but they only provide evidence of *one* Plaintiff's inability to cover *fourteen months* after the theft. The balance of Plaintiffs' Opposition addresses irrelevant issues, such as arguments under other states' law that Plaintiffs can seek consequential damages and raising supposed areas of factual dispute (and unexplored discovery) on topics that are not necessary to deciding McCaleb's motion.

This motion seeks to prevent Plaintiffs from obtaining a windfall that is without precedent in the history of litigation: they seek to make McCaleb responsible for Bitcoin's *twenty-thousand-fold* increase in value during the seven-year period when, because they did not seek cover or mitigate their damages, Plaintiffs bore no risk for bitcoin's rise or fall. Cover and mitigation allocate that risk with the plaintiff, the person who is better situated to evaluate and address his own risk of loss instead of letting his damages proliferate. Mississippi law does not support the outlandish recovery Plaintiffs seek here. The facts and law on the measure of damages are clear, and summary judgment is appropriate.

1

## I.   PLAINTIFFS DO NOT REBUT THAT THEY FAILED TO COVER OR MITIGATE DAMAGES AND THAT THEY HAD THE ABILITY TO COVER AT THE TIME OF THE BREACH

Plaintiffs acknowledge that they had a duty to cover or mitigate their damages and admit they failed to do so. Yet they contend that a fact question precludes summary judgment because they could not afford to cover or mitigate in March 2012, more than a year after the theft. Because Plaintiffs present no evidence that they could not cover at the time of the alleged theft, in January 2011, this argument fails and McCaleb's motion must be granted.

### a.   Plaintiffs do not dispute that they could have covered in early 2011

Plaintiffs admit they did not cover but argue they were unable to cover because in March 2012, Chris Raggio could not afford to purchase replacement bitcoins. Opposition Motion at 4 (¶ 15). But they offer no evidence that they could not cover during the fourteen months that followed the alleged theft in January 2011. This omission alone dooms their argument to failure.

### b.   Plaintiffs could have covered in early 2011

Furthermore, the evidence shows that Plaintiffs had both the financial and practical means to purchase replacement bitcoins in the weeks immediately following the theft. On December 29, 2010, shortly before the alleged theft, Plaintiffs withdrew $10,000 worth of cash from their MTGOX account. *See* McCaleb Original Exhibit I at 21.[1] Donald Raggio had several thousand dollars in his bank account on January 10, 2011. *See* Bancorp South documents, attached as McCaleb Exhibit L.[2] Plaintiffs' funds therefore were more than sufficient to purchase replacement bitcoins, which were valued at approximately $3,000 at the time of the alleged theft. *See* McCaleb Original Exhibit E.

---

[1] To avoid duplication, references to "Original" exhibits are to those exhibits of record to the Defendants' Motion for Partial Summary Judgment on the Measure of Damages, Doc. 232.
[2] This document is being filed under seal.

And if Plaintiffs did not want to use MTGOX, they knew of other bitcoin exchanges where they could buy bitcoins close to the time of the theft: In December 2010, less than one month before the theft, Plaintiffs purchased 1,500 bitcoins on BitcoinGateway.com, a different bitcoin exchange. *See* McCaleb Original Exhibit I at 5, 26-28.

Plaintiffs had the financial and practical means to purchase cover bitcoins in the weeks following the alleged theft in January 2011. Plaintiffs' Opposition does not contest that they could have purchased replacement bitcoins shortly after the alleged theft—nor could they contest it.

c. *Plaintiffs make no argument for why their cover obligation was only triggered in March 2012*

Plaintiffs offer no argument for why their obligation to cover or mitigate the January 2011 loss of their bitcoins did not arise until March 2012. A plaintiff has a duty to cover or mitigate damages "within a reasonable length of time" of the breach. *Travelers Indem. Co. v. Rawson*, 222 So.2d 131, 135 (Miss. 1969); Miss. Code Ann. § 75-2-712. March 2012 is more than a year after the bitcoins allegedly were stolen. Even accepting Plaintiffs' representations about their inability to cover or mitigate in March 2012, a year of delay is not a "reasonable time" as a matter of law.

d. *Plaintiffs only offer Chris Raggio's affidavit testimony about his finances as evidence of their financial inability to cover and are silent about Donald Raggio's finances*

Even if Plaintiffs' obligation to cover did not arise until March 2012, Chris Raggio's financial condition at the time would not have relieved them of their obligation to cover or mitigate. That is because Plaintiffs offer no evidence regarding *Donald Raggio's* finances in March 2012. Opposition Memorandum at 14-16; Opposition Motion at 3 (¶ 11); Plaintiffs' Exhibit A. Plaintiffs' own admissions in discovery establish that Donald Raggio funded their bitcoin investing; Chris Raggio's finances alone are not sufficient to prove neither Plaintiff could purchase replacement bitcoins. *See* Plaintiffs' July 11, 2016 Motion to Allow Time for Discovery Under Rule 56, attached as McCaleb Exhibit M, at 3 ("Chris did not have the capital for such a speculative

3

investment strategy, but suggested the idea to his father, Donald Raggio, who did have the capital.").

Evidence of Chris Raggio's finances therefore do not create a contested issue of fact regarding Plaintiffs' inability to cover. "[T]he existence of a hundred contested issues of fact will not thwart summary judgment where none of them is material." *Evan Johnson & Sons Const., Inc. v. State,* 877 So.2d 364, 364-65 (Miss. 2004). And the Court cannot surmise that Donald Raggio could not cover merely because Chris Raggio could not. *See Hertz Corp. v. Goza*, 306 So.2d 657, 661 (Miss. 1974) ("to leave the issue to surmise or conjecture is never sufficient"). Plaintiffs' collective financial resources—not Chris Raggio's alone—are the relevant factor for evaluating their ability to cover. And Plaintiffs do not provide any evidence that Donald Raggio was financially incapable of purchasing replacement bitcoins. Plaintiffs' "inability to cover" argument therefore fails for this additional reason.

e. *Chris Raggio should be judicially estopped from refusing to disclose his financial information and claiming financial inability to cover*

Furthermore, Chris Raggio's self-serving affidavit testimony about his financial resources—without any reference to financial records—is not a valid basis for avoiding summary judgment. *Chapel Hill, LLC v. SoilTech Consultants, Inc.*, 112 So.3d 1097, 1102 (Miss. Ct. App. 2013). That is especially true here, where McCaleb sought "evidence of the Raggios' financial information" for the explicit purpose of showing "the Raggios' ability and failure to mitigate damages by purchasing replacement bitcoins." *See* McCaleb's Response to Plaintiffs' Motion for Protective Order (Doc. 145) at ¶ 5. Defendants objected to producing that discovery and succeeded, concealing the evidence of Chris Raggio's 2012 finances. *See* Plaintiffs' Motion for Protective Order. (Doc. 138); *see also* June 5, 2018 Order (Doc. 195). They should not be allowed to take the position that McCaleb cannot obtain evidence of Chris Raggio's finances and then offer testimony

on that topic. *See Kirk v. Pope*, 973 So.2d 981, 991 (Miss. 2007) (estoppel appropriate where position is inconsistent with previous one and court accepted previous position).

f.   *Plaintiffs' subjective opinion about the safety of bitcoin exchanges in 2012 does not preclude summary judgment*

Plaintiffs also attempt to create a fact issue through Chris Raggio's affidavit testimony that he "was not aware of another location where [he] could safely replace that number of … bitcoin" in March 2012. Opposition Ex. A ¶ 17. But Plaintiffs provide no legal authority for the proposition that a cover or mitigation obligation fails if a plaintiff has a purely subjective opinion about the safety of marketplaces or if a plaintiff claims ignorance of any suitable marketplace with no indication that he expended any effort to investigate or identify one. Indeed, if that kind of subjective opinion were enough to defeat a mitigation defense, the defense would cease to exist.

And here, the objective evidence—the evidence outside Chris Raggio's head—shows that there were widely-known alternatives to MTGOX for purchasing bitcoins in March 2012. *See, e.g.,* Kaplanov, Nikolei M., "Nerdy Money: Bitcoin, The Private Digital Currency, and the Case Against Its Regulation," 25 Loy. Consumer L. Rev. 111, 122-23 (2012) (discussing the Camp BX bitcoin exchange in 2012), attached in relevant part as McCaleb Exhibit N; Doguet, Joshua J., "The Nature of the Form: Legal and Regulatory Issues Surrounding the Bitcoin Digital Currency System," 73 La. L. Rev. 1119, 1145-46, FN 201-202 (2013) (discussing Camp BX's trustworthiness and noting its existence in 2011), attached in relevant part as McCaleb Exhibit O. One of those exchanges, Camp BX, even had representatives present at a New York bitcoin convention that Chris Raggio attended in August 2011. *See* McCaleb Original Exhibit J at 40:6-9, 115:12-21; McCaleb Original Exhibit A at 15; Additional E-mail, attached as McCaleb Exhibit P; IEEE Spectrum article on conference, attached as McCaleb Exhibit Q, at 2 (Camp BX and MTGOX identified as bitcoin exchanges participating in conference). The Raggios cannot avoid

summary judgment on their failure to cover or mitigate damages by claiming Chris Raggio's completely subjective state of mind made cover impossible.

## II.    PLAINTIFFS CITE NO RELEVANT AUTHORITY THAT DAMAGES ARE MEASURED AT A TIME OTHER THAN THE TIME OF BREACH

McCaleb's motion provided legal authority that the measure of damages for each of Plaintiffs' numerous causes of action is the value of the bitcoins at the time of the alleged theft. Motion at 5-7. Plaintiffs ignore the caselaw for the claims other than conversion. And even those cases establish that the value of the property at the time of the theft controls.

  *a.  The measure of damages for Plaintiffs' claims is the value of the bitcoins at the time of the alleged theft*

The measure of damages for every one of Plaintiffs' claims is the value of the property at the time it was taken or lost. *See* Motion at 5-7 (collecting cases). Plaintiffs do not dispute that they learned of the alleged theft on January 9, 2011. Therefore, the measure of damages here is the value of the lost or stolen property on that date. In Mississippi, "[t]he measure of damages permitted is a matter of law" even where the amount of those damages might be a factual inquiry. *Wachob Leasing Co., Inc. v. Gulfport Aviation Partners, LLC*, 2016 WL 10536040, *5 (S.D. Miss. 2016) (aff'd 730 Fed. Appx. 277 (5th Cir. 2018)).

Although Plaintiffs cite several conversion cases in which courts permitted recovery of consequential damages or lost profits, none of those authorities contradict the Mississippi Supreme Court's clear statement that "the measure of damages in an action for conversion is the value of the property at the time and place of its conversion." *Masonite Corp.*, 404 So.2d at 568. The availability of consequential damages in addition to general damages is a separate question from the appropriate measure of general damages. Plaintiffs' authorities do not change the time for measuring general damages.

  *b.  Plaintiffs' conversion cases support McCaleb's position*

Plaintiffs rely on only two Mississippi cases to argue that Plaintiffs can recover the present-day $165 million value of the bitcoins they lost instead of its $3,000 value at the time of the loss. Opposition Memorandum at 11-13 (citing *Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So.2d 187 (Miss. 2000) and *Jamison v. Moon*, 43 Miss. 598 (1870)). Both cases are limited to conversion claims and neither supports Plaintiffs' position. *Id.*

In *Pride Oil*, the Mississippi Supreme Court affirmed a summary judgment order limiting Pride's award of damages to the fair market value of the converted property, concluding that "[a]n award of lost profits to Pride would sanction a windfall." *Id.*, 761 So.2d at 192. All the decision's language relating to consequential damages and lost profits is non-binding dicta. Plaintiffs seek the value of the stolen or converted property measured at its value today, but the *Pride Oil* court made clear that damages for conversion of property is measured *at the time of conversion*. *Id.* at 191-92.

Plaintiffs' other Mississippi decision, *Jamison*, is a conversion case from 1870. And while the *Jamison* court discussed some non-Mississippi decisions, it ultimately concluded that "[i]f there has been a wrongful taking, the redress would not be complete in any state of circumstances, unless the trespasser paid the value of the property, *as of the time of taking*, and interest to the time of trial." *Jamison*, 43 Miss. At 603 (emphasis added). As with *Pride Oil*, Plaintiffs' argument relies on dicta, but the Court's ruling supports McCaleb's position. Plaintiffs' damages are based on the value of the bitcoins at the time of the theft and Plaintiffs cannot cite a single Mississippi case from any of the last three centuries that supports their argument to the contrary.

Plaintiffs also cite decisions from other jurisdictions—Colorado, Connecticut, Louisiana, Massachusetts, Alabama, and Texas—that are not binding here. Moreover, these decisions are distinguishable on their face: every one involved securities (which in Mississippi would be covered by the UCC). And several of the decisions support McCaleb's position.

7

For example, in *Vanderbeek*, the court explained:

> Profits from a stock investment are not realized until the stock is sold at a higher price than that at which it was bought. These … shares … were neither bought nor sold. Thus, … determining the profits Respondent could have realized … is entirely dependent on an arbitrarily chosen 'sell' date."

*Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 874 (Colo. 2002). The court therefore found "lost profits" were too speculative given the wide range of prices at which the stock could have been sold. *Id.*, 50 P.3d at 875. The same reasoning holds here: the profits from Plaintiffs' allegedly stolen bitcoins are entirely dependent on an arbitrarily chosen "sell" date, and the prices on different dates varied wildly.

Plaintiffs quote the language in *Reed* that "the true and just measure of damages" is a value "between the time of its conversion and a reasonable time after the owner has received notice of the conversion to enable him to replace the stock." *Id.*, 571 S.W.2d at 397. But the *Reed* court went on to say that "[i]f the owner desires to receive earnings or recover the full matured value, *he has the obligation to replace the lost security*." *Id.* (emphasis added).

Plaintiffs' other cases support McCaleb's position except in instances of intentional conversion or where the defendant still possesses the converted property at the time of suit. *See Glaspey v. Prelusky*, 219 P.2d 585, 595 (Wash. 1950) (ordinary conversion damages are "the market value of the property at the time and place of its conversion" while willful conversion allows "highest market value" between conversion and filing suit); *Plikus v. Plikus*, 599 A.2d 392, 394 (Conn. Ct. App. 1991) (higher damages allowed if property still in possession of defendant). Plaintiffs admit they have no evidence to support a claim of intentional conversion by McCaleb, and the complaint does not allege McCaleb still has Plaintiffs' stolen bitcoins. Opposition Motion at 4 (¶ 15); *see also* Section V(a)-(c) below.

8

Again, "[i]t is well settled in this state that the measure of damages in an action for conversion is the value of the property at the time and place of its conversion." *Masonite Corp.*, 404 So.2d at 568. Plaintiffs cite nothing that contradicts this. Therefore, summary judgment as to the measure of damages in this case must be granted.

### c.   *Market gain is not the same as lost profits or consequential damages*

Although consequential damages or lost profits are recoverable in some circumstances, that is not what Plaintiffs seek here. The UCC defines "consequential damages" as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Miss. Code Ann. § 75-2-715(2)(a).  In the context of contract law, consequential damages are "losses proximately resulting from a contractual breach . . . which the parties at the time of contracting had reason to foresee as a probable result of the breach." *GuideOne Elite Insurance Co. v. Mount Carmel Ministries*, 676 Fed.Appx. 269, 279 (5th Cir. 2017) (applying Mississippi law). Lost profits are not a distinct type of damages but rather are a subset of consequential damages. *See Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 371 (5th Cir. 2002) ("Under Mississippi law, lost profits are recoverable as consequential damages").

Here, Plaintiffs seek a different kind of damages: the bitcoins' market gain—*i.e.,* the difference in between the market value of the bitcoins today and at the time of breach. Future market appreciation is precisely the type of damage that underlies the obligations cover and mitigate damages. A twenty-thousand-fold market gain over a seven-year span is never a loss that parties foresee "as a probable result of the breach" of a contract. This is in part because implicit in any contract is the understanding that if the object of the contract is lost, destroyed, or not delivered due to breach, the non-breaching party will purchase a replacement at the time of the breach or a reasonable time thereafter if needed to stem further injury.

9

Consequential damages and lost profits address an entirely different type of injury that is not at issue here. *Pride Oil* discusses examples of true consequential damages, such as hotel expenses incurred after property was stolen and indemnification by the converting party for environmental clean-up costs on underground gasoline tanks used without authorization. *Id.* 761 So.2d at 192. These damages are natural but indirect *consequences* of the breaches. The future appreciation of an asset is not a *consequence* of a breach: it happens independent of the breach.

When lost profits are recoverable it is because these damages can be shown to be contemplated by the parties by analyzing (1) a business's past profits or (2) already-contemplated re-sales of the property at issue. *See, e.g., Warren v. Derivaux*, 996 So.2d 729, 737 (Miss. 2008) (past profits sufficient method to establish lost profits); *J.T. White & Co. v. George S. Leatherbury, Jr., Co.*, 34 So. 358, 359 (Miss. 1903) (lost profits available where "vendor knows his chattels are being purchased for resale at a particular place" because "he should have contemplated" lost profits); *Mississippi Chemical Corp.*, 287 F.3d at 369-70 (calculating lost profit via lost sales); *see also, Miga v. Jensen*, 96 S.W.3d 207, 213, 217 (Tex. 2002) (market gain not lost profits because no re-sale of stock contemplated); *National Bank of Cleburne v. M.M. Pittman Roller Mill*, 265 S.W. 1024, 1025-26 (Tex. Ct. App. 1924) (excluding lost profits where no evidence of intent to re-sale); *Tractabel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements."). Increasing market values factor into lost profits damages where the parties explicitly contemplate re-sale of the property and, in many cases, where existing contracts with third parties already contemplate re-sale as well. *Id.*; *Piekarsky v. Rossman*, 95 F.Supp. 748,750-52 (M.D. N.C. 1951) (lost profits for increased market value where re-sale contemplated); *Campbellsville Lumber Co. v. Bradlee*, 29 S.W. 313, 315 (Ct. App. Ky. 1895) (market value relevant to breach of lumber sale when re-sale

certain and known by parties); *Bush v. Addison*, 151 S.E. 526 (Ct. App. Ga. 1930) (lost profit on cattle sale disallowed because re-sale not planned at time of contract).

Although Mississippi courts have not discussed this specific issue, the *Pride Oil* court treated consequential damages and lost profits as distinct from any damages related to a change in the property's market value. *Id.* 761 So.2d at 192. An intention to benefit from an asset as a long-term investment, without any plan for re-sale at the time of the contract, is not a contemplated re-sale that gives rise to consequential or lost profits damages.

The parties here did not contemplate at the time of contracting that Plaintiffs would re-sell their bitcoins. Indeed, Plaintiffs suggest that they would not have re-sold the bitcoins at all, but they have refused to disclose the prices at which they have sold other bitcoins. *See* Plaintiffs' Exhibit A at ¶ 5; McCaleb Original Exhibit I at 1-2, 5-6. Plaintiffs' theory amounts to the claim that the parties expected Plaintiffs to correctly predict bitcoin's all-time peak price and sell on that day. That is not consequential damages, and Plaintiffs therefore are not entitled to recover the market gain of the lost bitcoins.

### III.    PLAINTIFFS ARE NOT ENTITLED TO SPECIFIC PERFORMANCE

Several of Plaintiffs' damages theories are based in contract, including their claim that they are entitled to specific performance. McCaleb argued that there is no written contract at issue in this case, relying on affidavits and deposition testimony. Motion at 2 (¶ 8). Plaintiffs dispute this but cannot offer a scintilla of evidence to support their contention that a written contract exists. Opposition Motion at 2 (¶ 8). This case has been pending for several years and exhaustive discovery has been conducted, yet Plaintiffs still cannot identify any evidence to support the claim that a contract exists. Furthermore, Plaintiffs cannot identify any discovery that they intend to conduct in order to find a contract. Opposition Motion at 8-9; Plaintiffs' Exhibit B. Instead, Plaintiffs merely assert that they "do *claim* a breach of contract" and allude to representations on

the MTGOX website that it was "safe and easy." Opposition Motion at 2 (¶ 8). What could a jury infer about a contract's terms—and whether they were breached—from this isolated "representation?"

Plaintiffs' evidence is insufficient at the summary judgment phase to establish the existence of a contract between McCaleb and Plaintiffs. Mississippi courts consistently reject conclusory statements found in affidavits that lack substantial support. *See, e.g., Evan Johnson & Sons Const., Inc,* 877 So.2d at 364-65. At best Plaintiffs' are arguing an implied contract exists with McCaleb, but they have not identified any Mississippi case wherein specific performance was awarded based on an implied contract.

And even if Plaintiffs had evidence of a contract with McCaleb, they cannot articulate how money damages are an inadequate remedy, which is required to award specific performance. Even in *Cumbest*, the case Plaintiffs cite, the court focuses on the "irreplaceable" nature of the property at issue. *Cumbest v. Harris*, 363 So.2d 294, 296 (Miss. 1978)*.* And while the Court in *Osborne v. Bullins* notes an expanding availability of the remedy, it does so with the caveat that it must be feasible to give a plaintiff what he bargained for. *Id.,* 549 So.2d 1337, 1340 (Miss. 1989). Because Plaintiffs' stolen bitcoins were frozen in the "Baron" account, McCaleb does not have them, and therefore cannot give them to Plaintiffs. Summary judgment therefore is appropriate regarding Plaintiffs' requests for breach of contract damages including, but not limited to, specific performance.

## IV. LOST PROFITS AND CONSEQUENTIAL DAMAGES BASED ON BITCOIN'S UNFORESEEABLE APPRECIATION ARE IMPERMISSIBLY SPECULATIVE

Plaintiffs' injury must be foreseeable for them to recover lost profits or consequential damages. *See Massey-Ferguson, Inc. v. Evans*, 406 So.2d 15, 19 (Miss. 1981) (lost profits must be foreseeable); *see also Aetna Cas. & Sur. Co. v. Day*, 487 So.2d 830, 835 (Miss. 1986) ("generally

a plaintiff may recover consequential damages reasonably foreseeable at the time the contract was made"). As discussed above, the increased value of the bitcoins does not fit within the parameters of "lost profits" or "consequential damages." *See* Section II(c) *supra*. But even if it did, Plaintiffs cannot prove bitcoins' 20,000-fold appreciation was foreseeable. Plaintiffs offer no evidence that it was, and their own statements show the opposite.

Plaintiffs' own pleadings in this case state that "Chris [Raggio] did not have the capital for such a speculative investment strategy." McCaleb Exhibit M at 3 (referring to how the Raggios began investing in bitcoins). And in an email sent less than one month before the alleged theft, Chris Raggio described bitcoins to his father and stated: "Unfortunately, there are no real assets backing he [sic] currency of Bitcoin (and no coercive government backing it either). Thus ends BitCoin." McCaleb Original Exhibit A at 51 (describing cryptocurrency to his father). He then went on to describe a system different than Bitcoin that he thought could be viable. *Id.* "Thus ends BitCoin" and "speculative investment strategy" cannot be reconciled with the foreseeability of a $3,000 investment ballooning to $165 million in a few years.

Furthermore, no reasonable juror could conclude that a 20,000-fold increase in value in seven years is foreseeable under any set of facts. Plaintiffs have not and cannot cite any case in any jurisdiction that has found a commensurate increase in value to be foreseeable or awarded a windfall like that Plaintiffs seek here. Although Plaintiffs contend that the issue of foreseeability is improper for a court to consider on summary judgment, courts in Mississippi and elsewhere regularly engage in foreseeability determinations at the summary judgment phase. *See Rein v. Benchmark Const. Co.*, 865 So.2d 1134, 1146 (Miss. 2004) (affirming summary judgment based on lack of foreseeability); *Merix Pharmaceutical Corporation v. Clinical Supplies Management, Inc.*, 59 F.Supp.3d 865, 885 (N.D. Ill. 2014) (some consequential damages barred at summary judgment because not foreseeable); *Thistlethwaite v. Elements Behavioral Health, Inc.*, 2015 WL

13

11117306, *6 (D.N.M. 2015) (granting summary judgment on consequential damages because not foreseeable). Summary judgment on this issue therefore is appropriate.

## V.   PLAINTIFFS' REQUESTS FOR ADDITIONAL DISCOVERY ARE IRRELEVANT AND IMPROPER

Plaintiffs contend that additional discovery is needed before summary judgment can be granted, including: (1) a second deposition of Jed McCaleb, (2) a deposition of Mark Karpeles (whom they have not attempted to depose over the past four years), and additional discovery related to (3) the security of the MTGOX exchange, (4) the so-called "disputes" related to cover, and topics related to their speculation that McCaleb stole Plaintiffs' bitcoins or otherwise defrauded them. Opposition Motion at 8-9. This discovery is either inappropriate or irrelevant to the issues presented in McCaleb's motion.

### a.  McCaleb's deposition

Plaintiffs deposed Jed McCaleb on November 17, 2016 with the understanding that it would be their only opportunity to depose him. *See* E-mail Chain Re: Deposition, attached as Exhibit R; McCaleb Original Exhibit J at 4:14-19. And when they asked to re-open Mr. McCaleb's deposition, the Court denied it. McCaleb Original Exhibit K at 40. Now, four months later, Plaintiffs want to re-litigate the issue. McCaleb's deposition covered a wide array of topics, many of which Plaintiffs contend they need to revisit. McCaleb Original Exhibit J. Re-opening the deposition would be improper and further depositions of McCaleb are not necessary to deciding this motion. Moreover, this Court ruled in June that the topics about which Plaintiffs wanted to examine McCaleb—all relating to claims that he converted the bitcoins or otherwise defrauded Plaintiffs—are irrelevant. McCaleb Original Exhibit K at 40. Plaintiffs admit that no evidence suggests McCaleb defrauded the Plaintiffs or stole their bitcoins. Opposition Motion at 4 (¶ 15).

14

Nothing has changed in four months except Plaintiffs' counsel; that is an insufficient basis for reversing the Court's Order.

   b.   *Karpeles's deposition*

   Plaintiffs also claim they need to depose Mark Karpeles before summary judgment on the measure of damages can be decided. Opposition Motion at 8-9; Plaintiffs' Exhibit B. Yet Plaintiffs never served Karpeles when he was a party, dropped him from the caption of their recent Amended Complaint, and have not issued a subpoena to depose him. Although Plaintiffs allege that Karpeles conspired with McCaleb to defraud Plaintiffs and claim they want to depose him, their actions suggest instead that they are using their lackadaisical discovery as an excuse to avoid summary judgment.

   c.   *Fraud discovery*

   As noted above, Plaintiffs have admitted that after several years of litigation there is no evidence the McCaleb defrauded the Plaintiffs or stole their bitcoins. Opposition Motion at 4 (¶ 15). This subject was covered at the June 2018 hearing, where the Court made clear that discovery in pursuit of these theories was no longer relevant. And, again, this is not a basis for denying summary judgment on the proper measure of damages.

   d.   *MTGOX security discovery*

   Finally, Plaintiffs contend they need extensive discovery regarding the security of the MTGOX exchange. Opposition Motion at 8-9; Plaintiffs' Exhibit B. MTGOX's security measures are relevant to the merits of some of Plaintiffs' claims, but not to the damages arguments in this motion. The only conceivable relevance to damages is Plaintiffs' contention that McCaleb was "grossly negligent" in his maintenance of the MTGOX exchange. Opposition Memorandum at 3-5. Plaintiffs cannot in good faith contend that discovery will support such a claim.

To prove gross negligence, Plaintiffs must establish "willful, wanton, and reckless disregard for the rights of others." Mississippi Law of Damages 40:21 (3d ed.). The Mississippi Supreme Court has explained that the terms "willful, wanton, and reckless" connote a state of mind "treated in many respects as if harm was intended." *Maldonado v. Kelly*, 768 So.2d 906, 910 (Miss. 2000). This is an extraordinarily high bar, and Plaintiffs' cited evidence relies on mischaracterizing McCaleb's emails.

To support their gross negligence claim, Plaintiffs first point to the affidavit of their expert witness, who states that he believes McCaleb may have been grossly negligent. Opposition Memorandum at 4-6; Plaintiffs' Exhibit C (¶ 14). This opinion cannot create a fact issue because it is conclusory and lacks substantial support. *See, e.g., Evan Johnson & Sons Const., Inc.,* 877 So.2d at 364-65.

Plaintiffs also rely on an email in which McCaleb referred to a hack on the MTGOX site that had nothing to do with Plaintiffs or the theft of their bitcoins. Opposition Memorandum at 4-6; Plaintiffs' Exhibit D. The attack mentioned in that email involved manipulation of transactions from a site called "Liberty Reserve" and there is no mention of the theft of passwords or other security breaches associated with individual user accounts. *Id.* That is, it has nothing to do with the cause of Plaintiffs' loss—an unknown individual who accessed Plaintiffs' account using their own password. Plaintiffs seize on McCaleb's statement that "I know this guy was hacking around on the site" to suggest that McCaleb knew the individual was actively trying to hack MTGOX and took no action to stop him. *Id.* In context it is clear McCaleb is not saying he had known about it all along. Instead, McCaleb makes this statement to explain that *despite this hacker's efforts*, the site's security measures thwarted him for over a month. *Id.* This hardly suggests McCaleb had the intent to harm others.

While this hack has absolutely nothing to do with the Raggios, the record also makes clear that one of the security measures McCaleb had in place—limiting withdrawals to $1,000 worth of bitcoins per day—ultimately spared Plaintiffs the loss of *all* their bitcoins after their password was stolen. McCaleb Original Exhibit J at 36:10-17; Amended Complaint at ¶¶ 10-11. The alleged thief of Plaintiffs' bitcoins conducted the theft over three days, but the withdrawal limit prevented him from taking more than the 9,400 bitcoins at issue. Amended Complaint at ¶¶ 10-11. As established at his deposition, this is precisely why McCaleb had the security measure in place. McCaleb Original Exhibit J at 36:10-17. This allowed Plaintiffs to walk away with over 20,000 bitcoins, "a substantial majority" of which they still possess. *See* McCaleb Original Exhibit I at 5, 9; *see also* Plaintiffs' Exhibit A at ¶ 5.

Plaintiffs' cited evidence fails to create a genuine issue of fact that McCaleb was grossly negligent in his handling of security on the MTGOX; a gross negligence claim would require that McCaleb intended harm, and no reasonable juror could conclude he did based on Plaintiffs' cited evidence. *Maldonado*, 768 So.2d at 910 (gross negligence is treated as if "harm was intended"). Finally, even if Plaintiffs can create a fact issue, this argument is limited solely to the availability of punitive damages therefore the Court can still grant partial summary judgment while reserving until later the issue of punitive damages.

## CONCLUSION

Plaintiffs cannot rebut that the appropriate measure of damages is the value of the bitcoins at the time of the theft. Furthermore, there is no genuine issue of material fact on the issue of cover or mitigation of damages because the sole evidence Plaintiffs offer relates to the financial state of only one plaintiff a year after the theft—and the evidence shows Plaintiffs had the means to cover when the theft occurred. Finally, Plaintiffs' various other attempts to avoid the proper measure of damages—and to recover instead under alternative theories such as consequential damages, lost

17

profits, punitive damages, disgorgement of profits, and specific performance—cannot succeed on the facts of this case.

WHEREFORE, for the reasons stated above, and those set forth in the previously-filed Motion for Partial Summary Judgment, McCaleb urges the Court to grant Plaintiffs' motion for partial summary judgment.

Respectfully submitted, this the 15th day of November, 2018.

JED McCALEB and
CODE COLLECTIVE, LLC


By:   */s/ Edwin S. Gault Jr.*
      EDWIN S. GAULT, JR. (MSB #10187)
      MANDIE B. ROBINSON (MSB #100446)
      T. PEYTON SMITH (MSB #103867)

      *Attorneys for Defendants Jed McCaleb and*
      *Code Collective, LLC*

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

18

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2018, I served a true and correct copy of the foregoing document via electronic mail to the following counsel of record:

> Armin J. Moeller, Jr.
> Walter H. Boone
> Christine Crockett White
> Jonathan P. Dyal
> Andy Lowry
> Patrick Everman
> Perry P. Taylor
> Balch & Bingham, LLP
> 188 East Capitol Street
> Jackson, MS 39201-2608
> wboone@balch.com
> cwhite@balch.com
> alowry@balch.com

> ***Attorneys for Plaintiffs***

THIS, the 15th day of November, 2018.

/s/ Edwin S. Gault, Jr.
EDWIN S. GAULT, JR.

19

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI

DR. DONALD RAGGIO
DR. CHRIS RAGGIO                                          **PLAINTIFFS**

V.                                                        **CAUSE NO. 14-71**

MTGOX, Inc., a Delaware corporation;
CODE COLLECTIVE, LLC, a New York limited liability company;
JED McCALEB, an individual                               **DEFENDANTS**

# EXHIBIT L

# FILED UNDER SEAL

1

# IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**                                                      **PLAINTIFFS**
**DR. CHRIS RAGGIO**


**VS.**                                                        **CIVIL ACTION NO. 14-71**


**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5**                  **DEFENDANTS**

---

## MOTION TO ALLOW TIME FOR DISCOVERY UNDER RULE 56(d) AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

COME NOW THE PLAINTIFFS, Mississippi physicians, Dr. Chris Raggio & Dr. Donald Raggio, by and through the undersigned counsel, and file this their Motion to Allow Time for Discovery under Rule 56(f) and in Opposition to Defendants' Motion for Summary Judgment [Dkt. 29 & 30], as follows:

### INTRODUCTION

This cause of action arises out of the purchase and the subsequent theft of bitcoins. Plaintiffs, Doctors Chris and Donald Raggio wired money to purchase 9,400 bitcoins from Defendant, Jed McCaleb in California (hereinafter referred to as "California Defendant"). To deliver the bitcoins, California Defendant required the Raggios to open an account on his bitcoin exchange called MTGOX. California Defendant was the sole proprietor of MTGOX exchange,

1

**EXHIBIT M**

which he built out to become the largest bitcoin exchange in the world.  Pursuant to California Defendant's directions, Mississippi buyers, Chris and Donald Raggio, wired money to California Defendant, who would purchase the bitcoins and place the bitcoins in their account with his online exchange MTGOX.  MTGOX was an online bitcoin exchange which California Defendant launched in July 2010, and by 2013 was handling 70% of all bitcoin transactions. California Defendant was the creator of MTGOX, which allowed for the trading of bitcoins much like a typical stock exchange.  Traders of bitcoins would place their bitcoins into individual accounts on the MTGOX exchange.

The Plaintiffs in this matter are father and son who reside in Jackson, Mississippi.  The father, Dr. Donald Raggio, is a child psychologist and fully tenured professor in the Department of Pediatrics at the University of Mississippi Medical Center, where he has been employed for over forty years.   The son, Dr. Chris Raggio originally was a software engineer at Skytel in Jackson, Mississippi with an undergraduate degree in computer science from the University of Alabama.  In 1999, Chris matriculated into medical school at University of Mississippi School of Medicine.   After graduation, Chris began residency training in psychiatry at the Vanderbilt University Medical Center, where he completed his internship in psychiatry.  Throughout the years, Chris has maintained a strong interest in finance and economics as a passionate hobby. With all of his training, formally and informally, Chris developed a strong background in finance, economics, human behavior and computer science.

Chris discovered bitcoin in 2010.  He had the background and knowledge to complete a rigorous financial analysis of bitcoin's future value.  Chris' analysis revealed that bitcoin had a potential market capitalization of one billion dollars at minimum.  At the time, in 2010, bitcoin had a market capitalization of two million dollars, meaning that bitcoin could increase five

**EXHIBIT M**

hundred times in value.   Chris' analysis has proven to be correct, with today's market capitalization of bitcoin being over ten billion dollars.

At the time, Chris did not have the capital for such a speculative investment strategy, but suggested the idea to his father, Donald Raggio, who did have the capital.   Donald Raggio liked the idea enough to provide the funds for the investment and asked his son to execute the investment strategy.

In 2010, the Doctors began to acquire bitcoins from the www.bitcoingateway.com website.   However, the Doctors were limited in the volume of bitcoins they could purchase. Wanting to buy larger volumes of bitcoins, Dr. Chris Raggio contacted the owner of www.bitcoingateway.com, Eric Brigham, and inquired as to from whom or where larger volumes of bitcoins could be acquired.   Chris Raggio was given the name of the California Defendant, Jed McCaleb.   Chris Raggio contacted the California Defendant and was informed that he and his father could trade larger volumes of bitcoins through California Defendant's MTGOX website.

In December 2010, the Doctors opened a MTGOX account and began to acquire bitcoins from other individuals on the MTGOX exchange.   *See* Exhibit A, Affidavit of Chris Raggio at ¶ 2-3.   However, the Doctors were limited in the amount of bitcoins which could be withdrawn each day.   *Id* at ¶ 4.   The MTGOX account was funded by wire transfers from Donald Raggio's bank account directly to California Defendant.   *Id* ¶ 2.

