# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-M-1681-SCT

**MTGOX a sole proprietorship;**
**MTGOX, Inc., a Delaware corporation;**
**MT.GOX KK, a Japanese corporation;**
**TIBANE KK, a Japanese corporation;**
**MUTUM SIGILLUM, LLC a Delaware limited Liability Company;**
**CODE COLLECTIVE, LLC a New York limited liability company;**
**JED McCALEB, an individual;**
**MARK KARPELES, an individual;**
**JOHN DOES 1-5, and CORPORATE JOHN DOES 1-5     DEFENDANTS/PETITIONERS**

**VS.**

**DR. DONALD RAGGIO**
**DR. CHRIS RAGGIO                                    PLAINTIFFS/RESPONDENTS**

_____

### RESPONDENTS' ANSWER TO JED MCCALEB AND CODE COLLECTIVE, LLC'S PETITION FOR PERMISSION TO APPEAL INTERLOCUTORY ORDER

_____

**ATTORNEYS FOR THE RESPONDENTS:**

**MITCHELL H. TYNER, SR., MSB# 8169**
**CHARLES "BRAD" MARTIN, MSB# 100767**
**TYNER LAW FIRM, P.A.**
**114 West Center Street**
**Canton, MS 39046**
**Phone: (601) 825-1111**
**Fax: (601) 957-6554**

**EXHIBIT Y**

## STATEMENT OF THE CURRENT STATUS OF THE INSTANT CASE

This matter was filed less than three years after the failure of the Petitioners (hereinafter "California Defendants" or "California Defendant") to deliver bitcoins to their rightful owners, the Respondents/Plaintiffs Chris and Donald Raggio (hereinafter "The Doctors").   The Doctors filed claims for breach of the Mississippi Uniform Commercial Code, breach of contract, conspiracy, account stated, negligence, conversion, and specific performance.   The California Defendants filed their *Motion for Summary Judgment Based on the Statute of Limitations* on June 30, 2016. The Hinds County Circuit Court granted the Doctors' Rule 56(f) Motion on August 9, 2016 and subsequently denied the California Defendants' Motion for Summary Judgment on November 16, 2017.   Presently there are eleven (11) pending Motions before the trial court, including the Doctors' *Motion for Sanctions* and the *Doctors' Motion for Leave to File Supplemental Response in Opposition to Motion for Summary Judgment Based on Newly Discovered Evidence or, in the Alternative, to Supplement Summary Judgment Record*.   The two aforementioned motions are premised upon newly discovered documents which the Doctors allege were willfully withheld or destroyed by the California Defendants.   Since the filing of the California Defendants' Petition herein, the trial court entered a stay on December 13, 2017.   Counsel knows of no other cases or petitions that are currently pending before the Appellate Courts of Mississippi addressing the issues contained within the California Defendants' Petition or in any other way related to this cause.

## FACTS RELEVANT TO THE INSTANT ACTION

In the Petition for Permission to Appeal Interlocutory Order currently before this Court, California Defendants contend they are entitled to a dismissal of the instant cause based upon the

**EXHIBIT Y**

statute of limitations as applied to the claims asserted by the Doctors in this matter.   However, as the Hinds County Circuit Court correctly found, there are genuine issues of material fact for jury determination.

The causes of action asserted in this matter arise out of the purchase of bitcoins and the failure of the California Defendants to deliver these goods to the Plaintiffs, Mississippi physicians Dr. Chris Raggio and Dr. Donald Raggio.   The Doctors wired money to Defendant Code Collective, LLC, per the instructions of Defendant Jed McCaleb in California to fund an account on the California Defendant's bitcoin exchange named MTGOX to purchase bitcoins.   Bitcoins and currency could then be placed into the Doctors' account.   California Defendant was the sole proprietor of MTGOX exchange, which he built out to become the largest bitcoin exchange in the world.   MTGOX was an online bitcoin exchange which California Defendant launched in the fall of 2010.   MTGOX allowed for the trading of bitcoins much like a typical commodity exchange. Traders of bitcoins would place their bitcoins into individual accounts on the MTGOX exchange.

The Doctors in this matter are father and son who reside in Jackson, Mississippi.   The father, Dr. Donald Raggio, is a child psychologist and a tenured professor at the Department of Pediatrics at the University of Mississippi Medical Center, where he has been employed for over forty years.    His son, Dr. Chris Raggio originally was a software engineer at Skytel in Jackson, Mississippi with an undergraduate degree in computer science from the University of Alabama. In 1999, Chris matriculated into medical school at University of Mississippi School of Medicine. After graduation, Chris began residency training in psychiatry at the Vanderbilt University Medical Center, where he completed his internship in psychiatry.   Throughout the years, Chris has maintained a strong interest in finance and economics as a passionate hobby.   With all of his

2

**EXHIBIT Y**

training, formally and informally, Chris developed a strong background in finance, economics, human behavior and computer science.

Chris discovered the existence of bitcoin in 2010.   He had the background and knowledge to complete a rigorous financial analysis of bitcoin's future value.   Chris' analysis revealed that bitcoin had a potential market capitalization of one billion dollars at a minimum.   At the time, in 2010, bitcoin had a market capitalization of two million dollars, meaning that bitcoin could increase five hundred times in value.   Chris' analysis has proven to be correct, with today's market capitalization of bitcoin being nearly two hundred and forty billion dollars.

At the time, Chris did not have the capital for such a speculative investment strategy, but suggested the idea to his father, Donald Raggio, who had the capital.   Donald Raggio liked the idea enough to provide the funds for the investment and asked his son to execute the investment strategy.

In 2010, the Doctors began to acquire bitcoins from the www.bitcoingateway.com website.   However, the Doctors were limited in the volume of bitcoins they could purchase. Wanting to buy larger volumes of bitcoins, Dr. Chris Raggio contacted the owner of www.bitcoingateway.com, Eric Brigham, and inquired as to whom or where larger volumes of bitcoins could be acquired.   Chris Raggio was given the name of the California Defendant, Jed McCaleb.   Chris Raggio contacted the California Defendant and was informed that he and his father could trade larger volumes of bitcoins through California Defendant's MTGOX website.

In December 2010, at the instruction of Defendant McCaleb, the Doctors opened a MTGOX account and began to purchase bitcoins on the MTGOX exchange.   *See* Exhibit A, Affidavit of Chris Raggio at ¶ 2-3.   The California Defendant did not limit the number of bitcoins

**EXHIBIT Y**

that could be purchased or held in the Doctors' account, but did limit the rate of bitcoin withdrawal. *Id* at ¶ 4.   The MTGOX account was funded by wire transfers from Donald Raggio's bank account directly to California Defendant.   *Id* ¶ 2.