On January 9, 2011, Chris Raggio discovered that 9,400 bitcoins were missing from the Doctors' MTGOX account and, on the same date, contacted California Defendant regarding the missing bitcoins.   *Id*. at ¶ 5 and Exhibit B, Compilation of Emails between Raggios and California Defendant, Jan. 9, 2011 at 10:36 P.M. email.   Chris Raggio discovered on January 10, 2011 the online address of where the stolen bitcoins had been transferred and immediately

**EXHIBIT M**

notified California Defendant as to same.   *Id.* at ¶ 6 and Exhibit B, Jan. 10, 2011 at 4:44 A.M. email.   California defendant traced the transaction and determined that another one of his account holders ("Baron") on his MTGOX exchange had stolen the bitcoins from the Raggios' MTGOX account and placed them into his own account.   *See* Raggio Affidavit at ¶ 7. California Defendant took control of and froze both the Doctors' account and Baron's account that consisted of the stolen bitcoins and $45,000.   *Id.* at  ¶ 8 and Exhibit B, Jan. 10, 2011 at 4:51 A.M. email.

Unbeknownst to the Raggios, in February 2011, California Defendant sold a majority interest of the MTGOX business to Defendant Tibanne K.K., a Japanese entity, which was owned by Defendant Mark Karpeles, a Frenchman with a conviction of computer fraud who had absconded to Japan to avoid serving a one year prison sentence.  However, California Defendant could still be reached at administrator email account (admin@mtgox.com) at MTGOX.  *See* Exhibit C, Compilation of Emails between Raggios, California Defendant and Defendant Karpeles.  Chris Raggio discovered that MTGOX had been sold via online news accounts.  *Id.* at ¶ 9. He was never informed by California Defendant MTGOX would be sold to a convicted fugitive.  *Id.* at ¶ 10.  Furthermore, California Defendant never informed Chris Raggio that he retained an ownership interest in MTGOX or what role he would continue to retain in MTGOX, if any.  *Id.*

During this time, California Defendant made contact with Baron, the thief.  On February 26, 2011, California Defendant represented to Chris Raggio the following:

"It looks like at the very least this guy is going to give your coins back.  ***I want to wait longer though to gather more evidence if he is in fact related to the other fraud that has happened on the site***. (emphasis added)"

**EXHIBIT M**

*Id.* at ¶ 11 and Exhibit C, Feb 26, 2011 at 9:33 A.M. email.  At all times, through both email and telephone conversations, California Defendant asserted to the Doctors they would receive their bitcoins back.  *Id.* at ¶ 13 and Exhibit C.

It was not until March 7, 2011, that the Doctors learned from California Defendant that Defendant Karpeles, the convicted Frenchman and fugitive from justice, would now be handling the matter of the stolen bitcoins.  *See* Exhibit C, Mar 7, 2011 at 7:19 A.M. email and Raggio Affidavit at ¶ 12.  Within the email, California Defendant represented:

> "Yeah Mark is the new owner and he handle getting your coins back.  It will still take awhile though since he has to wait to be sure baron is bluffing ***about suing us etc.***"  (emphasis added) *See* Raggio Affidavit at ¶ 12.

After the March 7, 2011 email from California Defendant, the Chris Raggio began to communicate with Defendant Karpeles in order to recover their stolen coins, but to no avail.  *See* Raggio Affidavit at ¶ 14.   Defendant Karpeles (as Tibanne K.K.) would subsequently state, that upon buying MTGOX, he had not assumed any of the liabilities, only the assets.  *Id.* at ¶ 15. Suit in this matter was filed on March 5, 2014 against numerous defendants.  Four days later, on March 9, 2014, MTGOX filed for bankruptcy protection in the Japan.  On April 25, 2015, MTGOX filed for bankruptcy protection in Bankruptcy Court for the Northern District of Texas, to temporarily halt U.S. legal action by traders who insisted the MTGOX operation was a fraud.

Defendants' blanket statement that the Plaintiffs have not taken any action in this case is simply disingenuous. With the posturing of MTGOX entering bankruptcy and with criminal charges having been filed against Defendant Karpeles in Japan, and where Defendant Karpeles is currently in custody, this matter has proved difficult.

With the bankruptcy filings in both Japan and in the United States, the Doctors and their counsel were informed that an automatic stay of the litigation was be in place.  *See* Exhibit J,

**EXHIBIT M**

July 2, 2014, Brown Rudnick Letter.  Service of process for the Japanese Defendants proved extremely difficult.  Great expense was incurred on the retention of process servers to serve process in a foreign country in compliance with the Hague Convention.  *Id*. at ¶ 16.  Once MTGOX had filed for Chapter 15 bankruptcy protection in the United States, process servers were hired to serve Defendant Karpeles at the federal courthouse in Dallas, where Defendant Karpeles had been ordered to appear.  *Id*. at ¶ 17. Defendant Karpeles failed to appear and the Japanese Defendants were unable to be served at that time.  *Id.*  Thereafter, the Doctors moved this Court on July 3, 2014 for an extension of time in which to serve several Defendants, which was granted on July 8, 2014.  [Dkt. 18 & 19].  Unfortunately, several Defendants were never able to be served.

Once California Defendant had been served, California counsel for the Defendant made contact with the Doctors' counsel on August 22, 2014.  *See* Exhibit D, Compilation of Correspondence between Tyner Law Firm and Ethan Jacobs.  During this time, counsel for the Doctors made repeated requests to take the California Defendant's deposition.  *See* Exhibit E, Affidavit of Mitch Tyner at ¶ 4.  Each time counsel was denied the opportunity to take the California Defendant's deposition despite counsel's willingness to take the deposition in San Francisco.  *Id*. at ¶ 4-5.  The Doctors' counsel also communicated with California counsel regarding the possibility of a settlement and had reached an agreement that no default judgment would be taken and that no Answer needed be filed by the California Defendant during the time in which negotiations were taking place.  *Id*. at ¶ 3 and Exhibit D.

California Defendant has continued his work in the area of digital currency and has accounts with billions of coins of these type currencies.  Plaintiffs' counsel recognized that the easiest manner for California Defendant to handle this matter would be to trade a fraction of his

**EXHIBIT M**

other online currencies for the balance of the 9,400 bitcoins that the Mississippi physicians purchased, and simply deliver it to them.  However, it appears that California Defendant is unwilling to honor his obligation to Chris and Donald Raggio.

Recognizing California Defendant's unwillingness to satisfy his obligation to the Mississippi physicians, undersigned counsel informed California counsel that since a settlement did not appear likely at this time.  On May 11th, counsel for plaintiffs requested that the California Defendant answer the complaint and move forward with discovery.  *See* Exhibit F, Letter to Ethan Jacobs dated May 11, 2016 and Exhibit I, Martin Affidavit at ¶ 3.  California counsel requested sixty days to file an answer even though this matter had been filed two years before.  *See* Exhibit D.  In order not to further delay this matter, the Raggios' counsel did not grant additional time to answer the complaint.  *Id*.  Two years after this matter had been filed, local counsel for the California Defendant filed an Entry of Appearance on June 1, 2016 [Dkt. 24], with an Answer being filed on June 13, 2006 on behalf of California Defendant and Defendant Code Collective.  [Dkt. 25].

Three days before the Defendants' Answer was filed in this matter, the undersigned counsel requested deposition dates of California Defendant.  *See* Exhibit G, Letter to Edwin Gault dated June 10, 2016 and Martin Affidavit at  ¶ 4.   Local defense counsel, consistent with California defense counsel, failed/refused to provide deposition dates.  On June 21, 2016 counsel for Mississippi plaintiffs' againrequested dates for the deposition of California defendant.  *Id.* at ¶  5 and Exhibit H, Compilation of Compilation of Correspondence between Tyner Law Firm and Edwin Gault, email dated June 21, 2016.  Simultaneously with the request, Counsel properly filed a *Notice of Deposition* of California Defendant for a time and date certain, but informed counsel opposite that they would not hold counsel and California Defendant to that actual time

**EXHIBIT M**

and date and requested counsel opposite to again provide deposition dates.  Martin Affidavit at ¶ 6.  California Defendant failed to appear for his deposition which was properly noticed, filed and served pursuant to the Mississippi Rules of Civil Procedure.  *Id*. at 8.

Obstinately, rather than appearing at the properly noticed deposition or providing deposition dates, Defendants filed their Motion for Summary Judgment and Motion for Protective Order [Dkt. 29, 30 and 31] in what can only be seen as a discovery tool to glean what the Doctors know prior to producing their California defendant for sworn testimony, which they know will be devastating due to him in not only this case.  The Mississippi Supreme Court looks with disfavor upon "the practice of parties resisting discovery on the one hand and moving for summary judgment on the other." *Smith v. H.C. Bailey Companies*, 477 So. 2d 224, 234 (Miss. 1985).

The crux of the Defendants' summary judgment motion is that the statute of limitations ran on all claims asserted by the Doctors.  It is apparent on its face that no limitation period expired prior to Drs. Chris and Donald Raggio filing suit, and it will be even more apparent once Defendants are deposed, and written discovery has been conducted. The *Motion for Summary Judgment* is nothing more than a ruse to prevent and control discovery by this California Defendant.  Undersigned counsel has submitted an affidavit attached to this Motion detailing these events and why discovery and additional time is needed under Rule 56(f).  *See* Exhibit I, Martin Affidavit.

The Doctors request that this Court deny or hold in abeyance a ruling upon the Defendants' Motion for Summary Judgment until such time that discovery in this matter has been conducted for the following reasons.

**EXHIBIT M**

### Law in Support of Drs. Chris & Donald Raggio's Response

### & Request to Apply the Mississippi Rules of Civil Procedure as Intended.

Mississippi Rule of Civil Procedure 56(f) provides:

> Should it appear from the affidavits of the party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such order as is just.

Miss R. Civ. P. 56(f).

The Mississippi Supreme Court has stated that pursuant to Miss R. Civ. P. 56(f) a party may file his own affidavit with the court explaining his inability to oppose a motion for summary judgment because the party is *unable* to produce affidavits to oppose a motion for summary judgment. *Marx v. Truck Renting & Leasing Ass'n, Inc.*, 520 So. 2d 1333, 1343 (Miss. 1987) (emphasis added).

The *Marx* court stated that Rule 56(f) is appropriate when additional discovery is necessary or beneficial before the trial court can determine if there is a genuine issue of material fact. *Id.* The Court continued that "this is especially true where the party ... claims the necessary information rests within the possession of the party seeking summary judgment. However, the party resisting summary judgment must present specific facts why he cannot oppose the motion and must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Id.* at 1344. Finally, Marx states that the opposing party "may not rely on vague assertions that discovery will produce needed, but unspecified, facts..." *Id.*

Furthermore, the *Marx* Court reiterated "Rule 56(f) is not designed to protect the litigants who are lazy or dilatory and normally the party invoking Rule 56(f) must show what steps have

**EXHIBIT M**

been taken to obtain access to the information allegedly within the possession of the other party."
*Id.*

Applying *Marx* to the instant action, the Doctors are unable at this time to respond to the Defendants' Motion for Summary Judgment without conducting the deposition of the Defendants and the possibility of propounding written discovery.  As outlined in the Introduction above, and in the attached affidavit of Chris Raggio, certain written and oral representations were made by California Defendant as to the purported recovery of the bitcoins.   *See* Raggio Affidavit.  Furthermore, oral representations were made by Califoirnia Defendant as to the sale of MTGOX to Defendant Karpeles, what responsibility Defendant Karpeles would have in recovering the stolen bitcoins, and what responsibilities Defendant Karpeles had to the Doctors once Defendant Karpeles acquired MTGOX.   *Id.*

All of these representations made by California Defendant tie into the Doctors' theory that the statute of limitations was either tolled or had not yet began to run upon the theft of the bitcoins.  However, without the benefit of the California Defendant's deposition testimony to question the defendant regarding these representations, the Doctors are unable to fully respond to the arguments outlined in the Defendants' Motion for Summary Judgment.   With the California Defendant's deposition, the Doctors will be able to fully rebut the Defendants' arguments in their summary judgment motion and will be able to show that genuine issues of material fact do exist.

Defendants also attempt to argue that the Doctors have been both lazy and dilatory in this matter.  However, it should be reiterated that settlement discussions had previously taken place and that once it was apparent that the California Defendant had no intention to honor his obligation to the Mississippi physicians and would not submit to a deposition or examination under oath, counsel for the Doctors informed California counsel of the need for the Defendants

**EXHIBIT M**

to file an Answer.  The Doctors requested deposition dates throughout this litigation of the California Defendant and he has steadfastly refused.  California defendant has obviously acted in bad faith and in concert with convicted Frenchman and Japanese defendant to steal cash and bitcoin from Mississippi physicians and countless others around the world in an amount that exceeds $500,000,000.00.  (Five Hundred $ MILLION U.S. Dollars)  Thus, the Doctor's have actually acted in great haste to procure the California Defendant's deposition and have, in accordance with Rule 56(f) and the language of *Marx*, shown what steps they have taken to obtain access to information in the possession of the Defendants.

WHEREFORE PREMISES CONSIDERED, this honorable court should grant Plaintiffs' Motion for Rule 56(f) relief, order the deposition of the California Defendant, and deny or hold in abeyance a ruling upon the Defendants' Motion for Summary Judgment until such time that discovery in this matter has been conducted.  In the alternative, should this honorable court deny the Plaintiffs' Motion, this court should grant additional time for the Plaintiffs' to respond to the Defendants' Motion for Summary Judgment.

Respectfully submitted this the 11th day of July, 2016.


s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767


OF COUNSEL
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
5750 I-55 North
Jackson, Mississippi  39211
(601) 957-1113
(601) 957-1113 – *facsimile*

**EXHIBIT M**

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system and via email on the following:

> Edwin S. Gault, Jr., Esq.
> Mandie B. Robinson, Esq.
> Forman Watkins & Krutz LLP
> 200 South Lamar Street, Suite 100
> Jackson, Mississippi 39201-4099

Respectfully submitted, this the 11th day of July, 2016.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**EXHIBIT M**

Case 3:19-cv-00022-HTW-LRA   Document 2-10   Filed 01/10/19   Page 319 of 476

NERDY MONEY: BITCOIN, THE PRIVATE DIGITAL..., 25 Loy. Consumer L....

Case: 25CI1:14-cv-00071-JAS      Document #: 249-2      Filed: 11/15/2018      Page 1 of 4

**25 Loy. Consumer L. Rev. 111**

**Loyola Consumer Law Review**
2012

**Student Article**
Nikolei M. Kaplanov [a1]

Copyright (c) 2012 Loyola University of Chicago School of Law; Nikolei M. Kaplanov

# NERDY MONEY: BITCOIN, THE PRIVATE DIGITAL CURRENCY, AND THE CASE AGAINST ITS REGULATION

## I. Introduction

In 1601, Elizabeth I and her government devalued the Irish coin from nine ounces fine to three ounces fine of silver in order to finance the high cost of the Nine Years War in Ireland. [1] This unilateral move by the English government, combined with the failure to remove the old sterling from circulation, caused catastrophic problems throughout Ireland. [2] In addition to rapid inflation in common foodstuffs, Irish citizens would only accept the new coin at its reduced intrinsic value rather than its face value. [3] Further, merchants refused to accept the devalued coin in commercial transactions, which led to a shortage of vital goods from England. [4]

While the Irish experience during the Nine Years War is **\*112** just one example of a government's complete control over money in the marketplace, this practice has continued throughout much of history and persists even today. [5] Even the United States experimented with privately issued currency for a number of years, [6] but it ultimately legislated these private notes out of existence in favor of the "greenbacks," [7] which would later be controlled by the Federal Reserve System. [8] While some have argued that governments should not have any control over the money supply, [9] with the exception of some local alternative **\*113** currencies, people have not had any other choice. [10]

One of the reasons that government has maintained such a monopoly over currency is because there has never been an alternative that can offer the security of traditional money with the convenience of financial institutions that permit worldwide commerce. [11] This changed with the creation of bitcoin. Bitcoin is the world's first digital, private cryptocurrency exchanged over the Internet through the use of a peer-to-peer network. [12] Bitcoin has no intrinsic value, and there is no government, company, or independent organization upholding its value or monitoring its use. [13] Instead, bitcoin relies on a peer-to-peer network to gain value through demand and maintains security through the program its users run on their personal machines. [14]

This Comment explores the lawfulness of using bitcoin, a privately-issued currency transacted on a peer-to-peer network, and the ability of the federal government to bar transactions between two willing parties. While there are no cases challenging the ability of parties in the United States to make transactions using bitcoins, there are policymakers who have denounced the use of bitcoin. [15] This has led some to question whether the federal government has the ability under current federal law to prohibit the use of bitcoins among willing parties. [16] This Comment will show that the federal government has no legal basis to prohibit bitcoin users from engaging in traditional consumer purchases and transfers.

NERDY MONEY: BITCOIN, THE PRIVATE DIGITAL..., 25 Loy. Consumer L....

Case 3:19-cv-00022-HTW-LRA   Document 2-10   Filed 01/10/19   Page 320 of 476
Case: 25CI1:14-cv-00071-JAS   Document #: 249-2   Filed: 11/15/2018   Page 2 of 4

2. Bitcoin Distribution

Bitcoins are distributed into the market through the use of software. [50] This software tracks blocks and adds them to a chain. [51] But this process is difficult and laborious. [52] Software users who take the time to compute these activities and produce a block--a process called bitcoin mining--are rewarded with bitcoins. [53] Essentially, the value to the person who obtains bitcoins through mining is the value of his or her hardware needed to conduct the mining process plus the amount of time and energy spent.

a. Mining

Bitcoin mining--termed from the software used to create a block called Bitcoin miner--is designed to mimic the extraction of minerals. [54] Anyone is able to obtain bitcoins without purchasing them from other users by downloading and running bitcoin's mining program. [55] Thousands of personal computers **120** currently compute the bitcoin encryption function, and the system awards bitcoins to whichever miner happens to compute the proper block chain. [56] Since there is no central company managing the process, bitcoin miners are essentially volunteering their machines to the bitcoin network to solve multiple math problems. [57] The computer that correctly deciphers the problem is rewarded in bitcoins, and the bitcoin system continues to operate. [58] Currently, someone using a personal computer is unlikely to mine bitcoins. This is because the software is such that the more people who look for bitcoins, the harder it is for any one person to find them. [59] Some bitcoin miners combine their computing power and collectively mine bitcoins through pooled mining. [60] Instead of one computer solving a math problem, the problem is broken down into smaller parts and solved by multiple computers. Any subsequent reward is shared by all of the computers that participated. [61]

The bitcoin system limits the total number of bitcoins in existence, allowing for bitcoin mining, the process for verifying **121** every bitcoin transaction, [62] where miners receive a reward for the creation of a block. [63] Currently, bitcoin miners receive 50 bitcoins as a reward for every block created, but over time the value of this reward will decrease by 50-percent with every 210,000 created. [64] This gradual decrease systematically limits the supply of bitcoins and removes any human intervention. This means that bitcoin is not "subject to the inflationary whim of whatever Federal Reserve chief decides to print more money." [65] Bitcoin's distribution software automatically slows production over time to ensure there will never be more than 21 million bitcoins in circulation, [66] which should occur around 2025. [67] Thus, by having an automatic process, there is no need for or risk of central bank or government intervention. [68]

b. Bitcoin Exchanges

In addition to using mining software to obtain bitcoins, people may also obtain bitcoins from online exchanges. Bitcoin is currently traded on exchanges where the price of bitcoin floats against other currencies valued by demand. [69] Similar to **122** traditional exchanges that allow individuals and businesses to exchange one currency for another, there are online exchanges where people can exchange popular national and transnational currencies (e.g., Great British Pound or the Euro) for bitcoins. [70] The largest exchange is Mt.Gox, [71] but there exist others. [72]

Although nearly all bitcoin exchanges allow for the purchase of bitcoins, the different exchanges operate in different ways and offer different services. For example, to purchase bitcoins on Mt.Gox, a user needs to add state-backed currency to her account. [73] Then the user can direct Mt.Gox to execute an exchange of deposited funds for bitcoins. [74] Other sites offer over-the-counter services matching registered sellers with buyers. [75] One exchange, Camp BX, allows users to make over-the-counter trades with other users online and also offers margin trading and short-selling features. [76] On

NERDY MONEY: BITCOIN, THE PRIVATE DIGITAL..., 25 Loy. Consumer L....

Case 3:19-cv-00022-HTW-LRA   Document 2-10   Filed 01/10/19   Page 321 of 476
Case: 25CI1:14-cv-00071-JAS   Document #: 249-2   Filed: 11/15/2018   Page 3 of 4

each of these exchanges, users must enter into a service agreement that defines the rights of each party that attempts to limit liability for the exchange. [77]

**\*123**  In addition to using online exchanges to obtain bitcoins, they can also be purchased directly. This is done by finding someone who is willing to exchange bitcoins for cash. [78]  Websites, such as Bitcoin.local, provide contact information for buyers and sellers of bitcoins, thereby allowing individuals to connect and exchange bitcoins face-to-face. [79]  Typically, the parties meet in person, the bitcoin owner transfers her bitcoins to the purchaser via the Internet, and the purchaser pays the agreed-upon amount of cash. [80]

c. Accepting Bitcoins in the Market

Bitcoins can also be transferred to non-miners in exchange for goods and services. Currently, there are only a few dozen "real world" locations where bitcoins are accepted. [81]  However, there are hundreds, if not thousands, of online merchants that accept bitcoins for goods like computer software or clothing as well as services like graphic design, legal, and consulting services. [82]  The price of the goods or services is generally determined based on the bitcoin's rate of exchange with another currency. [83]  Approximately $30,000 worth of bitcoins is exchanged each day, and the use of this currency is growing among a subculture of online users. [84]  By providing goods or services in exchange for  **\*124**  bitcoins rather than dollars or other currencies through a simple offeror-offeree contract, merchants and individuals can obtain bitcoins and spend them elsewhere.

d. Bitcoin Storage

Once a person has found a place to obtain bitcoins--either through mining, purchase, or an online exchange--there are two ways to store them: in an online wallet or on a personal computer. [85]  Bitcoins are transferred online but, similar to cash, they need to be kept somewhere. One simple way to store them is by signing up for an online wallet through which transactions can be executed. [86]  An online wallet allows bitcoin owners to store their bitcoins in an online account managed by a third party. [87]  Entrusting a third party with bitcoins, however, means that the wallet operator could lose a person's bitcoins or a hacker could steal them. [88]  Alternatively, users can store bitcoins on their computers in a personal digital wallet, [89]  but they risk losing all of  **\*125**  their bitcoins if the computer is infected with a virus or suffers physical damage. [90]

3. Bitcoin Uses

While bitcoins may be completely functional and secure, there is still one large unanswered question: why would anyone use them? There are numerous stable and well-established currencies that are accepted throughout the world. So why would anyone use a currency that is only accepted by a few merchants and whose value is subject to unpredictable fluctuation? There appear to be three main reasons people use bitcoins: (1) cost, (2) security, and (3) anonymity. [91]

One large motivation Satoshi Nakamoto had in creating bitcoin was to eliminate the third party, like a credit card network, in online transactions. [92]  By creating a two-party payment system for online transactions, the cost of the transaction is reduced, thereby nearly eliminating the added costs to the consumer. [93]  Additionally, the functionality of bitcoins and the lack of a third party prevents the reversal of transactions, similar to a cash transaction. [94]

NERDY MONEY: BITCOIN, THE PRIVATE DIGITAL..., 25 Loy. Consumer L....

Case 3:19-cv-00022-HTW-LRA    Document 2-10    Filed 01/10/19    Page 322 of 476

Case: 25CI1:14-cv-00071-JAS    Document #: 249-2    Filed: 11/15/2018    Page 4 of 4

62    Barrett Sheridan, Bitcoins: Currency of the Geeks: The Untraceable New Virtual Currency is Exploding in Usage, Notoriety, and Value, Bloomberg Businessweek (June 16, 2011, 5:00 PM), http:// www.businessweek.com/magazine/content/11_26/b4234041554873.htm?campaign_id=rss_ search.

63    J.P., supra note 24.

64    Blocks, Bitcoin, https://en.bitcoin.it/wiki/Blocks (last visited Mar. 31, 2012).

65    Greenberg, Crypto Currency, supra note 55, at 40; see also DR, The Future of Money (Hint: It's Virtual), USNews.com (June 3, 2011), http:// money.usnews.com/money/blogs/my-money/2011/06/03/the-future-of-money-hint-its-virtual.

66    Id. Even after the twenty-first millionth bitcoin has been created, miners will still be enticed to create blocks since larger, more complex transactions require small transaction fees. These fees will be accumulated through the bitcoin software and rewarded to the miners who continue to create the block chains that maintain the bitcoin system. FAQ, Bitcoin, https://en.bitcoin.it/wiki/FAQ (last visited Mar. 31, 2012); see also Transaction Fees, Bitcoin, https://en.bitcoin.it/wiki/FAQ (last visited Mar. 31, 2012) (describing the manner and functionality of bitcoin transaction fees).

67    Dingle, supra note 50. Other commentators note that bitcoin could plateau at the twenty-one million level as late as 2030. See, e.g., J.P. supra note 24.

68    Greenberg, Crypto Currency, supra note 55, at 40.

69    Dan Lyons, The Web's Secret Cash: A Novel Version of Money is Sprouting Online, Letting People Shop In Complete Anonymity, Newsweek, June 27, 2011, at 32.

70    The Tuesday Podcast: Bitcoin, supra note 59.

71    Mt.Gox, https://mtgox.com/ (last visited Mar. 31, 2012).

72    See, e.g., Camp BX, https://campbx.com/main.php (last visited Mar. 31, 2012); TradeHill, https://www.tradehill.com (last visited Mar. 31, 2012).

73    MtGox, Bitcoin, https://en.bitcoin.it/wiki/MtGox (last visited Mar. 31, 2012).

74    Id.

75    See, e.g., Using Bitcoin-OTC, Bitcoin, http://wiki.bitcoin-otc.com/wiki/Using_bitcoin-otc (last visited Mar. 31, 2012) (explaining that bitcoin-otc is not an automatic system to match buyers and sellers).

76    Camp BX, Bitcoin, https://en.bitcoin.it/wiki/Camp_BX (last visited Mar. 31, 2012). Camp BX is a U.S. company based in Atlanta Georgia. Camp BX: Trusted Bitcoin Platform, Camp BX, https://campbx.com/main.php (last visited Mar. 31, 2012). Trading on margin occurs when a customer deposits "a sum of money, or its value in securities,... with a broker.... [and the] broker buys stock for a customer's margin account, [and] the broker lends to a customer the difference between the purchase price and the customer's margin deposit, and a daily debit balance of an account evidences the amount of the loan. 12 C.J.S. Brokers § 130 (2011). Short selling is another form of credit extension where a broker sells a security that the customer has not delivered. 79A C.J.S. Securities Regulation § 134 (2011).

77    See, e.g., Camp BX: Trusted Bitcoin Trading Platform, Camp BX, https://campbx.com/register.php (last visited Mar. 31, 2012). For example, CampBX's Terms of Use explain that a "[c]lient has no expectation of privacy" and may investigate any user's activity to prevent potential hacks or if it notices potentially illegal activity. Id. Further, the terms explain that the "[c]lient bears the entire risk of loss." Id.

78    The Tuesday Podcast: Bitcoin, supra note 59.

79    Bitcoin.local, http://tradebitcoin.com/ (last visited Mar. 31, 2012).

80    Transaction Guide, Bitcoin.local, http:// www.tradebitcoin.com/transactions (last visited Mar. 31, 2012).

Case 3:19-cv-00022-HTW-LRA   Document 2-10   Filed 01/10/19   Page 323 of 476
Case: 25CI1:14-cv-00071-JAS   Document #: 249-3   Filed: 11/15/2018   Page 1 of 4

73 La. L. Rev. 1119

Louisiana Law Review
Summer, 2013
Comment

Joshua J. Doguet [a1]

Copyright (c) 2013 Joshua J. Doguet

# THE NATURE OF THE FORM: LEGAL AND REGULATORY ISSUES SURROUNDING THE BITCOIN DIGITAL CURRENCY SYSTEM

*We are at the beginning of a mighty struggle for control of the Internet-the web links everything and very soon it will mediate most human activity-because the Internet has fashioned a new and complicated environment for an age-old dilemma that pits the demands of security with the desire for freedom.* [1]

## Introduction

Technology experts have described Bitcoin as a "masterpiece of technology"-a work of genius on par with the Mona Lisa. [2] Its beauty, though, is not outwardly apparent but instead lies at the heart of its design. Bitcoin is a digital currency system created to facilitate Internet commerce. It does this by using digital signatures and peer-to-peer technology to curtail the system's need for trusted third parties, such as financial intermediaries and central banks. [3] Bitcoin's architecture gives it several advantages over alternative payment systems: transaction costs are lower, privacy is enhanced, and inflationary pressures within the system should be reduced. [4]

"Currency . . . is exactly like religion. It's based entirely on faith." [5] This is especially the case with Bitcoin; no government, corporation, or commodity (like gold) backs the digital currency. [6] Practically, however, it is not very different from established fiat **\*1120** currencies. [7] Bitcoin's value fluctuates with respect to the value of other currencies, and Bitcoins can be spent anywhere a merchant is willing to accept them. [8]

In 2008, an enigmatic programmer, known only as Satoshi Nakamoto, first proposed the idea for Bitcoin on a cryptography email list. [9] Early the following year, he published the open-source software that implemented his system online. [10] Since then, a growing community of developers has maintained the software, which has been downloaded hundreds of thousands of times by individuals all over the world. [11] At one point, Bitcoin attained a circulation worth approximately $100 million. [12]

Bitcoin's positive attributes should make it attractive to consumers and merchants. [13] If it attains a critical mass with both groups, it could one day become a mainstream currency. [14] In fact, as a result of the increased access our society has to networked technology, some have intimated that the use of private, digital **\*1121** currencies may prove to be the norm in the future. Even their limited success could have a substantial impact on the fate of more traditional currencies. [15]

**EXHIBIT O**   1

Internet's landscape has transformed into one dominated by commerce. [187] In this new era, some feel that government involvement is required to enforce the rights of transacting parties. [188]

The Bitcoin system exemplifies the Internet's commercial evolution; indeed, the system is premised on the idea that software can be designed to address the shortcomings of the market. [189] However, Bitcoin's architectural constraints have, in fact, created their own problems. In turn, market mechanisms have developed to provide a solution without state intervention.

More specifically, Bitcoin transactions are practically irreversible. [190] Considering the amount of computing power that secures them, they are essentially etched in stone. While such architectural constraints are a boon to honest merchants, inasmuch as they are protected from the practices of fraudulent buyers, Bitcoin has no architectural constraints which protect honest buyers from fraudulent merchants. To provide these consumers with such protection, reputation systems and escrow services have naturally developed as a self-regulatory response. [191]

Reputation systems are an instrument through which legitimate business practices are enforced. If a merchant defrauds a buyer, then the buyer can complain about him in a public forum. [192] Thus, the community can punish the merchant by warning others of his malfeasance and encouraging them to refuse to patronize his business. [193] As a result, merchants are incentivized to protect their "reputational capital." [194] One such example of this system in **1145** practice is the Bitcoin Police, a community-run organization whose function is to identify and prevent scammers in the Bitcoin economy. [195]

This mechanism, though, has shortcomings. To be effective, it requires a small community where information is simple to collect and disseminate. [196] As the Bitcoin economy grows, complete information becomes harder to obtain and the chance of market failure increases. Furthermore, reputation systems may only protect consumers in an aggregate sense. As one of the recent fiascos in the Bitcoin economy has illustrated, a single incident of fraud can have particularly catastrophic results. [197] This problem is exacerbated because fraudsters may be able to obfuscate their identities using Bitcoin. [198]

Self-regulation could also be capable of preventing large-scale criminal activities if more Bitcoin exchanges were to employ "autonomous agents." Autonomous agents are software programs able to scan large amounts of financial transactions for irregularities; potentially, they can even halt a transaction from being processed. [199] As such, these agents represent a code-based approach to prevent the laundering of funds through Bitcoin exchanges. The incentive for these exchanges in developing and implementing autonomous agents is that it increases the legitimacy and trustworthiness of their business; effective laundering-prevention policies ensure that government authorities are less likely to shut them down and may even lead to increased business. [200] At least one Bitcoin exchange, CampBX, has already done this. [201] In fact, due to the time and **1146** money they have invested in developing this program, they consider it a competitive advantage. [202]

The use of these agents by a single Bitcoin exchange is not representative of the entire industry; more exchanges (in an effort to be seen as a legitimate) would have to follow in CampBX's footsteps. Furthermore, this mechanism also suffers from a lack of transparency; cooperation between Bitcoin exchanges in setting standards for how these invisible, code-based regulators operate would ensure that no single exchange has an exploitable loophole.

In the Bitcoin economy, self-regulation falls short in its inability to stop small-scale criminal activities. In tinier online communities, where the group's interests are cohesive, social norms can govern effectively, as long as the group has some kind of mechanism in place to enforce desired behaviors. [203] The Bitcoin community, however, does not. While many

Case 3:19-cv-00022-HTW-LRA   Document 2-10   Filed 01/10/19   Page 325 of 476
Case: 25CI1:14-cv-00071-JAS   Document #: 249-3   Filed: 11/15/2018   Page 3 of 4

within it criticize those who use the currency to commit crimes, others embrace the libertarian ideals that the currency represents and have no problem using it for such purposes. [204] Bitcoin is much more than a growing community: it is a growing economy, representing a diverse collection of interests. [205] And because the Bitcoin software provides no way to punish its users or to stop them from using it criminally, state action will be necessary to prevent such uses.

An evaluation of self-regulation in the Bitcoin economy shows that some mechanisms have developed to ensure that consumers are adequately protected. Furthermore, an increase in the use of autonomous agents by Bitcoin exchanges would help to reduce the occurrence of large-scale criminal activities. Admittedly, neither of these mechanisms is perfect, but they illustrate a drive by at least some members of the community to ensure that the economy is seen as legitimate. Where self-regulation fails outright, however, is with respect to small-scale criminal activities. The community itself **\*1147** possesses no discernable means to punish wrongdoers, and it is likely that state action is required.

### B. Regulation of Market Participants

Currently, the vast majority of activity in the Bitcoin economy involves the movement of funds by investors, speculators, and traders through Bitcoin exchanges. [206] By facilitating the conversion of Bitcoins to and from more established (and stable) currencies, they are indispensable entities to the functioning of the Bitcoin economy. That is, they could best be described as valves through which the illicit earnings of any major criminal enterprise must flow. Thus, these exchanges represent a logical place to begin implementing mechanisms designed to prevent large-scale criminal activities from taking place using the currency.

In fact, these exchanges may already fall into an existing regulatory scheme-one that governs the operation of certain financial institutions known as "money service businesses." These businesses cash checks, deal in foreign exchange, and provide prepaid access or money transmission services. [207] Bitcoin exchanges would probably be categorized as the latter. Money transmitters accept "currency, funds, or other value that substitutes for currency" and transmit it "to another location or person by any means." [208] Additionally, an entity may be classified as a money transmitter based on the specific facts and circumstances that surround the operation of its business. [209]

The definition of money transmitter was revised in 2011. The previous version was more limited, which led to some ambiguity as to where digital currency exchanges would fit into these regulations. [210] For example, an exchange might have raised the defense that private currencies do not actually qualify as "funds." [211] **\*1148** Regardless of the merits of such an argument, the inclusion of "value that substitutes for currency" is sure to foreclose any doubt whether Bitcoin exchanges are covered under the revised regulations. [212]

Under these regulations (and the federal statutes they cross-reference), if Bitcoin exchanges were indeed categorized as money transmitters, they would have to comply with a number of rules governing their operation. [213] First, operators of these businesses are required to register with the Financial Crimes Enforcement Network (also known as FinCEN, a division of the Department of the Treasury). [214] They must also compile "certain reports or records [that] have a high degree of usefulness in criminal, tax, or regulatory investigations" [215] in addition to developing and implementing effective anti-money-laundering programs. [216] Finally, under the provisions of the USA PATRIOT Act, these financial institutions would also be required to verify and maintain records on the identities of their customers. [217]

There are two major advantages to ensuring that Bitcoin exchanges comply with these regulations. The first is that the rules are preexisting; in other words, no additional legislative effort is required to devise a wholly new, Bitcoin-specific framework to govern the operation of these entities. Second, the reporting standards the regulations call for were precisely

200    Tucker, supra note 21 (noting that digital currencies that take a proactive approach to prevent fraud are the most popular).