On January 9, 2011, Chris Raggio discovered that 9,400 bitcoins were missing from their MTGOX account and, on the same date, contacted California Defendant regarding the missing bitcoins.[1]  *Id*. at ¶ 5 and Exhibit B, Email Compendium at p. 6, Jan. 9, 2011 at 10:36 P.M.   Chris Raggio discovered on January 10, 2011 the online address of where the stolen bitcoins had been transferred and immediately notified California Defendant as to same.   *Id*. at ¶ 6 and Exhibit B at p. 8, Jan. 10, 2011 at 4:44 A.M.   The transfers of the stolen bitcoins were traced, and it was determined that another one of the California Defendant's account holders ("Baron") on the MTGOX exchange had stolen the bitcoins from the Raggios' MTGOX account and moved them into his or her own MTGOX account.   *See* Exhibit A at ¶ 7 and Exhibit C at pps. 74-75, Deposition of Jeb McCaleb.   The California Defendant testified that once it was discovered that stolen bitcoins had been moved to another MTGOX account he froze the suspect account which contained numerous bitcoins and approximately $45,000.00, thus placing the bitcoins back under his complete control.   *See* Exhibit C at 75 and 79.

Unbeknownst to the Doctors, in February 2011, California Defendant surreptitiously partnered with Tibanne K.K., which is owned by Defendant Mark Karpeles, by selling a majority interest of the MTGOX business.   *See* Exhibit D.   Defendant Karpeles is a Frenchman with a

---

[1] The California Defendants make the erroneous assertion that the Raggios do not allege the hacker stole the bitcoins from MTGOX by compromising MTGOX's security.   However, a February 26, 2011 in an email from the California Defendant to Chris Raggio, the California Defendant mentions a "dictionary attack took place.   *See* Exhibit B, at p. 30.   A dictionary attack is a method of breaking into a password-protected computer or server by systematically entering every word in a dictionary as a password.   By its very nature, this is a type of hack that would have been aimed at MTGOX and would have compromised MTGOX's security.

**EXHIBIT Y**

felony conviction of computer fraud in France.   Defendant Karpeles absconded to Japan to avoid

serving his prison sentence.   California Defendant continued to act as an administrator at MTGOX

throughout 2011 and 2012 and used a MTGOX email address.   *See* Exhibit B at pps. 15-20.   After

the partnering with Defendant Karpeles, Defendant Karpeles left it to his partner, the California

Defendant, to conduct the investigation as to the Doctors' bitcoins.   *Id*. at 21.   The Raggios did

not learn until late February of 2011, that the California Defendant had partnered with Defendant

Karpeles when online news accounts reported that MTGOX had been sold.   *See* Exhibit A at ¶ 9.

Chris Raggio was not informed by California Defendant he was partnering with Defendant

Karpeles, a convicted fugitive.   *Id*. at ¶ 10.   Furthermore, California Defendant never informed

the Raggios that he was continuing his own work with MTGOX as an administrator and that that

he retained an interest in MTGOX.   *Id*.

Throughout February the California Defendant made several misrepresentations to the

Doctors regarding their bitcoins, writing on February 12, 2011, "Still investigating.   It will take a

while I think to be sure."   *See* Exhibit B at p. 25, February 12, 2011 at 1:55 PM.   During this

time, California Defendant made contact with Baron, the thief.   *See* Exhibit C, Deposition of Jed

McCaleb, pps. 76-78.   During a February 23, 2011 email exchange, Baron stated the stolen bitcoin

or either cash would be returned without objection to the rightful owner and asked whether the

California Defendant agreed.   *See* Exhibit B at p. 36.   On February 26, 2011, California

Defendant represented to Chris Raggio the following:

> "It looks like at the very least this guy is going to give your coins back.   ***I want
> to wait longer though to gather more evidence if he is in fact related to the other
> fraud that has happened on the site***. (emphasis added)"

*See* Exhibit A at ¶ 11 and Exhibit B at p. 30, Feb 26, 2011 at 9:33 A.M.   Chris Raggio wrote back

**EXHIBIT Y**

stating "Obviously I'd like the coins returned as soon as possible but it sounds like they have some value to in terms of conducting our investigation (sic) into further fraud on the site." *Id.* at ¶ 11 and Exhibit B at p. 30, February 26, 2011 at 3:19 PM. While Chris Raggio wanted delivery of the bitcoins as soon as possible, he agreed to delay delivery pursuant to the California Defendant's request. *Id.* At all times, through both email and telephone conversations, California Defendant asserted to the Doctors they would receive their bitcoins. *Id.* at ¶ 13 and Exhibit B at pp. 17-19 and 30-35.

It was not until March 7, 2011, that the Doctors learned from California Defendant that Defendant Karpeles, the convicted Frenchman and fugitive from justice, would allegedly be handling the matter of the stolen bitcoins. *See* Raggio Affidavit at ¶ 12 and Exhibit B at p. 32, Mar 7, 2011 at 7:19 A.M. email. Within the email, California Defendant represented:

> "Yeah Mark is the new owner and he will handle getting your coins back. It will still take awhile though since he has to wait to be sure baron is bluffing ***about suing us etc.***" (emphasis added) *Id.*

After the March 7, 2011 email from California Defendant, Chris Raggio began to communicate with Defendant Karpeles by email to obtain delivery the bitcoins that had been placed in safekeeping by the California Defendant. *Id.* at ¶ 14 and Exhibit B at pps. 31-35. Throughout the rest of 2011, Defendant Karpeles represented to the Doctors that the Raggio's bitcoins, which had been purportedly put into safekeeping would be delivered as soon as he  obtained legal authority in Japan. *Id.* and Exhibit B at pps. 31-35. No authority was ever obtained nor was it ever attempted. *See* Exhibit A at ¶ 16. On December 27, 2011, in response to an email from Chris Raggio, the California Defendant, Defendant Karpeles' partner, continued his misrepresentations that the Doctors would receive delivery of their bitcoins which he had

**EXHIBIT Y**

previously placed into safekeeping, writing, ***"I'm sure he (Defendant Karpeles) will eventually give it back to you.   I know he is trying to do everything very by the book so I think he had to wait for legal reasons."***   *See* Exhibit A at 15 and Exhibit B at p. 17, December 27, 2011 at 1:16 PM (emphasis added).