201    This exchange has "hard-coded additional rules in [its] trading engine to thwart illegitimate usage of the platform." Frequently Asked Questions, CampBX, https://campbx.com/faq.php (last visited Oct. 11, 2011) (located in the section labeled "Legal Compliance").

202    E-mail from Keyur, CampBX employee, CampBX, to author (Oct. 2, 2011, 1:03 AM) (on file with author).

203    Mark A. Lemley, The Law and Economics of Internet Norms, 73 Chi.-Kent L. Rev. 1257, 1270 (1998).

204    Chen, supra note 77. Compare, e.g., Trade, supra note 135 (which bans the public listing of any illegal products or services), with Vince, Maintaining Anonymity While Using Bitcoin, The Monetary Future (Jun. 16, 2011), http://themonetaryfuture.blogspot.com/2011/07/maintaining-anonymity-while-using.html (instructing users on the steps they can take to maintain greater anonymity, beyond that of what Bitcoin provides by default, in the event they plan on using the currency to purchase drugs from Silk Road).

205    See discussion supra Part III.A.

206    Paul Krugman - Golden Cyberfetters [Op-Ed on Bitcoin], Bitcoin Money (Sept. 7, 2011), http://www.bitcoinmoney.com/post/9913036774/paul-krugman-bitcoin-op-ed. See discussion supra Part III.A.

207    31 C.F.R. § 1010.100(ff) (2011). Money service businesses need not actually be "organized or licensed business concern[s]." Id.

208    31 C.F.R. § 1010.100(ff)(5)(i)(A) (2011).

209    31 C.F.R. § 1010.100(ff)(5)(ii) (2011).

210    William Hett, Digital Currencies and the Financing of Terrorism, 15 Rich. J.L. & Tech. 4, 24 (2008). Before the revision, a money transmitter was an entity "who engages as a business in accepting currency, or funds denominated in currency, and transmits the currency or funds, or the value of the currency or funds, by any means . . . ." 31 C.F.R. § 103.11(uu)(5)(A) (2010).

211    Tucker, supra note 21, at 610. The regulation's definition of currency does not encompass digital currencies, as the term is limited to that which is legal tender in the United States or in foreign nations. 31 C.F.R. § 1010.100(m) (2011).

212    Additionally, before the revision, businesses that would otherwise qualify as money transmitters were exempted if their "acceptance and transmission of funds [was] an integral part of the execution and settlement of a transaction other than the funds transmission itself (for example, in connection with a bona fide sale of securities or other property)." 31 C.F.R. § 103.11(uu)(5)(B)(ii) (2010). If Bitcoins were to be classified as securities instead of as a currency, see, e.g., Grinberg, supra note 8, at 194-99 (discussing the merits of such a classification), exchanges would have been exempted under this provision. However, the exemption now applies only if the money transmitter "[a]ccepts and transmits funds only integral to the sale of goods or the provision of services." 31 C.F.R. § 1010.100(ff)(5)(ii)(F) (2011).

213    Tucker, supra note 21, at 611-12; see also 31 C.F.R. § 1022.200 (2012).

214    31 U.S.C. § 5330(a) (2006); 31 C.F.R. § 1022.380(a) (2011). These businesses must also be licensed under state law, where it is required. Failure to comply with registration and licensing requirements can result in criminal sanctions. 18 U.S.C. § 1960 (2006). See, e.g., United States v. E-Gold, Ltd., 550 F. Supp. 2d 82 (D.D.C. 2008) (digital currency provider was a "money transmitting business," because the definition was not limited to only businesses that engaged in actual cash transmissions).

215    31 U.S.C. § 5311.

216    These programs "shall include provisions for . . . (A) Verifying customer identification . . . (B) Filing Reports; (C) Creating and retaining records; [and] (D) Responding to law enforcement requests." 31 C.F.R. § 1022.210 (2011).

217    31 U.S.C. § 5318(l); Hett, supra note 210, at 27.

**From:** draggio@umc.edu
**To:** CRaggio@umc.edu
**Subject:** hotel
**Date:** Tue, 9 Aug 2011 16:30:58 +0000

Chris,

Check this out. It's close to the bitcoin conference. Rate averages $194 a
nite, I just checked.  Clean, safe, and close to where you will be. Dad

1.

 <http://www.hamptoninn1.hilton.com/> Hampton Inn-Empire State Building

www.hamptoninn1.hilton.com - (646) 837-5623

**EXHIBIT P**

18 Oct 2011 | 13:31 GMT

# The World's First Bitcoin Conference

True believers and profiteers meet in the flesh for a two-year checkup on the global cryptocurrency

By **Morgen E. Peck**

Being at the opening of the world's first Bitcoin conference was like showing up for the first day of camp—a boys' camp—and finding that everyone already knew one another in an alternate universe. For a couple of days in August, the Roosevelt Hotel in New York City served as a real-world meeting place for about 50 people who had spent months riffing with one another on the phone, in chat rooms, and over Skype. They came to talk about how Bitcoin could change the world—and how it could make them rich.

Bitcoin is a digital cryptocurrency designed to resolve the discord between the way we move money online and the decentralized nature of the Web. The Internet has already eliminated other barriers to communication and trade, such as time and geography. You can browse Moroccan floor tiles in a virtual showroom at 3 a.m. on Christmas Eve if you feel the urge, but paying for your purchase will inevitably require the cooperation of a third party. The problem is that dollars do not exist on the Internet, only promises of payment that require the backing of trusted and centralized financial surrogates like banks and credit cards.

On Halloween in 2008, a hacker operating under the pseudonym Satoshi Nakamoto published a paper that described an entirely new currency called Bitcoin, which was made out of information instead of paper. In Satoshi's system, all the tasks performed by banks and credit cards, and even some chores of the federal government, were trusted to a peer-to-peer network instead.

Satoshi ducked into the shadows shortly after delivering the code that generates and processes Bitcoins, but new programmers, lured by the vision, quickly stepped in to shepherd the software development and create supporting websites and applications. In 2010, enthusiasts founded a website called Bitcoin Market, which allowed individuals to exchange Bitcoins for dollars and, for the first time, provided a way for curious investors to participate.

Soon after, a Bitcoin owner known on forums as "Laszlo" forked over 10 000 Bitcoins for a pizza—a notorious exchange now regarded as the first time anyone used Bitcoins to purchase physical goods. As more people became interested in the new currency, the value of Bitcoins continued to rise, culminating in a media feeding frenzy in the spring of 2011. The commotion seems to have enticed new speculators that temporarily drove the price even higher. When he bought his pizza in 2010, Laszlo spent about US $25 in Bitcoins. At the Bitcoin conference on 19 August, Laszlo's meal would have set him back over $100 000 at the new Bitcoin trading rate.

**EXHIBIT Q**

But what exactly *is* Bitcoin? That was the first question Jeff Garzik, a developer for Bitcoin and Linux Kernel, asked when it was his turn at the podium. "You'd be surprised at how difficult that is to answer," he said. He began to poll the audience. Is Bitcoin a currency? A commodity? A <u>security</u>? Hands went up and down with each term, and the only time the room agreed affirmatively was when Garzik asked whether Bitcoin is a "distributed digital notary service."

If you've never heard of Bitcoin, watching this <u>video put together by the Bitcoin community</u> is probably a good place to start. The simplest way to understand how Bitcoin works is to think of it as a digital transaction log. Imagine a bunch of people at a table who all have real-time access to the same financial ledger on laptops in front of them. The ledger records how many Bitcoins each person at the table has at a given time. By necessity, the balance of each account is public information, and if one person wants to give part of his wallet to the person sitting across from him, he has to announce that transaction to everyone at the table. The entire group then produces a new draft of the ledger that they all agree on. The money never has to exist in a physical form because it's all accounted for and can't be moved without consensus.

This is basically how Bitcoin works, except that the participants are spread anonymously across a global network, and access to an account on the ledger is protected by <u>public key cryptography</u>. People who own Bitcoins use a Bitcoin client to manage their accounts. When they want to access their funds, they use the client to send an encrypted transaction request. Each active Bitcoin node then competes to validate the request and sign over the funds to the new owner.

This effort does not go unrewarded. By volunteering their computers to secure and facilitate Bitcoin transactions, users can earn new Bitcoins. These participants are called miners, and like their physical counterparts, the more time and energy they put into the Bitcoin network, the more they earn. The reward, however, gets smaller over time and will stagnate when the number of Bitcoins approaches 21 million, at which point a transaction fee will likely have already been phased in to replace the built-in incentives.

At the conference, the attendees stood up one by one to introduce themselves. A few identified themselves as miners. Then there were representatives from the online Bitcoin exchanges like <u>Mt. Gox</u> and <u>Camp BX</u>, which allow people to convert Bitcoins into traditional currencies and vice versa. There were also students in economic theory, programmers working on smartphone apps, general enthusiasts, a corporate lawyer, and one man who simply introduced himself as a "Bitcoin millionaire."

Amateur economists mingled with the software programmers and hardware vendors, who are scrambling to shave off a slice of the nascent economy. At the tables surrounding them, representatives peddled their wares—nearly completed iPhone applications; cubes of metal that could be used to magnetically encode Bitcoin keys as a way to store them in an invisible, yet physical format; exclusive invitations to a Bitcoin bank. Those aspiring to create new Bitcoins could purchase a hulking <u>mining system</u>—an amped-up, liquid-cooled PC—for a few thousand dollars.

**EXHIBIT Q**

Most people there seemed to be either Bitcoin idealists or Bitcoin profiteers. Some of them were both. The true believers in the group form a kind of ideological brotherhood and they imagine a world where online vendors make direct financial contact with their customers. No need for credit cards, banks, PayPal, and their inevitable additional costs. No more turning over sensitive private information with every purchase—although account histories are public, account owners are quasi-anonymous. Many Bitcoin enthusiasts also dream of replacing the machinations of the Federal Reserve with an inherently predictable network, one that could never print new money.

But it will take more than enthusiasm to sell Bitcoin to the wider public. And the resources needed to build infrastructure around the Bitcoin network are most likely to come from those interested in making money from it. For now, at least, both the idealists and the profiteers have a shared priority—to simply keep the system running. Nearly every conversation at the conference centered on how best to do that.

In June, a hacker broke into Mt. Gox, the largest Bitcoin trading engine, stole an administrator account password, and ran off with thousands of Bitcoins (or the digital keys to access them). More suspicious losses soon followed at MyBitcoin (whose representatives were noticeably absent from the conference) and the Polish Bitcoin exchange, causing the price of the currency to plummet.

Security was the first topic addressed by Gavin Andresen, whom the Bitcoin community has unambiguously knighted as their lead programmer and ambassador to the public. Andresen made a clear distinction between online wallets and trading sites—which struggled to secure their systems after the media attention early this summer—and the Bitcoin client itself. "There have been no significant problems found," he said. "As far as we can tell, core Bitcoin is secure." Andresen reported that two security researchers, Dan Kaminsky and Jacob Appelbaum, looked over the Bitcoin client and gave it a clean bill of health. Scalability is another issue, and Andresen said he's spending most of his time ensuring that Bitcoin will be able to handle its next growth spurt.

Loading the video player...
Video: Morgen E. Peck
Gavin Andresen explains why stability and scalability are his top priorities for Bitcoin.
At night, the Bitcoiners took their new economy to the streets of New York City for a different kind of test. Bruce Wagner, the event organizer and host of a daily Bitcoin webcast, convinced a restaurant in the area to accept payments in Bitcoin, and the dinner was a chance for everyone to see how transactions could work in the physical world. After everyone had eaten, Wagner asked the members of the group to combine all their individual payments into a group payment. This was the owner's first time using the system, and everyone there wanted to make it as easy as possible. When Bitcoin transactions get sent out to the network, it takes about 10 minutes for the system to confirm them, a feature that could make some vendors nervous. Yifu Guo, a data analyst at Con Edison who had previously organized a Bitcoin meet-up in New York City, offered to pay for the group with an immediate voucher that he could e-mail from his account with Mt. Gox to the owner of the restaurant. Then everyone else could reimburse him through an Android-based Bitcoin wallet. All the tips still had to be in cash.

The experiment worked, but it was clumsy.

**EXHIBIT Q**

11/7/2018     Case 3:19-cv-00022-HTW-LRA   Document 2-10   Filed 01/10/19   Page 331 of 476
The World's First Bitcoin Conference - IEEE Spectrum

Case: 25CI1:14-cv-00071-JAS     Document #: 249-5     Filed: 11/15/2018     Page 4 of 4

At the time of the conference, one Bitcoin was selling for around $11, with a little more than 7 million coins in circulation and an average of 8000 nodes actively accepting 7000 Bitcoin transactions a day. It's a fluffy, downy fledgling of an economy—a curiosity to outsiders—but very serious to those who can call themselves "millionaires" and have invested in its further success. This week, after months of slow, but steady decline, the exchange rate hovers around 2 dollars. The drop could be a part of a necessary readjustment from the artificially inflated prices of the summer. But some commentators argue that investors may be leaving the network after discovering that there are very few places to spend the Bitcoins that they own. If the community is to build a committed list of Bitcoin vendors, developers will have to step up with some very simple and intuitive solutions for paying them. A quick swipe. A few keystrokes. Anything more, and the elegance of the Bitcoin network becomes irrelevant. Plenty of people are working on it, and in a few months we'll get a chance to see how far they've come. Wagner has already announced that there will be another Bitcoin conference in January and a third one next summer.

## About the Author

Morgen E. Peck is a freelance writer based in New York City. In August 2011, she reported on the security vulnerabilities of medical devices.

**EXHIBIT Q**

| | |
|---|---|
| **From:** | Brad Martin |
| **To:** | Win Gault |
| **Subject:** | Re: Raggio vs. McCaleb |
| **Date:** | Friday, November 11, 2016 9:52:04 AM |

Win, I'm traveling today. Please call me at 662–614–2848.

Thanks

On Nov 11, 2016, at 9:35 AM, Win Gault <Win.Gault@formanwatkins.com> wrote:

> Jed is booked to fly out at 4:15 pm on Thursday.  To make sure you have enough time,
> would you like to start earlier than 10:00 am?
>
> **Win Gault**
> Forman Watkins & Krutz LLP
> www.formanwatkins.com
>
> ---
>
> **From:** Win Gault
> **Sent:** Thursday, November 10, 2016 10:53 AM
> **To:** 'Brad Martin'
> **Subject:** RE: Raggio vs. McCaleb
>
> Are you still in agreement on the highlighted sentence below?
>
> **Win Gault**
> Forman Watkins & Krutz LLP
> www.formanwatkins.com
>
> ---
>
> **From:** Brad Martin [mailto:BMartin@tynerlawfirm.com]
> **Sent:** Tuesday, August 16, 2016 8:14 AM
> **To:** Win Gault
> **Subject:** RE: Raggio vs. McCaleb
>
> Win,
>
> Previously we had offered to take your client's deposition in San Francisco
> hoping that we could mutually agree to move this matter along with the
> possibility of meaningful settlement discussion and without prolonged litigation.
> Needless to say, we wish to depose your client in Mississippi.  We feel confident
> that if a Motion regarding the deposition location is presented to the Court we will
> prevail.
>
> Having said that, our client may acquiesce to the confidentiality order should we
> be able to reach an agreement to conduct the deposition of your client in
> Mississippi.

**EXHIBIT R**

I understand your concern with your client being deposed more than once, however the Court's Order limits the deposition to matters regarding the statute of limitations.  Granted that opens the door to a wide range of questioning, but the Order speaks for itself.  I believe we can reach an agreement regarding deposing your client only once if we can agree that the deposition will not be limited to only matters regarding the statute of limitations.

Let me know your thoughts and I will speak to my client.

Thanks,

Charles "Brad" Martin
Tyner Law Firm
5750 I-55 North
Jackson, MS 39211
Phone: (601) 957-1113, Ext. 198
Fax: (601) 957-6554

**From:** Win Gault [mailto:Win.Gault@formanwatkins.com]
**Sent:** Monday, August 15, 2016 1:39 PM
**To:** Brad Martin
**Subject:** RE: Raggio vs. McCaleb

Brad:

Jed is available to be deposed on October 12 at 10:00 AM at Ethan Jacob's office in San Francisco (which is where you offered to take it previously).  Do you want to take a 30(b)(6) of Code Collective as well?  We obviously believe he should be deposed once, so we will not agree to a subsequent deposition.

We propose the attached confidentiality order.  Will you agree to this?

**Win Gault**

Forman Watkins & Krutz LLP
www.formanwatkins.com

**From:** Brad Martin [mailto:BMartin@tynerlawfirm.com]
**Sent:** Monday, August 15, 2016 8:27 AM
**To:** Win Gault
**Subject:** Raggio vs. McCaleb

Win,

Please let me know what dates your client is available for deposition here in Mississippi.

Thanks,

**EXHIBIT R**

Charles "Brad" Martin
Tyner Law Firm
5750 I-55 North
Jackson, MS 39211
Phone: (601) 957-1113, Ext. 198
Fax: (601) 957-6554

**EXHIBIT R**

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                        **PLAINTIFFS**

V.                                                                          **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual**                                             **DEFENDANTS**

### ORDER ALLOWING FILING OF DOCUMENT UNDER SEAL

ON THIS DAY the Court has considered the *ore tenus* motion of Jed McCaleb and Code

Collective, LLC, to allow the filing of a document containing confidential financial information

and personal identifiers under seal, and finds the motion is well taken and should be granted.

IT IS THEREFORE ORDERED AND ADJUDGED, that the Defendants are permitted to

file the document identified as Exhibit L to their Reply to Plaintiffs' Response Opposing Motion

for Partial Summary Judgment under seal with the Circuit Clerk.

SO ORDERED, this the $\underline{10}$ day of November, 2018.

_____
CIRCUIT COURT JUDGE

1

Prepared & submitted by:

*s/ Edwin S. Gault, Jr.*
Edwin S. Gault, Jr., MSB # 10187
Mandie B. Robinson, MSB # 100446
T. Peyton Smith, MSB # 103867
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

*Attorneys for Defendants*

2

| | |
|---|---|
| **From:** | mec.nef@mec.ms.gov |
| **To:** | mec.nef@mec.ms.gov |
| **Subject:** | Activity in Case 25CI1:14-cv-00071-JAS RAGGIO V MTGOX ET AL Exhibit |
| **Date:** | Friday, November 16, 2018 3:02:14 PM |

**Zack Wallace**
**Hinds County Circuit Clerk**
**NOTICE OF ELECTRONIC CASE FILING**

<span style="color:red">**This is an automatic e-mail message generated by the Mississippi Electronic Courts (MEC) system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**</span>

**The document described below has been docketed in MEC, and you are able to access it by clicking on the Document Number hyperlink. You may only access the document one time using the link provided in this e mail. Be sure to download and/or print a copy of each document during this first viewing. Subsequent viewing of the document after the first will require you to login and pay $.20 per page.**

**You may visit mec.ms.gov for further updates related to the project. For technical support, please contact the MEC help desk at 601-576-4650 or send an e-mail to helpdesk@mec.ms.gov.**

**Mississippi Electronic Courts**

**Seventh Circuit Court District**

## Notice of Electronic Filing

The following transaction was entered on 11/16/2018 at 3:00 PM CST and filed on 11/16/2018

| | |
|---|---|
| **Case Name:** | RAGGIO V MTGOX ET AL |
| **Case Number:** | 25CI1:14-cv-00071-JAS |
| **Filer:** | |
| **Document Number:** | 251 |

**Docket Text:**
<span style="color:blue">**EXHIBIT L. (KB)**</span>

**25CI1:14-cv-00071-JAS Notice has been electronically mailed to:**

Armin J. Moeller, Jr amoeller@balch.com, kbrock@balch.com, kprem@balch.com

Mark D. Ray mdray@umc.edu, tbarnett@umc.edu

Mitchell H. Tyner, Sr mtyner@tynerlawfirm.com, lphillips@tynerlawfirm.com, rsumlar@tynerlawfirm.com, tpenson@tynerlawfirm.com

Walter Boone wboone@balch.com, ccabrera@balch.com, rsanford@balch.com

Christine Crockett White cwhite@balch.com, bnelson@balch.com, nthompson@balch.com

Edwin S. Gault, Jr Win.Gault@formanwatkins.com, sheila.toth@formanwatkins.com

Jonathan Paul Dyal jdyal@balch.com, agroves@balch.com, bmarshall@balch.com

Amanda B. Robinson mandie.robinson@formanwatkins.com,
amy.robertson@formanwatkins.com, kristy.grizzell@formanwatkins.com

Charles Bradford Martin (Terminated) bmartin@tynerlawfirm.com, cbradmartin@gmail.com,
frontdesk@tynerlawfirm.com, lphillips@tynerlawfirm.com, mtyner@tynerlawfirm.com

Andy Lowry alowry@balch.com, pfairchild@balch.com

T. Peyton Smith peyton.smith@formanwatkins.com, marissa.miller@formanwatkins.com

Michael Patrick Everman peverman@balch.com, callen@balch.com

Perry Taylor ptaylor@balch.com, pptaylor3@gmail.com

**25CI1:14-cv-00071-JAS Notice will be delivered by other means to:**

Ethan Isaac Jacobs


**25CI1:14-cv-00071-JAS Parties to the Case:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**14-71 EXHIBIT L - FILED UNDER SEAL.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1090522767 [Date=11/16/2018] [FileNumber=1649923-
0] [c8a702e9a8b128ebb4f8ae3322ed1041bed4be4435bd4ed2fce234dcdd23d0bf8a
b7ba8f03d2eaac71415585e2eb203c170df77e5fc36939571ddf5ad92e73bd]]

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO
DR. CHRIS RAGGIO**                                           **PLAINTIFFS**

**V.**                                                       **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;
CODE COLLECTIVE, LLC, a New York limited liability company;
JED McCALEB, an individual**                                **DEFENDANTS**

### AGREED PROTECTIVE ORDER

THIS COURT, having been informed that the Parties are in agreement, and having

considered the same, hereby enters this Protective Order setting forth the procedure for

maintaining the confidentiality of certain documents.   Accordingly, production of these

documents is governed by the following provisions:

    **1.**    **Non-Disclosure of Documents Designated Confidential.**

The Producing Party may designate any physical document it produces as confidential by

stamping the word "CONFIDENTIAL" on said document, and may designate any matters

produced electronically as confidential either (a) by adding the designation "CONF" in the

electronic filename, and/or (b) by serving a Production Log designating specific document

numbers within a larger set as "CONFIDENTIAL."   The documents and/or electronic files

(referred to herein as "Confidential Document" or "Confidential Documents") will be afforded the

protection provided in this Order, unless this Court finds otherwise by subsequent order.   Without

the prior written consent of the Producing Party, no Confidential Document may be shown to any

person by the party receiving the Confidential Document (i.e., the Receiving Party), except as

provided in this Protective Order or by subsequent order of this Court.   To the extent the

1

Receiving Party objects to the designation of any document as a Confidential Document under the
terms of this Order, said dispute will be handled as provided in paragraph 5 below.

## 2. **Permissible Disclosure.**

Confidential Documents, or portions thereof, may only be provided and disclosed to the
Parties; to counsel for the Parties who are actively engaged in the conduct of this matter of Dr.
Donald Raggio and Dr. Chris Raggio v. MtGox, Inc. (a Delaware corporation), Code Collective,
LLC (a New York Limited Liability Company), and Jed McCaleb, an individual; In the Circuit
Court of the First Judicial District of Hinds County, Mississippi, Civil Action No. 14-17
(hereinafter referred to as "the Litigation"); to the partners, associates, secretaries, paralegals,
paralegal assistants, and employees of such counsel to the extent reasonably necessary to render
professional services in the litigation; and to the Court and any related court officials involved in
the Litigation or any appeal thereof (including court reporters and persons operating video
recording equipment at depositions).

a.    Confidential Documents may also be provided and disclosed to the following
      persons provided such persons have first been provided with a copy of this
      Protective Order and have executed the Acknowledgment of Protective Order And
      Agreement To Be Bound (attached hereto as Exhibit "A") as a condition for
      receiving such Confidential Documents, thereby acknowledging their
      understanding of this Protective Order and agreement to be bound by its terms:

      i.    Any expert retained by the Parties or their counsel for the purpose of
            assisting in the Litigation; and

2

      ii.     Any mediator, settlement judge, or other person appointed, assigned or engaged by the parties or the Court to attempt to resolve all or part of the issues in this litigation.

b.     The signed copies of this Protective Order and Exhibit "A" will remain in the possession of the Receiving Party.

c.     It is expressly agreed that this Protective Order allows the Confidential Documents to be provided and disclosed only to the Receiving Party and other individuals set forth herein.

d.     If the Receiving Party believes that it is necessary for purposes of the Litigation to provide or disclose any Confidential Documents or information contained therein to any person not identified above, the Receiving Party may secure the written agreement of the Producing Party or may file a motion to amend the Protective Order to include any such person(s).

**3.**     **No waiver.**

a.     Review of the Confidential Documents and information contained therein by parties, counsel, experts, or consultants for the Plaintiffs and Defendants in the Litigation shall not waive the confidentiality of the documents or objections to production.

b.     The inadvertent, unintentional, or *in camera* disclosure of Confidential Documents shall not, under any circumstances, be deemed a waiver, in whole or in part, of any party's claims of confidentiality.

3

**4.** **Filing Documents with Court.**

Any party wishing to file a Confidential Document with the court in the Litigation must file the Confidential Document under seal in accordance with the procedures of the Court.

**5.** **Challenge to "CONFIDENTIAL" Designation.**

This Order shall not prevent any party from moving the Court for an Order that a document designated as confidential, should not, in fact, be designated and protected as confidential. A party shall not be obligated to challenge the propriety of a designation of confidential at the time the designation is made, and failure to do so shall not preclude any subsequent challenge. Until such time as the Court orders that a certain document is not properly designated as confidential, the parties must continue to treat said document as confidential.

**6.** **Destruction of Documents Designated Confidential.**

Within ninety (90) days of the conclusion of the Litigation or any appeals therefrom (whichever is later), the Receiving Party will deliver to the Producing Party, or at the discretion of the Receiving Party destroy and certify the destruction in writing of all Confidential Documents, including all copies, electronically saved or otherwise, reproductions, summaries, reports, analyses or extracts thereof or based thereon, in the Receiving Party's possession, custody, or control or in the possession, or control of any of his representatives or agents.

**7.** **Use.**

Persons obtaining access to Confidential Documents covered by this Order shall use the information only for the preparation and trial of the Litigation, and any appeals therefrom, or for purposes of negotiations to settle such actions, and shall not use such information for any other purposes including business, governmental, or commercial purposes.

4

**8.     Use of Confidential Documents in Depositions and at Trial.**

Without the necessity of filing a motion under Section 2.d. of this Protective Order,
contents of Confidential Documents may be disclosed to witnesses at a deposition, who agree on
the record to be subject to the provisions of this Order, at which time counsel introducing the
Confidential Document shall indicate on the record that the testimony is confidential and subject to
the provisions of this Order.   Disclosure of such confidential information to the deponent
hereunder is not intended to abrogate or otherwise affect any pre-existing obligations such person
may have regarding the confidentiality of such information.   Portions of deposition transcripts
containing testimony that has been designated confidential shall be marked "CONFIDENTIAL"
and shall be subject to the provisions of this Order.   Use of Confidential Documents at trial shall
be determined at the same time that the parties designate other documents or exhibits that will be
used at trial; any disagreements between the parties as to such use shall be raised at the pretrial
conference or by motion.

**9.     Non-Confidential Information.**

Nothing in this Order shall preclude any party from disclosing or using, in any manner or
for any purpose, any information that is (a) otherwise publicly available, or (b) independently
developed as evidence by written record.

**10.    Attorney-Client Privilege Work Product.**

a.     Nothing in this Order shall require production of information that a party contends
       is protected from disclosure by the attorney-client privilege or as work product.   If
       information subject to a claim of attorney-client privilege or work product is
       nevertheless inadvertently produced, such production shall in no way prejudice or

5

otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work product for such information.

b.      If a party has inadvertently produced to another party a document subject to a claim of privilege or work product, the Receiving Party upon request shall promptly return all copies of the document and shall destroy any newly created derivative document such as a summary of or comment on the inadvertently produced document.   Alternatively, the Receiving Party may move the Court for an order compelling production of such inadvertently produced document.

## 11.    **Miscellaneous Provisions.**

a.      In the event that a document which a party believes is entitled to protection as confidential is inadvertently produced without being designated as a Confidential Document, or any inspection of any such document proceeds without its being so designated, the Producing Party may notify the Receiving Party, and the Receiving Party shall thereafter treat the document as if it had been designated a Confidential Document.   If, prior to receiving such notice, the Receiving Party has disseminated the document to individuals not authorized to receive it hereunder, it shall make a reasonable effort to retrieve the document or to otherwise assure that the recipient(s) maintain the confidentiality of the document, but shall have no other responsibility or obligation with respect to the dissemination of the document or information contained in the document.

b.      In the event of any accidental or inadvertent disclosure of properly designated Confidential Documents, other than in a manner authorized by the Order, counsel

6

of the party responsible for disclosure shall immediately notify opposing counsel of all the pertinent facts, and make every reasonable effort to prevent further unauthorized disclosure, including retrieving all copies of the Confidential Documents from the recipient(s) thereof, and securing the agreement of the recipient(s) not to further disseminate the Confidential Documents in any form. Compliance with the foregoing shall not prevent a party from seeking further relief from the Court.

c.      The recipient of any Confidential Documents shall maintain such information in a secure and safe place, and shall exercise at least the same degree of care in handling the Confidential Documents as is exercised by the recipient with respect to its own confidential information of a similar nature, but in no event less than due care. Each recipient of any Confidential Document produced in this action hereby agrees to be subject to the jurisdiction of this Court for the purpose of the implementation and enforcement of this Order.

d.      This Order shall survive the termination of this Litigation.   The Court shall retain jurisdiction over the parties and the subject matter herein for the purpose of enforcement of this Order.

e.      If a party in possession of Confidential Documents obtained from the Producing Party receives a subpoena or other form of compulsory process from a non-party to this action seeking production or other disclosure of such Confidential Documents or information contained therein, it shall immediately give written notice to the Producing Party, specifying the information sought and enclosing a copy of the

7

subpoena or other form of compulsory process, and shall proceed in a good-faith manner consistent with affording the Producing Party the opportunity to timely object, intervene or otherwise have its interests heard and protected with respect to such subpoena or process.

f.    Nothing contained in this Order shall preclude the Producing Party from using its own Confidential Documents or information in any manner it sees fit, or from disclosing such Confidential Documents or information to whomever it chooses, without the prior consent of any other party or of this Court, provided that such use of a party's own Confidential Documents or information does not disclose the other party's confidential information.

**12.    Copying.**

In lieu of originals, copies of Confidential Documents may be disclosed to any persons to whom documents may be disclosed pursuant to this Order.   All copies of Confidential Documents shall be subject to and governed by all provisions of this Order as if such copies were originals.

SO ORDERED, this the 28th day of November, 2018.

CIRCUIT COURT JUDGE

8

AGREED TO BY:

**s/ Edwin S. Gault, Jr.**

Edwin S. Gault, Jr., MSB # 10187
Mandie B. Robinson, MSB # 100446
T. Peyton Smith, MSB # 103867
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

*Attorneys for Defendants*

**/s/ Walter H. Boone**

Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944
BALCH & BINGHAM, LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
(601) 961-9900 Phone
(888) 954-5405 Fax
alowry@balch.com
amoeller@balch.com

*Attorneys for Plaintiffs*

9

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

| | |
|---|---|
| **DR. DONALD RAGGIO and** | **PLAINTIFFS** |
| **DR. CHRIS RAGGIO** | |
| | |
| **V.** | **CIVIL ACTION NO. 14-71** |
| | |
| **JED McCALEB et al.** | **DEFENDANTS** |

### NOTICE OF SERVICE

Please take notice that Dr. Chris Raggio has this day served in the above-titled civil action a true and complete copy of the following:

1. Dr. Chris Raggio's First Set of Interrogatories to Defendant Jed McCaleb.

The undersigned retain the original as custodian thereof.

Respectfully submitted, this the 29th day of November, 2018.

*s/ Andy Lowry*_____
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

    Edwin S. Gault, Jr., Esq.
    Amanda B. Robinson, Esq.
    T. Peyton Smith, Esq.
    FORMAN WATKINS & KRUTZ LLP
    Post Office Box 22608
    Jackson, Mississippi 39201
    Win.Gault@formanwatkins.com
    Peyton.Smith@formanwatkins.com
    Mandie.Robinson@formanwatkins.com

    Ethan Jacobs, Esq.            *(via U.S. mail)*
    HOLLAND LAW, LLP
    220 Montgomery Street, Suite 800
    San Francisco, California 94104

So certified, this the 29th day of November, 2018.

                            *s/Andy Lowry*
                            Andy Lowry

3

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

| | |
|---|---|
| **DR. DONALD RAGGIO and** | **PLAINTIFFS** |
| **DR. CHRIS RAGGIO** | |
| | |
| **V.** | **CIVIL ACTION NO. 14-71** |
| | |
| **JED McCALEB et al.** | **DEFENDANTS** |

### NOTICE OF SERVICE

Please take notice that Drs. Donald and Chris Raggio have this day served in the above-titled civil action a true and complete copy of the following:

1. Plaintiff's Fourth Set of Requests for Production of Documents and Things to Defendant Jed McCaleb.

The undersigned retain the original as custodian thereof.

Respectfully submitted, this the 29th day of November, 2018.

*s/ Andy Lowry*
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS

1

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

Edwin S. Gault, Jr., Esq.
Amanda B. Robinson, Esq.
T. Peyton Smith, Esq.
FORMAN WATKINS & KRUTZ LLP
Post Office Box 22608
Jackson, Mississippi 39201
Win.Gault@formanwatkins.com
Peyton.Smith@formanwatkins.com
Mandie.Robinson@formanwatkins.com

Ethan Jacobs, Esq.              *(via U.S. mail)*
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104

So certified, this the 29th day of November, 2018.

*s/Andy Lowry*
Andy Lowry

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**DR. DONALD RAGGIO and**                                            **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**V.**                                                      **CIVIL ACTION NO. 14-71**

**JED McCALEB et al.**                                             **DEFENDANTS**

### PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES

Plaintiffs, Drs. Donald and Chris Raggio, designate the following individuals whom they may call as experts at trial or otherwise to offer opinion testimony at the trial of this cause.

1.     **Darek Dabbs**
       **Chief Technology Officer**
       **Sera-Brynn**
       **5806 Harbour View Blvd., Suite 204**
       **Suffolk, Virginia 23435**

Darek Dabbs is an expert in the field of cyber security.  His curriculum vitae is attached as Exhibit "1." Mr. Dabbs is Chief Technology Officer at Sera-Brynn, a cyber risk management company.

It is expected that Mr. Dabbs's opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Mr. Dabbs has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

262119.4

Mr. Dabbs has already prepared an affidavit summarizing some of the opinions on which he will testify and listing the documents which he has reviewed to date. That affidavit and list of documents is attached hereto as Exhibit "2."

Mr. Dabbs is expected to offer opinions on the subject of the cyber security of the MTGOX bitcoin exchange, and the deficiencies he has found in that system. Mr. Dabbs will testify about the timeline of events which occurred. He will opine that the security measures in place at MTGOX in December and January 2011 were inadequate and failed to meet the cyber security industry best practices and common standards of the time. He will opine that the webserver software was noted as being written in PHP-Lithium which most likely presented multiple vulnerabilities causing weaknesses with webserver security. He will opine that from the time the Raggios created an account on MTGOX (December 24, 2010) through the time of the hack of their account (January 7-9, 2011), MTGOX did not have salted password hashing implemented, which security practitioners at that time knew to use on all password databases.

Mr. Dabbs will opine that the most likely explanation for the compromise of the Raggios' account data was through an SQL injection vulnerability. He will opine that an SQL injection attack could have allowed the hacker to access the encrypted database of account user names and passwords, and thus a hacker would have cracked the password to access the Raggios' account. He will opine that if adequate security protocols had been in place, the SQL vulnerability likely would not have existed and the hack most likely could have been prevented or mitigated.

Mr. Dabbs will also opine that MTGOX's collection of log-in data on the Raggios' account and all accounts was also insufficient and contrary to best practice in the industry

and standards already in place at the time of this incident.  User Account Logging of auditable events was not implemented until after the Raggio user account compromise occurred, and even after the incident the implementation was not sufficient to support a reasonable forensic investigation.  At the time of the incident in question, MTGOX collected only log-in data for the successful last access to a user account.  The appropriate measure, in Mr. Dabbs' opinion, would have been to configure the logging mechanisms to capture all logins, both successes and failures.  Sufficient data logging of user account login information, while passive in design, would have supported mitigations; permitted an effective investigation and location of the stolen bitcoin; and possibly permitted the recovery of the stolen bitcoin.