Unknown to the Doctors neither the California Defendant nor Defendant Karpeles were doing everything "by the book" and had no intention whatsoever to deliver the 9,400 bitcoins the Doctors purchased.   Before entering the partnership agreement, Defendant Karpeles was made aware that MTGOX had suffered other losses under the leadership of the California Defendant other than just the Doctors' bitcoin, such as the loss of $50,000 during another hack.   *See* Exhibit B at pps. 37-38.   Within this exchange, the California Defendant expressly states, "We can just let the loss ride until the site either makes it or not." to which Defendant Karpeles replies, "…having mtgox working with only a fraction of the amounts exchanged might be problematic too."   *Id*.   More problems arose in April of 2011 when it became apparent 80,000 bitcoins were missing from MTGOX, but the California Defendant and Defendant Karpeles conspired to hide this fact from the public.   *Id*. at p. 39.   Two days later, on April 30, 2011, an email between the California Defendant and Defendant Karpeles indicates 95,000 bitcoins were missing from MTGOX.   *Id*. at p. 40.   During this same time frame, the California Defendant and Defendant Karpeles communicated through Skype chat.   *See* Exhibit E, Skype Chat Log.   On April 29, 2011, the following exchange took place between Defendant Karpeles and the California Defendant (using the username "mtgox"):

**EXHIBIT Y**

```
[Fri Apr 29 11:58:06 2011] mtgox:  hmm ok. it looks like it was ~94k that was stolen
[Fri Apr 29 11:59:03 2011] mtgox:  hmm wait
[Fri Apr 29 12:03:13 2011] mtgox:  ok it is: 94,984 stolen
[Fri Apr 29 12:03:33 2011] mtgox:  which I think is right since that is what they are bating around from address to address
[Fri Apr 29 12:03:45 2011] Mark Karpeles:  that's 208k$ atm
[Fri Apr 29 12:04:09 2011] mtgox:  I need to send you: 84,860 btc
[Fri Apr 29 12:04:14 2011] mtgox:  yeah it sucks
[Fri Apr 29 12:04:47 2011] Mark Karpeles:  btw I got the last missing piece from my japanese bank yesterday, I'll try to send those to my US agent via fedex today (hoping fedex works today)
[Fri Apr 29 12:05:04 2011] mtgox:  well you also have some btc from baron
```

*Id.*   Within this chat exchange, California Defendant essentially tells Defendant Karpeles that the Baron bitcoin, of which 9,400 belong to the Doctors, is "there for the taking."   *Id.*   Both the January and April emails, as well as the Skype log, indicate the California Defendant was willing to operate MTGOX as a Ponzi scheme along with the co-conspirator Defendant Karpeles and to covert the Doctors' bitcoin to their own use and for their own gain.

After several months of Defendant Karpeles operating MTGOX, the level of acrimony felt by the California Defendant towards Defendant Karpeles reached a boiling point.   The California Defendant sent several emails to Defendant expressing his dismay with Defendant Karpeles's lack of communication and oversight of MTGOX such as "Are you just intent on burning this thing to the ground?" and "…you don't communicate".   *See* Exhibit B at pps. 41-43.   Even more telling is a draft email by the California Defendant dated July 2, 2011, in which the California Defendant compiles a list of grievances pertaining to Defendant Karpeles's management of MTGOX and tells Defendant Karpeles "You guys are fucking this up big time."   *Id.* at p. 44.   The California Defendant never advised the Doctors of all these issues and only reassured them that they would receive their 9,400 bitcoins that he had put in safekeeping.

On December 6, 2011, exactly three weeks before California Defendant's "by the book" email to Chris Raggio, the California Defendant requests from Defendant Karpeles an "earnout"

**EXHIBIT Y**

of what he is owed under the agreement under which the California Defendant requested payment of $263,431 along with 3,140 bitcoins. *Id.* at pps. 45-46. Defendant Karpeles responds that sending the cash owed "should be fine", but that he could not cover the loss of the bitcoins. *Id.* Defendant Karpeles further states that the funds he would be sending "…are subject of investigation for now, with FinCen looking closely at our activity…" *Id.* Shortly thereafter, the California Defendant again drafts an email to Defendant Karpeles, writing "You are fucking up the company. You are incompetent as a manager." *Id.* at p. 47. That same day California Defendant sends an email to Defendant Karpeles with much more subdued language expressing concern over expense and telling Defendant Karpeles that he needs "to find someone that is a competent manager" and that "…you don't listen to anyone." *Id.* at p. 48-50. Defendant Karpeles responds with an explanation as to the expenses, but tellingly states "…MtGox has been operating illegally and allowing operations which shouldn't have been allowed…" *Id.*

Aggrieved by the inaction of the Defendants, in January 2012 the Doctors retained Japanese counsel to make contact with Defendant Karpeles and recover their 9,400 bitcoins. *See* Exhibit A at ¶ 16. In March of 2014, Defendant Karpeles (as Tibanne K.K.) indicated by letter, for the first time that he would not send the Doctors their bitcoins as previously promised and upon buying a share of MTGOX, he had not assumed any of the liabilities, only the assets. *Id.* and Exhibit F. This letter, which for the first time notified the Mississippi doctors that Defendant Karpeles and Jed McCaleb had no intention of ever delivering the Doctor's bitcoins. Suit in this matter was filed on March 5, 2014 against numerous defendants.

Since selling a majority interest of MTGOX to Defendant Karpeles, the California Defendant went on to find two very successful cryptocurrency companies, Ripple and Stellar. *See*

**EXHIBIT Y**

Exhibit L, January 2, 2018 Forbes Article.   The California Defendant has stated that he no longer holds any bitcoins, having sold them to find Ripple.   *Id.*   The California Defendant's current known cryptocurrency holdings are approximately valued at *twenty billion dollars* placing ranking him as one of the wealthiest Americans.   *Id.*

The crux of the California Defendants' Petition is that the statute of limitations ran on all claims asserted by the Doctors.   It is apparent on its face that no limitation period expired prior to the Doctors filing suit.   The Doctors' Complaint is predicated on the Defendants' failure to deliver the bitcoins.   Furthermore, this matter is currently in the discovery phase and has already produced extensive responsive documentation from both sides, with several disputes having risen. To date, there are eleven (11) pending motions before the trial court, nearly all of which concern discovery issues.

## STANDARD FOR INTERLOCUTORY APPEAL

Pursuant to Rule 5(a) of the Mississippi Rules of Appellate Procedure, an interlocutory appeal may be granted only "*if a substantial basis exists for a difference of opinion on a question of law* as to which appellate resolution may: (1): [m]aterially advance the termination of the litigation and avoid exceptional expenses to the parties; or (2) [p]rotect a party from substantial an irreparable injury; or (3) [r]esolve an issue of general importance in the administration of justice." (emphasis added).

## ARGUMENT & AUTHORITIES

## I.    THE PETITION FOR PERMISSION TO APPEAL SHOULD BE DENIED AS IMPROPER FOR REVIEW UNDER MISS. R. APP. P. 5(A).

The California Defendants must meet their burden under Rule 5 prior to discussion of the merits of the desired appeal.   Apart from cursory language that states the Petition should be

10

**EXHIBIT Y**

granted, the California Defendants completely fail to address why the appeal should be granted under the requirements of Rule 5.   Rule 5 is not simply a formality and the California Defendants are not entitled to an appeal as a right.   California Defendants have disregarded any meaningful discussion of the elements of Rule 5, apparently assuming this Court will grant the appeal.   As such, the Petition should be denied.