Mr. Dabbs will opine that MTGOX's security failures fell so far short as to amount to gross negligence. Discovery on this issue and other issues is ongoing.  Mr. Dabbs may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Mr. Dabbs' opinions when and if additional information becomes available.

2. **Allen Carroll, CPA/ABV, CFF, CVA**
   **Partner**
   **Wilkins Miller**
   **41 West Interstate 65 Service Rd. North, Suite 400**
   **Mobile, Alabama 36608**

Allen Carroll is an expert certified in the fields of accounting and financial forensics. Mr. Carroll is a partner at the Wilkins Miller accounting firm. His curriculum vitae is attached as Exhibit "3."

It is expected that Mr. Carroll's opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Mr. Carroll has reviewed several publicly available documents pertaining to Ripple Labs, Inc. formerly OpenCoin Inc. ("Ripple").

Mr. Carroll is expected to offer opinions on the value of the alleged unjust enrichment Jed McCaleb wrongfully received as a result of the alleged liability owed to the Raggios. Mr. Carroll will opine that McCaleb's failure to repay the Raggios for amounts they were allegedly owed ultimately resulted in additional amounts which McCaleb had available and used to fund Ripple, additional equity which McCaleb possessed in Ripple, and additional proceeds McCaleb reaped from Ripple. Mr. Carroll intends to testify that, generally speaking, the value of that alleged unjust enrichment and/or constructive trust can be calculated by taking the value of the liability owed by McCaleb to the Raggios as a result of the stolen bitcoin at the time of McCaleb's investment in Ripple and dividing that amount by the value of McCaleb's initial investment in Ripple, so as to reach a percentage of McCaleb's ownership in Ripple which rightfully belongs to the Raggios (for brevity, "Raggios' Ripple Investment Percentage"). Based upon publicly available information, McCaleb liquidated his equity in Ripple for unknown amounts and continues to possess XRP, another cryptocurrency, that he received as a result of his involvement with the founding of the cryptocurrency.  Mr. Carroll will opine that one measure of the Raggios' damages for unjust enrichment and/or constructive trust will be to apply the Raggios' Ripple Investment Percentage to the value which McCaleb extracted from Ripple and the

XRP cryptocurrency.  To date, McCaleb has not produced documents and information on the amount of McCaleb's investment in Ripple, the amount of McCaleb's liquidation of his equity in Ripple, and other relevant information.

Mr. Carroll may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Discovery on this issue and other issues is ongoing.   Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Mr. Carroll's opinions when and if additional information becomes available.

      **3.    Dr. Charles W. Evans**
              **Chyden LLC**
              **2631 Key Largo Lane**
              **Fort Lauderdale, Florida 33312**

Dr. Charles Evans is an expert in economics and finance, with a particular expertise in Bitcoin specifically and cryptocurrency/e-currency generally. His curriculum vitae is attached as Exhibit "4."

It is expected that Dr. Evans' opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Dr. Evans has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Dr. Evans is expected to offer fact and opinion testimony on cryptocurrencies, including a description of cryptocurrencies, the history of cryptocurrency and bitcoin in particular,  cryptocurrency wallets and storage, spending and receiving cryptocurrency, purchase and sale of cryptocurrency, "forks" in cryptocurrency and bitcoin in particular; on

the background and history of MTGOX, including its founding, history and bankruptcy, known and suspected MTGOX hacks, types of MTGOX records, the MTGOX user interface, MTGOX user experience, whether and when other bitcoin exchanges became available; and bitcoin prices, including a general description of how pricing is determined, bitcoin price volatility, reasonable expectations of future value, and how long-term bitcoin holders acted throughout price swings.

Dr. Evans is expected to offer opinions on the treatment of bitcoin. Dr. Evans is expected to testify that while bitcoin has not been clearly labeled by legal authorities, at a fundamental level, bitcoin is a form of property or commodity and may be considered as such by the Court and by the jury.

Dr. Evans is expected to testify regarding the pricing of bitcoins, how that pricing is determined, reliable sources to determine that pricing at any particular point in time, and the actual price of bitcoins at particular points in time.  Dr. Evans may opine on the value of the 9406.33 bitcoins at various times since the theft in January 2011 until present, and may opine on the financial loss suffered by the Raggios as a result of the theft of their 9406.33 bitcoins.

Dr. Evans is expected to testify that in 2010-11, bitcoin long-term investors had one viable option to purchase significant amounts of bitcoins, and that was the MTGOX exchange.  While there was the possibility that an investor could purchase bitcoins in ad hoc transactions with other individuals that one met online in discussion forums, those purchases were risky, unreliable, and many times could not accommodate larger transactions. Dr. Evans will describe and opine that there were no other sources to purchase large amounts of bitcoins in 2010 and 2011, and thus the Raggios were prevented from

replacing or covering their loss at the time of the theft. Dr. Evans will testify that other legitimate bitcoin exchanges did not begin operations until 2012. He will testify that the exchange, LocalBitcoins, began operations in June 2012 and was a matchmaking service which connected buyers and sellers in person to complete the transaction, but it probably was not possible to obtain 9406.33 bitcoins via LocalBitcoins in Jackson, Mississippi at that time. He will testify that the exchange, Coinbase, began operations in October 2012, by which time the bitcoin price had risen to $12, which meant that replacing the Raggios' bitcoin would have cost approximately $80,000.

Dr. Evans is expected to testify on the foreseeability, pricing, and reasonable expectation of future value of bitcoins. He will testify that when one buys bitcoins, one does so with the expectation that they will either facilitate transactions that would otherwise be more costly or even impossible or that the bitcoins will increase in value, or both. The Raggios believed that the bitcoins they purchased would increase substantially in value (as in fact they have). When assessing whether that expectation was reasonable, Dr. Evans is expected to testify that it is critical to identify the relevant population against which to compare that action or expectation.  In this case, Dr. Evans will testify that the relevant comparison of one long-term holder of Bitcoins (like the Raggios) is to other long-term bitcoin holders.

Dr. Evans is expected to testify that the top 100 Bitcoin addresses that have held bitcoins for five years and eight years have not spent or sold any of them over that time period, and rode out the peaks and valleys in the price of bitcoins over that time period. Thus, Dr. Evans has concluded and will testify that it was reasonable for the Raggios to

expect that their bitcoins would increase substantially in value and that they would have continued to hold their 9406.33 bitcoins had they not been stolen.

Dr. Evans may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Dr. Evans' opinions when and if additional information becomes available.

**4.      Kim Nilsson**
         **Chief Engineer and Analyst**
         **WizSec**
         **Tokyo, Japan**

Kim Nilsson is an expert in the areas of bitcoin and blockchain analysis. His curriculum vitae is attached as Exhibit "5."

It is expected that Mr. Nilsson's opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Mr. Nilsson has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Mr. Nilsson is expected to offer fact and opinion testimony on the technical aspects of bitcoin and bitcoin blockchain. He will opine on the mechanisms for how bitcoin transactions function and how they are observable by outside parties. He will opine on the process for identifying and proving control of bitcoin addresses.

Mr. Nilsson is expected to offer testimony and opinions on the MTGOX user account "Baron" and the ultimate destination of the Raggios' stolen bitcoins. He will describe how the Baron account was identifiable via blockchain analysis as being associated

with the Raggios' stolen bitcoins. Mr. Nilsson will testify that the stolen bitcoins were first withdrawn from the Raggios' MTGOX account to a bitcoin address that was previously connected to the Baron MTGOX account. Mr. Nilsson will testify that the stolen bitcoins were later deposited back into newly created MTGOX user accounts, which were presumably created solely to receive the stolen bitcoins. Mr. Nilsson will testify that the stolen bitcoins were then sold for USD and withdrawn via a service known as AurumXChange. Mr. Nilsson will testify that the Raggios' stolen bitcoins were never deposited into Baron's MTGOX account.

Mr. Nilsson is expected to offer fact testimony and opinions about Jed McCaleb's personal bitcoin activity using blockchain analysis. According to Mr. Nilsson's analysis, Jed McCaleb took personal possession of all of MTGOX's bitcoin holdings prior to selling the exchange to Mark Karpeles. Jed McCaleb commingled his personal bitcoins with those belonging to MTGOX. Mr. Nilsson will testify that McCaleb sold a large amount of bitcoins for personal gain from 2011 through 2013.

Mr. Nilsson will also testify that when McCaleb transferred ownership of the MTGOX exchange, the exchange was missing roughly 80,000 BTC and $50,000 USD from its reserves. As a result, Mr. Nilsson will testify that MTGOX did not have the number of bitcoins which MTGOX account holders believed they owned, and, thus, MTGOX was insolvent when McCaleb transferred ownership to Karpeles. He will opine that McCaleb knew or reasonably should have known of MTGOX's insolvency before transferring ownership to Karpeles.

Mr. Nilsson is expected to offer opinions on Jed McCaleb's involvement in "bot" accounts. He will testify that McCaleb used the MTGOX accounts "Gox Bot" and

"BotBot" to buy and sell bitcoins on the MTGOX exchange. He will testify that a "bot" in this context is usually associated with undisclosed, automated trading on an exchange, although the actual purpose is not yet clear. If that was in fact the purpose and effect of the "Gox Bot" and "BotBot" accounts, then Mr. Nilsson is expected to testify that such activities, since they were not disclosed to MTGOX account holders, undermined the credibility of the exchanges, because McCaleb controlled undisclosed bot accounts which were trading with and against MTGOX customers, and may be characterized as fraudulent.

Mr. Nilsson may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Mr. Nilsson's opinions when and if additional information becomes available.

**5.     Dr. Kristena Gaylor**
       **P.O. Box 16158**
       **Jackson, Mississippi 39236-6020**

Dr. Kristena Payne Gaylor is an expert in the field of economics. Dr. Gaylor's curriculum vitae is attached as Exhibit "6."

It is expected that Dr. Gaylor's opinions will be based upon her education, training, experience, and background. She has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Dr. Gaylor has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Dr. Gaylor is expected to offer opinions on the monetary value of bitcoin at points in time since the theft of the Raggios' bitcoins to the date of trial. In general, Dr. Gaylor will testify concerning the extent of Plaintiffs' financial loss as a result of the incident in question, and in doing so, will analyze the economic evaluation of damages, including, but not limited to, the value(s) of the stolen bitcoins, and any other aspects of Plaintiffs' damages that flow from the theft. Dr. Gaylor will calculate, based on credible, reported valuations of bitcoins like Coindesk's, the value of the stolen bitcoins for various points in time, including the date the Complaint was filed, the date on which the price of bitcoins reached its peak, the time of trial, and possibly other relevant times. For example, the value of 9406.33 bitcoins on the date of the filing of the Complaint (March 5, 2014) was approximately $6,000,000, and the value was approximately $180,000,000 on the date that bitcoins reached its peak price in December 2017. Dr. Gaylor may also testify about interest owed on Plaintiffs' financial losses, if appropriate. Dr. Gaylor is expected to testify regarding generally accepted methodologies for determining monetary damages which are permitted under Mississippi law, including but not limited to prejudgment and post-judgment interest.

Dr. Gaylor may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Dr. Gaylor's opinions when and if additional information becomes available.

Respectfully submitted, this the 7th day of December, 2018.

*s/ Andy Lowry*
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com

BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

> Edwin S. Gault, Jr., Esq.
> Amanda B. Robinson, Esq.
> T. Peyton Smith, Esq.
> FORMAN WATKINS & KRUTZ LLP
> Post Office Box 22608
> Jackson, Mississippi 39201
> Win.Gault@formanwatkins.com
> Peyton.Smith@formanwatkins.com
> Mandie.Robinson@formanwatkins.com

> Ethan Jacobs, Esq.                    *(via U.S. mail)*
> HOLLAND LAW, LLP
> 220 Montgomery Street, Suite 800
> San Francisco, California 94104

So certified, this the 7th day of December, 2018.

> *s/Andy Lowry*
> Andy Lowry

# Darek Dabbs
## CISSP, CISM

- Over 20 years' experience in Cyber Security Leadership and Network/Security Administration
- Multi-domain security design and architecture
- Vulnerability Management and Penetration Testing
- Cyber Forensic Investigations
- Cloud Security
- Department of Defense and Commercial Industry Information Security Policy Development and Implementation

PROFESSIONAL EXPERIENCE

*Skill areas*
- Windows/Unix Operating Systems
- Leading Cyber Forensic Investigations
- Network Security Testing
- Risk Analysis/Risk Management
- Policy and Compliance
- Configuration Management
- Payment Card Industry Qualified Security Assessment/Forensic Investigations

*Positions held*

### Chief Information Officer/Chief Information Security Officer/Partner 2012 -Present
- System owner of Sera-Brynn's Carver Software as a Service compliance management tool powered by blockchain technology.
- Provides strategic and operational cyber security information and technology leadership to all facets of Sera-Brynn service lines, incident response, forensic investigations, penetration testing, eDiscovery, PCI-DSS compliance audits, Risk Assessments and product resale spread across multiple industries such as Healthcare, Hospitality, Industrial, Retail, Manufacturing, local, state and federal government.
- Provides consulting to customer executive leadership in all aspects of information security, including engagement in the following initiatives and programs: information security governance, information security and privacy risk management, security awareness and training, capital planning and investment control, key performance and risk indicators – metrics, planning including contingency planning, services and products acquisition, or incident response and handling;
- Maintain complete awareness of current and developing information security regulations, technology, and threats.
- Responsible for developing and managing the Sera-Brynn Information Security Business Strategy.  Informs the Executive Board how technology will impact the day-to-day Information Security strategies, business cultivation and sales, activities, and goals to ensure bullet proof solutions for Sera Brynn customers.
- Solely charged with formulating intellectual property (IP) strategies and exploiting proprietary technologies which has resulted in the research and development of the Sera-Brynn Sentinel Server, the all-in-one Intrusion Detection and Vulnerability Management/Security Auditing solution.
- Develops, approves and supervises the Quality Assurance program for all Sera-Brynn customer security audits, architecture, engineering, and remediation project plans to ensure compliance with customer Information Security requirements.

### Information Security Officer/Information Security Consultant 2006-2012
- Delivered subject matter expertise on Information Security and Information Assurance through the development of INFOSEC and IA processes and policy
- Developing and maintained multiple Department of Defense Certification and Accreditation documentation across multiple defense security domains such as JWICS, SIPRNet, NIPRNet, DDTE-S, DDTE-TS, U-DREN, NPS, JTEN, and CFBLNet.

- Authored Certification and Accreditation packages from cradle to grave, to include systems design, architecture, mission requirements, concepts of operations, vulnerability assessment and remediation, drawings, and plans of actions and milestones.
- Provided risk analysis of threats and consequences of proposed modifications to software, and hardware while participating in a Configuration Control Board (CCB).
- Authored, managed and implemented a Department of Defense Information Security vulnerability management program
- Responsible for monthly system tests and evaluations utilizing software vulnerability tools such as eEye Retina, Nessus security scanner, nMap network scanner, Wireshark packet sniffer and the DISA Gold Disk suite.
- Authored and edited numerous Department of Defense Information Security policies and procedures.

**Network Administrator/Communications Engineer 2001-2006**
- Supported the US Navy's Continuous Training Environment (NCTE) in conjunction with the United States Fleet Forces Command.
- Planned and managed the install of network pack-up kits (PUKs) on 29 US Navy ships during 3 Fleet Synthetic Training (FST) exercises.  PUK's consisted of a router, 2 switches, VoIP and a 1u x86 server.
- Assisted in the upgrade of a communication suite, the Multi-Unit Tactical Training System (MUTTS) which significantly improved US Naval Training radio communications with full duplex.
- Participated in the physical installation of a new NCTE network suite at Dam Neck Naval Base, upgrading and enabling the NCTE to have viable network communication for the future.
- Re-organized the equipment in seven network racks, replacing the Ethernet cabling infrastructure, and standardizing equipment to switch connectivity across the network.
- Created and presented NCTE project briefs to senior staff onboard US Navy Ships.
- Team leader in managing a daily project delivery schedule for high availability legacy Sequence Database, to a Oracle Database.
- Responsible for ensuring that over 4 terabytes of data was migrated successfully to Sun Enterprise 25K servers without data loss or database inconsistencies.  He additionally created and presented weekly status reports delivered directly to the Chief Information Officer.
- Responsible for the placement, splicing, termination, testing and documentation of network infrastructure.  Mr. Dabbs was responsible for troubleshooting, identifying and providing solutions to operational problems that reduced operational costs 35% from budget expectations.
- Performed System Administration and Tier 3 Technical Support for over 5000 users at 30 sites in a multi-domain environment across the continental United States.
- Managed system operation, software deployment and installation, and perform remote system administration of platforms running UNIX / Solaris, Windows NT, and Windows 2000 operating systems.
- Conducted routine and emergency hardware maintenance, repair, equipment upgrades, server installation and deployment of SUN Enterprise-450, Enterprise-250, Blade 2000, and Ultra 80, 60, 10 and IBM compatible hardware platforms.
- Developed a standard operating procedure (SOP) covering the restoration of failed Solaris Volume Manager Volumes.  The average downtime of failed volumes was reduced from 48hrs to 10min-1.5hrs.
- Created troubleshooting and maintenance documentation for the  installation, configuration, updating of BIND 8.x and 9.x

PROFESSIONAL DEVELOPMENT
- ► Certified Information Systems Security Professional (CISSP), 421101
- ► Certified Information Security Manager (CISM)
- ► CompTia Security+
- ► Cisco Certified Networks Associate (CCNA) expired
- ► SANS GIAC Security Leadership (GSLC) expired
- ► US Army – All Source Intelligence Analysis
- ► US Navy – Cryptologic Technician Administration

MEDIA ENGAGEMENTS

- ► ANATOMY OF A CYBER BREACH AND RESPONSE https://www.cwm-law.com/wp-content/uploads/2018/07/ANATOMY-OF-A-CYBER-BREACH-AND-RESPONSE.pdf
- ► https://pilotonline.com/inside-business/news/technology/article_26215fa3-00f8-5c6c-9c5a-43e77127cf3c.html
- ► More cyber attacks to fear: malvertising and viruses that lurk unseen https://pilotonline.com/business/article_a90e5f84-707d-5b2f-bb27-c4a5cc3307e8.html
- ► Why building cybersecurity into the supply chain is imperative http://www.virginiabusiness.com/reports/article/why-building-cybersecurity-into-the-supply-chain-is-imperative
- ► Anatomy of a $500 Million Data Breach https://www.cprcv.org/phone/conference-agenda.html
- ► Televised WVEC Channel 13 (ABC Affiliate) expose titled: "Internet underground process prosperous for criminals" http://www.wvec.com/news/Internet-underground-proves-prosperous-for-criminals-257959191.html
- ► Breaking Down the Cost and Complexity Barrier to Network Monitoring https://logrhythm.com/resources/webcasts/breaking-down-the-cost-and-complexity-of-network-monitoring/
- ► 2013 Panelist at MODSIM World Conference speaking on Homeland Security and Cyber Analytics
- ► Co-Author 2013 Data Privacy, Information Security and Cyber Insurance Trends http://databreachinsurancequote.com/wp-content/uploads/2013/02/2013-Data-Privacy-Information-Security-and-Cyber-Insurance-Trends-Report.pdf
- ► 2013 Panelist at Independent Insurance Agents Annual Convention discussing Technology Challenges for the Insurance Industry https://www.iiaba.net/webfolder/va/2013ACRegBrochure-email.pdf
- ► 2012 Cyber Threats & Security featuring Incident Response http://www.onlinetech.com/news/data-center-industry-news/disaster-recovery/item/670-incident-response-and-2012-cyber-threats-a-security

# IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO and                                      **PLAINTIFFS**
DR. CHRIS RAGGIO

V.                                                        CIVIL ACTION NO. 14-71

JED McCALEB et al.                                           **DEFENDANTS**

## AFFIDAVIT OF DAREK DABBS, SR

**STATE OF VIRGINIA**

**INDEPENDENT CITY OF SUFFOLK**

PERSONALLY APPEARED before the undersigned officer duly authorized by law to administer oaths, Darek Dabbs, who, after being duly sworn and deposed, states as follows:

1.      I am over eighteen years of age and am competent to give this Affidavit, which is based upon my personal knowledge.

2.      I have been retained by Dr. Chris Raggio to be an expert witness in the matter of Dr. Donald Raggio and Dr. Chris Raggio vs. MTGOX, et. al, In the Circuit Court of Hinds County, First Judicial District, Cause No. 14-71, and I have personal knowledge of the facts set forth in this affidavit.

3.      All of the opinions set forth in this affidavit are made to a reasonable degree of certainty in the field of cyber security.

4.      I have reviewed all of the documents listed in Appendix A attached to this affidavit.

5.      I would like to review the following evidence regarding MTGOX's cyber security including the forensic artifacts that would contain:

- Webserver log and data files that depict login/logout activity;
- Web Server and Blog server production code and any backup code
- Firewall and Web Application Firewall configurations;
- Full Server image(s) to include all databases

6.  Jed McCaleb has not provided Plaintiffs a copy of the server images in this case.

7.  The security measures in place at MTGOX in December and January 2011 were inadequate and failed to meet the cyber security industry best practices and common standards of the time.  The webserver software was noted as being written in PHP-Lithium, which during 2011 was only available as a beta software and most likely presented multiple vulnerabilities causing weaknesses with webserver security.   User Account Logging of auditable events was not implemented until after the Raggio user account suspected compromise occurred, and even after the incident the implementation was not sufficient to support a reasonable forensic investigation.

8.  From the time the Raggios' created an account on MTGOX (December 24, 2010) through the time of the hack of their account (January 7-9, 2011), MTGOX did not have salted password hashing implemented.  Security practitioners at that time knew to use salted password hashing on all password databases.

9.  I read in Defendant Jed McCaleb's Memorandum Brief in Support of Motion for Partial Summary Judgment the allegation that "There is no evidence the exchange's security measures were circumvented." I disagree with that factual assertion and intend to offer opinions contrary to those assertions at the appropriate time.

10.  I read in Defendant Jed McCaleb's Memorandum Brief in Support of Motion for Partial Summary Judgment the allegation that "the theft was perpetrated by someone using the Raggios' own password to access their account."   While that assertion may be

true, I have not seen evidence to support Jed McCaleb's claim that the Raggios' account was compromised through the fault of the Raggios. Instead, in my opinion, the account was accessed through the use of the Raggios' own password, but that access was caused by the unauthorized hack of the password database caused by a SQL injection attack.

11.     In documents produced so far in this case, McCaleb has already acknowledged that security measures on the site were being probed in the same timeframe that the Raggios' bitcoins were stolen. But at that time, McCaleb did not have adequate security procedures in places to either detect those probes, or prevent unauthorized access.

12.     In my opinion, and based on the information I have seen to date, the most likely explanation for the compromise of the Raggios' account data was through an SQL injection vulnerability. An SQL injection attack would have allowed the hacker to access the encrypted database of account user names and passwords. With access to the encrypted database, the hacker could have cracked the password to access the Raggios' account. According to publicly available sources, we know that MTGOX was subjected to an SQL injection attack at some point in 2011, and there is evidence to suggest the attack occurred in January 2011 and could explain the compromise to the Raggios' account. Had adequate security protocols been in place, this vulnerability would not have existed and the hack could have been prevented.

13.     Although my review of the documents and information in this case is not complete and my opinions are not fully formed, I do believe that there is sufficient evidence that I have seen to date for a jury to find that MTGOX' security failures rose to the level of gross negligence. I certainly believe that the failures I have seen so far were grossly negligent.

14.     Because my review of documents and information is not yet complete, I reserve the right to add to and modify the opinions set forth in this affidavit.

Further, Affiant Sayeth Not.

_Darek Dabbs, Sr._

Sworn to and subscribed before me this ⎣ day of November, 2018.

Notary Public

My Commission expires: 6/30/2022

```
BRIAN DOUGLAS PARSONS
NOTARY PUBLIC
REGISTRATION # 7776176
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
JUNE 30, 2022
```

## Appendix A

136177075.txt

1361770758574142976.eml

Confidential Investigative Report FINAL w attach.pdf

log_otc_from_rtf.pdf

Mt Gox Account Dump Pastebin 8oct2014

Mtgox is changing owners_bitcointalkforum.pdf

myznc-#bitcoin-otc.log

myznc-#bitcoin-otc.log.tar.bz2

myznc-#bitcoin-otc_log.pdf

New Bitcoin Exchange (mtgox.com)_bitcointalkforum.pdf

otc.log

otc_log.pdf

otc_log.rtf

scan.JPG

Bitcoin\Baron Transactions SRC13723-14137.pdf

Bitcoin\Baron Transactions SRC13723-14137.txt

Bitcoin\Baron Transactions SRC13723-14137.xlsx

Bitcoin\BitcoinTalk Posts

Bitcoin\Defendants' Produced Discovery PDFS and attachments

Bitcoin\IRC Chat Log SRC14197-14208.pdf

Bitcoin\BitcoinTalk Posts\Baron

Bitcoin\BitcoinTalk Posts\Jed

Bitcoin\BitcoinTalk Posts\MagicalTux

Bitcoin\BitcoinTalk Posts\mtgox

Bitcoin\BitcoinTalk Posts\Baron\1 (posts 1-20).pdf

Bitcoin\BitcoinTalk Posts\Baron\2 (posts 21-40).pdf

Bitcoin\BitcoinTalk Posts\Baron\3 (posts 41-60).pdf

Bitcoin\BitcoinTalk Posts\Baron\4 (posts 61- 80).pdf

Bitcoin\BitcoinTalk Posts\Baron\5 (posts 81- end).pdf

Bitcoin\BitcoinTalk Posts\Jed\(1-20).pdf

Bitcoin\BitcoinTalk Posts\Jed\(101-120).pdf

Bitcoin\BitcoinTalk Posts\Jed\(121-140).pdf

Bitcoin\BitcoinTalk Posts\Jed\(141 -160).pdf

Bitcoin\BitcoinTalk Posts\Jed\(161- 180)pdf.pdf

Bitcoin\BitcoinTalk Posts\Jed\(181- end).pdf

Bitcoin\BitcoinTalk Posts\Jed\(21-40).pdf

Bitcoin\BitcoinTalk Posts\Jed\(41-60).pdf

Bitcoin\BitcoinTalk Posts\Jed\(61-80).pdf

Bitcoin\BitcoinTalk Posts\Jed\(81-100).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (1-20).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (101 -120).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (121 -140).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (141 - 160).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (161 -180).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (181 -200).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (201 -220).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (21-40).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (221-240).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (241 -260).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (261-280).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (281 -300).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (301 -320).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (321 -340).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (341 -360).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (361-380).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (381- 400).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (401-420).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (41-60).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (421-440).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (441-460).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (461-480).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (481 -500).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (501-520).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (521-540).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (541-560).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (561-580).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (581-600).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (601-end).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (61-80).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (81-100).pdf

Bitcoin\BitcoinTalk Posts\mtgox\1 (post 1-20).pdf

Bitcoin\BitcoinTalk Posts\mtgox\10 (post 181- 185).pdf

Bitcoin\BitcoinTalk Posts\mtgox\2 (post 21-40).pdf

Bitcoin\BitcoinTalk Posts\mtgox\3 (post 41-60).pdf

Bitcoin\BitcoinTalk Posts\mtgox\4 (post 61-80).pdf

Bitcoin\BitcoinTalk Posts\mtgox\5 (post 81-100).pdf

Bitcoin\BitcoinTalk Posts\mtgox\6 (post 101 - 120).pdf

Bitcoin\BitcoinTalk Posts\mtgox\7 (post 121 -140).pdf

Bitcoin\BitcoinTalk Posts\mtgox\8 (post 141-160).pdf

Bitcoin\BitcoinTalk Posts\mtgox\9 (post 161-180).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000001 Executed Signatures on Contract selling MTGOX to Tibanne (Karpeles).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000002 MTGOX sale contract to Tibanne (Karpeles).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000005 20110226-Re_logs otc-1361315.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000006 20110226-Re_logs otc-5370381.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000007 19691231-no_subject-768181.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000008 20101217-Re_deal-7156751.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000009 20101220-account funded by wire-1299061.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000010 20101221-funding-1295519.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000011 20101221-Re_account funded by wire-1273423.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000012 20101221-Re_account funded by wire-1277694.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000013 20101221-Re_account funded by wire-1280348.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000014 20101221-Re_account funded by wire-1284749.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000015 20101221-Re_account funded by wire-1289154.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000016 20101221-Re_account funded by wire-1293555.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000017 20101223-Re_account funded by wire-1262485.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000018 20101223-Re_account funded by wire-1265712.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000019 20101223-Re_account funded by wire-1270743.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000020 20101224-account funded by wire-1236414.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000021 20101224-Re_account funded by wire-1242546.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000022 20101224-Re_account funded by wire-1248745.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000023 20101224-Re_account funded by wire-1252490.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000024 20101224-Re_account funded by wire-1258037.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000025 20101225-Re_account funded by wire-1232076.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000026 20101227-Re_account funded by wire-1193201.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000027 20101227-Re_account funded by wire-1199421.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000028 20101227-Re_account funded by wire-1213726.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000029 20101227-Re_account funded by wire-1220432.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000030 20101227-Re_account funded by wire-1225331.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000031 20101228-Re_account funded by wire-1159934.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000032 20101228-Re_account funded by wire-1165909.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000033 20101228-Re_account funded by wire-1173280.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000034 20101228-Re_account funded by wire-1178756.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000035 20101228-Re_account funded by wire-1186000.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000036 20101229-Re_account funded by wire-1145570.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000037 20101229-Re_account funded by wire-1151845.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000038 20110109-Re_account funded by wire-1113141.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000039 20110109-Re_account funded by wire-1129184.pdf



# CURRICULUM VITAE OF
# W. ALLEN CARROLL, JR., CPA/ABV, CFF, CVA

**EXPERIENCE**

Mr. Carroll received his BS in Business in June 1987. Since that time, he has been employed with Wilkins Miller (or its predecessor). His experience includes: litigation services, audits of multiple-state wholesale distributors, multiple state manufacturers, corporate taxation, real estate developers, and income and estate tax planning.

**EDUCATION**

University of South Alabama -
BS in Business (Concentration in Accounting)

Certified Public Accountant

Accredited in Business Valuation

Certified in Financial Forensics

Certified Valuation Analyst

Member of Beta Alpha Psi, a National Scholastic Fraternity For Accounting and Finance Students

Certificate of Educational Achievement Awarded by the American Institute of CPAs in Tax Planning and Advising for Closely Held Businesses

**PROFESSIONAL HISTORY**

1987 - Present

Wilkins Miller, LLC (Successor Firm)
Managing Partner

1987 - 1991

Pannell Kerr Forster
Audit and Tax Senior

CURRICULUM VITAE OF
W. ALLEN CARROLL, JR., CPA/ABV, CFF, CVA (CONTINUED)

## SELECTED EXPERIENCES

- Engagement to evaluate the lost profits of a publically traded corporation due to a fire that resulted in the delay of a ship being placed into service.

- Played a key role in preparing, reviewing, and analyzing lost profit calculations in connection with a multi-district litigation settlement agreement for a variety of businesses.

- Maritime industry experience includes audits, tax and consulting services to companies that operate ships and vessels.

- Business Interruption Matter for an industrial manufacturer (the largest in North America for its niche) to determine losses associated with a shut-down due to a mechanical breakdown.

- For 10 years Mr. Carroll was responsible for all tax matters of a publicly traded, high-tech company with operations throughout the United States with revenues in excess of $100 million including tax planning, Federal and State tax compliance matters for all 50 states and representation before Internal Revenue Service in connection with tax audits.

- Mr. Carroll was responsible for all audit and tax matters of a paint manufacturing company with locations and retail outlets throughout the Southeast and the Caribbean.

- Reviewed income tax returns and accrual of income tax liabilities for financial statement purposes of a national company with numerous subsidiaries with various operations throughout the eastern United States. Operations included the coal and lumber industries.

- Audit experience includes audits of fast growth companies in the technology industry including those named by *Inc. Magazine* as the fastest growing companies in the country.

- Mr. Carroll served as a staff accountant through director of wholesale distributorships with multiple state operations with sales ranging from $7 million to $55 million involving internal control studies, inventory controls and preparation and review of audited financial statements and multi-state tax returns.

- Engagement relating to criminal defense trial including supervising team for expert witness involving up to 7 accountants and CPA's and over 5,000 man-hours in connection with analysis and review of over 30,000 documents produced by the Government involving multiple corporations with operations in three states.

CURRICULUM VITAE OF
W. ALLEN CARROLL, JR., CPA/ABV, CFF, CVA (CONTINUED)

SELECTED EXPERIENCES
 (CONTINUED)

- Engagement relating to criminal defense trial including supervising team for expert witness involving multiple automobile dealerships located throughout the United States as well as various civil litigation cases connected with the allegations including the evaluation of lost profit claims.

- Mr. Carroll served as an expert witness in a civil litigation matter involving two radio stations. Carroll's work included a detailed review and analyses of all accounting records and financial statements for a number of years. The records were maintained using QuickBooks.

- Engagement involving civil litigation related to fraud including forensic accounting in connection with the reconstruction of accounting records.

- Engagement relating to lost profits of an amusement park resulting in expert testimony at trial.

- Civil litigation engagement related to alleged malpractice by a CPA Firm.

- Engagements related to consultations with attorneys regarding various matters associated with determining damages.

- Audit, review, compilation, tax compliance and consulting services for small businesses including representation of clients before the Internal Revenue Service.

PROFESSIONAL & CIVIC
 ACTIVITIES (CURRENT & PRIOR)

Association of International Certified Professional Accountants
Alabama Society of Certified Public Accountants
National Association of Certified Valuators and Analysts
University of South Alabama Foundation, Board of Directors
Mitchell College of Business, Member of Executive Advisory Counsel
St. Luke's Episcopal School, Chairman, Board of Trustees
St. Luke's Episcopal School, Treasurer, Board of Trustees
Distinguished Young Women (formerly America's Junior Miss), Board of Directors
The University of South Alabama Accounting Advisory Board
Committee Member of Mobile Chapter of Young Certified Public Accountants
Instructor for continuing professional education programs for Mobile Chapter of Alabama Society of Certified Public Accountants and other continuing education programs

**Dr. Charles W. Evans**
2631 Key Largo Lane
Ft. Lauderdale, Florida 33312 USA
cwe@EvansEconomics.com
+1 317 PECUNIA (732-8642)

## PROFESSIONAL

**Chyden LLC (EvansEconomics.com), Fort Lauderdale, FL, USA : 2013-*current***
Qualified as Expert on Bitcoin/Cryptocurrency & Finance/Forensic Economics
    **Federal**:    US District Court, Southern District of Florida
    **State**:    11th Circuit Court, Miami-Dade County, Florida
        Superior Court of the State of California for the County of San Francisco
    **US Army**:    US Army Trial Judiciary, Fifth Circuit (Kaiserslautern, Germany)
Provide Deposition and Trial Testimony
Testimony History Available upon Request

**Independent Expert Witness**
    ***Secret Service, IRS, FBI, and US Attorney's Office*, Washington, DC, USA : 2003-2008**
        Testified before Federal Grand Jury for the Prosecution.
        Investigation Led to Conviction:
        Conspiracy to Engage in Money Laundering.
        Operation of an Unlicensed Money Transmitting Business.
    ***IRS*, Washington, DC, USA : 2002-2003**
        Witness for the Prosecution.
        Operation of Pyramid, Ponzi, and 'High-Yield Investment' Schemes.

**Financial Cryptography Consultant, Bahamas, Caribbean & USA : 1998-2003**
Independent Consultant
    Consulted with Bitcoin Startups on Accounting, Taxation, and Regulatory Compliance.
    Led Organization, Design, and Deployment of Online Payment Systems.

**Atlas Economic Research Foundation – Fairfax, VA : 1995-1998**
Director of Economic Information Services
    Designed and Maintained Online Informational Resources.
    Lectured in North America and Europe on Public Policy Aspects of the Internet.
    Promoted Licensing of eCash Software to Monetize Developing World Resources.