The Doctors' claims have been timely brought before the Hinds County Circuit Court based upon the non-delivery of bitcoins.   The California Defendants take the position that the statute of limitations as to the Doctors' claims began to run on the date the bitcoins were stolen from the Doctors' MTGOX account.   However, the undisputed case law and the facts at issue support the exact opposite conclusion and, therefore, Miss R. App. 5(a) requires the Petition be denied.   There exists no substantial basis for a difference of opinion on a question of law. The facts clearly show that the Doctors' bitcoins came back into another MTGOX account, an account which was frozen by the California Defendant and to which the California Defendant requested the Doctors' acquiescence as to an investigation before the purported delivery of their bitcoin.   Despite numerous misrepresentations by the Defendants as to the delivery of the Doctors' bitcoin, it was not until March 2012 the Doctors learned the conspiring Defendants never had any intention of delivering the purchased bitcoins, notwithstanding their repeated reassurance the coins would be delivered.   Thus, the trial court made its decision based upon the specific facts of this matter, as well as the applicable law, finding that "there are genuine issues of fact for jury determination." *See* Trial Court Docket #181.

The Doctors assert that appeal is improper because *a "threshold requirement of the rule, that is, that there be a substantial basis for a difference of opinion 'on a question of law' has not*

**EXHIBIT Y**

been proposed, nor can it be, by the California Defendants.  A*m. Elec., a Div. of FL Indus. v. Singarayar*, 530 So.2d 1319, 1322 (Miss 1988) (emphasis added).   This Court holds "the language of Rule 5(a) naturally suggests an opposition between a question of law and a question of fact or matter for the discretion of the trial court.   Common sense suggests matters of the latter category [are] least eligible for interlocutory review."   *Id*. at 1322.   Additionally, this Court has voiced "courts of necessity decline interlocutory jurisdiction over 'application' questions where the fact denominator of the equation is unsettled.   In other words, where we must settle disputes of fact before we apply the law to them, an interlocutory appeal should rarely be granted."   *Id*. at 1323.

A review of the Petition shows that the real reason the appeal is sought depends entirely on the factual underpinning of the Doctors' claims.   The California Defendants go to great length in their assertion that the date of the theft of bitcoins supports their argument (while ignoring the fact the bitcoins returned to MTGOX) and sets forth factual support in the form of dates and courses of action to support their argument.   Because the California Defendants actually are coming before this Court seeking a review of the factual basis for the trial court's denial of their Motion for Summary Judgment Based on the Statue of Limitations (essentially asking this Court to review the factual grounds for the Doctors advancing their claims in the Hinds County Circuit Court), the Doctors maintain that appeal is improper since there is realistically no basis for a difference of opinion as to controlling law.   *Id*.   Therefore, the California Defendants' Petition fails to satisfy the "threshold requirement of the rule" and should be denied.   *Id*. at 1322.

Even if this Court were to decide a substantial basis for a difference of opinion exists as to law in this matter, the fact remains that no grounds for accepting this appeal exist.   The Doctors assert that the Petition, if granted would not "materially advance the termination of litigation and

**EXHIBIT Y**

avoid exceptional expense to the parties."   Miss R. App. P. 5(a).   Quite the opposite, the appeal would likely extend this matter for another year and cause all parties involved, especially the Doctors, great expense.

Further, this appeal will not "[p]rotect a party from substantial and irreparable harm.   *Id*. In fact, granting the California Defendant's Petition would harm the Doctors in that multiple motions are currently pending before the trial court, one of which is a dispositive *Motion for Sanctions* requesting the trial court enter the "death penalty' against the California Defendants for their willful withholding and/or destruction of material documents of which several indicate that the representations made by the California Defendant were utterly false.   To grant the California Defendants' Petition would give the California Defendants' a Court-sanctioned attempt to escape the punishment of the trial court for discovery violations and, thus, should be a factor in this Court not granting their Petition.   Additionally, the Doctors have a pending *Motion for Leave to File Supplemental Response in Opposition to Motion for Summary Judgment Based on Newly Discovered Evidence or, in the Alternative, to Supplement Summary Judgment Record* of which the Doctors moved the trial court for leave to bring the aforementioned newly discovered documents.   This Motion was properly filed on August 17, 2017, before the denial of the California Defendants' Motion for Summary Judgment on November 16, 2017.   To grant the California Defendants' Petition, without allowing the trial court to properly hear these motions, would potentially allow the California Defendants to escape the punishment of the trial court for its flagrant discovery violations, thus irreparably and substantially harming the Doctors. Furthermore, due to the extreme volatility of the price of bitcoin (of which ranged in 2017 from a low of less than $1000.00 to an all-time high of $19,343.09), the delay in granting the California

13

**EXHIBIT Y**

Defendants' Petition would cause both undue harm and expense to the Doctors.

Lastly, granting the Petition will not "[r]esolve an issue of general importance in the administration of justice" because this matter is concerned with the facts supporting the Doctors' claims which have been carefully reviewed by the Hinds County Circuit Court to be proper for jury determination. *Id.*

The California Defendants' attempt to create an issue of law does little to disguise the real reason for the instant Petition, to escape the potential punishment of the trial court for discovery violations and to have this Court decide the factual basis for the Doctors' claims. Therefore, the California Defendants' attempts to have this Court grant their Petition under Miss. R. App. 5(a) should be denied in order that no further prejudice or harm is allowed through added delay or confusion of the issues.

## II.   THE DOCTORS' CLAIMS ARE PREMISED ON THE FAILURE TO DELIVER THE BITCOINS TO THEIR RIGHTFUL OWNERS, NOT THE THEFT OF THE BITCOINS.

The Doctors have claims for breach of the Mississippi Uniform Commercial Code, breach of contract, conspiracy, account stated, negligence, conversion, and specific performance. The California Defendants' argument that these claims are time barred are erroneous and misleading, as the Doctors' claims, which have either a six or three-year statute of limitation, are not based on the hacking of their account and theft of their bitcoins, ***but upon the California Defendants' failure to deliver the coins to their rightful owners***. *See* Exhibit G, Complaint.

It is without question that while the bitcoins in question were taken from the Doctors' MTGOX account, the Doctors' bitcoins were subsequently placed into another MTGOX account which also contained $45,000.00. Upon the Doctor's notification, the account was frozen by the

**EXHIBIT Y**

California Defendant and he repeatedly assured the Doctors he would deliver the coins to them. The thief ("Baron") even offered the California Defendant return of the stolen bitcoin. *See* Exhibit B at p. 36.  But for the calculated dishonesty of the California Defendants, the stolen bitcoins could had been delivered to their rightful owners, the Doctors.  However, evidence has been uncovered that not only did the Defendants steal the Doctors bitcoins, but stole the cash and additional bitcoins located in the Baron account as well.  *See* Exhibit E, Skype Chat Log.

The earliest the statute of limitations on any of the Doctors' claim could have begun to run is when Defendant Karpeles represented, by letter dated March of 2012, to the Doctors' Japanese lawyers that he would not deliver the purchased bitcoins.  Prior to this time, all Defendants represented they would deliver the purchased bitcoins.  Accordingly, the Doctors' claims were timely filed on March 5, 2014.