## EDUCATION

**PhD, Finance, Florida Atlantic University – Boca Raton, FL : 2011**
    Dissertation: *Essays on Bond Exchange-Traded Funds*
**MA, Economics, George Mason University – Fairfax, VA : 1994**
    Fields: Austrian School of Economics, Public Choice Theory
**BS, Education, Florida International University – Miami, FL : 1991**
    Major: Modern Language Education (German), K-12

## ACADEMIC

**Barry University – Miami, FL : 2014-2018**
*Associate Professor of Economics and Finance*
 **Graduate Courses:** Business Consulting, Economics for Strategic Decisions, Financial
  Institutions, Special Topics in Managerial Finance
 **Undergraduate Courses:** Managerial Finance, International Economics,
  Macroeconomics, Introduction to Business

**University of Nicosia – Nicosia, Cyprus : 2016-2017** (four semesters)
*Adjunct Professor, MSc Program in Digital Currency*
 **Graduate Course:** Money and Banking

**Florida Atlantic University** (FAU) **– Boca Raton, FL : 2006-2014**
*Instructor:* **2010-2014**
*Graduate Teaching Assistant (full responsibility, instructor of record):* **2008-2010**
 **Undergraduate Courses:** Managerial Finance, Advanced Managerial Finance,
  International Finance, Financial Institutions
*Research Assistant:* **2006-2007**

**Keiser University – Ft. Lauderdale, FL : 2003-2006**
*Business Department Chair & Economics Instructor, Online E-Campus*
 **Undergraduate Courses:** Macroeconomics, Microeconomics, Money & Banking

## PUBLICATIONS

"Delegated Proof of Stake: Between Anarchy and Leviathan," 2018, in submission.
"The Obamacare Defense in Civil Litigation," 2017, in submission.
"Bitcoin Prices: Noise vs Evolving Expectations," 2016, in submission.
"The Blind Economists and the Elephant: Bitcoin and Monetary Separation," 2015,
 *Southwestern Journal of Economics* 11(1): 106-122.
"Bitcoin in Islamic Banking and Finance," 2015, *Journal of Islamic Banking and Finance* 3(2):
 1-11.
"A Simple and or The Growth Alternative Continuing Value Method" (with Wm. R. McDaniel),
 2012, *Journal of Financial and Economic Practice* 12(2): 101-114.

## PRESENTATIONS

**Bitcoin and Other Cryptocurrencies Conference**, Fort Lauderdale, FL, USA, August 2018
    Presentation: The Creation of Bitcoin and Other Cryptocurrencies
    Presentation: Bitcoin, Blockchain, and the Technology behind Cryptocurrencies

**Blockchain Nation Conference**, Miami, FL, USA, April 2018
    Panel Discussion: "Academic Panel"
    Keynote Presentation: "Bitcoin in Islamic Banking and Finance"

**Louisiana State University**, Baton Rouge, LA, USA, October 2017
    Invited Speaker: "Bitcoin: The End of the Beginning"

**St. Thomas University**, Miami, FL, USA, June 2017
    Invited Speaker: "Bitcoin for Criminal Justice Professionals"

**Financial Education Association**, Fort Lauderdale, FL, USA, September 2016
    Presentation: "Bitcoin in Business Education"
    Presentation: "Forensic Economics: An Overlooked Branch of Applied Finance with Strong
        Career Opportunities"
    Presentation: "There's No Accounting for Bitcoin"

**OnChain Scaling: Future of Bitcoin**, Online, June 2016
    Presentation: "The Micro-Global Economy"

**Financial Management Association Financial Planning and Analysis Roundtable**, Orlando,
    FL, USA, October 2015
    Presentation: "The Blind Economists and the Elephant: Bitcoin and Managerial Finance"

**Atlanta Federal Reserve, Miami Office**, Miami, FL, USA, October 2015.
    Invited Speaker: "The Blind Economists and the Elephant: Bitcoin and Financial
    Regulation"

**Federación Latinoamericana de Bancos, Comité Latinoamericano de Automatización
    Bancaria (FELABAN CLAB)**, Miami, FL, USA, September 2015
    Panel Discussion: "Bitcoin and the Banking Industry"

**International Quality Productivity Center, Medios de Pago [Payment Methods]
    Conference**, Miami, FL, USA, August 2015
    Closing Keynote: "Addressing the Emergence and Expansion of eCommerce and Mobile
    Payment"

**Florida Leaders Summit**, Orlando, FL, USA, December 2014
    Invited Speaker: "Should Florida Become the Virtual Currency Capital of the World?"

**Dream Bitcoin Foundation Seminar**, Kumasi, Ghana, December 2014

Invited Speaker: "Cheetahs & Sharks: Opportunities and Dangers of a Borderless Global Marketplace"

**International Money Transmitters Conference**, Miami Beach, FL, USA, October 2014
    Keynote Speaker (Virtual Currencies & Alt. Pmts.): "Understanding Virtual Currencies"
    Closing Remarks (Main Conference): "Virtual Currencies and the Unbanked"

**North American Bitcoin Conference**, Miami Beach, FL, USA, January 2014
    Invited Speaker: "The Knowledge Economy in a Borderless World"

**Liberty & Entrepreneurship Camp**, Kumasi, Ghana, January 2014
    Invited Speaker: "The Knowledge Economy in a Borderless World"

**South Asian Bar Association Annual Meeting**, Miami, FL, USA, November 2013
    Panel Discussion: "The Future of Cross-Border Transactions, The Emergence of Bitcoin and Other Open Source P2P Currency with a Business Focus on Southeast Asia"

**Liberty & Entrepreneurship Camp**, Kumasi, Ghana, June 2013
    Invited Speaker: "Transition to the Knowledge Economy in the Developing World"

**Universidad Francisco Marroquín**, Guatemala City, Guatemala, May 2012
    Invited Papers:    "Austrian School Approaches to Value Investing"
                     "Portfolio Management and Austrian School Business Cycle Theory"

**Eastern Finance Association Annual Meeting**, Savannah, GA, USA, April 2011
    Presenter        2 papers
    Discussant      2 papers

**Southwestern Finance Association Annual Meeting**, Houston, TX, USA, March 2011
    Presenter        1 paper
    Discussant      1 paper

**FAU Executive MAcc in Forensic Accounting**, Boca Raton, FL, USA, April 2010
    Guest Lecture:    "The Seven-Parties Model for Payment System Governance,"

**Financial Management Association Annual Meeting**, Reno, NV, USA, October 2009
    Presenter        1 paper
    Discussant      1 paper
    Session Chair   1 session

**DeSantis Center for Motion Picture Industry Studies: Business Perspectives on the Film and Media Industries**, Boca Raton FL, USA, May 2009
    Invited Paper:    "Pseudo-Intellectual Property"

**MEDIA APPEARANCES**

"Is Venezuela's Petro a CryptoMilestone For Digital Currency – Or a CryptoMillstone?"
WLRN (2018-02-26, print & audio)
http://wlrn.org/post/venezuelas-petro-cryptomilestone-digital-currency-or-cryptomillstone

"Bitcoin Fever Grips U.S. Real Estate"
FloridaRealtors.org (2018-01-18, print)
http://www.floridarealtors.org/NewsAndEvents/article.cfm?id=361099

"Florida Lawmakers Want Bitcoin Covered under Money Laundering Law"
CCN (2017-04-23, print)
https://www.ccn.com/florida-lawmakers-want-bitcoin-covered-money-laundering-law/

"Bright Future for Bitcoin After Florida Case Dismissal"
Bitcoin.com (2016-07-26, print)
https://news.bitcoin.com/bright-future-bitcoin-florida-case/

"Florida Judge Rules That Bitcoin Isn't Money"
*Christian Science Monitor* (2016-07-26, print)
http://www.csmonitor.com/USA/2016/0726/Why-Bitcoin-isn-t-money-as-one-Florida-judge-ruled

"Bitcoin 'Not Real Money' Says Miami Judge in Closely Watched Ruling "
*The Guardian* (2016-07-26, print)
https://www.theguardian.com/technology/2016/jul/26/bitcoin-not-real-money-miami-judge

"Bitcoin's Not Money, Judge Rules As She Tosses Money-Laundering Charge"
*Washington Post* (2016-07-26, print)
https://www.washingtonpost.com/news/morning-mix/wp/2016/07/26/bitcoins-not-money-judge-rules-as-she-tosses-money-laundering-charge/

"Bitcoin Not Money, Miami Judge Rules in Dismissing Laundering Charges"
*Miami Herald* (2016-07-25, print)
http://www.miamiherald.com/news/local/crime/article91682102.html

"Economist Argues Bitcoin Isn't Money in Closely Watched Court Case"
*Time* (2016-05-31, print)
http://time.com/money/4352225/bitcoin-money-laundering-case/

"Miami Money-Laundering Case May Define Whether Bitcoin Is Really Money"
*Miami Herald* (2016-05-27, print)
http://www.miamiherald.com/news/local/crime/article80421072.html

"Miami Man Arrested in Bitcoin Case Challenging Prosecution"
*Miami Herald* (2016-05-27, print)
http://www.miamiherald.com/news/local/crime/article80277207.html

"Bitcoin vs. Malaria: A New Paradigm for Development Economics and Foreign Aid Emerges"
*Coin Telegraph* (2015-06-15, print)
http://cointelegraph.com/news/114569/bitcoin-vs-malaria-a-new-paradigm-for-development-economics-and-foreign-aid-emerges

"Dr. Charles Evans: 'My Expert Witness Fee in a Criminal Case Was Paid in Bitcoin'"
*Coin Telegraph* (2015-04-22, print)
http://cointelegraph.com/news/114042/dr-charles-evans-my-expert-witness-fee-in-a-criminal-case-was-paid-in-bitcoin

"Fool's Gold & Dolphin Tanks!"
 *Bitcoins and Gravy* (2015-01-25, audio)
 https://letstalkbitcoin.com/blog/post/bitcoins-and-gravy-episode-52-fools-gold-dolphin-tanks
"Fools' Gold Rushes"
 *Coin Telegraph* (2015-01-15, print)
 http://cointelegraph.com/news/113294/fools-gold-rushes-op-ed
"Dreamcoin: Africa's New Hope"
 *Bitcoin Magazine* (2014-09-29, print)
 http://bitcoinmagazine.com/16803/dreamcoin-africas-new-hope/
"Charles Evans on Bitcoin: I Haven't Felt This Excited in Two Decades"
 *Coin Telegraph* (2014-05-06, print)
 http://cointelegraph.com/post/charles_evans_on_bitcoin_i_haven_t_felt_this_excited_in_two_de
 cades
"Bitcoin"
 WSVN TV 7 (2014-03-17, transcript)
 http://www.wsvn.com/story/24998740/bitcoin
"Bitaccounting for the Bitcurious"
 *Financial Executives International* (2014-03-10, print)
 http://daily.financialexecutives.org/bitaccounting-for-the-bitcurious/
"Interview with Dr. Charles Evans"
 Bitcorati Interview Series (2014-02-04, video)
 https://www.youtube.com/watch?v=6m-
 e6xEpK60&list=PLlQkChXC4kzhMINEfpVYlAxwOkAODctj6&index=8
"Bitcoin in South Florida: Real Business Taking Virtual Money"
 WLRN Radio (2014-01-28, audio)
 http://wlrn.org/post/bitcoin-south-florida-real-business-taking-virtual-money
"Bitcoin in South Florida: From Shady Cash Deals to Bitcoin Accounting Firms"
 *New Times* (2014-01-23, print)
 http://blogs.browardpalmbeach.com/pulp/2014/01/bitcoin_in_south_florida_from.php
"Building Bitcoin Use in South Florida and Beyond"
 *Miami Herald* (2013-12-23, print)
 http://www.miamiherald.com/2013/12/23/3835016/building-bitcoin-use-in-south.html
"South Florida Can Buy with Bitcoin This Christmas"
 WLRN Radio (2013-12-19, audio)
 http://wlrn.org/post/south-florida-can-buy-bitcoin-christmas

## ABSTRACTS

"Delegated Proof of Stake: Between Anarchy and Leviathan," 2018, in submission.
    This paper develops a taxonomy, based on Public Choice Theory, of consensus algorithms that runs from highly centralized 'Leviathan' systems, like eCash, to highly decentralized 'Anarchy' systems, like Bitcoin, with a broad variety of systems that fall between these extremes, using Delegated Proof of Stake (DPOS) as an example that has several years of experience running in production. It concludes that the choice of optimal consensus algorithm is driven by the ultimate purpose of the system and its users' goals.

"The Obamacare Defense in Civil Litigation," 2017, in submission.
    Congdon-Hohman & Matheson (2013) argue that the "guaranteed issue" and "individual mandate" provisions of the Patient Protection and Affordable Care Act (2010) should cap damage awards in the USA for covered health expenditures at a maximum of $6,250 per year. This paper presents counterarguments to this 'Obamacare Defense', which calls for a radical departure from the principle that those who cause harm should bear the cost of that harm.

"Bitcoin Prices: Noise vs Evolving Expectations," 2016, in submission.
    This paper addresses the question of how much of the volatility in bitcoin prices (XBT) is driven by noise trading, and how much is driven by changes in market participants' evolving expectations based on information. It measures the entropy of USD/XBT prices over different sample periods within the Bitstamp price time series data, finding evidence that contradicts the hypothesis that the USD/XBT price generally is dominated by noise trading, except during brief spikes, when the noise content dominates. It concludes with suggestions for future research.

"The Blind Economists and the Elephant: Bitcoin and Monetary Separation," 2015,
    *Southwestern Journal of Economics* 11(1): 106-122.
    This paper applies some of the speculative conclusions of seminal New Monetary Economics (NME) papers that appeared in the 1970s and early 1980s to the analysis of real-world 'virtual currencies', the first-generation of which—beginning with eCash—were released in the early 1990s, and the second-generation—beginning with Bitcoin—in the late 2000s. In light of these innovations, and the regulatory and theoretical debates that they have inspired, NME is once again topical, and we are presented with the nearest thing to a controlled experiment to test the viability of monetary separation of *unit of account* and *measure of value* from *medium of exchange* and *store of value*.

"Bitcoin in Islamic Banking and Finance," 2015, *Journal of Islamic Banking and Finance* 3(2): 1-11.

This paper analyzes the compliance of distributed, autonomous blockchain management systems (BMS) like Bitcoin—also referred to as 'virtual currencies'—with the requirements of Islamic Banking and Finance. While intended as a narrow financial and economic analysis, and not as an in-depth analysis of the subtleties and nuances of Shari'a as they relate to banking and finance, it shows that a BMS can conform with the prohibition of *riba* (usury) and incorporate the principles of *maslaha* (social benefits of positive externalities) and mutual risk-sharing (as opposed to risk-shifting). It concludes that Bitcoin or a similar system might be a more appropriate medium of exchange in Islamic Banking and Finance than *riba*-backed central bank fiat currency, especially among the unbanked and in small-scale cross-border trade.

"A Simple and or The Growth Alternative Continuing Value Method," (with William R. McDaniel) 2012, *Journal of Financial and Economic Practice* 12(2): 101-114.

In business valuations, the long run operating cash flows' present value is often estimated by a continuing value (terminal value) method that intrinsically assumes a compounding growth rate. This assumption can be too ambitious, especially as the growth rate approaches the required rate of return. We develop a more conservative continuing value method using a simple growth rate assumption. The method has fewer constraints in usage than the compound method. We show a modification for situations where low compound growth follows simple high growth. Another modification allows for valuation where historical cash flows have been negative but are growing toward positive.

# Kim Nilsson

Software Developer and Independent Researcher | Tokyo, Japan | kim@wizsec.com

## Summary

I am a software developer by trade — a very good one if I say so myself — though I have received the most recognition from my side project of independently investigating the collapse of the MtGox bitcoin exchange, a personal effort spanning several years which has received widespread attention and recognition in both the cryptocurrency community and in international media.

Though initially started in 2014 as a collaborative effort between several MtGox victims under the name "WizSec", from 2015 onwards it was a one-man project. Being on location in Japan as well as operating ethically were important success factors for the investigation.

## Skills & Abilities

### SOFTWARE DEVELOPMENT

· Experienced software developer with a very deep approach to problem solving, favoring clever, self-contained and efficient solutions. Frequently trying to iterate and improve on existing solutions. My colleagues tend to rely on me as a source of knowledge and experience.

### ANALYSIS

· I have a strong need to fully understand a problem before I can comfortably move on, be it in debugging software or solving a puzzle. This tenacity was what drove my continued persistence in the multi-year MtGox investigation, more so than any financial stake.

### INITIATIVE

· If no one else will do it, I will step up. I don't strive for leadership roles, but if something needs doing and no one else will do it right, I will take the initiative and either try to organize the effort or do it myself.

## Experience

### CHIEF ENGINEER AND ANALYST | WIZSEC | 2014–

· Investigated the disappearance of over 650,000 BTC from the MtGox bitcoin exchange.
· Created custom software for efficient blockchain analysis.
· Traced a large number of stolen coins and identified a money laundering suspect, later arrested in Greece after U.S. authorities reached a similar conclusion in their investigation.
· Covered in the Wall Street Journal, the Financial Times, and many other international media.

### LEAD DEVELOPER | CYPHERPUNK PRIVACY | 2016–2017

· Designed and built the cross-platform desktop client for the Cypherpunk Privacy VPN service startup.

### SENIOR SOFTWARE DEVELOPER | OPERA SOFTWARE | 2006–2016

· Porting and delivering the Opera Mobile browser to a variety of Japanese mobile phones.
· Heavily involved in code design and architecture for subsequent versions of Opera Mobile.

· Later migrated to delivering Opera's SDK to Linux-based TVs and set-top boxes.

**WEB CONSULTING | 1997–2002**
· Web site development and maintenance for small company clients.

**SYSTEM ADMINISTRATOR | LUGNVIKSSKOLAN | 1997–1998**
· During junior high school, I set up and maintained the school's first computer network.

## Education

**MASTER OF SCIENCE | 2009 | LINKÖPING INSTITUTE OF TECHNOLOGY**
· Major: Information Technology (Computer Science)
· Additional courses: Japanese Language
· Awarded Tryggve Holm medal for academic excellence (similar to Valedictorian title)

**DIPLOMA | 2005 | TOKYO INSTITUTE OF TECHNOLOGY**
· Completed Young Scientist Exchange Program

# KRISTENA PAYNE GAYLOR, Ph.D., MBA
P. O. BOX 16158
JACKSON, MS 39236-6020
Office Phone: 601-209-7639
*KGaylor@mc.edu*

## EDUCATION

Ph.D.    Jackson State University, College of Business, Jackson, Mississippi.
**Doctor of Philosophy in Business Administration**, Major: Management,
Minor: Economics, May 2004.
Dissertation Title: "Organizational Commitment in Higher Education:
A Multi-Dimensional Perspective"
*In the study, I examined the antecedents and consequences of*
*organizational commitment among faculty at institutions of higher learning.*
*The findings revealed various factors that lead to job satisfaction, including*
*those unrelated to compensation.*

MBA    Millsaps College, Else School of Management, Jackson, Mississippi.
**Master of Business**, Management, May 1999.

BBA.    Mississippi State University, College of Business & Industry, Starkville,
Mississippi. **Bachelor of Business Administration**, Management Major, Cum
Laude, May 1995.

## ACADEMIC EXPERIENCE

ASSISTANT PROFESSOR of Management and Economics (2012-present). School of
Business, Mississippi College, Clinton, MS. (Undergraduate and Graduate level
courses)

ASSOCIATE PROFESSOR with Tenure (2009-2012). Business Administration. School of
Business, Belhaven University, Jackson, MS. (Undergraduate, Graduate level and On-
line courses)

ASSISTANT PROFESSOR (2004-2009). Business Administration. School of Business,
Belhaven University, Jackson, MS. (Undergraduate, Graduate level and On-line courses)

INSTRUCTOR (2003-2004). Principles of Management. Undergraduate (two sections)
School of Business, Alcorn State University, Lorman, MS.

INSTRUCTOR (2003 –2004). Computer Applications. Undergraduate (two sections) School of Business, Alcorn State University, Lorman, MS.

INSTRUCTOR (2003). Principles of Marketing. Undergraduate (two sections) School of Business, Alcorn State University, Lorman, MS.  (With full responsibility)

TEACHING ASSISTANT (2000-2003). Business Computer Applications. Undergraduate (three sections) College of Business, Jackson State University. (While in Graduate School, full responsibility for courses)

**Courses Taught:**

Undergraduate courses:
  Principles of Management
  Cases in Management
  Business Communication
  Organizational Behavior
  Principles of Supervision
  Consumer Behavior
  Principles of Marketing
  Business Policy
  Strategic Management
  Microeconomics
  Macroeconomics
  Survey of Economics
  Human Resource Management

Graduate courses:
  Organizational Change & Development
  Marketing Management
  Executive Leadership
  Strategic Human Resource Management
On-line courses:
  Organizational Behavior
  Principles of Management
  Business Communications
  Principles of Executive Leadership
  Microeconomics


**Curriculum Development**

Online Undergraduate ECO 232 Principles of Economics II: Topics, Objectives, Assignments, recordings

Online Undergraduate MGT 474 Human Resource Management: Topics, Objectives, Assignments, recordings

Online Graduate MBA668 Leadership and Organizational Change: Topics, Objectives, Assignments, Halls-recordings-videotaping

Online Graduate MBA682 Principles of Executive Leadership: Topics, Objectives, Assignments, Halls-recordings-videotaping

Online Graduate MSL658 Principles of Executive Leadership: Topics, Objectives, Assignments, Halls-recordings-videotaping

Online Undergraduate BBA412 Organizational Behavior: Topics, Objectives, Assignments, Halls-recordings-videotaping

Online Undergraduate BBA326 Principles of Management: Topics, Objectives, Assignments, Halls-recordings-videotaping

**RESEARCH INTERESTS**
Economic and Wage Loss Analysis; Functional/Dysfunctional Turnover; Work life Expectancy, Motivations of Adult Learners; Work/Life Balance; Organizational Commitment; Job Embeddedness; Professional Commitment; Employee Retention.

**PUBLICATIONS**
                        **Refereed Journal Articles**

Mathis, C.J., Horn, D., Randle, N., and Gaylor, Kristena P. (forthcoming Spring 2018). Unmasking the Mystery of Sex and Gender between the Bidirectional Relationship of Work-Family Conflict and Job Satisfaction. *Journal of Business Diversity*.

Smith, J.R., Gaylor, Kristena P., and McWilliams, Douglas (December 2016). An Empirical Investigation of Business School Faculty Members' Organizational Commitment in Higher Education. *Journal of Human Resources Management and Labor Studies*. Volume 4, No. 2, pp. 1-45.

Kimmel, S., Gaylor, Kristena P., and Hayes, B. (Spring 2016). Age Differences among Adult Learners: Motivations and Barriers to Higher Education, *Academy of Business Research Journal*. Volume IV, pp. 32-58.

Kimmel, S., Gaylor, Kristena P., Grubbs, M. Ray, & Hayes, J. Bryan. (2014). Motivations and Barriers to Higher Education for Online Learners Questionnaire [Measurement instrument]. Cited in the APA PsychINFO Database.

Kimmel, S., Gaylor, Kristena P., and Hayes, B. (2014). The Influence of Race/Ethnicity on Motivations and Barriers to Adult Learners, *Academy of Business Research Journal*.

Kimmel, S, Gaylor, Kristena P., and Hayes, B. (2013). Understanding Adult Learners by Gender, *Academy of Educational Leadership Journal*.

Wallace, J., and Gaylor, Kristena (2012). Study of the Dysfunctional and Functional Aspects of Voluntary Employee Turnover, *SAM Advanced Management Journal*, ISSN: 0749-7075.

Kimmel, S, Gaylor, Kristena P., Grubbs, R., and Hayes, B. (2012). Good Time to Hard Times: An Examination of Adult Learners' Enrollment from 2004-2010, *Journal of Behavioral and Applied Management*.

Mathias, C., Gaylor, Kristena P., Randle-Wilkins, V.N. (2007). Ethnic Differences and the Mediating Effect of Job-Focused Self-Efficacy: The Impact of Work-Family Conflict on Job Satisfaction, *Journal of International Business and Economics* (JIBE), ISSN: 1544-8037.

Smith, J.R., Gaylor, Kristena P., Mosley, A., and Perkins, Samuel. (2006). Organizational Commitment in Higher Education: A Multidimensional Perspective, *Journal of Academy of Business and Economics*, ISSN: 1542-9710, Vol. 6, No. 2, pp. 199-207.

Gaylor, Kristena P., and Finley-Hervey, J.A. (2002). Resisting and Driving Forces for Change: MS Flag Controversy, *Journal of Interdisciplinary Business Research*, Vol. 2, pp. 81-88.

Brown, U. J., III, and Gaylor, Kristena P., (2002). Organizational Commitment in Higher Education. *Journal of Interdisciplinary Business Research*, Vol. 2, pp. 39-52.

### Refereed Proceedings

Gaylor, K.P., & Gaylor, T.R. (2016). Lessons to Learn: How Jackson, Mississippi Should Emulate Various Cities that Successfully used Waterways to Create its own Sustainable Waterfront Development. Academy of Business Research International Conference.

Smith, J. R., Gaylor, K. P., & Mosley, A. L. (2014). Faculty commitment in higher education: An empirical investigation of the three-component model (TCM) of organizational commitment. Proceedings of the International Conference on Learning and Administration in Higher Education, May 21-23- Holiday Inn Vanderbilt Nashville, Tennessee USA

Wallace, Jolivette and Gaylor, Kristena. (2012). "A Study of the Dysfunctional and Functional Aspects of Voluntary Employee Turnover," *Society for the Advancement of Management Proceedings* in Las Vegas, NV.

Kimmel, S., Gaylor, K. P., Grubbs, R. (2009). "Motivations and Barriers to Business Education: Comparing Online and On Campus Adult Learners," *International Institute of Behavioral and Applied Management Proceedings* in Washington D.C.

Gaylor, Kristena P. (2003). "The Significance of Timely Delivery on Supplier Selection Decisions," *Society for the Advancement of Management Proceedings* in Orlando, FL.

Finley-Hervey, J.A. and Gaylor, Kristena P. (2002). "Mississippi's Official State Flag Special Election: The Affect on Business and Public Perceptions," *Society for the Advancement of Management Proceedings* in McLean, VA.

Brown, U.J. III., Gaylor, K. P., White-Johnson, S., & Ballard, V. (2001). "Computing Perceptions and Their Impact on Course Performance: A's for the Digital Generation," *Business Research Yearbook*: *Global Perspectives*, 8, pp. 312-316.

### Monograph

Brown, U.J., III, Gaylor, Kristena P., and Dodor, Koffi (2001). "Analysis of the Exit Questionnaire at Jackson State University." School of Business Summer Fellowship.

## REFEREED CONFERENCE PRESENTATIONS AND WORKSHOPS

Randle, N.W., Gaylor, K.P. & Mathis, C. (2017) Coping with Workplace Weight Discrimination, Stress, and Work-Life Conflict in a Wellness-Focused Human Resource Environment. *Society for the Advancement of Management International Conference*, Corpus Christ, Texas.

Gaylor, K.P. & Gaylor, R.R. (November 2016). Lessons to Learn: How Jackson, Mississippi Should Emulate Various Cities that Successfully Used Waterways to Create Its's Own Sustainable Waterfront Development. *Academy of Business Research International Conference*, San Antonio, Texas.

Kimmel, S., Gaylor, K. P. & Hayes, B. (November 2016). Age Differences among Adult Learners: Motivations and Barriers to Higher Education (Revised). *Academy of Business Research International Conference*, San Antonio, Texas.

Randle, N. W., Gaylor, K. P., Mathis, C. J., & Wilkins, J. L. (2015). "Professional intimacy in relationships between managers and subordinates: Moving toward scale development," *Society for the Advancement Management International Conference*, March 2015, Las Vegas, Nevada.

Steward, Dwight and Gaylor, Kristena (2015). Extending the Econometric Model of Worklife Expectancy," *Eastern Economics Association Conference*, February 2015. New York, New York.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2014). "Age Differences among Adult Learners: Motivations and Barriers to Higher Education," *Institute of Behavior and Applied Management*, October 2014. Orlando, Florida.

J.R. Smith, Gaylor, Kristena P., Mosley, A. (2014). "Faculty Commitment in Higher Education: An Empirical Investigation of the Three Component Model (TCM) of Organizational Commitment," *International Conference on Learning and Administration in Higher Education*, May 2014. Nashville, Tennessee.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2013). "The Influence of Race/Ethnicity on Motivations and Barriers to Adult Learners," *Academy of Business Research,* September 2013, San Antonio, Texas.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2013). "Understanding Adult Learners by Gender," *Allied Academies,* July 2013, Internet Conference.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2012). "Understanding the Community of Adult Learners through the Lens of Gender," *Institute of Behavioral and Applied Management,* October 2012, Nashville, Tennessee.

Randle, V. Natasha and Gaylor, Kristena (2012). "Professional Intimacy: Exploring Relationships Between Managers and Subordinates," *Allied Academics 2012 International Conference,* April 2012. New Orleans, Louisiana.

Wallace, Jolivette and Gaylor, Kristena (2012). **"**A Study of the Dysfunctional and Functional Aspects of Voluntary Employee Turnover," *Society for the Advancement of Management (SAM)*. March 2012. Las Vegas, Nevada.

Gaylor, K. P., Kimmel, S., Grubbs, R. (2011). "Motivations & Barriers to Adult Learners: The Influence of Economic "Hard Times" on Intent to Enroll," *Institute of Behavioral and Applied Management,* October 2011, Orlando, Florida.

Gaylor, K. P., Kimmel, S., Grubbs, R. (2010). "Motivations and Barriers to Business Education: Equipping Adult Learners for the Marketplace,*" Christian Business Faculty Association,* October 2010, Orlando, Florida.

Kimmel, S., Gaylor, K. P., Grubbs, R. (2009). "Motivations and Barriers to Business Education: Comparing Online and On Campus Adult Learners,*" International Institute of Behavioral and Applied Management Proceedings,* October 2009, Washington D.C.

Mathias, C., Gaylor, Kristena P., Wilkins-Randle, V.N (2007). "Ethnic Differences and the Mediating Effect of Job-Focused Self-Efficacy: The Impact of Work Stress on Work Family Conflict." Presented at the Southern Management Association Meeting, November 2007, Nashville, TN.

Mathias, C., Gaylor, Kristena P., Wilkins-Randle, V.N (2007). "Ethnic Differences and the Mediating Effect of Job-Focused Self-Efficacy: The Impact of Work-Family Conflict on Job Satisfaction." Presented at the International Academy of Business and Economics, October 2007, Las Vegas, NV.

Gaylor, Kristena P. Alli, A., and Wilkins, V.N. "A Pledge Allegiance: Academicians and Practitioners Working Together to Ensure Classroom Success" – Professional

Development Workshop-Facilitator-Academy of Management Annual Meeting, August 2007. Philadelphia, PA.

Smith, J.R., Gaylor, Kristena P., Mosley, A. and Perkins, S. "Organizational Commitment in Higher Education: A Multidimensional Perspective." Presented at the International Academy of Business and Economics, October 2006. Las Vegas, NV. Gaylor, Kristena P. and Kimmel, Sara. "Leader Commitment: Modeling Ethical Behavior for Organizational Change." Presented at the Institute of Behavioral and Applied Management, October 2006. Memphis, TN.

Alli, A., Gaylor, K., Noble, D, and Wilkins, V.N. "Minority Faculty Making an Impact at Majority Institutions." Presented at the Academy of Management Professional Development Workshops, August 2006. Atlanta, GA.

Finley-Hervey, J.A. and Gaylor, Kristena P. "Mississippi Official State Flag Special Election: An Analysis of Perceptions on Both Sides of the Vote." Paper accepted for presentation at the Academy of Business Disciplines, November 2005. Fort Lauderdale, FL.

Gaylor, Kristena P. "A Comparison of Employee-Organizational Linkages of Faculty Members at Public and Private Christian-based Colleges." Paper presented at the Christian Business Faculty Association Annual Meeting, October 2005. Point Loma, CA.

Gaylor, Kristena P., Smith, J.R. and Mosley, A. "Organizational Commitment in Higher Education: A Multi-Dimensional Perspective." Presented visually at the Academy of Management Annual Meeting, August 2005. Honolulu, HI.

Alli, A., Gaylor, K., Rodriquez, L, and Whitfield, G. "Minority Faculty Making an Impact at Majority Institutions." Presented at the Academy of Management Professional Development Workshops, August 2005. Honolulu, HI.

Gaylor, Kristena P., Smith, J.R. and Mosley, A. "An Evaluation of the Relationship between Organizational Commitment and Performance among Business School Faculty: An Empirical Analysis." Presented at the Economics and Research Symposium, Jackson State University, November 2004. Jackson, MS.

Gaylor, Kristena P. "Organizational Commitment in Higher Education: A Multi-Dimensional Perspective." Presented at the Romel Benjamin Research Symposium, Jackson State University, Spring 2003. Jackson, MS.

Gaylor, Kristena P. "The Significance of Timely Delivery on Supplier Selection Decisions." Presented at the Society for the Advancement of Management (SAM) Meetings, Spring 2003. Orlando, FL.

Brown, U.J., III. and Gaylor, Kristena P. "Organizational Commitment in Higher Education." Co-presented at the Western Decision Sciences Institute (WDSI) Thirty-First Annual Meeting, Spring 2002. Las Vegas, NV.

Finley-Hervey, J.A. and Gaylor, Kristena P. "Mississippi's Official State Flag Special Election: The Affect on Business and Public Perceptions." Presented at the Society for the Advancement of Management (SAM), Spring 2002. McLean, VA.

Brown, U.J. III., Gaylor, K. P., White-Johnson, S., & Ballard, V. "Computing Perceptions and Their Impact on Course Performance: A's for the Digital Generation." Presented at the International Association of Business Disciplines (IABD), Fall 2001. Orlando, FL. Brown, U.J., III. and Gaylor, Kristena P. "Organizational Commitment in Higher Education." Presented at the Eleventh Annual Economic Research Symposium, November 2001. Jackson State, MS.

Gaylor, Kristena P., and Finley-Hervey, J.A. "Resisting and Driving Forces for Change: MS Flag Controversy." Presented at the Eleventh Annual Economic Research Symposium, November 2001.  Jackson State, MS.

**ACADEMIC AWARDS & HONORS**

- 50 Leading Business Women for 2017 –*Mississippi Business Journal*
- Provisional Member of the Year – Junior League of Jackson – 2013-2014.
- Teacher of the Year – School of Business– Belhaven University – 2010.
- Outstanding Service Award, Academy of Management – Management Education & Development Division, Division Research Coordinator, Chicago, IL, 2009.
- Outstanding Service Award, Academy of Management – Management Education & Development Division, Division Program Evaluator, Honolulu, HI, 2005.
- Outstanding Reviewer Award, Academy of Management – Management Education & Development Division, Seattle, WA, 2003.

**PROFESSIONAL SERVICE**
### Academy Service
- Master Teacher Certification, The Brightman Workshops – conducted by Dr. Harvey Brightman, Professor Emeritus at Georgia State University School of Business – May 2015
- Research Coordinator, Management Education & Development Division, Academy of Management, 2007-2009.
- Team Leader, Management Education & Development Division, "Value in Teaching" Initiative, 2006.

- Reviewer, Organizational Behavior Division and Management Education & Development Division, Academy of Management Meetings, Atlanta, GA, 2006.
- 5-Year Strategic Review Committee – Management Education & Development Division, Academy of Management, 2000-2005.
- Program Evaluation Coordinator-Elect, Management Education & Development Division, Academy of Management, 2004-2005.
- Reviewer, Management Education & Development Division, Academy of Management Meetings, Seattle, WA, 2003.
- Facilitator, Shared Interest Track session, Academy of Management Meetings, Seattle, WA, 2003.
- Liaison, Mentoring Subcommittee & Organizational Behavior Division, Academy of Management, Denver, CO, 2002-present.

### Other Professional Associations' Service

- Member, National Association of Forensic Economists (NAFE) Software Review Committee – 2015-2017
- Facilitator, Management Doctoral Students Association Conference-Research Roundtable, 2005 and 2006.
- Reviewer, Southern Management Association (SMA), 2006.
- Panelist, "Here's the Real Deal: Ph.D. Student Experiences," The Ph.D. Project Management Doctoral Students Association Annual Conference, Seattle, WA 2003.
- Discussant, Society for the Advancement of Management Conference, 2002 and 2003.
- Participant, National Black MBA Association Case Competition located in Boston, MA, February 1999.