**A.   California Defendants are Not Entitled to a Dismissal of the Doctors' Claims Governed by a Three-Year Statute of Limitation.**

A defendant bears the burden of showing a claim is barred by an applicable statute of limitations.  *Jenkins v. Pensacola Health Tr., Inc*., 933 So.2d 923, 927 (Miss. 2006).  To show that a suit is barred by a statute of limitations, a defendant must prove that the relevant cause of action accrued outside the statute's limitation period.  *Id*.  This burden requires a defendant to "show that the claims for which [a plaintiff] did not provide a specific date of occurrence were barred by [the] statute [of limitations]."  *Id*.

Even a cursory review of the Doctors' Complaint reveals the Doctors' claims are based on the fact that their bitcoins were not delivered as promised by the Defendants.[2]  Paragraph 23 of

---

[2] The Doctors' claim for negligence is based on, but not limited to, the failure of the Defendants' to utilize reasonable and practical safeguards to protects the Doctors' bitcoins by utilizing adequate password protection. Even if the statute

**EXHIBIT Y**

the Complaint states the Defendants "failed to return the Raggios their bitcoins."   See Exhibit G at ¶ 23.   The Doctors' claim for breach of the Mississippi Uniform Commercial Code is predicated on "not delivering the 9,400 bitcoins that were ordered and paid in full by the Raggios…"   *Id*. at ¶ 24.   The breach of contract claim is based on the Defendants' breach by failing "to deliver said bitcoins."   *Id*. at ¶ 25.   The Doctors' account stated claim is predicated on the Defendants' failure and refusal "to return the remainder of the bitcoins, despite Plaintiffs' demands that they do so." *Id*. at ¶ 35.   The conversion claim is based on the Defendants converting and taking "unlawful possession of, said bitcoins for their own use and benefit by refusing to return all of the bitcoin paid for and belonging to Plaintiffs."   *Id*. at ¶ 43.   It follows that the claims for a constructive trust and for specific performance are also based upon the failure to deliver the bitcoins. *Id*. at ¶ s 46-50.

In this case, there is no question that the Doctors' claims did not accrue until Defendant Karpeles disavowed any responsibility regarding the bitcoins in March of 2012.   Until discovery occurred in this case, the Doctors had no idea of the level of fraud and bad faith of both Jed McCaleb's and Mark Karpeles's conspiracy to steal their bitcoins.   Accordingly, the Defendants' Petition should be denied.

### B.    A Six Year Statute of Limitations Applies to the Doctors' Breach of Contract Claim under the Mississippi Uniform Commercial Code.

The California Defendants argue that the Doctors' claim for breach of contract under the Mississippi Uniform Commercial Code, of which a six-year statute of limitation would apply, must fail in that bitcoins are not goods but constitute money.   ***Strikingly, the California Defendants***

---

of limitations on this claim began to run on the January 9, 2011 date of the theft of the bitcoins, the evidence shows that the repeated misrepresentations of the Defendants, as discussed below, tolled the statute of limitations.

**EXHIBIT Y**

***fail to cite to the clear language of the Mississippi Uniform Commercial Code's definition of "money", because doing would be deadly to their argument that bitcoins are money***.

Miss. Code Ann. § 75-1-201 b(24) clearly states, "'Money' means a medium of exchange currently authorized or adopted by a domestic or foreign government."  Miss. Code Ann. § 75-1-201 b(24) (2017).  Bitcoins cannot constitute "money" because no government (applicable here, the United States) has authorized or adopted bitcoin as a medium of exchange.  *See* Exhibit H, Jeanne L. Schroder, Bitcoin and the Uniform Commercial Code, 24 U. Miami Bus. L. Rev 1, 20 (2016).

Miss. Code Ann. § 75-2-105 (1) defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for the sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."  Miss. Code Ann. § 75-2-105 (2017).  Bitcoins are indeed "things" as defined by the Uniform Commercial Code in that bitcoins "have a specified form and nothing about the term "thing" implies they must take physical form."  *See* Exhibit I, *Initial Thoughts on Applicability of UCC and ICITA*, The BTC Law Blog, (Nov. 17, 2013) (available at http://www.btcblog.com/ucc-ucita-initla-thoughts) (discussing that bitcoins are goods under the UCC).  Bitcoins may take a physical form and may be moved.  *Id*.

Furthermore, the Internal Revenue Service has determined unequivocally that bitcoins are property and not currency (money) and properly noted that bitcoin does not have legal tender status in any jurisdiction.  *See* Exhibit J and K, Internal Revenue Serv., Notice 2014-21, IRS Virtual Currency Guidance (Mar. 25, 2014) and Internal Revenue Serv., Notice 2014-36, IRS Virtual Currency Guidance (Mar. 25, 2014) and

**EXHIBIT Y**

Bitcoins are not "money" under the Mississippi Uniform Commercial Code and clearly fit the definition of "goods" under the Mississippi Uniform Commercial Code.   Thus, the Doctors' claim for breach under the Mississippi Uniform Commercial Code is afforded the six-year statute of limitation provided by Miss. Code Ann. § 75-2-725 (1).

**III.     EVEN IF THE DOCTORS' CLAIMS GOVERNED BY A THREE-YEAR STATUTE OF LIMITATION ACCRUED AT THE TIME OF THE THEFT OF THE BITCOINS, THE DEFENDANTS' MISREPRESENTATIONS AND FRAUD TOLLED THE STATUTE OF LIMITATIONS.**

Evidence raises genuine issues of material fact about whether the California Defendants' and Defendant Karpeles's continual reassurances that the bitcoins would be delivered upon the completion of an investigation, the later representation by the partners that a Japanese judgment and delivery of the bitcoins was forthcoming induced the Doctors not to immediately file suit within three years of the January 9, 2011 theft of the bitcoins.   It begs the question as to why would the Doctors file a suit when there were repeated reassurances by the California Defendants and Defendant Karpeles that the bitcoins would be delivered?   The Doctors claims are based on the failure of the Defendants to deliver the bitcoins they purchased, which were being held by the Defendants for purposes of their "investigation". The Doctors, rather than file suit, agreed to the delayed delivery of their bitcoins.

Accordingly, even if this Court reaches the conclusion that the Doctors' claims subject to the three-year statute of limitation (breach of contract, account stated, negligence, conversion and specific performance) accrued more than three years before the Doctors sued the Defendants, the evidence raises fact questions, which are proper for a jury, as to whether the California Defendants are estopped from asserting limitations as a defense to the Doctors' tort claims and whether the statute of limitations were tolled by the continuing tort doctrine, fraudulent concealment and/or

**EXHIBIT Y**

the discovery rule."

A.    **The Defendants are Equitably Estopped from Asserting the Statute of Limitations as a Defense to the Doctors' Claims.**

Mississippi has long recognized "that the doctrine of equitable estoppel may, in a proper case, be invoked to prevent [a] defendant from relying upon the statute of limitations. *Izard v. Mikell*, 163 So.498, 499 (Miss. 1935.)  To invoke equitable estoppel in response to a statute of limitations affirmative defense, "the plaintiff must show ... that (1) it was induced by the conduct of the defendant not to file its complaint sooner, (2) resulting in its claim being barred by the applicable limitations, and (3) the defendant knew or had reason to know that such consequences would follow." *Harrison Enters., Inc. v. Trilogy Commc'ns, Inc.*, 818 So.2d 1088, 1095 (Miss. 2002).