### Campus Service

- Member, Faculty Council, 2016-2018.
- President, Mississippi College, Faculty Club, 2015-2016.
- Vice President, Mississippi College, Faculty Club, 2014-2015.
- Advisor, School of Business, Mississippi College, 2013-2016.
- Member, Ad hoc Committee responsible for developing a Faculty Leave policy, Mississippi College, 2013-2014.
- Member, Student Grade Grievance review committee, Mississippi College, 2014.
- Member, Faculty Tenure Review Committee, Belhaven University, 2010 – 2012
- Member, Education Review Committee (ERC), Belhaven University, 2010 – 2012
- Member, Academics Appeals Committee, Belhaven University, 2009 – 2012
- Taskforce Member, School of Business Career Bootcamp, Belhaven University, 2009 - 2011
- Developer, On-line Course, Virtual Campus, Belhaven College, 2007, 2010, 2011

- Vice President, Sigma Beta Delta, a Business Honor Society, 2006.
- Facilitator, Day of Learning, Belhaven College, September 2006 and September 2005.
- Small Group Facilitator, *Institute of Business Ethics*, Belhaven College, February 2005.
- Facilitator, Leadership in Career Management, Jackson State University, February 2002.
- Discussant, Eleventh Annual Economic Research Symposium, Jackson State University, November 2001.

### Speaking Engagements

- Served as guest panelist for: "Pathways to the Ph.D: Reflections from Women of Color at Mississippi State University" (March 4, 2015)
- Served as a speaker for the 4th Annual Mississippi College Healthcare Reform Summit. (2014). The presentation was titled "Healthcare Reform & the Economy."
- Served as a speaker for the 2nd Annual Women of Color Summit at Mississippi State University (2014). Topic of the session "Role of Women in Education."

## COMMUNITY LEADERSHIP

- *Mississippi Business Journal* 50 Leading Business Women for 2017
- Davis Magnet International Baccalaureate Elementary School Parent Teacher Association Board Member – Vice President of Fundraising. (2016 – 2018)
- Directory, Co-Chair, Junior League of Jackson. (2017-2018)
- Newsletter, Co-editor, Junior League of Jackson. (2016-2017)
- Project Development Chair, Junior League of Jackson. (2015-2016)
- Facilitator, City of Jackson Supervisor/Manager Training Workshop, Management 101; Teambuilding Workshop. (2014-present)
- Board Member, Parents for Public School Greater Jackson Chapter. (2015)
- Radio guest, *Business Matters* – a radio segment aired in Southwest Mississippi (WTYJ 97.7 FM) which talks about business issues to help improve quality of life and empower listeners to make better finance decisions. (ongoing)
- Junior League of Jackson, Member – At – Large, Arts & Education; Current co-chair of Helping Hands. (2014-2015)
- Co-Host, *Business Break* – a radio segment aired on Mississippi Public Broadcasting (91.3 FM) which highlights economic development projects across the state– May 2011-July 2012

- Facilitator, City of Jackson Supervisor/Manager Training Workshop – March 2011-2012
- Junior League of Jackson, New Member – Initiated in 2012 – "Provisional Member of the Year"
- McWillie Elementary School Parent Teacher Association Board Member – Vice President of Programs. (2010 – 2014)
- Parents for Public Schools, Leadership Institute Graduate – Jackson (MS) Chapter. (2007)
- Chairperson, Educational Development Committee-Delta Academy-Delta Sigma Theta Sorority, Inc., Jackson (MS) Alumnae Chapter, 2002-2004; Co-chair 2012-2014.
- Board Member, Central Mississippi Chapter - Mississippi State University Alumni Association. (2000-2004)
- Board Member, Operation Shoestring, Jackson, Mississippi. (2002-2004)

### Church Service

- Children's Sunday School Leader, Anderson United Methodist Church, 2002-present.
- Pastors' Parish Relations Board – Member – 2005-2007; Board Chair. (2009-2011)

**INDUSTRY EXPERIENCE**

Groen, A Dover Industries Company, Jackson, Mississippi. Database Marketing Coordinator, September 1997-August 2000.

JCPenney Company, Ridgeland, Mississippi. Merchandising Manager, June 1995-July 1997.

**CONSULTING EXPERIENCE**

KPG Consulting, LLC, President/CEO, Provides economic and loss wage analyses and management consulting, January 2012-present.

**PROFESSIONAL ASSOCIATION MEMBERSHIPS**

National Association of Forensic Economists (NAFE)
Academy of Management (AOM)
Society for the Advancement of Management (SAM)

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                                 **PLAINTIFFS**

**V.**                                                                           **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;**
**CODE COLLECTIVE, LLC, a New York limited liability company;**
**JED McCALEB, an individual;**                                        **DEFENDANTS**

---

**JED MCCALEB AND CODE COLLECTIVE, LLC'S REVISION TO RECORD
CITATIONS RELATED TO EXHIBIT A IN ITS MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

For the benefit of the Court and the parties, McCaleb offers the following revisions to citations to Exhibit A in the Memorandum in Support of Motion for Partial Summary Judgment to correct a clerical error:

- Page 2, Paragraph 2 –citation to page 50 should be page 21;

- Page 3, Paragraph 1 – citation to page 28-29 should be page 26-27;

- Page 3, Paragraph 2 – delete quote and citation to page 40;

- Page 3, Paragraph 2 – citation to page 38-39 should be page 17;

- Page 3, Paragraph 2 – delete citation to page 38-39;

- Page 4, Paragraph 3 – citation to page 40 should page 6;

Respectfully submitted, this the 17th day of December, 2018.

                                        **JED McCALEB and**
                                        **CODE COLLECTIVE, LLC**

                                By:    */s/ Edwin S. Gault Jr.*
                                        EDWIN S. GAULT, JR. (MSB #10187)
                                        *Attorneys for Defendants Jed McCaleb and*
                                        *Code Collective, LLC*

1

**IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT**

DR. DONALD RAGGIO and                                                    **PLAINTIFFS**
DR. CHRIS RAGGIO

V.                                                              **CIVIL ACTION NO. 14-71**

JED McCALEB et al.                                                      **DEFENDANTS**

**PLAINTIFFS' SUPPLEMENT TO RESPONSE OPPOSING
PARTIAL SUMMARY JUDGMENT**

This Supplement to Plaintiffs' response [244] opposing partial summary judgment on damages brings to this honorable Court's attention Plaintiffs' Designation of Expert Witnesses [255], filed in this Court on December 7, 2018, prior to the hearing on said motion. *See Martin v. B.P. Exploration & Oil, Inc.*, 769 So. 2d 261, 263 (Miss. Ct. App. 2000) (appellate court will review "entire record on appeal" de novo to ascertain propriety of summary judgment). A copy of the designation is attached as ex. 1. As mentioned by Plaintiffs at the hearing, special attention is directed to the opinions of Darek Dabbs and Charles Evans.

Respectfully submitted, this the 17th day of December, 2018.

*s/ Andy Lowry*
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com


BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

      The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

      Edwin S. Gault, Jr., Esq.
      Amanda B. Robinson, Esq.
      T. Peyton Smith, Esq.
      FORMAN WATKINS & KRUTZ LLP
      Post Office Box 22608
      Jackson, Mississippi 39201
      Win.Gault@formanwatkins.com
      Peyton.Smith@formanwatkins.com
      Mandie.Robinson@formanwatkins.com

      Ethan Jacobs, Esq.      *(via U.S. mail)*
      HOLLAND LAW, LLP
      220 Montgomery Street, Suite 800
      San Francisco, California 94104

So certified, this the 17th day of December, 2018.

                    ***s/ Andy Lowry***
                    Andy Lowry

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

| | |
|---|---|
| DR. DONALD RAGGIO and<br>DR. CHRIS RAGGIO | **PLAINTIFFS** |
| **V.** | **CIVIL ACTION NO. 14-71** |
| JED McCALEB et al. | **DEFENDANTS** |

### PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES

Plaintiffs, Drs. Donald and Chris Raggio, designate the following individuals whom they may call as experts at trial or otherwise to offer opinion testimony at the trial of this cause.

1.   **Darek Dabbs**
     **Chief Technology Officer**
     **Sera-Brynn**
     **5806 Harbour View Blvd., Suite 204**
     **Suffolk, Virginia 23435**

Darek Dabbs is an expert in the field of cyber security.  His curriculum vitae is attached as Exhibit "1." Mr. Dabbs is Chief Technology Officer at Sera-Brynn, a cyber risk management company.

It is expected that Mr. Dabbs's opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Mr. Dabbs has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Mr. Dabbs has already prepared an affidavit summarizing some of the opinions on which he will testify and listing the documents which he has reviewed to date. That affidavit and list of documents is attached hereto as Exhibit "2."

Mr. Dabbs is expected to offer opinions on the subject of the cyber security of the MTGOX bitcoin exchange, and the deficiencies he has found in that system. Mr. Dabbs will testify about the timeline of events which occurred. He will opine that the security measures in place at MTGOX in December and January 2011 were inadequate and failed to meet the cyber security industry best practices and common standards of the time. He will opine that the webserver software was noted as being written in PHP-Lithium which most likely presented multiple vulnerabilities causing weaknesses with webserver security. He will opine that from the time the Raggios created an account on MTGOX (December 24, 2010) through the time of the hack of their account (January 7-9, 2011), MTGOX did not have salted password hashing implemented, which security practitioners at that time knew to use on all password databases.

Mr. Dabbs will opine that the most likely explanation for the compromise of the Raggios' account data was through an SQL injection vulnerability. He will opine that an SQL injection attack could have allowed the hacker to access the encrypted database of account user names and passwords, and thus a hacker would have cracked the password to access the Raggios' account. He will opine that if adequate security protocols had been in place, the SQL vulnerability likely would not have existed and the hack most likely could have been prevented or mitigated.

Mr. Dabbs will also opine that MTGOX's collection of log-in data on the Raggios' account and all accounts was also insufficient and contrary to best practice in the industry

and standards already in place at the time of this incident.   User Account Logging of auditable events was not implemented until after the Raggio user account compromise occurred, and even after the incident the implementation was not sufficient to support a reasonable forensic investigation.   At the time of the incident in question, MTGOX collected only log-in data for the successful last access to a user account.   The appropriate measure, in Mr. Dabbs' opinion, would have been to configure the logging mechanisms to capture all logins, both successes and failures.   Sufficient data logging of user account login information, while passive in design, would have supported mitigations; permitted an effective investigation and location of the stolen bitcoin; and possibly permitted the recovery of the stolen bitcoin.

Mr. Dabbs will opine that MTGOX's security failures fell so far short as to amount to gross negligence. Discovery on this issue and other issues is ongoing.  Mr. Dabbs may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Mr. Dabbs' opinions when and if additional information becomes available.

    2.      **Allen Carroll, CPA/ABV, CFF, CVA**
            **Partner**
            **Wilkins Miller**
            **41 West Interstate 65 Service Rd. North, Suite 400**
            **Mobile, Alabama 36608**

Allen Carroll is an expert certified in the fields of accounting and financial forensics. Mr. Carroll is a partner at the Wilkins Miller accounting firm. His curriculum vitae is attached as Exhibit "3."

It is expected that Mr. Carroll's opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Mr. Carroll has reviewed several publicly available documents pertaining to Ripple Labs, Inc. formerly OpenCoin Inc. ("Ripple").

Mr. Carroll is expected to offer opinions on the value of the alleged unjust enrichment Jed McCaleb wrongfully received as a result of the alleged liability owed to the Raggios. Mr. Carroll will opine that McCaleb's failure to repay the Raggios for amounts they were allegedly owed ultimately resulted in additional amounts which McCaleb had available and used to fund Ripple, additional equity which McCaleb possessed in Ripple, and additional proceeds McCaleb reaped from Ripple. Mr. Carroll intends to testify that, generally speaking, the value of that alleged unjust enrichment and/or constructive trust can be calculated by taking the value of the liability owed by McCaleb to the Raggios as a result of the stolen bitcoin at the time of McCaleb's investment in Ripple and dividing that amount by the value of McCaleb's initial investment in Ripple, so as to reach a percentage of McCaleb's ownership in Ripple which rightfully belongs to the Raggios (for brevity, "Raggios' Ripple Investment Percentage"). Based upon publicly available information, McCaleb liquidated his equity in Ripple for unknown amounts and continues to possess XRP, another cryptocurrency, that he received as a result of his involvement with the founding of the cryptocurrency.  Mr. Carroll will opine that one measure of the Raggios' damages for unjust enrichment and/or constructive trust will be to apply the Raggios' Ripple Investment Percentage to the value which McCaleb extracted from Ripple and the

XRP cryptocurrency. To date, McCaleb has not produced documents and information on the amount of McCaleb's investment in Ripple, the amount of McCaleb's liquidation of his equity in Ripple, and other relevant information.

Mr. Carroll may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Discovery on this issue and other issues is ongoing. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Mr. Carroll's opinions when and if additional information becomes available.

**3.    Dr. Charles W. Evans**
**Chyden LLC**
**2631 Key Largo Lane**
**Fort Lauderdale, Florida 33312**

Dr. Charles Evans is an expert in economics and finance, with a particular expertise in Bitcoin specifically and cryptocurrency/e-currency generally. His curriculum vitae is attached as Exhibit "4."

It is expected that Dr. Evans' opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Dr. Evans has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Dr. Evans is expected to offer fact and opinion testimony on cryptocurrencies, including a description of cryptocurrencies, the history of cryptocurrency and bitcoin in particular, cryptocurrency wallets and storage, spending and receiving cryptocurrency, purchase and sale of cryptocurrency, "forks" in cryptocurrency and bitcoin in particular; on

the background and history of MTGOX, including its founding, history and bankruptcy, known and suspected MTGOX hacks, types of MTGOX records, the MTGOX user interface, MTGOX user experience, whether and when other bitcoin exchanges became available; and bitcoin prices, including a general description of how pricing is determined, bitcoin price volatility, reasonable expectations of future value, and how long-term bitcoin holders acted throughout price swings.

Dr. Evans is expected to offer opinions on the treatment of bitcoin. Dr. Evans is expected to testify that while bitcoin has not been clearly labeled by legal authorities, at a fundamental level, bitcoin is a form of property or commodity and may be considered as such by the Court and by the jury.

Dr. Evans is expected to testify regarding the pricing of bitcoins, how that pricing is determined, reliable sources to determine that pricing at any particular point in time, and the actual price of bitcoins at particular points in time.  Dr. Evans may opine on the value of the 9406.33 bitcoins at various times since the theft in January 2011 until present, and may opine on the financial loss suffered by the Raggios as a result of the theft of their 9406.33 bitcoins.

Dr. Evans is expected to testify that in 2010-11, bitcoin long-term investors had one viable option to purchase significant amounts of bitcoins, and that was the MTGOX exchange.  While there was the possibility that an investor could purchase bitcoins in ad hoc transactions with other individuals that one met online in discussion forums, those purchases were risky, unreliable, and many times could not accommodate larger transactions. Dr. Evans will describe and opine that there were no other sources to purchase large amounts of bitcoins in 2010 and 2011, and thus the Raggios were prevented from

replacing or covering their loss at the time of the theft. Dr. Evans will testify that other legitimate bitcoin exchanges did not begin operations until 2012. He will testify that the exchange, LocalBitcoins, began operations in June 2012 and was a matchmaking service which connected buyers and sellers in person to complete the transaction, but it probably was not possible to obtain 9406.33 bitcoins via LocalBitcoins in Jackson, Mississippi at that time. He will testify that the exchange, Coinbase, began operations in October 2012, by which time the bitcoin price had risen to $12, which meant that replacing the Raggios' bitcoin would have cost approximately $80,000.

Dr. Evans is expected to testify on the foreseeability, pricing, and reasonable expectation of future value of bitcoins. He will testify that when one buys bitcoins, one does so with the expectation that they will either facilitate transactions that would otherwise be more costly or even impossible or that the bitcoins will increase in value, or both. The Raggios believed that the bitcoins they purchased would increase substantially in value (as in fact they have). When assessing whether that expectation was reasonable, Dr. Evans is expected to testify that it is critical to identify the relevant population against which to compare that action or expectation.  In this case, Dr. Evans will testify that the relevant comparison of one long-term holder of Bitcoins (like the Raggios) is to other long-term bitcoin holders.

Dr. Evans is expected to testify that the top 100 Bitcoin addresses that have held bitcoins for five years and eight years have not spent or sold any of them over that time period, and rode out the peaks and valleys in the price of bitcoins over that time period. Thus, Dr. Evans has concluded and will testify that it was reasonable for the Raggios to

expect that their bitcoins would increase substantially in value and that they would have continued to hold their 9406.33 bitcoins had they not been stolen.

Dr. Evans may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Dr. Evans' opinions when and if additional information becomes available.

**4.    Kim Nilsson**
**Chief Engineer and Analyst**
**WizSec**
**Tokyo, Japan**

Kim Nilsson is an expert in the areas of bitcoin and blockchain analysis. His curriculum vitae is attached as Exhibit "5."

It is expected that Mr. Nilsson's opinions will be based upon his education, training, experience, and background. He has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Mr. Nilsson has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Mr. Nilsson is expected to offer fact and opinion testimony on the technical aspects of bitcoin and bitcoin blockchain. He will opine on the mechanisms for how bitcoin transactions function and how they are observable by outside parties. He will opine on the process for identifying and proving control of bitcoin addresses.

Mr. Nilsson is expected to offer testimony and opinions on the MTGOX user account "Baron" and the ultimate destination of the Raggios' stolen bitcoins. He will describe how the Baron account was identifiable via blockchain analysis as being associated

262119.4

with the Raggios' stolen bitcoins. Mr. Nilsson will testify that the stolen bitcoins were first withdrawn from the Raggios' MTGOX account to a bitcoin address that was previously connected to the Baron MTGOX account. Mr. Nilsson will testify that the stolen bitcoins were later deposited back into newly created MTGOX user accounts, which were presumably created solely to receive the stolen bitcoins. Mr. Nilsson will testify that the stolen bitcoins were then sold for USD and withdrawn via a service known as AurumXChange. Mr. Nilsson will testify that the Raggios' stolen bitcoins were never deposited into Baron's MTGOX account.

Mr. Nilsson is expected to offer fact testimony and opinions about Jed McCaleb's personal bitcoin activity using blockchain analysis. According to Mr. Nilsson's analysis, Jed McCaleb took personal possession of all of MTGOX's bitcoin holdings prior to selling the exchange to Mark Karpeles. Jed McCaleb commingled his personal bitcoins with those belonging to MTGOX. Mr. Nilsson will testify that McCaleb sold a large amount of bitcoins for personal gain from 2011 through 2013.

Mr. Nilsson will also testify that when McCaleb transferred ownership of the MTGOX exchange, the exchange was missing roughly 80,000 BTC and $50,000 USD from its reserves. As a result, Mr. Nilsson will testify that MTGOX did not have the number of bitcoins which MTGOX account holders believed they owned, and, thus, MTGOX was insolvent when McCaleb transferred ownership to Karpeles. He will opine that McCaleb knew or reasonably should have known of MTGOX's insolvency before transferring ownership to Karpeles.

Mr. Nilsson is expected to offer opinions on Jed McCaleb's involvement in "bot" accounts. He will testify that McCaleb used the MTGOX accounts "Gox Bot" and

"BotBot" to buy and sell bitcoins on the MTGOX exchange. He will testify that a "bot" in this context is usually associated with undisclosed, automated trading on an exchange, although the actual purpose is not yet clear.  If that was in fact the purpose and effect of the "Gox Bot" and "BotBot" accounts, then Mr. Nilsson is expected to testify that such activities, since they were not disclosed to MTGOX account holders, undermined the credibility of the exchanges, because McCaleb controlled undisclosed bot accounts which were trading with and against MTGOX customers, and may be characterized as fraudulent.

Mr. Nilsson may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Mr. Nilsson's opinions when and if additional information becomes available.

      **5.**      **Dr. Kristena Gaylor**
                **P.O. Box 16158**
                **Jackson, Mississippi 39236-6020**

Dr. Kristena Payne Gaylor is an expert in the field of economics. Dr. Gaylor's curriculum vitae is attached as Exhibit "6."

It is expected that Dr. Gaylor's opinions will be based upon her education, training, experience, and background. She has reviewed the relevant documents, including, but not limited to, the pleadings and written discovery filed in the cause, documents exchanged by the parties in discovery, and the transcript of the deposition of Jed McCaleb. Additionally, Dr. Gaylor has reviewed several publicly available documents pertaining to the MTGOX bitcoin exchange.

Dr. Gaylor is expected to offer opinions on the monetary value of bitcoin at points in time since the theft of the Raggios' bitcoins to the date of trial.  In general, Dr. Gaylor will testify concerning the extent of Plaintiffs' financial loss as a result of the incident in question, and in doing so, will analyze the economic evaluation of damages, including, but not limited to, the value(s) of the stolen bitcoins, and any other aspects of Plaintiffs' damages that flow from the theft.  Dr. Gaylor will calculate, based on credible, reported valuations of bitcoins like Coindesk's, the value of the stolen bitcoins for various points in time, including the date the Complaint was filed, the date on which the price of bitcoins reached its peak, the time of trial, and possibly other relevant times.  For example, the value of 9406.33 bitcoins on the date of the filing of the Complaint (March 5, 2014) was approximately $6,000,000, and the value was approximately $180,000,000 on the date that bitcoins reached its peak price in December 2017.    Dr. Gaylor may also testify about interest owed on Plaintiffs' financial losses, if appropriate.  Dr. Gaylor is expected to testify regarding generally accepted methodologies for determining monetary damages which are permitted under Mississippi law, including but not limited to prejudgment and post-judgment interest.

Dr. Gaylor may offer opinions to rebut the testimony of Defendants' experts, if any, as well as the testimony of Defendants and Defendants' witnesses within his field of expertise. Because discovery is ongoing, Plaintiffs reserve the right to supplement this designation and Dr. Gaylor's opinions when and if additional information becomes available.

Respectfully submitted, this the 7th day of December, 2018.

<u>*s/ Andy Lowry*</u>
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944

ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com

BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

> Edwin S. Gault, Jr., Esq.
> Amanda B. Robinson, Esq.
> T. Peyton Smith, Esq.
> FORMAN WATKINS & KRUTZ LLP
> Post Office Box 22608
> Jackson, Mississippi 39201
> Win.Gault@formanwatkins.com
> Peyton.Smith@formanwatkins.com
> Mandie.Robinson@formanwatkins.com

> Ethan Jacobs, Esq.            *(via U.S. mail)*
> HOLLAND LAW, LLP
> 220 Montgomery Street, Suite 800
> San Francisco, California 94104

So certified, this the 7th day of December, 2018.

> *s/Andy Lowry*
> Andy Lowry

# Darek Dabbs
## CISSP, CISM

---

- Over 20 years' experience in Cyber Security Leadership and Network/Security Administration
- Multi-domain security design and architecture
- Vulnerability Management and Penetration Testing
- Cyber Forensic Investigations
- Cloud Security
- Department of Defense and Commercial Industry Information Security Policy Development and Implementation

---

PROFESSIONAL EXPERIENCE

*Skill areas*
- Windows/Unix Operating Systems
- Leading Cyber Forensic Investigations
- Network Security Testing
- Risk Analysis/Risk Management
- Policy and Compliance
- Configuration Management
- Payment Card Industry Qualified Security Assessment/Forensic Investigations

*Positions held*

**Chief Information Officer/Chief Information Security Officer/Partner 2012 -Present**
- System owner of Sera-Brynn's Carver Software as a Service compliance management tool powered by blockchain technology.
- Provides strategic and operational cyber security information and technology leadership to all facets of Sera-Brynn service lines, incident response, forensic investigations, penetration testing, eDiscovery, PCI-DSS compliance audits, Risk Assessments and product resale spread across multiple industries such as Healthcare, Hospitality, Industrial, Retail, Manufacturing, local, state and federal government.
- Provides consulting to customer executive leadership in all aspects of information security, including engagement in the following initiatives and programs: information security governance, information security and privacy risk management, security awareness and training, capital planning and investment control, key performance and risk indicators – metrics, planning including contingency planning, services and products acquisition, or incident response and handling;
- Maintain complete awareness of current and developing information security regulations, technology, and threats.
- Responsible for developing and managing the Sera-Brynn Information Security Business Strategy.  Informs the Executive Board how technology will impact the day-to-day Information Security strategies, business cultivation and sales, activities, and goals to ensure bullet proof solutions for Sera Brynn customers.
- Solely charged with formulating intellectual property (IP) strategies and exploiting proprietary technologies which has resulted in the research and development of the Sera-Brynn Sentinel Server, the all-in-one Intrusion Detection and Vulnerability Management/Security Auditing solution.
- Develops, approves and supervises the Quality Assurance program for all Sera-Brynn customer security audits, architecture, engineering, and remediation project plans to ensure compliance with customer Information Security requirements.

**Information Security Officer/Information Security Consultant 2006-2012**
- Delivered subject matter expertise on Information Security and Information Assurance through the development of INFOSEC and IA processes and policy
- Developing and maintained multiple Department of Defense Certification and Accreditation documentation across multiple defense security domains such as JWICS, SIPRNet, NIPRNet, DDTE-S, DDTE-TS, U-DREN, NPS, JTEN, and CFBLNet.

- Authored Certification and Accreditation packages from cradle to grave, to include systems design, architecture, mission requirements, concepts of operations, vulnerability assessment and remediation, drawings, and plans of actions and milestones.
- Provided risk analysis of threats and consequences of proposed modifications to software, and hardware while participating in a Configuration Control Board (CCB).
- Authored, managed and implemented a Department of Defense Information Security vulnerability management program
- Responsible for monthly system tests and evaluations utilizing software vulnerability tools such as eEye Retina, Nessus security scanner, nMap network scanner, Wireshark packet sniffer and the DISA Gold Disk suite.
- Authored and edited numerous Department of Defense Information Security policies and procedures.

**Network Administrator/Communications Engineer 2001-2006**
- Supported the US Navy's Continuous Training Environment (NCTE) in conjunction with the United States Fleet Forces Command.
- Planned and managed the install of network pack-up kits (PUKs) on 29 US Navy ships during 3 Fleet Synthetic Training (FST) exercises.  PUK's consisted of a router, 2 switches, VoIP and a 1u x86 server.
-  Assisted in the upgrade of a communication suite, the Multi-Unit Tactical Training System (MUTTS) which significantly improved US Naval Training radio communications with full duplex.
- Participated in the physical installation of a new NCTE network suite at Dam Neck Naval Base, upgrading and enabling the NCTE to have viable network communication for the future.
- Re-organized the equipment in seven network racks, replacing the Ethernet cabling infrastructure, and standardizing equipment to switch connectivity across the network.
- Created and presented NCTE project briefs to senior staff onboard US Navy Ships.
- Team leader in managing a daily project delivery schedule for high availability legacy Sequence Database, to a Oracle Database.
- Responsible for ensuring that over 4 terabytes of data was migrated successfully to Sun Enterprise 25K servers without data loss or database inconsistencies.  He additionally created and presented weekly status reports delivered directly to the Chief Information Officer.
- Responsible for the placement, splicing, termination, testing and documentation of network infrastructure.  Mr. Dabbs was responsible for troubleshooting, identifying and providing solutions to operational problems that reduced operational costs 35% from budget expectations.
- Performed System Administration and Tier 3 Technical Support for over 5000 users at 30 sites in a multi-domain environment across the continental United States.
- Managed system operation, software deployment and installation, and perform remote system administration of platforms running UNIX / Solaris, Windows NT, and Windows 2000 operating systems.
- Conducted routine and emergency hardware maintenance, repair, equipment upgrades, server installation and deployment of SUN Enterprise-450, Enterprise-250, Blade 2000, and Ultra 80, 60, 10 and IBM compatible hardware platforms.
- Developed a standard operating procedure (SOP) covering the restoration of failed Solaris Volume Manager Volumes.  The average downtime of failed volumes was reduced from 48hrs to 10min-1.5hrs.
- Created troubleshooting and maintenance documentation for the  installation, configuration, updating of BIND 8.x and 9.x

PROFESSIONAL DEVELOPMENT
- ► Certified Information Systems Security Professional (CISSP), 421101
- ► Certified Information Security Manager (CISM)
- ► CompTia Security+
- ► Cisco Certified Networks Associate (CCNA) expired
- ► SANS GIAC Security Leadership (GSLC) expired
- ► US Army – All Source Intelligence Analysis
- ► US Navy – Cryptologic Technician Administration

MEDIA ENGAGEMENTS

- ► ANATOMY OF A CYBER BREACH AND RESPONSE https://www.cwm-law.com/wp-content/uploads/2018/07/ANATOMY-OF-A-CYBER-BREACH-AND-RESPONSE.pdf
- ► https://pilotonline.com/inside-business/news/technology/article_26215fa3-00f8-5c6c-9c5a-43e77127cf3c.html
- ► More cyber attacks to fear: malvertising and viruses that lurk unseen https://pilotonline.com/business/article_a90e5f84-707d-5b2f-bb27-c4a5cc3307e8.html
- ► Why building cybersecurity into the supply chain is imperative http://www.virginiabusiness.com/reports/article/why-building-cybersecurity-into-the-supply-chain-is-imperative
- ► Anatomy of a $500 Million Data Breach https://www.cprcv.org/phone/conference-agenda.html
- ► Televised WVEC Channel 13 (ABC Affiliate) expose titled: "Internet underground process prosperous for criminals" http://www.wvec.com/news/Internet-underground-proves-prosperous-for-criminals-257959191.html
- ► Breaking Down the Cost and Complexity Barrier to Network Monitoring https://logrhythm.com/resources/webcasts/breaking-down-the-cost-and-complexity-of-network-monitoring/
- ► 2013 Panelist at MODSIM World Conference speaking on Homeland Security and Cyber Analytics
- ► Co-Author 2013 Data Privacy, Information Security and Cyber Insurance Trends http://databreachinsurancequote.com/wp-content/uploads/2013/02/2013-Data-Privacy-Information-Security-and-Cyber-Insurance-Trends-Report.pdf
- ► 2013 Panelist at Independent Insurance Agents Annual Convention discussing Technology Challenges for the Insurance Industry https://www.iiaba.net/webfolder/va/2013ACRegBrochure-email.pdf
- ► 2012 Cyber Threats & Security featuring Incident Response http://www.onlinetech.com/news/data-center-industry-news/disaster-recovery/item/670-incident-response-and-2012-cyber-threats-a-security

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO and                                          PLAINTIFFS
DR. CHRIS RAGGIO

V.                                                    CIVIL ACTION NO. 14-71

JED McCALEB et al.                                            DEFENDANTS

### AFFIDAVIT OF DAREK DABBS, SR

STATE OF VIRGINIA

INDEPENDENT CITY OF SUFFOLK

PERSONALLY APPEARED before the undersigned officer duly authorized by law to administer oaths, Darek Dabbs, who, after being duly sworn and deposed, states as follows:

1.    I am over eighteen years of age and am competent to give this Affidavit, which is based upon my personal knowledge.

2.    I have been retained by Dr. Chris Raggio to be an expert witness in the matter of Dr. Donald Raggio and Dr. Chris Raggio vs. MTGOX, et. al, In the Circuit Court of Hinds County, First Judicial District, Cause No. 14-71, and I have personal knowledge of the facts set forth in this affidavit.

3.    All of the opinions set forth in this affidavit are made to a reasonable degree of certainty in the field of cyber security.

4.    I have reviewed all of the documents listed in Appendix A attached to this affidavit.

5.    I would like to review the following evidence regarding MTGOX's cyber security including the forensic artifacts that would contain:

- Webserver log and data files that depict login/logout activity;
- Web Server and Blog server production code and any backup code
- Firewall and Web Application Firewall configurations;
- Full Server image(s) to include all databases

6.    Jed McCaleb has not provided Plaintiffs a copy of the server images in this case.

7.    The security measures in place at MTGOX in December and January 2011 were inadequate and failed to meet the cyber security industry best practices and common standards of the time.  The webserver software was noted as being written in PHP-Lithium, which during 2011 was only available as a beta software and most likely presented multiple vulnerabilities causing weaknesses with webserver security.   User Account Logging of auditable events was not implemented until after the Raggio user account suspected compromise occurred, and even after the incident the implementation was not sufficient to support a reasonable forensic investigation.

8.    From the time the Raggios' created an account on MTGOX (December 24, 2010) through the time of the hack of their account (January 7-9, 2011), MTGOX did not have salted password hashing implemented.  Security practitioners at that time knew to use salted password hashing on all password databases.

9.    I read in Defendant Jed McCaleb's Memorandum Brief in Support of Motion for Partial Summary Judgment the allegation that "There is no evidence the exchange's security measures were circumvented." I disagree with that factual assertion and intend to offer opinions contrary to those assertions at the appropriate time.

10.    I read in Defendant Jed McCaleb's Memorandum Brief in Support of Motion for Partial Summary Judgment the allegation that "the theft was perpetrated by someone using the Raggios' own password to access their account."   While that assertion may be

true, I have not seen evidence to support Jed McCaleb's claim that the Raggios' account was compromised through the fault of the Raggios. Instead, in my opinion, the account was accessed through the use of the Raggios' own password, but that access was caused by the unauthorized hack of the password database caused by a SQL injection attack.

11.     In documents produced so far in this case, McCaleb has already acknowledged that security measures on the site were being probed in the same timeframe that the Raggios' bitcoins were stolen. But at that time, McCaleb did not have adequate security procedures in places to either detect those probes, or prevent unauthorized access.

12.     In my opinion, and based on the information I have seen to date, the most likely explanation for the compromise of the Raggios' account data was through an SQL injection vulnerability. An SQL injection attack would have allowed the hacker to access the encrypted database of account user names and passwords. With access to the encrypted database, the hacker could have cracked the password to access the Raggios' account. According to publicly available sources, we know that MTGOX was subjected to an SQL injection attack at some point in 2011, and there is evidence to suggest the attack occurred in January 2011 and could explain the compromise to the Raggios' account. Had adequate security protocols been in place, this vulnerability would not have existed and the hack could have been prevented.

13.     Although my review of the documents and information in this case is not complete and my opinions are not fully formed, I do believe that there is sufficient evidence that I have seen to date for a jury to find that MTGOX' security failures rose to the level of gross negligence. I certainly believe that the failures I have seen so far were grossly negligent.

14.    Because my review of documents and information is not yet complete, I reserve the right to add to and modify the opinions set forth in this affidavit.

Further, Affiant Sayeth Not.

_Darek Dabbs, Sr._

Darek Dabbs, Sr.

Sworn to and subscribed before me this ⌊ day of November, 2018.