Equitable estoppel prevents a party from denying any material fact, induced by his or her words or conduct, upon which another person relied and changed his or her position and would suffer injury if the denial or contrary assertion was allowed. *Swartzfager v. Saul*, 2017 Miss. LEXIS 67 at 10 (Miss. Feb. 16, 2017) (quoting *Koval v. Koval*, 576 So.2d 134, 137 (Miss. 1991). The doctrine is based on "public policy, fair dealing, good faith and justice[.]" *Id*.  It is premised on "the belief that a person should do what he says he will do in situations where another party is injured by reliance on the first party's representations." *Id*.  And its aim is to "forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." *Id*.

This Court has held "[c]oncerning the application of equitable estoppel, '[the] issue becomes a question for the trier of fact when there is evidence to support a finding that the plaintiff reasonably relied on the actions of the defendant to his detriment.'" *City of Tupelo v. McMillin*,

19

**EXHIBIT Y**

192 So.3d 948, 955-956 (Miss. 2016).

*Harrison* involved a suit open an open account where a seller, Trilogy, made repeated attempts to recover its debt from a buyer, Harrison Enterprises.   *Harrison Enters., Inc. v. Trilogy Commc'ns, Inc.*, 818 So.2d 1088, 1091 (Miss 2002.).   Harrison responded to Trilogy's requests by asking for more time and promising to pay later.   *Id.*   When Trilogy finally responded to legal action, this Court held that the equitable estoppel doctrine barred Harrison from asserting a limitations defense.   *Id.* at 1096.   This Court's rationale is particularly noteworthy:

> "The stated purpose behind the statute [of limitations] is to discourage lawsuits. Further, it is to reward the vigilant, not the negligent.   It is to prevent false and stale claims.   None of these concerns are exemplified here.   Trilogy was trying to solve this problem without resorting to a lawsuit.   Trilogy was vigilant in pursuing this debt, relying on continual reassurances by Harrison Enterprises."

*Id.*

Applying *Harrison* to analogous facts, the Mississippi Court of Appeals concluded that fact issues about whether equitable estoppel acted to toll limitations precluded summary judgment. *See Douglas Parker Elec., Inc. v. Miss. Design & Dev. Corp*., 949 So.2d 874, 879 (Miss App. 2007).   The Court reversed a summary judgment order because the plaintiff's version of events – *taken as true, as required on summary judgment* – showed that the defendant, who had made "regular reassurances" that it would pay the plaintiff, knew or should have known that its actions would cause plaintiff to delay filing suit.   *Id.*   Cleary, the same reasoning of *Harrison* and *City of Tupelo v. McMillin* applies to the case at bar.

1.   **The Doctors were induced by the Defendants' conduct not to file their complaint sooner.**

"[I]nducement may consist either 'of an express representation that the claim will be settled without litigation or *conduct that suggests a lawsuit is not necessary*.'"   *Peavey Elecs. Corp v.*

**EXHIBIT Y**

*Baan U.S.A., Inc.*, 10 So.3d 945, 954 (Miss. Ct. App. 2009) (quoting *Miss. Dep't of Pub. Safety v. Stringer*, 748 So.2d 662, 666 (Miss. 1999)) (emphasis added); *see also Douglas Parker*, 949 So.2d at 879.   For instance, a party attempting to resolve a problem without resorting to a lawsuit may be "induced" not to file its complaint within the limitations period by "continual reassurances" that the other party will perform its obligations.   *See Harrison*, 818 So.2d at 1096; *see also Izard v. Mikell*, 163 So. 498, 499, (Miss. 1935) (holding that estoppel tolls limitations when a plaintiff is induced "to believe that an amicable adjustment of the claim will be made without suit"); *Douglas Parker*, 949 So. 2d at 879.

While the Doctors' Complaint is predicated upon the Defendants' failure to rightfully deliver the bitcoins, assuming *arguendo* that the Doctors filed suit more than three years after the claims accrued, the evidence clearly raises a fact issue, which is proper to be heard by the trier of fact, as to whether the Defendants' continuing reassurances that once an investigation was completed and/or a Japanese judgment was obtained the Defendants would deliver the bitcoins induced the Doctors not to file suit within three years of the claims accruing.

Numerous email communications between the Doctors, the California Defendant, and Defendant Karpeles after the January 9, 2011 theft of the Doctors' bitcoins indicate the Defendants represented they would deliver the Doctors bitcoins.   *See* Exhibit B at pps. 1-20 and 22-35. From February 2011 to December 2011, the Defendants made representations that once an investigation into the theft of the bitcoins (which came back into another MTGOX account) was completed and/or a Japanese judgment was obtained the Defendants would deliver the bitcoins. *Id.* at pps 17-19 and 22-35.   For example, the California Defendant emailed the Doctors on February 26, 2011, writing "It looks like at the very least this guy is going to give your coins back.

21

**EXHIBIT Y**

*I want to wait longer though to gather more evidence if he is in fact related to other fraud that has happened on the site*." (emphasis added). *Id.* at p. 30, Feb 26, 2011 at 9:33 A.M. Doctor Chris Raggio sent an email back that same day, writing "Obviously I'd like the coins returned as soon as possible but it sounds like they have some value to in terms of conducting your investigaoin (sic) into further fraud on the site." *Id*. This is a textbook example of inducement. The evidence of the Defendants' reassurances that the bitcoins would be delivered is more than sufficient to raise a fact question, for a jury to determine, on the inducement element of equitable estoppel. *See Peavey* 10 So. 3d at 954, *Harrison*, 818 So. 2d at 1096; *Stringer* 748 So. 2d at 66; *Douglas Parker*, 959 So. 2d at 879.

2.    **The Doctors' claims were barred by the statute of limitations because of the Defendants' conduct.**

The Doctors do not concede their claims governed by a three-year statute of limitation accrued on January 9, 2011. However, even if these claims did accrue on January 9, 2001, the claims would be barred by the Defendants' success in inducing the Doctors from filing their lawsuit earlier and agreeing to the delayed delivery of their bitcoin. Accordingly, the second element of equitable estoppel is satisfied.

3.    **The Defendants knew their conduct would cause the consequences that followed.**

The evidence favorable to the Doctors raises a fact issue about whether the Defendants' knew their conduct would cause the consequences of the Doctors arguably filing claims that are time barred by the statute of limitations. There is an abundance of evidence that the Defendants lied to the Doctors that the bitcoins would be delivered. The Defendants clearly knew that their actions would prevent the Doctors from immediately filing a lawsuit. The communications indicate the Doctors were trying to solve this problem without resorting to a lawsuit and were

**EXHIBIT Y**

vigilant in pursing this matter.   Allowing the Defendants to hide behind a fallacious statute of limitations, despite their repeated misrepresentations as to needing time for an investigation and acquiring a Japanese judgment, would encourage defendants in the future to lie to escape their obligations and to use the statute of limitations inequitably.