Notary Public

My Commission expires: 6/30/2022

BRIAN DOUGLAS PARSONS
NOTARY PUBLIC
REGISTRATION # 7776176
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
JUNE 30, 2022

# Appendix A

136177075.txt

1361770758574142976.eml

Confidential Investigative Report FINAL w attach.pdf

log_otc_from_rtf.pdf

Mt Gox Account Dump Pastebin 8oct2014

Mtgox is changing owners_bitcointalkforum.pdf

myznc-#bitcoin-otc.log

myznc-#bitcoin-otc.log.tar.bz2

myznc-#bitcoin-otc_log.pdf

New Bitcoin Exchange (mtgox.com)_bitcointalkforum.pdf

otc.log

otc_log.pdf

otc_log.rtf

scan.JPG

Bitcoin\Baron Transactions SRC13723-14137.pdf

Bitcoin\Baron Transactions SRC13723-14137.txt

Bitcoin\Baron Transactions SRC13723-14137.xlsx

Bitcoin\BitcoinTalk Posts

Bitcoin\Defendants' Produced Discovery PDFS and attachments

Bitcoin\IRC Chat Log SRC14197-14208.pdf

Bitcoin\BitcoinTalk Posts\Baron

Bitcoin\BitcoinTalk Posts\Jed

Bitcoin\BitcoinTalk Posts\MagicalTux

Bitcoin\BitcoinTalk Posts\mtgox

Bitcoin\BitcoinTalk Posts\Baron\1 (posts 1-20).pdf

Bitcoin\BitcoinTalk Posts\Baron\2 (posts 21-40).pdf

Bitcoin\BitcoinTalk Posts\Baron\3 (posts 41-60).pdf

Bitcoin\BitcoinTalk Posts\Baron\4 (posts 61- 80).pdf

Bitcoin\BitcoinTalk Posts\Baron\5 (posts 81- end).pdf

Bitcoin\BitcoinTalk Posts\Jed\(1-20).pdf

Bitcoin\BitcoinTalk Posts\Jed\(101-120).pdf

Bitcoin\BitcoinTalk Posts\Jed\(121-140).pdf

Bitcoin\BitcoinTalk Posts\Jed\(141 -160).pdf

Bitcoin\BitcoinTalk Posts\Jed\(161- 180)pdf.pdf

Bitcoin\BitcoinTalk Posts\Jed\(181- end).pdf

Bitcoin\BitcoinTalk Posts\Jed\(21-40).pdf

Bitcoin\BitcoinTalk Posts\Jed\(41-60).pdf

Bitcoin\BitcoinTalk Posts\Jed\(61-80).pdf

Bitcoin\BitcoinTalk Posts\Jed\(81-100).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (1-20).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (101 -120).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (121 -140).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (141 - 160).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (161 -180).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (181 -200).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (201 -220).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (21-40).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (221-240).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (241 -260).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (261-280).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (281 -300).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (301 -320).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (321 -340).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (341 -360).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (361-380).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (381- 400).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (401-420).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (41-60).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (421-440).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (441-460).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (461-480).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (481 -500).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (501-520).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (521-540).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (541-560).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (561-580).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (581-600).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (601-end).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (61-80).pdf

Bitcoin\BitcoinTalk Posts\MagicalTux\Latest posts of MagicalTux (81-100).pdf

Bitcoin\BitcoinTalk Posts\mtgox\1 (post 1-20).pdf

Bitcoin\BitcoinTalk Posts\mtgox\10 (post 181- 185).pdf

Bitcoin\BitcoinTalk Posts\mtgox\2 (post 21-40).pdf

Bitcoin\BitcoinTalk Posts\mtgox\3 (post 41-60).pdf

Bitcoin\BitcoinTalk Posts\mtgox\4 (post 61-80).pdf

Bitcoin\BitcoinTalk Posts\mtgox\5 (post 81-100).pdf

Bitcoin\BitcoinTalk Posts\mtgox\6 (post 101 - 120).pdf

Bitcoin\BitcoinTalk Posts\mtgox\7 (post 121 -140).pdf

Bitcoin\BitcoinTalk Posts\mtgox\8 (post 141-160).pdf

Bitcoin\BitcoinTalk Posts\mtgox\9 (post 161-180).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000001 Executed Signatures on Contract selling MTGOX to Tibanne (Karpeles).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000002 MTGOX sale contract to Tibanne (Karpeles).pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000005 20110226-Re_logs otc-1361315.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000006 20110226-Re_logs otc-5370381.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000007 19691231-no_subject-768181.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000008 20101217-Re_deal-7156751.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000009 20101220-account funded by wire-1299061.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000010 20101221-funding-1295519.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000011 20101221-Re_account funded by wire-1273423.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000012 20101221-Re_account funded by wire-1277694.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000013 20101221-Re_account funded by wire-1280348.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000014 20101221-Re_account funded by wire-1284749.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000015 20101221-Re_account funded by wire-1289154.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000016 20101221-Re_account funded by wire-1293555.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000017 20101223-Re_account funded by wire-1262485.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000018 20101223-Re_account funded by wire-1265712.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000019 20101223-Re_account funded by wire-1270743.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000020 20101224-account funded by wire-1236414.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000021 20101224-Re_account funded by wire-1242546.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000022 20101224-Re_account funded by wire-1248745.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000023 20101224-Re_account funded by wire-1252490.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000024 20101224-Re_account funded by wire-1258037.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000025 20101225-Re_account funded by wire-1232076.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000026 20101227-Re_account funded by wire-1193201.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000027 20101227-Re_account funded by wire-1199421.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000028 20101227-Re_account funded by wire-1213726.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000029 20101227-Re_account funded by wire-1220432.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000030 20101227-Re_account funded by wire-1225331.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000031 20101228-Re_account funded by wire-1159934.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000032 20101228-Re_account funded by wire-1165909.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000033 20101228-Re_account funded by wire-1173280.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000034 20101228-Re_account funded by wire-1178756.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000035 20101228-Re_account funded by wire-1186000.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000036 20101229-Re_account funded by wire-1145570.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000037 20101229-Re_account funded by wire-1151845.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000038 20110109-Re_account funded by wire-1113141.pdf

Bitcoin\Defendants' Produced Discovery PDFS and attachments\MCCALEB 000039 20110109-Re_account funded by wire-1129184.pdf



## CURRICULUM VITAE OF
## W. ALLEN CARROLL, JR., CPA/ABV, CFF, CVA

**EXPERIENCE**

Mr. Carroll received his BS in Business in June 1987. Since that time, he has been employed with Wilkins Miller (or its predecessor). His experience includes: litigation services, audits of multiple-state wholesale distributors, multiple state manufacturers, corporate taxation, real estate developers, and income and estate tax planning.

**EDUCATION**

University of South Alabama -
BS in Business (Concentration in Accounting)

Certified Public Accountant

Accredited in Business Valuation

Certified in Financial Forensics

Certified Valuation Analyst

Member of Beta Alpha Psi, a National Scholastic Fraternity For Accounting and Finance Students

Certificate of Educational Achievement Awarded by the American Institute of CPAs in Tax Planning and Advising for Closely Held Businesses

**PROFESSIONAL HISTORY**

1987 - Present

Wilkins Miller, LLC (Successor Firm)
Managing Partner

1987 - 1991

Pannell Kerr Forster
Audit and Tax Senior

CURRICULUM VITAE OF
W. ALLEN CARROLL, JR., CPA/ABV, CFF, CVA (CONTINUED)

## SELECTED EXPERIENCES

- Engagement to evaluate the lost profits of a publically traded corporation due to a fire that resulted in the delay of a ship being placed into service.

- Played a key role in preparing, reviewing, and analyzing lost profit calculations in connection with a multi-district litigation settlement agreement for a variety of businesses.

- Maritime industry experience includes audits, tax and consulting services to companies that operate ships and vessels.

- Business Interruption Matter for an industrial manufacturer (the largest in North America for its niche) to determine losses associated with a shut-down due to a mechanical breakdown.

- For 10 years Mr. Carroll was responsible for all tax matters of a publicly traded, high-tech company with operations throughout the United States with revenues in excess of $100 million including tax planning, Federal and State tax compliance matters for all 50 states and representation before Internal Revenue Service in connection with tax audits.

- Mr. Carroll was responsible for all audit and tax matters of a paint manufacturing company with locations and retail outlets throughout the Southeast and the Caribbean.

- Reviewed income tax returns and accrual of income tax liabilities for financial statement purposes of a national company with numerous subsidiaries with various operations throughout the eastern United States. Operations included the coal and lumber industries.

- Audit experience includes audits of fast growth companies in the technology industry including those named by *Inc. Magazine* as the fastest growing companies in the country.

- Mr. Carroll served as a staff accountant through director of wholesale distributorships with multiple state operations with sales ranging from $7 million to $55 million involving internal control studies, inventory controls and preparation and review of audited financial statements and multi-state tax returns.

- Engagement relating to criminal defense trial including supervising team for expert witness involving up to 7 accountants and CPA's and over 5,000 man-hours in connection with analysis and review of over 30,000 documents produced by the Government involving multiple corporations with operations in three states.

CURRICULUM VITAE OF
W. ALLEN CARROLL, JR., CPA/ABV, CFF, CVA (CONTINUED)

### SELECTED EXPERIENCES
(CONTINUED)

- Engagement relating to criminal defense trial including supervising team for expert witness involving multiple automobile dealerships located throughout the United States as well as various civil litigation cases connected with the allegations including the evaluation of lost profit claims.

- Mr. Carroll served as an expert witness in a civil litigation matter involving two radio stations. Carroll's work included a detailed review and analyses of all accounting records and financial statements for a number of years. The records were maintained using QuickBooks.

- Engagement involving civil litigation related to fraud including forensic accounting in connection with the reconstruction of accounting records.

- Engagement relating to lost profits of an amusement park resulting in expert testimony at trial.

- Civil litigation engagement related to alleged malpractice by a CPA Firm.

- Engagements related to consultations with attorneys regarding various matters associated with determining damages.

- Audit, review, compilation, tax compliance and consulting services for small businesses including representation of clients before the Internal Revenue Service.

### PROFESSIONAL & CIVIC ACTIVITIES (CURRENT & PRIOR)

Association of International Certified Professional Accountants
Alabama Society of Certified Public Accountants
National Association of Certified Valuators and Analysts
University of South Alabama Foundation, Board of Directors
Mitchell College of Business, Member of Executive Advisory Counsel
St. Luke's Episcopal School, Chairman, Board of Trustees
St. Luke's Episcopal School, Treasurer, Board of Trustees
Distinguished Young Women (formerly America's Junior Miss), Board of Directors
The University of South Alabama Accounting Advisory Board
Committee Member of Mobile Chapter of Young Certified
    Public Accountants
Instructor for continuing professional education programs for
    Mobile Chapter of Alabama Society of Certified Public
    Accountants and other continuing education programs

**Dr. Charles W. Evans**
2631 Key Largo Lane
Ft. Lauderdale, Florida 33312 USA
cwe@EvansEconomics.com
+1 317 PECUNIA (732-8642)

## PROFESSIONAL

**Chyden LLC (EvansEconomics.com), Fort Lauderdale, FL, USA : 2013-*current***
Qualified as Expert on Bitcoin/Cryptocurrency & Finance/Forensic Economics
**Federal**:  US District Court, Southern District of Florida
**State**:  11th Circuit Court, Miami-Dade County, Florida
   Superior Court of the State of California for the County of San Francisco
**US Army**:  US Army Trial Judiciary, Fifth Circuit (Kaiserslautern, Germany)
Provide Deposition and Trial Testimony
Testimony History Available upon Request

**Independent Expert Witness**
***Secret Service, IRS, FBI, and US Attorney's Office*, Washington, DC, USA : 2003-2008**
Testified before Federal Grand Jury for the Prosecution.
Investigation Led to Conviction:
Conspiracy to Engage in Money Laundering.
Operation of an Unlicensed Money Transmitting Business.
***IRS*, Washington, DC, USA : 2002-2003**
Witness for the Prosecution.
Operation of Pyramid, Ponzi, and 'High-Yield Investment' Schemes.

**Financial Cryptography Consultant, Bahamas, Caribbean & USA : 1998-2003**
Independent Consultant
Consulted with Bitcoin Startups on Accounting, Taxation, and Regulatory Compliance.
Led Organization, Design, and Deployment of Online Payment Systems.

**Atlas Economic Research Foundation – Fairfax, VA : 1995-1998**
Director of Economic Information Services
Designed and Maintained Online Informational Resources.
Lectured in North America and Europe on Public Policy Aspects of the Internet.
Promoted Licensing of eCash Software to Monetize Developing World Resources.

## EDUCATION

**PhD, Finance, Florida Atlantic University – Boca Raton, FL : 2011**
Dissertation: *Essays on Bond Exchange-Traded Funds*
**MA, Economics, George Mason University – Fairfax, VA : 1994**
Fields: Austrian School of Economics, Public Choice Theory
**BS, Education, Florida International University – Miami, FL : 1991**
Major: Modern Language Education (German), K-12

## ACADEMIC

**Barry University – Miami, FL : 2014-2018**
   *Associate Professor of Economics and Finance*
      **Graduate Courses:** Business Consulting, Economics for Strategic Decisions, Financial
         Institutions, Special Topics in Managerial Finance
      **Undergraduate Courses:** Managerial Finance, International Economics,
         Macroeconomics, Introduction to Business

**University of Nicosia – Nicosia, Cyprus : 2016-2017** (four semesters)
   *Adjunct Professor, MSc Program in Digital Currency*
      **Graduate Course:** Money and Banking

**Florida Atlantic University** (FAU) **– Boca Raton, FL : 2006-2014**
   *Instructor:* **2010-2014**
   *Graduate Teaching Assistant (full responsibility, instructor of record):* **2008-2010**
      **Undergraduate Courses:** Managerial Finance, Advanced Managerial Finance,
         International Finance, Financial Institutions
   *Research Assistant:* **2006-2007**

**Keiser University – Ft. Lauderdale, FL : 2003-2006**
   *Business Department Chair & Economics Instructor, Online E-Campus*
      **Undergraduate Courses:** Macroeconomics, Microeconomics, Money & Banking


## PUBLICATIONS

"Delegated Proof of Stake: Between Anarchy and Leviathan," 2018, in submission.
"The Obamacare Defense in Civil Litigation," 2017, in submission.
"Bitcoin Prices: Noise vs Evolving Expectations," 2016, in submission.
"The Blind Economists and the Elephant: Bitcoin and Monetary Separation," 2015,
   *Southwestern Journal of Economics* 11(1): 106-122.
"Bitcoin in Islamic Banking and Finance," 2015, *Journal of Islamic Banking and Finance* 3(2):
   1-11.
"A Simple and or The Growth Alternative Continuing Value Method" (with Wm. R. McDaniel),
   2012, *Journal of Financial and Economic Practice* 12(2): 101-114.

## PRESENTATIONS

**Bitcoin and Other Cryptocurrencies Conference**, Fort Lauderdale, FL, USA, August 2018
    Presentation: The Creation of Bitcoin and Other Cryptocurrencies
    Presentation: Bitcoin, Blockchain, and the Technology behind Cryptocurrencies

**Blockchain Nation Conference**, Miami, FL, USA, April 2018
    Panel Discussion: "Academic Panel"
    Keynote Presentation: "Bitcoin in Islamic Banking and Finance"

**Louisiana State University**, Baton Rouge, LA, USA, October 2017
    Invited Speaker: "Bitcoin: The End of the Beginning"

**St. Thomas University**, Miami, FL, USA, June 2017
    Invited Speaker: "Bitcoin for Criminal Justice Professionals"

**Financial Education Association**, Fort Lauderdale, FL, USA, September 2016
    Presentation: "Bitcoin in Business Education"
    Presentation: "Forensic Economics: An Overlooked Branch of Applied Finance with Strong
            Career Opportunities"
    Presentation: "There's No Accounting for Bitcoin"

**OnChain Scaling: Future of Bitcoin**, Online, June 2016
    Presentation: "The Micro-Global Economy"

**Financial Management Association Financial Planning and Analysis Roundtable**, Orlando,
    FL, USA, October 2015
    Presentation: "The Blind Economists and the Elephant: Bitcoin and Managerial Finance"

**Atlanta Federal Reserve, Miami Office**, Miami, FL, USA, October 2015.
    Invited Speaker: "The Blind Economists and the Elephant: Bitcoin and Financial
    Regulation"

**Federación Latinoamericana de Bancos, Comité Latinoamericano de Automatización
    Bancaria (FELABAN CLAB)**, Miami, FL, USA, September 2015
    Panel Discussion: "Bitcoin and the Banking Industry"

**International Quality Productivity Center, Medios de Pago [Payment Methods]
    Conference**, Miami, FL, USA, August 2015
    Closing Keynote: "Addressing the Emergence and Expansion of eCommerce and Mobile
    Payment"

**Florida Leaders Summit**, Orlando, FL, USA, December 2014
    Invited Speaker: "Should Florida Become the Virtual Currency Capital of the World?"

**Dream Bitcoin Foundation Seminar**, Kumasi, Ghana, December 2014

Invited Speaker: "Cheetahs & Sharks: Opportunities and Dangers of a Borderless Global Marketplace"

**International Money Transmitters Conference**, Miami Beach, FL, USA, October 2014
> Keynote Speaker (Virtual Currencies & Alt. Pmts.): "Understanding Virtual Currencies"
> Closing Remarks (Main Conference): "Virtual Currencies and the Unbanked"

**North American Bitcoin Conference**, Miami Beach, FL, USA, January 2014
> Invited Speaker: "The Knowledge Economy in a Borderless World"

**Liberty & Entrepreneurship Camp**, Kumasi, Ghana, January 2014
> Invited Speaker: "The Knowledge Economy in a Borderless World"

**South Asian Bar Association Annual Meeting**, Miami, FL, USA, November 2013
> Panel Discussion: "The Future of Cross-Border Transactions, The Emergence of Bitcoin and Other Open Source P2P Currency with a Business Focus on Southeast Asia"

**Liberty & Entrepreneurship Camp**, Kumasi, Ghana, June 2013
> Invited Speaker: "Transition to the Knowledge Economy in the Developing World"

**Universidad Francisco Marroquín**, Guatemala City, Guatemala, May 2012
> Invited Papers:    "Austrian School Approaches to Value Investing"
>                    "Portfolio Management and Austrian School Business Cycle Theory"

**Eastern Finance Association Annual Meeting**, Savannah, GA, USA, April 2011
> Presenter        2 papers
> Discussant       2 papers

**Southwestern Finance Association Annual Meeting**, Houston, TX, USA, March 2011
> Presenter        1 paper
> Discussant       1 paper

**FAU Executive MAcc in Forensic Accounting**, Boca Raton, FL, USA, April 2010
> Guest Lecture:    "The Seven-Parties Model for Payment System Governance,"

**Financial Management Association Annual Meeting**, Reno, NV, USA, October 2009
> Presenter        1 paper
> Discussant       1 paper
> Session Chair    1 session

**DeSantis Center for Motion Picture Industry Studies: Business Perspectives on the Film and Media Industries**, Boca Raton FL, USA, May 2009
> Invited Paper:    "Pseudo-Intellectual Property"

4 of 8

## MEDIA APPEARANCES

"Is Venezuela's Petro a CryptoMilestone For Digital Currency – Or a CryptoMillstone?"
   WLRN (2018-02-26, print & audio)
   http://wlrn.org/post/venezuelas-petro-cryptomilestone-digital-currency-or-cryptomillstone
"Bitcoin Fever Grips U.S. Real Estate"
   FloridaRealtors.org (2018-01-18, print)
   http://www.floridarealtors.org/NewsAndEvents/article.cfm?id=361099
"Florida Lawmakers Want Bitcoin Covered under Money Laundering Law"
   CCN (2017-04-23, print)
   https://www.ccn.com/florida-lawmakers-want-bitcoin-covered-money-laundering-law/
"Bright Future for Bitcoin After Florida Case Dismissal"
   Bitcoin.com (2016-07-26, print)
   https://news.bitcoin.com/bright-future-bitcoin-florida-case/
"Florida Judge Rules That Bitcoin Isn't Money"
   *Christian Science Monitor* (2016-07-26, print)
   http://www.csmonitor.com/USA/2016/0726/Why-Bitcoin-isn-t-money-as-one-Florida-judge-ruled
"Bitcoin 'Not Real Money' Says Miami Judge in Closely Watched Ruling "
   *The Guardian* (2016-07-26, print)
   https://www.theguardian.com/technology/2016/jul/26/bitcoin-not-real-money-miami-judge
"Bitcoin's Not Money, Judge Rules As She Tosses Money-Laundering Charge"
   *Washington Post* (2016-07-26, print)
   https://www.washingtonpost.com/news/morning-mix/wp/2016/07/26/bitcoins-not-money-judge-rules-as-she-tosses-money-laundering-charge/
"Bitcoin Not Money, Miami Judge Rules in Dismissing Laundering Charges"
   *Miami Herald* (2016-07-25, print)
   http://www.miamiherald.com/news/local/crime/article91682102.html
"Economist Argues Bitcoin Isn't Money in Closely Watched Court Case"
   *Time* (2016-05-31, print)
   http://time.com/money/4352225/bitcoin-money-laundering-case/
"Miami Money-Laundering Case May Define Whether Bitcoin Is Really Money"
   *Miami Herald* (2016-05-27, print)
   http://www.miamiherald.com/news/local/crime/article80421072.html
"Miami Man Arrested in Bitcoin Case Challenging Prosecution"
   *Miami Herald* (2016-05-27, print)
   http://www.miamiherald.com/news/local/crime/article80277207.html
"Bitcoin vs. Malaria: A New Paradigm for Development Economics and Foreign Aid Emerges"
   *Coin Telegraph* (2015-06-15, print)
   http://cointelegraph.com/news/114569/bitcoin-vs-malaria-a-new-paradigm-for-development-economics-and-foreign-aid-emerges
"Dr. Charles Evans: 'My Expert Witness Fee in a Criminal Case Was Paid in Bitcoin'"
   *Coin Telegraph* (2015-04-22, print)
   http://cointelegraph.com/news/114042/dr-charles-evans-my-expert-witness-fee-in-a-criminal-case-was-paid-in-bitcoin

"Fool's Gold & Dolphin Tanks!"
 *Bitcoins and Gravy* (2015-01-25, audio)
 https://letstalkbitcoin.com/blog/post/bitcoins-and-gravy-episode-52-fools-gold-dolphin-tanks
"Fools' Gold Rushes"
 *Coin Telegraph* (2015-01-15, print)
 http://cointelegraph.com/news/113294/fools-gold-rushes-op-ed
"Dreamcoin: Africa's New Hope"
 *Bitcoin Magazine* (2014-09-29, print)
 http://bitcoinmagazine.com/16803/dreamcoin-africas-new-hope/
"Charles Evans on Bitcoin: I Haven't Felt This Excited in Two Decades"
 *Coin Telegraph* (2014-05-06, print)
 http://cointelegraph.com/post/charles_evans_on_bitcoin_i_haven_t_felt_this_excited_in_two_de
 cades
"Bitcoin"
 WSVN TV 7 (2014-03-17, transcript)
 http://www.wsvn.com/story/24998740/bitcoin
"Bitaccounting for the Bitcurious"
 *Financial Executives International* (2014-03-10, print)
 http://daily.financialexecutives.org/bitaccounting-for-the-bitcurious/
"Interview with Dr. Charles Evans"
 Bitcorati Interview Series (2014-02-04, video)
 https://www.youtube.com/watch?v=6m-
 e6xEpK60&list=PLlQkChXC4kzhMINEfpVYlAxwOkAODctj6&index=8
"Bitcoin in South Florida: Real Business Taking Virtual Money"
 WLRN Radio (2014-01-28, audio)
 http://wlrn.org/post/bitcoin-south-florida-real-business-taking-virtual-money
"Bitcoin in South Florida: From Shady Cash Deals to Bitcoin Accounting Firms"
 *New Times* (2014-01-23, print)
 http://blogs.browardpalmbeach.com/pulp/2014/01/bitcoin_in_south_florida_from.php
"Building Bitcoin Use in South Florida and Beyond"
 *Miami Herald* (2013-12-23, print)
 http://www.miamiherald.com/2013/12/23/3835016/building-bitcoin-use-in-south.html
"South Florida Can Buy with Bitcoin This Christmas"
 WLRN Radio (2013-12-19, audio)
 http://wlrn.org/post/south-florida-can-buy-bitcoin-christmas

## ABSTRACTS

"Delegated Proof of Stake: Between Anarchy and Leviathan," 2018, in submission.
> This paper develops a taxonomy, based on Public Choice Theory, of consensus algorithms that runs from highly centralized 'Leviathan' systems, like eCash, to highly decentralized 'Anarchy' systems, like Bitcoin, with a broad variety of systems that fall between these extremes, using Delegated Proof of Stake (DPOS) as an example that has several years of experience running in production. It concludes that the choice of optimal consensus algorithm is driven by the ultimate purpose of the system and its users' goals.

"The Obamacare Defense in Civil Litigation," 2017, in submission.
> Congdon-Hohman & Matheson (2013) argue that the "guaranteed issue" and "individual mandate" provisions of the Patient Protection and Affordable Care Act (2010) should cap damage awards in the USA for covered health expenditures at a maximum of $6,250 per year. This paper presents counterarguments to this 'Obamacare Defense', which calls for a radical departure from the principle that those who cause harm should bear the cost of that harm.

"Bitcoin Prices: Noise vs Evolving Expectations," 2016, in submission.
> This paper addresses the question of how much of the volatility in bitcoin prices (XBT) is driven by noise trading, and how much is driven by changes in market participants' evolving expectations based on information. It measures the entropy of USD/XBT prices over different sample periods within the Bitstamp price time series data, finding evidence that contradicts the hypothesis that the USD/XBT price generally is dominated by noise trading, except during brief spikes, when the noise content dominates. It concludes with suggestions for future research.

"The Blind Economists and the Elephant: Bitcoin and Monetary Separation," 2015,
> *Southwestern Journal of Economics* 11(1): 106-122.
> This paper applies some of the speculative conclusions of seminal New Monetary Economics (NME) papers that appeared in the 1970s and early 1980s to the analysis of real-world 'virtual currencies', the first-generation of which—beginning with eCash—were released in the early 1990s, and the second-generation—beginning with Bitcoin—in the late 2000s. In light of these innovations, and the regulatory and theoretical debates that they have inspired, NME is once again topical, and we are presented with the nearest thing to a controlled experiment to test the viability of monetary separation of *unit of account* and *measure of value* from *medium of exchange* and *store of value*.

"Bitcoin in Islamic Banking and Finance," 2015, *Journal of Islamic Banking and Finance* 3(2): 1-11.

This paper analyzes the compliance of distributed, autonomous blockchain management systems (BMS) like Bitcoin—also referred to as 'virtual currencies'—with the requirements of Islamic Banking and Finance. While intended as a narrow financial and economic analysis, and not as an in-depth analysis of the subtleties and nuances of Shari'a as they relate to banking and finance, it shows that a BMS can conform with the prohibition of *riba* (usury) and incorporate the principles of *maslaha* (social benefits of positive externalities) and mutual risk-sharing (as opposed to risk-shifting). It concludes that Bitcoin or a similar system might be a more appropriate medium of exchange in Islamic Banking and Finance than *riba*-backed central bank fiat currency, especially among the unbanked and in small-scale cross-border trade.

"A Simple and or The Growth Alternative Continuing Value Method," (with William R. McDaniel) 2012, *Journal of Financial and Economic Practice* 12(2): 101-114.

In business valuations, the long run operating cash flows' present value is often estimated by a continuing value (terminal value) method that intrinsically assumes a compounding growth rate. This assumption can be too ambitious, especially as the growth rate approaches the required rate of return. We develop a more conservative continuing value method using a simple growth rate assumption. The method has fewer constraints in usage than the compound method. We show a modification for situations where low compound growth follows simple high growth. Another modification allows for valuation where historical cash flows have been negative but are growing toward positive.

# Kim Nilsson

Software Developer and Independent Researcher | Tokyo, Japan | kim@wizsec.com

## Summary

I am a software developer by trade — a very good one if I say so myself — though I have received the most recognition from my side project of independently investigating the collapse of the MtGox bitcoin exchange, a personal effort spanning several years which has received widespread attention and recognition in both the cryptocurrency community and in international media.

Though initially started in 2014 as a collaborative effort between several MtGox victims under the name "WizSec", from 2015 onwards it was a one-man project. Being on location in Japan as well as operating ethically were important success factors for the investigation.

## Skills & Abilities

**SOFTWARE DEVELOPMENT**
· Experienced software developer with a very deep approach to problem solving, favoring clever, self-contained and efficient solutions. Frequently trying to iterate and improve on existing solutions. My colleagues tend to rely on me as a source of knowledge and experience.

**ANALYSIS**
· I have a strong need to fully understand a problem before I can comfortably move on, be it in debugging software or solving a puzzle. This tenacity was what drove my continued persistence in the multi-year MtGox investigation, more so than any financial stake.

**INITIATIVE**
· If no one else will do it, I will step up. I don't strive for leadership roles, but if something needs doing and no one else will do it right, I will take the initiative and either try to organize the effort or do it myself.

## Experience

**CHIEF ENGINEER AND ANALYST | WIZSEC | 2014–**
· Investigated the disappearance of over 650,000 BTC from the MtGox bitcoin exchange.
· Created custom software for efficient blockchain analysis.
· Traced a large number of stolen coins and identified a money laundering suspect, later arrested in Greece after U.S. authorities reached a similar conclusion in their investigation.
· Covered in the Wall Street Journal, the Financial Times, and many other international media.

**LEAD DEVELOPER | CYPHERPUNK PRIVACY | 2016–2017**
· Designed and built the cross-platform desktop client for the Cypherpunk Privacy VPN service startup.

**SENIOR SOFTWARE DEVELOPER | OPERA SOFTWARE | 2006–2016**
· Porting and delivering the Opera Mobile browser to a variety of Japanese mobile phones.
· Heavily involved in code design and architecture for subsequent versions of Opera Mobile.

· Later migrated to delivering Opera's SDK to Linux-based TVs and set-top boxes.

**WEB CONSULTING | 1997–2002**

· Web site development and maintenance for small company clients.

**SYSTEM ADMINISTRATOR | LUGNVIKSSKOLAN | 1997–1998**

· During junior high school, I set up and maintained the school's first computer network.

## Education

**MASTER OF SCIENCE | 2009 | LINKÖPING INSTITUTE OF TECHNOLOGY**

· Major: Information Technology (Computer Science)
· Additional courses: Japanese Language
· Awarded Tryggve Holm medal for academic excellence (similar to Valedictorian title)

**DIPLOMA | 2005 | TOKYO INSTITUTE OF TECHNOLOGY**

· Completed Young Scientist Exchange Program

# KRISTENA PAYNE GAYLOR, Ph.D., MBA
P. O. BOX 16158
JACKSON, MS 39236-6020
Office Phone: 601-209-7639
*KGaylor@mc.edu*

**EDUCATION**

Ph.D.   Jackson State University, College of Business, Jackson, Mississippi**.**
**Doctor of Philosophy in Business Administration**, Major: Management,
Minor: Economics, May 2004.
Dissertation Title: "Organizational Commitment in Higher Education:
A Multi-Dimensional Perspective"
*In the study, I examined the antecedents and consequences of*
*organizational commitment among faculty at institutions of higher learning.*
*The findings revealed various factors that lead to job satisfaction, including*
*those unrelated to compensation.*

MBA   Millsaps College, Else School of Management, Jackson, Mississippi.
**Master of Business**, Management, May 1999.

BBA.   Mississippi State University, College of Business & Industry, Starkville,
Mississippi. **Bachelor of Business Administration**, Management Major, Cum
Laude, May 1995.

**ACADEMIC EXPERIENCE**

ASSISTANT PROFESSOR of Management and Economics (2012-present). School of
Business, Mississippi College, Clinton, MS. (Undergraduate and Graduate level
courses)

ASSOCIATE PROFESSOR with Tenure (2009-2012). Business Administration. School of
Business, Belhaven University, Jackson, MS. (Undergraduate, Graduate level and On-
line courses)

ASSISTANT PROFESSOR (2004-2009). Business Administration. School of Business,
Belhaven University, Jackson, MS. (Undergraduate, Graduate level and On-line courses)

INSTRUCTOR (2003-2004). Principles of Management. Undergraduate (two sections)
School of Business, Alcorn State University, Lorman, MS.

Case 3:11-cv-00071-JCS   Document #: 255-16   Filed: 12/07/2018   Page 40 of 49

INSTRUCTOR (2003 –2004). Computer Applications. Undergraduate (two sections) School of Business, Alcorn State University, Lorman, MS.

INSTRUCTOR (2003). Principles of Marketing. Undergraduate (two sections) School of Business, Alcorn State University, Lorman, MS.  (With full responsibility)

TEACHING ASSISTANT (2000-2003). Business Computer Applications. Undergraduate (three sections) College of Business, Jackson State University. (While in Graduate School, full responsibility for courses)

**Courses Taught:**

Undergraduate courses:
   Principles of Management
   Cases in Management
   Business Communication
   Organizational Behavior
   Principles of Supervision
   Consumer Behavior
   Principles of Marketing
   Business Policy
   Strategic Management
   Microeconomics
   Macroeconomics
   Survey of Economics
   Human Resource Management

Graduate courses:
   Organizational Change & Development
   Marketing Management
   Executive Leadership
   Strategic Human Resource Management
On-line courses:
   Organizational Behavior
   Principles of Management
   Business Communications
   Principles of Executive Leadership
   Microeconomics

**Curriculum Development**

Online Undergraduate ECO 232 Principles of Economics II: Topics, Objectives, Assignments, recordings
Online Undergraduate MGT 474 Human Resource Management: Topics, Objectives, Assignments, recordings
Online Graduate MBA668 Leadership and Organizational Change: Topics, Objectives, Assignments, Halls-recordings-videotaping
Online Graduate MBA682 Principles of Executive Leadership: Topics, Objectives, Assignments, Halls-recordings-videotaping
Online Graduate MSL658 Principles of Executive Leadership: Topics, Objectives, Assignments, Halls-recordings-videotaping
Online Undergraduate BBA412 Organizational Behavior: Topics, Objectives, Assignments, Halls-recordings-videotaping
Online Undergraduate BBA326 Principles of Management: Topics, Objectives, Assignments, Halls-recordings-videotaping

**RESEARCH INTERESTS**
Economic and Wage Loss Analysis; Functional/Dysfunctional Turnover; Work life
Expectancy, Motivations of Adult Learners; Work/Life Balance; Organizational
Commitment; Job Embeddedness; Professional Commitment; Employee Retention.

**PUBLICATIONS**

**Refereed Journal Articles**

Mathis, C.J., Horn, D., Randle, N., and Gaylor, Kristena P. (forthcoming Spring 2018).
Unmasking the Mystery of Sex and Gender between the Bidirectional Relationship of
Work-Family Conflict and Job Satisfaction. *Journal of Business Diversity*.

Smith, J.R., Gaylor, Kristena P., and McWilliams, Douglas (December 2016). An
Empirical Investigation of Business School Faculty Members' Organizational
Commitment in Higher Education. *Journal of Human Resources Management and Labor
Studies*. Volume 4, No. 2, pp. 1-45.

Kimmel, S., Gaylor, Kristena P., and Hayes, B. (Spring 2016). Age Differences among
Adult Learners: Motivations and Barriers to Higher Education, *Academy of Business
Research Journal*. Volume IV, pp. 32-58.

Kimmel, S., Gaylor, Kristena P., Grubbs, M. Ray, & Hayes, J. Bryan. (2014). Motivations
and Barriers to Higher Education for Online Learners Questionnaire [Measurement
instrument]. Cited in the APA PsychINFO Database.

Kimmel, S., Gaylor, Kristena P., and Hayes, B. (2014). The Influence of Race/Ethnicity
on Motivations and Barriers to Adult Learners, *Academy of Business Research Journal*.

Kimmel, S, Gaylor, Kristena P., and Hayes, B. (2013). Understanding Adult Learners by
Gender, *Academy of Educational Leadership Journal*.

Wallace, J., and Gaylor, Kristena (2012). Study of the Dysfunctional and Functional
Aspects of Voluntary Employee Turnover, *SAM Advanced Management Journal*, ISSN:
0749-7075.

Kimmel, S, Gaylor, Kristena P., Grubbs, R., and Hayes, B. (2012). Good Time to Hard
Times: An Examination of Adult Learners' Enrollment from 2004-2010, *Journal of
Behavioral and Applied Management*.

Mathias, C., Gaylor, Kristena P., Randle-Wilkins, V.N. (2007). Ethnic Differences and the Mediating Effect of Job-Focused Self-Efficacy: The Impact of Work-Family Conflict on Job Satisfaction, *Journal of International Business and Economics* (JIBE), ISSN: 1544-8037.

Smith, J.R., Gaylor, Kristena P., Mosley, A., and Perkins, Samuel. (2006). Organizational Commitment in Higher Education: A Multidimensional Perspective, *Journal of Academy of Business and Economics*, ISSN: 1542-9710, Vol. 6, No. 2, pp. 199-207.

Gaylor, Kristena P., and Finley-Hervey, J.A. (2002). Resisting and Driving Forces for Change: MS Flag Controversy, *Journal of Interdisciplinary Business Research*, Vol. 2, pp. 81-88.

Brown, U. J., III, and Gaylor, Kristena P., (2002). Organizational Commitment in Higher Education. *Journal of Interdisciplinary Business Research*, Vol. 2, pp. 39-52.

### Refereed Proceedings

Gaylor, K.P., & Gaylor, T.R. (2016). Lessons to Learn: How Jackson, Mississippi Should Emulate Various Cities that Successfully used Waterways to Create its own Sustainable Waterfront Development. Academy of Business Research International Conference.

Smith, J. R., Gaylor, K. P., & Mosley, A. L. (2014). Faculty commitment in higher education: An empirical investigation of the three-component model (TCM) of organizational commitment. Proceedings of the International Conference on Learning and Administration in Higher Education, May 21-23- Holiday Inn Vanderbilt Nashville, Tennessee USA

Wallace, Jolivette and Gaylor, Kristena. (2012). "A Study of the Dysfunctional and Functional Aspects of Voluntary Employee Turnover," *Society for the Advancement of Management Proceedings* in Las Vegas, NV.

Kimmel, S., Gaylor, K. P., Grubbs, R. (2009). "Motivations and Barriers to Business Education: Comparing Online and On Campus Adult Learners," *International Institute of Behavioral and Applied Management Proceedings* in Washington D.C.

Gaylor, Kristena P. (2003). "The Significance of Timely Delivery on Supplier Selection Decisions," *Society for the Advancement of Management Proceedings* in Orlando, FL.

Finley-Hervey, J.A. and Gaylor, Kristena P. (2002). "Mississippi's Official State Flag Special Election: The Affect on Business and Public Perceptions," *Society for the Advancement of Management Proceedings* in McLean, VA.