**B.**   **The Behavior of the Defendants Tolled the Statute of Limitations on the Doctors' Claims Under the Fraudulent Concealment Doctrine.**

Fraudulent concealment of a cause of action tolls the statute of limitations until "the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered."   Miss. Code Ann. § 15-1-37 (2017); *see also Robinson*, 763 So. 2d at 887.   "The fraudulent concealment doctrine 'applies to any cause of action.'"   *Robinson*, 763 So. 2d 883, 887 (Miss. 2000).   This Court has ruled that two elements are necessary to establish fraudulent concealment.   First "there must be shown some act or conduct of an affirmative nature designed and which does prevent discovery of the claim.   *Id*. at 887, quoting *Reich v. Jesco, Inc*., 526 So.2d 550, 552 (Miss 1988) (plaintiff must show "some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim."   *See also Andrus v. Ellis*, 887 So.2d 175, 181 (Miss. 2004).   Second, a plaintiff must prove that despite his due diligence he could not have discovered the available claim.   *Robinson*, 763 So.2d at 887.   A plaintiff need only demonstrate "reasonable diligence to discover the fraud sooner, or show that he could not, with reasonable diligence have done so.   *New York Life Ins. Co., v. Gill*, 182 So. 109, 113-114 (Miss. 1938).

**1.**   ***The Defendants took affirmative actions to prevent discovery of the Doctors' claims***.

The Doctors could not have discovered their cause of action until receipt of the March 2012

**EXHIBIT Y**

letter from Defendant Karpeles stating "…we inherited only the assets related to the Bitcoin Exchange Service and we never inherited the debt which the former owner of the Exchange Service had incurred."  *See* Exhibit F.  (translated from Japanese).  Continuing false representations are affirmative acts that constitute fraudulent concealment, tolling the limitations period.  *Lundy v. Hazlett*, 147 Miss. 808, 821 (1927).  By continuous acts of false representation, the Defendants prevented the Doctors from discovering their claims.  The California Defendant made multiple false representations and repeatedly mislead the Doctors that he was conducting an investigation and that once the investigation was completed their bitcoins would be delivered.  *See* Exhibit B, pps. 17-19 and 22-35.  The California Defendant also hid the fact that MTGOX was a Ponzi scheme and that he directly told Defendant Karpeles to utilize the Doctors bitcoins which were still in the Baron account on April 29, 2011.  *See* Exhibit E.  Not only did the California Defendant mislead the Doctors in this regard, he also hid the fact that he had sold a majority interest of MTGOX to Defendant Karpeles.  *See* Exhibit A at ¶ 10.  Even after the sale of a majority interest in MTGOX, the California Defendant held an interest in MTGOX and was reached at MTGOX email address.  *See* Exhibit B at pps. 15-20 and 22-35.  Defendant Karpeles made continuing false representations to the Doctors about an "investigation" and a "judgment" from a Japanese Court.  *Id.* at pps. 32-34.

2. ***The Doctors exercised due diligence in trying to discover its claims.***

Immediately upon realizing bitcoins were missing from their account, the Doctors notified the California Defendant and began a yearlong exercise in due diligence.  *See* Exhibit B at p. 6.  In return they were promised an investigation was taking place and that that their bitcoins needed to be held to investigate other fraud on the MTGOX site.  *Id.* at pps. 22-35.  In fact, it was the

**EXHIBIT Y**

Doctors that conducted the investigation that showed their bitcoins ended up in another account on MTGOX under the exclusive control of the California Defendant.   Id at. pps. 11-13. Throughout 2011, the Doctors made repeated contact with the California Defendants about the status of the investigation and as to the judgment Defendant Karpeles promised he was seeking. *Id*. at pps. 22-35.   In fact, on August 1, 2011, Chris Raggio asked Defendant Karpeles for an update and a docket number.   *Id.* at 34.   Defendant Karpeles wrote back stating that there would be no judgment in Japan until 2012 due to the natural disaster that had taken place in the country. *Id*.   In December of 2011, Chris Raggio emailed Defendant Karpeles informing him it had been nearly a year and that he wanted the bitcoins back.   *Id*. at 34-35.   At the same time, Chris Raggio emailed the California Defendant and reiterated the context of the email to Defendant Karpeles. *Id.* at 17.   The California Defendant responded six days later, on December 27, 2011, writing to further his conspiracy with Defendant Karpeles to steal the Doctors' bitcoins, "I'm sure he will eventually give it back to you.   I know he is trying to do everything very by the book so I think he had to wait for legal reasons."   *Id*.   The following month, January 2012, the Doctors retained Japanese attorneys.   In response to the Japanese attorneys, Defendant Karpeles, for the first time, disavowed any liability in this matter by letter dated March 2012.   *See* Exhibit F.

The fact that the Doctors were attempting to obtain additional knowledge about the "investigation" and "judgment" concerning their stolen bitcoins raises a fact issue on the second element of the fraudulent concealment doctrine.   Accordingly, dismissal should be precluded.

### C.    <u>The Doctors' Claims Were Tolled Under the Continuing Tort Doctrine.</u>

This Court has defined the continuing tort doctrine as follows:

[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious

**EXHIBIT Y**

> acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong.
>
> A "continuing tort" is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.

*Estate of Fedrick v. Quorum Health Res., Inc*., 45 So.3d 641, 643 (Miss. 2010) (quoting *Stevens v. Lake*, 615 So.2d 1177, 1183 (Miss. 1993)).

For example, the continuing tort doctrine has been applied to a claim of negligence arising out of a nursing home's negligent and failure to place a patient on a restorative feeding program. *Quorum,* 45 So.3d at 643.   In so holding, this Court noted that the patient "needed feeding assistance throughout this entire period; therefore, a tortious omission may have occurred every day that the defendants failed to provide her this kind of assistance.  *Id*.  These allegations fit within the definition of a continuing tort, that is one inflicted over a period of time [involving] wrongful conduct that is repeated until desisted." *Id.*   In contrast, the doctrine did not toll the statute of limitations for an emotional distress claim arising out of a single act of misconduct – the filing of a frivolous lawsuit.  *Randolph v. Lambert*, 926 So.2d 941. 945 (Miss. App. 2006).   The crucial distinction is whether the alleged harm resulted from a single act or from "continuing unlawful acts."  *Id*.

The Doctors' claims arise out of the Defendants' continuing misrepresentations that the Doctors' bitcoins would be delivered.   These misrepresentations began in February of 2011, when the California Defendant represented he wanted to wait to gather evidence and conduct an investigation about fraud that had taken place on MTGOX before delivering the bitcoins to the Doctors.  *See* Exhibit B at 30.   The misrepresentations continued unabated when Defendant

Karpeles made repeated false promises on March 14, 2011 where he wrote "We are currently trying to escalate the issue to obtain a judgment that would tell us what to do with the stolen coins. We cannot just return them based on a decision taken on our own." *Id.* at 32.   Again, on August 1, 2011, Defendant Karpeles writes "There will be no judgment done in Japan before 2012 on that case…" *Id.* at 34.   On December 27, 2011, the California Defendant responding to Doctor Chris Raggio's email informing him that the one-year anniversary of the theft was approaching, writes back (and from a MTGOX email address) stating "I'm sure he (Defendant Karpeles) will eventually give it to you.   I know he is trying to do everything by the book so I think he had to wait for legal reasons." *Id.* at 17.