Brown, U.J. III., Gaylor, K. P., White-Johnson, S., & Ballard, V. (2001). "Computing Perceptions and Their Impact on Course Performance: A's for the Digital Generation," *Business Research Yearbook*: *Global Perspectives*, 8, pp. 312-316.

### Monograph

Brown, U.J., III, Gaylor, Kristena P., and Dodor, Koffi (2001). "Analysis of the Exit Questionnaire at Jackson State University." School of Business Summer Fellowship.

## REFEREED CONFERENCE PRESENTATIONS AND WORKSHOPS

Randle, N.W., Gaylor, K.P. & Mathis, C. (2017) Coping with Workplace Weight Discrimination, Stress, and Work-Life Conflict in a Wellness-Focused Human Resource Environment. *Society for the Advancement of Management International Conference*, Corpus Christ, Texas.

Gaylor, K.P. & Gaylor, R.R. (November 2016). Lessons to Learn: How Jackson, Mississippi Should Emulate Various Cities that Successfully Used Waterways to Create Its's Own Sustainable Waterfront Development. *Academy of Business Research International Conference*, San Antonio, Texas.

Kimmel, S., Gaylor, K. P. & Hayes, B. (November 2016). Age Differences among Adult Learners: Motivations and Barriers to Higher Education (Revised). *Academy of Business Research International Conference*, San Antonio, Texas.

Randle, N. W., Gaylor, K. P., Mathis, C. J., & Wilkins, J. L. (2015). "Professional intimacy in relationships between managers and subordinates: Moving toward scale development," *Society for the Advancement Management International Conference*, March 2015, Las Vegas, Nevada.

Steward, Dwight and Gaylor, Kristena (2015). Extending the Econometric Model of Worklife Expectancy," *Eastern Economics Association Conference*, February 2015. New York, New York.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2014). "Age Differences among Adult Learners: Motivations and Barriers to Higher Education," *Institute of Behavior and Applied Management*, October 2014. Orlando, Florida.

J.R. Smith, Gaylor, Kristena P., Mosley, A. (2014). "Faculty Commitment in Higher Education:  An Empirical Investigation of the Three Component Model (TCM) of Organizational Commitment," *International Conference on Learning and Administration in Higher Education*, May 2014. Nashville, Tennessee.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2013). "The Influence of Race/Ethnicity on Motivations and Barriers to Adult Learners," *Academy of Business Research,* September 2013, San Antonio, Texas.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2013). "Understanding Adult Learners by Gender," *Allied Academies,* July 2013, Internet Conference.

Kimmel, Sara, Gaylor, Kristena P., and Hayes, B. (2012). "Understanding the Community of Adult Learners through the Lens of Gender," *Institute of Behavioral and Applied Management,* October 2012, Nashville, Tennessee.

Randle, V. Natasha and Gaylor, Kristena (2012). "Professional Intimacy: Exploring Relationships Between Managers and Subordinates," *Allied Academics 2012 International Conference,* April 2012. New Orleans, Louisiana.

Wallace, Jolivette and Gaylor, Kristena (2012). **"**A Study of the Dysfunctional and Functional Aspects of Voluntary Employee Turnover," *Society for the Advancement of Management (SAM).* March 2012. Las Vegas, Nevada.

Gaylor, K. P., Kimmel, S., Grubbs, R. (2011). "Motivations & Barriers to Adult Learners: The Influence of Economic "Hard Times" on Intent to Enroll," *Institute of Behavioral and Applied Management,* October 2011, Orlando, Florida.

Gaylor, K. P., Kimmel, S., Grubbs, R. (2010). "Motivations and Barriers to Business Education: Equipping Adult Learners for the Marketplace,*" Christian Business Faculty Association,* October 2010, Orlando, Florida.

Kimmel, S., Gaylor, K. P., Grubbs, R. (2009). "Motivations and Barriers to Business Education: Comparing Online and On Campus Adult Learners,*" International Institute of Behavioral and Applied Management Proceedings,* October 2009, Washington D.C.

Mathias, C., Gaylor, Kristena P., Wilkins-Randle, V.N (2007). "Ethnic Differences and the Mediating Effect of Job-Focused Self-Efficacy: The Impact of Work Stress on Work Family Conflict." Presented at the Southern Management Association Meeting, November 2007, Nashville, TN.

Mathias, C., Gaylor, Kristena P., Wilkins-Randle, V.N (2007). "Ethnic Differences and the Mediating Effect of Job-Focused Self-Efficacy: The Impact of Work-Family Conflict on Job Satisfaction." Presented at the International Academy of Business and Economics, October 2007, Las Vegas, NV.

Gaylor, Kristena P. Alli, A., and Wilkins, V.N. "A Pledge Allegiance: Academicians and Practitioners Working Together to Ensure Classroom Success" – Professional

Development Workshop-Facilitator-Academy of Management Annual Meeting, August 2007. Philadelphia, PA.

Smith, J.R., Gaylor, Kristena P., Mosley, A. and Perkins, S. "Organizational Commitment in Higher Education: A Multidimensional Perspective." Presented at the International Academy of Business and Economics, October 2006. Las Vegas, NV. Gaylor, Kristena P. and Kimmel, Sara. "Leader Commitment: Modeling Ethical Behavior for Organizational Change." Presented at the Institute of Behavioral and Applied Management, October 2006. Memphis, TN.

Alli, A., Gaylor, K., Noble, D, and Wilkins, V.N. "Minority Faculty Making an Impact at Majority Institutions." Presented at the Academy of Management Professional Development Workshops, August 2006. Atlanta, GA.

Finley-Hervey, J.A. and Gaylor, Kristena P. "Mississippi Official State Flag Special Election: An Analysis of Perceptions on Both Sides of the Vote." Paper accepted for presentation at the Academy of Business Disciplines, November 2005. Fort Lauderdale, FL.

Gaylor, Kristena P. "A Comparison of Employee-Organizational Linkages of Faculty Members at Public and Private Christian-based Colleges." Paper presented at the Christian Business Faculty Association Annual Meeting, October 2005. Point Loma, CA.

Gaylor, Kristena P., Smith, J.R. and Mosley, A. "Organizational Commitment in Higher Education: A Multi-Dimensional Perspective." Presented visually at the Academy of Management Annual Meeting, August 2005. Honolulu, HI.

Alli, A., Gaylor, K., Rodriquez, L, and Whitfield, G. "Minority Faculty Making an Impact at Majority Institutions." Presented at the Academy of Management Professional Development Workshops, August 2005. Honolulu, HI.

Gaylor, Kristena P., Smith, J.R. and Mosley, A. "An Evaluation of the Relationship between Organizational Commitment and Performance among Business School Faculty: An Empirical Analysis." Presented at the Economics and Research Symposium, Jackson State University, November 2004. Jackson, MS.

Gaylor, Kristena P. "Organizational Commitment in Higher Education: A Multi-Dimensional Perspective." Presented at the Romel Benjamin Research Symposium, Jackson State University, Spring 2003. Jackson, MS.

Gaylor, Kristena P. "The Significance of Timely Delivery on Supplier Selection Decisions." Presented at the Society for the Advancement of Management (SAM) Meetings, Spring 2003. Orlando, FL.

Brown, U.J., III. and Gaylor, Kristena P. "Organizational Commitment in Higher Education." Co-presented at the Western Decision Sciences Institute (WDSI) Thirty-First Annual Meeting, Spring 2002. Las Vegas, NV.

Finley-Hervey, J.A. and Gaylor, Kristena P. "Mississippi's Official State Flag Special Election: The Affect on Business and Public Perceptions." Presented at the Society for the Advancement of Management (SAM), Spring 2002. McLean, VA.

Brown, U.J. III., Gaylor, K. P., White-Johnson, S., & Ballard, V. "Computing Perceptions and Their Impact on Course Performance: A's for the Digital Generation." Presented at the International Association of Business Disciplines (IABD), Fall 2001. Orlando, FL. Brown, U.J., III. and Gaylor, Kristena P. "Organizational Commitment in Higher Education." Presented at the Eleventh Annual Economic Research Symposium, November 2001. Jackson State, MS.

Gaylor, Kristena P., and Finley-Hervey, J.A. "Resisting and Driving Forces for Change: MS Flag Controversy." Presented at the Eleventh Annual Economic Research Symposium, November 2001.  Jackson State, MS.

## ACADEMIC AWARDS & HONORS

- 50 Leading Business Women for 2017 –*Mississippi Business Journal*
- Provisional Member of the Year – Junior League of Jackson – 2013-2014.
- Teacher of the Year – School of Business– Belhaven University – 2010.
- Outstanding Service Award, Academy of Management – Management Education & Development Division, Division Research Coordinator, Chicago, IL, 2009.
- Outstanding Service Award, Academy of Management – Management Education & Development Division, Division Program Evaluator, Honolulu, HI, 2005.
- Outstanding Reviewer Award, Academy of Management – Management Education & Development Division, Seattle, WA, 2003.

## PROFESSIONAL SERVICE
### Academy Service
- Master Teacher Certification, The Brightman Workshops – conducted by Dr. Harvey Brightman, Professor Emeritus at Georgia State University School of Business – May 2015
- Research Coordinator, Management Education & Development Division, Academy of Management, 2007-2009.
- Team Leader, Management Education & Development Division, "Value in Teaching" Initiative, 2006.

- Reviewer, Organizational Behavior Division and Management Education & Development Division, Academy of Management Meetings, Atlanta, GA, 2006.
- 5-Year Strategic Review Committee – Management Education & Development Division, Academy of Management, 2000-2005.
- Program Evaluation Coordinator-Elect, Management Education & Development Division, Academy of Management, 2004-2005.
- Reviewer, Management Education & Development Division, Academy of Management Meetings, Seattle, WA, 2003.
- Facilitator, Shared Interest Track session, Academy of Management Meetings, Seattle, WA, 2003.
- Liaison, Mentoring Subcommittee & Organizational Behavior Division, Academy of Management, Denver, CO, 2002-present.

### Other Professional Associations' Service

- Member, National Association of Forensic Economists (NAFE) Software Review Committee – 2015-2017
- Facilitator, Management Doctoral Students Association Conference-Research Roundtable, 2005 and 2006.
- Reviewer, Southern Management Association (SMA), 2006.
- Panelist, "Here's the Real Deal: Ph.D. Student Experiences," The Ph.D. Project Management Doctoral Students Association Annual Conference, Seattle, WA 2003.
- Discussant, Society for the Advancement of Management Conference, 2002 and 2003.
- Participant, National Black MBA Association Case Competition located in Boston, MA, February 1999.

### Campus Service

- Member, Faculty Council, 2016-2018.
- President, Mississippi College, Faculty Club, 2015-2016.
- Vice President, Mississippi College, Faculty Club, 2014-2015.
- Advisor, School of Business, Mississippi College, 2013-2016.
- Member, Ad hoc Committee responsible for developing a Faculty Leave policy, Mississippi College, 2013-2014.
- Member, Student Grade Grievance review committee, Mississippi College, 2014.
- Member, Faculty Tenure Review Committee, Belhaven University, 2010 – 2012
- Member, Education Review Committee (ERC), Belhaven University, 2010 – 2012
- Member, Academics Appeals Committee, Belhaven University, 2009 – 2012
- Taskforce Member, School of Business Career Bootcamp, Belhaven University, 2009 - 2011
- Developer, On-line Course, Virtual Campus, Belhaven College, 2007, 2010, 2011

- Vice President, Sigma Beta Delta, a Business Honor Society, 2006.
- Facilitator, Day of Learning, Belhaven College, September 2006 and September 2005.
- Small Group Facilitator, *Institute of Business Ethics*, Belhaven College, February 2005.
- Facilitator, Leadership in Career Management, Jackson State University, February 2002.
- Discussant, Eleventh Annual Economic Research Symposium, Jackson State University, November 2001.

### Speaking Engagements

- Served as guest panelist for: "Pathways to the Ph.D: Reflections from Women of Color at Mississippi State University" (March 4, 2015)
- Served as a speaker for the 4th Annual Mississippi College Healthcare Reform Summit. (2014). The presentation was titled "Healthcare Reform & the Economy."
- Served as a speaker for the 2nd Annual Women of Color Summit at Mississippi State University (2014). Topic of the session "Role of Women in Education."

## COMMUNITY LEADERSHIP

- *Mississippi Business Journal* 50 Leading Business Women for 2017
- Davis Magnet International Baccalaureate Elementary School Parent Teacher Association Board Member – Vice President of Fundraising. (2016 – 2018)
- Directory, Co-Chair, Junior League of Jackson. (2017-2018)
- Newsletter, Co-editor, Junior League of Jackson. (2016-2017)
- Project Development Chair, Junior League of Jackson. (2015-2016)
- Facilitator, City of Jackson Supervisor/Manager Training Workshop, Management 101; Teambuilding Workshop. (2014-present)
- Board Member, Parents for Public School Greater Jackson Chapter. (2015)
- Radio guest, *Business Matters* – a radio segment aired in Southwest Mississippi (WTYJ 97.7 FM) which talks about business issues to help improve quality of life and empower listeners to make better finance decisions. (ongoing)
- Junior League of Jackson, Member – At – Large, Arts & Education; Current co-chair of Helping Hands. (2014-2015)
- Co-Host, *Business Break* – a radio segment aired on Mississippi Public Broadcasting (91.3 FM) which highlights economic development projects across the state– May 2011-July 2012

- Facilitator, City of Jackson Supervisor/Manager Training Workshop – March 2011-2012
- Junior League of Jackson, New Member – Initiated in 2012 – "Provisional Member of the Year"
- McWillie Elementary School Parent Teacher Association Board Member – Vice President of Programs. (2010 – 2014)
- Parents for Public Schools, Leadership Institute Graduate – Jackson (MS) Chapter. (2007)
- Chairperson, Educational Development Committee-Delta Academy-Delta Sigma Theta Sorority, Inc., Jackson (MS) Alumnae Chapter, 2002-2004; Co-chair 2012-2014.
- Board Member, Central Mississippi Chapter - Mississippi State University Alumni Association. (2000-2004)
- Board Member, Operation Shoestring, Jackson, Mississippi. (2002-2004)

## Church Service

- Children's Sunday School Leader, Anderson United Methodist Church, 2002-present.
- Pastors' Parish Relations Board – Member – 2005-2007; Board Chair. (2009-2011)

**INDUSTRY EXPERIENCE**

Groen, A Dover Industries Company, Jackson, Mississippi. Database Marketing Coordinator, September 1997-August 2000.

JCPenney Company, Ridgeland, Mississippi. Merchandising Manager, June 1995-July 1997.

**CONSULTING EXPERIENCE**

KPG Consulting, LLC, President/CEO, Provides economic and loss wage analyses and management consulting, January 2012-present.

**PROFESSIONAL ASSOCIATION MEMBERSHIPS**

National Association of Forensic Economists (NAFE)
Academy of Management (AOM)
Society for the Advancement of Management (SAM)

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
HINDS COUNTY, MISSISSIPPI**

**DR. DONALD RAGGIO
DR. CHRIS RAGGIO**
                                                                **PLAINTIFFS**

**V.**                                                          **CAUSE NO. 14-71**

**MTGOX, Inc., a Delaware corporation;
CODE COLLECTIVE, LLC, a New York limited liability company;
JED McCALEB, an individual**
                                                               **DEFENDANTS**

<u>**AGREED AMENDED PROTECTIVE ORDER**</u>

THIS COURT, having been informed that the Parties are in agreement, and having

considered the same, hereby enters this Amended Protective Order setting forth the procedure for

maintaining the confidentiality of certain documents in the above-referenced case (the

"Litigation").   Accordingly, production of these documents is governed by the following

provisions:

1.     <u>**Non-Disclosure of Documents Designated Attorneys Eyes Only or
       Confidential.**</u>

a.     The Producing Party may designate documents containing information that is

       sensitive in nature to the opposing individual party or parties as "Attorneys Eyes

       Only" by (i) stamping the words "ATTORNEYS EYES ONLY" on said document;

       (ii) adding the designation "AEO" in the electronic filename of electronically

       produced documents, and/or (iii) by serving a Production Log designating specific

       document numbers as "ATTORNEYS EYES ONLY."   The documents and/or

       electronic files designated Attorneys Eyes Only will be afforded the protection

       provided in this Order, unless this Court finds otherwise by subsequent order.

       Without the prior written consent of the Producing Party, no document designated

1

for Attorneys Eyes Only may be shown to any person other than counsel for the party receiving the document (i.e., the Receiving Counsel), except as provided in this Protective Order or by subsequent order of this Court.   To the extent Receiving Counsel objects to the designation of any document as Attorneys Eyes Only under the terms of this Order, said dispute will be handled as provided in paragraph 5 below. For purposes of this Agreement, so-designated information includes, but is not limited to, non-public significant financial information of persons or entities, competitive or commercially sensitive information, valuation information, information regarding any entity's formation, structure, management, growth plans, trade secrets, or investment information.

b.      The Producing Party may designate any physical document it produces as confidential by stamping the word "CONFIDENTIAL" on said document, and may designate any matters produced electronically as confidential either (a) by adding the designation "CONF" in the electronic filename, and/or (b) by serving a Production Log designating specific document numbers within a larger set as "CONFIDENTIAL."   The documents and/or electronic files (referred to herein as "Confidential Document" or "Confidential Documents") will be afforded the protection provided in this Order, unless this Court finds otherwise by subsequent order.   Without the prior written consent of the Producing Party, no Confidential Document may be shown to any person by the party receiving the Confidential Document (i.e., the Receiving Party), except as provided in this Protective Order or by subsequent order of this Court.   To the extent the Receiving Party objects to the

2

designation of any document as a Confidential Document under the terms of this

Order, said dispute will be handled as provided in paragraph 5 below.

**2.    Permissible Disclosure.**

Documents designated Attorneys Eyes Only, or portions thereof, may only be provided

and disclosed to counsel of record representing the Receiving Party; the partners, associates,

secretaries, paralegals, paralegal assistants, and employees of such counsel to the extent

reasonably necessary to render professional services in the Litigation; and to the Court and any

related court officials involved in the Litigation or any appeal thereof (including court reporters

and persons operating video recording equipment at depositions) provided that the document be

filed under seal.   In addition to the persons identified above, Confidential Documents, or portions

thereof, may also be provided and disclosed to the named Parties in this Litigation, including the

representative of any entity and may be utilized in the manner specified below.

a.    Confidential Documents may also be provided and disclosed to the following

persons provided such persons have first been provided with a copy of this

Protective Order and have executed the Acknowledgment of Protective Order And

Agreement To Be Bound (attached hereto as Exhibit "A") as a condition for

receiving such Confidential Documents, thereby acknowledging their

understanding of this Protective Order and agreement to be bound by its terms:

i.    Any expert retained by the Parties or their counsel for the purpose of

assisting in the Litigation; and

3

  ii.  Any mediator, settlement judge, or other person appointed, assigned or engaged by the parties or the Court to attempt to resolve all or part of the issues in this litigation.

b.  The signed copies of this Protective Order and Exhibit "A" will remain in the possession of the Receiving Party.

c.  It is expressly agreed that this Protective Order allows the documents designated Attorneys Eyes Only or Confidential Documents to be provided and disclosed only to those individuals explicitly set forth herein.

d.  If the Receiving Party believes that it is necessary for purposes of the Litigation to provide or disclose any Confidential Documents or information contained therein to any person not identified above, the Receiving Party may secure the written agreement of the Producing Party or may file a motion to amend the Protective Order to include any such person(s).

**3.**  **No waiver.**

a.  Review of the documents designated Attorneys Eyes Only or of the Confidential Documents and information contained therein by parties, counsel, experts, or consultants for the Plaintiffs and Defendants in the Litigation shall not waive the confidentiality of the documents or objections to production.

b.  The inadvertent, unintentional, or *in camera* disclosure of documents designated Attorneys Eyes Only or Confidential Documents shall not, under any circumstances, be deemed a waiver, in whole or in part, of any party's claims of confidentiality.

4

4.    **Filing Documents with Court.**

Any party wishing to file a document designated as Attorneys Eyes Only or a Confidential Document with the court in the Litigation must file the document under seal in accordance with the procedures of the Court.

5.    **Challenge to Designations.**

This Order shall not prevent any party from moving the Court for an Order that a document designated as Attorneys Eyes Only or as Confidential, should not, in fact, be designated and protected.   A party shall not be obligated to challenge the propriety of a designation at the time the designation is made, and failure to do so shall not preclude any subsequent challenge. Until such time as the Court orders that a certain document is not properly designated, the parties must continue to treat said document in accordance with the restrictions of this Order.   In the event that a Party disagrees with a Party's designation, the objecting Party shall advise counsel for the Producing Party, in writing, of the objection and the need for altering the designation. Within seven (7) days of receiving the objection, the Producing Party shall advise whether said party will change the designation. If this cannot be resolved between the Parties, then the dispute may be presented to the Court by motion within twenty-one (21) days of receiving the objection.

6.    **Destruction of Documents Designated Attorneys Eyes Only or Confidential.**

Within ninety (90) days of the conclusion of the Litigation or any appeals therefrom (whichever is later), the Receiving Counsel will deliver to the Producing Party, or at the discretion of the Receiving Counsel destroy and certify the destruction in writing of all documents designated as Attorneys Eyes Only or as Confidential Documents, including all copies, electronically saved or otherwise, reproductions, summaries, reports, analyses or extracts thereof or based thereon, in the

5

Receiving Counsel or Receiving Party's possession, custody, or control or in the possession, or control of any of his representatives or agents.

      7.     **Use.**

Persons obtaining access to documents covered by this Order shall use the information only for the preparation and trial of the Litigation, and any appeals therefrom, or for purposes of negotiations to settle such actions, and shall not use such information for any other purposes including business, governmental, or commercial purposes.

      8.     **Use of Confidential Documents in Depositions and at Trial.**

Without the necessity of filing a motion under Section 2.d. of this Protective Order, contents of Confidential Documents may be disclosed to witnesses at a deposition, who agree on the record to be subject to the provisions of this Order, at which time counsel introducing the Confidential Document shall indicate on the record that the testimony is confidential and subject to the provisions of this Order.   Disclosure of such confidential information to the deponent hereunder is not intended to abrogate or otherwise affect any pre-existing obligations such person may have regarding the confidentiality of such information.   Portions of deposition transcripts containing testimony that has been designated confidential shall be marked "CONFIDENTIAL" and shall be subject to the provisions of this Order.   Use of Confidential Documents at trial shall be determined at the same time that the parties designate other documents or exhibits that will be used at trial; any disagreements between the parties as to such use shall be raised at the pretrial conference or by motion.

9.   **Non-Confidential Information.**

Nothing in this Order shall preclude any party from disclosing or using, in any manner or for any purpose, any information that is (a) otherwise publicly available, or (b) independently developed as evidence by written record.

10.   **Attorney-Client Privilege Work Product.**

a.   Nothing in this Order shall require production of information that a party contends is protected from disclosure by the attorney-client privilege or as work product.   If information subject to a claim of attorney-client privilege or work product is nevertheless inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work product for such information.

b.   If a party has inadvertently produced to another party a document subject to a claim of privilege or work product, the Receiving Party upon request shall promptly return all copies of the document and shall destroy any newly created derivative document such as a summary of or comment on the inadvertently produced document.   Alternatively, the Receiving Party may move the Court for an order compelling production of such inadvertently produced document.

11.   **Miscellaneous Provisions.**

a.   In the event that a document which a party believes is entitled to protection is inadvertently produced without being designated for Attorneys Eyes Only or as a Confidential Document, or any inspection of any such document proceeds without its being so designated, the Producing Party may notify the Receiving Party, and

the Receiving Party shall thereafter treat the document as if it had originally received such designation.   If, prior to receiving such notice, the Receiving Party has disseminated the document to individuals not authorized to receive it hereunder, it shall make a reasonable effort to retrieve the document or to otherwise assure that the recipient(s) maintain the confidentiality of the document, but shall have no other responsibility or obligation with respect to the dissemination of the document or information contained in the document.

b.      In the event of any accidental or inadvertent disclosure of properly designated documents, other than in a manner authorized by the Order, counsel of the party responsible for disclosure shall immediately notify opposing counsel of all the pertinent facts, and make every reasonable effort to prevent further unauthorized disclosure, including retrieving all copies of the documents from the recipient(s) thereof, and securing the agreement of the recipient(s) not to further disseminate the documents in any form.   Compliance with the foregoing shall not prevent a party from seeking further relief from the Court.

c.      The recipient of any documents shall maintain such information in a secure and safe place, and shall exercise at least the same degree of care in handling the documents as is exercised by the recipient with respect to its own confidential information of a similar nature, but in no event less than due care.   Each recipient of any document produced in this action hereby agrees to be subject to the jurisdiction of this Court for the purpose of the implementation and enforcement of this Order.

8

d.   This Order shall survive the termination of this Litigation.   The Court shall retain jurisdiction over the parties and the subject matter herein for the purpose of enforcement of this Order.

e.   If a party in possession of documents designated as Attorneys Eyes Only or as Confidential receives a subpoena or other form of compulsory process from a non-party to this action seeking production or other disclosure of such documents or information contained therein, it shall immediately give written notice to the Producing Party, specifying the information sought and enclosing a copy of the subpoena or other form of compulsory process, and shall proceed in a good-faith manner consistent with affording the Producing Party the opportunity to timely object, intervene or otherwise have its interests heard and protected with respect to such subpoena or process.

f.   Nothing contained in this Order shall preclude the Producing Party from using its own documents or information in any manner it sees fit, or from disclosing such documents or information to whomever it chooses, without the prior consent of any other party or of this Court, provided that such use of a party's own documents or information does not disclose the other party's confidential information.

**12.   Copying.**

In lieu of originals, copies of documents designated Attorneys Eyes Only or Confidential may be disclosed to any persons to whom documents may be disclosed pursuant to this Order.   All copies of such documents shall be subject to and governed by all provisions of this Order as if such copies were originals.

9

SO ORDERED, this the 21ˢᵗ day of _December_____, 201 8.

_____
CIRCUIT COURT JUDGE

AGREED TO BY:

_/s/ Walter H. Boone_____
Armin J. Moeller, Jr., MSB No. 3399
Walter H. Boone, MSB No. 8651
Christine Crockett White, MSB No. 10107
Jonathan P. Dyal, MSB No. 99146
Andy Lowry, MSB No. 100782
Patrick Everman, MSB No. 104870
Perry P. Taylor, MSB No. 104944
BALCH & BINGHAM, LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
(601) 961-9900 Phone
(888) 954-5405 Fax
alowry@balch.com
amoeller@balch.com

_Attorneys for Plaintiffs_

_s/ Edwin S. Gault, Jr._____
Edwin S. Gault, Jr., MSB # 10187
Mandie B. Robinson, MSB # 100446
T. Peyton Smith, MSB # 103867
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

10

ETHAN JACOBS (admitted *pro hac vice*)
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

*Attorneys for Defendants*

11

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

**DONALD RAGGIO, et al.**                                              **PLAINTIFFS**

**vs.**                                                    **CIVIL ACTION NO. 14-71**

**MTGOX, INC., et al.**                                                **DEFENDANTS**

### ORDER

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment on Measure of Damages [Docket No. 232].  The Court, having considered the papers, the arguments of counsel offered during the December 14, 2018 hearing, and being otherwise fully advised in the premises, finds that issues of fact preclude the Court from ruling on the merits of the issues presented by the Motion at this time.

ACCORDINGLY, IT IS HEREBY ORDERED that Defendants' Motion for Partial Summary Judgment on Measure of Damages [Docket No. 232] is DENIED at this time.

SO ORDERED, this the 26th day of December, 2018.

_____
Circuit Judge

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

**DONALD RAGGIO, et al.**                                    **PLAINTIFFS**

**vs.**                                               **CIVIL ACTION NO. 14-71**

**MTGOX, INC., et al.**                                      **DEFENDANTS**

### ORDER

THIS MATTER is before the Court on Defendants' Motion to Dismiss [Docket No. 231]. The Court, having considered the papers, the arguments of counsel offered during the December 14, 2018 hearing, and being otherwise fully advised in the premises, finds that the request for dismissal of Plaintiffs' claims pursuant to Miss. R. Civ. Pro. 12(b)(6) is not well-taken and should be denied.

In <u>Crum v. City of Corinth</u>, 183 So.3d 847 (Miss. 2016), Justice Kitchens summarized the Rule 12(b)(6) standard as follows:

> A Rule 12(b)(6) motion "tests the legal sufficiency of the complaint." *Little,* 129 So.3d at 135 (quoting *Little v. Miss. Dep't of Human Servs.,* 835 So.2d 9, 10–11 (Miss.2002)). " '[I]n order to grant a Rule 12(b)(6) motion to dismiss, there must appear to a certainty that the plaintiff is entitled to no relief under any set of facts that could be proved in support of the claim.' " *Little,* 129 So.3d at 135 (quoting *Little,* 835 So.2d at 11). When considering a Rule 12(b)(6) motion, "[t]he allegations in the complaint must be taken as true." *Rose,* 994 So.2d at 737 (citing *Ralph Walker, Inc. v. Gallagher,* 926 So.2d 890, 893 (Miss.2006)).

<u>Id.</u> at 850-51.

With respect to Defendants' request for dismissal of Plaintiffs' UCC claims (Counts 1-5), the Court is of the view that the submission of evidence is required for the Court to determine (a) what is a Bitcoin; (b) how did the MTGOX exchange operate; and (c) whether Defendants were ever in possession of the subject Bitcoins. The Court is expressing no view whether the answer to these questions may be determined based on facts that may be undisputed between the parties

1

or conclusively established, and thus, dismissal of such claims may be appropriate pursuant to Miss. R. Civ. Pro. 56(b). However, without the answer to these questions, the Court is unable to determine the viability of Plaintiffs' UCC claims as a matter of law, and Defendants' request for dismissal of these claims pursuant to Miss. R. Civ. Pro. 12(b)(6) should be denied.

With respect to Defendants' request for dismissal of Plaintiffs' contract and common law tort claims due to the expiration of the applicable three-year limitations period, this Court is precluded from re-consideration of this issue by the doctrine of law of the case. See, e.g., Fortune v. Lee County Board of Supervisors, 725 So.2d 747, 751 (Miss. 1998) (quoting Simpson v. State Farm Fire & Cas. Co., 564 So.2d 1374, 1376 (Miss.1990) (quoting Mississippi College v. May, 128 So.2d 557, 558 (1961)) ("Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided."). This issue previously was litigated before the Circuit Court, and the Circuit Court denied Defendants' motion on the merits. See Docket No. 181. Defendants sought appellate review of this interlocutory order, which was denied by the Mississippi Supreme Court. See Docket No. 194. Thus, this Court may not reconsider Defendants' assertion of its limitations defense.

Finally, the Court is of the view that factual issues preclude the dismissal of Counts 8 and 11 of the Amended Complaint at this time, and the remaining Counts (12, 13, 17 18 and 19) are equitable remedies that may be available to Plaintiffs if successful on the claims for relief pled in the Amended Complaint.

ACCORDINGLY, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss [Docket No. 231] is DENIED.

SO ORDERED, this the 26th day of December, 2018.

_____
Circuit Judge

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT
## HINDS COUNTY, MISSISSIPPI

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO**                                                    **PLAINTIFFS**

**VS.**                                                    **CAUSE NO. 14-CV-00071-TTG**

**MTGOX, et al.**                                                    **DEFENDANTS**

## NOTICE OF SERVICE OF DISCOVERY

      Jed McCaleb and Code Collective, LLC, by and through counsel of record, do hereby

give notice to the Court that the following discovery was served as follows:

### JED MCCALEB AND CODE COLLECTIVE, LLC'S FIFTH SET OF
### INTERROGATORIES AND EIGHTH SET OF REQUESTS FOR
### PRODUCTION OF DOCUMENTS TO PLAINTIFFS

      The undersigned retains the originals of the above papers as custodian thereof.

      Respectfully submitted, this the 3rd day of January, 2019.

                             **JED McCALEB and**
                             **CODE COLLECTIVE, LLC**

                             By: */s/ Edwin S. Gault, Jr.*
                             EDWIN S. GAULT, JR., MSB #10187
                             MANDIE B. ROBINSON, MSB #100446
                             T. PEYTON SMITH, MSB #103867

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Post Office Box 22608
Jackson, MS  39225-2608
Telephone:  (601) 960-8600
Facsimile:  (601) 960-8613
win.gault@formanwatkins.com
mandie.robinson@formanwatkins.com
peyton.smith@formanwatkins.com

ETHAN JACOBS
HOLLAND LAW, LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
Telephone: (415) 200-4984
ejacobs@hollandlawllp.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

> Armin J. Moeller, Jr.
> Walter H. Boone
> Christine Crockett White
> Jonathan P. Dyal
> Andy Lowry
> Patrick Everman
> Perry P. Taylor
> Balch & Bingham, LLP
> 188 East Capitol Street
> Jackson, MS 39201-2608
> wboone@balch.com
> cwhite@balch.com
> alowry@balch.com

> ***Attorneys for Plaintiffs***

Respectfully submitted, this the 3rd day of January, 2019.

/s/ *Edwin S. Gault, Jr.*
EDWIN S. GAULT, JR.

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**DR. DONALD RAGGIO and**                              **PLAINTIFFS**
**DR. CHRIS RAGGIO**

**V.**                                                 **CIVIL ACTION NO. 14-71**

**JED McCALEB et al.**                                 **DEFENDANTS**

### SUBPOENA DUCES TECUM

STATE OF MISSISSIPPI
COUNTY OF HINDS

To:   Ripple Labs, Inc.
      c/o Corporation Service Company, Registered Agent
      251 Little Falls Drive
      Wilmington, Delaware 19808

      You are HEREBY COMMANDED TO PRODUCE AND PERMIT INSPECTION AND
COPYING of the documents requested in **Exhibit A,** which is attached hereto and incorporated
herein, within ten (10) days after service of this subpoena on you, at the offices of Wilcox &
Fetzer, 1330 King Street, Wilmington, Delaware 19801.
      Instead of appearing at the date and time listed above, you may produce the materials by
mailing or delivering legible copies to the law offices of Balch & Bingham LLP, 188 East
Capitol Street, Suite 1400, P.O. Box 22587, Jackson, Mississippi 39201, provided the documents
arrive within ten (10) days after service of this subpoena. Alternatively, if you would prefer to
send them via electronic means, please contact Walter Boone by email at wboone@balch.com
within ten (10) days after service of this subpoena to make arrangements. Thank you for your
cooperation.

      WITNESS MY HAND AND SEAL OF SAID COURT, this the ⟋ day of January,

2019.

                          Circuit Court of Hinds County, Mississippi
                          Zack Wallace, Circuit Clerk

                          By:

262808.1

## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

DR. DONALD RAGGIO and                                      **PLAINTIFFS**
DR. CHRIS RAGGIO

V.                                                        **CIVIL ACTION NO. 14-71**

JED McCALEB et al.                                         **DEFENDANTS**

### NOTICE OF SERVICE

Please take notice that Drs. Donald and Chris Raggio have this day served in the

above titled action the following:

1.  Plaintiff's First Supplemental Response to Defendants' Sixth Set of Requests for
    Production of Documents to Plaintiffs.

    The undersigned retain the original as custodian thereof.

    Respectfully submitted, this the 9th day of January, 2019.

                                    *s/ Andy Lowry*
                                    Armin J. Moeller, Jr., MSB No. 3399
                                    Walter H. Boone, MSB No. 8651
                                    Christine Crockett White, MSB No. 10107
                                    Jonathan P. Dyal, MSB No. 99146
                                    Andy Lowry, MSB No. 100782
                                    Patrick Everman, MSB No. 104870
                                    Perry P. Taylor, MSB No. 104944

                                    ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Fax: (601) 961-4466
wboone@balch.com
cwhite@balch.com
alowry@balch.com

BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Fax: (228) 864-8221
jdyal@balch.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that on this day, he has electronically filed the foregoing with the Clerk of the Court via this Court's MEC system, providing electronic service on all counsel registered therefor, and serving via United States mail (postage prepaid) as set forth below:

> Edwin S. Gault, Jr., Esq.
> Amanda B. Robinson, Esq.
> T. Peyton Smith, Esq.
> FORMAN WATKINS & KRUTZ LLP
> Post Office Box 22608
> Jackson, Mississippi 39201
> Win.Gault@formanwatkins.com
> Peyton.Smith@formanwatkins.com
> Mandie.Robinson@formanwatkins.com

> Ethan Jacobs, Esq.                    *(via U.S. mail)*
> HOLLAND LAW, LLP
> 220 Montgomery Street, Suite 800
> San Francisco, California 94104

So certified, this the 9th day of January, 2019.

> *s/Andy Lowry*
> Andy Lowry