Even after the Doctors were vigilant and inquired about the delivery of their bitcoins in several emails over the course of 2011, the Defendants continued to make reassurances to the Doctors that they were being taken care of, which proved to be a complete lie.   The Defendants never attempted to obtain a judgment regarding the bitcoins and could have delivered the Doctors' bitcoins at any time.   Of course, unbeknownst to the Doctors, the California Defendant had already informed Defendant Karpeles to steal the Doctors' bitcoins located in the Baron account. *See* Exhibit E.   Each and every one of these acts by the Defendants were "continuing unlawful acts" in a conspiracy to deprive the Doctors of the delivery of their bitcoin.

In sum, the evidence most favorable to the Doctors raises fact issues about whether the Defendants engaged in repeated acts of wrongful conduct sufficient to toll the statute of limitations under the continuing tort doctrine.   Accordingly, this Court should deny the California Defendant's Petition to relitigate these matters previously ruled upon by the trial court.

      **D.**      **<u>The Discovery Rule Tolled the Statute of Limitations on the Doctors' Claims.</u>**

**EXHIBIT Y**

The discovery rule applies to toll limitations until "a plaintiff 'should have reasonable known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent.'"   *Boyles v. Schlumberger Tech. Corp.*, 832 So. 2d 503, 506 (Miss. 2002) (quoting Sarris v. Smith, 782 So.2d 721, 725 (Miss. 2001)).   The statute of limitations begins to run "when the [plaintiff] can reasonably to be held to have knowledge of the injury itself; the cause of the injury, and the causative relationship between the injury and the conduct of the [defendant]."   *Boyles* 782 So.2d at 725 (quoting *Smith v. Sanders*, 485 So.2d 1051, 1052 (Miss. 1986)).

At issue in all cases is when a plaintiff discovers his or her injury.   *Sweeny v. Preston*, 642 So.2d 332, 334 (Miss. 1994).   In *Sweeney*, this Court noted that, "knowledge that there exists a causal relationship between the negligent act and the injury or disease complained of is essential because 'it is well-established that prescription does not run against one who has neither actual nor constructive notice of the facts that would entitle him to bring an action.'"   *Id*.   Whether a plaintiff knew about the injury has typically been reserved as a jury question.   *Barnes v. Singing River Hosp. Sys*., 733 So.2d 199 (Miss. 1999).   In fact, this Court has held "whether the discovery rule tolls the statute of limitations requires a determination by the trier of fact***regarding the 'date of the alleged act, omission or neglect shall or with reasonable diligence might have been first discovered."   *Holaday v. Moore*, 169 So.3d 847 848 (Miss. 2015).

Where there is a latent injury, the discovery rule applies.   *PPG Architectural Finishes, Inc. v. Lowrey*, 909 So.2d 47, 50 (Miss. 2005).   Latent injury "is defined as one where the plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question…[or] when it is unrealistic to expect a

**EXHIBIT Y**

layman to perceive the injury at the time of the wrongful act." *Id*.   To be latent, an injury "must be undiscoverable by reasonable methods." *Id*. at 51.   "[T]o claim benefit of the discovery rule, a plaintiff must be reasonably diligent in investigating the circumstances surrounding the injury. The focus is on the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury." *Wayne Gen. Hosp. v. Hayes*, 868 So.2d 997, 1001 (Miss. 2004).

The Defendants' misrepresentations to the Doctors that their bitcoins would be delivered prevented the Doctors from discovering they had been injured.   In response to the Doctors' emails about the delivery of their bitcoins, the Doctors received false reassurances from the Defendants that delivery of the bitcoins was forthcoming, an investigation was being conducted, and later a Japanese judgment was being pursued.   *See* Exhibit B at pps. 17-19 and 30-35.   Based on these false representations, the Doctors had no knowledge of any injury until Defendant Karpeles stated in his March 2012 letter that he did not purchased any liabilities and was not responsible for the delivery of the Doctors' bitcoins.   *See* Exhibit F.

Because the Doctors could not have reasonably known about their injury – much less, about the causative relationship between their injury and the Defendants' misconduct – the Doctors' tort claims did not accrue until receipt of Defendant Karpeles's March 2012 letter.   Fact issues about the discovery rule's application precludes dismissal and should be determined by a jury.

<u>CONCLUSION</u>

As the Doctors have stated above, the California Defendants have failed to make a showing under Miss. R. App. P 5(a) as to why this Court should grant review of the trial court's Order denying summary judgment.   The Doctors maintain that this Court should deny the Petition as it

**EXHIBIT Y**

improperly attempts interlocutory review of issues which as factual in nature and because no legitimate differences of opinion as to the controlling law at issue exists.   Moreover, accepting the California Defendants' appeal will cause significant delay, prejudice and harm to the Doctors; none of which would happen if this matter is afforded what may be the relatively expeditious resolution by the Hinds County Circuit Court.   The Doctors' position is further reinforced by the very fact that there could be no injury until the Doctors were made aware in March of 2012 that their bitcoins would not be delivered, thus their complaint was timely filed under both the Mississippi Uniform Commercial Code six-year statute of limitations as well as Mississippi's general three-year statute.   The Hinds County Circuit Court's ruling that there are genuine issues of fact for jury determination was proper and, thus, the California Defendants' Petition should be denied.

Respectfully submitted this the 4th day of January, 2018.

s/Charles "Brad" Martin
CHARLES "BRAD" MARTIN, MSB# 100767

**OF COUNSEL:**
MITCHELL H. TYNER, SR., MSB# 8169
CHARLES "BRAD" MARTIN, MSB# 100767
**TYNER LAW FIRM, P.A.**
114 West Center Street
Canton, MS 39046
Phone: (601) 825-1111
Fax: (601) 957-6554

**EXHIBIT Y**

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served a true and correct copy of the above and

foregoing pleading via the Court's electronic filing system on the following:

> Edwin S. Gault, Jr., Esq.
> Mandie B. Robinson, Esq.
> Forman Watkins & Krutz LLP
> 210 East Capitol Street, Suite 2200
> Jackson, MS 39201-2375
>
> Ethan Jacobs, Esq.
> Keller Sloan Roman Holland, LLP
> 555 Montgomery Street, 17th Floor
> San Francisco, CA 94111
> ejacobs@ksrh.com

and service by United States mail has been made upon the following:

> Honorable Tomie Green
> Circuit Court of Hinds County
> Post Office Box 327
> Jackson, MS 39205-0327

Respectfully submitted, this the 4th day of January, 2018.

s/ Charles B. Martin
CHARLES "BRAD" MARTIN, MSB# 100767

31

**EXHIBIT Y**